# EXHIBIT A
# PART 1



1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

March 17, 2022

**SENT VIA EMAIL (Andrea.Gacki@treasury.gov)**

Andrea Gacki
Director
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220

Re:     **Request for Stay of Designation—Alain Goetz[1]**

Dear Ms. Gacki:

By means of this letter, Alain Goetz, a Belgian gold and precious metals expert, respectfully requests a stay of any potential designation of, or other related action targeting, him by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). This stay is requested in order for OFAC to review the information in this letter, and to allow additional arguments and evidence to be provided to OFAC in supplemental letters, showing that Mr. Goetz does not meet the criteria for designation under any relevant U.S. sanctions laws.

Mr. Goetz understands that certain parties have called upon OFAC and the U.S. government to sanction him pursuant to U.S. sanctions authorities. Mr. Goetz asserts, however, that information in his possession, and that has already otherwise been provided to and is in the possession of OFAC, will demonstrate that any allegations purportedly supporting such an action are false and/or that the circumstances are no longer applicable. Accordingly, Mr. Goetz requests that OFAC consider the information contained herein—as well as that to be presented in forthcoming submissions—as part of any pending designation action targeting him and include that information in any administrative record being created in support of such action.

---

[1] Because this submission contains business information and other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence as confidential. If OFAC believes that it is required to release this document or information contained in it to the public pursuant to the Freedom of Information Act or any other law, please notify undersigned counsel as soon as possible.

## I.      Basis for Request for Stay of Designation

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, provides that persons are permitted to appear before an agency or its employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.[2]

As noted above, Mr. Goetz believes that OFAC may possibly be undertaking an agency proceeding or other similar action relating to a potential designation of him under Executive Order ("E.O.") 13413, as amended, E.O. 13818, or another U.S. sanctions program administered by OFAC. For this reason, Mr. Goetz now appears before OFAC via written submission to provide information that may be relevant to any such proceeding or action. Mr. Goetz is provided this right pursuant to the APA. Thus, OFAC must consider his submission as part of any ongoing proceeding with respect to a potential designation action and should refrain from finalizing any pending agency action until such time as Mr. Goetz can submit arguments and evidence to show why such action is not warranted by the facts.

This letter, as well as any subsequent submissions, should be considered by OFAC and incorporated into any administrative record being created to support a designation action. As OFAC is aware, the administrative record underlying a designation action should "include 'all documents and materials that the agency directly or indirectly consider[s],'"[3] as well as documents and materials "that may have influenced the agency's decision[.]"[4] OFAC is not entitled to "skew the record in its favor by excluding pertinent but unfavorable information from the administrative record" nor can the agency exclude information "on the grounds that it did not 'rely' on the excluded information" when rendering its decision.[5] Indeed, a properly designated administrative record should "include[] evidence contrary to the agency's position," provided that such evidence was before the agency.[6]

For these reasons, Mr. Goetz respectfully requests that OFAC include this letter, as well as any subsequent submissions, into any administrative record being created in support of a sanctions investigation for his possible designation. Mr. Goetz also requests that OFAC consider all exculpatory information in its possession, including information that may have been received as

---

[2] 5 U.S.C. § 555(b).

[3] *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4-5 (D.D.C. 2006) (quoting *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)).

[4] *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citation omitted) (noting that a complete administrative record is not limited to those documents and materials "on which the agency relied in its final decision.").

[5] *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006).

[6] *Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65 (D.D.C. 2002).

part of other agency proceedings such as delisting matters, requests for a stay of designation, or other matters of which it is aware.

## II.    Information for OFAC's Consideration

### A.    Refining Gold in Central Africa

As noted above, Mr. Goetz is a Belgian gold and precious metals expert. Mr. Goetz operated within the gold industry for most of his career—from establishing refineries to reforming business processes and standards. As evidenced by his speeches and contributions to regional and international precious metals conferences over the past decade, Mr. Goetz has remained a strong advocate for fully transparent gold supply chains. Indeed, Mr. Goetz has advocated for the urgent adoption of rigorous global standards for the production, transport, and trading of gold and other precious metals. He has, however, found himself the subject of recent allegations by non-governmental organizations ("NGOs") that appear to be based on unsubstantiated third-party accounts from known smugglers and business competitors, and misunderstandings of his business profile and work. Mr. Goetz believes that, if left unaddressed, these inaccurate accounts could continue to have devastating effects on the African gold sector and the people dependent on it.

As OFAC is aware, illicit gold trade from the Democratic Republic of the Congo ("DRC") has funded conflicts in the region and has led to the exploitation of natural resources and the internal displacement and death of millions of Congolese people. In recent years, false and unsupported media reporting has linked Mr. Goetz to refining conflict gold from the DRC at the African Gold Refinery ("AGR") in Uganda. Mr. Goetz, however, has not sourced nor refined illegally smuggled conflict gold from the DRC at AGR. Indeed, AGR is the only established and visible gold refinery in the region that has signed an agreement with the DRC to establish a traceability system for sourcing gold, which includes, among other things, sharing information and statistical data with Le Centre d'Expertise d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses ("CEED"), a public institution of the DRC.[7]

In addition, the allegations against AGR with respect to conflict gold are not credible given AGR's due diligence measures relating to gold traceability which are in place both now, as well as during the time of the alleged conduct. For instance, AGR regulates its business practices and activities in accordance with the Organization for Economic Cooperation and Development ("OECD") and International Conference for the Great Lakes Region ("ICGLR") guidelines. Indeed, AGR has maintained a robust upstream supplier mapping system that handles client intake with detailed Know Your Customer ("KYC") procedures and evaluates gold sources by obtaining and verifying the supplier's legal documents.[8] Documents subject to verification include

---

[7] Annex A–CEEC and AGR Collaboration Agreement.
[8] Annex B–AGR Account Opening KYC Form.

certificates of incorporation, trading licenses, mining licenses, mineral dealer's licenses, memoranda of association and articles, proofs of address, and audited financial statements, along with requiring a minimum commercial track record of six months.[9] AGR refuses any business relationship with suppliers who are unable to furnish these requisite documents.[10]

Furthermore, AGR's compliance department supervises company and regulatory compliance procedures, which were routinely audited by independent consultants.[11] Finally, all client-facing employees at AGR are trained in anti-bribery compliance to eliminate any risk of corruption and money laundering associated with sourcing gold.[12] Given AGR's policies and procedures in place since at least the time of the alleged conduct, the sourcing and/or refining conflict gold is unlikely to have occurred at any point in the gold supply chain, and neither AGR nor its auditors have identified such dealings.

Additionally, some media articles have recently alleged that AGR received noncompliance notices from the Ugandan government on licensing, disclosure, and registration violations. To clarify, AGR received a letter from Uganda's Financial Intelligence Agency ("FIA") in 2017 requesting a copy of AGR's operating license for FIA registration purposes; however, AGR was subsequently cleared from investigations involving purported noncompliance with the Anti-Money Laundering Act of 2013, as amended.[13] Indeed, AGR is a fully licensed company and operates legitimately within the framework of Ugandan law.

Notwithstanding these allegations, and their lack of credibility, those allegations are irrelevant as Mr. Goetz is no longer a shareholder nor is he involved in AGR's management at any level. Currently, he only serves in a limited role as a consultant/promoter.[14] Moreover, Mr. Goetz is committed to preventing the sourcing, refining, and selling of conflict gold. Indeed, as evidenced by his cooperation with the United Nations and The Sentry, Mr. Goetz has worked with intergovernmental organizations and NGOs to clarify information underlying the historic

---

[9] *Id.*

[10] Annex C–AGR's Onboarding Process; Annex D–AGR's Client Acceptance Policy.

[11] Annex C–AGR's Onboarding Process; Annex D–AGR's Client Acceptance Policy; Annex E–AGR's Precious Metals Supply Chain Policy; Annex F–AGR's AML/CTF Compliance Requirements; Annex G–AGR Country List. These procedures are further elaborated in AGR's correspondence with the United Nations Security Council. Annex H–2018 Correspondence with the U.N. Security Council; Annex I–2019 Correspondence with the U.N. Security Council.

[12] Annex J–AGR's Anti-Bribery Policy Compliance Handbook; Annex K–Acknowledgement of AGR's Anti-Bribery Policy.

[13] Annex L–Letter from the FIA.

[14] Mr. Goetz sold his shares in AGR in February 2018 and resigned as the company's CEO in November 2018. Annex M–Goetz Sale of AGR Shares Agreement; Annex N–AGR Memorandum of Agreement. Further, Mr. Goetz no longer is involved in the management or ownership of Tony Goetz NV ("Tony Goetz") and currently only serves as a consultant in the company. Annex O–Legal Opinion Regarding Alain Goetz and Tony Goetz Allegations.

allegations, to engage in further dialogue in the mutual interest of improving oversight of the gold mining and refining sectors.[15]

Accordingly, far from meeting the criteria for designation under E.O. 13413, as amended, E.O. 13818, or another OFAC sanctions authority, Mr. Goetz has acted contrary to the designation criteria of those authorities, and in a manner which aligns with U.S. interests *vis-a-vis* the global gold trade.[16] Furthermore, he no longer owns nor controls AGR—the entity which has been the primary target of those allegations.

## ii.   Venezuelan Gold Allegations

Mr. Goetz has been alleged to have laundered $300 million worth of gold from Venezuela through AGR in 2019. Mr. Goetz completely denies these allegations as he has never been involved, in any capacity nor at any point, with sourcing, refining, or selling gold from Venezuela. Indeed, Mr. Goetz has previously rejected Venezuelan gold from private suppliers in the past. Further, Mr. Goetz believes that AGR was linked to those allegations based on an erroneous inference by the media arising from a separate and unrelated allegation concerning Venezuelan gold being imported to Uganda by an unidentified refinery.

Mr. Goetz also asserts that there was no investigation or court order against AGR involving Venezuelan gold, as has been alleged by some reports. Indeed, the Police Minerals Protection Unit in Uganda had suspected potential sanctions violations involving Venezuela, but the Attorney General cleared AGR from such allegations.[17] Indeed, Mr. Goetz understands that there are no pending investigations in any jurisdiction worldwide against AGR in connection to this or any other matter. Moreover, and as noted above, those allegations are irrelevant to Mr. Goetz as he sold his shares in AGR in February 2018 and resigned as the company's CEO in November 2018––well before the alleged conduct took place.

---

[15] *See, e.g.*, The Sentry, *The Golden Laundromat, The Conflict Gold Trade from Eastern Congo to the United States and Europe*, n.105 (Oct. 2018); U.N. Security Council, *Final Report of the Group of Experts on the Democratic Republic of the Congo*, S/2017/672 (Aug. 10, 2017). Mr. Goetz notes that he provided the U.N. Group of Experts with copies of AGR's KYC procedures, as well as client intake process and supply chain due diligence guidelines to Mr. Zobel Behalal following his meeting with them at AGR on May 12, 2017. Further, the report notes that AGR representatives met and corresponded with them on several occasions to answer questions about their operations and refinery in 2017. Mr. Goetz understands that AGR remains committed to disclose their list of gold suppliers to the U.N. Group of Experts, however, a Memorandum of Understanding has not yet been signed.

[16] The U.S. Department of State has dedicated an office, the Division for Counter Threat Finance and Sanctions, in part to support "due diligence guidelines intended to help industry develop a responsible minerals trade from conflict-affected and high-risk areas in the African Great Lakes Region." *See* U.S. Dep't of State, Threat Finance Countermeasures, *Conflict Minerals*, *available at* https://www.state.gov/conflict-minerals/.

[17] Annex P–Preliminary Report on AGR's Alleged Suspected Smuggled Gold.

Accordingly, there is no basis to designate Mr. Goetz in response to these allegations under a Venezuela-related executive order, nor any other OFAC-administered sanctions authority. The allegations are wholly false, and—even if accepted as true—the purported conduct occurred after Mr. Goetz had already divested and resigned from AGR.

### III.    <u>Conclusion</u>

For the foregoing reasons, Mr. Goetz respectfully requests that OFAC stay any pending designation action that may target him and consider the information contained in this letter, as well as any arguments and evidence to be submitted in subsequent letters. As noted above, if there is an ongoing agency proceeding with respect to him, Mr. Goetz has a right under the APA to submit written evidence to OFAC that must be considered by the agency and incorporated into any administrative record being compiled in support of an agency action.

