# EXHIBIT A
# PART 2

# Annex M

*Share Purchase and Sale Agreement*

*between*

Mr Alain Goetz

*and*

AGR International Limited

08 February 2018







**THIS SHARE PURCHASE AND SALE AGREEMENT** (this "*Agreement*") is entered into on 08th of February 2018 in Entebbe, Uganda

*between*

(1) **AGR INTERNATIONAL LTD**, a company duly incorporated under the International Business Companies Act 0f 2016 with registered office address at Global Gateway 8, Rue de la Perle, Providence, Mahe, Seychelles, represented herein by its sole shareholder and director, Mr. Majd Mohammed Abdulaziz Mousa (the "**Buyer**"),

(2) **Mr. Alain Goetz**, Belgium national, having its residential address at Frond N, villa 39, Palm Jumeirah, PO Box 64701, Dubai (the "**Seller**"),

and

(3) **AFRICAN GOLD REFINERY LIMITED**, a company organized under the laws of the Republic of Uganda, having its corporate address at Sebugwawo Road, Entebbe Kampala, Uganda (the "**Company**")

(individually a "*Party*" and together the "*Parties*").

### *RECITALS*

*Whereas,*

a) The Company is a private limited company incorporated in the Republic of Uganda with an authorised share capital of Five Million Ugandan Shillings (UGX 5,000,000) divided into 100 ordinary shares with a par value of Fifty Thousand Ugandan Shillings (UGX 50,000), of which 100 ordinary shares of have been fully paid-up or credited as fully paid-up.

b) The Seller owns 99% of the issued and outstanding share capital (being **99** shares) in the Company.

c) The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the Seller, an aggregate of **99** shares (the "**Shares**") of stock of the Seller in the Company, upon the terms and conditions set forth in this Agreement.

Now, Therefore, in consideration of the mutual covenants and undertakings contained herein, the receipt and sufficiency of which the Parties to this Agreement hereby acknowledge and subject to the terms and conditions herein set forth, and with the intent to be legally bound by the terms hereof, the Parties hereto agree as follows:

1. **DEFINITIONS AND INTERPRETATION**

1.1 Unless otherwise indicated, the following terms in this Agreement shall have the meanings set forth below:

| | |
|---|---|
| "**Accounting Policies**" | means the accounting practices carried out, in all material aspects, in accordance with IFRS (or other internationally accepted accounting principles), as applicable in the Republic of Uganda. |
| "**Agreement**" | means this agreement, as varied, amended or supplemented from time to time by the parties; |
| "**Business Day**" | means a day excluding Saturdays, Sundays and public holidays (including announced ungazetted public holidays), on which banking and financial institutions are open for business in the Republic of Uganda for transaction of business of the nature required or contemplated by this Agreement |
| "**Buyer**" | shall have the meaning set forth in the Recitals to this Agreement |



| | |
|---|---|
| "Claim" | means any claim arising under or in connection with this Agreement (or any related document). |
| "Closing" | shall have the meaning set forth in Section 4.1. |
| "Closing Date" | shall have the meaning set forth in Section 4.1. |
| "Company" | means **AFRICAN GOLD REFINERY LIMITED**, a private limited company incorporated in the Republic of Uganda and having its registered office at Sebugwawo Road, Entebbe Kampala Uganda; |
| "Encumbrance" | means any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement. |
| "Governmental Authority" | means any government or political subdivision, whether federal, state, local or foreign, or any agency, commission, instrumentality or other authority of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator. |
| "MOA" | means the Memorandum & Articles of Association of the Company that has been lodged with the Register of Companies in the Republic of Uganda; |
| "Parties" or "Party" | means the parties or any party to this Agreement, their heirs, estates, personal representatives, successors in title and permitted assigns; |
| "Seller" | shall have the meaning set forth in the Recitals to this Agreement. |
| "Shares" | shall have the meaning set forth in the Recitals to this Agreement. |
| "Share Purchase Price" | shall have the meaning set forth in Section 3.1. |
| "Transfer Terms" | means that all the Option Shares shall be transferred free from any encumbrances or any restriction in dealings together with all title, rights, benefits and interests attaching thereto as at the Exercise Date. |
| "UGX" | means the currency of the Republic of Uganda, the Uganda Shillings |
| "USD" | means the United States Dollar |

1.2   Words and expressions denoting the singular include the plural and vice versa.

1.3   Words and expressions denoting the whole include any part.

1.4   Words and expressions denoting any gender include all genders.

1.5   Words and expressions applicable to a natural person include any person.

1.6   A person includes its estate, heirs, personal representatives, successors in title and any other person for the time being deriving title under it.

1.7   A day, month or year means a day, month or year, as the case may be, reckoned according to the Gregorian calendar.

1.8   A statute or statutory provision includes a reference to:-

   a)   (a) that statute or statutory provision; and

   b)   (b) all statutory instruments or orders made pursuant to it;

   as from time to time amended, extended, re-enacted or consolidated.

1.9   Any word or expression used in this Agreement which is defined in the Act shall have the meaning ascribed to them in the said Act.

1.10  A document includes the same as from time to time varied in any manner or to whatsoever or howsoever, and any document from time to time issued or executed supplemental, in addition or in substitution to it.



1.11 Headings and sub-headings are inserted for convenience only and have no legal effect.

1.12 Unless prohibited by law, no rule of construction applies to the disadvantage of the Party responsible for the preparation of this Agreement.

## 2.    PURCHASE AND SALE

2.1 Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller hereby sells, assigns, transfers, conveys and delivers to the Buyer, and the Buyer hereby purchases, acquires and accepts from the Seller, free and clear of Encumbrances all of the Seller's right, title and interest in, at the time of Closing, the Shares.

2.2 The Seller hereby irrevocably waives any restrictions on transfer to the extent possible (including any of its rights of pre-emption) which may exist in relation to the Shares, whether existing under the articles of association (or local equivalent) of the Company or otherwise.

## 3.    PURCHASE PRICE

3.1 The purchase price of the Shares is USD 2,200,000.00 (Two Million Two Hundred Thousand United States Dollar).

## 4.    CLOSING

4.1 Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "**Closing**") held at the Company's office address on the date hereof (the "**Closing Date**"). Except to the extent expressly set forth in this Agreement to the contrary, and notwithstanding the actual occurrence of the Closing at any particular time on the Closing Date, the Closing shall be deemed to occur and be effective as of 12:01 PM on the Closing Date.

4.2 Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall deliver to the Buyer:

    c)  copies of the resolutions (or local equivalent) of the board of directors (or local equivalent) and, where required, the stockholder(s) of the Seller, authorizing and approving the transactions contemplated by this Agreement, certified by the respective corporate secretary (or local equivalent) or a director to be true and complete and in full force and effect and unmodified as of the Closing;

    d)  the share certificates relating to the Shares;

    e)  the share register of the Company;

    f)  a duly completed stock transfer form transferring the Shares to the Seller.

4.3 Each document of transfer or assumption referred to in this Section 4.2 (or in any related definition set forth in Article 1) that is not attached as an Exhibit or a Schedule to this Agreement shall be in customary form (including with respect to the jurisdiction to which it pertains) and shall be reasonably satisfactory in form and substance to the parties thereto, but shall not contain any representations, warranties, covenants or agreements other than those specifically contemplated in or referred to in this Agreement.

4.4 Upon the terms and subject to the conditions of this Agreement, at the Closing, the Parties shall sign the transfer of the Shares in the share register of the Company.

## 5    NOTICES

5.1 All notices and communications among the Parties shall be made in writing and in the English language by e-mail, delivery in person (including courier service) or registered airmail letter to the appropriate correspondence addresses set forth below:

**The Buyer:**

AGR INTERNATIONAL LTD
Global Gateway 8, Rue de la Perle,
Providence, Mahe, Seychelles
Attention to: Majd Mohammed Abdulaziz Mousa




**The Seller:**

Alain Goetz
PO Box 64701
Palm Jumeirah, Frond N, Villa 039
Dubai, United Arab Emirates

with a copy to:

**TEM ADVOCATES & SOLICITORS**
P.O. Box 6800, Kampala Uganda
Plot 11-A Acacia Avenue Kololo

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph; provided however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

5.2    Any such notice shall be deemed to be served and received,

(a) if left at any such address, at the same time when it is so left;

(b) if sent by post, forty-eight (48) hours after posting within the same country or seven (7) days after posting internationally;

(c) if sent by facsimile transmission, at the time of despatch of the facsimile transmission to the correct facsimile number;

(d) if sent by email, at the time of delivery of the email; and

(e) if sent by courier, on the second day following the day of placing it with the relevant courier services, as the case may be.

