**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————

ALAIN GOETZ,                )
                            )
        Plaintiff,          )
                            )
v.                          )        Civil Action No. 1:22-cv-1204 (JEB)
                            )
LISA M. PALLUCONI, Acting Director,  )
Office of Foreign Assets Control, *et al.*,  )
                            )
        Defendants.         )
———————————————————

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

AMY E. POWELL
Senior Trial Attorney
Federal Programs Branch
Civil Division, Department of Justice
c/o U.S. Attorney's Office
150 Fayetteville St., Suite 2100
Raleigh, NC 2760
Phone: 919-856-4013
Email: amy.powell@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND........................................................ 2

I.       The International Emergency Economic Powers Act (IEEPA)........................................ 2

II.      Economic Sanctions With Respect to the DRC. ............................................................. 4

III.     Administrative and Procedural Background ..................................................................... 6

LEGAL STANDARDS OF REVIEW.................................................................................. 10

DISCUSSION ....................................................................................................................... 11

I.       OFAC's Determination is Entitled to Substantial Deference. ....................................... 11

II.      OFAC Acted Reasonably in Denying Plaintiff's Second Petition for Delisting. ........... 13

III.     Plaintiff's Arguments Do Not Undermine that Conclusion............................................ 18

         A.      Plaintiff is Subject to Sanctions for Past Conduct. ............................................ 18

         B.      OFAC Has Reasonable Basis to Doubt that Goetz Has Cut Ties with AGR
                 and Reasonable Concerns that his Conduct Might Recur.................................... 20

         C.      OFAC Reasonably Linked Plaintiff's Conduct to Armed Groups in the
                 DRC. ................................................................................................................... 23

         D.      OFAC Reasonably Found No Change in Circumstances Justifying
                 Delisting.............................................................................................................. 24

         E.      OFAC Reasonably Found Goetz's Proposed Terms of Removal
                 Inadequate. .......................................................................................................... 25

         F.      Plaintiff's Arguments about Acknowledgement of Past Conduct are
                 Unpersuasive........................................................................................................ 26

CONCLUSION...................................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*32 Cnty. Sovereignty Comm. v. Dep't of State*,
  292 F.3d 797 (D.C. Cir. 2002) ........................................................................... 27

*Ajaka v. Gacki*,
  557 F. Supp. 3d 45 (D.D.C. 2021) ..................................................................... 13

*Basengezi v. Smith*,
  Civ. A. No. 23-1249 (JEB), 2024 WL 1050340 (D.D.C. Mar. 11, 2024),
  *appeal filed*, No. 24-5130 (D.C. Cir. May 14, 2024) ............................... 12, 19, 25, 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................... 11

*City of Olmsted Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ........................................................................... 12

*Conant v. Wells Fargo Bank, N.A.*,
  60 F. Supp. 3d 99 (D.D.C. 2014) ....................................................................... 10

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ............................................................................................. 2

*Deripaska v. Yellen*,
  Case No. 19-cv-00727 (APM), 2021 WL 2417425 (D.D.C. June 13, 2021),
  *aff'd*, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ............................................ 13

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................................... 11

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................................... 12

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ......... 13, 28

*Islamic Am. Relief Agency (IARA-USA) v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ........................................................................... 12

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ......................................................................... 27

*Joumaa v. Mnuchin*,
  798 Fed. App'x 667 (D.C. Cir. 2020) ................................................................. 11

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) ............................................................................ 10

*Karadzic v. Gacki*,
    602 F. Supp. 3d 103 (D.D.C. 2022) .............................................................. *passim*

*Lopez Bello v. Smith*,
    651 F. Supp. 3d 20 (D.D.C. 2022)*, aff'd sub nom.*
    *Lopez Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024) ........................................ 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 12, 18

*Olenga v. Gacki*,
    507 F. Supp. 3d 260 (D.D.C. 2020) .................................................. 13, 19, 25, 26

*Orvis v. Brownell*,
    345 U.S. 183 (1953) .............................................................................................. 3

*Pejcic v. Gacki*,
    Case No. 19-cv-02437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) .................. *passim*

*Propper v. Clark*,
    337 U.S. 472 (1949) .............................................................................................. 3

*Rahmani v. Yellen*,
    Civ. A. No. 24-0285 (RC), 2024 WL 1701681 (D.D.C. Apr. 19, 2024) ................................. 12

*Rakhimov v. Gacki*,
    Civ. A. No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020),
    *appeal dismissed*, 2020 WL 4107145 (D.C. Cir. July 1, 2020) ................................. 12

*Regan v. Wald*,
    468 U.S. 222 (1984) .............................................................................................. 3

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ........................................................................ 13, 28

*St. Mary Med. Ctr. v. Becerra*,
    581 F. Supp. 3d 119 (D.D.C. 2022) ..................................................................... 10

*Strait Shipbrokers Pte. Ltd v. Blinken*,
    560 F. Supp. 3d 81 (D.D.C. 2021) ....................................................................... 13

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ..................................................................... 13

*Zevallos v. Obama*,
10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015)........................ *passim*

*Zevallos v. Obama*,
793 F.3d 106 (D.C. Cir. 2015) ............................................................................. 10, 23

**STATUTES**

5 U.S.C. § 706 .............................................................................................................. 11, 29

50 U.S.C. §§ 1701-1708 ...................................................................................................... 1

50 U.S.C. § 1701 .................................................................................................................. 3

50 U.S.C. § 1702 .............................................................................................................. 3, 4

50 U.S.C. § 4305 .................................................................................................................. 2

65th Cong. Ch. 106, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. app. §§ 1-44).......... 2

Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept
and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"),
Pub. L. No. 107-56, 115 Stat. 272 (2001) ................................................................. 4

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................... 10

**REGULATIONS**

31 C.F.R. pt. 547 ................................................................................................................. 5

31 C.F.R. § 547.802 ............................................................................................................ 5

31 C.F.R. § 501.807 .................................................................................................. *passim*

Exec. Order No. 12978, Blocking Assets and Prohibiting Transactions With Significant
Narcotics Traffickers,
60 Fed. Reg. 54,579 (Oct. 21, 1995) .......................................................................... 3

Exec. Order No. 13224, Blocking Property and Prohibiting Transactions With Persons Who
Commit, Threaten to Commit, or Support Terrorism,
66 Fed. Reg. 49,079 (Sept. 23, 2001) ........................................................................ 4

iv

Exec. Order No. 13413, Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo,
71 Fed. Reg. 64,105 (Oct. 27, 2006), *as amended by* Exec. Order No. 13671, Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo,
79 Fed. Reg. 39,949 (July 8, 2014)................................................................*passim*

Exec. Order No. 14014, Blocking Property with Respect to the Situation in Burma,
86 Fed. Reg. 9429 (Feb. 10, 2021) ............................................................. 3