Finally, Mr. Goetz is available to respond to any questions OFAC may have or to engage in any dialogue necessary to OFAC's consideration of the request contained in this submission or with respect to any potential designation action. Mr. Goetz looks forward to cooperating with OFAC to ensure that its sanctions investigation does not yield any unwarranted or unlawful result.

Please forward all correspondence relating to this request to the following:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
ferrari@falawpc.com

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

# Annex A



**MAKERERE** **UNIVERSITY**

P. O. Box 7062,
Kampala Uganda
**website:** www.clcs.mak.ac.ug

**Tel:** +256 - 414 - 530106
**Email:** celacos@chuss.mak.ac.ug

**COLLEGE OF HUMANITIES AND SOCIAL SCIENCES (CHUSS)**
**CENTRE FOR LANGUAGE AND COMMUNICATION SERVICES**

*Your Ref:*

*Our Ref:*

*CLCSDC/B002/15/02/2019*

# COLLABORATION AGREEMENT

**BETWEEN**

LE CENTRE D'EXPERTISE D'EVALUATION ET DE CERTIFICATION DES
SUBSTANCES MINERALES PRECIEUSES ET SEMI-PRECIEUSES (CEEC)

(CENTER OF EXPERTISE FOR EVALUATION AND CERTIFICATION OF PRECIOUS
AND SEMI-PRECIOUS MINERAL SUBSTANCES), a Public Law Institution in the
Democratic Republic of Congo

AND

AFRICAN GOLD REFINERY (AGR) LTD

ENTEBBE, UGANDA

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

.................................
**COORDINATOR**

**Le Centre d'Expertise d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses (CEEC), a Public Institution,** established by the Decree no 011/28 of 07th June 2011 concerning the Constitution, whose registered office in the Democratic Republic of Congo, Kinshasa Town, number 3989, Avenue des Cliniques, Commune de la Gombe, represented by Mister Alexis MIKANDJI PENGE, Director, the duly authorized representative in accordance with the legal provisions regarding exercising the supervisory powers;

Herein consistently referred to as the **"CEEC:** on the one hand

And

**AFRICAN GOLD REFINERY LTD,** whose registered office is located at Sebugwawo Road Entebbe Kampala, Uganda, registered under number: M103/M106, P.O. Box 37574, herein represented by Mister Alain GOETZ, duly authorized

Herein referred to as "AGR", on the other hand:

Both herein referred to as **"Parties";**

## HAVING PREVIOUSLY STATED THAT:

The Democratic Republic of Congo and the Republic of Uganda, Countries of residence for the parties, are signatories to the Security, stability and development Pact of 15th December 2006 in the Great lakes Region as well as all the agreements and memoranda signed with the purpose of enforcing article 9 of the said pact recommending putting in place a mechanism for certification in order to combat illicit trafficking of mineral resources;

CEEC is the certification authority for mineral substances which, ahead of time, together with other authorized public departments ensure compliance with the above-mentioned Pact as well as international engagements aimed at combating illicit trafficking of mineral substances;

CEEC makes every effort and undertakes various actions to direct the trade of the minerals from DRC towards the official channels that are transparent and traceable;

The CEEC authorities support and encourage all attempts aimed at building capacities in that domain;

CEEC plans to pursue its efforts directed towards progressive implementation of mechanisms of traceability of ores in the DRC territory, in collaboration and with the assistance of Public and Private, national and international Organizations without exclusivity;

CEEC and AGR reaffirm their intentions to work together to achieve their common goals, particularly the one of establishing a well monitored and controlled supply chain of ores in the DRC, particularly gold.

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

African Gold Refinery Ltd (AGR) runs precious metal refinery plant in Entebbe, Republic of Uganda, in accordance with the processes and procedures of conformity with the rules of Organization of the Economic Cooperation and Development (OCDE);

AGR, as an enterprise operating in the Great lakes Region, is bound by legal provisions as well as international measures adopted to implement the above-mentioned pact;

AGR is an initiative that was established basing on recommendations of OCDE and the International Conference on the Great lakes Region (ICGLR) focused on avoiding blacklisting all African minerals, but rather encouraging operators in the sector to invest in Africa in the projects which tend to create opportunities for sustainable supply in accordance with the directives of the OCDE; in accordance with guidelines of OCDE

Given that its refinery is largely supplied by gold flows from the artisanal sector of the countries of the region around Uganda including the DRC, AGR intends to collaborate with the CEEC and, subsequently, with any other national, provincial or national, provincial or local public institution and department working for a chain of custody in charge of gold.

The parties recognize that the signing of this Collaborative Agreement will be a major step in the fight against smuggling and illegal border trade in minerals, as well as a means of channeling revenue to appropriate Offices, and that it is essential that adequate legal support be put in place by the parties;

The purpose of this Collaborative Agreement is to serve as a legal basis for the parties to observe a sustainable supply of minerals by creating the terms and conditions for collaboration between them in order to:

1) To monitor, within the framework of due diligence, before and afterwards the traceability gold flows from the artisanal sector of the Democratic Republic of Congo to the level of the AGR refining facilities located in the Republic of Uganda

2) Share information and statistical data in order to enable CEEC to identify and sensitize the operators in the chain of custody about the channeling into the official gold channels of the artisanal sector

3) Set up in the DRC, a network of points of gold purchase, following a business plan to be established by mutual agreement in order to channel to the refinery of AGR all the material flows captured

4) Collaborate technically and logically for purposes of implementing the clauses of this Collaborative Agreement

Article 2: Obligations of the parties

The parties undertake herein to:

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*



1) Avail to AGR the official versions of all the legal and regulatory provisions implementing the requirements of the agreements and protocols made pursuant to the Pact on Security, Stability and Development in the Great Lakes Region of 15 December 2006 and other relevant international, national and local instruments for sustainable supply of minerals

2) Furnish AGR with:

   a) Specimens of all traceability instruments for mineral substances exported from the DRC;

   b) The list of its staff involved in the traceability process at the Directorate and provincial entities as well as their telephone and electronic contact (e-mail, fax, etc.)

   c) Specimen signatures of persons authorized to sign certificates or any other document covering the legal export of gold on behalf of the CEEC

   d) Authorizations and facilitations necessary for the opening of the points of purchase of gold in the territory of the DRC, in partnership.

B) Regarding AGR

1) Provide CEEC with multifaceted technical assistance particularly financial and logistical in order to build its capacities in its statutory missions, in particular the mastery of traceability of artisanal ores and the fight against fraud;

2) Facilitate access to CEEC facilities and all documentation related to gold purchases to the LICC, in accordance with the terms and conditions to be agreed upon, to ensure compliance of the GIA system with the identification of gold flows to international requirements of sustainable supply of minerals from conflict or high-risk areas;

3) Provide the CEEC with all information necessary for the identification of operators in the chain of custody operating in the sector and any other information useful for the implementation of its obligations under the clauses of this Collaborative Agreement

C) Regarding the two parties:

1) Appoint each a focal point who will be responsible for the implementation of this Collaborative Agreement;

2) Within three months of the approval of this collaborative agreement, prepare a roadmap with an operational plan for the implementation of their obligations;

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

**Article 3.** MONITORING AND EVALUATION

The parties agreed to meet periodically, every three months, to assess the efficiency and execution of this Collaborative Agreement

**Article 4:** GOOD FAITH

The parties agreed that execution of this Collaborative Agreement shall be effected in good faith.

**Article 5:** CONFIDENTIALITY

The parties herein agreed to keep the content of this Agreement and all the information thereof, which was and which shall be shared.

This information shall not be divulged to any parties other than the Legal advisor, actors, experts and Officers, except  in the case of legal, regulatory or judicial requisition, and unless such disclosure facilitates the sustainable supply and legitimate trade of minerals in Africa

**Article 6:** BINDING NATURE OF THE MEMORANDUM

This Agreement is itself binding in nature and mandatory and defining for the parties

**Article 7:** DURATION, ANTICIPATED TERMINATION, AMENDMENT, STETTLEMENT OF DISPUTES

This Collaborative Agreement has been signed for a period of five (5) years with effect from the time of signing it, and it is renewable by tacit renewal, except in writing by one of the parties and will remain in effect until amended or terminated at the initiative of one of the parties or by mutual agreement expressed in a written amendment.

The party which wishes to terminate or amend the terms of this Agreement after the first year of its signing, shall notify the other party of its intention in writing and the two parties shall meet within ninety (90) days after reception of the notification to discuss and strike an agreement to be recorded in a written addendum

**Article 8:** RESOLUTION OF DISPUTES

In the event of dispute or disagreement pertaining to this Agreement, the parties herein agree to attempt a negotiated settlement and, where appropriate, the diligent party may resort to arbitration mechanisms before one of the arbitration courts in the DRC or Uganda or before the International Center for the Settlement of Investment Disputes (ICSID)

**Article 9: ADDRESS, CONTACT**

For the purpose of this Memorandum, the respective addresses of the parties shall be:

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*



➢ For AFRICAN GOLD REFINERY LTD, at the Head Office at Entebbe, Kampala, Sebugwawo, P.O. Box 37574, Ouganda
C/O Mister Alain Goetz, Directeur Général

➢ For Centre d'Expertise, Evaluation et Certification ses Substances minérales Précieuses et semi-précieuses (C.E.E.C) at Kinshasa, Democratic  Republic of Congo, au numéro 3989 Avenue des Cliniques, Commune de la Gombe
C/o Mister Alexis MIKANDJI PENGE, Directeur Général

All notification delivered d for purposes of this Memorandum of Association shall be considered as received, either:

✓ delivered at the Registered Office and considered having been duly received by the recipient on the date of reception
✓ Send by e-mail to the addresses which the parties shall share and considered having been received by the recipient on the same date of delivery

Drawn and signed in two copies by

Date of signature

For African Gold Refinery

Date of signature

For CEEC

Alexis MIKANDJI

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*



# ACCORD DE COLLABORATION

## ENTRE

## LE CENTRE D'EXPERTISE D'EVALUATION ET DE CERTIFICATION DES SUBSTANCES MINERALES PRECIEUESES ET SEMI-PRECIEUSES (CEEC), Etablissement public de droit de la République Démocratique du Congo

## ET

## AFRICAN GOLD REFINERY (AGR) LTD ENTEBBE, OUGANDA

2

Entre

***Le Centre d'Expertise, d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses,*** en sigle ***«CEEC »,*** ***Etablissement public,*** *créé par le Décret* n° 011/28 du 07 juin 2011 *portant ses statuts*, ayant son siège social en République Démocratique du Congo, Ville de Kinshasa, au numéro 3989, Avenue des Cliniques, Commune de la Gombe, représenté aux fins des présentes par Monsieur Alexis MIKANDJI PENGE, Directeur Général, dûment habilités aux fins des présentes conformément aux dispositions légales sur l'exercice du pouvoir de tutelle ;

Ci-après invariablement dénommé « **CEEC** », d'une part

Et

**AFRICAN GOLD REFINERY LTD,** dont le siège est à Sebugwano Road Entebbe Kampala, Ouganda, enregistrée sous le numéro M103/M106, P.O.Box 37574, ici représentée par monsieur Alain GOETZ, dument autorisé,

Ci-après invariablement dénommée « AGR », d'autre part ;

Toutes deux ci-après collectivement désignées les « **Parties** » ;

#### ETANT PREALABLEMENT EXPOSE QUE :

La République Démocratique du Congo et la République d'Ouganda, Etats de localisation des parties, sont signataires du Pacte sur la sécurité, la stabilité et le développement dans la Région des Grands Lacs du 15 décembre 2006 ainsi que de tous les accords et protocoles signés en vue de la mise en œuvre de l'article 9 dudit pacte recommandant l'institution d'un mécanisme de certification pour lutter contre le trafic illicite des ressources naturelles;

Le CEEC est l'autorité de certification des substances minérales qui, en amont, assure avec les autres services publics habilités, le respect du pacte précité ainsi que des engagements internationaux de la République Démocratique du Congo en vue de lutter contre le trafic illicite des substances minérales ;

Le CEEC déploie de grands efforts et mène diverses actions pour canaliser le commerce des minerais de la RDC vers des circuits officiels, transparents et traçables ;

Les autorités du CEEC soutiennent et appuient toute initiative visant à renforcer ses capacités dans ce domaine ;

Le CEEC entend poursuivre ses efforts tendant à la mise en place progressive de mécanismes de traçabilité des minerais extraits sur le territoire de la RDC, en coopération et avec l'aide des organismes publics et privés, nationaux et internationaux, sans exclusive ;



Le CEEC et AGR confirment leurs intentions de travailler ensemble pour atteindre leurs objectifs communs, notamment celui de parvenir à créer une chaîne d'approvisionnement mieux suivie et contrôlée des minerais extraits en RDC, spécialement de l'or.