## 6    COUNTERPARTS. EFFECTIVENESS

6.1    This Agreement may be executed in two or more consecutive counterparts (including by facsimile and/or e-mail attached PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy or otherwise) to the other Parties.

## 7.    GOVERNING LAW

7.1    The execution, validity, interpretation and implementation of this Agreement and the settlement of disputes thereunder shall be governed by the laws of the Republic of Uganda. Any and all disputes arising out of or in connection with this Agreement shall be finally settled by the Courts in the Republic of Uganda.

## 8    ASSIGNMENT

8.1    No Party to this Agreement may assign any of its rights and obligations under this Agreement without the prior written consent of the other party hereto; provided, however, either party may assign its rights and obligations to one or more of its respective Wholly-Owned Subsidiaries (it being understood that such assignment shall not be permitted if it would delay or impair the consummation of the transactions contemplated hereby); provided, further, that, no such assignment shall relieve the assigning party of any of its obligations hereunder.

**9     PARTIES IN INTEREST**

9.1  This Agreement and all the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder.

**10     ENTIRE AGREEMENT**

10.1  This Agreement (including the Schedules and Exhibits attached hereto or delivered in connection herewith) constitutes the entire agreement among the Parties hereto with respect to the matters covered by this Agreement and thereby, and supersede all previous written, oral or implied understandings among them with respect to such matters.

**11     FURTHER ASSURANCE**

11.1  After Closing, each of the Parties shall do, execute and deliver or procure to be done, executed and delivered, at the reasonable request and expense of the other Party, all such further acts, deeds, documents, instruments of conveyance, assignment and transfer and things as may be necessary to give effect to the terms of this Agreement.

**12     AMENDMENT AND MODIFICATION**

12.1  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

**13     WAIVER**

13.1  Any of the terms or conditions of this Agreement may be waived at any time by the party or parties hereto entitled to the benefit thereof, but only by a writing signed by the Party or Parties waiving such terms or conditions.

**14     SEVERABILITY**

14.1  If any term, provisions, covenant or restriction of this Agreement is held by a court of competent jurisdiction (i.e. including an arbitral tribunal) or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions completed by this Agreement is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

**15     INTERPRETATION**

15.1  Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:  (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the word "including" means "including without limitation".

15.2  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.





## 16     REPRESENTATIONS AND WARRANTIES

16.1 All representations and warranties from the Seller to the Buyer in connection with the transfer of the Shares are set forth in Schedule 1.

16.2 All representations and warranties from the Buyer to the Seller in connection with the transfer of the Shares are set forth in Schedule 2.

16.3 Each Party irrevocably and unconditionally waives any right it may have to claim  damages  for  any misrepresentation, or breach of any warranty, not contained in this Agreement or any such collateral or supplemental agreement unless such misrepresentation or warranty was made fraudulently.

16.4 Each Party irrevocably and unconditionally waives any right it may have to rescind this Agreement.

16.5 The Buyer confirms that, as at the time of entering into this Agreement, it has no knowledge (whether actual, constructive or imputed) of any fact, matter or circumstance which might lead to any Claim against the Seller and irrevocably and unconditionally waives any right to any Claim where it has any such knowledge on or before the Closing Date.


## 17     GOVERNING LANGUAGE

17.1 The English language shall be the definitive and controlling text of this Agreement, notwithstanding the translation of this Agreement into any other language.


IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.







Page **6** of **10**

<table>
<tr><td align="center"><strong>SCHEDULE 1</strong><br><strong>SELLER'S REPRESENTATIONS AND WARRANTIES</strong></td></tr>
</table>

**1.   RELATIONSHIP BETWEEN SCHEDULE 1 AND OTHER PROVISIONS OF THE AGREEMENT**

1.1  In case of any conflict between on the one hand any of the following provisions and on the other hand the previous provisions of this Agreement, the previous provisions shall prevail.

1.2  The following provisions are an integral part of the Agreement. All capitalized terms are defined in the Agreement.

**2.   GENERAL REPRESENTATIONS AND WARRANTIES of the SELLER**

The Seller hereby represents and warrants to the Buyer that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

2.1  Capacity of the Seller, and the Company.

The Seller and the Company has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

True, correct and complete copies of all organizing documents of the Seller have been provided to the Buyer.

The Seller declares that the Company has the right and full power to enter into and perform this Agreement and that, to the Seller's knowledge, each of them does not thereby violate any applicable law or any court or arbitration decision rendered by any court (of the jurisdiction of its incorporation or otherwise) to which it may be subject or any agreement to which it is a party.

2.2  Authorization by the Company – Enforceability.

The Company has taken all actions necessary for the execution, delivery and performance of this Agreement by each of them and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company. Assuming the due authorization, execution and delivery by the Buyer, this Agreement constitutes a valid and binding obligation of the Company enforceable against each of them in accordance with its terms.

2.3  Absence of certain conflicts.

To the Seller's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of the Company; (b) require the payment or the incurring of any obligation on the part of the Company or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which a Company is a party or the Shares may be bound, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Seller or the Shares or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to a Company, the Shares or any of its operations or property.

2.4  Title to Shares.

The Appendix to this Agreement sets forth the whole of the Seller's shares or interest in the Company (being the Shares) or in any subsidiary of the Company (and to the extent the Seller shall have any additional interest or shares in the Company, the same shall be included as Shares and transferred to the Buyer at Closing for no additional cost to the Buyer). The Shares have been duly authorized and validly issued and are fully paid and non-assessable. None of the Shares were issued in violation of any applicable Law. The Seller has and shall convey to the Buyer, good and marketable title to the Shares. The Shares are and shall be and remain to the Buyer free and clear of all Encumbrances, charges, demands or adverse claims or other restrictions on the exercise of any of the attributes of ownership. The Seller has full voting power over the Shares, subject to no proxy, shareholders' agreement, voting trust or other agreement relating to the voting of any of the Shares other than the articles of association of the Company. As of the Closing Date no person will have any

Page **7** of 10

preemptive right to purchase the Shares other than as set forth in this Agreement and/or the articles of association of the Company.

2.5   Litigation.

There are no legal proceedings now in progress, pending or, to the Seller's knowledge, threatened against the Seller which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer. The Seller is not subject to any order, writ, injunction or decree of any court or any Governmental Authority which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer.

The Company is not involved in any pending or, to the Seller's knowledge, threatened legal disputes, administrative proceedings or administrative inquiries nor are there any circumstances known to the Seller which might reasonably be expected to provide a basis for such litigation, or which might have a substantial negative impact on the Company's financial situation, unless disclosed.

2.6   Proper and valid organization.

The Company is a corporation that is duly organized and validly existing under the applicable laws of the Republic of Uganda and was properly constituted. It has its actual centre of administration at its registered office and it has no branches or representative offices, whether in Uganda or abroad; and it has all requisite corporate power and authority under applicable laws to carry on the business presently conducted by it.

The Company has at all times acted, in all material respects, in accordance with its respective articles of association and the laws and regulations of the Republic of Uganda.

2.7   Books and records.

The Company's books and records are up to date. All board meetings and shareholders meetings have been held in compliance with the applicable law and the respective minutes of the board meetings and shareholder meetings are kept and available at the Company's registered office.

2.9   No insolvency proceedings.

No insolvency or similar proceedings have been commenced or, to the Seller's knowledge, applied for in respect of the Company. The Company is not unable to pay its due debts.

2.10   Further assurances.

From time to time on or after the Closing Date, the Seller and the Buyer will execute and deliver to each other all such further assignments, endorsements and other documents as are reasonably requested in order to complete the transfer of the Shares to the Buyer, to enable the Buyer to exercise full rights as the sole owner of the Shares and to otherwise carry out the transactions contemplated by this Agreement.

2.13   Ownership rights.

Without limitation, to the extent the Seller shall have ownership interests or rights in the Company other than the Shares, such additional interests shall be conveyed to the Buyer at Closing without additional consideration due from the Buyer.







Page **8** of **10**

<table>
<tr><td>

**SCHEDULE 2**
**BUYER'S REPRESENTATIONS AND WARRANTIES**
</td></tr>
</table>

The Buyer hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

1. Buyer capacity

   a) The Buyer has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

   b) The Buyer declares that it has the right and full power to enter into and perform this Agreement and that, to the Buyer's knowledge, it does not thereby violate any laws of the Republic of Uganda (or regulation or ruling therefore) or foreign court to which it may be subject or any agreement to which it is a party.