89 Fed. Reg. 40372 (May 10, 2024, effective date August 8, 2024)............................................. 6

**OTHER AUTHORITIES**

OFAC, Sanctions Programs and Country Information,
https://ofac.treasury.gov/sanctions-programs-and-country-information ................................... 4

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540................................................. 3

# INTRODUCTION

Defendants are entitled to summary judgment because Plaintiff, a foreign national, cannot show that the Office of Foreign Assets Control acted unreasonably in concluding that Plaintiff's tweets and promises were insufficient to warrant delisting him from sanctions validly imposed for having acted on behalf of the African Gold Refinery Limited and his complicity in activities that threatened the peace, security, or stability of the DRC.  Pursuant to Article II of the Constitution, as well as powers conferred on him by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708 ("IEEPA"), the President has the authority to impose economic sanctions on persons and entities in response to declared national emergencies.  As relevant here, the President invoked IEEPA in relation to a previously declared national emergency, expanding economic sanctions against certain persons contributing to the conflict in the Democratic Republic of the Congo.  *See* Exec. Order No. 13413, Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo, 71 Fed. Reg. 64,105 (Oct. 27, 2006), *as amended by* Exec. Order No. 13671, Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo, 79 Fed. Reg. 39,949 (July 8, 2014) ("EO 13413, as amended" or "the Order"). ("E.O. 13413, as amended" or "the Order").

Acting pursuant to the Order, the Office of Foreign Assets Control ("OFAC") determined that (1) Plaintiff Alain Goetz was responsible for or complicit in, or had engaged in directly or indirectly, support to persons . . . involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo ("DRC") or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC; (2) Plaintiff Goetz was a leader of the African Gold Refinery Limited ("AGR"); and (3) that Plaintiff Goetz had acted for or on behalf of, directly or indirectly, AGR.  OFAC subsequently denied two petitions for

reconsideration, finding that although Goetz is no longer a leader of AGR, the other grounds for designation remain valid, and that Plaintiff Goetz has not demonstrated changed circumstances that merit delisting.

In the present lawsuit, Plaintiff brings a single claim, arguing that OFAC acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA") when it denied his most recent delisting petition. While his complaints of allegedly arbitrary action are numerous, they lack merit, both individually and collectively. Defendants had a reasonable basis to deny Plaintiff's petition, particularly given the deference afforded to the Executive Branch under the APA and in the realm of national security and foreign policy. Indeed, the relied-upon evidence demonstrates that Plaintiff was properly designated for his activities in trafficking illicit gold, and OFAC reasonably determined that Goetz's proposed future "remedial measures" are inadequate to demonstrate changed circumstances or any other basis for delisting. The Court should grant Defendants' Motion for Summary Judgment.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The International Emergency Economic Powers Act (IEEPA)

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals. During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 65th Cong. Ch. 106, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. app. §§ 1-44). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. *See* 50 U.S.C. § 4305(b)(1)(B); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). Although TWEA does not use the term "block," the authority

2

it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

In 1977, Congress amended TWEA and enacted IEEPA. *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declare national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a). Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . .
> transfer . . . of, or dealing in, or exercising any right, power, or privilege
> with respect to, or transactions involving, any property in which any foreign
> country or a national thereof has any interest . . . with respect to any
> property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions on many countries, including Iran, Burma, and North Korea, as well as on individuals, such as narcotics traffickers and terrorists, and their supporters. *See, e.g.*, Exec. Order No. 14014, Blocking Property with Respect to the Situation in Burma, 86 Fed. Reg. 9429 (Feb. 10, 2021) (Burma); Exec. Order No. 12978, Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers, 60 Fed. Reg. 54,579 (Oct. 21,

1995) (narcotics traffickers); Exec. Order No. 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001) (terrorists); *see generally* OFAC, Sanctions Programs and Country Information, https://ofac.treasury.gov/sanctions-programs-and-country-information.

In October 2001, Congress amended IEEPA by passing the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001). Among other things, those amendments provided that, in case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court *ex parte* and *in camera*." *See id.* at 278 (codified at 50 U.S.C. § 1702(c).

## II.    Economic Sanctions With Respect to the DRC.

In accordance with IEEPA, the President issued Executive Order No. 13413 on October 27, 2006, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo." E.O. 13413. In doing so, the President determined that "the situation in or in relation to the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities that continue to threaten regional stability . . . [,] constitutes an unusual and extraordinary threat to the foreign policy of the United States" and "declare[d] a national emergency to deal with that threat." *Id.* In July 2014, also pursuant to IEEPA, the President took further measures through the issuance of E.O. 13671, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo." E.O. 13671. The President explained that these additional steps were warranted "in light of the continuation of activities that threaten the peace, security, or stability of the Democratic Republic of the Congo and the surrounding region." *Id.* In particular, the President blocked, in relevant

part, all property and interests in property of any person determined by the Secretary of the

Treasury:

> (C) to be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following in or in relation to the Democratic Republic of the Congo:
> …
>> (7) support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo or that undermine democratic processes or institutions in the Democratic Republic of the Congo, through the illicit trade in natural resources of the Democratic Republic of the Congo;
>
> . . .
> (E) to be a leader of . . . (ii) an entity whose property and interests in property are blocked pursuant to this order;
> . . .
> (G)  to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.''

E.O. 13413, as amended, 79 Fed. Reg. 39,949, § 1(a)(ii).

The Order further authorizes the Secretary of the Treasury, in consultation with the

Secretary of State, to "take such actions, including the promulgation of rules and regulations, and

to employ all powers granted to the President by IEEPA and the [United Nations Participation

Act], as may be necessary to carry out the purposes of this order," and to re-delegate such functions

as needed.  *Id*. § 4.  Subsequently, the Secretary of the Treasury delegated to the Director of OFAC

the authority to block persons under the Order.  *See* 31 C.F.R. § 547.802.  The agency promulgated

regulations to implement E.O. 13413 and E.O. 13671.  *See* 31 C.F.R. pt. 547.

According to the regulations as worded at the time of Plaintiff's petitions, a person blocked

pursuant to the Order, as well as any other OFAC authority, "may seek administrative

reconsideration of his, her or its designation . . . , or assert that the circumstances resulting in the

designation no longer apply, and thus seek to have the designation rescinded." 31 C.F.R. § 501.807

(2023), *see generally* 64 Fed. Reg. 5614-01 (Feb. 4, 1999).[1]  The blocked person "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation."  *Id.* § 501.807(a).  In addition, the blocked person may propose "remedial steps . . . which the person believes would negate the basis for designation."  *Id.*  Upon review of the submitted information, OFAC could "request clarifying, corroborating, or other additional information."  *Id.* § 501.807(b).  OFAC provides "a written decision to the blocked person" after completing its assessment of the merits of the petition for reconsideration.  *Id.* § 501.807(d).