African Gold Refinery Ltd (AGR) exploite une raffinerie de métaux précieux à Entebbe, en République d'Ouganda en respectant les processus et procédures de conformité avec les règles de l'Organisation de Coopération et Développement Economique (OCDE);

AGR, en tant qu'entreprise opérant dans la sphère de la Région des Grands Lacs, est liée par les dispositions légales ainsi que des mesures internationales prises en exécution du pacte susmentionné;

AGR est une initiative fondée sur les recommandations de l'OCDE et de la Conférence Internationale sur la Région des Grands Lacs (CIRGL) qui vise notamment à éviter de mettre dans une liste noire les minerais africains dans leur ensemble, mais plutôt d'inciter les opérateurs du secteur à investir en Afrique dans des projets qui tendent à créer des opportunités pour un approvisionnement responsable, en conformité avec les directives de l'OCDE ;

Compte tenu du fait que sa raffinerie est approvisionnée en grande partie par les flux d'or provenant de la filière artisanale des pays de la région autour de l'Ouganda dont la RDC, AGR entend collaborer avec le CEEC et, par la suite, avec tout autre institution et service public national, provincial ou local œuvrant pour une chaîne de possession responsable de l'or ;

Les deux parties reconnaissent que la signature du présent Accord de collaboration sera un grand pas franchi dans la lutte contre la contrebande et le commerce frontalier illicite des minerais, en même temps qu'un moyen de canalisation des recettes vers les circuits officiels, et qu'il est indispensable qu'un accompagnement juridique adéquat soit mis en place par les parties ;

## DE CE QUI PRECEDE, LES DEUX PARTIES ONT CONVENU DE CE QUI SUIT :

### Article 1er : De l'objet

Le présent protocole d'accord a pour objet notamment de servir de base juridique aux parties pour observer une chaine d'approvisionnement responsable en minerais en créant les modalités de collaboration entre elles pour :
1) Suivre, dans le cadre de devoir de diligence raisonnable, la traçabilité, en amont et en aval des flux d'or de la filière artisanale de la République Démocratique du Congo identifiés au niveau des installations de raffinage de AGR localisées en République de l'Ouganda.

2) échanger les informations et données statistiques afin de permettre au CEEC d'identifier et de sensibiliser les opérateurs de la chaîne de possession pour la canalisation dans les circuits officiels de l'or de la filière artisanale ;

3) installer en République Démocratique du Congo, suivant un plan d'affaires à élaborer de commun accord, un réseau de points d'achats d'or afin de canaliser vers la raffinerie de AGR tous les flux matières captés ;

4) collaborer sur le plan technique et logistique pour la mise en œuvre des clauses du présent Accord de collaboration.

**Article 2 : Des obligations des parties**

Les parties s'engagent à:

(A) En ce qui concerne le CEEC à :

1) Mettre à la disposition de AGR les versions officielles de toutes les dispositions légales et règlementaires mettant en œuvre les exigences découlant des accords et protocoles pris en exécution du Pacte sur la sécurité, la stabilité et le développement dans la Région des Grands Lacs du 15 décembre 2006 ainsi d'autres instruments internationaux, nationaux et locaux relatifs à l'approvisionnement responsable en minerais;

2) Fournir à AGR :

a) les spécimens de tous les instruments de traçabilité des substances minérales à l'exportation de la République Démocratique du Congo ;

b) la liste de son personnel impliqué dans le processus de traçabilité à la Direction Générale et au niveau des entités provinciales ainsi que leurs coordonnées téléphoniques et électroniques (e-mail, télécopie,…)

c) les spécimens de signatures des personnes habilitées à signer au nom du CEEC les certificats ou tout autre document couvrant l'exportation légale d'or ;

d) les autorisations et facilitations nécessaires à l'ouverture, en partenariat, des points d'achat d'or sur le territoire de la République Démocratique du Congo ;

(B) En ce qui concerne AGR :

    1) Fournir au CEEC une assistance technique multiforme notamment financière et logistique, en vue de renforcer ses capacités dans ses missions statutaires notamment la maitrise de la traçabilité des minerais de production artisanale et la lutte contre la fraude ;

    2) faciliter au CEEC, suivant les modalités à convenir, l'accès à ses installations et à toute la documentation en rapport avec les achats d'or pour s'assurer de la conformité du système AGR d'identification des flux d'or aux exigences internationales d'approvisionnement responsable en minerais provenant des zones de conflit ou à haut risque ;

    3) fournir au CEEC toutes informations utiles pour l'indentification des opérateurs de la chaine de possession opérant dans le secteur et toute autre information utile pour la mise en œuvre de ses obligations découlant des clauses du présent Accord de collaboration ;

(C) En ce qui concerne les deux parties :

    1) Désigner chacune un point focal qui seront chargés de la mise en œuvre du présent Accord de collaboration ;

    2) élaborer dans les trois mois de l'approbation du présent accord de collaboration une feuille de route assortie d'un plan opérationnel pour la mise en œuvre de leurs obligations ;

**Article 3 :** DU SUIVI ET EVALUATION

Les parties conviennent de se rencontrer périodiquement, chaque trois mois, pour évaluer l'efficacité et le niveau de l'exécution du présent protocole d'accord.

**Article 4 :** DE LA BONNE FOI

Les parties conviennent que l'exécution du présent accord se déroulera constamment dans un esprit de bonne foi.

6

**Article 5 :** DE CONFIDENTIALITE

Les parties conviennent de garder confidentiels le contenu de cet accord et toutes les informations y relatives qui ont été et qui seront échangées.

Ces informations ne peuvent être divulguées à des tiers autres que les conseillers, agents, experts, et professionnels des parties, sauf en cas de réquisition légale, réglementaire ou judiciaire, et sauf si pareille divulgation contribue à faciliter l'approvisionnement responsable et le commerce légitime des minerais en Afrique.

**Article 6 :** DU CARACTERE CONTRAIGNANT

Cet accord de collaboration engage par lui-même et a un caractère obligatoire et définitif pour les parties.

**Article 7 :** DUREE, RESILIATION ANTICIPEE, MODIFICATION, REGLEMENT DES DIFFERENDS

Le présent Accord de collaboration est conclu pour une durée de cinq (5) ans à compter de sa signature, et il est renouvelable par tacite reconduction, sauf avis écrit de l'une des parties et restera en vigueur jusqu'à ce que modifié ou résilié à l'initiative d'une des parties ou par consentement mutuel exprimé dans un avenant écrit.

La partie qui désire résilier ou modifier les termes du présent accord après la première année de sa signature, notifiera par écrit son intention à l'autre partie et les deux parties se rencontreront dans les Nonante (90) jours à dater de la réception de la notification pour en conférer et trouver un accord à consigner dans un avenant écrit.

**Article 8 :** REGLEMENT DES DIFFERENDS

En cas de contestation ou désaccord portant sur le présent accord, les parties s'engagent à tenter un règlement négocié et le cas échéant la partie diligente pourra recourir aux mécanismes d'arbitrage devant l'une des juridictions d'arbitrage de la République Démocratique du Congo ou de l'Ouganda ou devant le Centre International de Règlement des différends des Investissements (ICSID/CIRDI).

**Article 9 :** DU DOMICILE. CONTACT

Aux fins de cet Accord de collaboration, les adresses respectives des parties seront :

> ➢ **Pour AFRICAN GOLD REFINERY LTD,** au siège social à Entebbe Kampala, Sebugwano, P.O.Box 37574, Ouganda
> A l'Attention de Monsieur Alain Goetz, Directeur Général.

7

> **Pour le Centre d'Expertise, d'Evaluation et de Certification des substances minérales précieuses et semi-précieuses (C.E.E.C.)**, à Kinshasa, en République Démocratique du Congo, au numéro 3989, Avenue des Cliniques, Commune de la Gombe
> A l'Attention de Monsieur Alexis MIKANDJI PENGE, Directeur Général.

Toute notification remise aux termes de cet Accord de collaboration sera considérée comme reçue, soit :

✓ Déposée au siège et considérée comme avoir été dûment reçue par le destinataire à la date de la réception ;

✓ Transmise par e-mail aux adresses que s'échangeront les parties et considérée avoir été reçue par le destinataire le même jour de l'expédition.

Ainsi établi et signé en deux exemplaires par :

Date de signature :                          Date de signature :

**Pour African Gold Refinery**              **Pour le CEEC**

# Annex
# B

 **AFRICAN GOLD REFINERY LIMITED**

## Corporate Account Opening Form

- Full Legal Title of Corporate Account  / Name as per the passport (for Individual):

  _____

- Date of Incorporation and Expiry / Date and Place of Birth:

  _____

- Country of Incorporation / Nationality:

  _____

- Registered Office Address / Permanent Address:

  _____

- Correspondence Address and Contact Details:

  _____

  _____

- Principle place of Business:

  _____

- Nature of Business / Occupation:

  _____

- Source of Funds:

  _____

 **AFRICAN GOLD REFINERY LIMITED**

Type of Activity, Volume & Purpose:

- Account Type:  Corporate ❑    Sole Proprietorship ❑    Individual ❑

- Details of all Beneficial Owners:

| Full Name + % of shares | Country of Residence | Passport Details Issuer, Number and Expiry |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

- Authorised Signatories:

| Full Name | Passport Details Issuer, Number, Expiry | Specimen Signature |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

 **AFRICAN GOLD REFINERY LIMITED**

I hereby confirm that the African Gold Refinery Terms and Conditions have been duly noted and that all of the terms and conditions contained therein have been understood and accepted.

Signature     _____

Name     _____

Date     _____

 **AFRICAN GOLD REFINERY LIMITED**

## <u>Corporate Account Opening Approval Form</u>

- Full Legal Title of Corporate Account  / Name as per the passport (for Individual):

_____

NEO Account Number          _____

Gold Trading Limit           _____

Silver Trading Limit         _____

Initial Margin %             _____

Margin Call %                _____

Close Out %                  _____

Borrowing Rate %             _____
(Currency / Metal)

Order Execution Charge       _____

Account Transfer Charge      _____

## <u>Authorisation</u>

_____          _____

"A" Signatory Authorisation 1          "A" Signatory Authorisation 2

# **AGR**   **AFRICAN GOLD REFINERY LIMITED**

**NOTE: NEW Account opening and Number to be recorded AFTER authorization.**

**Required Documentation for Corporate Account Opening / Renewal**

**A.**   Proof of legal existence of Applicant Company:
- Trade License (if relevant in country of incorporation)
- Certificate of Incorporation
- Memorandum and Articles of Association
- Shareholders Register

**B.**   Proof of Applicant Company's physical address in country of origin and physical address within the UAE (when applicable):
- Original utility bill; or
- Copy of lease/purchase agreement; or
- Original statement from a financial institution

**C.**   Contact details of Applicant Company:
- Office telephone number(s); and
- Office fax number(s); and
- Office email address; and
- Website address

**D.**   Identities and Addresses of all controlling individuals of the Applicant Company and its assets (shareholders, beneficial owners, partners):
- Copy of passport
- Original utility bill; or
- Copy of lease/purchase agreement

**E.**   Identities and Addresses of all authorised signatories of the Applicant Company (if different to those at D above)
- Declaration by the authorised signatories that the beneficial owners mentioned in D are the sole beneficial owners of the Applicant Company

**F.**   Identities and Addresses of all persons authorized to deal on behalf of the Applicant Company (if different to those at **D** and **E** above)

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,**
**Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com**
**www.agr-afr.com**



## AFRICAN GOLD REFINERY LIMITED

**G.    Identities and Addresses, (if different to those at D, E and F above) of:**
  ▪ **Individuals holding Powers of Attorney from Applicant Company; and**
  ▪ **Third Party mandate holders of Applicant Company**

**H.    First class bank reference whereby the Applicant Company has been known to the issuing bank for at least two years:**

**I.    Last (2) two years audited Applicant Company accounts**

**J. Six (6) months company track record, in the gold business.**
  ▪ **Indicate your experience in the gold sector, with reference contact details.**
  ▪ **Explain your experience in the region.**
  ▪ **Provide last 3 statements of gold transactions with supporting documents**
    *(i.e. import and export documents, refining and assay reports, etc.)*

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com
www.agr-afr.com**

# Annex

# C



# AFRICAN GOLD REFINERY LIMITED

# AFRICAN GOLD REFINERY LTD

## PRECIOUS METAL CUSTOMER ONBOARDING PROCESS



**PROSPECT CUSTOMER**

**1ST VERIFICATION**
Owner: **Key Account Manager**
-checks legal existence of prospect
-Reputation of the prospect
-Field of activity of the prospect
-Nature of business activity
-Risk (country, origin of PM, sanctions lists...)