2. Authorization by the Buyer – Enforceability.

   a) The Buyer has taken all actions necessary for the execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer. Assuming the due authorization, execution and delivery by the Seller, this Agreement constitutes a valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.

3. Absence of certain conflicts.

   a) To the Buyer's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of the Buyer; (b) require the payment or the incurring of any obligation on the part of the Buyer or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which the Buyer is a party, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Buyer or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to the Buyer or any of its operations or property.







Page **9** of **10**

**EXECUTION PAGE**

_____

Name: Alain Goetz

Title:

Authorised for and on behalf of Seller

_____

AGR INTERNATIONAL LTD

Name: Majd Mohammed Abdulaziz Mousa

Title: Director

Authorised for and on behalf of Buyer



# Annex N

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (the "Agreement") is made and entered into by and between:

**AFRICAN GOLD REFINERY LTD.**, a limited liability company incorporated under the laws of the Republic of Uganda with principal office address at Sebugwawo Road, Entebbe, P.O. Box 37574 Kampala, Uganda (hereinafter referred to as the "Company");

and

**ALAIN GOETZ**, national of Belgium, residing at Palm Jumeirah, Dubai, United Arab Emirates (hereinafter referred to as the "Consultant").

The Company and the Consultant are hereinafter individually referred to as a "Party" and collectively referred to as the "Parties".

WHEREAS

A.      The Company is a well reputed gold and metal processing company, who is familiar and experiences in gold and metal processing (hereinafter referred to as the "Relevant Business");

B.      The Consultant has experience in doing business in the African Region, in particular in the Republic of Uganda (hereinafter referred to as the "Territory"). The Consultant represents to have knowledge of the local circumstances and market conditions and to have good and interesting contacts within the different institutions regarding the Relevant Business in the Territory;

C.      The Company is desirous of appointing the Consultant as its Promoter for the purposes of promoting and developing the Relevant Business in the Territory and to assist the Company in safeguarding and furthering its business interests with regard to compliance standards of the Relevant Business in the Territory;

D.      The Consultant is desirous of acting as the Promoter of the Company for the purposes of promoting and developing the Relevant Business in the Territory and to assist the Company in safeguarding and furthering its interests with regard to compliance standards of the Relevant Business in the Territory.

NOW, IT IS HEREBY AGREED AS FOLLOWS:

## 1. RECITALS

The above Recitals shall be deemed an integral part of this Agreement.

## 2. APPOINTMENT AND DURATION

2.1.    Subject to and upon the terms and conditions of this Agreement, the Company hereby appoints the Consultant as its Promoter to assist the

PRIVATE AND CONFIDENTIAL

Company in safeguarding and furthering its interests with regard to compliance standards of the Relevant Business in the Territory.

2.2.     The Agreement shall commence on **10th of November 2018** (hereinafter referred to as the "Commencement Date") and subject to Clause 8, shall be effective and in force for an initial period of five (5) years (hereinafter referred to as the "Initial Period").

## 3. OBJECT OF THE AGREEMENT AND PROMOTER'S DUTIES

Pursuant to its obligation to provide assistance to the Company under Clause 2 and always subject to Clause 4, the Consultant shall:

3.1.     Develop, manage, coordinate, network, implement and monitor a public relations and communications strategy and associated products and activities with various audiences, with objective of promoting awareness and understanding of AGR and its activities including regulatory compliance.

3.2.     Inform the Company on the gold market situation and evolutions in the Territory as well as on new legislation and regulations bearing significant influence to tendering and/or execution of operations in the Territory.

3.3.     Inform in timely manner the Company of all and any relevant issues, data and information relating to the Relevant Business enabling the Company to evaluate the same.

3.4.     Provide the Company with such advice, information and guidance as the Company may require in relation to tendering for and the processing and award of contracts for Relevant Business in the Territory (hereinafter referred to as a "Contract").

3.5.     Introduce any natural person and/or companies to the Company as may be of assistance in award of a Contract.

3.6.     Assist and advice the Company generally, when required, on all aspects of its negotiations for the award of a Contract.

3.7.     After the award of such Contract as aforesaid, assist the Company as it may reasonably require to ensure the smooth operation thereof.

3.8.     At all times, use its best endeavours generally to promote the business of the Company and foster relationships and connections which may benefit the Company in its business and affairs in the Territory.

3.9.     Suggest to or upon request of the Company, prepare and assist visits for quality contacts in relation to the Relevant Business.

3.10.    Assist and advice the Company in relation to obtaining or renewing any required registration in the Territory and regulatory compliance of the Company as per international standards.

PRIVATE AND CONFIDENTIAL

3.11.   Assist and advice the Company in relation to its dealings with government of any tier, ministries, departments, municipalities and other offices and agencies thereof or allied thereto in the Territory.

3.12.   Advice the Company generally as required in connection with local maters in relation to the Relevant Business in the Territory.

## 4.  RESTRICTIONS AND LIMITATIONS ON THE PROMOTER'S DUTIES

4.1.   It is the intention that the Relevant Business accepted by the Company in the Territory shall be contractually awarded to the Company as principal unless the Company in any particular case in its absolute discretion decides otherwise and the Consultant in the performance of its duties hereunder shall have due regard therefore and shall raise no objection thereto.

4.2.   The Consultant is not entitled to oblige the Company to bid for tenders or to accept an order, a letter of intent, a letter of award or alike from a client introduced to it by the Consultant.

4.3.   The Consultant shall not, without the express prior written authority of the Company, have any power or authority under the Agreement (and shall not hold himself out as having power or authority):

4.3.1.   To sign the Contract or accept orders, a letter of intent, a letter of award, or alike, to settle Company's entitlement to debts, or to accept money on behalf of the Company;

4.3.2.   To give any guarantees or warranties to clients or potential clients;

4.3.3.   To commit the Company to any binding obligations;

4.3.4.   To commit the Company otherwise in any way.

## 5.  REMUNERATION AND REIMBURSEMENT OF INCIDENTAL EXPENSES

5.1.   As remuneration for the provision of the services by the Consultant, the Company shall pay to the Consultant a fee calculated as provided in the Schedule hereto. Such fee shall be deemed to cover all of the Consultant's operating expenses relative to the provision of its services under the Agreement and the Consultant shall, as a rule, not be entitled to any further or other remuneration or compensation whatsoever, be it reimbursement of expenses, fees, costs or otherwise in respect of its performance under the Agreement, except if and to the extent mutually agreed upon, beforehand and in writing between both Parties.

## 6.  EXCLUSIVITY

6.1.   The relationship contemplated by the Agreement regarding the Relevant Business has an exclusive character and the Consultant undertakes not to establish a similar association with any other person or Company in the

PRIVATE AND CONFIDENTIAL

Territory in respect of the Relevant Business while the Agreement continue in full force and effect.

6.2. The Consultant shall not, directly or indirectly, in part or in whole, alone or together with any third party, prepare or submit or take par in the preparation or submission of a tender proposal or any other offer in relation to the Contract other than in accordance with the stipulations of the Agreement.

6.3. The Consultant shall not act, either individually or as a prospective, former or actual member of the Company to participate or take any action which could conflict, or materially hinder the performance of its responsibilities under the Agreement.

6.4. The Consultant represents and warrants that by entering into this Agreement it shall not be in breach of or default under any agreement to which it is a party, or which is binding on it.

6.5. Nothing herein shall affect or restrict, however, the Company's freedom of action in respect of any business undertaken or sought by the Company outside the Territory, or any other business other than the Relevant Business undertake or sought by the Company inside the Territory.

## 7. CONFIDENTIALITY

7.1. All information acquired by a Party from the other Party, including prices and commercial or technical information, shall be treated as confidential by the recipient and shall not be used other than for the purpose contemplated by the Agreement without the prior consent in writing of such other Party unless such information:

7.1.1. Is or later becomes public knowledge other than by a breach of the foregoing paragraph, or;

7.1.2. Is in the possession of the recipient with the right to disclose prior to receiving it from the other Party;

7.1.3. Is independently received by the recipient from a third party having the right to disclose.

7.2. These confidentiality obligations shall survive the expiry or termination of the Agreement.

## 8. TERMINATION

8.1. Notwithstanding anything to the contrary expressed or implied elsewhere herein, the Agreement may be terminated forthwith (without prejudice to the accrued rights and/or remedies of the Parties):

8.1.1. By either Party in the event of a material breach by the other of the terms and conditions of the Agreement provided that, if such breach

PRIVATE AND CONFIDENTIAL

is capable or remedy, then the same shall take effect until the Party not in breach shall have given 14 days' notice to the other requiring the breach to be remedied and that the other shall not have remedied the same within that period;

8.1.2.   By either Party by giving notice in writing to the other in the event that the other becomes insolvent, bankrupt or goes into liquidation for the purpose of amalgamation or reconstruction), or enters into an arrangement or composition with its creditors;

8.1.3.   By the Company in the event that the Consultant ceases to be empowered or able to perform its services under the Agreement in the Territory.