### III.    Administrative and Procedural Background

On March 17, 2022, OFAC blocked Goetz's property and interests in property pursuant to E.O. 13413, as amended.  DRC-30316-0001-03.[2]  OFAC found that Goetz (1) was "responsible for or complicit in, or has engaged in directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the of the DRC or that undermine democratic process or institutions in the DRC, through the illicit trade in natural resources of the DRC; (2) was a leader of AGR (concurrently designated with Goetz); and (3) had acted or purported to act for or on behalf of directly or indirectly, AGR.  DRC-30316-0013. Goetz had operated the African Gold Refinery (AGR) in Uganda, as well as other companies in the United Arab Emirates (UAE) that received illicit gold from DRC mines controlled by armed

---

[1] A newer version of this regulation, in effect after the relevant decisions here, contains slightly different wording, but does not substantively change the standards applicable to Mr. Goetz.  *See* 89 Fed. Reg. 40372 (May 10, 2024, effective date August 8, 2024).

[2] The agency gathered materials considered with respect to each of the three agency actions related to the Plaintiff:  the original March 17, 2022 designation, the June 30, 2023 denial of the first delisting petition, and the March 1, 2024 denial of the second delisting petition.  *See* Notice of Filing of Certified Indices, ECF No. 29-1.  The materials related to the original designation are bates-stamped with a prefix beginning DRC-30316.  Additional materials underlying the June 2023 denial are bates-stamped with a prefix beginning DRC-34996.  And materials underlying the March 2024 denial are bates-stamped with a prefix beginning DRC-37986.

groups involved in destabilizing activities. DRC-30316-0007. As set forth in greater detail in the evidentiary memorandum accompanying the designation determination, the gold trade, particularly smuggled gold, is a major driver of conflict in the DRC, and provides significant revenue to armed groups. DRC-30316-00017-19. Goetz incorporated and controlled AGR from at least 2014-2017 and was widely identified as trading in large quantities of conflict gold, including trade with specifically identified rebel groups Mai-Mai Yakutumba, and Raia Mutomboki. DRC-30316-0026-34. OFAC further identified Goetz as a leader of AGR, and therefore subject to designation under E.O. 13413, as amended, § 1(a)(ii)(E). DRC-30316-0035-36. Finally, OFAC found that Goetz had acted for or on behalf of AGR, and was therefore also subject to designation under § 1(a)(ii)(G). DRC-30316-0036. These findings were summarized in a press release as well. DRC-30316-0006-09.

Plaintiff had apparently received word or rumor of such a potential action. In a letter dated March 17, 2022 but received after OFAC finalized the blocking order on that same day, Plaintiff requested a stay of any potential designation or other action targeting him in light of information he provided with the letter. DRC-34996-0089-94 (with exhibits 0095-211). On April 29, 2022, Plaintiff filed the original complaint in this matter, alleging that OFAC violated the APA by failing to consider his written submission before undertaking the March 17, 2022 designation action against him. Compl. ECF 1. The parties initially attempted to reach a settlement, but were unable to do so. *See* ECF Nos. 4-6, 9. By letter dated December 6, 2022, OFAC informed counsel for Goetz that OFAC was going to treat the March 17, 2022 letter requesting a "stay" as a petition for delisting under 31 C.F.R. § 501.807. DRC-34996-00948-49. The parties negotiated a schedule, adopted by the Court and later amended, for consideration of that petition prior to briefing in this matter. *See* ECF Nos. 11, 12. In January 2023, OFAC provided Plaintiff with a redacted copy of

the administrative record supporting the designation.  ECF No. 29.  On February 28, 2023, Plaintiff

submitted a supplement to the delisting petition, DRC-34996-0950-56, and later responded to two

questionnaires and made an additional supplement.  DRC-34996-0008-09, 0233-945, 0950-56.

On June 30, 2023, OFAC denied the petition for delisting.  DRC-34996-0001-03.  As set

forth in greater detail in the evidentiary memorandum supporting the denial, OFAC agreed with

Plaintiff's contention that he no longer met the standard for being a leader of AGR following his

formal resignation, but determined that he continued to meet the standards for designation under

Section 1(a)(ii)(C)(7) (has engaged in support to entities that threaten the peace through illicit trade

in natural resources) and Section 1(a)(ii)(G) (has acted for or on behalf of AGR).  DRC-34996-

0011-12.  Additional evidence regarding Goetz's decades-long participation in illicit gold trade

continues to support his original designation, and OFAC assessed that Goetz's denials in this

regard are not credible in light of the weight of the evidence.  *See generally* DRC-34996-0014-24.

Moreover, despite claims that he left AGR entirely in 2018, Goetz remained the majority owner

of AGR, continued signing documents on its behalf through at least mid-2021, and may have

continued to serve in some consulting role, all of which casts doubt on the credibility of claims of

divestment, particularly given his continued ability to participate in the gold trade and failure to

take responsibility for past actions.  DRC-34996-0024-30.  OFAC specifically assessed that

Goetz's proposed remedial measures (compliance measures, reporting requirements, audits and

other provisions) were inadequate to negate the basis for designation, particularly in light of the

difficulty of policing and enforcing the proposed terms of removal.  DRC-34996-0028-29.  The

decision relied in part on foreign policy guidance from State regarding foreign policy grounds for

denial of the petition.  DRC-34996-0012-14, 0030-31, 0961-69.

Following the denial, counsel for the parties were meeting and conferring about scheduling in this matter when Plaintiff indicated his intent to submit additional material to OFAC; specifically, he wished to propose information regarding Plaintiff's new remedial measures, and OFAC agreed to consider this new information in accordance with its reconsideration regulations, *see* 31 C.F.R. § 501.807. *See* ECF No. 18. The parties sought and received a stay of the litigation to permit OFAC to complete its consideration of this new material. *See* ECF Nos. 18-26.

On July 21, 2023, Plaintiff Goetz submitted a letter proposing additional remedial measures. DRC-37986-0036-38. In addition to the original proposed remedial measures, he proposed also to (1) make a public statement "clarifying" his position with respect to trade in conflict gold; (2) make a donation to a charity or nonprofit organization promoting transparent mineral trade or alleviating the consequences of the conflict, and (3) undertake unspecified future efforts to promote initiatives related to supply chain transparency. *Id*. He later responded to a questionnaire in which he provided more information about some of the proposed measures, attached examples of his public statements on Twitter (now X) regarding conflict gold, withdrew his offer to make a donation, and made additional arguments that there was an insufficient basis to maintain the designation. DRC-37986-0039-48 (with exhibits at 0049-99). For example, he relied on what appears to be a leaked, partially redacted copy of the 2023 State foreign policy guidance to argue with State's foreign policy judgment. DRC-37986-0065-73.