**2ND VERIFICATION**
Owner: **Compliance Department**
-checks information provided by key account manager on the preliminary report

**DUE DILIGENCE SENT TO PROSPECT**
Owner: **Key Account Manager**
-KYC questionnaire
-Declaration regarding the origin of funds and goods
-Power of Attorney & specimen of signatures
-Supply Chain Due Diligence Policy
-Documentary evidence

**3RD VERIFICATION**
Owner: **Compliance Officer**
-Sanction screening and risk profiling of prospect
-Apply enhanced due diligence for high-risk prospect.

**CLIENT VALIDATION**
Owner: **Compliance Committee**
-Decision based on a report submitted by the Compliance Officer to the Compliance Committee.
-Account only opened by unanimous consent of the Compliance Committee.

**OPENING OF ACCOUNT**
Owner: **Compliance Officer**
-Instruct controller of the business unit to open the account on NEO (risk classification and potential restrictions communicated by the Compliance Officer and reflected on client profile)
-Instructs accounts to open metal account of the client (subject to prior acceptance of the account by the Compliance Department.

# Annex D



# CLIENT ACCEPTANCE POLICY

2017
AFRICAN GOLD REFINERY LTD
Sebugwawo Road, Entebbe, Kampala, Uganda

**AGR** AFRICAN GOLD REFINERY LIMITED

# AFRICAN GOLD REFINERY LTD

## CLIENT ACCEPTANCE POLICY

### 1.    GENERAL

In order to protect itself and its employees from becoming a target regarding violation of national and international laws and applications such as money laundering and terrorism financing, African Gold Refinery Ltd ("AGR") implements effectively and keeps current continuously Know-Your-Customer (KYC) Procedures and Client Acceptance Policy in purchase and customer acceptance procedures regarding precious metals.

The entire personnel meticulously monitor and implements compliance processes and procedures within the scope of supply chain process and the processes are monitored and audited by Compliance Department.

AGR undertakes the principle that in all activities it participates in, cooperates in and develops regarding the supply of precious metals in terms of gold refining that precious metals come from legitimate and ethical sources and that they do not constitute any criminal elements and that they are not associated with armed conflict or human rights violations.

The principles of Customer Acceptance Policy that was implemented in order to protect AGR and its employees from becoming a target in the violation of national and international laws, money laundering and terrorism financing was based on these parameters:

  a. Country of origin of precious metals,
  b. Risk of conducting business with customer,
  c. Risk of product or service provided,
  d. Value of commercial transactions and type/duration of relations with customer.

Customer risk profile is created in accordance with the above parameters and is updated at least once a year. Risk profiles of repeat customers are updated in a more comprehensive manner with inspections such as on-site regular company visits and controlling the validity of administrative procedures.

In regard to administrative procedures, customers must at least provide evidence on the below issues:

  a. Detailed explanation of areas of business and activity,
  b. References from other companies in the industry, to be inquired and confirmed by Compliance Officer,
  c. Detailed evidence on the source of goods.

**AGR  AFRICAN GOLD REFINERY LIMITED**

## 2.    SCOPE

These instructions define Gold Supply Chain Customer Due Diligence processes, Customer Definition System requirements and how Risk Analysis shall be conducted in this regard, in accordance with Gold Supply Chain risks and it is implemented by all commercial units of AGR.

## 3.    RISK MANAGEMENT

AGR has adopted the principle of supporting all national and international efforts on the fight against money laundering, terrorism financing and other related crimes and to obey all national and international laws, other legal arrangements and regulations.

To this purpose, AGR aims to manage supply chain process and risks in a more effective and accurate manner by implementing risk based "Know Your Customer KYC procedures - Customer Due Diligence".

AGR makes an effort for effective risk analysis and management by applying ethical business principles in accordance with the law and all national and international certifications to which it is subject by managing all commercial relations with its customers using precautions and methods to prevent money laundering and terrorism financing, in order to not place the company in a condition, despite unintentionally, of being involved in money laundering or terrorism financing and other related crimes and in order to remove the risk of harming commercial standing.

AGR executes audits in order to create awareness for all personnel in this regard and refresh knowledge with training provided and to monitor and control applications by way of Compliance Unit and Compliance Committee.

**Definition of risks in gold supply chain**

By putting in action the Gold Supply Chain Responsibility Policy it has prepared to meet the requirements of associations such as London Bullion Market Association (LBMA) and in accordance with OECD's Due Diligence Guide in High Risk Areas and Areas Affected by Conflict AGR has adopted an effective internal management system and risk monitoring methods.

Supply Chain Monitoring System where supply information on each refined party is gathered and kept was created, information was recorded and saved, refreshment of information and applications on subject was ensured with personnel training and a Compliance Officer was appointed for each unit in order to start all Due Diligence processes for customers with appropriate and effective methods.

Obtaining necessary documents and legal documents from customers within the scope of Due Diligence by way of customer information form and customer risk evaluation following necessary inspections and as a result making customer risk classification and deciding whether to start commercial relations are all within applications developed. Risk evaluation in supply change begins with the

**AGR**    AFRICAN GOLD REFINERY LIMITED

determination of supply provision source. Different risk evaluations are done for different sources.

AGR demands documentation of business and commercial relations by conducting a detailed identification scan on customer in order to make an effective risk evaluation to start from the first exit point where gold is provided. At this stage, whether customer has tendencies and efforts in regards to money laundering, fraud, or terrorism financing and such illegal tendencies is researched, business and financial data are controlled to access details and customer risk analysis is developed with documents such as mining license, mine capacity, data on mining applications, documents determining the origin of mine, gold import/export licenses and additional documents obtained from both the mine and small scale establishments. For high-risk category customers, additional precautions are taken and on-site visits and research for the verification of information are done.

AGR demands officially approved, notarized power of attorney declaration from customers contacting via power of attorney and in case any forgery or deception is detected, reports the situation to related authorities.

Situations such as customers to be entered into trade with being reluctant about providing necessary documents, obtaining gold from countries or centers placed under suspicious status by OECD and other related agencies, not being able to document the source of mine, trying for large sums of money transfer, not willing to carry out transactions over bank in a registered and documented manner and such are evaluated within the suspicious operations category.

In order to monitor risks that might occur during the transportation of precious metals, controls are done by way of documents regarding their weight, transport and insurance; thus allowing for monitoring the transport stage of the goods.

Each new customer within supply chain is considered high risk and is monitored and each year regular customer visits are done to decide whether business relations shall continue.

## a. Risk of ore/gold source

Goods from that customer or country are accepted or declined based on the information obtained as a result of country investigation (www.countrywatch.com). Source of ore is verified in each operation in order to eliminate or minimize commercial risk.

Existing or possible embargos, bribery, Financial Action Task Force (FATF) rankings, political stability and such parameters are considered by Compliance Department to continuously monitor risky countries and if that country is deemed negative or suspicious as a result of the evaluation done, gold is either directly not accepted or it is accepted or declined after being controlled by the Compliance Officer.

# AGR  AFRICAN GOLD REFINERY LIMITED

**b. Customer risk**

Except for private investors known for gold investment products (investment bars, bullions, etc.) persons privately buying and selling precious ores/metals are not serviced.

AGR minimizes its risk of conducting business with non-boda fide persons and only works with professional customers. Business is not done with customers who employ child labor in breach of local laws.

A risk profile (low risk, medium risk or high risk) for each customer during the evaluation of forms and it is regularly revised.

Each customer is given a reference number (customer ID/Account Code) to this purpose and procedures are started and a customer file containing forms and documents that need to be declared is kept.

If there is an anomalous increase in the amount of precious metals purchased routinely from such regular customers, additional due diligence is done on the determination of the source of precious metals and the plausibility of customer explanation.

All operations between AGR and its customers are monitored and pursued by Compliance Officer and the functionality of Customer Acceptance Policy is checked. The results of these observations are reported to management once every 3 months. Risk profile of each customer is re-evaluated as a result of this reporting and revised if necessary. With independent external audits done each year, compliance process of the previous year is monitored and reported.

**c. Guarantee of no affiliation with illegal activities**

Customers must guarantee that they are not affiliated with illegal affairs such as money laundering, tax fraud and others. The source of all precious metals and money under their control should be verified. Customer should also prove that it abides by local laws regarding the employment of child labor.

Any doubt, no matter how small, regarding the above issues requires the immediate severing of relations with that customer or not starting such relations at all.

**d. Risk of service provided**

Each party of goods purchased is meticulously inspected by AGR. All operations are subject to goods purchase and compliance procedures. First time customers must go through a full acceptance process. A separate compliance program is applied to existing customers.



# AFRICAN GOLD REFINERY LIMITED

Customers from whom regular goods acceptance is decided are subject to internal audits on-site by AGR. During these on-site audits, customers must at least provide additional evidence such as the detailed explanation of their business and activity areas and the source of their goods, in terms of administrative procedures.

| Risk Categories | Definition | Due Diligence to be applied |
|---|---|---|
| Low Risk **A**<br><br>Low Risk Profile Customer | Gold with clean source from secure regions with secure transport routes<br><br>Customer with strong documents and records<br><br>Risk-free / secure regions / countries | Basic Due Diligence |
| Medium Risk **B**<br><br>Medium Risk Profile Customer | Gold from high-risk regions or regions affected by conflict and gold with risk transport routes<br><br>High number of undocumented, unregistered commercial operations<br><br>Reasonable and well meaning customers<br><br>Low risk-Partially secure regions / countries | Enhanced Due Diligence |
| High Risk **C**<br><br>High-risk Profile customer | Gold from high-risk regions or regions affected by conflict and gold with risk transport routes<br><br>High number of undocumented, unregistered commercial operations<br><br>Reasonable and well meaning customers<br><br>High-risk- Unsecured regions /countries | Enhanced Due Diligence |

**AGR   AFRICAN GOLD REFINERY LIMITED**

## 4.    CUSTOMER ACCEPTANCE POLICIES

Activity and operations are monitored on the basis of information, documents, references, purity/assay results, etc. given by customer by sample goods reception with whom commercial relations shall be started and in case of any inconsistency, Compliance Officer is immediately contacted. Customer identification documents are verified by sanctions screening solutions, and whether findings are accurate is researched and verified by on-site visit and audit in addition to administrative procedures (existence of mining, refining or production facilities, accuracy of capacity and market information provided by customer, on-site verification of information including situations for which customer acts as intermediary). Whether commerce shall continue with that country or customer is decided as a result of all these. If after on-site audit, the information and documents presented to us and issues determined during on-site audit coincide, this customer is placed under regular customer status and regular goods purchase is decided.

All professional customers must declare the below documents and fill out the customer information form:

1. Passport photocopy – shareholder, UBO, authorized representative (color) - minimum
2. If representative, notarized power of attorney- minimum
3. Documents showing the recent financial status of company
4. Documents showing bank accounts
5. Last electricity invoice of company
6. Precious ore selling license
7. Mining license
8. Gold import/export license
9. Documents on the weight of precious metal
10. Documents regarding carat/assay results - minimum
11. Commercial registration documents
12. Partnership structure
13. Documents regarding area of activity
14. Documents regarding company authorized representatives
15. Information on mine capacity
16. Information/document on mining applications

Checking and verification of forms and documents are done after they are received. If customer or company cannot be verified, operations are immediately halted and service is terminated.

**In case of doubt:**

In case of doubt, Compliance Officer requests additional information and documents regarding ID verification and operations continue if no problems arise after ID verification.


AFRICAN GOLD REFINERY LIMITED

If suspicions continue after control and verification cannot be done, operations are halted and commerce with that customer is terminated.

**Customer ID determination stages:**

Stage 1: Customers who wish to contact via internet in order to start business relations print and fill out the Pre-KYC form on www.agr-afr.com before AGR Know Your Customer-KYC processes and scan the signed document to contact Compliance Unit via email after adding the additional documents required and filling out Compliance Contact form at compliance@agr-afr.com.

Stage 2: If the information in the Pre-KYC Form is compatible with the policy and procedures of AGR customer is sent KYC form to complete including all documents regarding customer identification system and detailed information on opening up account after evaluation. Customer attaches the related documents to the form and either sends or hand delivers to company.