8.2.   This Agreement may also be terminated upon mutual written agreement of the Parties.

## 9.  EXTENT OF COMPANY'S LIABILITY

9.1.   The obligations of the Company under this Agreement shall be limited to the payment of fees in respect of relevant Contracts as provided in Clause 5 and the Schedule hereto.

9.2.   The Consultant shall have no right to claim a commission, as described in Clause 5, or any other compensation whatsoever in the event:

9.2.1.   The Company decided not to bid or to accept such introduced to it by the Consultant which the Company may decline for any reason, or

9.2.2.   For any reason whatsoever a Contract is not awarded to the Company or not paid to the Company.

9.3.   Nor shall any compensation be payable by virtue of the termination of this Agreement in accordance with Clause 8 hereof.

## 10. ASSIGNMENT

10.1.   Neither of the Parties shall without the written consent of the other Party assign, charge, subcontract or otherwise encumber the Agreement or any of its rights or obligations as hereunder.

10.2.   The Company shall have the right to assign this Agreement in whole or in part to any of its holding, associated, affiliated or subsidiary companies.

## 11. NOTICES

11.1.   Any communication by either Party shall be in writing and shall be deemed to have been sufficiently made:

11.1.1.   On the next business day after the same shall have been delivered by hand to the respective Party at the address hereinafter specified; or

                         P R I V A T E   A N D   C O N F I D E N T I A L

11.1.2.   Five business days after being posted by registered airmail post to the address hereto specified; or

11.1.3.   On the next business day after the same shall have been transmitted by mail or email to the respective Party at the address herein specified.

11.2.   For the purposes of this clause, a "business day" shall be a day on which banks are open for business in the country which the relevant communication is addressed.

## 12. MISCELLANEOUS

12.1.   The headings used in this Agreement are for convenience only and shall not be used to interpret the meaning or construction of the Agreement or any party thereof.

12.2.   All references to times or dates herein shall be construed with reference to the Gregorian calendar.

12.3.   This Agreement supersedes any previous agreements, arrangements or understandings between the Parties relating to the Relevant Business in the Territory.

12.4.   The relationship established hereby shall extend only to the Territory and shall be applicable only to the Relevant Business.

12.5.   Nothing herein shall be construed as creating a partnership between the Parties or as establishing an agency relationship and the Consultant specifically undertakes not to make representations to the contrary. For the avoidance of doubt, nothing herein shall be deemed to constitute a contract of employment.

12.6.   Nothing contemplated in this Agreement shall be construed as in any way limiting or restricting the freedom of action of any holding subsidiary, associated or affiliated company of the Company to establish separately in the Territory.

12.7.   The Parties shall at all times comply with the laws, decrees and regulations of the Territory.

12.8.   The Parties shall, in relation to this Agreement, act towards each other in the utmost good faith.

12.9.   In the event that the Company considers that the Relevant Business could, to its advantage, be developed by a close or modified association with the Consultant, then at the request of the Company both Parties will meet to attempt to work out a mutually acceptable revised basis for their cooperation and if successful in this regard the arrangements herein contained will thereupon be modified accordingly by formal written agreement signed by the Parties.

   P R I V A T E   A N D   C O N F I D E N T I A L

12.10.  If the Agreement is to be translated into any other language, the English language version of the Agreement shall always prevail.

## 13. GOVERNING LAW AND DISPUTE RESOLUTION

13.1.  This Agreement shall be governed and interpreted in accordance with the English laws.

13.2.  Parties shall use their best efforts to settle amicably any dispute arising out of or in connection with the interpretation, breach or enforcement of the Agreement.

13.3.  In the event a Party is of the opinion that an amicable settlement cannot be reached, the despite shall be finally settled under the Rules of the London Court International Arbitration (LCIA) by three (3) arbitrators appointed in accordance with said Rules. The venue of arbitration shall be in DIFC-LCIA. The arbitration shall be conducted in the English language.

The Parties have caused the Agreement to be executed in two (2) parts by their duly authorized representatives this 5th day of November 2018. Each Party recognizes having reached one (1) original.

Agreed and Signed                                   Agreed and Signed
For and on behalf of the Company      For and on behalf of the Consultant


**African Gold Refinery Ltd**                      **Alain Goetz**

PRIVATE AND CONFIDENTIAL

# Annex
# O

# L A U R I U S

ANTWERP – BRUSSELS

**To Whom It May Concern:**

Antwerp, 03 March 2020

Dear Sir, Madam,

Bert Luyten [13]

Dirk Wellens [13]

Michael Bollen [23]

David Ryckaert [23]

Karen Vermaere [1]

Arnaud Vanitterbeek [23]

Bob Roels [13]

Philippe Loix [13]

Eline Verelst [1]

Gerrit Hendrikx [1]

Stephanie Joris [13]

Ayse Özkan [1]

Lancelot Clément de Cléty [2]

Matthias Verschaffel [1]

Rainier Van Ghyseghem [1]

Zeno Vanregemorter [1]

Sandro Christiaens [2]

Claudia Bijnens [2]

Charlotte Wilmssen [13]

Quinten Hermans [1]

Conc.        :        Mr. Alain Goetz - Questions regarding judgement of 30 January 2020
Our  ref.    :        00004694

I act as Belgian local counsel to Industrial Refining Company NV (formerly known as "Tony Goetz NV" – hereinafter "TG") and Mr. Alain Goetz.

During the legal proceedings I represented TG before the court of first instance in Antwerp, which resulted in a judgement of 30 January 2020.

Mr. Alain Goetz requested me to provide a clarification of the standpoint of TG and as well himself regarding this judgment.

The facts underlying the court's decision mainly concern cash payments by TG that took place in 2010 and 2011. At this time, Mr. Alain Goetz was still a director of TG, a company of integrity that does not cooperate in any wat in the illegal trade of gold or other precious metals and conducts its activities in accordance with all applicable rules and regulation.

TG has been an all-Belgian company for more than 30 years, with all its industrial activities exclusively located in Belgium and all employees exclusively employed in Belgium. All employees of TG comply with strict guidelines with regard to the acceptance of gold and verification of the origin of the gold and the identity of the suppliers. Worthy to note also that TG does and did not import or accept gold originating from conflict zones, nor from Venezuela, Uganda, Congo or Dubai (UAE).

We believe that the judgment is erroneous. Neither Mr. Alain Goetz nor TG breached any anti-money laundering regulations or other legislations in force at that time.

Belgian traders in precious metals are currently prohibited from paying precious metals in cash and this follows from article 67 §2 of the Act of 18 September 2017 on the prevention of money laundering and terrorist financing and on restricting the use of cash.

LAURIUS CV

Werf & Vlasnatie, Oudeleeuwenrui 19, B-2000 Antwerp T +32 3 260 88 00 - F +32 3 260 88 10
Kunstlaan / Avenue des Arts 56, B-1000 Brussels T +32 2 313 87 87 - F +32 2 313 87 88
VAT BE 0880.655.773
[1] Antwerp bar - [2] Brussels bar - [3] BV

www.laurius.be

# L A U R I U S

ANTWERP – BRUSSELS

However, the anti-money laundering regulations have been amended several times over the past decades. In 2010-2011, there was no general ban on cash payments by traders when purchasing precious metals. Indeed, the anti-money laundering regulations only imposed cash restrictions (max. €15,000) on the trader who sold a good. This means specifically that the AML regulations prohibiting cash payments were not applicable in case TG purchased precious metals. Moreover, the fact that purchase was settled in case does not imply that the origin of the funds or the purchased goods were *ipso facto* illegal.

It was therefore widespread that cash payments were made in Belgium in the gold industry for amounts in excess of 15.000 EUR. This widespread practice was based on the then existing Belgian legislation and was confirmed by various authorities. The Belgian legislation was amended in 2013 and TG has always complied with the relevant legislation in force.