On March 1, 2024, OFAC denied the second petition for delisting. DRC-37986-0001-04. As set forth in greater detail in the evidentiary memorandum supporting the denial, OFAC found that Goetz's submission does not undermine the findings in the previous denial, that neither past tweets nor proposed future public statements were sufficient to negate the basis for designation, and that the proposed terms of removal were otherwise insufficient to negate the basis for

designation or demonstrate sufficiently changed circumstances. DRC-37986-0005-22. OFAC specifically considered and rejected Plaintiff's arguments regarding the 2023 foreign policy guidance. DRC-37986-0013. The denial was further supported by additional foreign policy guidance from State that Goetz's delisting under these circumstances would have negative foreign policy consequences in light of his decades-long involvement in the illicit gold trade and lack of demonstration of changed behavior. DRC-37986-0016-19, 0100-103.

Following the denial, OFAC produced the remainder of the administrative record related to designation and denials. ECF No. 29. On July 22, 2024, Plaintiff filed the operative complaint in this matter. *See* Am. Compl., ECF 31. The Amended Complaint challenges OFAC's denial of Plaintiff's second delisting petition, raising a claim under the APA only, and seeking declaratory and injunctive relief. *Id.*

## LEGAL STANDARDS OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 107 (D.D.C. 2014). In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *see also St. Mary Med. Ctr. v. Becerra*, 581 F. Supp. 3d 119, 131 (D.D.C. 2022) (remarking that in an APA record review case "the district judge sits as an appellate tribunal, . . . [and] '[t]he entire case on review is a question of law, and only a question of law.'" (internal citations omitted)).

**DISCUSSION**

OFAC acted reasonably in its designation of Alain Goetz, and Plaintiff has not presented evidence of changed circumstances or proposed terms of removal that would negate the basis for designation. Notably, Plaintiff does not challenge the findings in the original designation, nor the denial of his first delisting petition; he challenges only the denial of his second delisting petition, which asked the agency to consider his submissions again in conjunction with some additional proposed remedial measures. Considering that new information in conjunction with the full record, OFAC continued to act reasonably in denying the petition. Plaintiff's scattershot arguments attempting to poke holes in the agency's reasoning do not suffice to prevail under the APA, particularly under the deferential standard of review applicable here. The Court should grant summary judgment for the Defendants.

## I.    OFAC's Determination is Entitled to Substantial Deference.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). As relevant here, a court should uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416; *see also Joumaa v. Mnuchin*, 798 Fed. App'x 667, 668 (D.C. Cir. 2020) (reviewing OFAC action under "highly deferential" APA standard). An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely

11

failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency"; rather, the agency's decision should be affirmed as long as it is supported by a rational basis. *Id.*; *see also Zevallos*, 10 F. Supp. 3d at 118-19. "The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (cleaned up).

This deference is further heightened in cases, like this one, that involve national security and foreign affairs. *Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). The Supreme Court has emphasized the need for courts to grant this heightened deference, even when considering constitutional claims. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010). And courts routinely have applied such heightened deference in economic sanctions cases, such as the instant matter, including this Court. *See Basengezi v. Smith*, Civ. A. No. 23-1249 (JEB), 2024 WL 1050340, at *5 (D.D.C. Mar. 11, 2024) ("The D.C. Circuit . . . has urged courts to be particularly deferential to executive blocking orders, decisions 'at the intersection of national security, foreign policy, and administrative law.'" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734)), *appeal filed*, No. 24-5130 (D.C. Cir. May 14, 2024); *Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *6 (D.D.C. Apr. 20, 2020), *appeal dismissed*, 2020 WL 4107145 (D.C. Cir. July 1, 2020) (same); *see also Rahmani v. Yellen*, Civ. A. No. 24-0285 (RC), 2024 WL 1701681, at *16 (D.D.C. Apr. 19, 2024) (emphasizing the deferential nature of reviewing economic sanctions); *Karadzic v. Gacki*, 602 F.

Supp. 3d 103, 115 (D.D.C. 2022) (similar); *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 32 (D.D.C. 2022) (similar), *aff'd sub nom. Lopez Bello v. Gacki,* 94 F.4th 1067 (D.C. Cir. 2024); *Ajaka v. Gacki*, 557 F. Supp. 3d 45, 48 (D.D.C. 2021) (similar); *Deripaska v. Yellen*, Case No. 19-cv-00727 (APM), 2021 WL 2417425, at *6 (D.D.C. June 13, 2021) (similar), *aff'd*, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022); *Pejcic v. Gacki*, Case No. 19-cv-02437 (APM), 2021 WL 1209299, at *6 (D.D.C. Mar. 30, 2021) (similar); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 94 (D.D.C. 2021) (similar); *Olenga v. Gacki*, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The D.C. Circuit has shown 'extreme' deference to blocking orders, which fall 'at the intersection of national security, foreign policy, and administrative law.'" (citation omitted)); *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (similar); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

## II.    OFAC Acted Reasonably in Denying Plaintiff's Second Petition for Delisting.

Plaintiff puts forward a variety of reasons that he believes OFAC acted arbitrarily and capriciously, but each argument fails. OFAC's determination pursuant to E.O. 13413, as amended, "meets the 'minimal standards of rationality,' and therefore must be upheld[,]" *see Holy Land Found.*, 219 F. Supp. 2d at 74 (quoting *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)). While Plaintiff challenges only the second denial, that denial was based in part on the records for the original designation and the denial of Goetz's first delisting

petition.   The original designation and each subsequent delisting provide ample basis for the agency decisions at issue.

In 2022, OFAC found, based on ample record evidence, that Goetz was deeply involved in the trade of conflict gold from the DRC from at least 2014 to at least 2017 – a finding based on media reporting, investigation by an independent organization, and investigation by the UN Group of Experts, as well as other public and non-public information.   DRC-30316-0026-34.   For example, the designation record reflects that Goetz publicly admitted that AGR was working with "undocumented gold" as late as 2017 and denied the existence of "conflict gold," DRC-30316-0027 (citing 0273-82), and twelve different sources (including smugglers, traders and government officials) confirmed to an investigatory organization called the Sentry that AGR was trafficking DRC gold, DRC-30316-0029 (citing 0162-217).   The record before OFAC shows that this type of gold trading drove the conflict in the DRC generally, and that Goetz's illicit gold-trading conduct was tied to specific armed groups as well.   DRC-30316-0032-34.   OFAC further determined, based largely on public record evidence, that Plaintiff Goetz was acting for or on behalf of AGR (designated concurrently); indeed, he was identified as the CEO of AGR on a company website as late as October 2018.   DRC-30316-0027 (citing AR1699).   Additional public and non-public evidence supports each of these conclusions.   Thus, there is little doubt that Goetz has "engaged in . . . support to persons . . . involved in activities that threaten the peace, security, or stability of the DRC . . . . through the illicit trade in natural resources."   *See* E.O. 13413, as amended, § 1(a)(ii)(C)(7).   Nor is there any real doubt that Mr. Goetz has "acted or purported to act for or on behalf of . . ." AGR, a designated entity.   *Id*. § 1(a)(ii)(G).[3]

---

[3] OFAC also determined that Goetz was then a leader of AGR.   DRC-30316-0035-36.   Because OFAC subsequently withdrew that finding and it is not challenged, there is no need to reach it here.