Full Due Diligence and Risk analysis procedures take approximately 3-5 business days. By using sanction screening platform, all customers' ID verification and country inquiry including the research on the source of gold (www.countrywatch.com) are done and as a result, a comprehensive risk evaluation of that customer and source of gold is completed.

After deciding whether to form business relations with the customer, procedures are started by informing the customer of the result. All information on customer is kept private and confidential within these rules of ethics. The information that should not be shared is not shared with third parties or institutions.

Company Compliance Officer and related departments monitor and control all these procedures. Goods acceptance from customer does not begin unless all verification such as ID documents, references, analysis results, etc. are complete. In case of inconsistencies in documents and information, Compliance Officer is informed rapidly or by using compliance transition points system.

Stage 3: Following Full Due Diligence procedures, a metal account is opened for each customer and a reference number (customer code) is provided. From customer acceptance on, all procedures are monitored in the system with this customer code, gold containing precious metals sent to refining belonging to customer are monitored in compliance with lot numbering system and thus all commercial transactions, refining and exits after production of gold or gold containing precious ores are taken under monitoring from the origin of these metals. All these stages of the process are monitored with the internal audits by related units and Compliance Committee.

Compliance agreement form is signed with customers accepted into commercial relations and their declarations are obtained regarding being compatible with AGR's Compliance procedures, Gold Supply Chain Responsibility Policy and Due Diligence processes. Customer Declaration Form to be used by customers purchasing scrap from counters in declaring the source of goods.

# AGR

### AFRICAN GOLD REFINERY LIMITED

**5.   ORIGIN OF THE GOLD**

All customers deal with questions regarding the source of gold (whether counter customers' goods are savings or inheritance, etc.) at the stage of starting commercial relations within the framework of customer identification system and at goods purchase/acceptance counters and they should provide clear and net answers to these questions.

The high level of amount and value of operations also means that risk is low and monitoring and verification of operations in process hold an equal amount of high importance.

Goods from that customer or country are either accepted or declined based on the information obtained as a result of country investigation. Source of ore is verified at each operation.

AGR keeps record of a list of all gold exporting countries. Products that originate from these countries will either (i) not be accepted by AGR, or will (ii) only be accepted after explicit permission of the Compliance Officer.

The list is updated on a permanent basis using various parameters such as:

- Existing or imminent embargoes;
- Corruption;
- FATF Ratings
- Political (in)stability;

Based upon these parameters, each country is given a particular grade. The list is divided into three categories A, B and C. See Annex of country list.

AGR will decide whether to accept products that originate from countries categorized under C. In case of negative decision of AGR, no products will be accepted.

For products that originate from countries categorized under category B, the explicit permission of the Compliance Officer is needed, before any purchase of such products by AGR will be accepted.

During the intake procedure, these particular products and the seller in question will be vigorously screened by AGR.

Products with origin in countries categorized under A will be accepted by AGR in accordance with its regular intake procedure.

If evaluation results are compatible with the declarations of customer on the source of gold, evaluation stage is completed and goods acceptance begins.

If there is an inconsistency between evaluation results and customer's declarations regarding the source of gold, related customer representative calls the Compliance Officer and requests assistance for evaluation.

a. **Investment gold or refined gold:** The accuracy of document and explanations of customers that wish to provide goods to AGR as a one-time deal is diligently researched and determined. In case customer explanations regarding the origin of small amounts investment goods such as jewelry, coins, bars are found plausible and in keeping with their initial statement, the acceptance of such goods (savings, inheritance, etc.) is done directly from purchasing counter.

b. **Unrefined, scrap gold:** The source of gold with customers that wish to provide goods to AGR as a one-time deal is determined during the interview to be held with that customer and is thus evaluated. Customer declarations are taken on the source of gold (inheritance, savings, etc.). carat and analysis results of the goods to be purchased is checked and whether it is considered jewelry is determined based on the silver and copper ration within.

c. **Gold from areas of Conflict/problem regions:** If the source of gold provided by customer is within areas defined as areas of conflict by UN or OECD, goods from those countries and (in certain risky situations declared) goods from surrounding countries are not accepted – except for approvals of United Nations or OECD and such official establishments. If any customer declares having goods from such areas and research indicates to that area or under suspicious conditions, Compliance Officer must be contacted.

d. **In case of doubt:** In case of doubt, Compliance Officer requests additional information and documents regarding ID verification and operations continue if no problems arise after ID verification. If suspicious continue on the source of goods/gold after control and verification cannot be done, operations are halted and commerce with that customer is terminated.

**Regular customers**

AGR calls customers from whom it accepts ores/gold regularly as regular customers. Regular customers are subject to internal audit by AGR.

These audits are in the form of more comprehensive administrative procedures and regular company visits. During these on-site audits, customers must at least provide evidence on the following issues in regard to administrative procedures:

1. Detailed explanation of areas of business and activity,
2. References from other companies in the industry, to be inquired and confirmed by Compliance officer,
3. Detailed evidence on the source of goods,
4. Evidence and documents regarding that child labor is not employed.



**AFRICAN GOLD REFINERY LIMITED**

Sample goods acceptance may begin after verification process. If provided information and those detected during on-site audit are compatible, that customer/company is placed under regular customer status and trade begins. Despite being accepted as regular customer, periodic customer visits are not neglected and customer information verification procedures are executed at the same periods.

## 6.    SANCTIONS COMPLIANCE

AGR is committed to complying with the sanction laws and regulations passed by the Republic of Uganda, the United Nations Security Council, the European Union and the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) as well as applicable sanction laws in the jurisdictions in which AGR operate. Under the sanction laws, individuals and entities are prohibited from entering into financial transactions or provide financial assistance or services in relation to sanctioned individuals, entities or activities.

As such, AGR does not open accounts, continue customer relationships, provide products or services, execute or facilitate transactions (directly or indirectly) or engage in any activity involving sanctioned individuals, entities, countries or territories, subject to the extent permissible by sanction laws. AGR may also, in its sole discretion, decide not to process or to facilitate transactions or to provide products and services even where permissible by sanction laws, if these activities fall outside the risk appetite of the Company. Currently, the sanctioned countries and regions are the Crimea region in Ukraine, Cuba, Iran, North Korea, Sudan and Syria.

## 7.    INTERNAL CONTROL MECHANISMS

Non-Compliance Notification System has been installed as a communication mechanism to transfer any non-compliance deemed as risk within gold supply chain process to upper management and Compliance Access Points have been formed to this extent. Information is refreshed by creating awareness with planned personnel compliance training done during the year. By way of appointed unit compliance officers, setbacks in the application of supply process stages in related units, procedures and processes that should be done and within compliance system and supply chain as well as possible risks are taken under control and negative developments are reported and all these issues are discussed during periodic meetings of Compliance Committee.

AGR has created an internal audit system for customers with whom it is in regular commercial relations. It controls at various periods during the year with on-site audits and administrative applications its regular customers and thus provides the security and reliability of trade.

In this regard, the following are done:

    a.  Verification of detailed explanation on the activities done as company,

AGR    AFRICAN GOLD REFINERY LIMITED

    b.  Research on and verification of companies listed as references by Compliance officer,

    c.  Verification of detailed documents on the proof of origin of goods,

    d.  Audit and control on the guarantee of not employing child labor.

## 8.  MONITORING BY THE COMPLIANCE OFFICER

In order to run a proper Client Acceptance Policy, AGR Compliance Officer monitors all transactions made between the customers and AGR.

The results of this monitoring will be reported on a semi-annual basis to the Board of Directors of AGR. Based upon the results presented by the Compliance Officer, and after the consideration of these results by the Board of Directors, the risk profiles of each client will be evaluated, and if needed, be adjusted.

Every year, the Compliance Officer will draft a report regarding all compliance issues of the previous year (staff education, countries products originate from, number of atypical transactions, number of new clients with a risk profile..).

## 9.  METHOD OF APPLICATION

Customer Acceptance Policy is valid on the date of issue. All possible changes are published with revision number by Compliance Officer. Unit officers/managers are responsible to ensure that all unit employees understand clearly the principles of these directives and its method of application, providing an operation style to fulfil all requirements of instructions and procedure and to execute inter-unit applications in this regard.

- 0 –

# Annex E



# AFRICAN GOLD REFINERY LIMITED

## Responsible Precious Metals Supply Chain Policy

| | | |
|---|---|---|
| **Prepared by:** | Legal and Compliance Officer | Heizel Adante |
| **Approved by:** | Managing Director | Alphonse Katarebe |
| **Effective Date** | 04 January 2016 | |

| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| AGR | | | |
| | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 1 of 4 |

## AFRICAN GOLD REFINERY LIMITED
## Supply Chain Policy for a Responsible Global Supply Chain of Mineral from Conflict-Affected and High-Risk Areas

**AFRICAN GOLD REFINERY LIMITED** recognizes and takes very seriously the risk of significant adverse impacts which may be associated with extracting, trading, handling, and exporting minerals from conflict-affected and high-risk areas, and recognizes that we have responsibility to respect human rights and not contribute to conflict, we commit to adopt, widely disseminate and incorporate in contracts and/or agreements with suppliers the following policy on responsible sourcing of minerals from conflict-affected and high-risk areas, as representing a common reference for conflict-sensitive sourcing practices and supplier's risk awareness from the point of extraction until end user.

As part of our commitment to sourcing ethically responsible precious metals, we have established a Responsible Precious Metals Supply Chain Policy which is based on the following principles: Know Your Customer (KYC), Anti-Money Laundering (AML) and Combatting Financing of Terrorism (CFT). AGR's Responsible Precious Metals Supply Chain Policy is implemented through a comprehensive management system that encompasses strict risk-based due diligence approach. AGR risk management system policy has been designed and implemented to ensure that our commitments and operating procedures are rigorously in line with the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict Affected and High-Risk Areas and International Conference for the Great Lakes Region ("ICGLR") Policy and Procedures.

By applying this Responsible Precious Metals Supply Chain Policy, AGR participates and cooperates in global effort to combat money laundering, terrorism financing, armed conflict, and human rights abuses. AGR condemns formally any human rights abuse and any child right abuse and expect from all actors in the supply chain to be in line with these fundamentals. Our policy prohibits any employee from offering or receiving of a bribe. In addition, AGR requires from all partners in the supply chain, a clear, transparent and full compliance with local and international regulations, to ensure that our precious metals sourcing is legitimate, conflict free, ethical and social responsible. An on-going training program is performed on a regular basis in order to bring all counterparties and all relevant employees up to date on standards and due diligence, know-your-customer (KYC) best practices.

We strongly recommend our suppliers to operate in accordance with the OECD and International Conference for the Great Lakes Region ("ICGLR") Policy and Procedures.

As part of our responsibility, AGR is committed to:

1. Neither tolerate, nor by any means profit from, contribute to, assist with or facilitate the commission by any party of serious abuses associated with the extraction, transport, trade, handling or export of minerals as indicated in Annex II of the OECD Guideline, any transactions arising from:



| | **AFRICAN GOLD REFINERY LIMITED** | *Doc No.* | *AGRCM-04* |
|---|---|---|---|
| | | | |
| | **RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY** | *Date* | *04 January 2016* |
| | | *Pages* | *Page 2 of 4* |

(i)   Any form of torture, cruel, inhuman and degrading treatment;

(ii)  Any form of forced or compulsory labour;

(iii) The worst forms of child labour;

(iv) Other gross human violations and abuses such as widespread sexual violence; and/or

(v)  War crimes or other serious violations of international humanitarian law, crimes against humanity, or genocide.

(vi) To bride or to be bribed.

2.  Not to enter into any business relationship, or immediately suspend or discontinue engagement with counterparties supplying precious metals where we identify a reasonable risk that they are sourcing from, or are linked to, any party committing serious abuses as defined above. AGR 's intention is also to engage the Counterparty to ascertain the circumstances of identified risks and violations, how the Counterparty has handled these (through mitigation and remedy actions), and how the Counterparty has introduced reasonable control measures to prevent and better mitigate such risks in the future.

3.  Not to tolerate any direct or indirect support to non-state armed groups through the extraction, transport, trade, handling or export of precious metals. This includes, but is not limited to, procuring minerals from, making payment to or otherwise providing logistical assistance or equipment to non-state armed groups or their affiliates who:

(i)   illegally control mine sites or otherwise control transportation routes, points where minerals are traded and upstream actors in the supply chain; and/or

(ii)  illegally tax or extort money or minerals at points of access to mine sites, along transportation routes, or at point where minerals are traded; and/or

(iii) illegally tax or extort from intermediaries, export companies or international traders.