Nevertheless, TG and Mr. Alain Goetz were convicted by the judgement of 30 January 2020 of money laundering in relation to certain purchases with cash payments to its customers in the period 2010-2011.

TG and Mr. Alain Goetz were hereby amongst others sentenced to a fine (up to EUR 5,500 for Mr. Alain Goetz and up to EUR 99,000 for TG) with deferment of execution for a period of three years, suspended jail term and professional ban for a period of five years and certain amounts were confiscated.

TG and Mr. Alain Goetz contest these facts and uphold that the company did not violate any law, having regard to the facts on which it is based and the regulatory framework in force at the time.

They are invariably convinced that neither he nor any person or company associated with TG has infringed any rules of any kind.

TG and Mr. Alain Goetz emphasize that this discussion does not concern the company's activities since 2012.

To date, no dispute exists as to the legitimacy of TG's activities either before or after this period. Furthermore, TG's activities are regularly monitored by the competent authorities.

Despite its conviction, TG and Mr. Alain Goetz decided not to lodge an appeal and opted to look to the future rather than to the past.

TG and Mr. Alain Goetz therefore paid the confiscated amount of money (EUR 1,089,915.67 each) to the Belgian State **(see attachment 1)**. In addition, account should be taken of the forfeiture of the alleged wealth benefits opposed in the above-mentioned judgment. This means that all alleged illicit gains have disappeared from their assets. The legitimacy of the remaining assets is therefore certain.

Finally, in order to be complete that I point out that at the moment Mr. Alain Goetz is no longer part of TG's management or its shareholding **(see attachment 2)**.

2

# LAURIUS

ANTWERP – BRUSSELS

Please note that this letter is merely for information purposes and is not to be relied upon by any other person than our client and cannot be used or for any other purpose, nor is it to be quoted or made public in any way without our prior written consent.

We are at your disposal for further information.

Best regards,

Bert Luyten

Attachment 1: Proof of payment
Attachment 2: Dismissal of board of directors and UBO-register

3

## Proof of Payment



GOETZ ALAIN | 6145618-86

standaardprinter : P0AB2ZX0 on          3:16

**Verrichting raadplegen**

 terug naar overzicht

rekening
**BE63 7330 0776 7508 EUR**

tegenrekening
**0245H8661110**

**GOETZ ALAIN**

**KBC B BETALINGSSYST. & DIENSTEN**
**DRINGENDE UITGAANDE VERRICHTINGEN VIA TARGET - BE**

oorspronkelijke rekening

oorspronkelijke tegenrekening
**BE95 6792 0033 0258**
**PCHQBEBBXXX**

producttype
**KBC-Rekening**

verrichtingbedrag
**-1 089 915,67**

omschrijving
**OVERSCHRIJVING NAAR 27-05**
**BE95 6792 0033 0258**
**BANKIER BEGUNSTIGDE: PCHQBEBBXXX**
**KANT. NFI BRUSSEL 1**
**010374090685**
**DOORGEGEVEN OP 27-05-2020**
**MET KBC BUSINESS DASHBOARD**

verrichtingsdatum
**27-05-2020**
valutadatum
**27-05-2020**
boekingsdatum
**27-05-2020**

producttype
**SEPA Credit Transfer**
gebeurtenistype
**overschrijvingen via KBC-online for business**
opdrachtschematype
**individuele overschrijving niet lonen**

registratiekanaal
**met Online for Business**
registratie-user

telefoon registratie-user

afschrift
**2020 026**
weergave in cliëntcommunicatie
☑
bijlage
☐

geïntervenieerd
☐
geforceerd
**niet forceren (standaard)**



Mod Word 15.1

**In de bijlagen bij het Belgisch Staatsblad bekend te maken kopie na neerlegging ter griffie van de akte**



*18150794*

Rechtbank van Koophandel
Antwerpen

0 3 OKT. 2018

Griffie
afdeling ANTWERPEN

Bijlagen bij het Belgisch Staatsblad - 12/10/2018 - Annexes du Moniteur belge

Ondernemingsnr : **0426 598 575**
**Benaming**
(voluit) : **TONY GOETZ**
(verkort) :
Rechtsvorm : **NAAMLOZE VENNOOTSCHAP**
Volledig adres v.d. zetel : **JACOB JACOBSSTRAAT 58 TE 2018 ANTWERPEN**

**Onderwerp akte** : ONTSLAG EN BENOEMING RAAD VAN BESTUUR EN GEDELEGEERD BESTUURDER

De Bijzondere Algemene vergadering der Aandeelhouders van 10 september 2018 heeft unaniem beslist om ontslag te geven aan alle bestuurders, te weten :

1.ALAXY BVBA, met maatschappelijke zetel te 2018 Antwrpen, Jacob Jacobsstraat 56, gekend onder het ondernemingsnummer 0478.862.274 en met vaste vertegenwoordiger WEYLER Sandra, voornoemd;
2.CG-VASTGOED INVEST NV, met maatschappelijke zetel te 2018 Antwerpen, gekend onder ondernemingsnummer 0806.408.906 en met vaste vertegenwoordiger GOETZ Alain, voornoemd.

Tot nieuwe bestuurders worden met éénparigheid van stemmen benoemd voor de wettelijke maximumtermijn van zes jaar :

1.GOETZ Sylvain, wonende te 2970 Schilde, Boerendreef 16;
2.WORLD WIDE CONSULTING BVBA, met maatschappelijke zetel te 2018 Antwerpen, Jacob Jacobsstraat 56, gekend onder het ondernemingsnummer 0478.862.175 en met vaste vertegenwoordiger GOETZ Sylvain, voornoemd.

Zij aanvaarden hun mandaat.
Er wordt bevestigd dat het mandaat van bestuurder onbezoldigd is en blijft.

De Raad van bestuur van 10 september 2018 heeft unaniem beslist om De Heer GOETZ Sylvain, voornoemd te benoemen tot gedelegeerd bestuurder, die aanvaardt. Het mandaat van gedelegeerd bestuurder is onbezoldigd.

GOETZ Sylvain
Gedelegeerd Bestuurder

Op de laatste blz. van <u>Luik B</u> vermelden : <u>Recto</u> : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n(en) bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen
<u>Verso</u> : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").





# Informatie over de uiteindelijke begunstigde (UBO) Industrial Refining Company

Pagina 1/2

Gedrukt door: Luyten Bert
LAURIUS
23/09/2020

## GEGEVENS OVER DE ENTITEIT

| | |
|---|---|
| KBO-nummer of identificator: | 0426598575 |

| | | | |
|---|---|---|---|
| Aanmaakdatum: | 28/12/1984 | Status: | Normale toestand |
| Naam van de onderneming: | Industrial Refining Company | Rechtsvorm: | Naamloze vennootschap |

## ADRES VAN DE ENTITEIT

| | | | | | |
|---|---|---|---|---|---|
| Straat: | Jacob Jacobsstraat | N°: | 58 | Bus: | NA |
| Postcode: | 2018 | Gemeente: | Antwerpen | | |
| Land: | België | | | | |

## AANVULLENDE INFORMATIE

| Soort | Namen | % (kapitaal) | % (vote) | Aard van de controle |
|---|---|---|---|---|
| | **Industrial Refining Company** | 100,000 | 100,000 | |
| | **ARGOR INTERNATIONAL** | 100,000 | 100,000 | Cat.1 : Stemrechten of deelneming in het kapitaal |
| | Goetz Sylvain | 75,100 | 75,100 | Cat.1 : Stemrechten of deelneming in het kapitaal |
| | *Others* | 24,900 | 24,900 | |

Dit uittreksel uit het UBO-register bevat de informatie die momenteel beschikbaar is voor de betreffende rechtspersoon of structuur. Het bevestigt op geen enkele manier de juistheid of volledigheid van de informatie met betrekking tot UBO's van de betrokken juridische entiteit of structuur.