14

OFAC also acted reasonably in denying the first delisting petition in 2023. OFAC found that Goetz was no longer a leader of AGR, but that the other bases for listing continued to apply. During that proceeding, Goetz argued that the allegations against him in the media were not credible or specific, that he was an advocate for better transparency and due diligence, that he divested entirely from AGR, and that there was no evidence of ongoing sanctionable conduct, and he proposed certain remedial measures that he claimed justified delisting under a "Terms of Removal" agreement. DRC-34996-0009-11 (citing 89-211, 212-32). Upon consideration of each of these arguments, OFAC determined that Goetz was no longer subject to designation for "being a leader" of AGR under section 1(a)(ii)(E) but continued to meet the past-tense prongs in sections 1(a)(ii)(C)(7) and 1(a)(ii)(G). DRC-34996-001-03. OFAC re-affirmed its previous findings on these points and included additional, credible evidence, including but not limited to a report from UAE's Financial Intelligence Unit and a report from the Southern Africa Resource Watch, both of which provide detailed description and evidence of Goetz's long-standing participation in the trade of smuggled conflict gold in the DRC. DRC-34996-0014-19 (citing 1108-95, 1320-46). The latter report detailed involvement dating back into the 1990s. Id. The EU also sanctioned Goetz for his trade in DRC conflict gold. DRC-34996-0017 (citing 1087-1101). OFAC further determined that his claims of advocacy for transparency were not credible, given his longstanding involvement in conflict gold and continued attempts to obfuscate or deny that involvement. DRC-34996-0016-24. While Goetz stepped down as CEO around 2018, he continued signing documents on behalf of the company and was beneficial owner of the company until at least June 2021, and he later admitted to a continued consulting arrangement with AGR, a claim later walked back. DRC-34996-0024-28 (citing, inter alia, 0092, 0188-95, 0841, 0950-56, 0970-76. OFAC found that his public efforts to obfuscate that involvement undermine his other claims of changed circumstances.

DRC-34996-0026. OFAC further assessed, based on Plaintiff's questionnaire responses, that he

has the means to continue his participation in the conflict gold trade based on his ownership of

several metal companies, including an active gold refinery. DRC-34996-0029-30 (citing 0844-45,

1349-78). Finally, OFAC evaluated Goetz's public statements on the gold trade and found that he

continued to denounce those investigating the illicit gold trade and disclaim responsibility.

Relying on foreign policy guidance from the State Department, OFAC found that Goetz's

designation supported international cooperation on the issue of conflict gold, and that delisting

would undermine those efforts, particularly given his failure to take responsibility for his actions,

and ongoing international investigations. DRC-34996-0013-14, 0030-31 citing 0961-69, 1289-

1316. State advised that delisting Goetz without "full acceptance and acknowledgement of

responsibility for his decades-long pattern of past actions and their connection to the conflict in

the region" would "undermine actions the United States is taking both in Eastern Congo and other

contexts related to the conflict and illicit gold trade." DRC-34996-0967-68. OFAC further found

the proposed TOR insufficient to negate the basis for designation and unworkable in light of

Goetz's pattern of obfuscation and difficulties with enforcement. DRC-34996-0028-29. The

whole of the record supports the denial, and "[b]y relying on the opinion of a subject-matter expert

like the State Department, OFAC marshaled sufficient support for its determination." *Pejcic*, 2021 WL

1209299, at *8.

Ultimately, OFAC's denial of the second delisting petition was also reasonable, based on

a review of the whole record. In this second petition, Plaintiff requested that three new proposed

remedial measures be considered "alongside" his previous arguments. He later retracted one of

those proposals (for a donation), leaving only two new proposed remedial measures: (1) public

statements with regard to the trade of conflict gold; and (2) undertaking efforts to promote and

support initiatives related to supply chain transparency. In a supplement, he made further

arguments that his previous public statements and efforts were sufficient to support delisting, that the severing of his relationship with AGR supports delisting, that State's foreign policy guidance impermissibly imposes new requirements, and that he was treated differently than other Specially Designated Nationals (SDNs) given State's insistence that he accept responsibility for past conduct. DRC-37986-0010-11 (citing 0036-48). OFAC rejected the proposed TOR for the same reason as the previous proposal – it does not fully address the basis for designation or ameliorate the threat, and a TOR is unworkable without both trust and transparency. DRC-37986-0012. Additional foreign policy guidance from State confirms that conclusion, explaining that the proposed future statements and activities are too amorphous to demonstrate changed circumstances. *Id*. at 18, citing AR100-103.

OFAC expressly considered and rejected Plaintiff's contention that the State foreign policy guidance required him to admit past sanctionable conduct to be considered for delisting. DRC-37986-0013. His failure to accept responsibility certainly formed the basis for State's foreign policy views, but that is not an imposition of a blanket requirement for admission of past conduct. OFAC expressly stated "OFAC does not 'require an admission of sanctionable conduct' as a prerequisite to delisting in general, although in some cases, acceptance of responsibility for past acts could be evidence of changed circumstances, depending on the totality of the circumstances." *Id*. Here, there was no such evidence that might weigh against the powerful foreign policy interests in maintaining a designation.

OFAC also reasoned that the past conduct forming the basis for designation was not further contradicted, and that his vague public statements and amorphous proposals for collaborative partnerships failed to demonstrate the kind of changed circumstances that might negate the basis for listing. DRC-37986-0012-16. OFAC reiterated its finding that Goetz's resignation from AGR

17

was insufficient, including that Goetz's consulting relationship may have ceased. DRC-37986-0016. His long history of involvement in the illicit gold trade, a history of obfuscating his ownership and control of AGR and other entities, and his current ownership of companies that may enable his participation in the gold trade all support OFAC's second denial as well. *Id*. Finally, OFAC considered new foreign policy guidance from the State Department and State's recommendation that delisting under these circumstances would have negative foreign policy consequences. DRC-37986-0016-19 (citing 0100-03).

OFAC's decision is thus fully supported by the administrative record and consistent with the evidence before the agency. *See State Farm*, 463 U.S. at 43.