4.  Not to enter into any business relationship, or immediately suspend or discontinue engagement with upstream suppliers, where we identify a reasonable risk that they are sourcing from, or are linked to, any party providing direct or indirect support to non-state armed groups as defined above.

5.  Eliminate, in accordance with paragraph 10 of Annex II of the OECD Guidance, direct or indirect support to public or private security forces who illegally control mine sites, transportation routes and upstream actors in the supply chain; illegally tax or extort money or minerals at points of access to mine sites, along transportation routes, or at

| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| AGR | | | |
| | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 3 of 4 |

point where minerals are traded; or illegally tax or extort from intermediaries, export companies or international traders.

6.  Recognize that the role of public or public security forces at the mine sites and/or surrounding areas and/or along transportation routes should be solely to maintain the rule of law, including safeguarding human rights, providing security to mine workers, equipment and facilities, and protecting the mine site or transportation routes from interference with legitimate extraction and trade.

7.  Support efforts, or take steps, to engage with central or local authorities, international organizations and civil society organizations to contribute to workable solutions on how transparency, proportionality and accountability in payments made to public security forces for the provision of security could be improved.

8.  Not to enter into any business relationship immediately suspend or discontinue engagement with any upstream participant/s should we identify a reasonable risk that the supply chain directly or indirectly supports illegally acting public or private security forces.

9.  Not offer, promise, give, or demand any bribes, and resist the solicitation of bribes to conceal or disguise the origin of precious metals, to misinterpret taxes, fees and royalties paid to governments for the purposes of extraction, trade, handling, transport and export.

10. Support efforts, and/or take steps, to contribute to the effective elimination of money laundering as well as terrorism financing where we identify a reasonable risk of such illegal practices resulting from, or connected to, the extraction, transport, trade, handling or export of precious metals at points of access to mine sites, along transportation routes or at points where precious metals are traded by upstream participants in the supply chain. In this regard, we will immediately report to the relevant authorities any suspicion of any illegal financial transactions we identify.

11. Contribute and participate in the promotion of Responsible Sourcing of Precious Metals to our suppliers by (i) creating a long term association with suppliers and established strong relationship with our customers; (ii) supporting our suppliers of gold to adhere with the provision of this policy and encourage them to impart or convey it to its staff and their supply chain; (iii) disseminating the precious metal gold guidance by local and international bodies in which this policy was created such as the ICGLR, LBMA and OECD.

12. Systematically perform enhanced due diligence practices, including the Know-Your-Customer (KYC) process, following a risk-based approach, before entering a business relationship with any precious metals supplying counterparties. Conduct, utilizing a risk-based approach, appropriate scrutiny and monitoring of (i) the transactions undertaken through the course of the relationship; and (ii) the governance structures in place to prevent any risk of illegal activities. Implement a management strategy to respond to identified risks.

| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| | | | |
| | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 4 of 4 |

13. Adequately store and maintain all records and documentation relating to the precious metals supply chain in order to demonstrate appropriate and on-going due diligence has been performed, storage of such information should be for a minimum of 5 years.

14. Train relevant staff and educate its employees through formal education, trainings or seminars and conferences with the provision of this policy and the responsible sourcing of precious metals. AGR requires all its staff involved in the gold supply chain to strictly comply with this policy and implement it in the management system.

15. Require our Counterparties and, in particular, all Counterparties supplying precious metals, to mutually cooperate by committing to, and acknowledging in writing, compliance with a supply chain policy consistent with OECD Due Diligence Guidelines.

AGR has put in place the following email address admin@agr-afr.com  allowing our employees, stakeholders and counterparties to raise their questions and concerns related to the supply chain policy or newly identified risk.

- 0 -

# Annex F



# AFRICAN GOLD REFINERY LIMITED

## AML/CFT Compliance Requirements



# Annex
# G

01.06.2017

| Country name | RATING | COMMENTS | Statutes Company | Identification Card | copy PP beneficial owners | OECD receipt | General Terms | Document (info on origin goods) | Transport Documents | Certificate of origin | Mining License | Export License | Trade Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Afghanistan | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Angola | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Austria | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Bahrain | | Ok to conduct business after internal review and approval | x | x | x | | x | | | when directly from mine | x | | for new suppliers |
| Belgium | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Brazil | | Ok to conduct business | x | x | x | | x | see certificate | | | | x | for new suppliers |
| Bulgaria | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Burkina Faso | | Ok to conduct business | x | x | x | | x | see certificate | | | x | | for new suppliers |
| Burundi | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Central African Republic | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Chili | | Ok to conduct business after internal review and approval | N/A | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| China | | Ok to conduct business | x | x | x | | x | see certificate | | | | x | for new suppliers |
| Columbia | | Ok to conduct business after internal review and approval | x | x | x | | x | | | | | | for new suppliers |
| Cuba | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Cyprus | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Czech Republic | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Democratic Republic of Congo | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Denmark | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Eastern-Ukraine | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | x | | | | | | for new suppliers |
| Estonia | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Finland | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| France | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Germany | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Great Britain | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Greece | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Guinée (Guinea) | | Ok to conduct business after internal review and approval | x | x | x | | x | | | when directly from mine | x | | for new suppliers |
| Guyana | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Hong Kong | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | | | x | for new suppliers |
| Hungary | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| India | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Ireland | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Iraq | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Iran | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Israel | | Ok to conduct business | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Italy | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Kroatië (Croatia) | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Latvia | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Lithuania | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Luxemburg | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Malta | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Nederland | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Nigeria | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| North-Korea | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Off-Shore countries | | No business can be conducted due lack of transparency | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Peru | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Poland | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Portugal | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Romania | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Rwanda | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Sierra Leone | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Slovakia | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Slovenia | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Spain | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Sudan | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Suriname | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Sweden | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Switzerland | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Syria | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Tanzania | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| The Netherlands | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| The Netherlands Antilles | | Ok to conduct business after internal review and approval | N/A | N/A | N/A | | x | | | when directly from mine | x | | for new suppliers |
| Togo | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Turkey | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | | | x | for new suppliers |
| Uganda | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| Ukraine | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | x | | | | | | for new suppliers |
| United Arab Emirates | | Ok to conduct business after internal review and approval | x | x | x | | x | see certificate | | when directly from mine | x | | for new suppliers |
| United Kingdom | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |
| Venezuela | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Yemen | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Zambia | | No business can be conducted due to conflict area or embargo | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Zimbabwe | | Ok to conduct business | x | x | x | | x | | | | | | for new suppliers |

# Annex
# H



**Tem Advocates & Solicitors**

6ᵗʰ November 2018

Mr. David Biggs
Senior Secretary
**Security Council Committee established pursuant to Resolution 1533 (2004) Concerning the DRC**

### Re: <u>UNRELENTING INVESTIGATIONS OF THE AFRICAN GOLD REFINERY</u>

We represent the **AFRICAN GOLD REFINERY (AGR).**

We are in receipt of your further communication referenced S/AC.43/2018/GE/OC.63 addressed to the CEO of African Gold Refinery. We note with displeasure the continuous investigations, interrogations and questioning of AGR's operations despite the fact that we have on several occasions attended to your requests for information, provided all relevant documentation, and closely cooperated with the Group of Experts to the best of our ability.

We strongly believe that AGR is a target of discrimination as there are over 25 gold refineries based in Switzerland and U.A.E who are sourcing gold from the Great Lakes region whilst it's AGR alone under forensic investigation and attack.

Such acts of prejudiced investigation has serious detrimental effects in the industry and simply helping out the elicit gold traders /smugglers to make it as a tool in order to cease and shut-down a legitimate company like AGR as it is AGR's main objective is to address the issues of gold trafficking,

As far as we are concerned, AGR is the only established and visible gold refinery in the region that has signed an agreement with the DRC's agency CEEC in order to set up a traceability system for gold coming from the DRC and assist halt the smuggling ring. This definitely eliminates any undocumented gold from the DRC.

Nonetheless, your recent communication is exactly the same communication addressed to our client referenced S/AC.43/2017/GE/OC.38 from **Mr. Mohamed Kanja Sesay** the acting Secretary security council committee established pursuant to Resolution1533 (2004) concerning the DRC. Refer to our communication dated **12ᵗʰ June 2017** addressed to him in the same regard. <u>We reiterate our communication therein.</u>

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Ogwang Raymond   LLB  (Hons) (MAK) DIP. LP (LDC)  - 0773137618
Advocate: Banduru Diana LLB (Hons) (UCE) DIP. LP. (LDC) - 0785007241
Law Clerk: Mwenyi  Akimu   Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Email: tem@lawyer.com



**Tem Advocates & Solicitors**

As you have rightly quoted we take recognizance of resolution 2360 (2017), as renewed by resolution 2424 (2018) and aver that, should you require any further information from AGR then you should rightly channel your requests to the government of Uganda through the Ministry of Foreign Affairs; we will gladly give all the necessary and relevant information if any through the sovereign republic of Uganda.

AGR requires equity and fairness from the Group of Experts as they carry out their investigative mandate across all gold actors in the industry.

AGR upholds responsible sourcing as its primary objective.

**P.S.** Mr. Goetz is formally leaving his role as AGR's - Chief Executive Officer. Thus, kindly address your future correspondences to Mr. Alphonse Katarebe who will serve as his successor.

Yours faithfully

**Tem Advocates & Solicitors**

**C.C African Gold Refinery**

**C.C Ministry of Foreign Affairs**

**C.C Ministry of Finance**

**C.C Ministry of Energy and Mineral Development**

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Ogwang Raymond  LLB  (Hons) (MAK) DIP. LP (LDC)  - 0773137618
Advocate: Banduru Diana LLB (Hons) (UCE) DIP. LP. (LDC) - 0785007241
Law Clerk: Mwenyi  Akimu   Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Email: tem@lawyer.com

# Annex I



# AFRICAN GOLD REFINERY LIMITED

**Date:** 20th December 2019

**To:**

David Biggs
Senior Secretary
Security Council Committee
Established pursuant to
Resolution 1533 (2004)
Concerning the DRC

Dear Mr. Biggs,

Foremost, please accept our sincere appreciation and gratitude to you and the entire team at the Security Council committee for your enormous efforts and support towards the sector. We also wish to thank the Group of Experts on the Democratic Republic of Congo for visiting AGR premises and meeting with the AGR team on the 26th October 2019. AGR door is always open and AGR's entire team is here to cooperate in fulfilling the Security Council's mandate.

As requested, we wish to categorically respond to all the queries presented in your letter referenced S/AC/43/2019/GE/OC.91 dated 22 November 2019 as follows:

A Copy of Company's Supply Chain Due Diligence in accordance with guidelines established by the ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD);

A Copy of Company's Supply Chain Due Diligence report for 2018 and or 2019 in accordance with guidelines established by the ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD);

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,**
**Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com**
www.agr-afr.com



# AFRICAN GOLD REFINERY LIMITED

As far as AGR is concerned, the Implementation of the Pact on Security, Stability and Development in the Great Lakes Region had already been signed in December 2017 whilst it is important to note that ICGLR Mechanism is not implemented yet in Uganda.

Even though, AGR is not waiting for that schemes or initiatives to be executed as AGR has self-assessment tool in place to measure the customer, suppliers or any transaction as an integral part of AGR's responsible sourcing practices. AGR has strict KYC procedures and questionnaires that every customer, supplier and client must adhere to, which are reviewed by the Legal and compliance team thereafter submit with their recommendations for approval or rejection to the management. AGR operates under the stringent guidelines of compliance in accordance with ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD). The copies of AGR's main Supply Chain and Due Diligence policies are enclosed herewith however, we are not able to share them all through email due to heavy files. In fact, sets of documents have already been handed-over to the Group of Experts on the DRC during their visit in AGR on 12th May 2017 and if in case a second copy will be required it can be collected from AGR premises at any moment.

If not included in the 2018 and/or 2019 supply chain due diligence report, evidence of African Gold Refinery Ltd.'s supply chain due diligence checks undertaken for the year including on second tier suppliers.

Following the steps set out in ICGLR (International Conference for the Great Lakes Region) and the OECD (Organization for Economic Cooperation and Development) African Gold Refinery is undertaking risk assessment to any potential and existing customer or supplier, this risk assessment covers conflict-related risks:

To do so, AGR is collecting detailed and quantitative information on suppliers, prospective suppliers and points where the minerals are traded.