# Informatie over de uiteindelijke begunstigde (UBO) Industrial Refining Company

Pagina 2/2

Gedrukt door: Luyten Bert
LAURIUS
23/09/2020

| LIJST VAN DE EFFECTIEVE BEGUNSTIGDE | | | |
|---|---|---|---|
| UITEINDELIJKE BEGUNSTIGDE(N) | AARD VAN DE CONTROLE | NAAM VAN DE ONDERNEMING | AANVANG VAN DE CONTROLE |
| Goetz Sylvain | Cat.1 : Stemrechten of deelneming in het kapitaal | ARGOR INTERNATIONAL | 16/11/2006 |

 Juridische entiteit

 Andere

 Persoon/Uiteindelijke begunstigde

 Groepering van uiteindelijke begunstigden

Dit uittreksel uit het UBO-register bevat de informatie die momenteel beschikbaar is voor de betreffende rechtspersoon of structuur. Het bevestigt op geen enkele manier de juistheid of volledigheid van de informatie met betrekking tot UBO's van de betrokken juridische entiteit of structuur.

Luik B   **In de bijlagen bij het Belgisch Staatsblad bekend te maken kopie na neerlegging van de akte ter griffie**

Voor-
behouden
aan het
Belgisch
Staatsblad

*20335982*



Neergelegd
30-07-2020

*Griffie*

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

| | |
|---|---|
| Ondernemingsnr : | 0426598575 |
| **Naam** | |
| (voluit) : | **TONY GOETZ** |
| (verkort) : | **TG** |
| Rechtsvorm : | Naamloze vennootschap |
| Volledig adres v.d. zetel | Jacob Jacobsstraat 58 |
| : | 2018 Antwerpen |

<u>Onderwerp akte :</u>   BENAMING, ONTSLAGEN, BENOEMINGEN, STATUTEN
(VERTALING, COORDINATIE, OVERIGE WIJZIGINGEN)

Uittreksel afgeleverd vr registratie om neer te leggen ter griffie van de Ondernemingsrechtbank te Antwerpen, afdeling Antwerpen.
Uit een proces-verbaal verleden voor Meester Paul Wellens, notaris, met zetel te Mortsel, op 8 juli 2020, blijkt dat werd gehouden een buitengewone algemene vergadering van "TONY GOETZ" naamloze vennootschap, gevestigd te 2018 Antwerpen, Jacob Jacobsstraat 58, ingeschreven in het rechtspersonenregister te Antwerpen, afdeling Antwerpen onder het nummer BE 0426.598.575, en dat onder meer volgende besluiten werden genomen:
**I.** De vergadering beslist de naam van de vennootschap te wijzigen in **Industrial Refining Company**, afgekort "IRC"
Bijgevolg beslist de vergadering beslist om de eerste zin van Artikel 1: te vervangen door de volgende tekst:
"De vennootschap heeft de vorm van een naamloze vennootschap**.**
Haar naam luidt: **Industrial Refining Company**, afgekort "**IRC**".
**II.** In toepassing van artikel 39, §1, eerste en derde lid van de wet van 23 maart 2019 tot invoering van het WVV en houdende diverse bepalingen (1), besluit de algemene vergadering om de statuten aan te passen aan de bepalingen van het WVV.
**III.** Als gevolg van de voorgaande besluit, besluit de algemene vergadering volledig nieuwe statuten aan te nemen, die in overeenstemming zijn met het WVV, zonder evenwel een wijziging aan te brengen in haar voorwerp.
De algemene vergadering verklaart en besluit dat de tekst van de nieuwe statuten als volgt luidt:
**NAAM EN RECHTSVORM**
De vennootschap heeft de vorm van een naamloze vennootschap.
Haar naam luidt: **Industrial Refining Company**, afgekort "IRC".
Deze naam moet steeds – op alle akten, facturen, aankondigingen, bekendmakingen, brieven, orders, websites en andere stukken al dan niet in elektronische vorm, uitgaande van de vennootschap – vermeld worden, evenals de woorden 'naamloze vennootschap', in het Frans 'société anonyme', of het letterwoord 'NV', in het Frans 'SA'.
**ZETEL**
De zetel is gevestigd in het Vlaamse Gewest.
De vennootschap mag, bij besluit van haar bestuursorgaan, administratieve zetels, agentschappen, ateliers, opslagplaatsen en bijhuizen oprichten of opheffen wanneer en waar zij het nodig acht, zowel in België als in het buitenland.
**VOORWERP VAN DE VENNOOTSCHAP**
De vennootschap heeft tot voorwerp:
De groothandel in goudsmeedwerk en juwelen, diverse recuperatieproducten, meer bepaald oude juwelen, kleinhandel in goud- en zilverwerk en juwelen, oude kleren en tweedehandse goederen: meer bepaald oude juwelen.
Groothandel en kleinhandel in edele metalen en aanverwanten.
Groothandel en kleinhandel in monetair goud.

*Op de laatste blz. van Luik B vermelden :*    <u>*Voorkant*</u> *: Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n*
*bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen*
<u>*Achterkant*</u> *: Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").*

Mod PDF 19.01

**Luik B**    - vervolg

Voor-
behouden
aan het
Belgisch
Staatsblad

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

De vennootschap kan alle handels-, financiële, industriële, roerende en onroerende verrichtingen doen die de verwezenlijking van het maatschappelijk voorwerp rechtstreeks of onrechtstreeks in de hand werken.

Zij kan door middel van inschrijving, inbreng, fusie, opslorping, samenwerking, financiële tussenkomst of afspraak deelnemen in alle andere Belgische of buitenlandse vennootschappen, instellingen of ondernemingen, zonder onderscheid, ongeacht of zij opgericht zijn of nog moeten opgericht worden, wier maatschappelijk voorwerp gelijk is, verwant, verknocht of analoog aan het hare of waarvan de deelname of samenwerking kan bijdragen tot de verwezenlijking van haar doel. Zij kan zich ten gunste van dezelfde vennootschappen borgstellen of haar aval verlenen, optreden als haar agent of vertegenwoordiger, voorschotten toestaan, kredieten verlenen, hypothecaire of andere zekerheden verstrekken.

**DUUR**

De vennootschap is opgericht voor een onbepaalde duur.

**KAPITAAL VAN DE VENNOOTSCHAP**

Het kapitaal bedraagt twintig miljoen euro (20.000.000 EUR), verdeeld in honderd vijfentwintig (125) aandelen met fractiewaarde.

**BESTUUR EN VERTEGENWOORDIGING**

*Samenstelling van het bestuursorgaan*

De vennootschap wordt bestuurd door één of meer bestuurders, natuurlijke personen of rechtspersonen, al dan niet aandeelhouder, benoemd voor ten hoogste zes jaar door de algemene vergadering van aandeelhouders. Indien zij worden benoemd in de statuten, hebben zij de hoedanigheid van statutair bestuurder en is hun mandaat van onbepaalde duur.

De bestuurders worden geacht hun mandaat onbezoldigd uit te oefenen tenzij anders bepaald in de benoemingsbeslissing van de algemene aandeelhoudersvergadering.

De bestuurder wiens mandaat een einde heeft genomen, blijft, als het aantal bestuurders daalt onder het bij de toepasselijke wettelijke bepalingen voorziene minimum, in functie tot zolang de algemene vergadering, om welke reden ook, niet in zijn vervanging voorziet.

De raad van bestuur kan onder zijn leden een voorzitter benoemen. Bij ontstentenis van benoeming of bij afwezigheid van de voorzitter wordt het voorzitterschap waargenomen door de bestuurder aangeduid onder de aanwezige bestuurders door de raad van bestuur.

*Bestuursbevoegdheid*

Het bestuursorgaan is bekleed met de meest uitgebreide macht om alle handelingen te verrichten die nodig of dienstig zijn voor het bereiken van het voorwerp van de vennootschap, met uitzondering van die handelingen aan de algemene vergadering voorbehouden door de wet.

Ingeval er twee bestuurders zijn zullen zij gezamenlijk het bestuur voeren.

Indien er drie of meer bestuurders zijn, vormen deze een college, dat een voorzitter aanstelt en verder handelt zoals een raadsvergadering.

Het bestuursorgaan mag het dagelijks bestuur van de vennootschap delegeren aan één of meer (rechts)personen, al dan niet aandeelhouders. Wordt een bestuurder belast met het dagelijks bestuur dan draagt hij de titel van "gedelegeerd-bestuurder". Wordt een niet-bestuurder belast met het dagelijks bestuur dan draagt hij de titel van directeur of algemeen directeur of elke andere titel waarmee hij/zij in het benoemingsbesluit wordt aangeduid.

Het bestuursorgaan, evenals de gevolmachtigden voor het dagelijks bestuur binnen het kader van dit bestuur, mogen eveneens specifieke bevoegdheden aan één of meer personen van hun keus toekennen.