### III.    Plaintiff's Arguments Do Not Undermine that Conclusion.

A.  Plaintiff is Subject to Sanctions for Past Conduct.

First, Plaintiff argues generally that Defendants "fail[ed] to provide any basis for Plaintiff's continued designation that is connected to the designation criteria of [E.O. 13413, as amended], or to the bases for delisting set forth in [the regulations]. Am. Compl. ¶ 115. The Amended Complaint, however, does not appear to dispute now the central finding of the original designation – that Goetz was deeply involved in the trade of conflict gold from the DRC from at least 2014 to at least 2017. DRC-30316-0026-34. He also does not now dispute that he was acting for or on behalf of AGR, a now-sanctioned entity. *See, e.g.*, DRC-30316-036, 27 (citing 1699). Rather, the Amended Complaint takes issue only with the "continued" designation of Plaintiff, Am. Compl. ¶ 115, in part because "Defendants do not allege any specific or ongoing sanctionable conduct by Plaintiff." *Id*. ¶ 116.

Even assuming that were correct, designation on past conduct alone is permissible and reasonable. OFAC's determination is consistent with the text of the Executive Order, which

expressly permits the agency to designate an individual for past conduct.  *See* E.O. 13413, as amended, § 1(a)(ii)(C)(7) (permitting designation of an individual who has "engaged in . . . support to persons . . . involved in activities that threaten the peace, security, or stability of the DRC . . . . through the illicit trade in natural resources"); *id*. § 1(a)(ii)(G) (permitting designation of a person who has "acted or purported to act for or on behalf of . . ." a designated entity).  As courts in this district have repeatedly held, "past conduct alone is sufficient for maintaining sanctions."  *See Karadzic*, 602 F. Supp. 3d at 114; *see also Basengezi,* 2024 WL 1050340, at *7 ("E.O. 13413 expressly permits designating persons based solely on past activity") (citation omitted);  *Pejcic*, 2021 WL 1209299, at *7 ("Pejcic need not be engaged in sanctionable conduct at the time his delisting petition is considered for OFAC to reasonably conclude that he should remain a sanctioned person."); *Olenga*, 507 F. Supp. 3d at 281–82 ("[T]he President has broad authority under IEEPA and could reasonably conclude that the deterrence of international bad actors, at least at times, requires the imposition of sanctions on those who have retired or moved on to other pursuits. Such a determination is precisely the type of judgment that is properly left to the President and his advisors[.]").  In *Karadzic*, the Court reasoned that "[i]t is not unreasonable that sanctions could maintain their usefulness even if the original reasons for implementing them no longer apply" and declined to "second guess the Executive's permissible policy judgments in this area." 602 F. Supp. 3d at 114-15.  This Court should do the same, and Goetz's past conduct alone is sufficient to maintain the designation, especially where, as here, there are powerful policy reasons supporting the continued imposition of sanctions.  *See* DRC-34996-0961-69 (2023 FPG); DRC37986-00100-03 (2024 FPG).

    B.  OFAC Has Reasonable Basis to Doubt that Goetz Has Cut Ties with AGR and Reasonable Concerns that his Conduct Might Recur.

Moreover, OFAC remains justifiably dubious of Plaintiff's insistence that he has no further involvement in the illicit gold trade. Goetz has been involved in the illicit gold trade involving Congolese conflict gold since the 1990s. *See* DRC-34996-0012, 0018, 0961-69, 1108-95; DRC-37986-0100-03. And he admitted to some continued involvement with AGR as recently as two years ago, when he admitted to a continued consultancy role with AGR, DRC-34996-0027 (citing 0092) a role he now claims has either ceased, DRC-34996-0243, or never occurred, DRC-34996-0841; *see also* DRC-34996-0022 (citing 0981-84) (describing 2022 media reporting that Goetz sold his AGR shares in response to a new export tax but "stayed around"). Moreover, OFAC found that he has the means to continue participating in the illicit gold trade, DRC-34996-0029, and he described himself as having "operated within the gold industry for most of his career," including "establishing refineries." DRC-34996-0091.

Although Plaintiff now argues that the record "fails to describe how Plaintiff's inactive companies can be resuscitated to engage in the activities necessary to deal with rebel groups or trade in conflict gold in the DRC," Am. Compl. ¶ 119, the uncontradicted record shows that Goetz owns or controls several companies that have the means to participate in the gold trade, including an active gold refinery. DRC-34996-0029 (citing 0841, 0844-45 1349-78). And he himself has expansive, decades-long experience in the gold trade in the region. DRC-34996-0012, 0018, 0961-69, 1108-95; DRC-37986-0100-03. While the Amended Complaint refers to the companies as "inactive", his questionnaire responses indicate that he is a current owner of several companies involved in the metals trade, and that the gold refinery is active despite actions taken by the Rwandan government. DRC-34996-0845. The State department agreed, reasoning "Whether his business is conducted via AGR or other entities, his statements demonstrate that his ongoing and

likely future role in this trade and the broader policy concerns connected thereto remain a significant concern." DRC-34996-0014 (citing 0967).

Moreover, OFAC's concerns about Goetz's continued involvement are reasonable because the record supports OFAC's conclusion that Goetz has a long history of denying and obfuscating his involvement in the trade of conflict gold. DRC-34986-0016. Although Plaintiff argues that Defendants failed to explain why OFAC found Goetz not to be credible, Am. Compl. ¶ 124, nothing could be further from the truth. For example, Plaintiff told OFAC in 2022 that he "has not sourced or refined illegally smuggled conflict gold at AGR" and touted his compliance measures at AGR for preventing the use of conflict gold. DRC-34996-0091. OFAC assesses those claims to be false based on the whole record before it. *See, e.g.*, DRC34996-0021-24; DRC-30316-0028-31. To provide a small snapshot of a fraction of the evidence, twelve different sources told the Sentry that AGR sourced conflict gold from DRC, DRC-30316-0029-30 (citing 0164), and the UN group of experts examined sources and documents showing that AGR knew its suppliers were not always legal, including a supplier known to be a broker for DRC smugglers who had declared his gold was sourced from Tanzania, DRC-30316-0030 (citing 0990); *see also* DRC-30316-0030 (citing 0476) (another GOE report). And in a meeting with State, Goetz insisted he did not deal in conflict gold but admitted that there was no effective traceability of the gold he refined; another source indicated that Goetz was friendly to DRC warlords and AGR generally failed to investigate the source of its gold during his time there. DRC-30316-0031 (citing 0146-50). Reporting by media, investigators, governments and nonprofits all report that AGR's "due diligence" and "compliance" measures were but a fig leaf for what was likely massive gold smuggling from the DRC to Uganda. DRC-34996-0021-24.