Provided below is the overview of AGR's risk assessment:

AFRICAN GOLD REFINERY LIMITED

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com



**AFRICAN GOLD REFINERY LIMITED**

| DATE: | ENTITY | INDIVIDUAL | INQUIRY | Legal & Compliance Remarks |
|---|---|---|---|---|
| 28.12.2016 | | Christopher Haun | Assaying & Smelting 5 kgs nuggets | Insufficient Documents |
| 18.03.2017 | | Meteku David | Interested to buy 20 - 30kgs daily | Insufficient Documents |
| 31.03.2017 | New Kush Exploration & Mining | Laurence Craig Brown | To discuss the terms of refining the products from South Sudan | South Sudan Origin;  (High Risk Area) |
| 15.05.2017 | | Luis Miguel Landero | Would like to sell gold | No documents provided |
| 24.05.2017 | JH Import & Export Trade LTDA | Jossicleudo Sampaio De Melo | Seeking For Partnership | No documents provided |
| 06.07.2017 | CM Alvesta Enterprises | Tacy Musubao Caleb | Opening an Account | Incorporated in Uganda but Directors are from DRC  (High Risk Area) |
| 06.07.2019 | Mbulula John's | John M'bulula | Buying Gold | Insufficient Documents |
| 25.07.2019 | | Daniel Llinas | Opening an Account | USA based company with investments in DRC; No document has been provided |
| 01.08.2019 | Starsky Group | Erick Murilla | Smelting of 5 tons upon account opening confirmation | Based on our meeting with Mr. Erick Murilla on 01 August 2019; gold will be sourcing from the DRC (High Risk Area) |
| 15.08.2019 | | Brian Wheeler | Requires 100kgs supply monthly | No documents provided |
| 21.08.2017 | Brazania Limited | Nikolas Octavio | Opening an Account | Insufficient Documents |
| 29.08.2019 | Financial Engineering & Property Limited | Adam Zarasota | Opening an Account | Insufficient Documents |
| 29.08.2017 | Simnati Sarl | Cedric Kabongo | Opening an Account | Insufficient Documents |
| 31.08.2017 | TechnoMinerals Ltd | Roberto Calamai | Opening an Account | Insufficient Documents |

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,**
**Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com**
www.agr-afr.com



# AFRICAN GOLD REFINERY LIMITED

| | | | | |
|---|---|---|---|---|
| 03.09.2019 | | Juan Jimenez | Selling 5-10 Tons of Gold from Tanzania | Draft contract is inadequate to start business relations |
| 12.09.2017 | Shipping GL Uganda Limited | Patrick Katayi | Importing Gold | Gold from Europe to be imported to Uganda (Potential Money Laundering) |
| 15.09.2017 | Dragon Progress Holding Limited | Champlain Solo | Opening an Account | Company has been incorporated in June 2017; no proven track record in the sector |
| 28.09.2017 | | Nadav Palmach | Opening an Account | Walk-in Potential Customer/ Only Passport copy is provided |
| 26.10.2017 | Borderless Trading Limited | Jette Scott | Opening an Account | Insufficient Documents |
| 15.11.2017 | | Ben Young | Supply in Tanzania & DRC | No documents provided |
| 28.12.2017 | | Evgeny Titov | Interested in supplying Jewelry from Sokolov | Not in line with AGR business activities |
| 13.04.2018 | AA Int'l Consulting | Aime Shabani | Supply of 10kgs/month from the Great Lake Region & beyond | No proven track record |
| 22.05.2018 | STAR TAHINA LIMITED | Yossi Gabay | Opening an Account | Lack of information provided during the meeting |
| 24.05.2018 | | Mikhael Levy | Opening an Account | Insufficient Documents |
| 06.06.2018 | KLS Trading Int'l Limited | | Inquiring for metal trade in Zambia & Hong Kong | Incomplete KYC application |
| 12.06.2018 | Flas Gold Mine - Tza | Festo Mvwango | Opening an Account | Insufficient Documents |
| 27.06.2018 | Ocean Impex Limited | Winnie Nalukwago | Opening an Account | Unknown source of gold |
| 09.09.18 | | Shmuel Minski | Opening an Account | Insufficient Documents |
| 12.12.2018 | Goldex Global (u)Limited | Amos Bakeine | Opening an Account | No proven track record |

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com
www.agr-afr.com**



# AFRICAN GOLD REFINERY LIMITED

| | | | | |
|---|---|---|---|---|
| 26.02.2019 | Investor Link Mineral Ltd | Ian Haruperi | Opening an Account | Source of Gold is from Zambia (consider as High Risk Area) |
| 17.07.2019 | | Xavier Mugisha | Opening an Account | Insufficient Documents |
| 05.08.2019 | Kenger Khan Diamond Gold Trading DMCC | | Interested in buying gold | Incomplete KYC application |
| 19.10.2019 | | Maria | Delivery of 5kgs of nuggets | Hidden identity; fake gold dealers |

On the issue of Mr. Alain Goetz's capacity in the company, AGR is confirming that he stepped down as Chief Executive Officer in November 2018 and has since then moved to his charitable foundation and related humanitarian works in Uganda and abroad.

As part of AGR's full cooperation with the Group of Experts, our legal team is in consultation with the related stakeholders and its suppliers to develop a comprehensive opinion on developing a Memorandum of Understanding (MOU) between AGR and the UN Group of Experts so that AGR can ably share the requested details without facing any legal battles in courts of law for breach of confidentiality and disclosure clauses between AGR and its suppliers. We hope this will be worked upon by mid of year 2020.

We wish to thank you once again and unequivocally emphasize that we are always willing to cooperate with the Group of Experts in executing its mandate.

Regards,

AGR Management

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806 | P.O.Box 37574, No. M103/M106,**
**Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com**
www.agr-afr.com

# Annex J



AFRICAN GOLD REFINERY LIMITED

# ANTI-BRIBERY POLICY & COMPLIANCE HANDBOOK

AFRICAN GOLD REFINERY LIMITED

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

*Highly Responsible Sourcing of Gold*

1



AFRICAN GOLD REFINERY LIMITED

## CEO Statement

It is African Gold Refinery's (AGR) policy to conduct all of our business in an honest and ethical manner. We take a zero-tolerance approach to bribery and corruption and are committed to acting professionally, fairly and with integrity in all our dealings wherever we operate. We are committed to implementing and enforcing effective systems to counter bribery.

AGR is committed to compliance with anti-bribery laws that are applicable to the organization.

This policy and controls stated below apply to all individuals working at all levels and grades, including senior managers, directors, employees (whether permanent, fixed-term or temporary), consultants, contractors, and any other person providing services to us or working on behalf of us.

AGR is committed to continual improvement; the policies and controls described in this document represent our first step towards establishing, implementing and maintaining a robust anti-bribery management system in accordance to ISO 37001 Standard.

Alain Goetz

CEO



**AFRICAN GOLD REFINERY LIMITED**

## TABLE OF CONTENTS

I.   What is a bribe? ………………………………………… 4

II.  Anti-bribery compliance function ……………………….. 4

III. Risk Identification and Risk ……………………………... 5

IV.  Operational Controls ……………………………………….. 6

V.   Reporting, Monitoring, and Evaluation ………………... 12

VI.  Documented information ……………………………….. 18



## I. What is a bribe?

A bribe is a financial or other advantage offered or given:

- ► to anyone to persuade them to or reward them for performing their duties improperly or;
- ► to any public official with the intention of influencing the official in the performance of his/her duties.

## II. Anti-bribery compliance function

Top management shall establish a compliance function within AGR, and shall appoint the appropriate personnel to carry out the various compliance roles and responsibilities.

The compliance function personnel shall be independent and have the relevant competencies, skills and qualifications.



**AFRICAN GOLD REFINERY LIMITED**

### III. Risk Identification and Risk Assessment

*High Risks*

#### 1- Bribery and Money Laundering related to the sourcing of gold

Given the nature of AGR's business and the jurisdictions of operation, sourcing of gold ranks as the highest risk where bribery or money laundering could occur. Therefore, AGR shall implement strict procedures and operational controls, in line with the OECD requirements, to ensure that we minimise this risk. The relevant operational controls are stated below under 'Operational Controls'.

### 2- Gifts, hospitality, donations and similar benefits

AGR shall implement procedures which are designed to prevent the offer, provision or acceptance of gifts, hospitality, donations and similar benefits where the offer, provision or acceptance is or could reasonably be perceived as bribery. Such benefits include:

a. gifts, entertainment and hospitality

b. political or charitable donations

c. client or public official travel

d. promotional expenses

e. sponsorship

f. community benefits

g. training

h. club memberships

i. personal favours given in a business context.



AFRICAN GOLD REFINERY LIMITED

**3- Conflict of Interest**

AGR's personnel may have connections such as family, financial or other connection directly or indirectly related to their line of work which may result in personnel facilitating or failing to prevent or report bribery. AGR shall implement procedures to prevent internal and external, actual or potential conflicts of interest.

*Lower Risk*

**4- Bribery of AGR's personnel (inbound bribery)**

Bribery of AGR's personnel is most likely to occur in relation to personnel who are able to make or influence decisions on behalf of AGR (e.g. a procurement manager who can award contracts, a supervisor who can approve work done, a manager who can appoint personnel or approve salaries or bonuses, a clerk who prepares documents for granting of licenses, permits etc.). AGR shall implement controls to prevent inbound bribery.

The identification and assessment of risks shall be reviewed at least once annually.



AFRICAN GOLD REFINERY LIMITED

### IV. Operational Controls

**The following controls shall be implemented to mitigate the risks explained earlier.**

#### 1- Risks related to the sourcing of gold

AGR is committed to refraining from sourcing, trading, purchasing, using and selling gold in circumstances that might contribute directly or indirectly to financing criminal networks or non-state armed groups, perpetrating human rights abuses and other crimes, violating labour rights, as well as undermining political and socio-economic stability in the country of origin.

Corruption and money laundering in the gold trade are often associated with the illegal trafficking of gold, environmental violations, human rights abuses or war crimes, and/or finance of criminal networks or non-state armed groups. AGR's Due Diligence Management

System - based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance – along with this document shall be implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold.



AFRICAN GOLD REFINERY LIMITED

## 2- Gifts, hospitality, donations and similar benefits

AGR prohibits the offer, provision or acceptance of gifts, hospitality, donations and similar benefits where the offer, provision or acceptance is or could reasonably be perceived as bribery. Where such benefits are necessary and perceived as bribery, the following controls shall be strictly followed:

### Gifts and hospitality

Gifts and hospitality shall be limited to a maximum expenditure of the equivalent of US $100 per person.

The frequency of gifts and hospitality shall be limited to once per year for the same person unless otherwise approved by member of the management team. Where the frequency is higher than once per year, a rational for such shall be presented and documented.

The timing of gifts and hospitality shall not be during or immediately after tender negotiations.

The recipient of a gift or hospitality shall not be in a position to award contracts or approve permits, certificates or payments.

No-one within AGR can receive a gift or hospitality greater than a value which they are permitted to give.

Where there are legal requirements, in a certain location, that conflict with the above, such legal requirements shall take precedence.

All gifts and hospitality shall be approved by the relevant member of the management team and shall be effectively documented.



AFRICAN GOLD REFINERY LIMITED

Any exceptions to the above requirements shall be approved by a member of the management team, the rational for such exceptions shall be explained and effectively documented.

**Political or charitable donations, sponsorship, promotional expenses and community benefits**

In relation to political or charitable donations, sponsorship, promotional expenses and community benefits, AGR prohibits payments which are intended to influence, or could reasonably be perceived to influence, a tender or other decision in favour of AGR.

AGR will undertake and document due diligence on the political party, charity or other recipient to ensure that they are legitimate and are not being used as a channel for bribery (this could include, for example, searches on the internet or other appropriate enquiries to ascertain whether the managers of the political party of charity have a reputation for bribery or similar criminal conduct, or are connected with the AGR's business or customers).

Payments related to political or charitable donations, sponsorship, promotional expenses and community benefits shall be approved by the relevant member of the management team. Such payments shall be permitted by applicable law and regulations and publicly disclosed if required by law.

Contributions during or immediately after contract negotiations shall be avoided.