*Vertegenwoordigingsbevoegdheid van het bestuursorgaan*

Het bestuursorgaan vertegenwoordigt de vennootschap jegens derden en in rechte als eiser of als verweerder. De vennootschap wordt jegens derden en in rechte als eiser of als verweerder tevens geldig vertegenwoordigd, door elke bestuurder, afzonderlijk handelend.

Binnen het kader van het dagelijks bestuur, is de vennootschap tevens geldig vertegenwoordigd door (een) gevolmachtigde(n) tot dit bestuur.

De vennootschap is bovendien, binnen het kader van hun mandaat, geldig verbonden door bijzondere gevolmachtigden.

Bovendien kan de vennootschap in het buitenland vertegenwoordigd worden door iedere persoon uitdrukkelijk daartoe aangesteld door de raad van bestuur.

**ALGEMENE VERGADERING**

De gewone algemene vergadering van aandeelhouders, jaarvergadering genoemd, moet ieder jaar worden bijeengeroepen de *derde vrijdag van de maand juni om zestien (16.00) uur* .

Indien die dag een wettelijke feestdag is, wordt de vergadering op de eerstvolgende werkdag gehouden.

Te allen tijde kan een bijzondere algemene vergadering worden bijeengeroepen om te beraadslagen en te besluiten over alle aangelegenheden die tot haar bevoegdheid behoren en die geen wijziging van de statuten inhouden.

*Op de laatste blz. van Luik B vermelden :*    <u>*Voorkant*</u> *: Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen*
<u>*Achterkant*</u> *: Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").*

Mod PDF 19.01

**Luik B**    - vervolg

Voor-
behouden
aan het
Belgisch
Staatsblad

Te allen tijde kan ook een buitengewone algemene vergadering worden bijeengeroepen, om over een wijziging van de statuten te beraadslagen en te besluiten.

De gewone, de bijzondere en de buitengewone algemene vergaderingen worden gehouden in de zetel van de vennootschap, of op een andere plaats aangewezen in de oproeping.

Telt de vennootschap slechts één aandeelhouder, dan oefent hij de bevoegdheden uit die een algemene vergadering zijn toegekend. Hij kan deze niet overdragen. De beslissingen van de enige aandeelhouder die handelt als algemene vergadering worden vermeld in een register dat op de zetel van de vennootschap wordt bijgehouden.

*Bijeenroeping - Bevoegdheid - Verplichting*

Het bestuursorgaan en, in voorkomend geval, de commissaris kunnen zowel een gewone algemene vergadering als een bijzondere of een buitengewone algemene vergadering bijeenroepen. Zij moeten de jaarvergadering bijeenroepen op de bij de statuten bepaalde dag. Zij zijn verplicht de algemene vergadering binnen de drie weken bijeen te roepen wanneer aandeelhouders die een tiende van het aantal uitgegeven aandelen vertegenwoordigen, dat vragen, met ten minste de door de betrokken aandeelhouders voorgestelde agendapunten.

De oproepingen tot een algemene vergadering vermelden de agenda en geschieden door middel van een aankondiging die ten minste vijftien dagen vóór de vergadering geplaatst wordt in het Belgisch Staatsblad en in een nationaal verspreid blad.  Ingeval een nieuwe oproeping nodig is en de datum van de tweede vergadering werd vermeld in de eerste oproeping, moet de aankondiging voor de tweede vergadering ten minste zeventien dagen voor de vergadering geplaatst worden in het Belgisch Staatsblad en in een nationaal verspreid blad.  Indien de agenda van de gewone algemene vergadering zich beperkt tot de behandeling van de jaarrekening, het jaarverslag en, in voorkomend geval, het verslag van de commissaris en de stemming over de kwijting te verlenen aan de bestuurders en, in voorkomend geval, aan de commissaris(sen), is evenwel geen aankondiging in een nationaal verspreid blad vereist.  Om tot de vergadering toegelaten te worden, moeten de houders van aandelen aan toonder, uiterlijk vijf dagen voor de datum van de vergadering hun aandelen deponeren op de zetel van de vennootschap.

Op elke algemene vergadering wordt een aanwezigheidslijst bijgehouden.

*Toelating tot de algemene vergadering*

Het bestuursorgaan kan eisen dat teneinde aan de algemene vergadering te kunnen deelnemen:

- de eigenaars van aandelen op naam, ten minste vijf werkdagen vóór de datum van de algemene vergadering, het bestuursorgaan schriftelijk dienen in te lichten van hun intentie aan de vergadering deel te nemen, alsook van het aantal aandelen waarmee zij aan de stemming wensen deel te nemen.

- de eigenaars van gedematerialiseerde aandelen, ten minste vijf werkdagen vóór de datum van de algemene vergadering, op de zetel van de vennootschap op de plaatsen aangegeven in de oproeping een door de erkende rekeninghouder of door de vereffeningsinstelling opgesteld attest dienen neer te leggen, waarbij de onbeschikbaarheid van de gedematerialiseerde aandelen tot op de datum van de algemene vergadering wordt vastgesteld.

Bestuurders en commissarissen zijn vrijgesteld van deze formaliteit.

*Stemrecht*

Elk aandeel geeft recht op één stem.

*Buitengewone algemene vergadering - Statutenwijziging*

De buitengewone algemene vergadering moet worden gehouden ten overstaan van een notaris. Zij kan over een voorgestelde statutenwijziging slechts dan op rechtsgeldige wijze beraadslagen en besluiten, wanneer de aanwezige of vertegenwoordigde aandeelhouders ten minste de helft van het kapitaal vertegenwoordigen.

Is de laatste voorwaarde niet nageleefd, dan is een tweede bijeenroeping nodig en de nieuwe vergadering beraadslaagt en besluit op geldige wijze, ongeacht het door de aanwezige of vertegenwoordigde aandeelhouders vertegenwoordigde deel van het kapitaal.

Een wijziging is alleen dan aangenomen, wanneer zij drie/vierde van de uitgebrachte stemmen heeft verkregen, waarbij onthoudingen in de teller noch in de noemer worden meegerekend.

*Notulen van de algemene vergadering*

De notulen van een algemene vergadering worden ondertekend door de leden van het bureau en door de aandeelhouders die erom verzoeken; kopieën voor derden worden ondertekend door één of meer vertegenwoordigingsbevoegde leden van het bestuursorgaan.

BOEKJAAR

Het boekjaar van de vennootschap gaat in op *1 januari en eindigt op 31 december* van het zelfde jaar.

BESTEMMING VAN DE WINST

Jaarlijks houdt de algemene vergadering een bedrag in van ten minste een twintigste van de nettowinst voor de vorming van een reservefonds; de verplichting tot deze afneming houdt op wanneer het reservefonds een tiende van het kapitaal heeft bereikt.

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

*Op de laatste blz. van Luik B vermelden :*    <u>Voorkant</u> : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n
bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen
<u>Achterkant</u> : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

Mod PDF 19.01

Voor-
behouden
aan het
Belgisch
Staatsblad

**Luik B**   - vervolg

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

Het saldo staat ter beschikking van de algemene vergadering, die ieder jaar over zijn aanwending zal beslissen.

**ONTBINDING - VEREFFENING**

*Verliezen*

Wanneer ten gevolge van geleden verlies het netto-actief gedaald is tot minder dan de helft van het kapitaal, moet het bestuursorgaan de algemene vergadering oproepen tot een vergadering, te houden binnen twee maanden nadat het verlies is vastgesteld, of krachtens wettelijke of statutaire bepalingen had moeten worden vastgesteld, om te beraadslagen en te besluiten over de ontbinding van de vennootschap of over in de agenda aangekondigde maatregelen om de continuïteit van de vennootschap te vrijwaren. Tenzij het bestuursorgaan de ontbinding van de vennootschap voorstelt, zet het in een bijzonder verslag uiteen welke maatregelen het voorstelt om de continuïteit van de vennootschap te vrijwaren. Dat verslag wordt in de agenda vermeld en vijftien dagen vóór de algemene vergadering op de zetel van de vennootschap ter beschikking van de aandeelhouders gesteld.

Op dezelfde wijze wordt gehandeld wanneer het netto-actief ten gevolge van geleden verlies gedaald is tot minder dan een/vierde van het kapitaal, met dien verstande dat de ontbinding plaatsheeft wanneer zij wordt goedgekeurd door een vierde van de uitgebrachte stemmen, waarbij onthoudingen in teller noch in de noemer worden meegerekend.