It is noteworthy that his ownership and control of AGR was itself the subject of some possible obfuscation. Goetz informed OFAC in 2022 that the allegations against AGR were irrelevant because he was no longer an owner or manager since selling his shares in 2018, and provided documentation that he sold his shares to AGR International in 2018. DRC-34996-0092-93. And he apparently told a reporter that he no longer owned AGR. DRC-34996-0026 (citing 1229-37). Media reporting confirms that in 2019, Goetz nonetheless continued signing documents for AGR. DRC-34996-026 (citing 0970-76). He later confirmed, after receiving the administrative record for the initial designation, that he actually retained ownership control through his ownership of AGR International until June 2021. DRC34996-0025, 0218. In 2022, he claimed "he" wrote to Secretary Yellen regarding proposed sanctions, an apparent reference to a 2021 letter sent by AGR's attorney on behalf of AGR. DRC-34996-0027-28 (citing 1073-77, 1078-83). And, as noted above, Goetz has flipflopped on the question of his alleged "consulting" role with AGR after the sale of his shares.

This finding that Goetz lacks credibility is further buttressed by OFAC's findings that Goetz was importing Venezuelan gold to Uganda in 2019, and attempting to disguise its origin to evade US sanctions, a finding he continues to deny. DRC-34996-0019-20 (assessing that Goetz was falsely denying his role in Venezuelan gold smuggling) (citing 1229-37).[4] The determination that Goetz lacks credibility is further supported by nonpublic evidence. DRC-34996-0029.[5]

---

[4] Goetz was also convicted of money laundering and fraud for a fraudulent system in 2010 and 2011 for anonymous customers to sell gold to his company for cash, creating a black market in gold, DRC-30316-0036, further demonstrating his long history of participation in illicit gold trade.

[5] Confusingly, the Amended Complaint asserts that "Plaintiff has had to cease his involvement in companies that he founded, such as AGR, due to the designation." Am. Compl. ¶ 108. During the administrative process, of course, Goetz insisted that he had ceased his involvement with AGR prior to the designation. *See, e.g.,* DRC-34996-0218. His claims about the timing and degree of involvement with AGR continue to shift.

While Plaintiff may disagree with OFAC's treatment of his self-serving claims, he provides no reason for the Court to second-guess OFAC's fact-finding process or its credibility determinations, which prior decisions in this Circuit have upheld. *E.g.*, *Zevallos*, 10 F. Supp. 3d at 123 n.9 (finding unpersuasive plaintiff's argument that "OFAC relied on 'outdated, biased, and incredible sources'"—plaintiff "made these arguments to OFAC, . . . OFAC concluded that the evidence before it *was* credible, . . . [and] [i]t is not the province of this Court to reweigh the evidence and reconsider [plaintiff's] arguments on appeal" (citation omitted)); *Pejcic*, 2021 WL 1209299, at *8 ("While Pejcic might see the evidence differently, the court does 'not ask whether the record evidence could support the petitioner's view of the issue, but whether it supports the agency's ultimate decision.'" (quoting *Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015)).

  C. OFAC Reasonably Linked Plaintiff's Conduct to Armed Groups in the DRC.

Next, Plaintiff also argues that "Defendants' administrative record fails to specify conduct linking Plaintiff to rebel groups purportedly operating in the DRC, much less allege any ongoing conduct by Plaintiff." Am. Compl. ¶ 119. The record is replete with explanations as to how gold smuggled out of the DRC benefits armed groups that threaten the peace, security and stability of the DRC. Relying on media, nonprofit and UN reporting, OFAC explained that gold is a major driver of the conflict, providing the largest source of revenue to armed groups, including rebels and national military units that profit, and the vast majority of the gold leaving the DRC is smuggled out of the country in coordination with these groups. DRC-30316-0017-19 (citing, inter alia, 2092-2117, 0588-91). The bulk of evidence described in Part II describes AGR's sourcing of smuggled gold from DRC, and a general unwillingness to ask or answer questions about the source of that gold. *See generally supra.* And the foreign policy guidance provided by State explains that "Mr. Goetz has been an integral and essential part of the conflict gold trade in the DRC since the 1990s" and "his role as a buyer and trader of gold during the DRC's civil wars in

the 1990s helped create the ecosystem that exists today where gold is used by numerous armed groups to fund conflicts and violence." DRC-34996-0012 (citing 0961-69). There is no requirement that OFAC further identify the specific groups being supported or show direct linkage. Indeed, the EO specifies that the support may be "indirect[]". E.O. 13413, as amended. Accordingly, the general evidence about Goetz's use of smuggled gold from the DRC, which generally benefits armed groups and drives the conflict is sufficient to support Goetz's designation.

But in fact, OFAC has also identified specific groups whose activities that Goetz has supported – including Mai-Mai Yakutumba and Raia Mutomboki, both of which are armed groups threatening the peace of the region. DRC-30316-0032-33. While the majority of the information linking Goetz to these groups is redacted from the public record, it is available for the Court's review *ex parte* and *in camera*. Moreover, the public record confirms that, in 2022, EU sanctioned Goetz for his past support of these groups. DRC-34996-0017 (citing 1087-1101). Moreover, Mai-Mai Yakutumba was active in North Kivu and South Kivu provinces of the DRC. DRC-34996-0033 (citing 2242-48). Those are provinces from which AGR acknowledges sourcing large amounts of gold, even though it denies sourcing from "conflict areas." DRC-30316-0031 (citing 0172).

D.   OFAC Reasonably Found No Change in Circumstances Justifying Delisting.

Plaintiff also argues that OFAC has ignored the multiple changes in his circumstances – like his resignation from AGR and his public statements on the gold trade. Am. Compl. ¶¶ 122-23. This argument falls short – most of the written decision material addressing the first and second delisting petition are focused on this precise issue – whether the formal change in his position and other submissions warrant delisting under the circumstances. *See generally* DRC-34996-0001-36; DRC-37986-0001-22. OFAC accepted that Goetz had formally resigned from AGR but found that

the past conduct continued to justify his designation under other prongs and that these changes and his subsequent public statements to be insufficient under the circumstances. Past conduct alone can be sufficient to deny delisting. *See, e.g, Basengezi*, 2024 WL 1050340, at *7. The first denial memorandum amply considers his resignation from AGR and decides it is insufficient to justify delisting, particularly in light of continued concerns about his credibility and his continued ability to engage in the gold trade. DRC-34996-0011-12.

OFAC also adequately considered the public statements that Plaintiff invokes. The second denial memorandum shows that OFAC considered the five tweets he claimed justified delisting, and found them insufficient to negate the basis for his listing. DRC-37986-0013-16 (considering 0049-63). As described by the State FPG, the statements are "vague, high level and devoid of serious content" and "do not provide any meaningful demonstration of change in behavior". DRC-37986-0013 (citing 0100-03). Mr. Goetz cannot force the United States to delist him by tweeting generalized pablum about his personal support for transparency and traceability.