 **AFRICAN GOLD REFINERY LIMITED**

**Customer representative or public official travel**

In relation to client representative or public official travel:

payment shall be permitted by the procedures of the customer or public body, and by applicable law and regulations;

if the travel is necessary for the proper undertaking of the duties of the customer representative or public official;

a relevant member of the management team shall approve the payment;

AGR ensures where possible that the public official's supervisor or employer or anti-bribery compliance function is notified of the travel and hospitality to be provided;

Payments shall be restricted to the necessary travel, accommodation and meal expenses directly associated with a reasonable travel itinerary;

associated entertainment shall be limited to AGR's gifts and hospitality policy;

paying the expenses of family members or friends is prohibited;

paying of holiday or recreational expenses is prohibited.

**3- Conflict of Interest**

Conflict of interest may occur when delegating to personnel the responsibility or authority for the making of decisions in relation to which there is a risk of bribery. The decision process and the level of authority of the decision-maker(s) shall be free of actual or potential conflicts of interest.

Delegation of decision-making will not exempt top management of their duties and responsibilities, nor it will transfer to the delegated personnel potential legal responsibilities.


### AFRICAN GOLD REFINERY LIMITED

All personnel shall report any actual or potential conflict of interest such as family, financial or other connection directly or indirectly related to their or their colleagues' line of work. Situations where personnel may facilitate or fail to prevent or report bribery include and are not limited to:

- ► Sales personnel is/are related to a customer's procurement manager.
- ► A line manager has a personal financial interest in a competitor's business.
- ► Accounting and/or compliance personnel have family or strong personal relations with suppliers, customers or external auditors.

Employment and performance review procedures shall take in consideration potential or actual conflict of interest.

All records of any circumstances of actual or potential conflict of interest shall be maintained.

## 4- Bribery of the AGR's personnel (inbound bribery)

The measures necessary to prevent, detect and address the risk of personnel bribing others on behalf of the AGR ("outbound bribery") may be different from the measures used to prevent, detect and address the risk of bribery of the AGR's personnel ("inbound bribery"). For example, the ability to identify and mitigate inbound bribery risk may be significantly restricted by the availability of information that is not under the control of the AGR (e.g. employee personal bank account and credit card transaction data), applicable law (e.g. privacy law), or other factors. As a result, the number and types of controls available to AGR to mitigate the risk of outbound bribery will outweigh the number of controls it can implement to mitigate the risk of inbound bribery.



AFRICAN GOLD REFINERY LIMITED

Bribery of AGR's personnel is most likely to occur in relation to personnel who are able to make or influence decisions on behalf of AGR (e.g. a procurement manager who can award contracts, a supervisor who can approve work done, a manager who can appoint personnel or approve salaries or bonuses, a compliance personnel who verifies the source of gold, a clerk who prepares documents for granting of licenses, permits etc.).

As the bribe is likely to be accepted by personnel outside of the scope of AGR's systems of controls, the ability of AGR to prevent or detect these bribes can be limited.

To mitigate the risk of inbound bribery, the following controls shall be implemented:

a. Clearly communicate to all personnel, and anyone working on behalf of AGR, that AGR's policy strictly prohibits solicitation and acceptance of bribes.

b. Any bribery concerns shall be reported to the compliance function and/or the appropriate member(s) of the management team. Such reporting shall not result in retaliation under any circumstances.

c. AGR's gifts and hospitality policy/ controls stated above apply to AGR's personnel, and anyone working on behalf of AGR.

d. AGR's anti-bribery policy shall be publicly available and communicated to AGR's business associates; as a minimum, the policy shall be posted on the company's website to help to set expectations with business associates, so as to decrease the likelihood that business associates will offer, or AGR's personnel will solicit or accept, a bribe.

e. Only approved suppliers shall be used. Competitive bidding shall be applied and at least two signatures shall be obtained for contract awards, work approvals etc.



AFRICAN GOLD REFINERY LIMITED

### V.    Reporting, Monitoring, and Evaluation

#### Raising concerns, reporting and whistleblowing

AGR considers raising concerns, reporting or whistleblowing by personnel about attempted, suspected and actual or potential bribery to be its first line of defense against bribery risks. All personnel and anyone working on behalf of AGR shall report, either directly or through an appropriate third party, to the management any suspected and actual or potential bribery.

Except to the extent required to progress an investigation or by law, reports shall be treated confidentially so as to protect the identity of the reporter and of others involved or referenced in the report.

AGR strictly prohibits retaliation, and protects personnel from retaliation, after personnel have

in good faith or on the basis of a reasonable belief raised or reported a concern about attempted, actual, potential or suspected bribery or breaches of the anti-bribery policy or controls.

#### Investigating and dealing with bribery

Any reported, detected or reasonably suspected bribery, or breach of the anti-bribery policy or controls shall be assessed and, where appropriate, investigated.

An appropriate action shall be taken in the event that the investigation reveals bribery, or breach of the anti-bribery policy or controls.

AGR empowers and enables investigators and require co-operation in the investigation by relevant personnel. AGR requires that the status and results of the investigation are reported to the compliance function and top management, as appropriate.



AFRICAN GOLD REFINERY LIMITED

The investigations should be carried out by, and reported to, personnel who are not part of the role or function being investigated. AGR may appoint another organization to conduct the investigation and report the results to personnel who are not part of the role or function being investigated.

How to investigate and deal with a particular issue will depend on the circumstances. Every situation is different, and AGR's response should be reasonable and proportionate to the circumstances. A report of a major issue of suspected bribery would require a far more urgent, significant and detailed action than a minor breach of anti-bribery controls.

The compliance function should preferably be the recipient of any reports of suspected or actual bribery or breach of anti-bribery controls. If the reports go in the first instance to another person, then these reports should be passed on to the compliance function as soon as possible unless the compliance function is implicated in the

bribery to be investigated, in such event, the matter shall be reported directly to the top management.

Minor issues are dealt with by the compliance function, with a periodic summary report of all minor issues being made to top management.

Major issues are reported straight away by the compliance function to top Major issues are reported straight away by the compliance function to top management for top management decision on how to respond.

Upon identification of any issue, top management or the compliance function (as appropriate) should then assess the known facts and potential severity of the issue. If they do not already have sufficient facts on which to make a decision, they should commence an investigation.



AFRICAN GOLD REFINERY LIMITED

The investigation should be carried out by a person who was not involved in the issue. It could be the compliance function, internal auditor, another appropriate manager or an appropriate third party. The person investigating should be given appropriate authority, resources and access by top management to enable the investigation to be effectively carried out. The person investigating should preferably have had training or prior experience in conducting an investigation. The investigation should promptly establish the facts and collect all necessary evidence, for example:

► making enquiries to establish the facts;
► collecting together all relevant documents and other evidence;
► obtaining witness evidence;
► where possible and reasonable, requesting reports on the issue to be made in writing and signed by the individuals making them.

In undertaking the investigation and any follow up action, the relevant factors should be considered including:

► applicable laws (legal advice may need to be taken);
► the safety of personnel;
► the risk of defamation when making statements;
► the protection of people making reports and of others involved or referenced in the report;
► potential criminal and civil liability, financial loss and reputational damage for AGR and individuals;
► any legal obligation, or benefit to AGR, to report to the authorities;
► keeping the issue and investigation confidential until the facts have been established;
► the need for top management to require the full co-operation of personnel in the investigation.



**AFRICAN GOLD REFINERY LIMITED**

The results of the investigation should be reported to top management or the compliance function as appropriate.

Once the investigation has completed, and/or sufficient information to make a decision were obtained, then appropriate follow up actions shall be implemented. Depending on the circumstances and the severity of the issue, these could include one or more of:

- ► terminating, withdrawing from, or modifying the AGR's involvement in, a project, transaction or contract;

- ► repaying or reclaiming any improper benefit obtained;

- ► disciplining responsible personnel (which, depending on the severity of the issue, could range from a warning for a minor offence to dismissal for a serious offence);

- ► reporting the matter to the authorities;

- ► if bribery has occurred, taking action to avoid or deal with any possible

consequent legal offences (e.g. false accounting which may occur where a bribe is falsely described in the accounts, a tax offence where a bribe is wrongly deducted from income, or money-laundering where the proceeds of a crime are dealt with).

Anti-bribery procedures/controls should be reviewed to examine whether the issue arose because of some inadequacy in the procedures and, if so, immediate and appropriate steps should be taken to improve the procedures/controls.

**AGR** AFRICAN GOLD REFINERY LIMITED

### Internal audit

Internal audits shall be conducted at least once annually to verify compliance with AGR's anti-bribery policies and controls. These audits shall be reasonable, proportionate, and risk based.

Internal audits shall be independent and impartial. Personnel conducting the internal audits shall not audit their own work. Internal auditors shall be trained and knowledgeable about conducting internal audits.

Internal audits shall be documented and records shall be maintained.

### Top management review

Top management shall review AGR's anti-bribery policies and controls, at least annually, to ensure its continuing suitability, adequacy and effectiveness.

The top management review shall include consideration of:

- ► the status of actions from previous management reviews;
- ► changes in external and internal factors that are relevant to the anti-bribery policies and controls;
- ► information on the performance of the anti-bribery system, including trends in:
  a. nonconformities and corrective actions;
  b. audit results;
  c. reports of bribery;
  d. investigations;

The outputs of the top management review shall include decisions related to continual improvement opportunities and any need for changes to the anti-bribery policies and controls.

A summary of the results of the top management review shall be documented and records shall be maintained.

**AFRICAN GOLD REFINERY LIMITED**

### VI.  Documented information

All information related to the implementation and reviews of AGR's anti-bribery policies and controls shall be documented and maintained. The documented information include and are not limited to:

- ► Payments and expenses
- ► Approvals and exceptions and rational for exceptions
- ► Reports of suspected and actual briberies
- ► Records of investigations
- ► Internal audits
- ► Corrective actions
- ► Reviews including management reviews
- ► Reports of potential or actual conflict of interest
- ► Competencies and training.

# Annex
# K

**AGR**    AFRICAN GOLD REFINERY LIMITED

## Policy Receipt Acknowledgement for AGR's Anti-Bribery Policy & Compliance Handbook

I hereby acknowledge that I have received a copy of the AGR Compliance Handbook and agree to abide by the policy guidelines as a condition of my employment and my continuing employment at Your Company.

I understand that if I have questions, at any time, regarding this Policy, I will consult with my immediate supervisor or the compliance department.

I hereby acknowledge that I have received the AGR Compliance Handbook and I undertake to review it thoroughly and to comply with the AGR policy and controls.

Employee Signature: _____

Employee Printed Name: _____

Date: _____

AFRICAN GOLD REFINERY LIMITED

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

*Highly Responsible Sourcing of Gold*

# Annex
# L

Tel: Director: + 256-0414-332504

General    +256-414-332500
          + 256-414-332501

Toll Free:    0800112300

THE REPUBLIC OF UGANDA

Office of the Director of Public Prosecut
Workers House, 12th & 11th Floors
Plot 1, Pilkington Road,
P.O. Box 1550,
Kampala (Uganda)
admin@dpp.go.ug
www.dpp.go.ug

Our Ref:HQS-CO-00-2020

Date:  01 February, 2021

Director CID
**KIBULI.**

**RE:    CID HQTRS GEF 202/2018**
       **UGANDA VS:  AFRICA GOLD REFINERY LTD**

Reference is made to the above.

The Office of the Director of Public Prosecutions (ODPP) received a letter from Financial Intelligence Authority (FIA) vide Ref: FIA.DOA.25.10.17 dated 11th October 2017, recommending possible prosecution of African Gold Refinery Limited (AGR) for violation of Anti-Money Laundering Act 2013, specifically, Second Schedule, section 133 (2) which lists dealers in precious metals and gems as accountable persons.

The Act imposes an obligation on accountable persons to register with FIA and thereafter file a number of documents including, but not limited to: registration certificates, operating licences, audits of anti-money laundering systems and policies among others.    Apparently, AGR had failed/refused to comply hence the recommendation for the company's prosecution.

On that basis, the ODPP vide a letter Ref: ADM/104/01 to the AIGP at CID Headquarters, requested for investigations to be carried out into the activities of AGR with the view of establishing the legitimacy of the company's operations as well as its compliance with the Requirements of the Anti-Money laundering Act, 2013 as amended.

Investigations were accordingly conducted and a detailed report was made whose findings were that AGR had consequently registered with FIA as accountable persons on 15th February 2020.

In light of the above, AGR had discharged its obligations to FIA, hence the company has no case to answer.

Let the file be closed and put away.

Elem - Ogwal

**FOR: DIRECTOR OF PUBLIC PROSECUTIONS**