Wanneer het netto-actief is gedaald tot beneden eenenzestigduizend vijfhonderd euro (€ 61.500,00), kan iedere belanghebbende of het openbaar ministerie de ontbinding van de vennootschap voor de rechtbank vorderen. In voorkomend geval kan de bevoegde ondernemingsrechtbank aan de vennootschap een bindende termijn toestaan om haar toestand te regulariseren.

*Ontbinding*

De vennootschap kan op elk moment ontbonden worden door beslissing van de algemene vergadering, met inachtneming van de vereisten voor statutenwijziging.

*Onmiddellijke sluiting van de vereffening*

Een ontbinding en de sluiting van de vereffening in één akte zijn mogelijk onder de voorwaarden van artikel 2:80 WVV.

*Benoeming van vereffenaars*

Zijn er geen vereffenaars benoemd of aangewezen, dan worden de bestuurders die op het tijdstip van de ontbinding in functie zijn, ten aanzien van derden van rechtswege als vereffenaars beschouwd. De algemene vergadering van de ontbonden vennootschap kan te allen tijde en bij gewone meerderheid van stemmen, één of meer vereffenaars benoemen, of ontslaan.

Enkel indien uit de staat van actief en passief opgemaakt overeenkomstig artikel 2:71, § 2, tweede lid WVV, blijkt dat niet alle schuldeisers volledig kunnen worden terugbetaald, moet de benoeming van de vereffenaars in de statuten of door de algemene vergadering aan de voorzitter van de bevoegde ondernemingsrechtbank ter bevestiging worden voorgelegd. Deze bevestiging is evenwel niet vereist indien uit die staat van actief en passief blijkt dat de vennootschap enkel schulden heeft ten aanzien van haar aandeelhouders en alle aandeelhouders die schuldeiser zijn van de vennootschap schriftelijk bevestigen akkoord te gaan met de benoeming.

*Verdeling netto-actief*

Onverminderd de rechten van de bevoorrechte schuldeisers, betaalt de vereffenaar alle schulden naar evenredigheid en zonder onderscheid tussen opeisbare en niet opeisbare schulden, onder aftrek, wat deze betreft, van het disconto.

Indien uit de rekeningen blijkt dat niet alle schuldeisers integraal kunnen worden terugbetaald, legt de vereffenaar vooraleer de vereffening wordt gesloten, bij eenzijdig verzoekschrift overeenkomstig de artikelen 1025 en volgende van het Gerechtelijk Wetboek het plan voor de verdeling van de activa onder de verschillende categorieën schuldeisers ter goedkeuring voor aan bevoegde ondernemingsrechtbank.

Deze verplichting tot het ter goedkeuring voorleggen van het plan van verdeling aan de rechtbank geldt niet wanneer de schuldeisers die niet integraal werden terugbetaald, aandeelhouders van de vennootschap zijn en al deze aandeelhouders schriftelijk akkoord gaan met het plan van verdeling en afstand doen van het voorleggen van het plan van verdeling.

Na betaling van de schulden en van alle kosten van de vereffening, of consignatie van de nodige gelden om die te voldoen, en, indien er aandelen zijn die niet zijn volgestort, na herstelling van het evenwicht tussen de aandelen, hetzij door bijkomende volstorting te eisen lastens de niet voldoende volgestorte aandelen, hetzij door voorafgaandelijke terugbetalingen te doen in voordeel van de aandelen die in een grotere verhouding zijn volgestort, verdeelt de vereffenaar onder de aandeelhouders de gelden of waarden die gelijk verdeeld kunnen worden; hij overhandigt hun de goederen die hij voor nadere verdeling heeft moeten overhouden. Het te verdelen actief wordt verdeeld onder alle aandeelhouders naar verhouding van het aantal aandelen dat zij bezitten en de goederen die nog in natura voorhanden zijn worden op dezelfde wijze verdeeld.

**IV.** De algemene vergadering besluit de opdracht te geven aan de ondergetekende notaris om de

*Op de laatste blz. van Luik B vermelden :*    <u>Voorkant</u> : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n(en)
bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen
<u>Achterkant</u> : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

Mod PDF 19.01

**Luik B**    - vervolg

Voorbehouden aan het Belgisch Staatsblad

coördinatie van de statuten op te maken en te ondertekenen, in overeenstemming met het vorige besluit, en de neerlegging daarvan in het vennootschapsdossier te verzorgen.

**V.** De algemene vergadering verklaart dat het adres van de zetel is gevestigd te *2018 Antwerpen, Jacob Jacobsstraat 58.*

**VI.** De algemene vergadering besluit de bestuurder, hierna vermeld, ontslag te geven uit zijn functie: de besloten vennootschap **WORLD WIDE CONSULTING**, met zetel te 2018 Antwerpen, Jacob Jacobsstraat 56, vertegenwoordigd door haar vaste vertegenwoordiger de heer Goetz Sylvain.

De vergadering verleent, door een bijzondere stemming, volledige en algehele kwijting aan de ontslagnemende bestuurder voor het mandaat uitgeoefend in het maatschappelijk jaar begonnen op 1 januari 2020 tot op heden.

VOOR ONTLEDEND UITTREKSEL (get.) notaris Paul Wellens

Tegelijk hiermee neergelegd:

Afschrift van het proces-verbaal

Gecoördineerde statuten

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

---

*Op de laatste blz. van Luik B vermelden :*    <u>**Voorkant**</u> *: Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen*

<u>**Achterkant**</u> *: Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").*

# Annex P



TELEGRAMS "ADMINISTER"
DIRECT LINES
   MINISTER'S OFFICE        041-343401
     SOLICITOR GENERAL'S OFFICE   041-343941
     UNDER SECRETARY'S OFFICE   041-342261
     AG DIRECTOR CIVIL LITIGATION  041-231706
GENERAL LINES          041-2305389
Fax              041-254829
Fax  Civil Litigation     041-345100

In any correspondence on ADM7/212/01



THE REPUBLIC OF UGANDA

**ATTORNEY GENERAL'S CHAMBERS**
**P O BOX 7183,**
**Kampala, Uganda**

26th March, 2019

The Commandant,
Police Minerals Protection Unit,
P.O. Box 7183
Entebbe.

### RE: PRELIMINARY REPORT ON THE ALLEGED SUSPECTED SMUGGLED GOLD BY AFRICAN GOLD REFINERY (AGR) VIDE GEF 01/2019.

Reference is made to your letter dated 21st March, 2019 in which you forwarded to me a preliminary investigation report dated 19th March, 2019 in relation to the above subject matter, for my advice as per H.E the President's directive on 20th March, 2019 at Kyankwazi on the above matter.

As instructed by H.E the President on 25th March, 2019, at State House Entebbe, I advise you as follows;

I gather from your report that you received intelligence information about suspected gold smuggled into Uganda from Venezuela by African Gold Refinery Ltd (AGR), which is alleged to have occurred between 2nd and 4th March, 2019.

African Gold Refinery Ltd operates as a bonded ware house with License No. WO408 under the East African Customs Management Act, 2004 (EACMA). Under section 48 of the EACMA, bonded warehouses may be exempted from payment of duty on first importation into the bonded warehouse. Pursuant to the Directive of H.E the President dated 26th April 2017 Reference P0/1, communicated to Ministry of Energy and Mineral Development and the letter from Uganda Revenue Authority (URA) to AGR dated 5th June 2018, Reference CUST/T/3/16, Government granted AGR bonded facility exemption from import duty in accordance with section 164 Part XIII of the East African Community Customs Management Act, 2004.

Accordingly, URA granted clearance of the two consignments on 1st March 2019 ad 4th March 2019 respectively in line with the exemption already granted by Government and also issued release orders for the

consignments. This is also in line with section 117(2) of the Mining Act 2003 that requires an importer of minerals to make a declaration to a customs officer of minerals imported into the country. This, in my opinion dispels the suspicion of smuggling.

In light of the above, you are directed to withdraw your officers deployed at AGR premises and release any gold that may have been seized or impounded during this investigation.

Concerning the current sanctions imposed by the United States Government on Venezuela, in view of the principle of comity, by copy of this letter, AGR is instructed henceforth, save for the gold comprising of the consignments that have been the subject of investigation, cease and desist from any further importation of gold from Venezuela, until further notice.

William Byaruhanga, SC
**ATTORNEY GENERAL**

Cc: The Principal Private Secretary to H.E the President (for onward transmission to H.E the President)

Cc: The Hon. Deputy Attorney General

Cc: The Inspector General of Police

Cc: The Chief Executive Officer, African Gold Refinery Ltd