E.  OFAC Reasonably Found Goetz's Proposed Terms of Removal Inadequate.

Next, Plaintiff argues that OFAC improperly discounted his proposed Terms of Removal by finding that "commitments to take actions in the future are generally insufficient to justify delisting." Am. Compl. ¶ 123. In fact, OFAC made no such blanket finding. A commitment to future actions can form a reasonable part of a changed circumstances delisting in an appropriate case, but this is not that case. Mr. Goetz was designated based on past conduct that he has neither acknowledged or disproven. *Cf. Basengezi*, 2024 WL 1050340, at *7 (upholding denial based solely on past conduct); *Karadzic*, 602 F. Supp. 3d at 114-15; *Pejcic*, 2021 WL 1209299, at *7 ; *Olenga*, 507 F. Supp. 3d at 281–82. OFAC is under no obligation to delist people who have proposed future actions that OFAC has little meaningful way to monitor and enforce, particularly where "Goetz's past instances of obfuscation . . . undermine his credibility and OFAC's trust in the material that would be provided by Goetz under the

25

requirements of a TOR." DRC-34996-0029. As OFAC further reasoned, "OFAC may be constrained in its ability to enforce the requirements of the TOR as it relates to entities that are domiciled outside of the U.S." *Id*. For example, Plaintiff's proposals included regular documentation, certification and audits, as well as other reporting and informational requirements, but in order for those to be effective, OFAC would need to devote substantial resources to oversight and review and trust that it was getting accurate information from outside its jurisdiction. *See* DRC-34996-0010-11. As further explained in the second denial, although many of the proposed initiatives would be "welcome", "proposed possible future actions do not at this point provide a basis for finding changed circumstances." DRC-37986-0015-16. And the latest proposals lack any meaningful specificity about what Goetz is willing to undertake. *Id*. (citing 0036-48). Any one of these reasons would be a sufficient basis not to enter a Terms of Removal. *Cf. Karadzic*, 602 F. Supp. 3d at 114-15 ; *Pejcic*, 2021 WL 1209299, at *7 ; *Olenga*, 507 F. Supp. 3d at 281–82. Plaintiff's disagreement with the agency's action is not a basis for a finding that it was contrary to law.

    F.   Plaintiff's Arguments about Acknowledgement of Past Conduct are Unpersuasive.

Lastly, Plaintiff argues that Defendants inappropriately "requir[ed] an admission of sanctionable conduct to merit potential delisting," Am. Compl. ¶ 118, and that this requirement is inconsistent with the regulations and with due process, *id*. ¶ 120 and treats Goetz arbitrarily vis-à-vis other petitioners, *id*. ¶ 121. As explained above in Part II, OFAC expressly considered and rejected Plaintiff's contention that the State foreign policy guidance required him to admit past sanctionable conduct to be considered for delisting. DRC-37986-0013. His failure to accept responsibility certainly formed the basis for State's foreign policy views, but that is not an imposition of a blanket requirement for an admission in order to be considered for delisting. OFAC expressly stated "OFAC does not 'require an admission of sanctionable conduct' as a prerequisite to delisting in general, although in some cases, acceptance of responsibility for past acts could be

evidence of changed circumstances, depending on the totality of the circumstances." *Id*. Here, there was no such evidence that might weigh against the powerful foreign policy interests in maintaining a designation. *See generally* DRC-37986-0100-03.

Next, Plaintiff argues, the "requirement" that he admit past conduct is inconsistent with due process because past sanctionable conduct alone is sufficient to merit continued listing and he will remain listed regardless of whether he admits past conduct or not. Am. Compl. ¶ 120. To the extent Goetz is attempting to invoke the due process clause of the Constitution, such a claim is not properly noticed in a complaint that pleads only an APA claim. Moreover, as an alien outside the United States who has not identified any contacts with the United States, he lacks Fifth Amendment protection. *See Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (rejecting claim to constitutional rights where plaintiffs "demonstrated neither a property interest nor a presence in this country.").

But even if the Court were to reach this argument, the substance of Plaintiff's argument is nonsense. Goetz's dilemma -- that he can neither confirm nor deny his past conduct -- arises because he engaged in sanctionable conduct and has argued untruthfully to the contrary. If he could have persuaded OFAC he did not engage in sanctionable conduct, he could have been delisted on that basis. *See* 31 C.F.R. § 501.807. If he could have persuaded OFAC that he did engage in sanctionable conduct, but that the totality of the circumstances were sufficiently different now that sanctions were no longer justified, he could have been considered for delisting on that basis. *See* DRC-37986-0013. The State Department even offered an accounting of the sorts of circumstances that might be considered in future foreign policy guidance. DRC-34996-0967-68.

None of those things happened. OFAC's assessment that he has not demonstrated a change in circumstances that would negate the basis for the listing in light of his past conduct, lack of acknowledgement of past conduct, and general lack of credibility is reasonable under the circumstances. There is certainly no failure in OFAC's procedures – Plaintiff's dilemma is of his own making.

This Court rejected a similar argument in *Basengezi*, where the plaintiff argued that if past conduct was a basis for rejecting a delisting petition, then a plaintiff could never show changed circumstances under the regulation. "While he is right that a designated individual 'may' petition OFAC to be delisted by 'assert[ing] that the circumstances resulting in the designation no longer apply,' 31 C.F.R. § 501.807, nothing in the regulations compels OFAC to delist an individual who has ceased to engage in previous sanctionable conduct." *Basengezi*, 2024 WL 1050340, at *7. The Court thus upheld a delisting denial based on past sanctionable conduct.

Plaintiff also argues he was treated unfairly because others have been removed from the SDN List without admission of past sanctionable conduct. Am. Compl. ¶ 121. That allegation tends to demonstrate OFAC's point that there is not a blanket requirement for an admission of past sanctionable conduct; rather, each case is evaluated on its own merits and with due considerations for the foreign policy and national security implications of the proposed delisting.

                                        ***

As set forth above, the administrative record amply demonstrates that OFAC's denial of Goetz's second delisting petition satisfies the highly deferential APA standard that the Court must apply here. *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining that a court must uphold OFAC's decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'") (citation omitted); *Holy Land Found.*, 219 F. Supp. 2d at 74 (decision must be affirmed if it "meets the 'minimal standards of rationality'") (quoting *Small Refiner Lead Phase-Down Task Force*, 705 F.2d

at 521).  Accordingly, there is no basis to conclude that OFAC's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).  The Court should therefore grant Defendants summary judgment on Count One of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, and based on review of the whole administrative record, the Court should grant Defendants' Motion for Summary Judgment.

Dated: September 20, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/Amy E. Powell*
AMY E. POWELL
Senior Trial Attorney
Federal Programs Branch
Civil Division, Department of Justice
c/o U.S. Attorney's Office
150 Fayetteville St., Suite 2100
Raleigh, NC 2760
Phone: 919-856-4013
Email: amy.powell@usdoj.gov

*Counsel for Defendants*