

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

Case ID DRC-17840

OFFICE OF FOREIGN ASSETS CONTROL

### DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13413 of October 27, 2006, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," as amended by Executive Order 13671 of July 8, 2014, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo" (as so amended, the "Order"), the Democratic Republic of the Congo Sanctions Regulations, 31 C.F.R. part 547 (the "Regulations"), section 203 of the International Emergency Economic Powers Act (50 U.S.C. § 1702), the National Emergencies Act (50 U.S.C. §1601 *et seq.*), section 5 of the United Nations Participation Act, as amended (22 U.S.C 287c), and section 301 of title 3, United States Code, I hereby determine, in consultation with the Secretary of State, that the 1 individual and 9 entities identified below, and further addressed in the attached evidentiary memorandum (Case ID DRC-17840), meet one or more of the criteria for designation set forth in the Order. Therefore, the persons identified below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List (the "SDN List").

#### Individual:

1. GOETZ, Alain Francois Viviane (a.k.a. GOETZ, Alain; a.k.a. GOZ, Alen), The Palm Jumeirah 0-35, 65919, Dubai, United Arab Emirates; Villa 39, Frond N, The Palm Jumeirah, Dubai, United Arab Emirates; DOB 24 Apr 1965; alt. DOB 20 Apr 1965; POB Antwerp, Belgium; nationality Belgium; citizen Turkey; Gender Male; Passport EP985086 (Belgium) issued 08 May 2018 expires 07 May 2025; alt. Passport 50641895930 (Turkey) expires 10 Jul 2030; Identification Number 784196536027277 (United Arab Emirates) (individual) [DRCONGO] (Linked To: AFRICAN GOLD REFINERY LIMITED).

#### Entities:

1. AFRICAN GOLD REFINERY LIMITED (a.k.a. AFRICAN GOLD REFINERY UGANDA), Plot No. M103 and 106, Sebugwawo Road, Entebbe, Uganda; P.O. Box 37574, Kampala, Uganda; Organization Type: Mining of other non-ferrous metal ores; Target Type Private Company; Registration Number 180334 (Uganda) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

2. AGOR DMCC (a.k.a. AGOR LTD; a.k.a. AGOR PRECIOUS METALS), Office Number 703A, 7th Floor, Mazaya Business Avenue, AAI, JLT, Dubai, United Arab Emirates; Organization Type: Manufacture of jewellery and related articles; Commercial Registry Number 30641 (United Arab Emirates); alt. Commercial Registry Number 805920 (United Arab Emirates) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

3. AGR INTERNATIONAL LIMITED, Global Gateway, 8 rue de la Perle, Providence, Mahe, Seychelles; Organization Type: Activities of holding companies; Target Type Private Company; Company Number 200304 (Seychelles) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

4. ALAXY (a.k.a. ALAXY BVBA; f.k.a. BERKENRODE BVBA), Jacob Jacobsstraat 56, Antwerp 2018, Belgium; Organization Type: Other business support service activities n.e.c.; Target Type Private Company; Enterprise Number 0478862274 (Belgium) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

5. CG - VASTGOED INVEST, Jacob Jacobsstraat 56, Antwerp 204818, Belgium; Organization Type: Activities of holding companies; Target Type Public Company; Enterprise Number 0806408906 (Belgium) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

6. GOETZ GOLD LLC (a.k.a. PGR GOLD LLC; a.k.a. PGR GOLD TRADING LLC), Dubai, United Arab Emirates; Organization Type: Mining of other non-ferrous metal ores; Commercial Registry Number 689308 (United Arab Emirates) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

7. OROFINO NV (a.k.a. "OROFINO"), Jacob Jacobsstraat 56, Antwerp 2018, Belgium; Organization Type: Activities of holding companies; Target Type Public Company; Enterprise Number 0892529761 (Belgium) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

8. PREMIER GOLD REFINERY LLC, Al Qusais Industrial 5, Dubai, United Arab Emirates; P.O. Box 64701, Dubai, United Arab Emirates; Plot No. 248-384, Dubai, United Arab Emirates; Organization Type: Manufacture of basic precious and other non-ferrous metals; Business Registration Number 716708 (United Arab Emirates) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

9. WWG DIAMONDS, Jacob Jacobsstraat 56, Antwerp 2018, Belgium; Target Type Private Company; Enterprise Number 0821135682 (Belgium) [DRCONGO] (Linked To: GOETZ, Alain Francois Viviane).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the persons named above that are in the United States, that hereafter

come within the United States, or that are or hereafter come within the possession or control of U.S. persons are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the persons named above is prohibited.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are prohibited: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the Order or the Regulations and (2) any conspiracy formed to violate any of the prohibitions set forth in the Order or the Regulations.

The President has found in Section 4 of the Order that, because of the ability to transfer funds or other assets instantaneously, prior notice to persons designated pursuant to the Order who might have a constitutional presence in the United States of measures to be taken pursuant to the Order would render these measures ineffectual. Therefore, the President determined that there need be no prior notice of a listing or determination made pursuant to subsection 1(a) of the Order. Accordingly, I also find that no prior notice should be afforded any persons named above because to do so would provide an opportunity to evade the measures authorized by the Order and, consequently, render those measures ineffectual.

3/17/22

Date

Andrea M. Gacki
Digitally signed by Andrea M. Gacki
Date: 2022.03.17 11:05:48 -04'00'

Andrea M. Gacki
Director
Office of Foreign Assets Control

DRC-30316 0003

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Sanctions Alain Goetz and a Network of Companies Involved in the Illicit Gold Trade

March 17, 2022

*Action Highlights U.S. Focus on Illicit Exports of Gold from the Democratic Republic of the Congo*

WASHINGTON — Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), sanctioned Alain Goetz, the African Gold Refinery in Uganda, and a network of companies involved in the illicit movement of gold valued at hundreds of millions of dollars per year from the Democratic Republic of the Congo (DRC). The illicit movement of gold provides revenue to armed groups that threaten the peace, security, and stability of the DRC. Today's action was taken pursuant to Executive Order (E.O.) 13413, as amended by E.O. 13671, which targets, among other things, individuals and entities involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC. Our action demonstrates the U.S. commitment to disrupt the illicit mineral trade and encourage mining sector transparency.

More than 90 percent of DRC gold is smuggled to regional states, including Uganda and Rwanda, where it is then often refined and exported to international markets, particularly the UAE. In eastern DRC, where there are approximately 130 active armed groups, the gold trade is a major driver of conflict. A network of armed groups, smugglers, and companies generates illicit revenue from the gold industry through forced labor, smuggling, or by extorting payments from miners. These actors use revenue from gold to finance armed conflict and enrich themselves while depriving the DRC of tax revenue and disregarding the environment and local communities.

"Conflict gold provides the largest source of revenue to armed groups in eastern DRC where they control mines and exploit miners," said Under Secretary of the Treasury for Terrorism and Financial Intelligence Brian E. Nelson. "Alain Goetz and his network have contributed to armed conflict by receiving DRC gold without questioning its origin. Treasury has been very clear: global gold markets, at every step of the supply chain, must engage in responsible sourcing and conduct supply-chain due diligence."

DRC-30316 0006

## CONFLICT MINERALS COMPLIANCE

The United States supports private sector adoption of supply chain due diligence procedures in mineral supply chains, including ones for precious metals and gemstones. Today's action shows that given the multiple threat finance concerns throughout these supply chains, due diligence is a key tool for the private sector to mitigate risks from U.S. and international sanctions regimes.

Additionally, U.S. companies that are required to file a Conflict Minerals Report to the Securities and Exchange Commission must exercise due diligence on the source and chain of custody of their conflict minerals, including gold. The due diligence measures must conform to a nationally or internationally recognized due diligence framework, such as the Organization for Economic Cooperation and Development (OECD) Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas.

Today's action is also in line with the United States' continued support for international recognition of the importance of supply chain due diligence as captured by UNSC Resolution 1952 (2010) and the commitments by regional states and the International Conference on the Great Lakes Region (ICGLR) set out in the 2010 Lusaka Declaration to Fight the Illegal Exploitation of Natural Resources in the Great Lakes Region.

## ALAIN GOETZ (GOETZ)

Goetz is a businessperson from Belgium who operates the African Gold Refinery (AGR) in Uganda, as well as companies in the UAE that receive illicit gold from mines in regions of DRC that are controlled by armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki that are involved in destabilizing activities in South Kivu, DRC. Goetz's gold network has extensive refining and transport capabilities and sources gold from DRC, Kenya, South Sudan, and Tanzania. In 2014, Goetz incorporated AGR and has maintained ownership or control of AGR since then through his majority ownership of an offshore holding company in the Seychelles, AGR International Ltd., which holds virtually all of the shares of AGR, making Goetz the overall beneficial owner and/or shareholder of AGR. Since establishing AGR, Goetz has held multiple leadership positions in the company, including chief executive officer and director, and has been involved in AGR's gold trading activities. In 2018, Goetz acknowledged that AGR refines about 150 kilograms of gold from the DRC per week, or approximately 8.5 tons per year, valued at $496 million. This amounts to almost all of Uganda's total gold exports in 2018, which were approximately 10 tons and valued at $515 million.

Goetz was designated pursuant to E.O. 13413 for being a leader of AGR, for having acted or purported to act for or on behalf of, directly or indirectly, AGR, and for being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

## AFRICAN GOLD REFINERY (AGR)

Since 2016, AGR has sourced illicit gold from mines in regions of DRC that are controlled by armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki that are involved in destabilizing activities in South Kivu, DRC. AGR has a refining capacity of 219 tons per year and is considered one of the largest gold refineries in Africa, after refineries in South Africa and Ghana. AGR and Goetz acknowledged that a share of the gold AGR refines comes directly from mines in the DRC and has taken over a significant portion of the market for gold trafficked from the DRC.

AGR was designated pursuant to E.O. 13413 for being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

The following entities were also designated pursuant to E.O. 13413 for being owned or controlled by, or for having acted or purported to have acted for or on behalf of, directly or indirectly, Alain Goetz:

- **Agor DMCC** is a UAE-based gold refinery that imports gold from AGR and is owned or controlled by Goetz.
- **AGR International Ltd.** is a Seychelles-based holding company owned or controlled by Goetz.
- **Alaxy** is a Belgium-based management company that is owned or controlled by Goetz.
- **CG – Vastgoed Invest** is a Belgium-based holding company owned or controlled by Goetz.
- **Goetz Gold LLC** is a UAE-based gold trading company that is owned or controlled by Goetz. In 2020, Goetz rebranded Goetz Gold LLC to PGR Gold Trading LLC.
- **Premier Gold Refinery LLC** is a UAE-based gold refinery that imports gold from AGR and is owned or controlled by Goetz.

DRC-30316 0008

- **Orofino** is a Belgium-based holding company that is owned or controlled by Goetz.
- **WWG Diamonds** is a Belgium-based holding company that is involved in mining activities and is owned or controlled by Goetz.

## SANCTIONS IMPLICATIONS

As a result of today's action, all property and interests in property of these persons that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. In addition, any entities that are owned, directly or indirectly, 50 percent or more by one or more blocked persons are also blocked. Unless authorized by a general or specific license issued by OFAC or otherwise exempt, OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons. U.S. persons may face civil or criminal penalties for violations of E.O. 13413.

The power and integrity of OFAC sanctions derive not only from its ability to designate and add persons to the SDN List, but also from its willingness to remove persons from the SDN List consistent with the law. The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior. For information concerning the process for seeking removal from an OFAC list, including the SDN List, please refer to OFAC's Frequently Asked Question 897. Detailed information on the process to submit a request for removal from an OFAC sanctions list.

View identifying information on the individual and entities designated today.


###

**UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED**



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

DRC-17840

OFFICE OF FOREIGN ASSETS CONTROL

**EVIDENTIARY MEMORANDUM**

MEMORANDUM FOR: Andrea Gacki
Director
Office of Foreign Assets Control

THROUGH:        Gregory T. Gatjanis
Associate Director
Office of Global Targeting

████████████████

Assistant Director
Narcotics, Africa, and Western Hemisphere Division

████████████████

Section Chief
Africa and Western Hemisphere Section

FROM:           ████████████████

Sanctions Investigator
Africa and Western Hemisphere Section

SUBJECT: (U) DRC: Designation of ████ NON-RESPONSIVE ████ ALAIN
FRANCOIS VIVIANE GOETZ NON-RESPONSIVE
NON-RESPONSIVE

1. (U) **INTRODUCTION**

(U) On October 27, 2006, the President issued Executive Order 13413, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo." [Exhibit 86] On July 8, 2014, the President issued Executive Order 13671, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo," amending Executive Order 13413 (as amended, "the Order"). [Exhibit 1]

(U) The Order blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in the Order. [Exhibit 1, pp. 3–4]

**UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED**

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

(U) Information presented in this memorandum and the accompanying exhibits provides reason to believe that **AFRICAN GOLD REFINERY LIMITED**[1] (**AGR**) is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC, and therefore should be added to the Specially Designated Nationals and Blocked Persons List (SDN List).

(U) Information presented in this memorandum and the accompanying exhibits provides reason to believe that **ALAIN FRANCOIS VIVIANE GOETZ (GOETZ)** is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC, and therefore should be added to the SDN List.

(U) Information presented in this memorandum and the accompanying exhibits provides reason to believe that **GOETZ** is a leader of **AGR**, a person proposed concurrently for designation pursuant to the Order, and therefore should be added to the SDN List.

(U) Information presented in this memorandum and the accompanying exhibits provides reason to believe that **GOETZ** has acted or purported to act for or on behalf of, directly or indirectly, **AGR**, a person proposed concurrently for designation pursuant to the Order, and therefore should be added to the SDN List.



---

[1] (U) Throughout this memorandum, the names of proposed targets will appear in **BOLD CAPITAL** letters. An asterisk (\*) following a name in ALL CAPS denotes a person whose property and interests in property have been blocked.

DRC-30316 0013

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

**NON-RESPONSIVE**

2. (U) **IDENTIFYING INFORMATION**[2]

**NON-RESPONSIVE**

2. (U//FOUO) **ALAIN FRANCOIS VIVIANE GOETZ (Individual)** [Exhibit 64, p. 1]
   (U) A.K.A.:    Alain Goetz [Exhibit 2, p. 19]
   (U//FOUO) Gender:        Male [Exhibit 64, p. 1]
   (U//FOUO) Nationality:    Belgium [Exhibit 64, p. 1]

---

[2] (U//FOUO) Additional identifying information on **ALAIN FRANCOIS VIVIANE GOETZ** is included in a classified addendum to this evidentiary memorandum.

**NON-RESPONSIVE**

3

DRC-30316 0014

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

| | |
|---|---|
| (U//FOUO) D.O.B: | April 24, 1965 [Exhibit 64, p. 1] |
| (U) Alt. D.O.B.: | April 20, 1965 [Exhibit 7, p. 3] |
| (U) Address: | The Palm Jumeirah 0-35, 65919, UAE [Exhibit 7, p. 3] |
| (U//FOUO) Address: | Villa 39, Frond N, The Palm Jumeirah, Dubai, UAE [Exhibit 64, p. 1] |
| (U//FOUO) Passport: | EP985086 (Belgium), issued: May 8, 2018, expires: May 7, 2025 [Exhibit 64, p. 1] |
| (U//FOUO) ID number: | 784196536027277 (UAE) [Exhibit 41, p. 1] |
| (U//FOUO) P.O.B.: | Antwerp, Belgium [Exhibit 64, p. 1] |

NON-RESPONSIVE

NON-RESPONSIVE

4

DRC-30316 0015

UNCLASSIFIED//~~SENSTIVE BUT UNCLASSIFIED~~



NON-RESPONSIVE

[9] (U//~~FOUO~~)

[Exhibit 64, p. 49] According to a June 2. 2020 UN GOE DRC report, GOETZ confirmed that PGR Gold Trading LLC has the same license as **GOETZ GOLD LLC**, following its 2018 name change to PGR Gold Trading LLC. [Exhibit 60, p. 20]

NON-RESPONSIVE

5

UNCLASSIFIED//~~SENSTIVE BUT UNCLASSIFIED~~

DRC-30316 0016

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

## III. (U) **BACKGROUND INFORMATION**

(U) *Most of the gold mined in the DRC is illicitly traded to neighboring countries, specifically Rwanda and Uganda.*

(U) According to a February 2021 The Sentry[14] report, in eastern DRC, where there are approximately 130 active armed groups, gold is a major driver of conflict. An estimated 10 to 20 tons of gold, worth $300 to $600 million, is smuggled out of the DRC annually. [Exhibit 65, p. 4] According to an October 2018 The Sentry report, one DRC mining official estimated that approximately 700 kg of gold is produced per month in conflict-affected Lubero, North Kivu, DRC.[15] The gold is then consolidated in Butembo, DRC before being sold to Uganda. [Exhibit 6, pp. 12–13] The aforementioned February 2021 The Sentry report indicates that conflict gold[16] provides the largest source of revenue to armed actors in eastern DRC, including armed groups and many national military units that profit through illegal taxation, raiding of mines, and collaboration with smugglers. [Exhibit 65, p. 4]

(U) According to a September 2020 IMPACT[17] report, the majority of gold leaving the DRC is smuggled out and not declared to authorities. Only a fraction of gold production is officially declared and legally exported, where the official export tax is 2 percent. To avoid the high taxes, traders and exporters declare only a bare minimum of their gold purchases while smuggling out the rest. Since illicit traders evade legal taxes and fees, they can offer better prices to miners than the legal market does [Exhibit 83, pp. 11, 13, 15]

(U) According to a May 23, 2019 *Economist* article, Uganda does not have many gold mines, and most are neither sophisticated nor especially productive. According to official statistics,

# NON-RESPONSIVE

[14] (U) The Sentry describes itself as an investigative and policy team that follows the dirty money connected to African war criminals and transnational war profiteers and seeks to shut those benefitting from violence out of the international financial system. [Exhibit 55, p. 1]
[15] (U) According to Google Maps, Lubero is a town in the North Kivu province of the DRC. [Exhibit 80, p. 1]
[16] (U) According to the February 2021 The Sentry report, conflict gold is gold that funds armed groups and criminal networks. [Exhibit 65, p. 2]
[17] (U) IMPACT describes itself as an independent non-profit that investigates and develops approaches for natural resources to improve security, development, and equality. The report was supported by the Government of Canada. [Exhibit 83, p. 2]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0017

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

Ugandan gold exports surged to $514 million in 2018, from less than $10 million in 2009. The open secret of Uganda's gold boom is that most of this metal is dug up elsewhere. The Ugandan central bank reckons that only 10 percent of the exported gold comes from local mines. It says the rest comes from elsewhere in Africa. Officials insist that the trade is all legal and untarnished. But industry insiders gesture over the border to the DRC, whose eastern provinces are rich in minerals including gold, and which levies a 3 percent tax[18] on gold exports. According to gold industry insiders, more than 90 percent of DRC's gold production is illegally smuggled to neighbors such as Uganda and Rwanda and then onto planes flying to Dubai. Most of the gold processed in Uganda comes from areas controlled by armed militias that extort money from artisanal miners.[19] [Exhibit 26, pp. 1–2]

(U) According to an April 24, 2019 Reuters article, DRC is a major gold producer but one whose official exports amount to a fraction of its estimated production: most is smuggled into neighboring Uganda and Rwanda. The article quotes the director of the *Centre d'Évaluation, d'Expertise et de Certification*[20] (CEEC), the Congolese government body that is meant to register, value, and tax high-value minerals like gold, as saying: "It is of course worrisome for us but we have very little leverage to stop it." [Exhibit 27, p. 4]

(U) According to an April 20, 2019 *De Standaard*[21] article, more than 90 percent of DRC gold is smuggled to neighboring countries. "Most of it ends [up] in Uganda," said a 54-year-old gold smuggler from Kasese, in western Uganda. [Exhibit 12, p. 2]

(U) According to a January 8, 2019 Deutsche Welle[22] article, in the DRC's many artisanal mines, gold is both valuable and easy to find. Armed groups will often try to find a way to get involved in the industry, mostly through forced labor or smuggling. As a result, the DRC does not fully profit from the gold mining industry. The Belgian research group, International Peace Information Service, which has been investigating the mining sector in northeast DRC since 2008, estimates that between 75 and 98 percent of the gold crosses the border into Uganda illegally. [Exhibit 5, pp. 2–3]

(U) According to a March 23, 2018 Africa Confidential article,[23] UN investigations over the previous 12 years had consistently identified conflict gold from Ituri and North Kivu[24] going

---

[18] (U) The above September 2020 IMPACT report and the May 23, 2019 *Economist* article are inconsistent with respect to the rate of gold export tax, which is reported to be either 2 or 3 percent. [Exhibit 83, p. 13; Exhibit 26, p. 1]

[19] (U) According to a January 15, 2020 Reuters article, artisanal miners are people who operate freelance, and sometimes pay landowners to access mine sites, or give a share of their ore to bosses. [Exhibit 68, p. 2]

[20] (U) According to an August 2017 Government Accountability Office report, the CEEC stands for the *Centre d'Évaluation, d'Expertise et de Certification.* [Exhibit 66, p. 12]

[21] (U) *De Standaard* describes itself as a news organization that guarantees clear, reliable reporting, and quality journalism every day. It states its newspaper reaches 350,000 readers daily. [Exhibit 22, p. 1]

[22] (U) Deutche Welle describes itself as Germany's international broadcaster and one of the most successful and relevant international media outlets. Their multimedia content in 30 languages reaches over 197 million people worldwide each week. [Exhibit 17, p. 1]

[23] (U) Africa Confidential describes itself as one of the longest-established specialist publications on Africa, with a considerable reputation for being first with in-depth news and analysis on significant political, economic, and security developments across the continent. [Exhibit 20, p. 1]

[24] (U) According to a March 23, 2018 Africa Confidential article, Ituri, North Kivu, and South Kivu are provinces in DRC. [Exhibit 13, p. 1]

7

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

through Uganda.  Two Ugandan gold-trading companies, UCI Ltd. and Machanga Ltd, were sanctioned by the UN Security Council in 2007.  Gold-trading sources say that the former director of Machanga, Rajendra Vaya, now works with **GOETZ**. [Exhibit 13, p. 2]

(U) According to an August 10, 2017[25] United Nations (UN) Security Council (UNSC) Group of Experts (GOE) on the DRC report, the GOE confirmed that almost all artisanally sourced gold in the DRC was exported illegally and underestimated in both value and volume. [Exhibit 24, p. 23]

IV. (U) **BASES FOR DETERMINATIONS**



NON-RESPONSIVE

---

[25] (U) The UNSC GOE provided this report to the UNSC 1533 committee on June 30, 2016, the committee considered the report on July 21, 2016, and generally distributed in the UN on August 10, 2017. [Exhibit 24, p. 1]

NON-RESPONSIVE

8

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0019

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

NON-RESPONSIVE

NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0020

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0021

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

NON-RESPONSIVE

NON-RESPONSIVE

11

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0022

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0023

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

13

DRC-30316 0024

UNCLASSIFIED//~~SENSTIVE BUT UNCLASSIFIED~~



(U) **Additional Information**

(U) According to the same June 18, 2019 Dow Jones Morningstar article, in early-March 2019 **AGR** imported 7.4 tons of gold from the CENTRAL BANK OF VENEZUELA*,[52] 3.8 tons were then reexported to **GOETZ GOLD LLC**. **GOETZ** said some of the particular Venezuelan gold passed through **GOETZ GOLD LLC** but that it came from a company outside Venezuela and didn't break U.S. sanctions because contracts were signed before November 1, 2018. [Exhibit 34, pp. 1–2, 5–6]



UNCLASSIFIED//~~SENSTIVE BUT UNCLASSIFIED~~

DRC-30316 0025

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

2.  (U) **ALAIN FRANCOIS VIVIANE GOETZ (Individual) (GOETZ)**

a.  (U) *GOETZ is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.*

(U//FOUO) . (U) *GOETZ incorporated AGR in 2014, has directly or indirectly owned AGR since then, was* ▮▮▮▮ *and/or chief executive officer of AGR until at least* ▮▮▮▮ *and was involved in AGR's gold trading activities until at least 2017.*



DRC-30316 0026

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED



[Exhibit 64, p. 42]

Exhibit 65, pp. 5, 6]

[Exhibit 64, p. 6]

(U//FOUO)

[Exhibit 64, p. 20]

(U) According to the News & Articles page of the **AGR** website accessed on May 5, 2020, as late as October 3, 2018, **GOETZ** was identified as the CEO of **AGR**. [Exhibit 61, p. 1]

(U) According to an April 20, 2019, *De Standaard*[56] article, at a 2017 Organization for Economic Cooperation and Development conference, **GOETZ** admitted that **AGR**[57] also works with "undocumented gold" from "small-scale dealers." **GOETZ** also stated, "We are controversial in this: conflict gold does not exist."  "If a prospector is extorted somewhere in a conflict area in [DRC] by people walking around with weapons, then that person is in the most vulnerable situation of all people in the world.  Instead of calling his product bad and putting this "cancer label" of conflict gold on it, the UN should rather encourage him, for example by giving that gold a better price."  **GOETZ** says that all refineries in the world deal with "so called conflict gold" automatically.  "**AGR** is not more exposed than refineries in Switzerland or South Africa," **GOETZ** adds.  In a March 2014 conditions letter to the Ugandan President, **GOETZ** also requested that "gold traders who do not have official documents should be allowed to sell gold to this refinery [**AGR**], but be made to pay a penalty fee e.g., $ 500. [sic]" [Exhibit 12, pp. 3–4, 7–8]  Given that **GOETZ** made statements regarding **AGR**'s gold trading activities at the 2017 Organization for Economic Cooperation and Development conference [Exhibit 12, pp. 3–4], OFAC assesses that **GOETZ** was involved in **AGR**'s gold trading activities until at least 2017.

(U) According to a October 2018 The Sentry[58] report, **AGR** does acknowledge sourcing gold from DRC, and one of The Sentry's sources said **GOETZ** told him that **AGR** refined 100 to

---

[56] (U) *De Standaard* describes itself as a news organization that guarantees clear, reliable reporting, and quality journalism every day.  It states its newspaper reaches 350,000 readers daily. [Exhibit 22, p. 1]
[57] (U) According to the same April 20, 2019 *De Standaard* article, **GOETZ** referred to his "company in Uganda." OFAC assesses that his company in Uganda as referenced is **AGR** based on the speech's topic (gold), and no other identification of a **GOETZ** owned business in Uganda other than **AGR** in any source.
[58] (U) The Sentry describes itself as an investigative and policy team that follows the dirty money connected to African war criminals and transnational war profiteers and seeks to shut those benefitting from violence out of the international financial system. [Exhibit 55, p. 1]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0027

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

150 kg of gold from Haut-Uele,[59] Ituri, North Kivu, and South Kivu[60] per week, which amounts to 5.2 to 7.8 tons per year. [Exhibit 6, p. 11]  The report attributes that statement to an interview with a source dated May 2, 2017. [Exhibit 6, pp. 11, 41]  In response to questions posed by The Sentry, **AGR** said that it sources from accredited mines or scrap sources, and that it does not source from conflict areas. [Exhibit 6, p. 11]  Given the report contains details regarding **AGR**'s gold operations based on an interview with a source dated May 2, 2017, and the source indicated that the details had been told to the source by **GOETZ** [Exhibit 6, pp. 11, 41], OFAC assesses that **GOETZ** was involved in **AGR**'s gold trading activities until at least 2017.]

(U//SBU) According to a November 29, 2017 Department of State Embassy Kampala (Embassy Kampala) cable, in a November 17, 2017 meeting with the Embassy Kampala Economics Officer (EconOff), **GOETZ**, then the CEO of **AGR**, explained in detail how **AGR**'s large, formalized operations were responsible for Uganda's increase in gold exports.  Additionally, **GOETZ** insisted **AGR** was only a "service provider" and not in the export business.  As a service provider, **GOETZ** said he paid an 18 percent value-added tax on his operations amounting to $515,000 in 2016." [Exhibit 3, pp. 1, 3]  Given that **GOETZ** made detailed statements to EconOff regarding **AGR**'s gold trading activities at a November 17, 2017 meeting [Exhibit 3, pp. 1, 3], OFAC assesses that **GOETZ** was involved in **AGR**'s gold trading activities until at least 2017.

  2. (U) *AGR has engaged in illicit trade in gold of the DRC since at least 2016, and GOETZ was involved in AGR's activities.*

(U) According to an April 20, 2019, *De Standaard*[61] article, **AGR** said that they cannot disclose the precise identity of their suppliers 'without proper consent' because it would 'violate its relationship with its suppliers and other parties'.  According to the article, the **AGR** states that 'none of the gold comes from Congo'.  The article states: "However, in a recent reply to The Sentry, on October 4, 2018, **AGR** said exactly the opposite: '10% of the gold AGR handles' comes directly from 'mines in Tanzania, Kenya, Uganda, Rwanda and DRC'."  According to the article, in his March 2014 conditions letter, to President Yoweri Museveni, **GOETZ** also requested that "gold traders who do not have official documents should be allowed to sell gold to this refinery [**AGR**], but be made to pay a penalty fee e.g. $ 500." [Exhibit 12, pp. 3, 4]

(U) According to a June 2, 2020,[62] UNSC GOE final report on the DRC, the UNSC GOE obtained a January 2020 sales sheet issued by Metal Smelting and Testing Co. Ltd (Metal Testing) to a gold smuggler from Bunia, DRC,[63] for over 5 kg of smuggled gold.  The UNSC GOE viewed export and customs documents detailing that Metal Testing purchased gold from

---

[59] (U) According to Google Maps, Haut-Uele is a province in DRC. [Exhibit 81, p. 1]

[60] (U) According to a March 23, 2018 Africa Confidential article, Ituri, North Kivu, and South Kivu are provinces in DRC. [Exhibit 13, p. 1]

[61] (U) *De Standaard* describes itself as a news organization that guarantees clear, reliable reporting, and quality journalism every day.  It states its newspaper reaches 350,000 readers daily. [Exhibit 22, p. 1]

[62] (U) The UNSC GOE provided this report to the UNSC 1533 committee on May 4, 2020, the committee considered the report on May 22, 2020, and generally distributed it in the UN on June 2, 2020. [Exhibit 60, p. 1]

[63] (U) According to Google Maps, Bunia is a city in DRC. [Exhibit 79, p. 1]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

17

DRC-30316 0028

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC and traded gold with **GOETZ GOLD LLC**[64] in sales that were brokered by **AGR**. Legal and export documents reviewed by the UNSC GOE cited an October 21, 2019 export of 135 kg of gold bars from Metal Testing to **GOETZ GOLD LLC**, part of which was paid for in cash. The gold was transported by **AGR** from Uganda to Dubai, according to the documents. **AGR** stated that, "[Metal Testing] did not hold an account with **AGR**." [Exhibit 60, pp. 14–15, 19–20] Given that the UNSC GOE viewed documents for this transaction and identified **AGR** as a broker, OFAC assesses the facts to be true even though **AGR** denied that Metal Testing held an account with **AGR**. [Exhibit 60, p. 19]

(U) According to a June 18, 2019 Dow Jones Morningstar[65] article, Ugandan police, and Financial Intelligence Authority, and regional smugglers alleged that some of the gold **AGR** processes was smuggled from eastern DRC and other African Nations. Additionally, the article states that's **AGR** was founded in 2014 by **GOETZ**. [Exhibit 34, pp. 2–3]

(U) According to an April 20, 2019, *De Standaard*[66] article, at a 2017 Organization for Economic Cooperation and Development conference, **GOETZ** admitted that **AGR**[67] also works with "undocumented gold" from "small-scale dealers." **GOETZ** also stated, "We are controversial in this: conflict gold does not exist," he says. "If a prospector is extorted somewhere in a conflict area in [DRC] by people walking around with weapons, then that person is in the most vulnerable situation of all people in the world. Instead of calling his product bad and putting this "cancer label" of conflict gold on it, the UN should rather encourage him, for example by giving that gold a better price." **GOETZ** says that all refineries in the world deal with "so called conflict gold" automatically. "**AGR** is not more exposed than refineries in Switzerland or South Africa," **GOETZ** adds. [Exhibit 12, p. 4] [Exhibit 12, p. 3]

(U) According to an October 2018 The Sentry[68] report, numerous sources interviewed by The Sentry identified **AGR** as sourcing conflict gold from DRC. The report identifies **GOETZ** as the owner of **AGR**. Twelve different traders and government officials in the region told The Sentry that **AGR** has taken over a significant portion of the market for gold trafficked from DRC to Uganda and the region, and Ugandan export records reviewed by The Sentry show that **AGR** accounted for over 99 percent of gold officially exported from Uganda in 2017. Uganda is the main transit hub for gold smuggled out of DRC, according to the UNSC GOE (with Rwanda growing as such). Two major gold smugglers in DRC acknowledged to The Sentry that they illegally trafficked gold from eastern DRC to **AGR**, and other regional gold traders corroborated these accounts. Furthermore, four regional traders told The Sentry that two gold traffickers, who

---

[64] (U) In this report **GOETZ GOLD LLC** appears as PGR Gold Trading LLC, OFAC assesses these entities are the same. **GOETZ GOLD LLC** will be used throughout this evidentiary memorandum. See footnote 7 for more analysis on the two names.

[65] (U) Dow Jones Morningstar describes itself as being founded to deliver investment research to empower investor success. [Exhibit 75, pp. 2–3]

[66] (U) *De Standaard* describes itself as a news organization that guarantees clear, reliable reporting, and quality journalism every day. It states its newspaper reaches 350,000 readers daily. [Exhibit 22, p. 1]

[67] (U) According to the same April 20, 2019 *De Standaard* article, **GOETZ** referred to his "company in Uganda." OFAC assesses that his company in Uganda as referenced is **AGR** based on the speech's topic (gold), and no other identification of a **GOETZ** owned business in Uganda other than **AGR** in any source.

[68] (U) The Sentry describes itself as an investigative and policy team that follows the dirty money connected to African war criminals and transnational war profiteers and seeks to shut those benefitting from violence out of the international financial system. [Exhibit 55, p. 1]

18

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

have been named in several UNSC GOE reports on DRC as purchasers of conflict gold,[69] supplied gold to **AGR** in 2017. **AGR** specifically denies having received gold from the two gold traffickers and denies generally that it has otherwise received significant amounts of undocumented gold from other sources. [Exhibit 6, pp. 3]

(U) According to a December 18, 2018 UNSC GOE report,[70] two independent sources associated with **AGR** and Bullion Refinery Ltd. told the UNSC GOE that **AGR** and Bullion Refinery Ltd. were reluctant to disclose the names of their suppliers because they were aware that their activities were not always legal. In fact, documents concerning a supplier for **AGR** obtained by the UNSC GOE show the risk of contamination of the supply chain with gold illegally sourced or traded from the DRC. The supplier, a DRC national based in Bukavu,[71] DRC who provided **AGR**, in October 2018, with gold worth more than $3 million, travelled with an official document, delivered five months earlier, identifying his occupation as that of an electrician. The supplier declared to **AGR** that the gold was sourced from the United Republic of Tanzania. Initial investigations conducted by the UNSC GOE suggested that the individual was used as a broker by many Bukavu, DRC-based gold smugglers. **AGR** did not respond to the UNSC GOE's inquiry as to whether it had a policy to verify the accuracy of statements made by DRC nationals who claim that the gold they sell was not sourced from the DRC. [Exhibit 51, p. 19] Additionally, the UNSC GOE requested the names of suppliers from **AGR** in order to verify whether the suppliers were involved directly or indirectly in any sanctionable acts in the DRC. **AGR** sent two letters to the UNSC GOE. In the letters, **AGR** reiterated its previously expressed willingness to seek the "proper consent" of the suppliers before providing the information to the UNSC GOE. In the same letters, **AGR** reiterated that it did not source any undocumented gold from the DRC. [Exhibit 51, p. 19]

(U) According to a April 27, 2018 UNSC GOE[72] report, the UNSC GOE notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month. The UNSC GOE confirmed that, as is the case with Uganda, the official export route is controlled by **GOETZ**. Information gathered by the UNSC GOE showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighboring countries, including the DRC. [Exhibit 25, p. 21]

(U) According to the aforementioned October 2018 The Sentry report, according to multiple South Kivu, DRC and Kampala, Uganda-based traders,[73] a trader sold smuggled gold from South Kivu to **AGR** in 2016. The trader is also named in several UNSC GOE reports as having purchased gold from areas controlled by armed groups. A company owned by the trader asserted in correspondence with The Sentry that it only sources from conflict free mines. The trader has

---

[69] (U) According to a June 6, 2019 letter from the UNSC GOE on the DRC addressed to the President of the UNSC, the two gold traffickers were identified by sources as individuals involved with gold smuggling out of Bukavu, DRC. [Exhibit 28, p. 34]

[70] (U) The UNSC GOE provided this report to the UNSC 1533 committee on November 21, 2018, the committee considered the report on December 6, 2018, and generally distributed it in the UN on December 18, 2018. [Exhibit 24, p. 1]

[71] (U) According to the same October 2018 The Sentry report, Bukavu and Butembo are two eastern DRC cities, Bukavu is a city in South Kivu and Butembo is a city in North Kivu. [Exhibit 6, p. 33]

[72] (U) The UNSC GOE provided this report to the UNSC 1533 committee on April 27, 2018, the committee considered the report on May 18, 2018, and generally distributed it in the UN on May 20 2018. [Exhibit 25, p. 1]

[73] (U) According to the same October 2018 The Sentry report, Kampala is in Uganda. [Exhibit 6, p. 21]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0030

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

reportedly worked with **GOETZ** in the past to traffic gold from rebel-held areas, shared profits with him, and set up a gold trading office for **GOETZ** in the 1990s. **AGR** denies sourcing gold from traffickers named in UNSC GOE reports and says it refrains from any action that contributes to conflict financing. **AGR** does acknowledge sourcing gold from DRC, and one of The Sentry's sources said **GOETZ** told him that **AGR** refined 100 to 150 kg of gold from Haut-Uele,[74] Ituri, North Kivu, and South Kivu[75] per week, which amounts to 5.2 to 7.8 tons per year. In response to questions posed by The Sentry, **AGR** said that it sources from accredited mines or scrap sources, and that it does not source from conflict areas. [Exhibit 6, p. 11]

(U//SBU) According to a November 29, 2017 Department of State Embassy Kampala (Embassy Kampala) cable, on November 17, 2017, in a discussion with an Embassy Kampala Economics Officer (EconOff), **GOETZ**, the CEO of **AGR**, explained in detail how **AGR**'s large, formalized operations were responsible for Uganda's increase in gold exports. Though **GOETZ** claimed **AGR** only dealt with registered gold dealers in Uganda, he seemed to indicate that East Africa's gold trade was too unregulated for any effective traceability of the source of the gold **GOETZ** refined. **GOETZ** also noted that smuggled gold remained rampant in the region. **GOETZ** estimated informal mining yielded approximately 50-70 tons per year and his operation was processing approximately 10 percent of it. On October 26, 2017 during a meeting with EconOff, a ███████████ that while **AGR** was responsible for the large increase in Uganda's official gold exports, it failed to investigate the source of its gold. "They have no proof of source, no mining paperwork," th ███████████ further alleging that **GOETZ** was "friendly" to warlords with gold mines in the DRC, stemming from his days running a gold refining business in Burundi from 2001 to 2014. ███████████ "There are three ways to get gold out of DRC—formally through Anglogold [Ashanti], informally through informal gold panning, and violently through rebel groups that enslave miners," insinuating that **AGR** was sourcing from rebel groups. [Exhibit 3, pp. 1, 3]

(U) According to a February 22, 2017, Agence France Press (AFP) article accessed through Yahoo News, **GOETZ** told AFP he was aware of "the many controversies surrounding the regional gold trade" and was working hard to address them. "It is our due diligence mechanisms, compliance measures that we don't allow the bad boys into our supply chain," he said. When asked if the gold would be supplied from DRC and South Sudan, **GOETZ** merely said "there is no embargo on gold or minerals from South Sudan or [DRC]." [Exhibit 10, p. 2]

(U) Based on the information above, OFAC assesses that **AGR** has engaged in illicit trade in gold of the DRC since at least 2016, and **GOETZ** was involved in **AGR**'s activities.

(U//FOUO) 3. ~~(U)~~ *Through his involvement in AGR, GOETZ is responsible for or complicit in, or has engaged in, directly or indirectly, support to Mai-Mai Yakutumba, Raia Mutomboki, and* ███████████ *through the illicit trade in gold of the DRC.*

---

[74] (U) According to Google Maps, Haut-Uele is a province in DRC. [Exhibit 81, p. 1]
[75] (U) According to a March 23, 2018 Africa Confidential article, Ituri, North Kivu, and South Kivu are provinces in DRC. [Exhibit 13, p. 1]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0031

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

(U//FOUO 

[Exhibit 64, pp. 5–7]

(U//FOUO

- (U) According to the aforementioned May 23, 2019 *Economist* article, Uganda does not have many gold mines, and most are neither sophisticated nor especially productive. According to gold industry insiders, more than 90 percent of DRC's gold production is illegally whisked to neighbors such as Uganda and Rwanda and then onto planes flying to Dubai. [Exhibit 26, pp. 1–2]

- (U) According to the aforementioned September 2020 IMPACT report, the majority of gold leaving the DRC is smuggled out and not declared to authorities. Only a fraction of gold production is officially declared and legally exported, where the official export tax is 2 percent. [Exhibit 83, p. 11]

- (U//FOUO) [Exhibit 64, p. 7]

- (U//FOUO) [Exhibit 64, p. 5]

- (U) Through his involvement in **AGR**, **GOETZ** has engaged in illicit DRC gold trade since at least 2016, as assessed above in Section 2.2.

(U//FOUO) 4. (U) *Mai-Mai Yakutumba, Raia Mutomboki,* and *DRC rebel groups, are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC.*

---

[76] (U)

Exhibit 60, p. 2]

(U) According to a March 23, 2018 Africa Confidential article, South Kivu is in DRC. [Exhibit 13, p. 1]

21

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

DRC-30316 0032

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

(U) According to a 2020 Human Rights Watch[78] report on events that that took place in the DRC in 2019, more than 130 armed groups were active in the North Kivu and South Kivu provinces of eastern DRC where they attacked civilians. The groups included the largely Rwandan Democratic Forces for the Liberation of Rwanda (FDLR) and allied Congolese Nyatura groups, the largely Ugandan ALLIED DEMOCRATIC FORCES* (ADF*),[79] the Nduma Defense of Congo-Renové (NDC-R), the Mazembe and Yakatumba Mai Mai[80] groups, and several Burundian armed groups. Many of their commanders have been implicated in war crimes, including ethnic massacres, rape, forced recruitment of children, and pillaging. [Exhibit 81, p. 3] Based on Mai-Mai Yakutumba being described in the report as one of the armed groups active in the North Kivu and South Kivu provinces of eastern DRC where they attacked civilians, and based on the statement in the report that many commanders of such armed groups have been implicated in ethnic massacres, rape, and forced recruitment of children [Exhibit 81, p. 3], OFAC therefore assesses that Mai-Mai Yakutumba is involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC.

(U//FOUO



[81]                          [82] [Exhibit 64, p. 5–7]

[Exhibit 64, pp. 22–23]

*5. (U)  GOETZ is responsible for or complicit in, or has engaged in, directly or indirectly, support to other DRC rebel groups that are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.*

---

[78] (U) According to Human Rights Watch, they investigate and report on abuses around the world and directs their advocacy towards governments, armed groups and businesses, pushing them to change or enforce their laws, policies and practices. [Exhibit 82, p. 1]
[79] (U) On July 1, 2014, OFAC designated the ALLIED DEMOCRATIC FORCES* (ADF*) pursuant to E.O. 13413. [Exhibit 84, pp. 1–2]
[80]
[81] (U)                    [Exhibit 60, p. 2]
[82] (U) According to a March 23, 2018 Africa Confidential article, South Kivu is in DRC. [Exhibit 13, p. 1]

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

DRC-30316 0033

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

(U//SBU) According to a November 29, 2017 Department of State Embassy Kampala (Embassy Kampala) cable, in a October 26, 2017 meeting with the Embassy Kampala Economics Officer (EconOff), a ▮▮▮▮▮▮▮▮▮▮▮▮▮ that while **AGR** was responsible for the large increase in Uganda's official gold exports, it failed to investigate the source of its gold. "They have no proof of source, no mining paperwork," ▮▮▮▮▮▮▮▮ further alleging that **GOETZ** was "friendly" to warlords with gold mines in the DRC, stemming from his days running a gold refining business in Burundi from 2001 to 2014 ▮▮▮▮▮▮▮▮▮▮
"There are three ways to get gold out of DRC—formally through Anglogold [Ashanti], informally through informal gold panning, and violently through rebel groups that enslave miners," insinuating that **AGR** was sourcing from rebel groups. Given the description of such sourcing as representing a "way to get gold out of DRC" "violently" and not "formally," OFAC assesses that such sourcing constitutes illicit trade in gold of the DRC. [Exhibit 3, p. 3]  Given that the DRC rebel groups referenced in the ▮▮▮▮▮▮▮▮▮▮▮▮ are described as "enslav[ing] miners," OFAC assesses that such DRC rebel groups are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC.

(U) According to a February 2021 The Sentry report, in eastern DRC, where there are approximately 130 active armed groups, gold is a major driver of conflict. An estimated 10 to 20 tons of gold, worth $300 to $600 million, is smuggled out of the DRC annually.  Conflict gold provides the largest source of revenue to armed actors in eastern DRC, including armed groups and many national military units that profit through illegal taxation, raiding of mines, and collaboration with smugglers. [Exhibit 65, p. 4] Given that conflict gold provides the largest source of revenue to armed actors in eastern DRC [Exhibit 65, p. 4], OFAC assesses that **AGR**'s sourcing of gold from the aforementioned DRC rebel groups constitutes support for such DRC rebel groups.

(U//SBU) Given that (1) **GOETZ** *established AGR in 2014, has directly or indirectly owned AGR since then, was* ▮▮▮▮▮ *and/or chief executive officer of AGR until at least* ▮▮▮▮▮ *and was involved in AGR's gold trading activities until at least 2017* (see Section 2.A.1), (2) **AGR** has engaged in illicit trade in gold of the DRC since at least 2016, and **GOETZ** was involved in **AGR**'s activities (see Section 2.2), (3) through his involvement in **AGR**, **GOETZ** is responsible for or complicit in, or has engaged in, directly or indirectly, support to Mai-Mai Yakutumba, Raia Mutomboki, ▮▮▮▮▮▮▮ through the illicit trade in gold of the DRC, and such support was likely related to actions and/or omissions of **GOETZ** (see Section 2.3 above), (4) Mai-Mai Yakutumba, Raia Mutomboki, and ▮▮▮▮▮▮▮ re involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC (see Section 2.4 above), and (5) **GOETZ**'s role in **AGR**'s support to other DRC rebel groups that are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC (see Section 2.5 above), OFAC assesses that **GOETZ** is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

23

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

b.  (U) **GOETZ is a leader of AGR, an entity proposed concurrently for designation pursuant to the Order.**

(U//FOUO)



(U//SBU) According to a November 29, 2017 Department of State Embassy Kampala (Embassy Kampala) cable, on November 17, 2017, in a discussion with an Embassy Kampala Economics Officer (EconOff), **GOETZ**, the CEO of **AGR**, explained in detail how **AGR**'s large, formalized operations were responsible for Uganda's increase in gold exports.  Additionally, **GOETZ** insisted **AGR** was only a "service provider" and not in the export business.  As a service

FN 83 (U~~//FOUO~~)

Exhibit 64, p. 43]

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0035

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

provider, **GOETZ** said he paid an 18 percent value-added tax on his operations amounting to $515,000 in 2016." [Exhibit 3, pp 1, 3]

(U) According to a February 21, 2017 Reuters article, **GOETZ** was identified as the CEO and majority shareholder of **AGR**. [Exhibit 15, pp. 1–2]

> c.  (U) *GOETZ has acted or purported to act for or on behalf of, directly or indirectly, AGR.*

(U//FOUO)



(U//FOUO)

Exhibit 64, pp. 5–6, 40–41]

(U) According to the same April 20, 2019 *De Standaard* article, in a March 2014 conditions letter to the Ugandan President, **GOETZ** also requested that "gold traders who do not have official documents should be allowed to sell gold to this refinery [**AGR**], but be made to pay a penalty fee e.g., $ 500. [sic]" [Exhibit 12, pp. 3–4, 7–8]

(U//SBU) According to a November 29, 2017 Department of State Embassy Kampala (Embassy Kampala) cable, in a November 17, 2017 meeting with EconOff, **GOETZ** represented **AGR** as its CEO. **GOETZ** explained in detail how **AGR**'s large, formalized operations were responsible for Uganda's increase in gold exports. Additionally, **GOETZ** insisted **AGR** was only a "service provider" and not in the export business. As a service provider, **GOETZ** said he paid an 18 percent value-added tax on his operations amounting to $515,000 in 2016." [Exhibit 3, pp 1, 3]

(U) **Additional Information**

(U) According to a February 5, 2020 Reuters article, **GOETZ** and his brother were found guilty by a court in Antwerp of money laundering and fraud and given an 18-month suspended jail sentence. The court ruling said **GOETZ** and his brother set up a fraudulent system in 2010 and 2011 for customers to sell gold anonymously to the Tony Goetz NV refinery in Antwerp for cash, creating the basis for black market trade. [Exhibit 21, p. 2]

# NON-RESPONSIVE

25

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

26

DRC-30316 0037

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0038

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0039

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED



UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0040

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

NON-RESPONSIVE

NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0041

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED



UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0042

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0043

UNCLASSIFIED//~~SENSTIVE BUT UNCLASSIFIED~~

## LIST OF EXHIBITS

Exhibit 1:   (U) Executive Order 13671 of July 8, 2014, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo," 79 Fed. Reg. 132, (July 10, 2014), Overall classification is U.

Exhibit 2:   (U) South Africa Resource Watch, "Congo's Golden Web," May 2014, available at https://www.extractiveshub.org/servefile/getFile/id/991, Overall classification is U.

Exhibit 3:   (U//~~SBU)~~ 17 KAMPALA 2314, 291344Z NOV 17, Overall classification is U//~~SBU.~~

**NON-RESPONSIVE**

Exhibit 5:   (U) Deutche Welle, "Investigating DR Congo's illegal gold trade," January 8, 2019, available at https://www.dw.com/en/investigating-dr-congos-illegal-gold-trade/a-46997332, Overall classification is U.

Exhibit 6:   (U) The Sentry, "The Golden Laundromat," October 2018, available at https://thesentry.org/reports/the-golden-laundromat/. Overall classification is U.

Exhibit 7:   (U) Dun & Bradstreet report, Alaxy, DUNS # 40-058-0669, accessed, February 24, 2022, Overall classification is U.

**NON-RESPONSIVE**

Exhibit 10:   (U) Yahoo News, "Uganda gold refinery raises alarm over conflict minerals," February 22, 2017, available at https://news.yahoo.com/uganda-gold-refinery-raises-alarm-over-conflict-minerals-172037915.html, Overall classification is U.

**NON-RESPONSIVE**

Exhibit 12:   (U) De Standaard, "Gold is a dirty business, even if I do say so myself," April 20, 2019, available at https://www.standaard.be/cnt/dmf20190503_04370790, Overall is classification U.

33

DRC-30316 0044

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

Exhibit 13:  (U) Africa Confidential, "The Great Lakes gold rush," March 23, 2018, available at https://www.africa-confidential.com/article-preview/id/12279/The_Great_Lakes_gold_rush, Overall classification U.

**NON-RESPONSIVE**

Exhibit 15:  (U) Reuters, "Ugandan gold refinery to import from conflict ridden South Sudan, Congo," February 21, 2017, available at https://www.reuters.com/article/uganda-gold/ugandan-gold-refinery-to-import-from-conflict-ridden-south-sudan-congo-idUSL8N1G61QA, Overall is classification U.

**NON-RESPONSIVE**

Exhibit 17:  (U) Website of Deutche Welle, "Who We Are," available at https://www.dw.com/en/about-dw/profile/s-30688, accessed on April 22, 2020, Overall is classification U.

**NON-RESPONSIVE**

Exhibit 19:  (U) Website of Africa Intelligence, "About Us," available at https://www.africaintelligence.com/info/aboutus, accessed on April 22, 2019, Overall classification is U.

Exhibit 20:  (U) Africa Confidential, "About Us," available at https://www.africa-confidential.com/about-africa-confidential, accessed on April 22, 2019, Overall classification is U.

Exhibit 21:  (U) Reuters, "Ugandan gold refinery to import from conflict-ridden South Sudan, Congo," February 5, 2020, available at https://www.reuters.com/article/us-gold-refining-tony-goetz/court-convicts-belgian-gold-refinery-tony-goetz-of-money-laundering-idUSKBN1ZZ2JW, Overall is classification U.

Exhibit 22:  (U) Website of Mediahuis, "De Standaard,"available at https://www.mediahuis.be/en/media/de-standaard/, accessed on April 29, 2020, Overall classification is U.

**NON-RESPONSIVE**

34

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

DRC-30316 0045

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

/enterprises/crossroads-bank-enterprises, accessed April 15, 2020, Overall classification is U.

Exhibit 24:    (U) United Nations Security Council, "Letter dated 4 August 2017 from the Group of Experts extended pursuant to the Security Council Resolution (2293) (2016) addressed to the President of the Security Council," August 4, 2017, available at http://www.un.org/ga/search/view _doc.asp?symbol=S/2017/672, Overall classification is U.

Exhibit 25:    (U) United Nations Security Council, "Letter dated 20 May 2018 from the Group of Experts on the Democratic Republic of Congo addressed to the President of the Security Council," May 20, 2018, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531, Overall classification is U.

Exhibit 26:    (U) *The Economist*, "How Can Uganda Export So Much More Gold Than it Mines," May 23, 2019, available at https://www.economist.com /middle-east-and-africa/2019/05/23/how-can-uganda-export-so-much -more-gold-than-it-mines, Overall classification is U.

Exhibit 27:    (U) Reuters, "Gold Worth Billions Smuggled Out of Africa," April 24, 2019, available at https://www.reuters.com/investigates/special -report/gold-africa-smuggling/, Overall classification is U.

Exhibit 28:    (U) United Nations Security Council, "Letter dated 6 June 2019 from the Group of Experts on the Democratic Republic of Congo addressed to the President of the Security Council," June 6, 2019, available at http://www .un.org/ga/search/view_doc.asp?symbol=S/2019/469, Overall classification is U.

# NON-RESPONSIVE

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

DRC-30316 0046

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

Exhibit 34:    (U) Dow Jones, "How 7.4 Tons of Venezuela's Gold Landed in Africa and Vanished," June 18, 2019, available at https://www.reuters.com /investigates/special-report/gold-africa-smuggling/, Overall classification is U.

# NON-RESPONSIVE

Exhibit 41:    (U) ███████████████████████████████, Overall classification is U//FOUO.

# NON-RESPONSIVE

**36**

DRC-30316 0047

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

Exhibit 51:     (U) United Nations Security Council, "Letter dated 18 December 2018 from the Group of Experts on the Democratic Republic of Congo addressed to the President of the Security Council," December 18, 2018, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/133, Overall classification is U.

# NON-RESPONSIVE

Exhibit 55:     (U) Website of The Sentry, "About The Sentry," available at https://thesentry.org/about, accessed May 11, 2020, Overall classification is U.

# NON-RESPONSIVE

37

DRC-30316 0048

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

Exhibit 60:        (U) United Nations Security Council, "Letter dated June 2, 2020 from the
                   Group of Experts on the Democratic Republic of Congo addressed to the
                   President of the Security Council," June 2, 2020, available at https:
                   //documents-dds-ny.un.org/doc/UNDOC/GEN/N20/114/17/pdf
                   /N2011417.pdf?OpenElement, Overall classification is U.

Exhibit 61:        (U) Website of African Gold Refinery Limited, "News & Articles,"
                   available at https://www.gold.africa/news-articles/, accessed May 5,
                   2020, Overall classification is U.

# NON-RESPONSIVE

Exhibit 64:        (U//FOUO)

                   Overall classification is FOUO.

Exhibit 65:        (U) The Sentry, "Conflict Gold to Responsible Gold," February 2021,
                   available at https://thesentry.org/reports/conflict-gold-to-responsible
                   -gold/, Overall classification is U.

Exhibit 66:        (U) Government Accountability Office, "Conflict Minerals, Information
                   on Artisanal Mined Gold and Efforts to Encourage Responsible Sourcing
                   in the Democratic Republic of the Congo," August 2017, available at
                   https://www.gao.gov/assets/690/686745.pdf, Overall classification is U.

# NON-RESPONSIVE

Exhibit 68:        (U) Reuters, "What is artisanal gold and why is it booming?," January 15,
                   2020, available at https://www.reuters.com/article/us-gold-mining
                   -artisanal-explainer/what-is-artisanal-gold-and-why-is-it-booming
                   -idUSKBN1ZE0YU, accessed July 28, 2021, Overall classification is U.

Exhibit 69:        U//FOUO (U)

                   Overall classification is U.

DRC-30316 0049

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

**NON-RESPONSIVE**

Exhibit 71:          (U) Africa Intelligence, "Belgian gold refiner Alain Goetz battles for his interests in the Great Lakes region," August 30, 2021, Overall classification is U.

**NON-RESPONSIVE**

Exhibit 75:          (U) Morningstar, "About Us," available at https://www.morningstar.com/company/about-us, accessed February 11, 2022, Overall classification is U.

**NON-RESPONSIVE**

**UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED**

DRC-30316 0050

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

| | |
|---|---|
| Exhibit 79: | (U) Google Maps, "Bunia, DRC," available at https://www.google.com/maps /place/Bunia,+Democratic+Republic+of+the+Congo/@1.567712,30.2113 457,13z/data=!3m1!4b1!4m5!3m4!1s0x17642b5e630902fd:0x761881f32 60dc950!8m2!3d1.574278!4d30.2397336, accessed February 11, 2022, Overall classification is U. |
| Exhibit 80: | (U) Google Maps, "Lubero, DRC," available at https://www.google.com/maps /place/Lubero,+Democratic+Republic+of+the+Congo/@- 0.1536795,29.212602 8,13z/data=!3m1!4b1!4m5!3m4!1s0x19df9064dc1934b1:0x3f5c247121b e1223 !8m2!3d-0.1549602!4d29.2437011, accessed February 11, 2022, Overall classification is U. |
| Exhibit 81: | (U) Human Rights Watch, "World Report 2020: Democratic Republic of Congo." Accessed on February 12, 2022, available at https://www.hrw.org/ world-report/2020/country-chapters/democratic-republic-congo, Overall classification is U. |
| Exhibit 82: | (U) Human Rights Watch, "About Us," accessed February 12, 2022, available at https://www.hrw.org/about/about-us, Overall classification is U. |
| Exhibit 83: | (U) IMPACT, "The Intermediaries, Traders Who Threaten the Democratic Republic of Congo's Efforts for Conflict-Free Gold," September 2020, available at https://impacttransform.org/wp-content/uploads/2020/09/The-Intermediaries_Sept-2020_EN-web.pdf, Overall classification is U. |
| Exhibit 84: | (U) Notice of OFAC Actions, 84 Fed. Reg. 131 (July 9, 2014), Overall classification is U. |

**NON-RESPONSIVE**

| | |
|---|---|
| Exhibit 86: | (U) Federal Register, "Executive Order 13413 of October 27, 2006," 71 Fed. Reg. 210 (October 31, 2006), Overall classification is U. |

**NON-RESPONSIVE**

40

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

# NON-RESPONSIVE

UNCLASSIFIED//SENSTIVE BUT UNCLASSIFIED

DRC-30316 0052

~~SENSITIVE BUT UNCLASSIFIED~~    EXHIBIT 3

| From: | SMART Archive |
|---|---|
| Sent: | 11/29/2017 8:46:12 AM |
| To: | SMART Core |
| Subject: | Uganda: Gold Exports Surge with new Refinery, but Sector Remains Mostly in the Shadows |

## UNCLASSIFIED
~~SBU~~



| MRN: | 17 KAMPALA 2314 |
|---|---|
| Date/DTG: | Nov 29, 2017 / 291344Z NOV 17 |
| From: | AMEMBASSY KAMPALA |
| Action: | WASHDC, SECSTATE *ROUTINE* |
| E.O.: | 13526 |
| TAGS: | EMIN, ETRD, PGOV, PREL, EINV, EFIN, KCOR, EAC, UG |
| Captions: | SENSITIVE |
| Reference: | A) 17 KAMPALA 354 |
| | B) 17 JUBA 1336 |
| Subject: | Uganda: Gold Exports Surge with new Refinery, but Sector Remains Mostly in the Shadows |

1. (SBU) Summary: In 2016, Uganda's gold exports increased six-fold to $240 million and are on pace to nearly double to $400 million this year. ▮▮▮▮▮▮▮▮▮▮▮▮he surge did not reflect a spike in mining activity in Uganda, where small-scale, artisanal miners concentrated in western Uganda do most of the extraction in the gold mining sector. Following the February 2016 official opening of African Gold Refinery (AGR)—the largest gold refinery in sub-Saharan Africa—▮▮▮▮▮▮▮▮Uganda has become a magnet for gold dealers seeking to formalize previously unregulated exports from throughout East Africa (Refs A, B). AGR's owner denied any responsibility for sourcing gold smuggled from regional conflict zones, however, claiming that he only deals with licensed gold dealers. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮AGR fails to perform basic due diligence on gold imported from the Democratic Republic of the Congo, while ▮▮▮▮▮▮▮▮▮ accuses AGR of refining gold imported from South Sudan through dealers aligned with President Yoweri Museveni. Meanwhile, ▮▮▮▮▮▮▮▮▮▮▮ accuse the government of willfully ignoring its own mining regulations to avoid scrutiny of a sector many insiders see as a source of the regime's means of financing its political power. End summary.

**2017 Gold Exports to reach $400 million, but Sourcing Remains Tainted by Smuggling**

2. (SBU) During a November 17 meeting with EconOff, the CEO of African Gold Refinery (AGR) Alain Goetz explained in detail how his company's large, formalized operations were responsible for Uganda's six-fold increase of gold exports from $40 million in 2015 to $240 million in 2016. Goetz expected Uganda's gold exports to nearly double in 2017 to $400 million as his firm processed more of the region's gold. Goetz claimed his firm only dealt with registered gold dealers in Uganda with whom he felt "comfortable" dealing. In the end, however, East Africa's gold trade was too unregulated for any effective traceability of the source of the gold he refined. "I'm not a miner, so I don't have much information on the source of gold," added Goetz, "can you tell

DRC-30316  0146

~~SENSITIVE BUT UNCLASSIFIED~~    1 of 5

~~SENSITIVE BUT UNCLASSIFIED~~   EXHIBIT 3

me the source of a dollar on the streets of Uganda? It's the same with gold, it can come from anywhere."

3. (SBU) After AGR determined the purity of a gold dealer's product, Goetz explained, AGR credited the dealer's account in Dubai—the world's largest gold market—and physically exported the gold through Entebbe airport, which is located next door to the refinery. While helping his clients export their gold abroad, Goetz insisted AGR was only a "service provider" and not in the export business. As a service provider, Goetz said he paid an 18 percent value-added tax on his operations amounting to $515,000 in 2016.



Image 1: AGR employee preparing refined gold for bullion bars (left). Close up of the pure gold after cooling (middle). The gold is weighed and separated into 1 oz quantities for bullion (right).



DRC-30316  0147

SENSITIVE BUT UNCLASSIFIED              EXHIBIT 3

Image 2: AGR's all-female staff in the assay room is responsible for determining a customer's gold purity in order for AGR to credit customer accounts.

**AGR Owner Acknowledges Vast Amount of Gold is smuggled in the Region**

4. (SBU) Goetz noted that smuggled gold remained rampant in the region. He estimated informal mining yielded approximately 50-70 tons per year and his operation was processing approximately 10 percent of it. He claimed Middle Eastern air carriers—specifically mentioning Emirates—were complicit in smuggling gold, estimating that in recent years 156 tons of gold were smuggled in the carryon luggage of business class

that this smuggled gold was unrefined and contained residual mercury, which vaporized during transit and corroded the aircraft frame as well as endangered the health of passengers and crew. (Note: Mercury is used in small-scale gold mining where it is mixed with gold-containing materials, forming a mercury-gold amalgam, which is then heated, vaporizing the mercury to obtain the gold. End note.)

**AGR's Gold Comes from Conflict Regions in DRC...**

5. (SBU) During an October 26 meeting with EconOff,                              described how most of Uganda's gold exports came from small-scale miners selling 0.5 to 2.0 kilograms of gold sourced from informal mining operations in western Uganda and the eastern Democratic Republic of the Congo (DRC).

said prior to AGR, gold dealers would process gold for export at various informal refineries located in the town of Mubende in central Uganda.                    that while AGR was responsible for the large increase in Uganda's official gold exports, it failed to investigate the source of its gold. "They have no proof of source, no mining paperwork,                    further alleging that Goetz was "friendly" to warlords with gold mines in the DRC, stemming from his days running a gold refining business in Burundi from 2001 to 2014. "There are three ways to get gold out of DRC - formally through Anglogold [Ashanti], informally through informal gold panning, and violently through rebel groups that enslave miners,                    insinuating that AGR was sourcing from rebel groups.                    also accused AGR of altering gold from conflict regions to match the chemical composition of gold from Uganda in order for exporters to claim the gold was conflict free. (Note: Goetz told Econoff that gold mined in South Sudan was about 80 percent pure, while gold mined in the DRC could be nearly 100 percent pure. Gold from Uganda averages 90 percent purity. End note.)

...Whil               Claims Regime Insiders Importing Gold from South Sudan and DRC

6. (SBU)

**...While AGR fights Regime Insiders in Court**

DRC-30316  0148

SENSITIVE BUT UNCLASSIFIED              3 of 5

~~SENSITIVE BUT UNCLASSIFIED~~                    EXHIBIT 3

7. (SBU) During the November 17 meeting with Econoff, Goetz denied any improper relationship with the regime, saying President Museveni strongly supported the role AGR was playing in providing value-added services including personally vouching for the company in a meeting with cabinet earlier this year. He noted that Turemwa was corrupt and tried to use his ties to the regime to pressure AGR to give him shares in the company without compensation—                                                                Goetz claimed AGR was politically independent and Ugandan courts had sided with AGR over its dispute with Taremwa despite the latter's ties to Saleh. AGR's legal woes extend beyond Goetz's dispute with his former business partner, however. On July 15, Uganda's Inspector General of Government (IGG) wrote a letter to AGR titled, "Alleged aiding and abetting by government officials of fraudulent issue of mining concessions to African Gold Refinery limited," demanding AGR explain in detail its operations. On October 11, Uganda's Financial Intelligence Authority (FIA) wrote, "We hereby refer this matter to the Office of the Director of Public Prosecutions to prosecute African Gold Refinery Ltd for committing an offence under the Anti-Money Laundering Act, 2013," arguing that by not cooperating, AGR had something to hide from the FIA. Goetz flatly denied AGR's role in any mining or illicit activity, "These politicians have no idea about what they're talking about.

**GOU Insiders Benefit from Informal Mining Sector...**



8. (SBU)

9. (SBU)

10. (SBU)

DRC-30316   0149

**CLASSIFICATION: UNCLASSIFIED**
**Page 5 of 5**

~~SENSITIVE BUT UNCLASSIFIED~~

EXHIBIT 3



UNCLASSIFIED
~~SBU~~

DRC-30316    0150

**CLASSIFICATION: UNCLASSIFIED**
**Page 5 of 5**

~~SENSITIVE BUT UNCLASSIFIED~~

5 of 5

UNCLASSIFIED

EXHIBIT 6

# The Golden Laundromat

The Conflict Gold Trade from
Eastern Congo to the
United States and Europe

By The Sentry
October 2018



THE SENTRY

UNCLASSIFIED                    EXHIBIT 6

# The Golden Laundromat

## The Conflict Gold Trade from Eastern Congo to the United States and Europe

October 2018

**The Sentry is an initiative of the Enough Project and Not On Our Watch (NOOW).**

Cover photo: Enough Project

DRC-30316 0163

UNCLASSIFIED



UNCLASSIFIED                                                            EXHIBIT 6

## Executive Summary

An investigation by The Sentry raises significant concerns that gold mined from conflict areas in eastern Democratic Republic of Congo ("Congo") is reaching international markets, including the supply chains of major U.S. companies and in products that consumers use every day. Documents reviewed and interviews conducted by The Sentry raise serious concern that the corporate network controlled by Belgian tycoon Alain Goetz has refined illegally-smuggled conflict gold from eastern Congo at the African Gold Refinery (AGR) in Uganda and then exported it through a series of companies to the United States and Europe, potentially including Amazon, General Electric (GE), and Sony. According to the United Nations (U.N.), conflict gold provides the largest source of revenue to armed actors in the conflict in eastern Congo,[1] where an estimated 3.3 to 7.6 million people have died.[2] An estimated $300 to $600 million worth of gold is smuggled out of Congo each year.[3]

According to documents reviewed by The Sentry, AGR exported approximately $377 million in gold in 2017 to an apparent affiliate of the Belgian gold refinery Tony Goetz NV, based in Dubai.[4] According to 2018 U.S. Securities and Exchange Commission filings, 283 publicly-traded companies in the U.S. listed the Belgian refinery as an entity that may be in their supply chains,[5] despite the fact that the refinery failed a major international conflict minerals audit in 2017.[6] Those same filings indicate that AGR itself, opened in Uganda in 2016 and owned by Goetz,[7] may also be in the supply chains of 103 publicly traded U.S. companies, including GE and Halliburton.[8]

Numerous sources interviewed by The Sentry identified AGR as sourcing conflict gold from Congo. Twelve different traders and government officials in the region told The Sentry that AGR has taken over a significant portion of the market for gold trafficked from Congo to Uganda and the region,[9] and Ugandan export records reviewed by The Sentry show that AGR accounted for over 99 percent of gold officially exported from Uganda in 2017.[10] Uganda is the main transit hub for gold smuggled out of Congo, according to the U.N. Group of Experts (with Rwanda growing as such).[11] Two major gold smugglers in Congo acknowledged to The Sentry that they illegally trafficked gold from eastern Congo to AGR,[12] and other regional gold traders corroborated these accounts.[13] Furthermore, four regional traders told The Sentry that gold traffickers Buganda Bagalwa and Mange Namuhanda, who have been named in several U.N. Group of Experts reports on Congo as purchasers of conflict gold,[14] supplied gold to AGR in 2017.[15] AGR specifically denies having received gold from Bagalwa or Namuhanda and denies generally that it has otherwise received significant amounts of undocumented gold from other sources.[16] Goetz has set up a major gold trading hub in Rwanda as well.[17]

The activities of the network appear to be noncompliant with both international supply chain due diligence guidance and international anti-money laundering safeguards as the network's companies buy, refine, and then sell the gold. As a result, the hundreds of publicly listed U.S. companies that may source gold from the refineries in this network are at risk of purchasing conflict gold. Goetz is a director or owner of 14 different companies, from Uganda, Dubai, Belgium, and Luxembourg, and 6 of these companies have the same address in Belgium.[18]

For its part, AGR steadfastly maintains that it is committed to refraining from any action that contributes to the financing of conflict and that its due diligence systems are based on international guidance.[19] Further, Tony Goetz NV asserts that it follows strict procedures to avoid sourcing conflict minerals and that it follows all laws and international guidelines.[20]

Nevertheless, according to documents reviewed and sources interviewed by The Sentry, there is a significant risk that AGR has sourced large volumes of gold from eastern Congo with undocumented origins and lacking

1



UNCLASSIFIED                    EXHIBIT 6

conflict-free certification. Although AGR has confirmed that it sources gold from Congo and that it sources some undocumented gold,[21] it insists that the latter comes from old jewelry and other scrap sources.[22] However, sourcing scrap from countries known to be transit points for conflict gold is a red flag in international due diligence guidance because it can be a loophole for mixing in gold from conflict sources.[23]

It is illegal, according to Congolese law, to export gold from artisanal mines that are not certified as conflict-free in Congo.[24] An estimated 96 percent of artisanal gold mines in Congo are not certified at present (60 out of approximately 1,499),[25] an estimated 71 percent of gold miners work at conflict mines according to the latest independent survey,[26] and in 2017 the U.N. Group of Experts said that it had confirmed that nearly all artisanally sourced gold in Congo was exported illegally.[27] In sum, nearly all of the gold mined in Congo flowing to Uganda is very likely not from certified mines.

According to Ugandan export records, AGR also exported gold in 2017 to a Dubai-based company that in 2012 had reportedly been one of the most important cash suppliers to Kaloti Precious Metals, the Dubai-based gold refining giant.[28] In 2015, a Kaloti refinery was de-listed from the Dubai "Good Delivery" list after



failing to meet the criteria for Good Delivery certification and following a gold sourcing scandal.[29] AGR has denied exporting to this company or knowing of the links between the supplier and Kaloti.[30]

Goetz's new gold trading operation in Rwanda is also significant, exporting approximately one ton of gold per month since November 2017 (the equivalent of $500 million per year),[31] according to the U.N. Group of Experts.[32] The U.N. Group of Experts concluded in 2018 that much of the gold traded in Rwanda and Uganda is smuggled from Congo and/or other neighboring countries.[33]

Alain Goetz said in 2017: "Conflict minerals don't exist. All minerals are created by God. He did not put conflict minerals in the universe." Here, Goetz and Museveni launch AGR in 2017. Photo: The Independent (Kampala).

In 2016 and 2017, it appears that Goetz's network effectively assumed much of the market share previously controlled by another Uganda-based gold trading network run by the directors of Uganda Commercial Impex, which has been extensively involved in sourcing uncertified gold from eastern Congo for more than a decade, according to the U.N. Group of Experts.[34] That network has greatly decreased its trade but remains somewhat active and in competition with Goetz, according to regional experts and the U.N. Group of Experts.[35] The smuggling of gold from eastern Congo and the region by hand using commercial airlines also remains a key area of concern.[36]

The Sentry conducted over 100 interviews with gold miners, traders, and civil society organizations in Congo for this report. The investigation found evidence of armed groups and army commanders collecting illegal taxes on miners, government agents, and businessmen, and of clashes between armed groups and the Congolese army at gold mines. The trail of conflict gold follows a roughly six-step supply chain from eastern Congo to its primary end-products – jewelry, gold bars for investors and banks, and electronics.[37]

2

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
DRC-30316 0165                    UNCLASSIFIED                    4 of 56



Uganda, where AGR is the only gold refinery, is the main transit hub for smuggled gold from eastern Congo, according to U.N. Group of Experts reports.[38] Following AGR's opening, Uganda increased its gold exports by a staggering 85,000 percent, going from exporting approximately $443,000 worth of gold in 2014 to an estimated $377 million in 2017.[39] AGR signed agreements with a relative of Ugandan President Yoweri Museveni named Barnabas Taremwa, who the U.N. Group of Experts says traded in illegally trafficked gold from Congo,[40] as well as a former high-level Ugandan official and childhood friend of President Museveni, who resigned from the World Bank following reports of alleged bribery.[41] AGR has halted relationships with both men, but Taremwa has sued.[42]

Anti-money laundering (AML) practices are another key area of concern for certain companies in the Goetz network. Uganda's Financial Intelligence Authority referred AGR to the Director of Public Prosecutions for prosecution for violation of AML laws.[43] However, the case has not gone forward. Some Ugandan officials say this lack of action is a result of Goetz's relationship with President Museveni, who recommended that Uganda give AGR incentives to do business in the country.[44] AGR denies having any commercial relationship with Museveni or any other senior Ugandan government officials.[45]

> It is illegal, according to Congolese law, to export gold from artisanal mines that are not certified as conflict-free in Congo. An estimated 96 percent of artisanal gold mines in Congo are not certified.

Several corporate practices of AGR and the Goetz network of companies appear to raise AML red flags set forth by the Financial Action Task Force (FATF)[46] and to be inconsistent with U.N. Security Council and Organization for Economic Cooperation and Development (OECD) due diligence guidance on conflict minerals.[47] The FATF red flags are indicators of potential money laundering that should trigger enhanced scrutiny by banks and other companies. Potentially noncompliant practices of AGR and/or the Goetz network include failure to report to the national financial intelligence unit (FIU), the risk—described in this report—that it is trading in gold that is mined and traded illegally (which AGR denies),[48] setting up a complex web of companies with overlapping ownership structures and activities linked to the trade in Congo's gold, and conducting inadequate due diligence given the high risk of sourcing conflict gold. Collectively, such practices raise the risk that AGR may be attempting to hide the origins of high-risk gold from Congo. Indeed, AGR continues to export gold in large volumes despite having received noncompliance notices from Uganda on licensing, disclosure, and registration.[49] The company maintains that, although it is not licensed by the mining ministry, all of its data is publicly available,[50] and it has expressed a desire to assist with mapping and traceability.[51] Goetz has insisted his business record is clean. "Conflict minerals don't exist," he stated in 2017. "All minerals are created by God."[52]

Goetz co-owns Tony Goetz NV, the Belgian refinery whose apparent affiliate directly imports gold from AGR.[53] Although the company maintains that it has internal procedures to identify its clients and the origin of its gold, and avoid sourcing conflict minerals,[54] it failed a third-party audit of the Responsible Minerals Initiative (RMI) in 2017, which includes strict due diligence requirements on conflict minerals. Apple, Intel, and 345 multinational companies use RMI audits as a primary source for determining whether smelters meet responsible sourcing standards.[55] The RMI audit failure raises the question as to why the refinery remains certified by the main commodities trading association in Dubai, a global gold trading hub, as "Good Delivery," a status that includes conflict-free requirements.[56] It was due to be re-audited in 2017 under the Dubai program, but no new audit report has been published.[57] In addition, European press has reported that Belgian authorities were also investigating Tony Goetz NV for possible money laundering.[58] The company asserts that its activities are in accordance with the law and that it follows strict AML procedures.[59]

3

AGR marks a return to the region for Goetz. He reportedly made deals with a major rebel group in Congo in 1997,[60] and the corporate network operated by Goetz and his father is estimated to have purchased over 100 tons of gold worth approximately $1.1 billion in the 1990s.[61]

International due diligence, responsible minerals audits, and AML frameworks were established in order to combat corruption and the deadly conflict minerals trade. Companies that fail such audits, and that do not adhere to such guidance yet continue to sell their minerals internationally must face steep consequences, or else there will be no change in the conflict gold trade that fuels armed conflict. The activities of such companies are a primary obstacle to increasing the conflict-free, responsible gold trade from Congo, which can help de-link the gold trade from conflict and help the Congolese people benefit from their natural resources. The Sentry makes the following recommendations:

## Recommendations

1.  **Targeted network sanctions.** The United States, U.N. Security Council, and European Union should investigate and, if appropriate, sanction gold refining and trading companies and their beneficial owners discussed in this report. This should be done based on findings of support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Congo through the illicit trade in natural resources, for example purchasing gold sourced from areas controlled by armed groups. A conclusion that any of the companies have failed to implement U.N. Security Council and OECD due diligence guidance for conflict and high-risk gold should factor into the analysis of how sanctions are applied.[62]

2.  **Anti-money laundering measures (AML).** The U.S. Department of the Treasury and financial intelligence units (FIUs) in Europe and East Africa should issue advisories to alert financial institutions on conflict and high-risk gold from East and Central Africa, highlighting in particular the significant risks presented by the trade in illicit gold from Congo, Uganda, and Rwanda, as described in this report. The advisories should build on the 2015 Financial Action Task Force (FATF) typology report on gold and money laundering by identifying ways in which gold is used to finance conflict and requesting increased reporting of suspicious activity. The U.S. Department of the Treasury should also investigate and, if appropriate, issue a finding, pursuant to Section 311 of the Patriot Act, that the trade in conflict and high-risk gold with certain traders is a "class of transactions" that constitutes a primary money laundering concern. These actions should be specifically worded to target launderers, but not discourage the legitimate, conflict-free trade.

3.  **Prosecutions.** The United States and European Union should urge the Ugandan government to vigorously pursue an investigation of AGR for potential money laundering and, if the investigation concludes that an indictment is warranted, prosecute those responsible for violating the law. Belgium, the United States, and the United Arab Emirates should investigate potential breaches of relevant mining, customs, anti-money laundering, and anti-corruption regulations in relation to AGR, Goetz Gold, Tony Goetz NV, and Uganda Commercial Impex.

4.  **Use of AML red flags by banks.** Banks and other gold purchasing companies should conduct enhanced scrutiny and refer to the red flags in the 2015 FATF typology report to assess risks when dealing with the gold refining and trading companies and their beneficial owners identified in this report to ensure that they are not inadvertently aiding in laundering the proceeds of conflict gold.[63] They should also ensure to take measures to support the responsible, conflict-free gold trade from Congo.

UNCLASSIFIED                    EXHIBIT 6

5.  **Due diligence review and delisting/withdrawal of membership.** The Dubai Multi Commodities Centre (DMCC) should immediately review whether to de-list Tony Goetz NV from its "Good Delivery" list.

6.  **Improved AML implementation.** The U.S. Department of the Treasury should convene key gold refiners and traders, industry associations, and banks to highlight the need for better implementation of the red flags in the FATF typology report on gold. The United States and European FIUs should follow up with the Eastern and Southern Africa Anti-Money Laundering Group (ESAAMLG) on next steps for implementing the FATF typology on gold, including through future mutual evaluations.

7.  **Stopping smuggling by plane.** The International Civil Aviation Organization (ICAO) and the World Customs Organization (WCO) should develop rules for airlines to prevent the smuggling of gold by hand on commercial airlines, and donor governments should provide assistance focused on detecting smuggled gold to airlines with routes that service key smuggling airports in the Great Lakes region.

## Introduction

Recent violent clashes in gold-rich Beni, Ituri, and other areas of eastern Congo have left thousands of people dead and hundreds of thousands more displaced. Eastern Congo is the site of the world's deadliest conflict since World War II, with between 3.3 and 7.6 million people estimated to have died.[64] Armed conflict in Congo has also displaced 4.5 million people, one of the largest numbers of displaced people in the world.[65] Although the conflicts began for other reasons, and significant political and other dynamics are key factors in them, the gold trade is a central driver of both conflict and corruption. According to the U.N. Group of Experts on Congo, gold is the biggest source of funding for armed groups and criminal networks in eastern Congo.[66]



According to the UN, 4.5 million people are displaced in Congo at present as a result of conflict, and conflict gold provides the largest source of revenue to armed actors in the conflict in eastern Congo.

Photo: Kitchanga displaced persons camp, North Kivu, Congo. Enough Project

DRC-30316 0168                    UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 6

Alain Goetz, however, has denied even the existence of conflict gold. "Conflict minerals don't exist," he is quoted as telling a reporter in Uganda, where he opened the African Gold Refinery (AGR) in 2017. AGR is now one of the largest gold refineries on the continent. "All minerals are created by God. He did not put conflict minerals in the universe."[67]

"You cannot shoot with a mineral," he continued. "You have to get the mineral, sell it and get money, and then buy guns."[68] This statement, of course, implicitly recognizes that without a market for conflict gold, armed groups and criminal networks would not be able to use gold and other precious minerals to finance military operations. AGR further stated to The Sentry that "we have never seen a single military coming-in to our facilities to offer or deal gold with us neither direct nor indirect."[69]

"Conflict minerals don't exist. All minerals are created by God. He did not put conflict minerals in the universe." -Alain Goetz

Armed actors in eastern Congo profit from the trade of artisanal and small-scale gold through mining, illegal taxation, raiding of mines, and collaborating with smugglers.[70] Several armed groups trade gold for weapons and ammunition.[71] The human costs and exploitation tied to the conflict gold trade are devastating, despite the fact that artisanal gold mining does provide a livelihood for many Congolese miners. The various armed forces that profit from the trade have killed tens of thousands of people and engaged in extensive human rights abuses, including sexual and gender-based violence,[72] against civilians with impunity.[73] Child labor,[74] forced labor, exploitative debt, corporal punishment, and mine collapses are also common in the gold trade.[75] The trail of conflict gold follows a six-step supply chain from eastern Congo to its main end-products: jewelry, gold bars, and electronics, which accounted for 98 percent of global gold demand in 2017.[76] The steps are mines; smugglers and traders in Congo; regional smugglers in Congo, Uganda, and the region; traders and refiners in Dubai, Uganda, and Belgium; banks in Switzerland and elsewhere; and jewelers and other end-users worldwide.[77]

According to interviews and documents reviewed by The Sentry, companies controlled by Goetz, including AGR, provide a potential pathway for conflict gold sourced in eastern Congo to reach international markets and the supply chains of U.S. companies. People with direct knowledge of this refiner's operations told The Sentry that AGR purchases gold that is sourced from conflict-affected areas in eastern Congo. Documents reviewed by The Sentry and statements made by persons with direct knowledge of the matter indicate that AGR appears to be noncompliant with due diligence standards and is being investigated for potential violation of money laundering laws. In mapping the network of companies owned or controlled by Goetz that are linked to the gold trade—from Uganda to the United Arab Emirates to Luxembourg to Belgium—The Sentry has identified what we believe is a substantial risk that gold mined in eastern Congo and refined by Goetz may be ending up in the supply chains of 283 publicly listed companies in the United States, including Amazon, Sony, and GE.[78]

As noted throughout this report, two companies in the Goetz network, AGR and Tony Goetz NV, have insisted, in response to questions posed by The Sentry, that they adhere to international protocols and standards on conflict minerals and do not source conflict gold. Both companies have also indicated that they have strict compliance and Know Your Customer procedures to identify their clients and avoid sourcing conflict minerals. AGR maintains that it fully adheres to the OECD and ICGLR guidance and that all of its suppliers must have valid documents, and claimed that it is committed to contributing to a cleaner gold supply trade in the Great Lakes region and is willing to work with international organizations to do so. AGR also noted that it is a service provision company, not a trading company, and that it handles only the export, shipment, and delivery of gold for its clients.[79] In response to questions posed by The Sentry, AGR asserted that roughly 90 percent of the

DRC-30316 0169    UNCLASSIFIED

gold that it handles comes from licensed dealers and that the remaining 10 percent comes directly from "accredited mines" in Tanzania, Kenya, Uganda, Rwanda, and Congo.[80] It stated that the 90 percent comes mainly from the same five countries.[81]

Despite these assertions, The Sentry remains concerned about the role these companies may play in the sourcing of conflict gold. First, AGR does not appear to have halted or changed its purchasing practices from Congo[82] and has apparently continued to export very high volumes of gold despite the very high risks of sourcing gold from neighboring eastern Congo. Twelve different traders and government officials in the region told The Sentry that AGR has taken over a significant portion of the market for gold trafficked from Congo to Uganda and the region;[83] and the U.N. Group of Experts concluded that most of the gold going through Rwanda and Uganda is smuggled from Congo and other neighboring countries and is mainly controlled by Goetz.[84] Second, AGR's sourcing of undocumented gold that is scrap is concerning, given that this is an internationally recognized loophole, and AGR is apparently only checking the identification cards of the persons providing the scrap, not conducting enhanced due diligence. This is high risk given that approximately 96 percent of Congo's artisanal gold mines are not certified conflict-free. Third, Tony Goetz NV failed a major international conflict minerals audit, and AGR has not undergone an independent third-party audit through the ICGLR certification process.[85] Fourth, being a "service provider" does not eliminate the responsibility that AGR has for implementing comprehensive due diligence measures consistent with international standards that apply to both refiners and smelters. AGR has acknowledged that it bears the same due diligence responsibilities as other refiners.[86] However, The Sentry remains concerned about AGR's implementation of the OECD due diligence guidance as outlined below.

## Sourcing Conflict Gold

Alain Goetz is neither a new nor small player in the gold trade from Congo and the Great Lakes region. His network of companies is estimated to have purchased more than 100 tons of gold in the 1990s, mainly from eastern Congo.[87] The son of diamond and gold dealer Tony Goetz from Antwerp, Belgium, Alain Goetz became involved in the trade in the 1980s. By 1994, he reportedly had a "near monopoly"[88] on the region's gold trade by setting up a refinery and buying network.[89]

When war broke out in Congo in the 1990s, Goetz reportedly made a deal with Laurent-Désiré Kabila's armed opposition group, the Alliance des Forces Démocratiques pour la Libération du Congo-Zaïre (AFDL), to control



According to academic and NGO reports, Alain Goetz made a deal in 1997 with Laurent-Désiré Kabila's armed opposition group, the AFDL, to control the gold trade in rebel-held areas in exchange for paying tax to the rebels. Goetz reportedly became the leading gold exporter from AFDL-held territory.

Photo: AFDL rebels, March 1997. Reuters/Corinne Dufka - stock.adobe.com

7

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
DRC-30316 0170                    UNCLASSIFIED                    9 of 56



UNCLASSIFIED                    EXHIBIT 6

the gold trade in rebel-held areas in exchange for paying 1.5 percent tax to the rebels. [90] Goetz reportedly became the leading gold exporter from AFDL-held territory.[91] Buying offices that supplied Goetz's companies were set up under the name Congocom.[92] One Congocom manager, Kambale Kisoni, became known as "the cashier of the [RCD-ML] rebellion" in the 2000s after Goetz left the region. [93] Much of Goetz's gold was reportedly

> Several people involved in the trade of Congolese gold with direct knowledge of AGR's operations told The Sentry that the company sources gold from conflict-affected parts of eastern Congo.

refined in Belgium in the refinery that was later renamed Tony Goetz NV, according to one NGO.[94] Alain Goetz left the region in 2000, but in 2009 the U.N. Group of Experts alleged that Goetz was back and had purchased gold from a company that sourced gold from the Forces démocratiques de libération du Rwanda (FDLR) rebels.[95] Goetz denied buying that gold, and Tony Goetz NV said in response to questions posed by The Sentry that it did not purchase gold from the company or maintain relations with it.[96] By the same token, Goetz admitted to purchasing gold from a Congolese government official in 2009, and Tony Goetz NV also maintained that it had lawfully purchased gold from a Congolese government agency. That purchase, however, appeared to occur under highly irregular circumstances.[97] Tony Goetz NV stated in response to questions posed by The Sentry that the gold was legally imported through Belgian customs, which did not raise issues with the import. The U.N. Group of Experts also found that the company address of gold smuggler and former Goetz and Congocom employee Mutoka Ruganyira was the same as a Goetz-registered company in Antwerp.[98] Goetz denied links with Mutoka's company despite having the same name and address, and Tony Goetz NV stated in response to questions posed by The Sentry that the Belgium-based company was



incorporated seven years earlier and is "an entirely different private limited liability company that provides management services."[99]

Goetz made a high-profile return to the Great Lakes region with the opening of AGR in Entebbe, Uganda. The $15 million refinery began operating in 2015 but was formally inaugurated in a February 2017 ceremony attended by Ugandan President Yoweri Museveni. [100] Since its launch, AGR has drawn criticism for its potential role in facilitating the trade of conflict minerals.[101]

According to interviews conducted and documents obtained by The Sentry, there is a significant risk that AGR sources conflict gold from eastern Congo, and that it imports illegally exported artisanal gold mined in eastern Congo. In 2017, according to documents reviewed by The Sentry, AGR refined and exported 9.3 tons of gold, [102] although the company says it exported 7.7 tons.

Several people involved in the trade of Congolese gold with direct knowledge of AGR's operations told The Sentry that the company sources gold from conflict-affected parts of eastern Congo. Two prominent gold smugglers in eastern Congo acknowledged they sold illegally mined and trafficked gold to AGR from 2016-18, which two South Kivu-based traders confirmed.[103] Furthermore, four gold traders based in eastern Cong o and one government official told The Sentry that traffickers Buganda Bagalwa and Mange Namuhanda regularly sold gold to AGR in 2017.[104] In response to

In 2017, according to documents reviewed by The Sentry, AGR exported 9.3 tons of gold, although the company says it exported 7.3 tons. Both figures are far beyond Uganda's domestic production, and AGR acknowledges sourcing from Congo. Photo: AGR website.

questions posed by The Sentry, AGR denied having purchased or refined gold from Bagalwa and Namuhanda.[105] Bagalwa and Namuhanda have been named in several U.N. Group of Experts reports as purchasers of conflict gold.[106] According to multiple South Kivu and Kampala-based traders, Evariste Shamamba, owner of the company Établissement Namukaya, sold smuggled gold from South Kivu to AGR in 2016.[107] Namukaya is also named in several U.N. Group of Experts reports as having purchased gold from areas controlled by armed groups, including the FDLR.[108] Namukaya asserted in correspondence with The Sentry that it only sources from conflict-free mines.[109] Shamamba has reportedly worked with Goetz in the past to traffic gold from rebel-held areas, shared profits with him, and set up a Congocom gold trading office for Goetz in the 1990s.[110] AGR denies sourcing gold from traffickers named in U.N. Group of Experts reports and says it refrains from any action that contributes to conflict financing.[111]



The Sentry's investigation yielded multiple reports of armed groups and army commanders collecting illegal taxes on miners, government agents, and businessmen, and of clashes between armed groups and the Congolese army at gold mines.

Photo: Congolese Army soldiers at a gold mine in South Kivu, Congo. Enough Project.

AGR does acknowledge sourcing gold from Congo,[112] and one of The Sentry's sources said Goetz told him that AGR refined 100 to 150 kg of gold from Haut Uélé, Ituri, North Kivu, and South Kivu per week, which amounts to 5.2 to 7.8 tons per year.[113] In response to questions posed by The Sentry, AGR said that it sources from accredited mines or scrap sources, and that it does not source from conflict areas.[114] The remainder of the gold is likely sourced from Uganda,[115] Kenya, Rwanda, and Tanzania.[116]

Other documents obtained by The Sentry are consistent with the significant risk that conflict gold from eastern Congo may be flowing into AGR. In December 2014, before AGR was fully up and running, Alain Goetz and Tony Goetz NV signed a joint venture agreement with four other parties, including Barnabas Taremwa and Timberfric International, Ltd., a company owned by Taremwa.[117] In the agreement, Timberfric's role is described as ensuring the constant supply of gold as a raw material to AGR, and Taremwa and Timberfric were promised 45 percent of all AGR profits.[118] The U.N. Group of Experts alleged that Taremwa had engaged in illegal gold trafficking from Congo at the time,[119] and four South Kivu and Kampala-based gold traders corroborated this to The Sentry.[120] Taremwa is also the brother-in-law of Ugandan President Museveni's brother Salim Saleh, who the U.N. Panel of Experts says was involved in the illicit exploitation of natural resources in Congo and the training of paramilitary forces in the late 1990s and early 2000s.[121] Saleh denied these charges.[122] AGR later cut ties to Taremwa and stated that he "harbors a fantasy of owning AGR," but Taremwa has sued claiming that he was promised co-ownership of the company, a claim AGR denies.[123]

## Skirting certification?

Over the past decade, consumers and civil society groups in several countries around the world have prompted governments, international institutions, and industry groups to develop laws and standards designed to halt the illicit trade in conflict minerals.

The certification and regulatory regime for gold in Congo and the Great Lakes region is designed to provide assurance to buyers that gold legally sourced and exported is "conflict-free," a designation which means that it has not benefited either state or non-state armed groups. According to Congolese law, only artisanal gold that is sourced from mines that have been officially assessed and validated as "conflict-free" by a consortium of government, civil society, business, U.N., and donor representatives is eligible for legal export.[124] This means that such legally sourced gold must conform to the OECD Due Diligence Guidance and be compliant with the Regional Certification Mechanism of the International Conference on the Great Lakes Region (ICGLR). Artisanal gold traded from non-validated sites is therefore illegal. To date, only an estimated four percent of mines in Congo have been assessed and validated as conflict-free (60 out of approximately 1,499),[125] and in 2017 the U.N. Group of Experts said that it had "confirmed that almost all artisanally sourced gold in the Democratic Republic of the Congo was exported illegally and underestimated in both value and volume."[126] In sum, nearly all of the gold mined in Congo flowing to Uganda is not from certified conflict-free mines.

While AGR says that it complies with regional and international guidelines on conflict minerals,[127] The Sentry's investigation raises substantial concerns about whether AGR and certain companies in the Goetz network are using these systems or instead sourcing undocumented, non-certified gold from eastern Congo. AGR, meanwhile, claimed in response to questions posed by The Sentry that it conducts detailed checks on its clients by inspecting the documents of its gold suppliers.[128] According to Congolese law, only artisanal gold sourced from mines officially assessed and validated as "conflict-free" by teams of government, civil society, the U.N., and donor representatives may be legally exported.[129] AGR says that it also sources from Uganda, Rwanda, Kenya, and Tanzania and that it does not contribute to conflict financing.[130]



Gold from various sources in eastern Congo is reported to be typically mixed together by trader/smugglers or export houses in Bukavu and Butembo before it is exported.
Photo: Enough Project.

Accordingly, when buying artisanal and small-scale gold from Congo, the risks of purchasing illegally mined and exported conflict gold are very high. Indeed, only an estimated four percent of gold mines are certified as conflict-free, and 71 percent of gold miners in eastern Congo work at mines controlled by armed actors.[131] In addition, gold from various sources in eastern Congo is typically mixed together by traders, smugglers or export houses in Bukavu and Butembo before it is exported.[132] For example, one Congolese mining official estimated to The Sentry that approximately 700 kg of gold is produced per month in conflict-affected Lubero, North Kivu.[133] The

10

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
12 of 56

DRC-30316 0173                      UNCLASSIFIED

UNCLASSIFIED                                                    EXHIBIT 6

gold is then consolidated in Butembo before being sold to Uganda.[134] There are also reports of smuggling gold to certified mines, and of theft of gold export certificates.[135] If a refiner purchases from such traders and smugglers in Congo, particularly in large volumes, it is likely that part of this gold is conflict gold that has benefited armed groups.

## Compliance with Supply Chain Due Diligence Standards?

Goetz, who is active throughout the gold supply chain, has complained publicly about the conflict minerals certification standards. "We have to get audited for responsible sourcing of minerals," Goetz said in 2017. "We spend $100,000 a year to be audited, just papers. And they charge you anything because you want to get money from the bank, you have to get audited. It is useless, just useless."[136]

However, according to people familiar with Goetz' operations, information collected by The Sentry, and statements by Goetz and other corporate officers, AGR and at least one other company tied to Goetz appear to have failed to adequately implement U.N. Security Council and OECD Due Diligence Guidance on conflict and high-risk minerals despite AGR's high-risk location and its broad claims of adherence to the standards.[137] The OECD Guidance was recognized by the U.S. Securities and Exchange Commission as a way for companies to implement the Dodd-Frank law Section 1502 and has been adopted into law in Congo.[138]

One company in the network, Tony Goetz NV, failed a major international conflict minerals audit accredited by the Responsible Minerals Initiative (RMI) in 2017.[139] RMI conducts independent third-party audits of minerals refiners and smelters on sourcing and procurement practices to ensure they are sourcing only conflict-free minerals. Around 81 percent of the world's refiners and smelters of gold, tantalum, tin, and tungsten are active in the program.[140] Tony Goetz NV was removed from the active list in November 2017 for failure to meet the audit requirements, according to RMI, which oversees the audits.[141] Tony Goetz NV is also not, and never has been, accredited as "Good Delivery" by the London Bullion Market Association, and is therefore not subject to its stringent conflict-free third-party audits and sourcing requirements.[142] Tony Goetz NV, meanwhile, said in response to questions from The Sentry that it has internal procedures to identify its clients and the origins of gold in order to avoid sourcing conflict minerals and is not active in Congo.[143]

> Tony Goetz NV failed a major international conflict minerals audit accredited by the Responsible Minerals Initiative (RMI) in 2017.

Regarding AGR's due diligence, The Sentry has unsuccessfully attempted to verify AGR's assertion that it conducts adequate due diligence, and several company practices appear to fall short of the OECD guidance.[144] Moreover, while AGR has maintained that it does not deal in undocumented gold, Goetz has publicly stated that AGR does so and that it has "limited resources to map each and every gram reaching our facility."[145] It later stated in response to questions posed by The Sentry that it indeed deals in some undocumented gold from scrap dealers, and that it cross-checks the dealer(s)' identification card.[146] Indeed, Goetz similarly appeared to suggest in May 2017 that AGR's only due diligence on undocumented gold sellers is to "examin[e] their identification and cross check it."[147] He added that AGR wants to expand its due diligence procedures, but this was after the company had already refined at least $236 million in gold in 2015 and 2016.[148] AGR later stated in response to questions posed by The Sentry that its due diligence includes Know Your Customer procedures that require each potential client to submit certificates of incorporation, licenses, and audited statements.[149]

11

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
13 of 56

DRC-30316 0174                          UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 6

Despite AGR's claim to be in accordance with OECD guidance, these procedures appear to be inconsistent with the U.N. and OECD guidance.[150] The guidance states that companies should design and implement a strategy to respond to and mitigate risks. The steps outlined above appear to be insufficient in that regard. The OECD's suggested measures include alerting governments of abusive and exploitative practices in the supply chain,[151] and establishing a chain of custody that collects disaggregated data for all gold from a red-flagged supply chain, including the mine of origin, locations where the gold is consolidated, the corporate structures and military affiliations of all corporate officers, all tax payments, and all payments to security forces for every gold input.[152]

There appears to be no mention of these actions by AGR on its website or in its public documents reviewed by The Sentry. However, the company insisted in response to questions posed by The Sentry that it adheres to the OECD guidance and requires each potential client's documents to include certificates of incorporation, trading licenses, minerals dealers' licenses, audited financial statements, and other documents.[153] A statement on AGR's website notes that it helps miners in their applications for licenses and conducting audits, which would ensure that gold mining revenues would be kept out of the hands of rebels and is controlled instead by miners themselves.[154] The company only mentions rebel groups, yet the Guidance clearly applies also to mines controlled by the army or other public security forces.[155] That said, AGR's stated step would constitute a measure under OECD Step 3,[156] but on its own is insufficient given the very high risks of sourcing undocumented gold from the conflict zone of eastern Congo and the numerous other measures suggested under Step 3 of the OECD and U.N. guidance. AGR does not mention taking any of those steps on its website or in other public documents reviewed by The Sentry. AGR has also said that it adheres to the International Conference of the Great Lakes Region (ICGLR) standards, but it has not undergone an ICGLR audit unlike other major minerals exporters in the region.[157] AGR said in response to questions posed by The Sentry that it has appointed an external company to conduct a compliance audit in 2018, but per the ICGLR certification process, third-party auditors are appointed only by the ICGLR Audit Committee rather than by the auditee, something that AGR has acknowledged.[158]

> While AGR has maintained that it does not deal in undocumented gold, Goetz has publicly stated that AGR does so and that it has "limited resources to map each and every gram reaching our facility."

Moreover, AGR appears to fall far short of the recommendation in the guidance to demonstrate measurable improvement in eliminating the risk within six months, and if no measurable improvement has occurred within those six months, to halt sourcing from the high-risk areas and/or suppliers for a minimum of three months.[159] Since AGR commenced operations in Uganda, the U.N. Group of Experts and international and local NGOs have reported little to no improvement in the conflict gold trade in eastern Congo and continue to highlight extensive smuggling.[160] With no documented, measurable improvements, it is reasonable to expect that AGR would halt sourcing from Congo. But this has not occurred.

Based on The Sentry's review of publicly available information, it appears AGR has also failed to implement the recommendation in the U.N. and OECD guidance to publicly report on its due diligence policies and practices.[161] There are no publicly available AGR annual reports or annual corporate social responsibility reports on this topic. Former AGR Chairman Richard Kaijuka says that his efforts to ensure AGR adhered to accountable, transparent corporate governance practices and sourced gold responsibly were "in vain."[162] AGR responded by stating that Kaijuka no longer had a formal connection with the company, and that his "personal perceptions and views… have nothing to do with AGR and do not reflect the company's position in any way."[163]

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0175            UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 6

Furthermore, public statements suggest that AGR's efforts to conduct proper due diligence are insufficient. Goetz has stated that only 0.1 percent of gold mines in eastern Congo are controlled by armed groups, which contradicts U.N. and IPIS reports that show the majority of gold mines are conflict-affected.[164] He is also on record denying the existence of conflict gold.[165] The OECD Guidance states that refiners should identify and assess supply chain risks.[166] At least three red flags in the OECD Guidance for refiners are relevant for gold from Congo and AGR's supply chain, which are supposed to trigger enhanced due diligence.[167] Yet the assessment of risks by Goetz himself seems incongruent with the regional reality.

AGR has also acknowledged that it cannot map all the gold it receives,[168] and that it is not an accountable entity under anti-money laundering laws in Uganda because it merely refines the gold.[169] In response to questions posed by The Sentry, AGR does recognize that it has equal responsibility for conducting due diligence as other refiners, and that its procedures are based on international guidance.[170] From a due diligence standpoint, refiners are no different from other participants in the supply chain and the OECD and U.N. guidance state that they apply to gold refiners, something that AGR acknowledges.[171] Furthermore, there is at least reason to suspect that AGR buys gold. Trade insiders told The Sentry that AGR buys gold, and Goetz reportedly decides on the price paid to traders, as well as arranging terms and scheduling of payment.[172] Ugandan export records indicate that AGR exports gold: it exported 9.3 tons of gold in 2017, although AGR says it exported 7.7 tons.[173] Goetz's original AGR project proposal sent to President Museveni in 2014 calls into question the company's commitment to due diligence. In the document, Goetz, on behalf of Tony Goetz NV, states that AGR should attract gold from the region and that any gold traders who do not have official documents should be allowed to sell gold to AGR but pay a $500 penalty.[174] For traders, that would be a fraction of Congo's national 2 percent export tax, not to mention the higher provincial taxes.[175] This would therefore suggest that it may have been a proposal to monetize the illegal trafficking of gold that is inconsistent with the OECD and U.N. Guidance and the ICGLR certification process.[176] The Sentry does not have information that that policy was ever implemented by AGR.

> Goetz's original project proposal for AGR states that any gold traders who do not have official documents should be allowed to sell gold to AGR but pay a $500 penalty.

A similar pattern emerges when examining the Goetz network's operations through the lens of the Dubai Multi-Commodities Centre (DMCC) due diligence guidance.[177] From Uganda, AGR's gold flows to other Goetz-controlled companies in Dubai. The DMCC was scheduled to audit another company in the Goetz network, Tony Goetz NV, in 2017, but no new audit report has been published.[178] Despite the lack of an updated audit, Tony Goetz NV remains a Dubai Good Delivery (DGD) member today. It had passed the DMCC's audit on responsible practices in 2015 based on its 2014 activities – before AGR was launched.[179] The credibility of the DMCC auditing system was called into question in 2014 after it allegedly lowered its standards when one of its member refineries appeared to be sourcing conflict gold,[180] and the DMCC is not cross-recognized by the major international conflict-free audit programs.[181] Nonetheless, some international buyers recognize the DMCC standard. As an accredited DMCC member, Tony Goetz NV must comply with DMCC due diligence rules.[182] According to the guidance, DMCC members should develop a plan to control risks.[183] For high risk supply chains, the control mechanism is to suspend trading activities and gather more information to refute red flag risk assessments.[184] In order to respond to the high level of risk presented by undocumented gold trafficked from eastern Congo, Dubai-based buyers should suspend trading or disengage. Yet AGR, Goetz Gold, or Tony Goetz NV do not appear to have taken this step (although AGR and Goetz Gold are not DMCC members). As noted above, AGR exports nearly all of the gold it refines to Goetz Gold, and there is a significant risk that AGR sources uncertified conflict gold from Congo. Annex 2 provides a more detailed list of the DMCC red flags related to the Goetz network.

---

13

DRC-30316 0176                          UNCLASSIFIED

## Potential Money Laundering: Investigations and Red Flags

Goetz has suggested that the mineral sector in Congo is unfairly scrutinized, asserting that other transactions—including monetary transactions—should be subject to the same degree of certification. "If... you say conflict dollars, why not source [certify] all the dollars in the world?" Goetz said in 2017. "Why don't you go to the U.S. and say, what are you doing with all these conflict dollars?"[185] However, the financial industry is in many ways subject to significantly more oversight and scrutiny than the mineral trade. Many governments around the world have adopted relatively comprehensive anti-money laundering laws and regulations. Banks—especially those that conduct transactions in U.S. dollars—have clear international standards for imposing robust compliance regimes, undertaking due diligence on their customers, and reporting suspicious transactions.



Uganda's Financial Intelligence Authority (FIA) has written to the country's director of public prosecutions to request that AGR be prosecuted for violations of the anti-money laundering law. Photo: The Sentry.

Two companies in the Goetz corporate network, AGR and Tony Goetz NV, have reportedly been investigated by Ugandan and Belgian government agencies for possible violation of anti-money laundering laws. Uganda's Financial Intelligence Authority (FIA) has written to the country's director of public prosecutions to request that AGR be prosecuted for violations of Uganda's anti-money laundering law.[186] One published report suggests that AGR may have omitted to report as much as $1 billion to authorities.[187] Additionally, according to press reports, Tony Goetz NV has been investigated by Belgian authorities for possible money laundering.[188]

Beyond these investigations, documents reviewed by The Sentry indicate that some of AGR's business practices appear to raise "red flags" as indicators of potential money laundering as established by the world's leading intergovernmental body on anti-money laundering, the Financial Action Task Force (FATF). These red flags should trigger enhanced scrutiny by banks and other companies,[189] and are designed to aid companies and banks that work with companies dealing in gold by helping to determine when additional scrutiny on activities that may be money laundering should be triggered. The full list of red flags that relate to the Goetz network is outlined below in Figure 1. The net effect of red flag behavior is to hamper scrutiny of the network's operations while obfuscating the gold's origins and destination.

DRC-30316 0177

UNCLASSIFIED                                                    EXHIBIT 6

The first FATF red flag potentially relevant to AGR is non-reporting to the relevant financial intelligence unit (FIU).[190] On this front, AGR appears to run afoul of Uganda's FIU, the FIA, for failure to register and, as a result, to report on suspicious activities. The FIA's request for prosecution came after the company reportedly refused to register with the FIA and provide a copy of its license, which the FIA says violated Uganda's anti-money laundering (AML) law.[191] Additionally, Ugandan law stipulates that metals dealers must conduct specific due diligence.[192] AGR eventually responded to the FIA, stating that it is not subject to the Anti-Money Laundering Act because it is not a "dealer" of precious metals and gems.[193] However, the FIA disputes AGR's claim that it is not a dealer.[194] Furthermore, FATF's AML guidance equally applies to refiners such as AGR.[195] A red flag is raised when entities fail to register and refuse to report on transactions as necessary because of the possibility that the reason for non-reporting is involvement in illicit activity. AGR said in response to questions posed by The Sentry that it met with the FIA in November 2017 and that a non-reporting procedure was agreed. Despite this claim, AGR produced no evidence of any such agreement, and the FIA has not issued any public statements regarding any such agreement. AGR subsequently acknowledged to The Sentry that there is in fact no written agreement with the FIA but that it has not heard from the FIA since late 2017, and that it has a Manufacture Under Bond license.[196]

The second category of money laundering red flags relates to the sourcing of gold from illegal mining areas. The FATF highlights that refiners' processing of illegally mined gold is an under-enforced, high-risk area because without greater diligence by refiners on the source of the gold they process, terrorists or armed groups can exploit illegal mining areas and reap the financial benefits once refiners pay for it.[197] Since an estimated 96 percent of Congo's artisanal gold mines lack conflict-free validation status, and because it is illegal to export from them according to Congolese law, AGR's potential sourcing of gold from those areas raises a red flag. This is further described below as it also relates to the topic of due diligence.

Two other Ugandan agencies, the mining ministry[198] and the Inspector General of Government (IGG), also investigated AGR for reasons that implicate the FATF AML red flags, specifically with respect to those related to trade-based activity.[199] These investigations were based on apparent conflicting data submitted by AGR to the mining ministry and the Uganda Revenue Authority.[200] While the ministry reportedly gave AGR export permits for only 93 kg of gold between July 2016 and September 2017 (worth about $3.7 million),[201] AGR in fact exported 57 times that amount—5.3 tons of gold (worth approximately $212 million)—during this period.[202] The Sentry has reviewed a 2016 mining ministry notice of noncompliance to AGR, alleging that it had "flouted" export procedures in order to avoid paying taxes[203] and asking AGR to provide trade data as required by Ugandan law and its list of suppliers.[204] AGR denies that it failed to comply with these requirements and said in response to questions posed by The Sentry that it is licensed by the finance ministry, not the mining ministry, but that all of the relevant information is publicly available.[205] Full payment of taxes is also a part of the OECD and U.N. due diligence guidance.[206] Meanwhile, the IGG reportedly conducted a "broader investigation" of AGR, though AGR said in response to questions posed by The Sentry that that case was dropped and that it adheres to all Ugandan laws.[207]

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0178                        UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 6

Figure 1. FATF money laundering risks related to AGR and the Goetz network of companies[208]

| FATF red flags for money laundering activity (and underlying predicate activity) | | Comment re: AGR and the Goetz network |
|---|---|---|
| Non-reporting to the FIU by the gold industry organizations (where there is an obligation to report). | ✓ | AGR has refused to register with the Uganda FIU, the Financial Intelligence Authority, despite several letters from the FIU. |
| Production and commercialization of gold by a person or business without a license;<br><br>The development of mining activities in prohibited areas;<br><br>The development of mining activities without compliance with the administrative, technical, social and environmental regulation. | ✓ | Approximately 96 percent of artisanal gold mines in Congo are not certified as conflict-free, and it is illegal to export gold from them, per Congolese law. 62 percent of gold mines in eastern Congo have the presence of at least one armed actor. Goetz stated publicly in 2017 that AGR imports undocumented gold from Congo, and two major Congo-based traders acknowledge supplying AGR, which was confirmed by four other traders. In 2018, AGR denied sourcing undocumented gold and asserted that it conducts detailed checks on the gold it refines,[209] but then later said that it indeed accepted some undocumented gold from small scale gold dealers.[210] Based on the information discussed in this report, the Sentry believes there is a significant risk that much of the gold refined by AGR comes from Congo. |
| Significant number of companies registered to one natural person.<br><br>Use of a corporate structure of shell companies located across the jurisdiction;<br><br>The transaction involves the use of front or shell companies. | ✓ | AGR CEO Alain Goetz, his wife, and brother are directors or owners of at least 15 companies in four countries, several of which have stated purposes in the gold trade, and others control the gold trading companies. The Sentry has been unable to establish the operations of eight of the 15 companies which are registered at the address in Antwerp next door to Tony Goetz NV. These include Belgian Precious Metals Industries, Alaxy BVBA, WWG Diamonds, CG-Vastgoed Invest, Orofino, Worldwide Consulting, European Guarantee Agency International, and GSS NV (see Annex 1). |
| Gold is shipped to or from a jurisdiction designated as 'high risk' for money laundering activities. | ✓ | Congo, where there is significant cause for concern that large volumes of AGR's gold is sourced, is a high-risk money laundering jurisdiction. |
| Registration of a trading company in a tax haven even though its business relates to another jurisdiction. | ✓ | The bulk of gold refined by AGR is not from Uganda, yet Uganda offers a zero percent tax. Further, Alain and Sylvain Goetz transferred ownership of the Belgian refinery Tony Goetz NV to Argor International SA, a company they control based in the tax haven of Luxembourg. |

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018



UNCLASSIFIED                           EXHIBIT 6

The third category of FATF AML red flags that appears relevant to AGR and the Goetz network is the significant number of companies registered to one person and the overlapping ownership structure.[211] When interviewed by The Sentry in 2017 about what happens to gold refined by AGR, AGR senior management stated that it does not sell the gold but rather merely refines the gold and did not specify the destination companies for the gold.[212] Because of the significant risk that AGR sources large amounts of gold from eastern Congo,[213] the company would likely have trouble selling gold directly to multinational companies or banks. However, neither Tony Goetz NV nor its affiliates have been identified as high-risk. As a result, it is possible for Goetz to sell AGR's gold with little worry by transferring it to other companies in his network.[214]


Seven companies where Alain Goetz and/or his close family members are directors are registered at this address in Antwerp, Belgium, directly adjacent to Tony Goetz NV. Photo: Google.

Ugandan export documents reviewed by The Sentry indicate that AGR exports to other companies in Goetz's network, mainly to Goetz Gold.[215] Alain Goetz and/or his wife and brother are directors of at least 15 different companies that have complex and at times opaque, structures. At least seven of the companies are associated with AGR (see Annex 1). Additionally, seven of the companies are registered to the same address in Belgium, a small office building directly adjacent to Tony Goetz NV (see Annex 1).

Despite Tony Goetz NV's claims that it is not an owner or part-owner in AGR,[216] it appears from documents reviewed by The Sentry that AGR is connected to Tony Goetz NV through a series of companies. Tony Goetz NV was AGR's original 99 percent shareholder in 2014.[217] In November 2015, Alain Goetz replaced Tony Goetz NV as the primary shareholder, albeit with the same listed address as Tony Goetz NV.[218] As of 2018, Tony Goetz NV is owned by Alain and his brother Sylvain Goetz through a Luxembourg-based company.[219]

According to documents reviewed by The Sentry, Goetz sought the intercession of President Museveni in 2014 in order to gain a 10-year tax break for AGR.[220] Three years later, that became a reality when President Museveni announced a pending zero percent tax rate essentially benefitting only AGR.[221] This, in turn, potentially relates to a fourth FATF AML red flag that is applicable to the Goetz network: registration of a trading company in a tax haven even though its business relates to another jurisdiction. While Uganda is not a traditional tax haven, as a practical matter, it presently serves as one for gold refining since Uganda changed its tax structures on gold to attract gold companies. While it certainly is more stable to operate in Uganda than in Congo, most of AGR's gold appears to come from outside of Uganda, where it is based and doesn't pay export taxes.[222] By contrast, other companies exporting gold from Uganda pay a one or five percent export tax, depending on whether they import and then

17

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
DRC-30316 0180                           UNCLASSIFIED                           19 of 56

UNCLASSIFIED                                    EXHIBIT 6

re-export the gold (one percent tax) or whether they procure the gold from within Uganda and then export it (five percent tax).[223] Additionally, the Goetz network's transfer of ownership of Tony Goetz NV to a company based in the tax haven of Luxembourg owned by the Goetz brothers is another red flag along these lines.[224]

At the time of this writing, AGR has not been prosecuted for money laundering in Uganda. Documents reviewed by The Sentry indicate the company has links to Ugandan President Museveni, who ordered the Finance Ministry to discuss incentives for AGR (which it then granted) and presided at the official opening ceremony of the refinery in 2017,[225] and to President Museveni's childhood friend, Richard Kaijuka, who was appointed as chair of AGR's board. Kaijuka served as an alternate executive director of the World Bank until he resigned over alleged bribery.[226] AGR states that he terminated in mid-2017.[227] In response to questions posed by The Sentry, AGR denied having a commercial relationship with any Ugandan officials, including Museveni.[228]

> Despite Tony Goetz NV's representation that it is not an owner or part-owner in AGR, documents reviewed by The Sentry suggest that AGR is connected to Tony Goetz NV through a series of companies. Tony Goetz NV was AGR's original 99 percent shareholder. In November 2015, Alain Goetz replaced Tony Goetz NV as the primary shareholder, albeit with the same address as Tony Goetz NV.
>
> Photo: The Sentry.

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0181                    UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 6

## Conflict gold flowing to North America and Europe?

The Sentry has mapped the network of companies owned or controlled by Goetz that are linked to the gold trade, from Uganda to the UAE to Luxembourg to Belgium, through examining corporate registration documents, court filings, and export records in each of these countries. Several of these companies are involved in the supply chain for AGR. From Uganda, gold refined by AGR is transferred almost exclusively to companies owned or controlled by Goetz, according to Ugandan export records reviewed by The Sentry.[229] It is mainly transferred to an apparent affiliate of Tony Goetz NV called Goetz Gold based in Dubai (99 percent in 2017), but the documents also show that AGR exported gold in 2015-17 to Agor DMCC, Belgian Precious Metals Industries (both companies controlled by Goetz) and to Alain Goetz himself.[230] Other documents corroborate these trade flows. Data reviewed by The Sentry shows that AGR exported 936 kg of gold to the UAE in March 2016,[231] and U.N. trade statistics show that Uganda exported $332 million worth of gold to the UAE in 2016 and $7.5 million to Belgium.[232]

The flow of gold to the Tony Goetz NV apparent affiliate company is important because Tony Goetz NV likely sells directly or indirectly to major U.S. corporations. It was listed as potentially being in the supply chain for 283 publicly listed companies in the United States, including Amazon, Sony, and GE, according to 2018 U.S. Securities and Exchange Commission filings.[233] Furthermore, AGR itself is listed as potentially being in the supply chain for 103 publicly traded companies in the United States, according to the same filings.[234] This raises the question of whether conflict gold is entering major U.S. supply chains.



According to 2018 US Securities and Exchange Commission filings, AGR may be in the supply chains of 103 US publicly traded companies, including GE and Halliburton.
Photo: The Sentry. Kampala, Uganda, October 2018.

More recently, Goetz has also set up a second major regional gold hub in Rwanda. He has reportedly been exporting gold in Rwanda since 2017,[235] and Rwanda has begun exporting around one ton of gold per month since November 2017, most of which is controlled by Goetz, according to the U.N. Group of Experts.[236] At current prices, that would equal over $500 million per year.[237] The U.N. Group of Experts reports that most of the gold going through Rwanda and Uganda is smuggled from Congo and other neighboring countries.[238] Goetz has also reportedly entered into a partnership with the Rwandan government to build a gold refinery in Rwanda,[239] which is currently under construction.[240] Similar to Uganda, Rwanda has also seen a major surge in gold exports, rising from $8.1 million in 2014 to $242.5 million in 2017, a near 3,000 percent increase.[241] Gold is now one of Rwanda's largest export commodities[242] despite the country's very low domestic production,[243] and the UAE is its most important trading partner. However, Rwanda does not produce nearly that amount of gold. The Sentry has reviewed an internal Rwandan government study of gold production capacity from July 2016 which indicates an overall production capacity of merely 20-30 kg per annum.[244]

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

From Congo to the United States, continued: The links between AGR, the Goetz family, and the refinery Tony Goetz NV

| Company | Link to AGR |
|---|---|
| Belgian Precious Metals Industries (BPMI)[245] | Imported 175 kg of gold from AGR worth approximately $7.4 million in 2016.[246] At that time, BPMI's managing director was Sylvain Goetz, and its directors were Alaxy BVBA (whose sole shareholder is Alain Goetz), and Worldwide Consulting (controlled by Sylvain and his wife Ann Hilkmann, as of June 2018)[247] and listed address was adjacent to Tony Goetz NV.[248] There is further overlap with AGR, as the new managing director of BPMI, Cherry Ann Dacdac, is a director at AGR.[249] |
| Agor DMCC[250] | Imported 1.4 tons of gold from AGR in 2015-16 worth approximately $56.5 million in 2016.[251] Co-owned by Alain Goetz.[252] Linked to Tony Goetz NV.[253] Registered in Dubai. Same phone, fax, and PO Box address as Goetz Gold, LLC and additional linkages to Tony Goetz NV and Goetz Gold LLC.[254] |
| Goetz Gold, LLC[255] | Imported 9.3 tons of gold from AGR in 2017, which AGR says was 7.7 tons, and 4.5 tons of gold from AGR in 2015/16 worth approximately $169 million.[256] "Preferred partner" of AGR.[257] Apparent affiliate of Tony Goetz NV.[258] Registered in Dubai but listed headquarters is the Tony Goetz NV address in Belgium.[259] Additional linkages to Tony Goetz NV and Agor.[260] |
| Tony Goetz NV[261] | Did not pass a third-party audit accredited by the Responsible Minerals Initiative in 2017.[262] Listed as possibly being in the supply chain for 283 US-listed companies in 2018.[263] Owned by Alain and Sylvain Goetz through a company in Luxembourg, Argor International SA, as of 2018.[264] As of December 2017, Tony Goetz NV's managing directors were CG-Vastgoed Invest (permanently represented by Alain Goetz) and Alaxy BVBA (where Alain Goetz is the sole shareholder, and his wife Sandra Weyler is permanent representative).[265] Was the 99 percent shareholder in AGR when AGR was founded.[266] Address is directly adjacent to 7 companies controlled by Alain Goetz and family. |

## Conclusion

The conflict gold trade sustains ruthless armed groups such as the FDLR and Congolese army units that commit mass atrocities, sexual violence, and other human rights abuses against the population of eastern Congo. It is critical that actors in the international community, especially global banks that trade gold and the consumers of gold, know the origins of the precious metal they are buying. More importantly, governments and companies need to take action against the corporate networks that traffic conflict gold and move it into the global economy.

**Annex 1: The complex, overlapping web of companies controlled by Alain Goetz and family**

| Company | Description |
|---|---|
| African Gold Refinery (AGR)[267] | At first was controlled by Tony Goetz NV. Signed Joint Venture with Aldbra, Ltd. Then ownership changed to Alain Goetz (who controls 999 out of 1,000 shares).[268] Registered in Uganda. Listed as possibly being in the supply chains of 103 publicly traded U.S. companies in 2018.[269] |
| Tony Goetz NV[270] | Belgian refinery that did not pass a third-party audit accredited by the Responsible Minerals Initiative in 2017.[271] Listed as possibly being in the supply chain for 283 US-listed companies in 2018.[272] Transferred to Alain and Sylvain Goetz in 2001,[273] and owned by Alain and Sylvain Goetz through a company in Luxembourg, Argor International SA, as of 2018.[274] As of December 2017, Tony Goetz NV's managing directors were CG-Vastgoed Invest (permanently represented by Alain Goetz) and Alaxy BVBA (where Alain Goetz is the sole shareholder, and his wife Sandra Weyler is permanent representative).[275] Was the 99 percent shareholder in AGR when AGR was founded.[276] Address is directly adjacent to 7 companies controlled by Alain Goetz and family. |
| Argor International SA[277] | Controlled by Alain Goetz and brother Sylvain, as of 2018.[278] Owns the shares of Tony Goetz NV.[279] Registered in Luxembourg. Lists Alain's address in Dubai. |
| Agor DMCC[280] | Controlled by Alain Goetz.[281] Linked to Tony Goetz NV.[282] Registered in Dubai. Imported 1.4 tons of gold from AGR in 2015-16 worth approximately $56.5 million in 2016.[283] Same address as Goetz Gold, LLC and additional linkages to Tony Goetz NV and Goetz Gold LLC.[284] |
| Goetz Gold, LLC[285] | Apparent affiliate of Tony Goetz NV.[286] Registered in Dubai but listed headquarters is the Tony Goetz NV address in Belgium.[287] AGR exported more than 14.6 tons of gold in 2016-17 to Goetz Gold, worth approximately $585 million.[288] "Preferred partner" of AGR.[289] Other linkages to Tony Goetz NV and Agor.[290] |
| Belgian Precious Metals Industries (BPMI)[291] | Imported 175 kg of gold from AGR worth approximately $7.4 million in 2016.[292] At that time, BPMI's managing directors were Sylvain Goetz, and its directors were Alaxy BVBA (whose sole shareholder is Alain Goetz), and Worldwide Consulting (controlled by Sylvain and his wife Ann Hilkmann, as of June 2018)[293] and listed address was adjacent to Tony Goetz NV.[294] There is further overlap with AGR, as the new managing director of BPMI, Cherry Ann Dacdac, is a director at AGR.[295] |
| Aldabra Ltd[296] | Permanent representative was Alain Goetz as of December 2017, registered in Dubai.[297] As of August 2017, was Managing Director of Tony Goetz NV,[298] but was removed from this role in December 2017.[299] |
| Aldbra Ltd | AGR signed a Joint Venture Agreement in December 2014 with this company (in other documents named Aldabra), based in Uganda, and Goetz signed on behalf of this company in the agreement.[300] |
| Alaxy BVBA (previously named Berkenrode BVBA)[301] | Alain Goetz was the only shareholder as of June 2018, and his wife Sandra Weyler was permanent representative.[302] As of June 2018, Alaxy BVBA was a Managing Director of Tony Goetz NV. Registered in Belgium, address is directly adjacent to Tony Goetz NV. Name changed from Berkenrode to Alaxy BVBA on December 4, 2009, eleven days after |



UNCLASSIFIED    EXHIBIT 6

| | |
|---|---|
| | Berkenrode was mentioned in a U.N. Group of Experts report on Congo.[303] Tony Goetz NV stated in response to questions posed by The Sentry that the Berkenrode mentioned the U.N. report has no relationship with the Berkenrode based in Belgium.[304] |
| CG - Vastgoed Invest[305] | Founded by Alain Goetz. As of June 2018, Managing directors were Alaxy BVBA (controlled by Alain Goetz) and Worldwide Consulting (whose managing director is Sylvain Goetz). Registered in Belgium. Address directly adjacent to Tony Goetz NV. |
| European Guarantee Agency International[306] | As of June 2018, Managing Director was Sylvain Goetz, Directors were Alaxy BVBA (controlled by Alain Goetz), and Worldwide Consulting.[307] Deals in precious metals analysis and evaluation. Registered in Belgium. Address is directly adjacent to Tony Goetz NV. |
| GSS NV (formerly Gold and Silver Systems)[308] | As of June 2018, Managing Director was Alain Goetz, and Director was Alaxy BVBA (whose sole shareholder is Goetz).[309] Registered in Belgium. Address is directly adjacent to Tony Goetz NV. |
| Orofino NV[310] | As of June 2018, Managing directors were Alain Goetz and Alaxy BVBA (controlled by Goetz).[311] Set up by Berkenrode and Argor International. Registered in Belgium. Address is adjacent to Tony Goetz NV. |
| WWG Diamonds[312] | As of June 2018, co-owned by Alain and Sylvain Goetz. Registered in Belgium. Address adjacent to Tony Goetz NV. Lists Alain's address as Luxembourg. |
| Asteco SA[313] | As of September 2015, Alain Goetz was a director,[314] together with Yves Puttemans, Marjorie Golinvaux, MS Gestion. Registered in Luxembourg. Lists Alain's address in Dubai. |
| Worldwide Consulting | As of June 2018, shareholders were Sylvain Goetz and his wife Ann Hilkmann, and listed address is directly adjacent to Tony Goetz NV.[315] Director or Managing Director in several other Goetz companies. |

22

DRC-30316 0185          UNCLASSIFIED



UNCLASSIFIED                     EXHIBIT 6

**Annex 2: Dubai Multi-Commodities Centre (DMCC) risks associated with Tony Goetz NV and the Goetz Network**

| DMCC Risk Factors for geographical location of gold | Finding |
|---|---|
| Origin and transportation | Congo; undocumented |
| The level of government regulation and supervision | Low |
| The extent of cash transactions used in the country | High |
| The level of conflicts or human rights abuses | High |
| Payment systems used (formal banking vs. informal) | Often informal |
| Level of involvement of criminal organizations | High |
| Level of access from a country to nearby markets or processing operations that are termed as conflict and/or high risk areas | High |
| Level of enforcement of laws addressing significant criminal activity | Low |
| Existence of sanctions and/or embargoes that have been directed against the country and individuals/entities in that country | Multiple sanctions |

| DMCC Risk Factors for counterparties in the supply chain | Finding |
|---|---|
| KYC information of the company's suppliers as identified in Step 1 should include information about the origin and transportation of the gold and precious metals | Undocumented – insufficient information |
| Red flags (detailed in point 2 of this section) in any aspect of the entire supply chain | Multiple red flags |
| Number of suppliers i.e. the greater, the higher the risk | Large number in Congo |
| Level of control that the counterparty has over its suppliers | Limited |
| Level and adequacy of due diligence practices of the counterparty | Undocumented – inadequate |
| Whether the counterparty due diligence practices have been audited by a qualified third party auditor | No |
| For how long the counterparty has been in the gold and precious metals business (the longer, the lower the risk) | Long time, but named in U.N. GoE reports |
| Politically exposed persons that have been entrusted with prominent public functions or individuals who are closely related to such persons | Yes |

23

UNCLASSIFIED                                    EXHIBIT 6

| DMCC location-based red flags | Finding |
|---|---|
| The gold and precious metals originate from or have been transported through a conflict-affected or high-risk area | ✓ |
| The gold and precious metals are claimed to originate from a country that has limited known reserves or stocks, likely resources or expected production levels of gold and precious metals (i.e. the declared volumes of gold and precious metals from that country are in excess of its known reserves and/or expected production levels) | ✓ Burundi and Uganda |
| The gold and precious metals are claimed to originate from recyclable/scrap or mixed sources and has been refined in a country where gold and precious metals from conflict-affected or high-risk areas is known or reasonably suspected to transit | ✓ Yes, refined in Uganda |
| In each of these location-based red flag considerations, the risk is increased when anti-money laundering laws, anti-corruption laws, customs controls and other relevant government laws are weakly enforced, informal banking systems operate, and cash is extensively used | ✓ |

| DMCC supplier-based red flags | Finding |
|---|---|
| Suppliers or other known upstream companies operate in one of the red flagged locations of gold and precious metals' origin and transportation, or have shareholder(s) or other interests in suppliers of gold and precious metals from one of the above-mentioned red flag locations of gold and precious metals' origin and transportation | ✓ |
| Suppliers or other known upstream companies are known to have sourced gold and precious metals from a red flagged location of gold and precious metals origin and transit in the last 12 months | ✓ |

| DMCC circumstances-based red flags | Finding |
|---|---|
| Anomalies or unusual circumstances that are identified through the information collected in Step 2 give rise to reasonable suspicion that the gold and precious metals may contribute to conflict or serious abuses associated with the extraction, transportation of and/or trading in gold and precious metals | ✓ |

24



DRC-30316 0187                    UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 6

## Methodology

This report is based on extensive field and documentary research into illegal gold trafficking networks operating in eastern Congo. The findings are based upon direct observation and upon over 100 interviews with gold miners, mine site operators, gold traders, transporters, traffickers, refiners, civil society representatives, law enforcement agents, military personnel, non-state armed actors, local and national government officials, and international experts. Interviews were conducted in Congo, Burundi, Rwanda, Tanzania, Uganda, and the UAE. Several individuals with direct knowledge of the conflict gold trade spoke to The Sentry under the condition that their names would not be revealed.

The Sentry endeavored to contact the persons and entities discussed in this report and afford them an opportunity to address the information gathered during the course of our investigation prior to the report's completion. In most cases, these persons and entities did not respond to The Sentry's email or telephone requests that they speak with us and respond to our questions. Responses that were received—in particular from AGR, Tony Goetz NV, and Namukaya—have been included in our analysis and are otherwise reflected in the report itself. In order to distinguish comments received by The Sentry through this response process with other publicly available statements from these entities, the report specifically notes which statements were received "in response to questions posed by The Sentry."

## Acknowledgements

The Sentry follows the illicit money in order to create consequences for those benefiting from genocide or other mass atrocities in Africa, and to build leverage for peace and human rights. This report was made possible in part by the support of the Schwab Charitable Fund and by the generosity of Open Square Charitable Gift Fund, with special thanks to Wynnette LaBrosse.

We would also like to thank the following donors for their generous support:

**Foundations:** Clooney Foundation for Justice, Dutch Postcode Lottery, People's Postcode Lottery, Swedish Postcode Foundation, Humanity United, Carnegie Corporation of New York, Aurora Humanitarian Initiative Foundation, The Hunter Foundation, The MacArthur Foundation, Newman's Own Foundation, Kells Family Foundation, Weintraub Family Foundation, Bridgeway Foundation, The Pittsburgh Foundation, Anonymous Foundation (2x).

The report was written, edited, and formatted by The Sentry team. Legal support for The Sentry has been provided by Lee Levine, Al-Amyn Sumar, Chase Bales, Carlton Greene, Erik Woodhouse, Steve Shahida, and Praveen Madhiraju.

Countless others shared their expertise, insights, and hospitality with The Sentry team throughout the course of this investigation—some of whom knowingly put themselves at risk while doing so. This report would not have been possible without their support. The report is stronger for all of these contributions. The statements made and views expressed are solely the responsibility of The Sentry.

DRC-30316 0188                    UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 6

## Citations

[1] "Gold remains by far the mineral most used to finance armed elements and criminal networks," and "is the most lucrative and easily smuggled of the natural resources." U.N. Security Council, "Midterm report," S/2016/1102, p. 2, available at http://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2016_1102.pdf; U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/166, para. 115, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466

[2] This is as of 2007, and no reliable study has been conducted since then. As Anthony Gambino notes, "The IRC itself has stated: "The true number could be as low as 3.1 million or as high as 7.6 million. While the precise number will never be known – it is clear that millions of people died unnecessarily because of the war." I fully agree "that millions of people died unnecessarily because of the war," and that the IRC provides the key evidence for this. I note that my point estimate of 3.3 million falls within IRC's own confidence interval. In effect, I am arguing that the low end of the IRC confidence interval is likelier to be the most accurate estimate of excess mortality for the 1998-2007 period." Anthony W. Gambino, "Democratic Republic of Congo," in *World Development Report, 2011*, World Bank Group, March 2, 2011, pp. 30-34, available at http://documents.worldbank.org/curated/en/642841468247291959/pdf/620290WP0Democ0BOX0361475B00PUBLIC0.pdf; International Rescue Committee, "Mortality in the Democratic Republic of Congo," 2007, available at http://www.rescue.org/sites/default/files/resource-file/2006-7_congoMortalitySurvey.pdf

[3] This was the U.N. Group of Experts' estimate in 2013, but is likely significantly higher now, according to independent analysts. Kevin Kelley, "EA fingered in $400m worth of DR Congo gold smuggled to Uganda," *The East African*, February 8, 2014, available at http://www.theeastafrican.co.ke/news/Smuggled--400m-DR-Congo-gold-fuels-war-/2558-2198074-82g9nc/index.html; Kira Zalan, "Tracing conflict gold in the Democratic Republic of Congo," *Global Post*, June 23, 2017, available at https://www.pri.org/stories/2017-06-23/tracing-conflict-gold-democratic-republic-congo

[4] Uganda Revenue Authority Export Statistics for gold, 2017, reviewed by The Sentry. Uganda Revenue Authority Export Statistics for gold, 2015-16 reviewed by The Sentry. Ugandan export records reviewed by The Sentry show that AGR exported 9.3 tons of gold. For 2015/16, this was made up of 49 shipments from January to July 2016 for a total of 4.221 tons of gold. With the average price of gold at approximately $40,000 per kilogram during that time, the value equals $52.24 million. See www.goldprice.org. For 2017, this was made up of 120 shipments, worth approximately $377 million. However, AGR stated in response to questions posed by The Sentry that it exported 7.7 tons of gold in 2017. Email communication with AGR, August and October 2018. Goetz Gold is listed as the UAE office for Tony Goetz NV on the websites for both companies. Goetz Gold states on its website that Tony Goetz NV is the head office and refinery for the company. Goetz Gold also lists Tony Goetz NV as one of its two preferred partners on its website, and AGR stated in response to questions posed by The Sentry that Goetz Gold is a preferred partner of AGR. Goetz Gold states that it is an independent company that was set up by one of the shareholders of Tony Goetz NV. See http://www.goetzgold.com/companydetail.php?pagesid=12. AGR stated in response to questions posed by The Sentry that it is not a trading company, but rather a service provision company. "AGR handles the export, shipment and delivery of gold as part of the services that we offer to our clients." It also says that it has never exported gold to Tony Goetz NV. AGR clarified to The Sentry that "Preferred partner refers to the service provider (Goetz Gold LLC) and another party who is willing or allowed to deliver their products (AGR). Being a preferred partner provides pre-determined advantages and privileges between the parties." Email communication with AGR, August and October 2018.

[5] Securities and Exchange Commission 2018 filings, Form SD, available at https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp?search_text=%22tony%20goetz%22&sort=Date&formType=FormSD&isAdv=true&stemming=true&numResults=10&fromDate=01/01/2018&toDate=09/01/2018&numResults=10

[6] According to Leah Butler of the Responsible Minerals Initiative: "Tony Goetz NV was removed from the Responsible Minerals Assurance Program Active List in November 2017 for failure to meet RMAP audit standards requirements. RMI is not able to share details of companies' audits beyond what is provided on the RMI website. Audit information is protected by our program's non-disclosure agreements with auditees and auditors." Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018. In response to questions posed by The Sentry, Tony Goetz NV stated that it "has developed internal procedures to allow it to identify its clients and the origin of the precious metals, in

UNCLASSIFIED          EXHIBIT 6

order to avoid sourcing of so-called conflict minerals. In this respect, please note that Tony Goetz NV is not active in the Democratic Republic of Congo. ... By strictly following internal compliance procedure, Tony Goetz NV guarantees that its activities and all transactions are in accordance with its obligations under national law and international guidelines that exceed Belgian regulatory requirements." Correspondence with Tony Goetz NV, August 2018.

[7] Goetz owns 999 out of 1000 shares in AGR. Ugandan registration document for AGR reviewed by The Sentry.

[8] Securities and Exchange Commission 2018 filings, Form SD, available at https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp?search_text=%22african%20gold%22&sort=Date&formType=FormSD&isAdv=true&stemming=true&numResults=10&fromDate=01/01/2018&toDate=12/31/2018&numResults=10

[9] The U.N. Group of Experts reported in 2016 that a Congo-based exporting network named Cavichi had engaged in significant gold smuggling. Between February and July 2017, two Kampala–based major gold traders, five Ituri-based mine operators, and three South Kivu-based major gold traders, as well as a Congolese and Ugandan mining governance official, told The Sentry that AGR had become one of the most significant buyers of ASM gold from four provinces of eastern Congo. Sentry interview with Ugandan official, April 2017; Sentry interview with Congolese mining official, June 2017; Sentry interviews with five mine operators based in eastern Congo, June 2017; Sentry focus group discussion with miner's cooperative in eastern Congo, June 2017; Sentry interviews with three major gold traders in eastern Congo, March 2017; Sentry interview with gold trader based in eastern Congo, March 2017; U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/166, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466

[10] However, there is also gold illegally smuggled out of Uganda that does not make it into official statistics. Uganda Revenue Authority exports for 2017 reviewed by The Sentry.

[11] U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, August 4, 2017, para. 122, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672; "The Group notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month. The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz. Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring countries, including the Democratic Republic of the Congo." U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531

[12] Sentry interviews with two Congo-based gold traders, October 2016, March 2017, August 2017, and March 2018.

[13] Sentry interview with gold trader, March 2017; Sentry interview with gold trader, February 2017; Sentry interviews with two South Kivu-based gold traders, June 2017 and December 2017.

[14] U.N. Security Council, "Final Report of the U.N. Group of Experts on the DRC," S/2014/42, p. 38, para. 172; available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2014/42; U.N. Security Council, "Final Report of the U.N. Group of Experts on the DRC," S/2012/843, para. 187, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2012/843; See also Sara Geenen, *African Artisanal Mining from the Inside Out: Access, Norms and Power in Congo's Gold Sector*, 2015, p. 122.

[15] Sentry interview with regional gold trader, March 28, 2017; Sentry interview with Congo-based gold trader, March 29, 2017; Sentry interview with Congo-based gold trader, March 23, 2017; Sentry interview with regional gold trader, April 2, 2017.

[16] AGR stated in response to questions posed by The Sentry, "To the best of our knowledge and in the context of our internationally approved procedures AGR has never purchased or refined gold from Buganda Bagalwa or Mange Namuhanda. ... AGR has not purchased or refined gold from individuals named as traffickers in U.N. GoE on DRC reports. ... The U.N. Group of Experts noted that AGR representatives met and corresponded with them on several occasions to answer detailed questions about their operations and the refinery which AGR opened in Entebbe in 2017. AGR remains in contact with the Group and hopes to maintain an open dialogue with it with regards our future plans for the refinery and major reforms for gold the sector." Email communication with AGR, August 2018.

[17] The U.N. Group of Experts on Congo stated in its June 2018 report that, "In addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month. The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz. Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring [sic] countries, including the Democratic Republic of the Congo." U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

          UNCLASSIFIED



UNCLASSIFIED                                                    EXHIBIT 6

http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531; See also, Africa Confidential, "The Great Lakes Gold Rush," March 23, 2018, available at https://www.africa-confidential.com/index.aspx?pageid=7&articleid=12279
[18] See Annex 1 for more detailed information.
[19] As explained more fully in the Methodology, AGR was among those entities referenced in this report that responded to The Sentry's requests for comment. Specifically, AGR stated: "AGR is committed to refraining from any action which contributes to the financing of conflict. We will neither tolerate nor by any means profit from, contribute to, assist with or facilitate the illegal trafficking of gold. As such AGR has not purchased or refined gold from individuals named as traffickers in U.N. GoE on DRC reports. … We are fully committed to supply chain transparency and support all efforts by the U.N. and the international community to establish practical and workable solutions to current vulnerabilities. We take note that the U.N. Group concluded, 'that AGR could contribute to a cleaner gold trade in Uganda.' This is certainly the firmly held view of AGR and the Government of Uganda and we shall be working with all interested parties to ensure this happens." Email communication with AGR, August 2018. AGR elaborated further in a subsequent response: "AGR's Due Diligence Management System is based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance. Apart from this, AGR's Anti-Bribery Policy & Compliance Handbook is implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold: http://www.gold.africa/wp-content/uploads/2017/02/Anti-Bribery-Policy-Compliance-Handbook-1.pdf. AGR has similar responsibility as any other refinery yes, we received the guidance from our lawyer (Tem Advocates) AGR's in-house legal team while AGR complies with these guidelines and endeavors to maintain the highest standards in the responsible sourcing."
[20] In response to questions posed by The Sentry, Tony Goetz NV stated, "By strictly following internal compliance procedure, Tony Goetz NV guarantees that its activities and all transactions are in accordance with its obligations under national law and international guidelines, that exceed Belgian regulatory requirements. Tony Goetz NV obtained the Dubai Good Delivery certificate for the first time in 2015…. As set out above, Tony Goetz NV has developed internal procedures to allow it to identify its clients and the origin of the precious metals, in order to avoid sourcing of so-called conflict minerals. In this respect, please note that Tony Goetz NV is not active in the Democratic Republic of Congo." Email correspondence with Tony Goetz NV, August 2018.
[21] AGR has made varying statements about dealing with undocumented gold. In April 2017, AGR CEO Alain Goetz said in a speech to the OECD that, "Specifically, AGR is dealing with 2 categories of gold: Documented gold… [and] Undocumented gold." In email correspondence with The Sentry in August 2018, AGR then stated, "AGR does not handle or source undocumented gold. The AGR compliance team conducts detailed checks on our first phase clients by inspecting the relevant documents of the supplier of the raw material. All suppliers of AGR must have the valid documents to operate as mines or mineral dealers. We have turned down a considerable number of individuals who did not have the relevant and necessary documentation." However, in October 2018, AGR told The Sentry that it "is still accepting what we called the *undocumented gold* or [sic] *small scale gold dealers*, particularly from Kampala market, that includes: old jewelry, damaged or old chains, used necklace, bracelets, dental scrap and other scrap jewelries. The person is being checked by presenting his/her original identification card subject for cross checking and verification by our compliance person." Email communication with The Sentry, October 2018. Speech of Alain Goetz, CEO of AGR, during session on 'Gold from the Great Lakes Region', OECD Conference May 2017 in Paris, available at http://www.agr-afr.com/wp-content/uploads/2016/08/OECD-Speech-Alain-Goetz-OECD-Conference-2017.pdf Then-AGR Chairman Richard Kaijuka said that in terms of sourcing gold for AGR, "The focus is regional … we are looking at gold from the entire region, from Tanzania, from DRC and other countries." Forbes, "Smugglers Take Sheen From Uganda's Bright Gold Refinery," July 19, 2017, available at https://www.forbesafrica.com/investment-guide/2017/07/19/smugglers-take-sheen-ugandas-bright-gold-refinery/; AGR CEO Alain Goetz told The Observer (Kampala), "We have our own suppliers from Congo. We have an office in Bukavu in DR Congo. We will start operations soon. At the same time, we shall have a centre in Bunia and in Butembo to get the gold." Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," *The Observer (Kampala)*, March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html; Kaijuka told Reuters in July 2017 that "We have even got gold from West Africa, from the Democratic Republic of Congo, from Tanzania." Elias Biryabarema, "Ugandan firm to open gold refinery by end of 2016," Reuters, September 22, 2016, available at https://af.reuters.com/article/ugandaNews/idAFL8N1BY1RO; Global Witness also reported that "At least some of Uganda's gold exports are likely to be from Congo and South Sudan." Rodney Muhumuza, "Uganda launches gold refinery, amid fears of dirty minerals," AP, February 20, 2017, available at

DRC-30316 0191                          UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 6

https://apnews.com/3667f32ed9a94701beebae9ca02add46. Additionally, Kaijuka was quoted by Global Witness saying the gold is taken to the refinery's door steps and that it doesn't matter where it comes from. Business Focus Uganda, "Uganda Not Refining Illicit DRC Gold – Gov't," July 5, 2017, available at http://businessfocus.co.ug/uganda-not-refining-illicit-drc-gold-govt/; Finally, when asked if AGR's gold would be supplied from DRC and South Sudan, Goetz said "there is no embargo on gold or minerals from South Sudan or DRC." AFP, "Uganda gold refinery raises alarm over conflict minerals," February 22, 2017, available at https://www.news24.com/Africa/News/uganda-gold-refinery-raises-alarm-over-conflict-minerals-20170222; "Uganda opens refinery, to import from South Sudan, Congo," *The Vanguard*, February 21, 2017, available at https://www.vanguardngr.com/2017/02/ugandan-opens-gold-refinery-import-south-sudan-congo/ In correspondence with The Sentry in 2018, AGR said that "Approximately 90% of the gold that AGR handles comes from approved licensed dealers. Only 10% comes directly from the mining sector. This 10% can be divided roughly equally between accredited mines in Tanzania, Kenya, Uganda, Rwanda and DRC. … AGR has numerously stressed that none of the gold comes from South Sudan have been processed at the facility." Email correspondence with The Sentry, August 2018 and October 2018.

[22] Ibid – AGR statements.

[23] The OECD Due Diligence Guidance states that a red flag in the due diligence process for gold refiners is if "The gold is claimed to originate from recyclable / scrap or mixed sources and has been refined in a country where gold from conflict-affected and high-risk areas is known or reasonable suspected to transit." The Responsible Minerals Assurance Process Gold Refiner Standard for Audits states that "For all recycled gold, the auditee shall demonstrate that the gold received is recycled material and record the weight and gold content (as estimated by the gold supplying counterparty or determined by an assay)." Furthermore, the London Bullion Market Association (LBMA) also states that recycled gold from countries known to be transit points for conflict gold is high risk and should trigger enhanced due diligence: "The Recycled Gold comes from a country where gold from conflict-affected and human rights abuse high-risk areas are known, or reasonably suspected, to transit." Human Rights Watch stated in its 2018 report on human rights and jewelry supply chains that "using recycled gold is not risk-free either, as it can be used for money laundering or wrongly labeled as recycled." "OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas Supplement on Gold," OECD Publishing, 2012, p. 20, available at http://www.oecd.org/corporate/mne/GoldSupplement.pdf; Responsible Minerals Assurance Process, "Gold Refiner Standard" June 2018, available at http://www.responsiblemineralsinitiative.org/media/docs/standards/RMI_Gold%20Refiner%20Standard_FINAL.pdf; London Bullion Market Association (LBMA), "LBMA Responsible Gold Guidance," 2017, available at http://www.lbma.org.uk/assets/downloads/responsible%20sourcing/Responsible_Gold_Guidance.pdf; Human Rights Watch, "The Hidden Cost of Jewelry," February 2018, available at https://www.hrw.org/report/2018/02/08/hidden-cost-jewelry/human-rights-supply-chains-and-responsibility-jewelry; See also Marc Choyt and Greg Valerio, "Recycled Gold: How ethical is it really?," September 14, 2016, https://gregvalerio.com/tag/global-witness/ (accessed October 2018).

[24] Global Witness, « River of Gold, » July 5, 2016, p. 19, available at https://www.globalwitness.org/en/campaigns/conflict-minerals/river-of-gold-drc/; DRC Ministry of Mines, "Arrete Ministeriel No. 0057 Cab.Min/Mines/01/2012 du 29 Feb 2012 Portant Mise en Oevre du Mechanisme Regional Certification de la Conference Internationale sur la Region des Grands Lacs « CIRGL » en Republique Democratique du Congo, » February 29, 2012. See also Government Accountability Office, "Conflict Minerals: Information on Artisanal Mined Gold and Efforts to Encourage Responsible Sourcing in the Democratic Republic of the Congo," August 2017, p. 10, available at https://www.gao.gov/assets/690/686745.pdf

[25] In Congo, this is known as the mine "validation" process, which is one step of the ICGLR certification process, and is undertaken by multi-stakeholder teams. Sixty out of an estimated 1,499 gold mine sites have been validated as conflict-free (green). DRC Ministry of Mines and Cooperation Allemande, "Resume des Qualifications et Validations Ainsi Que des Audits CTC des Sites Miniers en RDC de Juin 2011 a Décembre 2017, » April 2018, available at http://cosoc-gl.org/wp-content/uploads/2018/03/Bulletin_MRC-CTC_vf2017121.pdf; Mine data from the International Peace Information Service, available at http://ipisresearch.be/home/conflict-mapping/maps/open-data/.

[26] The most recent independent, comprehensive survey of artisanal gold mines across eastern Congo was conducted by the International Peace Information Service (IPIS), which surveyed 559 gold mines in 2015-16. Conflict mines are defined as working in the permanent or regular presence of an armed actor at the mine site and includes 55,990 miners at conflict mines out of 79,213 gold miners in total. Relatedly, 62 percent of gold mines in eastern Congo are controlled by armed actors, as of the survey data. Armed actors include illegal armed groups and Congolese public security forces. IPIS, Mines and Armed Groups dataset, 2015-16 gold mines, available at



UNCLASSIFIED

UNCLASSIFIED                                                EXHIBIT 6

http://ipisresearch.be/home/conflict-mapping/maps/open-data/; For further explanation of the data between 2013 and 2015, see IPIS, "Analysis of the interactive map of artisanal mining areas in eastern DRC Congo, 2015 Update," Antwerp, October, 2016, available at http://ipisresearch.be/wp-content/uploads/2016/10/Analysis-and-map-artisanal-mining-DR-Congo_v005-1.pdf

[27] U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, p. 23, August 8, 2017, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672;

[28] That company is Motiwala Jewellers, based in the UAE. Ugandan Customs records from July 2017 reviewed by The Sentry. The address of the Motiwala Jewellers listed on the Uganda Customs record matches that of several websites listing Motiwala's address in the UAE. According to the Society for Threatened Peoples, "Motiwala is one of Kaloti's most important cash suppliers, with cash transactions from Kaloti to Motiwala in 2012 amounting to $527,337,847.51." AGR stated in response to a question from The Sentry on this issue that "AGR have not exported to Motiwala in 2017. On the other hand, AGR is not aware of the relationship between Motiwala and Kaloti Precious Metals." Society for Threatened Peoples, "Switzerland - a Hub for Risky Gold?", March 2018, p. 48, available at https://www.gfbv.ch/wp-content/uploads/bericht_gold_englisch_maerz_18.pdf

[29] This was the Al Kaloti Jewellers Factory LTD (later called "Kaloti Gold Factory LLC" in a subsequent DMCC press release), which was de-listed by the DMCC on April 4, 2015. The DMCC noted that this did not affect all Kaloti companies: "Kaloti Jewellery International DMCC is a separate legal entity to Kaloti Gold Factory LLC. Kaloti Jewellery International DMCC continues to be a DMCC licensed member company operating under the DMCC Free Zone rules and regulations." In response to the delisting, "'Kaloti Precious Metals can confirm that its refinery in Sharjah will no longer carry Dubai Good Delivery status.' It went on to say a new refinery in Dubai due to start operations later this year will apply for DGD status and that the delisting will have 'no material impact on our ability to operate or trade.'" Kaloti denied claims that it failed to comply with the audit process or regulations, and denied that it sourced gold from conflict zones. "We accept that we had some shortcomings in our initial report, these were quickly rectified to the full satisfaction of our external auditors and the regulators." DMCC, "Dubai Good Delivery Gold Members: Former List," July 2, 2018, p. 5, available at https://www.dmcc.ae/application/files/4515/3189/5579/DGD_List-_Gold_Alphabetical_-Final-02-07-2018.pdf; DMCC, "Notice: Kaloti Gold Factory LLC placement on former list of DMCC's Dubai Good Delivery refineries," September 2015, available at https://www.dmcc.ae/application/files/9215/0936/2973/Notice_Kaloti_Gold_Factory_LLC_placement_on_former_list_of _DMCCs_Dubai_Good_Delivery_refineries.pdf; Anthony McAuley, "DMCC removes Kaloti from Dubai Good Delivery list over gold sourcing," The National (UAE), April 13, 2015, available at https://www.thenational.ae/business/dmcc-removes-kaloti-from-dubai-good-delivery-list-over-gold-sourcing-1.34979; Simon Bowers and Juliette Garside, "Confidential papers raise fears over conflict gold," February 24, 2014, available at https://www.theguardian.com/business/2014/feb/25/conflict-gold-global-market-trading-kaloti

[30] See note 28.

[31] U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531; As of June 11, 2018, the average gold price in 2018 has been approximately $42,000/kg. See www.goldprice.org

[32] U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, p. 21.

[33] "Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring countries, including the Democratic Republic of the Congo." U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21.

[34] That is the network run by the directors of Uganda Commercial Impex. U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, p. 27, August 8, 2017, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672; U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/466, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466; U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2015/19, p. 141, January 12, 2015, p. 42, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2015/19; U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2008/773, para. 100, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2008/773; U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2014/42, para. 184, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2014/42; U.N. Security Council, "Final Report of the Group of

30

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0193                          UNCLASSIFIED                                  32 of 56

Experts on the Democratic Republic of the Congo," S/2009/603, para. 133 and 243 available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2009/603.

[35] According to *Africa Confidential*, "long-established Kampala-based gold-traffickers, such as J.V. Lodhia (aka Chuni), the patriarch of the Lodhia family, which is behind UCI Ltd, remain very much in competition with Goetz to buy gold from Congo-K. They have their own high-level connections in the Ugandan government." "The Great Lakes Gold Rush," *Africa Confidential*, March 23, 2018; Sentry interview with U.N. Group of Experts, April 18, 2018; Sentry interviews with regional gold trader and a Congo-based gold trader, January 2018 and March 2018.

[36] U.N. Security Council, "Report of the Group of Experts on the DRC," S/2018/531, June 8, 2018, p. 24.

[37] The first two categories are the most important and together, accounted for 91 percent of global gold demand in 2017. World Gold Council, "Gold Demand Trends Third Quarter 2017," November 7, 2017, available at https://www.gold.org/download/file/6379/gdt-q3-2017.pdf World Gold Council figures for 3Q2017 demand indicate that out of 915 tons of total global gold demand, 479 tons went for jewelry, 241 tons went to investment demand, 111 tons went to Central Bank net purchases, and 84 tons went to technology. The six general steps are mines, local smugglers and traders in Congo, regional smugglers; traders and refiners in Uganda, Dubai, and Belgium; banks in Switzerland and elsewhere, and jewelers worldwide. The Enough Project described this trade in further detail: "From the mines, the smuggled gold mainly flows to a handful of exporters in two of eastern Congo's cities, Bukavu in South Kivu and Butembo in North Kivu. The exporter/smugglers control a network of middlemen traders called *négociants* who go to the mines and buy the gold from the bosses of the mining cooperatives, or at times, miners themselves, and then bring the gold to large-scale exporters in Bukavu and Butembo. The exporters have their traders carry the gold by hand to Uganda, Burundi, and Tanzania. From Uganda, traders smuggle the gold mainly to Dubai, in the United Arab Emirates, where laws allow people to hand-carry gold with very few checks on its origins. .... In Dubai, the gold is sold to the gold market (*souk*) and to refineries and then exported to India or Switzerland, to be either further refined to a higher purity level or made directly into jewelry. Banks then buy a significant portion of the gold for investors and sell a large percentage to jewelers." Enough Team, "From Child Miner to Jewelry Store: The Six Steps of Congo's Conflict Gold" (Washington, The Enough Project, October 2012), available at http://www.enoughproject.org/files/Conflict-Gold.pdf

[38] U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, p. 2, August 8, 2017, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672

[39] This was 11 kg in 2014 and then 8.8 and 8.7 metric tons for 2016 and 2017 respectively. The values were calculated using average annual prices for gold from www.goldprice.org -- $41,000/kg for 2014, $38,000/kg for 2015, $40,000/kg for 2016, and $40,000/kg for 2017. The 2017 figure is an estimate based on exports for January to October 2017, which were 7.2 tons. Bank of Uganda export statistics, available at http://www.bou.or.ug/opencms/bou/bou-downloads/research/External_Sector_Statistics/Trade_Statistics/Composition-of-Exports_Values-and-Volumes.xlsx

[40] "In 2014, Barnabas Taremwa traded in gold illegally exported from the Democratic Republic of the Congo and illegally imported into Uganda. Two individuals involved in the gold trade in eastern Democratic Republic of the Congo and two individuals in close contact with Kampala gold traders confirmed Mr. Taremwa's role in trading Congolese gold. Mr. Taremwa is the majority shareholder of Westcorp Mining Limited and is involved in other businesses in Uganda." U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2015/19, 12 January 2016, p. 43.

[41] That was Richard Kaijuka. "Kaijuka resigns," *New Vision*, August 29, 2002, available at https://www.newvision.co.ug/new_vision/news/1074286/kaijuka-resigns; David Pallister, "Bank staffs dam after UK firm's payment to minister," *The Guardian*, July 18, 2002, available at https://www.theguardian.com/uk/2002/jul/19/davidpallister; "Refining Impurities," *Africa Confidential*, Vol 58 No 12., June 9, 2017.

[42] "Probing the Gold," *Africa Confidential*, December 17, 2017; Hadijah Nakitende, "Fight for Shares Plagues Uganda's first Gold Refinery," *Sunrise*, October 28, 2016, available at http://www.sunrise.ug/news/201610/fight-for-shares-plagues-ugandas-first-gold-refinery.html; Matsiko, "Museveni Defends 'Fake' Gold Dealer," *Independent (Kampala)*, January 8, 2018, available at http://allafrica.com/stories/201801070178.html

[43] The FIA letter to Uganda's Directorate of Public Prosecutions (DPP) reviewed by The Sentry states, "We therefore hereby refer this matter to the Office of the Directorate of Public Prosecutions to prosecute the African Gold Refinery, Ltd. for committing an offence under the Anti-Money Laundering Act, 2013." According to officials at the FIA and mining ministry, the figure is based on the approximate amount of gold that AGR did not declare to the mining ministry. Uganda Financial Intelligence Authority letter to the DPP, "Prosecution of Africa Gold Refinery Ltd under the Anti-

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
33 of 56



UNCLASSIFIED                                                    EXHIBIT 6

Money Laundering Act, 2013," FIA.DOA.25.10.17, October 11, 2017. Haggai Matsiko, "Museveni's gold dealer in trouble," *The Independent* (Kampala), November 13, 2017, available at https://www.independent.co.ug/musevenis-gold-dealer-trouble/

[44] In April 2014 the Ugandan Ministry of Finance noted that Museveni directed it to discuss incentives for AGR. At the meeting with the company, the Ministry indeed granted tax-free status to any minerals processed or exported by AGR. "Minutes of meeting between AGR and Ugandan Ministry of Finance," April 24, 2014, p. 2. Further, *Africa Confidential* has reported that "Goetz's resurgence as gold's primus inter pares in the Great Lakes has been partly enabled by his close association with Ugandan President Yoweri Museveni, who ceremonially inaugurated AGR and give it a major boost by announcing a 0% export tax on gold refined in Uganda." "Refining Impurities," *Africa Confidential*, Vol 58 No 12., June 9, 2017. "The Great Lakes Gold Rush," *Africa Confidential*, March 23, 2018; Sentry interviews with Ugandan officials, June 2017 and December 2017.

[45] AGR stated in response to questions posed by The Sentry that "AGR is a privately-owned business and has no formal or informal commercial relationship or link with any senior Ugandan government officials, particularly with H.E. President Yoweri Museveni." Email communication with AGR, August 2018.

[46] Financial Action Task Force and Asia/Pacific Group on Money Laundering (APG), "Money laundering and terrorist financing risks and vulnerabilities associated with gold," 2015, available at http://www.fatf-gafi.org/media/fatf/documents/reports/ML-TF-risks-vulnerabilities-associated-with-gold.pdf

[47] The OECD guidance was recognized by the U.S. Securities and Exchange Commission as a way for companies to implement the Dodd-Frank law Section 1502 and has been adopted into law in Congo. The US Government Accountability Office (GAO) further states that: "While SEC did not specifically mandate the framework to be used, the SEC adopting release noted that it appeared the only nationally or internationally-recognized due diligence framework available was the due diligence guidance approved by the OECD. The OECD due diligence guidance, which OECD adopted in 2011, includes supplements on tin, tantalum, tungsten, and gold. The framework's five steps are (1) establishing strong company management systems, (2) identifying and assessing risk in the supply chain, (3) designing and implementing a strategy to respond to identified risks, (4) carrying out an independent third-party audit of supply chain due diligence at identified points in the supply chain, and (5) reporting on supply chain due diligence. Government Accountability Office, "SEC Conflict Minerals Rule: Companies Face Continuing Challenges in Determining Whether Their Conflict Minerals Benefit Armed Groups," August 2016, available at https://www.gao.gov/assets/680/679232.pdf; Global Witness, "Four Years on, the Congolese Government is Failing to Enforce its Law Designed to Stem Conflict and Abuses in the Minerals Trade," November 4, 2016, available at https://www.globalwitness.org/en/blog/congolese-government-failing-to-enforce-law-to-stem-conflict-abuses-in-minerals-trade/; OECD, "Upstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict Affected and High-Risk Areas," June 2012, p. 7, available at http://www.oecd.org/investment/mne/UpstreamCycle2Report.pdf; See also Organisation for Economic Co-operation and Development, OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Second Edition, OECD Publishing (2013), accessed June 23, 2014, http://dx.doi.org/10.1787/9789264185050-en" U.N. Security Council, "Due Diligence Guidelines," available at https://www.un.org/sc/suborg/en/sanctions/1533/due-diligence-guidelines; Organization for Economic Cooperation and Development, "OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas," available at http://www.oecd.org/corporate/mne/mining.htm

[48] See note 19.

[49] A letter from the mining ministry to AGR in 2016 stated, "The Ministry has of recent been informed by the Office of the Inspector General of Government that AGR has since traded gold but has flouted statutory procedures for the export of mineral commodities, whose importation and exportation to and from Uganda is restricted under the Mining Act 2003 and East African Community Customs Management Act, 2005. Consequently, this has been perceived as an act of tax avoidance by AGR while purporting to be in compliance with relevant national and tax laws. The notice specifies trade data to include "all purchases and sales of minerals made by AGR and the nature and weight of the minerals - we request you to share with us any relevant gold export information (air way bills, quantities, destinations, buyers, etc.); the price paid or received for the minerals and the date of each purchase or sale; the name and address of the vendor and his or her right to be in possession of such minerals; the name and address of the purchaser or consignee to whom the minerals are sold or consigned."

[50] In response to questions posed by The Sentry, AGR stated that it "operates under a Manufacture Under Bond License issued by the Uganda Revenue Authority under the Ministry of Finance. As such, we are not licensed by the

32

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0195                    UNCLASSIFIED                    34 of 56



Department of Geological Survey and Mines. Nevertheless, the information to which this question relates is captured under the operation of the license with the URA. This information is public and is available to the Department of Geological Survey and Mines." Email correspondence with The Sentry, August 2018.

[51] AGR stated in response to questions posed by The Sentry that "We wish to reiterate our desire to assist with mapping, traceability and regional certification as a matter of urgency." Email communication with AGR, August 2018. It also posted recently on its website that "AGR aims to take steps further in mapping the gold by setting up a full documented chain of custody, first in the industry and unique in the world of gold trading and refining. With this in view, AGR seeks strong collaboration and partnership with international organizations, civil society, government departments and private sectors. This project will have a budget of USD 5M the first year and USD 2.5M/year for the following 4 year. Sponsors for this program will be sourced at the sector itself, from: civil society, governments and International organizations." See http://www.gold.africa/about/ (accessed October 2018).

[52] Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," *The Observer (Kampala),* March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html

[53] While Goetz Gold's website states, "GOETZGOLD is an independent company who has been set up by one of the shareholders of the family owned company NV TONY GOETZ (TG). GOETZGOLD has two preferential partners, TONY GOETZ and PREMIER GOLD REFINERY," four other facts suggest otherwise. 1) AGR exports almost all of its gold to Goetz Gold, per Ugandan export records. 2) Both AGR and Goetz Gold are owned by Alain Goetz. 3) Goetz Gold lists its headquarters on its website as Tony Goetz NV, with the address in Antwerp, Belgium. 4) Tony Goetz NV lists Goetz Gold as its UAE Representative office under "our locations" on its website. See http://www.goetzgold.com/companydetail.php?pagesid=12; https://www.tonygoetz.com/en/our-company/our-locations.html. AGR stated in response to questions posed by The Sentry that "Goetz Gold LLC purchases gold from individuals and entities who have had their gold processed by AGR. Goetz Gold LLC, is a preferred partner of AGR." The company also denies having ever exported gold to Tony Goetz NV. Email communication with AGR, August 2018.

[54] According to Leah Butler of the Responsible Minerals Initiative: "Tony Goetz NV was removed from the Responsible Minerals Assurance Program Active List in November 2017 for failure to meet RMAP audit standards requirements. RMI is not able to share details of companies' audits beyond what is provided on the RMI website. Audit information is protected by our program's non-disclosure agreements with auditees and auditors." Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018. In response to questions posed by The Sentry, Tony Goetz NV stated that it "has developed internal procedures to allow it to identify its clients and the origin of the precious metals, in order to avoid sourcing of so-called conflict minerals. In this respect, please note that Tony Goetz NV is not active in the Democratic Republic of Congo. … By strictly following internal compliance procedure, Tony Goetz NV guarantees that its activities and all transactions are in accordance with its obligations under national law and international guidelines, that exceed Belgian regulatory requirements." Correspondence with Tony Goetz NV, August 2018.

[55] RMI Members list as of July 30, 2018, available at http://www.responsiblemineralsinitiative.org/about/members-and-collaborations/; RMAP Indicators as of January 28, 2018, available at http://www.responsiblemineralsinitiative.org/responsible-minerals-assurance-process/active-and-conformant-smelter-count/

[56] This is under the Dubai Multi Commodities Centre (DMCC). According to the DMCC, Tony Goetz NV was supposed to be up for review in 2017, and the July 2018 list says it remains certified. The DMCC website states, "The Dubai Good Delivery standard… for gold refineries, the certification also includes responsible sourcing of gold in accordance with the 'DMCC Rules for Risk Based Due Diligence for Gold and Precious Metals'." DMCC, "Suspend trading activities whilst mitigating the identified risks by obtaining additional information/data confirming or refuting the adverse risk assessments. Disengagement from the red-flagged company and/or sources of the risk. See https://www.dmcc.ae/application/files/4515/3189/5579/DGD_List-_Gold_Alphabetical_-Final-02-07-2018.pdf

[57] The DMCC website stated in September 2018 that the next review period for Tony Goetz NV was to be from April 2016 to March 2017, but the most recent audit report listed is for one year prior to that, the period of January 2015 to March 2016. See https://www.dmcc.ae/gateway-to-trade/commodities/gold/accreditation-initiatives

[58] "Parket vervolgt grootste goudsmelterij," *De Tijd*, September 15, 2015, available at https://www.tijd.be/politiek-economie/belgie/federaal/parket-vervolgt-grootste-goudsmelterij/9676996.html "Grootste goudhandelaar België verdacht van witwassen," *De Telgraaf*, September 18, 2015, available at https://www.telegraaf.nl/nieuws/503410/grootste-goudhandelaar-belgie-verdacht-van-witwassen; "Parket vervolgt grootste goudsmelterij van het land," HLN, September 18, 2015, available at



https://www.hln.be/nieuws/binnenland/parket-vervolgt-grootste-goudsmelterij-van-het-land~a7b09e75/?referer=https%3A%2F%2Fwww.google.com%2F

[59] Tony Goetz NV stated in response to questions posed by The Sentry that "By strictly following internal compliance procedure, Tony Goetz NV guarantees that its activities and all transactions are in accordance with its obligations under national law and international guidelines that exceed Belgian regulatory requirements. ... Tony Goetz NV has - long before it became subject to the legislation concerning anti-money laundering and combatting of terrorist financing - acknowledged its responsibility in the domain of the prevention of money laundering and terrorist financing. The company is aware of the importance of being alert to suspicious financial transactions and of the requirement to do everything within its power to prevent any transactions that involve monies derived from criminal activity." Furthermore, Tony Goetz executive Sylvain Goetz maintained, in a published article on this issue, that "As a company, we have always followed the letter of the law. We never received a comment from the Federal Public Service Economy. But the court will judge this." Moreover, a lawyer of the company, Bert Luyten, has publicly expressed regret that the Antwerp courts were wrongly discrediting "a beautiful company, a global player. That is very unfortunate. Certainly because Tony Goetz always did more than the law in the gold sector, for example to check the identity of customers or to check the origin of gold and jewelery." "Parket vervolgt grootste goudsmelterij," *De Tijd*, September 15, 2015, available at https://www.tijd.be/politiek-economie/belgie/federaal/parket-vervolgt-grootste-goudsmelterij/9676996.html "Grootste goudhandelaar België verdacht van witwassen," *De Telgraaf*, September 18, 2015, available at https://www.telegraaf.nl/nieuws/503410/grootste-goudhandelaar-belgie-verdacht-van-witwassen; "Parket vervolgt grootste goudsmelterij van het land," HLN, September 18, 2015, available at https://www.hln.be/nieuws/binnenland/parket-vervolgt-grootste-goudsmelterij-van-het-land~a7b09e75/?referer=https%3A%2F%2Fwww.google.com%2F; Email communication with Tony Goetz NV, August 2018.

[60] Goetz's company Affimet reportedly signed a deal with the AFDL in April 1997. Southern Africa Resource Watch, "Congo's golden web: the people, companies and countries that profit from the illegal trade in Congolese gold," May 2014, pp. 17, 41, available at https://www.researchgate.net/publication/290602685_Congo's_Golden_Web_-_The_Commercialization_of_the_DRC's_gold; Daniel Fahey, *Rethinking the Resource Curse: Natural Resources and Polywar in the Ituri District, Democratic Republic of the Congo*, PhD Dissertation, University of California at Berkeley, Fall 2011, p. 110, available at http://digitalassets.lib.berkeley.edu/etd/ucb/text/Fahey_berkeley_0028E_11753.pdf

[61] Southern Africa Resource Watch estimates that the total gold intake of Goetz's various operations from 1987-2001 "must significantly exceed 100 tons of raw gold." "Congo's golden web: the people, companies and countries that profit from the illegal trade in Congolese gold," Southern Africa Resource Watch, "Congo's Golden Web," p. 41.

[62] Consolidated EU Regulation 1183/2005 provides for the designation of persons engaged in or providing support for acts that undermine the peace, stability or security of the DRC, including – "supporting individuals or entities, including armed groups or criminal networks, involved in destabilizing activities in the DRC through the illicit exploitation or trade of natural resources, including gold or wildlife as well as wildlife products." EU Council Regulation No 1183/2005, July 2015, para. 2a(1)(g), available at http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:02005R1183-20170719&from=EN

[63] See FATF and APG, "Money laundering and terrorist financing risks," pp. 20-23.

[64] This is as of 2007, and no reliable study has been conducted since then. As Anthony Gambino notes, "The IRC itself has stated: "The true number could be as low as 3.1 million or as high as 7.6 million. While the precise number will never be known – it is clear that millions of people died unnecessarily because of the war."57 I fully agree "that millions of people died unnecessarily because of the war," and that the IRC provides the key evidence for this. I note that my point estimate of 3.3 million falls within IRC's own confidence interval. In effect, I am arguing that the low end of the IRC confidence interval is likelier to be the most accurate estimate of excess mortality for the 1998-2007 period." Anthony W. Gambino, "Democratic Republic of Congo," in *World Development Report, 2011*, World Bank Group, March 2, 2011, pp. 30-34, available at http://documents.worldbank.org/curated/en/642841468247291959/pdf/620290WP0Democ0BOX0361475B00PUBLIC0.pdf; International Rescue Committee, "Mortality in the Democratic Republic of Congo," 2007, available at http://www.rescue.org/sites/default/files/resource-file/2006-7_congoMortalitySurvey.pdf

[65] This includes North and South Kivu and Ituri Provinces. If Ituri is removed, the number of displaced persons equals approximately 1.7 million people. U.N. OCHA, "République Démocratique du Congo: Personnes déplacées internes et retournées," November 30, 2017, available at https://reliefweb.int/sites/reliefweb.int/files/resources/drc_factsheet_novembre_2017_fr.pdf

34

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
36 of 56

DRC-30316 0197　　　　　　　　　UNCLASSIFIED



UNCLASSIFIED                    EXHIBIT 6

66 "Gold remains by far the mineral most used to finance armed elements and criminal networks," and "is the most lucrative and easily smuggled of the natural resources." U.N. Security Council, "Midterm report," S/2016/1102, p. 2, available at http://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2016_1102.pdf; U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/166, para. 115, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466.
67 Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," *The Observer (Kampala)*, March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html
68 Ibid.
69 Email correspondence with The Sentry, October 2018.
70 These include, among others, Mai Mai Yakutumba, the Allied Democratic Forces (ADF), the Democratic Forces for the Liberation of Rwanda (FDLR), the Nduma Defense of Congo-Renové (NDC-R), Raia Mutomboki. In 2017 there were major clashes at and around gold mines in Misisi, South Kivu. Mai Mai Yakutumba displaced Congolese army commanders from gold areas and attacked the town of Uvira. David Lewis and Aaron Ross, "Congo warlord seeks to unite rebel factions in anti-Kabila alliance," Reuters, October 1, 2017, available at https://www.reuters.com/article/uk-congo-rebels/congo-warlord-seeks-to-unite-rebel-factions-in-anti-kabila-alliance-idUKKCN1C61HW. For more information and background on this trade, see U.N. Security Council, "Mid-term report of the Group of Experts (2016)," S/2016/1102, p. 2, December 28, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/1102. U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/166, para. 115, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466; U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, para. 101, August 8, 2017, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672; Fidel Bafilemba and Sasha Lezhnev, "Congo's Conflict Gold Rush: Bringing Gold into the Legal Trade in the Democratic Republic of the Congo," (Washington: The Enough Project, April 2015), available at http://enoughproject.org/reports/congo%E2%80%99s-conflict-gold-rush, and Ruben de Koning and the Enough Team, "Striking Gold: How M23 and its Allies are Infiltrating Congo's Gold Trade," (Washington: The Enough Project, April 2013), available at http://enoughproject.org/reports/striking-gold-how-m23-and-its-allies-are-infiltrating-congos-gold-trade; U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2016/466, May 23, 2016, p. 26, available at http://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2016_466.pdf; Partnership Africa Canada, "All that Glitters is not gold" (Ottawa: May 2014), available at http://www.pacweb.org/images/PUBLICATIONS/All%20That%20Glitters.pdf; U.N. Security Council, "Final report of the Group of Experts on the Democratic Republic of the Congo," S/2015/19, paras. 193-4.
71 U.N. Security Council, "Final report of the Group of Experts," S/2015/19, p. 19.
72 U.N. experts have documented high rates of SGBV by armed groups and army commanders. Mining areas have documented increased rates of prostitution, rape, and forced marriage—including that of young girls. U.N. Security Council, "Final report of the Group of Experts on the Democratic Republic of the Congo," S/2015/19, pp. 3, 30-31, 100; paras. 138-139; Gregory Mthembu-Salter, "Gold baseline study 2," Organization for Economic Cooperation and Development, 2014, p. 4, available at http://www.oecd.org/daf/inv/mne/Gold-Baseline-Study-2.pdf; Free the Slaves, "Congo's Mining Slaves: Enslavement at South Kivu Mining Sites," (Washington: June 2013), p. 18, available at https://www.freetheslaves.net/wp-content/uploads/2015/03/Congos-Mining-Slaves-web-130622.pdf
73 When armed groups fight over mines and trading routes, local residents are forced to flee. An example is when rival rebel Raia Mutomboki factions fought over a gold mining area in Shabunda. Radio Okapi, "Shabunda: 2 factions Raïa Mutomboki se disputent le contrôle d'une concession minière" November 18, 2014, available at http://radiookapi.net/actualite/2014/11/18/shabunda-2-factions-raia-mutomboki-se-disputent-le-controle-dune-concession-miniere/ (translation by Enough).
74 Gold mines with child miners as young as eight years old, operate across the region, as children work as surface miners, rock crushers, transporters, or gold washers. Child miners are more prone to severe injuries. International Labour Organization, International Labour Office, "Minors out of mining! Partnership for global action against child labour in small-scale mining," (Geneva: 2006), p. 5 available at http://www.ilo.org/ipecinfo/product/viewProduct.do?productId=2519; see also Hahn, Hayes, and Kacapor, "Breaking the Chain," p. 10.
75 For a background on this trade, see Gregory Mthembu-Salter, "Gold baseline study 2," Organization for Economic Cooperation and Development, 2014, p. 4; Gregory Mthembu-Salter, "Gold baseline study 3," Organization for Economic Cooperation and Development, 2015, p. 15, available at http://www.oecd.org/daf/inv/mne/Gold-Baseline-

35



UNCLASSIFIED                                        EXHIBIT 6

Study-3.pdf; Enough Team, "From Child Miner to Jewelry Store: The Six Steps of Congo's Conflict Gold" (Washington, The Enough Project, October 2012), available at http://www.enoughproject.org/files/Conflict-Gold.pdf Miners are also exploited by armed groups, corrupt officials, and heads of mining "cooperatives" and receive very little compensation in the end. Basic equipment such as pumps are loaned to miners by local loan sharks at extremely high rates, forcing many miners into debt slavery. The heads of mining cooperatives reportedly get a large cut—between 75 and 84 percent—of the world gold price. Sentry interviews with miners and mine operators in eastern Congo, 2016-2017. Enough Project interviews with consultants of the Organisation for Economic Cooperation and Development and Partnership Africa Canada, April 2015. Hannah Poole Hahn, Karen Hayes, and Azra Kacapor, "Breaking the Chain: Ending the supply of child-mined minerals," PACT, October 2013, p. 22, available at http://www.pactworld.org/library/breaking-chain-ending-supply-child-mined-minerals; Debt bondage is the most persistent form of slavery among those involved in the mining sector. Senior individuals such as the President Director General (PDG), who own mining shafts and employ workers, enter into this form of enslavement as they generally invest their money to begin production by taking loans at high rates. New miners also become enslaved when they have to borrow money to sustain their daily needs before mining production begins. Free the Slaves, "Congo's Mining Slaves: Enslavement at South Kivu Mining Sites," (Washington: June 2013), p. 17, available at https://www.freetheslaves.net/wp-content/uploads/2015/03/Congos-Mining-Slaves-web-130622.pdf

[76] World Gold Council figures for 3Q2017 demand indicate that out of 915 tons of total global gold demand, 479 tons went for jewelry, 241 tons went to investment demand, 111 tons went to Central Bank net purchases, and 67.3 tons went to electronics. World Gold Council, "Gold Demand Trends Third Quarter 2017," November 7, 2017; Enough Team, "From Child Miner to Jewelry Store."

[77] The Enough Project described this trade in further detail: "From the mines, the smuggled gold mainly flows to a handful of exporters in two of eastern Congo's cities, Bukavu in South Kivu and Butembo in North Kivu. The exporter/smugglers control a network of middlemen traders called *négociants* who go to the mines and buy the gold from the bosses of the mining cooperatives, or at times, miners themselves, and then bring the gold to large-scale exporters in Bukavu and Butembo. The exporters have their traders carry the gold by hand to Uganda, Burundi, and Tanzania. From Uganda, traders smuggle the gold mainly to Dubai, in the United Arab Emirates, where laws allow people to hand-carry gold with very few checks on its origins. .... In Dubai, the gold is sold to the gold market (*souk*) and to refineries and then exported to India or Switzerland, to be either further refined to a higher purity level or made directly into jewelry. Banks then buy a significant portion of the gold for investors and sell a large percentage to jewelers." Enough Team, "From Child Miner to Jewelry Store: The Six Steps of Congo's Conflict Gold" (Washington, The Enough Project, October 2012), available at http://www.enoughproject.org/files/Conflict-Gold.pdf

[78] See note 5.

[79] Email communication with AGR, August 2018.

[80] AGR told The Sentry that "Approximately 90% of the gold that AGR handles comes from approved licensed dealers. Only 10% comes directly from the mining sector. This 10% can be divided roughly equally between accredited mines in Tanzania, Kenya, Uganda, Rwanda and DRC." Email communication with AGR, August 2018.

[81] In response to The Sentry's question about where the remaining 90 percent of the gold originates from, AGR stated that "The origin of the gold is mainly African Regional supply, including: Tanzania, Kenya, Uganda, Rwanda and DRC."

[82] In response to a question from The Sentry on this issue, AGR stated "This scenario is too often misunderstood by the some NGO's and media, though armed group is playing a central role in conflicts, during the 35 years in this line of business, we have never seen a single military coming-in to our facilities to offer or deal gold with us neither direct nor indirect." Email communication with The Sentry, October 2018.

[83] The U.N. Group of Experts reported in 2016 that a Congo-based exporting network named Cavichi had engaged in significant gold smuggling. Between February and July 2017, however, two Kampala–based major gold traders, five Ituri-based mine operators, and three South Kivu-based major gold traders, as well as a Congolese and Ugandan mining governance official, told The Sentry that AGR had become one of the most significant buyers of ASM gold from four provinces of eastern Congo. Sentry interview with Ugandan official, April 2017; Sentry interview with Congolese mining official, June 2017; Sentry interviews with five mine operators based in eastern Congo, June 2017; Sentry focus group discussion with miner's cooperative in eastern Congo, June 2017; Sentry interviews with three major gold traders in eastern Congo, March 2017; Sentry interview with gold trader based in eastern Congo, March 2017; U.N. Security Council, "Final report of the Group of Experts (2016)," S/2016/166, May 23, 2016, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2016/466

36

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
38 of 56

DRC-30316 0199                    UNCLASSIFIED

UNCLASSIFIED                                                      EXHIBIT 6

[84] "The Group notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month. The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz. Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring countries, including the Democratic Republic of the Congo." U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21.

[85] In response to questions posed by The Sentry, AGR said that it plans to undergo "a third party audit, as we are aware that the ICGLR mechanism and structures is not yet fully implemented in the region therefore the scheduled audit is not under the ICGLR certification process." Email correspondence with AGR, October 2018. Eight other minerals exporters, the main exporters in the Great Lakes region for gold, tin, tantalum, and tungsten, have undergone the third party audits accredited by the ICGLR. For the ICGLR audit reports of minerals exporters, see http://www.icglr.org/index.php/en/publications

[86] AGR stated in response to questions posed by to The Sentry: "…it should be noted that AGR is not a trading company, but a service company providing industrial services such as geological analysis, assaying, melting, refining, and the shipment and delivery of precious metals. … AGR's Due Diligence Management System is based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance. Apart from this, AGR's Anti-Bribery Policy & Compliance Handbook is implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold: http://www.gold.africa/wp-content/uploads/2017/02/Anti-Bribery-Policy-Compliance-Handbook-1.pdf. AGR has similar responsibility as any other refinery yes, we received the guidance from our lawyer (Tem Advocates) AGR's in-house legal team while AGR complies with these guidelines and endeavors to maintain the highest standards in the responsible sourcing." Email correspondence with AGR, August and October 2018.

[87] "Congo's golden web: the people, companies and countries that profit from the illegal trade in Congolese gold," Southern Africa Resource Watch, May 2014, p. 41, available at http://www.sarwatch.org/sites/sarwatch.org/files/Publications_docs/congogold3web.pdf

[88] Sara Geenen, *African Artisanal Mining from the Inside Out: Access, Norms and Power in Congo's Gold Sector*, 2016, p. 141.

[89] His Burundi-based refinery Affimet reportedly exported 7 tons of gold annually, most of which was sourced from then-Zaire, present-day Congo. Southern Africa Resource Watch (SARW), *Congo's Golden Web: the people, companies and countries that profit from the illegal trade in Congolese gold*, 2014, p. 40

[90] SARW, "Congo's Golden Web," p. 17; Daniel Fahey, *Rethinking the Resource Curse: Natural Resources and Polywar in the Ituri District, Democratic Republic of the Congo*, PhD Dissertation, University of California at Berkeley, Fall 2011, p. 110, available at http://digitalassets.lib.berkeley.edu/etd/ucb/text/Fahey_berkeley_0028E_11753.pdf; "Museveni goes for gold," *Africa Confidential*, March 3, 2017.

[91] Ibid.

[92] These were reportedly originally called Congo Comptoir and then renamed Congocom. SARW, "Congo's Golden Web," p.40.

[93] Congocom managers also trafficked gold from areas held by the FDLR, RCD, FNI, FRF, and several Mai Mai groups. Human Rights Watch, "The Curse of Gold," 2005, available at https://www.hrw.org/reports/2005/drc0505/11.htm Sara Geenen, *African artisanal Mining from the inside out: Access, norms and power in Congo's gold sector*, Routledge, 2015, p. 83; U.N. Security Council, "Final report of the Group of Experts (2009)," S/2009/603, November 23, 2009, p. 38 available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2009/603, p. 38. SARW, "Congo's Golden Web."

[94] SARW, "Congo's Golden Web," p. 41.

[95] They alleged that a North Kivu-based company, Glory Minerals, which purchased its gold from FDLR-held mines, had sold gold to Goetz. According to the U.N. experts, Goetz had received an email "to inform him that gold purchased by Glory Minerals did not come from areas controlled by FDLR or Mai Mai, and that any gold supply from Glory Minerals complies with United Nations standards." However, "The Group has established above that Glory Minerals continues to source gold from FDLR controlled areas." U.N. Security Council, "Final Report," S/2009/603, pp. 33, 37-8. Tony Goetz NV stated in response to questions posed by The Sentry that the correspondence mentioned in the report was a form of spam which was sent to all major gold refineries.

[96] Email communication with Tony Goetz NV, August 2018.

37

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
39 of 56

DRC-30316 0200                          UNCLASSIFIED

UNCLASSIFIED                                                              EXHIBIT 6

[97] U.N. Security Council, "Final Report," S/2009/603, pp. 37-8. Southern Africa Resource Watch states that there were a number of irregularities about this purchase. "Another mystifying case involves the September 2009 statement by Goetz that he had purchased 3 kgs of gold from Leonide Mupepele, Director General of CEEC in August 2008. According to a statement by Mupepele, Goetz had bought a second consignment, sent by courier, of an undisclosed quantity of gold. However, the Mupepele affair was never fully explored. Only the Kinshasa newspapers commented in sarcastic terms about how the head of the country's regulatory watchdog for honest dealings in minerals could possibly have ended up with gold worth more than US $100,000. Goetz told SARW that Mupepele submitted samples to him that originated from the Bas-Congo area. While this may very well be the case, the more important questions remain unanswered: who was the ultimate beneficiary of these transactions? And why did Goetz accept gold from a man that should have triggered very careful due diligence?" Southern Africa Resource Watch, "Congo's Golden Web," 41. Tony Goetz NV stated in response to questions posed by The Sentry that it bought 3 kg of gold from the Congolese government agency CEEC, and that "The gold concerned was legally and officially imported through Belgian customs and no comments whatsoever were made by the competent Belgian authorities." Email correspondence with Tony Goetz NV.

[98] They alleged that a North Kivu-based company, Glory Minerals, which purchased its gold from FDLR-held mines, had sold gold to Goetz. U.N. Security Council, "Final Report," S/2009/603, pp. 37-8.

[99] Southern Africa Resource Watch, "Congo's Golden Web," 41; Tony Goetz NV asserted in response to questions posed by The Sentry that, "Berkenrode is currently called Alaxy. The report states that the company of Mr. Ruganyira is registered and known with the Burundi authorities as Berkenrode BVBA SA. Mr. Ruganyira apparently changed the name of his company in 2009 from Gold Link Burundi Trading (GLBT) to Berkenrode BVBA SA. However, the Belgian company, called Berkenrode BVBA was incorporated in 2002, seven years earlier and is an entirely different private limited liability company, that provides management services." Correspondence with Tony Goetz NV, August 2018.

[100] "Uganda gold refinery raises alarm over conflict minerals," AFP, February 22, 2017, available at: https://www.news24.com/Africa/News/uganda-gold-refinery-raises-alarm-over-conflict-minerals-20170222

[101] Ibid.

[102] This was made up of 120 shipments for a total of 9.33 tons of gold. With the average price of gold of approximately $1,257.12 per troy ounce in 2017, that equals $377 million. Uganda Revenue Authority export statistics for gold, 2015-16 and 2017 reviewed by The Sentry; Average annual gold price, https://www.statista.com/statistics/268027/change-in-gold-price-since-1990/ AGR stated in response to questions posed by The Sentry in August 2018 that it exported 7.3 tons of gold in 2017. It later stated that it exported 7.7 tons: "To be more precise, AGR exported 7,721,000 gms in 2017. AGR's exported figures is being declared to the Bank of Uganda on monthly basis and captured by the Uganda Revenue Authority during the time of export." AGR also said that "it should be noted that AGR is not a trading company, but a service company providing industrial services such as geological analysis, assaying, melting, refining, and the shipment and delivery of precious metals." Email communication with AGR, August and October 2018.

[103] Sentry interview with gold trader, March 2017; Sentry interviews with gold trader, February 2017 and March 2018; Sentry interview with regionally-based gold traders, June 2017 and December 2017.

[104] Sentry interview with gold trader, March 2017; Sentry interviews with gold trader, June 2017; Sentry interview with gold trader based in Congo, March 29, 2017; Sentry interview with Congo-based gold trader, March 2017; Sentry interview with Congolese government official, March 2017.

[105] Email communication with AGR, August 2018.

[106] U.N. Security Council, "Final Report of the U.N. Group of Experts on the DRC," S/2014/42, p. 37, para. 172; available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2014/42; U.N. Security Council, "Final Report of the U.N. Group of Experts on the DRC," S/2012/843, para. 187, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2012/843; See also Sara Geenen, *African Artisanal Mining from the Inside Out: Access, Norms and Power in Congo's Gold Sector*, 2015, p. 122.

[107] Sentry interviews with gold trader, February 2017, March 2017, and April 2017; Sentry interview with regional gold trader, March 2017; Sentry interview with gold trader in eastern Congo, March 2017; Sentry interview with Congolese government official, March 2017.

[108] U.N. Security Council, "Final Report of the U.N. Group of Experts on the DRC," 2012, S/2012/843, para. 183; U.N. Group of Experts, "Final Report of the Group of Experts on the DRC submitted in accordance with paragraph 6 of Security Council resolution 1896 (2009)" November 29, 2010, para. 294, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2010/596; U.N. Group of Experts, "Final Report of the Group of

38



DRC-30316 0201                           UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 6

Experts on the DRC submitted in accordance with paragraph 8 of Security Council resolution 1857 (2008)" 23 November 2009, para. 159, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2009/603

[109] Namukaya said "Our production comes from green zones where we help ensure peace for the artisanal diggers. Our marketing department takes this issue into account in order to make our comptoir credible as regards international regulations and the country's realities. ... We have our partners in Dubai, and we try to do our work but without any insurance due to the multiple difficulties of diversion we are facing, which jeopardizes our capital now. At the present time, we operate at a low speed considering our financial means that could lead to our bankruptcy. Our sales statistics are recorded by our Congolese government services, authorized to do this every time we want to deliver the products to our partners." The Sentry Correspondence with Namukaya, September 2018.

[110] Sara Geenen, *African Artisanal Mining from the Inside Out: Access, Norms and Power in Congo's Gold Sector*, 2015, p. 122.

[111] AGR stated in response to questions posed by The Sentry: "AGR is committed to refraining from any action which contributes to the financing of conflict. We will neither tolerate nor by any means profit from, contribute to, assist with or facilitate the illegal trafficking of gold. As such AGR has not purchased or refined gold from individuals named as traffickers in U.N. GoE on DRC reports. ... We are fully committed to supply chain transparency and support all efforts by the U.N. and the international community to establish practical and workable solutions to current vulnerabilities. We take note that the U.N. Group concluded, 'that AGR could contribute to a cleaner gold trade in Uganda.' This is certainly the firmly held view of AGR and the Government of Uganda and we shall be working with all interested parties to ensure this happens." Email communication with AGR, August 2018. AGR elaborated further in a subsequent response: "AGR's Due Diligence Management System is based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance. Apart from this, AGR's Anti-Bribery Policy & Compliance Handbook is implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold: http://www.gold.africa/wp-content/uploads/2017/02/Anti-Bribery-Policy-Compliance-Handbook-1.pdf. AGR has similar responsibility as any other refinery yes, we received the guidance from our lawyer (Tern Advocates) AGR's in-house legal team while AGR complies with these guidelines and endeavors to maintain the highest standards in the responsible sourcing."

[112] In response to questions posed by The Sentry, AGR represented that "Approximately 90% of the gold that AGR handles comes from approved licensed dealers. Only 10% comes directly from the mining sector. This 10% can be divided roughly equally between accredited mines in Tanzania, Kenya, Uganda, Rwanda and DRC." AGR subsequently said in response to The Sentry's question about where the 90 percent comes from that "The origin of the gold is mainly African Regional supply, including: Tanzania, Kenya, Uganda, Rwanda and DRC." It also stated that "In compliance with AGR's Supply Chain Policy for a Responsible Global Supply Chain of Minerals from Conflict-Affected and High Risk Areas, AGR is committed to refraining from any action which contributes to the financing of conflict. The major example we could provide is that when the prospective supplier/s have not fully complied with our due diligence guidelines & procedure, their account opening process will be immediately terminated. On the other hand, if the applicant conforms to AGR's compliance process and requirements, their account opening application will be completed." Email correspondence with The Sentry, August and October 2018. For the public statements, see Note 20.

[113] Interview with Sentry source, May 2, 2017.

[114] In response to questions posed by The Sentry, AGR represented that "Approximately 90% of the gold that AGR handles comes from approved licensed dealers. Only 10% comes directly from the mining sector. This 10% can be divided roughly equally between accredited mines in Tanzania, Kenya, Uganda, Rwanda and DRC." AGR subsequently said in response to The Sentry's question about where the 90 percent comes from that "The origin of the gold is mainly African Regional supply, including: Tanzania, Kenya, Uganda, Rwanda and DRC." It was not clear whether that 90 percent comes from certified mines or not. Email correspondence with The Sentry, August and October 2018. For the public statements, see Note 21.

[115] Uganda's domestic gold production can be estimated at around three tons per year based on The Sentry's discussions with Ugandan mining governance officials, and regional ASM gold mining experts. Also, see Global Witness, "Under-Mined: How corruption mismanagement and political influence is undermining investment in Uganda's mining sector and threatening people and environment," June 2017, p.28.

[116] AGR stated in response to questions posed by The Sentry that "Approximately 90% of the gold that AGR handles comes from approved licensed dealers. Only 10% comes directly from the mining sector. This 10% can be divided roughly equally between accredited mines in Tanzania, Kenya, Uganda, Rwanda and DRC." Email communication with

39

DRC-30316 0202

UNCLASSIFIED

UNCLASSIFIED                                                                EXHIBIT 6

AGR, August 2018. AGR subsequently said in response to The Sentry's question about where the 90 percent comes from, "The origin of the gold is mainly African Regional supply, including: Tanzania, Kenya, Uganda, Rwanda and DRC. ... AGR has numerously stressed that none of the gold comes from South Sudan been processed at the facility." Email communication with The Sentry, October 2018.

[117] Alain Goetz, AGR , and Tony Goetz NV were defending as of the time of writing, in the Ugandan courts, a civil case brought by the plaintiff, Barnabas Taremwa, who claims that the defendants reneged upon a joint venture signed on 12 December 2014 that would have allotted him and an associated company a considerable share in AGR. Barnabas Taremwa claims to have sourced the land on which AGR constructed its refinery, as well as negotiated the original tax exemptions. Timberfric International Ltd is Barnabas Taremwa's co-plaintiff in the case.

[118] Document reviewed by The Sentry.

[119] "In 2014, Barnabas Taremwa traded in gold illegally exported from the Democratic Republic of the Congo and illegally imported into Uganda. Two individuals involved in the gold trade in eastern Democratic Republic of the Congo and two individuals in close contact with Kampala gold traders confirmed Mr. Taremwa's role in trading Congolese gold." U.N. Security Council, "Final Report of the Group of Experts on the Democratic Republic of the Congo," S/2015/19, January 12, 2015, para. 209, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2015/19

[120] Sentry interview with gold trader in eastern Congo, March 31, 2017; Sentry interviews with two Kampala-based gold traders, April 8, 2017 and June 4, 2017; Sentry interview with Congo-based gold trader, March 28, 2017.

[121] According to the U.N. Panel of Experts, "a paramilitary force is being trained under the personal authority of Lt. General Saleh. ... The network coordinates all elements of the diamond trade, local buying houses, Lebanese exporters, army protection from UPDF and individual militias, tax exonerations from the public sector, and Lebanese connections in Antwerp, under the aegis of the front company, the Victoria Group. ... Lt. General Saleh is recognized by the Panel's sources in Bunia, Kisangani and Kampala as the founder and director of the Victoria Group and as the mastermind of its operations." U.N. Security Council, "Final report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo," S/2002/1146, October 2002, paras. 102, 111, 112-3, available at https://reliefweb.int/report/burundi/plundering-dr-congo-natural-resources-final-report-panel-experts-s20021146

[122] Saleh stated, "Can they provide evidence? What does the commission want me to comment on, that I share money with Nyamwisi? I do not share money with Nyamwisi." And went on further to criticize the U.N. for the allegations, saying that the report was deliberately created to destroy some people. "They are not only picking on me but they also violated my rights to make the accusations without hearing from me." Saleh said, "You will find that I'm not at the core or even at the tail of this." Anne Mugisa and Milton Olupot, "Salim Saleh Criticises U.N. Over Congo," *New Vision*, August 28, 2001, available at https://www.newvision.co.ug/new_vision/news/1027461/salim-saleh-criticises-congo. The Ugandan government commissioned a separate report in 2001, which became the Porter Commission led by Justice David Porter. That report, released in 2003, concluded that Saleh was not complicit in illegal looting in Congo and placed the blame on Ugandan General James Kazini. "Uganda Plans Looting Charges," BBC, May 15, 2003, available at http://news.bbc.co.uk/2/hi/business/3030515.stm

[123] AGR further states that it "would like to reiterate that Mr. Barnabas Taremwa and Mr. Richard Kaijuka, whilst previously having been employees of AGR, currently they have no formal connections with our company. Therefore, we would like to stress that any of their statements and assertions are their own personal perceptions and views and have nothing to do with AGR and do not reflect the company's position in any way." AGR Press Statement, November 20, 2017, available at http://www.gold.africa/news-articles/; Matsiko, "Museveni defends;"

[124] DRC Ministry of Mines, "Arrêté ministériel No. 0057 Cab.Min/Mines/01/2012 du 29 février 2012 portant mise en œuvre du méchanisme régional de certification de la Conférence internationale sur la région des Grands Lacs 'CIRGL' en République démocratique du Congo," February 29, 2012. See also Government Accountability Office, "Conflict Minerals: Information on Artisanal Mined Gold and Efforts to Encourage Responsible Sourcing in the Democratic Republic of the Congo," August 2017, p. 10, available at https://www.gao.gov/assets/690/686745.pdf

[125] DRC Ministry of Mines and Cooperation Allemande, "Resume des Qualifications et Validations Ainsi Que des Audits CTC des Sites Miniers en RDC de Juin 2011 a Décembre 2017, » April 2018, available at http://cosoc-gl.org/wp-content/uploads/2018/03/Bulletin_MRC-CTC_vf2017121.pdf; Mine data from the International Peace Information Service, available at http://ipisresearch.be/home/conflict-mapping/maps/open-data/

[126] U.N. Security Council, "Final report of the Group of Experts (2017)," S/2017/672, p. 23, August 8, 2017, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/672;

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018



UNCLASSIFIED

EXHIBIT 6

[127] According to its website, "AGR complies with these [ICGLR and OECD] guidelines [on conflict resources] and endeavours to maintain the highest standards in the responsible sourcing of their [sic] metals." See "About AGR" available at http://www.gold.africa/about/ (accessed June 2018).

[128] AGR said in response to questions posed by The Sentry that all of its suppliers "must have the valid documents to operate as mines or mineral dealers. We have turned down a considerable number of individuals who did not have the relevant and necessary documentation." Email communication with AGR, August 2018. AGR elaborated on this in a subsequent email to The Sentry: "In compliance with AGR's Supply Chain Policy for a Responsible Global Supply Chain of Minerals from Conflict-Affected and High Risk Areas, AGR is committed to refraining from any action which contributes to the financing of conflict. The major example we could provide is that when the prospective supplier/s have not fully complied with our due diligence guidelines & procedure, their account opening process will be immediately terminated. On the other hand, if the applicant conforms to AGR's compliance process and requirements, their account opening application will be completed."

[129] DRC Ministry of Mines, "Arrêté ministériel No. 0057 Cab.Min/Mines/01/2012 du 29 février 2012 portant mise en œuvre du méchanisme régional de certification de la Conférence internationale sur la région des Grands Lacs 'CIRGL' en République démocratique du Congo," February 29, 2012. See also Government Accountability Office, "Conflict Minerals: Information on Artisanal Mined Gold and Efforts to Encourage Responsible Sourcing in the Democratic Republic of the Congo," August 2017, p. 10, available at https://www.gao.gov/assets/690/686745.pdf

[130] Email correspondence with AGR, October 2018.

[131] This is according to the most recent independent, comprehensive survey of gold mines in eastern Congo by the International Peace Information Service, which surveyed 559 gold mines in total. The 2015 data showed that 64 percent of gold miners worked at mines with at least one armed group present, but the 2016 data increased the overall figure to 71 percent (55,990 miners at conflict mines out of 79,213 gold miners in total). IPIS, "Analysis of the interactive map;" IPIS, Open Data Set for gold mines, 2015-16, available at http://ipisresearch.be/home/conflict-mapping/maps/open-data/

[132] The U.N. Group of Experts also stated, "Gold produced artisanally in conflict and post-conflict areas of eastern Democratic Republic of the Congo is blended in the country's main trading towns and neighbouring transit countries." U.N. Security Council, "Final report," S/2014/42; Sentry interview with Congolese mining official, June 22, 2017, Sentry interview with five mine operators in eastern Congo, June 22, 2017, Sentry interview with two Ugandan gold traders, April 8, 2017, Sentry interview with Congolese gold trader, March 29, 2017, Sentry interview with Ugandan government official, April 7, 2017.

[133] Illegal armed groups control much of the territory. U.N. Security Council, "Mid-term report of the Group of Experts (2017)," S/2017/1091, December 22, 2017, pp. 9, 11, 15, 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2017/1091

[134] Interview with Congolese government official, March 2017.

[135] This is per the ICGLR process. For example, 50 certificates went missing in 2017, and only 1 has been recovered. U.N. Security Council, "Midterm report," S/2017/1091, pp. 12-13; U.N. Security Council, "Final report," S/2017/672, pp. 24-5.

[136] Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," *The Observer (Kampala)*, March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html

[137] "AGR regulates its business activities and practices in accordance with the OECD and ICGLR guidelines, which are implemented at every level in our workplace." African Gold Refinery, "AGR at a Glance."

[138] The US Government Accountability Office (GAO) further states that: "While SEC did not specifically mandate the framework to be used, the SEC adopting release noted that it appeared the only nationally or internationally-recognized due diligence framework available was the due diligence guidance approved by the OECD. The OECD due diligence guidance, which OECD adopted in 2011, includes supplements on tin, tantalum, tungsten, and gold. The framework's five steps are (1) establishing strong company management systems, (2) identifying and assessing risk in the supply chain, (3) designing and implementing a strategy to respond to identified risks, (4) carrying out an independent third-party audit of supply chain due diligence at identified points in the supply chain, and (5) reporting on supply chain due diligence. Government Accountability Office, "SEC Conflict Minerals Rule: Companies Face Continuing Challenges in Determining Whether Their Conflict Minerals Benefit Armed Groups," August 2016, available at https://www.gao.gov/assets/680/679232.pdf; Global Witness, "Four Years on, the Congolese Government is Failing to Enforce its Law Designed to Stem Conflict and Abuses in the Minerals Trade," November 4, 2016, available at https://www.globalwitness.org/en/blog/congolese-government-failing-to-enforce-law-to-stem-conflict-abuses-in-

41

UNCLASSIFIED                                                    EXHIBIT 6

minerals-trade/; OECD, "Upstream Implementation of the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict Affected and High-Risk Areas," June 2012, p. 7, available at http://www.oecd.org/investment/mne/UpstreamCycle2Report.pdf; See also Organisation for Economic Co-operation and Development, OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Second Edition, OECD Publishing (2013), accessed June 23, 2014, http://dx.doi.org/10.1787/9789264185050-en"

[139] Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018.

[140] Of 333 eligible refiners/smelters for gold, tin, tantalum, and tungsten, 271 are active in the RMAP. RMAP Conformant and Active list as of October 10, 2018, available at http://www.responsiblemineralsinitiative.org/responsible-minerals-assurance-process/active-and-conformant-smelter-count/

[141] Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018.

[142] See http://www.lbma.org.uk/responsible-sourcing (accessed June 2018).

[143] Correspondence with Tony Goetz NV, August 2018.

[144] Specifically, The Sentry has searched AGR's publicly available materials and spoken to regional certification officials and traders.

[145] Goetz stated in 2017 that AGR dealt in undocumented gold,  Speech of Alain Goetz, CEO of AGR, during session on 'Gold from the Great Lakes Region', OECD Conference May 2017 in Paris, available at http://www.agr-afr.com/wp-content/uploads/2016/08/OECD-Speech-Alain-Goetz-OECD-Conference-2017.pdf; . For its part, AGR told The Sentry that it "does not handle or source undocumented gold. The AGR compliance team conducts detailed checks on our first phase clients by inspecting the relevant documents of the supplier of the raw material. All suppliers of AGR must have the valid documents to operate as mines or mineral dealers. We have turned down a considerable number of individuals who did not have the relevant and necessary documentation." Email communication with AGR, August 2018.

[146] "AGR is still accepting what we called the *undocumented gold* or *small scale gold dealers*, particularly from Kampala market, that includes: old jewelry, damaged or old chains, used necklace, bracelets, dental scrap and other scrap jewelries. The person is being checked by presenting his/her original identification card subject for cross checking and verification by our compliance person." Email correspondence with AGR, October 2018.

[147] Goetz further elaborates to say, "Our KYC and Due Diligence procedures are currently limited to carefully examining the supplier's credentials and making further enquiries with our extensive network of regional contacts as to their veracity. However, we are very keen [sic] make our procedures more and expand our Due Diligence Procedures and call upon the international community and NGOs to assist us in this endeavor." Speech of Alain Goetz, CEO of AGR, during session on 'Gold from the Great Lakes Region', OECD Conference May 2017 in Paris, available at http://www.agr-afr.com/wp-content/uploads/2016/08/OECD-Speech-Alain-Goetz-OECD-Conference-2017.pdf

[148] The $236 million figure only goes to July 2016 (the extent of the URA data), but Uganda continued to export gold at the same pace in the second half of 2016 and all of 2017, and AGR is the only refiner in Uganda.

[149] AGR said in response to questions posed by The Sentry that it "regulates its business activities and practices in accordance with the OECD and ICGLR guidelines. AGR's due diligence initially involves the KYC (Know Your Customer) procedures. Therein, we are requiring each potential client's legal documents including: certificate of incorporation, trading licenses, mining license, mineral dealers' license, memorandum of association and articles, proof of address and audited financial statements, along with at least six months' commercial track record. This can be seen on our account opening form: http://www.gold.africa/wp-content/uploads/2016/08/AGR-ACCOUNT-OPENING-FORM-KYC.pdf" Email communication with AGR, August 2018.

[150] The U.N. Security Council passed Due Diligence Guidelines in November 2009 that mirror the OECD Guidance. See https://www.un.org/sc/suborg/en/sanctions/1533/due-diligence-guidelines

[151] The Guidance states that "In areas in which minerals are illegally taxed or extorted, take immediate steps to ensure that upstream intermediaries and consolidators disclose downstream or publicly the payments made to public or private security forces for the provision of security;" or "engage with intermediaries and consolidators to help build their capabilities to document the behavior of security and payments to security forces." OECD, "OECD Due Diligence Guidance," pp. 25-6.

UNCLASSIFIED                                              EXHIBIT 6

[152] It says: "Upstream companies should: 1. Establish a chain of custody and/or traceability system that collects and maintains disaggregated information outlined in Step 2, Section I and II, (C) for all gold input and output from a red flagged supply chain." "OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas Supplement on Gold," OECD Publishing, 2012, p. 35, available at http://www.oecd.org/corporate/mne/GoldSupplement.pdf

[153] "AGR's due diligence initially involves the KYC (Know Your Customer) procedures. Therein, we are requiring each potential client's legal documents including: certificate of incorporation, trading licenses, mining license, mineral dealers' license, memorandum of association and articles, proof of address and audited financial statements, along with at least six months' commercial track record. This can be seen on our account opening form: http://www.gold.africa/wp-content/uploads/2016/08/AGR-ACCOUNT-OPENING-FORM-KYC.pdf"

[154] "In order to bring the local small-scale traders in conformity with the due diligence requirements imposed by the international organizations, AGR assists local miners in the conduct of their own sourcing of procured metals through license applications and stringent audits. In this way, revenue generated by artisanal mining is kept well away from rebel militias and instead is controlled by the miners themselves for the development of their communities. AGR regulates its business activities and practices in accordance with the OECD and ICGLR guidelines, which are implemented at every level in our workplace." African Gold Refinery, "AGR at a Glance," available at http://www.gold.africa/about/

[155] See "OECD Due Diligence Guidance," pp. 22, 55-6.

[156] Step 3 entails designing and implementing a strategy to respond to identified risks. "OECD Due Diligence Guidance," p. 18.

[157] The U.N. Group of Experts said it "requested a list of AGR suppliers but has not received it and takes note of the willingness of AGR to first require 'proper consent' of their suppliers. This information would help to ascertain if certain suppliers were involved in fraudulent trade with smugglers from the Democratic Republic of the Congo. The Group saw a copy of an agreement signed by AGR and CEEC, in which the two parties acknowledged that gold was smuggled from the Democratic Republic of the Congo to Uganda. Furthermore, it includes a commitment to work closely in the fight against smuggling according to international and International Conference on the Great Lakes Region regulations." U.N. Security Council, S/2017/672, p. 26.

[158] In response to questions posed by The Sentry, AGR acknowledged this. "This will be a third party audit, as we are aware that the ICGLR mechanism and structures is not yet fully implemented in the region therefore the scheduled audit is not under the ICGLR certification process." Email communication with AGR, August 2018 and October 2018; Per the ICGLR, "Accreditation [of third-party auditors] is undertaken by the ICGLR Audit Committee, or an outside agency, as mandated by the Audit Committee. It is carried out according to the criteria detailed in the Appendices to the ICGLR Certification Manual." International Conference on the Great Lakes Region, "Audit Methodology / Template for the Third Party Exporter Audits of the ICGLR's Regional Certification Mechanism," October 8, 2013, available at http://icglr.org/images/ICGLR%20Third%20Party%20Audit%20Methodology.pdf

[159] OECD, "Gold Supplement," p. 36-7; U.N. Security Council, S/2010/596, pp. 94-5.

[160] In January 2015, IPIS reported that 57 percent of gold miners worked at a mine with an armed group present. By the end of 2016, this had increased to 71 percent. Similarly, the U.N. Group of Experts reported in December 2016 that "gold remains by far the mineral most used to finance armed elements and criminal networks." IPIS, "Infographic – Mapping Mining Areas in Eastern DRC," January 28, 2015, available at http://ipisresearch.be/2015/01/infographic-mapping-security-human-rights-mining-areas-eastern-drc/; IPIS, "Analysis of the interactive map"; U.N. Security Council, "Midterm report," S/2016/1102, p. 2.

[161] That is Step 5 of the Guidance. OECD, "OECD Due Diligence Guidance," p. 52.

[162] According to The Independent (Uganda), when Kaijuka was contacted about the latest charges against AGR, he stated, "If it is true, I am extremely shocked and surprised because as chairman, I have always insisted on strict compliance, transparency and accountability." He noted, further, "You will also recall that as AGR chair I have been urging you to hold regular board meetings but in vain to ensure that AGR conforms to good corporate governance practices of accountability, transparency and responsible sourcing of gold from the region. Are you dismissing me so that you can keep a blind eye to all these issues?" Matsiko, "Museveni's gold dealer." See also, Matsiko, "Musveni defends."

[163] Ibid. AGR further states that "that this was his own personal perception and do not reflect the company." AGR, Press Release, November 20, 2017, available at http://www.gold.africa/media/

43

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
45 of 56

DRC-30316 0206                    UNCLASSIFIED

UNCLASSIFIED                                          EXHIBIT 6

[164] Goetz states, "investigations had shown that only 0.1% of gold mines in eastern DRC were in the hands of rebels." AFP, "Uganda gold refinery raises alarm over conflict minerals."

[165] He states, "Conflict minerals don't exist. All minerals are created by God. He did not put conflict minerals in the universe. It is the people who use it; they are the conflict guys." Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," *The Observer (Kampala)*, March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html

[166] U.N. Group of Experts, "Final Report of the Group of Experts," November 29, 2010, pp. 89-91; OECD, "OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Second Edition," OECD Publishing, 2013, p. 20, available at http://dx.doi.org/10.1787/9789264185050-en

[167] These include (1) gold originating from or transported through a conflict-affected or high-risk area, (2) gold that has been refined in a country where gold from conflict-affected and high-risk areas is known or reasonably suspected to transit, and (3) increased risk in countries when anti-money laundering laws, anti-corruption laws, customs controls and other relevant governmental oversight laws are weakly enforced, informal banking systems operate, and cash is extensively used. The OECD Gold Supplement also specifically calls on refiners to examine U.N. and NGO reports during this step. "OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas Supplement on Gold," OECD Publishing, 2012, pp. 11, 26, available at http://www.oecd.org/corporate/mne/GoldSupplement.pdf

[168] AGR CEO Goetz stated that it has "limited resources to map each and every gram reaching our facility. Our KYC and due diligence procedures are currently limited to carefully examining the supplier's credentials and making further enquiries with our extensive network of regional contacts as to their veracity." Speech of Alain Goetz, CEO of AGR, during session on 'Gold from the Great Lakes Region', OECD Conference, Paris, May 2017, available at http://www.agr-afr.com/wp-content/uploads/2016/08/OECD-Speech-Alain-Goetz-OECD-Conference-2017.pdf

[169] AGR states that it does not fit the description of a minerals dealer according to Ugandan law, because "it is an entity engaging in only the refining of raw minerals into a finished product." AGR letter to Ugandan FIU, November 7, 2017, available at http://www.gold.africa/wp-content/uploads/2017/11/AGRs-Response.pdf; "AGR is an industry providing services and not involved in the selling, buying or trading of precious metals," the company noted. "AGR do have a Mineral Dealer's License as it is essential for various business purposes and it is one of the requirements AGR is submitting whenever there is an export. AGR also noted it has mechanisms in place aimed at avoiding trading in conflict gold. "Any customer has to fulfill our KYC (Know Your Customer) procedures by providing relevant information and their company legal documents," AGR noted, "AGR is doing due diligence of its suppliers in the same way as other foreign / international refineries are doing." The company also noted that it has been competing with huge smuggling networks "as we are promoting the legal framework and legitimate supply chain thus smugglers are devastated on AGR's success and doing everything to suppress AGR." Matsiko, "Museveni defends 'fake' gold dealer." In response to questions posed by The Sentry, AGR added that it "is not a trading company, but a service company providing industrial services such as geological analysis, assaying, melting, refining, and the shipment and delivery of precious metals. ... AGR has not registered with the Ugandan Financial Intelligence Authority because it is not a requirement for us to do so. AGR lawyers had a meeting with FIA on November 2017 and a NON-REPORTING PROCEDURE was agreed." AGR later clarified that "Though, there is no written agreement, yet after submitting our response to their queries FIA have not communicated to us further. We would like to reiterate that AGR operates under Manufacture Under Bond license." Email correspondence with AGR, August and October 2018.

[170] "AGR's Due Diligence Management System is based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance. Apart from this, AGR's Anti-Bribery Policy & Compliance Handbook is implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold: http://www.gold.africa/wp-content/uploads/2017/02/Anti-Bribery-Policy-Compliance-Handbook-1.pdf. AGR has similar responsibility as any other refinery yes, we received the guidance from our lawyer (Tem Advocates) AGR's in-house legal team while AGR complies with these guidelines and endeavors to maintain the highest standards in the responsible sourcing." Email correspondence with The Sentry, October 2018.

[171] "This Guidance applies to all companies in the mineral supply chain that supply or use tin, tantalum, tungsten and their ores or mineral derivates and gold sourced from conflict-affected or high-risk areas." "Supply chain - The term supply chain refers to the system of all the activities, organisations [sic], actors, technology, information, resources and services involved in moving gold from the source to end consumers.

44

DRC-30316 0207                        UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 6

Upstream supply chain and Upstream Companies –"Upstream supply chain" means the gold supply chain from the mine to refiners. "Upstream companies" include miners (artisanal and small-scale enterprises or medium and large-scale gold mining companies), local gold traders or exporters from the country of gold origin, transporters, international gold traders of Mined/Recyclable Gold and refiners. Artisanal and small-scale gold producers such as individuals, informal working groups or communities are not expected included as upstream companies for the purposes of carrying out due diligence in line with this Guidance, although they are encouraged to remain involved in due diligence efforts of their customers and formalise so they can carry out due diligence in the future." OECD, "OECD Due Diligence Guidance"; OECD, "OECD Supplement on Gold," p. 11; Email correspondence with AGR, October 2018.

[172] Sentry interview with gold trader who supplied AGR, March 31, 2017; Sentry interview with separate gold trader who supplied AGR, March 29, 2017; Sentry interview with Kampala-based trader, June 4, 2017. The Sentry has also reviewed email correspondence between Goetz and Kaijuka from early 2014 projecting profit margins resulting from trading.

[173] Uganda Revenue Authority Export Statistics for gold, 2017, reviewed by The Sentry. AGR states that it exported 7.7 tons. "To be more precise, AGR exported 7,721,000 gms in 2017. AGR's exported figures is being declared to the Bank of Uganda on monthly basis and captured by the Uganda Revenue Authority during the time of export." Email communication with The Sentry, October 2018.

[174] The proposal states that "gold from the Region should be attracted to this Refinery and Gold Traders from the Region should be able to declare Gold at the Airport or borders freely as long as they have proper documentation from their countries of origin… Gold traders who do not have official documents should be allowed to sell Gold to this Refinery but be made to pay a Penalty Fee e.g. US $500 at the Airport or at the Refinery." Documents reviewed by The Sentry.

[175] Enough Project, "Breaking the Cycle Delinking Armed Actors from the Gold Supply Chain in Congo and the Great Lakes Region Through Fiscal Reform and Anti-Money Laundering (AML)," pp. 5-7, available at https://enoughproject.org/wp-content/uploads/2017/05/BreakingTheCycle_April2017_Enough_3.pdf

[176] Forbes Africa, "Smugglers Take Sheen from Uganda's Bright Gold Refinery", July 19, 2017, cited by the AGR website, http://www.agr-afr.com/media/, and available at https://www.forbesafrica.com/investment-guide/2017/07/19/smugglers-take-sheen-ugandas-bright-gold-refinery/; AGR website, http://www.agr-afr.com/media/, and available at http://www.chimpreports.com/museveni-commissions-20m-gold-refinery-in-entebbe-first-in-sub-saharan-africa/

[177] Practical Guidance: Market participants in the gold and precious metals industry, DMCC, April 2012. Available at https://www.dmcc.ae/gateway-to-trade/commodities/gold/responsible-sourcing

[178] The DMCC website stated in September 2018 that the next review period for Tony Goetz NV was to be from April 2016 to March 2017, but the most recent audit report listed is for one year prior to that, the period of January 2015 to March 2016. See https://www.dmcc.ae/gateway-to-trade/commodities/gold/accreditation-initiatives

[179] According to the DMCC, "The Dubai Good Delivery standard… for gold refineries, the certification also includes responsible sourcing of gold in accordance with the 'DMCC Rules for Risk Based Due Diligence for Gold and Precious Metals'." DMCC, "Suspend trading activities whilst mitigating the identified risks by obtaining additional information/data confirming or refuting the adverse risk assessments. Disengagement from the red-flagged company and/or sources of the risk. Available at on/files/9615/1677/3878/DGD_List-_Gold_Alphabetical_-January_Final-Version_7.pdf. See also DMCC Rules for Risk Based Due Diligence in the Gold and Precious Metals Supply Chain, Dubai, 26 May 2016, p.40

[180] DMCC denies those charges and has since delisted the refinery and updated its audit protocols. Andy Verity, "Gold Market Breaches 'Covered up," BBC, February 25, 2014, available at http://www.bbc.com/news/business-26341072

[181] These include the Responsible Minerals Assurance Program (RMAP) and the London Bullion Market Association (LBMA) Responsible Gold Guidance.

[182] DMCC Rules for Risk Based Due Diligence in the Gold and Precious Metals Supply Chain, Dubai Multi-Commodities Centre, May 26, 2016, p.40

[183] The Guidance states that the company should, in high risk situations, "Suspend trading activities whilst mitigating the identified risks by obtaining additional information/data confirming or refuting the adverse risk assessments. Disengagement from the red-flagged company and/or sources of the risk." Ibid, p.14

[184] Ibid, p.15

[185] Jeff Mbanga, "Conflict gold is just normal gold, says mineral expert," The Observer (Kampala), March 15, 2017, available at http://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html

45

UNCLASSIFIED                                                    EXHIBIT 6

[186] Matsiko, "Museveni's gold dealer;" Uganda FIA letter to the Director of Public Prosecutions of Uganda, October 11, 2017.

[187] This is based on the very large discrepancy between the Mining Ministry figures and the URA figures for AGR exports. Matsiko, "Museveni's gold dealer;" Sentry interview with regional journalist, February 2018.

[188] See Note 58.

[189] In a 2015 report, FATF and the Asia/Pacific Group on Money Laundering examined money laundering in the gold industry, from mining through the supply chain to retail and investment. Based on this examination, the report details a number of 'red flag indicators' designed to 'assist [] non-financial businesses [], financial institutions and others in identifying and reporting suspicious activities associated with [money laundering] and [terrorism finance] in the gold sector.' In AML regulation generally, 'red flags' are commonly used as indicators of potential money laundering activity that should trigger additional scrutiny by financial institutions and other interlocutors. FATF and APG, "Money laundering and terrorist financing risks."

[190] FATF and APG, "Money laundering and terrorist financing risks," p. 20.

[191] In the September 25, 2017 letter to AGR signed by FIA Executive Director Sydney Asubo, the FIA states "We have noted with concern that despite our earlier communication requesting you to provide us with a copy of your operating license and to register with the Financial Intelligence Authority as an accountable person, you have not complied so. This is contravention of Regulation 4 of the Anti-Money Laundering Regulations, 2015, and your actions constitute an offence under section 133(2) of the Anti-Money Laundering Act 2013." The letter refers to a previously unanswered letter to AGR on August 24, 2017. According to *The Independent*, after AGR failed to respond, Asubo wrote to the director of public prosecutions on October 11, 2017, requesting that AGR be prosecuted. FIA's letters aimed to "ensure the company complied with international anti-money laundering laws." Uganda had already earned a place on the FATF watchlist of risky countries in 2014. Haggai Matsiko, "Museveni defends 'fake' gold dealer."

[192] These include verifying beneficial owners of the gold and performing enhanced due diligence for transactions from high-risk jurisdictions. Uganda Anti-Money Laundering Act of 2013, pp. 15-21, available at https://ulii.org/ug/legislation/act/2013/2013/The-Anti-money-Laundering-Act-2013.pdf

[193] AGR states that it this is because it only refines gold. "AGR do have a Mineral Dealer's License as it is essential for various business purposes and it is one of the requirements AGR is submitting whenever there is an export." Matsiko, "Museveni defends." See also http://www.gold.africa/wp-content/uploads/2017/11/AGRs-Response.pdf

[194] Anti-Money Laundering Act of Uganda, 2013, p. 97, available at https://ulii.org/ug/legislation/act/2013/2013/The-Anti-money-Laundering-Act-2013.pdf

[195] According to the FATF, "the term 'dealer' encompasses a wide range of persons engaged in these businesses, from those who produce precious metals or precious stones at mining operations, to… precious metal refiners." One refiner, NTR Metals, was indicted and prosecuted in 2017 for not doing sufficient due diligence on $3.6 billion worth of gold from South America. Financial Action Task Force, "RBA Guidance for Dealers in Precious Metal and Stones," June 17, 2008, p. 2; Additionally, gold refiners globally are at risk of money laundering. John Dillard, "Gold is the new cocaine for money launderers," *Financial Times*, November 10, 2017, available at https://www.ft.com/content/bfba8cdc-c5fe-11e7-b2bb-322b2cb39656

[196] In response to questions posed by The Sentry, AGR stated, "Though, there is no written agreement, yet after submitting our response to their queries FIA have not communicated to us further. We would like to reiterate that AGR operates under Manufacture Under Bond license." Email communication with AGR, October 2018.

[197] FATF states that "illegally mined gold will often need to be smuggled to a refinery to be smelted. Whilst some enforcement action has been undertaken against smelting operations, anecdotal evidence indicates that the smuggling of gold from both legal and illegal mine sites is widespread." FATF/APG, 2015, p. 18.

[198] The general term mining ministry refers to Uganda's Ministry of Energy and Mineral Development, Department of Geology and Minerals (DGSM).

[199] According to the *New Vision*, the IGG's investigation was launched in May 2016 after AGR received tax exemption from the Ministry of Finance. A letter signed by Stanley Nsubuga on behalf of the IGG stated, "The Inspectorate General of Government is carrying out investigations into the operations of the above company." The article also refers to the mining ministry investigations. "Uganda economy will grow sustainably, says President Museveni." *New Vision*, December 7, 2017.

[200] Uganda's Auditor General has raised concerns about these discrepancies. Matsiko, "Museveni defends."

[201] Per an average 2017 gold price of $40,000/kg. See www.goldprice.org

[202] Matsiko, "Museveni defends."

The Sentry • TheSentry.org
The Golden Laundromat  The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
48 of 56

DRC-30316 0209                                    UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 6

[203] The letter states, "The Ministry has of recent been informed by the Office of the Inspector General of Government that AGR has since traded gold but has flouted statutory procedures for the export of mineral commodities, whose importation and exportation to and from Uganda is restricted under the Mining Act 2003 and East African Community Customs Management Act, 2005. Consequently, this has been perceived as an act of tax avoidance by AGR while purporting to be in compliance with relevant national and tax laws." The letter also requires AGR to apply for export and import permits and take immediate steps to pay outstanding royalties. "Non-Compliance Notice of the African Gold Refinery Facility In Entebbe Municipality And Recovery of Non Tax Revenue", 8 August 2016.

[204] The notice specifies trade data to include "all purchases and sales of minerals made by AGR and the nature and weight of the minerals - we request you to share with us any relevant gold export information (air way bills, quantities, destinations, buyers, etc.); the price paid or received for the minerals and the date of each purchase or sale; the name and address of the vendor and his or her right to be in possession of such minerals; the name and address of the purchaser or consignee to whom the minerals are sold or consigned."

[205] AGR says it has a mineral dealer's license that it uses, and that it promotes legal frameworks for trading gold. According to *The Independent*, "The company said in an email response that there is someone behind the allegations whose intention is to damage AGR's reputation. The company had earlier, in a press statement, claimed that person was Taremwa. 'AGR is an industry providing services and not involved in the selling, buying or trading of precious metals,' the company noted. 'AGR do have a Mineral Dealer's License as it is essential for various business purposes and it is one of the requirements AGR is submitting whenever there is an export. AGR also noted it has mechanisms in place aimed at avoiding trading in conflict gold. Any customer has to fulfill our KYC (Know Your Customer) procedures by providing relevant information and their company legal documents,' AGR noted, 'AGR is doing due diligence of its suppliers in the same way as other foreign / international refineries are doing.' The company also noted that they have been competing with huge smuggling networks 'as we are promoting the legal framework and legitimate supply chain thus smugglers are devastated on AGR's success and doing everything to suppress AGR.'" Matsiko, "Museveni defends 'fake' gold dealer." AGR further stated in response to questions posed by The Sentry that it "operates under a Manufacture Under Bond License issued by the Uganda Revenue Authority under the Ministry of Finance. As such, we are not licensed by the Department of Geological Survey and Mines. Nevertheless, the information to which this question relates is captured under the operation of the license with the URA. This information is public and is available to the Department of Geological Survey and Mines." Email communication with AGR, August 2018. The Sentry attempted to find AGR's detailed information on the websites of the Ugandan mining and finance ministries and Uganda's central bank but could not locate it. The Bank of Uganda came closest in that it gives statistics on gold but does not break it down by company.            See            http://www.dgsm.go.ug/home;            http://www.finance.go.ug/;
https://www.bou.or.ug/bou/rates_statistics/statistics.html

[206] OECD, "Due Diligence Guidance," p. 24.

[207] "Uganda economy will grow"; Matsiko, "Museveni defends." AGR stated in response to questions posed by The Sentry that "When it became apparent to the IGG that AGR is a refining and melting facility and not engaged in mining activities that attract royalties, the case was dropped. We have heard nothing since. AGR operates strictly within the requirements of the Ugandan authorities, as stated in the AGR investment license of 2014. (Royalties and taxes apply only for minerals and not for value-added services and finished products). AGR pays VAT on the services, customs duties on all not-exempted materials, and corporation and income tax. Our fiscal relationship with the State is fully transparent and can be accessed by you with the relevant authorities." Email communication with AGR, August 2018.

[208] FATF, "Money laundering / terrorist financing risks and vulnerabilities associated with gold."

[209] In response to questions posed by The Sentry, AGR said that its "compliance team conducts detailed checks on our first phase clients by inspecting the relevant documents of the supplier of the raw material. All suppliers of AGR must have the valid documents to operate as mines or mineral dealers. We have turned down a considerable number of individuals who did not have the relevant and necessary documentation." Email correspondence with The Sentry, August 2018.

[210] In response to questions posed by The Sentry, AGR stated that "AGR is still accepting what we called the *undocumented gold* or [sic] *small scale gold dealers,* particularly from Kampala market, that includes: old jewelry, damaged or old chains, used necklace, bracelets, dental scrap and other scrap jewelries. The person is being checked by presenting his/her original identification card subject for cross checking and verification by our compliance person." Email communication with The Sentry, October 2018.

[211] FATF, "Money laundering / terrorist financing risks and vulnerabilities associated with gold," pp. 20-21.

[212] Sentry interview with AGR management, April 2017.

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0210

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 6

[213] See Notes 9, 12, 13, and 28. See also, U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531; "The Great Lakes Gold Rush," *Africa Confidential*, March 23, 2018.

[214] Matsiko, "Museveni defends."

[215] Uganda Revenue Authority Export Statistics for gold, 2017 reviewed by The Sentry; Matsiko, "Museveni defends."

[216] In a press release, Tony Goetz NV stated, "Tony Goetz NV would like to congratulate African Gold Refinery Uganda (AGR) for their succesful [sic] start-up. The role of Tony Goetz NV is providing technical support to AGR as well as training and sharing 30 years of experience in gold-assaying, melting and refining. Tony Goetz NV would like to emphasize that the company has no participation whatsoever in the capital of AGR. The main promotor of AGR Uganda is Mr. Alain Goetz. The AGR participation is strictly done in his personal name." Tony Goetz NV press release, September 2016, available at https://www.tonygoetz.com/data/public/Persnota_Uganda-76007-1.pdf

[217] Certified copy of the Memorandum and Articles of Association of the African Gold Refinery Limited, Republic of Uganda, reviewed by The Sentry, March 17, 2014.

[218] Articles of incorporation documents reviewed by The Sentry.

[219] Alain and Sylvain Goetz, as well as Geraldine Santi are listed as administrators on the board of directors as of August 2018. Recueil Electronique des Sociétés et Associations Numéro, Luxembourg corporate filing RCS : B119953 Référence de publication : RESA_2018_176.827, August 8, 2018, available at https://gd.lu/resa/IDCPs Memorial, Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf; « Vervolgd in België, adres in Luxemburg" *De Tijd*, March 28, 2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-luxemburg/9996901.html

[220] The Sentry has reviewed the minutes of an April 2014 meeting between Alain Goetz, Barnabas Taremwa, Richard Kaijuka, and other representatives of AGR, with various senior civil servants from Uganda's Ministry of Finance regarding the incentives requested by the AGR project. The sixth agreed position following the meeting was that the Ministry's Permanent Secretary "would seek guidance from H.E. the President on the issue of granting of the 10-year corporate tax holiday to the project."

[221] On February 21, 2017, at AGR's official inauguration, President Yoweri Museveni announced a pending zero percent tax rate applicable to artisanal and small-scale (ASM) gold exported from Uganda. This tax rate incentive is still awaiting legislation by Uganda's parliament. This zero percent rate will likely apply to ASM gold with a 99.5 or 99.9 percent purity, so effectively only to gold processed by the refinery. Uganda's current tax rate for ASM gold, produced in Uganda, is 5 percent, while there is a 1 percent tax on imported gold, which will then be re-exported. According to Ugandan government officials, AGR currently enjoys a preferential exemption from export tax. Sentry interview with Ugandan official, June 2017; Gregory Mthembu-Salter, 'Baseline Study Four: Gold Trading and Export in Kampala, Uganda', OECD, Paris, 2015, p. 9, available at https://www.oecd.org/daf/inv/mne/Gold-Baseline-Study-4.pdf

[222] AGR is currently not paying export taxes in Uganda. Sentry interview with Ugandan official, June 2017; Also, AGR told Global Witness that because the company "does not trade in any precious metals," it is "exempted from certain taxes and royalties that only apply to mineral exporters." Global Witness, "Undermined," p. 28). "The Great Lakes Gold Rush," *Africa Confidential*, March 23, 2018.

[223] The 5 percent tax is referenced in the letter from Uganda's Mining Ministry to AGR. "Once the recorded source of importation is obtained in accordance with section 71 of the Mining Act 2003, AGR is liable for the due payment of all outstanding royalties due on any minerals bought, received or exported (at 5% gross value) for the period 2014 to date." "Non-Compliance Notice of the African Gold Refinery Facility In Entebbe Municipality and Recovery of Non Tax Revenue", 8 August 2016. See also, Gregory Mthembu-Salter, 'Baseline Study Four: Gold Trading and Export in Kampala, Uganda', OECD, Paris, 2015, p. 9, available at https://www.oecd.org/daf/inv/mne/Gold-Baseline-Study-4.pdf

[224] Memorial, Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf

[225] For example, the minutes of a meeting between AGR and the Ministry of Finance in April 2014 state that, "The purpose of the meeting was to discuss incentives requested by the African Gold Refinery Project for implementation of the refinery of gold and other precious metals. The meeting was a result of H.E. the President's directive to the Ministry to discuss the incentives for the project." At the meeting, the Ministry indeed granted tax-free status to any minerals processed or exported by AGR. Minutes of meeting between AGR and Ugandan Ministry of Finance, April 24, 2014, reviewed by The Sentry. Similarly, when Antoine "Tony" Goetz, father of Alain Goetz, set up the refinery Affimet in Bujumbura in 1989, it was the intercession of the then Burundian President Pierre Buyoya which secured a tax-free

    UNCLASSIFIED

zone for gold refining. Ruddy Doom, "The Power of Protection," 2006-7, available at http://docplayer.net/41039837-The-power-of-protection.html
[225] "Kaijuka resigns," *New Vision* (Kampala), August 29, 2002, available at http://www.newvision.co.ug/new_vision/news/1074286/kaijuka-resigns
[227] AGR states in a November 2017 press release that, "Although AGR is a new venture, AGR regulates its business activities and operates legitimately in accordance with local and international laws which are implemented at every level of our workplace. AGR has zero tolerance towards those who do not abide with our corporate ethics, whether committed by top management, employees at any other level, business partners, clients or customers. A major example of this is the Board of Director's decision to terminate Mr. Richard Kaijuka tenure as Board Chairman of AGR." AGR Press release, November 20, 2017, available at http://www.gold.africa/media/ See also, Matsiko, "Museveni's gold dealer."
[228] AGR stated in response to questions posed by The Sentry that it "AGR is a privately-owned business and has no formal or informal commercial relationship or link with any senior Ugandan government officials, particularly with H.E. President Yoweri Museveni." Email communication with AGR, August 2018.
[229] Uganda Revenue Authority export statistics for gold, 2017, reviewed by The Sentry.
[230] Uganda Revenue Authority Export Statistics for gold, 2015-16 reviewed by The Sentry; Matsiko, "Museveni defends."
[231] Bills of lading from Uganda to the UAE reviewed by The Sentry.
[232] U.N. Comtrade Statistics for 2015-16, available at https://comtrade.un.org/data
[233] Securities and Exchange Commission filings for 2018, Form SD, available at https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp?search_text=%22tony%20goetz%22&sort=Date&formType=FormSD&isAdv=true&stemming=true&numResults=10&fromDate=01/01/2018&toDate=09/01/2018&numResults=10
[234] Securities and Exchange Commission 2018 filings, Form SD, available at https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp?search_text=%22african%20gold%22&sort=Date&formType=FormSD&isAdv=true&stemming=true&numResults=10&fromDate=01/01/2018&toDate=12/31/2018&numResults=10
[235] Africa Confidential, "The Great Lakes Gold Rush," March 23, 2018, available at https://www.africa-confidential.com/index.aspx?pageid=7&articleid=12279; U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531
[236] "The Group notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month. The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz."
UN Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21, available at http://www.un.org/ga/search/view_doc.asp?symbol=S/2018/531
[237] As of June 11, 2018, the average gold price in 2018 has been approximately $42,000/kg. See www.goldprice.org
[238] "The Group notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month.14 The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz. Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring countries, including the Democratic Republic of the Congo." U.N. Security Council, "Final Report of the Group of Experts," S/2018/531, June 4, 2018, p. 21.
[239] Africa Confidential, "The Great Lakes Gold Rush," March 23, 2018, available at https://www.africa-confidential.com/index.aspx?pageid=7&articleid=12279
[240] http://en.igihe.com/economy/rwanda-targets-800-million-from-gold-by-2020.html
[241] Africa Confidential, "The Great Lakes Gold Rush," March 23, 2018, available at https://www.africa-confidential.com/index.aspx?pageid=7&articleid=12279
[242] "Rwanda targets $800 from gold by 2020," Igihe, November 10, 2017, available at http://en.igihe.com/economy/rwanda-targets-800-million-from-gold-by-2020.html
[243] The Sentry has reviewed a Rwandan government study of domestic gold production capacity, which indicates an overall production capacity of merely 20-30 kg per annum. Rwandan mining study, 2016, reviewed by The Sentry. See also, Africa Confidential, "The Great Lakes Gold Rush," March 23, 2018, available at https://www.africa-confidential.com/index.aspx?pageid=7&articleid=12279
[244] Rwandan mining study reviewed by The Sentry.

49



UNCLASSIFIED    EXHIBIT 6

[245] For a list of BPMI company filings, see
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0477567325&liste=Liste and
https://data.be/en/company/Belgian-Precious-Metals-Industries-SA-0477567325#Key-indicators
[246] These were two shipments, one on July 6, 2016, and the other on July 20, 2016, for a total of 175 kg of gold. Using
the approximate gold price at the time, $42,000 per kg, this was worth approximately $7.35 million. Uganda Revenue
Authority Export Statistics for gold, 2015-16 reviewed by The Sentry.
[247] Belgian corporate filings for Worldwide Consulting, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s15#
[248] From 2013 until October 2016, BPMI was controlled by Alaxy, Sylvain Goetz, and WorldWide Consulting. During
that period (in July 2016), BPMI imported 175 kg of gold from AGR. BPMI then changed its directorship in October
2016 to Cherry Ann Dacdac. Notably, there is overlap with AGR, as Cherry Anne Dacdac is a manager at AGR. The
company had changed its address in 2013. http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023661.pdf;
http://www.ejustice.just.fgov.be/tsv_pdf/2016/10/26/16148315.pdf
[249] Belgian corporate filing for BPMI, December 4, 2017, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s9#; Email correspondence with AGR, August 2018.
[250] www.agor.com
[251] This was made up of 19 shipments from December 2015 to February 2016 for a total of 1.412 tons of gold. With the
average price of gold at $37,000 per kilo during that time, that equals $52.24 million. Uganda Revenue Authority Export
Statistics for gold, 2015-16 reviewed by The Sentry; www.goldprice.org
[252] In an interview with Alain Goetz posted on the Tony Goetz NV website, "Alain Goetz is the co-owner of Tony Goetz
NV… and of Agor DMCC." "In Conversation with Alain Goetz," *Bullion Bulletin (India)*, February 2013, available at
https://www.tonygoetz.com/data/Unsorted/Bullion_bulletin-72661-1.pdf Furthermore, the Tony Goetz NV September
2016 press release, disclaiming responsibility for AGR, concludes "Information about this message can be obtained by
sending an email to: ceo@agor.com" Tony Goetz NV press release, September 2016, available at
https://www.tonygoetz.com/data/public/Persnota_Uganda-76007-1.pdf
[253] Agor DMCC's website states, "Representing with NV TONY GOETZ, one of the largest refinery [sic] in Belgium
and equipped to work with all precious metal products, including all material that may contain Gold, Silver, Platinum,
Rhodium, Iridium, Ruthenium and Rhenium." The website's home page has a slide of gold bars stamped Tony Goetz
Gold. Available at www.agor.com/about.html.
[254] Goetz Gold LLC is listed by the Dubai company registry as having the same address, phone, and fax number as
Agor DMCC: Telephone 971-4-2261866, Fax 971-4-2261860, P.O.Box 65919, available at
https://eservices.dubaided.gov.ae/Pages/Anon/TNSrch.aspx?1=1&PID=101066LID=&sname=Search_Trade_Names&
srp=-1&sfn=-1&ifn=419097609&pn=173956&pn2= and http://www.agor.com/contact.html
[255] See http://www.goetzgold.com/
[256] For 2015/16, this was made up of 49 shipments from January to July 2016 for a total of 4.221 tons of gold. With the
average price of gold of approximately $40,000 per kilo during that time, that equals $52.24 million. For 2017, this was
made up of 120 shipments. Uganda Revenue Authority Export Statistics for gold, 2017, reviewed by The Sentry.
Uganda Revenue Authority Export Statistics for gold, 2015-16 reviewed by The Sentry; www.goldprice.org
[257] Email correspondence with AGR, October 2018.
[258] Goetz Gold LLC is listed as the Dubai address for Tony Goetz NV, available at https://www.tonygoetz.com/en/our-
company/our-locations.html
[259] According to its website, "Established in 2013, GOETZGOLD is a Dubai-based company focused on buying and
selling of precious metals, and in particular gold. Our company is located in the heart of Gold Souq in Dubai, worldwide
referred to as the 'City of Gold'. GOETZGOLD is an independent company who has been set up by one of the
shareholders of the family owned company NV TONY GOETZ (TG).
GOETZGOLD has two preferential partners, TONY GOETZ and PREMIER GOLD REFINERY." Goetz Gold website,
available at http://www.goetzgold.com/company.php (accessed February 2018). However, this contradicts the Tony
Goetz NV website, which lists Goetz Gold as an address of Tony Goetz NV, https://www.tonygoetz.com/en/our-
company/our-locations.html
[260] Goetz Gold LLC is listed by the Dubai company registry as having the same phone, fax number, and PO Box
address as Agor DMCC: Telephone 971-4-2261866, Fax 971-4-2261860, P.O.Box 65919, available at
https://eservices.dubaided.gov.ae/Pages/Anon/CompProPopup_A.aspx?lc=L689308I284720R1335930T21588962&ifr
ame=true&width=680&height=440 and http://www.agor.com/contact.html

50

DRC-30316 0213

UNCLASSIFIED

The Sentry • TheSentry.org
The Golden Laundromat  The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
52 of 56

UNCLASSIFIED    EXHIBIT 6

[261] For full list of company filings, see
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0426598575&liste=Liste and
https://cri.nbb.be/bc9/web/catalog;jsessionid=B8BBB224187A37FF1A7C26C12656F057?execution=e1s1#
[262] Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018.
[263] See Note 5.
[264] Alain and Sylvain Goetz, as well as Geraldine Santi are listed as administrators on the board of directors as of
August 2018. Recueil Electronique des Sociétés et Associations Numéro, Luxembourg corporate filing RCS : B119953
Référence de publication : RESA_2018_176.827, August 8, 2018, available at https://gd.lu/resa/IDCPs Memorial,
Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at
http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf; « Vervolgd in Belgiё, adres in Luxemburg" De Tijd, March 28,
2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-luxemburg/9996901.html
[265] Belgian corporate filing for Tony Goetz NV, December 4, 2017, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2017/12/13/17174894.pdf;
[266] Certified copy of the Memorandum and Articles of Association of the African Gold Refinery Limited, Republic of
Uganda, Reviewed by The Sentry, March 17, 2014
[267] Articles of association and Joint venture agreements reviewed by The Sentry.
[268] Ugandan registration document for AGR reviewed by The Sentry.
[269] Securities and Exchange Commission 2018 filings, Form SD, available at
https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp?search_text=%22african%20gold%22&sort=
Date&formType=FormSD&isAdv=true&stemming=true&numResults=10&fromDate=01/01/2018&toDate=12/31/2018&n
umResults=10
[270] For a full list of company filings, see
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0426598575&liste=Liste and
https://cri.nbb.be/bc9/web/catalog;jsessionid=B8BBB224187A37FF1A7C26C12656F057?execution=e1s1#
[271] Interview with Leah Butler, Responsible Minerals Initiative, January 24, 2018.
[272] See endnote 3.
[273] "In the same year 2001 Tony Goetz transfers the ownership of the company to his sons Alain and Sylvain Goetz."
Tony Goetz NV: A brief history of our company. Available at https://www.tonygoetz.com/enmobile/our-
company/history.html (last accessed December 2017).
[274] Alain and Sylvain Goetz, as well as Geraldine Santi are listed as administrators on the board of directors as of
August 2018. Recueil Electronique des Sociétés et Associations Numéro, Luxembourg corporate filing RCS : B119953
Référence de publication : RESA_2018_176.827, August 8, 2018, available at https://gd.lu/resa/IDCPs Memorial,
Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at
http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf; « Vervolgd in Belgiё, adres in Luxemburg" De Tijd, March 28,
2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-luxemburg/9996901.html
[275] Belgian corporate filing for Tony Goetz NV, December 4, 2017, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2017/12/13/17174894.pdf;
[276] Certified copy of the Memorandum and Articles of Association of the African Gold Refinery Limited, Republic of
Uganda, Reviewed by The Sentry, March 17, 2014
[277] Memorial, Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at
http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf; « Vervolgd in Belgiё, adres in Luxemburg" De Tijd, March 28,
2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-luxemburg/9996901.html
[278] Alain and Sylvain Goetz, as well as Geraldine Santi are listed as administrators on the board of directors as of
August 2018. Recueil Electronique des Sociétés et Associations Numéro, Luxembourg corporate filing RCS : B119953
Référence de publication : RESA_2018_176.827, August 8, 2018, available at https://gd.lu/resa/IDCPs Memorial,
Journal Officiel de Grand Duche de Luxembourg, January 23, 2013, available at
http://www.etat.lu/memorial/2013/C/Pdf/c0167231.pdf; « Vervolgd in Belgiё, adres in Luxemburg" De Tijd, March 28,
2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-luxemburg/9996901.html
[279] Memorial, Journal Officiel de Grand Duche de Luxembourg, January 23, 2013 ; « Vervolgd in Belgiё, adres in
Luxemburg" De Tijd, March 28, 2018, available at https://www.tijd.be/nieuws/archief/vervolgd-in-belgie-adres-in-
luxemburg/9996901.html
[280] See www.agor.com

51



DRC-30316 0214                              UNCLASSIFIED

UNCLASSIFIED                                        EXHIBIT 6

[281] In an interview with Alain Goetz posted on the Tony Goetz NV website, "Alain Goetz is the co-owner of Tony Goetz NV… and of Agor DMCC." "In Conversation with Alain Goetz," *Bullion Bulletin (India)*, February 2013, available at https://www.tonygoetz.com/data/Unsorted/Bullion_bulletin-72661-1.pdf Furthermore, the Tony Goetz NV September 2016 press release, disclaiming responsibility for AGR, concludes "Information about this message can be obtained by sending an email to: ceo@agor.com"

[282] Agor DMCC's website states, "Representing with NV TONY GOETZ, one of the largest refinery in Belgium and equipped to work with all precious metal products, including all material that may contain Gold, Silver, Platinum, Rhodium, Iridium, Ruthenium and Rhenium." The website's home page has a slide of gold bars stamped Tony Goetz Gold. Available at www.agor.com

[283] This was made up of 19 shipments from December 2015 to February 2016 for a total of 1.412 tons of gold. With the average price of gold at $37,000 per kilo during that time, that equals $52.24 million. Uganda Revenue Authority Export Statistics for gold, 2015-16 viewed by The Sentry; www.goldprice.org

[284] Goetz Gold LLC is listed by the Dubai company registry as having the same address, phone, and fax number as Agor DMCC: Telephone 971-4-2261866, Fax 971-4-2261860, P.O.Box 65919, available at https://eservices.dubaided.gov.ae/Pages/Anon/TNSrch.aspx?1=1&PID=10106&LID=&sname=Search_Trade_Names&srp=-1&sfn=-1&ifn=419097609&pn=173956&pn2= and http://www.agor.com/contact.html

[285] See http://www.goetzgold.com/

[286] Goetz Gold LLC is listed as the Dubai address for Tony Goetz NV on the Tony Goetz NV website. Likewise, Goetz Gold LLC lists its "head office and refinery" at Tony Goetz NV in Antwerp. Furthermore, the logo on the Goetz Gold website is TG. See Tony Goetz NV website, available at https://www.tonygoetz.com/en/our-company/our-locations.html (accessed February 2018). Goetz Gold LLC website, available at http://www.goetzgold.com/companydetail.php?pagesid=12 (accessed February 2018).

[287] According to its website, "Established in 2013, GOETZGOLD is a Dubai-based company focused on buying and selling of precious metals, and in particular gold. Our company is located in the heart of Gold Souq in Dubai, worldwide referred to as the 'City of Gold'. GOETZGOLD is an independent company who has been set up by one of the shareholders of the family owned company NV TONY GOETZ (TG).

GOETZGOLD has two preferential partners, TONY GOETZ and PREMIER GOLD REFINERY." Goetz Gold website, available at http://www.goetzgold.com/company.php (accessed February 2018). This contradicts the Tony Goetz NV website, which lists Goetz Gold as an address of Tony Goetz NV, https://www.tonygoetz.com/en/our-company/our-locations.html

[288] In 2016, this was made up of 49 shipments from January to July 2016 for a total of 4.221 tons of gold. In 2017 to February 2018, this was made up of 127 shipments for a total of 10.4 tons of gold. With the approximate average price of gold of approximately $40,000 per kilo during that time, that equals $584.8 million. Uganda Revenue Authority Export Statistics for gold, 2015-16 and 2017 viewed by The Sentry; www.goldprice.org

[289] Email correspondence with AGR, October 2018.

[290] Goetz Gold LLC is listed by the Dubai company registry as having the same address, phone, and fax number as Agor DMCC: Telephone 971-4-2261866, Fax 971-4-2261860, P.O.Box 65919, available at https://eservices.dubaided.gov.ae/Pages/Anon/TNSrch.aspx?1=1&PID=10106&LID=&sname=Search_Trade_Names&srp=-1&sfn=-1&ifn=419097609&pn=173956&pn2= and http://www.agor.com/contact.html

[291] For full list of company filings, see http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0477567325&liste=Liste and https://cri.nbb.be/bc9/web/catalog?execution=e1s2#

[292] These were two shipments, one on July 6, 2016, and the other on July 20, 2016, for a total of 175 kg of gold. Using the approximate gold price at the time, $42,000 per kg, this was worth approximately $7.35 million. Uganda Revenue Authority Export Statistics for gold, 2015-16 reviewed by The Sentry.

[293] Belgian corporate filings for Worldwide Consulting, June 21, 2018, available at https://cri.nbb.be/bc9/web/catalog?execution=e1s15#

[294] From 2013 until October 2016, BPMI was controlled by Alaxy, Sylvain Goetz, and WorldWide Consulting. During that period (in July 2016), BPMI imported 175 kg of gold from AGR. BPMI then changed its directorship in October 2016 to Cherry Ann Dacdac. Notably, there is overlap with AGR, as Cherry Anne Dacdac is a manager at AGR. The company had changed its address in 2013. http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023661.pdf; http://www.ejustice.just.fgov.be/tsv_pdf/2016/10/26/16148315.pdf

52

UNCLASSIFIED

EXHIBIT 6

[295] Belgian corporate filing for BPMI, December 4, 2017, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s9#; Email correspondence with AGR, August 2018.
[296] Annual company filing for Tony Goetz NV, August 2017, available at
https://cri.nbb.be/bc9/web/catalog;jsessionid=19B1D6BE8FB809A90D711A658FCCC4E1?execution=e1s2#
[297] Ibid.
[298] Ibid.
[299] Belgian corporate filing for Tony Goetz NV, December 4, 2017, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2017/12/13/17174894.pdf;
[300] Aldabra/Aldbra owns the land that the AGR refinery occupies. Articles of Association and Land Title documents
viewed by The Sentry.
[301] Belgian corporate filing for Alaxy BVBA, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s6# Belgian
corporate filing for Alaxy BVBA, May 12, 2014, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2014/05/21/14103749.pdf. For full list of company filings, see
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0478862274&liste=Liste
[302] Belgian corporate filing for Tony Goetz NV, December 4, 2017, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2017/12/13/17174894.pdf;
[303] U.N. Security Council, "Final Report," S/2009/603, pp. 37-8;
http://www.ejustice.just.fgov.be/tsv_pdf/2009/12/08/09305230.pdf
[304] Tony Goetz NV stated, "Berkenrode is currently called Alaxy. The report states that the company of Mr. Ruganyira
is registered and known with the Burundi authorities as Berkenrode BVBA SA. Mr. Ruganyira apparently changed the
name of his company in 2009 from Gold Link Burundi Trading (GLBT) to Berkenrode BVBA SA. However, the Belgian
company, called Berkenrode BVBA was incorporated in 2002, seven years earlier and is an entirely different private
limited liability company, that provides management services." Email correspondence with The Sentry, August 2018.
[305] Belgian corporate filing for CG-Vastgoed Invest, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#; Corporate
filing for CG-Vastgoed Invest, January 28, 2013, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023663.pdf. For full list of company filings, see
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2# and
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0806408906&liste=Liste
[306] Belgian corporate filing for European Guarantee Agency International, January 28, 2013, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023662.pdf. For full list of company filings, see
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#and
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0474727502&liste=Liste
[307] Belgian corporate filing for European Guarantee Agency International, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s11#
[308] Belgian corporate filing for GSS NV, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s13# Belgian corporate filing for GSS NV, January 28, 2013, available
at http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023664.pdf. For full list of company filings, see
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#and
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0459534926&liste=Liste
[309] Belgian corporate filing for GSS NV, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s13#
[310] Belgian corporate filing for Orofino, January 28, 2013, available at
http://www.ejustice.just.fgov.be/tsv_pdf/2013/02/07/13023665.pdf. For full list of company filings, see
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0892529761&liste=Liste
[311] Belgian corporate filing for Orofino, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#;
[312] Belgian corporate filing for WWG Diamonds, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s13#; Belgian corporate filing for WWG Diamonds, December 4, 2009,
available at http://www.ejustice.just.fgov.be/tsv_pdf/2009/12/08/09305214.pdf. For full list of company filings, see

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018
55 of 56

DRC-30316 0216

UNCLASSIFIED

UNCLASSIFIED                EXHIBIT 6

https://cri.nbb.be/bc9/web/catalog;jsessionid=26179AC2D0CE05F884A80FF65E140FDF?execution=e1s2#and
http://www.ejustice.just.fgov.be/cgi_tsv/tsv_rech.pl?language=fr&btw=0821135682&liste=Liste
[313] MEMORIAL: Journal Officiel du Grand-Duché de Luxembourg, December 3, 2013, p. 146496, available at
http://www.etat.lu/memorial/2013/C/Pdf/c305203C.pdf.
[314] Luxembourg corporate filing for Asteco SA, September 25, 2015, available at
http://www.etat.lu/memorial/2015/C/Html/3310/2015169389.html
[315] Belgian corporate filings for Worldwide Consulting, June 21, 2018, available at
https://cri.nbb.be/bc9/web/catalog?execution=e1s15#

The Sentry • TheSentry.org
The Golden Laundromat: The Conflict Gold Trade from
Eastern Congo to the United States and Europe
October 2018

DRC-30316 0217                        UNCLASSIFIED

UNCLASSIFIED
EXHIBIT 12

# 'Gold is a dirty business, even if I do say so myself'

standaard.be/cnt/dmf20190503_04370790

Gold

20 april 2019  Kasper Goethals

He is one of the richest people in Belgium, but many of his fellow countrymen have never heard of him. The Antwerp gold trader Alain Goetz has expanded his empire abroad, including to Uganda, but his success raises big questions. Belgian newspaper *De Standaard* went to gold mines where children work and saw documents that link Goetz to Congolese conflict gold.

A warm afternoon in November 2012. At the Hyatt Regency Hotel in Dubai, the Belgian gold trader Alain Goetz has a lunch date with the influential Ugandan businessman Barnabas Taremwa. The two discuss the creation of the first large gold refinery in Uganda. 'Goetz did not believe it was possible at that time,' says Taremwa via phone. 'But he came across as relaxed and summed up his conditions to still invest in such a project.'

The Belgian requests an exemption from taxes in Uganda for a period of at least ten years, a monopoly position for five years and a piece of land close to the airport in Entebbe. Taremwa, a brother-in-law of General Salim Saleh, who in turn is the brother of President Yoweri Museveni, believes Goetz's conditions are feasible. 'It can be done,' he says.

Then things progress rapidly. They find a piece of land, a stone's throw from the airport in Entebbe, near the president's official residence and directly opposite the United Nation's largest base in Africa. Goetz receives his tax exemption and in 2014 the construction of the 'African Gold Refinery' (AGR) starts. In a letter to Museveni from 17 March 2014, read by *De Standaard*, Goetz writes that the 'state-of-the-art refinery' could be operational within eight months. 'Uganda will be proud of this regional gold hub,' he says.

Following the Belgian's arrival, Ugandan gold exports increased by 105,000 percent in four years, from 11 kilograms to 11.6 tons. Figures from the Ugandan tax authorities, seen by Belgian newspaper *De Standaard*, show that in three and a half years, Goetz exported no less than 31.2 tons of gold, worth 1.15 billion euros. AGR expects production to increase by 30 percent this year

## Buy gold?

The market of Mpondwe, on the Ugandan border with Congo. 'How much do you want?' Asks the man behind the counter. We are in a shop opposite the police station. The salesman is already on the phone. '10 grams? 100? A kilo?' He grins. 'It can be here within

fifteen minutes, straight from the Congo, you can't get fresher than that.' On the street we hear an orchestra of buzzing noises and shouts, a familiar border soundtrack. Everyone wants to sell you something. The streets and squares are full of clucking poultry, trays of ripe mangos and bottles of palm oil. Hundreds of Congolese slowly shuffle across the border, via an Ebola screening tent. In the opposite direction, a caravan of trucks loaded with Chinese household appliances makes its way to the hungry markets of Central Africa. Youngsters on mopeds escape without checks past the whizzing batons of soldiers. The border with Congo is open. Nobody knows exactly what is going on. Nobody seems to have a plan to do anything about it.



*photo by Kristof Vadino*

More than 90 percent of Congolese gold is smuggled to neighbouring countries. 'Most of it ends in Uganda,' says Kizza, a 54-year-old gold smuggler from Kasese, in western Uganda. On the condition of anonymity - Kizza is a pseudonym – he is willing to tell his story. For more than fifteen years he has controlled a small network between the Congolese city of Butembo and the Ugandan capital Kampala. Every week his drivers pass the border at the busy market of Mpondwe. 'We don't see this as something illegal,' says Kizza seriously. 'The gold trade has always gone this way.'

No trader pays the Congolese export taxes of 5 percent. Kizza and his colleagues deliver Congolese gold to intermediaries in Kampala, who smuggle it out of Africa via aeroplanes, to Dubai. For years this was the extent of the gold trade, but the arrival of the African Gold

UNCLASSIFIED                    EXHIBIT 12

Refinery brought part of the trade above ground. 'Goetz consumes part of the market,' Kizza notes. AGR has received a mineral dealer's license from the Ugandan government and is able to legally export gold - the refinery boasts that it has 'reduced the smuggling by 70 percent'. But eight different sources with knowledge of the matter tell *De Standaard* that the import to Uganda is still largely illegal. Moreover, the authorities do not have reliable import figures.

## Clooney filmscript

A two-day OECD conference in Paris, May 2017. Goetz tells acquaintances that he is surprised to find so few allies there. The Antwerp citizen sits in a panel on responsible gold mining in the Great Lakes region, but several attendees cannot believe their eyes when they see him. Their eyebrows are raised fully when Goetz admits, from the podium, that his company in Uganda also works with 'undocumented gold' from 'small-scale dealers'.

'We were shocked when we heard it,' said George Boden, a Global Witness researcher. 'You can't get away with something like that in 2017.' Experts saw Goetz's statement as a euphemism for smuggled gold from war zones. The international anti-corruption NGOs Global Witness and The Sentry both wrote extensive research reports. In them they link AGR to gold smuggling, corruption and conflict gold. An independent expert group from the UN Security Council is also strong in its criticism. In a 2018 report, the group cites two independent sources, linked to AGR, saying that the refinery is 'reluctant to disclose the names of their suppliers because they are aware that their activities are not always legal'.

AGR denies the allegations in the NGO reports. 'When I first started reading this report, I thought it must be Mr. George Clooney's latest movie script. It is a work of fiction', Goetz responded in a press release - Clooney is a major financier of The Sentry. The Antwerp citizen dismisses the criticism as a fabrication commissioned by criminal networks who want him to leave Uganda. He refers to Bullion Refinery Ltd., among others, who were unavailable for questions from *De Standaard*. The figures from the Ugandan tax authorities show that Bullion appeared from nowhere in September last year and began exporting similar quantities of gold to Dubai.

Two sources confirmed to *De Standaard* that the British-Indian Sameer Bhimji is the man behind Bullion. He could not be reached for comment. Gold trading in Uganda was sanctioned by the UN in 2006, but according to the UN Group of Experts, the Bhimjis and other Indian families in Kampala went underground and continued the trade. 'Those are the real criminals,' Goetz says about his competitors. 'I am a businessman with the Belgian nationality, I do not live in hiding and have children. Our refinery can be seen. We are working with the UN to make the gold trade cleaner and more transparent.' When asked about the origin of the gold, AGR says that they cannot disclose the precise identity of their suppliers 'without proper consent' because it would 'violate its relationship with its suppliers

UNCLASSIFIED    EXHIBIT 12

and other parties'. The AGR states that 'none of the gold comes from Congo'. However, in a recent reply to The Sentry, on October 4, 2018, AGR said exactly the opposite: '10% of the gold AGR handles' comes directly from 'mines in Tanzania, Kenya, Uganda, Rwanda and DRC'. In his March 2014 conditions letter, to President Yoweri Museveni, Goetz also requested that 'gold traders who do not have official documents should be allowed to sell gold to this refinery [AGR], but be made to pay a penalty fee e.g. $ 500.'

## Cancer Label

Four people who met Alain Goetz individually describe him as a businessman to watch out for. 'He is an adventurer,' an acquaintance says laughing, sitting next to a luxurious hotel swimming pool of in Entebbe. In order not to damage his relationship with Goetz, the acquaintance prefers to remain anonymous. 'Alain did not come to Africa to save the world. He builds great businesses that are good for the economy and create jobs. But I have not been able to catch him exerting many scruples.' Today, Goetz and his family are at the head of a network of at least 15 companies with offices in Belgium, Luxembourg, the United Arab Emirates and Uganda. His personal fortune is estimated by the website Richest Belgians at 40 million euros, but it is suspected that in reality it is many times this amount.

For several years he has owned a villa at the edge of Dubai's artificial palm-shaped islands. In Belgian newspaper *Het Laatste Nieuws*, Dutch broker Jeroen van der Geer testified that he helped the gold trader buy his villa, the so called 'M State'. This villa is located on the most expensive piece of land ever sold in Dubai. On YouTube there is a video in which the building is displayed. It is a modern three-story palace with glass balconies and an infinity pool.

On March 12, *De Standaard* spoke to Goetz by phone during his vacation in the Maldives. With a thick Flemish accent, the gold magnate speaks frankly about his life and work in Africa. 'We are controversial in this: conflict gold does not exist,' he says. 'If a prospector is extorted somewhere in a conflict area in Congo by people walking around with weapons, then that person is in the most vulnerable situation of all people in the world. Instead of calling his product bad and putting this "cancer label" of conflict gold on it, the UN should rather encourage him, for example by giving that gold a better price.' Goetz says that all refineries in the world deal with 'so-called conflict gold' automatically. 'AGR is not more exposed than refineries in Switzerland or South Africa,' he adds.

In 2016, the UN Gold Expert Group identified gold as the main source of funding for weapons in the conflicts in Eastern Congo, which have killed an estimated 5.4 million people. There are 170 armed groups in eastern Congo, controlling 64 percent of all mines. Companies that consciously work with the militias can be sanctioned by the UN Security Council.

UNCLASSIFIED    EXHIBIT 12

# Ants in the mercury mine

An illegal gold mine in the town of Busia on the Ugandan-Kenyan border. Four boys - clearly younger than eighteen - are up to their knees in a trough of brown water. The water is full of mercury, the teenagers rub their eyes and faces with soaking wet hands. Mostly oblivious that the liquid metal is extremely toxic and can cause irreversible brain damage, especially amongst young people. Twenty meters away a huge hole lies like a crater in the earth. It is an unlicensed artisan gold mine. Dozens of boys, some of whom are minors, walk up and down like worker ants with heavy bags and wheelbarrows full of ore and stones. Everything is crushed into powder in a mill and sieved by the boys through tubs full of mercury.



*photo by Kristof Vadino*

Gold trader Emmanuel Kibirige shows us around for two days. He has broad arms and knows everyone in the business. He shows us mines in Mubende and Busia. Along the way he lobbies for the legalization and regulation of artisanal mines. Kibirige hopes that mines will remain in Ugandan hands and act as an alternative to multinationals squeezing the region. None of the large pits that we visit have all the required permits. They are tolerated by the authorities in exchange for bribes. In Busia, a police officer spends the entire day at the mine. In the end he asks for money. We drive in jeeps and vans to deep shafts. They resemble places from Hollywood movies. The roads to them are flanked by towering molehills. Men with rolled up pants and bare feet look up while shovelling. 'You have whores and bars here, everything a miner needs,' says Kibirige with a sly smile.

UNCLASSIFIED     EXHIBIT 12

'Of course, much of the gold from the artisan mines ends up in the African Gold Refinery,' says Kibirige in the car. 'That Belgian, this Mr Goetz, he exports millions of euros of gold to Dubai every week. Most of it comes from Congo, Tanzania and other countries, but the AGR also absorbs part of the national market.' Since 2010, Uganda has had its own gold rush. The national production quadrupled to more than 3 tons. In a report from a local miners' NGO, that will appear in May ), there is an upward estimate of 7 tons. In the Karamoja, Mubende and Busia regions, gold fever drove tens of thousands of children, men and women into the ground in search of the jackpot. The Dutch Research Foundation for Multinational Enterprises (SOMO) calculated that around 12,500 children work in the artisan gold mines of Uganda, accounting for 25 percent of all artisan miners.

We see hundreds of young Africans with muscular bare arms. They attack the earth in search of their own slice of the jackpot. The word is spoken with a mixture of awe and excitement here. 'Jackpot'. You may be rich tomorrow. Released from the shackles of global inequality in one fell swoop. Hundreds of women scour the waste heaps of multinational mining companies in search of a forgotten piece of ore. Patrick, a twenty-year-old boy with fine features, balances a pot of stones on his head, taken from the mine. Now he earns 10,000 Ugandan shillings per day (less than 2.5 euros). 'If I have enough, I want to become a taxi driver.' He dreams modestly, but at the bottom of the well, gold is literally fished out of the water. 'This ore is so rich, so so rich!' Kibirige crows. He holds the bucket in his hands, at the bottom lies a beautiful layer of gold dust. 'I love it,' he says excitedly.



UNCLASSIFIED                                    EXHIBIT 12

*photo by Kristof Vadino*

Alain Goetz said he also visited gold mines in the region. Rather than its role in conflicts, he is concerned about the high toll on people and nature. 'Have you ever seen an artisanal mine? Gold is a filthy business, even if I do say so myself.' When asked about his responsibility for child labour and large-scale environmental damage, he reacted irritably. 'That is the responsibility of the local government. I cannot change that; the local authorities must resolve that. We are the ones asking to improve the circumstances.'

## Suspicious transactions

Monday morning, back in Kampala. The Ugandan capital is littered with the small offices of Indians who purchase gold. With its anarchist bustle, notoriously corrupt institutions and safe distance from regional conflicts, the city is the ideal hub for smuggled gold. Expats, rich children of ministers and sanctioned smugglers frequent the same clubs on Acacia Avenue on Saturdays. 'In Kampala not a week goes by without another naive European being ripped off after hoping to buy cheap conflict gold in Africa,' says Sydney Asubo, director of the anti-corruption watchdog Financial Intelligence Authority (FIA). We are in his office on the fourth floor of the Rwenzori Towers on Lumumba Avenue. Framed 5 billion Zimbabwean dollar bills hang on the wall. They are there to keep him focused. 'Every day they remind me of what government corruption can do', says Asubo. From behind his desk, the broad-shouldered forty-year-old studies hundreds of suspicious bank transactions. In 2017, his attention was drawn to the African Gold Refinery.

For an hour Asubo talks about his frustrations with AGR. 'For months they did not respond to our urgent requests. The refinery had quickly become one of the largest exporters in the country, but had not registered with us. However, for dealers in precious minerals this is mandatory.' AGR finally responded that it is 'not a trader' and merely 'provides a service' to customers who want to refine their own gold. 'Nonsense,' Asubo responds. 'AGR exports roughly 10 tons of gold per year, how is that different from trading?' The refinery only responded when the FIA had a bank account freeze after a suspicious $5 million transaction from Dubai. 'An Italian with three fake passports wanted to use the money to pay for a load of gold from Zimbabwe intended for AGR. That was smuggling', says Asubo.

Asubo tells *De Standaard* that AGR is being investigated by the Inspectorate of Government (IGG), Uganda's main anti-corruption body, for 'money laundering,' 'suspected tax evasion,' and 'other related crimes.' In a letter from October 2017 to the IGG, Asubo insists on prosecuting AGR for non-compliance with the FIA's registration procedure.

A year and a half after the first letter from Asubo, AGR has still not registered with the FIA. 'Failure to comply with our procedures is a crime in itself and can be prosecuted immediately, but the IGG says it wants to finish its major investigation into AGR first.' Sources in government refer to a speech by the Ugandan president at the ceremonial

opening of AGR in 2017. Museveni then said that government agencies opposing the refinery would be 'tackled hard'. 'Goetz feels unassailable. And not without reason. He clearly has the protection of President Museveni himself', says investigative journalist Haggai Matsiko of the Ugandan monthly The Independent. 'Goetz has put a lot of money into its project (AGR says it has already invested $40 million, ed.). The president seems convinced that the refinery adds economic value by turning Entebbe and Kampala into a gold hub.'

AGR does not wish to disclose exactly how much profit has been made in recent years although experts estimate 55 to 110 million euros since 2015. AGR itself has indicated that it has paid the equivalent of 560,000 euros in taxes for that period - consisting mainly of taxes on the wages of around 70 employees. 'The story of Goetz is part of a bigger problem,' says George Boden of the anti-corruption NGO Global Witness. He researched the African Gold Refinery in 2017. In its consequential report Global Witness writes that senior political figures appear ultimately to call the shots. 'A small group of Belgian and Ugandan businessmen, with close ties to the President, were found to be shipping out hundreds of millions of dollars' worth of gold, apparently paying barely any taxes and failing to disclose the origins of the gold.'



*photo by Kristof Vadino*

## With Kabila in the jungle

UNCLASSIFIED    EXHIBIT 12

It doesn't seem to bother Goetz. 'We've had some problems with that, what is it called, the Financial Intelligence Authority, but that has since been solved (Asubo says this is false, ed.).' On the phone, the Belgian tells us that he is fully withdrawing from Uganda. He says that he has already sold his shares in AGR to 'a family from the Middle East'. He says he will remain involved 'as a consultant' until the end of the year. His company in Dubai retains an exclusivity contract for the gold 'for a while'. However, our questions to AGR were still answered by the Goetz Gold Legal Service in Dubai.

*De Standaard* has also learned that Goetz is now working with the Rwandan government on a new refinery there. The Belgian responds that his role in Rwanda does not go beyond that of consultant, but Africa Confidential revealed that since mid-2017 Goetz has held a license to purchase large quantities of gold. Since 2014, gold exports to Rwanda have also increased by nearly 3,000 percent, from $7 to $214 million in 2017. Dubai became Rwanda's main gold trading partner and the Rwandan finance minister promises gold exports will amount to 1.6 billion a year by 2024. But just as in the case of Uganda, the gold comes from elsewhere. Rwanda barely produces its own gold (30 kilograms in 2016, according to Africa Confidential). In its article, Africa Confidential cites two sources that say that the gold comes from South Kivu, in eastern Congo.

On the phone, 54-year-old Goetz complains that the gold trade is no longer what it once was. 'That journalists like you are calling me now ... it used to be more fun.' In the past, Goetz refers to the tumultuous 90s on the Great Lakes. He came to live in the region with his father Tony in 1987. He spent fourteen years fighting his way to the top of the international gold industry, first in Burundi and then in Goma, in eastern Congo. Goetz told French newspaper, Le Monde that at the end of the 1980s he was once ripped off 'like a rookie', but he has learned from his mistakes. He demonstrated ambition and developed a thriving business in one of the most complex political environments in the world.

'Apparently I was the first white man to visit Laurent Kabila in the jungle,' Goetz explains on the phone. Kabila would have agreed to license Goetz and his Burundian company Affimet, in exchange for $500,000 paid in instalments, for gold from Eastern Congo. It was subsequently flown out of the country with Goetz's airline Congocom. 'We operated scheduled flights and we also had an interline agreement with Sabena, which transported passengers from Bujumbura and Goma to Kigali,' Goetz testified in 2002 to the Senate's Great Lakes parliamentary research committee. He said he did not engage in the arms trade. 'If soldiers did fly with us, they naturally had their weapons with them. But it didn't go beyond that. By the way, we didn't agree that they took those weapons, but we couldn't do much about it.'

Goetz thereby admits that he has supported Laurent Kabila's rebellion against President Mobutu, which was detrimental in the start of the bloody war in eastern Congo. Even without trading arms, Goetz knew that he supported an armed uprising. Kabila had not

UNCLASSIFIED

EXHIBIT 12

been elected or sworn in and therefore did not have a democratic mandate to dispense licenses on raw materials.

Goetz's role in the political upheaval cannot be underestimated. This is clear from a diplomatic cable sent on 2 April 1997, retrieved by De Standaard from the Wikileaks database. In it, the American ambassador lists the members of the incoming government of Laurent Kabila. Alain's father Tony Goetz is in the short list: 'Belgian citizen, finances Alliance of Democratic Forces [from Kabila] through the Affimet company,' it says.

*De Standaard saw hundreds of pages of emails, letters and court documents. In Kampala and Entebbe we spoke with two former employees of the African Gold Refinery, five people who know Alain Goetz personally, four employees of government departments, independent lawyers, consultants in the gold sector and an important gold smuggler. We also spoke with various researchers from NGOs and universities, which unfortunately could not all be quoted. Journalists Olivia Kortas from Germany and Haggai Matsiko from Uganda contributed to this investigation. Alain Goetz and the African Gold Refinery responded quickly to our questions. Their answers were processed as much as possible in the article. AGR says it does not trade in conflict gold (and says there is no such thing as conflict gold). AGR indicates that it has already refused suspicious suppliers. 'It is not true that AGR and Mr. Goetz are involved in one way or another in the illegal smuggling of gold from Congo or another jurisdiction. AGR and Mr. Goetz are not involved in illegal activity of any kind,' AGR writes. AGR says it has exported 28.1 tons of gold since 2015, more than 3 tons less than the documents from the Ugandan tax authorities show us. Just like the information about the origin of gold, those figures are not in accordance with previous responses and communication from AGR. AGR refuses to share the identity of suppliers with De Standaard. The refinery says it is committed 'to share this data in accordance with the certification mechanism of the International Conference on the Great Lakes Region and OECD guidelines and procedures.' AGR says it has built in sufficient mechanisms to prevent child labor and human rights violations in its supply chain.*

This website requires your consent to cookies. Cookies are placed on your device to allow this website to work to its optimum. To provide the best possible service, we may collect information on site performance and use to help personalise your contact with us. By clicking 'I Understand' you are agreeing to the placement of cookies on your device.

Further use of our site shall be considered as consent. You may view our privacy policy and cookie policy here for more information.

I consent to the use of cookies cookie policy

I Understand

# AFRICA CONFIDENTIAL

Reporting Africa Since 1960 22 April 2020

africa confidential

about

*Africa Confidential* is one of the longest-established specialist publications on Africa, with a considerable reputation for being first with in-depth news and analysis on significant political, economic and security developments across the continent.

Our track record owes much to our comprehensive network of local correspondents, and the connections we've built up throughout Africa since we started publishing back in 1960.

Why '*confidential*'?

This continent-wide, on-the-ground coverage enables us to identify and monitor upcoming issues long *before* they are picked up by the general media – and analyse their real significance for our readers.

What's more, all our contributors write for us on the basis of strict anonymity, a principle that was established from the outset in 1960 to ensure writers' personal safety in the turbulent, early years of post-colonial African independence. Hence the newsletter's title.

Who reads *Africa Confidential*?

Today, *Africa Confidential* is read fortnightly by a wide range of institutions and individuals around the world, all of them united in their need for timely, accurate and incisive analysis of contemporary African developments.

Our subscribers include:

- **agencies of national governments** – including defense, national intelligence, foreign affairs and the diplomatic corps
- **risk advisory firms** working in areas as varied as political, market & reputational risk, due diligence, anti-corruption (FCPA and UK Anti-Bribery Act) and KYC (Know Your Customer)
- **multilateral institutions** – including the IMF/World Bank, European Union and African Union
- **universities and other academic institutions**, in their departments of African Affairs, International Relations, International Development, and others

UNCLASSIFIED    EXHIBIT 20

- a wide range of **international NGOs and think tanks** working in the areas of humanitarian affairs, relief aid, anti-corruption/good governance and economic development
- **multinational corporations and companies** across a wide variety of commercial sectors, from mining, energy and telecommunications, to financial markets and automotive

To preserve our readers' information advantage, *Africa Confidential* is only available by subscription. You'll not find it on high street newsstands or other public outlets. Moreover, none of our commentary, news and analysis is syndicated to the international news services, re-sold to any of the web-based information aggregators like Reuters or LexisNexis, or aggregated on free sites like Google News.

So when you subscribe to *Africa Confidential*, you can be sure of receiving original, timely reporting and insightful analysis – actionable intelligence not available from any other media source.

That's why, more than 50 years after its founding, *Africa Confidential* remains at the forefront of reporting on the continent's key political, economic and security developments.

Related Links

The History of Africa Confidential

Readers' comments about Africa Confidential

---

- Copyright © Africa Confidential 2020

4/24/2020      Court convicts Belgian gold refinery Tony Goetz of money laundering - Reuters

UNCLASSIFIED      EXHIBIT 21

 REUTERS

**WORLD NEWS**
FEBRUARY 5, 2020 / 12:35 PM / 3 MONTHS AGO

# Court convicts Belgian gold refinery Tony Goetz of money laundering



BRUSSELS/LONDON (Reuters) - Two brothers from a Belgian gold refinery have been found guilty by a court in Antwerp of money laundering and fraud and given 18-month suspended jail sentences, a court ruling showed.

FILE PHOTO: Alain Goetz, CEO of AGR (African Gold Refinery) speaks during an interview with Reuters at a refinery in Entebbe, Uganda, October 4, 2018. REUTERS/Baz Ratner/File Photo

UNCLASSIFIED                                EXHIBIT 21

The judgment comes as investigators and states increase pressure on refineries to make sure illegally mined or traded gold does not enter the market.

It also increases the focus on Alain Goetz, one of the brothers sentenced, who established a refinery in Uganda that officials there say they are investigating for accepting gold from Venezuela that may have been smuggled. The refinery denies wrongdoing.

The court ruling said Alain and Sylvain Goetz set up a fraudulent system in 2010 and 2011 for customers to sell gold anonymously to the Tony Goetz refinery in Antwerp for cash, creating the basis for black-market trade.

The refinery registered gold traders as private customers and split large purchases to circumvent limits on cash transactions, and accepted metal taken by armed robbers in the Antwerp gold quarter, it said.

Tony Goetz paid more than 1 billion euros ($1.1 billion) in cash for gold during 2010 and 2011 and created around 9.2 million euros in illegal capital gains, the ruling, issued on Jan. 30, said.

The court fined the refinery 99,000 euros.

Both the jail terms and the fine were suspended, meaning they will not take effect unless the refinery or brothers re-offend.

Sylvain Goetz runs the refinery and is the eldest son of its founder.

"Tony Goetz contests these facts and upholds that the company did not violate any law," the refinery said in a statement, adding that it was considering whether to appeal.

Tony Goetz "does not cooperate in any way in the illegal trade of gold or other precious metals and conducts its activities in accordance with all applicable rules and regulations," it said, adding that since 2012 it has not accepted any cash payments.

It also said Alain Goetz was no longer connected with the company and it does not accept gold from Venezuela or Uganda.

Alain Goetz said he had resigned as a director and sold his shares around 2014. He also said he had stepped down from management and sold his shares in the Ugandan refinery.

Alain Goetz said the ruling was "erroneous" and paying for gold in cash was common and legal during 2010 and 2011.

"Neither Alain Goetz nor Tony Goetz NV breached any anti-money laundering regulations or other legislation in force at that time," he said in a statement to Reuters.

Around 25 customers of Tony Goetz were also found guilty by the court for participation in the system, with some given suspended jail sentences of up to nine months.

Reporting by Marine Strauss, Peter Hobson and David Lewis; Editing by Veronica Brown and David Evans

*Our Standards:    The Thomson Reuters Trust Principles.*

UNCLASSIFIED

EXHIBIT 24

United Nations

**S**/2017/672



**Security Council**

Distr.: General
10 August 2017

Original: English

---

### Letter dated 4 August 2017 from the Group of Experts extended pursuant to Security Council resolution 2293 (2016) addressed to the President of the Security Council

The members of the Group of Experts established pursuant to Security Council resolution 2293 (2016) have the honour to transmit herewith, in accordance with paragraph 5 of Security Council resolution 2360 (2017), the final report on their work.

The report was provided to the Security Council Committee established pursuant to resolution 1533 (2004) on 30 June 2016 and was considered by the Committee on 21 July 2016.

The Group would appreciate it if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Zobel **Behalal**
Acting Coordinator
Group of Experts on the Democratic Republic of the Congo
extended pursuant to Security Council resolution 2293 (2016)

(*Signed*) Roberto **Sollazzo**
Expert

(*Signed*) Christoph **Vogel**
Expert

(*Signed*) David **Zounmenou**
Expert


UNCLASSIFIED

Please recycle 

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

# Final report of the Group of Experts on the Democratic Republic of the Congo

*Summary*

The most significant event for the Group of Experts during the current mandate was the assassination of two of its members, Michael Sharp, Coordinator and armed groups expert, and Zaida Catalán, humanitarian expert. This unprecedented event constitutes a deliberate attack against the Security Council and impacted the Group's ability to fully implement its fieldwork agenda for the present report. More broadly, this also speaks to the concerning security situation prevailing in the Democratic Republic of the Congo: while the Kasais have witnessed a stark escalation of violence, other areas remain affected by chronic levels of insecurity.

Since its last report, the Group noted fewer cases of election-related violence across the country, notwithstanding several cases of interference by armed groups in voter registration.

Armed groups, such as the Forces démocratiques de libération du Rwanda (FDLR), the Conseil national pour le renouveau et la démocratie, the Allied Democratic Forces and the Forces républicaines du Burundi continue to represent threats to peace and security in the Democratic Republic of the Congo. However, there is a changing dynamic of conflict and armed mobilization in the Democratic Republic of the Congo, reflected by the previously reported shift towards a further fragmentation of armed groups operating in a more decentralized while heavily networked manner.

In this context, foreign and local armed groups are increasingly interconnected, which also impacts on the patterns of violence. These linkages can be partially explained by the fact that foreign armed groups have evolved over time and have begun to feature Congolese nationals in their ranks, sometimes even in leadership positions. The Group also documented instances of collaboration between elements of the Forces armées de la République démocratique du Congo (FARDC) and armed groups.

Concerning natural resources, the implementation of mineral traceability in the Democratic Republic of the Congo has considerably reduced instances of armed groups directly benefiting from the exploitation and trade of tin, tantalum and tungsten. In addition, opportunities for indirect benefits from such minerals are decreasing. The Group found that the ITRI Ltd Tin Supply Chain initiative traceability system — while well intentioned and designed — has shortcomings in its implementation, enabling different actors to intentionally or inadvertently facilitate smuggling. The Group also documented several breaches of the chain of custody for mineral trade in North Kivu Province as well as the ongoing sale of tags on the black market in the Democratic Republic of the Congo.

The gold sector continues to suffer from the lack of a traceability system. Consequently, artisanally sourced gold from conflict-affected areas can still be exported to international markets through smuggling, involving illicit financial flows. The Group also found that a senior FARDC officer is involved in gold exploitation. In addition, International Conference on the Great Lakes Region certificates are being used in a fraudulent manner to export gold to Dubai, the main recipient of artisanally sourced gold from the Democratic Republic of the Congo. Kampala remains the main transit hub for gold smuggled out of the Democratic Republic of the Congo. The Group found that rules and procedures could be improved to allow airlines and the Democratic Republic of the Congo as well as

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

transit and recipient countries to more efficiently tackle smuggling by way of hand-carry gold.

The Group observed violations of the arms embargo, both within the Democratic Republic of the Congo as well as in the frame of cross-border dynamics. A network of Congolese and Burundian nationals, including elements of the Forces de défense nationale (FDN) of Burundi, was involved in arms trafficking in Uvira, South Kivu Province. The Group documented further violations of the arms embargo involving FDN and FDLR.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

# Contents

| | | Page |
|---|---|---|
| I. | Introduction | 5 |
| II. | Armed groups | 6 |
| | A. Forces démocratiques de libération du Rwanda | 7 |
| | B. Conseil national pour le renouveau et la démocratie | 9 |
| | C. Nyatura | 11 |
| | D. Forces républicaines du Burundi | 12 |
| | E. Armed mobilization in the Grand Nord area | 13 |
| | F. Former 23 March movement | 16 |
| | G. Cases of participants in disarmament, demobilization and reintegration returning to Mai Mai groups | 17 |
| III. | Natural resources | 18 |
| | A. Tin, tantalum and tungsten | 18 |
| | B. Gold | 22 |
| | C. Charcoal | 27 |
| IV. | Arms | 29 |
| | A. Violations of the arms embargo | 29 |
| | B. Tracing efforts | 31 |
| V. | Violations of international humanitarian law | 32 |
| | A. Murder of two members of the Group of Experts | 32 |
| | B. Child rape in the Kavumu area | 33 |
| | C. Attack on the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo in Butembo | 34 |
| VI. | Recommendations | 34 |
| Annexes[*] | | |

_____

[*] The annexes are being circulated in the language of submission only and without formal editing.

UNCLASSIFIED    EXHIBIT 24

S/2017/672

## I. Introduction

1.    This final report of the Group of Experts on the Democratic Republic of the Congo is being submitted pursuant to paragraph 9 of Security Council resolution 2293 (2016). The Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo, after consultations following the tragic murder of two members of the Group of Experts, wrote to the Security Council noting the need to extend by a period of two months the deadline stipulated in resolution 2293 (2016) for the submission of this report to the Security Council. Subsequently, in resolution 2360 (2017), the Security Council extended the deadline for the submission of the report to 15 August 2017.

2.    Pursuant to paragraph 11 of Security Council resolution 2293 (2016), as reiterated in paragraph 8 of resolution 2360 (2017), the Group continued to exchange information with the Panels of Experts on the Central African Republic, South Sudan and the Sudan.

### Methodology

3.    The Group used the evidentiary standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). The Group based its findings on documents and, wherever possible, on first-hand, on-site observations by the experts themselves. When this was not possible, the Group corroborated information by using at least three independent and reliable sources.

4.    Given the nature of the conflict in the Democratic Republic of the Congo, there are few documents that provide definitive proof of arms transfers, recruitment, command responsibility for grave human rights abuses and the illegal exploitation of natural resources. The Group has therefore relied on eyewitness testimony from members of local communities, ex-combatants and current members of armed groups. The Group has also considered expert testimony by government officials and military officers from the Great Lakes region and United Nations sources.

### Cooperation

5.    The Group takes note of the support received from the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO). It welcomes the efforts undertaken by the Mission to search for and attempt to rescue the two members of the Group of Experts.

6.    During the period under review, the Group met with government officials, private sector actors and organizations in seven countries (see annex 1). The Group sent 77 requests for information to Governments and companies, and received varying levels of compliance with its requests (see annex 2). The present report covers investigations up to 15 June 2017. The lack of cooperation by some Member States slowed down the Group's efforts to trace arms and ammunition and hindered its investigations on the implementation of individual sanctions.

### Implementation of recommendations of the Group's midterm report

7.    In its midterm report, the Group made five recommendations on its findings about arms and natural resources to the Government of the Democratic Republic of the Congo and regional States (S/2016/1102, paras. 119-121). The Group is concerned that none of those recommendations has been implemented to date.

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

**Challenges to the implementation of the asset freeze**

8.    The Group provided technical assistance to banking and microcredit institutions in the Democratic Republic of the Congo on the implementation of United Nations sanctions measures. In this regard, the Group observed a general lack of proper communication and procedures concerning United Nations sanctions, in particular from the Central Bank of the Democratic Republic of the Congo to the local institutions. This resulted in improper action and technical violations of the sanctions regime. In addition, there was a lack of a national legal framework allowing banks and financial institutions to freeze the assets detained by sanctioned individuals and entities without being exposed to litigation procedures.

**Reporting obligations and mandate duration**

9.    The Group believes that the monthly updates are a useful channel for regular communication with the Security Council Committee established pursuant to resolution 1533 (2004), for which the Group shall maintain a regular presence in the field.

10.   Furthermore, since March 2017, the Group is subject to a special security regime, which is more stringent than before. While the Group appreciates the attention to the security of its members, it also wishes to highlight that the resulting procedures have an impact on the execution of its field investigations. For this reason, the Group would deem it appropriate that the next resolution foresee a longer mandate (see para. 182 (b) (iii)).

## II.   Armed groups

11.   During the period under review, the Group focused its investigations on the Forces démocratiques de libération du Rwanda (FDLR),[1] the Conseil national pour le renouveau et la démocratie (CNRD) and their local Nyatura allies. The Group also investigated the presence of Burundian armed groups, in particular the Forces républicaines du Burundi (FOREBU), and the situation in the Grand Nord including the Allied Democratic Forces (ADF) and Mai Mai groups. In addition, this section includes reports on the return of some elements of the ex-23 March movement (M23) and challenges linked to the reintegration of recently demobilized ex-combatants.

12.   In North Kivu Province, during 2017, there was continued insecurity and recurrent fighting involving several interconnected armed groups across Rutshuru and Masisi territories. This was most notable in the Bashali-Mokoto (Masisi territory) and Bwito (Rutshuru territory) chiefdoms (see annex 3). As previously reported by the Group (see S/2016/466, paras. 6-18; and S/2016/1102, paras. 8-30), the presence of two armed groups originating in Rwanda, FDLR and CNRD, remained a key enabler for the continuing insecurity. The Group's investigations suggested that FDLR remained the stronger of the two and prevailed in terms of alliances with local armed groups, in particular Nyatura factions. CNRD however benefited from both the occasional collaboration with elements of the Forces armées de la République démocratique du Congo (FARDC) as well as the latter's current focus on fighting FDLR (see paras. 19-20).

---

[1] Unless otherwise specified, "FDLR" refers to the FDLR-FOCA (Forces combattantes Abacunguzi), as opposed to other splinter groups, such as the Rassemblement pour l'unité et la démocratie-Urunana or CNRD.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

13.   The Group noted a similar trend in the Grand Nord area where various Mai Mai groups have emerged during the period of reporting. While their names are new, they draw upon longer-term dynamics of armed mobilization. In addition, their activities are interconnected and in reaction to recent violence, including that of ADF and local militia networks. In South Kivu Province, the main networks thrive around and against Burundian armed groups, such as FOREBU. In response to these increasingly networked conflict settings, the Group organized its findings on armed groups according to the different connecting logics in the following subsections.

## A.    Forces démocratiques de libération du Rwanda

14.   The Forces démocratiques de libération du Rwanda are a foreign armed group emanating from the former Forces armées rwandaises (ex-FAR) and operating in the Democratic Republic of the Congo since 2000. While weakened by FARDC-led Sukola II operations (see S/2016/466, paras. 10-15) and the breakaway of CNRD (see S/2016/1102, paras. 10-13), FDLR still showed resilience. This was mainly due to ongoing recruitment, alliances with local armed groups, the ability to generate revenues and its internal restructuring, including the dissolution of the Apollo sector and the Comete subsector (whose majority had defected to CNRD; see annex 4), making Sinai and Canaan the remaining sectors of FDLR (see annex 5).

15.   Since the Group's last report, the FDLR senior leadership has not undergone many changes (see S/2016/1102, annex 5). In October 2016, the FDLR command decided to divide its headquarters between two different locations (see annex 6). By mid-2017, FDLR maintained no relevant positions outside Rutshuru territory. FDLR also lost two senior leaders: on 23 October 2016 "Colonel" Joseph Habyarimana (also known as Sophonie Mucebo), the FDLR head of military intelligence, was arrested by FARDC. On 12 November 2016, Mathias Gatabazi (also known as Enock Dusabe), the FDLR political commissioner, was captured by local CNRD allies and handed over to FARDC.

### Alliances and recruitment

16.   Nyatura ex-combatants as well as FDLR and CNRD members told the Group that FDLR was able to recuperate allies erstwhile lost to CNRD. While local Nyatura groups (see S/2016/1102, paras. 44-52) were divided over siding with either FDLR or CNRD after the split, the Group observed a clear shift towards FDLR again in 2017. Internal FDLR documents seen by the Group contained instructions to FDLR units, most recently in November 2016, to cultivate relations with local authorities and intensify collaboration with local allies. Based on convergent testimony by FDLR ex-combatants, the Group believes these "local allies" to be Nyatura groups (see annex 7). FDLR leaders also discussed the possibility of reviving an alliance with the Rassemblement pour l'unité et la démocratie (RUD)-Urunana (see S/2011/738, paras. 128-134). In September 2016, a decision was taken "to welcome back CNRD defectors" (see annex 8).

17.   Combatants, military sources and local populations told the Group that FDLR continues to entertain cordial relations with the Alliance des patriotes pour un Congo libre et souverain (APCLS), a Mai Mai group led by "General" Janvier Karairi Buingo (see S/2011/738, paras. 219-237). FDLR also managed to foster novel coalitions such as the Alliance des patriotes pour la restauration de la démocratie au Congo (APRDC) and the Collectif des mouvements pour le changement (CMC) (see annex 9). Sources close to FDLR told the Group that this is consistent with previous attempts by FDLR to blend itself into local armed groups

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

(see S/2016/466, paras. 92-99).[2] Nyatura factions that adhere to these coalitions were involved in attacks in April and May 2017. The Group notes that both FDLR and CMC communiqués can be found at intabaza.com (see paras. 24-26).

18.   The Group collected evidence that FDLR continued to recruit combatants, including from Rwandan refugees but also among the Congolese Hutu population and in some cases from Rwandan refugee camps outside the Democratic Republic of the Congo (see annex 10). At the same time, defections remained a serious challenge to FDLR.

**Fighting against CNRD and FARDC**

19.   Internal documents shed light on how FDLR envisaged confronting CNRD, including the option of setting up a parallel command in South Kivu Province, capturing CNRD combatants as well as through propaganda (see annex 11), for instance through a communiqué signed by the acting FDLR president (see annex 12). Ex-combatants told the Group that, after a temporary lull, FDLR-CNRD clashes resumed from April 2017, with heavy participation of certain Nyatura factions. After intense combats, CNRD left its positions around the localities of Katsiru and around Mweso to almost completely retreat to the north-west into Walikale territory, as confirmed by local authorities and other sources to the Group.

20.   On the other side of the Virunga National Park, Sukola II operations have started targeting FDLR again since mid-April 2017. United Nations and military sources confirmed that FARDC progressed towards the FDLR heartland north of Nyiragongo and Nyamulagira volcanoes in an attempt to target the senior leadership as well as the headquarters of the FDLR Commando de recherche et d'action en profondeur (CRAP) in this area.[3] While the senior leadership of FDLR was concentrated in a small area by mid-2017, they still retained bases in different, sometimes hardly accessible positions, further complicating the task of dismantling them.

**Local supply and support**

21.   Supply and support are of vital importance to FDLR, especially since the onset of Sukola II operations (see S/2016/466, paras. 10-15; and S/2016/1102, paras. 14-17). As previously reported, there is no shortage of weapons in most FDLR units but ammunition remained a challenge. FDLR ex-combatants told the Group that usually AK-47 rounds cost around CGF 200 and uniforms cost US$ 10-20 when they buy them from individual FARDC soldiers, consistent with previously reported patterns (see S/2014/428, para. 54; S/2015/19, para. 71; and para. 159 below).[4] This can also take the form of barter, for example when FDLR sells marijuana or agricultural goods against ammunition.

22.   The Group noted that FDLR maintained their system of "non-conventional logistics", with certain units or parts of units tasked to generate revenues in cash and kind through agriculture, fishing, charcoal and timber as well as trade and

---

[2] The Alliance des patriotes pour la restauration de la démocratie au Congo published a video displaying CMC combatants on its Twitter feed at https://twitter.com/aprdcongo/status /834982505837117442 (last accessed on 15 June 2017).

[3] This concerns acting president "Major General" Gaston Iyamuremye (also known as Victor Byiringiro or Rumuli, CDi 003), FOCA commander "Lieutenant General" Sylvestre Mudacumura (also known as Bernard Mupenzi or Pharaoh, CDi 012), and his deputy, "Brigadier General" Pacifique Ntawunguka (also known as Omega Israel, CDi 024). "Colonel" Protogène Ruvugayimikore (also known as Gaby Ruhinda) commands the CRAP units.

[4] On 15 June 2017, the official exchange rate between Congolese francs (CGF) and United States dollars (US$) was: 1 US$ to 1,400 CGF.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

taxation (see S/2016/466, annex 4). Ex-combatants told the Group about a unit called La vie ("life") whose mission was to negotiate the illicit taxes local populations are required to pay (see paras. 133–142).

23.    The unit in question was led by an individual known as "Kanyoni" and had around 30 combatants. La vie operates near FARDC positions in Kagando and Bambu. Other than taxation, FDLR units also rent or occupy arable land to engage in their own agriculture. Ex-combatants told the Group that standard units do "non-conventional logistics", while the CRAP special forces are alimented by the former and focus on operations only.

**External support networks**

24.    During the period under review, the Group observed that the websites intabaza.com, umucunguzi.com (Radio Umucunguzi), urugaga.org and rwacu.org (the Rwandan cultural society — RCS) promoted the ideology and the activities of FDLR and possibly raised money on their behalf via donations on a PayPal account of RCS, to which all the aforementioned websites redirected (see annex 13). The Group sent a request for information to PayPal Holdings, Inc. and is awaiting a reply.

25.    The websites are all hosted in the Netherlands under the IP address 188.121.43.37 and administered by Ignace Ntirushwamaboko (also known as Darius "Sunray" Murinzi), residing in Canada. On 28 February 2014, Iyamuremye (also the acting president of the Front commun pour la libération du Rwanda (FCLR)-Ubumwe) designated Ntirushwamaboko as the FCLR representative for North America.[5] The Group found that Ntirushwamaboko published on the FCLR Facebook page until March 2016 and posted FDLR declarations on his own Facebook page until October 2016.

26.    Supporting FDLR, an entity listed by the Committee established pursuant to resolution 1533 (2004), is a sanctionable offence under paragraph 7 (g) of Security Council resolution 2293 (2016). The Group sent requests for further information to the concerned parties, in particular regarding the money flows associated with the aforementioned websites to ascertain if those flows benefited FDLR, either directly or indirectly, and is awaiting their response.

## B.    Conseil national pour le renouveau et la démocratie

27.    The Conseil national pour le renouveau et la démocratie is a foreign armed group that emerged following a split within FDLR (see S/2016/1102, para. 23). Since the Group's last report, CNRD has been weakened through arrests, defections, and the loss of most of its allies in North Kivu Province, with the exception of occasional FARDC collaboration. The Group collected new evidence regarding the split and its reverberations on the Rwandan refugee populations.

**Leadership and locations**

28.    While "Colonel" Laurent Ndagijimana (also known as Wilson Irategeka or Lumbago) remains its leader, CNRD lost three senior officers: sanctioned individual and operations commander "Colonel" Félicien Nzanzubukire (also known as Fred Irakeza, CDi.023) and South Kivu sector commander "Colonel" Anastase Munyaneza (also known as Job Kuramba) were arrested by Congolese security services in Makobola and Uvira, respectively. Nzanzubukire was arrested on his

---

[5] See http://www.therwandan.com/ki/2014/02/28/ibyemezo-byinama-yihuriro-fclr-ubumwe-yateranye-kuwa-25-gashyantare-2014/ (last accessed on 15 June 2017).

UNCLASSIFIED                                    EXHIBIT 24

way to a cash transfer agency with a fake Congolese electoral card under the name "Justin Makila" (see annex 14). "Colonel" Wellars Nsengiyumva (also known as Come) surrendered to MONUSCO and was repatriated to Rwanda.

29.  "Colonel" Harerimana Hamada (also known as Mulamba Junior) remains the overall military commander (see annex 15). At the time of writing, the Group estimated the CNRD areas of influence in North Kivu Province to be reduced to the north of the Mweso-Pinga road, where Ndagijimana is located alongside "Colonel" Antoine Hakizimana (also known as Jeva) and "Lt. Colonel" Marc Nzeyimana (also known as Masambaka). In South Kivu Province, the CNRD headquarters is located near the town of Hewa Bora, from where it deploys mainly within Fizi territory.

**Collaboration between CNRD and elements of FARDC**

30.  Three local sources in Bwito chiefdom told the Group they would regularly see CNRD and FARDC officers having meetings. FARDC officers told the Group that this was due to the high-quality intelligence they could gather from CNRD officers to help capture Mudacumura. CNRD also cohabitated with FARDC elements at revenue-generating checkpoints, for instance near the localities of Katsiru, Bweru and Kashuga.

31.  In September 2016, CNRD supported FARDC operations aimed at capturing senior FDLR leaders near Kamondoka and Kiyeye. In October 2016, the Group witnessed the friendly handover from CNRD to FARDC in Katsiru. Three FARDC elements told the Group that they were "here with CNRD now". Civilians confirmed that as FARDC reached Katsiru, CNRD began preparing for an orderly retreat to take up surrounding positions.

32.  The Group could not establish whether and to what extent this collaboration was sanctioned or known to the FARDC hierarchy. The Group sent an official communication to the Government of the Democratic Republic of the Congo in June 2017 but has not yet received a reply.

**Update on the FDLR/CNRD split and the refugee situation**

33.  In its previous report, the Group analysed the split of CNRD from FDLR (see S/2016/1102, paras. 10-13). During the past months, the Group collected further evidence and testimony as to the reasons for the split. Senior FDLR members told the Group that the divergences over the technicalities of a biometric refugee census were just the straw that broke the camel's back, with a separation having been foreseeable for at least one or two years before CNRD was created in May 2016 (see annex 16).

34.  Two ex-FDLR officers told the Group that, in order to motivate combatants to join CNRD, Ndagijimana initially paid salaries to combatants, offered bonuses for weapons they brought along and used politically charged arguments, including the prospect of a "dignified return" to Rwanda. Operational dynamics just after the split reinforced this narrative as FDLR sustained several months of significant pressure from FARDC as well as attacks from Nduma défense du Congo-Rénové (NDC-R) and certain Mai Mai Mazembe factions.

35.  Changes in the political organization of the Rwandan refugees in North Kivu Province also mirror the schism between FDLR and CNRD. Hitherto unified within the Societé civile des Rwandais réfugiés en RDC (SOCIRWA), parts of the refugee community created the Societé civile internationale des réfugiés rwandais (SOCIR) in January 2017, led by Anastase Kamuhanda, who is also the CNRD humanitarian commissioner (see S/2016/1102, annex 16). During the period under review, the

DRC-30316 0354
UNCLASSIFIED

S/2017/672

Group observed that SOCIRWA maintained a traditional pro-FDLR stance while SOCIR leans towards CNRD (see annex 17).

36.  Several ex-combatants told the Group that the refugees for the most part decided to support FDLR or CNRD on the basis of family ties or geographical origins. Sources close to the refugee community told the Group that a slight majority of refugees remained organized in SOCIRWA. Early in 2017, the Office of the United Nations High Commissioner for Refugees (UNHCR) estimated the number of Rwandan refugees in the Democratic Republic of the Congo at 245,000. The Group was not able to independently confirm their number.

## C.  Nyatura

37.  As previously reported, at least a dozen smaller, local armed groups also operated in Bashali and Bwito (see annex 18). The armed groups in question use the name Nyatura, an umbrella term for most Congolese Hutu militias (see S/2016/1102, paras. 44-47). While the Group identified around a dozen factions, it focused its investigations on the three strongest, led by "Colonel" Kasongo Kalamo, "Colonel" Ndaruhutse Kamanzi, also known as Domi, and "Lt. Colonel" Muhawenimana Bunombe, also known as John Love.

38.  The Group believes that, during the period under review, certain Nyatura factions committed acts sanctionable under Security Council resolution 2293 (2016). For example, Kasongo continued to recruit civilians into his group, and John Love continued to buy ammunition from individual State security agents. While the Group had previously reported that Nyatura factions were divided between FDLR and CNRD after the split in May 2016 (see S/2016/1102, para. 44), five ex-combatants told the Group that most of them allied to FDLR again, this being a sanctionable offence.

39.  Both in northern Bwito, where intercommunal fighting continued (see S/2016/1102, paras. 103-107) and around the CNRD-FDLR frontlines between Bashali and southern Bwito, Nyatura often took a frontline role, increasing the firepower of the more organized FDLR and CNRD that provide training, supplies and ideology.

### Nyatura Kasongo/Groupe de sécurité

40.  The Groupe de sécurité, or the Forces de défense des droits de l'homme, is a Nyatura group led by Kasongo. Local authorities in Bashali-Mokoto told the Group that Kasongo continued to operate in their chiefdom in 2017, with strongholds around Mweso and Kashuga. Nyatura ex-combatants told the Group that other Nyatura leaders, including Ngwiti Bahati and "Noheri", operate under his influence. According to three Nyatura ex-combatants, Kasongo continued to recruit among the local Hutu population, despite his commitment to the Bashali demobilization ceremony organized in 2016 (see S/2016/1102, paras. 51-52). The Group notes that obstructing demobilization is a sanctionable offence.

41.  Kasongo's group is made up of approximately 100 to 200 combatants, not all of them carrying individual weapons. Local State officials and civil society actors told the Group that, in Mweso and Kashuga, Kasongo is able to detain people and organize trials in collaboration with individual officers of the Congolese national police and other State institutions. In March 2017, Kasongo terminated a short-lived alliance with CNRD over a row regarding taxation and Kasongo's perception that CNRD did not live up to its commitment to return to Rwanda but instead sought contacts with returning ex-M23. In May 2017, Kasongo's group drove CNRD to the north of the Mweso-Kashuga road.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Nyatura Domi and Nyatura John Love**

42.  As previously reported (S/2016/1102, paras. 48-50), Domi and John Love remain close allies of FDLR in Bwito chiefdom. Domi is a former member of the Coalition des patriotes résistants congolais who created his own armed group in Bukombo grouping (see S/2008/773, paras. 114-120). Nyatura factions led by Nzayi Kanyange and "Jean-Marie" respond to him. FDLR documents suggest that, since 2014, Domi and John Love have a coordination structure involving "General" Benjamin Ndikuyeze, whom the Group identifies as the head of APRDC (see annex 19 and para. 17 above).

43.  Local authorities and sources close to FDLR told the Group that Nyatura Domi — with support from FDLR — attacked a FARDC position east of Kitchanga on 8 May 2017. The operation was aimed at liberating detained combatants and seizing ammunition. Assaulting with considerable firepower, they killed four FARDC soldiers and freed 12 prisoners, including a FDLR officer, according to witnesses that spoke to the Group. Ex-combatants emphasized that Nyatura John Love continued to work closely with FDLR "Major" Evariste Ndayishimiye (alias Gouverneur Kizito). Two ex-combatants of a Nyatura John Love unit led by "Captain Kasigwa" also told the Group they continued to collaborate with FDLR, for training, and with individual policemen to buy ammunition for CGF 200 per round.

44.  During the reporting period, Nyatura Domi maintained strongholds between Bukombo and Katsiru while Nyatura John Love had their headquarters in Muriki, exerting influence west and north up to Nyanzale and Kibirizi, respectively. Customary authorities in Bwito and sources close to FDLR told the Group that Nyatura Domi imposed taxes on approximately 3,000 households, including internally displaced persons from the camps near Kitchanga: CGF 1,000 monthly for the *lala salama* ("sleep peacefully") tax and a quarterly harvest tax of $5 per household. The Group estimates that these taxes, if collected without interruption, could yield up to an annual maximum of $40,000 to Nyatura Domi and its allies. Representatives of the internally displaced persons confirmed this pattern.

### D.  Forces républicaines du Burundi

45.  The Group had previously reported on Burundian armed groups, focusing on the Forces nationales de libération (FNL)-Nzabampema (see S/2016/466, paras. 42-45), and the Résistance pour un Etat de droit (RED)-Tabara, also known as FRONABU-Tabara (see S/2016/466, paras. 33-41; see annex 20 for both). During the period under review, the Group observed further mobilization of Burundian armed groups on the territory of the Democratic Republic of the Congo as well as interference by the Forces de défense nationale (FDN) (see paras. 148-150). FOREBU, which has no particular ideology besides opposing the Government of Burundi, emerged as the most relevant Burundian armed group operating in the Democratic Republic of the Congo by mid-2017.

**Leadership and locations**

46.  Since December 2015, FOREBU has been under the command of Colonel Edouard Nshimirimana, a FDN defector, and his second-in-command "Colonel" Abdu Rugwe. It is mainly active in Uvira and Fizi territories. FOREBU headquarters used to be located in the hills above Lusenda refugee camp, where UNHCR had registered over 26,000 Burundians by February 2017. During May and June, sources told the Group that significant elements of FOREBU had relocated towards Kiriama, in the hills above Runingu (see annex 21). Ex-combatants told the Group that FOREBU are made up of FDN defectors and newly recruited civilians,

UNCLASSIFIED

EXHIBIT 24

S/2017/672

including from Lusenda camp. Several ex-combatants told the Group they had earlier been involved with RED-Tabara as trainers (see S/2016/466, paras. 33-41), but had left since they disagreed with that group's ideology.

47.   While Colonel Nshimirimana leads FOREBU on the ground, five ex-members of the movement and as many FARDC officers told the Group that Hussein Radjabu, a former-leader-turned-dissident of the ruling party of Burundi, the Conseil national pour la défense de la démocratie-Forces pour la défense de la démocratie (CNDD-FDD), is their political leader. Many FOREBU members had ties to the Union pour la démocratie et le développement (UPD)-Zigamibanga, a political party created by Mr. Radjabu after he left CNDD-FDD. Speaking to the Group by telephone in June 2017, Mr. Radjabu acknowledged the existence of FOREBU but denied being its leader and stated not being aware of any FOREBU activities in the Democratic Republic of the Congo.

**Supply and alliances**

48.   The Group collected convergent testimony about the logistics of recruitment as well as the supply of arms and ammunition. While Nshimirimana initially arrived with around 30 people in December 2015, FOREBU can be estimated to have between 300 and 500 combatants as of May 2017. Ex-combatants and FARDC officers told the Group that several waves of recruits arrived throughout 2016 from Burundi, mainly by boat from Rumonge to Swima and via Uvira. The Group also found that four Ugandan nationals were arrested by Congolese intelligence in February 2017 for attempting to join FOREBU (see annex 22). Many FOREBU combatants wear military uniforms and carry AK-47-pattern rifles, but also heavier weapons, including light machine guns.

49.   Civilian populations in Fizi territory told the Group that, in most cases, FOREBU members would buy whole harvests of nearby fields or go to local markets instead of taxing supplies from local populations. This modus operandi suggests that FOREBU might enjoy certain forms of external support. Lusenda residents and civil society members told the Group that many combatants also had access to tokens allowing them to participate in food distribution events at Lusenda camp. FOREBU ex-combatants told the Group that further supplies were brought in across Lake Tanganyika in boats, including one named *ubumo iwacu* ("our unity").

50.   Late in 2016, FOREBU cohabitated with Mai Mai Réunion in northern Fizi territory according to the armed group's ex-combatants. Congolese intelligence services confirmed this. In addition, FOREBU tried to establish ties with other Congolese Mai Mai groups. At the same time, FARDC carried out several military offensives against FOREBU and other Burundian armed groups. This led to the detention of dozens of suspected Burundian combatants who confirmed to the Group that, in some instances, Congolese armed groups, including the Ngumino, would help to facilitate such detention.

## E.   Armed mobilization in the Grand Nord area

51.   During the period under review, violence in Beni territory decreased compared to the recent past (see S/2016/466, paras. 185-213). In the meantime, armed mobilization around Butembo has significantly increased since the Group's last report (see S/2016/1102, para. 103). In addition to ADF, the Group focused its investigations on three armed groups: Mai Mai Kilalo, Mai Mai Mazembe and Mai Mai Corps du Christ. While they have no integrated command structure, they share a narrative of "protecting the civilian population" against FDLR and massacres attributed to ADF. The Group is not aware, however, of any fighting between these

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

armed groups and ADF. Instead, certain Mai Mai groups committed sanctionable acts, including attacks against peacekeepers (see para. 56) and internally displaced persons (see para. 58).

**Allied Democratic Forces**

52.   In 2017, senior FARDC officers informed the Group that the Sukola I operations against ADF had slowed down and no large-scale attacks against civilians had occurred since the Rwangoma massacre on 13 August 2016 (see S/2016/1102, annex 34). The Group takes note of the recent military trial to establish responsibility for the massacres, held in Beni from February to April 2017. However, it is too early to assess the trial's long-term impact on the security situation. The Group limits its conclusions to certain specific aspects, focusing on abductions leading to large-scale forced recruitment, being a major violation of Security Council resolution 2293 (2016). The Government of Uganda reiterated that the Group cannot interview sanctioned individual Jamil Mukulu (CDi.015), arrested in April 2015 in the United Republic of Tanzania, until his trial in Uganda is over.

53.   Ex-combatants, FARDC officers and former abductees told the Group that a core ADF group remained intact, operating out of Madina II (Bayt al-Mal, Whisper, Bango and Hedikota/Headquarters) and near Mwalika (Camp Ya Miba) (see S/2016/1102, paras. 31-43, for both). Several sources confirmed that Seka Baluku (Madina II), Benjamin Kisokeranyo (Mwalika) and an individual known as Feeza ("mobile group") remained key ADF leaders. The Group noted that local militias continued to operate around the ADF zone of influence, some of them having family ties to ADF leaders. Four sources told the Group that Feeza maintained relations with a militia based in Bambuba-Kisiki grouping.

54.   The Group documented several cases of abductions leading to forced recruitment. In one case, seven people were kidnapped near Irungu, south of the Beni-Kasindi road, in March 2016. They were brought northwards until they reached a camp complex including Whisper, Bango and Headquarters (see annex 23). Most people in the camp spoke Luganda and Swahili. Three individuals told the Group that the leader was Baluku and recognized him in pictures. They estimated the camp population to be around 300 to 500 people, most of them combatants armed with AK-47-pattern rifles and wearing a mix of civilian clothes, FARDC camouflage and older green fatigues. The Group notes that the latter were reintroduced to avoid ambiguity between FARDC and armed groups. Two sources told the Group they were forced into agricultural labour and had to abide by a tight set of rules, such as not cooking at night to avoid being detected. This is consistent with the Group's previous findings (see S/2016/1102, paras. 40-43). Between the abduction and their escape in January 2017, all the witnesses interviewed by the Group gave consistent testimony about one attack against the camp, led from nearby FARDC positions.

55.   Since late 2016, the Group has observed several events in which abductions ended in a prompt release. On 13 February 2017, a group of seven farmers and two children were kidnapped in their fields near Mayangose and subsequently released on 25 February 2017, carrying two messages, the first one for the Government of the Democratic Republic of the Congo: "[...] tell the Government that they can never chase us from this forest. Waging war will not lead to anything, if there are no talks, nothing will change." A second message was addressed to the farmers themselves: "If we kill you it is because you talk too much and inform the FARDC of our whereabouts." Several of the farmers recognized Feeza as the leader of the kidnappers. They also reported that his troops were wearing a mix of camouflage and green FARDC uniforms.

    UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

### Mai Mai Kilalo/Union des patriotes pour la libération du Congo

56.    Mai Mai Kilalo is also known as the Union des patriotes pour la libération du Congo (UPLC). Its leader Katembo Kilalo is locally renowned for the production of *dawa*, the potion allegedly used to render combatants invincible (see annex 24). According to ex-combatants, Kilalo had previously served in the Mai Mai groups of Kakule Sikuli "Lafontaine" (see S/2011/738, paras. 266-269) and Paul Sadala "Morgan" (see S/2013/433, paras. 72-78). His deputies are "Colonel" Benoit Mumbere Malisawa and "Colonel" Kakule Kitelemire (alias Saperita or Mambari Bini Pélé), a former Mai Mai and FARDC. Ex-combatants told the Group that this armed group was based around Vurondo, north-west of Butembo (see annex 25) and responsible for the attack against MONUSCO in Butembo on 19 December 2016 (see paras. 177-179).

57.    Ex-combatants and FARDC officers told the Group that Mai Mai Kilalo had 200 to 300 combatants, though not all of them had individual guns. The Group collected testimonies of ex-combatants who were forced into Mai Mai Kilalo following abductions or initially lured by fake promises of employment by recruiters, for instance out of a football club called FC Mahamba B. Mai Mai Kilalo sustained itself through taxation (see annex 26), including in farms ($5 per farm/ week or one goat/month) and at checkpoints (CGF 1,500 per motorcycle, CGF 500 per pedestrian).

### Mai Mai Mazembe/Union des patriotes pour la défense des innocents

58.    Mai Mai Mazembe is a network of loosely connected armed groups, some of which also use the name Union des patriotes pour la défense des innocents, that emerged in 2015 in Lubero territory (see S/2016/466, paras. 78-79). On 27 November 2016, Mai Mai Mazembe combatants attacked the internally displaced persons camp in Luhanga, where they suspected FDLR elements were hiding. At least 30 internally displaced persons were killed during the attack, which followed a series of other assaults (see annex 27 and S/2016/1102, paras. 103-107). In line with previous findings, the Group observed the spread of xenophobic tracts featuring endorsements of Mai Mai Mazembe to "defend the Nande against the Hutu" (see annex 28 and S/2016/466, annex 59).

59.    Mazembe factions operated relatively independent from each other and with limited logistics. It is thus not possible to exactly enumerate their effectives. Three ex-combatants told the Group, that one "brigade" had 100 elements but only 15 firearms. Like other Mai Mai groups, Mazembe tried to protect themselves from enemy fire through *dawa*. Ex-combatants told the Group that Mazembe's main leaders were "Kabido", "Colonel" Augustin Kambale, "General" Muhindo Kitete Bushu and "Colonel" Albert Kasheke.

### Mai Mai Corps du Christ

60.    Early in October 2016, a coalition of Mai Mai groups entered Beni with the aim of fighting ADF (see annex 29). While most carried amulets and spears, there were also some with firearms. The Group could trace back this coalition's origin to an armed group called Corps du Christ, based out of Mont Carmel near Butembo. FARDC officers and ex-combatants told the Group that Corps du Christ repeatedly clashed with FARDC between October and December 2016, including near the Butembo-Beni road and at Mont Carmel, which FARDC retook on 3 November. Until his surrender to MONUSCO on 13 December 2016, the armed group's leader was Baraka Lolwako Mumbere, known for usually wearing a Congolese national police uniform.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

61.  After Baraka's surrender, David Maranatha took over the leadership. However, on 9 January 2017, in a radio broadcast in Swahili, sanctioned individual Kakolele Bwambale (CDi.002) proclaimed himself leader of Corps du Christ. Individuals associated with Corps du Christ and intelligence sources told the Group that Maranatha and Kakolele met in mid-January in Nairobi to discuss how to reorganize the movement. On 7 February, FARDC military intelligence arrested Maranatha but, on 11 June 2017, he managed to escape on the occasion of an attack on Kangbayi prison in Beni that set free around 930 of the 960 inmates. Corps du Christ maintained relations with Kakule Sikuli (see S/2011/738, paras. 266-269) and Charles Bokande (see S/2016/466, paras. 81-91).

## F.  Former 23 March movement

62.  Starting in mid-January 2017, an estimated 200 ex-M23 returned to the Democratic Republic of the Congo, led by sanctioned individual "Brigadier General" Sultani Makenga (CDi.008), the former military leader of M23. While the Group notes that armed group incursions into the Democratic Republic of the Congo are threats to peace and stability, its findings suggest that this incident was a short-lived, unsuccessful attempt to revive M23. During the period under review, the Group could not find any indication of external support for this incursion. Hence, the Group believes that any sustainable solution for the M23 question requires rather a political than a military approach, starting with the full implementation of the Nairobi Declaration of December 2013.

### Escape from Bihanga and reorganization in Virunga National Park

63.  Ex-M23 combatants interviewed by the Group in Rwanda, Goma and Rutshuru confirmed that they had escaped from Bihanga camp in Uganda. Of the 1,375 ex-combatants who arrived there in 2013, only 270 remained in February 2017 according to the Government of Uganda. Several ex-M23 combatants told the Group there were no entry or exit controls in Bihanga, allowing them to escape in small groups. While concordant sources estimated that around 200 ex-M23 combatants managed to cross into the Democratic Republic of the Congo, Ugandan security forces intercepted 101 escapees in Mbarara on 18 January 2017 (see annex 30).

64.  From Bihanga, most ex-M23 took buses towards Mbarara, before arriving in the area of Kisoro. FARDC officers and guards of the Virunga National Park underlined the challenges of performing effective and accurate border control given the lack of clear signposting. Talking to the Group, surrendered ex-M23 confirmed they crossed the border by night using forest paths to reach a meeting point near Mount Sabyinyo. Around 150 elements gathered there, including Makenga, "Lt. Colonel" Léon Kanyamibwa, "Colonel" Yusuf Mboneza and Erasto Bahati (see S/2012/348, para. 68, box 1 and annex 18; S/2012/348/Add.1, para. 268; and S/2013/433, para. 44). Ex-combatants told the Group that some of the commanders steered the sequential escape with the help of middlemen and mobile money transfers. The Group was unable to trace those transfers.

65.  From Mount Sabyinyo, the main part of this armed group moved south and established camps inside Virunga National Park just south of Mount Mikeno. Though poorly equipped with only around a dozen rifles (mostly recovered individually near Cyanzu and Runyoni), most combatants were given a pair of new boots. Most officers had handheld VHF radios and cell phones. Surrendered combatants reported that food supply was poor and very few officers wore uniforms, including Congolese, Ugandan and Rwandan ones.

UNCLASSIFIED    EXHIBIT 24

S/2017/672

**Clashes between ex-M23 and FARDC**

66.    On 27 January 2017, two FARDC Mi-24 helicopters crashed at the southern flank of Mount Mikeno while searching for suspected ex-M23 positions in the area. The Group believes that the first helicopter collided with a tree during low altitude manoeuvres while the second went down because of a technical defect (see annex 31). Despite the losses, FARDC dislodged the ex-M23, killing four and capturing three; the rest fled, 30 of them crossing to Rwanda unarmed, on 29 January 2017 (see annex 32). They were granted temporary refugee status by the Government of Rwanda and were visited by the Group in May 2017. The remaining ex-M23 combatants moved back north towards the Sabyinyo area where they merged with about 70 elements that had arrived from Uganda in the first half of February. With a total of over 150, this group reorganized into three "companies", one of which remained near Sabyinyo, one near Bunagana and the third attempted to move towards Masisi territory.

67.    On 21 February 2017, FARDC attacked the ex-M23 near the localities of Songa and Karambi. They met little resistance and over 50 ex-M23 moved towards Kitagoma on 22 February before they fled back into Uganda where at least 42 of them were arrested by the Uganda People's Defence Forces, including "Lt. Colonel" Ezechiel Mikekeno and "Colonel" Eric Ngabo (see annex 33). FARDC killed 12 ex-M23 combatants, recovered four weapons and registered that seven persons had been admitted to Rutshuru hospital.

## G.    Cases of participants in disarmament, demobilization and reintegration returning to Mai Mai groups

68.    The Group is concerned about the remobilization patterns of ex-combatants who had undergone the third National Programme for Disarmament, Demobilization and Reintegration in Kamina and Kitona. While the Group has not undertaken a full, countrywide investigation, the following snapshot suggests that challenges linked to the reintegration of ex-combatants remain the most difficult part of disarmament, demobilization and reintegration programmes.

69.    One example involved the former Mai Mai groups led by Mateke Wilondja "Mayele" and "Diego Maradona". Both underlined that some of their former combatants rejoined other armed groups after having returned from the disarmament, demobilization and reintegration programme. The Group collected information on 12 ex-combatants of Mai Mai Kashilogozi, who returned from Kamina in June 2017 and remobilized with Mai Mai Masabo (ex-Mai Mai Baleke) (see S/2012/843, para. 113). Five returnees and other sources told the Group that ex-combatants returning from the disarmament, demobilization and reintegration programme to Masisi and Rutshuru have rejoined armed groups, including Nyatura and Mai Mai groups. During the period of reporting, however, the Group was not able to systematically establish the total number of remobilized participants in the disarmament, demobilization and reintegration programme across the Democratic Republic of the Congo.

70.    In the framework of the third National Programme for Disarmament, Demobilization and Reintegration, a total of 4,656 Congolese ex-combatants (1,561 in Kitona and 2,216 in Kamina), of which 3,777 have already returned home, underwent demobilization. The Group also learned that 879 ex-combatants remained in the centres as of June 2017 (see annex 34). Ex-combatants also noted that reintegration activities were carried out in a partial manner only, and that the practical training lacked the necessary materials. This reflects the continuation of the challenges the Group previously noted (see S/2015/19, annex 23). Official

DRC-30316 0361
UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

statistics obtained by the Group suggested that 80 per cent of the kits were distributed across the country. However, returnees interviewed by the Group stated that they received incomplete or the wrong kits, meaning they lacked the tools required for their chosen career. The Group believes that this situation was an opportunity for commanders to lure demobilized combatants into joining armed groups again.

## III.    Natural resources

71.    During the period under review the Group documented several breaches of the mineral chain of custody for tin, tantalum and tungsten in the Democratic Republic of the Congo. In addition, the Group continued its investigations into the trading and smuggling of artisanally sourced gold. The Group also investigated charcoal production and taxation by FDLR in Rutshuru territory.

72.    The Group's findings are based on several visits to North Kivu, South Kivu, Tshopo, Haut-Katanga and Ituri provinces. The Group also conducted visits to Kampala, an important hub for smuggled Congolese gold, and to Dubai, the main destination market for gold traded from the Democratic Republic of the Congo and the Great Lakes region.

73.    The Group notes that illegal exploitation and trade of natural resources remained sources of revenue fuelling the ongoing insecurity in the eastern Democratic Republic of the Congo. At the same time, criminal networks, including inside FARDC, continued to benefit from illicit financial flows and money laundering associated with mineral smuggling.

## A.    Tin, tantalum and tungsten

74.    The Group appreciates that mineral traceability and the due diligence measures referred to in paragraph 24 of Security Council resolution 2293 (2016) have allowed minerals legally sourced from areas free from interference by armed groups in the Democratic Republic of the Congo to access international markets.

75.    The above-mentioned positive trends notwithstanding, the Group found that the implementation of the ITRI Ltd Tin Supply Chain initiative (iTSCi) traceability system in use in the Democratic Republic of the Congo had several shortcomings, which could lead to the smuggling of minerals from outside the chain of custody into the legal trading circuit. First and foremost, errors or deliberate acts committed by agents responsible for tagging, such as tagging mineral consignments from non-validated sites, could disrupt the integrity of the whole chain.

76.    Second, the Group found that agents of the Service d'assistance et d'encadrement du small-scale mining (SAESSCAM) did not properly implement the rules and instructions issued by ITRI Ltd for the handling and overseeing of the tagging operations (see annex 35).[6] Finally, the iTSCi procedures for the safekeeping and storing of tags and logbooks rendered them vulnerable to misuse by corrupted agents.

### Illegal sale of tags

77.    *Négociants* informed the Group that in the trading centre of Ndjingala, as well as in Mubi and Walikale town, tags were sold on the black market, allowing

---

[6] On 14 June 2017, ITRI Ltd sent a letter to the Group replying to questions addressed in the Group's mid-term report (S/2016/1102) and the present final report.

S/2017/672

minerals sourced from the non-validated site of Bisie (see S/2014/42, para. 206 and annexes 79 and 83) and Mpafu/Nyakoba to permeate the legal chain of custody. Those sources informed the Group that tags could be purchased for about $3 per 50-kg bag of minerals, or $500 per 10 tons (equivalent to $2.5 per tagged bag). This is consistent with the Group's previous findings for the Democratic Republic of the Congo and Rwanda (S/2015/19, paras. 173-180 and 189; and S/2015/797, paras. 59-67).

*Bisie*

78.    ITRI Ltd authorized the tagging of cassiterite, the raw ore for tin, artisanally sourced from the non-validated site of Bisie between February and November 2016.

79.    A large number of *négociants* based in Ndjingala, Mubi, Walikale and Goma informed the Group that artisanal production in Bisie continued after November 2016. They revealed that cassiterite was illegally tagged in Ndjingala trading centre as sourced from other validated sites in the area, such as Bisagowa, Kalay Boeing and others (see annex 36).

80.    The Group observed that the statistics reported in the iTSCi logbooks showed peaks in the production of the aforementioned validated sites around Bisie from November 2016 to March 2017. In March 2017, when investigations on tagging irregularities in Walikale territory began, the production recorded in iTSCi logbooks for Bisagowa and Kalay Boeing dropped to zero.

81.    The Group is of the view that these peaks and drops in production were too pronounced to be the result of a normal production cycle and thus reinforce its findings that minerals tagged between November 2016 and March 2017 from the aforementioned sites did not originate from those sites, but were likely brought in from Bisie.

*Mpafu/Nyakoba*

82.    In furtherance to the above observations, the Group also documented minerals extracted since 2015 from the non-validated site of Mpafu/Nyakoba in the Bafuna locality of the Wanianga sector in Walikale territory. Those minerals were tagged in Walikale town and Mubi as originating from validated sites.

83.    The site of Mpafu/Nyakoba is exploited by the Eglise de la Pentecôte pour l'Evangélisation du Monde (EPEM) church, which claims legal ownership of mining premises called Nyakoba Canaan EPEM Walikale. The Group saw produced minerals stocked in a warehouse on EPEM premises in the village of Nyamianda, 5 km south of Walikale town (see annex 37).

84.    According to one of the EPEM leaders and to *négociants* interviewed by the Group, EPEM mineral consignments were then tagged in Walikale town and Mubi as originating from validated sites, at the price of $3 per tagged bag. These sources revealed that the fraud was made possible by the fact that some mining police agents, one member of the provincial Division des mines (the technical arm of the Ministry of Mines) and SAESSCAM agents in Walikale town, Mubi and Ndjingala were EPEM members.

**Transport of minerals**

85.    The Group documented three cases of fraud along the Walikale-Masisi-Goma road. In these cases, transporters carried more minerals than the quantity declared in the respective transport authorizations issued by SAESSCAM agents at tagging centres (see annex 38).

DRC-30316 0363

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

86.  Transporters along the aforementioned axis, as well as workshops in Walikale town and Mubi, confirmed having reinforced the chassis and suspensions of vehicles in order to transport more weight than declared in official documents. These sources revealed that most vehicles used by transporters of minerals are 5-7-ton trucks that are brought up to 10 to 12 tons load capacity or 2-ton *camionettes* that are reinforced to carry 3 to 4 tons. Transporters informed the Group that, while trucks had more load capacity, *camionettes* were the most used by smugglers as they offered more hideouts for minerals (for example, spare tyre bay and spaces between the chassis and the plank). These sources and others from the Division des mines in Walikale and Masisi territories told the Group that transporters regularly bribed SAESSCAM agents to underreport the quantity of minerals actually transported in order to partially evade mineral taxes and other tolls.

87.  The Group is aware of projects in the Democratic Republic of the Congo to strengthen the technical capacity to detect fraud in the transport of goods, including minerals (such as the installation of six weighbridges along the Kisangani-Walikale-Masisi-Goma axis). The Group is of the view that such technical means can be a useful support but should not be a replacement for the adoption of structural measures to address the problem of corruption among agents responsible for the tagging of minerals.

**Problems with the validation of Mahanga sites**

88.  In its previous report (S/2016/1102, paras. 80-84), the Group expressed concern about the presence of the armed group Forces de défense du Congo (FDC)-Guides in the mining sites of Rubonga, Kibanda and Mushwao/Maboa, in the locality of Mahanga. The sites are exploited by two cooperatives, the Coopérative minière pour la promotion des communautés congolaises (COMIPCC) and the Coopérative des exploitants miniers de Karamo (CEMIKA), both based in Goma.

89.  The Group visited Mahanga and found that FDC defectors led by "Colonel" Tumusifu directly benefited from mining in the site of Rubonga. The Group also spoke to members of the Mouvement aquis au changement, an earlier breakaway faction of FDC led by "General" Mbura in Buhimba, and to members of APCLS stationed in Mahanga. The two villages overlook the mining sites.

90.  According to *comptoirs*, ITRI Ltd, SAESSCAM in Rubaya and Division des mines staff in Nyabiondo, Masisi, Rubaya and Goma interviewed by the Group, armed group presence in and around the Mahanga area was known but considered to be far enough from the above-mentioned mining sites to not interfere with operations; subsequently ITRI Ltd authorized tagging operations from those sites in August 2016.

91.  The Group thus observed that, at the time of writing, at least three different armed groups (FDC-Guides, MAC and APCLS) occupied areas around validated mining sites. APCLS elements led by "Colonel Safari Hibou" and the late "Colonel" Tumusifu organized their own police and taxation systems in Mahanga. At the same time, FDC controlled Muhima while MAC occupied Buhimba, right next to the alluvial mining site of Rubonga.

92.  APCLS elements, local miners and villagers in Mahanga, as well as two mining police officers in Nyabiondo, informed the Group that one out of 10 plots of the Rubonga mining site along the Bitsombito River benefited "Colonel" Tumusifu until his killing in November 2016. Miners working for COMIPCC and CEMIKA exploited the remaining nine plots. The Group believes that a part of minerals sourced from Rubonga, including during the period when official tagging was still allowed, benefited Tumusifu. This constitutes a violation of Security Council

UNCLASSIFIED       EXHIBIT 24

S/2017/672

resolution 2293 (2016) and a major breach of the due diligence procedures of the Democratic Republic of the Congo.

**Tagging from sites after their suspension**

93.   During the period under review, the Group found that tagging of minerals from the mining sites of Rubonga (Masisi territory) and Kalay Boeing (Walikale territory) continued. This was the case after ITRI Ltd suspended these sites due to the proven presence of armed groups there.

*Rubonga*

94.   On 19 October 2016, following reports of FDC presence, ITRI Ltd decided to suspend operations at all Mahanga sites and asked SAESSCAM to hand over tags and logbooks. SAESSCAM, however, handed over material to ITRI Ltd only on 3 November 2016 (see annex 39) and on 30 October 2016 tagged nine bags with a total of 421 kg of cassiterite from the Rubonga site produced by COMIPCC (see annex 40). ITRI Ltd informed the Group that the aforementioned tags were located only in April 2017, six months after they were unduly used, at the premises of a *comptoir* in Goma.

95.   The Group visited Mahanga in January 2017 and performed an air reconnaissance in February, observing that production in Rubonga continued despite the suspension (although Kibanda and Mushwao/Maboa sites showed much less activity). The Group notes that COMIPCC and CEMIKA, the two aforementioned mining cooperatives, still operated on the suspended sites: COMIPCC, which employed 51 workers on Rubonga site, had consolidated stocks of 1,700 kg of cassiterite on 19 December 2016 (see annex 40) and about 2 tons by February 2017, in its premises in Nyabiondo. CEMIKA told the Group it had 2 tons stocked in Mahanga by late February 2017. The Group also gathered consistent information, including by sources close to "General" Mbura, that four *négociants* from Goma, working under his protection, purchased and stocked 1,500 kg of cassiterite in Buhimba as of May 2017.

*Kalay Boeing*

96.   The Group notes that the Mai Mai Simba faction commanded by "General" Mando Mazero has made recurrent incursions into the mining site of Kalay Boeing since at least 7 January 2017. Speaking to the Group by telephone, "General" Mando confirmed the presence of his elements, as well as his intention to continue regular patrols in and around Kalay Boeing in reaction to the continuing influence in mining operations of the Biruwe-based FARDC elements.

97.   ITRI Ltd informed the Group that, following those incursions, tagging operations at Kalay Boeing were suspended. The Group observed that, despite the alleged suspension, iTSCi logbooks reported 38,247 kg of cassiterite tagged from Kalay Boeing from 18 to 23 January and 9,513 kg on 4 February. ITRI Ltd informed the Group that, of the 73 tags unduly used to tag minerals from Kalay Boeing after its suspension, 68 had been located, while five remained missing.

98.   ITRI Ltd also informed the Group that tagging at Kalay Boeing had resumed on 12 April 2017 and continued to date. Following "General" Mando's claim that his elements continued incursions into the site after 11 June 2017, the Group sought additional clarification from ITRI. During a telephone conversation in June 2017, ITRI Ltd told the Group that it was aware of Mando's continued presence in Kalay Boeing but stressed there was no indication that his troops benefited in any way from mining operations.

       UNCLASSIFIED

UNCLASSIFIED                                      EXHIBIT 24

S/2017/672

## B.   Gold

99.   The Group notes that there has been little progress towards the regulation of artisanally sourced gold since its last report (see S/2016/1102, paras. 56-76). In line with a recommendation contained in the Group's last final report, the Governments of the United Arab Emirates and Uganda provided information on their efforts to stop the sale of gold smuggled from the Democratic Republic of the Congo to their territories (see annex 41). The Government of Burundi has not yet replied (see S/2016/466, para. 241).

100. A long-awaited gold traceability scheme (Initiative pour la traçabilité de l'or artisanal) was publicly launched on 12 June 2017 in the Democratic Republic of the Congo. Nevertheless, it is still unclear when the implementation phase will start. The Group believes that the system should be further monitored in order to determine if it can solve the problems related to the lack of traceability.

101. The Group is aware of cases involving FARDC elements and other armed actors in the exploitation and trade of gold across the Democratic Republic of the Congo. This was consistent with the Group's previous findings (see, for example, S/2012/843, paras. 132, 133 and 135; S/2014/42, paras. 161-169; and S/2015/19, paras. 195-196). In the following subsection the Group presents its findings on the involvement of a senior FARDC officer in illegal gold exploitation.

**Major General Gabriel Amisi Kumba**

102. The Group documented the involvement of Major General Gabriel Amisi Kumba, also known as Tango Four (see S/2012/843, paras. 121-123 and 138), the FARDC commander of the first defence zone of the Democratic Republic of the Congo, in the gold sector. The Group notes that article 27 of the 2002 mining code of the Democratic Republic of the Congo excluded FARDC officers from any involvement in the exploitation and trade of natural resources.

103. In December 2016, a mining agent based in the town of Bafwasende, Tshopo Province, told the Group that when he was in Bomili to collect taxes from gold operators, two dredge operators refused to pay any State tax, arguing that Major General Amisi owned their dredges. In January 2017, during a visit to Bomili, four dredge owners and two miners working on the Awimi River told the Group that Major General Amisi owned four dredges through a local company called La Conquête. Two State mining agents in Kisangani and Bafwasende, as well as one civil society actor, also informed the Group that Major General Amisi owned dredges on the Awimi River in the city of Bomili, Bafwasende Territory.[7]

104. During the period under review, the Group collected testimony that La Conquête's management enjoyed instances of FARDC protection, for example in May and June 2016, as confirmed by Bomili-based sources. Several sources told the Group that gold from Major General Amisi's dredges was sent mainly to Kisangani.

105. Four dredge owners told the Group that gold production was low in January 2017 on the Awimi River compared to previous months, but still averaged 50 g daily per dredge. Two months earlier, in November 2016, the production was around 100 g daily per dredge.[8] The same sources told the Group they experienced periods when the production was as high as 500 g daily for each dredge operating on the

---

[7] The Group has previously reported on the dredging activity in the Democratic Republic of the Congo (see S/2015/19, paras. 192-194 and 225 (a); S/2015/797, paras. 68-73; and S/2016/1102, para. 69).

[8] Gold is traded in Bomili at $40/g, in Kisangani at $42-$45/g and in Butembo at $45-$50/g.

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

Awimi River. The Group sought to clarify these findings with Major General Amisi but could not reach him at the time of writing.

**Patterns of gold smuggling**

106. As previously reported (see S/2014/42, para. 171), the Group confirmed that almost all artisanally sourced gold in the Democratic Republic of the Congo was exported illegally and underestimated in both value and volume (see, for example, S/2016/466, para. 123). In 2016, the country officially exported 244.42 kg of gold according to the Commission interministérielle d'harmonisation et de consolidation des statistiques. The Group believes that these statistics underrepresent the actual volume of exports.

107. Exports declared by *comptoirs* do not reflect the reality of the market. For example in Butembo, the sole *comptoir*, Glory minerals, Glorym (see S/2016/466, paras. 140-144), declared less than 7 kg of gold exports in 2016. This contradicts information the Group obtained during its investigations. For instance, traders working at gold mining sites in North Kivu and Tshopo provinces told the Group that most of their production was sold in Butembo. Among others, the associates of Glorym continued to illegally export the largest part of the gold they purchased. Several people implicated in the gold trade in Bukavu and Bunia, two major gold trading hubs in the Democratic Republic of the Congo, told the Group that similar dynamics prevail there.

108. The Group conducted an investigation on a Congolese national, Ms. Elysée Kanini Chibalonza. In October 2016, customs agents in Dubai found 150 kg of undeclared gold in her luggage (see annex 42). Ms. Chibalonza was flying from Lubumbashi on Ethiopian Airlines.[9] The Group recovered records of Chibalonza's travels between Lubumbashi and Dubai from January 2015 to January 2017, confirming that she travelled at least once a month on this route (see annex 43). The Group visited Lubumbashi in February 2017 in order to investigate whether Ms. Chibalonza was affiliated with any *comptoir*, since these are the only entities allowed to acquire licences for gold export. Mining authorities told the Group that throughout 2016 Romineral Congo SARL was the only registered *comptoir* to have officially exported gold from Lubumbashi to Dubai, on three occasions in total. In May 2017, during a telephone conversation with the Group, Romineral's manager denied any affiliation with Ms. Chibalonza.

109. The Group believes Ms. Chibalonza to be a smuggler. It is unclear where the gold she exported from Lubumbashi was obtained. However, the Group's investigation cannot exclude that some of the gold traded in Lubumbashi originated from high-risk or conflict-affected areas such as South Kivu, Kasai or Tanganyika. In the absence of information from the Government of the United Arab Emirates, the Group is unable to estimate the total volume of gold Ms. Chibalonza could have carried to Dubai. To illustrate the magnitude of the issue, if Ms. Chibalonza had carried 150 kg of gold on each of her trips, she, alone, could potentially have smuggled up to 3.6 tons throughout the last two years. This is not an isolated case and highlights weaknesses in the control of hand luggage by airlines (see paras. 110-112) as well as recipient and transit countries (see paras. 118-125).

---

[9] Gold with a volume of a litre weighs roughly less than 20 kg. Standard size measures adopted by most commercial airlines suggest that a piece of hand luggage usually has a volume of around 15 litres. Hence, a passenger could theoretically travel with up to 300 kg of gold in a single carry-on bag.

S/2017/672

**Commercial airlines**

110. Airlines play an important role in enabling the transport of unwrought gold from the Democratic Republic of the Congo to Dubai. For example, four people involved in the gold sector told the Group that it was common practice for smugglers to purchase additional, empty seats in order to maximize the amount of gold smuggled on one single trip.

111. The Group requested information from the International Air Transport Association (IATA), Ethiopian Airlines and Kenya Airways, two airlines connecting Lubumbashi with Dubai, to know whether they had adopted specific measures to tackle the problem related to hand-carry gold. In a response to the Group's request dated April 2017, IATA clarified that it had not issued an instruction or mandated standards for its members. In June 2017, Ethiopian Airlines responded that while they had a procedure for securing and protecting valuable items from theft, they had no procedure to perform origin checks for transported gold and to authenticate the identity of carriers. In July 2017, Kenya Airways told the Group that the company does not allow transportation of gold either as checked or as hand luggage on the aircraft.

112. On the basis of the replies from IATA and Ethiopian Airlines, the Group understands that it is the responsibility of customs at the airport of departure to check the luggage and ensure that passengers have the required documents for gold export before boarding a flight. However, the Group's investigations suggest that customs in the Democratic Republic of the Congo and neighbouring countries, from where smugglers are boarding or transiting to Dubai, do not play their role. Several sources, including customs agents and people involved in the gold sector, told the Group that smugglers bribe State agents at Entebbe, Nairobi and Lubumbashi airports to pass unhindered through controls.

**Congolese International Conference on the Great Lakes Region certificates**

113. In June 2016, 50 International Conference on the Great Lakes Region certificates to ensure the traceability of minerals disappeared from the Centre d'évaluation, d'expertise et de certification (CEEC), the official agency issuing such certificates in the Democratic Republic of the Congo. The Group confirmed the illegal use of at least two of those certificates.

114. CEEC investigated the disappearance of the 50 certificates (see annex 44). Its inquiry was prompted in June 2016 after Belgian authorities refused to clear the export/import of a gold parcel associated to International Conference on the Great Lakes Region certificate number CD00007976. The Group has requested further information from the Government of Belgium and is awaiting a response.

115. In February 2017, three Congolese mining agents told the Group that a second missing certificate, number CD00001892, was used in Lubumbashi to export 99.5 kg of gold to Dubai via Nairobi on a Kenya Airways flight. After receiving this information, the Group requested additional details from the Government of Kenya and has not yet received a reply. The Group also shared this information with the Government of the United Arab Emirates for further investigations.

116. The Group is not aware whether the internal investigation by CEEC identified the person(s) responsible for the disappearance of the certificates given that no one has been held accountable to date. Furthermore, the Government of the Democratic Republic of the Congo has not yet replied to the Group's request for further information about its efforts to address this issue with the International Conference on the Great Lakes Region secretariat, as well as destination countries.

DRC-30316 0368

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

117. The Group notes with great concern that, beyond these two cases, further certificates could be used to smuggle gold or other minerals, including those sourced from mining sites under the control of armed actors. While the latter violates paragraph 7 (g) of Security Council resolution 2293 (2016), the Group emphasizes that the misuse of certificates also facilitates the generation of illicit financial flows and enables money-laundering.

**The role of foreign countries**

118. Beyond its investigations in the Democratic Republic of the Congo, the Group also notes that events in transit as well as destination countries for Congolese gold remain paramount to the dynamics of illegal exploitation and trade. Below, the Group focuses its observation on two examples.

*Uganda*

119. The Group had previously reported that Kampala-based gold traders were buying gold smuggled from the Democratic Republic of the Congo (see S/2014/42, paras. 182-188; and S/2015/19, paras. 199-201). During the period under review, the Group received testimony from several sources based in Bunia, Butembo and Kampala, all of which are involved in gold trading. They confirmed previously reported patterns of smuggling. In the course of its investigations, the Group received names of individuals and companies that illegally buy gold exported from the Democratic Republic of the Congo. Given that it has not yet been possible to confirm all of these cases according to its evidentiary standards, the Group believes this should be further investigated.

120. The Group interviewed eight people involved in the gold sector in Bunia, three of whom were also active in Butembo. They informed the Group that they still had business relations with the directors of the sanctioned entities United Commercial Impex (UCI; CDe.009) and Machanga Ltd (CDe.007). In Kampala, the Group also met with a civil society actor and three Congolese nationals who served as intermediaries between Kampala-based gold traders and those in Butembo and Bunia. The three intermediaries confirmed that the Director of Machanga Ltd was still a regular buyer of gold from the Democratic Republic of the Congo. The same sources also mentioned Sameer Bhimji (see S/2015/19, para. 207), stating that he competed over the same Congolese gold suppliers with Machanga Ltd. The Group is aware that, in December 2016, the Uganda Revenue Authority confiscated undocumented gold in Bhimji's house.

121. While the Group was not able to meet with the Director of Machanga Ltd in Kampala, it met on three occasions with the directors of UCI. The latter stated that following their listing they had not been involved in the gold sector. In addition, they expressed their wish to be delisted in order to resume operations and comply with international standards.

122. The major development in Kampala's gold market was the resurgence of legal exports from Uganda. The Group had previously documented the decline in official gold exports from Uganda after 2007, when sanctions were placed upon Machanga and UCI (see S/2014/42, paras. 182-188 and annex 71). According to online statistics from the Bank of Uganda, Uganda's official gold exports had increased from 11 kg in 2014 to 1,118 kg in 2015, and to 8,751 kg, the highest ever recorded, in 2016. From January to April 2017, Uganda officially exported 2,938 kg, which puts it on a pace to beat the 2016 record. Additional data from 2016, published by the Uganda Bureau of Statistics, confirmed previous findings regarding the country's limited own gold production, facts also confirmed in the Government of Uganda's letter to the Group in June 2017 (see annex 45). According to the

UNCLASSIFIED                              EXHIBIT 24

Government of Uganda, the discrepancy between export and production values results from undocumented domestic gold production. However, the Group believes that Uganda remained a transit hub for gold produced in other countries, such as the Democratic Republic of the Congo.

123. The revival of official gold exports from Uganda coincides with the 2016 opening of the country's first gold refinery, African Gold Refinery (AGR) owned by Alain Goetz (see S/2009/603, paras. 130 and 154-157). AGR senior management told the Group that they were expecting to export more than 10 tons of gold in 2017. This suggests that gold exports from Uganda had always been largely underreported. When the Government of Uganda provided statistics to the Group in 2014, official exports were less than 15 kg (see S/2015/19, para. 199), in line with the aforementioned Bureau of Statistics data. For the same year, the United Nations Commodity Trade Statistics Database (UN Comtrade) published exports of one ton. The Group therefore believes that AGR could contribute to a cleaner gold trade in Uganda.

124. During a meeting in May and subsequently in a letter in June 2017, AGR told the Group that the company to date "does not have the capacity to map the actual physical flow of each and every gram of gold". AGR senior management told the Group that there was a need for additional, internationally agreed procedures to fulfil this requirement. However, while the Group is not aware of any illegal activity of AGR to date, it believes that it is highly possible that gold smuggled from the Democratic Republic of the Congo could occasionally permeate the company's supply chain.

125. The Group requested a list of AGR suppliers but has not received it and takes note of the willingness of AGR to first require "proper consent" of their suppliers. This information would help to ascertain if certain suppliers were involved in fraudulent trade with smugglers from the Democratic Republic of the Congo. The Group saw a copy of an agreement signed by AGR and CEEC, in which the two parties acknowledged that gold was smuggled from the Democratic Republic of the Congo to Uganda. Furthermore, it includes a commitment to work closely in the fight against smuggling according to international and International Conference on the Great Lakes Region regulations.

126. Following several requests, the Group met with officials of the Government of Uganda in March 2017. During the meeting in Kampala, the latter did not deny the smuggling of gold from the Democratic Republic of the Congo to Uganda but attributed it mainly to the porosity of the borders. The Ugandan officials committed to sharing, with the Group, the results of their investigation into Kampala-based gold traders initiated in 2014 (see S/2015/19, para. 203).

*United Arab Emirates*

127. Dubai is the main recipient of artisanally sourced unwrought gold from the Democratic Republic of the Congo. The Group was able to confirm that Congolese gold arriving there is mainly exported fraudulently; this is consistent with the Group's previous findings (see S/2005/30, para. 119; S/2007/423, paras. 124-126; S/2008/773, para. 93; S/2015/19, para. 210; and S/2016/466, para. 166).

128. Several exporters and intermediaries implicated in the gold trade in the Democratic Republic of the Congo and Uganda told the Group that they regularly travelled with known smugglers to Dubai in order to sell gold. When the Group met with the Government of the United Arab Emirates in April 2017, the latter expressed willingness to assist the Group's investigations on the above-mentioned smugglers in Dubai. Consequently, the Group provided the Government of the United Arab Emirates with the names of smugglers it had collected, for instance that of

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

Ms. Chibalonza (see paras. 108-109), and believes that they should be further investigated.

129. In another case, the Group had previously given the name of Nilesh Subash Lodhia to the Government of the United Arab Emirates (see S/2009/603, para. 136).[10] Mr. Lodhia, the owner and sole employee of Rafiki General Trading, is also a former employee of UCI, a sanctioned entity. The Group documented that Rafiki General Trading was the sole buyer of gold from the Butembo-based *comptoir* Glorym during the period under review. The Group sought to meet Mr. Lodhia to inquire about the link between his gold trade and the stated activities of Rafiki General Trading (see annex 46). When the Group asked to talk to Mr. Lodhia, the Government of the United Arab Emirates informed the Group that it had already shut down Rafiki General Trading.

130. The Group welcomes the initiatives taken by the Government of the United Arab Emirates to meet the recommendation set out in its last final report (see S/2016/466, para. 241; and annex 47 to the present report). The Group believes, however, that they can only yield lasting results if fully implemented.

131. Nonetheless, the easy access for gold smugglers in Dubai's market is the consequence of the loopholes in the United Arab Emirates control system and legislation for hand-carry gold as documented previously (see S/2015/19, para. 210; and S/2016/466, para. 166). It is the Group's understanding that United Arab Emirates law does not consider smuggling activity to be a crime. Therefore, the customs authorities, most of the time, apply only trafficking fines. In April 2017, the Group visited the gold souk of Dubai's Deira district and found that the patterns described in previous reports still exist.

132. Based on its interviews with senior officials in the Democratic Republic of the Congo, at the International Conference on the Great Lakes Region secretariat, and in the United Arab Emirates and Uganda during the period under review, the Group understands that the efforts of these stakeholders could be improved to enhance the fight against gold smuggling. As previously reported (see S/2016/466, annex 53), regular collaboration between the aforementioned parties could significantly reduce such smuggling. The Group believes that the United Arab Emirates increased awareness of International Conference on the Great Lakes Region member State regulations for gold export would be a positive development. It could facilitate, among others, a system of authentication of the documents required for gold exports from those countries upon arrival in Dubai.

## C.  Charcoal

133. The Group's investigations showed that one of the most stable sources of income generation for FDLR remained the illegal taxation of charcoal produced and sold by local populations, as well as the sale of their own production (see S/2015/19, paras. 74-78; S/2015/797, paras. 33-34; and S/2016/466, paras. 26-27). The Group gathered consistent information that FARDC also benefited from charcoal produced in the aforementioned areas inside the Virunga National Park, levying taxes of CGF 1,700 per bag sold in Kitchanga and CGF 1,000 per bag loaded in Kabalekasha.

134. The Group observed that in one of the two supply chains investigated, centred on the areas of Bishusha and Kitchanga on the south-western margin of the Virunga National Park, charcoal production continues relatively unabated. The other supply

---

[10] Nilesh S. Lodhia has no family ties to Jamnadas V. Lodhia, also known as Chuni, one of the directors of UCI.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

chain, however, centred on the areas of Tongo and Mulimbi, was severely disrupted by a combination of controls by the Institut congolais pour la conservation de la nature (ICCN) and FARDC military manoeuvres against FDLR.

135. It is of note that charcoal remained a key source of subsistence for local populations. However, the Group's investigations confirmed that there was no international market for charcoal produced in the Virunga National Park.

**Charcoal production and taxation by FDLR in Rutshuru territory**

136. The Group investigated a cluster of three camps in the south-west of the Virunga National Park (10 km south of Bishusha) where 1,000 families unaffiliated to FDLR produced charcoal. Each family produced on average a kiln a week (1,000 kilns for the three sites), on which they have to pay taxes of CGF 6,500 per kiln to FDLR (see annex 48).[11] Further to this taxation, the above-mentioned sources told the Group that FDLR also produced some 450 bags of charcoal per week for direct sale.

137. In a second case, around Bishusha and Bwiza, the charcoal produced by some 500 families unaffiliated to FDLR amounted to 500 kilns per week: local producers had to pay a tax of CGF 4,000 per kiln of charcoal produced and an in-kind tax corresponding to one day of work to FDLR. Charcoal produced in these areas transited through the village of Kahe, where many traders from Kitchanga purchased it. According to some of them and Kahe residents, some 800 to 1,000 bags of charcoal used to transit through Kahe every day.

138. The Group notes that, while FDLR taxation occurs at the production level, FARDC elements also generate revenues by levying taxes on charcoal sold in Kitchanga and Kabalekasha.

139. *Ceteris paribus*, FDLR could generate up to CGF 8.5 million ($6,000) each week from illegal taxes on the production and CGF 12-15 million ($8,500-$10,700) from taxes on the sales of charcoal produced in all the aforementioned areas.

140. On the same assumptions, FARDC could in turn levy CGF 18.6-23 million ($13,200-$16,400) from the taxation of charcoal sold in Kitchanga and CGF 13-16 million ($9,300-$11,400) in Kabalekasha.

**Drop of charcoal production and taxation in Tongo area**

141. Around Tongo and Mulimbi, the Group observed a meltdown of charcoal production in FDLR-controlled areas from about 1,000 kilns to almost nil by early 2017. According to customary authorities in Tongo and Mulimbi as well as charcoal traders interviewed in Mulimbi, this sharp drop was due to the combined effect of FARDC military manoeuvres against FDLR and to ICCN establishing fixed checkpoints in Tongo and Kalengera to stop the transport of charcoal from the Virunga National Park.

142. The above-mentioned sources reported that, by the end of 2016, the FDLR officers responsible for charcoal production, taxation and sales in the area started to be concerned about the possibility of locals being informants for FARDC and limited the access to the Virunga National Park, including for charcoal-making purposes. As a consequence, most families resorted to producing legal charcoal

---

[11] Each kiln of charcoal, locally called *four*, burns on average five cubic feet of timber (equivalent to three adult trees), which yields on average 1.1 cubic metres of charcoal (equivalent to 8-10 bags) after a week of pyrolysis.

DRC-30316 0372

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

from eucalyptus trees outside the Park and beyond FDLR control.[12] Conversely, FDLR around Tongo began to compensate the loss in charcoal revenue by imposing in-kind taxes on other goods as well as protection rackets.

## IV.  Arms

143. The Group investigated three potential cases of violations of the arms embargo, including one heavy weapon recovered from FDLR; an incursion of FDN into the Democratic Republic of the Congo; as well as a network of arms traffickers operating across the Ruzizi River between Burundi and the Democratic Republic of the Congo. The Group notes that arms transfers in violation of the embargo occurred both domestically and across borders. In addition, the Group reports on efforts to trace arms and ammunition recovered from armed groups and the related lack of cooperation on the side of potential countries of origin and end users.

### A.  Violations of the arms embargo

144. In line with its mandate, the Group investigated a missile recovered from FDLR. The Group also investigated an incursion of the Burundian army into Congolese territory and a network of illegal arms trade in Uvira territory, South Kivu Province.

**SAM-16 recovered from FDLR**

145. In August 2016, FARDC recovered a missile system referred to as a man-portable air defence system from FDLR. The model in question, a SAM-16 Gimlet or 9K310 Igla-1, was found in a former FDLR headquarters near Mibirubiru, 10 km west of the town of Nyanzale in North Kivu Province (see annex 49).

146. Some components of the missile system, including the battery, the grip stock as well as the power supply system, were missing. It was produced in 1987. The Group saw that the materiel had characteristics similar to missiles produced in the former Union of Socialist Soviet Republics (USSR). The Group believes that such materiel in the hands of an armed group represents a significant threat to the population and, if properly fitted, to aircraft as well.

147. The Group had previously reported that FDLR possessed such materiel and that, in 1998, the Armée pour la libération du Rwanda, the de facto FDLR predecessor, captured it from the Rassemblement congolais pour la démocratie-Goma at Mount Goma during a clash (see S/2010/596, para. 94). Three FARDC sources and former senior FDLR leaders independently confirmed this to the Group. The Group began to trace the materiel in order to determine and confirm the producing countries as well as the original end users of the weapon in question.

**Kiliba Ondes attack**

148. On 21 December 2016, FDN entered Congolese territory near Kiliba Ondes, a village north of the Uvira-Bujumbura road. The Group is aware that FDN regularly crosses the border in order to carry out joint patrols with FARDC. In this case, the Group was not aware of any notification to the Security Council Committee established pursuant to resolution 1533 (2004) by the Government of Burundi about

---

[12] Charcoal produced from eucalyptus is much less efficient than from the tree species found inside the Virunga National Park, and thus sold at a lower price (CFG 5,000-6,000 per bag at wholesale trading hubs, where charcoal from the Park would be sold at CFG 13,000 per bag). For this reason eucalyptus charcoal is known locally as *makala biwerewere* ("idiots' charcoal").

UNCLASSIFIED                                        EXHIBIT 24

S/2017/672

the entry of FDN elements into Congolese territory with arms. The Group can confirm that this event led to fighting between FARDC and FDN around Kiliba Ondes.

149. Five eyewitnesses told the Group that they saw FDN soldiers entering the Democratic Republic of the Congo near the Vugizo border post around 7 a.m. Shortly after progressing towards Kiliba sector 6, FDN opened fire. While some witnesses reported that FDN might have intended to attack FNL-Nzabampema combatants, the nearby FARDC battalion retaliated as they experienced FDN fire. The belligerents came into direct contact near the sugar factory in Kiliba Ondes. Officers of FARDC, the Congolese national police and the Direction générale des migrations confirmed the event with the Group. Witnesses continued to hear gunfire exchange until 3 p.m. (see annex 50).

150. During the incident, one farmer and one FARDC soldier were wounded. While accounts of the number of victims are diverse, close to 10 witnesses agree that a minimum of three FDN soldiers were killed and subsequently brought to the morgue of the general hospital in Uvira.

**Arms traffic across the Ruzizi River**

151. The Ruzizi Plain and Lake Tanganyika continue to be hotbeds of armed mobilization and arms trading. The Group found at least three Burundian armed groups operating in these areas (FOREBU, RED-Tabara and FNL-Nzabampema; see paras. 45-50), embedded in complex relationships with local armed groups such as the Mai Mai and local defence groups.

152. The Group investigated one network of arms traffickers involving members of the Burundian army, various middlemen and Congolese armed groups (see annex 51). One of the key actors of this network was a Burundian named Manassé Hakizimana who was killed in March 2017. Eyewitnesses told the Group that on a monthly basis Manassé Hakizimana would go to the Ruzizi River that separates the two countries to take delivery of arms and ammunition shipments. On the Burundian side, FDN elements would arrive at night to deliver the arms. The Group requested further details from the Government of Burundi and is awaiting a reply.

153. Sources told the Group that an individual known as "Jadot", a former member of Mai Mai Kayamba, would accompany the FDN elements. Two sources involved in the transportation of the materiel, and several civil society sources told the Group that, once an arms shipment was ready at the shores, local fishermen would transport it across the river. Usually, a shipment would contain small quantities to circumvent control, as in three instances brought to the attention of the Group. While the Group was not able to document the transfers in situ, witnesses reported one transfer of 10 guns and six boxes of ammunition in Katogota, one transfer of 15 AK-47-pattern rifles and a bag of ammunition in Luberizi and one transfer of two light machine guns, two grenade launchers, two pistols, five AK-47-pattern rifles and several boxes of ammunition in Sange.

154. Upon arrival in the Democratic Republic of the Congo, designated motorbike drivers would pick up the shipments to deliver them. This was scheduled according to timings and locations previously agreed between involved officers, middlemen, fishermen, transporters and armed groups. In many cases, the delivery route passed near Katogota, next to the Mobutu Bridge. Among those that received supplies through this network were Mai Mai Mwenyemali, Mai Mai Bigaya, Mai Mai Nyerere and Mai Mai Karakara. Sources told the Group that the rationale behind these transfers was to counter security threats to the Government of Burundi posed by groups such as RED-Tabara and FOREBU, by way of supporting Congolese armed groups that the Burundians anticipated could eventually serve as proxies.

UNCLASSIFIED    EXHIBIT 24

S/2017/672

## B.  Tracing efforts

155. During the period under review, the Group's investigations on arms and ammunition recovered from armed groups formerly and currently operating on Congolese territory were slowed by certain factors. This was principally the result of the lack of responses to the Group's queries regarding certain countries of origin and certain end users, as well as the lack of cooperation on the side of the Government of the Democratic Republic of the Congo.

156. With a view to tracing the origin of the recovered arms and ammunition as previously reported (see S/2016/1102, para. 113), the Group had requested further information from potential countries of origin. The arms and ammunition had characteristics similar to those produced in Bulgaria, the Czech Republic (former Czechoslovakia), the Democratic People's Republic of Korea, Greece, Israel, China, Portugal, Romania, the Russian Federation (former USSR), the Sudan and Uganda.[13]

157. The Group appreciates the responses received from Bulgaria, Israel, the Russian Federation and Uganda. Israel and Uganda requested further details in order to confirm the initial end users, for example serial numbers on the original packages, in order to assist the Group in its tracing efforts. The Group notes that ammunition recovered from armed groups was rarely found in the original packages. The Government of Bulgaria also informed the Group that records on arms sales were kept only for a period of 10 years.

158. FARDC officers confirmed to the Group that most of the arms and ammunition documented might have been transferred from national stocks to the respective armed groups they were found with. The Group received consistent testimony that diversions from national stocks continued to be the main source of supply for armed groups in the Democratic Republic of the Congo, which is in line with its previous findings (see S/2009/603, paras. 23-29 and 40-43; S/2015/797, para. 46; S/2016/466, para. 229; and S/2016/1102, para. 113).

159. The Group has observed that across the Democratic Republic of the Congo, local variation notwithstanding, AK-47-pattern rifles could usually be purchased for as little as $30-$40 and light machine guns for around $200-$250. Several sources confirm these observations, including that ammunition could also be purchased from as little as CGF 200 per round (see para. 21).

160. The Group collected bullet casings spent during Mai Mai Kilalo's attack on MONUSCO and the Congolese national police in Butembo in December 2016 and analysed them. According to its investigations and senior FARDC officers, the bullets used by the Mai Mai combatants during the attack have head stamps similar to those found in national stocks (see annex 52).

161. In January 2017, during a mission to Ituri, the Group documented ammunition with the head stamp "L1-02", manufactured by the Ugandan Luwero Industries Ltd in 2002. The ammunition in question had been recovered from the Forces de résistance patriotiques en Ituri (FRPI) (see S/2012/348, paras. 51-52; and annex 53 to the present report). The Group asked the Government of Uganda about potential end users. In its response, the Government of Uganda clarified that the ammunition is for local use only. While the Group continues to investigate how FRPI obtained the ammunition, it notes the high likelihood of this representing a violation of the arms embargo.

---

[13] The Group has often relied on information provided by Member States that are either countries of origin or end users as well as the markings on the weapons and head stamps of ammunition in its attempts to trace them.

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

162. Several countries, including the Democratic Republic of the Congo, have not responded to the Group's requests for assistance in the tracing of arms and ammunition during the period of reporting. In the course of two meetings in October 2016 and February 2017, the Head of the National Commission for the Control of Small Arms and Light Weapons committed to providing updated statistics on the efforts of the Government of the Democratic Republic of the Congo to mark weapons and manage the stockpile of its security forces. The Group has not received the information at the time of writing.

163. In October 2016, the Group also visited the Congolese Ministry of Foreign Affairs and International Cooperation. During the meeting, a senior official of the Ministry committed to setting up a committee with focal points to respond to the Group's requests for information. The Group has not yet received an update regarding their nomination.

## V. Violations of international humanitarian law

164. During the period of reporting, the Group observed that violations of international humanitarian law and human rights continued to be at significant levels in the Democratic Republic of the Congo. The Group focused on violations such as the murder of two of its members on 12 March 2017 in Kasai Central Province, cases of child rape in South Kivu Province and an attack on MONUSCO in North Kivu Province.

## A. Murder of two members of the Group of Experts

165. On 12 March 2017, the Group's Coordinator and armed groups expert, Michael Sharp, and the humanitarian expert, Zaida Catalán, were assassinated in a premeditated setup under hitherto unclear circumstances. The Group wishes to stress that killing members of the Group of Experts represents an attack on the Security Council, which is a serious violation of international humanitarian law.

**Escalation of violence in greater Kasai**

166. The previously stable greater Kasai region in the south-central Democratic Republic of the Congo has seen an escalation of violence and alarming levels of violations of international humanitarian law and human rights since August 2016, when FARDC troops killed Jean-Pierre Mpandi Prince, customary chief of the Kamuina Nsapu clan and erstwhile leader of an homonymous insurgency. Kamuina Nsapu's violent reaction to Mpandi's killing, including attacks against State agents and symbols, prompted FARDC and the national police to launch offensives against the insurgent movement, often using disproportionate violence. Following that, dozens of mass graves and video footage showing deliberate killings, including of unarmed Kamuina Nsapu elements, have been documented.

167. Throughout 2017, this conflict moved away from an insurrection of a specific community towards a larger upheaval spreading the "Kamuina Nsapu" label far beyond its initial confines. Sources told the Group that, while many factions were hostile to the Government, pro-Government militias have also emerged operating under the Kamuina Nsapu label. At the time of writing, the ensuing violence has engulfed vast parts of Kasai, Kasai Central, Kasai Oriental and Haut-Lomami provinces.

UNCLASSIFIED    EXHIBIT 24

S/2017/672

**Assassination of Michael Sharp and Zaida Catalán**

168. Considering the level of human rights violations and potentially sanctionable offences, the Group began its investigations on the greater Kasai region. Two members of the Group, Michael Sharp and Zaida Catalán, visited Kananga in January 2017 to begin field investigations. Some of their preliminary results are reflected in the preceding paragraphs. Early in March, they returned to Kananga in order to finalize the ongoing investigations.

169. The Group retrieved an audiotape dated 11 March 2017, in which the two experts had a discussion with representatives of the Kamuina Nsapu family. Parts of the discussion concerned a field visit scheduled for the following day. The tape confirmed that the investigation aimed at better understanding Kamuina Nsapu's structure, its support networks and the potential recruitment and use of children.

170. On 12 March 2017, they embarked on a field visit from Kananga towards the locality of Bunkonde. The Group understands that, around 4 p.m. local time, Michael Sharp and Zaida Catalán were executed by a heteroclite group of individuals not yet identified at the time of writing.

**Ongoing investigations into the murder**

171. The Group conducted preliminary analyses of telephone records and a video of the murder, as well as interviews. The preliminary evidence does not yet allow the Group to attribute responsibility for the murder. However, the available evidence does not preclude the involvement of different actors such as (pro- or anti-Government) Kamuina Nsapu factions, other armed groups and members of State security services.

172. The Group is aware that the Congolese military justice, the Polismyndigheten (Swedish Police Authority) and the Federal Bureau of Investigation of the United States are conducting criminal investigations into the murder of the two experts. The Group appreciates the appointment of a Board of Inquiry by the United Nations Secretary-General. It is the Group's understanding that this Board can gather information that could contribute to the ongoing criminal investigations.

173. The Group notes that the military justice arrested certain suspects, two of whom are standing trial at the time of writing. However, the Group notes that other key suspects of the murder have not yet been arrested despite available evidence. In May 2017, the Group spoke to a senior police officer who denounced the lack of cooperation on the side of the Government security services involved in the investigations. In addition, the repeated diffusion by the Government of the Democratic Republic of the Congo of a tape featuring the murder of the two experts could obstruct ongoing criminal investigations.

## B.   Child rape in the Kavumu area

174. Between 2013 and 2016, the Panzi Hospital in Bukavu treated 42 cases of aggravated rape, leading to traumatic fistulae, of children and girls aged 1-16 in and around Kavumu, South Kivu Province. The Group found that a militia called Jeshi La Yesu ("Army of Jesus") carried out the rapes. Led by Frédéric Batumike Rugimbanja, at that time a member of the South Kivu provincial assembly, this militia is made up of former Raia Mutomboki and Mai Mai elements, national police elements and former workers from the Bishibirhu plantation.

175. Two militiamen and other sources told the Group that Jeshi La Yesu perpetrated child rapes as part of a ritual believed to render their combatants

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

impervious to bullets. The militiamen also confirmed their group's rituals were led by a person called "Kabuchungu" or "Kabotchonga". In June 2016, this person, together with Batumike and several members of the militia, were arrested on charges including rape of children and young girls.

176. The above-mentioned sources told the Group that the militia has engaged in targeted killings of critics since at least 2012.[14] This is consistent with testimonies collected from civilians who told the Group that they received death threats from Jeshi La Yesu members.

## C.  Attack on the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo in Butembo

177. On the basis of the testimony of former combatants — including some involved in the attack — the Group established that Mai Mai Kilalo attacked Butembo on 19 December 2016. Under the operational command of "Colonel" Kakule Kitelemire and his deputy known as "Kanyere", around 80 elements were involved in the operation. They arrived in Butembo around 5 a.m. and targeted MONUSCO premises, the national police office next to them and Kakwangura prison in Butembo. Ex-combatants told the Group that the purpose of the attack was to free some of their elements. Another aim was to liberate Baraka Lolwako Mumbere, the former leader of Mai Mai Corps du Christ, whom they believed to be detained at Butembo prison as well. However, the Group documented that the attack focused mainly on MONUSCO and the Congolese national police.

178. While the attack demonstrated firepower beyond that of most armed groups operating in the eastern Democratic Republic of the Congo, combatants told the Group that only a minority of them had firearms. Based on testimony from South African peacekeepers and national police officers involved in the half-hour fighting and the Group's investigation, Mai Mai Kilalo fired over 1,000 rounds from AK-47-pattern rifles and at least one light machine gun. The Group's initial analysis of the bullet casings left behind does not suggest outside supply; all of the ammunition codes can also be found in national police or FARDC stocks (see annex 52). An attacker killed during the fighting was wearing a scarf with "UPLC", Mai Mai Kilalo's acronym, written on it.

179. One South African peacekeeper, one FARDC soldier, one policeman, one civilian and nine Mai Mai Kilalo combatants were killed during the fighting. The Group notes that attacks on civilians and peacekeepers are violations of international humanitarian law and sanctionable acts.

## VI.  Recommendations

180. The Group makes the recommendations set out below.

### Government of the Democratic Republic of the Congo

181. The Group recommends that the Government of the Democratic Republic of the Congo:

(a)  Revise the implementation of its current disarmament, demobilization and reintegration programme with a focus on the aspect of reintegration, in

---

[14] Including Jean Bosco Kakonyi and a former member of the militia in 2013, as well as human rights activist Evariste Kasali Mbogo (who reported on Jeshi La Yesu in 25 February 2016 and was killed two months later) and the grouping chief of Bugorhe/Kavumu.

UNCLASSIFIED                                   EXHIBIT 24

S/2017/672

particular professional training and job creation, in order to avoid the re-mobilization of ex-combatants (see paras. 68-70);

(b)   Commence investigations on and, as appropriate, prosecute individuals engaged in illegal gold exploitation and trade, in particular Major General Gabriel Amisi Kumba, as well as those involved in the disappearance of International Conference on the Great Lakes Region certificates issued by the Democratic Republic of the Congo (see paras. 102-105 and 113-117);

(c)   Put in place a national legal framework on sanctions implementation, including specific provisions for banks and financial institutions operating in the Democratic Republic of the Congo to freeze the assets of designated individuals and entities (see para. 8);

(d)   Develop means to overcome identified loopholes in the implementation of due diligence, in particular through a zero-tolerance policy towards corruption as well as empowering field staff of the Service d'assistance et d'encadrement du small-scale mining (SAESSCAM) (see paras. 77-98).

**Security Council**

182.  The Group recommends that the Security Council:

(a)   Mandate the Secretary-General to establish an independent international investigation into the murder of Michael Sharp and Zaida Catalán to gather evidence to identify the perpetrators, their support networks, and motives (see paras. 165-173);

(b)   Revise Security Council resolution 2360 (2017) extending the mandate of the Committee established pursuant to resolution 1533 (2004) with a view to:

(i)   Amending the provisions of paragraph 7 (g) of Security Council resolution 2293 (2016) to read "supporting individuals or entities, including armed groups or criminal networks associated with illicit financial flows and money-laundering, involved …", in order to further qualify the notion of "criminal networks" already contained therein (see para. 73);

(ii)   Mandating the Group of Experts to work with other stakeholders, such as the Organization for Economic Cooperation and Development and the International Air Transport Association, to produce recommendations for guidelines to streamline and enhance the control of unwrought gold transported in carry-on luggage (see paras. 110-112);

(iii)   Extending the mandate of the Group of Experts until 30 December 2018 (see para. 10).

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 1: Organizations and entities the Group officially met with during its mandate**

GREAT LAKES REGION

**Democratic Republic of the Congo**

*Government*

Agence nationale de renseignement (ANR)

Auditorat militaire

Centre d'évaluation, d'expertise et de certification (CEEC)

Direction générale des migrations (DGM)

Forces armées de la République démocratique du Congo (FARDC)

Ministère des mines

Commission nationale pour le contrôle des armes légères et de petit calibre (CNC-ALPC)

Ministry of Foreign Affairs

Unité d'Exécution du Programme national de DDR (UEPN-DDR)

*Private sector*

Metachem

ITRI Ltd/PACT

Cooperative Minière pour la Promotion des Comunautés Congolaises (COMPCC)

Cooperative des exploitaints miniers Karamo (CEMIKA)

Association des Negociants de Minerais du Nord Kivu (ANEMNKI)

Cooperative des Creuseurs Artisanaux de Bisie (COCABI)

*Eglise de la Pentecôte pour l'Evangelisation du Monde* (EPEM)

RAWBANK

PRO CREDIT Bank

AFRILAND First Bank

Trust Merchant Bank (TMB)

Association Congolaise des Banques (ACB)

Ecobank DRC

Banque Commerciale du Congo (BCDC)

First International Bank DRC

Standard Bank DRC

*Organizations*

Bundesanstalt für Geowissenschaften und Rohstoffe (BGR)

Caritas

EPEM Church

UNCLASSIFIED                     EXHIBIT 24

S/2017/672

Banque Centrale du Congo - BCC
Embassy of France
Embassy of Sweden
Embassy of Italy
Embassy of the United States
European Union (EU) Delegation in Kinshasa
Human Rights Watch (HRW)
Office for the Coordination of Humanitarian Affairs (OCHA)
United Nations Joint Human Rights Office (UNJHRO)
United Nations Mine Action Service (UNMAS)
United Nations Organization Stabilization Mission in the DRC (MONUSCO)
Development Initiative (DI)
Mines Actions Group (MAG)
Norwegian People Aid (NPA)
International Organization for Migration (IOM)

Rwanda
*Government*
Ministry of Foreign Affairs and Cooperation
Ministry of Disaster Management and Refugees
Rwanda Defence Force

Uganda
*Government*
Ministry of Foreign Affairs
Ministry of Mines
Uganda People's Defence Force
Uganda Revenue Authority
*Private sector*
African Gold Refinery
*Organizations*
Embassy of the United Kingdom
Embassy of the USA
United Nations Organization Stabilization Mission in the DRC (MONUSCO)

UNCLASSIFIED                    EXHIBIT 24

OUTSIDE THE GREAT LAKES REGION

**Belgium**

*Government*

    Ministry of Foreign Affairs

*Organizations*

    European External Action Service (EEAS)

**France**

*Government*

    Ministry of Foreign Affairs

*Organizations*

    Organization for Economic Cooperation and Development (OECD)

**United Arab Emirates**

*Government*

    Ministry of Foreign Affairs

    Federal Customs Authority

*Organizations*

    Dubai Multi Commodities Center (DMCC)

**United States of America**

*Organizations*

    United Nations Department of Safety and Security

    United Nations Department of Peacekeeping Operations

    INTERPOL

UNCLASSIFIED  EXHIBIT 24

**S/2017/672**

Annex 2: Group of Experts' official communications

During the mandate, the Group addressed 77 official communications to Member States, international organizations and entities (including multiple communications to the same addressees).

The Group received responses from the Governments of Belgium, Bulgaria, Ethiopia, Israel, the People's Republic of China, Romania, Rwanda, the Russian Federation, the United Arab Emirates and the United Kingdom of Great Britain and Northern Ireland

The Group did not receive responses from the Governments of Burundi, Canada, Czech Republic, the Democratic People's Republic of Korea, the Democratic Republic of the Congo, Germany, Greece, Kenya, the Netherlands, Portugal, Sudan, Turkey, Uganda and the United Republic of Tanzania.

The Group received responses from the following international organizations and entities: C.M.M. SARL, Ethiopian Airlines, the International Air Transport Association (IATA), ITRI Ltd, Metachem, Mission Aviation Fellowship (MAF), ProCredit Bank, Signal Mining and Western Union.

The Group did not receive responses from the following international organizations and entities: the Central Bank of the Democratic Republic of the Congo (BCC), the African Gold Refinery (AGR), PayPal Holdings, Inc. and Exodus Mining.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 3: Major armed groups in Rutshuru and Masisi**

The below map indicates zones of influence (not necessarily of full, constant control) of the six strongest armed groups currently active in northern Masisi and western Rutshuru territories: FDLR, CNRD, APCLS, Nyatura-Kasongo, Nyatura-John Love and Nyatura-Domi. It reflects the situation as of June 2017.



(Map by the United Nations, edited by the Group)

UNCLASSIFIED

UNCLASSIFIED   EXHIBIT 24

S/2017/672

**Annex 4: Statistics on defections to CNRD from the former FDLR Comete subsector**



(Document recovered by MONUSCO in January 2017, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

Annex 5: FDLR leadership and structure as of June 2017

"Major General" Gaston Iyamuremye (also kown as Victor Byiringiro or Rumuli, CDi.003) remains the acting president of the movement and Callixte Mbarushimana (CDi.010) is the FDLR's executive secretary. "Lieutenant General" Sylvestre Mudacumura (also kown as Bernard Mupenzi, CDi.012) is the overall commander of FOCA, seconded by "Brigadier General" Pacifique Ntawunguka (also kown as Omega Israel, CDi.024). All of them are sanctioned individuals.

Three main troop blocs are FDLR's special forces *Commando Recherches et Actions en Profondeur* (CRAP) led by "Colonel" Protogène Ruvugayimikore (also known as Gaby Ruhinda) and the two operational sectors, Canaan led by "Colonel" Bernard Rishirabake (also known as Serge), in Kiringa, and Sinai led by "Colonel" Gustave Kubwayo (also known as Sirkoff) in Kazaroho. Mudacumura himself, together with "Colonel" Lucien Nzabanwita (also known as André Kalume) was reported at *Monument* near Kiringa early 2017, next to Rishirabake's position. Byiringiro is in Kalima and Ntawunguka near Mutoto. "Colonel" Ezechiel Gakwerere (also known as Sibo Stany) heads the military training schools near Katsiru.



(Table based on interviews conducted by the Group and documentary evidence)

UNCLASSIFIED

UNCLASSIFIED   EXHIBIT 24

**S/2017/672**

**Annex 6: Division of the FOCA headquarters in two separate locations**



(Document recovered by MONUSCO in January 2017, highlights by the Group)

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

### Annex 7: FDLR alliances

a) Collaboration with local authorities and civilian populations



b) Close collaboration with 'allies'



c) Reviving collaboration with RUD-*Urunana*



(Documents recovered by MONUSCO in January 2017, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 8: Invitation to CNRD elements to defect back to FDLR**

In September 2016, the FDLR leadership issued an order to its units to welcome back CNRD elements
who had previously defected the FDLR.



(Document recovered by MONUSCO in January 2017, highlights by the Group)

UNCLASSIFIED   EXHIBIT 24

S/2017/672

**Annex 9: CMC and APRDC publications**

a) CMC communiqué dated 7 February 2017

## REPUBLIQUE DEMOCRATIQUE DU CONGO
### Collectif des Mouvements pour le Changement
### CMC
E-mail: cmcrdcongo@gmail.com

#### DECLARATION POLITIQUE No. 0001/CN-CMC/02.2017

Mesdames et Messieurs, Chers Compatriotes,

La République Démocratique du Congo (RDC) est en crise constitutionnelle de son histoire.

Le mandat du Président de la République prévu par la constitution a pris fin la nuit du 19 décembre 2016. Au delà de cette date le Peuple Congolais ne reconnait plus Joseph Kabila comme Président de la République. En dépit de l'expiration de son mandat, le "Raïs" a expressément confisqué le pouvoir et l'exerce actuellement par défi.

Ce maintien au pouvoir par force est le résultat des scénarios plusieurs fois montés, pour tenter de légitimer voir même légaliser son pouvoir finissant. Les décisions de la cour constitutionnelle et les négociations contestées qui ont abouti aux accords du 18 octobre suivis de ceux du 31 décembre 2016 sous les auspices respectifs d'Edem Kodjo et de l'Eglise Catholique du Congo (la CENCO), sont une illustration.

L'acte posé par Kabila et sa racaille de classe politique corrompue et inassifiée de pouvoir est inacceptable. C'est un coup d'Etat monté contre lui-même, contre la Constitution et contre le Peuple Congolais. Le Président s'est rebellé contre son Peuple. Bref, Kabila déclare la guerre.

Démasqué, l'ennemi du Peuple Congolais est aujourd'hui identifié; Il s'appelle Joseph Kabila Kabange. Il dirige actuellement le pays en violation de la constitution et les lois qui régissent la RD Congo. Alors, trop c'est trop. Le peuple Congolais mécontent, a juré de faire respecter la constitution. L'article 64 lui donne le droit.
Vous remarquerez ainsi qu'aux dates du 19 et 20 décembre 2016, Kinshasa et toutes les provinces que compose la RD Congo ont vécu le théâtre des affrontements. Résultat, une cinquantaine des morts, sans compter des blessés, des arrestations en cascades, enlèvements, etc.

C'était bel et bien le début du soulèvement populaire:

Chers Compatriotes,

Considérant cette longue liste des violations des droits humains et autres, notamment les massacres à grande échelle des populations congolaises-zaïroises dont les morts sont actuellement estimés à plus de 6 million ou 2010 selon le rapport de Mapping des experts Onusiens, sans compter d'autres exactions à ce jour

Devant les innombrables preuves d'humiliation du peuple à travers le bradage de la souveraineté nationale, le pillage systématique de ressources naturelles, le détournement des fonds publiques, la corruption, vol et viol, le chômage chronique, la misère sans nom, bref, la condition de vie des congolais ne fait que se dégrader du jour au jour

Vu notre Congo assujetti jusqu' à être rangé à la dernière place des pays les plus pauvres du monde

Conscient de la gravité de la situation actuelle dans le pays, de sa responsabilité devant Dieu et devant l'histoire, les sensibilités politiques et les groupes d'autodéfense Congolais ont formé une coalition politico-militaire dénommée: le Collectif des Mouvements pour le Changement, qui lève le ton et déclare ce qui suit:

1. Dénonce et rejette en bloc les décisions de la cour constitutionnelle, les accords du 18 octobre, ceux du 31 décembre et ses corollaires qui confèrent à Joseph Kabila un autre temps de se maintenir au pouvoir

UNCLASSIFIED

UNCLASSIFIED                              EXHIBIT 24

S/2017/672

2. Persiste et signe qu'à partir du 20 décembre 2016, Mr Joseph Kabila n'est plus constitutionnellement reconnu Président de la République et que toutes les institutions de la République Démocratique du Congo sont caduques

3. Reconnait au peuple, seul souverain primaire, le droit légitime de se choisir les dirigeants des institutions établies par la constitution en cours en RD Congo

4. Assume la charge de représentant valable du peuple congolais en lutte pour la libération de la démocratie et de sauvent la constitution prise en otage

5. Prend l'engagement de combattre par tous les moyens le système mafraro dictatorial, antidémocratique et anticonstitutionnel érigé à Kinshasa.

6. A le devoir de défendre les intérêts du peuple et de le rétablir dans ses droits légitimes

Chers Compatriotes,

Le Collectif de Mouvements pour le Changement lance un appel vibrant aux Congolaises et Congolais de se mobiliser tous, comme un seul homme, pour soutenir ses actions afin de barrer la route et faire échec à ces putschistes.

Aux Militaires et policiers de faire montre du patriotisme de se joindre aux Forces de Défense du Peuple, seules engagées pour sécuriser la population, restaurer la paix et rétablir l'ordre constitutionnel dans le pays.

Le CMC lance une mise en garde à la MONUSCO, aux pays voisins limitrophes de la RDC et autres, de se prévenir de s'impliquer dans ce conflit purement constitutionnel à moins que cette implication consiste à exprimer la volonté populaire

Le CMC en appelle aux chantres de la paix et la démocratie à travers le monde et aux bonnes volontés de ne pas se tenir à observer mais plutôt de venir prêter mains fortes au peuple qui défend la jeune et fragile démocratie en péril en République dite -Démocratique du Congo

Le CMC jette toute responsabilité sur la personne de Joseph Kabila et ses complices pour toute perte en vies humaines et pour tout dégât, matériel et autres, causés tout au long de la lutte jusqu'à la libération et que justice sera faite.

Le CMC prend en témoins le Peuple Congolais, les missions diplomatiques et Onusiennes établies en RD Congo ainsi que la Communauté internationale.

Vive la République Démocratique du Congo- Zaïre
Vive le Peuple Congolais- Zaïrois
Vive le Collectif des Mouvements pour Changement.

Fait à Walikalé, le 7 février, 2017.

Pour la COORDINATION NATIONALE

Athanase KUBA MAKANDURA
Président

(Document recovered by the Group in February 2017)

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

b) APRDC manifesto dated 12 October 2017

# Manifeste sur les objectifs de l'APRDC

OCTOBER 12, 2016



Alliance des Patriotes pour la Restauration de la Démocratie au Congo (APRDC)

## Manifeste sur les objectifs de l'APRDC

La force des autorités se fonde sur celle de ceux qui sont derrière eux.

La force du peuple se fonde sur l'intégrité de ceux qui le dirige.

**Logo**

Le logo de l'APRDC consiste en la Colombe de la Paix encadrée par la Balance de la Justice, la Houe du Travail et le Stylo de l'Éducation. Les devises de Justice-Paix-Travail sont déjà celles de la RDC, mais l'APRDC pense que l'Éducation est aussi un pilier sur lequel la nouvelle République Démocratique du Congo doit se fonder.

**Présentation**

L'Alliance des Patriotes pour la Restauration de la Démocratie au Congo (APRDC) vise le rétablissement de la Démocratie en République Démocratique et au monde en général.

L'APRDC compte atteindre cet objectif à travers:

– L'éducation civique populaire basée sur l'expression libre de chaque citoyen à travers le vote comme méthode d'expression ;

– L'éducation politique de toute la population Congolaise afin de lui donner les outils nécessaires pour construire une nation forte;

– La promotion du consensus et du compromis comme culture publique;

– L'instauration d'une justice transparente et indépendante;

– La lutte contre toute forme de corruption et de détournement des deniers publics;

– La lutte contre toute violation du consensus national établi à travers la Constitution Nationale ou du consensus perçu publiquement à travers la recherche populaire de justice, de paix et de travail.

(See http://aprdcongo.org/2016/10/12/manifeste-sur-les-objectifs-de-laprdc/, last accessed on 15 June 2017)

UNCLASSIFIED    EXHIBIT 24

S/2017/672

### Annex 10: Continuous FDLR recruitment efforts

a) FDLR leadership orders recruitment in September 2016



(Document recovered by MONUSCO, highlights by the Group)

b) Recruitment out of Nakivale refugee camp in Uganda

One demobilised combatant explained to the group how the FDLR had been able to recruit him and a group of other adolescents from Nakivale refugee camp in Uganda. FDLR middlemen, two of them identified as "Hadj" and "Senga", in the camp sensitise young refugees to join FDLR. Once agreed, the recruits are given money for the travel and accompanied to Bunagana, from where they continue towards Virunga National Park, accompanied in at least one case by a fixer called "Mabirizi". Ex-combatants who had been recruited this way told the Group they ended up in the "non-conventional logistics" unit led by Kanyoni, based between Kazaroho and Kagando near Bambu.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 11: FDLR plan to attack CNRD in the second half of 2016**



(Documents recovered by MONUSCO in January 2017, highlights by the Group)

UNCLASSIFIED                EXHIBIT 24

S/2017/672

Annex 12: FDLR communiqué dated 26 January 2017

  **- FDLR -**
FORCES DEMOCRATIQUES DE LIBERATION DU RWANDA
DEMOCRATIC LIBERATION FORCES OF RWANDA
URUGAGA RUHARANIRA DEMOKARASI NO KUBOHOZA
U RWANDA


*BUREAU DU PRESIDENT / IBIRO BYA PEREZIDA / OFFICE OF THE PRESIDENT*

UBUTUMWA BW'UBUYOBOZI BUKURU BW'URUGAGA FDLR BUGENEWE
ABACUNGUZI BOSE N'INSHUTI ZARWO KURI IYI TALIKI YA 28 MUTARAMA 2017 KU
ISABUKURU Y'IMYAKA 56 YA DEMOKARASI IMAZE IVUTSE MU RWANDA.

Bacunguzi, Bacunguzikazi, nshuti z'urugaga FDLR. taliki 28/01/1961 ni umunsi mukuru utazibagirana
mu mateka y'igihugu cyacu u Rwanda.

Abanyarwanda twese twibukaho ko ingoma mbi ya cyami yari yarazambagije rubanda yasezerewe
burundu bikorewe i Gitarama, igasimbuzwa REPUBURIKA na DEMOKARASI. Kuri uwo munsi
abayobozi bo mu nzego z'ibanze bitorewe n'abaturage rubanda nyamwinshi bari bamaze kurambirwa
n'ikandamizwa ry'iyo ngoma ngome. Babyemeje rero ku manywa y'ihangu berekana ko bashaka
DEMOKARASI aribyo kuvuga " UBUTEGETSI BW'ABATURAGE, BUSHYIRWAHO
N'ABATURAGE, BUGAKORERA ABATURAGE ". Basezerera gutyo ingoma ya cyami na gihake
hajyaho Demokarasi igendanye na Repubulika akaba ari nayo mpamvu wiswe " IVUKA RYA
DEMOKARASI MU RWANDA », ariko abambari b'ingoma ya cyami bo bakawita uwo " coup d'Etat
yi Gitarama ", mbese ko ubutegetsi babwihaye ku ngufu.

Bacunguzi, Bacunguzikazi, nshuti z'urugaga FDLR, kugira ngo iyo Demokarasi igerweho habaye
ab'abagabo, impirimbanyi zitanze, bamwe baricwa, abandi babagira ibinuga ariko abandi bakomeza
umutsi kugeza bageze ku cyo biyemeje cyo guhirika ingoma ya cyami. Muri aka kanya rero dufate
umunota umwe tuzirikane izo ntwari zabaye ibitambo bya Demokarasi.

Bacunguzi, Bacunguzikazi, nshuti za FDLR, abambari b'ingoma ya cyami ntibemeye gutsindwa,
bitabaza na LONI ngo ibasubize ku butegetsi. Na bwo muri KAMARAMPAKA baratsindwa,
abaturage bashindangira ko ntn ngoma ya cyami bashaka, ko bahisemo Demokarasi muri Repubulika.

Ariko nyuma ibisigisigi bya cyami ntibarekeye aho, batangije ibitero kuri Repubulika na Demokarasi
bigiraguza ngo bisubize ubutegetsi, ariko ingabo z'u Rwnnda z'icyo gihe zikajyn zibakubita inshuro
kugeza mu 1967. Nyuma bahagarika ibitero bajya kwisuganya, bagaruka taliki ya 1/10/1990 biyise
FPR INKOTANYI. Nyuma y'imyaka 4 y'intambara na bwo bakubitwa inshuro, baje kugera ku
butegetsi nyuma yo kumena imivu y'amaraso y'abanyarwanda benshi ariko bafashijwe n'ibihugu bimwe
ndetse n'iby'ibihangange ku iyi isi.

Kandi na none kugira ngo bagere kuri uwo umugambi wabo inubisha bifashishije abalutu b'inda nini,
aba ari bo bashyira imbere kugira ngo rubanda nyamwinshi rubone ko atari ibisigisigi bya ya ngoma ya
cyami. Muri abo tubutu bagambaniye bene wabo twavugamo nka Koloneli Alexis Kanyarengwe.
Pasteur Bizimungu, Seth Sendashonga. Twagiramungu Faustin n'abandi.

Bacunguzi, Bacunguzikazi, nshuti z'urugaga FDLR, ubutegetsi bw'i Kigali, ni ubundi bwami
bwihinduye ukundi bugomba guhirikwa, Demokarasi ikongera igashinga imizi muri Repubulika. FDLR
ni byo duharanira kandi tugomba kubigeraho. Birasaba rero ubwitange no gukomeza umutsi bya buri
wese.

17-11025
DRC-30316 0395

UNCLASSIFIED                              EXHIBIT 24

S/2017/672

Gusa abameze uka ba Kanyarengwe baracyariho no mu rugaga rwacu barahagaragaye, ibitari kure ni Ndagijimana Lawurenti wiyita Irategeka Wilson, wagumuye bamwe mu bacunguzi ababeshye ko agiye kubacyura byihuse kandi mu cyubahiro. None amaso yahere mu kirere! Ariko bamwe batangiye kuvumbura imigambi ye mibisha yo kubasubiza ku ngoyi; nibigobotore rero hakiri kare. Na ba Pasteur Bizimungu, babibonye nyuma ko babaye ibikoresho nta garuriro.

Bacunguzi, Bacunguzikazi, ntimucihwe intege n'abagambanyi bafite imyumvire mibi bakoreshwa n'umwanzi. Abantu nkabo kuva na kera babaho. Kimwe n'ibindi bigwari bita urugaga bikishyira umwanzi cyangwa bikajya ahandi.

Buri wese rero nahagarare neza mu mwanya we, akore ibyo asabwa n'urugaga FDLR, kugira ngo tuzongere duheshe abanyarwanda Demokarasi nyayo, kandi IMANA turi kumwe.

Harakabaho Urugaga FDLR n'inshuti zarwo ;
Harakabaho Abacunguzi n'Abacunguzikazi ;
Harakabaho Demokarasi mu Rwanda.

Bikozwe tariki ya 26/01/2017

BYIRINGIRO Victor
General Major
Président a/ des FDLR

(Document recovered by the Group in February 2017, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 13: FDLR-supporting websites**

Websites hosted on IP address: 188.121.43.37
Hosted in the Netherlands
Location Latitude: 52.374
Location Longitude: 4.88969

Sites opened/administered by Ignace Ntirushwamaboko aka Darius Murinzi
FCLR representative for North America

Ignace Ntirushwamaboko
10-264 College Av. W, Guelph – Ontario N1G 1S8, Canada
Registrant Phone: +1.5192650593
Registrant Email: dariusmurinzi@yahoo.com
Admin ID: CR199497359

a) "rwacu.org", the Rwandan cultural society
Registrant Name: Ignace Ntirushwamaboko
Admin ID: CR234702839
Hosted IP Address: 188.121.43.37





UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

b) Pay Pal account of the Rwandese Cultural Society

## RWANDESE CULTURAL SOCIETY (RCS) INC.

English ▾

| Please enter your donation amount. | | | |
|---|---|---|---|
| Purpose | Donation amount | Make This Recurring (Monthly) | Total |
| SUPPORT OUR WORK | $ | ☐ | $0.000.00 |
| | Total: | | $8.000.00 USD |

Pay with Credit Card or Log in                    PayPal  🔒 Secure Payments

(See        https://www.paypal.com/us/cgi-bin/webscr?cmd=_flow&SESSION=DoY0ZhUk0IoOR_P8-
0LBwnhH6aVifA5fleanewY9KjB8sU-
9K6d9CtvPx3v&dispatch=5885d80a13c0db1f8e263663d3faee8d83a0bf7db316a7beb1b14b43acd04037,&rapids
State=Donation_DonationFlow_StateDonationStart&rapidsStateSignature=2e2bc5a7504c37bc916eac97eabb
db72c62eb65b, last accessed on 15 June 2017)

c) "intabaza.com"

Registrant Name: Ignace Ntirushwamaboko

Hosted IP Address: 188.121.43.37



UNCLASSIFIED    EXHIBIT 24

**S/2017/672**

d) "umucunguzi.com", Radio Umucunguzi

Registrant Name: Ignace Ntirushwamaboko

Hosted IP Address: 188.121.43.37



e) "urugaga.org"

Registrant Name: Ignace Ntirushwamaboko

Hosted IP Address: 188.121.43.37



UNCLASSIFIED                EXHIBIT 24

S/2017/672

f) Darius Murinzi's facebook page



g) Ignace Ntirushwamaboko's post on the FCLR's facebook page



UNCLASSIFIED          EXHIBIT 24

S/2017/672

**Annex 14: Counterfeit DRC electoral card used by "Colonel" Félicien Nzanzubukire**



(Recovered by the Group in February 2017)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 15: CNRD structure and leadership as of June 2017**



(Table based on interviews conducted by the Group and documentary evidence)

UNCLASSIFIED    EXHIBIT 24

S/2017/672

**Annex 16: Background on the FDLR/CNRD split**

Since former Rwandan Prime Minister Faustin Twagiramungu had created an opposition coalition in 2014, Ndagijimana, a 'southerner' like Twagiramungu and other progressives had been pushing for the FDLR to rally opposition efforts less extremist and not linked to the 1994 Genocide. FDLR interim president Byiringiro, Mudacumura and other 'northeners' remained reticent. Besides the regionalist dimension, FDLR and CNRD members told the Group that the split was also one of generational differences – the younger among the leadership accused the elder of not having brought back the refugees in dignity – as well as a split along former *Armée pour la libération du Rwanda* (ALiR, FDLR's two-winged predecessor organisation) lines, with Hamada and Ndagijimana originating from ALiR II while Mudacumura, Ntawunguka and Byiringiro were in ALiR I.

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

---

**Annex 17: SOCIRWA communiqué on the split of refugee communities**



**SOCIETE CIVILE DES RWANDAIS REFUGIES EN RDC**

**/SOCIRWA /RDC\**

E-mail <socirwardc11@gmail.com>

Tel :( +243) 825 940 306

---

COMMUNIQUÉ DE LA SOCIRWA/RDC No 016/028

COMMUNAUTÉ RWANDAISE RÉFUGIÉE EN RDC:"APPEL AU
RAPPROCHEMENT"

**01.** La société civile des rwandais réfugiés en RDC (SOCIRWA/RDC), apprenant la déclaration
du 20 nov 2016 de Mme IRAGENA Joséphine, prend acte de sa décision de s'auto-exclure de
la SOCIRWA/RDC dont elle était 2ème Vice-Présidente. La SOCIRWA/RDC lui souhaite bonne
chance dans la nouvelle organisation qu'elle a dénommée SOCIR (société civile internationale
des réfugiés rwandais).

**02.** A cette occasion, la SOCIRWA/RDC renouvelle son comité de coordination comme suit:
- Président :HABUMUREMYI MUHIRE ANGELO
- 1er Vice-Président :Pasteur NKUNDIYE Esron
- 2ème Vice-Présidente :Mme MUKAMANA Odette
- Secrétaire Général :MUTANGANA Alexandre
- Trésorière :Mme MUSABYIMANA Thérèse
- 1er Secrétaire général adjoint :SERUGENDO J Pierre
- 2ème Secrétaire générale adjointe :Mme FURAHA Eugénie
- Trésorier adjoint :KAMANZI Deogratias
- Secrétaire Particulier :BYIGERO Willy
- Secrétaire Permanente :Mlle UWIMANA Olive
- Conseiller Principal :TUYIZERE Maurice

**03.** Concernant le HCR et le CNR: la SOCIRWA/RDC démant catégoriquement avoir conspiré à
l'attaque de Bweru contre le site d'enregistrement des réfugiés rwandais (en avril 2016) et reste
convaincue que seule une enquête indépendante peut dégager la vérité. Le nouveau comité de
coordination de la SOCIRWA/RDC réitère son entière disposition à coopérer avec ces deux
institutions qui connaissent bien,d'une part ,les efforts fournis par la SOCIRWA/RDC dans le

---

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

processus du dossier "Réfugiés Rwandais en RDC" et ,d'autres part, la nature des difficultés et handicaps affrontés dans tout le processus de ce dossier depuis 2013

04.A propos des calomnies et autres accusations mensongères à l'endroit de la SOCIRWA/RDC et son Président, amalgamés délibérément avec les FDLR que combat actuellement le CNRD (dissidents aux FDLR dès le 31/05/2016) dont le chef est l'époux de Mme IRAGENA Joséphine,nous crions haut et fort qu'il s'agit purement et simplement d'un plan de diaboliser la SOCIRWA/RDC, ses officiels et même ses acquis,diabolisation mise en forme par la déclaration du 20 nov 2016 afin d'en faire le prétexte pour fonder la SOCIR qui pourtant, dans la liberté du droit associatif,pouvait voir le jour, sans toutefois se baser sur la stratégie de diffamer et surtout d'incriminer gratuitement sa grande soeur, la SOCIRWA/RDC.

05. Préoccupée par les graves conséquences que court la communauté rwandaise réfugiée si la DISCORDE entre elle n'est pas freinée et éradiquée avant qu'il ne soit trop tard,la SOCIRWA/RDC appelle la SOCIR et tous les autres acteurs influents au sein de la communauté à faire preuve de RETENUE et de TOLÉRANCE pour œuvrer au RAPPROCHEMENT et ce,dans l'intérêt suprême des réfugiés rwandais en RDC qui depuis 1994,ont évolué en une communauté unie,partageant les mêmes souffrances et surtout le même espoir de sortir ,un jour, en dignité de ce long calvaire sans précédent dans l'histoire des réfugiés au monde.

Fait à Goma, le 13/12/2016

Pour la SOCIRWA/RDC

HABUMUREMYI MUHIRE Angelo.

Président

(Document recovered by the Group in December 2016)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

Annex 18: Nyatura factions in Masisi and Rutshuru

The Group notes a high level complexity regarding local armed groups that refer to the umbrella term Nyatura ("those who hit hard") in North Kivu. By June 2017, Nyatura factions have been active in many parts of Rutshuru and Masisi territories. In the past, the Group reported on child recruitment by Nyatura factions (see S/2015/19, paras. 128-130, S/2014/42, paras. 158-160). The following table is an updated version of S/2016/1102, annex 21, and lists the factions the Group was able to identify during the period under review.

| Alias | Name | Leader | Area |
|---|---|---|---|
| APRDC | Alliance des Patriotes pour la Réstauration de la Démocratie au Congo | Benjamin Ndikusyeze | Bwito |
| Nyatura Domi | Forces de Patriotes Congolais | Ndaruhutse Kananzi | Bukombo |
| Nyatura John Love | John Love | Muhawenimana Bunombe | Muriki |
| Nyatura Jean-Marie | - | Jean-Marie | Mpati |
| Nyatura Nzayi | - | Nzayi Kanyange | Katsiru |
| Nyatura Kasongo | Groupe de Sécurité | Kasongo Kalamo | Mweso |
| Nyatura Ngwiti | Groupe de Sécurité | Ngwiti Bahati | Busumba |
| Nyatura Noheri | Groupe de Sécurité | Noheri | Mweso |
| Nyatura Bavakure | Justice et Egalité pour la Démocratie | Bavakure | Masisi |
| Nyatura Kavumbi | | Kavumbi | Kahira |
| Nyatura Kigingi | Mouvement de Résidents Congolais pour un Changement Vital | Kigingi Machekotala | Nyamaboko |
| Nyatura Delta | - | Delta Kashamare | Katoyi |
| Nyatura Kalume | - | Matias Kalume Kage | Ufamando |

(Table based on interviews conducted by the Group and documentary evidence)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 19: FDLR internal list of Nyatura-Domi/FPC leadership in December 2014**



(Document recovered by MONUSCO, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 20: FNL-Nzabampema and RED-*Tabara***

As previously reported by the Group (see S/2016/466 paras. 42-45), the *Forces nationales de liberation* (FNL)-Nzabampema branch continues to operate in eastern DRC with occasional incursions into Burundian territory. Led by "General" Aloys Nzahampema, a defector of the Burundian army, this armed group has recently lost in strength following joint operations by FARDC and MONUSCO. Currently, the FNL-Nzabampema's main operational theatre is Rukoko area. Nzabampema's deputies are "Colonel" Nestor Nizigama and "Colonel" Paul Ahayisenga. A separate FNL faction works under "Major" Evelyne since her husband "General" Shuti Baryanka has been killed in 2016.

Since the Group's last final report, the *Résistance pour un état de droit* (RED)-Tabara has been continuously weakened due to internal discord, the lack of foreign support, FARDC operations and increasing hostility from local armed groups in the Ruzizi plain (see S/2016/466, paras. 33-41). RED-Tabara is currently highly mobile and based out of the Uvira hills. It collaborates with factions of the Banyamulenge armed group Ngumino.

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 21: FOREBU area of influence in 2017**

While previously operating in the Tanganyika Sector, Fizi Territory, the FOREBU has, in early 2017, relocated a significant part of its effectives towards Uvira Territory, as indicated below. The respective areas of influence are approximations based on interviews conducted by the Group.



(Map by OCHA, edited by the Group)



(Forebu logo recovered by the Group)

UNCLASSIFIED          EXHIBIT 24

S/2017/672

**Annex 22: ID cards of Ugandan nationals arrested for planning to join FOREBU**





(Pictures recovered by the Group in February 2017)

UNCLASSIFIED                EXHIBIT 24

S/2017/672

**Annex 23: Approximate structure of the Madina II camp complex of the ADF**



(Graphic based on interviews conducted by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

### Annex 24: Mai Mai Kilalo *dawa*

Several ex-combatants explained to the Group the key feature of the ritual to prevent bullets and blades from wounding combatants during fighting: recruits tiptoe on a weapon, as fellow Mai Mai use razorblades to tattoo them with the ashes of sacred plants. These ashes are also mixed with local beer to drink and water to sprinkle combatant bodies prior to an operation. The Group retrieved Kilalo's *dawa*, including alcohol and light drugs. For it to work, combatants must obey rules: no sleeping with menstruating women, no raping, no intercourse on the floor, no stealing, no lying, no urinating into running water, no washing unless with source water, no eating of certain vegetables. Other ex-combatants, including from Mai Mai Mazembe provided similar accounts. Ex-combatants interviewed by the Group said that the tattooing procedure continues to stigmatise them even after having demobilized.



(Pictures by the Group in March 2017)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 25: Map of key Mai Mai groups operating around Butembo in mid-2017**

The map indicates approximate zones of influence of Mai Mai Kilalo, northwest of Butembo, Mai Mai
Corps du Christ, southeast of Butembo, as well as the much more decentralised Mai Mai Mazembe in
southern Lubero Territory.



(Map by the United Nations, edited by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 26: Mai Mai Kilalo (UPLC) taxation receipt, stamp and flag**

a) Taxation receipt of Mai Mai Kilalo/ULPC



(Recovered by the Group in February 2017)

b) Mai Mai Kilalo/ULPC stamp and flag

 

(Pictures by the Group)



(Picture by MONUSCO, after the 19 December 2016 attack in Butembo)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

Annex 27: Excerpts of the military justice report on the Luhanga massacre

RÉPUBLIQUE DÉMOCRATIQUE DU CONGO          Beni, le *10* /12/2016
JUSTICE MILITAIRE

AUDITORAT MILITAIRE SUPÉRIEUR
OPERATIONNEL DE NORD-KIVU
Cabinet du Substitut

                    N°AMG/OPS/.*S/U*./D8a/16

                    Transmis copie pour information à:
                    - Monsieur l'Auditeur Général des FARDC
                      à KIN/GOMBE ;
                    - Monsieur le Commandant 3ème Zone de
                      défense à KISANGANI ;
                    - Excellence Monsieur le Gouverneur de la
                      Province de Nord-Kivu à GOMA ;
                    - Monsieur le Commandant 34Région
                      Militaire et Commandant Secteur OPS
                      SUKOLA I Nord à BENI ;
                    - Monsieur le Commandant 3401Régiment
                      à KIRUMBA ;
                    - Monsieur l'Administrateur du Territoire de
                      LUBERO à LUBERO ;
                    - Monsieur le Chef de Bureau de la
                      MONUSCO BENI à BENI ;
                    - Monsieur le Chef de Section Appui à la
                      Justice MONUSCO BENI à BENI ;
                    - Monsieur le Chef de Section BCNUDH
                      MONUSCO BENI à BENI ;
                    - Monsieur le Chef de Cellule des
                      poursuites Judiciaires de la MONUSCO
                      BENI à BENI.

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 24

S/2017/672

2

Objet : Rapport relatif à la              A Monsieur l'Auditeur Militaire Supérieur
Mission Judiciaire                        Opérationnel de Nord-Kivu à GOMA
effectuée à LUHANGA
pour crime contre
l'humanité par meurtre

Monsieur l'Auditeur Militaire Supérieur
Opérationnel,

J'ai l'honneur de vous transmettre en
annexe le rapport d'enquête mené dans le village LUHANGA situé au sud du
territoire de LUBERO.

Veuillez agréer, Monsieur l'Auditeur
Supérieur Opérationnel, l'expression de ma respectueuse considération.

3

## RAPPORT DE LA MISSION EFFECTUEE DANS LA LOCALITE DE
## LUHANGA, EN TERRITOIRE DE LUBERO

### 1. Rétroactes

En date du 27/11/2016, un massacre a été perpétré dans le village de
LUHANGA. Le bilan de ce massacre annoncé par la presse, donne des
chiffres qui varient entre 30 à 36 personnes tuées et plusieurs autres blessés.

Le 1er AVOCAT GENERAL des FARDC Chef de l'Action Publique, en
mission à BENI, m'a instruit d'effectuer une descente sur le lieu du crime en
vue de mener des enquêtes.

UNCLASSIFIED

S/2017/672

5

### 7.2. Communauté assaillante

Les assaillants ont été identifiés comme étant des Mai-Mai MAZEMBE, qui sont de la communauté NANDE.

### 7.3. Déroulement de l'attaque

Avant l'attaque du 27 Nov 2016, 2 personnes de tribu NANDE, avaient été tuées à cause de leur familiarité avec les HUTU du Camp de LUHANGA. Il s'agit de KASEREKA KISUKI et de KASEREKA VOITURE. Ces meurtres ont été imputés aux Mai-Mai MAZEMBE.

Le 27 Novembre 2016, 3 groupes de Mai-Mai MAZEMBE ont encerclé le camp et ont ouvert le feu, tuant et blessant sans discernement. Ils ont également pillé systématiquement le camp avant de se retirer. Il est à noter que les Mai-Mai MAZEMBE ont également attaqué la position FARDC, située à côté du camp de LUHANGA et ont délogé nos militaires.

### 7.4. Bilan de l'attaque

- 29 personnes habitant le camp LUHANGA tuées par balles (voir liste en annexe 1)
- 01 Mai-Mai MAZEMBE, non autrement identifié, tué par balles
- 15 personnes blessées (voir liste en annexe 2)

### 7.5. Personnes considérées instigatrices de cette attaque

- Le Sénateur VENANT TSHIPASA, qui, le 20 Juillet 2016, avait déclaré au marché de LUHOFU que les Mai-Mai MAZEMBE devraient être considéré comme gardien de la paix par les NANDE. Pour la population HUTU, ces propos ont encouragé les Mai-Mai MAZEMBE dans les actions menées contre la communauté HUTU ;
- Le Chef de localité BONE BEMBELEZA, Chef de localité BUNYAKA ESINGA, qui aurait déclaré au cours d'une réunion de sécurité que si les NANDE tuent les HUTU c'est parce que ils ont la même langue et les mêmes comportements que les FDLR

(Document recovered by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 28: Anti-Hutu pamphlet circulated in February 2017 around Luhanga**

While the Group cannot ascertain the tract's authenticity, it collected testimony on the circulation of such pamphlets during the period under review. The below tract threatens Rwandophone populations to leave the area around Luhanga within three days. Signed by "Jean-Marie who will finish with the Hutu", the Group was not able to authenticate the identity the author



(Document recovered by the Group)

UNCLASSIFIED

EXHIBIT 24

S/2017/672

**Annex 29: Pictures of Mai Mai entering Beni on 15 October 2016**





(Pictures recovered by the Group)

UNCLASSIFIED

UNCLASSIFIED                          EXHIBIT 24

S/2017/672

Annex 30: Press release by the Government of Uganda on 19 January 2017

## M23 Press Release | Uganda Media Centre

19/1/2017

*PRESS RELEASE*

The Uganda Government would like to inform the public and the international community that the M23 rebels that have been cantoned at Bihanga Military Training School in Ibanda District since the Agreement of 2014 have been quietly escaping into the general public and some to unknown places.

Last night, the Uganda Security intercepted four (4) vehicles at Mbarara that were carrying 101 former M23 combatants who were travelling on their way to Democratic Republic of Congo (DRC).

These had disguised themselves as ordinary travelling passengers upon interrogation, it was established that they were part of the M23 former combatants who had been cantoned at Bihanga Barracks. These were stealthily leaving their gazetted place of abode contrary to the Agreement of 2014 and the protocols signed with the DRC Government.

Consequently, they were apprehended and are now being detained at Makenke Barracks, the second division Headquarters near Mbarara town. These 101 were following an earlier group of 40 that were discovered to have escaped seven (7) days ago and their whereabouts are not known.

Uganda would like to inform the public and international community that currently there are 270 former M23 combatants still cantoned at Bihanga.
We would like to restate our commitment to live by the agreements and obligations that were entered into in 2014.

Uganda will not and does not support any armed activities to distabilise the Democratic Republic of Congo.

We inform the media and observers to go to Makenke and conduct their own verification of these 101 former M23 detainees

Ofwono Opondo
Executive Director Uganda Media Centre

(Document recovered by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 31: Crash of two FARDC Mi-24 helicopters near Mount Mikeno**

a) Location of the crashes one and two




(Pictures by the Group)

b) Close-up pictures of the helicopters one and two




(Pictures by MONUSCO)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

### Annex 32: Press release of the Rwanda Defence Force

## PRESS RELEASE



1.   In the morning of 29 January 2017, a group of unarmed people claiming to be M23 combatants crossed into Rwanda through Rwanda-DRC common border, in Bugeshi Sector, Rubavu District. By 17.00 Hrs, 30 individuals had been registered.

2.   According to information received from the combatants by Rwanda Defence Force, they claim that they are fleeing from combat action by DRC Armed Forces (FARDC).

3.   The fleeing combatants have been seen by the International Committee of Red Cross (ICRC), and those requiring medical attention have been attended to by the ICRC, in accordance with International Humanitarian Law.

END

René Ngendahimana
Lt Col
Ag. Defence & Military Spokesperson

(See https://mod.gov.rw/news-detail/?tx_ttnews%5Btt_news%5D=3352&cHash=a5ec7234777607ca9178d616809-lba13, last accessed on 15 June 2016)

UNCLASSIFIED

EXHIBIT 24

S/2017/672

Annex 33: Ex-M23 combatants captured by the Ugandan army in Bunagana





(Pictures recovered by the Group in February 2017)

UNCLASSIFIED

EXHIBIT 24

S/2017/672

## Annex 34: PNDDR3 statistics

 **1. Statistiques globales au 22 mai 2017**

| SITES | SESSION 01 & 02 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | KITONA | | | KAZANA | | | TOTAL | | |
| | Hom | Fem | TOT | Hom | Fem | TOT | Hom | Fem | TOT |
| Installés physiques | 1545 | 16 | 1561 | 2153 | 63 | 2216 | 3698 | 79 | 3777 |
| En cours de reinsertion | 463 | 8 | 471 | 402 | 6 | 408 | 865 | 14 | 879 |
| TOTAL | 2008 | 24 | 2032 | 2555 | 69 | 2624 | 4563 | 93 | 4656 |

| SITES | SESSION 03 (ACTUELLEMENT DANS LES CPR) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | KITONA | | | KAZANA | | | TOTAL | | |
| | Hom | Fem | TOT | Hom | Fem | TOT | Hom | Fem | TOT |
| En cours de reinsertion | 463 | 8 | 471 | 402 | 6 | 408 | 865 | 14 | 879 |
| TOTAL | 463 | 8 | 471 | 402 | 6 | 408 | 860 | 14 | 879 |

 **2. Statistiques au 22 mai 2017 (suite)**

*répartition par groupe arme d'origine*

| GROUPE ARME | KAKANA | KITONA | TOTAL |
|---|---|---|---|
| FDC | 2 | | 2 |
| DQH/KAHIMA | 4 | | 4 |
| DDH/Kazega | | 2 | 2 |
| MM KIFGAKUA | 2 | | 2 |
| MM KIMIN | 2 | | 2 |
| HPOI | | 3 | 3 |
| ADP/Congalais | 1 | | 1 |
| ADM | 1 | | 1 |
| DC ASUADI | 1 | | 1 |
| DDM/Tanya | | 1 | 1 |
| DDH/NDELI | 1 | | 1 |
| FDLC | | 1 | 1 |
| SP | | 1 | 1 |
| LRA/Oueanda4 | 1 | | 1 |
| MJCR | 1 | | 1 |
| MM Bede/Fulhu | | 1 | 1 |
| MM TSHUMA | 1 | | 1 |
| Mudhembe | 1 | | 1 |
| NDC NDUMA | 1 | | 1 |
| NDC/NENOV1 | 1 | | 1 |
| Nyatora Intear | | 1 | 1 |
| NCD | 1 | | 1 |
| MMBA/PDS | 1 | | 1 |

| GROUPE ARME | BRANGNA | KITONA | TOTAL |
|---|---|---|---|
| Raihekk/Combagts | 58 | 149 | 187 |
| Mai Mai | 59 | 70 | 129 |
| Nyatura | 57 | 54 | 111 |
| FBR | 8 | 40 | 48 |
| NPO/5 Janviar | 28 | 15 | 43 |
| MJ1 | 27 | 9 | 36 |
| NDGCh4La | 4 | 29 | 33 |
| Kata Ketanga | | 26 | 26 |
| FDLR/TOCA | 15 | 10 | 25 |
| NUTRES | | 14 | 14 |
| FPC Laliocalme/UPCP | 1 | 13 | 14 |
| FPD | | 9 | 9 |
| UPCP/FFPC | 2 | 6 | 8 |
| MM Yakotumbu/Bombo | | 8 | 8 |
| FDLR/TOCA/Rwandph | | 5 | 5 |
| Nyatura Nyirag | | 4 | 4 |
| Gumbno Tawirdst | | 3 | 3 |
| FDRPS DE CHEST | 2 | | 2 |
| MIRA | 106 | | 106 |
| UPLD | 13 | | 13 |
| MM CHIMBINGI | 11 | | 11 |
| MM Mazembe | 11 | | 11 |
| MM MANU | 3 | | 3 |
| MM NSANDO | 1 | | 1 |

 **3. Réintégration : Statistiques**

- **Installés Physiques (3777)**



Observation

| Homm | 471 | | | |
|---|---|---|---|---|
| Femm | 849 | 1927 | 3797 | 196 |
| Rustihom | 961 | | | |

(Documents provided to the Group by the UE-PNDDR)

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

## Annex 35: Letter by ITRI Ltd to the Group

| Telephone | Fax | Internet | ITRI Ltd |
| +44 (0)1727 875 544 | +44 (0)1727 871 341 | enquiries@itri.co.uk | Unit 3, Curo Park, Frogmore, St Albans, Herts AL2 2DD, UK |

Zobel Behalal
Acting Coordinator, GOE on the DRC pursuant to resolution 2293 (2016)
c/o Mohamed Sesay Kamla
Acting Secretary, Security Council Committee 1533 (2004)
United Nations Secretariat
TB-08041 A
New York
NY 10017
USA

Via email to: sesaym@un.org

14th June 2017

Dear Zobel,

Thank you for your letter dated 31st May 2017 of which we confirmed receipt on 8th June. As highlighted in previous correspondence, we have endeavoured to respond to your request in a timely manner although I hope that you can understand that we are obliged to prioritise on-going implementation activities, including management of important incidents impacting supply chains, over ad-hoc requests from external parties. This can make it impossible to meet short deadlines and we would highly appreciate that the GOE provides a minimum of one month for responses to future enquiries.

**Request S/AC.43/2017/GE/DC.43**

Your letter states that the GOE have found that ITSCI tags have been used to launder minerals from sites in Walikale and Shabunda sometimes under the control of armed groups (Mai Mai Simba and Raia Mutomboki), or from non-validated sites.

*Non-validated sites*

Your enquiry implies that all non-validated sites are of the same level of concern as sites controlled by armed groups, however, this is not the case. Traceability is in place at many sites which do not have a current validation status.

The official validation process in the DRC has faced many delays. The original need for joint visits means that missions can be costly, long and difficult to organise. There have been many occasions when some organisations who wish to participate (for example IOM or BGR) have not been able to agree dates for visits due to limitations in budget, staff or because the mission would be to a complex area.

The process of validation is therefore still in progress, not all 3T sites in DRC have been visited by a validation team, even on a single occasion. While many sites have been validated in the past, the

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

validation entries are valid only for a 6 month period and most previously validated sites can no longer be considered to have a validation status since this period has expired.

Being a 'non-validated' site does not automatically mean that circumstances at the mine are unknown since alternative means for due diligence are possible. ITSCI was established prior to the start-up of official validations and gradual regularisation is still underway; validation teams have not visited all ITSCI sites within the past 6 months period, nevertheless, ITSCI baselines and continuous monitoring visits at every of our sites ensure issues, such as armed group presence, are known and reported.

The DRC Government is aware that regularisation of the validation process needs to be completed, and, that the validation process faces challenges of speed and cost. Their concern resulted in the Arrêté Ministériel N°0919/CAB.MIN/MINES/01/2015 du 29 Octobre 2015 fixant les procedures d'inspection, de qualification et de validation des sites miniers des filières aurifères et stannifère en République Démocratique du Congo, which introduced a more flexible approach to validation, allowing mine inspectors and/or traceability schemes to perform visits and report to the Minister. This was to move to a more cost effective and sustainable approach. In accordance with 0919 Arrêté, ITSCI is currently working on performing validation visits to some sites prior to implementation of traceability/due diligence.

There are of course other sites which are neither validated, nor approved for ITSCI implementation. One example is Kachuba site, Nzibira, our visit to which revealed possible involvement of FARDC which is not yet resolved.

The above represents our understanding of the reality on the validation process. In finalising your report, we request that the GOE avoids implying that all non-validated sites may be high risk, and includes exact details of site names which are a concern in order to allow proper evaluation of the evidence in the report, as well as future follow-up/mitigation.

*Laundering*

Your letter states that ITSCI tags have been used to launder minerals from Walikale, sometimes sourced from sites under the control of armed groups, and enquires as to whether we are aware of this reality. Since there is no information contained in your letter regarding tag numbers, locations, dates or other key reference points we can neither respond in detail, nor take any action on GOE allegations of risk. However, we are happy to confirm that we are fully aware of potential risks to 3T supply chains across the central African region, including the potential for illegal, criminal or corrupt activity that may raise the risk of connections between armed groups and ITSCI minerals or companies. ITSCI references the OECD guidance and categorises Annex II risks which include 'fraudulent misrepresentation of the origin of minerals' para 11, and armed groups and security services, para 3-10.

It is because we recognise that such risks are in reality likely, are complex to manage, and can never be completely eliminated, that we put in place many different measures to monitor for such risks and to mitigate them in an appropriate way. The key tools in managing risks is the ITSCI incident management system and our follow up with stakeholders at all levels and of all types. Information on potential incidents is available from our field staff who have a continuous presence in the area, as well as via a whistleblowing mechanism and other communications.

Page 3 of 6                    ITSCI-Detailed 3/13

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Wolkkale**

According to verbal information and testimonies, Mai-Mai Simba, and sometimes the self-proclaimed 'General' Mando, were present at or around Kalay Boeing (KB) camp at several occasions in the past months; specifically 7-9 January 2017 and 23 January-5 February 2017.

Tagging was suspended on 7 January 2017 when Mai Mai Simba arrived at the camp [Incident NK-2017-0003]. We can confirm that the suspension occurred on 7 January not on 17 January 2017 as stated in your letter – although see below regarding mis-used tags.

On 9 January, Mai-Mai Simba reportedly collected money from each person present at the camp/village of KB site before leaving. Miners were allegedly at the mine site and not present at the camp at the time of the taxation. There are no reports or evidence to indicate that miners paid the Mai Mai Simba directly. However, taking into account that traditional authorities including the chief of locality and land owners apply local taxes including on mining activities, and considering that traditional authorities gave money to the Mai-Mai Simba, there is a recognised risk of indirect support to the Mai-Mai Simba.

One unarmed Mai-Mai Simba fighter was later reported to have been seen at KB camp on 1 January 2017 and to have reportedly received money from traditional authorities at the camp during a New Year celebration [Incident NK-2017-0003].

For security reasons, ITSCI field staff left KB camp at the time Mai-Mai Simba arrived which left ITSCI tags and logbooks under the control of the SAESSCAM agent at the site. Both parties signed a written declaration to confirm the suspension of tagging, including the reference numbers of tags and logbooks handed over to SAESSCAM. This statement stipulated that no tags should be used until further notice by ITSCI, but unfortunately, the SAESSCAM and Divsmines agents mi-used 73 of these mine tags at KB [Incident NK-2017-0014].

All exporters were informed about the incidents. Information was also provided on the mine tag numbers mi-used by SAESSCAM, with the request to segregate the minerals when/if received at exporter facilities in Goma. To date, 68 mine tags have been located at two exporters in Goma, North Kivu. All associated minerals were segregated by the exporters and no authorisation for export has been provided by the authorities. Five mine tags have not yet appeared in the supply chain.

A range of stakeholder meetings and communications proceeded in the early months of 2017 and tagging was resumed on 12 April 2017 following improvement of the situation. For example, the security situation at and around KB had been reassessed and found to be more positive, and, mitigation measures including sensitisation of traditional authorities, and steps to reduce the risk of future payments from traditional authorities to Mai-Mai Simba, had been taken. As long as these mitigation measures are respected, and no other incident happen, these minerals can be exported from the DRC.

In March 2017, ITSCI put in place strengthened measures of tag distribution in Walikale to further reduce possible misrepresentation or origin of minerals from non-ITSCI sites [Incident NK-2016-157]. These measures allowed the provincial authorities to uncover illegal transport of untagged minerals in Walikale territory and the presence of large quantities of stocks in several negociants depots. This mineral is considered to have been sourced from Bisie mining area which is not validated, but on which there have been no recent reports of armed group activity. Recent high level stakeholder

S/2017/672

discussions resulted in an agreement for ITSCI to tag minerals mined in Bisie for a period of 7 months during which artisanal miners will be encouraged to move away from the Alphamin Bisie concession.

*Lubutuku*

ITSCI is aware of potential risks of minerals from non-ITSCI sites in Lubutuku and/or in Shabunda being fraudulently tagged in or around Nzibira town. For example, such risks were recorded and reported in ITSCI incident SK-2016-0065 in April 2016. Such risks are not unexpected due to the slow pace of official validation of nearby sites, and in particular, stakeholder disagreement over recognition of informal mining on the Banro concession.

3T mining activities have always occurred around Lubutuku, including on the Banro private concession. A number of stakeholder groups consider that formalisation of those miners and implementation of traceability would be a step forward, however other stakeholders are of the opposite opinion. Efforts to reach an agreement have been underway for several years without success, making it difficult to mitigate risks of fraud.

Nevertheless, the situation on the concession is well understood, and there are no armed groups or state security forces reported in that concession. Discussions between Banro and provincial authorities have been underway in order to allow artisanal miners to officially carry out activities in some areas of the concession in the same way as has been agreed at Bisie. This would further allow these 3T minerals to be tagged and controlled. In November 2016, the Provincial Minister of Mines sent an official letter to Banro, asking for their agreement in that regard but no actions have been taken by the end of the year.

Various allegations of minerals from non-validated or non-approved sites entering the ITSCI supply chain in the area have been made, but none have been confirmed with appropriate evidence. There have also been no known cases of minerals directly or indirectly supporting state or non-state armed groups, then fraudulently entering the ITSCI supply chain. The incident mentioned above was therefore closed as unresolved in December 2016.

On 12 January 2017, during a provincial stakeholder (CPP) meeting, the concession owner promised to give a favourable decision to allow formalization of 3T mining by the end of February. However, no decisions have so far been made. There has also been a lack of engagement from provincial authorities to hold the expected regular CPP meetings or to follow up on this issue. Therefore, in order to ensure continuous follow-up on this situation and risks of minerals from non-approved sources entering the ITSCI supply chain, a new incident was open in 2017 (incident SK-2017-0056).

ITSCI has also noted risks of minerals from non-approved sources allegedly entering the ITSCI supply chain in Nzibira. Two incidents were opened for two specific sites; SK-2017-0124 regarding minerals tagged at Chembeke site; and SK-2017-0146 regarding activities at Tuhosho site, both located in Walungu territory. Exporters were informed about these incidents and the risks present for those sites, and those exporters performed and provided risk analysis and due diligence for the minerals purchased from those sites, including with supplementary information from their own visit reports.

In neither case was there was any information to suggest, nor confirmation, that minerals were coming from mine sites controlled by non-state armed groups. Both incidents were closed as unresolved or inconclusive in May 2017.

To further mitigate such potential risks, ITSCI is also strengthening the management of tag and logbooks in South Kivu through a multi stakeholder tag management system. In future tags will not

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

be allocated only to the state agency such as SAESSCAM, but jointly to the state agency and the responsible cooperative.

*Shabunda*

ITSCI has been aware of, and received, various rumours regarding minerals originating in Shabunda, apparently transported to Bukavu by air and illegally tagged there. The parties alleged to be involved were negotiants and provincial SAESSCAM and Division of Mines authorities. As a result of information shared on these rumours, a delegation from national authorities visited Bukavu in September 2016 and the provincial directors of SAESSCAM and Division of Mines were called back to Kinshasa. While they later returned to their positions there have been no other similar rumours following this action, and the incident was therefore closed as inconclusive in January 2017 for lack of evidence [incident SK-2016-0066].

ITSCI first implemented tagging with the authorities at 5 mine sites in Shabunda territory in August 2016 and between that time and December 2016, only one security incident (involving road bandits) was recorded in the relevant implementation area. Mitigation measures were taken to reinforce security on a transport route and the incident was closed as resolved in March 2017 after the security situation had improved [incident SK-2016-0134].

Additional validation missions have taken place in 2017, although delayed due to factors mentioned above. The validation team recommended validation of 27 mine sites, including 26 sites for 3Ts, but this has not yet been signed by the Minister.

At the end of 2016, the ITSCI whistle blowing system was also extended to Shabunda, but to date, no information has been received in relation to possible tagging of unapproved minerals/sites in Shabunda.

Note that the involvement of armed groups in Shabunda seems more related to the gold trade, as highlighted by the Global Witness report published in July 2016 "River of Gold" [incident SK-2016-0084]. ITSCI also directly noted the involvement of armed groups at the gold sites of Mobe and Lukomyole in 2017 although this did not concern 3T's or ITSCI sites or minerals [incident SK-2017-0017].

**Request 1/AC.43/2016/SE/OC.31**

The GDE requested an update on the above point regarding information sharing. In my last email of 16 Feb 2017 I mentioned that we were consulting with our partners in governments on the potential MOU as any agreement would require their approval. This would be followed by a consultation with our member companies. It is unfortunate that this is a slow process however please be re-assured that we have not forgotten the proposal and still support the general concept of closer cooperation.

We have since received comment from Minister Kabwelulu, DRC who confirms that to support transparency he has no objections to sharing information between ITSCI and GDE, providing that the DRC Government is assured of receiving such information in advance. This raises some challenges for us in terms of cost and resourcing since all communications to the DRC Government must of course be in French, while the working language of ITSCI documentation for the supply chain is of course English. A significant additional translation budget would be required to put in place closer cooperation with the GDE which our members across industry may not view as a priority use of funds; this issue is yet to be resolved.

Page 5 of 5

17-11025
DRC-30316 0429
UNCLASSIFIED

85/111
85 of 111

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

We have also discussed the request with Minister Biruta, Rwanda. Our MOU with the Government signed in 2010 notes that "...both parties will work to agree on a general policy on what data may or may not be made available to official bodies such as the UN Group of Experts, and/or to other interested parties and/or to the general public before such information is released. We are still working on a mutually agreed framework for sharing information.

The 3T sector in Burundi has not been very active in the past 2 years so we have not discussed this request with the Government there. However, production is now re-starting and we will also communicate with them about your request at an appropriate time.

The next step, should we be able to locate funding for additional required translations, would be to move ahead with an MOU with the GOE which relates to information on companies within the DRC. We can also make further enquiries with the Government of Burundi and continue discussion with Rwanda. We would be pleased to work towards establishing a positive relationship and greater level of information exchange with the Group and hope that further discussion may ultimately lead to a successful conclusion.

**Response to GOE report S/2016/1102**

The last GOE report stated (para 84) that tagging was suspended at sites in Mashi after the GoE sent letters to three exporters, and as a result concluded that stakeholders cannot solely rely on validation procedures or on official norms to guarantee that the minerals are conflict-free.

We would agree with the second part of that statement, that official validation cannot be relied upon, since it represents the situation at any mine at the time of the validation visit and does not assist in monitoring any change in that situation or what risks arise. This is the reason why ITSCI finds it essential to have a continual on the ground presence (as also recommended in the OECD DDG).

The first statement is not correct as tagging was suspended prior to any letters from the GOE.

We would like to make the following clarification of events and actions for correction in the next GOE publication;

| | |
|---|---|
| 20 Oct 16: | the incident was reported by our field staff who witnessed the situation together with SAESSCAM agents |
| 22 Oct 16: | an incident report was opened |
| 22 Oct 16: | Provincial authorities, ANR and FEC were informed during a meeting in Goma |
| 24 Oct 16: | all tags and logbooks were withdrawn from the 8 mine sites |
| 25-26 Oct 16: | Signal Mining and Metachem were informed by ITSCI and requested to segregate purchased minerals from this sector |
| 11 Nov 16: | GoE sent the letter to exporters |

Note that CMM was not informed about the incident in October, as they had not purchased any minerals from this sector in that month; they only had purchased minerals in August 2016, at a time where the security situation was good and when there had been no report of presence of armed group in the sector. On 17 Nov 2016 we informed CMM of the letter from the GoE and related information since the letter had been sent to an email address that was not current. We also assured other exporters had received the GOE letter.

Note that CMM was named in para 83 of the French version of the GOE report, but not in the English version.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

The UN report further says, para 82, that members of the armed group "Guides" were present at mine sites and, according to a stakeholder working in mining and a representative of the civil society, received money from miners working at mine sites in Mahanga. According to annex 28, these "Guides" were later split in several sub-groups, respectively led by "General" Luanda (who renamed his groupe Forces de Défense du Congo, FDC), "Generals" Mbura and Bwira (who refer themselves as Guides-Mouvement acquis au changement, MAC). These "Generals" are all named in our incident update reports.

Also, note that the UN report includes in its annexes (Annex 29, pp. 73-75) a copy of the answer sent by Signal Mining which mentions that they had been informed by ITSCI on 25 October prior to receipt of the GOE letter and the incident report number. Signal Mining further wrote that ITSCI informed all authorities and stakeholders during meetings on 22, 26 Oct and 12 Nov.

While the GOE remarked in para 82 that elements from the armed groups "received money from the mining actors operating at the sites in Mahanga" we do not as yet have any evidence to substantiate that point.

Note that there was also a mis-use of tags in this case, 9 mine tags were used by a SAESSCAM agent despite suspension of tagging by ITSCI and while all tags and logbooks had already been withdrawn from the site, and were located at the SAESSCAM office (incident NK-2016-0125). All exporters were informed about the incident and expected to segregate the minerals if received at their facilities. After several months of investigation, the minerals were located at CMM in April 2017 and segregated. The delay in locating these tags was due to the fact that CMM had closed their facilities for several months and started to purchase minerals again only in April 2017.

Discussions between ITSCI, state agents (Division of Mines and SAESSCAM), cooperatives, and companies had already taken place in April to discuss the ITSCI procedures in general and also review the security situation in Nyamkubo sector. Such risks of minerals from this sector brought to other ITSCI areas for tagging were raised and discussed, but so far, although no evidence was found, exporters committed to looking at such risks closely (incident NK-2017-0134)

Should you have specific questions relating to the operation of the ITSCI Programme, its mines or its members please do contact me again. We are keen to assist in verification of any information you have and encourage sharing and discussion before publication of comment by the GOE to avoid inaccuracies and subsequent misunderstandings or need for correction.

We would be happy to further discuss with the group any aspects of our response that may not be clear or which require further clarification, either through in-person meeting or other means.

Yours sincerely,

[redacted]

Kay Nimmo,
Manager of Sustainability and Regulatory Affairs, ITRI Ltd, &
ITRI Representative to the ITSCI Governance Committee

Page 7 of 8                    ITRI-Behind 7/13

UNCLASSIFIED                          EXHIBIT 24

S/2017/672

Annex 36: Tagging in Walikale Territory

a) Validated mining sites around Bisie (Ndjingala, Mubi and Walikale are trading centres)



(Map by the International Peace Information Service, edited by the Group)

b) Tagged minerals from sites around Bisie



| SITE | SEP 16 | OCT 16 | NOV 16 | DEC 16 | JAN 17 | FEB 17 | MAR 17 |
|---|---|---|---|---|---|---|---|
| AMAMOKOA | 24,120 | 19,926 | 46,884 | 34,695 | 24,353 | 8,581 | 8,275 |
| ANIGISI | 117,195 | 70,554 | 0 | 10,027 | 23,895 | 8,502 | 5,018 |
| BISAGOWA | 2,356 | 0 | 33,067 | 38,968 | 21,718 | 8,026 | 0 |
| CAMP BRIQUES | 7,558 | 17,425 | 42,310 | 15,842 | 7,017 | 4,000 | 5,962 |
| CAMP PLANE | 21,148 | 6,708 | 45,408 | 14,230 | 10,015 | 0 | 3,713 |
| KALAY BOEINO | 0 | 0 | 0 | 6,013 | 43,508 | 9,513 | 0 |
| LUBILINGA | 27,609 | 18,292 | 26,916 | 32,916 | 16,034 | 5,005 | 9,770 |

(Graph by the Group, based on the table compiled from iTSCi logbooks)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 37: EPEM warehouse location and concession claim**

a) EPEM warehouse coordinates



b) EPEM's claim to Nyakoba concession



(Document recovered by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 38: Transport fraud detected at Kashebere control point**

On 23 March 2017, Théophile Kambale, a driver of the humanitarian non-governmental organisation "ALDI", was stopped at Kashebere checkpoint and found in possession of one ton of cassiterite hidden in its TATA vehicle (plate number 3303 AB / 19). The minerals were seized "as a temporary measure" by the mining authorities of the DRC.

On 7 February 2017, a négociant from Mubi, Morefu Karati, was arrested by authorities for transporting six tons of tagged cassiterite from Bisie while declaring only five tons on the transport manifest compiled by SAESSCAM in Mubi. The fraud was discovered by manually counting the bags, the vehicle seized and sent to Goma (see statement below).

On the same day, a Toyota Hilux pickup was also caught transporting two tons of cassiterite from Bisie instead of the 750kg declared in the accompanying SAESSCAM documentation.



(Document recovered by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 39: Handover of tags from SAESSCAM to ITRI Ltd staff**

REPUBLIQUE DEMOCRATIQUE DU CONGO        Rubaya, le 03/11/2016

MINISTERE · DES MINES

SAESSCAM NORD- KIVU

BUREAU DE MASISI

— Transmis copie pour information a:

le 03/11/2016

- Monsieur le chargé de l'Administration et Finance ai du SAESSCAM MASISI à Rubaya

Concerne: Transmission
Décharge de la remise
et reprise de matériels
de traçabilité des sites
d'ailes Nyunga, Kihabi,
Karuba et Nyabiondo.

A Madame le Chef de Bureau ai
du SAESSCAM /NK, Bureau de
Masisi à Rubaya,

Madame le Chef de Bureau,

Nous avons l'honneur de vous
transmettre en annexe de la présente ce dont l'objet est
repris en marge.

Veuillez agréer, Madame le Chef
de Bureau, l'expression de nos sentiments de franche
collaboration.

Pour le SAESSCAM /NK, Bureau de MASISI
MUNYOLERE LUHEMBA Justin

chargé de Techniques et Opérations

(Document recovered by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 40: Letter from COMIPCC to the Chef d'antenne minière in Nyabiondo**

On 19 December 2016, the director of the mining cooperative COMIPCC wrote to the Chef d'antenne minière (the local representative of the Ministry of mines) in Nyabiondo to pledge for the release and tagging of 1,700kg of cassiterite from the suspended sites in Mahanga they have in their warehouse in Nyabiondo. The letter refers to the 421kg of cassiterite from the same sites tagged by SAESSCAM on 30 October 2016.



(Document recovered by the Group, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

**S/2017/672**

---

### Annex 41: Ugandan measures to stop the sale of smuggled gold

#### 5. **Measures to stop illegal importation of Gold:**

Uganda is a signatory to the ICGLR Pact on Security, Stability and Development which contains a Protocol Against the illegal Exploitation of Natural resources and it has ratified both the Pact and the Protocol. The Protocol's central tool is the establishment of a Regional Certification Mechanism

Cabinet approved a bill for the domestication of the provisions of the Protocol on the Fight against the Illegal Exploitation of Natural Resources. The bill was recently presented to the Sectoral Committees of Foreign Affairs and Defense. The bill awaits tabling before Parliament.

The domestication of the ICGLR protocol is in the final stages of completion and once complete a more comprehensive due diligence mechanism such as the Regional Certification Mechanism will be implemented in a bid to curb illegal exploitation of natural resources.

Other related actions being undertaken include measures to ensure that before an import permit is issued for a consignment to be imported into Uganda, the entity intending to import is required to present an export permit and Certificate of Origin from the originating country of the consignment. This is a measure to make sure that consignments that officially enter Uganda are recognized by the originating country.

Uganda has also encouraged and attracted private sector investment in the gold sector in a bid to formalize it, enhance traceability and responsible sourcing of gold. The establishment of the refinery by African Gold Refinery (AGR) in Uganda is testimony to the response to attract investments to formalize the sector.

(Extract of a letter dated 19 June 2017 from the Government of Uganda addressed to the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 42: Non-declaration of 150 kilograms of gold**



Reference to 150 kilograms of gold

(Document provided to the Group by the Government of the UAE, highlights by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 43: Travel records of Ms. Elysée Chibalonza from 2016 to 2017**

**Subject:** UN Group of Experts on DRC request for travel information of Ms. Elysee Konini Chibalonza

Reference is made to letter dated 25 March 2016 with ref. no S/AC.43/2015/GE/OC.19 by Security Council committee established pursuant to resolution 1533(2004) concerning DRC requesting travel information about Ms. Konini.

Upon receipt of the letter, we have checked all documents and travel history of the individual. Based on our investigation of the matter, we would like to summarize our findings and kindly request your good office to communicate the information to the coordinator of the group of experts accordingly:

1. The start date and place of Ms. Konini travel on ET 612 flight are 13/09/2015 and Lubumbashi respectively.

2. Regarding list of all trips Ms. Konini made on Ethiopian Airlines since January 2015, the individual has made a total of 17 trips from January 2015 to March 2016 and the points of departure of all the trips is Lubumbashi and the final destination is Dubai. The dates of travel are 6/1/2015, 06/02/2015, 20/2/2015, 13/2/2015, 27/3/2015, 29/4/2015, 24/5/2015, 14/6/2015, 28/6/2015, 03/8/2015, 04/10/2015, 04/11/2015, 06/12/2015, 27/12/2015, 13/1/2016, 5/2/2016 and 8/3/2016.

Finally, Ethiopian Airlines would like to assure Your Excellency and the Esteemed UN Panel of Experts, that Ethiopian Airlines has always been transparent and sincere in carrying out its legal compliance and social responsibilities and as a good corporate citizen confirm that our airways, it will continue complying with any relevant and applicable UN Security Council Resolutions.



(Document obtained by the Group)

UNCLASSIFIED                    EXHIBIT 24

**Annex 44: Missing ICGLR certificates**

In June 2016, the Government of Belgium refused to clear an export of gold accompanied by the ICGLR certificate number CD 00007976. In February 2017, exporters in Lubumbashi used the ICGLR certificate number CD 00001892 to export 99.5 kilograms of gold to Dubai.

| Numbers of disappeared certificated | Number of certificates in the series |
|---|---|
| CD 00001892 – CD 00001893 | 2 |
| CD 00001911 | 1 |
| CD 00007631 | 1 |
| CD 00007937 – CD 00007958 | 22 |
| CD 00007976 – CD 00007999 | 24 |
| **Total certificates missing** | 50 |

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

### Annex 45: Official gold exports from Uganda

a) Official monthly gold exports from January 2014 to March 2017



(Source: Bank of Uganda Statistics, 2017)

b) Official monthly gold exports from January 1995 to April 2017



(Source: Bank of Uganda Statistics, 2017)

UNCLASSIFIED                EXHIBIT 24

S/2017/672

c) Official gold exports and production from 2011-2015



| | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| ■ Production | 0,5 | 4.3 | 4.5 | 24.4 | 12,7 |
| ■ Export | 163 | 199 | 46 | 5 | 1088 |

Year

(Source: Uganda Bureau of Statistics, 2016)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 46: Rafiki General Trading**

a) Example of an ICGLR certificate used by Glorym to export gold to Rafiki General Trading



b) Statement of activities by Rafiki General Trading



**Rafiki General Trading** FZE

Dated 22ⁿᵈ August 2016

To
The Ministry of Foreign Affairs
Dubai
United Arab Emirates

SUBJECT: RAFIKI GENERAL TRADING FZE – COMPANY ACTIVITIES

Dear Sir / Madam,

I am writing this letter to elaborate further about the activities of RAFIKI GENERAL TRADING FZE. It was founded in 2013 infive Al Khaimah, United Arab Emirates, which is owned and managed by Nilesh Subhash Ladhra.

The scope of the business activities mainly covers imports and exports which can be described as follows:

  ◆ From Democratic Republic of Congo, we are exporting pharmaceutical raw materials to India.
  ◆ From India we are exporting garments and fabric to Democratic Republic of Congo.
  ◆ Serve as mediator or agent between Suppliers and Buyers for sourcing high quality pharmaceutical raw materials. However, there are certain transactions in which buyers are directly sending their payments to the suppliers and they are just providing me the agreed commission amount in cheque or cash forms.

And with this letters, are some proofs of my business deals to support the aforesaid information, such as Invoice, Bill of Lading & Company Bank Statement.

Should you have further clarification please feel free to contact me.

Remain at your entire disposal.

Sincerely Yours,

Nilesh Subhash Ladhra

P.O.Box : 16600, Ras Al Khaima · U.A.E., Tel : +971 7 2079943, Fax : +971 7 2079941, E-mail : rafiki@eshhbd.ae

(Documents obtained by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

Annex 47: Response of the Government of the UAE to the Group



Ref 2017/31

8 February, 2017

Mr. Sharp,

I am writing in reference to letter No. S/AC.43/2017/GE/OC.5 dated 2 February 2017, regarding the information requested by the Group of Experts on the actions taken by the United Arab Emirates to implement the recommendations contained in the final report of the Group (S/2016/466), and the gold import figures of the United Arab Emirates from Burundi, the Democratic Republic of the Congo, Tanzania and Uganda starting from January 2016 to this date.

In this regard, I would like to inform you that we have requested the Federal Customs Authority in the United Arab Emirates to provide us with the gold import figures.

With regard to the actions taken to implement the recommendations contained in the final report of the Group of Experts, I am pleased to inform you that the National Committee on Anti-Money Laundering and Combating Terrorist Financing is committed to implement the measures contained in the report, and has developed corrective plans to regulate the process of importing gold and complete measures to stop illicit financial flows. Measures taken in this regard include the following:

- The concerned authorities in the United Arab Emirates implement measures which require the individuals carrying gold to declare, upon their arrival to the United Arab Emirates, the identity of gold exporters (full name and address).

Mr. Michael Sharp
Coordinator
Group of Experts on the Democratic
Republic of the Congo
Security Council Resolution 2283 (2016)

100/111
DRC-00316 0444
100

UNCLASSIFIED

17-11025
100 of 111

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

PERMANENT MISSION OF THE
UNITED ARAB EMIRATES
TO THE UNITED NATIONS
NEW YORK



دولة بعثة الممثلة الدائمة
للإمارات العربية المتحدة
لدى الأمم المتحدة
نيويورك

- The local customs authorities request individuals who transport gold to provide information that include copies of their passports or identification documents, the address of residence, and the destination to which the funds will be transferred, in conformity with the financial regulatory measures of the Financial Action Task Force (FATF), which require verification of sources of funds, currencies, gold and silver, and in accordance with the established procedures of the Organization for Economic Cooperation and Development (OECD) pertaining to gold.

- The United Arab Emirates implements a declaration system for cash amounts above AED 100,000.00 or its equivalent in foreign currencies. According to that system, individuals entering the United Arab Emirates must declare the amount of cash in their possession by filing the relevant form available at all points of entry, which is later carefully examined for authenticity of documents by the local customs authorities. Additionally, the local customs authorities request traders in the United Arab Emirates to register their names and addresses as a pre-condition for releasing the gold.

- The United Arab Emirates analyses the financial flow patterns in order to identify risks in accordance with the established standards implemented by the concerned authorities.

- The concerned customs authority imposes trafficking fines on individuals in the case of non-declaration, and follow-up on the reasons of not doing so.

Finally, the UAE Federal Customs Authority, in agreement with the National Committee on Anti-Money Laundering and Combating Terrorist Financing, continue to coordinate with security entities, Departments of Economic Development, the UAE Ministry of Economy and the other concerned authorities on measures to curtail the illicit trade in gold, jewelry and precious stones from conflict areas.

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

 

PERMANENT MISSION OF THE
UNITED ARAB EMIRATES
TO THE UNITED NATIONS
NEW YORK

البعثة الدائمة
للإمارات العربية المتحدة
لدى الأمم المتحدة
نيويورك

Please accept the assurances of my highest consideration.

**Jamal Jama Al Musharakh**
**Deputy Permanent Representative**
**Chargé d'Affaires, a.i.**

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

**Annex 48: Charcoal**

a) Map of charcoal producing areas



b) Production in areas under FDLR control

|  | PRODUCTION | | | | | |
|---|---|---|---|---|---|---|
|  | Population | | | FDLR | | |
| SITE | Producers | Kiln/week | Bags/week | Producers | Kiln/week | Bags/week |
| Songo | 100 | 100 | 800–1000 | 13 | 4 | 32–40 |
| Gitsimba | 400 | 400 | 3200–4000 | 13 | 4 | 32–40 |
| Karuli | 500 | 500 | 4000–5000 | 13 | 4 | 32–40 |
| Total camps | 1000 | 1000 | 8000–10000 |  |  | 96–120 |
| Bishusha/Bwiza | 500 | 500 | 5000–6000 | 0 | 0 | 800–1000 |

c) Illegal taxation by FDLR and FARDC on the production and sale in FC

|  | ILLEGAL TAXES FDLR | | ILLEGAL TAXES FARDC/BAG | | Selling price/bag |
|---|---|---|---|---|---|
| SITE | kiln | bag | Kitchanga | Kabalekasha |  |
| Songo | 6,500 | 1,000 | 1,000 | 1,000 | 3,000 |
| Gitsimba | 6,500 | 1,000 | 1,700 | 1,000 | 3,000 |
| Karuli | 6,500 | 1,000 | 1,700 | 1,000 | 3,000 |
| Bishusha/Bwiza | 4,000 | 0 | 1,700 | 1,000 | 5,000 |

17-11025
DRC-00316 0447
103

UNCLASSIFIED

103/111
103 of 111

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

d) Estimated revenues for FDLR from the illegal taxation of production and sales in FC

| SITE | FDLR tax/kiln | FDLR tax/bag | FDLR sales own bags | TOTAL REVENUES |
|---|---|---|---|---|
| Songo | 650,000 | 0.8–1 million | 96,000–120,000 | 1,546,000–1,770,000 |
| Gitsimba | 2,600,000 | 3.2–4 million | 96,000–120,000 | 5,896,000–6,720,000 |
| Karuli | 3,250,000 | 4–5 million | 96,000–120,000 | 7,346,000–8,370,000 |
| Total camps | 6,500,000 | 8–10 million | 288,000–360,000 | 14,788,000–16,860,000 |
| Bishusha/Bwiza | 2,000,000 | 0 | 4,000,000–5,000,000 | 6,000,000–7,000,000 |

e) Estimated revenues for FARDC from illegal taxation of sales

| SITE | FARDC Kitchanga | FARDC Kabalekasha | TOTAL REVENUES |
|---|---|---|---|
| Songo | 1,360,000–1,700,000 | 0.8–1 million | 2,160,000–2,700,000 |
| Gitsimba | 5,440,000–6,800,000 | 3.2–4 million | 8,640,000–10,800,000 |
| Karuli | 6,800,000–8,500,000 | 4–5 million | 10,800,000–13,500,000 |
| Total camps | 13,600,000–17,000,000 | 8–10 million | 21,600,000–27,000,000 |
| Bishusha/Bwiza | 5,000,000–6,000,000 | 5–6 million | 10,000,000–12,000,000 |

f) Registry of taxes collected from FDLR in VNP camps

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 49: MANPADS recovered from the FDLR**

a) Full MANPADS as recovered





b) Markings on the launching tube

  

90m 22-1-01 / 04-87 / 04860

9M313-1 / 04-87 / 04860 / C / LOD COMP         Reference numbers for quality control: 709 / 527

(Pictures by the Group)

UNCLASSIFIED          EXHIBIT 24

S/2017/672

c) Table of markings of the recovered MANPADS

| 90п22-1-01 | "Р", translated from Cyrilic alphabet |
|---|---|
| 04-87 | Year of production |
| 04860 | Serial number on the launching tube |
| 9М313-1 | Type of Missile-Variant 1 |
| C. LOD.COMP. | Indication that materiel was exported to an Anglophone country |
| 709 1141, 709 15381, 709 616 | The marking "709" indicates the sequence of quality control |

(Compiled by the Group)

d) Characteristics of a SAM-16 MANPADS



(See www.armyrecognition.com, last accessed on 15 June 2017)

106/111
DRC-S0316 0450
106

UNCLASSIFIED

17-11025
106 of 111

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 50: Pictures and map of the Kiliba incursion by FDN**




(Pictures recovered by the Group)



(Map by Google Inc., edited by the Group)

UNCLASSIFIED          EXHIBIT 24

S/2017/672

Annex 51: Route of arms traffic across Ruzizi river in early 2017



(Graph based on interviews conducted by the Group)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

**Annex 52: Ammunitions used in the attack against MONUSCO in Butembo**

| Photo No.: 01<br>Head stamp: 04_73 | Photo No.: 02<br>Head stamp: 61_10 | Photo No.: 03<br>Head stamp: 81_76 |
|---|---|---|
|  |  |  |
| Photo No.: 01 bis<br>Head stamp: 04_73 | Photo No.: 02 Bis<br>Head stamp: 61_10 | Photo No.: 03 bis<br>Head stamp: 81_76 |
|  |  |  |
| Photo No.: 04<br>Head stamp: 821_07 | Photo No.: 05<br>Head stamp:911_77 | Photo No.: 06<br>Headstamp 911_78 |
|  |  |  |
| Photo No.: 04 bis<br>Head stamp: 821_07 | Photo No.: 05 bis<br>Head stamp:911_77 | Photo No.: 6 bis<br>Head stamp: 911_78 |
|  |  |  |

(Map compiled from pictures taken by the Group)

UNCLASSIFIED                                    EXHIBIT 24

S/2017/672

**Annex 53: Ammunitions recovered from the FRPI**

a) Head stamps of FRPI ammunition

   

(Pictures by the Group)

b) Screenshots of Luwero Industries Ltd's website





(See www.luweroindustries.com, last accessed on 15 June 2017)

UNCLASSIFIED                    EXHIBIT 24

S/2017/672

## Annex 54: Timeline and traces of the attack on MONUSCO in Butembo

a) Timeline based on MONUSCO testimony

| Time | Events |
|------|--------|
| 0610 | Gunshots from northeast and west begin against MONUSCO and PNC. Mai Mai use cover of PNC office to shoot at MONUSCO. Attack also focuses on prison and the mayor's office. |
| 0645 | PNC run towards MONUSCO to hide. One peacekeeper gets shot into neck, survives wounded, prompting South African peacekeepers to repulse, they shoot four Mai Mai combatants. Peacekeepers see AK47, light machine guns and RPGs on the assailant side. Suspected aim of assailants seems to recover weapons. |
| 0705 | MONUSCO decides to chase assailants with four APCs, two westwards and two northwards. PNC recuperates three AK47 and light machine gun from fleeing Mai Mai. |
| 0710 | Next MONUSCO, one Mai Mai hides in a trench, shoots and kills one peacekeeper. Other Mai Mai fire a grenade against an APC and shoot another peacekeeper who survives. |
| 0930 | Attack ends, MONUSCO captures further Mai Mai. On MONUSCO side, one killed and two wounded are brought torn Goma. |
| 1300 | MONUSCO patrol discovers a killed FARDC soldier while clashes with retreating Mai Mai continue. |

b) Pictures of the damages at Butembo MONUSCO base

 

(Pictures by the Group)

UNCLASSIFIED

EXHIBIT 25

**Letter dated 20 May 2018 from the Group of Experts on the Democratic Republic of the Congo addressed to the President of the Security Council**

The members of the Group of Experts on the Democratic Republic of the Congo, whose mandate was extended pursuant to Security Council resolution 2360 (2017), have the honour to transmit herewith, in accordance with paragraph 6 of that resolution, the final report on their work.

The report was provided to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo on 27 April 2018 and was considered by the Committee on 18 May 2018.

The Group would appreciate it if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Zobel **Behalal**
Coordinator
Group of Experts on the Democratic Republic of the Congo

(*Signed*) Nelson **Alusala**
Expert

(*Signed*) Ledio **Cakaj**
Expert

(*Signed*) Virginie **Monchy**
Expert

(*Signed*) Bart **Vanthomme**
Expert

(*Signed*) David **Zounmenou**
Expert

# Final report of the Group of Experts on the Democratic Republic of the Congo

*Summary*

During the period under review, the security and humanitarian situation in the Democratic Republic of the Congo did not improve. The Group of Experts on the Democratic Republic of the Congo noted two major factors of concern: peacekeepers across the country faced serious attacks and armed actors continuously used the delay in the electoral process to promote acts of violence.

Armed groups continued to pose a threat to peace and security in the Democratic Republic of the Congo. Nduma défense du Congo-Rénové (NDC-R), led by sanctioned individual Shimiray Mwissa Guidon, increased its area of influence, recruited child soldiers and had some forms of collaboration with elements of the Forces armées de la République Démocratique du Congo (FARDC), the national army. Foreign and local armed groups, such as the Forces démocratiques de libération du Rwanda and Nyatura, continued to be interconnected in North Kivu Province.

With regard to natural resources and finance, armed groups and criminal networks, including national security officers, continued to use gold and taxation as sources of illegal revenue. The Group noted that, in Bunia and Bukavu, gold sourced in high-risk and conflict areas was exported illegally to Uganda and Rwanda. Smuggling activities in the tin, tantalum and tungsten sector continued to represent an obstacle to the successful implementation of due diligence measures.

In Beni and Djugu territories, civilians faced serious violations of international humanitarian and human rights law involving killings and internal displacement. The Group was not able to determine the main perpetrators of these violations.

Several countries failed to notify the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo regarding deliveries of arms and materiel in 2017 to the Democratic Republic of the Congo. The Group noted that FARDC stocks continued to represent the main source of supply of weapons and ammunition for armed groups.

UNCLASSIFIED                    EXHIBIT 25

## Contents

|  |  | *Page* |
|---|---|---|
| I. | Introduction | 4 |
| II. | Armed groups | 5 |
| | A. Forces démocratiques de libération du Rwanda | 5 |
| | B. Allied Democratic Forces | 8 |
| | C. Mai-Mai Yakutumba | 10 |
| | D. Nduma défense du Congo-Rénové | 14 |
| | E. Mai-Mai Kilalo | 18 |
| III. | Natural resources | 20 |
| | A. Gold | 20 |
| | B. Tin, tantalum and tungsten | 25 |
| IV. | Serious violations of international humanitarian law and human rights | 26 |
| | A. Attacks on civilians in Beni territory | 26 |
| | B. Violence in Djugu territory | 28 |
| V. | Attacks against United Nations peacekeepers | 29 |
| | A. Attacks on United Nations peacekeepers in Beni territory | 30 |
| | B. Attacks on, and killings of, United Nations peacekeepers in Fizi territory | 31 |
| VI. | Arms | 32 |
| VII. | Recommendations | 37 |
| Annexes* | | 39 |

---

* The annexes are being circulated in the language of submission only and without formal editing.

UNCLASSIFIED                    3 of 132

# I. Introduction

1.    The final report of the Group of Experts on the Democratic Republic of the Congo is being submitted pursuant to paragraph 6 of Security Council resolution 2360 (2017).

2.    In accordance with the request made by the Security Council in paragraph 8 of its resolution 2360 (2017), the Group continued to exchange information with the Panels of Experts on the Central African Republic, South Sudan and Yemen.

**Cooperation with the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo**

3.    The Group notes with appreciation the support and collaboration of the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO) during the period under review.

**Compliance with the Group's requests for information**

4.    During the reporting period, the Group met with government officials, private sector actors and organizations in six countries (see annex 1). While it transmitted 50 letters requesting information from Governments and companies, the Group received varying levels of compliance with its requests (see annex 2). It expresses regret that during the mandate, the authorities of the United Republic of Tanzania did not make possible a visit to that country. The Group would like to emphasize that lack of cooperation by Member States has impeded its investigations.

**Methodology**

5.    The Group used the evidentiary standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). The Group based its findings on documents and, wherever possible, on first-hand, on-site observations by the experts themselves. When this was not possible, the Group corroborated information by using at least three independent and reliable sources.

6.    Given the nature of the conflict in the Democratic Republic of the Congo, there are few documents that provide definitive proof of arms transfers, recruitment, command responsibility for serious human rights abuses and the illegal exploitation of natural resources. The Group has therefore relied on eyewitness testimony from members of local communities, ex-combatants and current members of armed groups. The Group has also considered expert testimony by government officials and military officers from the Great Lakes region and United Nations sources.

7.    During the period under review, general insecurity made it challenging for the Group to visit remote and less secured areas in the country. In certain instances, such as in Beni following the trial of elements of the armed group Allied Democratic Forces (ADF) and people associated with ADF as well as people who testified against officers of the Forces armées de la République Démocratique du Congo (FARDC), sources were reluctant to speak with the Group.

8.    The present report covers investigations up to 8 April 2018.

**Political context**

9.    At the time of preparation of the present report, the political situation in the Democratic Republic of the Congo remained volatile. The delay in the electoral process posed a significant threat to the country's peace and stability.

UNCLASSIFIED                    EXHIBIT 25

10.    The Group notes that a number of dynamics relating to the activities of armed groups have emerged as a result of the failure to fully implement the December 2016 agreement.[1] Local armed groups claimed to be mobilizing into coalitions (see annex 3) and sought the support of civilians in areas under their control.

11.    The Group is concerned that violence relating to the electoral process might lead to sanctionable acts and therefore believes that efforts to appease tensions relating to the electoral process should be encouraged.

**Update on sanctions individuals and entities**

12.    In September 2017, the Group met with sanctioned individual Ntabo Ntaberi Sheka (CDi.029), commander of Nduma défense du Congo (NDC-R), who surrendered to MONUSCO on 26 July 2017 together with 24 individuals, including 16 minors. Sheka was designated by the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo on 28 November 2011 pursuant to the criteria set out in paragraph 4 of Council resolution 1857 (2008). Sheka is detained at the military prison of Ndolo in Kinshasa and the Group is aware that his trial will start shortly in Goma. The Group believes that, if Sheka is convicted, it would represent a deterrent to the commission of further sanctionable acts and would constitute a milestone in the fight against impunity in the Democratic Republic of the Congo.

**Implementation of the recommendations of the Group**

13.    The Group reiterates that its previous recommendations to improve the security of the FARDC armouries (see S/2017/1091, para. 101 (e)) remain valid because the main source of weapons for armed groups remains FARDC stocks. The Group reiterates its recommendation for a disarmament, demobilization and reintegration programme to avoid the remobilization of ex-combatants (see S/2017/672/Rev.1, para. 181 (a)).

**Investigation into the murder of members of the Group in March 2017**

14.    The Group is aware that two new suspects for the murders of Michael Sharp and Zaida Catalán were arrested by the Agence nationale de renseignements (ANR) and military intelligence in March 2018. The Group had several exchanges with the senior United Nations official of the follow-on mechanism for the Democratic Republic of the Congo and noted with appreciation the mechanism's approach to the challenges associated with the investigations. On the basis of discussions with various sources close to the case, including Congolese senior justice officials, the Group learned that cooperation between the mechanism and the Congolese authorities has been deficient and that the Congolese security services have interfered with the investigations. The Group reiterates that the perpetrators of the murders of Michael Sharp and Zaida Catalán, including their support networks and motives, should be identified.

## II.   Armed groups

## A.   Forces démocratiques de libération du Rwanda

15.    The Forces démocratiques de libération du Rwanda (FDLR),[2] a sanctioned entity (CDe.005), continued to be active in parts of North Kivu, especially in western

---

[1] Comprehensive and Inclusive Political Agreement, signed in Kinshasa on 31 December 2016.
[2] Unless otherwise specified, FDLR refers to FDLR-Forces combattantes abacunguzi, as opposed to any other splinter groups, such as the Rassemblement pour l'unité et la démocratie or FDLR-Soki.

UNCLASSIFIED     EXHIBIT 25

Rutshuru territory, often inside the Virunga National Park. Although significantly weakened over the past 18 years of its existence owing to defections, FARDC operations and breakaway factions, FDLR remained a threat to civilians. During the reporting period, FDLR trained and armed local armed groups known as Nyatura, which extorted the local population and targeted both FARDC positions and other armed groups (see S/2017/672/Rev.1, paras. 37 and 38).

**Leadership and troop strength**

16.    Most of the FDLR leadership has remained intact since the previous report (see S/2017/1091, para. 15). According to 11 former FDLR combatants, the sanctioned individual Gaston Iyamuremye (CDi.003),[3] often referred to as the "President" of the movement, was located in Rubare, near Kirama, about 30 kilometres south-east of Kazaroho in Rutshuru territory. Colonel Gustave Kubwayo, also known as Sirkoff, was the military leader of subsector Mediane (formerly subsector Sinai) in Kazaroho, west of Kiwanja and east of the Kanyosha River. The headquarters of sector North, led by Pacifique Ntawunguka (CDi.024), also known as Omega Israel, was located near Tongo towards the Nyamulagira volcano, in a base called Paris. Approximately 200 armed combatants, including some children, comprised the security forces for Iyamuremye and Ntawunguka.

17.    Sylvestre Mudacumura (CDi.012), also known as Bernard Mupenzi, the FDLR army commander, changed bases frequently during the reporting period. Some former FDLR combatants stated that, by late 2017, Mudacumura was based in Makomarehe, north of Nyanzalé. Local sources told the Group that the FARDC operation "Rising Phoenix", which was conducted in September 2017, forced Mudacumura to leave Makomarehe and move to Rusave, north-west of Mweso. Only a small mobile protection unit provided security for Mudacumura, but a larger unit, often known as Diamant (formerly Canaan) was based in Makomarehe.

18.    On the basis of the testimony of former combatants, there were 600 to 700 FDLR combatants scattered in various bases, mostly near Kazaroho and Makomarehe. This number is also consistent with the Group's previous findings (see S/2016/1102, para. 9). While the troop strength of FDLR has diminished over time, new recruits continued to join, although in relatively small numbers.

**Recruitment and child soldiers**

19.    The Group learned that about 64 recruits completed three months of military training in November 2017. In addition, a former FDLR combatant who left his group in March 2018 stated that at least 100 more recruits were being trained during the first two months of 2018. The Group was unable to confirm this claim. The majority of the recruits were Rwandan, almost entirely from the Rwandan refugee population in the Democratic Republic of the Congo, although one former combatant claimed that some recruits came from Nakivale refugee camp in Uganda. Congolese men also joined FDLR, although in smaller numbers. Of the 64 men who completed their training in November 2017, 15 were Congolese and the rest were Rwandan.

20.    The training centre, located in Kyahemba, just north of Kitchanga, was reported to be under the command of a certain Colonel Gakwere. The centre provided lessons in handling a variety of weapons. Some former combatants claimed that a makeshift training centre also existed in Makomarehe.

21.    The Group previously reported on the use of child soldiers in FDLR ranks (see S/2017/1091, para. 16), a practice that has continued according to former FDLR

---

[3] Also known as Byiringiro Victor Rumuli, Victor Rumuri, Michel Byiringiro, Victor Byiringiro and Rumuli.

     UNCLASSIFIED

combatants. For example, a former military trainer who left the base at the end of 2017 claimed that most of the recruits there were aged between 14 and 18 years. The Group was unable to obtain further information on this. The recruitment and use of children in armed conflict in the Democratic Republic of the Congo is a sanctionable act under paragraph 7 (d) of resolution 2293 (2016), as reaffirmed in paragraph 2 of resolution 2360 (2017).

**Nyatura armed groups**

22. As previously reported by the Group, FDLR combatants provided training, ammunition and uniforms to Nyatura armed group members, especially Nyatura Domi, which reportedly comprises 400 to 500 men, mostly armed and based in the Bukombo groupement in Rutshuru territory. A former FDLR mid-level commander told the Group that the Nyatura Domi and John Love groups provided security for Mudacumura's camp and for the training centre in Kyahemba.

23. Nyatura combatants often attacked combatants from the Conseil national pour le renouveau et la démocratie (CNRD), an FDLR faction that split in May 2016, as well as FARDC. Nyatura combatants also taxed the local population, at times in conjunction with FDLR combatants (see S/2017/1091, para. 17). In early 2018, there were reports of Nyatura Domi and John Love clashing with Mai-Mai Mazembe near Nyanzalé. The December 2017 killing of Nyatura leader Kasongo Kalamo by CNRD in Mweso, Masisi territory, was followed by clashes between members of Kasongo's group and CNRD combatants near Mweso.

24. Nyatura armed groups appear to have used the political agenda of the Collectif des mouvements pour le changement, which is campaigning against the Kinshasa Government and foreign (Rwandan) influence in the shape of CNRD, in addition to defending themselves from Mai-Mai militias. While in practice this might often mean generating income from taxation and extortion of the local population, the political message of Nyatura armed groups might revitalize FDLR as a significant force behind Nyatura, especially given that FDLR combatants are fully aware of its leadership's inability to seriously challenge power in Kigali and its unwillingness to return to Rwanda.

**Defections and returns**

25. All former FDLR members whom the Group interviewed stated that most remaining combatants in FDLR were unhappy and wished to leave the ranks. This sentiment was illustrated by the relatively large numbers of defections throughout 2017, with at least 80 FDLR combatants surrendering from 1 September to mid-November 2017.

26. According to statistics of the disarmament, demobilization and reintegration component of MONUSCO, defections increased by 35 per cent in 2017 compared with 2016 (including CNRD combatants, for whom there were no data in 2016). Bad living conditions in the bush, disillusionment with the FDLR leadership and a deadline of 31 December 2017 for Rwandan refugees to return to Rwanda or secure host country residency were some of the main reasons for the defections and large returns to Rwanda. The Government of Rwanda reported more than 11,000 returnees from the Democratic Republic of the Congo in the first eight months of 2017, compared with 5,800 in all of 2016.[4]

---

[4] See www.theeastafrican.co.ke/rwanda/News/Rwandan-refugees-rush-back-home-as-status-deadline-looms/1433218-4172374-9iuac1z/index.html.

## B.  Allied Democratic Forces

27.   The Group investigated ADF in Beni territory. Sources reported that 400 to 450 armed elements were scattered in different bases, operating primarily to the south-east and north-east of Beni. The Group previously reported that ADF was continuing to recruit, primarily youth from Uganda (see S/2017/1091, paras. 29 and 30). However, according to various sources, the number of new recruits has been low, with only tens of combatants a year as opposed to hundreds. The Group did not find any evidence of links between ADF and international terrorist organizations.

28.   ADF remains an enigmatic armed group. The Group had access to fewer ADF defectors than in the past and responsibility for specific attacks is sometimes hard to determine because other armed groups in the Beni area sometimes mimic ADF tactics (see S/2016/466, para. 186). Such confusion was also apparent in the description of perpetrators of various attacks by witnesses and local sources as "presumed ADF".

**ADF bases**

29.   The Group previously reported the existence of ADF camps in Madina[5] camp (see S/2017/672/Rev.1, para. 53), a grouping of positions approximately 35 to 40 kilometres north-east of Beni, as well as at least three bases located in the Mwalika forest, south-east of Beni. In Mwalika, Irunga served as an important base, with a reception and training centre for recruits coming from the border between Uganda and the Democratic Republic of the Congo.

30.   As reported previously by the Group (see S/2016/466, para. 58), in Madina, the main base known as Whisper is the headquarters of ADF, commanded by Seka Baluku. Two former ADF combatants told the Group that Baluku remained the leader of Madina and Hood Lukwago, also known as London, was army commander and Baluku's deputy.

31.   Other commanders included Richard Mugisa, also known as Mzee, one of the sons of Jamil Mukulu (CDi.015) (former ADF leader and sanctioned individual), and Fezza Seguja, known for having ties to some local communities between Mbau and Eringeti. Seguja was reportedly in charge of an important base in Madina, a few kilometres north of Mamundioma, which served as a reception point for newly trained recruits coming from Mwalika and a gateway position to Whisper and the entire Madina complex. Other important ADF bases north of the Mbau-Kamango road included Mapobu and Sesele.

32.   Apart from Mwalika and Madina bases, local sources have reported ADF troop movements and bases in the Mayangose area between Beni town and the Mbau-Kamango road. A source told the Group that ADF had established a new position in Lahe, Mayangose, in October 2017. An FARDC commander told the Group that there had been a recent gathering of ADF groups in Mayangose following FARDC operations against ADF bases in Mwalika and Madina. At least two local sources told the Group that they had been in contact with armed elements in Mayangose in late 2017 and early 2018. These elements claimed to be part of NALU, referring to ADF-NALU, the name formerly used by the rebels.

33.   There had been reports that another armed group, based in Mayangose, consisted of Congolese combatants from the network of ex-Armée patriotique congolaise (APC) groups, including those formerly led by Kawa Seli and Hilaire Kombi and ex-Mayangose militia formerly led by Leandre Kitsa. The ex-APC is the armed wing of the Rassemblement congolais pour la démocratie-Kisangani,

---

[5]  Or Madina III camp, according to one former ADF combatant, after Madina I was destroyed in 2014 during Sukola 1 and Madina II in 2016 during Usalama 1 and 2.

Mouvement de libération. It is unclear, however, if this group mixed with or operated alongside ADF. The Group previously reported on a group of former APC combatants who had neither demobilized nor integrated into FARDC. It operated near Mwalika, called itself ADF and maintained a relationship with Mukulu, although it had a separate chain of command (see S/2016/466, para. 193).

**Operational strength and recruitment**

34.    On the basis of several interviews, the Group estimated the current strength of ADF groups to be 400 to 450 armed elements, including some women and children. The majority of ADF members were Ugandan, while some 100 to 200 were Congolese. Two former ADF combatants (one Ugandan and one Burundian) told the Group that there were also a small number of Tanzanian, Burundian and Rwandan combatants in ADF.

35.    ADF continued to arm and train children, who either were abducted in the Democratic Republic of the Congo, were recruited from neighbouring countries or were born and raised in ADF camps. Two former ADF combatants spoke of young children of 14 and 15 years of age being armed, trained and sent to fight, usually at the front lines.

**FARDC operations**

36.    On 13 January 2018, FARDC launched Usalama 2, a large-scale military operation against armed groups in North Kivu, including ADF. By the end of March 2018, FARDC reported it had taken over five positions in Mwalika. Intense fighting in the last two weeks of January and February 2018 occurred in Mapobu and Sesele, north of the Mbau-Kamango road. According to an FARDC commander, Mapobu was finally overtaken by FARDC (see annex 4) in early March 2018.

37.    FARDC suffered heavy losses, with at least 81 dead and 72 injured from 1 January to 8 March 2018, according to internal FARDC documents. According to FARDC and other sources, between 10 and 15 ADF combatants were killed and 4 were captured in the first three months of 2018.

**Case study: ADF attack on FARDC base at point kilométrique 28**

38.    The Group believes that a 16 September 2017 attack against an FARDC base at point kilométrique (PK) 28, about 1 kilometre west of the MONUSCO Mamundioma temporary operating base (TOB), was very likely carried out by ADF.

39.    On 16 September 2017, at about 3 p.m., two armed men attempted to abduct a young Congolese man on the outskirts of Mamundioma village at PK 25. The young man ran and reported the incident to the local FARDC base, which deployed a few soldiers and the youngster to show the way. The soldiers and the youngster fell into an ambush and the young man was shot and injured but managed to hide and survive. An armed group pursued the Congolese soldiers to their base, which was then abandoned as the soldiers sought shelter in the TOB manned by members of the Tanzanian battalion. The peacekeepers returned fire and repulsed the attack, with no casualties or injuries to their personnel.

40.    The Group interviewed a former ADF combatant injured in the firefight of 16 September 2017, who confirmed that the assailants were part of ADF. He had been left for dead owing to being covered in blood from injuries to his arms and head. Two other ADF fighters who were injured were picked up by their comrades.

41.    The same source informed the Group that ADF intended to attack the FARDC position at PK 25 as revenge for FARDC attacks on ADF recruits travelling from Irunga in Mwalika forest towards Madina, crossing the Mbau-Kamango road close to

Mamundioma. The Group was informed that FARDC had attacked an ADF group in the last week of August 2017 in Ngerere, Mwalika. The ADF group split in two before the attack. According to an eyewitness, both groups came from the north-east: one attacked the FARDC position at PK 28, while a second group continued west towards Mbau to try to stop any incoming FARDC reinforcements.

42.   The former ADF combatant confirmed that each of the two groups comprised about 50 people, including women and children, and that his group had tried to capture a young Congolese civilian who escaped and later returned with FARDC soldiers. The Group spoke with the young man, who confirmed the story.

## C.   Mai-Mai Yakutumba

43.   The Group conducted investigations on Mai-Mai Yakutumba,[6] a predominantly ethnic Bembe armed group. The Group noted that after being dormant for some years, this armed group had made a resurgence, especially after December 2016 and the postponement of the elections. Its leader, William Amuri, also known as Yakutumba (see S/2015/19, para. 106), managed to unite several small local armed groups and reform an old alliance, the Coalition nationale du peuple pour la souveraineté du Congo (CNPSC). At its peak, Mai-Mai Yakutumba and allies controlled large parts of the border area between South Kivu, Maniema and Tanganyika Provinces (see annex 5).

44.   The Group's investigations also included the military operations of Mai-Mai Yakutumba and its allies against the Congolese authorities, its continuous recruitment efforts and its organization of a parallel administration in the heartland of this area to generate income for the movement. Recent FARDC operations have changed the dynamics and taken over most of the territory formerly occupied by Mai-Mai Yakutumba, while its leader Amuri is on the run.

45.   Mai-Mai Yakutumba and its leader enjoy some popular and political support for the armed group's display of nationalism and its hostility towards populations perceived as originating from Rwanda, as previously documented. The Group obtained video and audio recordings indicating that Amuri was opposed to a third mandate for President Kabila and has appealed to other armed groups to join him in the fight against President Kabila.

46.   The Group believes that, despite the ongoing FARDC operations, Mai-Mai Yakutumba and allies still have the capacity to reorganize and to continue to be spoilers in the southern part of South Kivu, the northern part of Tanganyika and the southern part of Maniema.

**Organization and location**

47.   Amuri leads the armed group, which consists of a number of semi-independent units. Most of the troops were located near Amuri and his staff in the Ngandja forest and the Ubwari Peninsula (see annex 6). Until recently, he had been based in the vicinity of Kazimia, but since the start of an ongoing FARDC operation, his headquarters has been mobile. At the time of preparation of the present report, he was seen in Lulenge collectivity, in the western part of Fizi territory.

48.   According to several ex-combatants, none of the Mai-Mai Yakutumba leaders had assumed formal military grades in the movement and some commanders had regularly switched names, which had made their identification difficult. Amuri's

---

[6] Unless otherwise specified, Mai-Mai Yakutumba refers to the historical group of combatants affiliated with William Amuri Yakutumba.

UNCLASSIFIED    EXHIBIT 25

deputy was Alonda Bita, also known as Alida. He was in charge of the infantry and recruitment of new combatants. Saidi Ekanda, also known as Dragila or Baleine (see S/2015/19, para. 107), was the commander of the "navy" until he surrendered on 29 January 2018 in Rumonge to the Burundian authorities, who extradited him to the Democratic Republic of the Congo. Other important individuals in the armed group were the chief of operations, ex-FARDC Colonel Christophe Mukua, also known as Aigle, and the person in charge of finance and logistics, Bavon. The chief intelligence officer was Kitoto Kazuri, who died in December 2017.

49.  Besides this core group, several semi-independent entities worked closely together with the main group of Mai-Mai Yakutumba. Since the beginning of 2017 they have intensified their relations with other armed groups in the region, which has de facto integrated the movement. This is the case for the groups of Ebuela, René Itongwa, Shetani, Aoci, Mulumba, Apa na Pale and many others.[7] These small groups had their own leaders but coordinated attacks and received new recruits trained in training camps inside the Ngandja forest. Three ex-combatants confirmed the rotation of troops between Mai-Mai Yakutumba and its allies. Besides local armed groups, Mai-Mai Yakutumba had close relations with Burundian rebels, especially with the Forces républicaines du Burundi (see S/2017/672/Rev.1, paras. 45–50). Four ex-combatants and five FARDC officers said that Burundian combatants were integrated in Mai-Mai Yakutumba.

50.  On the basis of numerous interviews with ex-combatants, FARDC officers, civil society members and local researchers, the Group estimated that, at the peak of their power, Mai-Mai Yakutumba and allies had 1,000 to 1,500 combatants in their ranks. At the time of preparation of the present report, the number of combatants had decreased, some of them scattered over a large region. It was estimated that some 200 combatants were still together with the leader of the movement.

**Military activities**

51.  United Nations and FARDC sources documented over 100 attacks by Mai-Mai Yakutumba and allies against FARDC positions from January 2017 to January 2018, as well as the killing of an estimated 80 FARDC soldiers. The rise of Mai-Mai Yakutumba and allies started in December 2016 and increased gradually before reaching a peak in September 2017. Between September 2017 and January 2018, Mai-Mai Yakutumba controlled a significant area of Fizi territory, north Tanganyika and south Maniema. This ended abruptly with the ongoing large-scale FARDC operations.

52.  Eight Mai-Mai Yakutumba ex-combatants told the Group that FARDC positions were deliberately targeted to weaken the regime of President Kabila and to recover weapons and ammunition from these positions. Three major attacks on military camps increased the military equipment of the movement significantly. On 1 June 2017, Mai-Mai Yakutumba and allies attacked the FARDC position in camp Bendera (Tanganyika), looting from the existing arms depot (see S/2017/1091, paras. 95–97). A second major attack was launched on the FARDC position in camp Lulimba on 29 and 30 June 2017. A third major attack was launched on FARDC positions in Kabambare (Maniema) on 7 August 2017 by the Mai-Mai Malaika of Sheikh Assani, an important member of the CNPSC coalition.

53.  In early August 2017, Mai-Mai Yakutumba attacked FARDC positions north of the Ngandja forest, forcing FARDC troops to leave their positions in Kikonde, Kazimia, Sebele and the whole Ubwari Peninsula. Their power reached a climax with an attack on Uvira in September 2017 (see paras. 68 and 69 below).

---

[7] This list is not exhaustive; unless specified, all these small armed groups will be referred to as Mai-Mai Yakutumba and allies.

UNCLASSIFIED                    EXHIBIT 25

54.  FARDC was regularly ambushed by Mai-Mai Yakutumba and allies. Convoys of officers were a frequent target. A Mai-Mai Yakutumba liaison officer told the Group that the convoy of General Philemon Yav, commander of operational sector Sukola II South, South Kivu, was ambushed on 18 January 2018 near Lulimba, when three members of his close protection unit were killed by Mai-Mai Yakutumba and allies although General Yav himself escaped injury. The Group witnessed a high-ranking FARDC officer removing his grades because he had to travel from Baraka to Fizi, fearing an ambush by Mai-Mai Yakutumba.

**FARDC operations and impact on civilians**

55.  The Group noted that major FARDC operations against Mai-Mai Yakutumba had not been effective in the past. Since the rise of Mai-Mai Yakutumba and allies, FARDC had continued to lose positions in Fizi and Uvira territories until the Uvira attack of 27 September 2017, when new FARDC troops arrived to fight Mai-Mai Yakutumba and allies. The new troops had quickly recovered the main axes towards Baraka and Fizi from the rebels, although ambushes still occurred from time to time.

56.  Several FARDC officers told the Group that they lacked adequate means to control their area of operations. New troops were deployed but without rations or regular salary payments, which had worsened the already tense relationship with the local (Bembe) population.

57.  On 26 December 2017, General Yav replaced Admiral Safari as commander of FARDC operational sector Sukola II South, South Kivu. New troops and additional logistical support were provided to embark on a new round of FARDC operations against the rebels. On 21 January 2018, General Yav commenced the operation on three axes south of the Fizi-Baraka region, resulting in a quick victory against Mai-Mai Yakutumba. Some clashes were reported but most of the Mai-Mai Yakutumba infantry withdrew, first to the Ngandja forest and later further inward to the Lulenge collectivity. FARDC regained control over the Ubwari Peninsula and a large part of the Mai-Mai Yakutumba "naval forces" surrendered, including their leader Saidi Ekanda. In a press statement, General Yav claimed that, during the operation, FARDC had captured 133 combatants and killed 48 combatants while losing nine FARDC soldiers. On 9 February 2018, 85 Mai-Mai Yakutumba combatants were transferred to Munienze prison (see annex 7).

58.  At the time of preparation of the present report, FARDC operations continued with a view to tracking down the leader of the armed group.

59.  Ex-combatants, civil society members and politicians told the Group that, after the Uvira attack at the end of September 2017, some FARDC elements had carried out arbitrary arrests of young adults of the Bembe community because they were considered to be Mai-Mai Yakutumba rebels. Men without an electoral card were arrested, while young men with typical Bembe scarification were also targeted. The civil society of the Basimukindje (Baraka) groupement listed incidents against the local population from November 2017 until mid-January 2018, half of which involved FARDC soldiers (see annex 8). Anger at FARDC harassment was an extra incentive for youth to join Mai-Mai Yakutumba ranks. Five ex-combatants told the Group that it was their main reason for joining the Mai-Mai rebels.

**Administration and finances**

60.  During the current Group's mandate, Mai-Mai Yakutumba leader Amuri continued to operate a parallel administration in a large part of his zone of control, more specifically on the Ubwari Peninsula and the coastal area up to Talama. Under the label of CNPSC, Amuri organized his own customs office, migration office and

                    UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

interior office in Kazimia. The Group documented this parallel administration and the generation of revenues for the movement.

61.    Mai-Mai Yakutumba controlled Lake Tanganyika with its "naval forces" and taxed all the traffic on the lake, passengers as well as ships. They set up passenger manifests and inspected ships' cargoes. They used CNPSC paperwork for this (see annex 9). Mai-Mai Yakutumba's own immigration offices issued "laissez-passer" documents for leaving the country and stamped existing Economic Community of the Great Lakes Countries circulation papers (see annex 10). The Group obtained an example of the latter with a CNPSC as well as a Burundian immigration stamp (see annex 11).

62.    Mai-Mai Yakutumba also organized a taxation system in its zone of control. Ships passing through the controlled zone paid taxes, depending on the cargo (see annex 12). Five ex-combatants and members of the local population told the Group that all passengers of mooring ships paid a tax of 1,000 Congolese francs[8] to come on land. Every week, on market day, the market vendors had to pay 1,000 Congolese francs in order to sell their goods. Fisherfolk were obliged to give 20 fish per pirogue per week to Mai-Mai Yakutumba. Fisherfolk of Baraka who plied the coastal waters near the Ubwari Peninsula were beaten and tortured if they did not want to pay the taxes. Ex-combatants and a resident of Kazimia told the Group that the financial administrator, Bavon, was in charge of this taxation system and that he had a team in charge of collecting taxes in the harbour or at the market place.

63.    Mai-Mai Yakutumba also continued to generate income via mining activities in its area of control, in particular in Misisi region (see S/2011/738, paras. 179–183; S/2012/348, para. 59; and S/2014/42, para. 169). The Group did not focus on these mining activities; however, ex-combatants, FARDC officers and politicians confirmed the continuation of Mai-Mai Yakutumba's operations at mining sites.

**Recruitment and training**

64.    Five ex-combatants, four civil society actors and supporters of Mai-Mai Yakutumba told the Group that the armed group actively recruited new combatants. Complaining about President Kabila and the alleged Rwandan supremacy in the region, they convinced many young people in local communities to join the group. Politicians, combatants and local community leaders told the Group that the Bembe community had felt marginalized over the years by the national Government and President Kabila. Another reason for joining Mai-Mai Yakutumba can be found in the harassment of the civilian population by some FARDC elements in the region (see para. 59 above).

65.    Three ex-combatants claimed that Alonda Bita had conducted recruitment campaigns for Mai-Mai Yakutumba. Alonda was present in Misisi and Baskalangwa when he recruited a dozen young men and he also offered money to attract youth to join the movement. Some ex-combatants told the Group they had received from 30,000 to 50,000 Congolese francs when they joined Mai-Mai Yakutumba, while others did not receive the promised money. Four ex-combatants said they were forcefully recruited to join the rebels.

66.    Sources told the Group that the recruitment campaign was sometimes very successful, attracting several hundred new combatants. Especially after the Lulimba and Uvira attacks, in July and September 2017, respectively, the rebels welcomed a wave of new recruits. Ex-combatants claimed that, in July 2017, there were more than 500 recruits in the training camp in the Ngandja forest. Another training camp was

---

[8] On 20 April 2018, the official exchange rate between the Congolese franc (CGF) and the United States dollar ($) was $1 to 1,570 CGF.

situated in Nemba, not far from Nsebele. Training was conducted by former FARDC officers. Saidi Ekanda told the Group that Abika Mandama, an ex-FARDC captain, was the chief training officer; however, the Group could not confirm this information. The duration of the training depended on the time available. In general, most of the ex-combatants interviewed received two months of training before being deployed to a combat unit. However, in some cases the duration of training was as long as six months and in others as short as one week. During training, combatants learned the code of conduct of the movement, how to operate and service their weapons, including AK-47 rifles, PKM machine guns and 60 mm mortars, and received some tactical training.

67.    At the time of interview, Saidi Ekanda told the Group that he was aware only of seven children present in the armed group, whereas United Nations officials reported 30 cases of child recruitment in Mai-Mai Yakutumba in 2017.

**Attack on Uvira on 27–28 September 2017**

68.    On 27 September 2017, Mai-Mai Yakutumba, its allies and the CNPSC coalition attacked Uvira, the second-largest city in South Kivu. FARDC forces were quickly overrun by the attackers, but MONUSCO peacekeepers blocked the rebels at Kulundu port at the entrance of Uvira. On 28 September 2017, Mai-Mai Yakutumba "naval forces" attacked the city of Uvira from Lake Tanganyika with motorized boats mounted with 12.7 mm guns. MONUSCO attack helicopters retaliated and managed to neutralize three of the four armed pirogues, effectively ending the attack.

69.    Ten ex-combatants reported that Ebuela Kibekila, also known as Mutetezi, was the commander of the Uvira operations who led infantry towards the city. Saidi Ekanda confirmed to the Group that he also participated in the attack on Uvira as commander of the naval forces.

## D.    Nduma défense du Congo-Rénové

70.    The Group found that NDC-R was one of the largest armed groups active in North Kivu and that it had increased its zone of influence significantly since the Group's last reporting on the group (see S/2016/466, paras. 76 and 77). The name of the NDC-R leader, "General" Shimiray Mwissa Guidon, was added to the sanctions list of the Committee on 1 February 2018 (CDi.033).[9]

71.    The Group found that sanctioned individual Guidon was still popular among the local community in Walikale territory owing to his ability to provide security and to defend their interests. At the same time, NDC-R combatants were involved in illegal taxation of the local population, as well as in committing human rights violations against the population. NDC-R took advantage of the lack of the FARDC presence in the region, their own disciplined organization and their relationship with some FARDC elements to control a significant part of North Kivu.

**Organization and location**

72.    In 2014, Guidon had left NDC-R, which at the time was led by sanctioned individual Sheka Ntabo Ntaberi (CDi.029), for "strategic reasons". Since that time, NDC-R had gradually expanded its area of control to include large parts of Walikale territory, significant parts of Lubero territory and small parts of Rutshuru and Masisi territories (see annex 13). In a recent statement (see annex 14), NDC-R claimed to be active in Tshopo and Maniema Provinces as well, but the Group could not verify this

---

[9] See www.un.org/press/en/2018/sc13194.doc.htm.

information. Even without this last claim, NDC-R controlled a zone that was larger than any other armed group in North Kivu.

73.    According to a large variety of sources, NDC-R is an armed group that is considered to be well-disciplined and structured. Guidon (see annex 15), together with deputy commander "General" Gilbert Bwira Chuo and his chief of staff, "Colonel" Deo Bafosse Mparanyi, resides in the armed group's headquarters, located in Irameso in Walikale territory. Other important individuals in the movement are cited below, starting with "Colonel" Masiya Sita Tondeze, the T5[10] of the movement. He was one of the main leaders during the attack on Miriki in July 2017 (see S/2017/1091, para. 37) and started the occupation of Kasugho in March 2017. "Colonel" Jean-Claude Kamutoto was the brigade commander in Kasugho, while "Colonel" Kasereka Kifagiyo was the brigade commander in Irameso. Eustache Kabaya Suwamene and Désiré Ngabo Kisuba, respectively the spokesperson and secretary of Guidon, also manage public relations. They travel regularly to Kinshasa, Goma or Beni.

74.    Three ex-combatants told the Group that Guidon had a close protection unit of about 90 combatants and that several hundred combatants were present in Irameso. At the time of preparation of the present report, Kasugho in Lubero territory was considered to be the second headquarters of the movement. Several ex-combatants and two civilians told the Group that, at any one time, 150 to 250 combatants were present in Kasugho, with an advanced post in Kagheri comprising 75 elements. Other localities with a significant presence of NDC-R combatants were Bukumbirwa, Bunyatenge, Fatua, Buleusa, Oninga, Mutongo, Fungulamachu and Makokundu.

75.    The Group estimated that there were 1,000 to 1,250 active NDC-R combatants.[11] Nine ex-combatants told the Group that the rebel movement operated as a military structure. Every morning, there was a military parade. NDC-R were organized in sections (15 elements), companies (two sections), battalions (four companies) and finally brigades (two battalions). There were at least four brigades in NDC-R, probably more. Four ex-combatants told the Group that they had received a salary during their time in the movement. Some of them were sent to headquarters to deliver tax revenues to Guidon himself in Irameso and to bring back money and the necessary ammunition to their respective positions.

**Recruitment, training and child soldiers**

76.    There were various reasons why combatants joined NDC-R. Four ex-combatants told the Group that they joined the movement voluntarily because of the atrocities committed by FDLR in their villages or against their families. Three other ex-combatants explained that they joined because they were able to earn money and it seemed like an opportunity to improve their lives. Three ex-combatants said they were forced to join the movement on the threat of death.

77.    Eight ex-combatants told the Group that they received a basic form of military training. Most of the recruits received a uniform, when available, and learned to operate a weapon. Training was given during the daily parade and morning drill when all combatants were present in the camp.

78.    FARDC officers, NDC-R ex-combatants and Walikale leaders told the Group that uniforms and ammunition were regularly sold by individual FARDC soldiers to

---

[10] The T5 is responsible for relations between military forces and local communities.

[11] There are at least four brigades of approximately 240 combatants in the movement; together with Guidon's close protection unit of 90 combatants, this gives a total of 1,050 combatants. On the basis of these approximate numbers, the Group estimates that there are between 1,000 and 1,250 combatants.

NDC-R. NDC-R commanders wore military fatigues, mostly FARDC uniforms (see annex 16). Ex-combatants said that the commanders had new uniforms while the soldiers had old uniforms, mostly secured during clashes with other armed groups. They did not know where the new fatigues came from. A former agent of ANR told the Group that NDC-R purchased the commanders' uniforms for $30 to $50 per uniform.

79.   Ten ex-combatants told the Group that there were many children present in the movement and that several were considered to be combatants. According to MONUSCO officials, there were 46 documented cases of child recruitment by NDC-R in 2017. Guidon, Bwira and Kamutoto were cited as the commanders who ordered these mostly forced recruitments. The Group endeavoured to obtain access to some of the children but did not succeed. Child recruitment is a sanctionable act under paragraph 7 (d) of resolution 2293 (2016), as reaffirmed in paragraph 2 of resolution 2360 (2017). Several ex-combatants and civil society members told the Group that, for the first time, the children in their camps were gathered and summoned to go home in early February 2018. Guidon's having been sanctioned on 1 February 2018 appeared to have triggered some reactions from NDC-R (see annex 17) and Guidon himself. The Group received a letter allegedly from Guidon requesting the President of the Security Council to reconsider this decision. In April 2018, Guidon's spokesperson told the Group that NDC-R never used children.

**Clashes with other armed groups**

80.   The Group also investigated clashes between NDC-R and other armed groups operating near or in the NDC-R zone of influence, including the Alliance des patriotes pour un Congo libre et souverain (APCLS), Mai-Mai Mazembe groups and the other NDC faction. It is noteworthy that clashes with FDLR, the primary target of NDC-R according to its cahier des charges (see annex 18), were not regularly reported. Ex-combatants told the Group that there was a shift of priority when FDLR was driven out of Walikale and Lubero territories in early 2017.

81.   Most of the clashes reported were against Mai-Mai Mazembe groups and their former allies, known as the Union pour la protection des innocents (UPDI) (see S/2016/466, paras. 78–79). These clashes took place in the western part of Lubero territory near two major villages, Miriki and Kashugo. Dozens of clashes were reported and NDC-R was expanding its zone of influence at the expense of Mai-Mai Mazembe armed groups, resulting in several casualties and internal displacement.

82.   In the region of Pinga and Mutongo, on the border between the Walikale and Masisi territories, several clashes occurred with the other NDC faction, under the command of "Colonel" Mandaima. Since the arrest of Sheka, Mandaima has been leading the remaining elements of this armed group. In the same region and especially since the beginning of January 2018, NDC-R was also fighting the APCLS of "General" Janvier Karairi Buingo.

83.   The Group did not observe any alliance between NDC-R and armed groups in the northern part of their zone of control after the end of its alliance with UPDI. In the south-western part of Pinga region, local sources saw a close collaboration between NDC-R and APCLS-Mapenzi, a recently formed dissident group of the APCLS of "General" Janvier.

**Relationship with FARDC**

84.   NDC-R maintained control over a large area, with little FARDC presence. The ex-combatants who were interviewed told the Group that there was an important standing order not to militarily engage FARDC or its positions. On several occasions, when FARDC approached its positions, NDC-R combatants had withdrawn; once

FARDC had left, NDC-R returned to its original positions. Ex-combatants also told the Group that some NDC-R commanders regularly conferred with FARDC officers in local bars and discussed the strategy for attacking the positions of other armed groups. This was the case in the Kagheri-Kasugho area and also in the Pinga area, where mixed FARDC-NDC-R patrols were spotted by the local population.

85.   At the time of preparation of the present report, the Group did not observe FARDC operations against NDC-R, although the operational plan of FARDC for the first months of 2018 had cited NDC-R as one of the targets of its operations. The Group received an internal FARDC document that mentioned only one incident between NDC-R and the FARDC in the first part of 2018, which was an NDC-R attack on an FARDC position in the Mafilo mining site.

**Human rights violations**

86.   During its mandate, the Group documented several human rights violations committed by NDC-R.

87.   The Group interviewed several victims of the brutal enforcement of an established community service activity called *salongo* (see S/2010/596, para. 159; and S/2011/738, para. 453), which was instituted by NDC-R commanders at Kasugho and Kagheri and involved adult men, on Wednesdays, cleaning in the military camp, building houses for the combatants or rehabilitating roads in the region. Those who did not attend to perform such labour were beaten and detained. Several ex-combatants confirmed the use of forced labour. Almost every week, people were punished and imprisoned because they did not participate. Two larger incidents were reported: on 19 October 2017, 22 inhabitants of Kagheri were detained and on 14 March 2018, 100 men of Kasugho were detained. They were only released after having paid a ransom.

88.   Others were ordered to transport goods to other NDC-R camps. One victim told the Group that he and 12 others had to travel for four days from Kasugho to Fatua. One girl was injured during the trip and was left behind. They had to carry drinks, medicine and women's clothes. Ex-combatants told the Group that this happened frequently during their time in the movement. Two members of the local population told the Group that, on 12 February 2018, 60 men were seized at random in Kasugho and compelled to carry goods towards Fatua.

89.   The Group also interviewed an individual who had witnessed summary executions by NDC-R. He was arrested by NDC-R in November 2017 and remained for two weeks in prison, where he was beaten daily. The Group saw the marks of the beating. During the detention of this witness, all other prisoners were beaten and tortured by NDC-R combatants and the commanding NDC-R officer, "Colonel" Jean-Claude Kamutoto, ordered the killing of six prisoners who were subsequently executed by NDC-R combatants. United Nations sources and members of the local population and of civil society told the Group that summary executions were carried out regularly in the Kasugho region under NDC-R control.

**Finances**

90.   As previously documented (see S/2017/1091, para. 72), the Group found that NDC-R continued to generate revenue from the taxation of individuals and goods, including gold.

91.   The Group's sources indicated that NDC-R financed its activities by taxing the population within its areas of operation in several ways, including by taxing every adult within its area of control. The armed group forced adults to pay a monthly fee of 1,000 Congolese francs and issued a "jeton" as proof of payment. The sources

showed the Group the jetons they had paid for in Kasugho before escaping to Lubero, where they were now internally displaced persons (see annex 19). They informed the Group that those found without jetons were either heavily fined or incarcerated. The Group heard the testimony of seven persons displaced in Lubero who had deserted their homes in Kasugho because of forced taxation and torture.

92.   In addition, NDC-R compelled artisanal miners in the localities that it controlled to sell their gold to NDC-R at about $25 per gram or less, instead of the market price of about $60 per gram that they would receive from independent buyers. A miner from Kipese, a civil society leader from Kasugho and a Congolese official from Lubero territory informed the Group that gold diggers under the control of NDC-R numbered from 1,000 to 1,500. On the assumption that the armed group purchased gold at $25 per gram from the 1,000 diggers and sold it to middlemen at $60 per gram, the Group estimated the profit that NDC-R could make from a conservative figure of 1,000 gold diggers under its control to be $35,000 ($35 x 1,000 grams) per week or $140,000 per month. The Group confirmed from its sources that middlemen bought gold from NDC-R through the gold market in Kasugho and then sold it in Butembo, following which it would be exported to Kampala, a path consistent with the Group's earlier findings (see S/2014/42, para. 96).

93.   In addition to gold diggers being forced to sell their gold to NDC-R, they were also forced to pay taxes in gold, depending on their daily production. This could range from 15 to 35 grams per mining pit per week, depending on the size of the pit and the number of miners operating in a pit.

94.   Another form of income source for NDC-R was to tax farmers in its area of operations. Sources informed the Group that the owners of quinine trees were forced to pay $250 to $450 every three to six months as a tax to access their farms. The amount varied depending on the size of the farm and on the arrangements some individual farmers may have had with the NDC-R command structures. The Group could not establish how many quinine farmers were under NDC-R control.

## E.   Mai-Mai Kilalo

95.   The Union des patriotes pour la libération du Congo (UPLC) is commonly known as Mai-Mai Kilalo, after its leader Katembo Kilalo, a locally renowned *féticheur* or producer of *dawa*, a potion believed to render combatants invincible (see S/2017/672/Rev.1, para. 56 and annex 24).

96.   The Group previously reported that Kilalo's group was responsible for a December 2016 attack in Butembo in which a South African peacekeeper, a Congolese soldier, a police officer and a civilian were killed, in addition to nine UPLC combatants (see S/2017/672/Rev.1, paras. 177–179). While Kilalo's troops were believed to be responsible for six different attacks in the town of Lubero between August 2017 and January 2018, the Group could verify only the attack that occurred on 9 January 2018.

97.   Two former combatants told the Group that Kilalo's groups had attacked Butembo on 9 January because of their opposition to President Kabila's Government. A public statement released a day before the attack on behalf of UPLC had called for attacks against the Congolese State (see annex 20). At least three Congolese soldiers were killed during the 9 January attack.

98.   Kilalo's overall strength has varied over the years. By early 2017, he was reportedly in charge of 200 to 300 combatants (see S/2017/672/Rev.1, para. 57). According to interviews with eight former combatants and other sources, by February 2018, Kilalo commanded 500 to 600 elements based in different positions to the

UNCLASSIFIED                          EXHIBIT 25

south-east of Lubero town. In early 2018, Kilalo's groups were spread across at least 10 different bases, ranging from Mushenge, north-east of Kanyabagonga, to Kyaviyonge, east of Butembo and south of Isango-Isoro. Other bases, mostly on the western shores of Lake Edward, included Bihanzi, Bukununu, Kirikiri, Kabinirio, Masereke, Muramba and Ngalukira.

99. While Kilalo frequently moved to most of the bases to avoid capture and to collect money from the taxation of local farmers and fisherfolk on Lake Edward, until at least August 2017 his headquarters was located in Mushenge. Later in 2017, after clashes with FARDC, the headquarters was moved to Kasisi, near Kipese, about 15 kilometres south-east of Lubero. One of Kilalo's most loyal combatants and deputy is "Colonel" Kakule Kitelemire, also known as Saperita, another veteran Mai-Mai member.[12]

100. About 400 UPLC combatants were armed with AK-pattern rifles, rocket-propelled grenades (RPGs), FN FAL rifles and PKM machine guns. All of the interviewed combatants told the Group that ammunition was often in short supply, and at least three former combatants said that a civilian member of UPLC, known as Kapitula or "*le ministre*", acted as a link between Kilalo and Butembo businessmen who provided financial support to the group. One former combatant told the Group that Kapitula often brought ammunition and weapons from Butembo to UPLC camps.

101. Former combatants told the Group that Kilalo had been working on building coalitions of Mai-Mai groups from Ituri in the north and Rutshuru in the south. The UPLC statement of 8 January 2018 referred to the "Kinshasa government" as an "occupying regime".[13] One former combatant from Bwafasende in Ituri Province, who spent five years with Mai-Mai Simba before joining one of Kilalo's groups, said that, in 2014, Kilalo and Mai-Mai Simba made a pact of non-aggression and exchanged combatants to formalize the alliance.

102. Three UPLC combatants told the Group that Jackson Muhukambuto Paluku, a former FARDC colonel who deserted in February 2017, brought about 75 Mai-Mai combatants from northern Rutshuru, south-east of Lake Edward, to join forces with Kilalo at the end of 2017. Jackson had reportedly already sent a big group in October 2017 to assist Kilalo in responding to an FARDC offensive.

103. Other sources said that about 80 Mai-Mai from the group of Charles "Bokande" Mwandibwa attempted to reach Kilalo's positions on boats via Lake Edward in January 2018 but were thwarted by FARDC. Two former UPLC combatants told the Group that, after a disagreement over the leadership of the combined troops, Jackson and his combatants left Kilalo's bases in February 2018.

104. At the end of September 2017, UPLC combatants attacked and took over the FARDC position in Kipese, controlling also the villages of Kiri Kiri and Kavisege, 20 and 25 kilometres east of Lubero town, respectively. FARDC reinforcements followed a week later, attacking after retaking Kipese and nearby villages. Two former combatants told the Group that they had joined Kilalo's group after brutal FARDC attacks that had left many civilians injured, their property burned or looted. Anger towards members of FARDC and Kilalo's rhetoric of fighting the Kinshasa Government constitute significant reasons why some local youth joined Kilalo's ranks.

---

[12] Some former combatants have referred to Saperita as commanding his own Mai-Mai group, with Kilalo acting as the group's *fetisheur* only.

[13] The statement issued on 8 January 2018, a day before UPLC attacked Lubero, called for guerrillas (*maquisards*) and State security forces to chase away the occupying criminals from Congolese territory.

UNCLASSIFIED    EXHIBIT 25

105. UPLC attacks against FARDC positions in Kipese and Kitsambiro in January 2018 brought about a renewed FARDC offensive against UPLC bases in February and March 2018. One former combatant claimed that some combatants belonging to NDC-R attacked UPLC bases at the same time as FARDC.

106. Many of the UPLC bases were overrun and over 30 combatants surrendered. Kilalo and most of his top commanders escaped unscathed, reorganized themselves and have been attacking FARDC positions and reclaiming their old bases. On 20 March 2018, UPLC combatants attacked FARDC in Lukanga, 30 kilometres north-east of Lubero, and on 31 March 2018, a new UPLC group was reportedly settled in Musasa, 15 kilometres north-west of Lubero town.

107. All former combatants interviewed by the Group confirmed the presence of children, many as young as 10 or 11 years of age, in each of the UPLC groups. On 21 February 2018, the Group witnessed the transport, via MONUSCO, of at least 13 children, formerly in UPLC, from Lubero to Beni. The young boys were often in charge of carrying and administering *dawa*, the potion that Kilalo usually prepares personally. Older boys, between 16 and 17 years of age, received rudimentary training in weapons handling but were often armed with machetes and knives. After joining, most UPLC recruits, both children and young men, were often prevented from leaving. In the case of most adult males, their identity cards (electoral cards) were burned or kept by the group commanders. Three former UPLC combatants told the Group that they could not live a peaceful life at home without electoral cards, as security agents would consider them to be rebels.

108. Most UPLC groups maintained barriers where they taxed the local farmers trying to access their lands as well as fisherfolk on Lake Edward. For example, in one position in Bukenene, the UPLC group charged fisherfolk 15,000 Congolese francs per week per boat, with at least 30 boats fishing near that position alone. By early 2018, there were at least six such positions near the shores of Lake Edward. All the proceeds from the taxes went to UPLC group commanders, who in turn handed them over to Kilalo. All the low-ranking former combatants told the Group that they received no salary during their time in UPLC.

## III. Natural resources

109. Since the beginning of its mandate, the Group conducted field visits in North and South Kivu, Ituri and Tanganyika Provinces for investigations related to gold and to tin, tantalum and tungsten. The Group found that certain armed elements and criminal networks in the Democratic Republic of the Congo have continued their illegal involvement in the exploitation and trade of these resources.

### A. Gold

110. The Group focused its investigations on two of the main gold trading centres in the eastern Democratic Republic of the Congo. Furthermore, as suggested by the Security Council (see S/PRST/2017/23), during its current mandate the Group engaged with various stakeholders to streamline and enhance the control of unwrought gold transported in carry-on luggage.

111. The Group noted that the United Arab Emirates and the Democratic Republic of the Congo started exchanges to improve their cooperation in order to combat gold smuggling. The Group welcomed this initiative in line with its previous recommendation (see S/2017/1091, para. 102), but believes that the initiative will be

    UNCLASSIFIED

sustainable only if all 12 States members of the International Conference on the Great Lakes Region (ICGLR) are also involved.

112. The Group previously welcomed the launch of the Initiative pour la transparence de l'or artisanal (ITOA), a Congolese gold traceability system. During this mandate, the Group noted that ITOA had been operational in a pilot phase at a mining site in South Kivu Province since 30 January 2018. The Group therefore believes that its implementation should be monitored.

113. The Group notes that, in addition to Uganda, Rwanda is now becoming a major gold exporter in the Great Lakes region in the amount of 1 ton per month.[14] The Group confirmed that, as is the case with Uganda, the official export route is controlled by Alain Goetz (see S/2009/603, paras. 130 and 154–157; and S/2017/672/Rev.1, paras. 122–125). Information gathered by the Group showed that a large part of the gold traded by Uganda and Rwanda is sourced fraudulently from neighbouring countries, including the Democratic Republic of the Congo (see paras. 120, 121 and 128 below).

**Bunia**

114. During the period under review, provincial mining authorities in Ituri told the Group that Bunia was still an important gold trading centre, consistent with the Group's previous findings (see S/2014/42, para. 171). The Group interviewed 10 Bunia-based gold traders — one *comptoir* owner, six *négociants* and three other gold buyers — who informed the Group that gold traded in Bunia was mainly sourced from mining sites in Mambasa, Djugu and Irumu territories in Ituri Province. The Group noted that most of the mining sites in those areas were not validated.[15] As a result, most of the gold traded in Bunia was illegally sourced and had the potential to contaminate supply chains at its final destination in Uganda and the United Arab Emirates. The main findings of the Group's investigations in Bunia are set out below.

*Jean-marc Banza wa Banza*

115. The Group received credible information from various sources associated with the gold trade in Ituri Province that Jean-Marc Banza wa Banza, Provincial Director of ANR, was involved in the gold trade. The Group saw a copy of a letter signed by Mr. Banza addressed to the manager of a gold mining site in Djugu territory, in which Mr. Banza requested rights to a pit for gold exploitation. Two government mining officials and two civil society leaders told the Group that, generally, as soon as Mr. Banza was informed about a productive gold mining site, he requested that a pit be given to him. The same sources told the Group that ANR agents were regularly sent to mining sites where Mr. Banza owned the rights to pits. Two government mining officials confirmed the information and added that ANR agents were present at Mr. Banza's sites to ensure that the mineral production was not officially recorded or subjected to taxation.

116. The Group also received credible information about the involvement of Mr. Banza in gold exploitation at the mining site in Watsa territory. The Group stresses that the involvement of security officials in the natural resources sector violates the due diligence standards set by the Organization for Economic Cooperation and Development (OECD)[16] and the Security Council,[17] which were

---

[14] Alain Goetz confirmed this to the Group.

[15] Only six gold mining sites in Ituri Province are validated as "green" and are thus eligible for legitimate export; they are all located near Mambasa (see annex 21).

[16] See www.oecd.org/corporate/mne/mining.htm.

[17] See www.un.org/sc/suborg/en/sanctions/1533/due-diligence-guidelines.

incorporated into ICGLR and Congolese legislation. [18] The Group tried to contact Mr. Banza but received no response.

*Underdeclaration*

117.  Two government mining officials told the Group that it was common for *négociants* in Bunia to underdeclare the volume and value of the gold that they traded. According to Congolese law, *négociants* should sell all the gold that they received to official *comptoirs*, but a document obtained by the Group showed that between 2013 and 2017 there was a persistent discrepancy between what Bunia-based official *négociants* purchased and what they sold to *comptoirs*. The Group archived the above-mentioned document at the Secretariat.

118.  The Group investigated five of the official *négociants*[19] in Bunia. In 2017, they declared having received at least 1 kilogram each of gold. The Group found that one *negociant*, Edmond Kasereka, declared that he sold about 40 per cent of his gold to *comptoirs* in Bunia or Butembo, while the other four *négociants* claimed that they had not sold any of the gold that they had received in 2017. The Group was not able to meet with the five *négociants* but was told by government mining officials in Bunia that they claimed to keep their gold in reserve. A worker associated with one of the *négociants* told the Group that his boss did not maintain any reserves but rather sold the gold in Uganda. The worker also told the Group that his boss had instructed him not to declare all the purchased gold to the provincial mining authority. While this was a specific case related to only one of the *négociants*, it highlights the need for further investigation. The Group also obtained information from a mining official in Bunia that *négociants* normally sold all their gold illegally. The official could not confirm the existence of gold reserves maintained by *négociants*.

119.  The Group was provided with the names of other actors involved illegally in gold trade in Bunia by a worker from a Bunia-based *comptoir*, a government mining official, a gold broker active in Mambasa territory and a Bunia-based broker; the actors identified included Jean Lopa, President of the local Fédération des entreprises du Congo, Exodus Deba (see S/2016/1102, para. 76), Karte and Kirikou. The Group conducted further investigations concerning these individuals and was informed by brokers who worked with a few of them that most of them had been involved in the gold trade for decades but had used gold to finance other businesses, such as gas stations, hotels and real estate. From the information obtained, the Group established that these individuals continued to buy large amounts of gold that they sold mostly to Kampala-based gold dealers.

*Smuggling from Bunia to Uganda*

120.  In the course of its investigations, the Group received detailed information on a gold smuggling route from Bunia to Uganda (see annex 22). Smugglers used the road to Mahagi, where they travelled either by motorbike, taxi or even truck. At the border with Uganda, when they were eventually checked, they bribed customs officials on the Congolese side. All of the Group's informants on this issue confirmed that, in Goli, on the Ugandan side of the border, they were not asked to present papers or explain the origin of gold that they carried. Mahagi is a long-established hub of the smuggling route.

121.  Two brokers told the Group that they mainly carried gold from mining sites in Kawa and Monbgwalu in Djugu territory. When they arrived in Goli, they would meet with a broker from the Democratic Republic of the Congo, who would accompany them to sell to Kampala-based dealers. One of the brokers told the Group that, until

---

[18]  See, for example, article 27 of the mining code of the Democratic Republic of the Congo.
[19]  Kakule Kahotwa, Edmond Kasereka, Lombela, Banga Ndjelo and Bapu Dirokpa.

February 2018, he travelled to Kampala every two weeks with about 3 kilograms of gold (approximately $132,000)[20] per trip.

**Bukavu**

122. Bukavu is the main gold trading centre in South Kivu Province. Several people engaged in the mining sector, including government officials, told the Group that most of the gold traded in Bukavu came from the territories of Shabunda, Walikale and Fizi, where armed actors or criminal networks were involved in the supply chain. The Group found that Bukavu-based gold traders generally underdeclared their exports.

123. Official statistics obtained by the Group showed that three *comptoirs* exported 69,738 kilograms of gold from Bukavu in 2017 (see annex 23). The Group, during discussions with four Bukavu-based mining inspectors, confirmed that the official exports represented only a fraction of what was actually leaving the country from Bukavu.

124. Mining inspectors in Bukavu also informed the Group that smuggling was well organized and systematic, involving the use of false documents by official and illegal exporters. The Group noted that this was consistent with its previous findings (see S/2016/466, paras. 151–155). During its investigations, the Group obtained evidence that illustrated the illegal practices in Bukavu (see annex 24).

125. The Group confirmed that, in June 2017, a company known as OBWIN Sarl used fraudulent documents to illegally export gold from the Democratic Republic of the Congo. Mining officials in Bukavu told the Group that the company was not officially registered to export gold. In addition, the head of the South Kivu mining division told the Group that he did not sign any export documents for OBWIN during 2017, although his signature appeared on paperwork that OBWIN used to export gold produced in Nyakabindi, Democratic Republic of the Congo,[21] via Cyangugu in Rwanda.

126. The Group's investigations uncovered that, in addition to using forged documents and signatures to export gold illegally from Bukavu, smugglers benefited from the corruption of officials and a lack of enforcement at the border. One customs official and two migration officers told the Group that, every week, they witnessed known smugglers crossing the border with gold and forged export documents. When the Group asked why the smugglers were not arrested, the two migration officers mentioned independently two cases in August and November 2017, when they arrested smugglers only to observe them being immediately released following the intervention of government officials from Kinshasa.

127. The Group also found that controls in Rwanda were insufficient to identify smuggled gold. In fact, customs officers in Rwanda only received and recorded papers presented by gold dealers. Despite the prevalence of forged documents, they did not question the authenticity of the documents presented. Gold dealers received a receipt that they presented at Kamembe International Airport before boarding, but the gold that they carried was not checked at the customs office or at the airport.

128. The paperwork used by OBWIN Sarl in the case mentioned above cited Dubai, United Arab Emirates, as the gold's final destination, but according to two brokers in Kamembe, Rwanda, and three individuals familiar with the gold trade in Bukavu, smugglers usually flew from Kamembe International Airport to Kigali, where they sold the gold to Kigali-based exporters. The Group requested gold production and export figures from the Rwandan authorities but had not received a response at the time of preparation of the present report. During its investigations, the Group received

---

[20] At the time of preparation of the present report, 1 gram of gold was sold in Kampala for $44.
[21] A validated mining site in South Kivu Province.

reports regarding individuals and networks in Rwanda that illegally bought gold exported from the Democratic Republic of the Congo. Given that it had not yet been possible to confirm all of these cases according to its evidentiary standards, the Group believes these reports should be further investigated.

**Airlines and gold carried in hand luggage**

129. The Group continued its investigations of gold carried in hand luggage on commercial aeroplanes as a means of smuggling gold from the Democratic Republic of the Congo and outside the Great Lakes region. The Group focused its investigations on Bukavu and Entebbe airports and found that ongoing practices were consistent with its previous findings (see S/2017/672/Rev.1, para. 110). Furthermore, as suggested by the Security Council (see S/PRST/2017/23), the Group engaged with various stakeholders concerning the control of unwrought gold transported in carry-on luggage.

*Patterns for gold smuggling in carry-on luggage*

130. Three migration officers based in South Kivu, including one who was stationed at Kavumu Airport in Bukavu, told the Group that gold from areas such as Walikale and Shabunda territories is transported by small planes to Kavumu Airport. The three sources told the Group that gold is carried under *colis valeur* (premium cargo), generally without official documentation. They added that, once at the airport, freight companies bribe security and migration agents to be allowed to collect the gold without restriction. Another migration officer confirmed the bribing of security agents and added that, since crew members are not generally checked, they sometimes carry gold in their luggage and deliver it to traders in Bukavu. In March 2018, at the offices of two freight companies in the city of Bukavu, the Group witnessed traders who had no official affiliation with the gold sector receiving gold sent from Shabunda. The Group inquired from two of the traders where they intended to sell the gold that they had received from the freight company, and they responded that the gold was for buyers based in Cyangugu in Rwanda. The Group was not able to obtain the identity of those buyers.

131. The Group confirmed that, in Entebbe Airport, companies sell empty seats. As previously documented, empty seats are used by smugglers to transport gold concealed in hand luggage. Two individuals associated with the gold sector in Kampala, one Kampala-based gold broker from the Democratic Republic of the Congo and one migration officer stationed at the airport in Entebbe told the Group that, despite the official claim that minerals cannot leave the country without proper paperwork, gold smugglers continue to travel either without documentation or with forged documents. The migration officer and the broker told the Group that the owners of gold being trafficked do not travel themselves but use couriers who fly to Dubai to deliver the gold to buyers there. The two sources added that couriers can operate easily because they bribe customs and security officers at Entebbe airport.

132. Two Ugandan nationals working for two airlines operating from Entebbe informed the Group that they are not requested to check gold in hand luggage. In the course of its current mandate, the Group held discussions with senior officials of eight airlines operating in and out of the Great Lakes region, who said that their primary role in checking passengers was to make sure no one was carrying anything that could jeopardize the security of the plane, a policy focusing almost entirely on weapons and explosives. The Group is of the view that gold transported on commercial aeroplanes should not be banned as it represents a key form of export for responsible artisanal and small-scale mining activity that observes the requisite due diligence guidelines. However, there is a need to address the loopholes related to the illegal transportation of gold carried in hand luggage on commercial aeroplanes.

*Suggestions to reinforce the control of gold carried in hand luggage*

133. During the period under review, the Group consulted various stakeholders, including major airlines flying from the Great Lakes region. The Group would like to thank OECD, which assisted in this process. The Group believes that additional work should be done to further develop guidelines to help airlines to reinforce their ability to control smuggled gold transported on their aeroplanes.

134. The Group would like to propose two actions to mitigate the illegal transportation of gold carried in hand luggage: assistance to enable airlines to detect smuggled gold and the creation of a mechanism to undertake further investigation and prosecution.

135. On the basis of the documented evidence, the Group is of the view that the International Civil Aviation Organization (ICAO) and the World Customs Organization (WCO) should develop rules to be observed by airlines in order to ensure that gold is not smuggled. The rules should be applicable at all airports prone to smuggling in the Great Lakes region.

## B.   Tin, tantalum and tungsten

136. The Group investigated cases of the smuggling of tin, tantalum and tungsten, documenting cases on the basis of the evidence collected and the testimony obtained from sources. The Group concluded that the smuggling of tin, tantalum and tungsten continued in a manner consistent with its previous findings (see S/2014/42, paras. 214–216).

137. The Group investigated the violation of the Tin Supply Chain Initiative traceability system of the International Tin Research Institute. The Group notes that the smuggling of tin, tantalum and tungsten also contravenes the due diligence guidelines of the ICGLR Regional Certification Mechanism and OECD.

138. The investigations concerned the involvement of FARDC and the trafficking of minerals by individuals and entities. The Group points out that it did not witness the presence of armed groups at mining sites. Similarly, the Group neither viewed nor received reports of the involvement of either FARDC or armed groups in the mining of tin, tantalum and tungsten.

139. However, the Group received several cases in which FARDC officers were involved in the violation of the Tin Supply Chain Initiative traceability system for tin, tantalum and tungsten. Sources in the mineral sector in South Kivu informed the Group that some FARDC officers had participated in the smuggling and illegal transportation of minerals, consistent with the Group's previous findings (see S/2016/466, para. 119). Two cases illustrate this. In the first case, in December 2017, FARDC soldiers from Goma attempted to seize control of 1,300 kilograms of coltan belonging to a *négociant* in Numbi, Kalehe territory. The administration of the Numbi mineral sector in South Kivu intervened and sent the minerals to Bukavu (see annex 25). The minerals had been sourced from Lumbishi mines in South Kivu, which by then had not been validated. In this instance, both the *négociant* and FARDC were handling untagged minerals.

140. The Group also sought to understand the intensity of the smuggling of tin, tantalum and tungsten along the Minova-Kalungu axis in South Kivu. According to information from sources, including six motorbike transporters, a senior government anti-fraud officer and a *négociant* operating in South Kivu, the Minova-Kalungu axis was a growing centre of importance for minerals trafficked from South Kivu and North Kivu Provinces. Traditional leaders, artisanal miners, motorbike transporters

UNCLASSIFIED EXHIBIT 25

and middlemen who were involved in or had experience of minerals trading confirmed to the Group that they often witnessed the transportation of untagged minerals. Others confirmed that they had sold such minerals.

141. On 8 November 2017, agents from the North Kivu division of mines confiscated 26 bags of different types of untagged minerals found in the home of a *négociant* in Kalungu, South Kivu. The origin of the minerals was disputed, with the mineral authorities of North Kivu and South Kivu both claiming ownership (see annex 26).

142. The Group also investigated a case in which 2,300 kilograms of untagged coltan were found by law enforcement officers in Kalungu (see annex 27). According to the two law enforcement officers who intercepted the minerals and a local mineral dealer based in Kalungu, two entities, the Société aurifère du Kivu et du Maniema (SAKIMA), located in Kalehe territory in South Kivu, and the Société minière de Bisunzu (SMB), located in Masisi territory, North Kivu, claimed ownership of the minerals. The Group sought further information from the two entities, but at the time of preparation of the present report, the Group had not received a response.

143. The Group also documented a case in which, on 7 November 2017, mineral security agents intercepted 26 bags of untagged coltan from a *négociant* in Kalungu. However, the *négociant* appealed to have his minerals returned to him (see annex 28). In his appeal, he stated that the minerals were a sample that he had sourced from a new mining site that he had discovered, and that he was taking the minerals for testing to establish their types when he was intercepted.

144. The Group spoke to three independent sources with in-depth knowledge of mineral trafficking between North Kivu and South Kivu, as well as a minerals law enforcement officer in Sake, North Kivu. They all told the Group that Minova and Makelele were the most favoured routes used by smugglers operating in Masisi and Kalehe territories because they were less monitored. The Group interviewed seven motorbike transporters operating independently on the Kalungu-Minova route, four of whom confirmed that they often transported people, mostly young men, possessing varying quantities of minerals from either Numbi (South Kivu) or Rubaya (North Kivu) to Kalungu and Minova.

145. In one instance, a government official with knowledge of the trafficking routes along the North Kivu and South Kivu border described to the Group the routes that traffickers used in transporting minerals from Numbi and Rubaya. The traffickers supplied middlemen in towns of Makelele and Minova, on the shores of Lake Kivu.

146. The Group notes that the above-mentioned cases demonstrate a lack of adherence to the rules of chain of custody tracking from mine site to export, as recommended by ICGLR, OECD and Security Council resolutions. The Group sent official communications to both SAKIMA and SMB seeking additional information on the magnitude of mineral smuggling from their sites. Both companies informed the Group that they would provide detailed responses.

## IV.  Serious violations of international humanitarian law and human rights

### A.  Attacks on civilians in Beni territory

147. After a relative lull during the first part of 2017, the killing of civilians resumed in Beni territory in September 2017. The number of deadly attacks against civilians increased from mid-January 2018 (see annex 29), immediately after the beginning of FARDC operations in the area (see para. 36 above). As previously reported, since early October 2014 a variety of armed actors have killed hundreds of civilians in Beni

territory. Those responsible included local militias, various ADF factions and various armed actors, including some Kinyarwanda-speakers. Some FARDC officers and troops have also been involved (see S/2015/19, paras. 41–45; S/2015/797, paras. 84–92; S/2016/466, paras. 185–213; and S/2016/1102, paras. 98–102). As in previous years, no armed group has taken responsibility for the recent killings, although ADF is usually blamed for the attacks.

148. The Group focused its investigations on the killings of 26 civilians on the Mbau/Kamango road on 7 October 2017 and on the attacks against Kithevya, Ngite and Mbau in February 2018. The Group conducted fieldwork between January and March 2018 and interviewed various sources, including eyewitnesses. It also obtained photographs of some of the victims and villages attacked and a photograph of a dead assailant. The Group could not, however, identify the perpetrators of any of the attacks.

**Massacre at PK 40 on the Mbau/Kamango Road**

149. The killing of 26 civilians at PK 40 on the Mbau/Kamango road on 7 October 2017 (see annex 30) constituted the largest death toll of any attack in the area during 2017. The attack occurred two days before the second attack against United Nations peacekeepers in Mamundioma (see para. 166 below), about 12 kilometres away on the same road, and coincided with a series of attacks against FARDC on or near the Mbau/Kamango road. On the same day, armed elements took control of three FARDC positions in the forest nearby and ambushed FARDC at PK 40.

150. According to witnesses and other sources interviewed by the Group, in the afternoon of 7 October 2017, well-armed men dressed in FARDC uniforms apprehended and captured motorcycle taxi drivers and their passengers on the road at PK 40. Other armed men in mixed military and civilian clothes hidden nearby shot at those who tried to escape, but some managed to get away.

151. On the basis of the account of a witness interviewed by the Group and MONUSCO information, the assailants robbed their victims. They also recorded information about each person, including their name and religion. They asked them why they had not converted to Islam and showed the Qur'an to one of them. The attackers shot most of their captives but spared some women and small children. Photos of the dead show that they had been bound and some had been tied together. After the killings, they shot in the air twice, saying that they had killed all the "*kafir*" ("infidels" in Arabic).

152. Before leaving PK 40, the assailants burned about 20 motorbikes (see annex 31). Witnesses said that the assailants spoke local and Ugandan Swahili as well as Luganda.

153. After this incident, local and military officials prohibited access to the Mbau/Kamango road. Although traffic has since been almost non-existent, there have been a few killings of civilians. The closure of the road, which is one of the three lifelines between Beni town and Uganda, has caused significant human, social and economic problems, including the displacement of local populations, who have been deprived of access to their fields, and turning the towns of Kamango and Nobili into enclaves, virtually cut off from all nearby Congolese towns.

**Resurgence of attacks against the civilian population in early 2018**

154. The Group investigated three attacks near Beni in February 2018. These attacks bore several similarities, including that, some of the assailants wore FARDC uniforms, the assailants included women and children and the appearance and statements of the assailants suggested that at least some of them were Muslim. The

Group was, however, unable to confirm their identities and affiliations or to determine if the same group carried out all three attacks.

155. On 2 February 2018, an armed group attacked Kithevya, 6 kilometres north-west of Oicha, killing seven men, beheading two and slitting the throats of five, and looted homes and a health centre. The assailants allegedly spoke non-Congolese Swahili and Lingala. The local population said the assailants included women and children. The women were dressed in Muslim-type clothing and participated in the looting of houses and shops.

156. One week later, on 9 February 2018, an attack took place at Ngite, a village close to Mavivi, where the main MONUSCO base is located. The unidentified attackers killed eight people with guns and machetes and kidnapped two 12-year-old boys who eventually managed to escape. The assailants spoke in non-local languages and a strange Swahili. They included women wearing Muslim-type clothing and children. According to two sources, the leader, dressed in an FARDC uniform, was called "Docta" and referred to Islam. After the attack, the group headed toward Vemba, the area it had come from. Many sources reported to the Group the presence of armed elements in Vemba since October 2017.

157. On 22 February 2018, an unidentified armed group attacked Mbau, killing two civilians by slitting their throats. Witnesses said the group consisted of men, women and children. One witness specified that this first group of assailants was joined by a second group composed of only men. The men wore FARDC uniforms, in some cases mixed with civilian clothes, and some women wore headscarves. According to one witness, their chief wore a kind of keffiyeh with a headband and a long white dress and held a Koran. Another of their chiefs was called "Al-Qaïda". They reportedly spoke various languages, including Kinyarwanda, Lingala, Luganda and Swahili, and made statements about Islam to someone whom they had kidnapped. As with the attack at Ngite, the assailants came from and returned towards Vemba.

## B.  Violence in Djugu territory

158. The Group conducted preliminary investigations into the sudden eruption of violence affecting the Hema and Lendu communities in Djugu territory since mid-December 2017. Djugu territory had been the theatre of a conflict between the Hema and Lendu communities from 1999 to 2003, which had caused tens of thousands of deaths. During its mandate, the Group conducted interviews with representatives of each community, MONUSCO staff, prosecutorial authorities and seven individuals detained for their alleged participation in the violence. Although the Group noted some form of organization in the attacks, it did not find any evidence of external actors manipulating the perpetrators.

159. The Group established that this new wave of violence had started on 16 December 2017 in Uzi, in Walendu Djatsi, when a group of Hema badly beat a young Lendu from Tete, in Walendu Pitsi, allegedly for an altercation with an official of the security forces of the Democratic Republic of the Congo stationed there. In retaliation, the day after, a group of Lendu from Tete attacked with machetes two Hema women in the fields of the village of Maze, in Walendu Pitsi, injuring them seriously. This led to a wave of reprisals from 17 to 20 December 2017, notably with Hema elements burning about 80 Lendu houses in Tete, and Lendu elements burning at least six Hema villages. At least six Hema were also killed in Bahema Nord.

160. On 29 December 2017, on the initiative of the Governor of Ituri Province and with MONUSCO support, leaders of each community reached a peace and sensitization agreement. There was a relative lull in January 2018, although tensions persisted.

161. The violence resumed at the beginning of February 2018, with the killing of more than 20 persons in Blukwa and Drodro, leading to retaliations and a spreading spiral of violence to certain areas, notably Walendu Pitsi, Walendu Tatsi and Walendu Djatsi sectors (see annex 32). The violence took the form of the torching of many villages, killings that indiscriminately targeted men, women and children of each community and the massive displacement of the civilian population. In several cases, women and children left their home in anticipation of potential attacks, leaving the men alone in the villages. In mid-March 2018, through the Ministry of Interior and Security of Ituri Province, leaders of both communities signed an agreement to cease hostilities (see annex 33). However, according to two reliable sources, they signed the accord without meeting each other to discuss its contents. Nevertheless, at the time of the drafting, the violence had reduced and displaced people started returning home.

162. At this stage of its investigations, the Group is of the view that there may have been some form of coordination for the attacks. Two sources pointed out the simultaneous timing of some of the attacks, with up to seven or eight attacks against Hema villages occurring at the same time, and the use of Motorola radios. One of the two sources also mentioned the use of call signs and some coordination in transporting looted goods. Furthermore, according to two sources, including a Lendu leader, members of the Lendu community retaliated on a much larger scale to provocations or attacks than did members of the Hema community. Only a few killings were committed with guns, the vast majority being committed with bladed weapons such as machetes, knives, arrows or spears.

163. The Hema leader interviewed by the Group, as well as two Lendu detainees, told the Group that those responsible for the violence belonged to a new church called CODECO, created about three years ago. The Group could not confirm this information. Other sources, including a Lendu leader, told the Group that CODECO is known in the area as the Coopérative économique pour le développement du Congo and was formerly known as CODEZA, an agricultural cooperative. The Group noted that the late president of the cooperative was convicted for war crimes by the Ituri Military Tribunal in 2010.[22]

164. The Group believes that it is necessary to identify and address the root causes of the conflict between the Hema and Lendu, including those resulting from the 1999–2003 conflict.

## V.    Attacks against United Nations peacekeepers

165. During its mandate, the Group investigated the attacks against United Nations peacekeepers in Beni and Fizi territories (see S/2017/1091, para. 8). As is the case for attacks against civilians in Beni territory (see para. 147 above), attacks against peacekeepers have usually been attributed to ADF. However, the Group received credible information that all three attacks against the peacekeepers in Beni territory were committed by a coalition of armed groups or a recently formed armed network, involving ADF and Mai-Mai elements. The Group believes that further investigation should be conducted to identify the exact perpetrators. With respect to the attacks against the peacekeepers in Fizi territory, the Group found that all three attacks occurred in a zone that was at that time under the control of Mai-Mai Yakutumba and allies. The Group recalled that attacks against United Nations peacekeepers are a sanctionable act under paragraph 3 of resolution 2360 (2017).

---

[22] The judgement of the Ituri Military Tribunal is accessible (in French) at https://issuu.com/ avocatssansfrontieres/docs/asf_rdc_crimesinternationaux_part6 (last accessed on 14 April 2018).

## A.  Attacks on United Nations peacekeepers in Beni territory

166.  All three attacks targeting the Tanzanian peacekeepers in Beni territory occurred on the Mbau/Kamango road and coincided with a series of attacks against FARDC on or near that road from mid-August 2017. The first attack on United Nations peacekeepers targeted the Mamundioma TOB, at PK 27, on 17 September 2017, when one peacekeeper was killed and another wounded. The second attack, which occurred on 9 October 2017, targeted the same TOB but killed three peacekeepers and wounded 18. The third attack occurred at the Semuliki Company Operating Base (COB) at PK 51 (see annex 34) on 7 December 2017. With 15 [23] peacekeepers killed, 43 wounded and 1 still missing, it remained one of the deadliest attacks against peacekeepers in the Democratic Republic of the Congo.

167.  The Group's investigations encompassed fieldwork in September and October 2017 and in January, February and March 2018 in Beni territory, including a visit to the Semuliki COB and many interviews. During its investigations, the Group collected credible information that a coalition of armed groups or a recently formed armed network, comprising ADF and Mai-Mai elements, was involved in all three attacks against United Nations peacekeepers in Beni territory. The Group is of the view that the strength and professionalism displayed by the assailants during the attacks were consistent with the information provided.

168.  One civil society actor in Beni area and one FARDC intelligence officer cited Bongela Chuma as being one of those implicated in the three attacks. The information that Bongela Chuma was one of the 900 prisoners who escaped from Kangbayi prison (see S/2017/672/Rev.1, para. 61) was confirmed by an FARDC intelligence officer, MONUSCO, another FARDC source and a former ADF combatant detained with Bongela Chuma. The latter had served as an imam in the prison. He had links with ADF and had been convicted and sentenced, on this basis, by the Operational Military Court of North Kivu. The Group cannot confirm that Bongela Chuma was involved in the three attacks against the peacekeepers with the same individuals or even the same armed groups. However, the Group noted that the three attacks shared similar characteristics and displayed a level of strength and professionalism that no previous attack from any armed group in the area had showed before.

169.  The Group noted, in particular, the tactics used, the number of assailants, their preparation in terms of both training and knowledge of the targets, their demonstrated confidence in their ability to overpower the United Nations peacekeepers, their equipment and the strength of their firepower.

170.  The attack against the Semuliki COB is, in this respect, particularly revealing. Indeed, the attack started at about 1730 hours, about one hour after the United Nations weekly resupply helicopter had left the COB, and lasted about 14 hours. Soon after the beginning of the attack, the COB came under heavy fire from assailants positioned in a "U" shape around the COB. The intensity of the assault forced the peacekeepers, at some point during the night, to retreat to one part of the COB, while the assailants entered the COB. The assailants then looted many items, including weapons, ammunitions, other military equipment, food and medicine.

171.  Witnesses interviewed by the Group reported the use of weapons such as AK-47s, 12.7 mm machine guns, mortars, medium machine guns, RPGs, rocket launchers, submachine guns, light machine guns, sniper rifles, tracers and hand grenades. Some suspected that night-vision equipment was used as well. The Group could not confirm that all this weaponry was used during the attack — except for RPGs since the Group saw an unexploded RPG stuck in a tree near the COB (see

[23] One of the peacekeepers subsequently died in hospital.

annex 35). Nevertheless, the Group noted the strength of their firepower, which allowed the assailants to pursue combats for about 14 hours, although at some stage the shooting became more sporadic and less intense.

172. The extent and the nature of the casualties further confirmed the strength of the firepower of the assailants: 15 peacekeepers were killed and 43 wounded. The Group also observed that the material damages were significant, including one armoured personnel carrier, five tents and one truck burned. The Group saw multiple bullet impacts on many other items, including the toilets, water tank, mobile water treatment unit, generator and tents (see annex 36).

173. While it was difficult to establish the exact number of the assailants, witnesses cited numbers between 300 and 1,000, most of them estimating the number at about 500. Some women wore head covers. Witnesses heard the assailants say: "We will exterminate the Tanzanians and there will be no survivors this time". When they left the COB, the assailants said: "If you do not leave, we will come back on Sunday". They spoke Congolese Swahili. Witnesses also heard some words in Arabic, such as "*Allah Akbar*" (God is the greatest), "*Takbïr*" (Greatest) and "*Amir*" (Commandant). They also heard "*Medina*", which according to some was used as a kind of password between the assailants to identify themselves, thereby indicating coordination among the assailants.

174. A further demonstration of the organization of the assailants was their removal from the COB of the bodies (except for one) of assailants killed in the attack, which was consistent with previous attacks in the area.

## B.    Attacks on, and killings of, United Nations peacekeepers in Fizi territory

175. During the current mandate, three incidents occurred involving United Nations peacekeepers in Maniema and South Kivu Provinces, a region that was considered to be under the influence of Mai-Mai Yakutumba and allies. In several public statements, Mai-Mai Yakutumba warned MONUSCO not to work together with the "illegal FARDC troops of Kabila", although it never threatened publicly to attack United Nations forces.

### Two helicopter attacks

176. On 20 September 2017, Mai-Mai Yakutumba and allies[24] clashed with and took over the FARDC position in Pene-Mende, Maniema Province. On 22 September 2017, a United Nations helicopter was deliberately targeted by Mai-Mai Yakutumba and allies. An eyewitness told the Group that, during a tactical flight near Pene-Mende, one Mai-Mai combatant in a group of armed Mai-Mai elements fired at the helicopter. The helicopter was hit in the fuel tank and rear tyre. The helicopter safely landed in Baraka and no casualties were reported.

177. On 5 January 2018, a second incident of a United Nations helicopter coming under fire was reported. During a reconnaissance flight over the Ubwari Peninsula, a bullet struck at the base of the Oryx helicopter. At the time of the incident, the Ubwari Peninsula was fully controlled by Mai-Mai Yakutumba.

---

[24] In this particular incident, the combatants belonged to the Mai-Mai groups of Aochi, Maheshe and Makindo

**Attack on MONUSCO convoy**

178. On 27 January 2018 at about 1300 hours, a United Nations convoy consisting of four vehicles was fired upon by Mai-Mai combatants in Kalonda 2 village, 22 kilometres south of Lulimba. Some 50 combatants fired on the convoy, killing one Pakistani peacekeeper and injuring four others. The United Nations peacekeepers retaliated and estimated that they had killed approximately 14 Mai-Mai combatants. The attackers were armed with RPGs, AK-47s and arrows. The attackers retreated, taking along all of the wounded and killed combatants. The incident took place in a zone where in the recent past other convoys, especially FARDC, had been ambushed.

## VI.  Arms

179. During the period under review, the Group continued its efforts to trace weapons and ammunition recovered from armed groups, including investigations into the delivery of military materiel to the Government of the Democratic Republic of the Congo without notification. During the course of these investigations, the Group discovered instances of countries delivering military materiel to the Democratic Republic of the Congo without notification to the Committee.

180. The Group also continued its investigations into the cross-border transfer of arms and ammunition from Burundi and analysed recent developments related to stockpile management in the Democratic Republic of the Congo. It found that the cross-border transfer of weapons and ammunitions remained an important source of supply for local and foreign armed groups active in the Democratic Republic of the Congo. Finally, and consistent with its previous findings, the Group noted that armed groups continued to obtain materiel from the national stock of the Democratic Republic of the Congo, either through targeted attacks on FARDC depots or through the sale or direct transfer of materiel from some FARDC officers.

**Arms recovered in the hands of armed groups**

181. The Group considers that the possession of weapons and ammunition by armed groups in the Democratic Republic of the Congo is in violation of the sanctions regime. During its investigations, weapons and ammunitions found with armed groups, in violation of the arms embargo, were collected, documented and traced. The Group investigated cartridges collected from materiel recently delivered to the Congolese Government as well as weapons and ammunitions recovered from armed groups, including Mai-Mai Yakutumba and alleged ADF combatants.

182. Following FARDC military operations against Mai-Mai Yakutumba, military materiel was seized and displayed in Uvira, South Kivu, in February 2018. The Group was able to obtain access to and inspect some of the weapons and ammunition recovered (see annex 37), some of which looked old and did not have clear markings allowing for effective tracing; FARDC sources informed the Group that most of the materiel recovered was diverted from national stock.

*107 mm Bi-tube Multiple Rocket Launcher Type 63*

183. During its inspection of the weapons and ammunitions seized from Mai-Mai Yakutumba, the Group observed a 107 mm Bi-tube Multiple Rocket Launcher (see annex 38). There were no indications or markings on the materiel to allow the Group to trace its exact origins. However, several FARDC officers told the Group that the materiel nicknamed "Ousama or Osama" within the ranks of FARDC, was derived from the existing 12-tube or 32-tube Multiple Rocket Launcher of FARDC, mounted on trailers and known as "Yana". Five high-ranking FARDC officers and two military

intelligence sources informed the Group that the materiel was modified in approximately early 2000 to facilitate its transportation during troop movements. The modifications were completed with the technical assistance of engineers from the Democratic People's Republic of Korea in a FARDC workshop in Likasi, Katanga. The same sources informed the Group that there existed a variety of such materiel within FARDC.

### 75 mm Recoilless Rifle (Cannon sans recul)

184. The Group observed materiel with characteristics similar to an M20 Recoilless Rifle (see annex 39). The absence of clear markings and relevant signs made it difficult to conclusively determine its exact origins. However, according to FARDC and military intelligence sources that the Group interviewed, the materiel was known as "*solola bien*" within FARDC ranks. It was initially adapted to motorized boats for FARDC naval forces but some difficulties had been revealed. It could damage the boat after firing because of the lack of a support base, forcing troops to use it on the ground instead. The materiel is generally used as a close infantry support weapon. Several FARDC officers and military intelligence sources informed the Group that the materiel was diverted from FARDC stock, mainly during the Mai-Mai Yakutumba attacks on the FARDC camp in Bendera in June 2017. The Group sent a request to the Congolese Government for further details on weapons and ammunitions stolen from Bendera in June 2017. At the time of preparation of the present report, the Group had not yet received a response.

### 7.62x54R mm Machine Gun, model MG-1M

185. During its investigations in Beni, the Group received a report of a PKM machine gun, model MG-1M with serial number 501104, that had been collected during FARDC operations in Mwalika. The materiel has characteristics similar to materiel produced in Bulgaria. It was allegedly recovered from alleged ADF combatants in Mwalika by FARDC units. The model was produced in 2010 (see annex 40). Several military sources indicated to the Group that such weapons were part of FARDC stock. According to military intelligence sources, four were given per battalion as "*armes d'appui*" for FARDC troops. The Group also observed the same model in the hands of Mai-Mai Yakutumba combatants and other FARDC patrols in Bukavu and Uvira.

186. The Group initiated further investigations into the patterns of transfer of the materiel. It sent a request to Bulgaria as a potential country of origin. In their response to the Group's request, the Bulgarian authorities confirmed that the materiel was produced by the joint stock company Arsenal, a Bulgarian company, in 2010. The Bulgarian authorities further confirmed to the Group that the materiel was part of an authorized export shipment by the company in 2013 to the headquarters of the Special Presidential Security Group of the Democratic Republic of the Congo. The Congolese Government received the materiel on 15 June 2013 and issued a delivery verification certificate on 17 June 2013. The application for the licence was accompanied by an original end user certificate indicating the Congolese Government as the end user.

### 7.62 x 39 mm and 7.62 x 54 mm ammunition

187. The Group documented a variety of ammunition for AK-type rifles. Some has characteristics similar to ammunition produced in Bulgaria, the former Union of Soviet Socialist Republics, China and Iran (Islamic Republic of) (see annex 41). The Group sent requests to the potential countries of origin identified for further details. It received a response from Bulgaria regarding the 10_96 7.62 x 39 mm ammunition. The Bulgarian authorities informed the Group that the materiel was produced in Bulgaria in 1996, but that by law such records were not retained for more than 10 years. The Group also received a reply from the Russian Federation regarding

7.62 x T-46R mm (188-D) ammunition. The Russian authorities explained to the Group that the joint stock company Novosibirsk Cartridge Plant manufactured rifle cartridges of 7.62 mm calibre with a T-46 tracer bullet and a ballistic cartridge case packed in metal boxes, as well as the 7.62 x 54R mm calibre, in 1987 and 1953, respectively. The Russian Federation further explained to the Group that, given the year of manufacture of the cartridges and the expiration of the normative retention period for the relevant documentation, it was not possible to provide the Group with details on the buyer or the year of delivery.

188. The Group is of the view that the ammunition might have been a legal sale to the Congolese Government and then retransferred from national stock. At the time of preparation of the present report, the Group has not received a response from the remaining countries.

*73 mm Round RHEAT-9MA*

189. During the inspection of the weapons and ammunitions recovered from Mai-Mai Yakutumba in Uvira in February 2018, the Group observed some anti-tank grenades, model 73 mm Round RHEAT-9MA (see annex 42). The characteristics of the materiel were similar to those produced in Bulgaria.

190. In the course of its investigations, the Group sent a request to Bulgaria. In a response dated 28 March 2018, the Bulgarian authorities confirmed to the Group that the materiel was produced by the joint stock company Arsenal in 2010. It was exported to the Democratic Republic of the Congo as part of a legal sale in 2012 to the headquarters of the Special Presidential Security Group in Kinshasa. The material was exported on 25 October 2012 and the Congolese Government acknowledged receipt of the materiel on 11 December 2012 with a delivery verification certificate. The Bulgarian authorities also informed the Group that the Congolese Ministry of Defence and Military Veterans ordered another consignment of the same materiel in 2013, which was delivered on 28 September 2013 and the Government acknowledged receipt on 18 December 2013 with a delivery verification certificate. This indeed confirmed that the materiel was initially part of the Congolese national stock.

191. The Group sent a request to the Government of the Democratic Republic of the Congo for further information as to how and when Mai-Mai Yakutumba came into the possession of such materiel initially destined for the Special Presidential Security Group and has not yet received a response. In April, a senior official informed the Group that he was tasked to collect further details on questions raised by the Group.

**Failure to notify**

192. During the period under review, the Group uncovered cases of failure to notify the Committee.

*China Xinxing Shanghai Import and Export Corporation*

193. The Group observed that some FARDC troops deployed across the country had new equipment, including new fatigues and weapons (see annex 43). The Group started collecting information on their origin and determined that, in October 2017, there had been a delivery to the Congolese Government of military materiel, including military helmets, bulletproof vests, military boots and uniforms. The Group obtained information that China Xinxing Shanghai Import and Export Corporation had delivered some of the military materiel at the port of Matadi (see annex 44). China Xinxing is a company that is specialized in the supply of military equipment. The Group sent a request for further information on the delivery, details on the materiel and whether the delivery was notified to the Committee. At the time of preparation of

the present report, the Group had not yet received a response from the Government of China.

194. The Group is not aware of any notification to the Committee in accordance with paragraph 1 of Security Council resolution 2360 (2017).

*Materiel with characteristics similar to that produced in Egypt*

195. In the course of its investigations, the Group received information that, in late 2017 and in January 2018, Kader Factory for Development Industries delivered military materiel from Egypt to the Democratic Republic of the Congo, including crowd control materiel such as tear gas and various types of ammunition (see annex 45). The Group noted that Egypt had notified the delivery of some materiel in 2012; however, the Group is not aware of any recent notification related to the recent shipment of tear gas. The Group requested further details from the Government of Egypt but has not yet received a response.

196. The Group is not aware of any notification to the Committee in accordance with paragraph 1 of Security Council resolution 2360 (2017).

**Cross-border transfer networks for weapons and ammunition in the Ruzizi Plain**

197. The Group continued its investigations into cross-border transfers of weapons and ammunition. It focused on the trafficking network based in Burundi and documented the incursion of elements belonging to RED Tabara, a Burundian armed group active in Fizi territory.

*Burundian arms trafficking network*

198. As indicated in its previous report (see S/2017/672/Rev.1, paras. 151–154; S/2017/1091, paras. 90–94), the Group received information on the transfer of weapons and ammunition from Burundi to the Ruzizi Plain. Two officers of the Forces de défense nationale du Burundi (FDN) and two members of the ruling party youth league known as Imbonerakure informed the Group that, in November 2017, a vehicle without a number plate had transported 33 AK-47s, 4 PKM machine guns and a number of grenades to the shores of the Ruzizi River of the Democratic Republic of the Congo. Five motorbike drivers who helped transport weapons in the area in the Democratic Republic of the Congo told the Group that, toward the end of January 2018, they assisted three individuals who had travelled from Cibitoke to Mabayi by boat. The individuals were carrying two parcels wrapped in plastic bags, containing ammunition. All three were armed with revolvers. They said they were on mission for authorities from Burundi. The motorbike drivers helped them transport the parcels to the mountains to be delivered to an unknown armed group.

199. Two members of the Burundian militia known as Imbonerakure, who took part in the planning, and two FDN sources with access to information confirmed to the Group that some government officials remained involved in the cross-border activities of armed individuals and the transfer of arms into the Democratic Republic of the Congo (see S/2016/466, paras. 42–45; and S/2017/1091, paras. 90–94). The same sources confirmed to the Group that, in early 2016, officials of the ruling party of Burundi, the Conseil national pour la défense de la démocratie (CNDD), had appointed Manassé Hakizimana to lead a mission to destabilize the anti-government forces active in the Fizi Plain in South Kivu. Manassé worked with a team of 11 combatants recruited among the Imbonerakure. This included Nsabimana Eric also known as Marobe, Cishahayo Donatien, Nduvimana also known as Makwanza, Butoyi also known as 100kg, Birigimana Abdul, Buxene, Muoya Ru, Kireko, Nduwimana Jean Claude also known as 79, Bakenga Asmani and Manassé. The

sources further informed the Group that, following the death of Manassé in the Fizi Plain in March 2017, some CNDD officials had convened a meeting to set up a commission composed of high-level government officials.

**RED Tabara crossing with arms and ammunitions in violations of the embargo**

200.  In late June 2017, near Kalongwe in South Kivu, FARDC officers arrested about 30 combatants belonging to RED Tabara, a Burundian armed group active in the Fizi Plain. The Group interviewed the FARDC officers who intercepted the combatants. They informed the Group that the combatants came from the Mahanga refugee camp and had crossed the Ruzizi River to reach the Democratic Republic of the Congo. The armed group was in possession of seven AK-47s, three Motorola smartphones, one Thuraya satellite phone, two telephones, a solar panel system, a 12.7 mm machine gun, 14 rockets, bands of 12.7 mm ammunition and pharmaceutical products (see annex 46). The combatants were led by "Major-General" Birembu Melkiade (see annex 47). The Group's attempts to interview the combatants were not successful. The Group identified Melkiade in Ndolo Prison in Kinshasa but was not able to interview him owing to his ill health. The Group views the presence of foreign armed individuals on the territory of the Democratic Republic of the Congo as a violation of the arms embargo.

**Update on stock management**

201.  The Group continued to follow up on stockpile management in the Democratic Republic of the Congo. On 22 February 2018, during a meeting held in Kinshasa with a representative of the National Commission for the Control of Small Arms and Light Weapons of the Democratic Republic of the Congo, the Group received information that 45,000 weapons had been marked. The representative also informed the Group that the Republican Guard had finally accepted to have its weapons marked. The representative equally informed the Group that a national plan was being elaborated to accelerate the process of monitoring small arms and light weapons in the Democratic Republic of the Congo. The validation of this plan by all stakeholders is expected to consolidate the normative and institutional frameworks in order to address the illicit transfer of weapons and ammunition in the Democratic Republic of the Congo and the region.

202.  However, in terms of weapons that have been marked, the Group noted a discrepancy between the data of the Commission and that of its partners, including the Mines Advisory Group (MAG) and the Mine Action Service of the United Nations (UNMAS). The Group received from MAG and UNMAS a slightly higher number of weapons that have been marked since 2016. A total of 56,401 State-owned weapons have been marked in Kinshasa and Bas-Congo Province as of the end of February 2018. These included 6,044 weapons marked before 2016 and 50,357 marked since January 2016 with MAG as an implementing partner, 8,733 weapons belonged to the Police nationale congolaise (PNC) and 47,668 to FARDC.

203.  The Group took note of the achievements of the Commission in terms of the rehabilitation of some storage facilities and building capacity to manage them. In its final report of November 2016, the Commission had indicated that it had trained 168 armoury officers in Kinshasa for the management of facilities in line with international standards; trained four trainers for PNC and FARDC (two each); upgraded six armouries (three for PNC and three for FARDC) to meet international standards with the assistance of MAG; and provided PNC and FARDC with four containers (two each) with the capacity to store 160 small arms and light weapons each in Kinshasa and Kasangulu (Kongo Central).

UNCLASSIFIED    EXHIBIT 25

204. While the Group welcomes the relative progress made by the Commission, it is concerned about the accuracy of its data and absence of a coordinated exchange of information between implementing partners. As indicated in its previous reports (S/2015/797, para. 107), the Group observed that the conditions of storage facilities outside Kinshasa had not improved, leaving FARDC and PNC storage sites vulnerable to the attacks of armed groups. Given the scope of the challenges faced in the country, the stated achievements remained far below the national needs. The Commission also indicated to the Group that it was still short of technical capacity in profiling and tracing.

## VII. Recommendations

205. The Group makes the recommendations set out below.

### Government of the Democratic Republic of the Congo

206. The Group recommends that the Government of the Democratic Republic of the Congo:

(a)    Conduct thorough audits of *comptoirs* in Bunia and Bukavu and impose penalties, as appropriate, for the fraudulent underreporting of gold (see paras. 117–119 and paras. 123–126 above);

(b)    Investigate and prosecute, as appropriate:

(i)    Individuals and entities involved in the illegal trade and smuggling of natural resources (see paras. 115 and 116 above);

(ii)    FARDC officers collaborating with armed groups (see para. 84 above);

(iii)    Individuals responsible for serious violations of international humanitarian and human rights law in proceedings that fully guarantee fair trial rights (see paras. 147–164 above).

### Special Representative of the Secretary General for Children and Armed Conflict

207. The Group recommends that the Special Representative of the Secretary-General for Children and Armed Conflict work with stakeholders, armed groups and the Government of the Democratic Republic of the Congo to prevent the recruitment and use of children by armed groups through information, advocacy, screening of armed groups and disarmament, demobilization and reintegration (see paras. 21 and 35 above).

### Security Council Committee established pursuant to resolution 1533 (2004)

208. The Group recommends that the Security Council Committee established pursuant to resolution 1533(2004):

(a)    Encourage Member States to notify the Committee of any delivery of military materiel and related assistance to the Government of the Democratic Republic of the Congo pursuant to paragraph 1 of Security Council resolution 2360 (2017) (see paras. 192–196 above);

    UNCLASSIFIED

(b)    Encourage ICAO and WCO to act on the recommendations of the Group and report to the Committee thereon (see paras. 129–135 above).

## Member States

209. The Group recommends that Member States provide adequate financial and logistic support to UNMAS in addressing MONUSCO challenges related to weapons and arms management in the Democratic Republic of the Congo (see paras. 181–191 above).

UNCLASSIFIED                    EXHIBIT 25

**Annexes**

### Annex 1: Organizations and entities the Group officially met with during its mandate

**GREAT LAKES REGION**

**Democratic Republic of the Congo**

*Government*

Agence nationale de renseignement (ANR)

Auditorat militaire

Centre d'évaluation, d'expertise et de certification (CEEC)

Direction générale des migrations (DGM)

Forces armées de la République démocratique du Congo (FARDC)

Ministère des mines

Ministère de la Justice et Garde des Sceaux

Ministère des Affaires étrangères et de la Coopération internationale

Unité d'Exécution du Programme national de DDR (UEPN-DDR)

*Private sector*

Metachem

ITRI Ltd/PACT

Association des Negociants de Minerais du Nord Kivu (ANEMNKI)

Association Congolaise des Banques (ACB)

*Organizations*

Bundesanstalt für Geowissenschaften und Rohstoffe (BGR)

Caritas

Banque Centrale du Congo - BCC

Embassy of Belgium

Embassy of France

Embassy of Sweden

Embassy of the United States

European Union (EU) Delegation in Kinshasa

Human Rights Watch (HRW)

Office for the Coordination of Humanitarian Affairs (OCHA)

United Nations Joint Human Rights Office (UNJHRO)

United Nations Mine Action Service (UNMAS)

United Nations Organization Stabilization Mission in the DRC (MONUSCO)

International Organization for Migration (IOM)

UNCLASSIFIED                    EXHIBIT 25

**Rwanda**
*Government*
Ministry of Defence

**Uganda**
*Private sector*
African Gold Refinery
*Organizations*
United Nations Organization Stabilization Mission in the DRC (MONUSCO)

**OUTSIDE THE GREAT LAKES REGION**

**France**
*Government*
Ministry of Foreign Affairs
*Organizations*
Organization for Economic Cooperation and Development (OECD)

**The Netherlands**
*Government*
Ministry of Foreign Affairs

**United States of America**
*Organizations*
United Nations Department of Safety and Security
United Nations Department of Peacekeeping Operations
INTERPOL

**United Arab Emirates**
*Government*
Ministry of Foreign Affairs

UNCLASSIFIED    EXHIBIT 25

## Annex 2: Group of Experts' official communications

During the mandate, the Group addressed 50 official communications to Member States, international organizations and entities (including multiple communications to the same addresses).

The Group received responses from the Governments of Burundi, People's Republic of China, Tanzania, The Russian Federation and The Netherlands

The Group did not receive responses from the Governments of Bulgaria, The Democratic Republic of the Congo, Iran, Rwanda[1], Serbia, Sudan, Uganda, and United Arab Emirates

The Group received responses from the following international organizations and entities: International Civil Aviation Organization (ICAO), International Tin Association (formerly ITRI ltd), United Nations Organization Stabilization Mission in the DR Congo (MONUSCO) and Organisation for Economic Co-operation and Development (OECD)

The Group did not receive responses from the following international organizations and entities: International Air transport association (IATA), International Precious Metal Refiners (IPMR) and Paypal holdings

[1] The Group acknowledge that the rwandan government allowed the Group to interview former FDLR combatants in Rwanda in January 2018.

UNCLASSIFIED                    EXHIBIT 25

### Annex 3: CMC and CNPSC Coalitions

During the duration of the Group's mandate, several armed groups claimed to be part of large coalitions taking up arms against the Congolese national Government. Two of the most striking coalitions are the *Collectif des mouvements pour le changement* (CMC) and the *Coalition nationale du peuple pour la souveraineté du Congo* (CNPSC), both claiming to have the capacity to destabilize the regime of the Democratic Republic of the Congo. The Group investigated the two coalitions but did not find sufficient evidence to confirm their claims.

#### *Collectif des mouvements pour le changement* (CMC)

The *Collectif des mouvements pour le changement* (CMC) was created in January 2015. Its armed wing is called *Force de défense du peuple* (FDP). The president of the movement is Athanase Kuba Marandura, who is, according to several sources, residing in Tanzania (see S/2018/531, Annex 2). Jules Mulumba, the spokesperson of the group, claimed in an interview in March 2017[2] that the coalition is composed out of several armed groups from North Kivu, South Kivu and Ituri, and that they have established links with Kamuina Nsapu in Kasai province. The Group could not establish a concrete link with any armed groups in South Kivu, Ituri or Kasai provinces.

Nyatura leader John Love, active in Rutshuru territory in North Kivu, told the Group that his armed unit is part of the coalition and that the goal of the CMC is to overthrow the government of President Kabila.

In July 2017, 13 alleged members of the CMC were arrested in Burundi and transferred to the Democratic Republic of the Congo. After interviewing several of them, the Group noted that only one of the arrested individuals was linked to the CMC.

In a public statement of 6 April 2018, Mulumba, claimed the attack and killing of 40 FARDC soldiers during clashes between the FDP and the FARDC on 3 and 5 April 2018. An FARDC source and a local researcher told the Group that during the clashes only a small number of FARDC and Nyatura were killed.

The Group did not find any evidence that the CMC has the capacity to destabilize the current Congolese State.

#### *Coalition nationale du peuple pour la souveraineté du Congo* (CNPSC)

William Amuri 'Yakutumba' created the *Coalition nationale du peuple pour la souveraineté du Congo* (CNPSC) in 2013 to oppose the government of President Kabila. In a statement, he claimed to have gathered like-minded armed groups to resist the bad governance, the foreign occupation and the balkanization of the country (see S/2018/531, Annex 30). It is unclear if the CNPSC has an active political wing. The coalition stayed dormant for a while, but from December 2016 the coalition became increasingly present in the Congolese media issuing various public statements.

Amuri managed to convince several armed groups to join the coalition. Apart from a few small armed groups from the Bembe community, other armed groups included

---

[2] http://www.politico.cd/en-off/2017/03/09/face-a-limpasse-politique-coalition-militaire-menace-de-restaurer-democratie-armes.html.

                    UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

Mai Mai Mailaka aka *Les anges pour la libération de l'esclavagisme de Salamabila* (ALES) under the command of Sheikh Assani, active in Maniema, Raya Mutomboki groups from the Shabunda area as well as armed groups from the Ruzizi Plain like Mai Mai Karakara, Mwenyemali and Mushombe.

Several sources told the Group that 'General' Janvier Buingo Karairi, commander of the *Alliance des patriotes pour un Congo libre et souverain* (APCLS), active in Masisi and Rutshuru territories in North Kivu province, is Amuri's deputy in the CNPSC. However, the Group noted that there was no active participation of APCLS in the most recent CNPSC actions in South Kivu, Maniema and Tanganyika provinces.

In the build up to the Uvira attack, the CNPSC and Amuri publicly stated that they would occupy Uvira and Bukavu before taking over from President Kabila in Kinshasa.

However, the Uvira attack of 27 September 2017 showed the weakness of the coalition. Some of the coalition partners from the Ruzizi Plain did not participate in the attack as initially planned and the attack was repulsed. Since then, the Ruzizi groups are not considered as members of the coalition any longer.

Following FARDC operations in January-February 2018 against Mai Mai Yakutumba, there have been no public statements from the CNPSC.

    UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

**Annex 4: Images from ADF camp MAPOBU**





Photos by FARDC in March 2018

    UNCLASSIFIED

## Annex 5: CNPSC area of influence

The map below indicates the zone of influence (not necessarily in full or constant control) of the CNPSC coalition in South Kivu, Maniema and Tanganyika provinces in October 2017 when their zone of influence was on the highest level.



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED   EXHIBIT 25

## Annex 6: Detailed map of the heartland of Mai-Mai Yakutumba in Ngandja forest and Ubwari Peninsula

The map below indicates the zone of control of Mai Mai Yakutumba on the Ubwari Peninsula, the Ngandja forest and the coastal areas from Talama up to Mizimu. In this area, the Mai Mai Yakutumba established a parallel administration and controlled the maritime traffic on Lake Tanganyika. Kazimia was the base camp of the movement until the FARDC operations ended this situation in January 2018.



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED

UNCLASSIFIED        EXHIBIT 25

## Annex 7: Mai-Mai Yakutumba prisoners in Munienze prison

### LISTE DES CBT MAI – MAI GP YAKUTUMBA

| SERIE | NOM ET POST NOM | FONCTION | SPEC OU FORCES | LIEU ET DATE D' ARRESTATION | OBN |
|---|---|---|---|---|---|
| 01 | EKANDA SAIDI Alias DRAGILA | Comd Force Nav | Force Nav | Burundi/Rumonge, le 29/01/018 | Ex Cap FARDC |
| 02 | WAKANDA MONGELO | N3 et Cnmd 2nd | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 03 | MONGA DUNIANI ARCHIMEDE | N1 et Srt | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 04 | BYAMUNGU SADI | Chef N2 | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 05 | MUCHUKIWA KALUME FERDINAT | Adjt N2 | Force Nav | Burundi/Rumonge, le 29/01/018 | Ex Li FARDC du 3301 Regt auteur assassinat du Cap KITAMBALA DJUMA dans la nuit du 12 au 13 Oct à Baraka |
| 06 | KINTU KIYOMBE · SEBA | N2 Adjt | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 07 | WASHIKALA RAMAZANI SALUMU | N4 | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 08 | ISAYA DJUMA ISHIBO | Comd Bde | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 09 | SAFARI FIKIRI | Comd Base 2nd | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 10 | MITUNGANO BALIBANGA | Comd Cie | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 11 | MUKOKA WAZABANGA WABOZONGA | Comd Cie | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 12 | EMUNGA EDDY KENZO | Comd Cie | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 13 | DUNIA AMULI | Comd Cie | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 14 | NURDINE PHILIPO MUDJINGA NKULU | Soldat | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 15 | KARIMU LUMUMBA | Soldat | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 16 | DUNIA OREDI SHINDANO | Soldat | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 17 | ANTEJI ABWE | N4 Adjt | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 18 | OREDI NGELA | Srt N3 | Force | Burundi/Rumonge, | |

        UNCLASSIFIED

UNCLASSIFIED          EXHIBIT 25

| | | | | Nav | le 29/01/018 | |
|---|---|---|---|---|---|---|
| 19 | SOCRATE RAMAZANI KASHINDI | Soldat | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 20 | IBRAHIM REMY | Soldat | | Force Nav | Burundi/Rumonge le 29/01/018 | |
| 21 | EVALE PATRICE | Soldat | | Force Nav | Burundi/Rumonge. le 29/01/018 | |
| 22 | MWEMA MAKAZA | Chef Section | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 23 | ANDRE MBUNGA | Soldat | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 24 | OMARI LEONARD | Operateur | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 25 | CHANCE ROGER | Soldat | | Force Nav | Burundi/Rumunge, le 29/01/018 | |
| 26 | ERESI AABUTI | OPJ N2 | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 27 | KASKILE ABEDI | Chauffeur | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 28 | BOLAKA EMMANUEL | Chef PI | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 29 | BYAMUNGU KASHINDI | Soldat | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 30 | INNOCENT MORICE | Sm Bu | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 31 | GABRIEL KABANTU | Soldat | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 32 | MALINDOGO RASHIDI | Soldat | | Force Nav | Burundi/Rumonge, le 29/01/018 | |
| 33 | RAMAZANI OMBA GABRIEL | Comd Sect | Infanterie | | Le 02/01/018 | Ex Lt FARDC de la Bde Reguln |
| 34 | DUNIA NDAKONGABA | Comd Bde | Infanterie | | Kataka, le 19/01/018 | |
| 35 | BALEKELO KONE CIKURU | Comd Cie | Infanterie | | Mukera, le 09/11/017 | |
| 36 | ANANA BYAMUNGU BUSHIRI | Chef PI | Infanterie | | Kabumbe, le 15/01/018 | |
| 37 | JEAN JACQUES MUFAUME | Comd Bde | Infanterie | | Uvira, le 27/11/017 | |
| 38 | BUCHEKABIRI FUNGULO | Srt Bn | Infantene | | Baraka, le 29/01/018 | |
| 39 | VICTOR SUMAILI | Rav Cie | Infanterie | | Kazima, le 03/02/018 | |
| 40 | KUMBE BYAMUSE PAUL | S1 Bde | Infanterie | | Kazima, le 27/01/018 | |
| 41 | RAMA NSA | Chef Sec | Infanterie | | Mizimu, le 03/02/018 | |
| 42 | LOKWANGO | Soldat | Infanterie | | Misisi, le | |

UNCLASSIFIED                    EXHIBIT 25

| | | | | 18/12/017 |
|---|---|---|---|---|
| 43 | KAMILI KABE SHAMALA | Soldat | Infanterie | Misisi, le 18/12/017 |
| 44 | RIGEN TAMBWE | Soldat | Infanterie | Burundi, le 28/12/017 |
| 45 | MANASE MAKANGILA | Soldat | Infanterie | Misisi, le 13/01/018 |
| 46 | SULEMANI BYAMUNGU | Soldat | Infanterie | Uvira, le 28/01/018 |
| 47 | HAKIZANO BAHATI | Soldat | Infanterie | Sebele, le 28/01/018 |
| 48 | DJUMA RAJABU | Soldat | Infanterie | Karamba, le 26/01/018 |
| 49 | ATEMBO EXUDU | Soldat | Infanterie | Kihanda, le 28/01/018 |
| 50 | SAIDI ELISE | Soldat | Infanterie | Yungu, le 26/01/018 |
| 51 | TAMBWE PIERRE | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 52 | ASSA ASSANI | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 53 | ESPOIR KASHINDI | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 54 | ZABONA DERO | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 55 | KIBINDA EBENGO  . | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 56 | NDERUMBU WERRA | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 57 | BISIMWA MAPENDANO | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 58 | LUCHWA MITEMBE | Soldat | Infanterie | Kibanga, le 26/01/018 |
| 59 | WEKEYA RAMAZANI | Soldat | Infanterie | Sebele, le 28/01/018 |
| 60 | ALAKE MAMBO | Soldat | Infanterie | Lusenga , le 03/02/018 |
| 61 | HERITIER MALEGA | Soldat | Infanterie | Kagando, le 30/01/018 |
| 62 | MAKENE MSENWA | | Infanterie | Kibanga, le 03/02/018 |
| 63 | RAMAZANI SILIMU HUSSENI | | Infanterie | |
| 64 | MAMBO ERI KASHINDI | | Infanterie | |
| 65 | CLEMENT ASSUMANI | | Infanterie | Sebele, le 01/01/018 |
| 66 | MWAMBA ANDRE | | Infanterie | Baraka, le 03/02/018 |
| 67 | ANGALA PILIPILI | | Infanterie | Baraka, le |

UNCLASSIFIED                    EXHIBIT 25

| | | ALEMBE JEAN BOSCO CHUBAKA | | | Bereita, le 24/01/018 | |
|---|---|---|---|---|---|---|
| 68 | | | | Subomerie | | |
| 69 | | OBEDI NSABIMANA (Burundais) | | Infanterie | Kalima, le 01/02/018 | Transf in PT UP, ile 18 |
| 70 | | MSAMBYA SELEMANI | Comd Bn | Sec. | Burundi, le 30/01/018 | |
| 71 | | BONANE SELEMANI | S4 Bn | Force nav | Burundi, le 30/01/018 | |
| 72 | | ISAYA GARIEL | Fus | Force nav | Burundi, le 30/01/018 | |
| 73 | | BONHEUR LABEURNE | Démobilisé | - | Burundi, le 30/01/015 | |
| 74 | | BYAMUNGU LUKANYAGA | Civil | - | Burundi, le 30/01/018 | |
| 75 | | SHUKURU MBAREMBA | Civil | - | Burundi, le 30/01/018 | |
| 76 | | ILONGA LOKANDA | Civil | - | Burundi, le 30/01/018 | |
| 77 | | SHABANI SIKUZANI | Fus | Force nav | Burundi, le 30/01/018 | |
| 78 | | MANUELI IDI | Fus | Force nav | Burundi, le 30/01/018 | |
| 79 | | BAHATI JYPEIRO | Civil | - | Burundi, le 30/01/018 | |
| 80 | | DIEME NESTORI | Fus | Infanterie | Burundi, le 30/01/018 | |
| 81 | | FARIALA LOMONA | Civil | - | Burundi, le 30/01/018 | |
| 82 | | SUMAILI RAMAZANI | Fus | Force nav | Burundi, le 30/01/018 | |
| 83 | | KASKILE TOHI | Fus | Force nav | Burundi, le 30/01/018 | |
| 84 | | WILONDJA FINASI | Civil | - | Burundi, le 30/01/018 | |
| 85 | | FREDI ASUMANI | N4 | Force nav | Burundi, le 30/01/018 | |

Fait a Uvira, le 09 Fev 018

Aye T2 Rens

BULAMBO JANVIER
Lt-Col Rens
Chef T2 Sect Ops SKL II SSK

Document received from the FARDC in March 2018

DRC-30316 0505

UNCLASSIFIED    EXHIBIT 25

**Annex 8: Civil society security report of Basimukindje groupement between November 2017 and January 2018**

GROUPEMENT BASIMUKINDJE

MINI RAPPORT SECURITAIRE POUR CERTAINS VILLAGES DU GROUPEMENT BASIMUKINDJE

| N° | LIEU (VILLAGE) | PERIODE | INCIDENTS | AUTEURS |
|---|---|---|---|---|
| 01 | KALUNDJA | 08/11/2017 | Vole et pillage des Véhicule de passagers | Voleurs à mains armés |
| 02 | MATONGD | 08/11/2017 | Vole d'une Arme de PNC | Non Identifié |
| 03 | MATONGD | 09/09/2017 | Mort d'un agent volontaire de securité (kwankinzi SECURITY) | militaire FARDC |
| 04 | KIKWENA | 10/11/2017 | Vole et pillage des biens des Commerçants à Brd d'un Véhicule margui | Voleurs à mains armés |
| 05 | MATONGD | 11/11/2017 | Mort de 2 militaires FARDC dans la nuit | Non Identifié |
| 06 | MATONGD | 12/11/2017 | Arrestation arbitraire des 3 Chefs de Villages | FARDC |
| 07 | KAFULD | 15/11/2017 | déplacement de la population, pillage et vole des biens de population | FARDC et MAI MAI |
| 08 | MONGEMONGE | 20/11/2017 | Arrestation arbitraire des Jeunes gens sous motif maimai | FARDC |
| 09 | KIKWENA | 08/12/2017 | Mort de 2 militaire par Salle | Non Identifié |
| 10 | KIKWENA | 11/12/2017 | Arrestation arbitraire des Jeunes gens sous motif ils sont des maimai | FARDC |
| 11 | KIKWENA | 24/12/2017 | Mort d'1 militaire par Salle | Non Identifié |
| 12 | KIKWENA | 25/12/2017 | Vole et pillage des biens de population ainsi Incendier les maisons | FARDC |
| 13 | AEBAZ I | 26/12/2017 | Vole dans la maison et Boutique | Voleurs à mains armés |
| 14 | MATATA | 08/12/2017 | Vole dans la maison dans la nuit | Voleurs à mains armés |
| 15 | TUSENGE | 02/12/2017 | Arrestation arbitraire du Chef du village sous prétexte ils sont des maimai | FARDC |

DRC-30316 0506

UNCLASSIFIED                    EXHIBIT 25

| N° | LIEU (villages) | PERIODE | INCIDENTS | AUTEURS |
|---|---|---|---|---|
| 16 | KALINGA SUD | 29/12/2017 | Vole dans la maison et Boutique, Kiosque. | Voleurs à mains armées |
| 17 | TUJENGE | 17/01/2018 | Pillages des biens de population suite aux affrontements entre FARDC et Maï-maï | FARDC et Maï maï |
| 18 | KALINGA NORD | 18/01/2018 | Arrestation de 1 préfet des Etudes et son enseignant sous prétexte ils sont maï-maï | FARDC |
| 19 | KALINGA SUD | 14/01/2018 | Vole dans la maison aux environs de 20 h⁰⁰ | Les gens en tenues militaire |
| 20 | MOMA | 06/12/2017 | Arrestation arbitraire de 2 personnes sous prétexte ils sont les traducticien de maï maï | FARDC |

N B. - la population du Groupement GASIMUKINJE eut estimée à 168.788 habitants.

- Arrestation arbitraire des pêcheurs par les FARDC (Forces Navales) suite à l'interprétation dite à non enfante l'ordre de l'hierarchie.

- Comme une petite recommandation, l'essentiel serait de mener une négociation entre les FARDC et MAï-MAï sous la médiation de la MONUSCO.

Document received from a local source in Baraka in January 2018

UNCLASSIFIED    EXHIBIT 25

## Annex 9: Organization of CNPSC administration



Mai Mai Yakutumba used documents with the CNPSC heading of the CNPSC ministry of interior and security affairs

Document received by the Group from a DRC official in January 2018

UNCLASSIFIED                    EXHIBIT 25



Mai Mai Yakutumba used documents with the CNPSC heading of the CNPSC ministry of interior, decentralization and security affairs

Mai Mai Yakutumba had their own migration office

There was a Mai Mai Yakutumba DGM post in Kazimia

CNPSC stamp

Document received by the Group from a DRC official in January 2018

UNCLASSIFIED                    EXHIBIT 25

## Annex 10: Issue of international travel permits



Document received by the Group from a DRC official in January 2018

UNCLASSIFIED    EXHIBIT 25

### Annex 11: CNPSC and Burundian stamps on a CEPGL *laissez passer* document



Document received by the Group from Monusco in January 2018

UNCLASSIFIED                    EXHIBIT 25

**Annex 12: Example of Mai-Mai Yakutumba taxation of ships**



Document received by the Group from Monusco in January 2018

UNCLASSIFIED          EXHIBIT 25

## Annex 13: Map of NDC-R zone of influence

The map below indicates the zone of influence (not necessarily in full or constant control) of the NDC-R in Walikale, Masisi, Rutshuru and Lubero territories in March 2018. Irameso and Kasugho are the two main localities with a significant NDC-R presence. Other localities with NDC-R presence are Bukumbirwa, Bunyatenge, Fatua, Buleusa, Oninga and Mutongo.



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED                    EXHIBIT 25

## Annex 14: NDC-R statement on sanctioning Guidon Shimiray Mwissa

**INDIGNATION DU MOUVEMENT NDUMA DEFENCE OF CONGO RENOVE SUR LA SANCTION DU CONSEIL DE SECURITE DES NATIONS UNIES A L'ENCONTRE DE SON PRESIDENT ET COMMANDANT SUPREME SON EXCELLENCE Guidon SHIMIRAY MWISSA.**

Faisant suite aux informations qui circulent sur les ondes des médias tant nationaux qu'internationaux sur la décision du 1ᵉʳ janvier 2018 du conseil de sécurité des nations unies créée par la résolution 1533(2004) concernant la République Démocratique du Congo dont le Général Guidon SHIMIRAY MWISSA figure sur la liste de quatre personnalités actives représentant une menace pour la paix, la stabilité et la sécurité en République Démocratique du Congo au titre du paragraphe 7 g de la résolution 2293 (2016).

Nous n'oublierons pas ici à vous rappeler que c'est après le génocide rwandais de 1994 que la communauté internationale obligeant le gouvernement Zaïrois d'ouvrir les frontières et accueillir plus d'un million des Hutus rwandais armés et créant d'immenses camps aux abords de la ville de Goma.

En 1997, l'aide portée aux troupes du Mzee Laurent Désiré KABILA par l'Ouganda et le Rwanda oblige plus de 400.000 réfugiés Hutu rwandais à se disperser dans les forets du Kivu étant bien armés.

A leur arrivée, la population Kivucienne étant caractérisée par l'esprit d'hospitalité, a donné à manger et à boire à ces derniers.

En cette même année 1997, les FDLR en revanche ont commencé à violer, tuer, piller, incendier, exploiter illicitement notre richesse et jusqu'à s'accaparer même du pouvoir coutumier.

Voilà pourquoi après plusieurs plaidoyers adressés au gouvernement congolais et à la communauté internationale mais sans succès, nous qui n'avions plus le droit de vivre, nous qui n'avions plus la possibilité d'être des citoyens libres et qui, par la contrainte et la terreur dépendaient entièrement des étrangers, avons jugé bon de nous prendre en charge en créant le mouvement : NDUMA DEFENCE OF CONGO à Bujumbura, dans la localité Ngereza, groupement Utunda, secteur des Wanlanga, Territoire de Walikale, province du Nord-Kivu en République Démocratique du Congo en date du 1ᵉʳ janvier 2008 avec comme objectif de se prendre en charge en combattant ces ennemis de la paix et leurs alliés.

Soucieux du contexte auquel la pauvre population de l'Est se trouve, puis en étant d'accord avec cette dernière, ému par le sens patriotique, Monsieur Guidon SHIMIRAY MWISSA sera plébiscité à la tête des opérations de traque et chasse des FDLR et d'autres groupes armés étrangers et locaux nocifs à la population.

UNCLASSIFIED    EXHIBIT 25

Il sied de signaler qu'après le travail de titan effectué par le Général Guidon SHIMIRAY MWISSA et son groupe, nous avons réussit à mettre hors d'état de nuire l'ennemi dans le Territoire de Walikale, Lubero, Rutshuru, Masisi, une partie de la province de la Tshopo et celle de Maniema où la population vaque librement dans ses activités quotidiennes.

Vu cette paix durable longtemps cherchée par le gouvernement congolais et la communauté internationale sans succès, mais instauré cependant par le mouvement N D C R; d'où la MONUSCO a jugé bon de vider ses bases dans le Territoire de Walikale et ses environs, pourtant jadis la population devrait être convoyée par la MONUSCO et /ou les FARDC pour se déplacer d'un lieu à un autre suivant un programme hebdomadaire ;

A titre d'exemple : Mpofi –Kembe, Kibua-Ishunga, Kashebere-Kaancha, Pinga-Kalembe, Kalembe-Mwesso, … pour les marchands et les voyageurs, par fois même pour les agriculteurs.

Au lieu que le gouvernement congolais et la communauté internationale louent notre bravoure au service que nous faisons qu'était pourtant leur mission, nous sommes surpris d'apprendre une telle décision hâtive et montée de toutes pièces  portée à la personnalité de notre chef.

Eu égard à ce qui précède, nous nous insurgeons contre la décision prise par la communauté internationale et rejetons en bloc toutes les allégations contenues dans cette décision que nous qualifions de non fondée, conçue dans des bureaux climatisés qui ne reflète pas la réalité du terrain.

Etant informé et formé sur le respect du droit international humanitaire, nous restons ouvert aux enquêtes pouvant être diligentées par la communauté nationale qu'internationale dans l'étendue sous notre contrôle d'une façon objective en vue de s'imprégner de la vraie réalité des faits.

Ainsi, fait à Musituni, le 04/02/2018

Pour le bureau d'études du mouvement NDCR

1)  Christian HANGI MWISSA

2)  Désiré NGABO KISUBA

3)  MUNDJUZA MUNGANGA Floribert

4)  BATIFEMI MOLISHO Dieu Merci

The Group received the document from a source in March 2018

UNCLASSIFIED   EXHIBIT 25

**Annex 15: Photos of "General" Shimiray Mwissa Guidon**





Pictures posted on the internet in March 2018

   UNCLASSIFIED

UNCLASSIFIED          EXHIBIT 25

**Annex 16: Photos of NDC-R combatants in military fatigues**





Pictures posted on the internet in March 2018

UNCLASSIFIED                    EXHIBIT 25

## Annex 17: Letter of Guidon to the President of the United Nations Security Council

Guidon SHIMIRAY MWISSA
Nord Kivu/RD Congo
Président et Commandant suprême
du Mouvement NDC Rénové
Contacts :
+243 812572319
Email :

Objet : contestation de la sanction          Au président du conseil de sécurité des Nations
                                             Unies à New York.
    Portée à ma personne
                                             Monsieur,

                                             Par votre publication du 1er Janvier 2018 parue
sur les ondes des médias portant sanction à ma personne ;

Bien qu'accordant la plus grande importance à vos observations, je tiens à contester cette
décision.

                                  En effet, étant d'origine congolaise et animé par
l'esprit du patriotisme, Vu la misère que traverse la population congolaise à l'Est du pays par
les FDLR et alliés depuis les années 1997 et d'autres Groupes armés étrangers et locaux
nocifs à la population ;

D'un commun accord avec cette misérable population locale de base, avons jugé bon de
nous prendre en charge ;

Notre objectif étant loin de vouloir représenter une menace pour la paix, la stabilité et la
sécurité en RD Congo mais plutôt de garantir une paix durable à notre population.

En outre, mon groupe et moi sommes informés et formés sur le respect du Droit
International Humanitaire par les Agences des Nations Unies entre autres : Child Protection
de la MONUSCO, CICR, Geneva Call,...

                                    Je sollicite de votre part un réexamen de votre
décision et reste à votre entière disposition pour un entretien.

                                   En vous remerciant de votre compréhension, je
vous prie d'agréer Monsieur, l'assurance de ma considération distinguée.

                                   Ainsi fait à Musituni, le 08 Février 2018



The Group received the document from a source in March 2018

UNCLASSIFIED          EXHIBIT 25

**Annex 18:** *Cahier de charge* **of NDC-R**



UNCLASSIFIED          EXHIBIT 25



Dans le richesse de Walikale développer les terres arables alors que la
[...] locale de [...] n'a pas accès aux soins médicaux appropriés, à l'eau potable
[...] nos écoles, toutes nos institutions, aérodrome ou piste d'aviation.

Cette population oubliée, négligée, marginalisée et opprimée est sacrifiée à la
merci de toutes les atrocités des FDLR gardés par nos frères Congolais mal intentionnés
et mon averti, des mains noirs pour réussir leurs missions de tuer, violer, piller et
exploiter illicitement notre richesse.

En effet, après plusieurs plaidoyers adressés au Gouvernement Congolais et à la
Communauté Internationale mais sans succès, avons jugé bon de nous prendre en
charge.

## LES OBJECTIFS

Néanmoins, notre prise en charge loin de vouloir renverser le pouvoir
Démocratiquement éla, viserait :

1. Combattre les FDLR pour réhabiliter notre misérable population dans  ses
   droits ;
2. Lutter contre l'exploitation illicite et anarchique de notre richesse qui remplisse
   les poches de particuliers pillards et pêcheur en eau trouble au lieu de contribuer
   au développement de la population Congolaise ;
3. Aussi lutter contre la non représentativité à la gestion de la chose publique de
   l'État car c'est inadmissible de reproduire plus et rester exclus à la gestion de
   notre production.

UNCLASSIFIED                    EXHIBIT 25



The Group received the document from a source in March 2018

UNCLASSIFIED     EXHIBIT 25

**Annex 19: Taxation system of NDC-R: monthly *jetons* at 1, 000 francs congolais each**



Collected by the UN in Kasugho in March 2018

UNCLASSIFIED          EXHIBIT 25

## Annex 20: Public Statement of UPLC in January 2018



**REPUBLIQUE DEMOCRATIQUE DU CONGO**
**UNION DES PATRIOTES POUR LA LIBERATION DU**
**CONGO**
**« U.P.L.C »**
*E-mail: uplcrdc@gmail.com, tél : 0972921704,*

### DECLARATION POLITIQUE N° 00 1 /UPLC/RDC/2018

Nous, Union des Patriotes pour la Libération du Congo, U.P.L.C en sigle, mouvement politique et la Force Patriotique Congolaise, FPC en sigle sa branche armée, déclarons à partir de ce jour démissionnaire le régime de Mr Joseph KABILA KABANGE.

En effet, c'est depuis plus de deux décennies que notre pays, la République Démocratique du Congo, la terre de nos ancêtres, connait des guerres injustes et est occupé par des imposteurs sous la houlette du RWANDA et de l'OUGANDA. Cet état des choses a été à la base de l'occupation effective de notre pays. C'est ainsi que les envahisseurs se sont livrés au pillage systématique de nos ressources naturelles, à la mauvaise gouvernance doublée de l'infiltration de nos frontières et des institutions de la République à tous les niveaux.

Au phénomène d'infiltration et du pillage systématique de nos ressources s'ajoutent l'injustice sociale, les tueries et massacres de tout genre des paisibles populations, un système génocidaire importé du Rwanda. Le braquage et le kidnapping, les intimidations à quiconque souhaiterait revendiquer et défendre les droits et libertés des congolais.

C'est pour cette raison que l'Union des Patriotes pour la Libération du Congo, en sigle UPLC, interpelle tout congolais vivant sur le territoire national et ceux de la diaspora préoccupés par cette situation soucieux de la libération du peuple congolais de s'aligner derrière l'Union des Patriotes pour la Libération du Congo afin d'éradiquer ce système d'occupation nous imposé par les hommes animés de mauvaise foi et d'esprit d'agression.

1

UNCLASSIFIED

UNCLASSIFIED     EXHIBIT 25

Nous lançons un appel solennel :

- A tous les compatriotes congolais des Forces Armées de la République Démocratique du Congo, FARDC et de la Police Nationale Congolaise, PNC et à tous les maquisards de se démobiliser des ennemis de la paix et se ranger derrière l'Union des Patriotes pour la Libération du Congo, UPLC et sa branche armée dite Force patriotique Congolaise, FPC, pour chasser les criminels envahisseurs de notre territoire national, la RDC.

- Aux pays voisins de la République Démocratique du Congo de ne pas s'ingérer dans les problèmes congolais mais plutôt de tisser des relations de bon voisinage.

    Nous en appelons aussi à la SADEC, à l'Union Africaine, à l'Union Européenne et aux Nations Unies de prendre acte de cette libération qui constitue désormais la clé de voute de notre indépendance effective comme voulu par nos ancêtres dont Emery PATRICE LUMUMBA, SIMON KIMBANGU, MSR EMMANUEL KATALIKO et ENOCH NYAMWISI MUVINGI etc. Nous leur demandons de soutenir les efforts du peuple congolais car ils sont aussi témoins de notre situation misérable et catastrophique ;

    Enfin, nous saluons à leur juste valeur, les mesures et les sanctions que ces différentes organisations de la Communauté internationale ont prises pour geler les comptes bancaires de certains bourreaux et de tous leurs complices, contribuant ainsi à chercher une solution, tant soit peu, au problème de notre pays.

    o **Que vive le peuple congolais ;**
    o **Que vive la République Démocratique du Congo ;**
    o **Que vive l'Union des Patriotes pour la Libération du Congo.**

    Fait à L'UBERO, le 02 /04/2018

    **Lue par MAHANGAIKO APIPAWE John**
                     **Porte-parole**

                **BALEMBI WANGAHEMUKA**
                     **Coordonnateur**

2

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 25

**Annex 21: Ministerial decree on validated mining sites in Ituri province**





MINISTERE DES MINES

*Le Ministre*

ARRETE MINISTERIEL N° 0 0 0 5 CAB.MIN/MINES/01/2016 DU 0 2 FEB 2016
PORTANT QUALIFICATION ET VALIDATION DES SITES MINIERS DU TERRITOIRE DE
MAMBASA DANS LA PROVINCE DE L'ITURI

Vu la Constitution, telle que revue et complétée par la Loi n°
11/002 du 20 janvier 2011, spécialement ses articles 9, 93 et 202 point
36 litera f ;

Vu la Loi n°007/2002 du 11 juillet 2002 portant Code Minier ;

Vu la Loi n°015/2002 du 16 octobre 2002 portant Code du travail ;

Vu le Décret 038/2003 du 26 mars 2003 portant Règlement Minier;

Vu, telle que modifiée et complétée à ce jour, l'Ordonnance n°
014/078 du 07 décembre 2014 portant nomination des Vice-Premiers
Ministres, des Ministres d'Etat, des Ministres et des Vice-Ministres ;

Vu l'Ordonnance n° 15/014 du 21 mars 2015 portant organisation
et fonctionnement du Gouvernement, modalités pratiques de
collaboration entre le Président de la République et le Gouvernement
ainsi qu'entre les membres du Gouvernement ;

Vu l'Ordonnance n° 15/015 du 21 mars 2015 fixant les attributions
des Ministères, spécialement son article 1er B point 19 ;

Vu l'Arrêté Ministériel n° 057/CAB.MIN/MINES/01/2012 du 29
février 2012 portant mise en œuvre du Mécanisme Régional de
Certification de la Conférence Internationale de la Région des Grands
Lacs « CIRGL » en République Démocratique du Congo ;

Vu l'Arrêté Ministériel n° 0919/CAB.MIN/MINES/01/2015 du 29
octobre 2015 fixant des procédures d'inspection, de qualification et de

7ème Etage, Hôtel du Gouvernement, Place Royal, Boulevard du 30 Juin - Kinshasa - Gombe
Site Web : www.mines-rdc.cd
E-mail : [illegible]

DRC-30316 0525

UNCLASSIFIED    EXHIBIT 25

- Ministre

validation des sites miniers des filières aurifère et stannifère en République Démocratique du Congo;

Considérant la lettre n° CAB.MIN/MINES/02/0379/2011 du 13 avril 2011 transmettant les termes de référence aux équipes conjointes pour la validation des Mines ;

Considérant le rapport de qualification des sites miniers du Territoire de Mambasa dans la Province de l'Ituri dressé par l'équipe conjointe multipartite, le 16 novembre 2015 et réceptionné le 25 novembre 2015 au Cabinet du Ministre des Mines ;

Vu la nécessité et l'urgence ;

A R R E T E :

**Article 1 :**

Est approuvé, le rapport de mission effectuée, du 11 au 16 novembre 2015, par l'équipe conjointe en Territoire de Mambasa dans la Province de l'Ituri, pour la qualification et la validation des sites miniers de cette entité territoriale.

**Article 2 :**

Le tableau repris en annexe au présent Arrêté fait état des sites miniers validés et non validés suivant la qualification conférée par le rapport de mission dont question à l'article 1ᵉʳ.

La durée de validité de la présente qualification est de six (06) mois à compter de la date de signature du présent Arrêté.

Le rapport de mission et le présent Arrêté y compris son annexe sont publiés sur les sites WEB du Ministère des Mines et du Projet PROMINES.

**Article 3 :**

Les sites miniers qualifiés et validés peuvent faire l'objet d'un audit indépendant, soit à l'initiative du Ministre National ayant les Mines dans ses attributions, soit à l'initiative des organismes internationaux tels que l'ONU, l'OCDE, la CIRGL ou tout autre organisme public ou privé national

1ᵉʳ étage, Immeuble du Développement Place « Royal » Boulevard du 30 Juin, Kinshasa/Gombe – RDC
Site Web : www.mines.gouv.cd
E mail : info@mines.cd

    UNCLASSIFIED

*są das Mines*
*& Mande*

Page 3 de l'Arrêté Ministériel **N° 0.1.2**/CAB.MIN/MINES/01/2010

ou international concerné et/ou impliqué dans la mise en œuvre des standards CTC, OCDE et CIRGL.

Les sites miniers qualifiés « **Rouge** » ou « **Jaune** » et non validés ne peuvent faire l'objet d'aucune activité minière.

Les intervenants lésés par la non validation des sites miniers dans lesquels ils opèrent peuvent requérir une inspection de suivi en vue d'examiner l'évolution de la situation sécuritaire et sociale desdits sites.

Article 4 :

Le Secrétaire Général des Mines, le Directeur Général du Cadastre Minier, le Coordonnateur Général du SAESSCAM et le Coordonnateur National du Projet Promines sont chargés, chacun en ce qui le concerne, de l'exécution du présent Arrêté qui entre en vigueur à la date de sa signature.

Fait à Kinshasa, le **0 2 FEB 2016**

**Martin KABWELULU**

3ᵉᵐ Etage *ensuntó et/Commerciและ, Paris + Paysl I, Boulevard du 30 Juin, Kinshasa/Gombe + RDC*
*Tér Tel. *www.mines.rdc.cd*
*E-mail: info@mines.rdc.cd*

UNCLASSIFIED         EXHIBIT 25



*République Démocratique du Congo*

MINISTERE DES MINES

*Le Ministre*

ANNEXE A L'ARRETE MINISTERIEL N° **0 0 0 5** /CAB.MIN/MINES/01/2016 DU **0 2 FEB 2016** PORTANT QUALIFICATION ET VALIDATION DES SITES MINIERS DU TERRITOIRE DE MAMBASA PROVINCE DE L'ITURI

| N° | SITES MINIERS | | | | Coordonnées géographiques | | | Qualification/ Validation | | Observations |
|----|---------------|--|--|--|---------------------------|--|--|--------------------------|--|------------|
| | Dénomination | Territoire | Minerais extraits | Code | Longitude | Latitude | Altitude (m) | Vert, Jaune, Rouge | Validé | |
| 01 | Kbembose | Mambasa | Or | EKM/MAS/PI/Mines/Cert/001/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |
| 02 | Kafavesna (Moldi échangé) | Mambasa | Or | NDB/SOM/PI/Mines/Cert/002/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |
| 03 | Kanda te | Mambasa | Or | JPK/ME/PI/Mines/Cert/003/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |
| 04 | Tokoleko (Kalabooge) | Mambasa | Or | FKW/TOK/PI/Mines/Cert/004/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |
| 05 | Tokooneka | Mambasa | Or | IB/BUT/PI/Mines/Cert/005/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |
| 06 | Uripe Kitupe | Mambasa | Or | HR/MAK/PI/Mines/Cert/006/2016 | E28°51'02.9" | N01°43'22.7" | 2.521 | Vert | Validé | |

**Légende :**

Cert  : Certifié ;
PI    : Province orientale démembrée ;
MAS   : Village Masangi ;
SOM   : Village Some ;
ME    : Village Métal ;
TOK   : Village Tokoleko ;
EKM   : Mr Ehundu Monga Mokonzi ;
NDB   : Mr Nestor Djurrahini Bin Kipulgu ;

JPK   : Mr Jean Paul Kuballi ;
BUT   : Village Butane ;
MAK   : Village Matatanga ;
FKW   : Mr Frederic Kpatale Wambengedi ;
IB    : Mr Isieka Baya ;
HR    : Mr Hefi Ramazani.

Fait à Kinshase, le **0 7 FEB 2016**

Martin KABWELULU

UNCLASSIFIED                EXHIBIT 25

**Annex 22: Gold smuggling route in Ituri province**



Map edited by the Group

UNCLASSIFIED                    EXHIBIT 25

### Annex 23: Gold exports from South Kivu in 2017

| CEEC Sud-Kivu | 2017 | | |
|---|---|---|---|
| Date Emission | Exportateur | Pays de destination | Poids Net en kilogramme |
| 24/01/2017 | Ets NAMUKAYA | EMIRAT ARABES UNIS | 3,09 kg |
| 27/01/2017 | Mines Propres | EMIRAT ARABES UNIS | 5,36 kg |
| 23/03/2017 | Mines Propres | EMIRAT ARABES UNIS | 5,66 kg |
| 21/04/2017 | Mines Propres | EMIRAT ARABES UNIS | 5,29 kg |
| 14/06/2017 | Mines Propres | EMIRAT ARABES UNIS | 5,98 kg |
| 28/07/2017 | Mines Propres | EMIRAT ARABES UNIS | 7,10 kg |
| 28/08/2017 | Ets NAMUKAYA | EMIRAT ARABES UNIS | 4,91 kg |
| 06/09/2017 | Ets NAMUKAYA | EMIRAT ARABES UNIS | 6,02 kg |
| 14/09/2017 | Mines Propres | EMIRAT ARABES UNIS | 6,18 kg |
| 03/11/2017 | RUBYAF sarl | EMIRAT ARABES UNIS | 13,66 kg |
| 29/11/2017 | Mines Propres | EMIRAT ARABES UNIS | 6,49 kg |
| Total | | | 69,738 Kg |

The Group received the document from CEEC South Kivu in February 2018

UNCLASSIFIED

EXHIBIT 25

**Annex 24: Documents used by OBWIN SARL to export gold from
Bukavu in 2017**



UNCLASSIFIED                    EXHIBIT 25



FACTURE N°001/OBN/SK/017

Bukavu, le 10/02/2017

Dénomination : BLEU DIAMOND METAL
TRADING GOLD SOUQ 288
DUBAI

Doit pour livraison de ce qui suit :

Marchandise : OR de production Artisanale

| Nombre de colis | Tare | Poids net | Poids brut |
|---|---|---|---|
| 1 | 00 | 5044g | 5044g |

Prix Unitaire : 2 714 USD/g

Prix total : 13690USD

Nous disons dollars des Etats –Unis : Treize mille six cent quatre vingt dix

Pour ORWIN SARL

UNCLASSIFIED          EXHIBIT 25



UNCLASSIFIED                    EXHIBIT 25



UNCLASSIFIED          EXHIBIT 25



DRC-30316 0535



UNCLASSIFIED          EXHIBIT 25



UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 25

## Annex 25: Smuggling of tin, tantalum and tungsten along the Minova-Kalungu axis

An incident report of the Kalungu-Minova sector, with the details of 1,300kg of coltan that FARDC officers attempted to snatch from a négociant in Numbi, South Kivu

REPUBLIQUE DEMOCRATIQUE DU CONGO
PROVINCE DU SUD-KIVU
DIVISION PROVINCIALE DES MINES
BUREAU MINIER ISOLE DE KALEHE-IDJWI
ANTENNE MINIERE DE NUMBI
SECTEUR MINIER DE KALUNGU-MINOVA                    Kalungu, 14/12/2017

N° MINES/SK/7/DIVMINES/BMIKI/AMN/SMKA/M/

Transmis Copie pour information à:

- Son Excellence Monsieur le Ministre Provincial des mines, des Hydrocarbures et de l'Environnement du Sud-Kivu
- Monsieur le Chef de Division Provincial des mines du Sud-KIVU
                                          (TOUS) à BUKAVU
- Monsieur l'Auditeur Supérieur de l'auditorat militaire à BUKAVU
- Monsieur l'Administrateur du Territoire de Kalehe à KALEHE
- Monsieur le Commandant de District de la Police de Kalehe à MINOVA
- Monsieur le Chef du Bureau minier Isolé de Kalehe IDJWI à KALEHE
- Monsieur le Chef de poste d'Encadrement Administratif de Minova à
- Monsieur le Chef de Groupement de Buzi à MINOVA

A Monsieur le Chef d'Antenne minière de Numbi à NUMBI

Objet: Rapport Circonstancié
DESS/TENTATIVE DE FRAUDE

Monsieur le Chef d'Antenne;
Par la présente vous informe que

Pas une grande Surprise en cette date du 14/12/2017 nous venions de voir des militaires en provenance du Nord-KIVU (GOMA) venus se présenter à Kalungu avec deux (15) militaires qui nous Surtenant si l'eau

UNCLASSIFIED    EXHIBIT 25

écrit a chargés les minerais Coltan de Monsieur
▓▓▓▓▓▓▓▓▓▓▓▓ Négociant en ordre en
lieu de validité en provinance du kumbishu et
cés minerais Bootés ayant toute les déclaration
possible, d'où nous avons fait Appel à minova,
Cardonnes sument interceptés avec les minerai
et quant l'ordre nous viendr Bukavu précisement
chez l'Excellence Monsieur le Gouverneur de Provin
du Sud-Kivu pour Encheminé Ces minerais de
décharge du Conseil de Sécurité la Col de miner
avec nous le Service technique des mines

                    Veuillez agréer monsieur le
Chef d'antenne nos Sentiments patriotique,

                    hui le Secteur minier de Kal
                    ▓▓ ▓ - Minova ▓



The Group received the document from the South Kivu mining authorities in March
2018

**Annex 26: Letter documenting a dispute between North Kivu and South Kivu mineral authorities regarding ownership of untagged minerals found in the house of a *négociant***



UNCLASSIFIED                    EXHIBIT 25




REPUBLIQUE DEMOCRATIQUE DU CONGO
PROVINCE DU SUD-KIVU
DIVISION PROVINCIALE DES MINES ET GEOLOGIE DU SUD-KIVU
BUREAU MINIER ISOLE DE KALEHE-IDJWI
ANTENNE MINIERE DE NUMBI
SECTEUR MINIER DE KALUNGU-MINOVA

KALUNGU , le 07/11/2017

N° MINES/354.7/DIVIMINES/BMIKI/AMN/S/KM/009/017

Transmis copie pour Information à
- Son Excellence Monsieur le Ministre Provincial des Mines, des Hydrocarbures et de l'Environnement du Sud-Kivu ;
- Monsieur le Chef de Division Provinciale des Mines du Sud-Kivu ;
- Monsieur l'Auditeur Supérieur de l'Auditorat Militaire ;
  (Tous) à BUKAVU
- Monsieur l'Administrateur de Territoire de et à KALEHE ;
- Monsieur le Commandant de District de la Police de KALEHE à MINOVA ;
- Monsieur le Chef de Bureau Minier Isolé de KALEHE-IDJWI à KALEHE
- Monsieur le Chef de Poste d'Encadrement Administratif de et à MINOVA ;
- Monsieur le Chef de Groupement de BUZI à MINOVA
- Monsieur l'Agent Territorial de et à KALUNGU

Objet : Rapport circonstanciel          A Monsieur le Chef d'Antenne Minière de et
Concerne : Fraude Minière               à NUMBI

                    Monsieur le Chef d'Antenne,
                    C'est avec tant des questions que je vous adresse ce
Rapport pour vous parler de la situation du Secteur Minier de KALUNGU-MINOVA d'où je
suis le Chef de Secteur.

                    En effet, c'est la troisième fois que nous recevons la
même délégation en provenance de GOMA, Province voisine du Nord-Kivu, pour venir à la
recherche des minerais échappés dans la Zone de Contrôle de MASISI (Nord-Kivu) mais qui

UNCLASSIFIED    EXHIBIT 25

ne voulait pas nous exhibé leur Ordre de Mission ni de nous parler de leur qualité, même nous associer de leur Mission entant qu'Agent de l'Etat comme eux ayant aussi les responsabilités de cette Entité à notre personnalité dans le Domaine Minier ; même pour d'autres Services de l'Etat œuvrant dans cette Entité.

Pour ce faire, par une grande surprise en date du 07/11/2017, nous avons reçu un coup de téléphone qui disait que le domicile de Monsieur _____, Opérateur Economique Libéral de KALUNGU est entouré des personnes non autrement identifiées mais déclarent de leurs remettre les minerais qui ont échappé le contrôle dans la Zone de MASISI où ils sont Responsables. C'est maintenant que l'Inspecteur _____ va m'appeler et me dire de faire KALUNGU avec lui et quelques éléments de l'Auditorat à sa disposition vers 23h 47'. C'est ainsi que tous avons passé la nuit débout au centre de KALUNGU, Le matin en date du 08/11/2017, tous ensembles avons trouvé dans un enclos proche de la maison de l'Opérateur précité Un lot de 26 Colis des minerais des différentes dimensions non tagués sans aucun Document Administratif ni Comptable que nos Confrères en provenance du Nord-Kivu voulaient ramener à GOMA ; décision qui n'a pas été adoptée par nous les Agents du Sud-Kivu (Poste d'Etat de MINOVA en Territoire de KALEHE).

Toute fois, je me communiquais avec mon Hiérarchie à travers le téléphone mais sans appui ni réaction de leur part.

C'est maintenant que Monsieur l'Inspecteur de l'Auditorat Militaire de MINOVA a reçu l'ordre de son Hiérarchie pour amener les minerais à BUKAVU à l'Auditorat Supérieur de Bukavu où tous avons accompagné ces minerais que nous avons remis aux mains du Secrétaire et le Magistrat en cette date du 08/11/2017 vers 16h*'46' tel qu'ils étaient arrêtés au niveau de KALUNGU (26 colis au total).

En fin, nos Confrères du Nord-Kivu nous ont maintenant exhibés leur Ordre de Mission dont copie en annexe.

Veuillez agréer, Monsieur le Chef d'Antenne Minière de NUMBI mes sentiments les plus dévoués.

Pour le Secteur Minier de KALUNGU-MINOVA



The Group received the document from the South Kivu mining authorities in March 2018

UNCLASSIFIED                    EXHIBIT 25

**Annex 27: Letter from SAKIMA, in which the entity claims ownership of untagged coltan (SMB, another entity, claims ownership of the same coltan)**



SAKIMA S.A.
SOCIETE MINIERE DU KIVU ET DU MANIEMA

RCCM/CD/KNH/CCM/14-B-5786        Numéro Impôt : A1902881J
ID. NAT. K38889W                Numéro Import/Export : AQ01-13/10041 38 EZX

Bukavu, le 10/11/2017

N°/Réf : BKV/050 - 040/BUR/2017



Transmis copie pour information à :

- Monsieur le Chef de Division Provinciale
  des mines et Gélogie à Bukavu
- Monsieur le Chef d'Antenne Provincial
  de SAEMAPE à Bukavu
- Monsieur le Coordonnateur Provincial de
  la cellule antifraude à Bukavu
- Monsieur le Directeur du CEEC à Bukavu
- Monsieur le Président de la FEC/Mines à
  Bukavu
- Monsieur le Président du Comité de
  Gestion de SAKIMA SA à Kinshasa

Concerne: information sur un cas de fraude d'un lot
de 2.300 kgs de Coltan interceptée
à Kalungu

A Son Excellence Monsieur le Ministre Provincial
des Mines, Hydrocarbures et Environnement de
la Province du Sud-Kivu

Excellence Monsieur le Ministre,

La Représentation SAKIMA SA/Sud-Kivu vient
par la présente vous tenir informé sur l'objet repris en exergue.

En effet, c'est depuis le début de l'année en
cours que la SAKIMA SA Sud- Kivu a constaté la faible déclaration de la production de la filière
Coltanifère issue de ses sites miniers qualifiés et validés à Numbi dans le PE 2598 en Territoire
de Kalehe, qui ne correspond pas à la capacité de productivité au niveau d'activités sur terrain,
ayant été informé sur l'activisme d'un réseau mafieux qui échappe au contrôle des services
intervenants dans la chaîne d'approvisionnement en minerais de Numbi.



DRC-30316 0543

UNCLASSIFIED   EXHIBIT 25

La SAKIMA SA en collaboration avec tous les autres services étaient à pied d'œuvre pour le démantèlement de ce réseau.

De ce fait, en date du 07/11/2017 nous avons été informés de l'interception d'un lot de 2.300kgs de Coltan qui a échappé à notre contrôle à Numbi et même à la chaîne d'approvisionnement. Cette cargaison est revendiquée par l'entité de traitement SMB sous prétexte que ces produits venaient des sites du Nord Kivu au moment où tous minerals retrouvés à Kalungu viennent probablement du PE 2598 appartenant à SAKIMA SA.

Nous vous demanderions, Excellence Monsieur le Ministre Provincial d'instruire les services techniques en la matière afin de faire le suivi de ce dossier et remettre la SAKIMA SA dans ses droits dont le manque à gagner affectera même la Province.

Veuillez agréer, Monsieur le Ministre Provincial, l'assurance de notre haute considération.

Pour la Représentation



The Group received the document from the South Kivu mining authorities in March 2018

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

**Annex 28: Letter from a *négociant* appealing to authorities to release his untagged minerals which were confisticated in Kalungu(the minerals were later released to the claimant)**



**EXPLOITANT MINIER DANS LA ZONE DE MASISI**

Bukavu, le.../.../2017



Transmis copie pour l'information à :

- Son Excellence Monsieur le Gouverneur de province du Sud-Kivu à BUKAVU
- Son Excellence Monsieur le Ministre des Mines, des Hydrocarbures et de l'Environnement du Sud-Kivu,
- Monsieur le Directeur provincial du CEEC et coordonateur de la Commission de lutter contre la fraude minière de BUKAVU
- Monsieur le chef division provinciale des Mines et Géologie du Sud-Kivu,
- Monsieur le Commandant Escadron police des mines et Hydrocarbure ville de BUKAVU et point focal de la police des mines Sud-Kivu

(Tous à BUKAVU)

Objet : Réclamation de mes minerais 26 Colis saisis à partir de KALUNGU en date de 07/11/2017

A Monsieur l'auditeur supérieure de l'auditorat militaire de BUKAVU à BUKAVU.



Monsieur l'auditeur supérieur,

Par la présente j'ai l'honneur de venir auprès de votre haute personnalité pour réclamer mes 26 colis de minerais tel qu'il est signalé en marge,

En effet, moi étant exploitant dans la province du Nord-Kivu précisément à Masisi l'imitrophe de KALEHE avais découvert un nouveau $\text{site}$. Ayant cette qualité des minerais que je ne connais pas encore son teneur cause pour laquelle j'avais emballé ces 26 colis de différentes dimensions passant par KALEHE/KALUNGU qui semblent proche de se cite plus que SAKE. Malheureusement juste en arrivant à KALUNGU les minerais étaient appréhendés sans tenir compte de ma destination.

UNCLASSIFIED    EXHIBIT 25

Pour ce faire je sollicite de votre concours pour me remettre ces minerais, enfin que je puisse l'examiner à travers les spectreux de l'OCC, moi étant présent ici à BUKAVU à partir du vendredi 11/11/2017.

Espérant de vous une suite favorable, veuillez agréer, Monsieur l'auditeur supérieur, l'expression de mes sentiments les plus dévoués.



Propriétaire des minerais

The Group received the document from the South Kivu mining authorities in March 2018

UNCLASSIFIED                    EXHIBIT 25

**Annex 29: DEADLY ATTACKS AGAINST CIVILIANS IN BENI TERRITORY FROM 2 SEPTEMBER 2017 TO 8 APRIL 2018**

List compiled by the Group on the basis of combined information from FARDC, MONUSCO eyewitnesses, actors of the civil society in Beni area and open sources

| DATE | PLACE | TOTAL OF CIVILIANS KILLED |
|---|---|---|
| **2017** | | |
| 2 September 2017 | Kbudukbudu (Mayangose) | 3 |
| 7 October 2017 | PK40 (Mbau/Kamango road) | 26 |
| 26 October 2017 | Boikene (Mayangose) | 1 |
| 29 October 2017 | PK20 (Mbau/Kamango road) | 2 |
| 22 November 2017 | PK17 (Mbau/Kamango road) | 1 |
| 16 December 2017 | PK22/PK23 (Mbau/Kamango road) | 1 |
| 17 December 2017 | Mamiki | 1 |
| **TOTAL of civilians killed from 2 September to 17 December 2017:      36** | | |
| **2018** | | |
| 11 January 2018 | Rizerie/Semuliki Bridge (Beni/Kasindi road) | 1 |
| 20 January 2018 | Mayi Moya | 1 (died of heart attack during the attack) |
| 21 January 2018 | Kokola | 3 |
| 25 January 2018 | Tungudu | 1 |
| 2 February 2018 | Kithevya | 7 |
| 9 February 2018 | Ngite | 4 |
| 9 February 2018 | Masulukwede/Vemba | 4 (bodies found) |
| 11 February 2018 | Opira | 2 (bodies found) |
| 12 February 2018 | Vemba | 1 (body found) |
| 17 February 2018 | Tungudu (RN4) | 7 |
| 19 February 2018 | Kalinda Quarter, Beni Town | 1 (body found) |
| 22 February 2018 | Mbau | 2 |
| 25 February 2018 | Kisiki | 1 |
| 3 March 2018 | Luna/Eringeti | 6 |
| 5 March 2018 | Mangolikene (south of Mayangose) | 8 |
| 6 March 2018 | PK16 (Mbau/kamango road) | 2 |
| 13 March 2018 | Nyaleke/Semuliki Bridge | 3 |

UNCLASSIFIED                    EXHIBIT 25

| | (Beni/Kasindi road) | |
|---|---|---|
| 15 March 2018 | Kididiwe | 6 |
| 27 March 2017 | Kasinga/Paida (Beni Town) | 11 |
| 4 April 2018 | Bunake (Eringeti) | 1 |
| **TOTAL of civilians killed from 11 January to 4 April 2018:** | | 72 |

**Annex 30: Map of Beni territory, including the locations of attacks discussed in the report**



Map edited by the Group of Experts

UNCLASSIFIED                    EXHIBIT 25

**Annex 31: Motorbikes burnt during the PK40 massacre**



Picture provided to the Group by a member of the civil society of Beni Territory

UNCLASSIFIED

EXHIBIT 25

**Annex 32: Lists of hostilities reported by the Lendu and Hema communities**

**A.  List of hostilities reported by the Lendu community**

1

REPUBLIQUE DEMOCRATIQUE DU CONGO
**ASSOCIATION CULTURELLE LORI**
ACL-ASBL
COORDINATION DE DJUGU

## LES EVENEMENTS QUI ENDEUILLENT LE PEUPLE BBALE DEPUIS L'ASSASSINAT DU PERE CARME FLORENT DUNJI

I.   Introduction

Le Territoire de DJUGU est habité principalement par deux grandes tribus : les Lendu (Bbale) et les Hema. Celles-ci vivent en perpétuelles tensions souvent mal interprétées par beaucoup de gens ignorant la réalité. Ainsi, s'avère-t-il indispensable d'éclairer la lanterne de l'opinion publique tant nationale qu'internationale en leur fournissant non seulement le tableau chronologique des événements actuels et les observations y relatives mais aussi des propositions des solutions durables et capables de produire la paix.

II.   Tableau chronologique des événements

| N° | DATES | PROVOCATIONS HEMA | REACTIONS LENDU |
|----|-------|-------------------|-----------------|
| | | A)  SECTEUR DES WALENDU/PITSI | |
| 01 | 05/01/ 2017 | Assassinat du Père Carme Florent DUNJI au couvent de la Paroisse catholique de DRODRO, Diocèse de BUNIA, par l'Abbé Curé NZINDJU Faustin, sujet Hema. Cet assassinat a fait l'objet de moquerie de tous les Lendu à travers des chansons traditionnelles et des discours des Hema. | Le cas a été déposé devant le Parquet de Grande Instance de l'Ituri à BUNIA ; le présumé assassin a été libéré.  Les cadres Lendu ont peiné à calmer la Communauté à ne pas réagir. |
| 02 | 16/12/ 2017 | Un jeune homme du village TETE du Secteur des Walendu/PITSI a été tabassé et grièvement blessé au marché de UZI du Secteur des Walendu/DIATSI. | Deux jeunes gens du village TETE ont agressé deux jeunes filles hema du village MAZE. |
| 03 | 17/12/ 2017 | Incendie du Village TETE : 88 cases calcinées.  Les HEMA sont venus de MAZE et de DHEDJA. | Les jeunes gens de TETE ont incendié le village TSUKI chez les HEMA. |
| 04 | 17/12/ 2017 | Il y a eu 4 fois de provocations par les HEMA venus de BLUKWA à DZENGELE au marché de DZUDDA ; Qu'avez-vous fait quand nous avons tué votre prêtre, incendié ce marché et brûlé votre village TETE ? | Les Lendu n'ont pas répondu à ces attaques. Les soldats des FARDC et de PNC ayant leur position au marché de DZUDDA en sont témoins. |
| 05. | 18/12/ 2017 | Les Hema ont répété les mêmes menaces, provocations au Marché de DZUDDA | Les jeunes gens ont dû repousser les Hema. |
| 06. | 19/12/ 2017 | Les soldats des FARDC basés du côté Hema se sont permis d'ouvrir le feu sur les Lendu au Marché de DZUDDA à DZENGELE. | Les jeunes gens Bale n'ont rien fait, mais ils se sont rendus chez eux aux villages sans secours. |
| 07 | 19/12/ 2017 | Les fusillades ont été enregistrées dans le village GOLD, Groupement DHENDO. | Les Lendu ont ravi deux fusils dont les balles ont été tirées sur eux. Ces deux |

Arrêté Ministériel N°1117/CCA/RLI/ et G3/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJK/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts.  Acte d'existence n°4 /96 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED                    EXHIBIT 25

2

| | | | |
|---|---|---|---|
| | | Destruction de la culture de maïs dans le champ de RICHARD à JIBA/CHEGA par les Hema de DDADDA. | fusils ont été remis au major MICHEL des FARDC dépéché de BULE. |
| 08 | 10/01/ 2018 | Le Président de la Société Civile MALO DRA de BULE a tenu une réunion qui devait interdire l'arrivée des Bbale au Marché de BULE. | Les Lendu qui n'avaient pas entendu cette information se sont présentés au Marché de BULE. |
| 09 | 11/01/ 2018 | Arrestation de 8 mamans Lendu : ZIZINA, NESTORINE, TS'KA, KOKO, Jeanne TIINYO, TRIPHONNETTE, SHALO et NGABUSI venues au Marché de BULE, dont : SHALO, TRIPHONNETTE et Jeanne TIINYO sont portées disparues. ZIZINA, NESTORINE, TS'KA, KOKO et NGABUSI ont été libérées grâce à l'intervention du Chef de Chefferie des Hema Badjere et un certain SINGO. | Les Hema ont attendu en vain les réactions des Lendu. |
| 10 | Du 11 au 12/01/ 2018 | Provocations contre les Lendu lancées des villages Hema, notamment LUTS'KO, KALISHA, KIJA en disant : « Vous Walendu, venez retirer le corps de votre TRIPHONNETTE que nous avons abattue ici ». Comme les Walendu ne venaient répliquer, ils ont traversé la limite pour s'introduire au village PETRO en lançant les mêmes mots de provocation et un combattant Hema a giflé et lapidé RAFA MAWA du village GOLO. | Aucune réaction |
| 11 | 12/01/ 2018 | MELCHIOR, un sujet Lendu, a été battu dans le village CHENDJI (DDADDA) par les Hema. Il s'est fracturé l'avant-bras. Les soldats de position l'ont sauvé. | Pas de réaction. |
| 12 | 12/01/ 2018 | Les Hema sont arrivés déclarer au village PETRO qu'ils ont tué le Père Carme Florent DUNDJI et ont demandé aux Lendu ce qu'ils ont fait en réaction. | Aucune réaction |
| 13 | 02/02/ 2018 | Le reste des cases du village TETE et celles de BUJU ont été incendiées par les jeunes du Groupement BUKU. Avant ces incendies, les femmes et les jeunes gens Lendu étaient souvent menacés et battus dans ce Groupement. Les Hema utilisaient chaque fois les soldats des FARDC et les PNC afin d'agir ensemble. | Fatigués par les provocations répétitives les Lendu ont incendié plusieurs villages Hema. |
| 14 | 04/02/ 2018 | Les soldats des FARDC venus de LARGU et BLUKWA, soit- disant l'équipe de sécurité, envoyés par S.E. Monsieur le Gouverneur de l'ITURI, ont ouvert le feu sur les élèves de l'Institut de BLUKWA-MBII (chez les Walendu/PITSI) qui jouaient au jeu de dame. | Aucune réaction. |
| 15 | Du 05 au 19/02/ 2018 | Les Hema du village NYIKPA ont abattu Maman CHARLOTTE du village MALO et M. R'KPA. Des maisons des Lendu ont été incendiées à GOBU-NDJII. Les Hema se sont moqués ouvertement de la tuerie des sujets Lendu de plusieurs villages au bord du Lac Albert. | Incendie des villages Hema du bord de Lac ALBERT. |
| 15 | 10/02/ 2018 | Incendie de 3 maisons dans le village DDIKPA (SAYO) au Groupement DHENDO, par les HEMA venus du Groupement DHENDRO. Le même jour les Hema du Village DDADDA, Groupement DHENDRO, accompagnés de 2 soldats | Les assaillants Hema ont été repoussés par les Lendu qui ont pourchassé les Hema jusqu'à la rivière LIVI, entre DHENDRO et BULE. |

Arrêté Ministériel N°1117/CCA/RIJ/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/RIJX/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

3

| | | | |
|---|---|---|---|
| | | FARDC, ont traversé à JIBA Village et ont tué un jeune du village NDJAJI. A l'instant, le Village TALIKPA a vu ses maisons incendiées par les miliciens HEMA accompagnés des FARDC venus de DHENDRO. | |
| 16 | --- | Les Hema ont incendié le village VIDZA et LODYA (Groupement LINGA) et coupé à machette 3 Lendu qui s'étaient transportés à moto. | Le motocycliste est soigné à l'HGR RETHY. Les villages MOKE (NGOLOKPA), KAU et le village SUMBUSO ont été incendiés. |
| 17 | 28/02/ 2018 | Pillage du Centre de Santé de Référence de Blukwa-Mbi par les FARDC accompagnées des milices Hema. Toutes les portes ont été forcées y compris celles des bureaux des écoles primaires et secondaires | Aucune réaction |
| 18 | 05/03/ 2018 | Les soldats des FARDC accompagnés des Hema ont ouvert le feu sur les Lendu qui participaient à une séance de sensibilisation pour la paix au village MALALI, dans le Groupement LADDEDJO. Il y a eu 4 morts et 4 blessés. | Les Lendu ont repoussé les assaillants jusqu'au chef-lieu de chefferie des Bahema Nord. |
| 19 | 06/03/ 2018 | Les Hema, accompagnés des FARDC venant de BULE ont pillé au village PETRO : 1 mort, 2 blessés graves et 1 disparu. | Aucune réaction |
| 20 | 11/03/ 2018 | SUMBU, NJAZA, NGADJOLE tués à IGA/BARRIERE au retour d'un match de football de BUNIA à MONGBWALU/SAYO | – |
| B)  SECTEUR DES WALENDU TATSI | | | |
| 21 | | Menace verbale de M. BUBU LENGA  Constant en disant que les Hema vont faire une coalition avec le Gouvernement pour massacrer les peuples Lendu. Avant ce massacre, ils vont ordonner aux Hema de quitter les zones d'attaque. | Ce message d'un grand leader Hema a paniqué toute la communauté Lendu. |
| 22 | 07/03/ 2018 | Vers 19 heures, après le marché de Kparnganza, 'Il y a eu coups de balle tirés par un sujet Hema. Vendeur commerçant LOKPACHU, ce qui avait alerté le centre de Négoce. Après ces coups de balles, la même nuit il y a eu incendie des maisons à partir de KPARNGANZA jusqu'à SINGO a embrasé les villages LONA et TOTO. Alors que la situation était calme sur l'ensemble du Secteur des W/Tatsi, cette situation a provoqué des vagues de banditisme et de pillage dans la région. Dans la situation de KPARNGANZA, les dégâts sont collatéraux. | Aucune réaction |
| 23 | 15/02/ 2018 | Arrestation arbitraire des 16 personnes au village LIDYO en Groupement SALIBOKO, pillage de plus des 100 chèvres, 5 motos et panneaux solaires, organisé par les jeunes Hema venu de LOGO accompagnés des militaires FARDC. | Aucune réaction |
| 24 | 16/02/ 2018 | La maison du chef de Groupement GOBI, Mr LOPA GOBI Richard a été attaquée par les sujets HEMA venus de LOGO sous la houlette des FARDC. Ils ont tirés 2 coups de balle et ont pillé systématiquement | Aucune réaction |

Arrêté Ministériel N°1117/CCA/RU/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJK/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

DRC-30316 0553

UNCLASSIFIED                    EXHIBIT 25

4

|  |  |  |  |
|---|---|---|---|
|  |  | tous les biens de sa maison. Ici nous citons les noms de ces jeunes de LOGO, il s'agit de : LONDO LENGA qui détient l'arme à feu, GADO, LIRIPA et Emmanuel qui ne sont pas arrêtés jusqu'aujourd'hui et ces gens continuent à provoquer dans les villages. |  |
| 25 | 16/02/ 2018 | A la même date, le chef de Secteur des Walendu Tatsi a été arrêté à KATOTO et menacé de mort par la population de KATOTO | Aucune réaction |
| 26 | 19/02/ 2018 | Les villages MARIFA et SALIBOKO ont été attaqués par les sujets HEMA venus de TCHE toujours sous la houlette des FARDC. Du côté de la population de ces deux villages attaqués, il y a eu un cas de mort. | Au cours de cette attaque les jeunes de SALIBOKO se sont défendus (auto-défense) avec les flèches et ont réussi à repousser les assaillants jusqu'à identifier un certain LOKANA (sujet Hema) en tenue militaire. |
| 27 | 03/03/ 2018 | Attaque du village DHADHA bilan 2 cas de mort et ce même jour plusieurs villages du Groupement LOGA étaient en feu : LITA, KALANDA, JOMBE, ... incendiés par les jeunes de KATOTO. | Aucune réaction |
| 28 | 03/03/ 2018 | A la même date, il y a eu attentat d'assassinat de Mr LONA taximan de LIBA dans le Groupement MASUMBUKO par un assassin MAKI de LARGU sous la houlette de l'ancien Président des guérisseurs qui est actuel Chef de Chefferie des B/Nord Mr. PILO MULINDRO, heureusement ce dernier a été libéré de justesse par les militaires des FARDC de bonne foi. | Aucune réaction |
| 29 | 06/03/ 2018 | Attaque du village BBAU dans le Groupement LOGA, le bilan 4 morts et 7 blessés par les hommes venus en armes à feu, habillés en tenue militaire et les autres avec les salopettes de cantonniers distribués dans la région pour le cantonnage manuel de la route KATOTO-TALI.<br><br>A la même date, les Hema venus du Groupement SALA ont incendié l'école primaire PENYI.<br><br>Les militaires FARDC venus de TCHOMIA envoyés par les éleveurs HEMA ont incendié le village GOTCHUKPU en disant qu'ils étaient à la recherche de leurs vaches volées dans la région. | Aucune réaction |
| 30 | 09/03/ 2018 | Attaque du village BULO en Groupement GOBI par les HEMA venus de LARGU. Bilan : l'EP BULO incendiée ainsi qu'une partie du village BULO. |  |
|  |  | C) SECTEUR DES WALENDU/DJATSI | |
| 31 | 09/02/ 2018 | Vers 21 heures, incendie du village GOHU et Goba du Groupement Gokpa par les assaillants ressortissants de MAZE de chefferie de Bahema Nord, groupement Ndahura. Bilan : 65 cases brulées à GOHU et GOBA. |  |
| 32 | 10/02/ 2018 | La suite d'incendie par les mêmes sujets des MAZE dans les mêmes villages. |  |
| 33 | 12/02/ 2018 | Vers 21 heures : pillage dans la résidence de M. NDJABU MATESO par des hommes armés venus à |  |

Arrêté Ministériel N°1117/CCA/RLI/ et G5/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJK/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED                    EXHIBIT 25

5

| | | | |
|---|---|---|---|
| | | bord do deux jeep, dans le village Jitso, en Groupement Fataki | |
| 34 | 13/02/ 2018 | Torture de deux hommes et une maman sur le tronçon reliant BB'ASA et GOKPA. | |
| 35 | 16/02/ 2018 | Deux sujets Lendu ont été abattus près de la rivière NIZI à IGA-Barrière. | |
| 36 | 23/02/ 2018 | Attaque du village JIPI et NDJAUDHA par les miliciens HEMA portant les armes à feu venu de DHEDJA, LID'A et UKPA. Bilan : un Vieux de 80 ans du nom de Fidèle et un jeune homme ont été abattus. | |
| 37 | 29/02/ 2018 | Incendie du village KISABU et TSEDHA dans le groupement SESELE par les sujets Hema venus de TSOTSO(LOPA). | |
| 38 | 27/02/ 2018 | Attaques du village Djokpa du Groupement DZ'NA par les assaillants Hema venus de TCHELE. Bilan : 1 Jeune homme BBALE décapité et 58 maisons incendiées. | |
| 39 | 01/03/ 2018 | Un jeune commerçant BBALE du nom de Richard est abattu dans la localité TSIZ' par les sujets Hema venus de........ | |
| 40 | 02/03/ 2018 | Le rapport de l'événement ci-dessus est diffusé sur la voie des ondes (RADIO CANDIP). | |
| 41 | 03/03/ 2018 | Attaque du village NDJALA par les sujets Hema venu de NYAPALA. | |
| 42 | 04/03/ 2018 | Deuxième attaque du village NDJALA par les mêmes sujet Hema du village NYAPALA. Bilan : quelques jeunes BBALE ont été blessés. | |
| 43 | 06/03/ 2018 | Assassinat d'une maman Lendu mariée à un sujet Hema sur le chemin de retour du marché de IGA-Barrière vers NIZI par les jeunes de NIZI alors qu'elle était accompagnée de son mari, qui est rentré veuf chez lui. | |
| 44 | 11/03/ 2018 | A IGA-Barrière, 2 jeunes BBALE revenant de Bunia, où ils étaient allés au match de football, pour Mungwalu, ont été décapités. Leur chauffeur taxi-moto, un sujet Lugbara, a été admis aux soins intensifs à l'HGR de BAMBU. | |

## III.  Observations

1. Toutes les actions posées par les Lendu ne sont que des réactions aux provocations exactions perpétrées par les Hema accompagnés des soldats des FARDC qui sont déployés dans leurs entités contre les Lendu.

2. Les Hema n'ont jamais attaqué les Lendu seuls. Ils se font toujours appuyer, accompagner par des éléments visibles comme cités ci – haut et d'autres agissant dans l'ombre.

3. Les conflits ont été déclenchés par l'assassinat du Révérend Père Carme FLORENT DUNJI, Ministre de Dieu, suivi des rançonnements des populations Lendu, dans le village Hema, par les agents de l'ordre sur la route du marché UZI.

Arrêté Ministériel N°1117/CCA/RU/ et 63/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJC/94 du 28 mars 1954 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/88 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED    EXHIBIT 25

6

4. Les Hema choisissent avec soin des accusations mensongères et fallacieuses, capables de choquer tout esprit, d'émouvoir à tel point qu'on est amené à condamner immédiatement les Bbale, sans vérifications préalables. On se réduit en croyant simplement sans le moindre doute, à tout ce que les Hema disent, même à des stupidités, sans se poser la question élémentaire d'un homme intellectuel : « Est- ce fondé, y a-t-il suffisamment de preuves ? ». On élève alors les Hema au rang des « petits dieux» dont les oracles sont reçus comme tels.

5. Produire beaucoup de bruits pour distraire les esprits de bonne foi qui cherchent à aborder objectivement les problèmes de DJUGU.

6. Ils font souvent des accusations projectives, c'est-à-dire quand ils font un mal, ils accusent les Bbale de le faire. Par exemple : Ils forment les milices hema en Ouganda et au chef-lieu des Bahema Banywagi à MANDRO. Les Walendu regrettent que l'Honorable TCHEDYA PATAY Raymond se permette de professer des mensonges en affirmant que les Walendu Pitsi forment leurs milices près de la Centrale Hydro électrique de KODA à KPANDROMA et dans la forêt de WAGO près de BLUKWA. Ces propos calomnieux ont été relayés sur toutes les chaînes des radios locales basées à BUNIA, tout en faisant la campagne d'incitation à la haine contre la communauté Lendu. Quels peuvent être des apports d'un tel représentant de peuple au Parlement pour la construction du pays ?

Voici d'autres exemples de leurs accusations :
- les Lendu préparent la guerre contre les Hema !
- les Lendu achètent des armes !
- les Lendu ont de camps où ils forment les milices !
- les Lendu tuent nos prêtres !
- Au secours ! Au secours ! Au secours ! Les Lendu nous attaquent! Gouvernement, frappez immédiatement ces « assaillants » avec « la dernière énergie, jusqu'à leur dernier retranchement » et en fermant les yeux (sans la moindre vérification).

L'homme sage, objectif et de bonne foi devra attentivement écouter toutes les accusations que les Hema portent contre les Lendu, ensuite les vérifier une à une en profondeur et en extension, chez les Hema avant tout, puis chez les Lendu après, parce qu'elles sont souvent projectives.

7. La communauté Hema s'entête à poser des actes illégaux, car l'Etat n'a ni poursuivi ni inquiété ni arrêté ces fauteurs jusqu'ici, depuis toujours.

8. Les conflits derniers ont commencé le 19 Juin 1999 et ont duré pendant cinq ans. Ils sont partis de problèmes des concessions foncières élargies frauduleusement par les sujets Hema. Le nombre des concessions se chiffre chez les Walendu Pitsi seuls à 152, Djatsi 28, Tatsi 12. Ces agrandissements des concessions ont englouti plusieurs villages Lendu d'où le pouvoir public déguerpissait les Lendu.

Procédures illégales utilisées :
a) Arrestations arbitraires des chefs locaux, des notables et surtout l'élite intellectuel et les hommes d'affaires Lendu, conduits au parquet et arrêtés en prison centrale dont certains y étaient morts ;

Arrêté Ministériel N°1117/CCA/RU/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJX/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/85 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED                    EXHIBIT 25

7

b) Déguerpissement de la population par fusillade.

NB :   -   L'Etat laissait les concessionnaires libres d'agir.
       -   Jusqu'à ce jour, l'Etat n'a jamais enquêté ni jugé les concessionnaires. Par contre, l'Etat commence à renouveler leurs contrats d'emphytéose.
       -   Toutes ces concessions gérées par les Hema ont été transformées en centre d'entrainement des milices hema sous la formation des troupes étrangères : UPDF (Uganda) et APR (Rwanda). Cas des concessionnaires : SINGA KODJO, Thomas SAVO, LOBO TSORO, la liste n'est pas exhaustive.

La cause de tous les conflits qui opposent les Hema aux Lendu, clairement exprimée en public aux pourparlers de paix au Centre Culturel Interdisciplinaire C.C.I. NYAKASANZA à BUNIA, du 29/07 au 04/08/1999, est la conquête des terres habitées par les Walendu sur les flancs des Monts Bleus avec accès au Lac ALBERT. A cette occasion les hema avaient déclaré la « cohabitation impossible » avec les Lendu. Ils voulaient occuper seuls les portions déjà occupées par les Lendu. Un concessionnaire Hema, vers 1998 avait déclaré à ses bouviers, sujets Lendu : « Nous allons vous chasser au-delà de l'Uélé (rivière). », ce qui veut dire en dehors de l'Ituri.

Qui est responsable de conflit ? Celui qui fait la conquête (« déplace les bornes ») ou celui qui la subit ?

Les agrandissements frauduleux des concessions avaient engloutis plusieurs villages autour d'elles d'où la population devait partir forcément. Même une ferme collective avait été transformée, toujours frauduleusement, en une propriété privée d'un sujet hema. (Ce problème n'est pas résolu jusqu'à ce jour).

Pour conquérir les villages non atteints par les agrandissements des concessions, les hema ont suivi d'autre procédure. Les hema qui habitaient ces villages, au milieu des Lendu, bien sûr, ont commencé à jeter des tracts qu'ils ont rédigés au nom des LENDU avec le contenu suivant : « Vous, les hema, vous devez quitter nos villages, vous devez rentrer chez vous, sinon vous allez voir. »

Ils ont alors porté plainte contre les Lendu auprès du chef des Bahema-Nord à Blukwa, Kpadhingu Londri au lieu du Chef des Secteur des Walendu Pitsi dont ils sont dans la juridiction. Ils accusaient les Lendu de les chasser de leurs villages à travers des tracts. Le jeudi 17 juin 1999, le Chef KPADHINGO LONDRI s'est déporté dans le village MOKPA de Pitsi à l'insu du chef de Secteur. Mais quand la vérité, qui toujours est toute-puissante, menaçait de sortir en lavant les Lendu, il a brusquement interrompu l'enquête, ne voulant plus jamais continuer et il la remporta malignement pour le samedi, 19/6/1999. Mais la même nuit, les Hema ont incendié une de leurs maisons abandonnée. Ils en ont de nouveau accusé les Lendu pour profiter le samedi à les attaquer dans le village voisin LOKEMA alors qu'ils s'attendaient à continuer l'enquête. Armés de fusils, ils ont surpris ceux qui étaient dans une maison de deuil et ont fait beaucoup de morts dont la première victime était la maman ONOSIATA, fille Lendu, épouse d'un sujet hema, en attente de la maternité. La guerre avait été déclarée.

L'Etat n'a pas intervenu. Mais poussé irrésistiblement par la force de la haute diabolisation quotidienne du Chef du secteur des Walendu Pitsi et de ses notables de la part des Hema, il a plutôt commencé à chercher à arrêter ces leaders Lendu pour la justice (Parquet) et pour impitoyablement les limoger, les remplacer. Pourquoi dans la chaîne d'autorités qui se

Arrêté Ministériel N°1117/CCA/RU/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJK/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED    EXHIBIT 25

8

superposent, on choisit les chefs de Secteur des Lendu ? Ce problème ne concerne-t-il pas toutes ces autorités ?

9. Il est évident que les hema ont fait de haute coopération. Ils ont formé librement leurs troupes à l'étranger, les ont fait pénétrer librement dans le pays, pour opérer librement. Ils ont consenti de gros moyens, certainement, moyens qu'on ne peut rassembler en un jour, l'objectif poursuivi étant élevé.

10. Dans des actions de sécurité menées par les agents de l'ordre en Ituri, la Communauté Lendu a toujours été un objet d'injustice. Dans la situation sécuritaire qui prévaut actuellement dans le Territoire de DJUGU, les Hema portent des armes blanches et de guerre tandis que les Lendu sont coincés, obligés de ne rien détenir. Les soldats déployés pour la sécurité tirent des balles sur les Lendu qui portent les machettes pour aller au champ.

11. Les agents de la police, nouvellement affectés à Kpandroma font des tirs sporadiques, dont un des coups dans la maison d'une maman Hema, a risqué de causer la perte en vie humaine. Les rumeurs font entendre que ces agents de l'ordre ont comme mission de déclencher le trouble de l'ordre public à Kpandroma par des menaces et des fusillades qu'ils ont déjà commencées. D'autres rumeurs courent que, même si l'on déploie les agents de l'ordre chez les Lendu, ce n'est pas pour les protéger, mais pour protéger toujours les Hema.

12. Les militaires déployés à LARGU, BLUKWA, BULE (milieux Hema) sont mêlés de jeunes Hema, vêtus en tenues militaires : équation compliquée.

13. Dans les conflits derniers, les Hema ont tout fait pour placer en tête de la Province un sujet Hema, la maman LOTSOVE MUGISA Adèle. Alors les conflits ont pris une allure terrifiante. Comme les conflits suivent toujours le même schéma, cette fois-ci, si par ruse ou par force les hema remplacent le Gouverneur de la Province de l'Ituri par un sujet Hema, c'est qu'ils ont résolu de donner aux conflits une allure de grande envergure.

14. Les Hema tuent innocemment les rares prêtres Bbale qui parviennent à ce niveau à travers des épines touffues que leur dressent les hema, dans tous leur parcours et même dans leur carrière, au vu et au su de leur Dieu. Pour s'en féliciter et pour s'en réjouir, ils en composent des chansons moqueuses qu'ils aiment bien savourer. Leur cruauté dépasse le paroxysme. Deux Révérends Pasteurs Protestants, sujets Hema, s'entretenant entre eux ont dit dans leur dialogue : « Si vraiment Dieu existe, ce que nous faisons contre les Lendu ne nous permettra jamais d'entrer dans le Royaume des Cieux. »

15. Ayant vécu dans une impunité continua, les Hema ont perdu la notion du mal. Tout leur est bien. En conséquence, ils ont l'audace de poser n'importe quelle action, pas seulement envers les Lendu mais aussi envers n'importe qui, à n'importe quel niveau, même envers ceux qui croient les favoriser ou être leur ami intime. Les Lendu, leurs oncles, étaient leurs premiers amis, les plus intimes au Congo.

A titre d'illustrations :

a) Ils ont, eux-mêmes, tué à KASENYI leur propre frère et ont ramené en exposition le corps dans la ville de BUNIA afin de déchaîner la colère de la population Hema et de l'Etat pour frapper immédiatement les Lendu qu'ils accusaient d'être responsables de cet acte criminel. Ils se fondaient sur la vérité que l'Etat ne prend pas soin de mener les enquêtes pour vérifier les multiples accusations qu'ils portent contre les Lendu. Dans cette conviction aussi, comme ils en ont l'art, ils diabolisent intensément les chefs et la

Arrêté Ministériel N°1117/CCA/RJJ et GS/94 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°05/CAB/MJS/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

9

population Lendu. Toutes ces diabolisations c'est pour faire croire davantage qu'il ne vaut pas la peine de vérifier les accusations portées contre les Lendu, mais tout simplement de les frapper avec la dernière énergie.

b) Ils ont lapidé Son Excellence Monsieur le Gouverneur de la Province de l'Ituri à Blukwa et à Bunia.

16. Ils ont des stratégies subtiles capables de gagner les esprits et réduire même les grandes personnalités à leur service jusqu'au service odieux.

17. Voici quelques points relevés du TOP SECRET, trouvé à RULE/SUMBOSO, un village Hema. Ce document est intitulé « PROCEDURE DE LA GUERRE DE CONQUETE DES BAHEMA AU CONGO » :

- L'équation de cette guerre est très compliquée, car la procédure est très longue ...
- Exterminer tous les hommes influents et ceux qui ont les possibilités financières ...
- Massacrer les jeunes congolais par prison, exercices lourds et travaux forcés ...
- Exterminer les autorités coutumières et locales pour affaiblir le pouvoir coutumier et des guerriers traditionnels
- S'attaquer aux intellectuels congolais partout où ils sont pour les affaiblir par torture, famine, enlèvement ...
- Brûler tous les villages ...
- Occasionner la famine dans les villages qui entraînent les guerriers en détruisant l'intérieur c'est-à-dire les territoires qui ravitaillent, il faut priver de l'eau et du courant si possible ...
- Détruire les archives pour effacer l'histoire et tous les documents de référence sur les réalités du Congo.
- Affaiblir le secteur santé, le non accès aux soins de santé en désorganisant les agents spécialiste de santé (médecins) ainsi que les organismes internationaux de la santé.

18. Lors d'une visite des notables Lendu chez M. BUBU LENGA Constant, notable Hema, à la surprise de tout le monde, il a gravement déclaré ce qui suit : « Il n'y a rien à négocier avec les Lendu. Les FARDC et les milices Hema seront utilisés ensemble pour massacrer les Lendu. Par conséquent tous les hema doivent évacuer le Territoire de DJUGU car tous ceux qui se trouveront sur terrain seront bombardés. L'actuelle guerre sera entre le Gouvernement et les Lendu. » Il a lui-même organisé l'évacuation de la population Hema en véhicules et en barques respectivement vers Bunia et l'Ouganda au vu et au su de tout le monde y compris le pouvoir en place.

19. Les prêtres Hema ont porté la tenue militaire sous la soutane et menacé les chrétiens Lendu dans leurs homélies. Ils ont, en 1999, réquisitionné le véhicule du Diocèse de Bunia dans l'opération militaire pour massacrer leurs chrétiens Lendu et tous les membres de leurs communauté en trois jours. Ils ont, le 5 juin 2017, tué au couvent de DRODRO le père carme FLORENT DUNJI.

20. Jusqu'aujourd'hui, les Lendu continuent à héberger et protéger les pauvres déplacés Hema au Chef-lieu du Secteur Walendu Pitsi à LIBI, à GODJOKA, à KPANDROMA etc.

Arrêté Ministériel N°1117/CCA/RLU/ et GS/36 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJCI/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED                    EXHIBIT 25

10

## IV. Pistes des solutions

### A. Son Excellence Monsieur le Gouverneur de la Province de l'Ituri

1. Interdire aux radios de faire la campagne d'incitation à la haine contre la communauté Lendu ;
2. Vérifier si le curé assassin est en prison ; s'il n'y est pas, « frapper avec la dernière énergie » cette justice qui, comme toujours entretient les conflits qui font couler le sang dans le Territoire de Djugu  prenant le plaisir à libérer les malfaiteurs, mais jeter en prison, même pour y mourir, les pauvres innocents ;
3. Vérifier dans la fraîcheur :
   a) Les camps de formation signalés par l'Honorable TCHEDYA PATAY Raymond à KODA et dans la forêt de WAGO.
   b) Les camps de formation de milices à MANDRO et en Ouganda par KAWA MANDRO PANGA du parti PUSIC, avec leur débarquement à TCHOMIA, le 6 février 2018.
   c) Le projet de balkanisation de la RDC par M. KAWA PANGA MANDRO hautement instrumentalisé par ses partenaires ougandais et rwandais et très présent sur les réseaux sociaux.

### B. Au Gouvernement Central

4. Former promptement une équipe objective et impartiale qui doit aller sur terrain, mener l'enquête :
   a) Sur les concessions ;
   b) Pour analyser avec grand soin quand, comment, où et par qui se déclenchent les conflits entre Hema et Lendu depuis 1999 et opèrent jusqu'à ce jour ;
   c) Pour trouver ceux qui ont opéré en 1999 et y opèrent encore ;
   d) Pour analyser les solutions qui ont apporté les accalmies, cette paix fragile...
   e) Pour publier le résultat et remettre à la justice les coupables ;
   f) Pour enfin, envisager les solutions se dégageant logiquement des résultats fournis par les enquêtes menées sur terrain.
5. Enquêter pour rendre justice réellement sur les allégations des personnalités suivantes :
   1° Constant BUBU LENGA : Président de FEC/ITURI, Commerçant
   2° Raymond TCHEDYA PATAY : Député national
6. Organiser une conférence de pacification de l'Ituri ainsi que celle de vérité et réconciliation en Territoire de Djugu.

Arrêté Ministériel N°1117/CCA/RLU/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MJK/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED                 EXHIBIT 25

11

C. A l'Eglise Catholique

7. Que les paroisses catholiques dans les Secteurs Lendu soient dirigées par les missionnaires carmes.

V.    Conclusion

Environ 60 ans après l'Indépendance, nous nous contentons de bâtir le pays sur le sable en mobilisant nos medias dans la campagne d'incitation à la haine des citoyens entre eux, de voir la justice commettre l'injustice, l'administration baigner dans la corruption et la partialité, les intellectuels réfléchir comme des analphabètes et enfin l'Eglise prêcher « un autre évangile », celui de la violence.

Fait à Kpandroma, le 13 mars 2018

Pour la Communauté Bbale,

Le Président de l'Association Culturelle LORI ai WALENDU/PITSI



M. JEROME NDJANGO NDALO

Arrêté Ministériel N°1117/CCA/RU/ et GS/96 du 10 décembre 1996 du Ministère de la Justice et Garde des Sceaux ; N°09/CAB/MIN/94 du 28 mars 1994 du Ministère de la Jeunesse Culture et Arts. Acte d'existence n°47/86 du 26 octobre 1986 de l'Hôtel de la ville de Kinshasa

UNCLASSIFIED   EXHIBIT 25

**B.   List of hostilities reported by the Hema community**

République démocratique du Congo
Province de L'ituri
Territoire de Djugu
Chefferie de Bahema-Nord

Bilan de catastrophe en chefferie des Bahema-Nord depuis le 17.12.2017 au 23.01.2018 par les assaillants Lendu (massacres - incendies - pillages)

| N° | Groupement | Nombre des personnes massacrées | Nombre des personnes blessées | Nombre des maisons incendiées | Nombre des bêtes tuées (gros bétail/petit bétail) | Nombre des villages incendiés | Observation |
|---|---|---|---|---|---|---|---|
| 01 | Buku | 30 | 1 | 1727 | 445 | 1896 | 30 |
| 02 | Utaha | 55 | 7 | 752 | 145 | 206 | 18 |
| 03 | Dirokpa | 87 | 14 | 796 | 74 | 2334 | 34 |
| 04 | Luvangira | 6 | – | 402 | 42 | 344 | 6 |
| 05 | Loisa-Nietpo | 42 | 12 | 1017 | 306 | 2007 | 96 |
| 06 | Kpachu | 11 | 6 | 105 | 12 | 605 | 16 |
| 07 | Dhendro | 44 | 10 | 1526 | 67 | 1115 | 24 |
| 08 | Songuso | 113 | 36 | 2016 | 129 | 1856 | 97 |
| 09 | Malado | 4 | 12 | 108 | 64 | 673 | 6 |
| 10 | Singo | 13 | 9 | 610 | 76 | 526 | 22 |
| 11 | Ngazi-Djelu | . | . | . | . | . | . |
| | TOTAL | 408 | 134 | 9039 | 1931 | 11.451 | 299 |

Fait à Bukwa, le 23-02-2018
Le chef de chefferie des Bahoku
WILLY. Tibo-Ndulinaba
Chef coutumier

DRC 30316 0562

UNCLASSIFIED                    EXHIBIT 25

**Annex 33: Agreement to cease hostilities signed by leaders of the Lendu and Hema communities in mid-March 2018**

---

## REPUBLIQUE DEMOCRATIQUE DU CONGO

## MINISTERE DE L'INTERIEUR ET SECURITE

## PROVINCE DE L'ITURI

### TERRITOIRE DE DJUGU

## ACTE D'ENGAGEMENT DES CHEFS DES SECTEURS ET DES CHEFFERIES DU TERRITOIRE DE DJUGU EN VUE DE LA CESSATION IMMEDIATE DES HOSTILITES COMMUNAUTAIRES DECLENCHEES DEPUIS LE MOIS DE DECEMBRE 2017

---

UNCLASSIFIED

EXHIBIT 25

### ACTE D'ENGAGEMENT DES CHEFS DES SECTEURS ET DES CHEFFERIES DU TERRITOIRE DE DJUGU EN VUE DE LA CESSATION IMMEDIATE DES HOSTILITES COMMUNAUTAIRES DECLENCHEES DEPUIS LE MOIS DE DECEMBRE 2017

Nous, Chefs de Secteurs et Chefferies du Territoire de Djugu, en Province de l'Ituri ;

Ayant constaté les massacres de nos populations civiles et des incendies des villages à grande échelle depuis la deuxième quinzaine du mois de décembre 2017 dans le Territoire de Djugu, occasionnant ainsi les déplacements massifs des populations civiles de leur milieu de vie naturelle dans les familles d'accueil et dans des camps des déplacés créés à cette fin à Bunia, ailleurs et à l'étranger ;

Constatant les conditions humanitaires précaires dans lesquels vivent nos populations respectives, notamment les personnes vulnérables : les vieillards, les femmes enceintes, les enfants, les malades, etc. ;

Considérant que toutes les activités administratives territoriales, sociales et économiques sont globalement paralysées dans le Territoire de Djugu, à savoir le travail des bureaux des entités territoriales, le commerce, les formations médicales fermées et surtout la fermeture des écoles, mettant ainsi en péril l'avenir de la jeunesse, pépinière humaine de notre cher Territoire ;

Considérant la position géographique stratégique du Territoire de Djugu qui se trouve au centre de la Province de l'Ituri et partage les limites administratives non seulement avec tous les quatre autres territoires de notre Province (ARU, MAHAGI, IRUMU et MAMBASA), mais encore avec la Province voisine du Haut-Uélé, étant frontalier au Territoire de WATSA ;

Considérant que, partant de sa position géographique, la déstabilisation du Territoire de Djugu entrainera ipso facto la déstabilisation de toute la Province de l'Ituri ;

Soucieux de ce que les conditions de vie sociale de nos populations respectives reviennent à la normale, pour que tout le monde et chacun vaque normalement à ses occupations habituelles pour l'essor de notre nouvelle Province de l'Ituri que nous avons tant réclamée et qui est une réalité à ce jour ;



UNCLASSIFIED

EXHIBIT 25

Page | 2

Eu égard à tout ce qui précède ;

**PRENONS A TEMOIN ET DECLARONS :**

- Devant toutes les communautés du Territoire de Djugu ;
- Devant toutes les communautés de la Province de l'Ituri ;
- Devant toutes les communautés Nationales de la République Démocratique du Congo ;
- Devant toute la Communauté Internationale ;
- Devant Dieu et le monde ;

1. Prenons l'engagement ferme de nous impliquer activement dans la cessation immédiate des hostilités dans nos entités territoriales respectives ;
2. Pour ce faire, nous nous engageons d'une part à dénoncer toutes les personnes qui s'attaquent aux paisibles populations civiles et à leurs biens ; et d'autre part, à appuyer tous les services spécialisés de l'Etat en charge de maintien de la tranquillité et de l'ordre public, à savoir la Police Nationale, les FARDC, les différents services de sécurité et la Justice ;
3. Prenons le ferme engagement de faciliter la libre circulation des personnes et de leurs biens sur toute l'étendue du Territoire de Djugu, plus particulièrement à travers les axes vitaux ci-après :
   1) Tchomia – Kafé – Tché – Largu ou Katoto – Kparnganza – Saliboko – Masumbuko – Largu-Drodro – Mazee aussi Largu-Blukwa-Mbi-Dhedja-Bule.
   2) Bunia – Makpo – Iga-Barrière
      * Nizi – Kobu – Klio – Mongbalu – Mbidjo – Makofi
      * Nizi – Zibiti – Panduru – Gele/Mabanga – Tchele
      * Iga/Barrière – Lopa – Jina – Pimbo – Djugu – Fataki allant vers Sanduku – Libi – Dhera et Sanduku – Kpandroma
   3) Kobu – Tchudja – Dix Zaïre – Dala
   4) Jina – Juli – Mbau – Tchele – Mangale – Dzu'dda
   5) Likopi – Djugu
   6) Fataki – Bule – Dhedja – Blukwa
   7) Dhedja – Maze – Drodro – Largu
   8) Nizi – Bakombe – Dz'na – Tchele
   9) Blukwa – Juba – Bubba – Kpandroma ;
   10) Bunia – Nyangaray – Bengwe – Klio
   11) Bunia – Lipri – Bambu ;
   12) Mongwalu – Pluto – Lodjo – Yedi.



UNCLASSIFIED

EXHIBIT 25

Ainsi fait en âme et conscience,

## LES CHEFS DES SECTEURS ET DES CHEFFERIES DU TERRITOIRE DE DJUGU,

| N° | PRENOM, NOM & POSTE-NOM | ENTITE TERRITORIALE | N° DE TELEPHONE | LIEU, DATE ET SIGNATURE |
|----|--------------------------|---------------------|-----------------|-------------------------|
| 01 | Emile LONGBE TCHABI LIBI | WALENDU-PITSI | 081038887 ; 0829732471 | Kpandwa de 13/03 |
| 02 | Chrysante LOTULE JINGUNGA RISASI | BAHEMA-BAGURU | 0810132471 | |
| 03 | Freddy NGIDJO NAHORO PANGA | BAHEMA-BANYWAGI | 0813002636 | Le 13/03 |
| 04 | Richard DHEDA KONDO LENGA | BAHEMA-BADJERE | 0811343994 ; | le 14/03 /14 |
| 05 | Innocent MADUKADALA KOSSIANDEY | BANYALI-KILO | 0822701999 ; 0698276475 | |
| 06 | Claude MATESO NGUTCHU | WALENDU-DJATSI | 0823999972 | |
| 07 | Jean DZ'BA BANDJU | NDO OKEBO | 0812141440 | |
| 08 | Faustin LIXPA ADRUGESE | MABENDI | 0815003085 | |
| 09 | Joël MANDE LONEMA | WALENDU-TATSI | 0817100809 ; 0813819096 | |
| 10 | Henri JUGA TCHELE KRILO | MAMBISA | 0817193853 ; 0827506641 | |
| 11 | Willy PILO MULINDRO | BAHEMA-NORD | 0817277816 ; 0810905707 | Blatti le 14/3/2018 |

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

**Annex 34: Aerial view of Semuliki COB**



Picture provided by an FARDC Officer

UNCLASSIFIED          EXHIBIT 25

**Annex 35: RPG found in a tree on the southern side of the Semuliki COB on the Semuliki River**



Photo taken by the Group during its field visit to Semuliki COB on 25 January 2018

UNCLASSIFIED    EXHIBIT 25

**Annex 36: Pictures of the Semuliki COB damages**



One of the five burnt tents



One of the five burnt tents



One of five burnt tents

Photos taken by the Group during its field visit to Semuliki COB on 25 January 2018

    UNCLASSIFIED    114 of 132

UNCLASSIFIED                        EXHIBIT 25



Burnt APC and burnt truck with western part of the COB in the background



Burnt APC



Bullets' impacts on the UN mobile water treatment unit

Photos taken by the Group during its field visit to Semuliki COB on 25 January 2018

UNCLASSIFIED                    EXHIBIT 25

**Annex 37: Weapons seized from Mai-Mai Yakutumba and displayed in Uvira and list of materiel collected from Mai-Mai Yakutumba**



Photo by FARDC in February 2018

- 03 RPG 7
- 04 BOMBES RPG 7
- 04 BOMBES 107'm
- 01 Mo.60
- 01 BTR/107mm
- 03 MACHINES ORBORDS
- 01 CANNON 7 75 ou SPG9
- 03 BOMBES Mo.82mm
- 01 BIPIED 107mm
- 01 BAGH

04 mitrailleuses : n° 711857, 840494, 708461
MAG TYPE BELGE n° 0321
- 404 Mun 7,62mm x 51
- 2562 coups 7,62 mm x 54
- 920 coups 7,62mm x 39
- 172 coups 12.7 mm

1   AKA56 M70A8276441
2   AKA 47 n° 1170131
3   AKA 56 n° 563866404
4   AKA47 n° 1974-66734
5   AKA47 n° 563815922
6   AKA n° 264054
7   AKA 56 n°18027
8   AKA 56 n° 87341
9   AKA 56 n° 8097
10  AKA 56 n° 09805
11  AKA 47 n° 1969-TX4793

12. AKA 47 n° 0983(pièce mobile)
13. AKA 56 n° 3605274
14. AKA 56 n° 3732613
15. AKA 56 n° 4122057
16. AKA 56 n° 37009575
17. AKA 56 n° 1158(pièce mobile)
18. AKA 56 n° 353534159
19. AKA 47 n° 1966452
20. AKA 47 n° 1965M876
21. AKA 56 n° 79729(couvercle)
22. AKA 56 sans n° (carcasse)
23. AKA 56 n° 35031855
24. AKA 47 n° 4812P (carcasse)
25. AKA 56 n° 3600563
26. M.16 carcasse sans n°
27. AKA 56 n° 1853(pièce mobile)
28. RPD n° 1971-00-0997
29. 01 Grenade (type ananas)

List received from the FARDC with annotation of the Group in February 2018

**Annex 38: 107mm "Bi-tube" multiple rocket launcher type 63**



Photos by the Group in March 2018

UNCLASSIFIED    EXHIBIT 25

**Annex 39: 75mm Recoilless Rifle (Cannon sans recul) similar to M20 and mortar**



Photos provided by FARDC in February 2018



Sample of 75 mm, Source:
https://www.militaryfactory.com/smallarms/detail.asp?smallarms_id=548



Photo by the Group in February 2018

UNCLASSIFIED    EXHIBIT 25

**Annex 40: 7.62x54Rmm Machine Gun model MG-1M**







Photos provided by Monusco/FARDC in March 2018

UNCLASSIFIED          EXHIBIT 25

**Annex 41: Samples of 7.62 x 39 mm and 7.62 x 54 mm ammunition collected from armed groups and under investigation by the Group of Experts**

**7.62x39R**



RA_53



FN_66

 

188_87

Photos by the Group in February 2018

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25

  

945_06



945_07



BN_40_2



671_54.6

 

71_06

Photos by the Group in February 2018

UNCLASSIFIED    EXHIBIT 25

 

LC_67







10_96

 

41_97

Photos by the Group in February 2018

UNCLASSIFIED          EXHIBIT 25

 

811_05



188- Д

 

SU_1_S1_01

Photos by the Group in February 2018

UNCLASSIFIED    EXHIBIT 25

**7.62x54R**

 



7.62x54R_01



7.62x54R_07

 

71_71

Photos by the Group in February 2018

    UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 25



**82MB-HE *20*-08-62**

Photo by the Group in February 2018

UNCLASSIFIED    125 of 132

UNCLASSIFIED                    EXHIBIT 25

**Annex 42: 73 mm Round RHEAT-9MA**

 

Photos by the Group in March 2018

UNCLASSIFIED          EXHIBIT 25

**Annex 43: Sample of new uniforms, bullet-proof vests and helmets delivered in October 2017**





Photos provided by FARDC in February 2018

UNCLASSIFIED                    EXHIBIT 25

## Annex 44: China Xinxing Shanghai Import and Export Corporation Bill of Lading



Photo by the Group in February 2018

**Annex 45: Materiel with characteristics similar to that produced in Egypt**

PROCES VERBAL DE RECEPTION DES MUNITIONS EN PROVENANCE DE L'EGYPTE

**B. MUNITIONS**

| N° SERIE | NOMENCLATURE | U/M | Qté REÇUE | Année de fabrication | Obm |
|---|---|---|---|---|---|
| 01 | Cart 7.62 x 39mm Ball | Cps | 1.000.000 | 1984 | |
| 02 | Cart 7.62 x 39mm Tranç | Cps | 250.000 | 1982 | |
| 03 | Cart 7.62 x 39mm Blank | Cps | 500.000 | 1984 | |
| 04 | Cart 7.62 x 54mm Ball | Cps | 1.000.800 | 1980 | |
| 05 | Cart 7.62 x 54mm Tranç | Cps | 250.800 | 1979 | |
| 06 | Cart 7.62 x 54mm Blank | Cps | 250.200 | 2000 | |
| 07 | Cart 12.7mm APi | Cps | 500.100 | 1971 | |
| 08 | Cart 12.7mm APi-T | Cps | 250.200 | 1961-1971 | |
| 09 | Cart 14.5mm APi | Cps | 15.120 | 1968-1985 | |
| 10 | Cart 14.5 APi-T | Cps | 10.080 | Idem | |
| 11 | Cart à Obus 30mm | Cps | 15.000 | 1958 | |
| 12 | Bombes Mor 60mm HE | Cps | 3.500 | 1982 | |
| 13 | Bombes Mor 82mm HE | Cps | 3.510 | 1972 | Idem Compert |
| 14 | Obus 100mm HE | Cps | 1.500 | 1971 | |
| 15 | Obus 122mm HE D30 | Cps | 1.000 | 1984 | |
| 16 | Roq 122mm BM-21 | Cps | 700 | Années différentes | |

DESC (www.dese-wondo.org), April 2018

UNCLASSIFIED                    EXHIBIT 25

**Annex 46: Arms, ammunition and medicine recovered from RED Tabara combatants by FARDC**







Photos provided by FARDC in March 2018

**Annex 47: REDTabara combatants intercepted by FARDC in South Kivu**



"Maj General Birembu Melkiade, CoS/Red Tabara



UNCLASSIFIED    EXHIBIT 25



Photos provided by FARDC, annotation by the Group in March 2018

UNCLASSIFIED                    EXHIBIT 26

# How can Uganda export so much more gold than it mines?

**economist.com**/middle-east-and-africa/2019/05/23/how-can-uganda-export-so-much-more-gold-than-it-mines

May 23,
2019



DEEP IN PITS hewn from the earth dozens of teenage boys slam their hammers into the rock. Other men pan the crushed ore by hand in tubs filled with water and mercury. Uganda does not have many gold mines and most, like this one in Busia, in the east of the country, are neither sophisticated nor especially productive. Yet this small east African nation exports a fantastic trove of the yellow metal.

According to official statistics, gold exports surged to $514m in 2018 from less than $10m a decade ago. Last year gold surpassed coffee as Uganda's biggest earner of foreign currency.

The open secret of Uganda's gold boom is that most of this metal is dug up elsewhere. Its central bank reckons that only 10% of the exported gold comes from local mines. It blandly says the rest comes from elsewhere in Africa. Officials insist that the trade is all legal and untarnished. But industry insiders gesture over the border to the Democratic Republic of Congo, whose lawless eastern provinces are rich in minerals including gold, and which levies a 3% tax on gold exports. They think that more than 90% of Congo's gold production is illegally whisked to neighbours such as Uganda and Rwanda and then onto planes flying to Dubai. Some go direct. In 2016 customs officials in Dubai checked the rather overweight baggage of a Congolese frequent-flyer from Lubumbashi. In it was 150kg of gold. One

UNCLASSIFIED    EXHIBIT 26

investigation for the OECD, a club of mostly rich countries, found that airline passengers were regularly stopped by security officials at Entebbe airport trying to sneak off with gold bars crammed into their carry-on bags.



**All that glitters is not Ugandan**
Uganda, gold exports, $m

Source: Central Bank of Uganda

The Economist

Uganda, too, used to tax gold exports, but in 2014 Uganda's president, Yoweri Museveni, waived the tax. In 2015 Belgian investors spent $15m building African Gold Refinery after being assured of tax exemptions for both the import of raw gold and the export of refined gold for at least ten years. Since then the refinery has exported more than 31 tonnes of gold to Dubai and Antwerp. Last year a competitor, Bullion Refinery, entered the market, and is now thought to be exporting similar quantities.

Uganda's export boom ought to be a shining example of how governments can spur investment and minerals beneficiation with sensible tax policies. Yet investigators for the UN have singled out Uganda for shame and named both refineries in a report to the Security Council on how gold smuggling funds warlords and militias.

Their report says that middlemen selling gold to the refineries are linked to Congolese smugglers. The Sentry, an American watchdog backed by George Clooney, an actor, last year estimated that $300m-600m of gold is smuggled out of Congo each year. African Gold Refinery says it selects its suppliers carefully and complies with laws prohibiting the trade in minerals from conflict areas. Bullion Refinery, whose website welcomes "small, medium and large scale suppliers" of "raw gold dust and powder", did not respond to a request for comment.

Most of the gold processed in Uganda comes from areas controlled by armed militias that extort money from artisanal miners. A report for the UN found that one militia forces miners to sell their gold at $25 per gram, far less than the $60 they would get on the open market, and charges miners a monthly fee for access to the pits. Rebel militias are not the only ones getting rich. Another UN report alleges that officers in Congo's army illegally own mines or extort gold from miners.

Mr Museveni shows little interest in policing the trade. At the opening of a gold refinery he said he would deal harshly with officials who were "frustrating" investors in the industry. Some locals may profit, but gold smuggling fuels violence in the country's large, unstable, neighbour.

This article appeared in the Middle East and Africa section of the print edition under the headline "Gold blush"

Reuse this contentThe Trust Project

## The best of our journalism, handpicked each day

Sign up to our free daily newsletter, The Economist today

Sign up now

UNCLASSIFIED                    EXHIBIT 26



UNCLASSIFIED

EXHIBIT 28

United Nations

$S$/2019/469



# Security Council

Distr.: General
7 June 2019

Original: English

## Letter dated 6 June 2019 from the Group of Experts on the Democratic Republic of the Congo addressed to the President of the Security Council

The members of the Group of Experts on the Democratic Republic of the Congo, whose mandate was extended pursuant to Security Council resolution 2424 (2018), have the honour to transmit herewith, in accordance with paragraph 4 of that resolution, the final report on their work.

The report was provided to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo on 8 May 2019 and was considered by the Committee on 24 May 2019.

The Group would appreciate if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) David **Zounmenou**
Acting Coordinator
Group of Experts on the Democratic Republic of the Congo

(*Signed*) Nelson **Alusala**
Expert

(*Signed*) Jane **Lewis**
Expert

(*Signed*) Virginie **Monchy**
Expert

(*Signed*) Bart **Vanthomme**
Expert

19-07687 (E)   110619

Please recycle 



S/2019/469

# Final report of the Group of Experts on the Democratic Republic of the Congo

*Summary*

The presidential elections in the Democratic Republic of the Congo of 30 December 2018 brought about a relatively peaceful transfer of power despite having been contested and marred by interference from armed groups. In the period since the inauguration of the new President, the Group has observed a growing number of armed groups willing to surrender provided that adequate structures are established and conditions are met.

Nevertheless, numerous local and foreign armed groups continued to pose serious security threats in the Democratic Republic of the Congo. The Allied Democratic Forces (ADF), led by Seka Musa Baluku, has regrouped and rebuilt its capacity. ADF continued to attack civilians and security forces during the reporting period. The Group found that ADF continued to recruit and use children, in particular during attacks and combat. It also found that ADF engaged in conflict-related sexual violence, including through forced marriage. Although the radical interpretation of Islam by ADF and its recent propaganda suggested a willingness to be associated with other Islamist groups, the Group found no evidence of direct collaboration between them during the period under review. The Group noted that, for the first time, Islamic State in Iraq and the Levant had claimed an attack on Congolese territory in April 2019, but the Group was not able to confirm any direct link with ADF at the time of writing.

Following violent clashes with local armed groups, the Conseil national pour le renouveau et la démocratie (CNRD), a Rwandan armed group, decamped with 4,000 combatants, dependants and Rwandan refugees from Masisi, North Kivu, to Kalehe, South Kivu, beginning in December 2018, following attacks of the Nduma défense du Congo-Rénové (NDC-R). Growing tensions between CNRD, the local population and the national armed forces, the Forces armées de la République démocratique du Congo (FARDC), raise concerns for civilian protection, underlining the urgency of durable solutions for an evolving situation.

NDC-R, on the other hand, expanded its territorial control in North Kivu and increased its troop strength, thereby posing a serious threat to stability in the area. Armed clashes between NDC-R and other local armed groups in northern Masisi and western Rutshuru territories in mid-January 2019 resulted in a number of serious human rights violations. The Group also identified collaboration between FARDC and NDC-R in these areas, consistent with previous findings.

Collaboration between local and foreign armed groups on Congolese territory was an exacerbating factor. For instance, in South Kivu, several Burundian armed groups, including the Résistance pour un état de droit au Burundi (RED Tabara), collaborated with local armed groups in the Middle Plains of Uvira. In turn, at least two military incursions were launched on Congolese territory by the Burundian armed forces, the Forces de défense nationale du Burundi (FDN), alongside members of a Burundian youth group known as Imbonerakure, affiliated with the Burundian ruling party, the Conseil national pour la défense de la démocratie-Forces pour la défense de la démocratie. Two local armed groups supported FDN and Imbonerakure. Direct military interventions and the provision of material support to armed groups operating in the Democratic Republic of the Congo constitute violations of the sanctions regime.

Ongoing insecurity caused by armed groups continued to hamper the response to the outbreak of the Ebola virus disease in Beni territory. Challenges relating to

S/2019/469

community acceptance and trust, coupled with repeated attacks against treatment centres and medical staff, were exacerbating factors.

In Yumbi territory, members of the Batende community systematically and indiscriminately killed hundreds of members of the Banunu community and persons perceived as being close to that community on 16 and 17 December 2018. The attacks were well planned, organized and coordinated, including by local leaders of the Batende community. These acts are serious human rights violations and sanctionable acts and may constitute crimes against humanity, and those responsible should be held to account.

With respect to natural resources, the Group noted that regulations in the artisanal and small-scale gold sector were either incomplete or poorly enforced in the Democratic Republic of the Congo. The Group also found that smuggling and underdeclaration continued in Bukavu and Butembo, for onward delivery through Bujumbura, Kigali and Kampala to Dubai.

The Group found that armed groups continued to finance their activities through the illegal mining of tin (cassiterite), tantalum (coltan) and tungsten (wolframite), thereby contaminating the supply chain. The Group also documented cases of smuggling of tin, tantalum and tungsten involving criminal networks using various tactics, as well as specific instances in which some Congolese government officials were involved in the diversion of minerals. These acts constitute violations of Security Council resolutions, the Organization for Economic Cooperation and Development Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the International Conference on the Great Lakes Region Regional Certification Mechanism.

The Group documented a number of cases of violations of the arms embargo and non-compliance by supplier States with the requirement to notify the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo in advance of the delivery of arms and related military equipment. Armed groups continued to target FARDC camps and depots in order to seize weapons and ammunition and recovered a significant number of weapons and ammunition from FARDC losses during combat.

DRC-30316 0605

S/2019/469

# Contents

|  |  |  | Page |
|---|---|---|---|
| I. | Introduction | | 5 |
| II. | Armed groups in North Kivu | | 6 |
| | A. | Allied Democratic Forces | 6 |
| | B. | Conseil national pour le renouveau et la démocratie | 11 |
| | C. | Nduma défense du Congo-Rénové | 12 |
| | D. | Forces démocratiques de libération du Rwanda | 14 |
| III. | Armed groups in South Kivu | | 15 |
| | A. | Incursion by the Forces de défense nationale du Burundi and Imbonerakure | 15 |
| | B. | Résistance pour un état de droit au Burundi | 18 |
| | C. | Disarmament, demobilization, integration and reintegration | 20 |
| IV. | Serious violations of international humanitarian law and human rights | | 20 |
| | A. | Recruitment and use of children | 20 |
| | B. | Conflict-related sexual violence | 22 |
| | C. | Attacks against civilians in Beni territory | 23 |
| | D. | Attacks against civilians in Yumbi territory | 25 |
| V. | Natural resources and financing | | 30 |
| | A. | Tin, tantalum and tungsten | 30 |
| | B. | Gold | 33 |
| | C. | Financing of the Nduma défense du Congo-Rénové | 37 |
| VI. | Arms | | 38 |
| | A. | Violations of the arms embargo | 38 |
| | B. | Failure to notify | 40 |
| VII. | Recommendations | | 40 |
| Annexes* | | | 43 |

---

\* The annexes are being circulated in the language of submission only and without formal editing.

S/2019/469

# I.  Introduction

1.    The final report of the Group of Experts on the Democratic Republic of the Congo is being submitted pursuant to paragraph 4 of Security Council resolution 2424 (2018). Zobel Behalal (Cameroon), natural resources expert and Coordinator of the Group, reached the end of his five-year term as a sanctions expert on 27 March 2019 but was involved in the investigations for the report. David Zounmenou (Benin), arms expert, was subsequently appointed as Acting Coordinator. On 2 January 2019, Jane Lewis (Ireland) was appointed as one of the two armed group experts.

2.    From 28 April to 5 May 2019, the Chair of the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo, Mansour Ayyad Alotaibi (Kuwait), visited the Democratic Republic of the Congo, Uganda and the United Arab Emirates together with a number of members of the Committee. The Chair and his delegation were not able to visit the United Republic of Tanzania, which notified the Committee that the visit should take place at a later date.

3.    In accordance with the request made by the Security Council in paragraph 8 of its resolution 2360 (2017), and as renewed by paragraph 5 of its resolution 2424 (2018), the Group continued to exchange information with the Panels of Experts on the Central African Republic, on the Sudan and on South Sudan.

**Cooperation with the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo**

4.    The Group notes with appreciation the support and collaboration of the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO) during the period under review.

**Compliance with the requests of the Group for information**

5.    During the reporting period, the Group met with government officials, private sector actors and organizations in eight countries (see annex 1). While it transmitted 47 letters requesting information from Governments and entities, the Group received varying levels of compliance with its requests (see annex 2). For example, although the Burundian authorities eventually held a brief meeting with the Group in Bujumbura, Burundi, and provided some answers to its questions, the Group regrets that the process of seeking to meet with the authorities was unnecessarily cumbersome. The Group had requested a meeting on 14 March 2019 in a letter dated 30 January 2019. On 14 March 2019, the authorities confirmed the date of 14 March for the meeting. The Group travelled to Burundi following the establishment of a new date of 16 March 2019 and waited three more days for the meeting. Burundian officials informed the Group that they had not received the Group's official communications on requests and issues to be discussed (which were contained in the letter from the Group of 30 January). It is the Group's understanding that the Permanent Representative of Burundi to the United Nations had acknowledged that all official communications from the Group had been transmitted to capital, including the questions to be addressed during the meeting in Burundi. The Group also exchanged several emails with and made several phone calls to the Burundian authorities in connection with the meeting.

**Methodology**

6.    The Group used the evidentiary standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). The Group based its findings on documents and, wherever possible, on

UNCLASSIFIED    EXHIBIT 28

S/2019/469

first-hand, on-site observations by the experts themselves. When that was not possible, the Group corroborated information by using at least three independent and reliable sources.

7.    Given the nature of the conflict in the Democratic Republic of the Congo, few documents provide definitive proof of arms transfers, recruitment, command responsibility for serious human rights abuses and the illegal exploitation of natural resources. The Group has therefore relied on eyewitness testimony from members of local communities, ex-combatants and current members of armed groups. The Group has also considered expert testimony by government officials and military officers from the Great Lakes region and United Nations sources.

8.    The present report covers investigations conducted up to and including 18 April 2019.

**Implementation of the recommendations of the Group**

9.    In its midterm report of December 2018, the Group reported that the Kokodikoko faction of Raia Mutomboki, led by Masudi Alimasi Kokodikoko, had committed conflict-related sexual violence and used child soldiers in Shabunda territory, South Kivu, in September 2018 and had recommended that the perpetrators of those crimes be investigated and prosecuted (S/2018/1133, paras. 72–83 and 112 (b)). Kokodikoko, who was injured during combat, surrendered to the Forces armées de la République démocratique du Congo (FARDC) on 26 March 2019, and 28 of his elements surrendered or were captured by FARDC on that day and in the following days. The Group was further informed that the Congolese military judicial authorities had initiated an investigation against Kokodikoko and his deputy for murder, rape, torture and looting. The Group welcomes this positive development.

**Update on sanctioned individuals and entities**

10.    The Group received information that Ignace Murwanashyaka (CDi.016), President of the Forces démocratiques de libération du Rwanda (FDLR) (see S/2016/466, annex 6), died in the university clinic of Mannheim, Germany, in April 2019, while awaiting retrial on charges of war crimes.

**Correction of the midterm report of the Group of 2013**

11.    In its midterm report of July 2013, the Group reported that "Ntaganda's allies in Kitchanga worked clandestinely with Mudahunga and his deputy, Lt. Col. Alexis Muhire, to recruit for M23 and establish a rear base for the movement at Kitchanga" (S/2013/433, para. 120). However, the correct name of Mudahunga's deputy was not Lt. Col. Alexis Muhire but rather Lt. Col. François Muhire.

**Investigation into the murder of members of the Group in March 2017**

12.    The Group reiterates that the perpetrators of the murders of Michael Sharp and Zaida Catalán, including their support networks and motives, should be identified and that those involved should be prosecuted under Congolese law.

## II.  Armed groups in North Kivu

### A.  Allied Democratic Forces

13.    The Group investigated foreign armed groups in the Beni-Butembo region in North Kivu and observed that the Allied Democratic Forces (ADF) continued to be active (S/2018/531, paras. 27–42). The Group found that ADF had regrouped and

UNCLASSIFIED
19-07687

S/2019/469

rebuilt its capacity since suffering heavy losses in the FARDC operations against it in 2014 (S/2015/19, para. 5). During the reporting period, ADF continued to attract new recruits through an international recruitment network, while launching attacks against civilians, abducting children and engaging in sexual violence (see paras. 94–101 and 105–108 below).

14.   ADF has long demonstrated radical interpretations of Islam. During the period under review, although ADF propaganda suggested a willingness to be associated with other Islamist groups, the Group found no evidence establishing a direct link between them.[1]

15.   As previously reported (see S/2014/428, annex 9), the Group noted that several ex-combatants and former ADF abductees continued to use interchangeably different names for the same armed group, namely, ADF, ADF-NALU (Allied Democratic Forces – National Army for the Liberation of Uganda), NALU (National Army for the Liberation of Uganda) and Madina at Tawhid Wai Muwahedeen (MTM).[2]

**Locations**

16.   The Group observed that ADF was a well-organized armed group spread over several camps in the Beni-Butembo region near or in the Virunga National Park. On the basis of testimonies of nine ex-combatants, 10 victims, civil society, local researchers, MONUSCO sources and FARDC officers, the Group located several main camps[3] used by ADF (see annex 3). It is worth noting that, while exact camp locations have changed over time, most of their names have remained constant. In addition, the Group found that men, women and children were present in all ADF camps (see paras. 94–101 below).

17.   The ADF base camp called Madina,[4] divided into Madina I and Madina II, was a complex of smaller camps in the so-called "Death Triangle", situated between Oicha, Eringeti and Kamango, some 35 kilometres north of Beni. Leaders of ADF stayed in Madina II, which included Kajaju, Bango, Whisper and Richard camps, all situated approximately one kilometre from each other (see annex 4). The Group estimated that there were between 150 and 200 ADF elements in each of the four aforementioned smaller camps.

18.   Another important ADF camp, known as Mwalika, Irungu and Domaine, was situated in the vicinity of Mwalika village, between Kasindi and Butembo in Beni territory, in the Virunga National Park. This camp was used primarily as an assembly point for foreign recruits. Mwalika camp was moved frequently and was usually situated near the Semuliki River. Four ex-combatants told the Group that Mwalika had been moved twice during their four-month stay and that it had taken them approximately five hours to reach the new campsite on foot. The Group estimated that Mwalika accommodated between 100 and 150 people depending on the supply of new recruits.

19.   A third camp, named Mulalo after its leader and also known as Lahe camp, was situated in the Mayangose forest north-east of Beni (see annex 5). This camp counted some 60 to 80 combatants. Mulalo was used as a transit camp for elements of ADF and their captives travelling between Mwalika and Madina. On the basis of satellite

---

[1] The Group is aware that Islamic State in Iraq and the Levant claimed an attack in the Democratic Republic of the Congo on 18 April 2019 (see para. 34).

[2] This can be translated as "the city of Tawhid and the monotheists".

[3] ADF also relied on smaller positions as hideouts or observations posts that were often not permanently manned and were likely used as departing points for attacks.

[4] In previous reports, the Group has repeatedly reported on a camp called Madina, but it assessed that, while the name of the camp has remained the same, the position of the camp has changed within the same region over the years.

S/2019/469

images taken in January 2019, it is likely that this camp was moved after the joint FARDC-MONUSCO operations of November 2018 (see paras. 38–42 below) but remained in the same general area.

20.  Another ADF camp, situated near Mapobu, was attacked and occupied by FARDC in February 2018 (S/2018/531, para. 36). According to an ex-combatant and several former abductees, ADF has since moved the camp between two FARDC positions near Mapobu. The camp was used as a logistical hub for provisions coming from Beni towards Madina and numbered some 30 combatants with dependants.

**Leadership**

21.  While ADF was weakened and dispersed following the FARDC operations against it in 2014, the Group observed that the armed group has since regrouped and reinstated a single command and control structure. Fifteen ex-combatants and former abductees confirmed the continued presence and leadership of long-standing ADF commanders (see S/2015/19, annexes 3 and 4; and see annex 6). The overall and undisputed leader of ADF continued to be Seka Musa Baluku. He resided in the Kajaju quarter of the Madina complex. Sources confirmed that Baluku tightly controlled the movement.

22.  In Madina, "Sheikh" Lumisa was the religious leader and in charge of external communications. Abdulrahman Waswa, also known as "PC Sentongo", was a judge and police commissioner responsible for discipline and punishment. Kasadha took over as camp commander from Kajaju, who left for another unknown position.

23.  In Mwalika, recruits and ex-combatants identified a man called Amigo as being in charge of recruitment and communications with Madina camp. "Sheikh" Koko was the religious leader and Kikote the camp commander.

24.  Ex-combatants, former abductees and recruits cited a number of other military leaders, including Kajaju, Kikote, Werrason, Mugisa, Rafiki, Mulalo, Braida and Akeda, who rotated across different camps.

25.  The majority of ADF combatants were Ugandan nationals, but the movement also included nationals of Burundi, the Democratic Republic of the Congo, Rwanda, the United Republic of Tanzania and other countries. Two sources identified a certain Hussein, or Marabou, as a non-African, Arabic-speaking member of ADF (see annex 7). Combatants included men, women and children (see para. 100 below).

26.  FARDC sources and two ex-combatants told the Group that an important ADF commander, Richard Mugisa, also known as Mzee (son of the founder and long-time ADF leader Jamil Mukulu, who was arrested in the United Republic of Tanzania in 2015 (S/2018/531, para. 31)), had been killed. Three ex-combatants confirmed that Mzee was no longer in the ADF camps, while two of them believed that he had been killed by members of ADF. FARDC sources also told the Group that the deputy of Baluku, Lukwago Hood, had died in 2018. While two ex-combatants confirmed Hood's death, a former abductee told the Group that Hood was still alive. Ugandan officials also informed the Group during an official meeting that Hood was still alive.

**Ugandan recruitment network**

27.  The Group was able to confirm that the international recruitment network identified in its midterm report of December 2018 (S/2018/1133, paras. 8–17) was part of the ADF recruitment network. An FARDC officer informed the Group that recruitment through Bukavu and Goma had diminished following the arrest of key individuals in July 2018. The Group continued its investigation of the Ugandan pillar of the ADF network and found that the recruitment methods were consistent with those previously reported (S/2015/19, paras. 19–21).

S/2019/469

28.   Six people told the Group that they had been recruited in Uganda by ADF using different pretexts. Two had been recruited in mosques in Uganda, two said that they had been promised employment in the Democratic Republic of the Congo, while two had been misled by a family member into visiting the Democratic Republic of the Congo. One person had been recruited to teach Islam to ADF but denied having prior knowledge of their violent tactics. At least three individuals had been involved in recruiting those six people. During a meeting with the Group on 1 March 2019, Ugandan officials confirmed that the three above-mentioned recruitment methods continued to be used by ADF in Uganda.

29.   New recruits entered the Democratic Republic of the Congo near the Kasindi border crossing, staying in Mwalika camp until being transferred in large groups to Madina through Mulalo (see annex 8).

30.   The Group also found that ADF leaders were making a concerted effort to recruit demobilized ADF ex-combatants in Uganda and is concerned about the security of ex-combatants who returned to Uganda and their possible re-recruitment into ADF.

**Ideology and training**

31.   ADF remains a secretive organization that does not share its objectives in the public domain or claim attacks. However, in March 2019, several released abductees delivered a dual message from the armed group: (a) for FARDC to leave ADF in peace and to allow its members access to marketplaces; and (b) for all people to convert to Islam (see paras. 111–115 below).

32.   The Group sought to confirm whether ADF had links with other known Islamist groups and requested additional information on several individuals from the Governments of Kenya, South Africa and the United States of America. At the time of writing, the Group had not received any response. The Group also requested to speak with prisoners alleged to have links with an international finance network of ADF in Uganda. The Government of Uganda informed the Group that prisoners could not be interviewed before the completion of ongoing legal proceedings.

33.   The Group obtained several videos displaying the MTM logo (see annex 10) and portraying the training of men and children, religious instruction, weapons and combatants. The Group was able to authenticate them as ADF videos. Several sources recognized ADF combatants and identified some of the locations where the videos had been recorded as the Madina I camp. One former abductee confirmed being present while two of the videos were recorded. Most of the videos were posted in private groups on social media and are likely to date from mid-2017 onwards. One such video was widely circulated on the Internet and included propaganda messages. Although the videos suggested that ADF may be aligning itself with other Islamist movements and reaching out to attract foreign fighters, they did not in themselves offer proof of direct contact or association with other Islamist groups.

34.   On 18 April 2019, Islamic State in Iraq and the Levant (ISIL) claimed an attack on a small FARDC camp in Bovota, a village on the Mbau-Kamango road in Beni territory, on 16 April 2019, during which two FARDC soldiers and one civilian were killed. This was the first time that ISIL had claimed an attack on Congolese soil (see annex 9).[5] However, the Group was not able to confirm any direct link between ISIL and ADF at the time of writing.

35.   ADF continued to cultivate a culture of internal secrecy and fear among its combatants. New recruits received precise instructions on how to behave in the camps. "Sheikh" Koko, the religious leader of Mwalika camp, instructed recruits not

---

[5] See www.nytimes.com/2019/04/20/world/africa/isis-attack-congo.html.

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

to ask questions on leadership, camps, women or the number of weapons held by ADF. Koko also said that recruits who did not follow orders would be punished and that those who tried to escape would be killed. In addition, recruits and former abductees told the Group that they had been instructed not to light fires during the day, and, in the event that helicopters or drones hovered above their camps, they were drilled to camouflage the huts, weapons and solar panels and hide.

36.   Eight ex-combatants told the Group that a certain Muzaya in Mwalika was responsible for basic training, including weapon manipulation and drills. Advanced training was led by Akeda and Rafika in the Kajaju quarter of Madina. After three weeks of training, most combatants were transferred to a nearby camp called Kabila where only combatants resided.

37.   Consistent with the Group's previous reports (S/2016/1102, para. 43), former abductees and ex-combatants told the Group that practising and teaching Islam played an important role in the ADF camps. Daily prayers were followed by Islamic instruction and the opportunity for ADF leadership to convey messages to the whole camp. Female ADF members were expected to wear outfits similar to niqabs (see para. 97 below). The Group also documented cases of forced conversion to Islam (see para. 98 below).

**Joint operations of the Forces armées de la République démocratique du Congo and the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo and attacks by the Allied Democratic Forces**

38.   During the reporting period, FARDC and MONUSCO launched one joint operation against ADF. From 13 to 15 November 2018, the Usalama Centre operation was executed in the Mayangose forest near Beni in order to recover two ADF targets. During the operation, and in two different clashes with ADF, 7 United Nations peacekeepers were killed and 10 wounded, while 2 were still in action at the time of writing. FARDC reported that 14 had been killed, 29 had been wounded and 12 were still missing in action. An estimated 40 to 50 ADF combatants were killed.

39.   According to eight United Nations peacekeepers and one FARDC officer, the joint FARDC-MONUSCO troops secured the first target, a former FARDC camp known as Kididiwe, in the early morning of 14 November 2018. Just before reaching the second target, they were ambushed by ADF and forced to withdraw to the first target. In the late afternoon, ADF attacked the joint FARDC-MONUSCO troops in that position (see annex 11).

40.   United Nations peacekeepers heard or saw many women and children among the attackers (see para. 100 below). All ADF combatants were armed, and they screamed before the attack. Some attackers shouted "surrender United Nations, surrender Malawi".[6] Some attackers wore uniforms similar to those of FARDC, while others were in civilian clothing. They used several types of weapons, including AK-pattern assault rifles, machine guns and mortars. The attack lasted for at least five hours and continued into the night, when some isolated United Nations peacekeepers were tracked down by remaining ADF combatants. The United Nations peacekeepers estimated that they were attacked by at least 200 ADF combatants.

41.   The pattern of the attack and the fact that ADF did not hesitate to attack significant and well-armed forces demonstrate the resilience and capacity of the group. ADF was organized and sufficiently prepared, causing United Nations peacekeepers and at least one FARDC officer to believe that its members had been aware of the operations beforehand.

---

[6] Malawian soldiers were among the United Nations peacekeepers involved in the joint operations.

S/2019/469

42. During the same period, in addition to attacks against civilians (see paras. 109–115 below), ADF also attacked and clashed with FARDC during the first months of 2019. According to FARDC official figures, 53 FARDC soldiers were killed by ADF in 13 attacks and clashes between January and March 2019. The deadliest attack took place on 21 January, when 25 FARDC soldiers were killed at a military position near Mapobu. The Group collected other evidence that corroborated this information. During the same period, several sources witnessed a high number of injured ADF combatants brought back to ADF camps, indicating their involvement in attacks and clashes.

43. Furthermore, according to FARDC sources, between January 2018 and March 2019, 69 AK-pattern assault rifles, seven PKM machine guns, two RPG-7 rocket-propelled grenade launchers, one 60 mm mortar, six Motorola radios, 183 rounds of ammunition, five magazines, two PKM ammunition chains and six artisanal bombs were recovered from ADF. The high number of weapons seized from ADF, together with the significant number of weapons taken by ADF from FARDC (see para. 202 below), demonstrate the military capacity of ADF. The Group also obtained a propaganda video in which an ADF combatant showed the weapons arsenal of the armed group (see annex 12).

## B. Conseil national pour le renouveau et la démocratie

44. The status of the Conseil national pour le renouveau et la démocratie (CNRD), a foreign armed group active in North and South Kivu, has changed significantly since the Group's previous mandate (S/2017/1091, paras. 23–27). The Group observed the effective loss of territorial control by CNRD in North Kivu following attacks by local armed groups in December 2018. Subsequently, the movement of a large group of CNRD combatants and dependants was observed towards Kalehe territory, South Kivu.

45. According to four civil society members and community leaders, growing tensions over the control of territory between CNRD, the Nduma défense du Congo-Rénové (NDC-R) and Nyatura armed groups resulted in the attack on CNRD headquarters in Faringa, Rutshuru territory, at the end of 2018 (see annex 13). Three CNRD combatants present in Faringa at the time of the attack told the Group that its command had been taken by surprise by a coalition of approximately 300 well-armed NDC-R and Nyatura John Love[7] combatants. On the basis of testimonies of Rwandan refugees, combatants and civil society actors and MONUSCO reports, at least 18 civilians and 15 combatants were killed during the attack.

46. "General" Antoine Jeva, the CNRD operational commander for North Kivu, ordered combatants and their dependants to leave Faringa for Kashuga, Masisi territory. However, NDC-R continued to pursue and attack CNRD. By 18 January 2019, CNRD, joined by a number of Rwandan refugees from the area, had abandoned its last bastion in Kivuye, Masisi territory, and taken flight in the direction of South Kivu. According to three refugees, the leaders did not clearly state where they were going. The refugees were told that they would go to "a big forest" in South Kivu.

47. The Group was not able to establish the larger aim or objective of the movement of CNRD into South Kivu beyond fleeing armed attacks or to confirm whether it intended to join forces with other armed groups. At the time of writing, the situation of CNRD in Kalehe territory, South Kivu, was still evolving.

---

[7] The leader of the armed group, John Love, told the Group in 2017 that his group was part of Nyatura Domi and a larger coalition called the Collectif des mouvements pour le changement (S/2017/1091, para. 32).

S/2019/469

48.   Convergent testimonies of local sources, community leaders, FARDC officers and MONUSCO sources showed that at least two main groups of around 1,000 and 2,000 people were observed, while others followed in smaller groups. According to refugees and combatants, armed individuals went ahead and followed from behind. Three ex-CNRD combatants told the Group that they had taken as many weapons and ammunition with them as possible, including by giving weapons to women and children to carry (see annex 14). During the journey, several clashes with FARDC and other armed groups took place and a significant number of people were reportedly killed, but no exact figures were available.

49.   MONUSCO sources told the Group that, since early February 2019, some 4,000 people had moved from North Kivu to South Kivu and settled across several camps near Rutare and Kitindiro villages in Kalehe territory. On the basis of testimonies of ex-combatants and refugees, the Group assessed the number of combatants among the 4,000 people to be around 400. Ex-combatants indicated that the overall leader of CNRD, Laurent Ndagijimana, also known as Lumbago or Wilson Irategeka, had fled to South Kivu, but the Group could not establish his exact location.

50.   Five ex-combatants informed the Group that most of the Congolese members of CNRD, who comprised an estimated one third of the troop strength of the armed group, had not moved to South Kivu. Several Congolese combatants joined other armed groups such as NDC-R and Nyatura Domi, while others surrendered to FARDC or MONUSCO or remained in their places of residence.

51.   According to four Rwandan refugees who stayed behind in Masisi territory, several hundred Rwandan refugees remained in the region and were scattered across Masisi territory. They kept a low profile to avoid harassment from local armed groups and were reluctant to return to Rwanda.

52.   Some incidents between CNRD and FARDC and the local population, including CNRD-imposed taxation, have occurred in Kalehe territory since the end of March 2019. At the time of writing, MONUSCO-led negotiations with CNRD were ongoing. The Group is concerned about the presence of a large number of civilian dependants and refugees among CNRD combatants and in particular the protection of such civilians during any possible future armed clashes.

## C.   Nduma défense du Congo-Rénové

53.   During its mandate, the Group observed an increase in incidents of violence and a territorial shift of control in northern Masisi and parts of Rutshuru territories in North Kivu. NDC-R, led by sanctioned individual "General" Shimiray Mwissa Guidon (CDi.033), gained pre-eminence by increasing the territory under its control and its troop strength by absorbing combatants from other armed groups. An NDC-R-run administrative system based on taxation and forced labour, analogous to the system in Lubero and Walikale territories previously reported by the Group (see paras. 187–191 below), was established in recently occupied locations in Masisi territory. The Group also identified collaboration between FARDC and NDC-R in those areas that was also consistent with previous findings (S/2018/531, paras. 84–85).

**Armed clashes with and absorption of combatants from other armed groups**

54.   The departure of CNRD (see paras. 44–52 above) triggered a power struggle among local armed groups active in northern Masisi and western Rutshuru territories in mid-January 2019. NDC-R fought against the Alliance des patriotes pour un Congo libre et souverain (APCLS) of "General" Janvier Karairi and the Nyatura groups of Nzai, Jean-Marie and Kavumbi for control over the Mpati-Kivue area of Masisi

S/2019/469

territory. In Rutshuru territory, NDC-R clashed with the Nyatura group of Domi[8] for control of higher ground north of Kashuga and Mweso.

55.   Armed clashes resulted in the killing of at least 46 civilians and 101 combatants and the displacement of thousands of civilians between January and March 2019. The Group recorded at least 30 incidents between armed groups in dozens of small and remote villages in the area. Civil society and MONUSCO sources also informed the Group of various cases of sexual violence committed by armed groups in the region. By the end of March 2019, NDC-R controlled large parts of northern Masisi (see annex 15). FARDC officers and local sources informed the Group that one of the main opponents of NDC-R, "General" Kavumbi, had surrendered to FARDC with a high number of combatants on 29 March 2019 following attacks by NDC-R on his main positions.

56.   In late 2018, the Alliance des patriotes pour un Congo libre et souverain-Rénové (APCLS-R) and NDC-R were close allies (S/2018/1133, para. 61). This alliance evolved into the full integration of APCLS-R into NDC-R in January 2019. According to local and MONUSCO sources, "General" Poyo of APCLS-R had become one of the NDC-R commanders in the Nyabiondo-Kalungu area of Masisi territory. The former leader of APCLS-R, "General" Mapenzi Bulere Likuwe, was said to have "disappeared" from the area after clashes in February 2019. However, civil society representatives and a source close to NDC-R told the Group that Mapenzi had received a new position in NDC-R headquarters near Pinga, Walikale territory.

57.   On 4 February 2019, an official ceremony was held in Kalembe to integrate at least 75 combatants of other armed groups into NDC-R. An eyewitness told the Group that Guidon had led the ceremony and identified the origin of the new recruits, who included former Nyatura, CNRD and APCLS-R combatants. The Group obtained several pictures of the ceremony (see annex 16). According to local and MONUSCO sources, the integration of combatants from other armed groups has since continued. On 30 March 2019, some 80 Nyatura elements of various factions were integrated into NDC-R. The Group also received information from local sources regarding the forced recruitment of demobilized combatants in Kalungu by NDC-R.

**Continued collaboration between the Nduma défense du Congo-Rénové and the Forces armées de la République démocratique du Congo**

58.   Consistent with previously reported practices (S/2018/1133, paras. 63–68), the Group observed FARDC collaborating with NDC-R in new areas under the latter's control in Masisi territory. The Group also witnessed FARDC tolerating the free movement of NDC-R elements and the use of FARDC uniforms by NDC-R cadres in parades in areas under FARDC control (see annex 17). The Group was not aware of any FARDC operations against NDC-R during the period under review.

59.   Civil society and local sources told the Group that NDC-R leadership and a local FARDC commander had held a joint meeting in mid-2018 in Kalungu[9] to reassure the population that there was nothing to fear from the presence of NDC-R.

60.   The Group received several testimonies of collaboration with NDC-R involving Colonel Yves Kijenge, an FARDC commander of the 3411th Regiment, based in the Kitchanga area. According to local sources and civil society, Kijenge delivered weapons and ammunition to NDC-R combatants. An eyewitness saw Kijenge handing over at least 10 boxes of ammunition to NDC-R combatants in January 2019 in Kalembe. Furthermore, an FARDC soldier under Kijenge's command told the Group

---

[8] NDC-R, the Nyatura Domi and John Love were, however, still allies in the attack against CNRD two weeks before, in early January 2019.

[9] NDC-R had a position in Kalungu with around 200 combatants.

UNCLASSIFIED    EXHIBIT 28

S/2019/469

that, in March 2019, he had received orders from his hierarchy not to interfere with the movement of NDC-R combatants and that he had recently given free passage to the NDC-R leader, Guidon. The Group tried to speak with Kijenge but was unable to reach him.

61.   In March 2019, the Group witnessed the unhindered movement of NDC-R combatants through Kalembe and Kashuga villages, both in the presence of FARDC and the Congolese National Police (see annex 18). In the same period, the Group saw an NDC-R combatant armed and in uniform walking the streets of Kashuga without any action taken by the Police. The Group also observed several NDC-R positions in the vicinity of FARDC positions (see annex 19).

62.   Several inhabitants of Kalembe told the Group that six local FARDC elements of unknown ranks had been present during the ceremony for the integration of new NDC-R recruits on 4 February 2019 (see para. 57 above). FARDC wore civilian clothing. The witnesses did not see any high-ranking FARDC officers during the ceremony.

## D.   Forces démocratiques de libération du Rwanda

63.   Two important members of FDLR were arrested by Congolese authorities at the border post of Bunangana, Rutshuru territory, North Kivu, on 16 December 2018. The FDLR spokesperson, Ignace Nkaka, also known as "La Forge Fils Bazeye" (S/2016/466, para. 16), and the deputy intelligence officer of the military branch of FDLR, Jean-Pierre Nsekanabo, also known as "Abega", were arrested upon their return from Kampala, where they had met with a delegation of the Rwanda National Congress (RNC).

64.   The Group spoke with La Forge and Abega in Kigali in February 2019. According to La Forge, the first Vice-President and interim President of FDLR, Victor Byiringiro, appointed La Forge and Abega to meet with RNC in Kampala. This was an initial meeting between FDLR and RNC to explore possibilities of future collaboration, but the Group could not establish whether FDLR intended to collaborate with RNC beyond this meeting. La Forge and Abega told the Group that the meeting had been organized by a certain Tito and that Frank Ntwali and a certain Rashid of RNC had been present. According to La Forge and Abega, while in Kampala, they also met with the Minister of State for Foreign Affairs/Regional Cooperation of Uganda, Philémon Mateke. During an official meeting with the Group on 1 March 2019, the Ugandan authorities said that they were not aware of the meeting between FDLR and RNC in Kampala. The Group submitted an official request to meet with Mr. Mateke to obtain further details regarding the visit of La Forge and Abega. On 23 April 2019, the Ugandan authorities replied that the Group's request and motivation were based solely on allegations made in the press.

65.   The status of FDLR, a sanctioned entity (CDe.005), did not change significantly during the mandate of the Group (S/2018/531, paras. 15–21). FDLR elements continued to be active in parts of North Kivu, and the main structure of the movement remained intact, with the exception of the arrests described above. On 16 April 2019, the FDLR President, Ignace Murwanashyaka (CDi.016), died in Germany. According to La Forge, Murwanashyaka was still considered the President of FDLR despite having been imprisoned for a long time (see S/2016/466, annex 6). The Group assessed that neither the arrests nor the death of Murwanashyaka had had a major impact on the structure of the movement.

UNCLASSIFIED

## III.  Armed groups in South Kivu

66.    During the period under review, the Group investigated a series of incursions by the national armed forces of Burundi, the Forces de défense nationale du Burundi (FDN), on the territory of the Democratic Republic of the Congo. The Group observed that many of the attacks led by FDN had taken place alongside members of a Burundian youth group known as Imbonerakure, affiliated with the Burundian ruling party, the Conseil national pour la défense de la démocratie-Forces pour la défense de la démocratie. Attacks by FDN and Imbonerakure were focused on a Burundian armed group, the Résistance pour un état de droit au Burundi (RED Tabara),[10] and conducted against locations inside the Democratic Republic of the Congo and accessible from Burundi across the Ruzizi Plain in South Kivu. The Group previously reported on the deployment of FDN in South Kivu (S/2015/19, paras. 83–87, and S/2017/672/Rev.1, paras. 148–150) and on the presence of Imbonerakure on Congolese territory (S/2015/19, paras. 88–89). It is the Group's view that the Government of Burundi committed violations of the sanctions regime during the Group's mandate. These violations included the provision of material support to Mai-Mai Kijangala and Mai-Mai Mbulu, two of the local armed groups operating in the Democratic Republic of the Congo (see paras. 71–74 and 193–196 below), and direct FDN and Imbonerakure military interventions on Congolese territory, in contravention of paragraph 1 of Security Council resolution 2293 (2016), as renewed by paragraph 1 of its resolution 2424 (2018).

## A.  Incursions by the Forces de défense nationale du Burundi and Imbonerakure

67.    In February and March 2019, the Group collected convergent testimonies of eyewitnesses, civil society actors, Congolese and Burundian combatants who were active, who had been captured or who had surrendered, security officials and high-level Congolese government authorities and gathered evidence of the presence of FDN and Imbonerakure elements on Congolese territory in the Middle Plains of Uvira, South Kivu. On this basis, the Group established that, between October 2018 and February 2019, elements of FDN and Imbonerakure were in the Democratic Republic of the Congo. The Group previously documented a similar occurrence of the presence of FDN and Imbonerakure in Kiliba Ondes, a village north of the Uvira-Bujumbura road in South Kivu, in 2014 and late 2016 (S/2015/19, paras. 82–90, and S/2017/672/Rev.1, paras. 148–150).

68.    Local sources, FARDC officers, active and ex-combatants and civil society sources informed the Group of at least two waves of infiltrations by FDN and Imbonerakure, coupled with a series of armed clashes directed against RED Tabara in South Kivu (see annex 20). The first attacks took place in late October and November 2018 in and around Kabere, Uvira territory. The second wave of attacks occurred in January and February 2019 in and around Mulenge, Uvira territory. Witnesses of the incursions and subsequent clashes, including combatants, reported dozens of combatant casualties. According to the Office for the Coordination of Humanitarian Affairs, in November 2018 and January 2019, as many as 12,000 and 25,000 civilians, respectively, were displaced in the Middle Plains of Uvira.

---

[10] On the basis of discussions with various sources, including active and ex-combatants, the Group confirmed the continued and active presence of two other Burundian armed groups in South Kivu (see paras. 80–88). Neither group was the focus of the incursions or attacks by FDN and Imbonerakure described in the present report.

UNCLASSIFIED                                    EXHIBIT 28

69.    Three independent sources with direct knowledge of the incursions informed the Group that Major Aron Ndayishimiye of the 212th FDN commando battalion had led elements of FDN on both occasions. Eyewitnesses attested to the presence of up to 500 members of FDN and Imbonerakure wearing Burundian military fatigues and civilian clothing and carrying light and heavy weaponry. FARDC officers, local sources and civil society confirmed the capture, arrest and detention by FARDC in November 2018 of an FDN corporal, Mustapha Birori, who was found separated from his squad and who recounted the incursions and attacks to the FARDC officers interviewed by the Group (see annex 21). The Group sent a request to the Government of Burundi to confirm whether Major Aron Ndayishimiye and Mustapha Birori were members of FDN and was awaiting a response at the time of writing. The Group also recovered military rations in Nyamoma in the Middle Plains of Uvira produced exclusively for the Ministry of National Defence and Former Combatants of Burundi (see annex 22). Following a request, the Government of Burundi informed the Group that those military rations were likely in the hands of elements of the military involved in the coup d'état of 13 May 2015.

70.    The launch of the Sukola II operations led by FARDC against local and foreign-armed groups in the High Plains of Uvira territory on 6 February 2019 coincided closely with the retreat of FDN forces to Burundi. FARDC reported to the Group that operations between 6 February and 11 March resulted in 37 enemy combatant casualties and the capture or surrender of 52 combatants and the recovery of their weapons and ammunition. As at mid-April 2019, operations against Burundian armed groups by FARDC were ongoing.

**Collaboration with local armed groups**

71.    Several military sources, active and ex-combatants and civil society representatives informed the Group that FDN and Imbonerakure were aided by at least two local armed groups:[11] Mai-Mai Mbulu and Mai-Mai Kijangala (see annex 23). Mai-Mai Kijangala was the primary operational partner of FDN and Imbonerakure in the Middle Plains of Uvira and has emerged as one of the most influential groups in the area, having also secured functional alliances with Mai-Mai Buhirwe and Mai-Mai Munyamali. Similar alliances between FDN and local armed groups were previously documented by the Group (S/2017/672/Rev.1, paras. 151–154).

72.    According to active combatants, local sources and security officials, Mai-Mai Mbulu was led by Kamale Mbulu, a Bafuliro native of Sange, and comprised some 25 combatants. The group's headquarters were in Lukobero, Uvira territory. The Group determined that, during the period under review, Mai-Mai Mbulu aided the crossing of the Ruzizi Plain by FDN and Imbonerakure and their entry into the Democratic Republic of the Congo in Uvira territory. The scope of the alliance of Mai-Mai Mbulu with FDN and Imbonerakure was limited to guiding and facilitating their safe passage to Mai-Mai Kijangala positions.

73.    According to active and ex-combatants, FARDC officers, civil society and local sources, "Colonel" Kijangala,[12] a Bafuliro native of Kanga, Uvira territory, was the military commander of a Mai-Mai group of the same name under the overall leadership of a certain Kapapa. The group's headquarters were located in Buleza, near Mubere and Kabere in Uvira territory, although combatants were dispersed by the Sukola II operations led by FARDC. At the time of writing, the Group determined

---

[11] The Group is aware of the presence of other local armed groups embedded in local communities in the Middle Plains of Uvira.

[12] Kijangala was previously associated with the Rassemblement congolais pour la démocratie and with Mai-Mai Bede, led by Bede Rusagara (deceased).

that Kijangala was located in Kahanda, Uvira territory. The Group estimated the group's troop strength at between 40 and 50 armed elements.

74.    The stated objective of Mai-Mai Kijangala was to restore peace and protect the Bafuliro against foreign armed groups. An alliance with FDN and Imbonerakure took shape in 2018, with the joint aim of pursuing Burundian armed groups on Congolese territory. According to active and ex-combatants, Mai-Mai Kijangala provided intelligence and led FDN and Imbonerakure to RED Tabara locations and fought alongside them in return for food, cash, ammunition and, later, weapons (see paras. 193–196 below). Congolese officials and combatants told the Group that a limited number of FDN officers were embedded with Mai-Mai Kijangala after the Sukola II operations led by FARDC, although the Group was not able to independently establish their presence.

**Official positions of the Governments of Burundi and the Democratic Republic of the Congo**

75.    Following several requests, the Group met with officials of the Government of Burundi on 19 March 2019 (see para. 5 above). During the meeting in Bujumbura, the Group sought to clarify whether military incursions by FDN into the Democratic Republic of the Congo had taken place and whether there was an agreement with the Government of the Democratic Republic of the Congo to that end. Officials of the Government of Burundi told the group that FDN had not been involved in any incursions and confirmed that an agreement did not exist.

76.    The Government of Burundi further informed the Group that Burundian armed groups active in the Democratic Republic of the Congo included the Forces nationales de libération-Nzabampema (FNL-Nzabampema), RED Tabara and renegade soldiers of the failed coup d'état of 2015 in Burundi who had deserted with weaponry and continued to wear Burundian military uniforms to create confusion. During the meeting, officials of the Government of Burundi also informed the Group that they could not grant access to captured or surrendered Burundian combatants who had been transferred to Burundi from the Democratic Republic of the Congo before the completion of ongoing legal proceedings.

77.    The Group received a written reply on 25 March 2019, in which the Government of Burundi reiterated that reports of FDN incursions in November 2018 and January 2019 into the Democratic Republic of the Congo were unfounded, adding that FDN had never crossed the common border with the Democratic Republic of the Congo.

78.    The Group requested information from the Government of the Democratic Republic of the Congo regarding operations by FDN against Burundian armed groups in a letter dated 4 January 2019 but has not yet received a response. In March 2019, however, a senior Congolese army official confirmed that FDN had launched at least two incursions into Congolese territory during the period under review without consulting the Congolese authorities beforehand. The same official told the Group that there was no bilateral agreement between the Governments of the Democratic Republic of the Congo and Burundi to launch military operations on Congolese territory. Furthermore, commanding officers of FARDC in South Kivu told the Group that they had not received any orders or instructions from their hierarchy related to the entry of FDN and Imbonerakure into Congolese territory. FARDC officers in South Kivu told the Group that, once they had been processed, Burundian combatants who had been arrested or who had surrendered were transferred directly to Burundi.

79.    The Group is not aware of any notification from the Government of Burundi to the Security Council Committee established pursuant to Security Council resolution 1533 (2004) concerning the Democratic Republic of the Congo regarding incursions by FDN into the Middle Plains of Uvira, as required by paragraph 5 of Security

S/2019/469

Council resolution 1807 (2008) and as renewed by paragraph 1 of resolution 2293 (2016) and paragraph 1 of resolution 2424 (2018). In the Group's view, such incursions by FDN and Imbonerakure and their association with Mai-Mai groups in the Middle Plains of Uvira have exacerbated the already tense and violent relationships between and among local armed groups. Conflict dynamics as documented by the Group, whereby local armed groups from the same community were involved in violent clashes at the behest of foreign allies, have had a secondary effect of pitting local armed groups against each other, running the risk of reprisal and with negative consequences for civilians. The Group is concerned that such collaboration represents a threat to peace and security in the Democratic Republic of the Congo.

## B.   Résistance pour un état de droit au Burundi

80.   As previously reported, RED Tabara, a Burundian armed group, was created in April 2011 and operated in South Kivu (S/2016/466, paras. 33–41). RED Tabara was believed to be connected with the founder and leader of the Burundian political party Mouvement pour la solidarité et la démocratie, Alexis Sinduhije. According to a high-level officer of RED Tabara, since May 2018, the group has been represented by the Burundian opposition platform in exile Conseil national pour le respect de l'Accord d'Arusha pour la paix et la réconciliation au Burundi et la restauration de l'état de droit (CNARED). The Group further notes, however, that, on 18 January 2019, the Mouvement pour la solidarité et la démocratie issued a communiqué in which it declared its withdrawal from CNARED (see annex 24).

81.   As indicated by active and ex-combatants and FARDC officers, despite his arrest in 2017, "General" Birembu Melkiade, also known as "General" David, was recognized as the leader of RED Tabara (S/2018/531, para. 200). In April 2019, Congolese authorities informed the Group that Melkiade was still in detention. FARDC officers and active and ex-combatants told the Group that "Colonel" Raymond Lukondo, also known as "Bowaze", was the interim leader and second-in-command, "Colonel" Bahati was in charge of intelligence and "Colonel" Kisiga was in charge of logistics and operations. Other commanders included "Colonel" Obedi and "General" Aimé.

82.   On the basis of the Group's interviews with FARDC officers and active and ex-combatants, RED Tabara consisted entirely of Burundian citizens, including former FDN defectors who joined the group after the failed coup d'état in Burundi in mid-May 2015 (S/2016/466, paras. 33–34). Most new recruits had no previous military training and came from Burundi and Burundian refugee camps. New recruits completed military training, including weapons handling and tactical instruction, in the Democratic Republic of the Congo. According to a high-level officer of RED Tabara and ex-combatants, support and financing originated from contacts in Burundi and undisclosed countries in Europe.

83.   The Group noted that RED Tabara did not share the same goals with other Burundian armed groups active in South Kivu, namely FNL-Nzabampema and the Forces populaires du Burundi, previously known as the Forces républicaines du Burundi or FOREBU. However, on the basis of interviews with active and ex-combatants, the Group determined that these groups did cooperate inasmuch as they periodically exchanged information and intelligence. The Group also noted during its investigations that observers struggled to differentiate between Burundian armed groups, often attributing incidents under the generic label "FNL", despite differences in their modus operandi.

S/2019/469

84.    Active and ex-combatants, FARDC officers and civil society sources told the Group that RED Tabara was active in the Middle Plains of Uvira, with its headquarters in the forest of Kitavuga Mbegere and bases near the villages of Kiriama and Kifuni (see annex 25). In March 2019, FARDC officials and a high-level officer of RED Tabara informed the Group that, through the Sukola II operations, these and other locations had been successfully recovered from local and foreign armed groups. They also informed the Group that RED Tabara had not engaged with FARDC troops but had instead retreated. The Group believes that, at the time of writing, RED Tabara elements were located in the High Plains of Uvira, near Kitoga. The Group estimated the troop strength of RED Tabara at between 500 and 750 combatants, organized across three brigades.

85.    The Group collected testimonies and evidence confirming collaboration between RED Tabara and local armed groups, including Mai-Mai Kihebe, commanded by Kihebe Ngabunga, as early as 2017 and Mai-Mai Mushombe since at least 2018.

86.    Kihebe Ngabunga (see annex 26), a Bafuliro native of Mulenge, was previously associated with Molière Mutulani's demobilized local defence forces (S/2011/738, paras. 252–254), the late "Colonel" Kayamba of Mai-Mai Kayamba and Mai-Mai Kijangala. Following a dispute with Kijangala in 2017, Kihebe created an armed group headquartered in the village of Mulenge, in the Middle Plains of Uvira. According to the testimony of local sources, civil society, FARDC officers and active and ex-combatants, Mai-Mai Kihebe provided local intelligence and facilitated the safe passage of food and supplies for RED Tabara.[13] In an interview with the Group, Kihebe denied any collaboration with Burundian armed groups, stating that he had never heard of RED Tabara but had negotiated with "FNL" for its members not to carry weapons to the marketplace in Mulenge. The Group was informed by multiple sources of Kihebe's often non-aligned and opportunistic collaboration with local and foreign armed groups.

87.    Kihebe surrendered to FARDC in February 2019 with seven other combatants,[14] including a battalion commander, Zabene Basabini, a native of Lemera, and two AK-pattern rifles. There were 34 combatants in his group, from which 10 children were released to MONUSCO in early February 2019. The remaining combatants, including Kihebe's deputy, Mubiri, were still at large.

88.    According to local sources and active combatants, Mai-Mai Mushombe was based in Marungu, in the High Plains of Uvira, and led by "Major-General" Mushombe, with "General" Llunga in charge of operations. The group had been established as a local defence force in the face of rising tensions with the Baynamulenge community in the late 1990s and was active in the territories of Uvira, Itombwe and Mwenga. On the basis of interviews with active combatants, the Group confirmed that Mai-Mai Mushombe had provided protection and fought alongside RED Tabara to repel FDN and Imbonerakure attacks. According to a senior member of Mai-Mai Mushombe, the group included as many as 120 combatants and had the capacity to mobilize others as needed.

---

[13] According to active and ex-combatants, while not the sole motivation, Kihebe's association with RED Tabara was an additional source of dispute with Kijangala, which further encouraged him to cooperate with FDN and Imbonerakure.

[14] A senior FARDC officer informed the Group that two combatants have since absconded from FARDC custody.

DRC-30316 0621

S/2019/469

## C.    Disarmament, demobilization, integration and reintegration

89.    While the Group did not undertake a full countrywide investigation, during interviews with dozens of combatants who were active or had recently surrendered in North and South Kivu between January and March 2019, it documented an apparent willingness to demobilize. The interest of armed groups in surrendering and the conditions under which they would do so varied over time according to local contexts and conditions. While not exhaustive, the main drivers cited by combatants were exhaustion, disillusionment, FARDC operations against them and the new change of Government.

90.    The Group noted high expectations with regard to livelihood support and employment and to integration into FARDC, including the assignment of ranks and positions. Some combatants highlighted the importance of demobilization cards in enabling them to safely rejoin their communities.

91.    The effective monopoly of force by the Government of the Democratic Republic of the Congo and its armed forces was often mentioned as a precondition for armed groups to surrender, especially in places where foreign armed groups remained active. Other combatants pointed to the persistence of local and community-based violence and conflict and called for investment in dialogue and mediation to accompany the process of surrender.

92.    The Group concluded that the apparent willingness of armed groups to demobilize should be seen as an opportunity to reduce violence and restore peace and security in the Democratic Republic of the Congo. Careful analysis and a needs-based approach would be necessary to define an adequate response to the demand for demobilization, integration and reintegration. Significant resources would also be required to accompany the process. The Group further noted the importance of a transparent vetting process to ensure that ex-combatants who are responsible for serious human rights violations and serious crimes under international humanitarian law are not reintegrated into public institutions. In addition, timely criminal prosecutions to address impunity would be required as appropriate.

## IV.    Serious violations of international humanitarian law and human rights

## A.    Recruitment and use of children

93.    During its investigations, the Group found that ADF and the Union des patriotes pour la libération du Congo (UPLC) continued to recruit and use children. These acts constitute serious violations of human rights and international humanitarian law and sanctionable acts under paragraph 7 (d) of Security Council resolution 2293 (2016), as renewed by paragraph 2 of resolution 2424 (2018).

### Recruitment and use of children by the Allied Democratic Forces

94.    The Group found that ADF, under the overall command of Seka Musa Baluku (see para. 21 above), continued to recruit and use children, including during attacks and combat operations, consistent with previously documented practice (S/2015/19, para. 131). The Group established that many children had been arriving and continued to arrive in ADF camps, although it could not determine their number. Abductions remained one of the main means of recruitment. Children continued to be forced to convert to Islam, to receive military training, to participate in attacks and to be subjected to forced labour. The Group's findings are based on interviews with 13

EXHIBIT 28

S/2019/469

former abductees (4 children and 9 adults), three ADF recruits, two ex-combatants, six United Nations peacekeepers, civil society, witnesses of attacks, information from MONUSCO and FARDC and video and audio recordings.

95.    The evidence shows a significant presence of children and the continuous arrival of new children at ADF camps, including Madina, Malolu, Mapobu and Mwalika. Madina hosted most of the children. One recently abducted child explained to the Group that there were many Congolese children in Madina, "as if an entire village had moved there". Two of the above-mentioned propaganda videos, recorded in the presence of one former captive interviewed by the Group, confirm the presence of many children in Madina (see para. 33 above and annex 27). Furthermore, one ex-combatant explained that children were transferred from Mwalika to Madina without their families and that ADF did so to deter parents from leaving the armed group.

96.    Children were abducted generally during attacks and when undertaking daily activities. For example, according to one witness, civil society and MONUSCO sources, 16 children were abducted on 24 September 2018 during an attack on Oicha.[15] The abductors told two sources that they needed the children, that they would not release them and that they would abduct more. While ADF has been abducting children of all ages, the evidence suggests that ADF has not recently targeted younger children and pregnant women. The Group documented four incidents in which ADF abducted young women and their older children but left their babies behind. ADF released pregnant women or women pretending to be pregnant. In one case, ADF elements told a young mother that they needed her but not her two-month-old baby.

97.    Five former captives of Madina camp reported that girls over the age of 9 years had been separated from boys and men to integrate groups of women and that they had been treated in the same way as the adult women captives in the camp. They were detained in pits in the ground, forced to wear outfits similar to niqabs (see annex 28), prohibited from talking to men (see S/2015/19, annex 7) and, in several cases, subjected to sexual violence (see paras. 105–108 below).

98.    According to three former abducted children, ADF has continued its practice of forcing children to convert to Islam (S/2015/19, para. 137). One child explained to the Group that ADF elements had threatened to kill her and her 12-year-old sister if they refused to become Muslims. They were taught the Arabic alphabet and the Qur'an in Malolu and Madina camps. Mariam Lumisa, the daughter of "Sheikh" Lumisa (see para. 22 above), was their teacher. They were prohibited from praying to another God, pronouncing Jesus's name and eating pork. They were also given Muslim names. A 16-year-old Catholic girl held in Madina reported that she had been forced to become Muslim under the threat of being killed. One recently released 9-year-old child showed the Group the Muslim prayer that he had been taught immediately after his arrival in Madina. Several former abducted adults confirmed the ADF practice of forced conversion to Islam.

99.    ADF also continued to give military training to children (S/2015/19, para. 131, and S/2013/433, para. 94). According to one former captive in Madina, children over the age of 9 years received weapons and training on how to use them and undertook makeshift military drills. Their instructor was Muse Mea, a Ugandan national. Two children formerly held in Madina were told by their captors that they would begin military training. One of the above-mentioned videos displays young children performing martial arts in Madina (see paras. 33 and 95 above and annex 29). Two former captives recognized and identified on another video a child performing martial

---

[15] Three of these children were reunited with their families in October 2018.

S/2019/469

arts (see annex 30). One recruit reported that, in Mwalika, all those above the age of 12 years carried weapons and were trained by a certain Muzaya.

100. Witnesses and victims of attacks consistently reported the presence of children in ADF attacks, often describing them as carrying ammunition, weapons and machetes, as they did during the attacks on Mamove of 12 and 24 February 2019 (see paras. 110–115 below). One eyewitness of the attack in Oicha on 24 September 2018 (see para. 96 above) told the Group that children aged 9 or 10 years had been ordered to capture a civilian. Six United Nations peacekeepers who participated in the joint FARDC-MONUSCO operations (see paras. 38–41 above) confirmed having heard and seen children among the ADF combatants. A 9-year-old child explained to the Group that, immediately after his capture by ADF during a recent attack, he had been tasked with carrying ammunition. Children were also used to carry loot. According to one abducted child, 9-year-old children carrying weapons were used to guard abducted children in Madina.

101. The interviewed children confirmed the persistent practice of forced labour (S/2015/19, para. 133; see annex 7). The children had to collect wood and food, including from other ADF camps, and cultivate ADF-controlled fields, such as in Dayusi and Data. One formerly abducted girl described having been treated as a "slave", while another former abductee identified a child on one of the above-mentioned videos as being Lumisa's "slave" (see para. 33 above).

**Recruitment and use of children by the Union des patriotes pour la libération du Congo**

102. UPLC, also known as Mai-Mai Kilalo, is a local armed group active between Beni and Butembo. Its headquarters were situated near Kalunguta on the Ndengere hill in Beni territory. On the basis of interviews with ex-combatants, MONUSCO officials and local researchers, the Group estimated the number of combatants at around 400. The military leader of UPLC was Kambale Mayani, also known as Kapitula. UPLC was previously active in the surroundings of Kipese, near Lubero town (S/2018/531, paras. 95–108), but it moved its area of operations northwards in mid-2018. UPLC continued to recruit and use children.

103. The Group interviewed 15 ex-UPLC combatants who all confirmed the presence of 15 to 20 children, aged between 10 and 14 years, in the movement. MONUSCO officials, FARDC officers and ex-combatants confirmed the forced recruitment of children, mostly boys, from neighbouring villages.

104. Six ex-combatants told the Group that children were involved in the rituals for the initiation of new combatants and in the administration of a potion, known as *dawa*, before operations (see S/2017/672/Rev.1, annex 24). The spiritual leader of the movement, François Kambale Twabhiramundu,[16] also known as Kilalo, led these ceremonies and prepared the potions, but boys administered the potions to combatants. Children also performed scarification during the initiation rituals and administered the potion believed to render combatants invincible before combat. During UPLC operations, children carried buckets of the potion. According to one combatant, they used children to administer the *dawa* because they were undefiled.

## B.    Conflict-related sexual violence

105. The Group found that ADF continued to engage in forced marriage (S/2015/19, para. 139). Although rape (outside forced marriage) was still punishable by ADF (see

---

[16] There is some confusion regarding the real name of Kilalo. Some sources said that he is also called François Kisokero or François Munduabyira.

S/2015/19, annex 9), the Group documented a practice not previously documented, whereby ADF elements raped girls and women once following their arrival in Madina in order to use the stigma attached to rape to deter them from escaping the camp. The Group also documented two instances of rape by ADF elements outside Madina, which suggests disciplinary problems outside the main camp. These acts constitute serious violations of human rights and international humanitarian law and sanctionable acts under paragraph 7 (e) of Security Council resolution 2293 (2016), as renewed by paragraph 2 of resolution 2424 (2018).

106. Two abducted girls and one ex-ADF member, whose testimonies were corroborated by two videos recorded in October 2018 and obtained by the Group from civil society sources, confirmed that the practice of forced marriage prevailed within ADF. A 16-year-old girl held captive in Madina in the second part of 2018 told the Group that she had been forcibly married to an old man and raped by him. A girl who had been abducted at 14 years of age and who had escaped in mid-2018 reported that girls aged from 9 to 16 years were given "fiancés" in Madina and that she herself had been given a "fiancé" among the ADF combatants. In the two above-mentioned videos, a young woman and a young girl, both former ADF abductees, state that they had each been forcibly given a husband and raped by him and that ADF assigned husbands to girls above 9 years of age to avoid prostitution within ADF.

107. One formerly abducted girl explained to the Group that, sometime in 2017, together with other girls and women, she had been brought before Baluku in Madina camp. Baluku said that he was the leader of the camp and ordered that the girls and women be raped so that they would not return to Beni. They were then raped once outside, in front of other people in the camp who laughed at them. Afterwards, the women and girls were freed from the pit where they had been detained and integrated into women's groups in the camp. The source identified Baluku on photographs shown to her by the Group.

108. One abducted woman and one abducted girl reported two separate instances of rape outside Madina, possibly pointing to issues of discipline outside the proximity of the main camp. The abducted woman, who was first held in Mapobu and then in a temporary camp in the "Death Triangle" from mid-November 2018 to February 2019, told the Group that, in both camps, she had been raped several times per week, usually at night. She did not know whether the same man had raped her each time. The abducted girl told the Group that she had been gang-raped by an unknown number of ADF abductors on the way to Madina during the second part of 2018. Her rapists had tied her hands behind her back and covered her eyes and mouth.

## C.  Attacks against civilians in Beni territory

109. While attacks against civilians continued in various parts of Beni territory during the period under review, most attacks took place further north of Beni city (see annex 31). In particular, the following areas were targeted in a series of attacks: (a) Mavivi and its surroundings, in January and February 2019; (b) the area of Mamove in the north-western part of Oicha, from mid-February 2019; and (c) the area of Kamango, close to the Ugandan border, since late March 2019 (see annex 32). The Group recalls that attacks on civilians and medical facilities constitute serious violations of human rights and international humanitarian law and sanctionable acts under paragraph 7 (e) of Security Council resolution 2293 (2016), as renewed by paragraph 2 of resolution 2424 (2018).

110. The Group focused its investigations on the attacks on Mamove and its surroundings on 12 and 24 February 2019 and immediately afterwards and on Mavivi on 7 January 2019. The Group found that ADF had conducted the attacks on and

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

around Mamove, while the attack on Mavivi on 7 January 2019 may not have been conducted by ADF, or at least not by ADF alone.

**Attacks in Mamove area**

111. On 12 February 2019, the first of a series of attacks in the area of Mamove, the breadbasket of Oicha, was launched. The attack targeted the health centre of Mamove, which was looted together with houses and shops. A clash with FARDC followed the attack (see annex 33). As the assailants retreated, they abducted at least 17 civilians between Mamove and Oicha. Mamove was attacked a second time on 24 February 2019. During the second attack, three civilians were killed and the health centre, houses and shops were looted and set aflame (see annex 34). At least 24 civilians were abducted during the attack and its aftermath. Most of those abducted during and after the attacks on 12 and 24 February 2019 were released on 2 and 5 March 2019, respectively.

112. The Group found that ADF had carried out the attacks on Mamove and its surroundings on 12 and 24 February 2019. The Group's conclusion is based on interviews with seven formerly abducted civilians, two witnesses, four civil society actors and two FARDC officers and on information from MONUSCO.

113. The Group spoke to one person who had been forced to participate in the ADF attack on Mamove on 12 February 2019. The source had been abducted by ADF during an attack at the end of 2018. The source recounted that ADF had decided to attack Mamove owing to a lack of medical supplies after an operation conducted before Christmas 2018, after which many ADF elements had returned wounded. The source had been forced to loot medicines in the health centre of Mamove. The source's account of the attack was consistent with other evidence collected.

114. In addition, four persons abducted during the attacks on 12 and 24 February 2019 told the Group that their abductors had introduced themselves as "NALU" and "ADF", included men, women and children, wore military fatigues and outfits similar to niqabs and practised Islam. Three abductees of the attack of 12 February 2019 reported having been held captive in pits in a camp, which, according to one of them, was called Bango. Just before their release, they saw a group of about 20 people abducted during the attack on Mamove and its surroundings on 24 February 2019 arriving at the camp. According to an FARDC officer who had interviewed abductees of the attack of 24 February 2019, abductees confirmed that they had been brought to a camp named Bango.

115. The Group noted that the attacks on Mamove followed the same patterns, which until recently were unusual.[17] The area had to a certain degree been spared from attacks since the beginning of 2015 (see S/2016/466, annex 55). The attacks on 12 and 24 February 2019 were relatively less lethal. They involved the massive abduction of mostly adults who were forced to carry looted food and medicine and were blindfolded and detained in pits in an ADF camp, most likely Bango in Madina (see para. 17 above). Most of the abductees (with the exception of most of the children) were released after a fairly short period of time and told to convey messages from ADF (see para. 31 above). On the basis of these patterns and the evidence summarized above, the Group is able to conclude that ADF conducted these attacks. According to information from FARDC and MONUSCO,[18] several attacks carried out

---

[17] According to information from MONUSCO, similar patterns were noted in Mayi Safi on 9 January 2019, where most of the 21 civilians abducted during the attack were eventually released after transporting goods.

[18] According to information from FARDC and MONUSCO corroborated by witness testimony, a total of 76 recently abducted civilians, most of whom were adults, had been released by 5 April 2019.

UNCLASSIFIED    EXHIBIT 28

S/2019/469

in the same area in March and at the beginning of April 2019 followed similar patterns, suggesting the involvement of ADF, but the Group did not independently investigate these attacks.

**Attack in Mavivi**

116. Owing to the general environment of insecurity and lawlessness, created in part by the presence and activities of ADF, all attacks north of Beni were widely attributed to ADF. However, as underlined in previous reports (S/2015/19, paras. 41–45, and S/2016/466, paras. 185–213), other armed actors, taking advantage of the situation, have committed crimes in the area. The modus operandi and the apparent targeting of some of the victims of the attack on Mavivi on 7 January 2019 suggest that ADF may not have conducted that attack, or at least not alone.

117. On the basis of interviews with four witnesses, two civil society actors and one MONUSCO source, the Group found that 11 civilians, including 6 children, were killed during the attack on Mavivi on 7 January 2019. With the exception of one victim, all were killed in the same house, which belonged to a local chief.[19] The neighbouring families of two FARDC officers based in Mavivi had taken refuge in the chief's house at the beginning of the attack.

118. The modus operandi followed by the assailants was unusual and suggests that at least some of the victims were specifically targeted. Indeed, the house of the chief was the only house attacked in the neighbourhood that day. With the exception of the chief, who was killed outside in the courtyard, all victims were gathered and killed by gunshot in the living room. Among the 11 victims, there were 6 children. ADF was not known to kill children (S/2015/19, para. 43, and S/2015/797, para. 89).

119. The presence of children among the assailants in itself is insufficient to attribute the killings to ADF. The Group received information about possible links to leadership conflicts in the area of Mavivi but could not independently confirm this information.[20]

**D.    Attacks against civilians in Yumbi territory**

120. The Group found that a large number of men of the Batende[21] community had systematically and indiscriminately attacked and killed members of and persons perceived as being close to the Banunu[22] community in Yumbi, Bongende and Nkolo II in Yumbi territory, Mai-Ndombe province, on 16 and 17 December 2018.[23] The patterns of violence and the evidence gathered by the Group suggest that the attacks were well planned, organized and coordinated, including by local leaders of the Batende community, such as the *chef des terres* of Yumbi, Ngobila Malala. The attacks caused the displacement of most of the Banunu community and, to a lesser extent, the Batende community, as well as the postponement of the general elections to 31 March 2019. These acts are serious human rights violations and sanctionable acts under paragraph 7 (e) of Security Council resolution 2293 (2016), as renewed by paragraph 2 of resolution 2424 (2018). They may also constitute the crimes against

---

[19] The local chief was the *chef de 10 maisons* (chief of 10 houses).

[20] The Group previously documented the involvement of local militias in killings in Mayangose area, which borders Mavivi (S/2016/466, paras. 69 and 195–197).

[21] The Batende are also known as Tiene.

[22] The Banunu are also known as the Banunu-Bobangi, although some members of the Batende community challenge that name.

[23] The Group was not able to investigate the allegations that seven members of the Banunu community were killed in the Société industrielle et forestière du Congo compound in Mbanzi camp on or around 17 December 2018.

UNCLASSIFIED

S/2019/469

humanity of murder, extermination, deportation, forcible displacement, persecution and other inhumane acts.

121. The Group based its findings on interviews with 15 victims, eight witnesses, 15 detainees, local and judicial authorities, FARDC, civil society, MONUSCO and non-governmental organization sources and on evidence from photographs, videos, documents and the Group's visit to Yumbi and Bongende in January 2019. The Group established that the attack on Yumbi took place on 16 December 2018 at about 2.00 p.m. and lasted a maximum of two hours. Attacks on the villages of Nkolo II and Bongende took place on 17 December 2018. The attack on Bongende lasted the entire day. Bongende was almost entirely destroyed and was still deserted at the time of the Group's visit (see annex 35). Members of the Banunu community perpetrated acts of revenge, likely including killing some of the members of the Batende community who had remained in Yumbi and destroying Batende houses, in the days immediately following the attacks.[24]

122. According to the United Nations Joint Human Rights Office,[25] at least 535 persons were killed (170 in Yumbi, 348 in Bongende and 10 in Nkolo II)[26] and 111 wounded (91 in Yumbi, 12 in Bongende and 8 in Nkolo II), while 967 buildings, mostly houses, were destroyed (see annexes 36 and 37).[27] According to the Office for the Coordination of Humanitarian Affairs, while some returns have since been observed, about 12,500 persons were still internally displaced at the end of February 2019 and more than 11,000 refugees were still in the Congo as at 21 March 2019.[28]

123. Yumbi, Nkolo and Bongende are on the shores of the Congo River and opposite the Congo (see annex 38). The city of Yumbi was predominantly inhabited by members of the Banunu community. Nkolo was divided into two parts, one inhabited by members of the Banunu community (Nkolo II) and the other by members of the Batende community (Nkolo I). Bongende was almost exclusively inhabited by members of the Banunu community. With the exception of two Banunu villages that were not attacked, the other 33 villages of Yumbi territory are inhabited almost exclusively by members of the Batende community.

124. The attacks in Yumbi, Bongende and Nkolo II followed the same patterns. The Group noted that they were preceded by preparatory acts and rising tensions that led to the mass mobilization of men from the Batende community. This was followed by systematic and indiscriminate attacks targeting members of the Banunu community and persons perceived as being close to that community, using similar weapons and tactics.

**Preparations for and rising tensions between communities before the attacks**

125. The long-standing conflict over land between the Batende and Banunu communities was one of the reasons for the eruptions of violence in 1963, 2006 and 2011 (see annex 39). Documentation from members of the Batende community, including from a Batende association named Kebima, warned in 1995 that the Banunu

---

[24] Several sources indicated that the administrator of the territory was shot dead by some members of the Banunu community during the attack on the office of the Independent National Electoral Commission on 17 December 2019, but the Group could not establish that on the basis of its evidentiary standards.

[25] See www.ohchr.org/Documents/Countries/CD/Report_on_Yumbi_March2019.pdf.

[26] Most of the population of Nkolo II had fled before the attack.

[27] A total of 462 buildings and 230 pirogues in Yumbi, 270 buildings, mostly houses, and 85 pirogues in Bongende and 204 buildings, mostly houses, in Nkolo II were destroyed.

[28] See https://reliefweb.int/sites/reliefweb.int/files/resources/ocha_sitrep_yumbi_mars_2019_sitrep01.pdf.

S/2019/469

claims over land would dispossess the Batende community of Batende land and may resurrect inter-ethnic conflicts (see annex 40).

126.  On 2 December 2018, the Banunu customary chief, Mantoma Bompinda Fedor, died in Kinshasa. A dispute erupted between both communities over the location of his burial site,[29] which further exacerbated already existing tensions. Many sources stated that some members of the Batende community had warned that there would be problems or war if the Banunu customary chief was buried next to his father in his plot of land in Yumbi city. Three members of the Batende community and one government official told the Group that the *chef des terres* of Yumbi, Ngobila Malala, was among those spreading this warning. According to the same government official, Ngobila Malala was the spokesperson for the Batende delegation that conveyed this message to the late administrator of the territory.

127. Most sources told the Group that almost all Batende families and Batende spouses had left Yumbi and Bongende a few days before the attacks. Five sources reported that, around the same time, members of the Batende community had erected barriers on roads to prevent supplies from reaching Yumbi and members of the Banunu community from entering Batende villages. One source, who was neither Batende nor Banunu, was stopped by a group of Batende men from entering Yumbi. The men told him that chief Malala wanted to buy his food and did not want it to be sold to the Banunu, their "enemies". He was eventually allowed to pass after one of the Batende men pleaded on his behalf that he was not Banunu.

128.  The body of the Banunu chief was secretly buried in the family plot on the night of 14 and 15 December 2018 (see annex 41). Banunu rituals, such as forcing everyone to walk barefoot for several days before the burial, as well as marching and singing in celebration of the burial in his family plot, were perceived as provocative by members of the Batende community and further exacerbated the already heightened tensions.

129. During the night of 15 and 16 December 2018, violence erupted in the mixed quarter of Yumbi and the house of a local Batende chief was burned. Accounts varied, however, as to whether Banunu elements burned the house or whether Batende elements did so because of the chief's alleged opposition to the violence. According to sources from the Batende community, the house of Ngobila Malala was also burned, but the Group could not independently confirm this information. These events triggered some initial displacement of the population. According to 14 sources, on the morning of 16 December 2018, members of the Batende community killed one Banunu man from Bongende in a Batende village called Mansele. This prompted four of the seven elements of the FARDC naval forces based in Yumbi to travel to Bongende to investigate, leaving Yumbi with only half of its FARDC forces. According to several sources, 30 to 60 minutes before the attack on Yumbi, the late administrator of the territory conveyed to the population of Yumbi a message from the former provincial governor that inhabitants should stay in Yumbi as they had nothing to fear.

130. One government official told the Group that, before the attack, he had sent reports to various national and provincial authorities to raise the alarm and request additional security forces in the light of the rising tensions. The Group could not, however, obtain copies of these reports. Another government official stated that he had orally reported these tensions to his hierarchy, but no additional security forces had been deployed.

---

[29] Burying the chief in his plot of land in Yumbi city would be interpreted as recognition that the land in question belonged to the Banunu community.

S/2019/469

**Mass mobilization of men from the Batende community against the Banunu community**

131. Five sources mentioned meetings of men from the Batende community in different Batende villages just before or on the day of the attack on Yumbi. Two of these sources explained that, during the meetings, the attacks against Yumbi and Nkolo had been organized and that Ngobila Malala had been involved. One member of the Batende community told the Group that all the men from Batende villages had gathered in Kidiki, a village seven kilometres from Yumbi, on 16 December 2018 to organize a response to the provocations from the Banunu community. According to him, all village chiefs were present, including Ngobila Malala. They concurred that the Banunu could not steal their land. A "very big group" then marched to Yumbi, "killed and wounded people and burned houses".

132. Another member of the Batende community confirmed that Batende men had gathered in not only Kidiki but also Nkombe, a Batende village three kilometres from Yumbi. According to him, Ngobila Malala told other Batende villages to wage war in Yumbi and Nkolo. Furthermore, a document dated 28 January 2019 and signed by 136 members of the Batende community stated that "around 2 p.m. the Batende came to rescue their brothers in danger in Yumbi, which marked the beginning of the fighting between both communities, causing death on both sides" (see annex 42). In the same document, the "fighting" in Bongende and Nkolo was justified as responses to criminal acts by the Banunu community.

133. In addition, a Mutende notable told the Group that, on 15 December 2018, the day before the attack on Yumbi, many Batende notables from several localities had met in Mansele, but denied that the meeting was linked to the attacks. Two other witnesses reported that large meetings had been held in a house in a Batende village close to Bongende just before the attack. According to one of the two witnesses, the house belonged to Yashin, a Mutende who was the director of the Bongende primary school. A government official confirmed that Batende youth had been prepared to fight and waiting for the signal, while another source was told by Batende assailants aged between 16 and 20 years that they had been forced to attack.

134. Many victims and witnesses had recognized some of the perpetrators as their Batende neighbours. For example, two had recognized the above-mentioned Yashin among the assailants in Bongende. At least two victims had recognized local police officers participating in the attack on Yumbi. One of those victims reported having recognized two Batende police officers based in Yumbi, one of whom was named Lipasa, among the assailants who had prevented her from escaping from her burning house. Another source had heard a man escaping the attack and shouting that he had seen Lipasa killing someone.

**Systematic and indiscriminate targeting of members of the Banunu community and persons perceived as being close to that community**

135. Evidence collected by the Group shows that members of the Banunu community were systematically and indiscriminately targeted and killed. Eight victims and one witness whose testimonies were corroborated by photographs and videos explained that the Batende assailants had killed the inhabitants of Bongende, a village almost exclusively Banunu, regardless of their gender and age. One of the victims interviewed by the Group had lost 21 close relatives in the burning of the family's house. Eight victims of the Yumbi attack interviewed by the Group reported similar patterns. The Group observed wounds and scars on all kinds of victims, including very young children. The number of casualties (see para. 122 above) in less than 48 hours also reflects the level and efficiency of the violence perpetrated.

136. The Batende assailants told a witness that they had killed many people and that they had been successful because there were no more Banunu on their land. Furthermore, an inscription in Lingala found on one of the houses in Bongende after the attack read: "This is our land, we the Batende. You are demons" (see annex 43).

137. Several victims told the group that the assailants had enquired about the victims' ethnicity before assaulting them. One source reported having been asked whether she was Banunu. As the source denied being Banunu, the Batende assailants requested her to speak the language of the community to which she claimed to belong and to show her electoral card. The source was requested to show her electoral card each time she met a new group of assailants. Another victim was asked by the assailants whether she and other people with her were Banunu. When they denied being Banunu, the Batende assailants told them that they had come to kill and would leave no one alive in Yumbi and then killed seven of them. One source saw Batende assailants arguing about whether they should kill a man who was not Banunu; they eventually decided not to kill him. That source also heard a 14-year-old Batende assailant saying that he would kill his friend if his friend was Banunu.

138. After the attacks, one source independent from both communities heard members of the Batende community stating that all Banunu should be exterminated.

**Tactics and weapons**

139. Victim and witness accounts consistently described the assailants using hunting rifles of 12- or 00-calibre, spears, arrows and machetes during the attacks. Three sources, including one FARDC officer, told the Group that 12- or 00-calibre ammunition was regularly imported from the Congo and easy to find in the markets of Yumbi and Bolobo territories. The Group sent a letter to the Government of the Congo in which it enquired about the cross-border trade of such ammunition. At the time of writing, the Group had not received a response.

140. Some victims and witnesses heard bursts of fire from automatic weapons in Yumbi and Bongende. Two victims and one witness of the Bongende attack saw individuals described as "military" in a line, leading the other assailants and carrying automatic weapons. Two independent sources confirmed that assailants took the automatic weapon of a member of the FARDC naval unit who was killed in Bongende. Two automatic weapons of two FARDC naval forces killed in Nkolo were also stolen. Four independent sources told the Group that some of the victims' wounds were consistent with wounds from automatic weapons. In the above-mentioned letter to the Government of the Congo, the Group also sought to determine whether wounds treated in its health facilities were consistent with wounds from automatic weapons.

141. Most eyewitnesses described the assailants as having blackened their faces and wearing banana or cassava leaves and underwear. One witness saw about 35 "military" in Bongende carrying automatic weapons and wearing partial military fatigue jackets and underwear. One victim saw some of the assailants in Yumbi wearing military fatigue trousers and carrying automatic weapons.

142. Furthermore, four persons testified that the assailants of Bongende had come from different directions and surrounded the entire village. According to one of them, one assailant, the above-mentioned Yashin, used to be a member of the Congolese national army.

143. Victims consistently described the assailants as methodically attacking one house after another. Many victims were killed or suffered severe burns after their houses, where they had hidden, were set ablaze by the assailants. Petrol was used to set houses alight. The assailants prevented victims from escaping by staying around their houses or by locking the doors from outside. They also shot at victims or

UNCLASSIFIED    EXHIBIT 28

S/2019/469

assaulted them with bladed weapons when they tried to escape. The assailants told one victim when setting her house on fire that she would die in her house and that they had to "burn everybody to the ground".

144. Several victims recounted that those who were injured had been subsequently killed by bladed weapons. Nine witnesses and victims stated that many of those killed were also mutilated (their hands, genital organs and feet were cut off), which was corroborated by videos and photographs.

**Need for accountability**

145. Although the Group was not able to establish any link between the attacks described above, it received worrying information from various sources regarding a violent incident between the Basengele and Banunu communities in Inongo territory, about 60 kilometres from Yumbi, on 22 November 2018. In the same vein, the Group obtained a copy of a letter dated 2018 (the exact date being illegible) from the customary chief of the Bateke community, in which he warned the former Governor of Mai-Ndombe province that land claims by the Banunu community in Bolobo territory, neighbouring Yumbi territory, could lead to bloodshed between the Bateke and Banunu communities (see annex 44).

146. Given these circumstances, the long-standing conflict over land and the current state of fear and defiance between the Banunu and Batende communities observed by the Group, the Group is concerned that further violence will occur if all those responsible for the attacks, including those who planned and instigated them, are not held accountable.

## V. Natural resources and financing

147. The Group investigated cases of smuggling of artisanal gold and found that, as previously reported (S/2018/1133, paras. 95–96), most Congolese gold was smuggled through neighbouring countries to Dubai as the main destination. The absence of a traceability system for artisanal gold continued to hamper efforts to control the sector.

148. The Group also investigated and documented a number of cases of mineral smuggling involving tin (cassiterite), tantalum (coltan) and tungsten (wolframite). Consistent with its final report of 2018, the Group documented that some armed groups continued to finance their activities through illegal mining, thereby contaminating the supply chain (S/2018/531, paras. 136–146). The Group also found that NDC-R levied taxes on civilians in areas occupied by the armed group. The Group concluded that these acts constitute violations of the due diligence guidelines developed by the Group, [30] the Organization for Economic Cooperation and Development Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the International Conference on the Great Lakes Region Regional Certification Mechanism.

## A. Tin, tantalum and tungsten

149. During the period under review, the Group documented and traced the trafficking of tin, tantalum and tungsten from mining sites, including those occupied by armed groups, to illicit markets. In addition, the Group documented a dozen cases in which a similar modus operandi was used by smugglers to evade arrest and to avoid losing large quantities of minerals if apprehended. The Group also found that some

---

[30] Available at www.un.org/securitycouncil/sanctions/1533/due-diligence-guidelines.

UNCLASSIFIED
19-07687

public officials tasked with fighting fraud had themselves diverted minerals seized from smugglers.

**Involvement of armed groups in tin, tantalum and tungsten**

150. As previously reported (S/2018/1133, paras. 49–52), armed groups controlled the mining activities of non-validated tin, tantalum and tungsten mining sites in Kibanda and Rubonga in the Mahanga area of Masisi territory. Two smugglers buying from armed groups and two truck drivers operating between Masisi and Goma told the Group that the NDC-R and Nyatura groups had fought over the control of mining sites in the Mahanga area. The Group documented several cases of tin, tantalum and tungsten minerals being obtained from the armed groups and smuggled to illicit markets.

151. The Group traced minerals from the tin, tantalum and tungsten mining sites of Kibanda and Rubonga to a depot in the outskirts of Goma. Two smugglers who were arrested in December 2018 along the Numbi-Kalungu[31] road with 70 kg of coltan (see annex 45) informed the Group that they regularly obtained coltan from Kibanda and Rubonga through middlemen who sourced minerals from armed groups. The transactions were cash-based. The two smugglers purchased coltan at between $15 and $20 and sold it for between $30 to $40 per kilo (depending on the purity of the ore) in Minova, Goma and Kalungu, usually making two or three trips per week.[32] The same middlemen delivered payment in United States dollars to armed groups. The mode of transport used to smuggle minerals from Masisi varied. Large quantities were concealed in trucks, as previously documented by the Group (S/2018/1133, para. 50), while smaller quantities were transported by motorbike. The Group found that the smuggling network relied on trust and confidentiality, risking death or serious bodily harm. The two smugglers mentioned the existence of several other smuggling networks.

152. The Group found that tin, tantalum and tungsten minerals from a similar network and sourced from the same mining sites under the control of armed groups were kept in clandestine depots before transit or sale. The Group visited three improvised depots, one on the outskirts of Goma (see annex 46), one in Minova and one in a village in Kalungu on the shore of Lake Kivu (see para. 159 below). The depot owner in the outskirts of Goma told the Group that minerals were either immediately transported to Rwanda or washed and dried while in the depot to increase their value before sale. The depot was a store-like room outside a residential house, used also to store other items. The two other improvised depots visited by the Group, in Minova and Kalungu, were rooms in residential houses, also used for storing an assortment of items. The owners of the two depots informed the Group that the middlemen who bought the minerals from the depots sold them in Rwanda.

**Criminal networks**

153. The Group documented 12 cases of individuals and networks obtaining minerals without first determining their origin. Anti-fraud officials, smugglers and transporters of minerals in North Kivu informed the Group that, previously, smugglers had incurred heavy losses whenever their minerals transported in huge quantities were intercepted. In order to avoid such heavy losses, they had learned to smuggle minerals in smaller quantities that were easier to conceal and transport and in less detectable places. The Group focused on the cases described below to illustrate this.

---

[31] Kalungu in Kalehe territory, South Kivu.
[32] The estimated gross income per week based on a network of two smugglers selling 50 kg of coltan per trip at $40 per kg and making three trips per week is $6,000.

S/2019/469

154. The Group investigated a case involving a network of four smugglers, comprising three Congolese nationals and a Rwandan financier named Jean-Claude Gafishi. In September 2018, they were arrested with minerals, using smuggling routes from the Rubaya area (S/2018/531, paras. 144–145, and S/2018/1133, paras. 53–55). They had concealed about 100 kg of coltan in multi-pocket jackets (see annex 47). Other smugglers and judicial officials confirmed the involvement of Gafishi and his accomplices in the smuggling of coltan and wolframite to Rwanda. The Group sent a letter to the Government of Rwanda in which it enquired into Gafishi's smuggling activities. The Group also sought from the International Tin Association information on incident reports documented in Rwanda in the course of its mandate to confirm its findings. At the time of writing, the Group had not received responses from the Government of Rwanda or the International Tin Association.

155. In January 2019, a transporter was arrested with 50 kg of untagged cassiterite along the Kalungu-Minova road. In an interview with the Group, he confirmed that he had been transporting the cassiterite to a smuggler for onward delivery to Gisenyi, Rwanda (see annex 48).

156. The Group also investigated a case in which, on 25 March 2019, at the Rutoboko checkpoint along the Sake-Masisi road in North Kivu, the mining police intercepted a four-wheel-drive vehicle with 519 kg of coltan in its tyres (see annex 49). Official sources in the North Kivu provincial mining sector familiar with the case informed the Group that the vehicle belonged to a well-known smuggler in the Rubaya area.

157. In relation to this case, one artisanal miner and an anti-fraud mining official informed the Group that tin, tantalum and tungsten minerals were usually smuggled by artisanal miners and security guards of the Société minière de Bisunzu (SMB) and the Société aurifère du Kivu et du Maniema (SAKIMA). From there, minerals were sold to smugglers around Rubaya town.

158. Three *négociants* and two employees of mineral buying houses (*comptoirs*) in Goma explained to the Group a tactic for diverting minerals that entailed mixing coltan and cassiterite and tagging the bags as cassiterite at the mining sites. The minerals were separated during the cleaning process on Congolese territory. Coltan, which fetched a higher price than cassiterite, was sold outside the supply chain, while cassiterite was retagged.

159. According to testimonies from fishers, government security agents, civil society and *négociants* familiar with mineral trafficking on Lake Kivu, the lake was also used as a smuggling route to Rwanda. During a visit to some of the villages and towns located along the lake, such as Makelele, Ruhunde and Minova (see annex 50), sources recounted to the Group cases of smuggling across the lake.

160. The Group found that networks diversified their smuggling tactics, including by ferrying minerals in small quantities to avoid detection and by concealing and transporting in non-conventional ways. The smuggling of minerals represents a clear threat to the effectiveness of existing due diligence mechanisms.

**Diversion of tin, tantalum and tungsten by mining police**

161. The Group documented several cases of officials of the Police des mines et hydrocarbures (PMH) diverting minerals intercepted from smugglers in Kalehe territory, South Kivu, and Masisi territory, North Kivu.

162. A smuggler told the Group that, on 25 December 2018, he had been arrested transporting 169 kg of untagged coltan concealed in his four-wheel-drive vehicle (see annex 51). The arresting officer, Isidor Olamba Shoja, the Head of PMH, Sake squad, North Kivu, had accepted a bribe of $1,200 for the release of the smuggler and the merchandise. In turn, Olamba had freed the smuggler but retained the vehicle and

replaced the coltan with sand. Two judicial officers informed the Group of several cases in which Olamba had diverted minerals intercepted from smugglers. Two mineral smugglers who used to operate along the Sake-Masisi road in North Kivu also informed the Group that they were aware that Olamba diverted seized minerals. This had caused the two smugglers to shift to the Numbi-Kalungu-Minova smuggling route. At the time of writing, Olamba was in detention.

163. In a similar case, two officers of PMH, Bahati Mushora Heritier and Heshima Kafanya Grace, deployed in Rubaya town, North Kivu, were arrested on 21 March 2019 for facilitating the smuggling of minerals. Instead of intercepting minerals on the Kibabi-Ngungu road, they accepted a bribe of $600.

164. The arrest of corrupt officials by the Congolese authorities is a positive step in the implementation of the due diligence guidelines of the International Conference on the Great Lakes Region and the Organization for Economic Cooperation and Development and relevant Security Council resolutions. The Group acknowledged a letter sent on 24 December 2018 by the Government of the Democratic Republic of the Congo to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo, in which the Government addressed a number of issues relating to the illegal exploitation and smuggling of natural resources in the country (see annex 52).

## B.  Gold

165. The Group noted that regulations of the artisanal and small-scale gold sector in the Democratic Republic of the Congo continued to be poorly implemented. During the period under review, the Group focused its investigations on two main gold-trading centres in the eastern part of the country: Bukavu and Butembo. In both places, the Group noted similarities with previously documented practices, including smuggling and underdeclaration (S/2016/466, para. 123). The Group also investigated transit and destination countries to assess whether they were adequately enforcing laws and rules intended to prevent the trade in gold illegally sourced from the Democratic Republic of the Congo.

### Bukavu

166. Artisanal and small-scale mining sites in Fizi, Shabunda and Kamituga territories were the main sources of gold traded in Bukavu according to two *négociants* and two individuals associated with the gold trade.

167. The Group noted that most mining sites in those areas were not validated[33] and therefore illegal, in part because of the ongoing involvement of armed groups and Congolese security forces in the production and trade of gold. The Group received testimonies that, as documented in its midterm report of 2018, factions of Raia Mutomboki were still involved in gold trade in Shabunda territory (S/2018/1133, paras. 90–92). The Group confirmed the same pattern in Fizi territory. Two mining officials in Bukavu and Uvira and two Bukavu-based *négociants* shared with the Group examples of "taxation" involving armed actors at the mining sites in Misisi, Fizi territory. The two *négociants* confirmed that Mai-Mai Yakutumba (S/2018/531, paras. 43–51) continued to be involved in mining, including by collecting taxes on gold production and transport in Fizi territory.

168. Once in Bukavu, most of the gold was smuggled to Bujumbura and Kigali, usually in cars with carriers by road. A senior official of the mining administration in South Kivu assessed that about 300 kg of undeclared gold transited each month

---

[33] Only 47 out of hundreds of mining sites in South Kivu were validated.

UNCLASSIFIED                                      EXHIBIT 28

S/2019/469

through Bukavu, but provincial government statistics showed about 5 kg a month on average (see annex 53).

169. Two owners of Bukavu-based *comptoirs* told the Group that they received only part of the production available in Bukavu. Three mining agents in charge of gold trade inspection in Bukavu confirmed this, adding that they knew of *négociants* who failed to declare or sell the production to the *comptoirs* as required by the national mining code. The mining agents pointed to corruption of law enforcement agents as the main reason for them not to report suspected cases. The Group also talked to two workers at two different *comptoirs* who said that their bosses asked them to give false data to the mining administration in order to conceal the extent of the smuggling.

170. Two sources shared with the Group names of individuals involved in the smuggling in Bukavu, including Buganda Bagalwa and Manghe Namuhanda O'bigaba, who were cited in a previous report (S/2012/843, para. 187), and Maurice Mushamalirwa and Bezo Fuganrobo. According to the same sources, some of those individuals were officially registered as *négociants* but also smuggled gold to neighbouring countries in violation of the mining code. In the course of its investigations, the Group learned from several sources that these *négociants* were equipped with material to melt raw gold in their houses or offices.

171. The Group believes that weaknesses persist in the mitigation and prevention of gold-smuggling by provincial authorities in South Kivu. In addition to the failure to arrest and prosecute known smugglers, the Group noted serious shortcomings in the application of regulations for the production and trade of gold from artisanal and small-scale mines. For example, provincial authorities did not consider a trader's records when renewing the licence of a *négociant* or a *comptoir*. Several provincial mining authorities told the Group that records of past gold-related smuggling activities were not required in the renewal of the licences of *négociants*.

**Butembo**

172. The Group found that the gold trade in Butembo was characterized by a lack of due diligence, underdeclaration and smuggling.

173. As previously documented (S/2016/466, para. 139), the Group established that Butembo gold traders did not verify the origin of the gold that they purchased. The Group interviewed five *négociants* and two individuals associated with the gold trade in Butembo who confirmed that they were more concerned about the quality and volume of gold purchased than the source of the gold made available by their suppliers. Given that gold traded in Butembo was produced mainly in North Kivu, Tshopo, Ituri and Haut-Uélé provinces, where armed groups and some FARDC elements were known to interfere with gold production and trade, the Group cannot exclude the possibility that gold traded in Butembo included gold produced in conflict areas and unvalidated sites.

174. Several mining agents informed the Group that insecurity due to the presence of armed groups prevented them from gaining access to gold mining sites in south Lubero territory, North Kivu. The same agents added that mining sites located around Mbingi, Luofu, Bunyatenge and Miriki produced a large share of the gold traded in Butembo. Three Lubero-based civil society actors confirmed to the Group that elements of NDC-R and other local armed groups were present in those areas (see paras. 187–191 below) and involved in gold trade taxation.

175. The Group noted that Glory Minerals (Glorym) was still the only *comptoir* in Butembo (S/2016/466, paras. 140–144, and S/2009/603, paras. 128–132 and 135–136) and confirmed that, of its five associates, only three were active during the period

S/2019/469

under review.[34] In 2018, Glorym associates declared to mining authorities that they had purchased 5.177 kg of gold, of which 3.237 kg had been exported to the United Arab Emirates in June 2018. The export certificate (see annex 54) mentioned "Gold Market" as the importer in Dubai. During a visit to Dubai in February 2019, the Group could not confirm the existence of such a company. In addition, the authorities of the United Arab Emirates told the Group that they did not have a record of a company known as "Gold Market".

176. The Group determined that the official exports of gold from Butembo were less than the available supply. The Service d'assistance et d'encadrement de l'exploitation minière artisanale et à petite échelle (SAEMAPE) said in a report that, in 2018, 70 *négociants* declared 23.48 kg from western Lubero mining sites. The statistics did not take into account the quantity in the hands of 86 other *négociants*. Four *négociants* told the Group that they bought an average of 2 kg per month. This degree of discrepancy indicates to the Group that the vast majority of the gold traded from Butembo was smuggled.

177. In this context, the Group received information about smuggling patterns and the underdeclaration of exports in Butembo. *Négociants* sold small amounts of gold (an average of 11 g) each month to Glorym in order to fulfil their legal obligations and sold the rest of their gold to traders in Kampala (S/2017/672/Rev.1, paras. 119–126). In addition, Glorym associates did not officially export the entire quantity they bought from *négociants*. Two mining agents in charge of monitoring Glorym's activities and two individuals associated with Butembo-based gold traders told the Group that Glorym had not complied with inspections or disclosed its stocks.

**Transit and destination countries**

178. Through its investigation, the Group concluded that gold smugglers from Bukavu and Butembo continued to use the same trading routes as in the past. From Bukavu, traders generally travelled to Kigali and Bujumbura, while traders from Butembo carried their gold supplies to Kampala. Several sources involved in the gold trade, civil society actors, and Congolese mining officials described to the Group the trade routes.

179. In Butembo, for example, two individuals working with two Butembo-based gold traders informed the Group that, during the period under review, they had used fraudulent Congolese export documents when taking gold from Butembo across the Congolese-Ugandan border in Kasindi and then to Kampala. They said that their principal buyers were Kunal Lhodia, a director of the sanctioned entity Uganda Commercial Impex (UCI) Ltd (CDe.009), and Sameer Bhimdji (S/2017/672/Rev.1, para. 120). The Group heard similar accounts in Bukavu of cross-border smuggling but could not confirm the names of the buyers in Bujumbura and Kigali.

180. The Group noted that several sources described corruption among officials at the borders. In Bukavu, two middlemen working with two Bukavu-based gold traders told the Group that they crossed the Ruzizi border at least twice a week and that officials never checked their vehicles, reportedly because of an arrangement between their employers and border officials.

181. Several sources associated with gold trade told the Group that wealthy traders in Butembo and Bukavu or buyers in transit countries and Dubai financed the smugglers, enabling them to buy gold and transport it to foreign markets. Two sources directly involved in such transactions with gold traders based in Butembo told the Group that traders with no affiliation with the gold trade lent money to their bosses.

---

[34] Edouard Kambale Vikalwe, Edmond Kathoheryo and Katina Kambale Mbayahi are the current Glorym associates.

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

The latter used the money in order to buy gold in Butembo. Traders who lent money were paid back in cash, either in Kampala or in Dubai, by those who received gold. The Group believes that circumventing the banking system through gold-based financial transactions generates a lack of transparency and violates the recommendations of the Financial Action Task Force as reflected in Congolese legislation.

*Transit countries*

182. During the period under review, the Group met with companies and officials in Burundi, Rwanda and Uganda. All interlocutors denied knowledge of illicit gold trading and claimed to have in place reliable due diligence systems to detect and avoid any smuggled gold in their supply chains.

183. However, the Group noted discrepancies in the statistics provided by the Democratic Republic of the Congo, transit countries and the United Arab Emirates, which suggest a pattern of smuggling. In 2018, the Government of Burundi officially exported 601.7 kg of gold to Dubai, but the United Arab Emirates statistics covering January to September 2018 indicate that traders in the Dubai market received more than 2,130.57 kg from Burundi. Similarly, the statistics from the Government of the Democratic Republic of the Congo suggest that artisanal and small-scale miners produced 246.3 kg of gold in 2018, of which 56.2 kg was exported to the United Arab Emirates, but the United Arab Emirates statistics covering January to September 2018 show that Dubai traders officially purchased 207.11 kg of gold from the Democratic Republic of the Congo. Rwanda declared gold exports of 2,163 kg, while the United Arab Emirates officially imported 12,539 kg from Rwanda during the first nine months of 2018. Uganda declared gold exports of 12,000 kg, but the United Arab Emirates said that it had received 21,044 kg of gold from Uganda.

184. The Group noted that, at the time of writing, the authorities of Uganda had failed to send the Group the report of their investigations into the activities of Kampala-based gold traders, as officials had promised. On 16 January 2019, the Group met with representatives of African Gold Refinery Ltd. (AGR) at AGR premises in Entebbe, Uganda, and discussed in particular the fact that AGR had yet to provide the names of its suppliers to the Group (S/2018/1133, paras. 98–100). AGR representatives reiterated that, on the basis of Ugandan law and contractual provisions, it could not provide their names without their prior consent, but claimed that investigations were under way to ensure that none of its suppliers were involved in illegal activities. They further mentioned that AGR was concerned about sharing such confidential information with the Group. The Group responded that it could sign a memorandum of understanding on sharing sensitive information with third parties under certain conditions and encouraged AGR representatives to send a draft to the Group should they wish to consider that option. In February 2019, during a meeting in Kigali, officials of the Government of Rwanda informed the Group that a new gold refinery (Aldango Ltd.) would officially launch its activities later in 2019. The Group believes that relevant government authorities and supply chain actors should monitor the activities of this company in order to ensure that due diligence standards are implemented.

*Dubai*

185. Dubai remained the final destination for gold produced by artisanal and small-scale miners in the Democratic Republic of the Congo. Officially declared exports from Bukavu in 2018 were sent primarily to Dubai, and the only official export from Butembo (see para. 175 above) had the same destination. During its visit to the gold souk in Dubai, the Group was told by four individuals from the Great Lakes region that they helped smugglers to sell their gold illegally upon their arrival in Dubai. The

Group also confirmed that "Pedro" Chibalonza, one of the owners of the former Bukavu-based company Caetano Victor Chibalonza (Cavichi) SARL (S/2016/466, paras. 151–155),[35] made at least one trip from Bujumbura to Dubai during the period under review. According to the Group's sources, Chibalonza, who no longer had an official licence to operate in the gold sector, engaged in business with three Dubai-based gold traders. While one of those traders confirmed to the Group that Chibalonza had approached him, claiming that his gold came from Bukavu, the others denied any engagement with Chibalonza.

186. The Group noted that the United Arab Emirates has established new procedures to control gold arriving in carry-on luggage from the Democratic Republic of the Congo. The Government's procedures reflect previous proposals of the Group and discussions between officials of the Democratic Republic of the Congo and the United Arab Emirates in 2018 (S/2017/1091, paras. 59–62 and 102). However, not all procedures have been fully implemented. During a meeting with the authorities of the United Arab Emirates in Dubai in February 2019, the Group learned that the two Governments still needed to clarify several aspects of their cooperation to prevent and detect the smuggling of gold in carry-on luggage. For example, the Democratic Republic of the Congo required the signature of a memorandum of understanding between the Governments as a starting point. The authorities of the United Arab Emirates were, however, of the opinion that they could begin to cooperate pending the adoption of the memorandum of understanding. The authorities of the United Arab Emirates also claimed that they still could not understand many of the documents submitted by the Democratic Republic of the Congo because they were in French. The Group is aware that, in April 2019, the Democratic Republic of the Congo suggested a follow-up meeting in Kinshasa. However, a United Arab Emirates senior official informed the Group that the meeting had not taken place owing to the short notice given.

## C.   Financing of the Nduma défense du Congo-Rénové

187. As previously reported (S/2018/531, para. 90), the Group confirmed that NDC-R continued to finance its activities through the control of mining sites and taxation in Walikale and Lubero territories, expanding into Masisi territory (see paras. 53–54 above).

188. Five ex-combatants and one gold miner informed the Group that NDC-R controlled mining sites in Lubero territory, such as in Bunyatenge (gold), Fatua (gold and coltan), Masekeseke (gold), Libeta (gold), Yama (gold), Makokwalo (gold) and Kitoa (gold). Miners were taxed on the quantity of minerals mined, depending on production.

189. NDC-R also levied taxes on communities in Walikale and Lubero. Taxes included a *taxe savon* of 2,000 Congolese francs per month per adult and a *fonds de guerre* of 6,500 Congolese francs per adult before or after combat. Taxes were collected by combatants under the command of "Colonel" Ndlame.

190. Local sources in Kashuga and Kalembe, Masisi territory, informed the Group that, in January 2019, NDC-R began to collect a monthly tax of 1,000 Congolese francs per adult. NDC-R issued a token (*jeton*) as proof of payment (see annex 55), without which individuals were beaten, fined and detained.

191. NDC-R also subjected communities to forced labour. Several victims reported that men in Kalembe, Masisi territory, were forced to perform construction work for

---

[35] The company was closed down following the Group's report.

S/2019/469

NDC-R once a week. Furthermore, in Kalungu, Masisi territory, villagers were forced to supply food to the NDC-R camp for about 200 combatants.

## VI.  Arms

192.  During the current mandate, the Group found a number of cases of violations of the arms embargo and non-compliance with the notification requirements in pursuance of paragraphs 2 and 3 of Security Council resolution 2293 (2016), as renewed by paragraph 1 of resolution 2424 (2018).

### A.  Violations of the arms embargo

#### 7.62 x 54R mm calibre ammunition cartridges

193.  In February 2019, the Group collected ammunition cartridges in Mulenge, Uvira territory, South Kivu, where combat had taken place between RED Tabara and FDN and Imbonerakure (see paras. 68–69 above). The recovered cartridges were of 7.62 x 54R mm calibre. The Group observed four types of markings on the cartridges, with characteristics similar to products of Bulgaria (10_85), China (61_90, 945_05) and the former Union of Soviet Socialist Republics (188_76) (see annex 56).

194.  The Group interviewed four Mai-Mai Kijangala combatants who had participated in the fighting and one high-level commander of RED Tabara. They confirmed that the bullets in question had been fired by FDN and Imbonerakure on RED Tabara positions in Mulenge during the fighting in February 2019. The four Mai-Mai Kijangala combatants also told the Group that FDN had provided them with weapons, ammunition and food when FDN had departed from the territory of the Democratic Republic of the Congo.

195.  At a meeting in Bujumbura on 19 March 2019, officials of the Government of Burundi informed the Group that renegade soldiers of the failed coup d'état of 2015 in Burundi had escaped with weapons and ammunition, which had been documented by the Burundian authorities. They also indicated that all weapons and ammunition of the national stockpile were inventoried, marked and securely stored. The Group submitted a request to the Government of Burundi for information to determine whether the cartridges collected by the Group in Mulenge were part of its national stock. The Group also requested to receive the inventory report completed in the aftermath of the failed coup d'état of 2015, as agreed during the meeting in March. In a letter sent to the Group on 19 April 2019, the authorities of Burundi confirmed that the cartridges documented were part of the materiel with which renegade soldiers involved in the failed coup d'état of 2015 had fled. Although the Burundian authorities conveyed the inventory of lost materiel, the Group was not able to confirm the markings on the cartridges with the provided document.

196.  The delivery of weapons and ammunition to armed groups active in the Democratic Republic of the Congo and the presence of foreign armed forces on Congolese territory without due authorization, as in this case, constitute violations of the arms embargo.

#### Diversion of weapons and ammunition

197.  Armed groups continued to target FARDC camps and weapons depots in order to seize weapons and ammunition (see paras. 42–43 above). Armed groups also recovered a significant number of weapons and ammunition from FARDC during combat.

EXHIBIT 28

S/2019/469

198. On 24 May 2018, a coalition of Mai-Mai Malaika of Sheikh Assani, Mai-Mai Yakutumba and Mai-Mai Apa na Pale attacked an FARDC position in Namoya, Kabambare territory, Maniema province (see annex 57). Four active combatants, two researchers and one FARDC intelligence officer informed the Group that the aim of the attack had been to loot military materiel.

199. Combatants told the Group that they had received intelligence from an FARDC contact about the presence of a large quantity of military materiel. According to combatants, part of the looted military materiel included 31 cases of 7.62 x 39R mm calibre ammunition, six cases of 7.62 x 54R mm calibre ammunition (for PKM machine guns), quantities of loose ammunition, 26 PKM machine guns, 13 cases of anti-tank bombs, 19 AK-pattern assault rifles, 11 RPG-7 rocket-propelled grenade launchers and nine 60 mm mortars.

200. At an official meeting in March 2019, high-ranking FARDC officers confirmed the attack in Namoya. The officers informed the Group that only a few AK-pattern assault rifles had been taken and that FARDC officers had prevented further looting by setting the rest of the stock on fire.

201. In addition, FARDC has lost significant quantities of weapons and ammunition during combat with and attacks by armed groups. The Group received information about lost materiel in North and South Kivu in 2018 and the first trimester of 2019.

202. Over this period, in North Kivu, FARDC lost at least 162 AK-pattern assault rifles, 19 Motorola radios, 14 PKM machine guns, nine RPG-7 rocket-propelled grenade launchers, four 40 mm rockets, two 60 mm mortars, two bulletproof vests, rounds of ammunition, one SPG-9 recoilless rifle, one cannon 12.7 mm, one pistol, one Dragonov sniper rifle, two magazines and one 82 mm mortar. In South Kivu, FARDC recorded losses including a 107 mm rocket launcher, 40 AK-47 pattern assault rifles, four PKM machine guns, one 92 mm mortar, two 91 mm mortars, seven 60 mm mortars, 16 RPG-7 rocket-propelled grenade launchers, one light assault machine gun, one magazine, 10 SPG-9 recoilless rifles, one rocket launcher, one grenade, seven cases of 7.62 x 39R mm ammunition, 30 anti-tank bombs, two RPG-7 grenades, seven cases of 12.7 mm ammunition, an unspecified number of obsolete weapons, one AKC-pattern assault rifle, six Motorola radios and rounds of ammunition.

203. While losses are inevitable during combat, the Group is concerned about their recurrence and scale, not to mention the implications for peace and security in the Democratic Republic of the Congo.

**Type 80 general purpose machine gun**

204. In January 2019, during an ADF attack on an FARDC camp in Mapobu, Beni territory (see para. 42 above), FARDC seized a type 80 general purpose machine gun from an ADF combatant. This weapon has similar characteristics to products of China (see annex 58). Although the Group could not confirm this finding independently, two FARDC logistics officers told the Group that the type 80 general purpose machine gun was not part of the Congolese national stock. The Group sent a request to China to identify the end users. On 16 April 2019, in a letter sent to the Group, the authorities of China informed it that the structure of the weapon was not consistent with that of products of China. This suggests that the gun either had been transferred to ADF from another source or was an imitation by another source.

DRC-30316 0641

S/2019/469

### B.  Failure to notify

**LBD 40 mm anti-riot gun and SIR-X 40 x 46 mm grenades**

205.  An FARDC source informed the Group of the use of LBD 40 mm anti-riot guns and SIR-X 40 x 46 mm grenades by the Congolese police for crowd control (see annex 59). The LBD 40 mm has South African markings and bears the logo of a company based in Switzerland, Brugger & Thomet. In its midterm report of December 2018, the Group documented the delivery of SIR-X 40 x 46 mm grenades and noted that the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo had not been notified (S/2018/1133, para. 105). The Group sent a request for further information on the transfer of the LBD 40 mm and the SIR-X 40 x 46 mm grenades to the Governments of South Africa and Switzerland, respectively. The Governments acknowledged the Group's request for information on 1 and 9 April 2019, respectively. The Government of South Africa, in a letter dated 12 April 2019, informed the Group that it was awaiting the responses of relevant national entities.

**Delivery of Warrior soft-walled shelters**

206.  In February 2019, Nile Dutch, a company based in South Africa, delivered sets of Warrior soft-walled shelters (see annex 60) to the Democratic Republic of the Congo. Warrior soft-walled shelters are used as military shelters. The delivery took place at the port of Matadi.

207.  On 12 April 2019, the South African authorities informed the Group that Nile Dutch was not registered with the National Conventional Arms Control Committee of South Africa. The authorities added that permits in respect of the Democratic Republic of the Congo were issued on a temporary basis and to support the peacekeeping contingent of the South African Defence Force to MONUSCO.

208.  The Group established that Nile Dutch is a container shipping company[36] and believes that the materiel in question was exported without notification to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo.

## VII.  Recommendations

209.  The Group makes the recommendations set out below.

**Government of the Democratic Republic of the Congo**

210.  The Group recommends that the Government of the Democratic Republic of the Congo:

  (a)  Develop and implement a comprehensive policy, beyond a strictly military solution, to address the ADF problem while protecting civilians from attacks (see paras. 13–43, 94–101 and 105–119);

  (b)  Clarify policies and related instructions aimed at preventing all forms of collaboration between the Congolese security forces and armed groups, including granting free passage to armed groups (see paras. 58–62 and 197–200);

---

[36]  See www.niledutch.com/en/contact/durban/.

(c)  Investigate and prosecute FARDC elements providing information to armed groups regarding weapons and ammunition or otherwise collaborating with armed groups (see paras. 58–62 and 197–200);

(d)  Continue investigations to identify and prosecute all those responsible for the crimes in Yumbi territory (see paras. 120–146);

(e)  Establish mechanisms to assist communities in Yumbi territory to restore peace, stability and confidence (see paras. 120–146);

(f)  Conduct regular audits of *comptoirs* and *négociants*, in particular in Bukavu and Butembo, to detect underdeclaration of gold and impose penalties as appropriate (see paras. 165–177);

(g)  Ensure the effective enforcement of anti-smuggling legislation along known mineral smuggling routes and regional borders, including by monitoring Lake Kivu in cooperation with neighbouring countries (see paras. 154–159 and 162);

(h)  Implement without delay a comprehensive disarmament, demobilization, integration and reintegration policy and programme, providing clarity on integration opportunities, with adequate resources and safeguards to preserve accountability and combat impunity (see paras. 89–92).

**Government of Burundi**

211. The Group recommends that the Government of Burundi cease all violations of the sanctions regime and of the arms embargo by halting all incursions into the Democratic Republic of the Congo, withdrawing any remaining personnel of FDN and Imbonerakure and ceasing to provide support to local armed groups in the Democratic Republic of the Congo (see paras. 66–79).

**Governments of the Democratic Republic of the Congo and the United Arab Emirates**

212. The Group recommends that the Governments of the Democratic Republic of the Congo and the United Arab Emirates clarify and finalize any remaining processes necessary to implement the procedures to efficiently combat the illegal export of gold (see paras. 185–186).

**International Conference on the Great Lakes Region**

213. The Group recommends that the International Conference on the Great Lakes Region undertake the verification of incursions by FDN and Imbonerakure into the territory of the Democratic Republic of the Congo and submit reports, as appropriate, to the Committee of Ministers of Defence of the International Conference on the Great Lakes Region (see paras. 66–79).

**United Nations Organization Stabilization Mission in the Democratic Republic of the Congo**

214. The Group recommends that the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo:

(a)  Support, with partners, the Democratic Republic of the Congo in its efforts to fight impunity and restore peace, stability and confidence in Yumbi territory (see paras. 120–146);

(b)  Support, as appropriate, the Democratic Republic of the Congo in developing and/or implementing a comprehensive strategy, beyond a strictly military

UNCLASSIFIED                                    EXHIBIT 28

solution, to address the ADF problem while protecting civilians from attacks (see paras. 13–43, 94–101 and 105–119).

**Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo**

215. The Group recommends that the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo take into consideration non-compliance with relevant recommendations of the Financial Action Task Force when examining information to sanction individuals or entities involved in destabilizing activities in the Democratic Republic of the Congo through the illicit exploitation of or trade in natural resources (see para. 181).

**Member States**

216. The Group recommends that Member States provide adequate financial and logistical support for the timely implementation of the disarmament, demobilization, integration and reintegration programme in the Democratic Republic of the Congo (see paras. 89–92).

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

**Annexes**

## Annex 1: Organizations and entities the Group of Experts officially met with during its mandate

### GREAT LAKES REGION

**Democratic Republic of the Congo**

*Government*

Agence nationale de renseignement (ANR)

Auditorat militaire

Centre d'évaluation, d'expertise et de certification (CEEC)

Commission nationale de lutte contre la fraude minière (CNLCFM)

Direction générale des migrations (DGM)

Forces armées de la République démocratique du Congo (FARDC)

Ministère des Affaires étrangères et de la Coopération internationale

Ministère des mines

Service d'assistance et d'encadrement de l'exploitation minière artisanale et à petite échelle (SAEMAPE)

*Organizations*

Embassy of Belgium

Embassy of United Kingdom

Embassy of France

Office for the Coordination of Humanitarian Affairs (OCHA)

United Nations Joint Human Rights Office (UNJHRO)

United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO)

**Rwanda**

*Government*

Ministry of Defence

Ministry of Foreign Affairs

Rwanda mines, petroleum & gas board

*Private sector*

Aldango Ltd

UNCLASSIFIED                    EXHIBIT 28

**Uganda**

*Government*

Ministry of Foreign Affairs

Ministry of mines

Uganda People's Defence Force

*Private sector*

African Gold Refinery

*Organizations*

United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO)

**Burundi**

*Government*

Ministry of External Relations and International Cooperation

**OUTSIDE THE GREAT LAKES REGION**

**France**

*Government*

Ministry of Foreign Affairs

*Organizations*

Organization for Economic Co-operation and Development (OECD)

**United States of America**

*Organizations*

United Nations Department of Safety and Security

United Nations Department of Peace Operations

**United Arab Emirates**

*Government*

Ministry of Foreign Affairs

Customs

**Kenya**

*Organizations*

Office of the Special Envoy of the Secretary-General for the Great Lakes Region

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

## Annex 2: Group of Experts' official communications

During the mandate, the Group of Experts addressed 47 official communications to Member States, international organizations and entities (including multiple communications to the same addresses).

The Group of Experts received responses from the Governments of Burundi, China, South Africa, Switzerland, Uganda, United Arab Emirates and United Kingdom.

The Group of Experts did not receive responses from the Governments of Bulgaria, The Democratic Republic of the Congo, Djibouti, Kenya, Republic of Congo, Sudan, Tanzania, the Russian Federation and the United States of America.

The Group of Experts received responses from the following international organizations and entities: African Gold Refinery Ltd.

The Group of Experts did not receive responses from the following international organizations and entities: Sakima, Bullion Ltd and Etc RICA.

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

## Annex 3: Map of the main ADF camps



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469



Map by Google Earth, as edited by the Group of Experts

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

### Annex 4: Schema of Madina camp

The ADF base camp called "Madina" was situated between Oïcha, Eringeti and Kamango and consisted of several other camps. Most combatants and dependents lived in Madina II that was subdivided into four smaller camps. The ADF leader, Baluku, lived in camp Kajaju, while Lumisa and PC Setongo lived in camp Bango. New recruits arrived in camp Whisper where they undertook a three-week training before being transferred to camp Kabila. The camps of Madina II were situated on higher ground. Most of the agricultural fields of the ADF were located in Madina I, in particular in the vicinity of Dayusi camp where the bulk of food supplies were kept. Combatants were regularly sent from Madina to Mapobu camp (approximately a 6-hour walk) to collect goods coming from Beni or other towns in the area.



Schema made by the Group of Experts based on testimonies of ex-combatants and former abductees

UNCLASSIFIED                          EXHIBIT 28

S/2019/469

### Annex 5: Photographs of the Mulalo – Lahe camp

Based on testimonies of former abductees and ex-combatants, the Group of Experts assessed that the photographs below likely depict the ADF 'Mulalo' – Lahe camp. This camp was situated in the Mayangose forest, about 15 km northeast from Beni city but was moved to another nearby position between October 2018 and January 2019. The difference between the active and abandoned camp is clearly visible in the photographs.



Photograph taken in October 2018

19-07687
DRC-30316 0651
UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 28

S/2019/469



Photograph of the same position taken in January 2019

UNCLASSIFIED

EXHIBIT 28

S/2019/469

## Annex 6: List of ADF leaders

**Seka Baluku** (also known as Musa and Mzee Kajaju the leader of Kajaju camp) is the overall commander of the ADF. He is Ugandan and approximately 43 years old. He lived in the Kajaju camp of Madina II. He was married to several women including the daughters of Jamil Mukulu and PC Sentongo.

**Lumisa** (also known as Muhamad and Dr. Lumisa) is a sheikh and medical doctor of approximately 60 years old who joined the ADF in 1999. Lumisa was the leader of Bango camp in Madina II and was in charge of the Ugandan supply and recruitment network.

**Amigo** (also know as Simba Amigo, Mzee Amigo and Ami) is a hunchback who progressed from being a military commander to the coordinator of Mwalika camp where he organized the transit of international recruits and managed the recruitment network in South Africa, Tanzania and Burundi. He was also in charge of communications with Madina camp.

**Kalume** (also known as Amisi Kasadha, Wako and Dr. Kalume) was promoted to army commander and military leader of the Madina complex. He was also a medical doctor.

**Mulalo** (also known as Fezza or Feeza and Elias Segujja) was a senior military commander and commander of the Mulalo camp in the Mayangose, named after him. Mulalo was also the coordinator of operations and organised ambushes against the FARDC.

**Kajaju** (also known as Canada and Kibuye) was until recently the military commander of the Madina complex, but was now in Mwalika or Mapobu camps. FARDC sources claimed that he was killed during an attack in Mamove, but the Group of Experts could not confirm this.

**Kikote** (pronounced "Chi-ko-té" or Kikutte and also known as Diiro) was the military commander of camp Mwalika. He took over from Werrason.

**Braida** was the military commander of Mapobu camp and in charge of acquiring food for the ADF from the forest and nearby communities.

**Ben** or Benjamin (also known as Muza Mea) was a military leader in Madina and second in command to Kalume. He was also in charge of the training of children.

**Werrason** or Werason was a military commander in camp Mulalo and until recently the commander of Mwalika camp, but he was replaced by Kikote.

**Abdulrahman Waswa** (also known as PC Sentongo and Setongo) was ADF's police commissioner and Sheikh. He lived in Bango camp in Madina II. He is disabled and walks with crutches. He dispensed judgements and executed punishments in Madina camp.

**Akeda** was a military trainer in Madina and also transported new recruits from Mwalika to Madina.

**Rafiki** was a military trainer in Madina.

**Muzaya** was a military commander and the chief instructor in Mwalika camp.

**Cheikh Moussa** was a teacher in Madina.

**Panisha** was considered to be the primary bomb-maker of the ADF.

**Sheikh koko** was the Imam in Mwalika camp and taught the Quran to new recruits.

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

The following ADF leaders and combatants were reportedly killed or at least there are serious doubts about their presence in the current ADF.

**Kahira Muhamadi or Kayiira Mahammad,** also known as Ogundipe – reportedly died in 2018.

**Lukwago Hood** reportedly died in 2018.

**Richard Mukulu** reportedly died or left the ADF in 2018.

**Recoilence** was reportedly killed during combat.

**Adra** was reportedly killed during combat in 2018.

**Patero** was reportedly killed during combat in 2017.

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 28

S/2019/469

## Annex 7: Photographs of ADF combatants

Several sources confirmed the presence in Madina camp of the man on the photograph below. He is called "Hussein" or "Marabou".



Screenshot from a video posted on Internet by the ADF (referred to as MTM in the video)

The sources also recognized other members of the ADF on the video.



Screenshot from a video posted on Internet by the ADF (referred to as MTM in the video)

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

## Annex 8: ADF recruitment network via Uganda

The ADF displayed consistent patterns in its process of recruitment from Uganda to its camps in the Democratic Republic of the Congo. New recruits were often accompanied by their recruiters to the Democratic Republic of the Congo from Fort Portal or Kampala and via Bwera using public transportation or motorbikes. Recruits told the Group of Experts they had crossed into the Democratic Republic of the Congo illegally near Kasindi and were received by armed men who took them to Mwalika camp. Once enough recruits were assembled, the lead recruiter, a certain "Amigo", called for reinforcements from the Madina base camp. Some 15 combatants under the command of "Akeda" escorted recruits to the Mulalo camp – a two-day walk – and onwards to Madina – another 6-7 day walk. Five recruits told the Group of Experts that over a period of four months, two groups of between 60 and 70 recruits left Mwalika.



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 9: Claim by the Islamic State of an attack in the Democratic Republic of the Congo on 18 April 2019**

First statement released by Amaq News on 18 April 2019: "*Breaking: Deaths and injuries among the Congolese army in an attack by Islamic State fighters in the town of Kamanago, near the border of Congo with Uganda.*" (translation by the Group of Experts)



Second statement released by Amaq News on 18 April 2019: "*Relying on God the Almighty, the soldiers of the Caliphate assaulted barracks of the Congolese army in Bufata village, in the Beni region, where they clashed with them using light and medium heavy weapons. It led to the death of 3 of them and wounded 5 others, and unto Allah is fully praise for His granting of success.*" (translation by the Group of Experts)



UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

### Annex 10: MTM logo and flag in ADF videos

The ADF used the MTM logo in its propaganda videos. The most recent videos all start with this logo and some of them display a flag analogous to the flag used by Islamic State.





Screenshot from a video posted on Internet by the ADF (referred to as MTM in the video)

UNCLASSIFIED

EXHIBIT 28

S/2019/469

### Annex 11: Attack in Kididiwe against joint FARDC-MONUSCO forces on 14 November 2018

At approximately 4:30 p.m. on 14 November 2018, MONUSCO and FARDC troops were attacked at a position called Kididiwe by a large number of ADF combatants, including men, women and children. The first attack started from the northwestern direction and was followed by attacks from all sides. The whole attack lasted at least until 1:00 a.m. when the last United Nations peacekeepers managed to escape the perimeter. Seven United Nations peacekeepers were killed at this position.



Photograph taken in October 2018, edited by the Group of Experts

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

## Annex 12: Weapons and ammunition displayed by the ADF in a propaganda video

Screenshots of weapons from a video posted on the Internet by the ADF (referred to as MTM in the video)



Double rocket launcher (locally modified MRL, bitubes)



107mm ammunition



AK-47 pattern assault rifle and boxes of ammunition

UNCLASSIFIED

EXHIBIT 28

S/2019/469



75mm recoilless rifle



Heavy Machine Gun

S/2019/469

## Annex 13: CNRD move from North Kivu to South Kivu



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 14: Pictures of a woman and children carrying CNRD weapons**



Screenshot of a video provided to the Group of Experts by a local source in January 2019 in Masisi territory.



Screenshot of a video provided to the Group of Experts by a local source in January 2019 in Masisi territory

19-07687

PRC-30316 0663

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

**Annex 15: NDC-R's expansion into northern Masisi and western Rutshuru territory**



Expansion of area of control to northern Masisi and a small part of western Rutshuru territory

Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 16: Photographs of the NDC-R integration ceremony for new combatants in Kalembe on 4 February 2019**





The sanctioned NDC-R leader "General" Guidon presiding over the ceremony

UNCLASSIFIED    EXHIBIT 28

S/2019/469



Photographs provided to the Group of Experts by local sources

S/2019/469

**Annex 17: Photograph of the NDC-R leader "General" Guidon and his commanders in military fatigues**



"General" Gilbert Bwira, deputy commander of the NDC-R

Sanctioned individual "General" Shimiray Mwissa Guidon, leader of the NDC-R

"Colonel" Deo Bafosse Mparanyi, Chief of Staff of the NDC-R

Photograph taken in Kilembe in January and posted on the Internet in March 2019, as edited by the Group of Experts

UNCLASSIFIED    EXHIBIT 28

S/2019/469

### Annex 18: Detailed maps of northern Masisi under control of the NDC-R

During the first months of 2019, the NDC-R gained control over a large part of northern Masisi territory. They installed new camps in Kalembe and Kashuga and increased their presence in Kalungu, where they were present since mid-2018. Especially in Kalembe and Kashuga, the NDC-R positions were close to existing FARDC camps in the same localities.

Map by the United Nations, as edited by the Group of Experts



Image from Google Maps, annotated by the Group of Experts. Proximity of FARDC and NDC-R positions in Kalembe

UNCLASSIFIED        EXHIBIT 28

S/2019/469



Image from Google Maps, annotated by the Group of Experts. Proximity of FARDC and NDC-R positions in Kashuga

UNCLASSIFIED    EXHIBIT 28

S/2019/469

## Annex 19: Pictures of NDC-R positions in Kalembe and Kashuga





Photographs taken by the Group of Experts in March 2019

UNCLASSIFIED        EXHIBIT 28

S/2019/469

**Annex 20: Two waves of infiltrations by the FDN and Imbonerakure coupled with a series of armed clashes directed against RED-Tabara in South Kivu (November 2018)**



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

**Annex 21: FDN Corporal Mustapha Birori, captured by the FARDC in November 2018**



Handwritten paper includes identifying information of the arrested individual, including name, rank, weapons carried and crossing point into the Democratic Republic of the Congo from Burundi with the date and time.



Photographs received by the Group of Experts from a Congolese official in March 2019.

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 22: Military rations produced exclusively for the Ministry
for National Defence and Former Combatants of Burundi**

 

Photographs received by the Group of Experts in Nyamoma, in the Middle Plains of
Uvira, South Kivu

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

### Annex 23: Headquarters of Mai Mai Mbulu and Mai Mai Kijangala, associates of FDN and Imbonerakure

The headquartes of Mai Mai Kijangala and Mbulu are located in Buleza (near Mubere and Kabere) and Lukobero, respectively.



Map by the United Nations, as edited by the Group of Experts.

The Middle Plains of Uvira in the province of South Kivu include a large number of local armed groups imbedded in local communities, often alternating between their stated aim of providing local protection, extortion and theft.

The Group of Experts documented the presence of the following armed groups (not exhaustive) with varying degrees of contact, collaboration and conflict between them: Mai Mai Bigaya, Mai Mai Buhirwe, Mai Mai Kashumba, Mai Mai Kihebe, Mai Mai Kijangala, Mai Mai Kilolo, Mai Mai Kilimatavi, Mai Mai Kivue Songa, Mai Mai Mbulu, Mai Mai Mahangwe, Mai Mai Munyamali, Mai Mai Mushombe/Llunga and Mai Mai Rene.

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 24: MSD-issued communiqué marking its withdrawal from the CNARED**




### Mouvement pour la Solidarité et la Démocratie

#### COMMUNIQUE

Membre très actif du CNARED depuis sa création le 1er août 2015, le Parti MSD s'est constamment et sans relâche investi pour la réalisation de l'objectif de cette plate-forme résumé dans sa dénomination, à savoir le respect de l'Accord d'Arusha pour la Paix et la Réconciliation au Burundi.

Bien que travaillant dans un contexte politique et humain extrêmement difficile, le CNARED a eu le mérite incontestable d'avoir pu maintenir le Burundi sur l'agenda diplomatique international et révéler au monde entier la nature éminemment criminelle du régime de Pierre Nkurunziza dont personne ne doute plus aujourd'hui, ni dans la Sous-région ni en Afrique ni dans le Monde entier.

Mais malheureusement, au lieu de maintenir le rythme qui lui a permis d'atteindre ce résultat, la plate-forme s'est au fur et à mesure du temps fourvoyée dans des querelles individuelles stérilisant son action.

C'est dans ce contexte que le Parti MSD a organisé des consultations au sein de ses organes, à l'issue desquelles les militants ont préconisé son retrait du CNARED pour éviter que son maintien dans la plate-forme n'entrave son action de lutte contre le régime sanguinaire de Bujumbura et de réhabilitation de l'Accord d'Arushà, ce retrait prenant effet à la date du présent communiqué.

Le 18 janvier 2019

Pour le Parti MSD

Le Secrétaire Général

François NYAMOYA

Téléphone : 22273805    E-mail: msdburundi@gmail.com
Kinanira III, Avenue GASIBE, No 8

UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

## Annex 25: Headquarters and current location of RED-Tabara



Map by the United Nations, as edited by the Group of Experts. Locations are approximate.

UNCLASSIFIED

EXHIBIT 28

S/2019/469

## Annex 26: Kihebe Ngabunga, leader of Mai Mai Kihebe



Photograph by the Group of Experts in February 2019 in Uvira, South Kivu

UNCLASSIFIED

UNCLASSIFIED    EXHIBIT 28

S/2019/469

**Annex 27: Screenshots from two ADF propaganda videos showing children in the Madina Camp**





Screenshots from two ADF propaganda videos obtained by the Group of Experts and assessed as having been recorded during one of the 2017 Eid festivals

**Annex 28: Screenshots from two ADF propaganda videos showing the outfits worn by women and girls above nine years of age in Madina Camp**



Screenshot from one ADF propaganda video obtained by the Group of Experts. The woman reading the Quran was identified by one former ADF abductee interviewed by the Group of Experts as one of the female ADF combatant.

UNCLASSIFIED                    EXHIBIT 28

S/2019/469





Screenshots from one ADF propaganda video obtained by the Group of Experts and
assessed as having been recorded during one of the 2017 Eid festivals

UNCLASSIFIED     EXHIBIT 28

S/2019/469

**Annex 29: Screenshots from one ADF propaganda video showing children performing martial arts**





Screenshots from one ADF propaganda video obtained by the Group of Experts and assessed as having been recorded in Madina during one of the 2017 Eid festivals

S/2019/469

**Annex 30: Screenshot from one ADF propaganda video showing one child performing martial arts**



Screenshot from one ADF propaganda video obtained and edited by the Group of Experts showing one child performing martial arts. The child was recognised and identified by two former captives interviewed by the Group of Experts.

S/2019/469

## Annex 31: Attacks in Beni territory (Beni city and north of the city) from 10 November 2018 to 15 April 2019

List compiled by the Group of Experts on the basis of combined information from FARDC, MONUSCO, eyewitnesses, civil society and open sources

| Date | Locations | Number of FARDC casualties | Number of United Nations peacekeepers casualties | Number of civilian casualties | Total number of persons killed |
|---|---|---|---|---|---|
| 10-11 November 2018 | Boïkene | | | 1 killed 3 missing | 1 |
| 11 November 2018 | Mayi Moya | | | 5 killed 2 injured 2 abducted | 5 |
| 14 November 2018 | Mayangose/ Kididiwe (Joint FARDC-MONUSCO operations) | 14 killed 29 injured 12 missing | 7 killed 10 injured 2 missing | | 21 |
| 15 November 2018 | PK13 (Mbau/Kamango road) | 1 killed 3 injured | | | 1 |
| 15 November 2018 | Mambanike (2km from Oïcha) | | | 4 killed 2 injured 1 abducted | 4 |
| 16 November 2018 | Boïkene | | | 2 injured | |
| 18 November 2018 | Mukoko | | | 2 killed 2 missing | 2 |
| 22 November 2018 | Semuliki Bridge (Mbau/ Kamango road) | | | | |
| 23-24 November 2018 | Boïkene | | 1 injured | 1 killed 1 injured | 1 |
| 26 November 2018 | PK5 (Mbau/ Kamango road) | | | 2 killed | 2 |
| 26 November 2018 | Oïcha | 2 injured | | 5 killed 1 injured | 5 |
| 27 November 2018 | Boïkene | | | 2 abducted | |
| 5-6 December 2018 | Nyaleke - Mangolikene | | | 12 killed | 12 |
| 7 December 2018 | Païda | | | 5 killed 2 injured 3 abducted | 5 |
| 8 December 2018 | Matete | | | 1 abducted | |
| 10 December 2018 | Semuliki COB (Mbau/ Kamango road) | | 1 injured | | |

UNCLASSIFIED                          EXHIBIT 28

S/2019/469

| 10 December 2018 | Oïcha (Kekelibo, Mbibi and Mabasele) | | | 9 killed 2 injured 1 missing | 9 |
|---|---|---|---|---|---|
| 11 December 2018 | Kisiviki | | | | |
| 12-13 December 2018 | Nyaleke (Rizerie Kitchanga) | | | | |
| 15 December 2018 | Maïbo | | | 2 injured | |
| 16 December 2018 | Mangoko (5km from Mavivi) | | | | |
| 16 December 2018 | Mbau/Mapati | | | 1 injured | |
| 17 December 2018 | | | | 1 abducted | |
| 18 December 2018 | PK2/PK6 (Mbau – Kamango road) | | | 3 killed | 3 |
| 22 December 2018 | Beni/Masiana | 1 killed | | 4 killed 3 injured 2 abducted | 5 |
| 23 December 2018 | Boïkene and Kipriani | | | | |
| 29 December 2018 | Muzambayi/ Boïkene | | | 1 abducted | |
| 30 December 2018 | PK25 and PK28 (Mbau/ Kamango road) | 2 killed 7 injured | | | 2 |
| | | Total: 18 killed 41 injured 12 missing | Total: 7 killed 12 injured 2 missing | Total: 53 killed 18 injured 19 missing/ abducted | Total: 78 |
| | | **2019** | | | |
| 6 January 2019 | PK20 (Mbau/ Kamango road) | 1 injured | | | |
| 7 January 2019 | Mavivi | | | 11 killed 1 injured | 11 |
| 9 January 2019 | Mayisafi/ Bukane | 4 killed 4 injured | | 8 killed 11 injured 21 missing (14 returned) | 12 |
| 17 January 2019 | Semuliki COB (Mbau/ Kamango road) | | | | |
| 21 January 2019 | Mapobu | 25 killed 22 injured 5 missing | | | 25 |

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

| Date | Location | | | | |
|------|----------|--|--|--|--|
| 23 January 2019 | Kididiwe | | | 1 injured 1 missing | |
| 24 January 2019 | Mayi Moya / Kisiki | 1 injured | | **3 killed** 3 injured | **3** |
| 24 January 2019 | Malolu | | | 1 injured | |
| 26 January 2019 | PK26/27 (Mbau/ Kamango road) | **2 killed** 14 injured | | | **2** |
| 28 January 2019 | PK18 (Mbau/ Kamango road) | | | **2 killed** | **2** |
| 28 January 2019 | PK19 (Mbau/ Kamango road) | | | **1 killed** | **1** |
| 2 February 2019 | Kasinga | | | | |
| 4 February 2019 | Mapobu | **6 killed** 2 injured | | | **6** |
| 7 February 2019 | Rwangoma | | | **6 killed** 2 injured 8 abducted (including 6 children) | **6** |
| 8 February 2019 | PK9 (Mbau/ Kamango road) | **2 killed** 3 injured | | | **2** |
| 8 February 2019 | Kudu Kudu | | | **4 killed** 2 injured | **4** |
| 11 February 2019 | Mayi Moya | **1 killed** | | | **1** |
| 12 February 2019 | Mamove | **2 killed** 1 injured | | | **2** |
| 13 February 2019 | Mulolya | | | **2 killed** 1 missing | **2** |
| 13 February 2019 | Between Mamove and Oïcha | | | 17 abducted (14 released on 2 March 2019) | |
| 14 February 2019 | Oïcha (Matombo-Mambanike) | 1 injured | | **1 killed** | **1** |
| 16 February 2019 | Masulukwede | **5 killed** 3 injured | | | **5** |
| 18 February 2019 | Mavivi/Ngite | | | **2 killed** 1 injured 1 abducted | **2** |
| 24 February 2019 | Mamove | | | **3 killed** 7 abducted | **3** |
| 25 February 2019 | Kithevya | | | **3 killed** | **3** |
| 26 February 2019 | Ngite-Mavivi | 2 injured | | | |
| 26 February 2019 | Mulolya, Apetinasana and Kengele | | | **3 killed** 2 injured 23 abducted (including 4 | **3** |

DRC-30316 0685
UNCLASSIFIED

S/2019/469

| | | | | | |
|---|---|---|---|---|---|
| | | | | children – 22 released on 5 March 2019) | |
| 27 February 2019 | Atokaka-Garlic | 1 killed 2 injured | | | 1 |
| 5 March 2019 | Mapobu | | | | |
| 7-8 March 2019 | Apetinasana, Manzanzaba and Kengele | | | 1 killed 33 abducted (23 released on 12 March 2019) | 1 |
| 10 March 2019 | Kegele | | | 11 abducted | |
| 16 March 2019 | Semuliki COB | | | | |
| 19 March 2019 | Maleki | | | 1 killed | 1 |
| 23 March 2019 | Mamundioma | 1 killed 1 injured | | | 1 |
| 24 March 2019 | Baoba | | | 1 killed | 1 |
| 24 March 2019 | Kithevya | 1 killed | | 1 injured | 1 |
| 26 March 2019 | Mavivi/Ngite | | | | |
| 27 March 2019 | Mapela (5km from Eringeti) | 2 killed | | | 2 |
| 29 March 2019 | Semuliki COB – PK51 (Mbau/ Kamango road) | 1 killed | | | 1 |
| 29 March 2019 | Ngite - Vemba jungle | | | 3 killed | 3 |
| 29 March 2019 | Maïbo and Mukoko | | | | |
| 29 March 2019 | Mukakati (9km from Kamango) | | | 7 abducted (6 released) | |
| 30 March 2019 | Masulukwede | | | 1 killed | 1 |
| 2 April 2019 | Boïkene / Matete | 1 injured | | | |
| 2 April 2019 | Makulu – Mayi Moya | | | 4 abducted | |
| 3 April 2019 | Samboko | 3 killed 4 injured | | 1 injured 36 abducted (2 escaped and 13 released) | 3 |
| 6 April 2019 | Supa Kalau | | | 2 killed 4 injured At least 18 abducted (18 released) | 2 |
| 10 April 2019 | Kokola | | | 3 abducted (all released) | |
| 11 April 2019 | Kyanimbe (8km from Kamango) | 2 injured | | 7 killed | 7 |

84/150
DRC-30316 0686
042

UNCLASSIFIED

19-07687

84 of 150

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

|  |  | Total:<br>56 killed<br>64 injured<br>5 missing |  | Total:<br>65 killed<br>30 injured<br>191 abducted or missing (115 escaped or released) | Total: 121 |

The Group of Experts notes that the accuracy of the data of abductees or missing persons can be impaired by several factors, including lack of information about the exact number of people missing and abducted during attacks, and lack of proper reporting of those who escaped, were released or killed.

DRC-30316 0687

UNCLASSIFIED     EXHIBIT 28

S/2019/469

## Annex 32: Map of the north-eastern part of Beni territory



Map by the United Nations, as edited by the Group of Experts

UNCLASSIFIED
19-07687

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

**Annex 33: Photograph of the medicines recovered by the FARDC from the ADF attack on Mamove on 12 February 2019**



Photograph provided to the Group of Experts by civil society

EXHIBIT 28

S/2019/469

### Annex 34: Photographs of the ADF attack on Mamove on 24 February 2019







Photographs provided to the Group of Experts by civil society

         19-07687

UNCLASSIFIED    EXHIBIT 28

S/2019/469

### Annex 35: Photographs of Bongende after the attack of 17 December 2018

Photographs of destroyed and burned houses. The last photograph depicts the former police station and the two photographs before the last one depict a house where 21 members of the same family were killed.










UNCLASSIFIED

EXHIBIT 28

S/2019/469

 

All photographs taken by the Group of Experts on 26 January 2019

Individual and mass graves in the village

 

 

All photographs taken by the Group of Experts on 26 January 2019

UNCLASSIFIED

EXHIBIT 28

S/2019/469

## Annex 36: Photographs of Yumbi after the attack of 16 December 2018



Aerial photograph of Yumbi taken by the Group of Experts on 24 January 2019



Photograph of the former CENI office of Yumbi taken by the Group of Experts on 26 January 2019

UNCLASSIFIED    EXHIBIT 28

S/2019/469





Photographs of destroyed buildings taken by the Group of Experts on 24 January 2019

UNCLASSIFIED

EXHIBIT 28

S/2019/469

### Annex 37: Security report of the Democratic Republic of the Congo dated January 2019 regarding the events in Yumbi, Bongende, Nkolo and Camp Mbanzi in December 2018

Report provided to the Group of Experts by a source who had redacted the name of the signatory of the report

RÉPUBLIQUE DÉMOCRATIQUE DU CONGO



PROVINCE DU MAI-NDOMBE
TERRITOIRE DE YUMBI

Yumbi, le   janvier 2019

N°154/......../BUR/AT/TER/YBI/2019

TRANSMIS copie pour information à :

-   Son Excellence Monsieur le Vice-Premier Ministre de l'Intérieur et Sécurité ;
-   Son Excellence Ministre de la Défense Nationale.
    (Tous) A KINSHASA/GOMBE
-   Son Excellence Monsieur le Gouverneur de Province du Mai-Ndombe ;
-   Son Excellence Madame le Ministre Provincial en charge de l'Intérieur et Sécurité du Mai-Ndombe ;
-   Monsieur le Secrétaire Provincial du Mai-Ndombe ;
-   Monsieur l'Inspecteur Provincial de la Territoriale du Mai-Ndombe.
    (Tous) à INONGO

Objet :
Rapport de la Situation Sécuritaire
Et Administratif du Territoire de Yumbi

Au Commandant de la 1ère Zone
de Défense à KINSHASA/ GOMBE.

Mon Général,

**I.    SITUATION SÉCURITAIRE**

-   Mort de l'Administrateur de Territoire de Yumbi, feu Paul NSAMI MBO
-   Incendie Bureau CENI ;
-   Fuite des Autorité Politico-administratives, Policières et Sécuritaires ;
-   Fuites des chefs des Service et Agents
-   Déplacement Massif de la Population vers BWEMBA, MAKONTIMPOKO et dans les îlots voisins ;
-   Morts d'hommes dans les sites ci-après :
1)  Yumbi cité 166 Morts ;
2)  Village BONGENDE 339 Morts dont 230 enterrées par la Croix Rouge ;
3)  Village NKOLO/NUNU 12 morts dont deux Militaires
4)  CAMP MBANZI 7 morts
    Total 524 Morts
    NB : Dans chaque village précité, le nombre de personnes morts n'est pas exhaustif (corps jettés dans le fleuve, calcinés dans les maisons, soit enterrés par la population...),
-   Blessés (82) dans la cité de Yumbi et hospitalisés dont 10 décédés à YUMBI, 7 transférés à KINSHASA.
-   Maison brulées et incendiées reparties comme suit :
    1   YUMBI Cité       : 462
    2   NKOLO/NUNU       : 235
    3   BONGENDE         : 270
        Total            : 967

UNCLASSIFIED

- Pirogues Perdues :
  1. YUMBI Cité          : 230
  2. NKOLO/NUNU          : 48
  3. BONGENDE            : 85
     Total               : 363

- Biens pillés (Panneaux solaires, Groupe Electrogènes, vélos, Motos, Ustensiles de cuisine, filets, pagaie, machine à coudre etc...)
- Autres biens calcinés (objets classiques, téléphones, ordinateurs...)

## II. ÉTAT DE LIEUX DE L'APPAREIL ADMINISTRATIF

- Absence des Autorités Politico-Administratifs du Territoire ;
- Retour Progressif des cadres et agents des différents services,
- Désignation du Comd des opérations Yumbi en qualité de l'Administrateur de Intérimaire ;
- Inexistence de l'outil de travail et d'un cadre approprié ;
- Existence de deux types d'agents (Sous statut et Nouvelles Unités), soit 92 payés et plus de 400 non payés ;
- Inexistence de Frais de Fonctionnement et de la rétrocession ;
- Manque de moyen de mobilité pour approches les administrés ;
- Absence de moyens de communication (internet, phonie, TURAYA...)
- Absence d'Électricité et d'Eau portable ;
- Manque de matériels et produits chimiques pour désinsectiser et désinfecter le milieu;
- Perte de carte d'électeur,
- Présence des agents exclusivement NUNU et TIENE,
- Manque de résidence des fonctions aux cadres administratifs du territoire ;
- Non opérationnalité des Régies Financières

## III. PISTE DES SOLUTIONS

- Nomination de nouvelles Autorités Territoriales ;
- Permutation des cadres de différents services ;
- Allocation des frais de fonctionnement ;
- Dotation en Fournitures de bureau et Matériel informatique ;
- Dotation en véhicule, motos et hors bord pour les itinérances ;
- Dotation en moyen de communication (Internet, PC, TURAYA, Phonie...)
- Dotation en panneaux solaires, Batteries ;
- Dotation en produits de purification d'eau ;
- Dotation en produits désinfectants et insecticides ;
- Campagne de sensibilisation aux deux Ethnies en prévision des élections pour leurs réconciliations ;
- Duplicata des cartes d'Electeur ;
- Aide Humanitaire (baches, filets de pêches, tôles cahiers, matelas, habits, panneaux solaires, vivres, pirogues etc...) ;
- Dotation en carburant et Lubrifiants ;
- Constructions du bâtiment administratif du territoire ;
- Renfort en policier (Plus au moins 150 Éléments) en prévision des élections prochaines,

Plus rien à vous ordres

UNCLASSIFIED                         EXHIBIT 28

S/2019/469

### Annex 38: Maps of Yumbi territory



UNCLASSIFIED                    EXHIBIT 28

S/2019/469



Maps by the World Food Programme, as edited by the Group of Experts

S/2019/469

**Annex 39: Document from the Batende community dated
4 September 2018**

Provided to the Group of Experts by civil society



S/2019/469



- Monsieur le Président de l'Assemblée Provinciale du Mai-Ndombe ;
- Monsieur le Gouverneur de la Province du Mai-Ndombe ;
- Monsieur le Commissaire Provincial de la Police Nationale Congolaise de Mai-Ndombe ;
- Monsieur le Directeur Provincial de l'ANR/Mai-Ndombe ;
- Monsieur le Directeur Provincial ai de Migration/Mai-Ndombe ;
- Madame le Ministre Provincial de Mai-Ndombe en charge de l'Administration du Territoire et Sécurité ;
- Monsieur le Procureur près le Tribunal de Grande Instance d'Inongo.

(Tous) à Inongo

- Messieurs les Administrateurs des Territoires de Bolobo et Yumbi ;
- Monsieur le Chef de Secteur de Mongama à Mongama ;
- Monsieur le Chef de Groupement Batende à Mansele ;
- Monsieur le Chef de Groupement Banunu-Bobangi à Yumbi ;
- Messieurs les Chefs de Cités de Bolobo et Yumbi.

UNCLASSIFIED                           EXHIBIT 28

S/2019/469

3

A Son Excellence Monsieur le Premier Ministre, Chef du Gouvernement
Hôtel du Gouvernement
à Kinshasa Gombe.

OBJET : Lettre N°CT/GBB/T-B/SECT- MONG/T.Y/02/2018 du 09/08/2018
d'un certain  Monsieur MEKA BATSANA
Dénonciation d'une Liste provocatrice
des prétendus chefs de terre du Groupement
Banunu-Bobangi des Territoires de Yumbi et Bolobo

Excellence Monsieur le Premier Ministre,

Nous, Notables de la Communauté Batende des Territoires de Yumbi et Bolobo, venons par la présente nous faire l'ultime obligation, pour la énième fois, de dénoncer le comportement provocateur des populations génériquement et abusivement appelées Banunu-Bobangi installées en Territoires de Yumbi et Bolobo au sujet de leurs prétentions usurpatrices récurrentes des terres Tiene en ce 21è siècle dans les deux Territoires administratifs précités.

A première vue, la présentation de cette lettre, dont nous prions votre Excellence de trouver une copie en annexe, ne mérite aucune considération tellement que sa forme ressemble au dessin des enfants d'école maternelle ; elle est une comédie de mauvais goût et dénoterait une aventure : sans énumérer toutes les incongruités que l'on peut y relever :
  ➢ le papier porte l'en-tête d'un certain "Ministère de la Coutume",
  ➢ un certain Territoire Yumbi-Bolobo inexistant ;
  ➢ et le signataire, un "Président du comité des chefs des terres des Banunu et Bobangi".

De toute évidence, nous connaissons la problématique millénaire des gens d'eau », ils sont des « landless people  et ce, depuis le 19è siècle¹.».

 Pour votre gouverne, l'ethnographie du Congo renseigne, et tout le monde le sait, que les populations riveraines dites Banunu ou Moyi, ainsi appelés au Congo-Brazzaville d'où ils sont originaires, et Babangi, des « gens d'eau du groupe de Ngiri » selon Vansina et plusieurs autres auteurs, occupent de Lukolela à Bolobo les rives des terres Mpama, Basengele, Batende et Bateke.

¹ HARMS Robert. Eco-cutural history of the Nunu of Equatorial Africa, Cambridge University Press, 1987.

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

Il sied aussi de souligner que les Batende n'ont pas de répit avec ces "gens d'eau" « Babale » depuis l'époque coloniale jusqu'au-delà de l'indépendance de notre pays en 1960.

Ce faisant, pour combler leur besoin en manque de terres, les Banunu et Babangi ne cessent de forger des stratégies usurpatrices : hier, elles procédaient par "des camps permanents des pêcheurs"(Vansina) « fishing camps for the mixing of river people »(R.Harms) càd les camps de pêche pour le mixage de peuple riverain, qui se transformaient rapidement en villages. Mais depuis l'indépendance, l'on assiste à une recherche effrénée contre vents et marées des "entités territoriales et administratives au sein de celles déjà occupées par d'autres communautés". Cela ne se passe pas sans heurts.

En effet, les archives de notre pays montrent que les Batende et les Banunu-Babangi ont connu plus d'une guerre :

1°) En 1963, c'est la guerre dite « Moyen-Congo » par l'annexion, à l'initiative des leaders Banunu et Bobangi, d'une portion des terres de la contrée de Bolobo-Yumbi à la Provincette du Moyen-Congo, au-delà de celle de la Cuvette Centrale,alors que la contrée formait un bloc avec la Provincette du Lac Léopold II.
La carte ci-après est plus éloquente.



UNCLASSIFIED                    EXHIBIT 28

S/2019/469

5

2°) En 1977, ces populations avaient boutiqué une « collectivité administrative qui allait être constituée de la bande de terres des Batende comprises entre les rives et la grande route reliant les deux grandes agglomérations de Yumbi à Bolobo » ; MAKOLO JUBIKILAY en sait quelque chose même si Mafema Nganzeng nous a quitté.Paix à son âme.

3°) En novembre 2006, à la veille des premières élections présidentielles démocratiques, le Général KALUME est encore en vie pour témoigner des atrocités qui eurent lieu à Bolobo entre les Batende et la coalition de ces populations riveraines ; en cette même année 2006, les mêmes populations Banunu et Babangi avaient aussi l'imagination fertile pour inventer un «secteur Banunu/Mitsandungu » inexistant en RDC, l'Honorable Professeur MBEMBA Théophile encore en vie a arbitré ce conflit ;

4°) Depuis 1995 jusqu'à ce jour 2018, les Basengele sont constamment en bute aux mêmes querelles entre cette faction des Nunu et Babangi habitant la contrée de Nkuboko, le nord du Territoire d'Inongo caractérisé par « des marécages les plus insalubres du Congo ». [2]

5°) Le 27 février 2015, votre Gouvernement était forcé de sursoir le Décret décrié No13/025 du 13 juin 2013 par celui No 15/013 du 28 juillet 2015 [3] : les noms et limites de futures Communes et Ville de Bolobo, tels que repris dans ce Décret sursis, étaient extravagants, ...dépouillaient les Batende de leurs terres du Groupement Bwema... Nous y fustigions le comportement du Député ETIBAKO NDITO Eddy.

6°) Pas plus tard en juillet 2017, les Batende avaient saisi toutes les instances du pouvoir public pour dénoncer « les troubles de jouissance orchestrés par un Député ci-haut cité, ressortissant Nunu et/ou Mobangi[4], à MOLEBO et MPOZO à Bolobo. Ces endroits seraient ses propriétés foncières qu'il aurait héritées de ses parents émigrés récemment en 1939-40[5] des ''marécages les plus insalubres du Congo» alors que bien avant en 1880, IBAKA, le chef de tous ces Banunu et Babangi voire des Bankusi, Mboshi, Koyo, Likwala, Likuba et Ngungulu à Bolobo, était ''un ancien esclave d'origine Teke'', nous citons: « IBAKA was an ex-slave and adventurer who really came from the low part of the Alima River, and was probably the Bateke origin. »[6]

7°) Il y a peu de temps, ces Banunu et Babangi du territoire de Yumbi ont présenté des îlots comme étant leurs terroirs ancestraux que le projet WWF-PIRED devait aménager.

---

[2] L'expression est de l'A.T. Van ACHT, R, Document administrative du 01.06.1947
[3] Voir lettre No 25/CAB/VPM/MININTERSEC/EB/3601/2015 du 25 septembre 2015 du Vice-Premier Ministre, Ministre de l'Intérieur et Sécurité.
[4] Nous ne maîtrisons pas sa réelle tribu.
[5] A.T Van ACHT, R., idem:
[6] J. Harry Grenfell and the Congo, London, vol. II,1908,p.704

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

Aujourd'hui, les Nunu et Babangi seraient devenus des chefs des terres et non plus des chefs des îlots. Leurs pirogues vont-elles se mouvoir sur la terre ? N'est-ce pas là une négation de leur identité ethnique ?

Vous êtes de notre avis qu'il y a des indices d'une comédie de mauvais goût et de nature provocatrice dans le chef des populations riveraines de Banunu et Babangi.

Nous sommes habitués à ces provocations et ces Banunu et Babangi nous connaissent très bien. Nous les attendons voir concrétiser leurs blagues millénaires.

Aucun vrai patriote congolais,propriétaire terrien de bon sens,ne pourrait acquiescer l'humiliation que le conglomérat des Banunu(Moye) et Babangi cherche à y plonger les Batende en leur expropriant des terres de leurs ancêtres, acquises depuis la nuit de temps , en ce 21$^{\text{ème}}$ siècle, à moins qu'il soit tombé dans l'obscurantisme.La terre,dans la tradition Tende, à l'instar de toutes les tribus de l'ancienne ·Province Coloniale de Léoplodville (dans le Grand Bandundu et la Province du Kongo Central ,est l'apanage des clans et non des individus comme le Sieur Nunu de MEKA BATSAMA s'aventure à les présenter.

En tout état de cause, il faudra retenir que :

1. Les clans tende, propriétaires fonciers le long du fleuve congo, allant de la rivière Solu (Yumbi) à la rivière Lesane (en aval de Bolobo) sont :
   - Clans Kintwali, dont le patriarche Ndeme Ngambala a obtenu le titre foncier en 1906 pour le terres couvrant la Cité de Yumbi et Kentuma où se situe le fameux marché dit Maroc dans quarier Bokongo au bord de la rivière Solu ,Mokonga n'étant pas un quartier de la Cité de Yumbi comme d'aucuns voudraient le faire croire ;
   - Clan Mpaale ;
   - Clan Bompasa ;
   - Clan Molene ;
   - Clan Ntsewene ;
   - Clan Lumu-le-Maane ;
   - Clan Mundinghja ;
   - Clan Bokuku ;
   - Clan Kamfunyi ;
   - Clan Nkaame ;
   - Clan Leme ;
   - Clan Kamvuma ;
   - Clan Lekaka ;

UNCLASSIFIED   EXHIBIT 28

S/2019/469

7

2. Les villages exlusivement Banunu :Molumbu,Bontaba,Bongende et mixtes Nkolo ,Bolobo et Yumbi sont établis en terre Tiene des clans propriétaires fonciers le long du fleuve tels que sont repris ci-dessus.

3. Les cartes des limites des terres ancestrales entre les tribus voisines présentées ci-dessous sont illustratives à plus d'un point.



103
19-07687
DRC-30316 0705
UNCLASSIFIED
103 of 150
103/150

UNCLASSIFIED                    EXHIBIT 28

S/2019/469



*The Kuus and Their Neighbors*

UNCLASSIFIED

EXHIBIT 28

S/2019/469



Le territoire des Baboma.

9

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

10

Nous avons ainsi tenu à informer votre haute Autorité en attendant que les auteurs Banunu-Babangi qui ne contrôlent plus leurs enfants irresponsables exécutent leur sale besogne s'ils sont sérieux.

Veuillez agréer, Excellence Monsieur le Premier Ministre, l'expression de notre très haute considération.

106/150
DRC-00316 0708
106

UNCLASSIFIED

19-07687
106 of 150

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

POUR LA COMMUNAUTE BATENDE

Daniel MOKELO/MUEKOLINGA

Marcel MPETI MPIA

Bruno NGELINGONO

Pierre MPOTO BALOKO

Faustin MAYO BELOKO

Joseph MOKELO MPAYI

Freddy MBONGO KILIYO

Jean   NGAMA NGUANGO

EXHIBIT 28

**Annex 40: Extracts from one booklet compiling two requests dated 2015 from KEBIMA, a Batende association**

Document provided to the Group of Experts by civil society



REPUBLIQUE DEMOCRATIQUE DU CONGO
Province du Mai-Ndombe
Territoires de Yumbi et Bolobo

A PROPOS DES NOMS ET LIMITES INADEQUATS ET
DECRIES DE LA VILLE ET DES COMMUNES DE BOLOBO :
LE DECRET NO 13/025 DU 13 JUIN 2013 SURSIS PAR
CELUI NO 15/033 DU 28 JUILLET 2015.

La Mission de l'Ecole pour les Sociétés Africaines"

JUILLET 2015



19-07687
BRC-90316 0711
109

UNCLASSIFIED

109/150
109 of 150

UNCLASSIFIED                    EXHIBIT 28

S/2019/469



objectif que d'éviter, par une lutte des idées, anticipative et d'une manière démocratique, l'énième conflit qui pointait à l'horizon à la suite d'une mesure gouvernementale, la Décentralisation, laquelle pouvait encore constituer l'un de ces divers moments tumultueux auxquels les communautés ethniques de Bolobo, les Batende et les Banunu surtout, sont souvent confrontées au moment où le pays opère de grands changements de son histoire politique : penser à l'année 1962-63 quand le Congo Démocratique passait de 6 à 21 provinces dites "provincettes", les deux communautés précitées s'étaient plutôt retrouvées dans une guerre de triste mémoire à cause d'une configuration administrative inexplicable de cette Province dite Moyen-Congo, bastion des populations Nunu et Bobangi, qui englobait illogiquement les terres allant de Yumbi à Bolobo, terres des Batende, alors qu'elles constituaient plutôt un bloc de la province du Lac Léopold II, et pour lesquelles ces Banunu et Bobangi, jadis, "payaient le tribut au chef de terres Motende (=une cuisse et a mention de toutes les bêtes tuées sur terres fermes) selon l'A.T. Cordemans.

La mise en commun de ces requêtes et les suites y réservées par les différentes instances étatiques saisies à cette fin, offrent un bel exemple de lutte démocratique et pacifique à léguer a la postérité, toutes centrées confondues.

Pour la mise en commun des textes

Randolph Sébastien Mbanga Manzimi et Joseph Mokelo Mpayi-Kaloo

S/2019/469

20

PRESENTATION DE LA DEUXIEME REQUETE

Pendant que Kebima s'attelait aux recommandations de la Primature ayant trait à sa première requête, elle examina aussi des observations inhérentes au projet de loi qui était en examen au Parlement sur la répartition des sièges par circonscription électorale et ce en prévision des élections législatives nationales, provinciales, municipales et locales qui pointaient à l'horizon 2016. Elle contextualisa sa première requête dont la présentation ci-après ainsi que la réaction des instances françaises.

2.1 Introduction

En prévision de l'examen du projet de loi portant répartition des sièges par circonscription électorale pour les élections municipales et locales qui pointent à l'horizon 2016, nous, ressortissants des Territoires de Bolobo et Yumbi, avons l'insigne honneur de rappeler que nous avons déjà adressé à vos Autorités notre requête en rectification des noms et limites erronés inhérents à la Ville de Bolobo et ses trois Communes tels que repris dans le Décret no 13/025 du 13 juin 2013 conférant le statut de ville et commune aux Cités de Bolobo et Yumbi, et ce par notre lettre référencée KEBIMA/CD/015/2015 du 15 février 2015, reçue en vos cabinets respectivement les 16 et 23 février 2015, sous les no 1335/0931 et 06505.

Nous sommes encore dans la procédure de normalisation de ces données erronées, telle recommandée par le Cabinet du Premier Ministre suivant sa lettre no CAB/PM/CJFAD/MIN/2015/1157 du 27 février 2015.

Si nous revenons aujourd'hui sur cette question, c'est parce que nous ne sommes pas encore en possession de la suite promise par son Excellence Monsieur le Ministre de la Décentralisation et des Affaires Coutumières ainsi qu'il ressort de sa lettre no CAB/MEMIN/DAC/APP/0679 du 27 mars 2015.

En tout état de cause, nous jugeons important de vous redonner la quintessence de la requête sus évoquée, car la communauté Tiene dont la population se trouve à cheval entre les deux territoires de Bolobo et Yumbi, voire dans le Territoire d'Inongo, appelée à tort les Bakukuma, tient à insister sur la délicatesse de la question dans la région. Sans passion aucune, les données avancées par nos voisins immédiats, telles que reprises dans le Décret précité par nous décrié, ne correspondent pas du tout aux réalités en nos sociolinguistiques et juridico-administratives de la contrée.

Elles sont plutôt de nature à dépouiller les Batende de leur héritage foncier du Groupement Bwema, et susceptibles alors de ressusciter, pour la énième fois, les conflits intercommunautaires déplorables (de 1963, 1977 et 2006), que la contrée de Bolobo-Yumbi a connus, toujours à des moments où le pays est en passe d'opérer de grands changements politiques de son histoire.

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

21

Nous ignorons quelle pourra en être l'issue si ce décret décrie passait avec ses données tarées, telles que déjà détaillées dans notre requête sus évoquée.

Toutefois, en attendant, nous voudrions parer au plus pressé et demandons à vos Autorités de bien vouloir trouver ci-dessous les noms et limites des Ville, communes et Groupements rectifiés, se retrouvant dans les Territoires de Bolobo et Yumbi, car proches des acquis historiques, juridico-administratifs, propres à chaque communauté ethnique, Tiene, Teke et Nunu, habitant la contrée.

2.2 Dénonciation des données extravagantes inhérentes aux Communes de la Ville de Bolobo

Eu égard au passé de la région, quelques mises au point s'imposent en vue de dégager des conciliations inhérentes aux noms et limites de nouvelles Ville et Communes de Bolobo. La paix sociale dans cette contrée est à ce prix. En effet :

1. Nous sommes conscients que tout congolais peut s'établir là où bon lui semble sur le territoire national et que chaque congolais a aussi sa terre natale.

2. Pour dire à quel prix «la terre est à l'échelle collective, un symbole fort de l'identité d'une communauté»[21]

3. Selon l'historique, le nom de Bolobo est impérativement un héritage commun.

4. D'aucuns n'ignorent que l'histoire de Bolobo est étroitement liée aux fondateurs européens (Capitaine Hanssens, Grenfell et autres), ainsi que l'écrivit Margaret Stockwel Bafende : «l'histoire de Bolobo commence avec le nom de Grenfel»[22]

5. Aucune de trois principales communautés y habitant ne peut s'en approprier.

6. De ce qui précède, l'urbanisation de Bolobo et Yumbi ne doit offrir à quiconque le droit de faire table rase des acquis historiques et coutumiers, la mémoire collective des peuples.

7. Les dimensions de la future Ville de Bolobo, telles que reprises dans le Décret décrié sous examen, ont largement dépassé les limites de la Cité de Bolobo et dépouilleraient les Batende de la portion sud de leur héritage foncier, le Groupement Bwema, dont les clans Kentiba, kemvuma, Kevuke, Lekaka, Lieme, Madiba, Mfanzale et Ndua sont propriétaires terriens.

8. D'ailleurs, à ce point précis, les communautés riveraines, les migrants trafiquants Bobengi et pêcheurs Nunu-Moye payaient «le tribut au chef de terre Motende», ainsi que l'écrivait l'Administrateur Cordemans. cf. la requête sus évoquée déjà en votre possession.

[21] Kengabanze M'bambi, la loi du 20 juillet 1973, trente ans après : quel bilan ? p.161
[22] Margaret Stockwel Bafende, Missionnaire protestante, in le commencement de l'œuvre chrétienne à Bolono, speech inédit prononcé en 1988 à Bolobo, lors du 1er centenaire de création (en 1888) de Bolobo

UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 41: Photograph of the grave of deceased Banunu chief Mantoma Bompinda Fedor**



Photograph taken by the Group of Experts on 27 January 2019

19-07687
DRC-80316 0715
113

UNCLASSIFIED

113/150
113 of 150

S/2019/469

**Annex 42: Document dated 28 January 2019 sent by the members of the Batende community to the Prime Minister of the Republic Democratic of the Congo**

Provided to the Group of Experts by civil society



UNCLASSIFIED                    EXHIBIT 28

S/2019/469

*(Tous) à Yumbi,*
- Monsieur le Chef de Secteur de Mongama.
  *à Mongama*
- Monsieur le Chef de Groupement des Batende.
  *à Mansele*
- Monsieur le Chef de Groupement des Banunu-Bobangi
  *à Yumbi*

*A Son Excellence Monsieur le Premier Ministre, Chef du Gouvernent*
*à Kinshasa/Gombe*
*(Avec l'expression de nos sentiments patriotiques)*

Concerne : Transmission Mise au point de la Communauté Batende sur les affrontements ayant opposé les Batende et les Banunu les 16 et 17 décembre 2018 à Yumbi.

*Excellence Monsieur le Premier Ministre,*

Nous, Notables de la Communauté Batende des Territoires de Yumbi et Bolobo, faisons l'ultime obligation de venir par la présente vous transmettre notre mise au point, mieux spécifiée en concerne, pour éclairer votre lanterne.

De toute évidence, ces affrontements ont déjà fait l'objet de plusieurs rapports.

Toutefois, la Communauté Batende estime qu'une mise au point s'impose au regard des déformations que certains fils mal intentionnés de la communauté Banunu véhiculent autour desdits événements.

Nous vous en souhaitons bonne réception.

Veuillez agréer, **Excellence Monsieur le Premier Ministre, Chef de Gouvernement,** l'expression de nos sentiments patriotiques.

POUR LA COMMUNAUTE BATENDE
Faustin MAYO BELOKO

PRESIDENT

UNCLASSIFIED    EXHIBIT 28

S/2019/469

# COMMUNAUTE BATENDE

### Avenue KILOMBWE n°43 C/ LEMBA-KINSHASA, Tél: (+243) 081 813 68 11

MISE AU POINT SUR LES AFFRONTEMENTS AYANT OPPOSE LES BATENDE ET
LES BANUNU LES 16 ET 17 DECEMBRE 2018 A YUMBI.

I.    Bref rappel des faits saillants ayant conduit à ces affrontements.

1. Monsieur Mantoma Bompinda Fédor, Chef de Groupement Banunu, meurt à Kinshasa le 02 décembre 2018.
2. Depuis Kinshasa, des bruits persistants couraient annonçant la décision de la communauté Banunu de l'enterrer en pleine Cité de Yumbi.
3. Les Batende ne l'entendaient pas de cette oreille considérant que ceux-là n'ont pas des droits fonciers dans les Territoires de Yumbi et Bolobo.
4. Avant l'arrivée de la dépouille à la Cité Yumbi, les ressortissants Nunu, majoritaires dans ladite Cité Yumbi, avaient décrété les interdits suivants :
   ✓ Marcher pieds nus et déchausser tout celui qui osera défier ce principe ;
   ✓ Les femmes, en plus du premier point, portaient des pagnes à la racine des seins ;
   ✓ Interdiction d'acheter et de manger tout produit émanant des Batende ;
   ✓ Interdiction de se laver, voire de brosser les dents ;
   ✓ S'abstenir même des rapports sexuels.
5. Qui connaît les mœurs africaines sait que ces interdits présageaient une guerre. Il y a la préméditation dans le chef de la communauté Banunu.
6. Les Autorités locales dont l'Administrateur du Territoire, ayant pris vent de leurs manœuvres, les en ont dissuadé, évoquant l'illégalité de leur volonté et l'interdiction sur le plan hygiénique de mélanger les vivants avec les dépouilles mortelles dans le monde civilisé.
7. La tension montait entre les deux communautés.
8. Devant cette animosité, les minorités Batende quittèrent la Cité de Yumbi et se réfugièrent dans leurs autres villages environnants.
9. Le vendredi 14.12.2018, le corps arrive à Yumbi vers 19 heures.
10. Il est furtivement inhumé la nuit de vendredi à samedi 15 décembre vers 2 heures et ce, à l'insu et à l'encontre de la décision du comité locale de sécurité.
11. Le même samedi après l'enterrement, les Banunu organisent une marche triomphale à travers la Cité en lançant le slogan tel que 3 à 0, bokanisah Mantoma akokweya, waya ! Pour dire « vous n'avez pas réussi à nous interdire l'enterrement».

    UNCLASSIFIED       19-07687

S/2019/469

12. Dans cette euphorie, ils sont allés incendier les maisons des Batende (minoritaires dans la Cité de Yumbi) dont celles de Ngobila Malala, chef de terre de Yumbi, de Beloko Paul Dauphin, chef de quartier Yumbi-Moyi et du Greffier MANDENDELI.On dirait qu'ils visaient le pouvoir coutumier Tende en attaquant à ses symboles, tuant même les Batende mariés aux femmes Nunu qui n'avaient pas fui.

13. Vers 14 heures, les Batende sont venus à la rescousse de leurs frères qui étaient en péril à Yumbi, c'est le début des affrontements entre les deux communautés qui ont causé des morts de deux cotés.

14. Et comme si tout cela ne suffisait pas, les Nunu iront tuer un enseignant Tende du village de Mpunyi, alors qu'il revenait de la pêche aux environs du village Bongende. Ce meurtre va encore provoquer des affrontements de Bongende et les environs. De la même façon, les Banunu à Nkolo, profitant de la fuite des Batende minoritaires dans ce village, ont aussi commencé à incendier les maisons des Batende. Cela incitera les Batende des environs à venir aussi à la rescousse de leurs frères à Nkolo ; on assistera à de nouveaux affrontements, les morts n'en manquaient pas.

15. Le comble de tout, ils ont assassiné délibérément l'Administrateur du Territoire en présence de son Assistant Monsieur Denis Nsola, de son garde du corps, de Chef d'Antenne de la CENI, de son chauffeur et autres, et après, ils ont incendié le Centre de CENI. C'est une autre façon d'attaque du pouvoir public.

II. De la préméditation des affrontements des 16 et 17 de Yumbi

Les déclarations de Monsieur ETIBAKO NDITU Eddy, sujet Nunu alors Député de Bolobo à travers sa radio tribale à Bolobo, les éléments sonores étant disponibles, ainsi que des interdits ci-haut rappelés (signes de préparatifs de guerre suivant les traditions africaines), démontrent à suffisance de la préméditation de ces affrontements, surtout lorsque ce Député dit qu'il connaissait le plan A, le plan B et le plan C et que le Major Charles de la Force Navale en poste à Yumbi, qu'entouraient les Banunu devant le centre de CENI, est fréquemment cité dans l'assassinat de l'Administrateur de Territoire de Yumbi par les Banunu.(Cfr les Témoignages de l'Administrateur de territoire Assistant, du chauffeur de l'infortuné et de son Garde du corps).

III. Les Batende et les Banunu n'en sont pas à leur premier affrontement:

Les heurts entre les deux Communautés en terre Tende depuis l'émigration des Banunu et Bobangi de leur terroir originel - Afrique Equatoriale Française, A.E.F.- Nsangasi-Nkuboko et Ubangi dans les parages équatoriaux, jalonnent l'histoire de leur cohabitation.

2

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

Tenez :

1. L'histoire renseigne que depuis leurs ultimes migrations, l'occupation des terres Tende par les Nunu avait provoqué des guerres.[1]

2. Lors du découpage territorial en 1963 consacrant les Provinces du Moyen-Congo(Mongala), de la Cuvette Centrale (l'actuel Equateur) et du Lac Léopold II (Maï-Ndombe aujourd'hui), les Banunu ,aidés par leurs politiciens sans scrupule, avaient obtenu à faire administrer par la Province du Moyen-Congo, le Territoire de Lukolela (de la Cuvette Centrale) et le Poste d'Etat de Bolobo en Territoire de Mushie (Province du Lac-Léopold II) n'ayant eu aucune frontière commune avec le Moyen-Congo. Les Batende, les Basengele et les Bateke avaient contesté ce découpage. Ce qui avait conduit à ladite guerre qualifiée par ces peuples de la contrée « guerre de Moyen-Congo ».(Pces 1et 2).

3. En 1977, les tentatives des Banunu d'obtenir leur Collectivité-Secteur autonome au sein de la Collectivité-Secteur de Mongama, a failli replonger la contrée dans une autre guerre fratricide.

4. En 2006,les Banunu de Bolobo avaient créé des incidents fâcheux qui avaient conduit aux affrontements meurtriers entre les deux Communautés notamment ;

   • l'assassinat d'un jeune homme Tende sur le fleuve après lequel ils se sont livrés au triomphalisme ;
   • l'incendie des maisons des Batende, minoritaires dans la Cité de Bolobo.

IV. Les Banunu ne sont pas seulement en conflits avec les Batende à Yumbi et Bolobo, mais également avec les Basengele dans le Territoire d'Inongo et avec les Bateke en Territoire de Bolobo, voire avec les Mpama dans le Territoire de Lukolela.

La recherche effrénée et surannée des terres autonomes par les Banunu en ce 21è siècle est à la base desdits conflits, alors qu'ils sont historiquement reconnus comme des « gens d'eau », « the water people » (Vansina) ou des peuples sans terre, « the landless people »(Robert Harms). Or, tout congolais peut habiter où bon lui semble sur toute la république. Constitution, art. 30.

En effet :

1. En 1963, ils étaient en guerre contre les Mpama à Lukolela, avec les Basengele dans la contrée de Nkuboko Mpenda du Groupement Mbelo en Territoire d'Inongo, avec les Batende et les Bateke dans la région de Yumbi-Bolobo.

---

[1]Cordemans, document administratif du 20 avril 1949

3

S/2019/469

2. A deux reprises, en février 2018 et du 19 au 22 novembre 2018, les Banunu s'étaient affrontés avec les Basengele à Inongo.Le rapport du Chef de Secteur de Basengele y afférent fait état de:
➢ l'utilisation des armes de guerre par les Banunu ; cfr rapport du 28/02/2018
➢ les actes de vandalisme en déchirant le drapeau national congolais, le destruction de l'amigo, de la paillotte du bureau de Sous-Commissariat de Police Nationale avec tous les mobiliers (Pièces 13-18)
3. Récemment, le conflit se ravive entre les Banunu et les Bateke autour des villages Botanankasa, Mabwa-Mabwa, Mankondo, Mompondo et Mompulenge situés en bordure du fleuve Congo, en aval de la Cité de Bolobo, dans la Chefferie des Bateke-Nord.(pces 19 à 23)

V. De tout ce qui précède, il appert que :
➢ les Banunu défient l'Etat (ils avaient fait usage des armes de guerre à Nkuboko en novembre 2018, ils ont déchiré le drapeau de la République et ont séquestré le commandant de la police nationale sans être inquiétés, La rapport du chef de secteur des Basengele en annexe en dit tout ; ils viennent d'abattre l'Administrateur du Territoire de Yumbi non avec des sagaies, leurs spécificités culturelles, mais avec une arme de guerre. De qui les obtiennent-ils ? De leurs fils, Officiers Supérieurs de l'armée ? Ils ont incendié les maisons de la CENI, ? du chef de quartier Yumbi-Moyi, du chef de terre des Batende et du Greffier ; etc...(Pièces 13-18)
➢ les allégations tonitruantes faites par les ressortissants Banunu-Bobangi quant aux causes de la survenance des affrontements à Yumbi en décembre 2018 sont purement fallacieuses et calomnieuses.

Ainsi la Communauté Batende les dénonce toutes de la manière la plus catégorique et exige qu'une enquête mixte soit diligentée, la présence du Député ETIBAKO NDITO Eddy et de Monsieur Séverin BAMANI étant très exigée, pour :
1° décortiquer les déclarations radiodiffusées de Monsieur ETIBAKO NDITO Eddy qui a dit « je connaissais le plan A, le plan B et le plan C, je vous l'interdisais, vous ne m'aviez pas suivi ».
2° identifier les Banunu auteurs planificateurs des tueries, du crime odieux de meurtre crapuleux de l'Administrateur du Territoire, avec une arme de guerre, des sujets Batende, des incendies des maisons de la minorité des Batende dans la Cité de Yumbi et de Centre de CENI à Yumbi, crime ayant provoqué la colère des Batende jusqu'à cet accrochage.
3°Exhumer les restes de trois corps des Banunu enterrés en pleine Cité de Yumbi pouvant être prétendus comme des vestiges historiques aux

S/2019/469

générations futures des Banunu, épines dorsales des présents affrontement déplorables, l'une des conditions sine qua non pour une chance de pai durable dans la contrée.

4° inviter les Banunu :

a) au respect des us et coutumes de leurs voisins Baboma, Batende, Basengele Bateke et Mpama en matière de propriété terrienne afin de mettre définitivement un terme à leurs prétentions éhontées et surannées de se prévaloir détenteurs des sols longeant le fleuve en Territoires de Lukolela Yumbi, Bolobo et d'Inongo ,et à la pratique scandaleuse prohibée et non hygiénique de l'inhumation de leurs cadavres en pleine cité de Yumbi et/ou Bolobo ;

b) à la tolérance.

5° la paix durable dans les régions concernées par les guerres et conflits ci-haut évoqués est à ce prix. Un atelier du genre « Vérité et Réconciliation » regroupant les ethnies avoisinantes notamment, les Batende, Bateke, Basengele, Baboma, Banunu-Bobangi, Mpama, voire les Basakata est très utile quant à ce.

Telle est, **Excellence Monsieur le Premier Ministre et Chef du Gouvernement, la** quintessence de notre présente mise au point pour la recherche d'une paix durable entre les Banunu et tous leurs voisins.

Fait à Kinshasa, le 28/01/2019

**POUR LA COMMUNAUTE BATENDE**

UNCLASSIFIED                    EXHIBIT 28

S/2019/469



**POUR LA COMMUNAUTE** BATENUE

8

1. Bisation MAYO BELOKO
2. MAYO EBOYA FADELE
3. NGANYONYI-NSELE AZIZA
4. MBONGO-BAHO
5. MABIALA-TRIDON
6. NSANKESE-NKUMPEKA
7. BILOKO-MBONGO
8. MABIALA-MBOMWALI
9. BILANSA-CILE
10. NGAMA MALITA ALIOT
11. NGAMAOI-ELVIS
12. MBIMI-JUNIOR
13. MOWENI BAKANA Roy
14. MAYU-LOREET
15. NENOL-BOOLONGO
16. MUPE-MCNAENDELE
17. NGANYONYI-KIMPAGUPE
18. APEH MASYA
19. NGELIN GONO
20. MPAYNIM MOYELE
21. NGANZANI MABIALA MATHYSON
22. NKEE-MOBUIA-JUNIOR
23. durbois-mputu
24. MABIALA-MBONGO-GARY
25. Ngama N...

19-07687
DRC-00316 0723

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

9

## POUR LA COMMUNAUTE ( Suite )

1) DWEME. LEMOKOMO - TODOR
2) MWANYA - MONKOME
3) NGWE - ENGINA - DANIEL =
4) NKUMBO. MANGALA
5) MBONGO - KILIO
7) DWEME - MOWENI
8) NKUMBU - MAKWARI
9) MBAKA - BOMWELE.
10) MAYO - MPAYI.
11) NGOBILA - MBAKA

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

10

## POUR LA COMMUNAUTE BATENDE

| 0 | | SIGNATUR |
|---|---|---|
| 1 | MBJEME MPELI | |
| 2 | MULOLO HYMI | |
| 3 | NYA NGELI | |
| 4 | MPETI NYMO | |
| 5 | MBANGA - MANKOTO | |
| 6 | NGANI MBAKA | |
| 7 | MBAKA - NISANECII | |
| 8 | NIMI - MBO | |
| 9 | EXUMI - LOKONGO | |
| 10 | MABUYO LOKOLO | |
| 11 | MAYALA LOKOLEYO | |
| 12 | NIA LOKOLU | |
| 13 | MBIA MANKNYI | |
| 14 | NGELI EYITA | |
| 15 | NGELI-EYITA DIGI | |
| 16 | MBOMWALE BIBAKAMBA | |
| 17 | MPAY KILALA | |
| 18 | MFUTI MBO | |
| 20 | MAYO. DININ | |
| 21 | MBO-ENKETA | |
| 22 | NOAMA MANKOTO | |
| 23 | MPEN - MANGALA | |
| 24 | MPAYI - BILIMI | |
| 25 | NGWE - MPEN | |
| 26 | NKUPEKE - MPETI | |
| 27 | NKOMO - MPEN | |
| 28 | HASOLA - MPEN | |
| 29 | BRIDEL - MPAYI | |
| 30 | NGODILA LOKONGO | |
| 31 | MUNZUBA-keddY | |
| 32 | LOKONGO - NBAKA J.JACEUB | |
| 33 | MBO - LOKONGO - BSTON | |
| 34 | NGANA - LOKONGO | |

19-07687
DRC-00316 0725
123
UNCLASSIFIED
123/150
123 of 150

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

-14

| 35 | MBO - DBENGA · LOKONGO | |
| 36 | MBAKA - LOKONGO BLAISE | |
| 37 | NABONYO - LOKONGO | |
| 38 | NTKA - NKOMO - lokolt,n | |
| 39 | NKOKO - LOKONGO | |
| 40 | MAYALA — LOKONGO | |
| 41 | MVUANKA - LOKONKO | |
| 42 | MBO - LOKONGO - SIMONI | |
| 43 | NDJULI - LOKONGO | |
| 44 | NTLA — TABITA | |
| 45 | BINGWA - LAKONGO | |
| 46 | NOLA - LOKONGO | |
| 47 | MPEME - LIBONGO | |
| 48 | MOWALA - SUDANZEY | |
| 49 | MANTSHA - WILLY | |
| 50 | KOYA - MONDULU | |
| 51 | MBAKA - LOKONGO - ISRAEL | |
| 52 | NGELI - JONATHAN | |
| 53 | NISPLE - LEVU - LOKONGO | |
| 54 | FYUMI — PAMELA | |
| 56 | MAFUTA - FI - LOSWA | |
| 57 | NSEG - LWAIE — " — | |
| 58 | AYUNGE - CARINE — " — | |
| 59 | LOKWA - MOBANZA | |
| 60 | MPAY - FIFI | |
| 61 | MPAY - CLAUDINE | |
| 62 | MPAY - LYDIE | |
| 63 | MONZIRA - ALAIN | |
| 64 | NKUMBIEME DWETTE | |
| 65 | MPIANGAMBOLI | |
| 66 | NJLL NGONO | |
| 67 | POBAKA NTSAKETE | |
| 69 | NKETE NACBO | |
| 70 | MOKELO MBAKA | |
| 80 | MFUTI MABZALA | |

UNCLASSIFIED                    124 of 150

19-07687

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

-12

| 81 | MBLEME  NTBAKETT | |
| 82 | MOWENI  MBAKA | |
| 83 | AKUMUSENGE  NGINGA | |
| 84 | MAR  BOWNGN | |
| 85 | DWEME  MOWENI | |
| 86 | MAKOTO - MAMBOLO | |
| 87 | MBAKA - CLARICE | |
| 89 | MUWENI  DWAMA | |
| 90 | MPOL  MBETI | |
| 91 | MPIA  ENGINA | |
| 92 | MBOLOKO  SASILINGA | |
| 93 | MAYO  EBANI | |
| 94 | BILOKO  KUMINANO | |
| 95 | NKELE  MPIA | |
| 96 | BONGESE  KUKINAI | |
| 97 | MBLEME  NGYA | |
| 98 | MFUTI  MONANGA | |
| 99 | MOSELI  NTANGA | |
| 100 | DWEME  NGYA | |

19-07687
DRC-30316 0727
125

UNCLASSIFIED

125/150
125 of 150

UNCLASSIFIED                              EXHIBIT 28

S/2019/469

**Annex 43: Photographs of an inscription in Lingala found on one
of the houses of Bongende after the attack on 17 December 2018**

The inscription states: "This is our land, us the Batende. You are demons" (translation
by the Group of Experts).





Photographs taken by the Group of Experts on 26 January 2019

UNCLASSIFIED    EXHIBIT 28

S/2019/469

## Annex 44: Letter dated 2018 from the customary chief of the Bateke community to the Governor of the Maï-Ndombe province

Provided to the Group of Experts by civil society



HKO, le [...]    [...]

RÉPUBLIQUE DÉMOCRATIQUE DU CONGO
PROVINCE DU MAÏ-NDOMBE
TERRITOIRE DE YUMBI

CHEFFERIE DES BATEKE-NORD
SECTEUR DU GRAND NORD

**N°126/1750/CHEF-BAT6N/076/2018**

**TRANSMIS** copie pour information à :

- Son Excellence Monsieur Vice-Premier Ministre, Ministre de l'Intérieur et Sécurité
*(Avec l'expression de ma haute considération)*
- Son Excellence Monsieur le Ministre d'État, Ministre des Affaires Coutumières
- Monsieur le Président Général de l'Association de BANUNU-BOBANGI
- Monsieur le Président territorial de l'Association de BANUNU-BOBANGI de YUMBI-BOLOBO
(Tous) à Kinshasa
- Son Excellence Madame la Ministre Provincial en charge de l'Intérieur et Sécurité
- Monsieur le Commissaire Provincial de la PNC
- Monsieur le Directeur Provincial de l'ANR/DSI
- Monsieur le Secrétaire Provincial
- Monsieur le Président de la Commission Provinciale d'Arbitrage des conflits coutumiers de Maï-Ndombe
(Tous) à Inongo
- Monsieur le Chef de Secteur de MONGAMA à Mongama

Objet : *Risque d'un bain de sang entre les TEKE-NORD et les NUNU-BOBANGI/Territoire de BOLOBO*

À Son Excellence Monsieur le Gouverneur de la Province du MAI-NDOMBE
à INONGO

*Excellence Monsieur le Gouverneur,*

Je viens respectueusement auprès de votre autorité manifester mon indignation face aux ambitions démesurées du peuple BANUNU-BOBANGI qui s'autorise à installer les Chefs de terre dans le territoire de BOLOBO.

Excellence, le peuple TEKE est un peuple pacifique, hospitalier et avait accueilli en son temps le peuple BANUNU-BOBANGI dans les villages situés le long du fleuve Congo.

Plusieurs tentatives de conquérir les terres TEKE ayant échoué, les peuples TEKE chassèrent les NUNU de tous les villages riverains. Cela avait bien entendu entraîné d'énormes pertes en vies humaines.

./.

S/2019/469



Vous vous souviendrez qu'en 2016, les mêmes ambitions étaient manifestées chez les peuple BANUNU-BOBANGI à BOLOBO et la conséquence directe était la guerre entre les NUNU et les TENDE.

Ce qui se passe aujourd'hui entre les NUNU et les BASENGELE dans le territoire d'INONGO prouve à suffisance le souci majeur de peuple NUNU-BOBANGI de troubler la paix dans notre Province.

Excellence, est-il possible à l'heure actuelle de conquérir la terre d'une autre communauté en plein vingt et unième siècle ? Que cherche alors le peuple BANUNU-BOBANGI ?

Par sa lettre N°C/GBB/Y-B/SECT-MONG/T-Y/02/2018, Monsieur MEKA BOTSANA, Président du Comité de Chefs des terres de BANUNU-BOBANGI avait transmis la liste des Chefs de terre du Groupement BANUNU-BOBANGI dans le territoire de YUMBI-BOLOBO aux Administrateurs de ces deux entités respectives.

Fauteur de trouble, il souligne que le village Momoulenge est dans leur Groupement. N'est-ce pas là un mépris envers moi, Grand Chef de la Chefferie des BATEKE-NORD et à mon peuple ?

Excellence, face à de telles menaces, le peuple TEKE défendra ses terres jusqu'au sacrifice suprême et n'en cédera aucun périmètre aux envahisseurs BANUNU-BOBANGI alignés derrière leur politicien à la recherche de positionnement.

Le peuple NUNU n'a aucun droit de porter la tenue traditionnelle de Chef de terre sur les sols TEKE, TENDE, SENGELE et BOMA et ne peut percevoir aucune redevance coutumière sur ces sols.

Pour sauvegarder la paix dans le territoire de BOLOBO et dans la Chefferie des BATEKE-NORD pendant cette période électorale, et en ma qualité de gardien de la coutume TEKE-NORD, je demande à tous les NUNU installés le long du fleuve, dans ma Chefferie, particulièrement à MANKONDO, MABWA MABWA, MOMPOLENCE MOMPONDO, BOTANDANKASA, de quitter lesdits villages pour l'intérêt supérieur de mon peuple et de son territoire.

Ceci ne constitue pas la violation de l'article 30 de la Constitution de notre pays, mais bien au contraire un motif de sécurité pour les vies humaines de toutes nos communautés.

Pour éviter un bain de sang entre les NUNU et les TEKE-NORD, votre implication s'avère à la fois urgente et indispensable.

Veuillez croire, Excellence Monsieur le Gouverneur, en l'expression de ma haute considération.

*Grand Chef Coutumier et Chef de la Chefferie des BATEKE-NORD*

## Annex 45: Letter of arrest of two cassiterite smugglers

A letter of attestation documenting the incident in which two smugglers were caught transporting 70kg of cassiterite along the Numbi-Kalungu road in December 2018. They were heading to Goma.



UNCLASSIFIED

EXHIBIT 28

S/2019/469

**Annex 46: A section of a clandestine depot on the outskirts of Goma showing untagged cassiterite awaiting re-bagging**



Photograph by the Group of Experts

DRC-90316 0732

UNCLASSIFIED

19-07687

### Annex 47: Multi-pocketed jackets to smuggle coltan

Photograph of the three Congolese who were arrested together with Gafishi. They had stuffed coltan in multi-pocketed jackets and worn other jackets on top to conceal it.



Photograph by the Group of Experts

UNCLASSIFIED                              EXHIBIT 28

S/2019/469

### Annex 48: Letter of arrest of a smuggler

A letter of attestation stating a case in which a smuggler was arrested in January 2019 with 50kg of coltan. According to the letter, he was on his way to deliver the coltan to his financier with contacts in Rwanda where he usually sold the coltan.



Photograph by the Group of Experts

132/150
DRC-00316 0734
132

UNCLASSIFIED

19-07687
132 of 150

UNCLASSIFIED  EXHIBIT 28

S/2019/469

### Annex 49: Car used to smuggle coltan

A photograph of a Jeep Landcruiser with all the five tires carrying coltan. The mining police intercepted the Jeep at the Rutoboko roadblock on its way to Goma.





Photos shared by the Commission nationale de lutte contre la fraude minière (CNLFM).

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

### Annex 50: Some of the locations on the shores of Lake Kivu used for smuggling minerals

Ruhunde village on the shores of Lake Kivu, Kalehe territory, South Kivu.



Photographs by the Group of Experts

Makelele beach on the shores of Lake Kivu, Kalehe territory, South Kivu.



Photographs by the Group of Experts

134/150
DRC 80316 0736
134
UNCLASSIFIED
19-07687
134 of 150

UNCLASSIFIED

EXHIBIT 28

S/2019/469

Minova town on the shore of Lake Kivu in Kalehe territory, South Kivu.



Photograph by the Group of Experts

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

### Annex 51: A vehicle used to smuggle coltan

A jeep with a false belly in which 169 kg of smuggled coltan was concealed.

 

Photos shared by the Commission nationale de lutte contre la fraude minière (CNLFM).

UNCLASSIFIED    EXHIBIT 28

S/2019/469

**Annex 52:** Letter from the Government of the Democratic Republic of the Congo to the Committee on issues relating to illegal exploitation and smuggling of natural resources.

Réponses à présenter à la réunion d'information convoquée pour le lundi 26 novembre 2018 par le Président du Comité du Conseil de Sécurité créé par la résolution 1533 (2004) concernant la République Démocratique du Congo

1.  **Les mesures prises par le Gouvernement pour procéder à un contrôle minutieux des comptoirs de Bunia et de Bukavu et prendre les sanctions nécessaires en cas de fraude dans les déclarations portant sur l'or**

En ce qui concerne cette première question, qu'il nous soit permis de relever qu'au delà des questions spécifiques liées à la situation de Bunia et de Bukavu, villes situées respectivement dans les Provinces de l'Ituri et du Sud-Kivu, le Gouvernement national, en accord avec les partenaires bilatéraux et multilatéraux notamment l'USAID et le BGR(Coopération allemande), est en train de mettre en place une stratégie nationale pour l'encadrement du secteur de l'or artisanal. A la suite des ateliers organisés, pour ce faire, à Kinshasa et à Bukavu en juin et en octobre 2018, des recommandations pertinentes y ont été formulées. (Annexe I)

Le Ministère des Mines est en train de s'atteler à mettre en œuvre lesdites recommandations. Et, à ce sujet, il sied de mettre en exergue, la stratégie de l'absorption de la production issue des Zones d'Exploitation Artisanale validées par la reprise des achats d'or par la Banque Centrale du Congo en collaboration avec les services techniques du Ministère des Mines à savoir: le Service d'Assistance et d'Encadrement de l'Exploitation Minière Artisanale et de la Petite Mine (SAEMAPE), l'Administration des Mines et le Centre d'Expertise, d'Evaluation et des Certification (CEEC). (Annexe II)

Au regard des études préalables menées à cet effet, le Gouvernement de la République Démocratique du Congo espère que, combinés avec les actions antérieures déjà menées pour l'encadrement de l'exploitation artisanale de l'or, les opérations d'achats de la Banque centrale vont à terme canaliser vers les circuits officiels une part très importante des flux d'or qui sont charriés par les réseaux frauduleux.

Pour revenir à la situation particulière de Bunia et de Bukavu, il y a lieu de mentionner que les permis d'exploitation conférés aux opérateurs comme KIBALI GOLD MINES, TWANGIZA et NAMOYA, le secteur industriel de l'or est en expansion tant il est vrai que le volume de production est passé en cinq ans à plus de 30 tonnes l'an.

1

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

Cela constitue une avancée très remarquable même si, en revanche, la canalisation vers les circuits officiels des flux d'or provenant de deux contrées susmentionnées demeurent un défi de taille qu'entend relever le Gouvernement de la République.   A ce sujet, en collaboration avec les Gouvernements provinciaux, le Ministère des Mines, fort de nouvelles dispositions issues de la réforme des code et règlement miniers mise en exécution depuis bientôt six mois, est en train de promouvoir dans ces contrées et ailleurs, le regroupement des exploitants artisanaux en coopératives minières dans les zones d'exploitation artisanale à viabiliser. (Annexe III)

Ce qui va aboutir à des chaines d'approvisionnement responsable. A titre d'illustration, l'implémentation de l'initiative de Traçabilité de l'or d'Exploitation Artisanale (ITOA) dans la localité de NYAMURALE au Sud-Kivu, en partenariat avec TETRA TECH/USAID, est une expérience de l'implémentation d'une chaine d'approvisionnement responsable qui a permis pour la première fois de vendre dans une bijouterie de New York de l'or artisanal totalement tracé (Annexe IV)

Pour rappel, les actions de lutte contre la fraude, à l'instar de celles ayant abouti à l'arrestation en 2015 de 50 sujets étrangers, sont intensifiées sur terrain. Tel aussi le cas de Monsieur ABBAS KAYONGA, en tête d'une organisation de trafic illicite des substances minérales, mis au arrêt avec ses collaborateurs en 2018.

II. **Les efforts que déploie le Gouvernement pour enquêter sur les personnes et les entités participants au commerce illicite et à la contrebande des ressources naturelles et engager des poursuites si nécessaires**

A ce niveau, le Gouvernement tient à relever le cas de la raffinerie à capitaux belges installée près de l'Aéroport d'Entebbe en République de l'Ouganda. Elle est liée techniquement à la société Tony Goetz Refinery basée à Anvers, au Royaume de  Belgique. Pour votre gouverne, la raffinerie susmentionnée inaugurée le 20 février 2017 produit une (1) tonne d'or fin (titrant 99,99%) par mois avec une capacité installée de production d'une (1) tonne par semaine. Suivant les déclarations du Manager de la firme, Monsieur Alain GOETZ, sa firme n'est pas en mesure de tracer l'or raffinée au sein de son usine.

Pourtant, il est unanimement reconnu aujourd'hui qu'avec sa capacité géologique documentée, la République d'Ouganda ne peut pas produire une telle quantité d'or.

1

UNCLASSIFIED    EXHIBIT 28

S/2019/469

A ce sujet, le Gouvernement de la République Démocratique du Congo ne cesse de mentionner ce cas dans les forums internationaux sur l'approvisionnement responsable. La question que posent nos officiels est simple: pourquoi les consommateurs finaux ne s'abstiennent –il pas d'acheter cet or non tracé issu de l'exploitation illégale alors qu'ils affirment respecter les normes du devoir de diligence raisonnable issues notamment:

✓ de la résolution 1952/2010 du Conseil de Sécurité de l'ONU dans le secteur minier congolais ;
✓ du Guide de l'OCDE pour un approvisionnement responsable en minerais provenant des zones de conflit ou à haut risque ;
✓ du Mécanisme régional de Certification de la CIRGL ;
✓ ainsi que la section 1502 de la Loi Dodd-Frank du 21 juillet 2010 de réforme de Wall Street et de protection du consommateur (*Dodd-Frank Wall Street Reform and Consumer Protection Act*).

Qu'à cela ne tienne, le Gouvernement de la République Démocratique du Congo a, sur recommandation du Comité du Conseil de Sécurité, amorcé des échanges avec le Gouvernement des Emirats Arabes Unis pour la prise des actions conjointes de lutte contre les exportations illégales de l'or de la RDC par les réseaux illégaux qui approvisionnent les raffineries comme AGR. A la suite des réunions bilatérales tenues respectivement à New York et à Dubaï en janvier et en avril 2018, sur recommandation de la réunion du Comité du Conseil de Sécurité du 26 janvier 2018, une liste des personnes et les entités participants au commerce illicite et à la contrebande des ressources naturelles a été remise au Gouvernement des Emirats Arabes Unis tel que cela ressort du rapport des réunions établi à cet effet. (Annexe V)

**III. Les mesures prises par le Gouvernement pour lutter contre l'exploitation illégale et la contrebande des ressources naturelles, et notamment amener les éléments des FARDC qui se livrent au commerce illicite des ressources naturelles, en particulier l'or et les produits provenant des espèces sauvages à répondre de leurs actes**

La République Démocratique du Congo tient à souligner que les Forces Armées ainsi que sa Police Nationale ne se livrent pas à des activités d'exploitation illégales des ressources naturelles.

Cependant, force est de reconnaître les cas de quelques éléments égarés contre lesquels des poursuites judiciaires sont en cours.

3

UNCLASSIFIED                    EXHIBIT 28

Pour décourager toute tentative de commission de pareil comportement de la part des éléments des FARDC et de la Police Nationale Congolaise, une instruction permanente du Chef d'Etat-Major Général, traduisant les instructions pertinentes du Président de la République, Chef de l'Etat et commandant suprême des Forces armées, interdit les pratiques illicites des ressources dans ses rangs. (Annexe VI)

Par ailleurs, dans le cadre de leurs opérations de pacification des zones de conflit, les unités de FARDC peuvent se retrouver autour des sites miniers qui, au regard des dispositions de l'Arrêté ministériel n°0057/CAB.MIN/MINES/01/2012 portant mise en œuvre du mécanisme régional de certification de la Conférence Internationale sur la Région des Grandes Lacs « CIRGL » en République Démocratique du Congo, sont qualifiés « rouge ». Leur présence est dans ce cas conforme. (Annexe VII)

IV. **Les mesures prise par le Gouvernement pour mettre un terme au financement des groupes armés qui prennent part à des activités déstabilisatrices en se livrant au commerce illicite des ressources naturelles**

Le financement des groupes armés est plutôt le fait de certains Etats voisins de la Région des Grands Lacs. Ceux-ci sont à la base de la création de certains de ces groupes armés ou, à tout le moins, de leur manipulation dans l'objectif, entre autre, de faire canaliser vers lesdits Etats aux fins d'exportation, les ressources naturelles provenant de la République Démocratique du Congo qu'ils font passer comme leur production nationale. Et, il est reconnu unanimement que les produits de la commercialisation de ces ressources naturelles sorties illégalement de notre territoire contribuent au financement des groupes armés.

C'est ici l'occasion de solliciter de la communauté internationale de continuer à accompagner le Gouvernement pour mettre définitivement fin à l'activité des groupes armés dans son espace territorial et aussi à faire pression à respecter leurs engagements souscrits dans le cadre du pacte de la CIRGL.

4

UNCLASSIFIED                                    EXHIBIT 28

S/2019/469

V.  **L'état de la coopération et de la coordination entre le Gouvernement et la CIRGL et ses États membres en vue de limiter l'exploitation et la contrebande des ressources naturelles en RDC**

Le Gouvernement de la République Démocratique du Congo collabore avec la CIRGL pour la mise en œuvre des clauses du Pacte sur la sécurité, la stabilité et le développement dans la Région des Grands Lacs du 15 décembre 2006. En exécution de l'article 9 du Pacte qui exige la mise en place d'un mécanisme régional de certification pour lutter contre l'exploitation et le trafic illégal des ressources naturelles, le Gouvernement congolais est un des rares de la sous-région des Grands Lacs qui a intégré dans son système juridique, le Mécanisme Régional de Certification de la CIRGL et le met en œuvre au quotidien.

Il convient de relever, en outre que depuis la signature du Pacte susmentionné, l'histoire ne mentionne pas un seul cas de fraude des minerais des autres État de la CIRGL vers la République Démocratique du Congo. C'est plutôt l'inverse qui est déploré.

En tout état de cause, le Gouvernement participe à toutes rencontres convoquées par les organes de la CIRGL et ne cesse de relever les griefs ci-après à l'endroit des autres États membres :

✓ L'absence des sanctions à l'encontre des États membres de la CIRGL n'ayant pas mis œuvre les six outils de lutte contre le trafic illicite des substances minérales ;
✓ La persistance des cas de fraude et la contrebande minière transfrontalières ;
✓ L'absence des directives précises de la CIRGL sur la mise en œuvre de certains de ses outils ;
✓ La domestication partielle ou insuffisance de la mise en exécution du Protocole de la CIRGL sur la lutte contre l'exploitation illégale des ressources naturelles par les États membres.

VI.  **Le soutien que le Gouvernement a reçu de l'ONU et des partenaires internationaux pour répondre aux besoins du pays en matière de renforcement des capacités, notamment aux fins de la mise en œuvre de l'ITOA**

Le Gouvernement ne reconnait pas un soutien direct bilatéral ou multilatéral pour l'appui de la lutte contre la fraude minière (

5

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

Cependant, il sied de soutenir que des partenaires, ainsi qu'il a été mentionné au point 1, contribuent par leur appui au renforcement des capacités. Il en est de même de l'appui de TETRA TECH/USAID dans le cadre du projet pilote de NYAMURALE pour la mise en œuvre de l'ITOA ainsi que celui de la coopération allemande pour l'élaboration de la stratégie nationale sur l'exploitation et la commercialisation de l'or de la filière artisanale qui peuvent être cités.

Il sied de relever que le contrat liant TETRA TECH à l'USAID est arrivé à son terme même si nous osons croire qu'au niveau du Gouvernement américain des dispositions sont prises pour la continuation du projet pilote de NYAMURALE de mise en œuvre de l'ITOA.

Fait à Kinshasa,

Pascal NYEMBO MUYUMBA,

Directeur Général Adjoint du CEEC
et Coordonnateur de la CNLFM

142/150
DRC-00316 0744
142

UNCLASSIFIED

19-07687
142 of 150

S/2019/469

### Annex 53: Gold exports from South Kivu in 2018

| Date | Weight in Kg | Value in USD |
|---|---|---|
| 05 February 2018 | 1.096 | 36787 |
| 09 February 2018 | 7.961 | 297347 |
| 31 March 2018 | 2.343 | 88115 |
| 03 April 2018 | 1.9 | 40268 |
| 23 April 2018 | 4.819 | 188016 |
| 03 May 2018 | 2.114 | 71572 |
| 15 June 2018 | 5.101 | 191547 |
| 14 August 2018 | 1.788 | 66559 |
| 21 August 2018 | 2.636 | 74616 |
| 21 August 2018 | 0.272 | 6819 |
| 25 September 2018 | 6.321 | 221877 |
| 07 November 2018 | 2.027 | 70498 |
| 13 November 2018 | 4.734 | 163931 |
| 17 November 2018 | 5.072 | 183184 |
| **Total** | 48.184 | 1701136 |

Compilation by the Group of Experts of official statistics of provincial authorities (South Kivu)

UNCLASSIFIED     EXHIBIT 28

S/2019/469

## Annex 54: Export certificate of the company Glorym



144/150
DRC-00316 0746
144

UNCLASSIFIED

19-07687
144 of 150

S/2019/469

**Annex 55: NDC-R taxation system: Photographs of "jetons" that the NDC-R issued as proof that an individual had paid tax**

 

 

Photographs by the Group of Experts

UNCLASSIFIED                              EXHIBIT 28

S/2019/469

**Annex 56: Cartridges 7.62x54Rmm calibre cartridges**



| Photo 1 | Photo 2 | Photo 3 | Photo 4 |
|---------|---------|---------|---------|
| 10_85 | 61_90 | 188_76 | 945_05 |

Photographs by the Group of Experts

UNCLASSIFIED    EXHIBIT 28

S/2019/469

**Annex 57: Map of attack on Namoya FARDC position**



Map made by MONUSCO in June 2018

    UNCLASSIFIED

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

### Annex 58: Type 80 Machine Gun





Photographs by the Group of Experts in January 2019

UNCLASSIFIED                          EXHIBIT 28

S/2019/469

**Annex 59: Anti-riot gun LBD-40 and B&T Cartridge SIR-X 40x46mm**









Photographs provided by MONUSCO in February 2019

UNCLASSIFIED                    EXHIBIT 28

S/2019/469

## Annex 60: Dutch Nile bill of lading



NileDutch South Africa (Durban)

**Non-negotiable Liner Sea Waybill**

LWB No  ECSAA21415
Reference No  DU1011445

**NileDutch**

NileDutch is operated by Nile Dutch Africa Line B.V

...HAVEN AFRICA PTY (LTD)
...BUSINESS PARK,
...NAPUS DRIVE
...ENE, CENTURION
TEL: 012 6711010

Shippers (not to order)
MINISTERE DE LA DEFENCE NATIONALE
MONT NGALIEMA STREET,
KINSHASA, DRC
CTC: COL  MALUNGILA
TEL: 0024 385 515 1123

Cnet. Address
MINISTERE DE LA DEFENCE NATIONALE
MONT NGALIEMA STREET, KINSHASA,
DRC
CTC: CCL  MALUNGILA
TEL: 0024 385 515 1123
EMAIL: MARCELMALUNGILE@GMAIL.COM

Pre carriage by *                Place of Receipt by pre carrier *

Vessel                           Port of loading
JPO LEO                          80727 SZ DURBAN
Port of discharge                Place of delivery on-carrier *
PONTE NOIRE                      MATADI              FCL/FCL

*Origina*

Container Nrs : Seal No.         Particulars furnished by the Merchant page 1 of 2    Gross weight    Measurement
Marks and Nos.                   Number and kind of packages, description of goods

cntnr: NIDU 518820-5             2 X 40FT HI CUBE CONTAINERS STC:          15,480.000 kgs    100.000 cbm
seal nr: A138360                 22 X BOXES WARRIOR SOFT WALLED SHELTER     Tare 7,790.000 kgs
                                 4.8M X 4.8M

cntnr: NIDU 511785-5             21 X BOXES WARRIOR SOFT WALLED SHELTER
seal nr: A138369                 4.8M X 4.8M

                                 TOTAL NO BOXES: 43
                                 INVOICE NO: PIN20055

                                 FERI NO: #2018 0402271

                                 SHIPPED ON BOARD
                                 FREIGHT PREPAID

(ananr) the carrier is not responsible for a absent or incorrect s.r.c.l b.r.l.number; the merchant remains liable for any
penalties in such case and will reimburse the carrier
(cotes) the carrier is not responsible for a absent or incorrect s.c.t.n. / t.a.r.l. number; the merchant remains liable for any penalties
in such case and will reimburse the carrier.
(cityl) containers to remain within city limits of the port of discharge. Prior approval of local office is required if containers are to be carried
outside city limits.
(conpr) container is and remains carrier property. merchant will reimburse damages, loss and  demurrage/detention during period
container is in merchants custody.
(dema.) Containers are subject to demurrage & detention and deposit might be required. Free time and rates are published on our website
www.niledutch.com
(endor) whenever bills of lading covering containerised  cargo shall be endorsed, the merchant undertakes in  informing the line and/or
his agents beforehand in  writing, stating full style of final receiver.
(genea) before loading and after discharge cargo is at  merchants risk & expense and carrier is not liable for any  damage or pilferage.
(seal) carrier shall be under no liability in the event of  damage to or shortage of cargo from containers which have  not been provided
with a container-seal by shippers.
(sstc) shippers load, stow and count, contents, quantity  and quality not checked by master and/or agents.
(expds) all expenses from discharge on quay onwards incl  redelivery of containers to terminal are for receivers  account.
                                                CLAUSES

All cargo parts that are mentioned by shippers but not be acknowledged by the carrier

SHIPPED on board in apparent good order and condition  weight, measurements, marks,
numbers, quality, contents and value unknown, for carriage to the port of discharge or to such
thereunto as the vessel may safely get and lie at any afloat  to be delivered in the like good
order and condition at the aforesaid port to consignees or their assigns against production of
proof of identity without any documentary formalities   They paying freight as indicated at over-
leaf, other charges incurred in accordance with the provisions contained in that bill and/or
to in replying this bill together the merchant expressly accepts and agrees to all its stipulations
on both the part, whether written, printed, stamped or other wise incorporated in hdfr as if they
were all signed by the merchant
This is level WAB the same this Liner sea waybill Full delivery in made to the proper party. However

I freight payable at       Place and date of issue
DURBAN                     DURBAN      29/07/2018

Freight payable as per agreement not  Signature
received waived <this another cargo load
of this bill

Number of original Sea Waybills

150/150
DRC-00316 0752
150

UNCLASSIFIED

150 of 150

19-07687

UNCLASSIFIED

EXHIBIT 51

United Nations

**S**/2018/1133*



# Security Council

Distr.: General
18 December 2018

Original: English/French

---

### Letter dated 18 December 2018 from the Group of Experts on the Democratic Republic of the Congo addressed to the President of the Security Council

The members of the Group of Experts on the Democratic Republic of the Congo, whose mandate was extended pursuant to Security Council resolution 2424 (2018), have the honour to transmit herewith, in accordance with paragraph 4 of that resolution, the midterm report on their work.

The report was provided to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo on 21 November 2018 and was considered by the Committee on 6 December 2018.

The Group would appreciate it if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Zobel **Behalal**
Coordinator

(*Signed*) Nelson **Alusala**
Expert

(*Signed*) Virginie **Monchy**
Expert

(*Signed*) Bart **Vanthomme**
Expert

(*Signed*) David **Zounmenou**
Expert

---

* Reissued for technical reasons on 2 January 2019.

UNCLASSIFIED

Please recycle 

S/2018/1133

# Midterm report of the Group of Experts on the Democratic Republic of the Congo

*Summary*

Since the submission of the most recent report of the Group of Experts on the Democratic Republic of the Congo (S/2018/531), the overall security situation in the Democratic Republic of the Congo has remained volatile. During the period under review, the Group noted major security incidents including attacks against civilians, security forces and United Nations peacekeepers in many provinces. While the upcoming elections have continued to raise security concerns, the Group has not found evidence of direct involvement by armed actors in the electoral process.

In the present report, the Group chose to organize its findings with a focus on four territories in the North and South Kivu Provinces, where it documented findings relevant to its mandate.

The Group uncovered a well-established international network dedicated to the recruitment of combatants sent to Beni territory. Although it was not able to confirm that combatants were recruited for the Allied Democratic Forces (ADF), the Group found similarities to previously documented recruitment patterns for ADF. Attacks, which were often deadly and targeted the civilian population, the Forces armées de la république démocratique du Congo (FARDC) and/or United Nations peacekeepers, occurred on an almost daily basis in various locations in the entire north-eastern part of the territory, including in Beni city.

The Group found that an armed group active in Fizi and Uvira territories and associated with Rwandan opposition groups benefited from local and external support for the recruitment of its combatants. The Group confirmed that most of the arms and ammunition used by the armed group were transferred from Burundi, but it could not confirm the identities of the individuals and entities involved.

The Group documented a split in the Alliance des patriotes pour un Congo libre et souverain (APCLS), a dominant armed group in Masisi territory, into two factions: APCLS and APCLS-Rénové. The latter controls the tin, tantalum and tungsten mining sites and is responsible for violations of international humanitarian law. The Group also found some forms of collaboration between that faction and some elements of FARDC. The smuggling of tin, tantalum and tungsten continue to occur in Masisi territory.

The Group concluded that Masudi Alimasi Kokodikoko, leader of a Raia Mutomboki faction in Shabunda territory, was a lead perpetrator of the gang rapes of at least 17 women in September 2018. The Group documented that his group, as well as other Raia Mutomboki factions, profit from the exploitation and trade of natural resources. FARDC elements were the main armed actors involved in mining tin, tantalum, tungsten and gold in Shabunda territory. Tin, tantalum and tungsten sourced from areas controlled by armed actors were introduced into the formal supply chain with the authorization of authorities of the Democratic Republic of the Congo. The Group found that Uganda remained an important transit hub for gold illegally sourced from the Democratic Republic of the Congo, including from Shabunda territory.

Several Member States failed to notify the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo regarding deliveries of arms and materiel to the Democratic Republic of the Congo.

S/2018/1133

# Contents

| | | Page |
|---|---|---|
| I. | Introduction | 3 |
| II. | Beni territory | 3 |
| | A. Recruitment network of combatants | 3 |
| | B. Humanitarian and security situation | 6 |
| III. | Fizi and Uvira territories | 9 |
| | A. Armed movement associated with the Rwanda National Congress and Ngomino | 9 |
| | B. Arms transfers from Burundi in violation of arms embargo | 11 |
| IV. | Masisi territory | 11 |
| | A. Tin, tantalum and tungsten | 11 |
| | B. Armed groups | 12 |
| V. | Shabunda territory | 15 |
| | A. Conflict-related sexual violence and use of child soldiers in Shabunda territory | 15 |
| | B. Tin, tantalum, tungsten and gold | 16 |
| VI. | Non-notification of deliveries of weapons and related materiel | 20 |
| | A. Re-exportation of sponge grenades by South Africa | 20 |
| | B. Delivery of military-related materiel from New Zealand | 20 |
| | C. Delivery of military-related materiel from the United Arab Emirates | 20 |
| | D. Delivery of military-related materiel from China | 21 |
| VII. | Recommendations | 21 |
| | Annexes* | 22 |

---

\* The annexes are being circulated in the language of submission only and without formal editing.

S/2018/1133

## I. Introduction

1.    The current Group of Experts on the Democratic Republic of the Congo, whose mandate was extended pursuant to resolution 2424 (2018), was appointed by the Secretary-General on 26 July 2018 (see S/2018/741). The Group began its mandate with a visit to New York from 27 to 31 August 2018 and conducted two field visits to the Democratic Republic of the Congo between September and October 2018. Ledio Cakaj, one of the Group's two armed groups experts, resigned from the Group effective 15 October 2018.

2.    In accordance with the request made by the Security Council in paragraph 8 of its resolution 2360 (2017), and as reaffirmed by its resolution 2424 (2018), the Group continued to exchange information with the Panel of Experts on the Central African Republic.

**Cooperation with the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo**

3.    The Group expresses its gratitude for the valuable support and collaboration provided by the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO) during the period under review.

**Compliance with the Group's requests for information**

4.    Following its appointment, the Group addressed 17 official communications to Member States, international organizations and private entities during the first part of its mandate. In its final report, the Group intends to provide a full accounting of the replies received.

**Methodology**

5.    The Group used the evidentiary standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). The Group based its findings on documents and, wherever possible, on first-hand, on-site observations by the experts themselves. When that was not possible, the Group corroborated information by using at least three independent and reliable sources.

6.    Given the nature of the conflict in the Democratic Republic of the Congo, there are few documents that provide definitive proof of arms transfers, recruitment, command responsibility for grave human rights abuses and the illegal exploitation of natural resources. The Group has therefore relied on eyewitness testimony from members of local communities, former combatants and current members of armed groups. The Group has also considered expert testimony by government officials and military officers from the Great Lakes region, other countries and United Nations sources.

7.    The present report covers investigations conducted up to and including 9 November 2018. Investigations relevant to the Group's mandate that occurred after that date will be reflected in the final report.

## II. Beni territory

### A.    Recruitment network of combatants

8.    During the period under review, the Group found that a well-developed international network was actively recruiting young men for an armed group in Beni

S/2018/1133

territory. That information was based on the accounts of 17 individuals arrested by the Forces armées de la république démocratique du Congo (FARDC) in Uvira, Goma, Butembo and Beni, who were interviewed separately by the Group in October 2018. The Group also learned about the network from other recruits, one ex-combatant, civil society actors, FARDC officers, non-governmental organizations and MONUSCO contacts.

9.    Among the 17 arrested individuals, 2 of them were members of the recruitment network and told the Group that they were working for the Allied Democratic Forces (ADF), but 8 others said they did not know whom they worked for. Although the Group could not definitively link the recruitment network to any specific armed group, it noted some similarities with ADF recruitment schemes documented in previous reports (S/2017/1091, paras. 29–30, and S/2015/19, paras. 16–23).

**Deception in recruitment**

10.    Among those interviewed, six recruits[1] told the Group that recruiters convinced them to travel to the Democratic Republic of the Congo on false pretences and that they had not intended to join an armed group. At least four recruits were attracted with a promise of working in the gold business, while others claimed that a family member had invited them. Still other recruits were deceived with false promises of opportunities to study abroad. The recruiters focused mostly on Muslims.

**Organization of the network**

11.    The recruitment network had several layers. Four interviewees, including an arrested recruiter, identified a man called "Amigo" as the coordinator of the network.[2] One recruit and an ex-ADF combatant positively identified Amigo in a photograph shown by the Group (see annex 1).

12.    Several sources informed the Group of the presence of recruitment cells in South Africa, the United Republic of Tanzania and Burundi that facilitated the transfer of recruits from their country of residence to the Democratic Republic of the Congo by way of Burundi and Rwanda. In November 2018, the Group informed the Governments of those countries of the recruitment network and asked for further information.

13.    The network relied upon individuals in key cities along the path to Beni territory. One of those individuals defined himself and the others as "focal points". They were in charge of the recruits travelling through their respective areas of responsibility and provided them with the necessary support and identity documents. The focal point for Uvira was Rachid Senga (also known as Senga Khaled Eid or Issiakah Abu Saifullah).[3] Abu Said was the focal point for Goma; Karim Abdu for Bujumbura; and Hamu for Bukavu. The focal points had at least two houses at their disposal in Goma and Bukavu to accommodate recruits during their transfer to Beni territory.

14.    The focal points worked with others, including motorcyclists who transported recruits from Butembo to the armed group and deliverymen in Uvira, Bukavu and Goma who supplied fraudulent electoral cards.

---

[1] The Group refers generally to recruits, even if it cannot confirm that all were aware they were going to join an armed group. Among those six recruits, four claimed to have escaped from the armed group's camp and two were still en route when arrested.

[2] Amigo, also known as Simba Amigo or Mzee Amigo. Amigo was a long-time ADF member and his role in the movement was documented in a previous report (see S/2015/19, annex 4). Nevertheless, the Group could not confirm if he was still a member of ADF.

[3] He called himself a "point focal de l'ADF".

S/2018/1133

15.   In October 2018, the arrested focal point and five other interviewees confirmed the existence of an international recruitment network that used three different routes (see annex 2). Several sources provided the names of local recruiters and mentioned that most of the recruits were received in Beni territory in a camp they referred to as "Domaine".

**Use of fake Congolese identity cards**

16.   Several detained recruits told the Group that at some point, after having crossed the Congolese border, a focal point took their original identity documents and gave them falsified Congolese electoral cards to facilitate their travel (see annex 3). A staff member of the Commission électorale nationale indépendante (CENI) based in Uvira allegedly forged the electoral cards used by recruits in one or two days. Each recruit received a new card bearing his or her picture and a fake name. The focal point paid the CENI staff member $30 for each electoral card.

**Other recruitment networks**

17.   Two escaped Ugandan combatants told the Group that they had been recruited in Uganda and arrived in the same camp, Domaine, as other recruits. A Somali recruit coming from South Africa told the Group that he saw the same two Ugandan recruits at the Domaine camp. Moreover, four detained recruits told the Group that the armed group also included Congolese nationals, which suggests recent or past recruitment within the Democratic Republic of the Congo. During the remainder of its mandate, the Group intends to continue its investigations with regard to the patterns and routes of recruitment and the identity of the armed group organizing the recruitment.

## B.   Humanitarian and security situation

18.   Since the outset of the Group's mandate, the humanitarian and security situation in Beni territory has continuously deteriorated. Attacks have occurred on an almost daily basis against civilians, FARDC and peacekeepers (see annex 4). As in the past four years (S/2018/531, para. 147, and S/2016/466, para. 182), no armed group has taken responsibility for the attacks. The Group received conflicting information about possible perpetrators and is not in the position to confirm their identity or whether the same armed group carried out all the attacks. The Group will continue its investigations in that respect.

**Increased armed group activities in the Mayangose**

19.   On the basis of interviews conducted with FARDC, MONUSCO, local authorities and civil society actors, the Group found that armed groups have strengthened their presence in the Mayangose area (S/2018/531, para. 32), in the immediate north-eastern part of Beni city (see annex 5). Starting in mid-September 2018, several FARDC positions in the Mayangose, such as Point 46/Malolu and Kididiwe, were taken over by armed groups. That is a noticeable change of tactics from the beginning of 2018, when attacks against those FARDC positions were mainly hit-and-run attacks.

20.   According to information from the same sources, armed group camps were located around Point 46/Malolu, Kididiwe, Vemba and/or Lahe. As a result of their activities, many civilians fled the area. The Group observed that many recent attacks were conducted against locations directly accessible from the Mayangose.

21.   During the drafting of the present report, the Group received a press release from MONUSCO announcing the "launch of FARDC and MONUSCO joint

S/2018/1133

operations against ADF".[4] The Group intends to investigate, in its final report, any potential security changes generated by those operations.

### Attacks against the Forces armées de la république démocratique du Congo, the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo and civilians

#### *Attacks against the Forces armées de la république démocratique du Congo*

22.   Many of the recent attacks targeted FARDC positions, often killing FARDC soldiers and resulting in the seizure of FARDC ammunition and weapons by the assailants. According to MONUSCO, by the end of August 2018, 125 FARDC soldiers had been killed by armed groups operating in Beni territory since January 2018.

23.   An attack on 24 August 2018 against one FARDC position in Ngadi, about four kilometres south-east of Mavivi, was particularly deadly and resulted in the deaths of at least 17 FARDC soldiers and officers. MONUSCO and FARDC sources and one local authority confirmed that the assailants had seized weapons and ammunition from the FARDC camp. According to one MONUSCO source, the assailants had taken 17 AK-type assault rifles, 2 60 mm mortars, a box of rockets, 7 PK machine guns, 1 recoilless B10 rifle and an unknown quantity of ammunition.

24.   Several of the same sources told the Group that the assailants, wearing FARDC uniforms and yellow armbands similar to those used by FARDC troops in the camp, managed to enter the camp. Furthermore, the attack was conducted on a FARDC payday, indicating that the assailants had benefited from intelligence.

#### *Attacks against the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo*

25.   United Nations peacekeepers were more directly engaged by armed assailants, including when responding to shooting incidents or at the MONUSCO base in Mavivi. MONUSCO reported at least five armed attacks on peacekeepers' positions, vehicles and assets along the Beni/Mavivi axis since July 2018.

26.   According to MONUSCO sources, the first attack of that kind since the deadly attacks against the United Nations peacekeepers in Mamundioma and Semuliki at the end of 2017 (S/2018/531, paras. 165–174) took place on 6 July 2018. Responding to a shooting incident near the Kasinga and Boikene neighbourhoods of Beni, United Nations armoured personnel carriers sustained targeted fire and one was damaged by armour-piercing bullets. Indicative of the assailants' determination, one tried to climb into a carrier. Two United Nations peacekeepers were injured during the assault.

27.   In addition, during ambushes on the Mavivi/Boikene road on 3 September 2018, two United Nations peacekeepers were injured and four armoured personnel carriers were damaged. On 29 July and 24 October 2018, peacekeepers repelled attacks against the MONUSCO company operating base in Semuliki.

#### *Attacks against civilians*

28.   Two major attacks targeted the city of Beni on 22 September and 20 October 2018, respectively. The second attack targeted a northern quarter of Beni city, Boikene, and at least 12 civilians and 1 FARDC soldier were killed. One MONUSCO source told the Group that the discharge of heavy weaponry could be heard during the attack.

---

[4] **Available at** https://monusco.unmissions.org/en/fardc-and-monusco-launch-joint-operations-against-adf.

S/2018/1133

29.   During the attack 22 September, at least 17 civilians and 4 FARDC soldiers were killed, all by gunshots. Based on FARDC, MONUSCO and civil society sources, as well as on the account of one civilian eyewitness, the Group found that the attack took place along the Beni/Kasindi road, and the assailants were visible from a well-known roundabout in the city (see annex 6). The fact that this attack occurred shortly after an attack against FARDC in Kasinga, 3 kilometres north-east of Beni, apparently in order to divert the focus of FARDC and United Nations peacekeepers, is indicative of the level of planning by the assailants.

30.   One civilian eyewitness, who hid in a shop on the Beni/Kasindi road during the attack on 22 September, told the Group that around 5.30 p.m., he saw armed men wearing full FARDC camouflage uniforms entering Beni from three directions. They walked in columns and wore bulletproof vests like elements of FARDC. The source initially believed the men to be FARDC soldiers, until they started shooting at a vehicle and its passengers. According to the source, the assailants shot randomly at civilians. They were well armed, including with rockets, PK machine guns and AK-type rifles. The source saw only men. They spoke Swahili and one other language, but the source could not distinguish whether it was Kiganda or Kinyarwanda. However, it appears that not all attacks followed the same pattern (see annex 7).

**Adverse consequences of the attacks**

31.   The attacks in Beni territory have had devastating consequences on civilians: as of the time of writing, at least 200 people have been killed since the beginning of 2018[5] and many have been injured or abducted, including women and children. The attacks have also led to massive displacements to other locations within Beni territory or to the neighbouring Ituri Province. The Office for the Coordination of Humanitarian Affairs of the Secretariat assessed that by 24 October 2018, two thirds of the population of the Ruwenzori commune, on the outskirts of Beni city, had left their homes following the armed attacks.[6]

32.   While the Group cannot confirm the motivations of the assailants, the attacks, in particular those against Beni city, have clearly spread terror among the civilian population.

33.   The terror, along with the exasperation of the population, has triggered a growing and worrying distrust towards local and national Congolese authorities, FARDC and MONUSCO. The weeks following the 22 September attack against Beni were marked by strikes, "ghost town" operations and demonstrations requesting security, some of which turned violent. The events that followed the 20 October attack in Boikene are particularly symptomatic of the explosive situation, as an angry mob brought at least one of the bodies of the victims to the office of the mayor of Beni, burned the post office and pelted some United Nations vehicles.

34.   In addition, the Group is aware of the circulation of messages on social media, including from a politician who called for a violent mobilization against the attackers (see annex 8). The Group is concerned that those calls might fuel the conflict.

35.   The Group is also aware of recent mob attacks in Beni territory against members of the Hutu community allegedly suspected of joining ADF. Although the Group is

---

[5] On 16 August 2018, the Office for the Coordination of Humanitarian Affairs of the Secretariat reported that since the beginning of 2018, 127 people had been killed in Beni territory. See https://reliefweb.int/sites/reliefweb.int/files/resources/rd_congo_-_nord-kivu_note_dinformations_humanitaires_du_16_aout_2018.pdf. See also annex 4.
[6] See https://reliefweb.int/sites/reliefweb.int/files/resources/rd_congo_-_nord-kivu_note_dinformations_humanitaires_du_24_octobre_2018.pdf.

not in a position to confirm any of those allegations or the motivations behind those attacks, it will continue to monitor the situation.

## III.  Fizi and Uvira territories

### A.  Armed movement associated with the Rwanda National Congress and Ngomino

36.  The Group investigated armed group activities in the Hauts Plateaux of Fizi and Uvira territories in South Kivu. The Group found that a widespread recruitment network was established that benefited from local and external support.

37.  In September 2018, the Group separately interviewed 12 ex-combatants. They all told the Group that Shaka Nyamusaraba was the commander of the armed group, which included both foreign combatants, most of Rwandan origin, and Congolese Banyamulenge. They also told the Group that they had received a briefing during which the armed group was called "P5",[7] the Rwanda National Congress or "the group of Kayumba Nyamwasa".[8] Several ex-combatants informed the Group that Nyamwasa frequently travelled to the region. The Group could not confirm the information and requested the assistance of South Africa. The latter has not yet responded to the request. Nyamusaraba was previously known as the leader of the local armed group Ngomino.

**Recruitment network**

38.  Several ex-combatants provided consistent testimonies regarding a recruitment network, directed from Bujumbura,[9] that enabled recruiting from several African countries, often through facilitators based in East, Central and Southern Africa as well as Western Europe, to Bijabo in Fizi territory. Recruitment strategies varied from phone calls and face-to-face meetings to social media.

39.  According to all interviewed ex-combatants, the main recruiter was a man called "Rashid", also known as "Sunday/Sunde Charles". He was reported to be the leading communication link between field recruiters, recruits and commanders (in particular Nyamusaraba) based in Bijabo. Rashid covered the cost of travel for the foreign recruits who travelled from other countries to his house in Bujumbura. Once at the house, recruits were asked to surrender all personal items, including identity cards, money and phones, and to prepare to go to the Democratic Republic of the Congo.

40.  The large majority of the ex-combatants described a very similar modus operandi. Recruiters or facilitators transported them to Bujumbura, where Rashid smuggled parties of 25 to 30 new recruits to the Democratic Republic of the Congo on motorized pirogues crossing Lake Tanganyika, or on rafts crossing the Ruzizi River. Upon reaching the Democratic Republic of the Congo, the recruits were taken to the heights of the Hauts Plateaux to the movement's base in Bijabo, inside the

---

[7] The "P5" is a coalition of Rwandan opposition political organizations including the Amahoro People's Congress (AMAHORO-PC), the Forces démocratiques unifées-Inkingi (FDU-INKINGI), the People's Defence Pact-Imzani (PDP-IMANZI), the Social Party-Imberakuri (PS-IMBERAKURI) and the Rwanda National Congress.

[8] Kayumba Nyamwasa is an exiled Rwandan general. He resides in South Africa and is considered a political opponent in Rwanda.

[9] The Group could not confirm if the Government of Burundi was aware of such a network. It requested clarification of such a network from the Government of Burundi, but did not receive a response.

UNCLASSIFIED    EXHIBIT 51

S/2018/1133

Bijombo forest (see annex 9). The arrival of new recruits appeared to have taken place at least once a month for most of the first eight months of 2018.

41.  All of the interviewed ex-combatants told the Group that they had been deceived by acquaintances or distant relatives. They believed they were getting jobs in Bujumbura. Most of them were originally from Burundi, Rwanda and Uganda. At least one had been recruited from Malawi. Ex-combatants told the Group that some combatants, many still in Bijabo, had been recruited from Kenya, the United Republic of Tanzania, South Africa and Mozambique.

**Location, organization and leaders**

42.  Ex-combatants, civil society actors and FARDC officers indicated that the movement comprised a local group, Ngomino, and a few hundred foreign combatants, primarily of Banyamulenge or Rwandan origin. The combatants were often separated into four units, with three main positions known as Alpha, Bravo and Delta "battalions" manned by roughly 120 armed men each. The three defensive positions were spaced around Bijabo, where the movement's headquarters were located. Based on interviews with 10 recent defectors, the Group assessed that by September 2018, the movement numbered around 400 mostly armed and trained members.

43.  New recruits were subjected to military training, lasting from four to six weeks, that included weapon assembly and assault tactics. Several ex-combatants explained that the trainers, who spoke Kinyarwanda, described themselves as former Rwandan military. The trainers also told the recruits that the leader of their movement was Kayumba Nyamwasa.

44.  According to several ex-combatants, Nyamusaraba was in frequent contact by phone with sources outside the Democratic Republic of the Congo, especially in Burundi. Nyamusaraba was known to receive all new recruits and personally informed them that P5 was "Kayumba Nyamwasa's group". Nyamusaraba told the new recruits that the aim of P5 was to liberate Rwanda. However, all of the interviewed ex-combatants stated that they had never attacked Rwanda but instead attacked what they thought were Burundian rebel groups active within the Congolese territory, especially the Forces nationales de libération, led by Aloys Nzabampema, and the Résistance pour un état de droit au Burundi (RED Tabara), as well as some Mai-Mai factions.

**Support**

45.  All of the ex-combatants stated that the P5 combatants were on good terms with the local Banyamulenge population in the vicinity of Bijabo. Some described having received food from local civilians while others said they were afraid to flee the base because they suspected the local communities around Bijabo would deliver them back to the P5 commanders. One ex-combatant said that a small weekly market near Bijabo was controlled by Nyamusaraba himself, who levied small taxes on the food market traders.

46.  Several ex-combatants interviewed by the Group stated that P5 received supplies, including weapons and ammunition, food, medicines, boots and uniforms, from Burundi (see paras. 47–48 below). Ex-combatants were consistent in saying that Rashid, the main recruiter, was also in charge of providing supplies, which were often delivered in the same pirogues that transported recruits from Burundi to the Democratic Republic of the Congo. Most of them described almost monthly deliveries of medicine and food, and that at least once Rashid made the journey from Burundi to Bijabo, in early 2018, to ensure the supplies were delivered intact.

    UNCLASSIFIED

## B. Arms transfers from Burundi in violation of arms embargo

47.    Twelve ex-combatants told the Group that in February, April and June 2018, various quantities of weapons and ammunition were delivered to the P5 combatants in the Democratic Republic of the Congo. Three ex-combatants stated that they received eight AK-type assault rifles in February 2018 while also receiving 18 new combatants from Burundi. Two ex-combatants reported that they had received 3 machine guns and 15 rocket-propelled grenades for a rocket-propelled grenade launcher (an RPG-7) in April 2018. One ex-combatant explained that another batch of weapons and ammunition had been delivered near Lusenda from Lake Tanganyika. The shipment included three PK machine guns, two rocket-propelled grenade launchers and one small machine gun, while the remainder were AK-type rifles. Ammunition came in both boxes and bags and was well packed.

48.    Three ex-combatants stated that another batch of weapons was delivered in June 2018, comprising 9 machine guns, 100 grenades, 45 AK-type rifles, 8 rocket-propelled grenade launchers, 30 rocket-propelled grenades and approximately 30 boxes of ammunition. Close to 40 people transported the weapons. Each of them carried one weapon, one box of ammunition, one belt of ammunition and two grenades. The weapons were brought from Burundi to the Democratic Republic of the Congo through Rumonge. The Group could not confirm the names of the individuals and entities involved in the delivery, and intends to continue its investigations in the lead-up to its final report.

# IV. Masisi territory

## A. Tin, tantalum and tungsten

### Involvement of Alliance des patriotes pour un Congo libre et souverain elements in the mining sector

49.    The Group found that armed factions of the Alliance des patriotes pour un Congo libre et souverain (APCLS) controlled mining sites that contained tin, tantalum and tungsten in the areas it occupied in Masisi territory. Four individuals familiar with the mineral sector in Masisi and a local leader of a non-governmental organization informed the Group that APCLS had split into two factions: APCLS, led by "General" Janvier Buingo Karairi, and APCLS-Rénové (APCLS-R) led by "General" Mapenzi Bulere Likuwe. The two factions constantly fought one another for control of the mines in Kibanda and Rubonga in the Mahanga area of Masisi territory. The sources added that FARDC had been trying to liberate the mines from the control of the armed groups, with little success, as APCLS-R (see para. 57 below) was still active in the area.

50.    The Group also interviewed five négociants and four truck drivers from various parts of Goma who operated between Goma and Masisi territory. Two of the négociants had set up a camp in Masisi, where they coordinated a network of local agents who obtained minerals from mining sites in Rubonga, Kibanda, Ibanda and Mushwao/Maboa controlled by APCLS-R. The négociants stated that only people with links to the armed group were permitted access to those mines, which forced the négociants to use agents operating on behalf of APCLS-R. The négociants added that the stocks of minerals they purchased were transported in trucks operating between Masisi and Goma and were delivered to them in Goma. A local civil society leader in Nyabiondo confirmed having been aware of artisanal miners who acted as local agents of APCLS-R in transporting minerals sourced from Lukweti and Nyabiondo, and selling them to buyers in Masisi town. The Group noted that this was consistent with

S/2018/1133

the Group's past reports on mining in Mahanga (S/2016/1102, paras. 80–84, and S/2017/672/Rev.1, paras. 88–95).

51.    The Group sought a list of validated mines in Masisi (see annex 10) and a confirmation of the presence of armed groups from the North Kivu mining authorities. The authorities confirmed to the Group that although the Kibanda and Rubonga mines were listed as validated, sourcing from the two mines had been suspended because they were occupied by APCLS factions.

52.    The same sources informed the Group that the two APCLS factions also fought over the control of local market centres in the Masisi territory at Bafuna and Banyungu *groupements* for the purpose of extorting taxes on people who used the markets. APCLS factions claimed a tax of between 300 and 500 Congolese francs depending on the merchandise people bought, or demanded a share of the farm produce and/or minerals they carried. The Group's efforts to access those locations were unsuccessful owing to sporadic fighting by the armed groups.

**Illegal trade**

53.    The Group spoke to five individuals involved in the trade of minerals originating from areas controlled by armed groups in Masisi and three truck drivers involved in the smuggling network. Two of the sources stated that the minerals came from Masisi centre and the Rubaya area, where they ran a network of local agents. The minerals were transported to Goma, often on motorbikes or concealed in loaded trucks. Buyers were often stationed at specific centres along the route, including Kamatare and Kabigo in North Kivu, and Numbi, Kihonga, Kalungu and Minova in South Kivu. Sometimes the smugglers stocked minerals until a sizeable quantity was reached and/or a customer was found. In October 2018, the Group was shown a stock of untagged coltan along the route, waiting for a buyer (see annex 11). The Group could not estimate the quantities and the value of the minerals trafficked along the route.

54.    The three truck drivers operating between Goma and Masisi declared that they were often hired to collect minerals, which they concealed among sacks of charcoal or farm produce such as bananas and delivered to the buyers, mostly in Goma. A mining official from North Kivu confirmed the existence of the smuggling route. The Group is also aware of the existence of other smuggling routes, but documented only the one discussed.

55.    Two sources from the Commission nationale de lutte contre la fraude minière, as well as two négociants from the Kabashuba and Koyi mining areas, told the Group that minerals from zones occupied by armed groups and minerals smuggled from other mines continued to contaminate the supply chain due diligence process. In October 2018, two négociants stated that they were in possession of the International Tin Supply Chain Initiative (ITSCI) traceability system tags, but had no minerals to tag, owing to the shortage of minerals on the market. They added that it was very difficult to differentiate between minerals from green zones and those from red zones in Masisi territory because of the suspension of the ITSCI tagging system as a result of the involvement of armed groups in the actual mining, taxation or sale of minerals. The Group noted that in a letter dated 26 April 2018 (see annex 12), the Société minière de Bisunzu (SMB) complained about the smuggling of minerals in Rubaya (Masisi territory).

**B.    Armed groups**

56.    The Group investigated armed group activities in the northern part of Masisi territory. The Group found that the split in the dominant armed group APCLS had led to heavy fighting and serious human rights violations in the region. The situation had

worsened when other armed groups allied with the different factions of APCLS. Some FARDC elements also played a role in the polarization of the conflict.

**Split in the Alliance des patriotes pour un Congo libre et souverain and alliance with other armed groups**

57.   In December 2017, "General" Mapenzi Bulere Likuwe broke away from APCLS with a small number of combatants to start a new armed group called APCLS-Rénové (APCLS-R). "General" Janvier Buingo Karairi has been the long-standing leader of APCLS (S/2011/738, para. 219). Several sources in the local community, the civil society of Masisi and local researchers told the Group that there were several reasons for the split.

58.   First, there was the personal dispute between Mapenzi and Janvier concerning the exploitation of mining sites in their area of control. Janvier was reluctant to increase the number of mining sites under APCLS control while Mapenzi was in favour of more exploitation of natural resources.[10]

59.   Second, political actors had manipulated Mapenzi in order to replace Janvier, who was difficult to control. Janvier was opposed to the regime of the President of the Democratic Republic of the Congo, Joseph Kabila, and would be an unreliable factor in the electoral process. Several political actors linked to the presidential majority were cited as the driving forces behind Mapenzi's efforts to decrease the influence of Janvier. The Group could not, however, document the involvement of any specific political actors.

60.   During the period under review, the split in APCLS was the trigger for increased violence in the region, which was reinforced by the involvement of other armed groups. According to most sources, two factions of armed groups were facing each other in the northern part of Masisi territory (see annex 13).

61.   On one side, APCLS-R collaborated with the Nduma défense du Congo-Rénové (NDC-R), led by the sanctioned individual "General" Shimiray Mwissa Guidon, and with the Buhoza/Apollo group, led by "General" Apollo.[11] This can be considered a fully fledged coalition. Several sources witnessed joint attacks by those groups against villages and APCLS (see, for example, para. 69 below). Furthermore, NDC-R and APCLS-R shared headquarters in Kilambo.

62.   On the other side, APCLS developed a loose coalition with Nyatura Kavumbi, Nyatura Nzai and Nyatura Jean-Marie. The foreign armed group Conseil national pour le renouveau et la démocratie (CNRD) was also involved in fighting against NDC-R and APCLS-R. Most of the sources told the Group that the common enemy, in this case the armed Rwandan opposition group NDC-R, was the driving factor behind the loose coalition.

**Role of the Forces armées de la république démocratique du Congo**

63.   The Group found that some FARDC elements in Masisi territory were using armed groups such as APCLS-R and NDC-R in their fight against other armed groups.[12] Fifteen sources, including eyewitnesses, civil society members, local

---

[10] Some sources told the Group that Janvier was not active in mining sites. However two ex-APCLS combatants told the Group that APCLS was active in different mining sites near Mahanga. Furthermore, the Group has previously documented mining activities by APCLS (see S/2017/672/Rev.1, paras. 91–92).

[11] This list is not exhaustive. There are other smaller armed groups also linked with APCLS-R, but they are not usually involved in the incidents reported.

[12] The Group has previously documented that practice (see, for example, S/2016/466, para. 80).

S/2018/1133

researchers, human rights actors, community leaders and State authorities, confirmed that fact to the Group.

64.   One civil society source told the Group that when a government official reported a fight between two different armed groups in August 2018, the official was told by an officer of FARDC that he could not report the fight because one of the armed groups, APCLS-R, was working with FARDC.

65.   Another FARDC officer declared that collaboration with APCLS-R was necessary owing to the lack of FARDC resources in the region to fight other armed groups.

66.   Local sources saw APCLS-R combatants riding in a KAMAZ truck owned by FARDC, while others observed APCLS-R combatants in the FARDC camp in Nyabiondo in October 2018. According to civil society sources, the headquarters of APCLS-R and NDC-R were located in Kilambo between two FARDC positions (in Lwibo and Lukweti respectively), and FARDC allowed armed group combatants to move freely.

67.   Several sources indicated that elements of the first battalion of the 3410 regiment, in particular, were working together with APCLS-R and NDC-R in Masisi territory. The Group is also aware that several FARDC officers were involved, but could not confirm that the FARDC high command was aware or informed of that collaboration. The Group asked the Government of the Democratic Republic of the Congo for clarification, but had not received a response at the time of writing.

68.   Three sources informed the Group that FARDC troops deployed in Nyabiondo collaborated with APCLS-R in the illegal taxation of civilians on the roads from the mines to Lwibo and Lukweti. Both FARDC and APCLS-R erected roadblocks and levied between 200 and 500 Congolese francs per person per passage. Those without money were taxed a share of whatever they carried, whether farm produce and minerals.

**Human rights violations in the Kahira area**

69.   The Group found that Kahira village and its surroundings, considered to be under the control of APCLS, had been attacked at least six times by armed groups since July 2018. The attacks resulted in serious violations of international humanitarian law and in the displacement of thousands of people to the areas near Nyabiondo and Kitchanga. Eight eyewitnesses and internally displaced persons stated that a coalition of APCLS-R, NDC-R and Buhoza/Apollo combatants, under the command of Mapenzi, his deputy, "General" Poyo, and Apollo, conducted the attacks.

70.   They also explained that the village had been attacked by well-armed combatants mostly dressed in military fatigues and accompanied by children, who often carried the loot. More than 150 houses were looted in total.

71.   At least 10 villagers were killed during the attacks, including a student and the wife of a village chief. Three witnesses said that seven children were kidnapped by the attackers. In September 2018, five internally displaced persons told the Group that combatants had raped at least 13 women during the different attacks, including 3 girls aged 12, 13 and 14.

S/2018/1133

## V.   Shabunda territory

## A.   Conflict-related sexual violence and use of child soldiers in Shabunda territory

72.   Based on interviews in June, September and October 2018 with 17 victims, 1 witness, civil society members, local authorities, local researchers, 1 ex-Raia Mutomboki element and staff from non-governmental organizations and MONUSCO, the Group found that the Kokodikoko faction of Raia Mutomboki, led by Masudi Alimasi Kokodikoko, committed mass gang rapes, serious sexual crimes amounting to torture and sexual slavery against at least 17 women around Lubila in Shabunda territory in September 2018. The Group also found that Kokodikoko and his group used child soldiers. All of those acts constitute serious violations of human rights and international humanitarian law, and are sanctionable acts under subparagraphs (d) and (e) of paragraph 7 of Security Council resolution 2293 (2016).

73.   The Group obtained a picture of an individual and, based on its investigations, believes that the individual is Kokodikoko (see annex 14).

74.   During a phone call held on 9 November 2018, Kokodikoko denied any involvement, including any involvement by any member of his faction, in the rapes. He told the Group that he had never heard of any rapes having been committed around Lubila. He also denied the presence of any soldier under the age of 18 within his group. He explained that while there were child soldiers at the beginning of the Raia Mutomboki movement, they had been released "a long time ago".

75.   Kokodikoko confirmed, however, that his group's headquarters were based in the Lubila forest, though at the time he was in Katenge, close to Lutunkulu, following an attack by FARDC a week before the phone call.

### Modus operandi of the rapes

76.   The Group is aware that on 8 and 9 September 2018, armed elements of the Raia Mutomboki Kokodikoko faction conducted a hit-and-run attack against Lubila[13] and its surroundings, a gold-rich area that was difficult to access (see annex 15 and paras. 84–95, below). During the attack, they looted several houses, shops and merchants, taking various goods and money. They abducted at least 4 men and 15 women, forcing several to carry the looted belongings, and brought them to a location in the Lubila forest which most described as a big stone cave.

77.   A total of at least 17 women, between the ages of 15 and 70, including 2 women not abducted in Lubila, were held captive in the cave. During four days the Raia Mutomboki elements repeatedly gang-raped the women. They also introduced various tools into the vaginas of several of the women, severely injuring some. Women who resisted being assaulted were additionally mistreated.

78.   Raia Mutomboki elements shouting "Tchai! Tchai!"[14] (Tea! Tea!) usually announced the beginning of the rapes. Before the rapes, Raia Mutomboki elements also danced and sang. Some of the songs, described as full of insults, spoke about penises, vaginas and penetration. The songs expressly mentioned the name of "Chief Kokodikoko" and praised him. During this last ritual, Kokodikoko was either in the middle of his elements or on the side watching them.

---

[13] One of the victims said that the village was called Lubige.

[14] Shouting "Restaurant! Restaurant!" was also used as a signal for the rapes.

S/2018/1133

79.  Kokodikoko chose the women he preferred, usually selecting the youngest ones, and raped them first. He raped at least nine women. It was only after he had raped the selected women that he authorized or ordered his elements to rape the women.

*Use of child soldiers*

80.  Six rape victims cited the presence of child soldiers, referring to "*Kadogo*" or small boys, in charge of Kokodikoko's escort and/or involved in the attack and abductions in Lubila. Some of the boys also committed rapes. One victim specified that there were three child soldiers, around 15 or 16 years old, in the cave.

81.  One local authority and one civil society representative corroborated the presence of child soldiers within the faction. The local authority stated that three children below the age of 18 were part of it.

*Other instances of rapes and recruitment and use of child soldiers*

82.  The Group established that other gang rapes and the recruitment and use of child soldiers by various Raia Mutomboki factions had taken place (see annex 16), but could not confirm, based on its methodology, the involvement of the Kokodikoko faction.

83.  In October 2018, the Group received information that people assisting rape victims were being threatened by unidentified individuals. In particular, the Group saw text messages containing explicit and targeted death threats sent between 14 and 16 September 2018 to one such person (see annex 17).

## B.  Tin, tantalum, tungsten and gold

### Illegal tin, tantalum and tungsten minerals from Shabunda territory laundered in Walungu territory

84.  During the period under review, the Group found that tin, tantalum and tungsten sourced from areas controlled by Raia Mutomboki factions and some FARDC elements in Shabunda territory had been laundered in Walungu territory. The Group confirmed that Congolese mining officials were aware of the practice.

85.  In October 2018, one civil society actor, two traders from Kigulube (Shabunda territory) and one mining official from Nzibira (Walungu territory) told the Group that most of the tin, tantalum and tungsten tagged as being from the Chaminyago mining site located near Nzibira were in fact from mining sites located in Kigulube and Nzovu (Shabunda territory). The official list of validated mining sites obtained by the Group shows that mining sites in Kigulube and Nzovu were not validated and therefore not eligible for mineral exploitation and trade. Several officials said to the Group that the sites could not be validated because of the involvement of armed actors in the exploitation of minerals. The official list shows that Chaminyago is validated (see annex 18), but the Group visited the site in June and October 2018 and witnessed no mining activity taking place there.

86.  Several sources confirmed that Raia Mutomboki factions led by Ngandu and Donat received 10 per cent of the tin, tantalum and tungsten production as part of the "war effort" in non-validated mining sites such as Katombi, Luyuyu and Kasilu in Shabunda territory. Two mining officials from Walungu territory and two Kigulube-based minerals traders told the Group that some FARDC elements based in Kigulube also received 10 per cent of the production from the same mining sites for "security effort". The Group confirmed that they were commanded by Lieutenant Colonel Kitenge Yesu Albert, also known as Diabos, but was not able to confirm if their commanders had been informed. According to the sources, both Raia Mutomboki

leaders and some FARDC officers sent their representatives to collect 10 per cent of the production from the managers of the local mining sites. Two of the sources confirmed that the 10 per cent was generally provided in kind.

87.   The Group received information that the minerals collected were either sent to Bukavu by road or laundered at the Chaminyago mining site. When the Group investigated the main buyer of minerals from the site, it found that Ets Rica, a Bukavu-based processing company, was one of the leading buyers. For example, the Group was able to confirm that Ets Rica received 3,300 kilograms on 7 October and 2,200 kilograms on 26 October from Chaminyago. Five sources involved in the mineral sector in South Kivu told the Group that Ets Rica pre-financed the activities of négociants who operated in Nzovu and Kigulube in order to ensure that the company would receive the minerals sourced there.

88.   Three mining officials told the Group that the minerals received by Ets Rica in October 2018 were sourced from the Nzovu area. The officials added that they had received instructions from their hierarchy to maintain the system of tagging minerals from non-validated mining sites. In fact, besides Chaminyago, other validated sites were deliberately used by mining officials to launder minerals from Shabunda territory. For example, the Group confirmed that in November 2018, 2,530 kilograms of tin, tantalum and tungsten sourced from the Nzovu area had been introduced into the supply chain as minerals from Zolazola and Kanyugu, two validated mining sites located near Nzibira. The Group could not confirm which company purchased the minerals.

89.   The Group conveyed its findings in a letter to the heads of Ets Rica, but has not received a response as of the time of writing. The Group also presented its findings to the International Tin Association Ltd. which manages the ITSCI Programme for Responsible Mineral Supply Chains in the Democratic Republic of the Congo. In a letter to the Group dated 12 November 2018, the Association responded that it had briefly investigated the Group's findings and would continue to do so with the aim of mitigating any confirmed issues in the coming weeks. The Association also opened an incident report in relation to the Group's inquiry and provided additional contextual information on the tin, tantalum, tungsten and gold sectors in Shabunda territory. The Group intends to discuss those issues further with the Association.

**Gold**

*Armed groups and involvement of the Forces armées de la république démocratique du Congo*

90.   During the period under review, the Group found that, as previously documented (S/2015/19, paras. 192–194), gold exploitation in Shabunda territory was still controlled by either armed groups or some FARDC elements. The Group noted that both were involved in various ways and in different parts of the territory.

91.   The Group interviewed three owners of dredges who exploited gold on the Ulindi River around Shabunda city. They all reported that FARDC elements collected between 1 and 2 grams of gold per dredge every two weeks, depending on the level of production. The information was confirmed to the Group by a civil society actor in Shabunda. The four sources told the Group that FARDC elements were paid either in kind or in cash. The Group could not independently confirm the exact number of dredges around Shabunda city, but from various testimonies it estimated that the total number was around 15 in September 2018.

92.   The Group investigated activities related to gold in Lubila and Kigulube and learned from two local chiefs, one civil society actor and two individuals associated with the gold trade that in both areas, miners were requested to work at least once a

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

week for FARDC elements. Two of the sources told the Group that in Bimpanga, located 9 kilometres from Kigulube, they witnessed elements of FARDC collecting gold from local miners. According to those sources, taxation took place on a weekly basis and each of the 18 sites paid 2 grams in kind or in cash.

93.    The sources also informed the Group that the Raia Mutomboki factions who operated in the two areas mainly obtained gold by looting the population, including miners at the mining sites. They presented the faction led by Kokodikoko as the most active and violent in the recent months. The Group was informed of a series of incursions by Raia Mutomboki Kokodikoko elements in the Lubila area and noted that the most recent one took place in October 2018, 5 kilometres from the FARDC position. During the operation, the armed group looted 20 grams of gold. In November 2018, during a phone conversation, Kokodikoko denied any recent involvement in the gold sector.

94.    The Group interviewed several individuals associated with the gold trade in Shabunda territory and noted that gold exploited in Shabunda city, Lubila and Kigulube was mostly traded in Bukavu. The Group received the names of Bukavu-based individuals who illegally facilitated the export of gold sourced from Shabunda territory. It is the Group's intention to continue its investigations on those individuals for its final report.

95.    The Group confirmed that the gold in Bukavu was mainly smuggled to Burundi, Rwanda and Uganda, and was ultimately exported to the United Arab Emirates.[15] The Group interviewed sources who confirmed the pattern the Group documented regarding the Rwandan route in its previous report (S/2018/531, paras. 127–128). The Group received a letter from the authorities of Rwanda concerning its findings (see annex 19). During the period under review, the Group specifically investigated realities relating to gold smuggled to Uganda.

**Uganda**

96.    Several sources, including mining officials, researchers and Kampala-based gold traders, told the Group that Kampala was a recipient of smuggled gold from the Democratic Republic of the Congo, which is consistent with the Group's previous findings (S/2018/531, paras. 92 and 121, S/2017/672/Rev.1, paras. 72 and 119–126, S/2015/19, paras. 199–201, and S/2014/42, paras. 182–188). In addition, the Group found that Ugandan authorities lacked a coherent policy to combat smuggling. The Group also found that Kampala-based gold exporters did not have an efficient system to avoid the contamination of their supply chains with illegally traded gold from the Democratic Republic of the Congo.

*Main gold exporters*

97.    The Group confirmed that, in addition to African Gold Refinery Ltd. (AGR),[16] a new refinery, Bullion Refinery Ltd., currently processes and exports gold from Uganda to Dubai.[17] Documents obtained by the Group showed, for example, a significant volume exported by Bullion Refinery Ltd. in October 2018 (see annex 20). In September 2018, three sources familiar with Ugandan gold production and export told the Group that the domestic production was low compared to the volume of

---

[15] The Group intends to further investigate the United Arab Emirates route in the lead-up to its final report.
[16] The Group has previously reported on the activities of African Gold Refinery (see, for example, S/2017/672/Rev.1, paras. 123–125).
[17] Publicly available reports also mentioned another refinery, Simba, but the Group could not confirm the information and the authorities of Uganda did not respond to the Group's request for information.

DRC-30316 0989

UNCLASSIFIED     EXHIBIT 51

S/2018/1133

exports. The sources added that most of the gold exported from Uganda was sourced from the Democratic Republic of the Congo, as well as from the United Republic of Tanzania, Mali, Burundi and Kenya.

98.    The Group requested the names of suppliers from AGR and Bullion Refinery Ltd. in order to verify whether the suppliers were involved directly or indirectly in any sanctionable acts in the Democratic Republic of the Congo.[18] While Bullion Refinery Ltd. did not respond to the request, AGR sent two letters to the Group. In the letters, the company reiterated its previously expressed willingness to seek the "proper consent" of the suppliers before providing the information to the Group (S/2017/672/Rev.1, para. 125). In the same letters, AGR reiterated that it did not source any undocumented gold from the Democratic Republic of the Congo. AGR also stated that Alphonse Katarebe would succeed Alain Goetz as Chief Executive Officer of the company.

99.    The Group notes with concern the lack of cooperation from the two companies and believes that such a lack impedes its ability to conduct a comprehensive analysis on the compliance by the two companies with the Group's guidelines on due diligence (see S/2011/738). The Group requested the information on suppliers from the authorities of Uganda and is expecting a response.

100.    Two independent sources associated with AGR and Bullion Refinery Ltd. told the Group that the companies were reluctant to disclose the names of their suppliers because they were aware that their activities were not always legal. In fact, documents[19] concerning a supplier for AGR obtained by the Group show the risk of contamination of the supply chain with gold illegally sourced or traded from the Democratic Republic of the Congo. The supplier, a Congolese national based in Bukavu who provided AGR, in October 2018, with gold worth more than $3 million, travelled with an official document, delivered five months earlier, identifying his occupation as that of an electrician. The supplier declared to AGR that the gold was sourced from the United Republic of Tanzania. Initial investigations conducted by the Group suggested that the individual was used as a broker by many Bukavu-based gold smugglers. AGR did not respond to the Group's inquiry as to whether it had a policy to verify the accuracy of statements made by Congolese nationals who claim that the gold they sell was not sourced from the Democratic Republic of the Congo.

101.    The Group also confirmed that a major supplier for Bullion Refinery Ltd. is a Congolese trader based in Ariwara in the Ituri Province. Initial investigations conducted by the Group show that the individual is not officially eligible for the gold trade inside or outside the Democratic Republic of the Congo. The Group intends to continue its investigations regarding the suppliers of Bullion Refinery Ltd. and AGR.

*Role of the authorities*

102.    The Group noted that, in Uganda, the International Conference on the Great Lakes Region certificate is not yet compulsory.[20] The Group spoke with two Kampala-based gold exporters who explained that this was the reason they did not request those certificates from suppliers from the Democratic Republic of the Congo.

---

[18]    The Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo designates for sanction, inter alia, individuals or entities that illegally support armed groups and criminal networks through the illicit trade of natural resources, including gold.

[19]    Archived at the Secretariat.

[20]    As of the time of writing, only two countries of the International Conference on the Great Lakes Region (the Democratic Republic of the Congo and Rwanda) require the certificates.

UNCLASSIFIED

S/2018/1133

103. The Group also noted that the authorities of Uganda have failed to share the results of their investigations into Kampala-based gold traders (S/2015/19, para. 203).

104. On 1 November 2018, the Group sent a request for information to the Government of Uganda. On 8 November, in a response to the Group, the authorities of Uganda told the Group that, while they were willing to cooperate and work closely with the Group, they had concerns about the short notice of one week to provide the information. The Group extended the deadline for one more week and did not receive a response. The Group will consider the response from the Government of Uganda once it is received.

## VI. Non-notification of deliveries of weapons and related materiel

### A. Re-exportation of sponge grenades by South Africa

105. The Group received information that, between December 2017 and January 2018, South Africa delivered quantities of sponge grenades to the Government of the Democratic Republic of the Congo (see annex 21). Sponge grenades are riot control weapons, intended to be non-lethal, and are generally fired from a 40 mm grenade launcher. The sponge grenades (SIR-X BT 23715) that the Group identified were produced in Switzerland. The Group received credible information that the materiel was re-exported by South Africa to the Democratic Republic of the Congo. The Group requested further details from the authorities of South Africa but has not yet received a response at the time of writing.

### B. Delivery of military-related materiel from New Zealand

106. The Group received information that, in April 2018, a company named Eastpac International Trade Ltd. delivered military-related materiel, including helmets, boots and bulletproof vests, to the Democratic Republic of the Congo. The Group's initial investigations established that the company was based in New Zealand. The Group requested assistance from the authorities of New Zealand with regard to tracing the activities of the company and checking its compliance with the sanctions regime. The New Zealand authorities asked for further details on the materiel delivered, which the Group provided. However, the authorities of New Zealand told the Group in November 2018 that, in the absence any additional specific evidence, they were unable to find any relevant exports by the company.

### C. Delivery of military-related materiel from the United Arab Emirates

107. In October 2018, the Group received information that a company named Eastpac International LLC delivered military-related materiel, including boots and bulletproof vests, to the Government of the Democratic Republic of the Congo. The Group found that the company is based in the United Arab Emirates (see annex 22) and that the materiel was loaded in Djibouti. The Group sent a request for information to the United Arab Emirates and is still waiting for their response. In November, the Group informed the authorities of Djibouti of its finding and requested information.

108. The Group could not confirm if Eastpac International Trade Ltd. and Eastpac International LLC belonged to the same group. The Group found that, in New Zealand, Eastpac International Trade Ltd. is known as an importer. The Group is also

S/2018/1133

aware of the existence of many companies with the name of Eastpac, including some generic holding companies in secrecy jurisdictions.

109. The Group believes that the role of Eastpac in arms deliveries in the Democratic Republic of the Congo should be further investigated.

## D. Delivery of military-related materiel from China

110. In April 2018, the Group received information that China North Industries Group Corporation Ltd. (NORINCO) delivered military-related materiel to the Government of the Democratic Republic of the Congo (see annex 23). Military intelligence officers informed the Group that NORINCO delivered 47 20-foot containers that held 26,280 cases/boxes of AK-type rifles and ammunition. The Group sent a request to the authorities of China for further details, but has not yet received a response at the time of writing.

## VII.  Recommendations

111. The Group makes the recommendations set out below.

**Government of the Democratic Republic of the Congo**

112. The Group recommends that the Government of the Democratic Republic of the Congo:

(a)   Investigate and prosecute, as appropriate, FARDC officers and elements involved in the illegal exploitation of tin, tantalum, tungsten and gold in Shabunda territory, as well as those who collaborate with armed groups in Masisi territory (see paras. 56, 63–68, 84–86 and 90–93);

(b)   Investigate and prosecute direct and indirect perpetrators of conflict-related sexual violence and of the recruitment and use of child soldiers in Shabunda territory (see paras. 72–83).

**Government of Uganda**

113. The Group recommends that the Government of Uganda adopt legislation implementing the compulsory use of International Conference on the Great Lakes Region certificates (see para. 102).

**Security Council Committee established pursuant to resolution 1533 (2004)**

114. The Group recommends that the Security Council Committee established pursuant to resolution 1533 (2004) renew its call to Member States that offer military assistance or deliver military-related materiel to the Government of the Democratic Republic of the Congo to strictly adhere to the notification requirement (see paras. 105–107 and 110).

S/2018/1133

## Table of Contents_

Annex 1: Photos of Amigo ................................................................................. 23

Annex 2: Recruitment routes ............................................................................. 24

Annex 3: Fake Congolese electoral cards found in a house of a focal point of the recruitment network ............................................................................................................ 26

Annex 4: Armed groups' attacks in Beni territory from 6 July to 9 November 2018 .......................... 27

Annex 5: Map of the north-eastern part of Beni territory ....................................................... 31

Annex 6: Map of Beni city depicting the roundabout and the road to Kasindi .................................... 32

Annex 7: Attack against Matembo on 9 September 2018 ................................................... 33

Annex 8: Call by National Deputy Muhindo Nzangi Butondo to violent mobilization against attackers in Beni territory .................................................................................................... 34

Annex 9: Details on the recruitment routes to Bijombo forest .......................................... 36

Annex 10: List of validated mines in Masisi territory as of October 2018 ........................................ 37

Annex 11: Sacks of smuggled coltan awaiting a potential buyer along the Masisi-Goma route ......... 38

Annex 12: Part of the reply that SMB sent to the Group in April 2018 ................................... 39

Annex 13: Clashes between armed groups in Masisi territory .......................................... 43

Annex 14: Picture of Kokodikoko provided to the Group by two different sources from the civil society ........................................................................................................... 44

Annex 15: Maps of relevant locations in Shabunda territory and Google Earth image of Lubila ....... 45

Annex 16: Other instances of rapes and recruitment and use of child soldiers by Raia Mutomboki factions .......................................................................................................... 47

Annex 17: Death threats SMS received by one person assisting rape victims from the Shabunda territory ......................................................................................................... 48

Annex 18: List of validated mine sites in Walungu territory .................................................. 50

Annex 19: Letter from the Rwandan authorities .................................................................. 51

Annex 20: Examples of Gold exported by Bullion Refinery Ltd in September and November 2018 . 54

Annex 21 : Sponge Grenade SIR-X 40x46mm ................................................................. 55

Annex 22: Eastpac International L.L.C ............................................................................. 56

Annex 23: NORINCO ................................................................................................... 57

UNCLASSIFIED

EXHIBIT 51

S/2018/1133

### Annex 1: Photos of Amigo (aka Simba Amigo, Mzee Amigo)

 

Photos of Amigo from the archives of the Group

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

### Annex 2: Recruitment routes (Beni territory, North Kivu)

The arrested focal point confirmed the existence of an international recruitment network via three different routes and provided the names of several local recruiters. Five other interviewees corroborated his evidence.

- One recruitment cell was active in South Africa under the command of a man called Souleyman. One recruit of Somali origin told the Group that he travelled first from Cape Town to Johannesburg, then to Harare, Dar-Es-Salaam, and finally Bujumbura before entering the Democratic Republic of the Congo via Bukavu. He added that his recruiter in South Africa—a Congolese man called Hamza—suggested this route.

- Another recruitment cell run by a man called Uzzidin operated from Dar-Es-Salaam in Tanzania. According to the detained focal point, at least four recruiters were active in this cell. Two Tanzanian recruits arrested in Beni had travelled from Tanzania to Bujumbura to enter the Democratic Republic of the Congo in Uvira.

- A third recruitment cell was active in Bujumbura, Burundi. Two arrested Burundian recruits identified a Muslim teacher at a mosque in Bujumbura as their recruiter. From Burundi the recruits crossed the border in Uvira or Bukavu (via Rwanda).



Diagram made by the Group

Eventually all the recruits from these three routes passed through Goma and travelled by road to Butembo. All the interviewed recruits said they travelled individually or in small groups. When in Butembo, they contacted a motorcyclist who took them to a

UNCLASSIFIED

EXHIBIT 51

S/2018/1133

specific point north-east of Butembo, where half a dozen armed men picked them up and escorted them into the bush. After walking for about 10 hours, they arrived at an armed group's camp, which most of interviewed recruits referred to as Domaine.

When the new recruits arrived at the camp, combatants checked their personal belongings. Money, cell phones and any identity documents in their possession were taken from them. The armed group's camp was occasionally moved to another place in the eastern part of Beni territory. The new recruits were not allowed to discuss their journey with other recruits.

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

### Annex 3: Fake Congolese electoral cards found in a house of a focal point of the recruitment network



Photo by the Group in October 2018

**Annex 4: Armed group attacks in Beni territory from 6 July to 9 November 2018**

List compiled by the Group on the basis of combined information from FARDC, MONUSCO, eyewitnesses and civil society actors in Beni area.

| Date | Locations | Number of FARDC casualties | Number of MONUSCO casualties | Number of civilian casualties | Total number of people killed |
|---|---|---|---|---|---|
| 6 July | PK35 (Mbau/ Kamango road) | | | | |
| 6 July | Boikene/Paida | 1 killed | 2 injured | 1 injured | 1 |
| 10 July | Between Linzo and Bilimani, near Eringeti | | | | |
| 10 July | Jericho | 1 injured | | | |
| 12 July | PK13 (Mbau/ Kamango road) | 1 missing | | | |
| 13 July | Between Jericho and Makembi | 1 injured | | | |
| 14 July | Mapiki camp near Oïcha | | | | |
| 14 July | Masulukwede near Mavivi | 1 killed | | 6 killed | 7 |
| 20 July | Between Opira and Abialose | 1 killed | | | 1 |
| 22 July | Ngite/Mavivi/ Masulukwede | | | 4 killed 4 injured 3 abducted | 4 |
| 25 July | Between Kasinga and Kididiwe | | | | |
| 28 July | Kadou | | | 1 killed | 1 |
| 29 July | Semuliki COB | | | | |
| 31 July | Bukane near Eringeti | 1 injured | | | |
| 2 August | Ruwenzori/ Mayangose | | | 14 killed 2 abducted (2 escaped) | 14 |
| 3 August | Muzambayi/ Ngadi axis | 1 killed 4 injured 2 missing | | | 1 |
| 5 August | Malolu | | | 3 abducted | |
| 7 August | Ngerere/Mwalika | | | 15 abducted | |
| 7 August | Mabanga near Eringeti | 1 injured | | | |
| 7 August | Kalingati | | | 1 killed 11 abducted | 1 |
| 7 August | PK23 (Mbau/ Kamango road) | | | 1 killed | 1 |
| 8 August | PK23 (Mbau/ Kamango road) | 2 killed | | 1 killed | 3 |
| 8 August | Kasinga | 1 killed | | 1 killed | 2 |

S/2018/1133

| Date | Location | | | | |
|---|---|---|---|---|---|
| 10 August | Mayi Moya/ Brazza | | | 7 killed 1 injured 3 abducted | 7 |
| 11 August | PK25 (Mbau/ Kamango road)/ Mamundioma | 2 killed 1 injured | | | 2 |
| 11 August | Kitchanga/ Rizerie near Nyaleke | | | | |
| 18 August | Boikene | | | | |
| 20 August | Kasinga | 3 killed 1 injured | | | 3 |
| 20 August | Mapobu | | | | |
| 20 August | Mukoko | | | 1 injured | |
| 22 August | Between Mukoko and Maibo | | | 2 killed | 2 |
| 23 August | Kitchanga | | | 2 abducted | |
| 24 August | Ngadi | 17 killed | | 1 killed | 18 |
| 24 August | Between Jericho and Makembi, near Eringeti | 1 killed | | | 1 |
| 30/31 August | Kakuka, Sayo, Kingamuviri and Muzirandulu | 1 killed | | 5 killed 2 injured 1 raped | 6 |
| 30 or 31 August | Masululwede near Ngite | | | 1 injured | |
| 3 September | Ngadi | 2 injured | 2 injured | 2 injured 2 abducted (2 escaped) | |
| 9 September | Matembo/ Nzuma/Mavivi/ Ngadi | 4 killed | | 1 killed | 5 |
| 16 September | Kididiwe | | | | |
| 18 September | Mbau/Kamango road | 2 killed | | | 2 |
| 19 September | Kokola | | | 1 killed 2 injured 4 abducted | 1 |
| 22 September | Kasinga | | | | |
| 22 September | Beni | 4 killed | | 17 killed 11 injured 10 abducted | 21 |
| 24 September | Oïcha | | | 1 killed 16 abducted (3 escaped) | 1 |
| 24 September | Makembi | 1 killed | | | 1 |
| 27 September | Kididiwe and "Point 46" | | | | |
| 28 September | Mukoko/ Matombo | 1 killed | | 6 killed 3 injured 10 abducted | 7 |
| 3 October | Kididiwe, Malolu and Kipeyayo | | | | |

UNCLASSIFIED                        EXHIBIT 51

S/2018/1133

| Date | Location | | | | |
|---|---|---|---|---|---|
| 4 October | Paida | 8 killed 6 injured | | 2 killed | 10 |
| 5-6 October | PK5/PK6/PK7 (Mbau/Kamango road) | | | | |
| 8 October | Kasinga | | | | |
| 9 October | Mayi Moya | | 1 injured | | |
| 9 October | Maibo near Mayi Moya | | | 7 killed 3 injured | 7 |
| 15 October | Boaba | 2 killed 1 injured 3 abducted | | | 2 |
| 20 October | Boikene | 1 killed | | 12 killed 4 injured 11 abducted | 13 |
| 20 October | Kimbau near Kokola | 1 killed 3 injured | | | 1 |
| 22 October | Paida | | | 2 killed | 2 |
| 23 October | PK5 (Mbau/Kamango road) | | | 1 killed | 1 |
| 24 October | Semuliki COB | | | | |
| 24 October | Oïcha | | | 3 killed 3 injured 10 abducted (5 escaped) | 3 |
| 28 October | Makumbo near Mbau | | | 8 killed 3 injured 2 abducted | 8 |
| 3 November | Mangboko | 1 killed | | 7 killed 4 injured | 8 |
| 3 November | Mambanike near Oïcha | | | 1 killed 14 abducted (10 escaped) | 1 |
| 3 November | Ngite/Masulukwede | | | 1 killed | 1 |
| 5 November | Paida | | | | |
| 6 November | PK9 (Mbau/Kamango road) | | | | |
| 8 November | Mulobia near Mayi Moya | | | 1 killed | 1 |
| 9 November | Silimbamba | 6 killed 2 injured | | | 6 |
| | | Totals: 60 killed 24 injured 6 abducted/missing | Totals: 5 injured | Totals: 117 killed 42 injured 122 abducted/missing 1 raped | Total: 177 killed |

S/2018/1133

Whenever available, the Group specified the number of the abductees/missing people who managed to escape.

DRC-30316 1001

18-20140

UNCLASSIFIED

EXHIBIT 51

S/2018/1133

### Annex 5: Map of the north-eastern part of Beni territory



Map by the United Nations, as edited by the Group

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

### Annex 6: Map of Beni city depicting the roundabout and the road to Kasindi

The red arrows indicate the directions from where the assailants of the 22 September 2018 attack against Beni city came from, according to the eyewitness interviewed by the Group.



Image from Google Maps, annotated by the Group

UNCLASSIFIED

### Annex 7: Attack against Matembo on 9 September 2018

The account of the 22 September 2018 attack, as reported by that the eyewitness interviewed by the Group, differs from that of the 9 September 2018 attack against Matembo which was conveyed to the Group by the same person, who was also a direct witness of that attack.

First, the assailants' purpose in Matembo was apparently not to kill civilians. Indeed, the source, in his escape, accidentally bumped twice into two assailants who each told him which direction he should take. The source also heard the assailants' leader specifically instructing his troops not to kill, but to loot only. According to the source, the assailants shot and killed one civilian who was trying to escape with his goats. One local authority and MONUSCO sources actually confirmed the killing by gunshot of one civilian escaping with his goats, as well as the assailants' looting of the villagers' livestock.

Second, the source described men, women and children among the assailants. Some wore FARDC-like uniforms, but no bullet-proof jackets, while others wore cassocks and head covers. Some of the men carried firearms. Women and children carried machetes. They spoke Swahili.

Third, the source saw the assailants arriving in a jumble and making a lot of noise, whistling and ululating.

However, similarly as other recent attacks, the attack against Matembo was launched within a short timeframe of other attacks. Indeed, attacks were also launched against FARDC positions in Matembo, Nzuma and Ngadi and killed four FARDC soldiers.

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

### Annex 8: Call by National Deputy Muhindo Nzangi Butondo to incite violent mobilization against attackers in Beni territory

Screen shots taken by the Group of Experts on 12 November 2018 of the Facebook account of National Deputy Muhindo Nzangi Butondo:

https://fr-fr.facebook.com/butontonzangi/posts/575209269619100?__tn__=K-R



**Voir plus de contenu de Honorable Muhindo Nzangi Butondo**

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

Interview of National Deputy Muhindo Nzangi Butondo confirming his call on his Facebook account, available at https://www.youtube.com/watch?v=JCU5Vo2tjeo (last consulted on 12 November 2018)

Screen shot taken by the Group of Experts on 12 November 2018 on Youtube



Hon Nzangi Butondo appelle à l'unité et propose l'implication des groupes armes locaux pour anéantir

UNCLASSIFIED    EXHIBIT 51

S/2018/1133

### Annex 9: Details on the recruitment routes to Bijombo forest

The map below shows the routes that recruits took to arrive at the "P5" base of Bijabo, inside the Bijombo forest in the Democratic Republic of the Congo.

A dedicated group of recruiters appears to have consistently transported people from areas inside Burundi, Uganda, Kenya, South Africa, Mozambique and the Dzaleka refugee camp in Dowa District, Malawi, to a house in a Bujumbura neighborhood. Most people boarded public buses to Bujumbura. The parties of new recruits, often between 25 and 30, left the house around 8:00 p.m., travelled southward toward Rumonge and after about an hour or 50 kilometres, turned right, on a dirt road to the shores of the lake where a motorized pirogue brought them to the Congolese side.

Most of the ex-combatants described having landed in the Ubwari peninsula where they were received and hosted by local fighters they described as being part of Maï Maï Yakutumba. One ex-combatant who travelled the route in January 2018, stated that the pirogue had taken his group to Mizimu, a small village at the tip of the Ubwari peninsula. Other combatants claimed that the route at some point, between February and March 2018, changed, with the pirogues landing directly on the Congolese mainland without stopping in Ubwari, much further north. These recruits were assisted by another Maï Maï group, which they could not identify but one ex-combatant claimed they spoke Bembe. All recruits were received by a mobile group of armed men, usually between 10 and 12, coming from Bijabo who took them on a three-day journey to Bijabo.

One former combatant described having crossed the Rusizi river together with six other recruits in February 2018.



Map by the United Nations, as edited by the Group

UNCLASSIFIED       18-20140

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

## Annex 10: List of validated mines in Masisi territory as of October 2018

REPERTOIRE DES SITES MINIERS QUALIFIES ET VALIDES" VERTS " EN PROVINCE DU NORD-KIVU

| N°ordre | Dénomination | Minerais extraits | Code | Statut du site(qualification & validation) | observation |
|---|---|---|---|---|---|
| | **1. TERRITOIRE DE MASISI** | | | | |
| 01 | D3 BIBATAMA | Coltan | PE/4731/MJH6/NK/Mines/Cert/001/2014 | Vert | AR ARN .0078 du21 FEV.2014 |
| 02 | D2 MATABA | Coltan | PE/4731/MJH6/NK/Mines/Cert/002/2014 | Vert | AR ARN .0078 du21FEV.2014 |
| 03 | D2 BIBATAMA | Coltan | PE/4731/MJH6/NK/Mines/Cert/003/2014 | Vert | Idem |
| 04 | D4 GAKOMBE | Coltan | PE/4731/AJH6/NK/Mines/Cert/004/2014 | Vert | Idem |
| 05 | LUYOWO | Coltan | PE/4731/AJH6/NK/Mines/Cert/005/2014 | Vert | Idem |
| 06 | BUNDJALI | Coltan | PE/4731/HJL6/NK/Mines/Cert/006/2014 | Vert | Idem |
| 07 | KOTI | Coltan | PE/4731/MH6/NK/Mines/Cert/007/2014 | Vert | Idem |
| 08 | BIHULA | Coltan & Cassitérite | CN/Rub/NK/Mines/Cert/008/2014 | Vert | Idem |
| 09 | MULULU | Coltan | CN/Rub/NK/Mines/Cert/009/2014 | Vert | Idem |
| 10 | D6 MUFUZI | Coltan | PV/ED/Mines/Cert/010/2014 | Vert | Idem |
| 11 | RATANENDA | Cassitérite | FE 76/SAX/NK/Mines/Cert/0011/2014 | Vert | Idem |
| 12 | EIS HASHA | Wolframise | FE 76/SAX/NK/Mines/Cert/0012/2014 | Vert | Idem |
| 13 | NYAMUKUBI | Cassitérite | FE 76/SAX/NK/Mines/Cert/0013/2014 | Vert | Idem |
| 14 | LUZIRANTAKA | Or | FE 76/SAX/NK/Mines/Cert/0014/2014 | Vert | Idem |
| 15 | LWIZI | Or | FE76/SAX/NK/Mines/Cert/0015/2014 | Vert | Idem |
| 16 | SIRAMBO | Coltan | FE 76/SAX/NK/Mines/Cert/001/2018 | Vert | Idem |
| 17 | RAMATALE | Coltan &Cassitérite | FE76/SAX/NK/Mines/Cert/002/2016 | Vert | AR. MIN /M04 du 02 FEV.2016 |
| 18 | KAMATEMBE | Coltan &Cassitérite | PE76/SAX/NK/Mines/Cert/003/2016 | Vert | Idem |
| 19 | KATEMBE | Coltan | PE76/SAX/NK/Mines/Cert/0017/2014 | Vert | AR.MIN .0078 du 21FEV.2014 |
| 20 | KARUBA-LUSHASI | Coltan | néant | Vert | AR.MIN .0078 du 21FEV.2014 |
| 21 | SHABUBANGWA | Coltan | PE76/SAX/NK/Mines/Cert/004/2016 | Vert | AR.MIN 0004 du 02 FEV.2016 |
| 22 | RUKUNDA | Cassitérite | PE76/SAX/NK/Mines/Cert/005/2016 | Vert | Idem |
| 23 | MUHISI | Coltan | PE76/SAX/NK/Mines/Cert/006/2016 | Vert | Idem |
| 24 | MUTANGA | Coltan&Cassitérite | PE76/SAX/NK/Mines/Cert/007/2016 | Vert | Idem |
| 25 | KIBANDA | Coltan&Cassitérite | SA.Kib/NK/Mines/Cert/008/2016 | Vert | Idem |
| 26 | PUBONGA | Coltan&Cassitérite | EA.Sha/NK/Mines/Cert/009/2016 | Vert | Idem |
| 27 | MUSHWAU/MABOA | Cassitérite | BA.Mus/NK/Mines/Cert/010/2016 | Vert | Idem |
| 28 | RWANDANDA | Coltan | IV.K.Mus/NK/Mines/Cert/0011/2016 | Vert | Idem |
| 29 | KATOYU/KALOBA | Coltan | Ma.K/NK/Mines/Cert/012/2016 | Vert | Idem |
| 30 | MUHO-NYAKAGESI | Coltan | PE76/SAX/NK/Mines/Cert/013/2016 | Vert | Idem |
| 31 | LUTINGITA | Coltan&Cassitérite | PE76/SAX/NK/Mines/Cert/014/2016 | Vert | Idem |
| 32 | KAHENEREZO | Coltan | MAS/NK/Mines/Cert/015/2016 | Vert | Idem |
| 33 | KILUKU | Coltan | BAR.Si/NK/Mines/Cert/016/2016 | Vert | Idem |
| 34 | NYENGE/BUKOMBO | Cassitérite,Or et Coltan | MB/005/NK/Mines/Cert/0029/2016 | Vert | AR JA-N.0808 du 10 NOV.2016 |
| 35 | PIKI | Coltan | HX/MIVEN/NK/Mines/Cert/0003/2016 | Vert | Idem |
| 36 | MUTIRI | Coltan | MAM/TU/NK/Mines/Cert/0031/2016 | Vert | Idem |
| 37 | KAVUTA | Coltan | BUG/KALO/Fi.X/Mines/Cert/0032/2016 | Vert | Idem |
| 38 | SHAKINGI KASHOVU | Cassitérite | SHA/BLA/HIS/NK/Mines/Cert/0001/2017 | Vert | AR.MIN 0002 du 09 JANV.2013 |
| 39 | MUHARISA | Cassitérite | MUH/BUA/JEMA/NK/Mines/Cert/0002/2017 | Vert | Idem |
| 40 | NDAHIMBWA | Cassitérite | NYAM/NK/PA/PE76/NK/Mines/Cert/0003/2017 | Vert | Idem |
| 41 | OSSO LUWOGHO | Coltan | BITO/MUPN/PE76/NK/Mines/Cert/0004/2017 | Vert | Idem |
| 42 | NYAGISENYI | Coltan | BITO/MUPN/PE76/NK/Mines/Cert/0005/2017 | Vert | Idem |
| 43 | NYAKAIANGA KANYAMITSINDO | Cassitérite | NYAM/MUPM/PR8592/NK/Mines/Cert/0006/2017 | Vert | Idem |
| 44 | NYABIBWE KK | Cassitérite | NYAM/MUPBA/PR8592/NK/Mines/Cert/0007/2017 | Vert | Idem |
| 45 | BUHUMBA | Cassitérite | KILO/MUPLI/PR13784/NK/Mines/Cert/0008/2017 | Vert | Idem |
| 46 | MUSHAKI NYAMIRAZO | Coltan et Cassitérite | 13.1.1.1.0.0002 | Vert | Idem |
| 47 | GUZUNDIZO | Coltan et Cassitérite | HUM/MUPN/PE76/NK/Mines/Cert/0009/2017 | Vert | Idem |
| 48 | KASHARI LUSHOA | Cassitérite | KAR/MUPB/PE76/NK/Mines/Cert/0010/2017 | Vert | Idem |
| | **2. TERRITOIRE LUBERO** | | | | |

Document obtained by the Group from the Mining Division, North Kivu province, in October 2018

UNCLASSIFIED    EXHIBIT 51

S/2018/1133

### Annex 11: Sacks of smuggled coltan awaiting a potential buyer along the Masisi-Goma route



Photo by the Group of Experts in October 2018

S/2018/1133

**Annex 12: Part of the reply that the Société Minière de Bisunzu (SMB) sent to the Group in April 2018**



# SOCIETE MINIERE DE BISUNZU

ID.NAT. : 5-910-N79880N ; RCCM : GOM/RCCM/14-B-0009 ;
NIF: A1407282G; IMPORT-EXPORT: G/007-14/I00889E/X

### 1. Mining Statistics

Please consult the attached excel spreadsheet table providing mineral production statistics.[1]

The quantity lost by SMB Sarl each year represents more than 50% of the production of our mine. An estimated 500 plus tons of mineral production is lost each year due to smuggling. Officially, only between 10 and 15 tons of coltan minerals from SMB Sarl production are caught or recovered by government services each year. This portion of recovered minerals is greatly inferior in comparison to the rest of the smuggled minerals that succeed to reach their final destination in the neighboring country of Rwanda, or which are smuggled by buying entities—registered especially, in Goma and Bukavu—who declare false origins for these minerals. Please find attached in appendix videos[2] relating to fraud caught during the previous year of 2017. These videos really emblematically illustrate the global issue of fraud.

### 2. On the SAKIMA letter of November 10th, 2017
Addressed to the Provincial Division's Chief of Mines, South Kivu

Regarding a letter from SAKIMA dated November 10th, 2017 accusing SMB Sarl of claiming 2300 Kg of minerals: we contest this letter and the allegations contained therein. We have never had an ore dispute between our company SMB and SAKIMA in South Kivu Province or in the city of Bukavu regarding 2300 Kg of minerals.

---

[1] In appendix, an excel spreadsheet table containing statistics representing PE4731 between January 2017 and March 2018
[2] In, Google Drive http://drive.google.com/open?id=1CKsmeAvben1rbbnwIIJohJmrx41Mq3VA9

11, Av de Gali  Q, Katindo  C, Goma /Goma-Nord-Dve
Tel : (+24)8950004113 – (+243)8991752781 (+243)811342401
BP 388 Goma, RDC.
Site : www.smbrsarl.com , E-mail : info@smbrsarl.com

UNCLASSIFIED                        EXHIBIT 51

S/2018/1133

3.  Fight Against Fraud:
    Industrial Guard, Mine Police, and Delimitation of the Mining Perimeter

In order to improve the traceability of minerals, SMB SARL has taken the following measures to combat fraud:

Industrial Guard

The law in the Democratic Republic of Congo authorizes those with mining rights to form and supervise an industrial guard for the surveillance and safety of their workers and of their production operations within the mining perimeter.

Thus, according to Article 8 of Annex IV of the Mining Regulations, which stipulates that every holder of a mining perimeter is obliged to organize the safety of the mine, its warehouses; and on the recommendations of the National Commission against Mining Fraud (CNLFM[1]) North Kivu, and the Provincial Minister of Mines to strengthen traceability, and actively fight against fraud and mineral smuggling; in September 2017, we sent a letter[4] to the Governor of North Kivu Province seeking his authorization, as required by the procedure, for the training of the Industrial Guard (IM) to ensure the safety of the mine and SMB Sarl warehouses.

By letter N ° 01/1168 / CAB / GP-NK / 2017 dated October 12, 2017, the Governor authorized[5] SMB Sarl to train its Industrial Guard. On this basis, SMB Sarl sent a letter[6] requesting personnel training from the National Police Academy (PNC) in Mugunga, North Kivu for the formation of our Industrial Guard.

The training of 30 Industrial Guardians lasted 30 days, during which they were trained namely regarding the protection of vital facilities, enforcement of traceability, safe guarding of human rights, and adherence to mining legislation.

On Monday November 27th, 2017, a ceremony[7] of completion was conducted at the Mugunga National Police Academy in honor of all the trainees who completed the program and officially became industrial guardians. The completion ceremony was

_____

[3] In appendix, the Minutes of the technical meeting of 25 July 2017 held at the initiative of the CNLFM North Kivu
[4] In appendix, the Letter to the Governor of North Kivu Province
[5] In appendix, the letter n ° 01/1168 / CAB / GP-NK / 2017 of October 12th, 2017 authorizing SMB Sarl to form its Industrial Guard
[6] En annexe, notre correspondance référencée 195/SMB/GM-NK/10/2017 demandant la formation de cette Garde Industrielle
[7] See the attached press video

11, Av du Golf  Q. Katindo  C. Goma /Goma-Nord-Kivu
Tél : (+243)808004513 – (+243)999175781 (+243)811342401
BP 103 Goma, RDC.
Ste : www.smb.srl.com , E-mail : info@smb-sarl.com

UNCLASSIFIED                                      EXHIBIT 51

S/2018/1133

held in the presence of all the stakeholders of the mining sector in North Kivu that were invited for the occasion. This new Industrial Guard was deployed as of December 4th 2017 at the SMB Sarl concession PE 4731 in Masisi. All the proper authorities and stakeholders were again notified[a] of this deployment.

### The Mine Police

In the spirit of strengthening our arsenal in the fight against mining fraud, SMB Sarl signed a sentinel contract with the Congolese National Police in order to support the traceability reinforcement measures undertaken by SMB Sarl management and its Industrial Guard. By signing the contract with the police, all police enforcement personnel not invited by SMB Sarl had to vacate our mining perimeter.

### Delimitation of SMB Sarl Perimeter

One of the arguments used by fraudsters to steal our minerals was that our perimeter (PE 4731) was superimposed on that of SAKIMA (PE 76) and that there existed a confusion of limits. Based on Article 31 of the Congolese Mining Code and in line with the recommendations of the Minutes of the Technical Meeting of 25 July 2017, held by initiative of the CNLFM North Kivu on the issue of supply chains in the territory of Masisi, and the Minutes of Adoption of August 11, 2017 by all stakeholders—especially in point 2—SMB Sarl has proceeded since February 2018 to complete a total demarcation of our perimeter and it turns out that our concessions numbered PE 4731 is not superimposed or confused with that of SAKIMA in Masisi numbered PE 76. See the Delimitation or Bornage PV[b] of February 28, 2018.

4. Other Efforts by SMB Sarl in the Fight Against Mining Fraud

- SMB Sarl employs a traceability and anti-fraud team made up of 16 experienced officers and managers to monitor the supply chain and contribute to the fight against mining fraud and smuggling.

---

[a] In appendix, the SMB Sarl Communiqué n ° 002/2017 of December 8 2017
[b] In appendix, the Boundary Minutes No. CAMI / 001/2018 of February 28, 2018

11, Av de Golf Q, Katindo C, Goma /Goma-Nord-Kivu
Tel : (+243)9900045 13 – (+243)949175721 (+243)811247401
BP 101 Goma, RDC.
Site : www.smb-sarl.com, E-mail : info@smb-sarl.com

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

- SMB Sarl provided support to the Provincial Ministry of Mines by donating two motorcycles, in April 2016, to facilitate the mobility of its agents as they fight against mining fraud.

- SMB Sarl regularly writes to and informs State services to denounce cases involving fraud or interrupt the proper supply chain of minerals.

- Regular, yet answered, mineral sequestration from our PE 4731 to ITRI and its ITSCI labeling system. In fact, ores from our mining perimeter are sent to SAKIMA for labeling on behalf of the latter and sent to contracting treatment entities with SAKIMA in Goma. Consult our correspondence in annex[10].

- SMB Sarl has sounded the alarm to ITRI and ITSCI, cautioning against the fact that under its current labeling system minerals are rerouted from our concession and then tagged / attributed to other sites. Specifically, SMB Sarl minerals are illegally tagged and attributed to SAKIMA then sent to Comptoirs in Goma that have signed contracts with SAKIMA.

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

### Annex 13: Clashes between armed groups in Masisi territory

The map below indicates the areas with the most clashes between armed groups in Masisi territory since July 2018.

Over 30 clashes were reported between armed groups in Masisi territory of North Kivu province. Most of these incidents took place in Bashali chefferie and Banyungu sector, but there were also some attacks in the northern part of Katoyi sector. At least 60 combatants were killed in several of these small incidents. Most of the fighting happened in the broader surroundings of Lukweti, the former headquarters of APCLS-Janvier.

Since September 2018, an increase of attacks was observed on the Pinga-Mweso axis in the vicinity of Kalembe and Kashuga involving NDC-R, APCLS-Janvier and CNRD combatants.

The high number of incidents also had an impact on the local population. At least 31 civilians were killed during attacks, and thousands of IDPs took shelter in the vicinity of Nyabiondo and Kitchanga.



Map by the United Nations, as edited by the Group

EXHIBIT 51

S/2018/1133

**Annex 14: Picture of Masudi Alimasi Kokodikoko provided to the Group by two different sources from civil society**



UNCLASSIFIED    EXHIBIT 51

S/2018/1133

**Annex 15: Maps of relevant locations in Shabunda territory and Google Earth image of Lubila**





Maps by the United Nations, as edited by the Group

UNCLASSIFIED     EXHIBIT 51

S/2018/1133

Location of Lubila based on the GPS coordinates provided to the Group by an NGO (2°47'30.37"S, 28°0'56.11E). However, several sources indicated that Lubila is closer to Isezia than to Kigulube, and more directly south of Isezia.



S/2018/1133

### Annex 16: Other instances of rape and recruitment and use of child soldiers by Raia Mutomboki factions

Based on the interviews conducted by the Group, including with 18 additional rape victims, the Group found that, at least since the beginning of 2018, various Raia Mutomboki factions committed widespread and systematic acts of sexual violence in Shabunda territory as well as at the limit of the neighbouring Walungu territory.

Though the Group could not confirm which specific factions were involved, it notably established that armed Raia Mutomboki elements gang raped:

- At least eight women, aged between 27 and 70,[1] in the vicinity of the villages of Kamungini, Kiluma and Keba (close to Kigulube) in mid-April 2018;[2]

- At least five women, aged between 25 and 55, in the vicinity of the village of Busolo/Kabogosa, at the limit between Shabunda and Walungu territories, in April 2018;

- At least four women,[3] aged between 37 and 43, abducted from Nzovu on 10 October 2018. The rapes, perpetrated over a period of three days, followed a modus operandi similar as that used by the Raia Mutomboki Kokodikoko in September 2018. The four interviewed rape victims reported that the Raia Mutomboki elements who raped them also forcibly recruited and used several child soldiers, including some as young as eight, ten and twelve years old.

Other reliable information provided to the Group indicates higher numbers of rape victims, but the Group was not able to investigate all reported instances.

---

[1] The eldest woman was raped once.

[2] One victim said it was around May 2018.

[3] The four victims and two sources from the civil society told the Group that 19 women in total were abducted and raped.

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

### Annex 17: Death threats SMS received by one person assisting rape victims from Shabunda territory

All three SMS were sent from the same phone number.

Photos and translations by the Group

*First SMS (redacted by the Group)*







Translation:

[Redacted] we know what you are doing there, you [redacted]. You believe that these women whom we have raped are special? We will continue raping other women every day and you will do nothing. We will cut your head before October 2018 and we will see if [redacted] will do anything. They are idiots like you.

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

*Second SMS (redacted by the Group)*

 

Translation:

Wait for us in [redacted]. We know your home, your house on the hill, we will burn it with petrol. You will die with your children and we will see what they will do to us.

*Third SMS (redacted by the Group)*

 

Translation:

You believe that we do not know that you brought the women we raped at [redacted]. Do not play with us, we are militaries native from [redacted]. We will burn you, your kids and your entire house with petrol and we will rape again these idiots.

S/2018/1133

**Annex 18: List of validated mine sites in Walungu territory**



UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

## Annex 19: Letter from the Rwandan authorities

REPUBLIC OF RWANDA



PERMANENT MISSION OF THE REPUBLIC OF RWANDA TO THE UNITED
NATIONS
NEW YORK

Ref: RPM/583/29.08/D/18                                    29th August 2018

Excellency;

Reference is made to the final report by the UN Group of Experts on the Democratic
Republic of Congo (S/2018/531) transmitted to the President of the Security Council on 20th
May 2018. Reference is also made to the letter from the Group of Expert dated 26th October
2017. The Government of Rwanda would like to make the following clarifications:

- **Gold production and export figures of Rwanda in 2017**

  Rwanda produced and exported 2.4 tons of unwrought gold for the entire year of 2017 as
  opposed to 1 ton per month as indicated in the final report. Gold in Rwanda is produced
  by scattered artisanal miners in the Northern, Western and Southern part of the country.

- **Gold figures from DRC transiting through Rwanda in 2017**

  In 2017, 46.01 kilograms of gold from DRC transited through Rwanda to UAE. The list
  of names of exporters and destinations of gold which transited through Rwanda from
  DRC is enclosed.

- **Steps taken by GOR to ensure existing ICGLR legislation concerning the export of
  gold are enforced by relevant authorities.**

  For the 3Ts (Tantalum, Tin and Tungsten), Rwanda implements two minerals supply-
  chain due diligence mechanisms. The first is the ITSCI system (https://www.itsci.org/),
  an internationally recognized system operating in Burundi and Eastern DRC. The second
  is known as Better Sourcing Program (https://bettersourcing.io/). Both systems have in-
  country representatives. Rwanda also issues ICGLR Mineral Export Certificates, with a
  specific team dedicated to working on the 3Ts.

  With regard to gold whose trend of exports is making it increasingly relevant for Rwanda
  to focus on due diligence mechanisms, the country, through its national agency in charge
  of minerals, is collaborating with the ICGLR Secretariat and other ICGLR Member States
  on the regional initiative aiming to develop ICGLR's due diligence strategy for gold.

  Rwanda actively participates in discussions to develop this gold strategy, as observed in

*124 East 39th Street*          *Tel: +1 212-679-9010*          *Email: ambanewyork@gmail.com*
*New York, NY 10016*            *Fax: +1 917-591-9279*          *ambanewyork@minaffet.gov.rw*

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

the last two events organized by the ICGLR Secretariat: Regional Mineral Exporters Conference in the Great Lakes Region (Nairobi, March 2017) and the ASM Gold Experts Meeting (Arusha, March 2018).

In addition, we have been following gold traceability and certification initiatives in DRC, including the 'Just Gold Project' in Mambasa Territory, Ituri province (https://impactransform.org/en/work/project/just-gold/) ; and the 'Capacity Building for Responsible Minerals Trade' in Walungu Territory, South Kivu (http://www.tetratech.com/en/projects/capacity-building-for-responsible-minerals-trade). Our objective is to find out effective options to successfully trace conflict-free and legal gold while making an economic case.

- **The current state of cooperation and coordination between GOR and the DRC to reduce the illegal exploitation and smuggling of natural resources in the DRC.**

Control mechanism on gold smuggling: Rwanda Customs signed an MOU with DRC Customs back in 2011, and among other elements, the MOU calls for exchange of information on cross border fraud and smuggling. When traceability requirements were established in 2011, we managed to intercept over 100 tons of tin that we handed over to DRC officials in 2011. As the DRC enforced traceability mechanisms, there has been no smuggling of minerals across the border.

Cooperation and coordination efforts between Rwanda and DRC can be strengthened further, since both countries are Member States of ICGLR. Representatives of both countries often meet and exchange ideas and initiatives to improve the regional certification mechanism, this is done through meetings and conferences organized by the ICGLR Secretariat for all ICGLR member states. The Government of the Republic of Rwanda is open to further improvement of cooperation with DRC and other ICGLR member states to fight illegal exploitation of minerals in the region.

Within the Rwanda Revenue Authority we do have a special department in charge of smuggling and revenue protection, this works hand in hand with other government agencies to curb smuggling across the borders and within the country.

Valentine Rugwabiza,

Ambassador and Permanent Representative

H.E. Ambassador Mansour Al-Otaibi

Chair, Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo.

New York

124 East 39th Street       Tel: +1 212-679-9010       Email: ambanewyork@gmail.com
New York, NY 10016         Fax: +1 917-591-9279       ambanewyork@minaffet.gov.rw

UNCLASSIFIED    EXHIBIT 51

S/2018/1133

**TRANSIT OF MINERALS THROUGH RWANDA IN 2017**

| S/No | EXPORTER | COUNTRY OF EXPORT | COUNTRY OF DESTINATION | NET WEIGHT (KG) |
|------|----------|-------------------|------------------------|-----------------|
| 1 | Mines Propress sarl (Bukavu-SUD KIVU) | Democratic Republic of Congo | United Arab Emirates | 34.51 |
| 2 | Propress sarl (SUD KIVU) | Democratic Republic of Congo | United Arab Emirates | 6.5 |
| 3 | OBWIN SARL (BUKAVU) | Democratic Republic of Congo | United Arab Emirates | 5 |
| | Total | | | 46.01 |

UNCLASSIFIED                    EXHIBIT 51

S/2018/1133

### Annex 20: Examples of Gold exported by Bullion Refinery Ltd in September and November 2018



Photo by the Group in November 2018

S/2018/1133

### Annex 21 : Sponge Grenade SIR-X 40x46mm



Source: FARDC

UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133

## Annex 22: Eastpac International L.L.C



Photo by the Group in October 2018

UNCLASSIFIED    EXHIBIT 51

S/2018/1133

## Annex 23: NORINCO



UNCLASSIFIED                                    EXHIBIT 51

S/2018/1133



Photo by the Group in October 2018

UNCLASSIFIED

EXHIBIT 60

United Nations

S/2020/482*

 **Security Council**

Distr.: General
2 June 2020

Original: English

## Letter dated 2 June 2020 from the Group of Experts on the Democratic Republic of the Congo addressed to the President of the Security Council

The members of the Group of Experts on the Democratic Republic of the Congo, the mandate of which was extended pursuant to Security Council resolution 2478 (2019), have the honour to transmit herewith, in accordance with paragraph 4 of that resolution, the final report on their work.

The report was provided to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo on 4 May 2020 and was considered by the Committee on 22 May 2020.

The Group would appreciate it if the present letter and report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) David **Zounmenou**
Coordinator, Group of Experts on the Democratic Republic of the Congo

(*Signed*) Nelson **Alusala**, Expert

(*Signed*) Raymond **Debelle,** Expert

(*Signed*) Virginie **Monchy**, Expert

(*Signed*) Emmanuel **Ngueyanouba**, Expert

(*Signed*) Sophia **Pickles**, Expert

* Reissued for technical reasons on 15 June 2020.



Please recycle 

UNCLASSIFIED

# Final report of the Group of Experts on the Democratic Republic of the Congo

*Summary*

The reporting period was characterized by relative political stability. The Group of Experts on the Democratic Republic of the Congo noted significant changes in the command structures of Congolese security forces during this period, with the Armed Forces of the Democratic Republic of the Congo (Forces armées de la République démocratique du Congo (FARDC)) pursuing simultaneous operations against armed groups in eastern Democratic Republic of the Congo. Serious violations of human rights and international humanitarian law remained widespread in that area.

The Group found that FARDC operations scattered and weakened a number of those armed groups, including the Allied Democratic Forces (ADF), the Conseil national pour le renouveau et la démocratie (CNRD), the armed branch of the Rwanda National Congress (RNC), known as P5, and the Maï-Maï Malaika.

In North Kivu, ADF benefited from established external and local recruitment and supply networks, and its combatants continued to target FARDC and civilians in Beni territory. The Group did not find any direct links between ADF and Islamic State in Iraq and the Levant (ISIL). Clashes between Nduma défense du Congo-Rénové (NDC-R) and various Nyatura armed groups increased in Masisi and Rutshuru territories. In particular, the Collectif des mouvements pour le changement/Forces de défense du peuple (CMC/FDP) lost positions following NDC-R attacks and FARDC operations in Bwito area, Rutshuru territory.

In South Kivu, FARDC operations dislodged CNRD from Kalehe territory, scattering the movement. Hundreds of combatants and dependants were repatriated to Rwanda. The P5 came under attack in June 2019 when decamping from its headquarters to resettle in North Kivu. As a result, it lost key leaders and many combatants. In Maniema, the Maï-Maï Malaika, led by Sheikh Hassani Huzaifa Mitenda and active in Kabambare territory, lost most of its camps around Salamabila following FARDC operations, and experienced internal dissension.

In terms of natural resources, the Congolese gold sector remained vulnerable to exploitation by armed groups and criminal networks and to unregulated trading. The volumes of smuggled gold were significantly higher than the volumes of legally traded gold. Companies operating in the tin, tantalum and tungsten sectors implemented mineral traceability and due diligence measures in accordance with the due diligence standards set by the Organization for Economic Cooperation and Development and the recommendations on guidelines for due diligence for importers, processing industries and consumers of Congolese mineral products produced by the Group, which the Security Council supported taking forward (Council resolution 1952 (2010), para. 7) and which were subsequently incorporated into International Conference on the Great Lakes Region (ICGLR) guidance and Congolese legislation. However, the Group documented a number of persistent implementation challenges undermining the integrity of some supply chains.

The Group traced Congolese gold to regional refineries and other international destinations and found that some refineries acted as brokers, used cash payments, undertook refiner-to-refiner trading and used corporate networks to obscure ownership, thereby inhibiting supply chain accountability. Gold traders also avoided the use of formal banking networks.

UNCLASSIFIED                                          EXHIBIT 60

S/2020/482

The Democratic Republic of the Congo was the only member of the 12 ICGLR member States that was using ICGLR certificates for tin, tantalum, tungsten and gold exports. The eastern provinces issued 14 ICGLR certificates for gold in 2019. Other ICGLR member States had not yet started using the ICGLR Regional Certification Mechanism for gold.

Combatants from NDC-R, led by sanctioned individual Guidon Shimiray Mwissa (CDi.033), and from CMC/FDP, led by Ndaruhutse Kamanzi Dominique, also known as Domi, committed widespread conflict-related sexual violence amidst recurrent combat operations in Masisi and Rutshuru territories from January 2019 to February 2020. However, the commanders of both armed groups, who had effective control, failed to take necessary measures to punish subordinates responsible for those acts, despite awareness thereof.

In Beni territory, and in southern Irumu and Mambasa territories, Ituri province, a wave of brutal attacks targeting civilians began in November 2019, almost immediately after the launch of FARDC operations against ADF. Hundreds of civilians were killed and thousands were displaced. ADF combatants were involved in this wave of attacks, including in the killings that took place on 5 December 2019 and 30 January 2020 in Mantumbi, northwest of Beni territory.

Mai-Mai Malaika combatants led by Sheikh Hassani committed multiple abuses in Salamabila since at least 2018.

With regard to the arms embargo, several countries offered military training and delivered significant quantities of arms, ammunition, equipment and military vehicles to FARDC without prior notification to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo. Civilian helicopters were transferred to FARDC and used for military operations.

Foreign pilots, flight instructors and technicians provided support to FARDC in the operation of ground attack aircraft and combat or transport helicopters, and participated in military operations in eastern Democratic Republic of the Congo. Over the last decade, a large part of the air logistics of FARDC relied on a fleet of foreign civilian-registered cargo carriers operating in contravention of international and national civil aviation norms and regulations.

EXHIBIT 60

S/2020/482

## Contents

|  |  |  | Page |
|---|---|---|---|
| I. | Introduction | | 5 |
| II. | Armed groups | | 6 |
| | A. | Collectif des mouvements pour le changement/Force de défense du peuple | 6 |
| | B. | Nduma défense du Congo-Rénové | 8 |
| | C. | Conseil national pour le renouveau et la démocratie | 9 |
| | D. | Allied Democratic Forces | 10 |
| | E. | Mai-Mai Malaika | 12 |
| | F. | Rwanda National Congress | 13 |
| III. | Natural resources and finances | | 13 |
| | A. | Gold | 14 |
| | B. | Congolese minerals and regional supply chains | 19 |
| | C. | Tin, tantalum and tungsten and supply chain challenges | 21 |
| | D. | Due diligence reporting by Congolese companies | 23 |
| | E. | Developments in the International Conference on the Great Lakes Region | 24 |
| | F. | Financial flows and Congolese minerals | 24 |
| IV. | Serious violations of human rights and international humanitarian law | | 25 |
| | A. | Conflict-related sexual violence in Masisi and Rutshuru territories | 25 |
| | B. | Attacks targeting civilians in Beni, Irumu and Mambasa territories | 29 |
| | C. | Violence against civilians in Salamabila | 30 |
| V. | Arms | | 31 |
| | A. | Failure to provide notification of training by foreign instructors | 32 |
| | B. | Failure to provide notification of the transfer of arms, ammunition and vehicles | 32 |
| | C. | Foreign civilian airlines supporting the Armed Forces of the Democratic Republic of the Congo | 36 |
| | D. | Support by foreign personnel to the Congolese airforce | 37 |
| VI. | Recommendations | | 38 |
| Annexes* | | | 40 |

---

\* The annexes are being circulated in the language of submission only and without formal editing.

## I. Introduction

1.    The members of the Group of Experts on the Democratic Republic of the Congo, whose mandate was extended pursuant to Security Council resolution 2478 (2019), were appointed by the Secretary-General on 29 July 2019 (see S/2019/607). The Group attended a two-day inter-panel workshop in New York in December 2019.

2.    The final report of the Group is submitted pursuant to paragraph 4 of resolution 2478 (2019). In accordance with the request made by the Security Council in paragraph 8 of its resolution 2360 (2017), and as reaffirmed in resolution 2478 (2019), the Group continued to exchange information with the panels of experts on the Central African Republic, Libya, Mali, Somalia, South Sudan and the Sudan.

**Cooperation with the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo**

3.    The Group expresses its gratitude for the valuable support and collaboration provided by the United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO) during the period under review.

**Compliance with the Group's requests for information**

4.    Following the appointment of its members, the Group addressed a total of 259 official communications to Member States, international organizations and private entities in the course of its mandate. At the time of drafting the present report, the Group had received only 91 responses. The Group undertook a five-day official visit to Rwanda and extends its thanks to the Government of Rwanda for its cooperation. Burundi and Uganda did not respond to the Group's requests for official visits.

5.    The Group would like to thank the relevant organs of the Government of the Democratic Republic of the Congo that oversee natural resources for their cooperation. It expresses regret that it was unable to hold meetings with the Minister of Defence, Veterans and Reintegration, the Minister of the Interior and Security, and the Permanent Secretary of the National Commission for the Control of Small Arms and Light Weapons and the Reduction of Armed Violence of the Democratic Republic of the Congo, despite three formal requests.

6.    The Group underlines that the lack of timely cooperation from Member States undermines its ability to fulfil its mandate.

**Methodology**

7.    The Group used the evidentiary standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). It based its findings on documents and, wherever possible, on first-hand, on-site observations by the experts themselves. When that was not possible, the Group corroborated information by using at least three independent and reliable sources.

8.    Given the nature of the conflict in the Democratic Republic of the Congo, few documents provide definitive proof of arms transfers, recruitment, command responsibility for grave human rights abuses and the illegal exploitation of natural resources. The Group has therefore relied on eyewitness testimony from members of local communities, former combatants and current members of armed groups. The Group has also considered expert testimony by government officials and military officers of countries in the Great Lakes region and other countries, as well as by United Nations sources.

S/2020/482

9.    The present report covers investigations conducted up to 25 April 2020. The Group was forced to cease its fieldwork and leave the region by 20 March 2020 owing to the outbreak of coronavirus disease (COVID-19), which limited its ability to complete planned investigations. In addition, several countries and entities expressed their inability to send timely responses to the Group's requests in the light of the pandemic.

**Update on the murders of members of the Group of Experts in March 2017**

10.    March 2020 marked the third anniversary of the murders of Michael J. Sharp and Zaida Catalán. The Group notes that criminal proceedings are ongoing. The Group maintained contact with the follow-on mechanism for the Democratic Republic of the Congo. The Group reiterates that the perpetrators of the murders of Mr. Sharp and Ms. Catalán, including their support networks and motives, should be identified and that those responsible should be tried in a court of law.

## II.  Armed groups

### A.  Collectif des mouvements pour le changement/Force de défense du peuple

11.    The Group found that the Collectif des mouvements pour le changement/Force de défense du peuple (CMC/FDP),[1] the largest and leading member of the CMC Coalition (see S/2017/1091, annex 2), was active in Rutshuru and Masisi territories. CMC/FDP was the military wing of CMC, according to one CMC/FDP leader. The Group based its findings on interviews with two high-ranking CMC/FDP leaders, five ex-CMC/FDP combatants, four NDC-R combatants, and civil society, Armed Forces of the Democratic Republic of the Congo (FARDC) and MONUSCO sources.

**Leadership, structure and network support**

12.    Four ex-CMC/FDP combatants, one CMC/FDP leader and one FARDC officer stated that "Major General" Ndaruhutse Kamanzi Dominique, also known as Sanctus Nkuba Kongolo, or "Domi" (see annex 2), was the CMC/FDP leader. Domi's deputy was "General" Mbitezi Jean, also known as Bizimana Jacques. CMC/FDP headquarters were at Mashango/"Chaine de Gaza" and its positions were mainly in Bwito and Bwisha areas in Rutshuru territory. Domi resided in Kitunva/Mashango, Rutshuru territory. One CMC/FDP leader and three ex-combatants said that CMC/FDP was composed of some 500 combatants.

13.    The Group established that CMC/FDP was structured around one division, led by Domi, and five brigades (see annex 3). According to one ex-combatant, each brigade acquired its own weapons and ammunition. Three ex-CMC/FDP combatants explained that the movement purchased ammunition from some FARDC members (see S/2017/1091, para. 99) at 500 Congolese francs[2] per piece of ammunition, and purchased supplies from the Forces démocratiques de libération du Rwanda (FDLR)–Forces combattantes abacunguzi (FOCA). One CMC/FDP leader reported that they acquired weapons following successful combat with NDC-R. As of April 2020,

---

[1] The movement changed name several times. Up to 2016 it was called FDP. It adopted the name CMC/FDP following the creation of the CMC Coalition in 2016.

[2] As at 31 December 2019, 1 United States dollar was equivalent to 1,650 Congolese francs. See https://fiscal.treasury.gov/files/reports-statements/treasury-reporting-rates-exchange/ratesofexchangeasofdecember312019.pdf.

S/2020/482

CMC/FDP controlled Kitunva/Mashango, Mudugudu, Rubwe Sud, Gatovu and Muliki, major positions in Bwito *chefferie*.[3]

14.    According to three ex-*CMC/FDP* combatants, MONUSCO sources and civilians, the movement raised funds by taxing the population (see S/2017/672/Rev.1, para. 44). The ex-combatants explained that CMC/FDP levied a monthly *indengera buzima* ("sleep peacefully")[4] "security tax" of 1,500 Congolese francs per adult and through checkpoints in exchange for *jetons* (tokens). The combatants set a quarterly tax, which varied, paid by farmers per head of cattle.

15.    According to the ex-combatants, CMC/FDP leaders targeted individuals involved with the Tutsi community from Bwito *chefferie* and applied severe punishments against anyone suspected of having or proved to have connections with ethnic Tutsi. Punishable behaviour included being seen with, sharing a drink with or having a work relationship with a Tutsi. Two ex-combatants explained that, during morning parades, Domi consistently taught that Tutsi community members were the enemy. Punishments for associating with Tutsi included fines, whipping and the death penalty.

16.    According to two victims of whippings, between March 2019 and March 2020, CMC/FDP strictly enforced the measures and executed at least 20 individuals accused of having a connection with Tutsi individuals. Between December 2018 and August 2019, 10 other individuals received between 75 and 350 lashes and/or were fined between $200 and $1,000, according to the same sources. Several others were either fined or whipped. During a telephone call on 29 April 2020, Jules Mulumba, CMC/FDP General Secretary and spokesperson, said that CMC/FDP demonstrated acceptance towards the Tutsi community, provided that its members showed respect and consideration to other ethnic groups in the Democratic Republic of the Congo.

**Violent armed clashes between Collectif des mouvements pour le changement/ Force de défense du peuple and Nduma défense du Congo-Rénové**

17.    Two ex-CMC/FDP combatants and four Nduma défense du Congo-Rénové (NDC-R) combatants stated that NDC-R attacks re-intensified (see S/2019/469, para. 54) as of late September 2019, following the reported death of the FDLR-FOCA commander, sanctioned individual "General" Sylvestre Mudacumura (CDi.012) (see S/2019/974, para. 8), and again between October 2019 and December 2019. Since March 2020, at least one clash a day has been recorded. According to United Nations sources, this led to killings and massive displacement of civilians to camps and host families in or around Kizimba (6 km east of Kitchanga), Jardins théicoles de Ngeri (JTN), Mugote, Kitchanga, Nyanzalé, Bambo, Bukombo centre and Mubirubiru.

18.    CMC/FDP leaders stated that, between October 2019 and March 2020, the following positions were lost to NDC-R: Katsiru, JTN, Kitunda, Kirumbu, Kairangiriri, Kamodoka, Mpati and Kitso. The Group observed that CMC/FDP had attempted to carry out retaliatory attacks to recover those positions but, according to four ex-CMC/FDP combatants and four NDC-R combatants, intensive attacks by NDC-R between October 2019 and the end of November 2019 prevented CMC/FDP from doing so.

---

[3] A *chefferie* is a decentralized territorial entity. See Loi organique n° 08/016 du 07 octobre 2008 portant composition, organisation et fonctionnement des Entités Territoriales Décentralisées et leurs rapports avec l'Etat et les Provinces (Organic Act No. 08/016 of 7 October 2008 on the composition, organization and functioning of the decentralized territorial entities and their relationships with the State and the provinces). Available at www.leganet.cd/Legislation/ Droit%20Public/Administration.ter/L.08.16.17.10.2008.htm.

[4] Previously spelled *rengera buzima* (see S/2017/1091, para. 64).

UNCLASSIFIED                                    EXHIBIT 60

19.   The Group observed that individuals affiliated to CMC/FDP had conducted ambushes against NDC-R in Rutshuru territory, in response to armed clashes. Two civil society representatives and two NDC-R combatants said that NDC-R leader Guidon Shimiray Mwissa had attributed the ambushes to CMC/FDP and had retaliated against civilians.

## B.   Nduma défense du Congo-Rénové

### Command and control

20.   NDC-R remained the largest armed group active in North Kivu, and sanctioned individual Guidon Shimiray Mwissa (CDi.033) remained its leader. The leadership structure remained unchanged as previously reported (see annex 4; S/2019/469, para. 53; and S/2019/974, para. 12). The Group conducted interviews with two high-ranking NDC-R members, four combatants, two ex-combatants and several civil society leaders with direct access to NDC-R.

21.   Three active combatants estimated that the total number of NDC-R combatants was 5,000, all armed and mostly deployed in Walikale and Masisi territories and, to a smaller extent in Rutshuru and Lubero territories, in North Kivu (see S/2019/974, para. 19). According to NDC-R combatants and two representatives of civil society, NDC-R had not recruited new combatants since the Group's midterm report (S/2019/974). However, they stated that, during sustained attacks against CMC/FDP positions in Rutshuru and Masisi territories, the movement continued to enrol CMC/FDP defectors and captured combatants, as previously reported (S/2019/974, para. 16), including from the Alliance des patriotes pour un Congo libre et souverain (APCLS), Nyatura Kisura and Nyatura Jean-Marie, between November 2019 and February 2020.

### Structure and support network

22.   During the reporting period, NDC-R was structured around two operational sectors. The first and main sector was headquartered in Kilambo village, Masisi territory, and was led by "Colonel" Masiya Sita, otherwise known as "Tondeuse" (see S/2018/531, para. 73). The second sector, headquartered in Kashuga, located across Masisi and Rutshuru territories, was led by "Colonel" Poyo Bauma. They were divided into six brigades, each comprising 250 to 300 combatants, according to two NDC-R combatants. One of those combatants and one civil society representative said that a fourth NDC-R brigade, led by a "Colonel" Mené, was in Bunyatenge, in south Lubero territory.

23.   Civil society actors from Masisi and Walikale territories reported that, between February and March 2020, Guidon travelled extensively throughout those territories and held meetings with local community leaders to strengthen collaboration, including in areas that had recently fallen under NDC-R control.

24.   Between 28 and 30 November 2019, Guidon convened a two-day meeting in Bukumbirwa, in Walikale territory, with leaders from Mai-Mai armed groups, including Mai-Mai Kifuafua, Mai-Mai Simba, Mai-Mai Guides-Mouvement acquis au changement, Mai-Mai Mazembe-Union pour la protection des innocents and Raia Mutomboki, and created the Réseau des patriotes résistants congolais (RPRC), according to three civil society representatives and a video showing an interview with Guidon. Guidon was appointed coordinator of that coalition (see annex 5).

25.   "Colonel" Mapenzi Lwanche Likuhe, also known as Fidel Mapenzi or Mike, NDC-R administration and logistics officer (see S/2019/974, annex 3), frequently travelled between NDC-R headquarters and sector headquarter-controlled territories

and sometimes to Goma to raise funds for NDC-R. In February 2020, Mapenzi was seen in Goma (see annex 6), where he was said to have held meetings with NDC-R supporters.

26.    During the reporting period, civil society representatives reported only one attack by FARDC against NDC-R, in October 2019. Moreover, NDC-R and FARDC maintained positions in the same villages, including in Kashuga, Ibuga, Mbuhi, in Mweso, Kalembe, Mpati, Malemo, Pinga, Katsiru and JTN, in Masisi and Rutshuru territories, according to two NDC-R combatants, one ex-CMC/FDP combatant and community members. The same sources said that it was only after NDC-R took Katsiru from CMC/FDP, at the end of December 2019, that FARDC established a position there. Three NDC-R combatants described how FARDC had asked NDC-R not to retake Chaala, a position in Bwito *chefferie*, lost to CMC/FDP in December 2019. In January 2020, FARDC established their position in Chaala, according to one ex-CMC/FDP combatant.

27.    Two NDC-R leaders reported that NDC-R combatants were paid a monthly wage, ranging between 30,000 and 50,000 Congolese francs per combatant, and 400,000 and 500,000 Congolese francs per high-ranking officer and leader (see S/2018/531, para. 75), quite a high fee in the context of the Democratic Republic of the Congo. In a video authenticated by the Group, an NDC-R combatant explained to residents of Nyabiondo, in Masisi territory, that NDC-R offered jobs and accepted all candidates, regardless of community of origin. During a telephone call on 1 May 2020, Désiré Ngabo Kisuba, NDC-R spokesperson, denied any payment and said that combatants lived off farming and support from communities.

## C.    Conseil national pour le renouveau et la démocratie

28.    Operations carried out by FARDC on 26 November 2019 weakened the Conseil national pour le renouveau et la démocratie (CNRD). CNRD leadership lost command and control of the movement, leaving combatants and dependants scattered across Kalehe, Mwenga, Walungu and Uvira territories, in South Kivu.

29.    Following those operations, FARDC dislodged CNRD from Kalehe, according to two FARDC officers and six ex-CNRD combatants. One ex-CNRD combatant who participated in the combat stated that combatants had lost contact with the leadership. Seven residents explained that FARDC had maintained pressure on CNRD across Walungu and Mwenga forest, resulting in multiple casualties. Thousands of dependants were transferred to Nyamunyunyi FARDC camp in Bukavu, while others fled to Itombwe forest in the highlands of Uvira, according to ex-CNRD combatants and two FARDC officers. The ex-combatants also said that many combatants and dependants had been killed during the operations and that others had died from starvation and disease. One FARDC officer stated that about 200 CNRD combatants had been killed as a result of the operations, and about 70 combatants remained in Kalehe territory.

30.    The same ex-CNRD combatants were unaware whether their leaders, Laurent Ndagijimana, also known as Lumbago or Wilson Irategeka (see S/2019/469, para. 49), and Antoine Hakizimana, also known as Jeva (see S/2017/672/Rev.1, para. 29), were still alive.

31.    FARDC stated that 360 combatants and 2,691 dependants had been captured during the operations across Walungu and Mwenga territories, and many of them had been repatriated to Rwanda in December 2019.

UNCLASSIFIED    EXHIBIT 60

## D.  Allied Democratic Forces

32.   The Group found that the FARDC operation "Sokola I", launched on 30 October 2019, scattered the Allied Democratic Forces (ADF) and that several ADF positions in Beni territory, North Kivu, fell under FARDC control. ADF nevertheless maintained its international and local recruitment, support and supply networks, including in Butembo and Beni towns (see S/2018/531, paras. 29–31). ADF continued to carry out attacks on both civilians and FARDC (see paras. 137–142 below). The Group did not find any direct links between Islamic State in Iraq and the Levant (ISIL)[5] and ADF (see S/2019/974, para. 25). The Group is concerned that ADF may have retained the ability to recruit and to reorganize.

**Operations of the Armed Forces of the Democratic Republic of the Congo**

33.   According to FARDC officers and military intelligence sources, between February and March 2020, almost all former ADF camps, including Kididiwe Mapobu, Mwalika and Madina I and II, were taken by FARDC (see annexes 7 and 8; S/2018/531, paras. 29–33; and S/2019/469, paras. 16–20). Some senior FARDC officers, however, expressed concern over the ability of FARDC to maintain control over those camps.

34.   According to FARDC sources, as at 24 April 2020, 88 ADF combatants had been killed, 29 had been captured and 10 had surrendered. They also reported that FARDC had recovered 35 AK-47-pattern rifles, two rocket-propelled grenades (RPGs), 22 artisanal bombs, two boxes of ammunition, six pieces of TNT and one machete from ADF (see annex 9). The Group inspected some of the recovered materiel and found that the weapons and ammunition had similar characteristics to those in FARDC stock. Ex-ADF combatants explained that they had obtained most of the materiel during attacks on FARDC. The improvised explosive devices (IEDs) recovered from ADF were made with rudimentary elements (see annex 10).

**Allied Democratic Forces retaliations, recruitment and supply networks**

35.   Senior ADF leaders were aware of operation "Sokola I" and some decamped beforehand (see S/2019/974, para. 22). Twenty-five ex-ADF combatants, three FARDC officers and five civil society representatives confirmed that known ADF leaders had fled, including sanctioned individual Seka Baluku (CDi.036) and Lukwago Rashid Swaibu Hood, also known as Pierro or London (see S/2019/974, para. 21).

36.   Four ex-combatants stated that Amigo Kibirige, also known as Simba Amigo, Mzee Amigo or Marine (see S/2016/1102, para. 33; and S/2019/469, para. 23), a former leader of the Mwalika camp, remained in the Democratic Republic of the Congo to coordinate recruitment and ADF attacks against FARDC and civilians. Ex-combatants recognized Amigo in a photograph depicting him (see annex 11) and some said that he remained in the surroundings of Mamove, northwest Beni territory, until at least the end of February 2020.

37.   Several ex-combatants explained that Amigo continued to coordinate the local and regional recruitment of new combatants, consistent with past findings (see S/2018/531, paras. 29–33). Four ex-combatants said that Baluku Abdurrahman, identified as part of the Ugandan ADF leadership, had returned to Uganda in early November 2019 to organize recruitment and establish a materiel supply network from there in coordination with Amigo. Between November 2019 and January 2020, two

_____

[5]  Islamic State Central Africa Province, or Wilayat Wasat Ifriqiyah, (ISCAP) has sometimes claimed responsibility for attacks on behalf of ISIL.

DRC-30316 1180    UNCLASSIFIED

S/2020/482

of those ex-combatants respectively brought 20 and 30 new recruits from Abdurrahman to the Democratic Republic of the Congo and had been paid $30 per recruit.

38.   Twelve Congolese ex-ADF combatants who were part of a local network explained that they had recruited combatants, provided subsistence and gathered information on FARDC for ADF. Two main intermediaries, identified as key local recruiters by the same ex-combatants, confirmed that, in early January 2020, they had sent 40 combatants to Mamove, to join Amigo. They added that they had bought motorbikes for new collaborators in Beni and Butembo towns, which they used to deliver foodstuffs and medicines to ADF. This was confirmed by six motorcyclists collaborating with ADF. The network also recruited former or current Mai-Mai combatants. Two ex-Mai-Mai Shetani combatants explained that an ADF intermediary had recruited them in December 2019.

39.   The Group also received testimonies from two motorcyclists who had transported improvised explosive devices from Kampala to Beni territory. According to the two individuals, Amigo had given specific instructions by telephone. One ex-combatant explained that he had been tasked by Amigo to go to Uganda in December 2019 to collect improvised explosive devices from Baluku Abdurrahman, but had surrendered them to FARDC and asked for protection instead. The ex-combatant shared with the Group the telephone numbers of other ADF collaborators. The Group shared those numbers with Ugandan authorities for further investigation but had not received any response at the time of drafting the present report.

40.   The Group noted that ADF resorted to hit-and-run tactics in some locations. Five ex-combatants said that, since the launch of FARDC operations, Amigo had sent small ADF groups armed with assault rifles and machetes to attack civilians in order to force FARDC away from the front line. The ex-combatants, two civil society representatives and three high-ranking FARDC officers said that attacks were mostly retaliatory, as punishment for the betrayal of ADF collaborators and to weaken the population's trust in the national security forces.

**Sources of financing**

41.   Several ex-ADF combatants, an individual close to ADF and some FARDC officers stated that ADF continued to build its financial capacity. Two ex-ADF combatants explained that, in early November 2019, Amigo had received cash from unidentified sources in Uganda. Seven ADF collaborators also explained that ADF leaders forced Congolese farmers to pay monthly taxes of $10 to $25 per acre per farmer, or part of their harvest. Some farmers said ADF bought their production. For instance, around Mwalika Kabasewe, many farmers were forced to support ADF with their production.

**Links with Islamic State in Iraq and the Levant**

42.   As previously reported, the Group did not find any direct links between ISIL and ADF (see S/2019/974, para. 25).

43.   Several ex-ADF combatants captured by FARDC from the main camps of Madina and Mwalika said that they had never heard of ISIL. However, four ex-combatants recognized, in a photograph, the black and white ISIL flag, similar to the one they had seen in their camps (see S/2019/974, para. 25).

44.   During their operations, FARDC did not recover any documents or items or capture any high-profile ADF leaders that could have substantiated any connection with ISIL. Between January and April 2020, ISIL claimed two attacks in Beni territory, among the many carried out on both FARDC positions and civilians. The

UNCLASSIFIED                                        EXHIBIT 60

Group noted discrepancies between the claims and the reality on the ground (see annex 12).

### E.  Mai-Mai Malaika

45.   The Group found that, during the reporting period, the Mai-Mai Malaika, led by Sheikh Hassani Huzaifa Mitenda, remained active in Kabambare territory, Maniema province (see paras. 73–76 and 143–147 below; and S/2018/531, para. 51). The Group based its findings on interviews with two active combatants, four ex-combatants, three FARDC officers, two civil society representatives and MONUSCO sources.

**Leadership, capacity and locations**

46.   According to four ex-combatants, two FARDC officers and two civil society representatives, Sheikh Hassani was the leader of the Mai-Mai Malaika and his deputy was Assani Juma, also known as Mandevu (see annex 13). An individual known as Demi-Kilo oversaw Mai-Mai Malaika activities. Until the FARDC operations on 25 February 2020 (see para. 51 below), Sheikh Hassani was headquartered at Mbinguni/Chechenie camp, in Machapano forest, south west of Salamabila, while his deputy controlled the movement in Kasongo. Other Kabambare positions, including the Wamaza-Kibangula axis, were controlled by "Major" Zoro and "Major" Kunda.

47.   Three ex-combatants indicated that, since late 2018, Sheikh Hassani had resumed recruitment after his initial intention to surrender and disarm. According to them, the Mai-Mai Malaika had about 2,000 combatants, most of whom were armed (see annex 14). The Group was unable to independently verify that information. The Mai-Mai Malaika did not often confront FARDC in direct combat, but resorted to ambushes and hit-and-run attacks.

**Alliance and rivalry**

48.   Two ex-combatants, a researcher and community members said that, in 2019, a former ally known as "Souverain" had defected from the Mai-Mai Malaika and had fought against Sheikh Hassani alongside FARDC. FARDC sources and a researcher said that the split had been intended to weaken the armed group.

49.   As previously reported, Sheikh Hassani remained a member of the Coalition nationale du peuple pour la souveraineté du Congo (see S/2018/531, para. 52).

**Operations of the Armed Forces of the Democratic Republic of the Congo**

50.   According to 16 community members, four civil society representatives, one ex-combatant, one researcher and MONUSCO sources, from at least November 2019, the Mai-Mai Malaika controlled one part of Salamabila, including the Kimbaseke and Lotissement quarters, while FARDC retained the other part, called Beton, where Namoya Mining SA was located (see paras. 73–76 below). FARDC removed the Mai-Mai Malaika from those locations during violent armed clashes on 11 and 12 January 2020, which caused the death of at least eight civilians.

51.   On 23 February 2020, FARDC launched another operation against Mai-Mai Malaika. One active combatant, three ex-combatants, one FARDC officer and three civil society representatives stated that Mai-Mai Malaika combatants had avoided confrontation with FARDC and, ahead of the operation, had vacated the Mbinguni/Chechenie camp, which fell under FARDC control on 25 February 2020 (see annex 15).

UNCLASSIFIED    EXHIBIT 60

S/2020/482

## F. Rwanda National Congress

52.   The Group found that P5, the armed branch of Rwanda National Congress (RNC)[6] (see S/2018/1133, para. 37), was significantly weakened by the FARDC operation "Sokola II" and had decamped from Bijabo, Uvira territory, as of April 2019, to settle in North Kivu. The Group spoke to five ex-P5 combatants, four P5 leaders, two FARDC officers and three civil society sources.

**Recruitment, locations and leadership**

53.   Five ex-combatants and two P5 leaders confirmed that recruitment of combatants had continued during the reporting period. One ex-combatant explained how, in February 2019, a man named "Vichimo", whom he said was a Rwandan national, had lured him and 16 others into the P5 on the promise of work in the Democratic Republic of the Congo. Another ex-combatant confirmed that, around the same time, between 20 and 30 new recruits from Burundi, Rwanda and Uganda had been brought to the camp in Bijabo.

54.   All ex-combatants said that, once recruited, they had transited Bujumbura, Burundi, where Burundian individuals had provided logistical assistance and coordinated their transfer to Bijabo. This was consistent with past reports (see S/2018/1133, paras. 38–40). The Group wrote to Burundian authorities in that connection and had not received a response at the time of drafting the present report.

55.   Ex-combatants said that the late Charles Sibomana had led the P5 in Bijabo, with Habib Mudathiru, also known as "Colonel" Musa, in charge of training, Richard Hitimana in charge of supply and logistics, Richard Ntare in charge of administration and Jean-Paul Nyirinkindi as a political officer. Ex-combatants added that, before fleeing Bijabo, the P5 had had 200–250 combatants.

56.   The Group spoke to General Kayumbua Nyamwasa, often cited by ex-combatants as the overall P5 leader. He acknowledged his role within the Rwanda National Congress but denied being the leader of the military group in Bijabo.

**Operations of the Armed Forces of the Democratic Republic of the Congo**

57.   Three ex-combatants, one P5 leader and an FARDC officer said that, in April 2019, P5 combatants had received instructions to decamp from Bijabo to Masisi via Kalehe. In Kalehe, they had been temporarily hosted by CNRD combatants. In June 2019, P5 combatants faced operations involving FARDC around Kashovu in Masisi territory. Many were killed and some were arrested.

58.   Several combatants fled to Binza, Rutshuru territory, and met with RUD-URUNANA and FDLR combatants, according to two ex-combatants and two civil society representatives.

## III.   Natural resources and finances

59.   The Group noted that, during the reporting period, mineral traceability and due diligence measures were implemented in the tin, tantalum and tungsten sectors, as previously reported (see S/2016/466, para. 117), and as recommended by the International Conference on the Great Lakes Region (ICGLR), the Organization for

---

[6] A coalition of Rwandan "opposition political organizations", including the Amahoro People's Congress, the United Democratic Forces-Inkingi, the People's Defence Pact-Imanzi, the Social Party-Imberakuri and the Rwanda National Congress. The People's Defence Pact-IMANZI left the coalition in February 2020.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

Economic Cooperation and Development (OECD) and the Security Council.[7] Such efforts were largely absent in the gold sector.

60.    The Group found that armed groups, criminal networks and some law enforcement agents benefited from illicit exploitation and trade in natural resources. The Group investigated trends in trading of Congolese gold in the region and beyond and found that some refineries acted as brokers, used cash payments that evaded tracing, undertook refiner-to-refiner trading that concealed the origin of smuggled gold and used corporate networks, making it difficult to establish beneficial ownership. Most gold trading evaded the formal banking network.

## A.    Gold

61.    The Group found that, for 2019, North and South Kivu and Ituri provinces had reported official production of a total of just over 60 kg of artisanal gold and had exported a total of just over 73 kg (see annex 16). The Group interviewed over 40 gold traders and diggers and 37 mining officials across the Democratic Republic of the Congo. The country remained one of the Great Lakes region's largest artisanal gold producers, and yet one of its smallest official exporters (see annex 17).

**Under-declaration, untraceable origin and smuggling**

62.    The Group found that Bunia, Ituri province, remained a gold trading and smuggling hub (see S/2017/672/Rev.1, para. 107; and S/2018/531, para. 114). In Bunia alone, eight gold-buying houses purchased a minimum of 2 to 3 kg of gold each per week, according to three traders and a mining official. On the basis of those quantities, the Group estimated that a minimum of 1,100 kg of gold had been purchased and smuggled out of the Democratic Republic of the Congo in 2019 from Ituri alone (see annex 18), which could have generated up to $1.88 million in taxes had it been legally exported (see annex 19). According to the same sources, registered *négociants* Banga Ndjelo, Edmond Kasereka (see annex 20; and S/2018/531, para. 118) and Sangote Dehmani and businessmen Bosco Atama, Mambo Kamaragi, Exodus Deba (see S/2016/1102, para. 76), Lombela and Karte (see S/2018/531, para. 119) were still involved in gold smuggling, as previously reported. Their responses to the Group's findings are contained in annex 21.

63.    Gold smuggled from Ituri was traded notably in Kampala (see S/2014/42, para. 96; and S/2018/531, para. 92). Two smugglers described three recent trips from Bunia to Kampala with a combined total of 7 kg of gold, which they sold to "Indian" traders.[8] Both those smugglers and an individual involved in legal trading stated that Jamnadas V. Lodhia (who uses the alias Chuni) of sanctioned entity Uganda Commercial Impex (UCI) (CDe.009) (see S/2014/42, para. 184) and "members of the Lodhia family" continued to buy gold originating in the Democratic Republic of the Congo. A company member of Aurum Roses (see S/2015/19, para. 204) stated that UCI was dormant, however, and that J. V. Lodhia was no longer active in the trade. In October 2019, Ugandan authorities provided the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo with a report of their investigations into the activities of Kampala-based gold traders (see annex 22; and S/2015/19, para. 203). The Group also obtained a sales sheet for January 2020 issued by Metal Smelting and Testing Co. Ltd (see

---

[7] "Due diligence guidelines for the responsible supply chain of minerals from red flag locations to mitigate the risk of providing direct or indirect support for conflict in the eastern part of the Democratic Republic of the Congo". Available at www.un.org/securitycouncil/sanctions/ 1533/due-diligence-guidelines.

[8] They were afraid to disclose the names of their buyers and called them "the Indians".

UNCLASSIFIED    EXHIBIT 60

S/2020/482

S/2019/974, para. 51) to a gold smuggler from Bunia for over 5 kg of smuggled gold (see para. 87 below).

64.    Smuggled gold from South Kivu went to Burundi, Rwanda, the United Arab Emirates and the United Republic of Tanzania (see paras. 82, 86 and 87 below), according to seven smugglers. Two traders described transporting gold from Bukavu to Kamembe International Airport in Rwanda (see annex 23) and then to the United Arab Emirates throughout 2019 (see S/2018/531, para. 127). Four smugglers explained that Dubai customs authorities and buyers did not ask questions regarding the origin of gold. Congolese traders accepted mine-of-origin information provided by customers and did not undertake checks themselves (see S/2016/466, para. 146). Three traders who travelled to the United Arab Emirates to sell gold in 2020 reported that Dubai customs officers had accepted official Congolese sales receipts (*bons d'achat*), which were not export documents, as proof of origin for Congolese gold imports.

65.    In December 2019, the Group received an update from the United Arab Emirates, which had been sent to the Committee, concerning steps taken bilaterally with the Democratic Republic of the Congo to combat the illicit trade in gold. The United Arab Emirates stated that its Federal Customs Authority had taken steps to train customs officers, among others. In November 2019, the Congolese authorities said that relevant translations were under way in that regard (see S/2018/531, para. 111).

66.    The Group found that gold smuggling stifled legal trading and traceability schemes. For instance, Just Gold, a project in the Democratic Republic of the Congo that traced legal artisanal gold from mine sites free from armed influence to export, while applying regional and international standards, had revised its approach after determining that legal production and trade were not commercially viable. Representatives of Just Gold stated that the project could not compete with gold prices offered through the smuggled trade (see annex 24).

67.    The Group also found that some buying houses operated as fronts for gold smuggling. In 2019, two registered gold-buying houses purchased gold but did not make official exports. Combined Mining Company, one of the three registered gold-buying houses in Ituri, bought gold during 2019, according to two gold traders and an individual familiar with gold trading, but did not record any official exports. Representatives of the company claimed that it operated as a cooperative and did not undertake exports. Similarly, Glory Minerals, an entity previously linked to untraceable gold exports (see S/2009/603, paras. 128–136; and S/2016/466, paras. 140–144), did not record any exports in 2019, although it maintained its operating licence for 2020.

68.    In an environment of under-declaration, untraceable sourcing and smuggling, the Group is concerned that the planned Equinoxe SARL refinery in Bunia (see S/2019/974, para. 50) and the Congo Gold Raffinerie under construction in Bukavu (see annex 25) may face challenges in ascertaining whether gold purchased did not benefit armed groups and criminal networks.

**Armed groups**

*Mai-Mai Yakutumba*

69.    The Mai-Mai Yakutumba financed its activities from gold that was traded and taxed from mine sites in Misisi, Fizi territory, South Kivu, where the armed group operated, and then transported to Bukavu.

70.    In April and May 2019, the Mai-Mai Yakutumba occupied mines on the Kachanga hill (see S/2019/974, paras. 39–42). Four artisanal miners and a gold trader from Misisi stated that Mai-Mai Yakutumba local leaders had tasked local authorities

S/2020/482

around Kachanga hill and Miba and Nyange mine sites with monitoring gold production. It was taxed at between 30 and 50 grams per pit per week and between 20 and 40 pits were covered in the area controlled by the armed group. A gold trader, a transporter and a smuggler described how the money accrued was split between local authorities and Mai-Mai Yakutumba local leaders as "payment for security".

71.    The same four miners and trader said that they bought gold from Mai-Mai Yakutumba local leaders and the local chiefs and sold it to buying houses in Bukavu. The Group reviewed sales receipts for 1,349 grams and 6,923 grams of gold that had been sold in May and June 2019, respectively, by Mai-Mai Yakutumba emissaries to a branch of Maison Bezo, an unregistered buyer in Misisi, for transfer to Bukavu (see annex 26). In Bukavu, three independent sources confirmed that the comptoirs Le Miracle and Mines Propres SARL and the unregistered buyers Maison Bezo, Buganda (see S/2016/466, para. 161; and S/2019/469, para. 170)) and Cavichi (see S/2016/466, paras. 151–154) bought gold from Misisi. Mines Propres SARL stated they only bought from registered *négociants* and validated mine sites. The Group contacted Le Miracle on several occasions but did not receive a response.

72.    The Group found that indiscriminate gold purchasing by buyers in Misisi was a starting point for the mixing of legally and illegally sourced gold, which then entered international supply chains. Four buyers in Bukavu admitted that they were aware of the potential risk of sourcing from armed groups, but continued buying regardless.

*Mai-Mai Malaika*

73.    During 2019 and 2020, the Mai-Mai Malaika (see S/2018/531, para. 52; and paras. 45–51 above) violently opposed industrial gold-mining activities at the Namoya Mining SA concession in Salamabila. Namoya Mining, a subsidiary of Banro Mining Corporation (see S/2010/596, paras. 213 and 302), began commercial gold production at the site in 2016,[9] an area previously exploited by artisanal miners. The Group interviewed 22 individuals engaged in the gold sector in Salamabila. The Group established that Mai-Mai Malaika leader Sheikh Hassani profited from clandestine artisanal gold production at the Namoya Mining concession. Namoya Mining confirmed that it was aware that clandestine artisanal activity took place at its Namoya concession.

74.    The Group reviewed public notices published around Salamabila during 2019 and 2020 and signed by Sheikh Hassani, threatening Namoya Mining staff and demanding that the company "respects the demands of the population" (see annex 27). On 26 July 2019, Mai-Mai Malaika combatants abducted four Namoya Mining employees and destroyed company property. According to audio recordings by Sheikh Hassani reviewed by the Group and confirmed by four community members, the abductions were a further attempt by the armed group to secure the community's right to continue to dig at Namoya,[10] including at the gold-rich Mwendamboko pits (see annex 28).

75.    Since at least November 2019, on the orders of Sheikh Hassani, all crushing and processing equipment for artisanally produced gold was moved to Lotissement, a quarter of Salamabila controlled by Sheikh Hassani, according to six eyewitnesses (see annex 29). Three individuals explained that diggers paid Sheikh Hassani a $20 tax per crushing machine installed at Lotissement and a further 1,000 Congolese francs per bag of mineral-rich sand brought for processing, while Sheikh Hassani also

---

[9] Mining Technology, "Namoya Gold Mine, Maniema". Available at www.mining-technology.com/projects/namoya-gold-mine-maniema/.

[10] Representatives of Namoya Mining told the Group that the abductions in July 2019 were the fifth in a series since September 2016. In an abduction in 2018, Mai-Mai Malaika combatants killed one Namoya Mining employee.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

took up to 30 per cent of the gold produced. The Group estimated that Lotissement could have generated just under $17,000 per month for the armed group from taxed sandbags alone (see annex 30). Two community members and an eyewitness stated that, between September and November 2019, Sheikh Hassani had prohibited artisanal digging for a two-week period.

76.    Activity at Lotissement was temporarily suspended following the clashes on 11 and 12 January 2020 between the Mai-Mai Malaika and FARDC at Salamabila, when Sheikh Hassani was dislodged, according to two people with knowledge of the matter (see para. 50 above). Four eyewitnesses and photographs reviewed by the Group confirmed that, in March 2020, gold processing continued at Lotissement, but that Sheikh Hassani no longer controlled the area. Bukavu was the main destination for artisanal gold from Salamabila (see annex 31).

**Members of the Armed Forces of the Democratic Republic of the Congo**

77.    According to five community members and an eyewitness, some FARDC members, deployed in 2019 and 2020 outside the Namoya Mining perimeter to secure the concession against armed attack, taxed clandestine artisanal gold production at the concession. Diggers paid bribes in cash to some FARDC members to access the concession, according to three diggers. One individual described the site as "covered with FARDC" watching over the pits they taxed. A FARDC company of up to 150 soldiers rotated at the concession throughout 2019 and 2020, according to Namoya Mining representatives. The company stated that FARDC were stationed outside the Namoya Mining perimeter since mid-2018 and had replaced mining police on the orders of "Kinshasa" to protect the company assets after Mai-Mai attacks in 2018 (see S/2019/469, paras. 198–200). The company acknowledged that the Congolese Mining Code and military regulations forbade FARDC presence at mining sites (see annex 32).

78.    The notebook of an artisanal mine manager, dated November 2018 and obtained by the Group, documented an unnamed FARDC Major as one of the regular beneficiaries of daily gold production from a gold seam at Namoya (see annex 33). Three sources with knowledge of the matter stated that some FARDC members sent money generated from those activities to the 33rd military region hierarchy. The Group spoke to sanctioned individual General Muhindo Akili Mundos (CDi.032) (see S/2016/466, paras. 198–204), commander of the 33rd military region, who said that isolated cases of military indiscipline could not be ruled out but that they were rigorously punished.

79.    In Fizi territory, FARDC members taxed diggers entering the Kachanga gold mine (see para. 70 above) in a manner consistent with previous findings (see S/2016/466, paras. 134–135). According to two diggers, a journalist and a community member, from 2019 until at least March 2020, anyone entering Kachanga mine paid 1,000 Congolese francs per passage to some FARDC members, who sent the money to the military hierarchy of the 33rd military region. Three diggers described how the over 120 combined members of their gold-mining cooperatives had to pay the tax daily. The town's 45 *négociants* also paid FARDC members, according to two local businessmen. In March 2019, a mixed delegation of FARDC, mining authorities and civil society representatives visited Misisi and dismantled 20 illegal FARDC checkpoints between Bukavu and Misisi, although the checkpoint at the entrance of the Kachanga mine remained. Sanctioned individual General Mundos (CDi.032), commander of the 33rd military region, stated that several initiatives to dismantle illegal FARDC checkpoints had taken place and shared documents to that effect (see annex 34).

80.    During 2019 and 2020, some members of the 3306th regiment of the FARDC 33rd military region provided protection to Congo Bluant Minerals SARL, a

S/2020/482

semi-industrial gold-dredging company, in contravention of the Congolese Mining Code (see para. 77 above). Although its gold-dredging activities had been officially suspended in mid-2019, the company continued to maintain a presence on the Elila river, between Kitumba in Mwenga territory and Kiziba in Shabunda territory, South Kivu, according to two eyewitnesses, mining officials and official documents consulted by the Group. The Group was able to consult an official sales receipt from 2019 showing that the company had sold gold, amounting to 15.288 kg,[11] to Mines Propres SARL. The Group wrote to Congo Bluant Minerals SARL, which had not responded at the time of drafting the present report.

**Criminal networks**

81.   The Group documented networks comprising some Tanzanian nationals involved in smuggling gold from Misisi. Several of the persons involved offered stone-crushing services to artisanal gold miners and had questionable immigration status.[12] Three Congolese law enforcement officers stated that that made it difficult for them to identify the smugglers.

82.   Gold smuggled from Misisi by some Tanzanians went via Makobola port in Uvira, and across Lake Tanganyika to Rumonge port, in Burundi, then to Bujumbura, or to Kigoma in the United Republic of Tanzania, a route previously reported by the Group (S/2011/738, para. 145), as described by a Tanzanian smuggler, three Makobola leaders and a *négociant*. In October 2019 Congolese authorities apprehended Alex Tobias Kaila, a Tanzanian involved in gold smuggling along that route (see annex 35). In another case, a gold smuggler described how he had illegally transported 1.5 kg and 2 kg of gold in July and August 2019, respectively, to Emmanuel Samuel Imana, a Bujumbura-based gold trader, using the same route. The Group wrote to the Governments of Burundi and the United Republic of Tanzania requesting information, but at the time of drafting the present report had not received responses about either individual.

83.   Bribery affected law enforcement efforts in gold-related cases. A Tanzanian gold trader disclosed that he had bribed different agents within law enforcement agencies with a total of $6,500 to secure his freedom. A senior prison officer in Bukavu and a mining official described natural resources-related cases as "quick cash" (*dossiers d'argent*), owing to bribes paid by suspects. The Group was aware of efforts by the Government of the Democratic Republic of the Congo to combat smuggling (see annex 36).

84.   Mining authorities in South Kivu stated that, in an effort to combat smuggling in Misisi, they had attempted to suspend gold-mining activity in August and December 2019 and March 2020. The decision was contested by some artisanal miners who claimed they had paid the correct taxes and should not be held accountable for smuggling activities (see annex 37).

---

[11] 15,288.17 grams.

[12] Congolese mining regulations allow the provision of services to cooperatives by non-nationals. See Arrêté Ministériel N° 0285/Cab Min/Mines/01/2010 du 24 mai 2010 portant occupation des zones d'exploitation artisanale par les coopératives minières (Ministerial Decision No. 0285/ Cab Min/Mines/01/2010 of 24 May 2010, on occupation of artisanal exploitation zones by mining cooperatives).

UNCLASSIFIED

EXHIBIT 60

S/2020/482

## B.  Congolese minerals and regional supply chains

85.   The Group found that Congolese gold, the mining and sale of which benefited armed groups and criminal networks, was traded regionally, including to gold refineries in the Great Lakes region. Some buyers outside of the Democratic Republic of the Congo stated that, "gold is gold, and they simply need gold," and did not undertake supply chain due diligence checks, according to three smugglers. Investigations showed that regional gold refineries did not recognize Congolese ICGLR certificates as valid or compulsory, used cash payments for gold sales and brokered gold between themselves and other traders, sometimes disguising the origin of the gold.

86.   The Group traced three official ICGLR export certificates issued in 2019 in the Democratic Republic of the Congo to regional gold refineries and found that the refineries did not recognize the certificates. In one case, Le Miracle gold-trading house, in South Kivu, exported 2.105 kg of gold in March 2019 to African Gold Refinery Ltd (see S/2018/1133, paras. 97–98), via Vaya Forex Bureau Ltd.[13] African Gold Refinery Ltd denied receiving the gold or knowing the named suppliers (see annex 38). The Group contacted Vaya Forex Bureau but did not receive a response. In a second case, Ets Namukaya (see S/2018/531, annex 23) exported a total of 6.028 kg in April and September 2019 to Aldango Ltd (see S/2019/974, para. 50). In a meeting with the Group in February 2020, representatives of Aldango Ltd said that the company had not received the gold and that they did not recognize the named supplier (see annex 39). Congolese mining authorities confirmed that Ets Namukaya had used ICGLR certificates for those exports.

87.   The Group viewed export and customs documents detailing that the Ugandan refinery Metal Smelting and Testing Co. Ltd had purchased gold from the Democratic Republic of the Congo (see para. 63 above) and had traded gold with PGR Gold Trading LLC in the United Arab Emirates, in sales that were brokered by African Gold Refinery Ltd. Legal and export documents reviewed by the Group cited an export on 21 October 2019 of 135 kg of gold bars of 999.9 fineness[14] from Metal Smelting and Testing Co. Ltd to PGR Gold Trading LLC in Dubai, part of which had been paid for in cash. The gold had been transported by African Gold Refinery Ltd from Uganda to Dubai, according to the documents. On 24 October 2019, Robert Ojuku, an employee of Metal Smelting and Testing Co. Ltd, hand-carried $1.2 million in cash back into Uganda as part payment for the sale, according to the documents. PGR Gold Trading LLC stated that neither Metal Smelting and Testing Co. Ltd nor Robert Ojuku were registered in their customer and supplier database and stated "non-involvement" in the transaction. African Gold Refinery stated that, "in summary Metal Smelting and Testing Co. Ltd did not hold an account with AGR". Both entities provided the Group with due diligence policies and procedures (see annex 40). The Group contacted the Ugandan authorities for further information about the case but, at the time of drafting the present report, had not received a response.

88.   Two Bukavu-based smugglers who deposited gold at Aldango Ltd during 2019 explained that they were paid in cash. One smuggler described how he regularly travelled to Dubai, where his gold was transported and sold, to receive his cash payment without receipt. Representatives of Aldango Ltd stated, in a meeting with

---

[13] The two shareholders of Vaya Forex Bureau, incorporated in 2007, were Vaya Kiran Rajendra and Vaya Vipal Kumar Maganlal, family members of Rajendra "Raju" Vaya, owner of the sanctioned entity Machanga Ltd (CDe.007) (see S/2015/19, annex 63).

[14] Gold purity is defined by parts per thousand, with the purest being 999.9. See London Bullion Market Association, "The good delivery rules for gold and silver bars: specifications for good delivery bars and application procedures for listing", January 2019. Available at www.lbma.org.uk/assets/market/gdl/GD_Rules_16_January_FINAL_20190131.pdf.

UNCLASSIFIED                                    EXHIBIT 60

the Group in February 2020, that the company might pay cash to individuals for small gold sales, but that commercial clients had an account. According to sales documents seen by the Group, Hyacinthe Gahunde of Golden Golden Limited had received cash payments from Aldango Ltd in exchange for about 4 kg of gold in five transactions during the first two months of 2020. The Group contacted Aldango Ltd and Gahunde about the sales made in 2020 but, at the time of drafting the present report, had not received a response.

89.   The Group established that Golden Golden Limited was owned by Karim Somji, previous owner of Golden Gold in Burundi and the Democratic Republic of the Congo (see annex 52; and S/2016/466, para. 145), and that Somji also financed Mines Propres SARL and part-financed Congo Gold Raffinerie, according to three mining authorities (see annex 41; and para. 68 above).[15] The Group noted that several of the region's gold-trading houses were owned by the same individuals using different trading names. In some cases, beneficial ownership information had been concealed.

90.   The Group found that African Gold Refinery Ltd and Aldango Ltd were established within a corporate network linked to Alain Goetz (see S/2009/603, paras. 130 and 154–157; S/2017/672/Rev.1, para. 123; and S/2018/531, para. 113), and that PGR Gold Trading LLC shared the same trading licence, telephone number and address as another company previously managed and part-owned by Goetz, according to company licences reviewed by the Group. In February 2018, African Gold Refinery Ltd was sold to Seychelles-registered AGR International. Goetz told the Group that he had set up African Gold Refinery Ltd but was no longer directly involved in the company. He noted that he was the owner of Aldabra, a real estate company, and that a company of that name owned the African Gold Refinery Ltd facility. The Group established independently that a company named Aldabra Ltd was a shareholder in Aldango Ltd. Further, Goetz confirmed that PGR Gold Trading LLC had the same licence as Goetz Gold LLC, following its 2018 name change to PGR Gold Trading LLC. Goetz told the Group that PGR Gold Trading LLC offered refining and trading services to Aldango Ltd and African Gold Refinery Ltd (see annex 42).

91.   The Group analysed gold production and trade data for Burundi, Rwanda, Uganda and the United Republic of Tanzania on the basis of the frequency and volume of gold smuggling from the Democratic Republic of the Congo into regional trading and transit hubs and beyond. Using available data, the Group noted that recorded artisanal production for many of those countries was low relative to their gold exports. The Group estimated, using information published by the Ugandan authorities, that over 95 per cent of gold exports from Uganda were of non-Ugandan origin for 2019. Rwanda did not publicly report its gold production statistics. Public statistics for 2019 for Burundi were not available, although in 2018 the country reported 598 kg of gold production and exports of 2,000 kg. The Group contacted those Member States but had received a response only from Rwanda at the time of drafting the present report (see annex 43).

92.   The Group established that the region's gold-refining capacity for 2019 stood at over 330 tonnes (see annex 44). In an effort to understand the due diligence activities of regional refineries, the Group contacted the active regional gold refineries about their supply chain due diligence reporting. The responses are contained in annex 45.

---

[15] Rwanda Mining Authority confirmed that Somji was the owner of Golden Golden Limited, although it was unsure if the company was still active. See also http://rma.co.rw/our-members/.

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

## C.  Tin, tantalum and tungsten and supply chain challenges

93.  The Group assessed traceability and transparency mechanisms in the tin, tantalum and tungsten mineral supply chains (see S/2010/596, paras. 173–247 and 289) and found that the use of ICGLR certificates and traceability and due diligence activities, also reflected in Congolese law,[16] and that were supported by the International Tin Supply Chain Initiative (see S/2018/1133, para. 55) and the Better Sourcing Program (see S/2016/466, para. 117) had improved information and trading transparency. However, drawing on testimonies from over 100 diggers across 15 mining areas, the Group continued to observe systemic weaknesses in the trade in tin, tantalum and tungsten, and noted that, in some cases, supply chain integrity was jeopardized across North and South Kivu (see S/2017/672/Rev.1, para. 75).

### Mine validation and mineral tagging challenges

94.  The Democratic Republic of the Congo mine site validation process continued to be slow (see annex 46), consistent with previous findings (see S/2012/348, para. 144 and box 6). As a consequence, the situation at mine sites, including control by armed groups, sometimes changed while validation confirmation was pending (see S/2019/974, para. 44).

95.  The Group found that not all producing mines were validated and that untagged minerals from non-validated mines were sometimes smuggled into the tagged supply chain. In addition, minerals produced at mine sites covered by the International Tin Supply Chain Initiative scheme were sometimes tagged at a distance from the mine site of production, posing a risk of contamination (see S/2018/1133, para. 55). The Group noted that that was a risk spread across North and South Kivu.

96.  For example, in March 2019, the Group visited Kisongati, a validated coltan and cassiterite mine in Kalehe territory, where six eyewitnesses described insufficient and irregular tag production for their daily production of 200–300 kg of coltan-rich earth (before washing).[17] A total of 55 diggers explained that, rather than wait for tags, they sold their coltan production untagged elsewhere, including to independent visiting buyers, because it was a quicker source of cash for subsistence. The International Tin Association stated that, in response to that situation at Kisongati, the number of tags they provided per site might sometimes not match "requirements" if fraudulent minerals were introduced at the site, and that was the purpose of their controls (see annex 47).

97.  Five diggers, a local chief and a civil society representative from Kamatale, a validated coltan and cassiterite mine in Masisi territory, described how, throughout 2019 and early 2020, coltan produced at the site had been transported untagged to Ngungu, Masisi territory, where it was tagged in a depot belonging to the Société aurifère du Kivu et du Maniema (SAKIMA SA) (see S/2018/531, paras. 142 and 146). Another digger, a member of the Coopérative des exploitants artisanaux miniers de Masisi (COOPERAMMA), described regular trips, most recently in January 2020, during which he had transported 50 kg of coltan to Ngungu and sold it for $2,500 to a SAKIMA SA *négociant* on the periphery of the town. The International Tin Association explained that it had implemented improved tagging procedures, including additional controls, by setting up transit and tagging depots at the SAKIMA SA PE76 concession, owing to higher risks of fraud. Similarly, the Coopérative des artisanaux miniers du Congo (CDMC) denied buying minerals sourced from Kamatale, and stated that its partners SAKIMA and COOPERAMMA adhered strictly

---

[16] Arrêté Ministériel n° 0057/CAB.MIN/MINES/01/2012 du 29 février 2012 (Ministerial Decision No. 0057/CAB.MIN/MINES/01/2012 of 29 February 2012).

[17] Kisongati, also locally known as "Vumbura", was validated in May 2017 as a cassiterite mine.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

to the International Tin Supply Chain Initiative improved traceability guidelines (see annex 48).

**Armed groups**

98.    The Group noted cases in which coltan and cassiterite, the extraction and sale of which benefited armed groups, were traded into tagged supply chains.

99.    At Biholo, Masisi territory, over 30 diggers, local officials and mineral traders described how, between January and October 2019, the extraction of coltan and cassiterite at the mines had benefited combatants of APCLS led by Janvier Karairi and of Dusabe Jovial Delta, also known as Dusabe Kashamere Delta, or Delta, leader of the Nyatura Forces de défense des droits de l'homme (FDDH) (see annex 49). Armed Nyatura FDDH and APCLS combatants intimidated the diggers, including by using physical force, demanded cash payments of up to $2,000 per week and forced them to hand over an entire day's production each week (see annex 50). Delta denied his combatants' involvement in mining activity. Cassiterite and coltan produced at Biholo during 2019 was transported to Ngungu, according to at least 10 diggers, where it was bought and tagged, most often on behalf of SAKIMA SA, for onward sale to CDMC. In around November 2019, the armed groups left Biholo mine site.

100. Also in North Kivu, 10 diggers, four *négociants* and a combatant described how the extraction and sale of coltan and cassiterite from Kamatale mine (see para. 97 above) benefited Nyatura Matata[18] combatants who had dug and sold minerals produced at the site until around October 2019 (see annex 51). One *négociant* described two purchases in 2019 of 70 kg of coltan directly from "General" Matata, the armed group's leader, that the *négociant* had then sold, untagged, to a trader in South Kivu. Three other diggers and six *négociants* said that Kamatale's minerals were sold to depots in Ngungu, where they were tagged and entered the same supply chain described in paragraph 99.

101. The International Tin Association was aware of the presence of Nyatura combatants at Biholo until June 2019, and said it would investigate further. CDMC stated that it did not buy minerals from Biholo and that, according to its own investigations, Nyatura combatants were not present at Kamatale mine (see annex 52).

**Mineral smuggling**

102. During the reporting period, coltan produced on the Société Minière de Bisunzu SARL (SMB) PE7431 concession in Rubaya area, Masisi territory, which was covered by the Better Sourcing Program, continued to be sold outside of the mine site (see S/2018/531, paras. 136–146). A digger from the D4 Gakombe mine described how he had smuggled untagged coltan from the SMB concession and sold it at a Ngungu depot for $20 per kilo and had been paid in cash. A digger from Luwowo mine did the same, and sold to travelling *négociants*. Both diggers were owed payments from SMB from May and November 2019, respectively. The diggers said they were also compelled to sell to middlemen, called *Rusias*, who were able to pay immediately in cash, but who bought at prices reduced by between $5 and $7 per kilo compared with market rates. *Rusias* then cashed in when SMB was ready to buy. Seven diggers, all COOPERAMMA members who dug at the SMB concession, explained that untagged coltan was often smuggled off the concession because diggers' payments were delayed, compelling them to sell elsewhere. The mining and trading agreement between COOPERAMMA and SMB had yet to be renewed (see S/2019/974, para. 47).

---

[18] A Nyatura faction operating in Rubaya area, Masisi territory.

UNCLASSIFIED    EXHIBIT 60

S/2020/482

The Group obtained letters from both entities describing alleged smuggling of coltan (see annex 53).

103. RCS Global, a company that manages the Better Sourcing Program digital traceability process, stated that the main challenge faced by the scheme was the irregular presence of government agents tasked with tagging at the site, which occasionally delayed tagging but did not negatively affect supply chain integrity. SMB stated that cases of mineral smuggling recorded outside its perimeter was beyond its jurisdiction and was therefore the responsibility of the National Commission to Combat Mining Fraud (Commission nationale de lutte contre la fraude minière) of the Democratic Republic of the Congo. SMB further stated that, by mid-March 2020, it had paid all debts outstanding from May 2019 to artisanal miners and that only 5 per cent was yet to be settled (see annex 54).

104. Two *négociants* who smuggled minerals in areas controlled by armed groups in Walungu territory said that, in January 2020, armed groups financing their activities from mining sites included the Raia Mutomboki Maheshe and Butachibera factions and Mai-Mai Kirikicho and Nyatura combatants. The *négociants* explained that they sold their untagged minerals to middlemen in Bukavu, who sold them across the border in Rwanda (see paras. 106–107 below).

105. The Group visited two clandestine depots of untagged tin, tantalum and tungsten minerals in Goma. One of them had been relocated following persistent raids by police demanding bribes. Both depot owners continued to trade untagged minerals from the same mine sites in Masisi territory, as previously reported (S/2019/974, paras. 44–47).

106. During a meeting in February 2020, Rwandan authorities showed the Group 155 kg of coltan that had been seized on 23 January 2020 and stored in Gisenyi, Rubavu district. They stated that it had been smuggled from the Democratic Republic of the Congo, the first such case at the Rubavu-Goma border crossing since June 2019. They also showed the Group seven lots of untagged minerals seized from elsewhere in Rwanda since June 2019. They included 360 kg of presumed beryllium, 293 kg of presumed cassiterite, 250 kg of presumed wolframite and 54 kg of presumed coltan.[19] Rwandan officials stated that they considered cross-border mineral smuggling a security risk and used a combination of border police working with the Rwanda Revenue Protection Unit, paid agents and unpaid community-level informants to monitor and intercept smuggled goods, including minerals, along the country's borders. They emphasized that it was illegal for untagged minerals to transit through Rwanda.

107. Four independent sources, including a Congolese anti-mineral-fraud officer, confirmed that Jean-Claude Gafishi, previously investigated by the Group (see S/2019/469, para. 154), remained involved in cross-border mineral smuggling between the Democratic Republic of the Congo and Rwanda. Rwandan authorities confirmed the authenticity of identity information shared with them by the Group (see annex 55) but stated that they were unable to locate the individual.

## D.    Due diligence reporting by Congolese companies

108. The Group requested copies of supply chain due diligence reports from the Democratic Republic of the Congo mining and export companies to assess exporters' risk-based checks and mitigation efforts regarding tin, tantalum and tungsten, and gold. Eight companies, all traders in tin, tantalum and tungsten, shared reports with the Group and noted several risks and mitigation measures applied. Some tin,

---

[19] Official assay results were pending at the time of the visit.

UNCLASSIFIED

UNCLASSIFIED                        EXHIBIT 60

S/2020/482

tantalum and tungsten companies recognized smuggling, tagging and export challenges in their public due diligence reporting and took some steps to address them. However, some incidents were left unresolved or were termed "closed" after a six-month period, regardless of outcome (see annex 56).

## E.   Developments in the International Conference on the Great Lakes Region

109.   Only the Democratic Republic of the Congo issued ICGLR certificates for minerals covered in the ICGLR traceability manual.[20] In a meeting with the Group in March 2020, representatives of the ICGLR secretariat acknowledged that the region had yet to adopt a common certificate for gold exports, and said that consultations on the matter were under way.[21] The secretariat representatives stated that, in the meantime, member States were at liberty to put their own internal controls in place. As such, Rwanda launched a new national certificate for gold exports, effective from April 2020 (see annex 57). In October 2019 and February 2020, respectively, Burundi (see annex 58) and the United Republic of Tanzania had launched domestic ICGLR certification processes for natural resources in accordance with the 2010 Lusaka Declaration of the ICGLR Special Summit to Fight Illegal Exploitation of Natural Resources in the Great Lakes Region. Delays by ICGLR member States other than the Democratic Republic of the Congo in using ICGLR certificates for gold exports hindered regional traceability efforts (see para. 85 above).

110.   In 2019, the Democratic Republic of the Congo issued 14 ICGLR certificates for nine licensed artisanal gold exports across North Kivu, South Kivu and Ituri. In an effort to establish the effectiveness of those certificates outside of the Democratic Republic of the Congo, the Group wrote to the recipients of the 14 exports. The results are analysed in annex 59.

111.   Consistent with previous findings, fraudulent ICGLR certificates were used in mineral smuggling (see S/2017/1091, para. 55; and S/2019/974, paras. 55–56). On 24 February 2020, Ssose Yusuf attempted to export 50 kg of gold from Bunia to Metal Rush Uganda Ltd in Kampala using a fraudulent ICGLR certificate (see annex 60), which was intercepted by Congolese immigration authorities at the border between Mahagi, Democratic Republic of the Congo, and Goli, Uganda. The Group wrote to the company but had not received a response at the time of drafting the present report.

## F.   Financial flows and Congolese minerals

112.   Three Congolese gold traders explained that their customers in Rwanda, Uganda and the United Arab Emirates often refused to use the banking system to pay for gold, including because banks asked questions about the source of funds. One trader repatriated funds from a Dubai gold sale using an acquaintance at a transport company, another had to transfer funds to a cooperative in Goma that agreed to receive the money, which was subsequently carried by the trader in cash by ferry to Bukavu. Two bank representatives and two gold traders described challenges associated with repatriating cash from foreign gold sales because correspondent banks blocked transactions to the Democratic Republic of the Congo, as it was considered "high risk." The Group sent surveys to a total of 18 Congolese banks requesting information on their efforts to check the trading practices of their minerals sector

---

[20] ICGLR, *Manual of the Regional Certification Mechanism (RCM) of the International Conference on the Great Lakes Region (ICGLR)*, 2nd ed. (2019).

[21] ICGLR, "ICGLR strategy for artisanal and small-scale gold" (April 2019). Available at www.icglr-rinr.org/media/attachments/2019/04/16/icglr-asm-gold-strategy.pdf.

UNCLASSIFIED

S/2020/482

clients and spoke to 4 of them. At the time of drafting the present report, only Trust Merchant Bank, Rawbank and Banque commerciale du Congo (BCDC) had responded.

113. Illegal gold traders concealed financial evidence by using hawala or goods-for-gold swaps (see S/2016/466, para. 139).[22] Three gold traders and a local government official described how gold smugglers used the proceeds of gold sales to purchase fuel that they sold at the fuel stations they owned. They then used the proceeds from fuel sales to buy and smuggle more gold. The same sources stated that gold traders Banga Ndjelo (see S/2018/531, para. 118), Exodus Deba (see S/2016/1102, para. 76; and S/2018/531, para. 119) and Mambo Kamaragi traded fuel swapped for gold in fuel stations they owned in Bunia (see annex 61). The Group was unable to reach those traders by the time of drafting the present report. The Group requested information from the Democratic Republic of the Congo Directorate of Imports but had not received a response at the time of drafting the present report. An eyewitness explained that, during 2019, Lombela, a businessman (see S/2014/42, para. 174; and S/2018/531, para. 118), had smuggled gold to Uganda in exchange for merchandise, including rice and flour, that he sold in the Democratic Republic of the Congo, using the cash to buy more gold for illegal export. Such activities concealed gold-generated cash flows and provided additional obstacles to establishing legal gold trading.

## IV. Serious violations of human rights and international humanitarian law

### A.  Conflict-related sexual violence in Masisi and Rutshuru territories

114. The Group found that armed combatants, especially those from NDC-R, led by sanctioned individual Guidon (CDi.033), and CMC/FDP, led by Domi, committed widespread conflict-related sexual violence amidst recurrent fighting in Masisi and Rutshuru territories from January 2019 to February 2020 (see annex 62). Those acts included rape, gang rape, some instances of sexual slavery and forced marriage. Such acts may amount to torture, may constitute war crimes and crimes against humanity, and are sanctionable under paragraph 7 (e) of Security Council resolution 2293 (2016), as renewed by the Council in paragraph 2 of its resolution 2478 (2019).

115. Some NDC-R and CMC/FDP commanders committed those acts, and commanders of both armed groups, who had effective control, failed to take the necessary measures to punish subordinates responsible for those acts, despite awareness thereof or owing to wilful ignorance.

116. The Group based its findings on individual interviews conducted between June 2019 and March 2020 with 92[23] rape victims aged between 12 and 70 and of different ethnicities, two relatives of victims, 21 civil society actors from various locations in Masisi and Rutshuru territories, one local chief, one researcher, one ex-combatant and MONUSCO sources, as well as on physical evidence (see annex 64) and medical documentation.

---

[22] Bartering is a long-standing practice in the region's gold trade. See Gregory Mthembu-Salter, "Baseline study three: production, trade and export of gold in Orientale Province, Democratic Republic of Congo" (Paris, OECD, 2015); and Gregory Mthembu-Salter, "Baseline study four: gold trading and export in Kampala, Uganda" (Paris, OECD, 2015).

[23] The Group found that all 92 victims had been raped by armed combatants but could not attribute each rape to a specific armed group based on its evidentiary standards. Details of the Group's methodology and findings on rapes committed by combatants other than NDC-R and CMC/FDP are contained in annex 63.

UNCLASSIFIED                                  EXHIBIT.60

S/2020/482

### Conflict-related sexual violence by Nduma défense du Congo-Rénové

117. The Group found that NDC-R combatants had raped at least 35 victims in various locations in Masisi and Rutshuru territories[24] under NDC-R control and/or during NDC-R operations between February 2019 and February 2020.

*Patterns of rape*

118. The victims described how one to five armed NDC-R combatants had raped them during that period. Perpetrators often targeted isolated women or small groups of women with children, occasionally with their husbands, undertaking daily activities. According to nine victims and two civil society representatives, NDC-R combatants used the verification of *jetons* issued as proof of payment for the NDC-R monthly tax as a pretext for rape (see annex 65; and S/2019/974, para. 18). After being raped, three victims were detained for a few days in underground pits inside NDC-R positions.[25]

119. Six victims stated that the perpetrators introduced themselves as NDC-R combatants and one of them added that his chief was Guidon. Women living in NDC-R positions told two victims that the perpetrators belonged to NDC-R. Seven heard their rapists chanting the name of NDC-R. Five saw their rapists before and/or after the rape in their villages and recognized them. Three knew their rapists' names.

120. In at least seven instances, NDC-R combatants targeted Hutu women because of real or perceived links to CMC/FDP. Perpetrators said to five victims, including the wife of a local chief collecting taxes for CMC/FDP, that they sought "CMC" or "Nyatura".[26] One was accused of being a "CMC wife" and another of preparing food for "Nyatura".

121. Rapes in Bashali *chefferie* between October 2019 and February 2020 were particularly violent. Six victims were held captive and repeatedly raped in NDC-R positions by several NDC-R combatants for periods ranging from one day to one month. Several NDC-R combatants raped one victim during the first week and then one of them raped her during the rest of her one-month captivity. NDC-R combatants subjected other women to forced marriage, according to one civil society source and two victims who were subjected to such treatment, one for three days and one for three months.

122. Several rapes were connected to murders in Bashali *chefferie* between October 2019 and February 2020. According to two Hutu victims of separate incidents, during an incursion in their respective villages, NDC-R combatants raped them, together with three other Hutu women, and killed their husbands, together with other male villagers, mostly Hutu, whom they accused of being "Nyatura" in one of the incidents. Five NDC-R combatants raped another Hutu victim and killed her husband and her two children, aged 8 and 10, when they tried to rescue her.

*Responsibility of Nduma Défense du Congo-Rénové commanders*

123. Some NDC-R commanders committed rape. Three victims of separate incidents in Bwito *chefferie* in January and February 2020 were raped by one NDC-R commander while his escorts, some underage (see annex 66), stood guard. The

---

[24] In or around Bibwe, Kitso, Ronga, Nyabikeri, Shibo, Mukwenga, Hembe, Kahira, Busumba and Nyampanika in Bashali *chefferie* in Masisi territory, and Katsiru, Muhanga, Rutiba, Mukaka, JTN, Mashango, Kanyatsi and Kanyangohe in Bwito *chefferie* in Rutshuru territory.
[25] They were not raped in the positions.
[26] In the relevant areas, CMC/FDP was commonly referred to as "CMC" or "Nyatura".

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

commander of an NDC-R position in Bashali *chefferie*, where a victim was subjected to forced marriage and sexual exploitation, subjected another girl to forced marriage.

124.  NDC-R commanders[27] with effective control over their troops (see paras. 20–22 above and 127 below; and S/2018/531, para. 73) failed to take the necessary measures to punish rape by subordinates, despite awareness thereof or owing to wilful ignorance.

125.  NDC-R commanders imposed no, or hardly any, measures to punish rape, according to nine civil society sources, one victim and one researcher. A civil society actor reported four rape cases to two NDC-R commanders based in Bashali *chefferie*, but only one NDC-R combatant was jailed, and only for several hours. Similarly, in Bwito *chefferie*, an NDC-R commander failed to act despite knowing that a child had been raped by his subordinates, according to two civil society sources. Following a report by a victim of rape, another NDC-R commander in *Bashali chefferie* promised to punish his subordinates. However, a few days later, the victim saw the subordinates checking *jetons* in her village. Four civil society sources reported that they had never seen or heard of any NDC-R combatant being punished for rape, although two mentioned an NDC-R sanctions system and a policy by which rapists were referred to Congolese authorities. The others had heard of only isolated cases in which NDC-R combatants had been arrested. One referred to an NDC-R commander temporarily jailed by Guidon for multiple rapes and commented that "this was for the show" because it had only happened once.

126.  The threatening and violent behaviour of NDC-R commanders and combatants deterred people from reporting rape, even had a sanctions system existed. Victims, civil society representatives and MONUSCO sources unanimously mentioned serious risks of retaliation associated with reporting rape committed by NDC-R combatants (see annex 67). Rapists threatened three victims with death if they reported them, and some rapists threatened the same if victims sought medical treatment, according to one civil society source. NDC-R combatants destroyed post-rape medical consultation forms and pages mentioning rape from registers in health centres in Bashali and Bwito *chefferies*, according to two civil society sources. Eight victims and two civil society sources confirmed that carrying such consultation forms exposed individuals to a high risk if checked at NDC-R checkpoints. Two civil society sources highlighted that NDC-R commanders' awareness of the legal implications of rape led to denial (see annex 68).

127.  During a telephone call on 1 May 2020, Désiré Ngabo Kisuba, NDC-R spokesperson, strongly denied any act of sexual violence by any NDC-R combatant and claimed that any such reports were false and only "defamation". Ngabo referred to an internal code of conduct, but said that if any NDC-R combatant were to commit any such act – which was not the case thanks to international humanitarian law training – he would be handed over to the judicial authorities. Ngabo confirmed that NDC-R was well structured and organized, and that commanders had effective control over their troops, all under Guidon's command. He described an intelligence service reporting throughout the chain of command, up to Guidon. Considering the NDC-R reporting chain and commanders' presence close to or at the crime scenes, the Group concludes that NDC-R commanders must have been aware that their subordinates had committed rape in 2019 and 2020 but took no measures to punish them. Ngabo and eight other sources confirmed Guidon's presence on the front line in Bashali *chefferie* between January and March 2020, when many rapes were committed (see para. 23 above).

---

[27] The Group has withheld the names of NDC-R commanders, specific locations and dates to protect its sources.

UNCLASSIFIED                          EXHIBIT 60

S/2020/482

128. Ten civil society sources, nine victims, a relative of one victim and a local chief deplored the inaction of FARDC with regard to NDC-R, highlighting that the two forces walked, took photographs and/or drank beers together and/or held positions and/or checkpoints adjacent to one another (see para. 26 above; S/2018/1133, paras. 63–68; S/2019/469, paras. 58–62; and S/2019/974, paras. 66–73). In April and May 2019 in Kanyangohe, one source witnessed some FARDC members saying through a loudspeaker that the people should not be scared of NDC-R because FARDC used NDC-R to fight CMC/FDP. Two mentioned that NDC-R and FARDC fought alongside one another, including twice against CMC/FDP in Mweso towards the end of 2019, according to one witness.

### Conflict-related sexual violence by the Collectif des mouvements pour le changement/Forces de défense du peuple

129. The Group found that CMC/FDP combatants had raped at least 20 victims in various locations in Rutshuru territory[28] under CMC/FDP control and/or during CMC/FDP operations between January and December 2019.

*Patterns of rape*

130. According to the victims, one to five armed[29] CMC/FDP combatants targeted isolated women, or small groups of women with children, undertaking daily activities. Rapists requested and/or stole money from six victims and requested that one pay CMC/FDP taxes. Two perpetrators introduced themselves to one victim as Domi's combatants. One victim knew the identity of her rapist.

131. At least two victims were targeted on ethnic grounds. After asking about her ethnicity, three rapists told their victim that they would kill her because she was Hunde. In another case, two rapists accused their Hutu victim of being Hunde. When she responded that she was Hutu, they replied that she looked like a Hunde.

*Responsibility of Collectif des mouvements pour le changement/Forces de défense du people commanders*

132. Some CMC/FDP commanders committed rape. A commander raped one victim while three of his subordinates, two underage, stood guard. One civil society source explained that some low-level CMC/FDP commanders abducted women for forced marriage.

133. CMC/FDP leaders with effective control over their troops failed to take the necessary measures to punish rape by subordinates, despite awareness thereof or owing to wilful ignorance. Although five sources mentioned that Domi punished rape, only two cited a case where Domi had killed[30] a subordinate for rape. One of those sources pointed out that Domi's subordinate had raped the daughter of another CMC/FDP combatant, but that she did not report her own rape owing to a lack of support from any CMC/FDP combatants. Another stated that Mbitezi troops had killed a man who had complained about the rape of his wife by those troops in mid-March 2020. Awareness of the legal implications of rape led to denial, according to one civil society source. Two others said that CMC/FDP combatants would kill anyone suspected of investigating the movement. Rapists threatened two victims with death if they reported them.

---

[28] In or around Bukombo, Rutiba, Bumbasha, Kashali, Karambi, Bishusha, Tchahemba/Kyahemba, Kazuba, Ngangi, Luya and Sisa in Bwito *chefferie* in Rutshuru territory.

[29] In one instance, the rapist carried only a machete.

[30] Summary killing by armed groups cannot constitute an appropriate punishment.

S/2020/482

134. During a telephone call on 29 April 2020, Jules Mulumba, CMC/FDP spokesperson, firmly denied any act of sexual violence by any CMC/FDP combatant and instead blamed NDC-R combatants and FARDC members for committing rape in Bwito *chefferie* since the end of 2019. Mulumba stated that the CMC/FDP military penal code provided for sanctions, but that sexual violence cases were referred to Congolese authorities, after internal punishment, which could consist of whipping. Mulumba insisted, however, that CMC/FDP had recorded only one case of sexual violence, and this was in 2017. He confirmed that CMC/FDP leaders had effective control over their troops and were well informed of events on the ground, thanks to its "Service 5", which was in charge of military-civilian cooperation and was present at all levels of the chain of command, its political administrators who were in close contact with local authorities, and its intelligence service. Given the CMC/FDP multi-reporting chain and the presence of CMC/FDP headquarters and Domi's residence in the Mashango area (see para. 12 above), where many rapes were perpetrated, the Group concludes that CMC/FDP commanders must have been aware that subordinates committed rape in 2019, but took no measures to punish them.

**Scale and impact of rape**

135. The Group interviewed just 92 of the numerous rape victims in Masisi and Rutshuru territories. Half of the victims interviewed knew other women and girls who had been raped by armed combatants. Nineteen civil society sources, a relative of one victim, one local chief, MONUSCO sources and a report from the Congolese National Police (Police nationale congolaise (PNC)) obtained by the Group confirmed that sexual violence was widespread (see S/2019/469, para. 55). According to one source, rape was so widespread that it was considered a "normal" occurrence.

136. The impacts of rape were devastating for the victims, their children and the very social fabric of the society. Several victims were badly wounded while resisting rape. Rape exacerbated vulnerability when victims were already displaced or had to leave their village because of the rape. Several were left with the impossible choice of returning to the scene of the rape and risking being raped again or losing their means of subsistence. Many were rejected by their husbands and/or family, and/or were stigmatized by their community.

## B.    Attacks targeting civilians in Beni, Irumu and Mambasa territories

137. Almost immediately after the launch of FARDC operations against ADF on 30 October 2019, civilians in Beni territory were targeted in a wave of brutal attacks (see paras. 32 and 40 above; and S/2019/974, para. 26). The attacks expanded to north-western Beni territory, and southern Irumu and Mambasa territories in Ituri (see annex 69).

138. Hundreds of civilians were killed during those attacks – some of which were simultaneous – while thousands were displaced as a result. In November and December 2019 alone, over 260 civilians, mainly women and children, were killed, according to MONUSCO.[31] The acute violence triggered, in turn, violent popular reactions, including the lynching of alleged ADF collaborators and attacks against MONUSCO (see S/2018/1133, para. 33).

---

[31] MONUSCO, "Independent assessment of MONUSCO's response to recent attacks against civilians in Beni area, DRC", 22 January 2020. Available at https://monusco.unmissions.org/en/independent-assessment-monusco%E2%80%99s-response-recent-attacks-against-civilians-b%C3%A9ni-area-drc

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

139. The Group found that ADF combatants were involved in this wave of attacks, including in the killings on 5 December 2019 and 30 January 2020 in Mantumbi, Beni territory, and on the border of Mambasa territory, an area previously spared from ADF attacks. The findings are based on testimonies from 14 witnesses, including 2 who had been temporarily abducted by ADF, and two civil society and MONUSCO sources.

140. At least 17 civilians, including 10 women, were killed during the attack on 5 December 2019. Several of the 10 eyewitnesses initially mistook the assailants for FARDC soldiers, as they wore military fatigues with armbands and carried arms, including PKM machine guns. Three said that the female assailants wore clothing similar to *khimar* and two saw children among the assailants. The assailants introduced themselves as NALU,[32] according to an eyewitness captured alongside three young men and four girls. A certain Boazi, who has a scar on his face "as if he had been shot in the mouth", led the assailants.[33] The eyewitness saw the assailants kill six civilians; Boazi killed one of them. The abductees were forced to carry the assailants' loot to the ADF/NALU Madina II camp. There, the eyewitness and other male abductees were held in an underground pit, forced to farm and to practice Islam, while the girls were forced to become ADF/NALU combatants' "wives", which was consistent with previous findings (see S/2019/469, paras. 17, 37 and 97–115). The eyewitness escaped Madina II soon after ADF vacated in anticipation of FARDC assault. ADF/NALU combatants in Madina II told him that they would attack Mantumbi again.

141. Between 28 and 30 January 2020, at least 61 civilians were killed in a series of attacks conducted north-west of Beni territory, including in Mantumbi. At least 14 civilians, including nine women, were killed in Mantumbi itself. Three eyewitnesses described assailants similar to those involved in the attack on 5 December 2019. One of the eyewitnesses, abducted by the assailants for three days, said that his abductors were Muslim. He witnessed them kill eight civilians in various locations.

142. Most eyewitnesses and one civil society source insisted that Mai-Mai groups active in north-western Beni territory and southern Mambasa territory had not conducted any of those attacks, asserting that the Mai-Mai usually targeted Congolese security forces and Ebola response teams.

## C.  Violence against civilians in Salamabila

143. The Group found that Mai-Mai Malaika combatants, led by Sheikh Hassani (see para. 46 above) had committed multiple abuses in Salamabila since at least 2018. Those acts are sanctionable under paragraph 7 (e) of Security Council resolution 2293 (2016), as reaffirmed by the Council in paragraph 2 of its resolution 2478 (2019). The findings are based on interviews with 16 community members, four civil society actors, one ex-combatant, one researcher, a provincial government official and MONUSCO sources, as well as documentary, photographic and audio evidence.

144. According to those sources, from at least November 2019 to 12 January 2020, when FARDC forced the Mai-Mai Malaika out of Salamabila (see para. 50 above), Sheikh Hassani strengthened his control over the population of Salamabila. This

---

[32] Sources referred interchangeably to NALU (the National Army for the Liberation of Uganda) and ADF.

[33] Over recent years, Boazi was regularly mentioned to the Group as a mid-level ADF commander. Another source recounted that a group of NALU, led by a man with a scar on the cheek and a deformed mouth, had abducted him in the vicinity of Lukaya, Mambasa territory, for several days in February 2020. He witnessed their attack on Makumo, Mambasa territory, on 26 February 2020 and the killing of several civilians.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

included weekly forced labour (*salongo*), consisting of transporting stones over distances of kilometres to maintain roads. Sheikh Hassani imposed a strict dress code, prohibiting women from wearing trousers, heels, skirts above the ankles and tight clothes, and men from wearing low-hanging or short trousers, long hair or a beard. Failure to respect those rules was punished by severe whipping and/or payment of a fine. One interviewee working as a prostitute recounted that, in January 2020, five Mai-Mai Malaika combatants had beaten her badly for wearing a split skirt (see annex 70).

145. Sheikh Hassani also acted as a parallel authority in Salamabila, including by deciding on matters under the competency of the justice system and using his troops to arrest and bring people to the PNC prison, according to eight sources.

146. In addition to staff of Namoya Mining (see para. 74 above), the Mai-Mai Malaika abducted and unlawfully detained, sometimes for several weeks, administrators, citizens and activists denouncing abuses by Sheikh Hassani combatants and/or suspected of supporting rivals and/or FARDC. Several sources highlighted that they would be in danger if Sheikh Hassani learned that they had spoken to the Group. Some had already been threatened for reasons unrelated to the Group.

147. According to a written communiqué and five sources, including a provincial government official, immediately after the armed clashes on 11 and 12 January 2020, Sheikh Hassani had threatened to attack FARDC and had instructed the population to leave Salamabila (see annex 71). This prompted thousands of civilians from Salamabila to flee, and many children went missing during the displacement (see annex 72). The population returned progressively after a message from Sheikh Hassani on 24 January 2020 promising not to retaliate against FARDC. Most sources pointed out that, while the population had initially supported Sheikh Hassani owing to his stance regarding Namoya Mining (see paras. 73–74 above), that had changed because of abuses committed by his movement. The Group's attempts to contact Sheikh Hassani were unsuccessful.

## V.  Arms

148. The Group found that foreign instructors had provided training to FARDC members on Congolese territory, that materiel was delivered to the Congolese security forces and that foreign civilian aviation actors had provided support to the Congolese military. The Group is not aware that relevant notifications for all the cases below were submitted to the Security Council Committee established pursuant to resolution 1533 (2004) concerning the Democratic Republic of the Congo. Furthermore, complete tracing of diversion of materiel from national stockpiles was hampered by the failure to provide notifications on training and also by the lack of responses, including by some Member States, to requests made by the Group for details such as batch, year of ammunition production and weapon model with regard to notifications addressed to the Committee.[34] Diversion from national stockpiles remained the main source of supply for armed groups in the Democratic Republic of the Congo (see annexes 73, 78, 81, 85, 93, 96 and 97). The Group requested information from several Governments. In their responses, the Governments of Albania, Romania and Turkey requested further information, including serial numbers.

---

[34] Available at www.un.org/securitycouncil/sanctions/1533/guidelines.

UNCLASSIFIED                                    EXHIBIT 60

## A.   Failure to provide notification of training by foreign instructors

149. The Group documented that several Member States offered military training to FARDC and continued to investigate training allegedly provided by other Member States. It sent official communications related to that training but had not received a response at the time of drafting the present report.

### Instructors with Israeli citizenship

150. Between December 2019 and January 2020, instructors with Israeli citizenship provided training in Goma area to the FARDC Special Forces. The Group received testimonies from three diplomatic and two military sources regarding that training and the citizenship of the instructors, and obtained pictures showing at least 10 of them involved in the training (see para. 175 above and annex 74).

### South Africa

151. The Group documented at least three training sessions provided to FARDC by South African military instructors in 2011, 2014 and 2016 at Mura camp, Haut-Katanga province, and at Kitona military base, Kongo Central province. At least three FARDC battalions from the 42nd and 43rd Rapid Reaction Units were trained. Training of FARDC by South Africans was reported previously (see annex 75 and S/2009/603, paras. 295–296).

### China

152. Five FARDC officers and three diplomatic sources stated that, between 2010 and the writing of the present report, Chinese military instructors provided several training sessions to FARDC at the Kamina military base, Haut-Lomami province (see annex 76).[35] Those training sessions were also reported in open-source documents between 3 June 2010 and 30 July 2019, including statements in the Congolese press by the Defence Attaché of China in the Democratic Republic of the Congo, photographs and official documents related to the provision of materiel. Some aspects of the training were previously documented by the Group (see S/2009/603, para. 264).

153. Between 2016 and 2017, members of the FARDC 32nd Rapid Reaction Brigade received training (see annex 76/2). Two soldiers and one sergeant who had participated explained that the training had covered defensive and offensive operations, reconnaissance patrol, combat sport and live shooting with small arms and heavy weapons. The Group obtained an official document dated 30 May 2012 signed by a Chinese official stating that 3,100 semi-automatic rifles, sniper rifles, light and heavy machine guns, 60mm and 82mm mortars, anti-tank rocket launchers and recoilless rifles, as well as more than 7.6 million rounds of associated ammunition, 10 tons of explosives and materiel, had been provided (see annex 77).

## B.   Failure to provide notification of the transfer of arms, ammunition and vehicles

154. The Group collected and analysed data from multiple documents related to deliveries of arms and related materiel to the Democratic Republic of the Congo by

---

[35] In June 2008, China notified the Committee about a one-year training programme to be conducted by a team of 16 instructors and the necessary materiel for training exercises. The Group is not aware of any renewal of that notification.

EXHIBIT 60

S/2020/482

air and sea between 2015 and 2020. It investigated the origin and production of the materiel.

155. The Group addressed letters to Member States and entities identified as manufacturing and/or exporting materiel with characteristics similar to those documented by the Group. It received a limited number of responses, which limited its capacity to trace the materiel, especially that documented as being in the hands of armed groups.

156. The Group found that, since January 2018, more than 2,000 tons of materiel intended for FARDC, including arms and ammunition, had been sent to the Democratic Republic of the Congo by supplier States without the Committee having been notified in advance. In addition, military trucks were delivered to FARDC between 2016 and 2018. In 2018, seven civilian helicopters were repainted upon arrival in the Democratic Republic of the Congo, given military registration and transferred to FARDC

157. Some of the materiel delivered to FARDC was later diverted to armed groups in eastern Democratic Republic of the Congo.

**Materiel with characteristics similar to Chinese production**

158. The Group found that, between 31 January 2015 and 9 January 2019, eight transfers of materiel had been made by the armed forces of China (the People's Liberation Army), by China Ordnance Industries Group Corporation Limited (NORINCO), also known as China North Industries Group Corporation Limited, a State-owned arms and munitions company, and by private companies producing and/or marketing materiel for the defence sector.

159. Some of the materiel used from 2010 by FARDC and PNC had characteristics similar to those of Chinese production (see annex 78; S/2007/40, box between paragraphs 58 and 59; S/2008/43, para. 79; S/2014/42, annex 49; S/2015/19, annex 41; S/2015/797, annexes 10–11; S/2016/466, annex 21; S/2016/1102, annexes 37–38; S/2018/531, para. 193; S/2018/1133, para. 110; and S/2019/974, annex 18, photograph 4).

160. The Group received information from a high-ranking FARDC officer and reviewed photographs from open sources illustrating that, since 2015, one model of jeep, four models of military truck used by FARDC and two models of armoured vehicle used by PNC had characteristics similar to those of Chinese production (see annex 79).

161. The Group collected documents related to the delivery, in July 2019, of four Type 996Y patrol boats transferred to FARDC by the People's Liberation Army at Matadi port, Kongo Central province. The transfer included six heavy machine guns, 12 light machine guns and 300,000 rounds of associated ammunition (see annex 80).

162. The Group documented ammunition of PG-7 thermobaric rockets, 82-mm mortar bombs, 107-mm rockets and 12 batches of ammunition for small arms and light weapons with markings indicating manufacture after the 2009 notification by China and with characteristics similar to Chinese production (see annex 81).

163. The Group obtained two bills of lading related to materiel transferred by NORINCO referring to contracts dated 2017 (see annexes 82–83). Those transfers of small arms and light weapons and artillery ammunition corresponded to a volume of more than 1,760 tonnes.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

---

> **Case study**
>
> The Group documented a crate of 7.62x39-mm ammunition in Bwito, Rutshuru territory, found on 19 November 2019 in an area of confrontation between NDC-R and CMC/FDP. The crate was marked "20170223/FP/CK/MOD/GDW", consistent with a contract reference.
>
> Markings indicated that the crate was part of a batch of 20,000 similar crates, each containing 1,440 rounds of 7.62x39-mm ammunition, amounting to 28,800,000 rounds.
>
> The Group obtained a bill of lading dated 15 April 2018 with references identical to those marked on the crate.
>
> According to the document, NORINCO had transferred the materiel (see S/2018/1133, para. 110).

164. The Group collected a bill of lading dated 31 January 2015 related to the transfer of 22 packages containing "chemical spare parts" by BOMETEC GEHQ, identified in a previous report as the Bureau of Military Equipment and Technology Cooperation at the People's Liberation Army General Headquarters (see S/2009/603, para. 262), to the Government of the Democratic Republic of the Congo (see annex 84).

165. In April 2009, China notified the Committee of a delivery of 5,000 Type 56-2 assault rifles and 2 million rounds of related ammunition, 500 Type 80 light machine guns and 2 million rounds of related ammunition, and 400 Type 69-1 anti-tank grenade launchers and 4,000 rounds of related ammunition. The Group is not aware of other notifications being submitted to the Committee since April 2009. Chinese authorities stated that they were investigating the Group's requests.

**Assault rifles with characteristics similar to Albanian production**

166. The Group received information that, since 2013, MONUSCO had collected 30 assault rifles similar to the ASH-78, of Albanian production, from ex-combatants of 10 armed groups in North Kivu (see annex 85).

**Materiel with characteristics similar to Brazilian production**

167. In 2019, the Group observed PNC units with non-lethal 37/38 mm grenade launchers similar to the AM-637 and with stun grenades similar to the GB-704, both similar to Brazilian production. It also reviewed open-source photographs of the same weapons and ammunition. At the time of drafting, the Group had yet to receive a response from the Government of Brazil to its letter related to that materiel (see annexes 86 and 87).

**Materiel with characteristics similar to Bulgarian production**

168. The Group obtained a bill of lading related to a transfer, in 2015, of 667 crates of OG-7 anti-personnel rockets (12,006 rockets) and 9,091 crates of 7.62x54R-mm ammunition (8,000,080 rounds). The materiel had left the port of Burgas, Bulgaria, in September 2015 to Matadi (see annex 88).

169. The Group reviewed open-source pictures from 2018 of FARDC and PNC with AR-M1F assault rifles and UBGL-1 (under-barrel grenade launchers) similar to Bulgarian production (see annex 89). The notifications submitted in 2014 and 2015 by the Bulgarian authorities did not cover that materiel.

UNCLASSIFIED

EXHIBIT 60

S/2020/482

### Sniper rifles with characteristics similar to Romanian production

170. In February 2020, the Group observed the FARDC 21st Rapid Reaction Unit with sniper rifles similar to the FPK of Romanian production (see annex 90).

### Shotguns with characteristics similar to Turkish production

171. The Group observed PNC with shotguns with characteristics similar to those manufactured by the Maestro arms company. The Turkish authorities requested further information from the Group to complete their inquiry (see annex 91).

### Rockets with characteristics similar to Iranian production

172. The Group reviewed pictures taken in January 2020 of "Fateh" (PG-7) rockets manufactured in 2018, similar to those manufactured in the Islamic Republic of Iran, among the materiel used by an FARDC unit deployed in South Kivu. The markings on the materiel were consistent with those used to attack a MONUSCO patrol in Ituri in July 2019 (see S/2019/974, para. 75). The Group noted that the crate markings associated the materiel with a batch of 1,010 crates representing 6,060 rockets (see annex 92).

173. The Government of the Islamic Republic of Iran informed the Group that the materiel in question had not been manufactured by the Islamic Republic of Iran and that the country had never transferred any materiel into the Democratic Republic of the Congo.

174. However, the Group also received information on two lots of ammunition with characteristics similar to Iranian production, manufactured in 2007. It had been documented in the hands of armed groups in eastern Democratic Republic of the Congo (see S/2014/42, annex 49; and S/2018/531, para. 187). The Group is concerned that Iranian materiel could have been transferred into the Democratic Republic of the Congo by a third party (see annex 93).

### Materiel of the Special Forces Unit of the Armed Forces of the Democratic Republic of the Congo

175. The Group reviewed photographs of the FARDC Special Forces Unit carrying precision rifles of unknown origin with characteristics similar to the SVDM "Dragunov" (7.62x54R mm), retrofitted assault rifles and light machine guns, equipment such as "multicam" uniforms, class IV personal protective equipment and tactical helmets (see annex 94).

### Land Rover Defender "Snatch 2", similar to United Kingdom of Great Britain and Northern Ireland production

176. In January 2020, in Beni territory, the Group observed FARDC members operating Land Rover Defender "Snatch 2" technical vehicles, similar to production of the United Kingdom of Great Britain and Northern Ireland (see annex 95). A FARDC officer stated that several dozens of the vehicles had been distributed to FARDC in November 2019. The Government of the United Kingdom informed the Group that the matter was under investigation.

### Materiel transferred by the Democratic People's Republic of Korea, the Sudan and Zimbabwe

177. The Group obtained official documents (see annexes 96–97/1-4) related to the transfer, between 2007 and 2009, of materiel by the Democratic People's Republic of Korea (see S/2014/42, annex 49; and S/2015/797, annex 10), the Sudan (see

S/2009/253, para. 69; S/2009/603, paras. 265–271; S/2014/42, annex 49; and S/2016/1102, annex 37) and Zimbabwe (see S/2008/773, box 1; S/2010/596, para. 95; S/2014/42, annex 49; and S/2016/1102, annex 38).

**Uniforms and individual equipment**

178. According to the Group's observations and photographs, quantities of uniforms and individual equipment supplied to FARDC and the Republican Guard since 2004 were not notified (see annex 97/5–17).

## C. Foreign civilian airlines supporting the Armed Forces of the Democratic Republic of the Congo

**South Airlines[36]**

179. The Group documented that, since 2012, six civilian cargo aircraft with foreign registrations (Antonov AN-32 "EK-32400", Antonov AN-72 "EK-72425", Antonov AN-72 "EK-72903", Ilyutshin-76 "EK 76992" and Ilyutshin-76 "ST-BDN") supported FARDC by transporting personnel and materiel (see S/2019/974, para. 65). Some members of the crew of those aircraft held Ukrainian and Russian passports. Five of the aircraft were owned or operated by Vagram Simonyan, a Russian national (see annexes 98–106; and S/2013/99, paras. 83–89 (Libya)). Simonyan was a shareholder in those airlines and Director General of South Airlines Co SARL and South Airlines Co.[37] In his capacity as Director General of South Airlines Co, Simonyan leased aircraft to the Government of the Democratic Republic of the Congo through Zaabu International SARL, of which he was a board member (see annexes 101/2, 103/2, 104/2, 106/2 and 109/1–2).

180. The Group spoke to Simonyan, who acknowledged that he had provided support to FARDC since 2012.

**Compliance with aviation regulations**

181. The Group found that neither Zaabu International SARL nor South Airlines Co SARL had complied with paragraph 6 of Security Council resolution 1807 (2008), renewed by the Council in paragraph 4 of its resolution 2293 (2016) and paragraph 1 of its resolution 2478 (2019), in particular regarding aircraft registration, operating licences, air operator's certificates, pilots' flight licences and rules related to the carriage of passengers.

182. The Armenian authorities informed the Group that the Antonov AN-32 with the registration number "EK-32400" and the Antonov AN-72s with the registration numbers "EK-72425" and "EK-72903", until the crash of the latter in October 2019, were still using Armenian registrations, despite having been deregistered from Armenian civil aviation records (see annex 105/1–8).[38]

183. The Ilyutshin-76 with the Iraqi registration "YI-BAT" (see S/2019/974, para. 64) was deregistered from the Armenian aviation registry on 16 December 2014. The Iraqi authorities informed the Group that the only Ilyutshin 76 with a valid "YI" registration was grounded in Iraq (see annex 106/5).

---

[36] South Airlines LLC (Armenia) ceased effective activity on 1 October 2016 and South Airlines Co SARL was registered in the Democratic Republic of the Congo in July 2015.

[37] According to the lease agreements with Zaabu International SARL, South Airlines Co was registered in the United Arab Emirates.

[38] The Antonov AN-32 "EK-32400" and the Antonov AN-72 "EK-72425" were deregistered on 15 May 2019. The Antonov AN-72 "EK-72903" was deregistered on 12 May 2016.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

184.  A Congolese Civilian Aviation Authority senior official informed the Group that none of the above-mentioned four aircraft had been assigned Congolese registration numbers, contrary to national aviation regulations. The official underlined that South Airlines Co SARL and Zaabu International SARL operated without valid operating licences and approved air operator's certificates. He also pointed out that the Civilian Aviation Authority did not validate the captains' pilot licences. There was no evidence that the aircrafts' cycle of maintenance had been carried out or that they met airworthiness standards, according to the official. The Ukrainian authorities confirmed that the Antonov company had no information on the maintenance or maintenance of the airworthiness of the Antonov AN-72 "EK-72425" since 1997 and the Antonov AN-72 "EK-72903" since 2003 (see annexes 105/1–3). On 20 November 2019, the Government of the Democratic Republic of the Congo launched an investigation to identify, among other things, violations of national and international regulations by South Airlines Co SARL and Zaabu International SARL. In parallel, the Civilian Aviation Authority grounded both companies' aircraft that were operating in the country.

**Sudanese Iluytshin 76 chartered by Simonyan**

185.  According to photographic evidence, at the end of December 2018, an Iluytshin 76 aircraft owned by the Sudanese company Badr Airlines and using Sudanese registration "ST-BDN" transported members of the 12th FARDC Brigade between the Kamina military base and Kisangani, Tshopo province (see annex 110). Simonyan confirmed in a meeting with the Group in December 2019 that he had chartered the aircraft in 2018 to carry out FARDC troop rotations between Kinshasa, Goma, Kisangani and the Kamina military base. Badr Airlines was already mentioned by the Panel of Experts on the Sudan for violating the embargo on Darfur (see S/2007/584, paras. 106–108).

**Transfer of helicopters to the Armed Forces of the Democratic Republic of the Congo**

186.  In October 2018, five Bell 204/205 UH-1 helicopters and two Bell 206 helicopters (both made in the United States of America) were acquired through Presidential Aviation Services led by Charles Deschryver (see annex 111; and S/2009/603, para. 270). Upon arrival in the Democratic Republic of the Congo, they were repainted in a military colour, fitted with military registration and transferred to the Congolese airforce. The helicopters supported FARDC during operations by transporting military personnel and materiel (see annex 111/5). The Group is concerned that helicopters acquired for civilian purposes were used for military operations.

## D.  Support by foreign personnel to the Congolese airforce

187.  Three diplomatic sources told the Group that the pilots of three Sukhoi 25 (SU-25) with Congolese airforce registrations were of Eastern European origin. Two diplomatic sources reported that they were from Georgia. The Group documented that, since late 2019, the pilots had operated the SU-25 aircraft from Bangoka airfield, Kisangani, in support of FARDC operations against ADF in the Beni area.

188.  The Group obtained further information and photographs from social media showing that, between September 2011 and April 2020, at least 80 individuals of Georgian and Belarusian origin operating as pilots, flight instructors and technicians had provided support to the Congolese airforce on ground attack aircraft and combat or transport helicopters, including during military operations (see annex 112). Some wore uniforms similar to those of the Georgian or Belarusian armed forces, and three

UNCLASSIFIED                                    EXHIBIT 60

carried assault rifles (see annexes 112/7, 112/10 and 112/22). The Georgian authorities provided the FARDC service card of the Georgian pilot of the Mi-24 that crashed in North Kivu on 30 January 2017 during an operation against M23 (see S/2017/672/Rev.1, para. 66).

189. Several Congolese and three Georgian contacts reported that Georgians who left active service with the Georgian Air Force had been recruited by the Congolese authorities. The Group is concerned that the activities of foreign private military personnel could amount to mercenaryism.

## VI.  Recommendations

190. The Group makes the recommendations set out below.

**Government of the Democratic Republic of the Congo**

191. The Group recommends that the Government of the Democratic Republic of the Congo:

(a)    Ensure that all companies operating in the tin, tantalum, tungsten and gold sectors fulfil their obligations pursuant to paragraphs 8 and 9 of Security Council resolution 1952 (2010) and in line with OECD and ICGLR guidance and Congolese law by reporting annually on supply chain due diligence (see paras. 85–92 above);

(b)    Require all entities operating in the Democratic Republic of the Congo providing financial services to companies and individuals operating in the tin, tantalum, tungsten and gold sectors to implement OECD supply chain due diligence guidance, the ICGLR Regional Certification Mechanism and the due diligence guidelines produced by the Group of Experts on the Democratic Republic of the Congo,[39] which the Security Council supported taking forward (Council resolution 1952 (2010), para. 7), as well as Congolese due diligence law (see paras. 112–113 above);

(c)    Strengthen investigations into and prosecution of Democratic Republic of the Congo-based individuals and entities involved in smuggling relating to tin, tantalum, tungsten and gold (see paras. 62–68, 81–84, 102–107 and 111 above);

(d)    Take urgent action to prevent FARDC members from providing any further support to NDC-R, whose commanders and combatants are responsible for acts of conflict-related sexual violence in Masisi and Rutshuru territories (see paras. 26, 114–128 and 135);

(e)    Investigate, arrest and prosecute, as appropriate, NDC-R and CMC/FDP commanders and combatants responsible for acts of conflict-related sexual violence in Masisi and Rutshuru territories (see paras. 114–136 above);

(f)    Reinforce the implementation of comprehensive strategies to raise awareness among communities, in conjunction with customary and local leaders and civil society, to prevent the rejection of rape victims by their families and communities and to fight stigma (see para. 136);

---

[39] "Due diligence guidelines for the responsible supply chain of minerals from red flag locations to mitigate the risk of providing direct or indirect support for conflict in the eastern part of the Democratic Republic of the Congo". Available at www.un.org/securitycouncil/sanctions/1533/due-diligence-guidelines.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

(g)  Take all necessary actions to ensure that all aircraft operating in the Democratic Republic of the Congo adhere to Congolese and international aviation regulations (see paras. 181–184 above).

### Government of the Democratic Republic of the Congo and other States in the region

192.  The Group recommends that the Government of the Democratic Republic of the Congo and other States in the region:

(a)  Reinforce cooperation and information-sharing to:

(i)  Dismantle ADF regional recruitment and supply networks (see paras. 37–39 above);

(ii)  Dismantle cross-border networks for smuggling in natural resources (see paras. 63, 86, 104–107 and 111–113 above);

(b)  Combine efforts to investigate and prosecute individuals and entities in their jurisdictions that smuggle Congolese gold by circumventing trading and banking structures, and share information on suspicious transactions (see paras. 63, 87–88, 104–107, and 111–113 above);

(c)  Commit to the implementation of the Peace, Security and Cooperation Framework for the Democratic Republic of the Congo and the Region and halt all support to foreign and local armed groups active in eastern Democratic Republic of the Congo (see paras. 37–39 above).

### Member States

193.  The Group recommends that Member States fulfil the provisions contained in the Guidelines of the Committee for the Conduct of its Work, adopted on 6 August 2010,[40] in particular those reflected in section 11, on notifications prior to shipment of military materiel to the Democratic Republic of the Congo and training of Congolese military personnel (see para. 148 above).

### United Nations

194.  The Group recommends that United Nations peacekeeping missions in the subregion set up and maintain a common database on weapons and ammunition documented as being owned by armed groups, and reinforce capacities in data collection and training to counter the illicit transfer of arms, ammunition and related materiel (see para. 148 above).

### International Civil Aviation Organization

195.  The Group recommends that the International Civil Aviation Organization initiate investigations into the adherence to international civil aviation regulations of all aircraft linked to Vagram Simonyan (see paras. 179–185 above).

---

[40]  Available at www.un.org/securitycouncil/sanctions/1533/guidelines.

UNCLASSIFIED                          EXHIBIT 60

S/2020/482

**Annexes**

**Annex 1**

**Organizations and entities the Group officially met with during its mandate**

**Organisations et entités que le Groupe a officiellement rencontré durant son mandat**

GREAT LAKES REGION
REGION DES GRANDS LACS

**Democratic Republic of the Congo**

Government

Agence nationale de renseignement (ANR)

Auditorat militaire

Autorité de l'aviation civile (AAC)

Centre d'évaluation, d'expertise et de certification (CEEC)

Commission nationale de lutte contre la fraude minière (CNLFM)

Direction Générale des Migrations (DGM)

Etat-major Renseignement (FARDC)

Forces armées de la République démocratique du Congo (FARDC)

Ministère des mines, Secrétariat général

Service d'assistance et d'encadrement de l'exploitation minière artisanale et à petite échelle (SAEMAPE)

*Private Sector*

Aldango Ltd

Alex Stewart International

African Gold Refinery Ltd

International Tin Association (ITA)

LuNa Smelter Ltd

Mines Propres SARL

Rawbank

RCS Global Group

*Organizations*

Embassy of Belgium

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

Embassy of United Kingdom

Embassy of France

Embassy of the United States

Embassy of the Netherlands

Embassy of the Republic of Korea

Permanent representation of the Republic of Singapore (New York)

Office for the Coordination of Humanitarian Affairs (OCHA)

United Nations Joint Human Rights Office (UNJHRO)

United Nations Organization Stabilization Mission in the Democratic Republic of the Congo (MONUSCO)

International Conference on the Great Lakes Region (ICGLR)

## OUTSIDE THE GREAT LAKES REGION

**United Kingdom**

*Government*

Foreign and Commonwealth Office

HM Treasury

**United States of America**

*Organizations*

United Nations Department of Safety and Security

United Nations Department of Peace Operations

UNCLASSIFIED   EXHIBIT 60

S/2020/482

Annex 2

**Photograph of Kamanzi Ndaruhutse Dominique, aka Sanctus Nkuba Kongolo or "Domi"**

**Photographie de Kamanzi Ndaruhutse Dominique, alias Sanctus Nkuba Kongolo ou « Domi »**



Photograph provided to the Group by a CMC/FDP ex-combatant

Photographie fournie au Groupe par un ex-combattant du CMC/FDP

Screenshots of two videos of CMC/FDP military training in Kanage and Busesa, in Bwito *chefferie* in Rutshuru territory in February 2016.  One CMC/FDP ex-combatant explained to the Group that the training focused on military tactics, discipline, weapon assembly and CMC ideology. The source said that Domi taught CMC ideology. 483 students graduated from the training.

The screenshots are from two videos provided to the Group by CMC/FDP ex-combatants.

Captures d'écran de deux vidéos d'une formation militaire du CMC/FDP dans les villages Kanage et Busesa, chefferie de Bwito, dans le territoire de Rutshuru, organisée en février 2016. Un combattant du CMC/FDP a informé le

UNCLASSIFIED

EXHIBIT 60

S/2020/482

Groupe que cette formation portait sur les tactiques militaires, la discipline, l'assemblage des armes et l'idéologie du CMC La source a ajouté que Domi a enseigné l'idéologie du CMC. 483 combattants ont bénéficié de la formation d'après cette source.

Les captures d'écran ont été réalisées à partir deux vidéos fournies au Groupe par des ex-combatants du CMC/FDP.

**Screenshot 1:**

Military training in Kanage located two kilometers away from Kitunva/Mashango which was Domi's headquarters. Formation militaire à Kanage, situé à deux kilomètres de Kitunva/Mashango où se trouvait le quartier général de Domi.



**Screenshot 2**: Military training in Busesa - Formation militaire à Busesa



UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

## Annex 3

**CMC/FDP organigram**

**Organigramme du CMC/FDP**



UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 4**
**NDC-R Organigram**
**Organigramme du NDC-R**



UNCLASSIFIED                    EXHIBIT 60

S/2020/482

### Annex 5

**Screenshots and photographs of Guidon and participants of a two-day meeting in Bukumbirwa**

**Captures d'écran et photographies de Guidon et des participants à une réunion de deux jours à Bukumbirwa**

Screenshots and photographs of sanctioned individual Guidon Shimiray Mwissa (CDi.033) and participants of a two-day meeting in Bukumbirwa, Walikale territory, with Mai-Mai armed groups leaders including Mai-Mai Kifuafua, Mai-Mai Simba, Mai-Mai Guides-Mouvement acquis au changement, Mai-Mai Mazembe-Union pour la protection des innocents and Raia Mutomboki. These groups created the Réseau des patriotes résistants congolais (RPRC) and Guidon was nominated the coordinator. The screenshots are from a video provided to the Group by civil society actors.

Captures d'écran et photographies de Guidon Shimiray Mwissa, individu sous sanctions des Nations Unies (Cdi.033) et des participants à une réunion de deux jours à Bukumbirwa, territoire de Walikale, tenue avec plusieurs leaders des groupes armés Mai-Mai, y compris Mai-Mai Kifuafua, Mai-Mai Simba, Mai-Mai Guides-Mouvement acquis au changement, Mai-Mai Mazembe-Union pour la protection des innocents et Raia Mutomboki. À l'issue de cette réunion, les participants ont créé le Réseau des patriotes résistants congolais (RPRC) dont Guidon a été nommé cordonateur. Les captures d'écran sont réalisées à partir d'une video fournie au Groupe par des sources de la société civile.

**Screenshot 1:**

Arrival of the NDC-R delegation to Bukumbirwa

Arrivée de la délégation du NDC-R à Bukumbirwa



UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Screenshot 2:**

Beginning of the meeting. The delegation chanted the congolese national anthem. From left to right: a security guard; the second in the white shirt and tie is Désiré Ngabo Kisuba, NDC-R spokesperson; and the third is Guidon.

Début de la réunion. La délégation chante l'hymne national congolais. De gauche à droite : agent de sécurité ; le second en chémise blanche et cravate est Désiré Ngabo Kisuba, le porte-parole de NDC-R, et la troisième personne est Guidon.



UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Screenshot 3:**

Guidon interviewing with local radio station following the meeting

Guidon donnant une interview à une radio locale après la réunion



**Photograph 1:**

Guidon surrounded by NDC-R generals. They can be recognized by their blue and light green armbands.

Guidon entouré des généraux NDC-R. Ils peuvent être reconnus par leurs brassards bleus et verts clairs.



Photograph provided to the Group by civil society sources

Photographie fournie au Groupe par des sources de la société civile

EXHIBIT 60

**S/2020/482**

**Photograph 2:**

Majo Moba, representative of Mai-Mai Kifuafua Delphin shaking hands with Guidon

Majo Moba, représentant de Mai-Mai Kifuafua Delphin serrant la main de Guidon



**Screenshot 6:**

Kitete Bushu from Union pour la protection des innocents (UPDI) shaking hands with Guidon

Kitete Bushu de l'Union pour la protection des innocents (UPDI) serrant la main à Guidon



UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 6**

**Photographs of Mapenzi Lwanche Likuhe (on the left) and Kisuba Ngabo Désiré (on the right)**

**Photographies de Mapenzi Lwanche Likuhe (à gauche) et de Kisuba Ngabo Désiré (à droite)**



Photograph provided to the Group by civil society sources

Photographie fournie au Groupe par des sources de la société civile

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 7**

**Maps displaying track of FARDC operations along various axes in Beni territory**

**Carte de la progression des opérations des FARDC sur différents axes dans le territoire de Beni**

- Red pin = ADF camps
- Yellow pin = FARDC controlled areas



20-06401
DRC-30316 1221

UNCLASSIFIED                    EXHIBIT 60

S/2020/482





UNCLASSIFIED                    EXHIBIT 60

**S/2020/482**





UNCLASSIFIED    EXHIBIT 60

S/2020/482



Maps provided to the Group by FARDC
Cartes fournies au Groupe par les FARDC

UNCLASSIFIED                          EXHIBIT 60

S/2020/482

**Annex 8**

**Photographs of part of Madina camp under the control of FARDC**

**Photographies du camp de Madina sous le contrôle des FARDC**






UNCLASSIFIED                    EXHIBIT 60

S/2020/482



Photographs provided to the Group by FARDC
Photographies fournies au Groupe par les FARDC

UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 9**

**Weapons and ammunition recovered from ADF**

**Armes et munitions récupérées auprès des ADF**

Type 56 and AK-47 assault rifles
Fusils d'assaut Type 56 et AK-47



12.7x108mm ammunition
Munitions 12.7x108mm



188_*_81_*                    188_65

20-06401
DRC-30316 1227

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482



188_85                          9631_11

Photographs taken by the Group in March 2020
Photographies prises par le Groupe en mars 2020

UNCLASSIFIED        EXHIBIT 60

S/2020/482

**Annex 10**

**IEDs recovered from ADF combatants, Madina camp, March 2020**

**EEIs récupérés auprès des combattants ADF après la prise de Madina, mars 2020**





Photographs provided to the Group by FARDC
Photographies fournies au Groupe par les FARDC

UNCLASSIFIED EXHIBIT 60

S/2020/482

**Annex 11**

**Photograph of Amigo Kibirige, aka Simba Amigo, Mzee Amigo or Marine**

**Photographie de Amigo Kibirige, aka Simba Amigo, Mzee Amigo or Marine**



Photograph of Amigo from a source with knowledge of the matter
Photographies d'Amigo obtenue d'une source familière avec cette question

UNCLASSIFIED   EXHIBIT 60

**S/2020/482**

**Annex 12**

**22 January 2020 claim by ISIL of an attack**

**Revendication du 22 janvier 2020 par l'État Islamique**



Image provided to the Group by MONUSCO
Image fourni au Groupe par le MONUSCO

While the claim mentioned Eringeti as the location of the attack, the attack referred to in the claim is most likely the attack that took place on 21 January 2020 against an FARDC position in Kithekya (about four km east of Mayi Moya and 10 km sud of Eringeti). According to MONUSCO, no casualties or injuries were reported as a result of the January attack, contrary to the ISIL claim.

Alors que la revendication mentionnait Eringeti comme lieu de l'attaque, l'attaque mentionnée dans la revendication est certainement celle qui a eu lieu à Kithekya (environ quatre km à l'est de Mayi Moya et 10 km au sud de Eringeti) contre une position des FARDC le 21 janvier 2020. D'après la MONUSCO, aucun mort ni blessé n'a été rapporté, contrairement à la revendication de l'État Islamique.

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 13**

**Photographs of Mai-Mai Malaika leaders Sheikh Hassani Huzaifa Mitenda (left) and Assani Juma aka Mandevu (right)**

**Photographies des dirigeants de Mai-Mai Malaika, Sheikh Hassani Huzaifa Mitenda (à gauche) et Assani Juma alias Mandevu (à droite)**




Photographs provided to the Group by Mai-Mai Malaika combatants in March 2020
Photographies fournies au Groupe par des combattants Mai-Mai Malaika en mars 2020

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 14**

**Mai-Mai Malaika combatants**

**Combattants Mai-Mai Malaika**

 

 

Photographs provided to the Group by Mai-Mai Malaika combatants in March 2020
Photographies fournies au Groupe par des combattants Mai-Mai Malaika en mars 2020

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 15**

**Mai-Mai Malaika main camp Mbinguni/Checheni, Kabambare territory, Maniema**

**Camp principal des Mai-Mai Malaika à Mbinguni/Checheni, territoire de Kambabare, Maniema**



Screenshots from a video obtained by the Group from various sources in March 2020
Capture d'écran d'une vidéo obtenue par le Groupe de sources diverses en mars 2020

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 16**

**Official and publicly available production and export figures for artisanal gold for North, South Kivu and Ituri provinces, eastern DRC, for 2019**

**Chiffres officiels et publiquement accessibles de la production et des exportations d'or artisanal pour les provinces du Nord et Sud Kivu et de l'Ituri, à l'est de la RDC pour 2019**

|  | Production figures* (g) | Export figures** (g) |
|---|---|---|
| Ituri | 47,766.54 | 24,228.37 |
| North Kivu | 4,134.63 | 0.00 |
| South Kivu | 8,105.72 | 48,789.61 |
| Total | 60,006.89 | 73,017.98 |

\* According to official Service d'assistance et d'encadrement des mines artisanales et de petite échelle (SAEMAPE) annual statistics seen by the Group
\*\* According to official Mining Division figures seen by the Group

\* Selon les statistiques officielles du Service d'assistance et d'encadrement des mines artisanales et de petite échelle (SAEMAPE) observées par le Groupe
\*\* Selon les chiffres officiels de la Division minière observés par le Groupe

For 2019, North and South Kivu and Ituri provinces reported official production of a total of 60,006.89 grams of artisanal gold and exported 73,017.98 grams, taking residual 2018 stocks into account (a difference of just over 13,000 grams minus residual stock). North Kivu and Ituri reported a combined total of 27,672.80 grams more artisanal gold production than they exported, while in South Kivu official exports, which were 48,789.61 grams, exceeded formal production by 40,683.89 grams. North Kivu did not report any official exports. The Group noted that, based on interviews with mining authorities and gold diggers and traders across all three provinces and as previously reported by the Group, officially recorded production figures for gold were not an accurate representation of overall actual production, which far exceeded recorded figures.

Pour l'année 2019, les provinces du Nord et du Sud Kivu et de l'Ituri ont déclaré une production officielle d'un total de 60 006,89 grammes d'or artisanal et, tenant compte des stocks résiduels de 2018, elles en ont exporté 73 017,98 grammes (une différence de juste 13 000 grammes moins le stock résiduel). Le Nord Kivu et l'Ituri ont déclaré un total combiné de 27 672,80 grammes de production d'or artisanal en surplus de ce qu'elles ont exporté, tandis qu'au Sud Kivu, les exportations officielles, qui étaient de 48 789,61 grammes, ont dépassé la production officielle de 40 683,89 grammes. Le Nord Kivu n'a pas enregistré les exportations officielles. Sur la base d'entretiens avec les autorités minières, creuseurs et négociants d'or dans ces trois provinces et comme indiqué par le Groupe dans les rapports précédents, les chiffres de la production officielle enregistrés pour l'or n'offrent pas une représentation fidèle de la production réelle globale, qui dépasse de loin les chiffres enregistrés.

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 17**

**Under-reporting of Congolese gold production**

**Sous-déclaration de la production d'or congolais**

The Group interviewed six SAEMAPE officials during the reporting period, all of whom noted that the DRC's real artisanal gold production far exceeded documented volumes. SAEMAPE is the Congolese mining authority charged with oversight of the artisanal mining sector, for all minerals.

For 2018, the DRC officially recorded 246.27 kilograms of artisanal gold production for the entire country, according to publicly available figures on the DRC national mines website.[1] At the time of drafting this report, available figures from the same source recorded 186.24 kilos of artisanal gold production for the first six months of 2019. However, according to the Group's own interviews with gold traders in Bunia, Ituri province (just one of the gold trading towns in eastern DRC), annual purchases by traders in the town would amount to around 1.1 tonnes, at conservative estimates (see para. 62 of this report). A 2015 Organisation for Economic Cooperation and Development (OECD) baseline study of artisanal gold production noted estimated annual artisanal production at around 10-15 tonnes per year and an IPIS 2011 study estimated it to be as high as 16.5 tonnes for former-Orientale Province alone.

SAEMPE officials described challenges preventing them from recording all artisanal gold production that included lack of logistical support (e.g. including but not limited to no or inadequate availability of cars or motorbikes to access mining sites), inadequate staffing and late or failed payment for existing staff. Officials also said that they faced particular challenges documenting production where artisanal miners in mining cooperatives had signed legal agreements with semi-industrial dredging companies. In these cases, gold production often went unrecorded, a phenomenon previously recorded by the Group (see S/2017/672.Rev.1, para. 105; S/2015/19, paras. 192, 194 and 225 (a); S/2015/797, paras. 68-73).

Given the high volumes of artisanal gold smuggled out of the DRC as documented in this report, the Group also reviewed publicly available artisanal gold production and export data for countries through which smuggled Congolese gold was traded or smuggled, according to the Group's research. These included Burundi, Rwanda, Tanzania and Uganda (see annex 43 below for further analysis).

Le Groupe a interviewé six agents officiels de la SAEMAPE au cours de la période faisant l'objet de ce rapport. Tous ont noté que la production réelle d'or artisanal excédait de loin les volumes documentés. La SAEMAPE est l'autorité congolaise chargée de surveiller le secteur artisanal minier pour tous les minerais.

Pour l'année 2018, et selon des chiffres publiquement accessibles sur le site Web des mines nationales de la RDC,[2] la RDC a officiellement déclaré une production artisanale d'or pour l'ensemble du pays de 246,27 kilogrammes. Au moment de la rédaction de ce rapport, les chiffres disponibles provenant de cette même source ont enregistré 186,24 kilos de production d'or artisanal pour les six premiers mois de 2019. Cependant, selon les informations obtenues par le Groupe auprès des négociants d'or à Bunia, province de l'Ituri (l'une des villes à l'est de la RDC où se conduit le négoce de l'or) et selon une estimation prudente, les achats annuels par les commerçants de la ville s'élèveraient à environ 1,1 tonne (voir par. 62 du présent rapport). Une étude de l'Organisation de la coopération et du développement économique (OCDE) de 2015 sur la production artisanale d'or a estimé à environ 10-15 tonnes la production artisanale annuelle tandis qu'une étude IPIS (2011) estimait qu'elle atteignait 16,5 tonnes pour la seule ancienne province Orientale.

---

[1] www.mines-rdc.cd/fr/wp-content/uploads/documents/Statistiques/2018/STATISTIQUES_MINIERES_EXERCICE%20_2018.pdf
[2] www.mines-rdc.cd/fr/wp-content/uploads/documents/Statistiques/2018/STATISTIQUES_MINIERES_EXERCICE%20_2018.pdf

    UNCLASSIFIED

S/2020/482

Les responsables de la SAEMAPE ont décrit au Groupe plusieurs difficultés qui les ont empêché d'enregistrer toute la production artisanale d'or, notamment le manque de soutien logistique (y compris, mais sans s'y limiter, le manque ou l'inadéquation des voitures ou des motos disponibles pour accéder aux sites miniers), un personnel insuffisant et l'absence de paiement ou le paiement tardif ou absent de son personnel. Ils ont également souligné des difficultés particulières lorsqu'il s'agit de documenter la production, notamment celle de mineurs artisanaux membres d'une coopérative minière qui a signé un protocole d'accord avec des sociétés de dragues semi-industrielles. Dans ces cas, la production d'or n'est souvent pas enregistrée, un phénomène déjà rapporté par le Groupe (voir S/2017/672.Rev.1, par. 105; S/2015/19, par. 192, 194 and 225 (a); S/2015/797, par. 68-73).

Comme indiqué dans le présent rapport et compte tenu des volumes élevés d'or artisanal sortis en contrebande de la RDC, le Groupe a également examiné les données publiques de production et d'exportation d'or artisanal pour les pays à travers lesquels l'or congolais sortait en contrebande ou non, selon les recherches du Groupe. Il s'agit notamment du Burundi, du Rwanda, de la Tanzanie et de l'Ouganda (voie annexe 43 ci-dessous pour une analyse plus approfondie).

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 18**

**Estimation of gold smuggled out of Bunia, Ituri province, 2019**

**Estimation de l'or sorti clandestinement de Bunia, dans la province de l'Ituri, 2019**

The estimated annual 1.1 tonnes was based on gold traded in Bunia town and excluded gold traded through other hubs such as Butembo (see S/2018/531, para. 92; S/2014/42, para. 96) and also excluded gold produced by cooperatives that worked in partnership with semi-industrial dredging companies, for which production and sales figures were unavailable. Four mining authorities and three traders in Bunia told the Group that the majority of gold produced in this way was not purchased by export houses in Bunia, and that they did not know where this gold production was sold.

According to interviews conducted by the Group, unofficial weekly gold purchases by significant gold buyers in Bunia varied. Three traders and a mining authority confirmed that purchases hovered at between 2 and 3 kilograms per week per trading house at a minimum.

The Group calculated as follows: 3 kilograms per week x an estimated 48 trading weeks per year x 8 (the eight named big gold traders in Bunia according to the Group's interviews and as named in this report). Obtaining official export and import data for Congolese gold remained challenging (see annex 43).

Le volume annuel estimé à 1,1 tonnes a été établi sur la base de l'or échangé à Bunia et exclu d'autres plateformes telles que Butembo (voir S/2018/531, par. 92; S/2014/42, par. 96) et exclu également l'or produit par des coopératives travaillant en partenariat avec des sociétés de dragage semi-industrielles, pour lesquelles les chiffres de production et de vente n'étaient pas disponibles. Sur Bunia, quatre autorités minières et trois commerçants ont déclaré au Groupe que la majorité de l'or ainsi produit n'était pas achetée par les maisons d'exportation de Bunia et qu'ils ne savaient pas où cette production d'or était vendue.

Selon des interviews conduits par le Groupe, les achats officieux et hebdomadaires d'or des grands acheteurs d'or à Bunia ont fluctué. Trois commerçants et une autorité minière ont confirmé que leurs achats oscillaient entre 2 à 3 kilogrammes par semaine et par maison d'achat au minimum.

Le Groupe a donc calculé comme suit : 3 kilogrammes par semaine multiplié par 48 (48 semaines de commerce par an), multiplié ensuite par huit (les interviews conduits par le Groupe indiquent la présence de huit grands négociants d'or sur Bunia, comme indiqué dans le présent rapport). L'obtention de données officielles sur les exportations et les importations d'or congolais est restée difficile (voir annexe 43).

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 19**

**Calculation used to estimate taxes lost for an estimated 1.1 tonnes of gold production**

**Calcul utilisé pour estimer les taxes perdues pour une production d'or estimée à 1,1 tonne**

1,100,000 grams x 48.9656* x 3.5% gold export tax

*Assuming gold of 99 percent purity using 31 December 2019 fixing of $48.9656

Three gold traders interviewed by the Group noted that although official Congolese export taxes for gold were 3.5 percent, they often paid closer to six percent of the total export value in official taxes when exporting the yellow metal when adding up all domestic taxes.

1,100,000 grammes x 48.9656* x 3.5% de taxe d'exportation de l'or

* Considérant de l'or à 99 pourcents de pureté et en utilisant le taux (de fixing) du 31 décembre 2019 de $48,9656

Trois négociants en or ont précisé au Groupe que, bien que les taxes officielles à l'exportation congolaise pour l'or soient de 3,5 pourcents, ils payaient souvent des taxes officielles proches de six pourcents de la valeur totale des exportations si on ajoutait toutes les taxes domestiques.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 20**

**List of negociants Bunia, Ituri 2019 (publicly available)**

**Liste des négociants Bunia, Ituri 2019 (publiquement accessible)**



UNCLASSIFIED                                    EXHIBIT 60

**S/2020/482**

**Annex 21**

**Responses to the Group from traders**

**Réponses des commerçants au Groupe**

Bosco Atama confirmed to the Group that he had established a gold mining cooperative called *Action pour le développement communautaire* but said that it still awaited official ministerial agreement and was not yet officially operational. Atama also noted that the diggers he pre-financed in the meantime produced much less than 1 kilogram of gold per month, which was sold locally in the DRC and was not sold beyond its borders.

The Group contacted Exodus Deba in April 2020 to request a response. Representatives of Deba said that he would provide a response, which the Group had not received by the time of drafting this report.

The Group was unable to reach Edmond Kasereka, Sangote Dehmani, Mambo Kamaragi, Lombela and Karte.

Bosco Atama a confirmé au Groupe qu'il avait créé une coopérative minière d'or dénommée Action pour le développement communautaire mais il a indiqué qu'il attendait toujours l'accord ministériel officiel et que la coopérative n'était donc pas encore officiellement opérationnelle. Atama a également noté que les creuseurs qu'il avait entre-temps préfinancés produisaient bien moins d'un kilogramme d'or par mois, qui était vendu localement en RDC et non au-delà de ses frontières.

Le Groupe a contacté Exodus Deba en avril 2020 pour demander une réponse. Des représentants de Deba ont promis de fournir une réponse, mais le Groupe ne l'avait pas reçue au moment de la rédaction de ce rapport.

Le Groupe n'a pas pu joindre Edmond Kasereka, Sangote Dehmani, Mambo Kamaragi, Lombela et Karte.

UNCLASSIFIED EXHIBIT 60

S/2020/482

**Annex 22**

**Uganda Police investigation into Kampala-based gold traders and updated information about sanctioned entities**

**Enquête de la police ougandaise sur les commerçants d'or basés à Kampala et informations actualisées sur certaines entités sanctionnées**

In October 2019, the Group received a copy of a report of a Uganda Police investigation into Kampala-based gold traders initiated in 2014 by Ugandan authorities (see S/2015/19, para. 203). According to the report of the investigation reviewed by the Group, Ugandan Police did not find "independent and concrete" evidence of the involvement of sanctioned entity Uganda Commercial Impex (UCI) Ltd (CDe.009), sanctioned entity Machanga Ltd (CDe.007) or, separately, of trading by individual Sameer Bhimji (see S/2017/672/Rev.1, para. 120 and S/2019/469, para. 179).

The Group found however that during the reporting period, sanctioned entity Uganda Commercial Impex (UCI) Ltd (CDe.009) retained an active business registration according to publicly available Uganda Registration Service Bureau information. The Group also noted that, according to an official ICGLR gold export certificate, Vaya Forex Bureau in Uganda acted as an intermediary in an official gold export (see para. 87 of this report). Incorporated in 2007, the two shareholders of Vaya Forex Bureau were Vaya Kiran Rajendra and Vaya Vipal Kumar Maganlal, family members of Rajendra "Raju" Vaya, owner of sanctioned entity of Machanga Ltd (CDe.007) (see S/2015/19, annex 63). The Group wrote to Vaya Forex Bureau but did not receive a response by the time of writing this report. Finally, the Group noted that, according to publicly available Uganda Registration Service Bureau information, Sameer Bhimji was a signatory on the bank accounts of The Bullion Refinery Ltd (see S/2018/1133, para. 97) until 23 April 2019.

Le Groupe a reçu, en octobre 2019, la copie d'une enquête de la police ougandaise sur des négociants d'or basés à Kampala. L'enquête avait été ouverte en 2014 par les autorités ougandaises (voir S/2015/19, par. 203). Selon le rapport d'enquête revu par le Groupe, la police ougandaise n'a trouvé aucune preuve « indépendante et concrète » de l'implication de l'entité sanctionnée Uganda Commercial Impex (UCI) Ltd (CDe.009), de l'entité sanctionnée Machanga Ltd (CDe.007) ou, séparément, du commerce par Sameer Bhimji (voir S/2017/672/Rev.1, par. 120 et S/2019/469, par. 179).

Le Groupe a toutefois constaté qu'au cours de la période considérée, l'entité sanctionnée Uganda Commercial Impex (UCI) Ltd (CDe.009) avait conservé un enregistrement commercial actif selon les informations publiquement accessibles du Bureau d'information du Bureau d'enregistrement de l'Ouganda. Le Groupe a également noté que, selon un certificat officiel d'exportation d'or de la CIRGL, Vaya Forex Bureau en Ouganda avait servi d'intermédiaire dans une exportation officielle d'or (voir par. 87 du présent rapport). Constituée en société en 2007, les deux actionnaires de Vaya Forex Bureau étaient Vaya Kiran Rajendra et Vaya Vipal Kumar Maganlal, membres de la famille de Rajendra "Raju" Vaya, propriétaire de l'entité sanctionnée de Machanga Ltd (CDe.007) (voir S/2015/19, annexe 63). Le Groupe a écrit à Vaya Forex Bureau mais n'avait pas reçu de réponse au moment de la rédaction de ce rapport. Le Groupe a noté que, selon les informations rendues publiques par le Bureau d'information du Bureau d'enregistrement de l'Ouganda, Sameer Bhimji était signataire des comptes bancaires de The Bullion Refinery Ltd (voir S/2018/1133, par. 97) jusqu'au 23 avril 2019.

UNCLASSIFIED   EXHIBIT 60

S/2020/482

**Annex 23**

**Procedures on gold imports into Rwanda, including from the DRC**

**Procédures relatives aux importations d'or au Rwanda, y compris en provenance de la RDC**

In a February 2020 meeting with the Group, Rwandan customs authorities confirmed that for gold that is officially *imported from other countries into Rwanda*, Rwandan customs made a customs declaration at point of entry. They also confirmed that East African Community tariffs were applied for gold imports and that, in accordance with the EAC rules, gold that was imported for inward processing and then exported was not taxed, because, as per standard practise, it was considered a temporary import.

Also in a February 2020 meeting, Rwandair Ltd told the Group that per its handling procedures for export of valuable cargo, Rwandair Ldt required and verified the following documentation for gold cargoes:

(a)  Certificate of Origin;
(b)  Minerals Buying and Selling Permit;
(c)  Exportation of Non-Conflict Minerals;
(d)  Assay Certificate;
(e)  Packing List;
(f)  Original Invoice;
(g)  Airway bill.


Lors d'une réunion avec le Groupe en février 2020, les autorités douanières rwandaises ont confirmé que pour l'or officiellement *importé au Rwanda depuis d'autres pays*, les douanes rwandaises faisaient une déclaration en douane au point d'entrée. Ils ont également confirmé que les tarifs de la Communauté de l'Afrique de l'Est s'appliquaient pour les importations d'or et que, selon les règles de la CAE, l'or qui était importé pour le raffinage puis exporté, n'était pas taxé, car, selon une pratique courante, il était considéré comme une importation temporaire.

Toujours lors d'une réunion de février 2020, Rwandair Ltd a déclaré au Groupe que, conformément à ses procédures de traitement pour l'exportation de cargaisons précieuses, Rwandair Ltd exigeait et vérifiait la documentation suivante pour les cargaisons d'or :

a) Certificat d'origine ;
b) Permis d'achat et de vente de minéraux ;
c) Exportation de minéraux non issus de zones de conflit ;
(d) Certificat d'analyse ;
(e) Liste de colisage ;
(f) Facture originale ;
(g) Lettre de transport aérien.

UNCLASSIFIED   EXHIBIT 60

S/2020/482

**Annex 24**

**Just Gold**

**Or Juste**

The Coopérative de développement des exploitants miniers artisanaux (CODEMA), the *Just Gold* cooperative, exported 24.95 kilograms from the six validated artisanal gold mines in Ituri province between 2017 and 2019. Representatives of *Just Gold* told the Group that the project could not compete with gold prices offered through smuggled trade. *Just Gold* also told the Group that to be successful the DRC's gold sector required reliable inventory financing, additional validated mine sites resulting in higher volumes, and producers and traders to pay reduced fees and taxes from mine site to export.

La Coopérative de développement des exploitants mineurs artisanaux (CODEMA), la coopérative du projet *Or Juste*, a exporté 24,95 kilogrammes des six mines d'or artisanales validées de la province de l'Ituri entre 2017 et 2019. Des représentants d'*Or Juste* ont déclaré au Groupe que le projet ne pouvait pas concurrencer les prix de l'or offerts par le commerce de contrebande. Ils ont également déclaré au Groupe que pour réussir, le secteur aurifère de la RDC nécessitait un financement fiable des stocks, des sites miniers validés supplémentaires entraînant ainsi une augmentation des volumes, et des producteurs et commerçants payant des frais et taxes réduits du site minier à l'exportation.

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 25**

**Upcoming gold refinery in Bukavu, March 2020**

**Raffinerie d'or prévue à Bukavu, mars 2020**



Congo Gold Raffinerie (CGR) construction site, Bukavu, South Kivu
(photograph taken by the Group in March 2020)

Chantier de construction de la Congo Gold Raffinerie (CGR), Bukavu, Sud-Kivu
(photographie prise par le Groupe en mars 2020)

Obedi Uruma Zaidi, manager of CGR told the Group that the refinery was the "project B" of Mines Propres sarl (see S/2018/531, annex 23), a gold trading house in Bukavu, South Kivu owned by Burundian national and long-time regional gold trader Karim Somji (see S/2013/433, para.159 and annex 70; S/2012/348, para. 156). CGR's direct shareholders were Marathon sarl represented by Robert Mutesa, former managing partner of Planet Air (see S/2002/1146, para. 107) and Global Investment Congo sarl, represented by Lui Zhigang.

Obedi Uruma Zaidi, directeur de CGR, a déclaré au Groupe que la raffinerie était le « projet B » de Mines Propres SARL (voir S/2018/531, annexe 23), une maison de négoce d'or à Bukavu, au Sud-Kivu, détenue par Karim Somji ressortissant burundais le négociant régional en or de longue date, (voir S/2013/433, par. 159 et annexe 70; S/2012/348, par. 156). Les actionnaires directs de CGR étaient Marathon sarl, représentée par Robert Mutesa, ancien associé directeur de Planet Air (voir S/2002/1146, par. 107) et Global Investment Congo SARL, représenté par Lui Zhigang.

UNCLASSIFIED                    EXHIBIT 60

**S/2020/482**



Excerpt from Ministerial Decree no. 0503/CAB.MIN/MINES/2019 signed 15 July 2019 for Congo Gold Raffinerie SARL: available at: https://www.mines-rdc.cd/fr/wp-content/uploads/documents/Ar retes/2019/A0503_2019.pdf?x57237

Extrait de l'Arrêté ministériel n° 0503/CAB.MIN/MINES/2019 du 15 juillet 2019 pour la société Congo Gold Raffinerie SARL, disponible sur : https://www.mines-rdc.cd/fr/wp-content/uploads/documents/Ar retes/2019/A0503_2019.pdf?x57237

UNCLASSIFIED

UNCLASSIFIED                                    EXHIBIT 60

**S/2020/482**

**Annex 26**

**Receipts showing gold sales from individuals affiliated with Mai-Mai Yakutumba to Maison Bezo, Misisi branch, South Kivu, dated May and June 2019**

Factures datées de mai et juin 2019 montrant la vente d'or à la Maison Bezo, succursale de Misisi, Sud Kivu, par des individus affiliés à Mai-Mai Yakutumba

20-06401
DRC-30316 1247

UNCLASSIFIED

EXHIBIT 60

S/2020/482

---



**MAISON FUNGAROHO BEZO SIMISI**

**MAISON D'ACHAT D'OR ET TRANSFERT A MISISI**

**REÇU N° 12.**

VENDEUR : P. P.O. ALenga

QUALITE / ARTICLE : Or brut

QUANTITE : 6.923 gr.

MONTANT : 498 456 500 Fc soit 332 304$ (payé en dollars.)

ACHETEUR : Maison Bezo Misisi

DESTINATAIRE : Maison Bezo à Bukavu l'Essence

RECEPTIONNISTES : Aganze

QUALITE : Gerant Maison Bezo Misisi

PAYE CASH

Date : 21 / 06 / 2019.

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 27**

**Public notices distributed around Salamabila by Sheikh Hassani and a speech in Salamabila by Sheikh Hassani, all between July and September 2019**

**Avis publics distribués autour de Salamabila par Sheikh Hassani et discours de Sheikh Hassani à Salamabila, tous entre juillet et septembre 2019**



Provided to the Group by various sources

Fourni au Groupe par des plusieurs sources

UNCLASSIFIED   EXHIBIT 60

S/2020/482

Translation by the Group/traduction par le Groupe

To all those living in Kabamare, at Kipepe (non-readable) in general. Everybody must buy food to put in stock at their home because from 01/07/2019 no-one is allowed to work: motorbike driver, driver, cart-bearers, business people of all kinds. Nothing is allowed apart from to go to church, prepare food and go out to the toilets, until Banro respects the demands of the population.

SHEIK HASANNI HUZAIFA MITENDE, President

À tous les habitants de la zone Kabambare à Kipepe (pas lisible) en général. Que chaque habitant achète de la nourriture pour faire des stocks dans sa maison car à dater du 01/07/2019 personne ne doit travailler : Motard, Chauffeur, Charretier, Commerçant en tout genre, sauf pour aller à l'église, préparer la nourriture, et aller aux toilettes, jusqu'à ce que BANRO respecte la demande de la population.

SHEIK HASANNI HUZAIFA MITENDE, Le président



Provided to the Group by various sources

Fourni au Groupe par des plusieurs sources

UNCLASSIFIED    EXHIBIT 60

**S/2020/482**

Translation by the Group/traduction par le Groupe

Announcement
For the attention of all workers of BANDRONT to not come to work as of Thursday 12/09/2019, until there is an agreement.

For those who arrive, there will be consequences.

Done 12/09/2019
For MAILAIKA, SHEIK HASSANI UZAIFA MITENDA
President


Communiqué
Il est porté à la connaissance de tous les travailleurs de BANDRONT de ne pas arriver au travail à partird'aujourd'hui Jeudi 12/09/2019, jusqu'à ce qu'il y ait entente.

Celui qui viendra en assumera les conséquences.
Fait ce 12/09/2019
De la part de MALAIKA, SHEIK HASSANI UZAIFA MITENDA
Président



Screenshot of Sheikh Hassani giving a speech in September 2019 after the "agreement" was signed with Namoya Mining. Recorded by an eye-witness in Salamabila

Capture d'écran montrant Sheikh Hassani donnant un discours après la signature d'un « accord » avec Namoya Mining. Enregistré par un témoin oculaire à Salamabila.

UNCLASSIFIED                              EXHIBIT 60

S/2020/482

Transcription et translation by the Group/transcript et traduction par le Groupe

"We don't have a megaphone but what we want to say to you is that we might be able to help [yes], and give you hope apart from the ones you have. Your mountains have been given back to me [yes that's what we are celebrating], tomorrow morning we will do the handover with the vice-governor [yes], and after having done the handover with the vice-governor tomorrow [yes], then we will outline the program to go dig gold [ok]. So the main information [yes], we wanted first of all to tell you to go to rest and I will go back to my headquarters. "

« Nous n'avons pas de mégaphone mais ce que nous voulons vous dire pourrait vous aider [oui], vous donner d'autres espoirs à part celui que vous avez. Vos montagnes me sont remises [oui c'est ça notre joie], demain matin nous allons faire la remise avec le vice-gouverneur [oui], et après avoir fait la remise avec le vice-gouverneur demain [oui], alors nous allons donner le programme d'aller creuser l'or [ok]. Donc l'information principale [oui], nous voulions d'abord que vous alliez vous reposer et moi je rentre à mon Etat-major. »

In addition, the Group reviewed January 2020 audio recordings from Sheikh Hassani, authenticated by two reliable sources, that stated that until Banro (Namoya Mining) met the population's demands, his combat "would not stop". Namoya Mining had not recommenced gold mining activity at the time of drafting this report.

En outre, le Groupe a examiné plusieurs enregistrements de Sheikh Hassani de janvier 2020, authentifiés par deux sources fiables, selon lesquels son combat "ne s'arrêtera pas" jusqu'à ce que Banro (Namoya Mining) réponde aux demandes de la population. Namoya Mining n'avait pas repris ses activités d'extraction d'or au moment de la rédaction de ce rapport.

S/2020/482

## Annex 28

## Background

## Contexte

In September 2019, Banro Mining Corporation suspended all activities in the DRC, under a *force majeure* (see S/2019/469, para. 43) following an August 2019 "agreement" with Sheikh Hassani ceding *Mwendamboko* and other gold-rich parts of the Namoya Concession to the community of Salamabila. Representatives of Namoya Mining, the Banro subsidiary, told the Group that they had signed the August 2019 "agreement" under duress in order to secure safe release of the final hostage, who Sheikh Hassani had threatened to kill. They also noted that under the agreement, the company would have been required to cede 60 percent of the capital ore body to Sheikh Hassani, whereas the ore body belonged to the company shareholders and that ceding it would render the asset unviable. Under these terms, Namoya Mining did not consider the "agreement," which was signed by representatives of the Maniema provincial government, the Banro CEO and Sheikh Hassani, as legally legitimate. A copy of the "agreement" is included in this annex.

According to Namoya Mining, the four employees abducted by Mai-Mai Malaïka in July 2019 had been preparing the road to Matongo artisanal mining zone, an area identified as an alternative artisanal mining location for the Salamabila community. This occurred after the community and company had reached agreement at a May 2019 Peace Forum coordinated by MONUSCO and the interim provincial government of Maniema.

Community representatives told the Group they they had welcomed the August 2019 "agreement," however. One digger showed the Group a SAEMAPE-stamped form drawn up shortly afterward August 2019, giving him the right to begin formally digging on the newly-appointed concession. When Namoya Mining had reneged on the agreement shortly after their final hostage was released, the community considered this a further let down by the company.

Four community members told the Group that in their view, Namoya Mining had not met the terms of the agreement that the company had signed with the population of Salamabila in September 2014, and a representative of Maniema's provincial government told the Group that, had Namoya Mining respected the terms of the agreement, the relationship between the community and the company would have been much improved. . The Group was unable to obtain a copy of the agreement but includes in this annex a copy of the preceding demands laid out by the community, signed by a then-Banro representative, in 2013. These included provision of water and electricity to Salamabila town, rehabilitation of the road between Kasongo and Salamabila, investment in agricultural projects, and a commitment to preferentially engage local people in the company, amongst others.

The Group also noted that social mobilisation against industrial mining has existed at Namoya since Banro Mining Company began exploration activities in 2004.[3] In 2013 artisanal miners were ordered to leave the concession by provincial decree.[4] Two artisanal diggers told the Group that they had been chased off the mountain in 2013 by the industrial miner. One digger estimated that around 90 percent of the community at Salamabila economically depended on the artisanal gold mining sector.

---

[3] See also Geenen, S., *The Extractive Industries and Society* (2017) and; Verweijen, J., *Luddites in the Congo?* (2017).
[4] *Arrêté interministériel des ministres provinciaux* no. 02/085/CAB/MINPRO/INOP/MMA/2013 et no. 001/001/CAB/MINPRO/EME/MMA/2013 portant mesures d'application de l'Arrêté provincial no. 13/017/CAB/GP-MMA/2013 du 12/04/2013 portant interdiction de l'exploitation artisanale dans le périmètre minier de Namoya Mining Sarl dans le secteur des BB Salamabila en territoire de Kabambare*

UNCLASSIFIED   EXHIBIT 60

S/2020/482



2019 "agreement" provided by multiple sources with knowledge of the matter and signed between representatives of
Banro Mining Corporation, Sheikh Hassani
and representatives of the provincial government of Maniema

« Accord » de 2019 fourni par multiples sources avec des source familieres avec cette question, signé entre des
représentants de Banro Mining Corporation, Sheikh Hassani
et des représentants du gouvernement provincial du Maniema

Namoya Mining told the Group that it had invested at least $947,390 on education, $1,207,201 on health,
$2,670,000 on infrastructure and $2,780,002 on community development since 2014, but that since 2016 its com-
munity projects had been regularly interrupted by security incidents targeting the company and its community
works.

Finally, the Group noted that since 2014 Namoya Mining SARL has undergone several changes in ownership.
During the reporting period the project's financiers were Gramercy Funds LLP and Baiyin International Invest-
ments.

UNCLASSIFIED    EXHIBIT 60

**S/2020/482**

En septembre 2019, Banro Mining Corporation a suspendu toutes ses activités en RDC, en raison d'un cas de force majeure (voir S/2019/469, par. 43) suite à un « accord » d'août 2019 avec Sheikh Hassani cédant Mwendamboko et d'autres parties riches en or de la concession de Namoya à la communauté de Salambila. Des représentants de Namoya Mining, la filiale de Banro, ont déclaré au Groupe qu'ils avaient signé « l'accord » d'août 2019 sous la contrainte afin d'obtenir la libération en toute sécurité du dernier otage que Sheikh Hassani avait menacé de tuer. Ils ont également noté qu'en vertu de « l'accord », la société aurait dû céder 60 pourcents du gisement à Sheikh Hassani, alors que le gisement appartenait aux actionnaires de la société et que la cession du gisement rendrait l'actif non viable. Dans ces conditions, Namoya Mining ne considérait pas « l'accord », signé par des représentants du gouvernement provincial du Maniema, le PDG de Banro Mining Corporation et Sheikh Hassani, comme légalement légitime. Une copie de « l'accord » est incluse dans cette annexe.

Selon Namoya Mining, les quatre employés enlevés par Mai-Mai Malaika en juillet 2019 préparaient la route vers la zone d'exploitation minière artisanale de Matongo, une zone identifiée comme un site alternatif d'extraction minière artisanale pour la communauté de Salambila. Cela s'est produit après que la communauté et la société avaient conclu un accord à ce sujet lors d'un forum de paix en mai 2019 coordonné par la MONUSCO et le gouvernement provincial intérimaire du Maniema.

Les représentants de la communauté ont cependant déclaré au Groupe qu'ils avaient salué « l'accord » d'août 2019. Un creuseur a montré au Groupe un formulaire estampillé SAEMAPE établi peu après août 2019, lui donnant le droit de commencer à creuser officiellement sur la concession nouvellement désignée. Lorsque Namoya Mining a rdénoncé « l'accord » peu de temps après la libération de leur dernier otage, la communauté a considéré que la société les avait de nouveau abandonnés.

Quatre membres de la communauté ont déclaré au Groupe qu'à leur avis, Namoya Mining n'avait pas respecté les termes de l'accord que l'entreprise avait signé avec la population de Salambila en septembre 2014, et un représentant du gouvernement provincial du Maniema a déclaré au Groupe que, avait Namoya Mining respecté les termes de l'accord, les relations entre la communauté et l'entreprise se seraient beaucoup améliorées. Le Groupe n'a pas pu obtenir une copie de cet accord mais inclut dans cette annexe une copie des demandes précédentes formulées par la communauté, signées par un représentant de Banro de l'époque, en 2013. Il s'agissait notamment de l'approvisionnement en eau et électricité à la ville de Salambila, de la réhabilitation de la route entre Kasongo et Salambila, de l'investissement dans des projets agricoles et un engagement à engager de préférence les populations locales dans l'entreprise.

Le Groupe a également noté que la mobilisation sociale contre l'exploitation minière industrielle existait à Namoya depuis que Banro Mining Company avait commencé ses activités d'exploration en 2004.[5] En 2013, les mineurs artisanaux ont été sommés de quitter la concession par décret provincial.[6] Deux creuseurs artisanaux ont expliqué au Groupe qu'ils avaient été chassés de la montagne en 2013 par la société minière. Un chercheur a estimé qu'environ 90 pour cent de la communauté de Salambila dépendait économiquement du secteur de l'extraction artisanale d'or.

Namoya Mining a déclaré au Groupe qu'il avait investi au moins 947 390 $ dans l'éducation, 1 207 201 $ dans la santé, 2 670 000 $ dans les infrastructures et 2 780 002 $ dans le développement communautaire depuis 2014, mais que depuis 2016, ses projets communautaires avaient été régulièrement interrompus par des incidents de sécurité visant l'entreprise et ses travaux communautaires.

Enfin, le Groupe note que depuis 2014 Namoya Mining a subi plusieurs changements de propriétaire. Durant la période considérée, les financiers du projet étaient Gramercy Funds LLP et Baiyin International Investments.

---

[5] Voir aussi Geenen, S., *The Extractive Industries and Society* (2017) and; Verweijen, J., *Luddites in the Congo?* (2017).
[6] Voir Arrêté interministériel des ministres provinciaux n° 02/085/CAB/MINPRO/INOP/MMA/2013 et n° 001/001/CAB/MINPRO/EME/MMA/2013 portant mesures d'application de l'Arrêté provincial n° 13/017/CAB/GP-MMA/2013 du 12/04/2013 portant interdiction de l'exploitation artisanale dans le périmètre minier de Namoya Mining Sarl dans le secteur de Salambila en territoire de Kabambare.

UNCLASSIFIED   EXHIBIT 60

S/2020/482

# PROTOCOLE D'ACCORD

SIGNÉ

ENTRE

LA SOCIÉTÉ NAMOYA MINING SA

(LA SOCIÉTÉ)

ET

LE SECTEUR DE BANGUBANGU SALAMABILA

(LE SECTEUR)

ENSEMBLE DÉSIGNÉ CI – APRÈS SOUS LE NOM DE

" PARTIES"

Protocole d'Accord BB Salamabila – Namoya Mining SA

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 60

S/2020/482

## I

### I.    INTRODUCTION

Ce protocole d'accord est une reponse mutuelle par les parties suivant le "Cahier des charges" de la Communauté des BB Salambabila dresse a la Compagnie Baern via sa Filiale NAMOYA MINING SA sous la direction du Chef de Secteur des HH Salambabila.

Le cahier des charges datant de Janvier 2013, se traduit par cet engagement de bonne foi entre parties qui se resolvent à examiner vers des objectifs communs, dans un esprit de respect mutuel et dans les limites des droits des uns et des autres.

### II.    OBJECTIFS COMMUNS

Les parties réitèrent leur engagement commun conclu et approuvé au cours des discussions ayant été guidées par l'esprit et la lettre des Termes des Références sur lesquelles elles se sont référées.

A l'issue des discussions faites, il n'en est déduit l'intention commune des parties dont l'importance de construire des relations fondées sur un climat social apaisé et mutuellement bénéfique durant toute la vie de la mine à Namoya.

Il est entendu que les questions d'intérêt mutuel seront abordées en collaboration en vue de faciliter la prospérité de la mine de Namoya et de la communauté des HH Salambabila en particulier et de la population du Maniema en général, et que cet acte d'engagement réciproque sert de cadre approprié et de préalables directeurs qui conduisent les relations des parties. C'est dans cette optique, qu'il est utile clairement utile que nos attestes communes exprimées dans leur forme soient leur band system expressément connues.

Il est neanmoins important, que les relations entre la société et la communauté soient réciproquement honnêtes. Les parties s'engagent à cet égard à ce qu'elles se touchement pleinement et mutuellement dans leurs efforts visant d'une part, à la communauté de soutenir la compagnie à exploiter la mine de Namoya et d'autre part à la compagnie d'exécuter de bonne foi les attentions de la communauté exprimées dans le cahier de charges. Toutefois, les conduites respectives des parties doivent se caractériser par le respect mutuel de manière qu'elles agissent en tout égard d'éthique sans qu'aucune d'elles ne sous-estime l'autre, tout en gardant à l'esprit l'objectif commun.

### III.    LES ATTENTES DE LA COMMUNAUTE ET L'ENGAGEMENT DE LA SOCIETE

#### 1.    De l'Emploi

La priorité et la promotion de la main d'œuvre disponible localement et dans la province du Maniema lors des engagements. La Societe veillera à ce que cet engagement soit applicable à ses

*Protocole d'Accord BB Salambahlio – Namoya Mining SA*

2

construction et ses sous-contractants compte tenu de leurs besoins en terme de recrutement. Le recrutement et la présentation des cadres du Maniema aux fonctions de maîtrise et de commandement. Toutefois les autres postes de direction, de commandement et maîtrise seront publiés conformément aux procédures et dispositions légales en vigueur en RDC en matière d'emploi, sous l'encadrement du gouvernement provincial. La classification des emplois occupés sera communiquée au gouvernement provincial de façon qui sera la signature du présent protocole d'accord

Les parties reconnaissent pour cette fin le "Charte d'Emploi" ayant déjà existé, pour créer donner de priorités de recrutement au sein de la mine pour le niveau inférieur à celui des travailleurs qualifiés et des superviseurs. Des représentants compétents de deux parties siègeront au sein du comité d'emploi. En outre, les parties se conviennent de mettre en place le comité d'exécution et de suivi pour le cahier de charges, ainsi que le comité de l'environnement dont la composition et les modes de fonctionnement sont définis dans l'annexe de ce présent protocole. L'évaluation d'exécution et de suivi des projets sera faite chaque trimestre.

## 2. Du développement de la Communauté de Namoya à travers un mécanisme conjoint de concertation

Plusieurs attentes ont été exprimées par la communauté de Namoya au sujet de son développement socio-communautaire par la société Namoya Mining SARL. Ces attentes seront matérialisées par les mécanismes décrétées de commun accord entre la société Namoya Mining SARL et la Communauté des BB Salambila comme suit

### 2.1. Des sources de financement:

Étant convenu sur la durée de la vie de la mine dans sa phase de production.

- La communauté des BB Salambila bénéficiera du 1% sur le bénéfice net réalisé par la société Namoya Mining SARL après paiement des tous les taxes;
- En addition, la communauté des BB Salambila bénéficieront en substance de 15 pour chaque mois produit par la société Namoya Mining SA. La communauté a réadéquat adhésion le préfinancement de quelques projets jugés prioritaires.

### 2.2. Du mécanisme de la mise à disposition des fonds, de sa gestion et de la réalisation des projets:

Dans le cadre du mécanisme de financement prévu dans cet accord, la société s'engage à mettre à la disposition de la communauté des BB Salambila (de la Fondation Banro les sommes dues par un montant trimestriel pour ce fonds de SI par ce il) et prévoit alors que les 1% des bénéfices réalisés le seront à la fin de chaque année fiscale lorsque la société aura déduit ses bénéfices.

*Protocole d'Accord BB Salambila – Namoya Mining SA*



UNCLASSIFIED                          EXHIBIT 60

S/2020/482

3

La fondation Ramn ou l'organe créé par la Corporation Ramn en vue de soutenir ses projets dans le cadre du développement durable, dans les domaines d'activités qui aboutiront à l'amélioration des conditions de vie et des appropriés, des communautés locales compétibles des entités dans lesquelles ses filiales opèrent. D'où , pour le cas en concerne, à travers cet organe, en collaboration avec le comité local d'exécution et de suivi du cahier de charges , dans une entente naturelle et commune au de la communauté des fils Salamabila, la société Namaya Mining SA s'engage à intervenir dans les domaines suivants:

- L'Education
- La Santé
- Les Infrastructures
- Le Développement économique

Se référant aux problèmes tels que repris dans le cahier des charges, il est convenu que la communauté décidera par ordre des priorités, en proportion des ressources financières réelles, les projets par lesquels elle entame pouvoir commencer leur réalisation.

Par ailleurs, il est entendu que:

A. Dans le domaine des infrastructures:
  - La société n'a pas la capacité financière requise de pouvoir municipaliser la route Salamabila - Kigoa, longue de 3(a) kilomètres ni de goudronner les principaux axes routiers de la cité de Salamabila. Cela n'excluant pas d'autres possibilités d'intervention dans la réhabilitation des routes telle qu'envisagée dans le cahier des charges.
  - Pour ce qui concerne les matières relatives aux bureaux et résidence du chef de secteur, ceci fera l'objet d'entente particulière et non contenu dans le présent accord entre l'autorité du secteur et la société, dans la mesure où l'autorité ne fait pas partie intégrante de la communauté en tant que telle.

B. Dans le domaine de l'Education:

La communauté établira par ordre de ses priorités la réalisation successive des projets visant à soit , à savoir cahier des charges notamment la construction et ou la réhabilitation et équipement des infrastructures scolaires en vue d'accroître l'offre de l'éducation ainsi que la qualité de celle-ci conformément aux directives du gouvernement en la matière.

L'autorité, flagan Fondation en concertation avec la communauté locale, planifiera dès la prochaine année scolaire et académique, un mécanisme d'octroi des bourses d'études aux élèves et étudiants pourvus de la communauté qui le mériteront.

Protocole d'Accord BB Salamabila – Namaya Mining SA

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

4

Par ailleurs, la Fondation Banro poursuivra son œuvre d'appui à l'enseignement de base telle qu'initiée et entreprise depuis une certaine période conformément à sa vision et ses objectifs.

Il est cependant convenu que le premier projet à réaliser dans le cadre du cahier des charges en ce qui concerne le domaine éducatif sera la construction et l'équipement d'une école d'apprentissage des métiers à Kayembe.

C. Dans le domaine de la Santé:

Le projet de construction de Centre Hospitalier de Salamabila qui est un vaste projet devra évoluer par étape jusqu'à se concrétiser en un Hôpital Général de Référence pour le bénéfice de la communauté locale sans toutefois occulter la possibilité de pouvoir réaliser les autres attentes énumérées dans le cahier des charges dans le domaine de la santé.

D. Dans le domaine du développement économique:

Du privilège à accorder aux entreprises locales :

La société s'engage à donner par ailleurs à la communauté l'opportunité de présenter leurs offres pour la fourniture des services, denrées alimentaires, équipement et matériels à la société. Sera privilégiée en cas d'embarras de choix l'entreprise locale ayant l'affiliation la plus proche de Namoya. La compétitivité des prix et services ainsi que la qualité des produits seront de rigueur observé.

De la promotion du secteur agro-pastoral et l'établissement des concessions agricoles

sur des terres rendues disponibles par le Secteur BH Salamabila:

Namoya Mining SA, sous le truchement de la Fondation Banro va travailler avec la communauté et l'assister dans la promotion et le développement d'activités agro-pastorales dans les zones à forte potentialité agricole en milieu d'avantage sur les groupes des terrains et des terrains affectés par le projet.

De la question de l'eau et de l'électricité:

La Fondation Banro, sur base d'un projet déjà planifié, selon la disponibilité des fonds, travaillera avec la communauté pour la mise en œuvre d'un projet d'hydraulique rurale dans le but de desservir les populations locales en eau potable.

Par contre, au regard de la dimension exponentielle des projets hydrélectriques, la construction des barrages et ses extensions jugé un coût exorbitant, Namoya Mining SA ne pourra les construire tel qu'exprimé dans les attentes.

*Protocole d'Accord BH Salamabila – Namoya Mining SA*

UNCLASSIFIED

EXHIBIT 60

S/2020/482

Aussi bien que celui de la communauté à travers son engagement à coopérer à l'amiable avec la Direction de la société.

**3. Le réaménagement de la liste des attentes:**

Le savoir des BB Salamabila indique que son cahier des charges tel que fourni n'est pas exhaustif des attentes de la communauté et qu'elle pourrait les réexaminer au cours des réunions du comité d'exécution et de suivi jusqu'à la fin de la vie de la mine. La société est d'avis que le but commun des parties pourrait être compromis par des modifications fréquentes et inappropriées. Elle fera appel dans ce cas au Chef de Secteur des BB Salamabila et au comité d'exécution et de suivi du cahier de charges pour faire usage de modération et d'agir de bonne foi sur ce type de question.

**V.   RÈGLEMENT DES CONFLITS ENTRE PARTIES**

Les parties s'empêchent au préalable de recourir aux instances judiciaires. Elles privilégient les étapes suivantes au cas où l'une se sentirait lésée:

1. Dans l'éventualité d'une allégation de grief à l'encontre d'une des obligations citées dans le présent protocole d'accord, la partie faisant cette allégation devra, avant de s'engager dans toute autre action, notifier la partie présumément en tort du fait qu'elle est tenue pour responsable, et fera appel à celle-ci pour la réparation du tort dans les trente jours qui suivent la réception de la notification;

2. Les parties devront se rencontrer à deux reprises endéans les trente jours susmentionnés afin de trouver de résoudre le problème à l'amiable;

3. En cas de non résolution du problème par la partie incriminée, les deux rencontres, ou plus, tenues, n'ayant abouti au préalable à aucun arrangement à l'amiable, la partie lésée contacte la province et la hiérarchie de la société pour un arbitrage.

4. À l'épuisement des précédentes démarches sans aboutissement à une réconciliation, la partie lésée pourra alors décider de recourir aux juridictions de droit commun de la République du Congo de ressort de la mine.

**VI.   PROJETS PRIORITAIRES**

1. Sans préjudice aux attentes convenues entre parties dans le présent protocole d'accord, les parties conviennent de construir accord dans sa première phase de mettre en exécution des aspirations du cahier de charges convenues comme actuels "priorité des priorités", à court terme:

   - Réhabiliter et entretenir la route Salamabila- Kasongo.

*Protocole d'Accord BB Salomebila – Namoya Mining SA*

Document provided by a source familiar with the matter

Document fourni par une source familière avec cette question

UNCLASSIFIED          EXHIBIT 60

S/2020/482

### Annex 29

**Photograph of Lotissement, an area of land accorded to Sheikh Hassani within Salamabila area**

**Photographie de Lotissement, un terrain concédé à Sheikh Hassani dans la zone de Salamabila**



Photograph taken by the Group in March 2020
Photographie prise par le Groupe en mars 2020

          UNCLASSIFIED          20-06401
92 of 528

UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 30**

**Calculation for estimated taxation at Lotissement for bags of sand entering the area**

**Calcul estimé de la taxation pour les sacs de sable entrant à Lotissement**

Calculation was based on interviews with eight individuals familiar with digging at Salamabila and information extracted from a mine manager's notebook reviewed by the Group, and assuming an available workforce of up to 3,000 diggers working in teams of five in rotations of eight hours per team and for a seven-day working week, and assuming that each team produced a conservative five bags of mineral-rich sand per rotation.

Le calcul s'est fait sur la base d'entretiens avec huit personnes bien informées des activités d'extraction à Salamabila et d'informations extraites d'un cahier de gestion de mine examiné par le Groupe, et en supposant un effectif disponible de jusqu'à 3 000 creuseurs travaillant en équipes de cinq en rotation de huit heures par équipe et pendant sept semaines de travail journalier, et en supposant que chaque équipe produisait cinq sacs de sable riche en minéraux par rotation (évaluation prudente).

UNCLASSIFIED   EXHIBIT 60

S/2020/482

**Annex 31**

**Sale of Namoya artisanal gold**

**Vente de l'or artisanal de Namoya**

Throughout 2019 artisanal gold produced at Namoya was sold to buying houses in Salamabila including at Kimbaseke market. Diggers told the Group they sold to the following buying houses: Mushamalirwa, Mulikusa, Kadjango and Baba Alain, and that the gold produced was transported by air or road to Bukavu, South Kivu. A mining authority and an eye-witness in Bukavu confirmed to the Group that Salamabila gold was sold to export houses in Bukavu including *Mines Propres SARL*.

Tout au long de 2019, l'or artisanal produit à Namoya a été vendu à des maisons d'achat à Salamabila, y compris au marché de Kimbaseke. Des creuseurs ont déclaré au Groupe qu'ils avaient vendu aux maisons d'achat suivantes : Mushamalirwa, Mulikusa, Kadjango et Baba Alain, et que l'or produit avait été transporté par voie aérienne ou routière jusqu'à Bukavu, Sud Kivu. Une autorité minière et un témoin oculaire à Bukavu ont confirmé au Groupe que l'or de Salamabila était vendu à des maisons d'exportation de Bukavu, dont Mines Propres SARL.

UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 32**

**FARDC at Namoya**

**FARDC à Namoya**

According to 18 of the Group's interviewees, Namoya Mining provided food and some logistical support to some FARDC members stationed at Salamabila. The FARDC members also escorted Namoya Mining vehicles on some occasions, according to community members. Namoya Mining representatives told the Group that this was the case but that, firstly, Namoya Mining only provided support to the company of up to 150 FARDC charged with securing its concession, and not for the entire battalion stationed at Salamabila. Namoya Mining also added that, in reality, FARDC were so poorly provisioned that it was necessary to feed those soldiers charged with protecting their asset in order for them to properly function. Namoya Mining reiterated that the FARDC around its concession were stationed there in order to protect against armed attack from Mai-Mai Malaika and Mai-Mai Yakutumba. Namoya Mining told the Group that authorities had insisted that certain convoys, notably those transporting fuel and blasting equipment, had to be accompanied on the road between Baraka and Salamabila because they represented a security threat if the cargo fell into the hands of armed assailants. In 2018 Mai-Mai Yakutumba and Mai-Mai Malaika had mounted a significant attack on the company (see S/2018.531, para. 52).

Selon 18 des personnes interviewées par le Groupe, Namoya Mining a fourni de la nourriture et un soutien logistique à certains membres des FARDC stationnés à Salamabila. Selon des membres de la communauté, des membres des FARDC ont également escorté des véhicules de Namoya Mining à certaines occasions. Des représentants de Namoya Mining ont déclaré au Groupe que c'était le cas mais que, premièrement, Namoya Mining n'avait fourni un soutien que pour un maximum de 150 soldats FARDC chargés de protéger sa concession, et non à l'ensemble du bataillon FARDC stationné à Salamabila. Namoya Mining a ajouté qu'en réalité l'armée congolaise était si mal approvisionnée qu'il était nécessaire de nourrir les soldats chargés de protéger leurs actifs afin qu'ils puissent fonctionner correctement. Namoya Mining a réitéré que les FARDC autour de sa concession y étaient stationnées afin de protéger la concession des attaques armées des Maï-Maï Malaika et Maï-Maï Yakutumba. Namoya Mining a déclaré au Groupe que les autorités congolaises avaient insisté sur le fait que certains convois, notamment ceux transportant du carburant et du matériel de dynamitage, devaient être escortés sur la route entre Baraka et Salamabila car ils représentaient une menace pour la sécurité si la cargaison tombait entre les mains d'agresseurs armés. En 2018, les Maï-Maï Yakutumba et Maï-Maï Malaika avaient lancé une attaque importante contre l'entreprise (voir S/2018.531, par. 52).

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 33**

**Excerpt from artisanal mine-owner's log book at Namoya dated November 2018**

**Extrait du journal du propriétaire d'une mine artisanale sur Namoya daté de novembre 2018**



Document provided by a source familiar with the matter

Document fourni par une source familière avec question

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 34**

**A written circular dated February 2019 and signed by sanctioned individual General Muhindi Akili Mundos (CDi.032), calling upon FARDC operational units in Maniema province to desist from erecting check-points, which he says interfered with the free movement of people and goods**

**Circulaire datée de février 2019 et signée par le Général Muhindi Akili Mundos, sous sanction des Nations Unies (Cdi.032), appelant les unités opérationnelles des FARDC au Maniema à renoncer à ériger des barrières qui, selon lui, interfèrent avec la libre circulation des personnes et des biens**



UNCLASSIFIED                    EXHIBIT 60

S/2020/482

### Annex 35

**Identification documents of Alex Tobias Kaila, a Tanzanian arrested in South Kivu for gold smuggling**

**Documents d'identité d'Alex Tobias Kaila, un tanzanien arrêté au Sud Kivu pour traffic d'or**





UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 36**

**A circular by the Congolese mining authorities denoucning mineral fraud and calling on all the relevant sectors to combat mineral fraud**

**Circulaire des autorités minières congolaises dénonçant la fraude minière et appelant tous les secteurs concernés à lutter contre la fraude minière**

*République Démocratique du Congo*
*Gouvernement de la République*

*MINISTERE DES MINES*
*Le Ministre*

**NOTE-CIRCULAIRE N° 0 0 0 0 1 .........../CAB.MIN/MINES/01/2020 DU 0.8 AVR 2020**

**Concerne** : Activités de la fraude minière et toute activité minière illicite

A l'attention de :
➢ Tous les Chefs de Divisions Provinciales des Mines et Géologie ;
➢ Tous les Directeurs Provinciaux du Cadastre Minier ;
➢ Tous les Directeurs Provinciaux du CEEC ;
➢ Tous les Directeurs Provinciaux du SAEMAPE
(TOUS) en <u>RDC</u>

Les renseignements des aviseurs recrutés sur terrain et même des autorités en Provinces font état de fraude minière et d'activités minières illicites non signalées par vos services respectifs toute l'année 2019.

Cette situation frise la complicité des services des mines locaux et centraux, et la fuite des capitaux au Trésor Public.

En vue de protéger les acquis du Gouvernement de la République et au regard de la situation ci-haut évoquée, j'ai décidé ce qui suit :
1) La transmission des rapports hebdomadaires de vos services respectifs à vos autorités hiérarchiques avec copie directement au Ministre des Mines ;
2) La vérification des activités de vos services respectifs par l'instauration des contrôles et audits ponctuels de vos activités ;
3) Le démantèlement de tous les réseaux maffieux à travers vos entités respectives et l'identification de leurs auteurs.

Cette Note-Circulaire est de stricte application et ne doit souffrir d'aucune faille. Je vous instruis d'en assurer une large diffusion à tous vos services respectifs.

Fait à Kinshasa, le 0.8 AVR 2020 .

**Prof. WILLY KITOBO SAMSONI**

3ème Etage, Hôtel du Gouvernement, Place Royal, boulevard du 30 Juin - Kinshasa/Gombe - RDC
Site Web : www.mines-rdc.cd
E-mail : info@mines-rdc.cd

UNCLASSIFIED

EXHIBIT 60

**S/2020/482**

**Annex 37**

**Screenshot of artisanal miners in Misisi, disputing the closure of their mine sites by South Kivu provincial authorities in March 2020**

Capture d'écran de creuseurs artisanaux à Misisi, contestant la fermeture de leurs sites miniers par les autorités provinciales du Sud Kivu en mars 2020

 

UNCLASSIFIED                          EXHIBIT 60

S/2020/482

**Annex 38**

**AGR response to the Group about ICGLR certificates, March 2020**

**Réponse d'AGR au Groupe sur les certificats de la CIRGL, mars 2020**

AGR told the Group that "a so called Vaya Forex Bureau" was unknown to the company and did not hold an account with AGR. The company further stated that they considered that the ICGLR document may be a "forgery" or "fraud" and that the company had already been the target of several such attacks. The company further committed to preventing forgery or fraud, and to reporting such activities to relevant Ugandan authorities and to relevant authorities abroad, as well as "instituting criminal and civil proceedings against the perpetrators".

AGR shared with the Group copies of the following of its procedural documents:
i. account opening form;
ii. code of conduct;
iii. supply chain policy;
iv. anti bribery policy and compliance handbook.


AGR a déclaré au Groupe qu 'un « soi-disant Bureau Vaya Forex » n'était pas connu de la société et n'avait pas de compte auprès d'AGR. La société a en outre déclaré qu'elle considérait que le document de la CIRGL pouvait être un « faux » ou une « fraude » et que la société avait déjà été la cible de plusieurs de ce ty pe d'attaques. La société s'est en outre engagée à prévenir la contrefaçon ou la fraude et à signaler ces activités aux autorités ougandaises compétentes et aux autorités compétentes à l'étranger, ainsi qu'à « engager des poursuites pénales et civiles cont re les auteurs ».

AGR a partagé avec le Groupe des copies des documents de procédure suivants :
i. formulaire d'ouverture de compte ;
ii. code de conduite ;
iii. politique de la chaîne d'approvisionnement ;
iv. politique anti-corruption et manuel de conformité.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 39**

**ICGLR certificates traced by the Group for legal Congolese gold exports to regional gold refineries**

**Certificats CIRGL tracés par le Groupe en vur d'exportations légales d'or congolais vers des raffineries d'or régionales**

1. Certificate showing legal 20/04/2019 export of 2.827 kilograms (net weight) of gold from registered exporter Ets Namukaya to Aldango Ltd.
Certificat CIRGL du 20/04/2019 démontrant une exportation d'or de 2,827 kilogrammes (poids net) de l'exportateur Ets Namukaya à Aldango Ltd.



2. Certificate showing legal 24/09/2019 export of 3.201 kilograms (net weight) of gold from registered exporter Ets Namukaya to Aldango Ltd.
Certificat CIRGL du 24/09/2019 démontrant une exportation d'or de 3,201 kilogrammes (poids net) de l'exportateur Ets Namukaya à Aldango Ltd.



UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 60

S/2020/482

3. Certificate showing legal 23/03/2019 export of 2.105 kilograms (net weight) of gold from registered exporter Le Miracle to AGR Ltd, via Vaya Forex Bureau.
Certificat CIRGL du 23/09/2019 démontrant une exportation d'or de 2,105 kilograms (poids net) de l'exportateur Le Miracle à AGR Ltd, via Vaya Forex Bureau.



As described in the body of this report, Aldango Ltd told the Group in a February 2020 meeting that they had not received the ICGL certificate, and that they did not recognise the named supplier. They also confirmed that the address on the certificate was the company's old trading address in Nyaraturama, Kigali, and that the refinery no longer bought gold at that address since it had moved to its new refining premises. Representatives confirmed to the Group that the refinery bought gold from individuals and corporate clients and some scrap gold, and that it did not hold any off-take agreements with gold mining companies in Rwanda. The company also confirmed that they bought artisanally produced Rwandan gold, although volumes were minimal and had dropped in 2019 due to on-going environmental and working condition reforms in the Rwandan artisanal mining sector. Aldango Ltd committed to share purchasing volumes with the Group, which the Group had not received by the time of drafting. Aldango Ltd also told the Group that it required all suppliers to complete Know Your Customer checks, complete an account opening form, including information on the registered office correspondent address and other details such as copies of passports and trading licenses. The Group requested copies of the company's KYC and account opening forms and a copy of their supply chain due diligence, and had not received these by the time of drafting this report.

Comme décrit dans le corps de ce rapport, les représentants Aldango Ltd ont déclaré au Groupe, lors d'une réunion en février 2020, qu'ils n'avaient pas reçu le certificat de la CIRGL et qu'ils ne reconaissaient pas le fournisseur désigné. Ils ont également confirmé que l'adresse figurant sur le certificat était l'ancienne adresse commerciale de la société à Nyaraturama, Kigali, et que la raffinerie n'achetait plus d'or à cette adresse depuis qu'elle avait déménagé dans ses nouveaux locaux de raffinage. Les représentants ont confirmé au Groupe que la raffinerie avait acheté de l'or à des particuliers et à des entreprises ainsi que de la ferraille et qu'elle n'avait conclu aucun accord de prélèvement avec des sociétés d'extraction d'or au Rwanda. Les représentants ont également confirmé que la société avait acheté de l'or rwandais produit artisanalement, bien que les volumes soient minimes et aient chuté en 2019 en raison des réformes en cours relatives à l'environnement et aux conditions de travail dans le secteur minier artisanal rwandais. Aldango Ltd s'est engagée à partager les volumes d'achats avec le Groupe, lesquels n'avaient pas été reçu au moment de la rédaction du rapport. Les représentants ont également déclaré au Groupe que la société exigeait que tous les fournisseurs effectuent les contrôles « Connais ton client » (KYC), remplissent un formulaire d'ouverture de compte, comprenant des informations sur l'adresse du correspondant du siège social et d'autres détails tels que des copies de passeports et de licences commerciales. Le Groupe a demandé des copies des formulaires KYC et

UNCLASSIFIED   EXHIBIT 60

**S/2020/482**

d'ouverture de compte de la société ainsi qu'une copie de leur politique de vérification diligente de leur chaîne d'approvisionnement et ne les avait pas reçues au moment de la rédaction du présent rapport.

EXHIBIT 60

S/2020/482

## Annex 40

**PGR and AGR responses to the Group about 21 October 2019 export of 135 kilograms of 999.9 fineness gold bars from Metal Testing and Smelting Co Ltd to PGR in United Arab Emirates**

**Réponses de PGR et AGR fournies au Groupe à propos de l'exportation le 21 octobre 2019 de 135 kilogrammes de lingots d'or d'une pureté de 999,9 de Metal Testing and Smelting Co Ltd à PGR aux Émirats arabes unis**

AGR told the Group that Metal Testing and Smelting Co. Ltd operated "under Manufacture Under Bond issued by Uganda Revenue Authority" and that "this company does not have a refining facility" and "does not have KYC or due diligence procedures in place," that it was exporting "raw UAE gold to Uganda by hand carry" and that Metal Testing and Smelting Co. Ltd were "bribing officials at Entebbe airport". AGR also said that "Metal Smelting and Testing Co. Ltd does not hold an account with AGR".

PGR told the Group that it had developed a "comprehensive supplier identification, verification and KYC process" and that "all KYC and transaction documents are uploaded in our compliance system where the list of supplier and customers is easily identified". PGR further stated that based on their records, "Metal Testing and Smelting Co. Ltd and Mr. Robert Ojuku are not registered on our company or supplier database" and confirmed "non-involvement in this transaction".

PGR also provided the Group with a copy of its Risk Mitigation Policy and stated that it had "fully complied with each step in the OECD Guidance and DMCC Rules for Risk Based Due Diligence in the Gold and Precious Metals Supply Chain."

The Group noted that PGR was not listed on the Dubai Multi Commodities Centre Good Delivery list.

AGR a déclaré au Groupe que Metal Testing and Smelting Co. Ltd opérait « dans le cadre de la fabrication sous caution émise par l'Administration fiscale ougandaise » et que « cette société n'a pas d'installation de raffinage" et "n'a pas de KYC ou de procédures de diligence raisonnable en place », qu'elle exportait « de l'or brut des Émirats Arabes Unis vers l'Ouganda par transport manuel » et que Metal Testing and Smelting Co. Ltd « soudoyaient des fonctionnaires à l'aéroport d'Entebbe ». AGR a également déclaré que « Metal Smelting and Testing Co. Ltd ne détient pas de compte auprès d'AGR ».

PGR a déclaré au Groupe qu'il avait développé un « processus complet d'identification, de vérification et de KYC s'agissant de ses fournisseurs » et que « tous les documents KYC et de transaction sont téléchargés dans notre système de conformité où la liste des fournisseurs et clients est facilement identifiable ». PGR a en outre déclaré que sur la base de leurs dossiers, « Metal Testing and Smelting Co. Ltd et M. Robert Ojuku ne sont pas enregistrés dans notre base de données d'entreprise ou de fournisseur » et a confirmé « leur non-implication dans cette transaction ».

PGR a également fourni au Groupe une copie de sa politique d'atténuation des risques et a déclaré qu'il s'était « pleinement conformé à chaque étape du Guide de l'OCDE et des règles du DMCC pour la diligence raisonnable basée sur les risques dans la chaîne d'approvisionnement de l'or et des métaux précieux ».

Le Groupe note que PGR ne figure pas sur la liste du Good Delivery du Dubai Multi Commodities Centre.

UNCLASSIFIED           EXHIBIT 60

S/2020/482

## Annex 41

## Statute of Congo Gold Raffinerie (CGR) – extract (publicly available)

## Statut de Congo Gold Raffinerie (CGR) – extrait (accessible au public)

Entre les soussignés

1.- La société MARATHON SARL, immatriculée au RCCM sous le n° RCCM/CD/KING/RCCM/19-D-00029 ; Id.Nat. 01-83-N41776Z, dont le siège social est situé au n° 158, Boulevard du 30 juin, dans la Commune de la Gombe, représentée par Monsieur Robert MUTESA, son gérant ;

2.- La Société GLOBAL INVESTMENT CONGO SARL, dont le siège social est situé dans le Bâtiment GHTC, Avenue Lukelenge, dans la Commune de Kintambo à Kinshasa, inscrite au RCCM sous le numéro CD/KIN/RCCM/16-B-10589 ; Id.Nat. 01-83-N15303A, représentée par Monsieur LIU ZHIGANG, son, gérant ;

Il est établi ainsi qu'il suit les statuts de la Société à Responsabilité Limitée devant exister entre eux et tous autres propriétaires de parts qui pourraient entrer dans la société ultérieurement.

TITRE I : FORME – DÉNOMINATION – OBJET – SIÈGE – DURÉE - EXERCICE SOCIAL

Article 1 : Forme – Dénomination

1.1 Il est formé entre les soussignées, une Société à Responsabilité Limitée qui sera régie par l'Acte Uniforme de l'OHADA relatif au droit des sociétés commerciales et des groupements d'intérêt économique, et par toutes autres dispositions légales et réglementaires complémentaires ou modificatives et par les présents statuts (la « Société »).

1.2 La Société pourra, sur décision unanime des associés, prendre une autre forme sans que cette transformation donne naissance à une personne morale nouvelle.

1.3 La société a pour dénomination « CONGO GOLD RAFFINERIE »

TITRE III : ADMINISTRATION – ASSEMBLÉE - SURVEILLANCE

Article 13 : Gérance

13.1 La Société est gérée par une ou plusieurs personnes physiques, choisies parmi les associés ou en dehors d'eux. La nomination des gérants au cours de la vie sociale est décidée à la majorité de plus de la moitié des parts sociales.

13.2 Les gérants sont nommés pour une durée de 4 années. Ils sont rééligibles.

13.3 Tout gérant peut démissionner à tout moment de son mandat, moyennant une notification adressée à la Société contre récépissé.

13.4 Les gérants sont révocables par décision des associés représentant plus de la moitié des parts sociales.

13.5 Les fonctions de gérant sont gratuites ou rémunérées dans les conditions fixées dans une décision collective des associés.

Est nommé en qualité de Gérant de la Société, Monsieur OBEDI URUMA ZAIDI.

Article 14 : Pouvoirs des gérants

14.1 Dans les rapports entre associés, les gérants peuvent faire tous les actes de gestion dans l'intérêt de la Société.

14.2 Dans les rapports avec les tiers, les gérants sont investis des pouvoirs les plus étendus pour agir en toute circonstance, au nom de la Société, sous réserve des pouvoirs expressément attribués aux associés par la loi

**S/2020/482**

**Annex 42**

**License and statute information**

**Informations sur les licences et les statuts**

According to official "Uganda Registration Services Bureau" company documents reviewed by the Group, African Gold Refinery Ltd (AGR) was legally incorporated in 2014 and Tony Goetz, whose address was recorded as Jacob Jacobstreet, 58-2018, Antwerp, Belgium, held 99 of 100 shares at registration. The company has since changed ownership (see below).

As stated in the body of this report, in May 2020 Alain Goetz confirmed to the Group that he was no longer directly involved in the company. According to the same Uganda Registration Services Bureau records, as of 29 May 2019, Alain Francois Goetz was listed as one of the two directors of the company even though, in an October 2019 meeting with the Group, representatives of AGR said that he was no longer a director in the company. In a March 2020 letter addressed to the Group, AGR stated that "[I]t is true that was the position in the Uganda Registration Services Bureau at the time because the changes had been made in the company and resolutions signed the changes were not reflected at the registry we confirm that Alain Goetz is no longer a Director in AGR and Sharon Tem is the acting CEO".

The Group established that, on 9 February 2018, African Gold Refinery Ltd sold its shares to AGR International Ltd, a company registered in the Seychelles at Global Gateway, 8 rue de la Perle, Providence, Mahe, Seychelles (see screenshot below). The Group wrote to the authorities of the Seychelles, who confirmed that AGR International Ltd was registered in the Seychelles at the address listed in the Uganda Registration Services Bureau documents.

Goetz underlined to the Group that the Great Lakes refineries had made great strides in their due diligence and compliance work in recent years but that was often not recognised. He also noted that the Great Lakes region was in need of investment but that too much pressure made it difficult to operate in the region and that his supporting contracts would terminate around 2020/2021.

Selon les documents officiels du Bureau d'enregistrement des services de l'Ouganda examinés par le Groupe, African Gold Refinery Ltd (AGR) a été légalement constituée en 2014 et Tony Goetz, dont l'adresse a été enregistrée à Jacob Jacob-street, 58-2018, Anvers, Belgique, détenait 99 des 100 actions à l'enregistrement. La société a depuis changé de propriétaire (voir la photographie ici-dessous).

Comme indiqué dans le corps du présent rapport, Alain Goetz a confirmé en mai 2020 au Groupe qu'il n'était plus directement impliqué dans l'entreprise d'AGR. Selon les mêmes documents du Bureau d'enregistrement des services de l'Ouganda, au 29 mai 2019, Alain François Goetz figurait parmi les deux directeurs de la société, mais lors d'une réunion avec le Groupe on octobre 2019, des représentants d'AGR ont déclaré qu'il n'était plus directeur de l'entreprise. Dans une lettre de mars 2020 adressée au Groupe, AGR a déclaré : « [I]l est vrai que c'était le poste mentionné au Bureau des services d'enregistrement de l'Ouganda à l'époque, parce que les changements avaient été apportés à la société et que les résolutions signées, adoptant ces changements, n'avaient pas été reflétées dans le registre. Nous confirmons qu'Alain Goetz n'est plus Directeur d'AGR et que Sharon Tem en est la PDG par intérim ».

Le Groupe a établi que le 9 février 2018, African Gold Refinery Ltd a vendu ses actions à AGR International Ltd, une société enregistrée aux Seychelles à Global Gateway, 8 rue de la Perle, Providence, Mahé, Seychelles (voir capture d'écran ci-dessous). Le Groupe a écrit aux autorités des Seychelles, qui ont confirmé qu'AGR International Ltd était enregistrée aux Seychelles à l'adresse indiquée dans les documents du Bureau d'enregistrement des services de l'Ouganda.

S/2020/482

Goetz a souligné au Groupe que les raffineries des Grands Lacs avaient fait de grands progrès dans leur travail de devoir de diligence raisonnable et de conformité au cours des dernières années, mais que cela n'était souvent pas reconnu. Il a noté également que la région des Grands Lacs avait besoin d'investissements mais que trop de pression faisait qu'il était difficile d'opérer dans la région et que les contrats le soutenant prendraient fin vers 2020/2021.



According to official company documents available at the Office of the Registrar General in Rwanda, Aldango Ltd had two shareholders, Hilly Metals Investment Ltd and Aldabra Ltd, each of which held 1000 ordinary shares as of last amendment in May 2019. Hilly Metals Investment Ltd was registered in Rwanda and had two Rwandan shareholders. The Group identified Aldabra Ltd in the December 2018 annual filing for Tony Goetz, a company registered on Belgian Crossroads Bank for Companies registry.[7] The filing, which covered the year 2017, listed Alain Goetz as a direct or indirect representative of Aldabra Ltd, registered at AE151605 Rolex Tower, 26th Floor, Sheikh Zayed Road PO Box 1 in Dubai, United Arab Emirates, according to the document. The Group wrote to the Government of the United Arab Emirates to request updated information about the company's registration, and had not received the response at the time of writing this report.

Selon les documents officiels de la société disponibles au bureau du Registraire général du Rwanda, Aldango Ltd avait deux actionnaires, Hilly Metals Investment Ltd et Aldabra Ltd, qui détenaient chacun 1000 actions ordinaires à la dernière modification en mai 2019. Hilly Metals Investment Ltd était enregistré au Rwanda et avait deux actionnaires rwandais. Le Groupe a identifié Aldabra Ltd dans le rapport annuel de décembre 2018 de Tony Goetz, une société inscrite au registre de la banque belge Crossroads Bank for Companies. Le rapport, qui couvrait l'année 2017, indiquait Alain Goetz comme représentant direct ou indirect d'Aldabra Ltd, enregistré à AE151605 Rolex Tower, 26th Floor, Sheikh Zayed Road PO Box 1 à Dubaï, Émirats Arabes Unis, selon le document. Le Groupe a écrit au Gouvernement des Émirats Arabes Unis pour lui demander des informations actualisées sur l'enregistrement de la société et n'avait pas reçu de réponse au moment de la rédaction du présent rapport.

---

[7] https://economie.fgov.be/en/themes/enterprises/crossroads-bank-enterprises

UNCLASSIFIED                                    EXHIBIT 60

**S/2020/482**



The Group reviewed official publicly available license documents for PGR Gold Trading LLC[8] that showed that the company shared the same business license number (689308), phone number, PO Box and registration address as Goetz Gold LLC. Alain Goetz was the manager and a shareholder of Goetz Gold LLC, which is no longer trading.

PGR Gold Trading LLC told the Group that is was "not a sister company of African Gold Refinery Ltd" and that it had "no relation in terms of financial or of any equity shareholding" and that "PGR Gold Trading LLC is a completely separate company with no sharing of management" with Africa Gold Refinery Ltd.

Le Groupe a examiné les documents de licence officiels publiquement accessibles pour PGR Gold Trading LLC qui démontrent que la société partageait les mêmes numéro de licence commerciale (689308), numéro de téléphone, boîte postale et adresse d'enregistrement que Goetz Gold LLC. Alain Goetz était le gérant et actionnaire de Goetz Gold LLC, qui ne négocie plus.

---

[8] https://eservices.dubaided.gov.ae/

UNCLASSIFIED                                    EXHIBIT 60

**S/2020/482**

PGR Gold Trading LLC a déclaré au Groupe qu'il n'était « pas une société sœur d'African Gold Refinery Ltd » et qu'il n'avait « aucune relation en termes financiers ou de participation au capital » et que « PGR Gold Trading LLC est une société complètement distincte, sans partage de gestion » avec Africa Gold Refinery Ltd.

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 43**

**Regional gold production and exports**

**Production et exportations régionales d'or**

Given the widespread regional trade of Congolese gold, and in particular high levels of smuggling as documented by the Group in this report, the Group sought to map out gold production and export trends across the Great Lakes region. The information below is based on open source, publicly available data and supplemented with a small amount of data made available directly to the Group by other sources (as indicated). The Group noted that both production and export data was often unavailable at a national level, or that published data was inconsistent across national authorities, or data was messy, and therefore difficult to interpret.

The Group was unable to identify publicly available artisanal production or export data for gold from Tanzania.

Summary table (see country-by-country analysis below)

Compte tenu du commerce régional généralisé d'or congolais, et en particulier des niveaux élevés de contrebande tels que documentés par le Groupe dans ce rapport, le Groupe a cherché à cartographier les tendances de production et des exportations d'or dans la région des Grands Lacs. Les informations ci-dessous sont basées sur des données publiquement accessibles et complétées par une petite quantité de données mises à la disposition directe du Groupe par d'autres sources (comme indiqué). Le Groupe a noté que les données de production et d'exportation étaient souvent indisponibles au niveau national, ou que les données publiées étaient incohérentes entre les autorités nationales, ou que les données étaient désordonnées et donc difficiles à interpréter.

Le Groupe n'a pas été en mesure d'identifier les données de production artisanale ou d'exportation publiquement accessibles en provenance de Tanzanie.

Tableau récapitulatif (voir l'analyse pays par pays ci-dessous)

| Regional gold flows analysis using 2018 publicly available data (kilograms) Analyse des flux régionaux de l'or sur la base des données de 2018 disponibles 5 (kilogrammes) | | | | |
|---|---|---|---|---|
| | Burundi | DRC[9] | Rwanda | Uganda |
| Publicly available production data Données publiques disponibles sur la production | 598.00 | 246.27 | see below voir ci-dessous | 12.00 |
| Publicly available export data Données publiques disponibles sur les exportations | 2.000 | 56.18 | see below voir ci-dessous | 12,700.00 |

**Burundi**

Publicly available figures for 2019 Burundian gold production or export were not available at the time of drafting this report. The Group noted however that in 2018 Burundi produced 598 kilograms of gold and exported 1,112.49 kilograms according to publicly available figures from the *Institut de statistiques et d'études économiques du Burundi*. The Group wrote to the Government of Burundi to request production and export figures for 2019 but did not receive a response at the time of drafting this report.

---

[9] http://www.mines-rdc.cd/fr/wp-content/uploads/documents/Statis tiques/2018/STATISTIQUES_MINIERES_EXERCICE%20_2018.pdf

S/2020/482

Les chiffres publiquement disponibles pour la production ou l'exportation d'or burundais de 2019 n'étaient pas disponibles au moment de la rédaction du présent rapport. Le Groupe a toutefois noté qu'en 2018, le Burundi avait produit 598 kilogrammes d'or et exporté 1112,49 kilogrammes selon les chiffres publiquement accessibles de l'Institut de statistiques et d'études économiques du Burundi. Le Groupe a écrit au Gouvernement burundais pour demander les chiffres de production et d'exportation pour 2019 mais n'a pas reçu de réponse au moment de la rédaction de ce rapport.

**Rwanda**

In a February 2020 meeting, Rwanda Revenue Authority (RRA) informed the Group that the country had recorded 5256.8 kilograms of gold imports for the year 2019. RRA also informed the Group that it had recorded 1,201 kilograms of gold of Rwandan origin for 2019. The Rwandan government confirmed to the Group that in 2019 Rwanda had imported gold from Burundi, Burkina Faso, the DRC, Guinea and Tanzania and that the country had a single gold exporter for the year.

Rwandan authorities also informed the Group that as of March 2020 Rwanda had 35 valid licenses for trading in 3Ts and gold. Authorities added that Rwanda had 18 gold mining licenses that had full mining and production rights, of which six licenses covered gold mining operations and 12 licenses for gold that combined exploratory mining and exploration. The authorities also noted that there were several small artisanal mining cooperatives in the process of formalizing into commercial operations.

As reported in its midterm report (see S/2019/469, para. 53), Rwanda did not publicly report its gold production statistics for 2019. The 2018/19 NBR annual report disaggregated export figures for cassiterite, coltan, wolframite and hides and skins, but not for gold, when the last disaggregated record was for 2010.[10]

Lors d'une réunion de février 2020, la Rwanda Revenue Authority (RRA) a informé le Groupe que le pays avait enregistré 5256,8 kilogrammes d'importations d'or pour l'année 2019. La RRA a également informé le Groupe qu'elle avait enregistré 1,201 kilogrammes d'or d'origine rwandaise pour 2019. Le gouvernement rwandais a confirmé au Groupe qu'en 2019 le Rwanda avait importé de l'or du Burundi, du Burkina Faso, de la RDC, de la Guinée et de la Tanzanie et que le pays disposait d'un seul exportateur d'or pour l'année.

Les autorités rwandaises ont également informé le Groupe qu'en mars 2020, le Rwanda détenait 35 licences valides pour le commerce des 3T et d'or. Les autorités ont ajouté que le Rwanda disposait de 18 licences d'exploitation aurifère dotées de pleins droits d'extraction et de production, dont six licences couvrant les opérations d'extraction d'or et 12 licences pour l'or combinant exploitation minière exploratoire et exploration. Les autorités ont également noté que plusieurs petites coopératives minières artisanales étaient en train de se formaliser en opérations commerciales.

Comme indiqué dans son rapport à mi-parcours S/2019/469, paragraphe 53, le Rwanda n'a pas rendu public ses statistiques de production d'or pour 2019. Le rapport annuel 2018/19 NBR a ventilé les chiffres des exportations de cassitérite, coltan, wolframite et cuirs et peaux, mais pas pour l'or, dont le dernier enregistrement désagrégé était pour 2010.

**Uganda**

According to export information reviewed by the Group, Uganda's gold exports totalled just over 25 tonnes (25185.8 kilograms) net weight for 2019.[11] Uganda's reported domestic gold production was 12 kilograms in 2018,

---

[10] https://www.bnr.rw/news-publications/publications/annual-reports/
[11] This figure covered 7108.12 unwrought gold, non-monetary and 7108.13 semi-manufactured gold, non-monetary and excluding official gold re-exports. Figures published by the Uganda Revenue Authority recorded 12.7 tonnes of gold exported for 2018, also covering 7108.12 unwrought gold, non-monetary and 7108.13 semi-manufactured gold, non-monetary.

UNCLASSIFIED   EXHIBIT 60

S/2020/482

according to publicly available Uganda Bureau of Statistics data. [12] Assuming the same annual domestic gold production for 2019 as that of 2018, the Group estimated that over 95 percent of Uganda's gold exports were therefore likely of non-Ugandan origin. The Group officially requested up-to-date production and export data from Ugandan authorities but did not receive a response by the time of drafting this report.

Selon les informations sur les exportations examinées par le Groupe, les exportations d'or de l'Ouganda ont totalisé un peu plus de 25 tonnes (25185,8 kilogrammes) de poids net pour 2019. [13] La production d'or nationale déclarée de l'Ouganda était de 12 kilogrammes en 2018, selon les données publiquement accessibles du Bureau de statistiques de l'Ouganda. Assumant que la production d'or intérieure annuelle pour 2019 était la même que pour 2018, le Groupe a estimé que plus de 95% des exportations d'or de l'Ouganda étaient donc probablement d'origine non ougandaise. Le Groupe a officiellement demandé des données actualisées sur la production et l'exportation aux autorités ougandaises, mais n'avait pas reçu de réponse au moment de la rédaction de ce rapport.

Table showcasing publicly available data on Ugandan gold production
and exports between 2016 and 2019

Tableau présentant les données publiquement accessibles sur la production
et les exportations d'or ougandais entre 2016 et 2019

|  | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|
| Uganda Bureau of Statistics gold production figures (kilograms) | NDA | 12 | 4 | 11 |
| Uganda Revenue Authority export data (kgs)[14] | NDA | 12,700 | NDA | NDA |
| Bank of Uganda gold exports (American dollars)[15] | NDA | 514,8 | 417,9 | 339,5 |
| Bank of Uganda gold exports converted to kilograms using average annual fixing | NDA | 12,623 | 10,377 | 8,646 |

---

[12] https://www.ubos.org/explore-statistics/65/

[13] Ce chiffre comprend 7108.12 d'or sous forme brute non monétaire, et 7108.13 d'or semi-manufacturé non monétaire, et à l'exclusion des réexportations d'or officielles. Les chiffres publiés par la Uganda Revenue Authority mentionnaient 12,7 tonnes d'or exportées pour 2018, comprenant également 7108.12 d'or brut non monétaire et 7108.13 d'or semi-manufacturé non monétaire.

[14] https://www.ura.go.ug/openFile.do?path=/webupload//upload//download//staticContent//TOPMENU//10082//10085_Annual_Trade_Statistics_Formal_Exports_2018.pdf

[15] https://www.bou.or.ug/bou/bouwebsite/Statistics/Statistics.html

UNCLASSIFIED                           EXHIBIT 60

S/2020/482

**Annex 44**

**Estimated regional gold refining capacity**

**Estimation de la capacité régionale pour le raffinage de l'or**

| | | Published daily refining capacity (kilograms) Capacité quotidienne de raffinage publiée (kg) | Published annual refining capacity (tonnes) Capacité annuelle de raffinage publiée (tonnes) | Estimated annual capacity assuming 48 weeks, 5 days per week Estimation de la capacité annuelle de raffinage sur la base de 48 semaines et de 5 jours par semaine | |
|---|---|---|---|---|---|
| Africa Eye Ltd | Tanzania | 40 | | | website link |
| Aldango Ltd | Rwanda | 200 | | | website link |
| African Gold qRefin | Uganda | 600 | | | website link |
| Bullion Refinery Ltd | Uganda | n/a | n/a | 12 | Conservative estimation based on average refining for a small gold refinery. Estimation prudente basée sur le raffinage moyen d'une petite raffinerie d'or |
| Congo Gold Raffinerie | DRC | | | under construction | |
| GG Refinery Ltd | Tanzania | n/a | 100 | | website link |
| Metal Smelting and Testing Co Ltd | Uganda | n/a | n/a | 12 | Conservative estimation based on average refining for a small gold refinery. estimation prudente basée sur le raffinage moyen d'une petite rafinerie d'or |
| Simba Refinery Ltd | Uganda | n/a | n/a | 12 | Conservative estimation based on average refining for a small gold refinery. estimation prudente basée sur le raffinage moyen d'une petite rafinerie d'or |
| **Total regional max annual capacity (estimated) tonnes/ Estimation de la capacité régionale totale (tonnes)** | | | | **337.6** | |

UNCLASSIFIED    EXHIBIT 60

S/2020/482

**Annex 45**

**Supply chain due diligence information received from regional refineries**

**Informations sur le devoir de diligence de la chaîne d'approvisionnement par des raffineries régionales**

Pursuant to its mandate as renewed by resolution 2478 (2019), and taking into account the large volumes of gold that may have funded armed or criminal activity, and significant smuggled volumes from the DRC to neighboring countries, the Group assessed whether necessary measures were in place by all importers, processing industries, including gold refiners, and consumers of Congolese gold to exercise supply chain due diligence per paragraph 9 of resolution 1952 (2010) (see S/2010/596) and ICGLR and OECD guidelines.

The Group wrote to the seven gold refineries listed in annex 39 above. The Group requested copies of supply chain due diligence reporting and supplier lists from each entity. The Group recalls that according to paragraphs 8 and 9 of resolution S/2010/1952, failure to report on supply chains may be considered a sanctionable act.

African Gold Refinery Ltd provided five documents including a supply chain policy, see annex 38 above. Aldango Ltd informed the Group that it had not yet established a supply chain report and did not yet conduct supply chain due diligence on gold purchases, but was in the process of establishing its policies. It also said that Aldango Ldt adhered to Rwandan legislation on the matter.

Metal Testing and Smelting Company Ltd did not provide any documents but stated its "clear and uncompromising policy not to trade in and/or deal in Minerals sourced from conflict areas" and that it "deals majorly [with].. Artisanal Miners from Uganda".

Simba Gold Refinery (SGR) told the Group that "the Company respects and complies with all the laws of the Republic of Uganda and its international obligations" but that while the company was "desirous to support" the Group, requests for documentation and information must be channelled through the appropriate Organs or Agencies of the Government of Uganda. SGR added that it had been required to submit its due diligence reporting to the Criminal Investigations Department of the Uganda Police Force and the Ministry of Foreign Affairs of the Government of Uganda, as part of ongoing investigations.

Geita Gold Refinery told the Group that its registered trading name was GG Refinery Limited and that the refinery was not yet operational, but that its purpose was to "provide a defined export pathway for gold originating in Tanzania and not from any neighbouring country" and that it would not purchase any gold other than that produced in Tanzania. It also noted that in the past 50 years Tanzania's gold production had increased by 700 percents and that it now conservatively reached 50 tonnes per year.

The Group did not receive a response from The Bullion Refinery Ltd or Africa Eye by the time of drafting this report.

Conformément à son mandat renouvelé par la résolution 2478 (2019), et compte tenu des volumes importants d'or susceptibles d'avoir financé des activités armées ou criminelles et des volumes significatifs de contrebande depuis la RDC vers les pays voisins, le Groupe a évalué si les mesures nécessaires étaient mises en place par tous les importateurs, les industries de transformation, y compris les raffineurs d'or, et les consommateurs d'or congolais pour exercer un contrôle diligent de la chaîne d'approvisionnement, conformément au paragraphe 9 de la résolution 1952 (2010) (voir S/2010/596) et aux directives de la CIRGL et de l'OCDE.

Le Groupe a écrit aux sept raffineries d'or énumérées à l'annexe 39 ci-dessus. Le Groupe a demandé des copies des rapports de diligence raisonnable de la chaîne d'approvisionnement et des listes de fournisseurs à chaque entité.

UNCLASSIFIED

EXHIBIT 60

**S/2020/482**

Le Groupe rappelle qu'en vertu des paragraphes 8 et 9 de la résolution S/2010/1952, le fait de ne pas faire rapport sur les chaînes d'approvisionnement peut être considéré comme une infraction passible de sanctions.

African Gold Refinery Ltd a fourni cinq documents, y compris une politique de chaîne d'approvisionnement (voir l'annexe 38 ci-dessus). Aldango Ltd a informé le Groupe qu'il n'avait pas encore établi de rapport sur la chaîne d'approvisionnement et qu'il n'avait pas encore mené de diligences raisonnables de la chaîne d'approvisionnement s'agissant des achats d'or, mais qu'il était en train d'établir sa politique. Il a également déclaré qu'Aldango Ltd adhérait à la législation rwandaise en la matière.

Metal Testing and Smelting Company Ltd n'a pas fourni de documents mais a déclaré une «politique claire et sans compromis de ne pas faire de commerce et/ou d'opérations avec des minéraux provenant de zones de confli t» et qu'elle « traite ... majoritairement [avec] ...les mineurs artisanaux d'Ouganda ».

Simba Gold Refinery (SGR) a déclaré au Groupe que « la Société respecte et se conforme à toutes les lois de la République d'Ouganda et à ses obligations internationales » mais que, bien que la société soit « désireuse de soutenir » le Groupe, toute demande de documentation et d'informations devait leur être adressée par le biais d'organes ou d'agences du gouvernement ougandais. SGR a ajouté qu'elle avait été tenue de soumettre son rapport de diligence raisonnable au Département des enquêtes criminelles des forces de police ougandaises et au Ministère des affaires étrangères du gouvernement ougandais, dans le cadre d'enquêtes en cours.

Geita Gold Refinery a déclaré au Groupe que son nom commercial enregistré était GG Refinery Limited et que la raffinerie n'était pas encore opérationnelle, mais que son objectif était de « fournir une voie d'exportation définie pour l'or originaire de Tanzanie et non d'un pays voisin » et qu'il n'achèterait pas d'autre or que celui produit en Tanzanie. Il a également noté qu'au cours des 50 dernières années, la production d'or de la Tanzanie avait augmenté de 700 pourcents et qu'elle atteignait désormais prudemment 50 tonnes par an.

Le Groupe n'avait pas reçu de réponse de The Bullion Refinery Ltd ou Africa Eye au moment de la rédaction de ce rapport.

UNCLASSIFIED

EXHIBIT 60

S/2020/482

## Annex 46

### Validation of mine sites in South Kivu

### Validation des sites miniers au Sud Kivu

In South Kivu, only 23 percent of mine sites for 3Ts and gold had been validated as at January 2020. That means out of about 926 mines in the province, according to SAEMAPE data, 707 were yet to be validated.[16] As shown in the table below, Walungu territory led in terms of mines classified as yellow (11 mines) or red (one mine). According to *Service d'assistance et d'encadrement de l'exploitation minière artisanale et à petite échelle* (SAEMAPE) representatives during discussions with the Group, some of Walungu's mines were inaccessible due to lack of infrastructure, which renders them vulnerable to occupation by armed groups, a situation also confirmed by *Agence nationale de renseignement* (ANR) and *Centre d'évaluation, d'expertise et de certification* (CEEC).

Au Sud Kivu, seulement 23 pourcents des sites miniers pour les 3T et l'or avaient été validés en janvier 2020. Cela signifie que 707 sur environ 926 mines de la province, selon les données de SAEMAPE, devaient encore être validées.[17] Le tableau ci-dessous montre que, dans le territoire de Walungu, 11 sites miniers sont classés comme « jaune » et un comme « rouge ». D'après le Service d'assistance et d'encadrement de l'exploitation minière artisanale et à petite échelle (SAEMAPE), certaines mines de Walungu étaient inaccessibles en raison du manque d'infrastructures, ce qui les rendaient vulnérables à l'occupation par des groupes armés. L'Agence nationale de renseignement (ANR) et le Centre d'évaluation, d'expertise et de certification (CEEC) ont observés la même chose.



---

[16] The Group included a full list of validated mine sites and further explanation of the validation process in S/2019/974, para. 44 and annex 7.

[17] Le Groupe a inclu une liste complète des sites miniers validés ainsi que des explications sur le processus de validation dans S/2019/974, par. 44 and annex 7.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482



UNCLASSIFIED                    EXHIBIT 60

S/2020/482

20-06401
DRC-30316 1289

UNCLASSIFIED                                EXHIBIT 60

S/2020/482

UNCLASSIFIED

EXHIBIT 60

S/2020/482



| WATURUU | | | Vert | Valide | BYAGE | 2'74'/ 17.0" | COLTAN |
| WAMETI | | | Vert | Valide | MULUMBA | 3'01'47.5" 27'40'23.9" | COLTAN |
| WAGILA | | | Vert | Valide | MULUMBA | 3'01'24.1" 27'40'9.8" | COLTAN |
| WAMISENGE | | | Vert | Valide | MULUMBA | (2'59'32.5" 27'42'14.1" | COLTAN |
| MASEZI | | | Vert | Valcio | NYABILUGA | -2'57'22.6" 27'43'59.3" | COLTAN |

Document provided to the Group by SAEMAPE, South Kivu

Document fourni par au Groupe par SAEMAPE, Sud Kivu

UNCLASSIFIED                                        EXHIBIT 60

S/2020/482

**Annex 47**

**Further information from the ITA response**

**Informations complémentaires sur la réponse de l'ITA**

ITA told that Group that, regarding Kisongati, SAEMAPE had reported difficulties whereby diggers did not want to form cooperatives or be part of the legal supply chain, because production was low. ITA also said that its last baseline study at Kisongati had taken place in September 2019 and that the mine was currently inactive. ITA was aware of planned activity at the site via a new cooperative, but that this had not materialised at the time of drafting this report. ITA agreed that at the time of the Group's visit the mine was active.

Finally, ITA noted that where diggers said there were insufficient tags it was often linked to two main issues: misuse of iTSCi tags by State agents to tag minerals from unknown origin, including after receiving bribes; and the transport of minerals by miners or negociants from artisanal mining areas to other concessions, or vice-versa, depending on best prices offered by buyers. ITA highlighted a number of incidents opened in this regard.

L'ITA a également indiqué au Groupe qu'en ce qui concerne le site de Kisongati, SAEMAPE avait signalé des sitations dans lesquelles les creuseurs ne voulaient pas former de coopératives ou faire partie de la chaîne d'approvisionnement légale, car la production était faible. L'ITA a également déclaré que sa dernière étude de référence à Kisongati avait eu lieu en septembre 2019 et que la mine était actuellement inactive. L'ITA était au courant des activités prévues sur le site via une nouvelle coopérative, mais cela ne s'était pas concrétisé au moment de la rédaction de ce rapport. L'ITA a convenu qu'au moment de la visite du Groupe en 2019, la mine était active.

L'ITA a noté que lorsque les creuseurs s'étaient plaints un nombre insuffisant d'étiquettes, c'était souvent lié à deux problèmes principaux: l'utilisation abusive des étiquettes iTSCi par des agents de l'État pour étiqueter des minéraux d'origine inconnue, y compris après avoir reçu des pots-de-vin; et le transport de minerais par des mineurs ou des négociants des zones minières artisanales vers d'autres concessions, ou vice-versa, selon les meilleurs prix offerts par les acheteurs. L'ITA a souligné un certain nombre d'incidents ouverts à cet égard.

EXHIBIT 60

S/2020/482

**Annex 48**

**Further information from CDMC and SAKIMA SA responses**

**Informations complémentaires sur la réponse de CDMC et SAKIMA SA**

CDMC told the Group that it was not aware of any such situation at Ngungu, that all of its minerals were properly documented and that further, it had diligently read the iTSCi risk reports where no such issue had been recorded.

CDMC added that, following the Group's enquiry about Kamatale and Ngungu, the society had immediately opened its own enquiry covering its partners SAKIMA SA, COOPERAMMA and the State authority, SAEMAPE, charged with oversight of tagging. CDMC also provided the Group with a full response in order to "ensure against disinformation campaigns", including full responses to CDMC from SAKIMA SA and COOPERAMMA. The company also stated that it only bought minerals from green sites around Ngungu, that although it was aware of a Nyatura presence in the area around Kamatale, the armed men were not engaged in mining activities, and that CDMC shared its due diligence reporting with its sole purchaser, Star Dragon Corporation Ltd, for 2019.

In a separate communication SAKIMA SA told the Group that before 2019 minerals from validated mine sites were brought to SAKIMA SA buying points for tagging, but that this had changed since 2019 due to the number of incidents recorded. Since 2019 the company used an "improved traceability system" which used transit depots closer to production sites. Regarding Kamatale, SAKIMA SA noted that neither civil society, the local monitoring committee, iTSCi or any other of the relevant partners had raised an alert that armed elements were involved in mining at the site but did acknowledge that Nyatura elements were present in the surrounding area.

CDMC a déclaré au Groupe qu'elle n'était pas au courant d'une telle situation à Ngungu, que tous ses minéraux étaient correctement documentés et qu'en outre, elle avait lu avec diligence les rapports de risques fournis par iTSCi et qu'aucun problème de ce type n'avait été enregistré.

CDMC a ajouté que, suite à l'enquête du Groupe sur Kamatale et Ngungu, la société avait immédiatement ouvert sa propre enquête englobant ses partenaires SAKIMA SA, COOPERAMMA et l'agence étatique SAEMAPE, chargée de surveiller l'étiquetage. CDMC a également fourni au Groupe une réponse complète afin de « se prémunir contre les campagnes de désinformation », y compris des réponses complètes à CDMC de SAKIMA SA et COOPERAMMA. La société a également déclaré qu'elle n'achetait que des minéraux sur des sites verts autour de Ngungu, que bien qu'elle soit au courant de la présence de Nyatura dans la région de Kamatale, les hommes armés n'étaient pas engagés dans des activités minières, et que CDMC partageait ses rapports de diligence raisonnable avec son seule acheteur, Star Dragon Corporation Ltd, pour 2019.

Dans une autre communication, SAKIMA SA a indiqué au Groupe qu'avant 2019, les minéraux provenant des sites miniers validés avaient été acheminés aux points d'achat SAKIMA SA pour l'étiquetage, mais que cela avait changé depuis 2019 en raison du nombre d'incidents enregistrés. Depuis 2019, l'entreprise a utilisé un « système de traçabilité amélioré » qui utilisait des dépôts de transit plus proches des sites de production. Concernant le site minier de Kamatale, SAKIMA SA a noté que ni la société civile, ni le comité de suivi local, ni l'iTSCi, ni aucun autre des partenaires concernés n'avaient signalé que des éléments armés étaient impliqués dans l'exploitation minière sur le site, mais reconnaissaient que des combattants de Nyatura étaient présents dans les environs.

UNCLASSIFIED                          EXHIBIT 60

S/2020/482

**Annex 49**

**Armed presence at Biholo mine site**

**Présence armée sur le site de Biholo**



The Group reviewed hours of video footage, provided by a source familier with the issue – of which a screenshot of one of several videos shown here - displaying armed Nyatura Delta elements in Biholo mine site.

Le Groupe a examiné des séquences vidéo de plusieurs heures, fournies par une source familière avec le sujet - dont une capture d'écran d'une ces nombreuses vidéos est présentée - montrant des éléments armés de Nyatura Delta sur le site de la mine de Biholo.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Annex 50**

**Transcripts and translations of two discussions between diggers at Biholo about armed Delta com-batants in the site, September 2019 and March 2019 respectively, shared with the Group by a source with knowledge of the matter**

**Transcriptions et traductions de deux discussions entre des creuseurs à Biholo au sujet de combat-tants armés de Delta sur le site en septembre et mars 2019, partagé avec le Groupe par une source connaissant du sujet**

Translation by the Group/Traduction par le Groupe

**Discussion 1**

A: That is to say, you will give the armed men their dues?
B: That they don't do that.
A: They want a particular channel, that they can exploit for themselves.
A: So they've come here to do this!
A: I didn't yet speak to them, we crossed paths.
…
B: Otherwise we are not going to allow these agreements.
A: So, they must clean the mineral themselves!
B: Yes
A: Do they know this work?
B: So it's like they must be here every day!
A: Exactly, but…
B: Oh ok
A: And if they are not going to accept, we will have to see what to do.
B: Because they control all of the paths.
A: Where can you travel without them getting to you?
B: Exactly
A: It's like we have to give them their parts.


A : C'est à dire qu'ils donneront aux soldats leurs parts ?
B : Qu'ils ne fassent pas ça,
A : Qu'ils demandent une rigole, qu'ils vont chaque fois exploiter
A : Donc ils sont venus pour ce fait !
A : Je ne leur ai pas encore parlé, nous nous sommes croisés
…
B : Sinon, nous n'allons pas admettre ces conventions.
A : Donc il faut qu'eux-mêmes nettoient !
B : Oui
A : Est-ce qu'ils savent ce travail ?
B : Donc il faut qu'ils soient ici chaque jour !
A : Justement, mais ....
B : Ah bon
A : Et s'ils ne vont pas accepter, on doit voir ce qu'il faut faire;
B : Car tous les chemins sont sous leur contrôle
A : Où est-ce que tu passeras sans qu'ils ne t'attrapent ?
B : C'est ça
A : Il faut toujours leur donner leurs parts.

UNCLASSIFIED                    EXHIBIT 60

S/2020/482

**Discussion 2**

A: I was telling you that when they come to dig
B: That they should leave their whips at home
B: That they put up their money but they leave their whips
A: Yes
B: Papa [...], weigh up this dossier
A: Do they come in military dress?
B: They also carry arms
A: I see
B: Both colonels came with their soldiers
A: There was the commander from your place
B: The one they call Roni
A: Kikandi?
B: Yes, Kikandi was here
A: There was Maheshe – they called him "General"
B: And there was Pytchen
A: And both of them had a lot of armed [Nyatura] men around him
B: So many!
A: Was the FARDC here too?
B: No
A: I don't put up a fight when there are armed men around
B: They asked me to give them $2000
A: They asked you for $2000?
B: Yes, that I should give them $2000 and I asked them to make me out a report for that
A: Each week?
B: Precisely
A: There were two small pits given to them but they failed to dig them.
B: They changed their approach, they began to say: we don't want these pits but give us $2000. [....]
B: They wanted at least 6 kilograms
A: I told them to come each Friday
B: To do an evaluation of the week's work so that they knew what they could get? [...]
B: That's why, I suggested to them that they come dig for themselves.


A : Je te dis que lorsqu'ils viennent creuser
B : Qu'ils laissent leurs fouets chez eux
B : Qu'ils placent leur agent mais sans fouets
A : Oui
B : Papa [...], raisonnez sur ce dossier
A : Est-ce qu'ils viennent étant habillés en uniforme militaire ?
B : Ils portent aussi des armes
A : Ah bon
B : Tous ces deux colonels étaient venus avec leurs soldats
A : Il y avait le commandant de chez vous
B : Celui qu'on appelle Roni
A : Kikandi ?
B : Oui, Kikandi était ici.
A : Il y avait Maheshe qu'on appelait le général
B : Il y avait Pytchen
A : Et chacun d'entre eux avait beaucoup des soldats [Nyatura] autour de lui.
B : Beaucoup !
A : Est-ce que les FARDC aussi étaient là ?
B : Non

UNCLASSIFIED

UNCLASSIFIED

EXHIBIT 60

**S/2020/482**

A : Et moi aussi je ne peux pas résister là où se trouve des armes

B : Ils me demandaient 2000$

A : Ils t'avaient demandé 2000$?

B : Oui, que je leur donne 2000$ et moi aussi je les avais invités qu'ils fassent un constat

A : Pour chaque semaine ?

B : Justement

A : Il y avait deux puits miniers pour eux qu'ils avaient échoué à exploiter.

B : Ils avaient changé de méthodes en disant : nous ne voulons pas de ces puits miniers mais donnez-nous 2000$.
[....]

B : Ils désiraient avoir au moins 6kgs

A : Je leur avais dit de venir l'autre vendredi avant le temps

B : Pour faire une évaluation de la semaine et savoir si par jour ils peuvent avoir combien ? [...]

B : C'est pourquoi, moi je leur avais dit de venir creuser pour eux-mêmes

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 51**

**Transcript and translation of a discussion between diggers at Kamatale in conversation about armed Nyatura Matata elements in the site, March 2019**

**Transcription et traduction d'une discussion entre des creuseurs à Kamatale au sujet des combattants armés de Nyatura Matata sur le site en mars 2019**

Translation by the Group/Traduction par le Groupe

A: If you get minerals do you easily find a buyer?
B: Straight away
A: The buyers are always ready...
B: Up there (above) there are buyers waiting [...]
A: What happened with those young Nyatura who were here?
B: Here, at this military position there are around 400 [FARDC] soldiers.
A: Up there near us!
B: Just there
A: The others are spread out here
A: How did the Nyatura end up leaving here?
A: How did they go?
B: The army arrived here and when they arrived, the Nyatura left without even firing one single shot.
A: Really they did well for us...
B: They left without even a single shot fired.
A: Not even one?
B: Yes [..]
A: What about the whips now!
B: Before, they said that the whippings were ferocious
A: Who can still use whips now? [...]
B: There's no more trouble with whippings
A: Without the will of God, digging here is hard
B: Mineralised earth has become really rare
A: Maybe you can find another pit [...]
A: If someone buys here, can he still sell here at Kamantale?
B: No you take the mineral to Ngungu
A: Ah ok you take it to Ngungu
A: Yes
B: Those who buy here, sell at Ngungu
A: Is there a good market for minerals at Ngungu?
B: There is a buying house
A: At Ngungu, there is a buying house?
B: Yes, there are people charged with buying minerals there, they tag the minerals and then they take them away.


A : Est-ce que si tu trouves les minerais, tu trouves facilement les acheteurs ?
B : Directement
A : Les négociants sont toujours prêts
B : Là en haut il y en a trop de négociants [...]
A : Quelle est la suite de ces jeunes Nyatura qui étaient ici ?
B : Voici, sur cette position militaire, il y a environ 400 soldats [FARDC]
A : Là, à côté !
B : Là seulement
A : Les autres sont éparpillés ici.

UNCLASSIFIED

EXHIBIT 60

**S/2020/482**

B : Comment est-ce que les Nyatura étaient parvenus à sortir d'ici ?

A : Comment est-ce qu'ils étaient sortis ?

B : Les troupes étaient arrivées et quand elles arrivèrent, les Nyatura s'étaient retirés sans même un seul coup de feu.

A : Vraiment ils avaient bien fait de notre part...

B : Ils étaient partis sans même un seul coup de feu.

A : Pas même un seul ?

B : Oui [..]

A : A propos des fouets !

B : La fois passé, on disait que le problème des fouets faisait rage

A : Qui peut utiliser encore les fouets ?

B : Pas de fouets ?

A : Loin de suffire

B : Il n'y a plus le problème de fouets

A : A part l'intervention de Dieu, l'exploitation de votre puits minier est difficile

B : Vraiment les sables minéraux deviennent très rares

A : Peut-être si on peut trouver un autre puit minier [...]

B : Comme celui qui les achète ici, il peut toujours les vendre ici à Kamantale ?

A : On les amène à Ngungu

B : C'est à Ngungu là où on les amène

A : Oui

B : Celui qui les achète ici, il les vend à Ngungu

A : Est-ce qu'à Ngungu il y a un marché des minerais ?

B : Il y en a un comptoir

A : A Ngungu, il y a un comptoir ?

B : Oui, il y a ceux qui sont chargés de l'achat des minerais, ils les taguent et enfin, ils les amènent.

UNCLASSIFIED                                    EXHIBIT 60

S/2020/482

**Annex 52**

**Further company responses about armed interference at Biholo and Kamatale**

**Réponses additionnelles des entreprises concernant l'ingérence armée sur les sites de Biholo et Kamatale**

CDMC told the Group that the company only bought from validated mine sites and therefore did not buy from Biholo and that the company had created an information network in the area that ensured it had not bought from this site (see CDMC's response regarding Kamatale in annex 48 above).

SAKIMA SA told the Group that regarding Biholo, the minerals from that site were transported via a supply chain passing through Masisi and Walikale, and that given that SAKIMA SA did not buy coltan, it was difficult for the company to provide any further information. The company also clarified that it did not employ any negociants operating in Rubaya area and that those operating on its PE 76 concession were independent of the company, and who provided minerals to entities in Goma who were partners of SAKIMA SA.

CDMC a dit au Groupe que la société n'achetait que sur les sites miniers validés et qu'elle n'achetait donc pas du site de Biholo. Elle a ajouté que la société avait créé un réseau d'information dans la région qui garantissait qu'elle n'aurait pas acheté sur ce site (voir aussi la réponse de CDMC concernant le site de Kamatale à l'annexe 48 ci-dessus).

SAKIMA SA a déclaré au Groupe qu'en ce qui concerne Biholo, les minéraux de ce site étaient transportés via une chaîne d'approvisionnement qui passait par la ville de Masisi et puis le territoire de Walikale, et qu'étant donné que SAKIMA SA n'achetait pas de coltan, c'était difficile pour l'entreprise de fournir des informations complémentaires sur ce sujet. La société a également précisé qu'elle n'employait aucun négociant opérant aux alentours de Rubaya et que ceux opérant sur sa concession PE 76 étaient indépendants de la société et qui fournissaient des minéraux à des entités à Goma partenaires de SAKIMA SA.

UNCLASSIFIED

EXHIBIT 60

S/2020/482

**Annex 53**

**SMB letter citing mineral fraud from SMB mining site by some COOPERAMMA members and response by COOPERAMMA**

**Lettre de la SMB mentionnant une fraude minière dans le site minier SMB par certains membres de COOPERAMMA et réponse de COOPERAMMA**



# SOCIETE MINIERE DE BISUNZU
ID.NATL: 5-910-N79B60N : RCCM : GOM/RCCM/14-B-009 :
NIF: A1407282G, IMPORT-EXPORT: 0023/AWX-18/I000B89NK/Z

Goma, le 24 Février 2020

N/Réf 045/SMB/GM-NK/9.E/2020

Transmis copie pour information à:

- Son Excellence Monsieur le Président de la République Démocratique du Congo Avec notre parfaite considération
- Son Excellence Monsieur le Premier Ministre Chef du Gouvernement
- Son Excellence Monsieur le Ministre National des Finances
- Monsieur l'Auditeur Général des FARDC Kinshasa/Gombe
- Son Excellence Monsieur le Gouverneur de Province du Nord-Kivu
- Son Excellence Monsieur le Ministre Provincial des Mines Tous à Goma/Nord-Kivu

Excellence Monsieur le Ministre National des Mines Kinshasa/Gombe

Objet : Vol et détournement de minerais extraits du PE 4731 par certains creuseurs oeuvrant dans le PE 4731
Lettre d'information

Excellence Monsieur le Ministre,

Avec l'expression de notre considération, nous avons l'insigne honneur de venir très respectueusement auprès de votre autorité pour ce dont émargé en objet.

11, Avenue du Golf Q Katindo-Gauche/Goma/Nord-Kivru
Tél: (+243)811312401- (+243)990004518
BP 163 Goma
Site : www.smbsarl.com
E-mail : info@smb-sarl.com
République Démocratique du Congo

Generated by CamScanner

S/2020/482



En effet, la Société Minière de Bisunzu, SMB Sarl en règle a l'obligation de vous informer qu'elle constate avec amertume un manque d'approvisionnement des minerais causant ainsi un énorme préjudice à sa productivité depuis quelques mois suite au vol et détournement des minerais extraits de son périmètre couvert par le PE 4731 par certains membres de la Cooperamma, qui préfèrent la mort à tout creuseur qui oserait apporter les minerais dans les entrepôts de la SMB.

Ces individus sont auteurs de plusieurs cas de fraudes enregistrés par la CNLFM en apportant ou faussant l'origine des minerais extraits du PE de la SMB vers les sites non productifs du PE voisin pour ainsi d'une part, alimenter certains comptoirs de la place tels que CDMC et SOGECOM ou d'autre part, les font traverser vers les pays voisins et ce, en connivence avec certaines autorités militaires du Nord-Kivu dont l'Auditeur Supérieur Militaire Ordinaire le Colonel NKULU et l'Auditeur Supérieur Militaire Opérationnel le Colonel NDAKA.

La SMB Sarl, étant titulaire des droits miniers et propriétaire exclusive des substances minérales extraites du PE 4731, doit bénéficier de la totalité de la production des minerais extraits dans sa mine ainsi qu'une jouissance paisible de son titre conformément à l'esprit de l'article 273(h) du nouveau code minier.

A cet effet, elle déplore qu'une quantité importante de ses minerais lui échappe ce qui cause des pertes énormes dans ses finances et celles du trésor public. Ce trafic illégal n'est ni profitable à la SMB, ni au gouvernement congolais, pourtant le secteur minier congolais reste au cœur de l'économie congolaise.

Excellence Monsieur le Ministre des Mines, par cette missive, la SMB insiste sur le fait que le gouvernement enregistre d'énormes pertes suite à ce trafic illégal de minerais qui ne sont assujettis à aucune taxe, qui plus est en violation des prescrits de la loi. La SMB Sarl pense que la problématique de la fraude et de la contrebande minières est un défi qui devrait concerner toutes parties prenantes à savoir l'Etat Congolais, les services étatiques et elle comme détentrice du titre.

En définitive, la SMB réitère sa bonne volonté de s'acquitter de ses dettes et sollicite votre implication comme le garant du secteur minier congolais afin que ces minerais soient ramenés dans un bref délai dans les entrepôts de la SMB installés à Bibatama. Au cas contraire, la SMB ne saurait être capable le cas échéant de s'acquitter de ses obligations fiscales qui pourtant haussent les recettes de l'Etat, ni de payer les salaires de ses agents.

La SMB Sarl implore une mesure d'urgence en vue d'éviter la récidive de la fermeture de la mine suite au manque d'actions concrètes causant préjudice à tous les investissements consentis depuis plusieurs années par elle.

22, Avenue du Golf, Q. Katindo, Commune/Goma/Nord-Kivu
Tél : (+243)811342401 ; (+243)990004510
BP 103 Goma
Site : www.smbsarl.com
E-mail : info@smb-sarl.com
République Démocratique du Congo

Generated by CamScanner

UNCLASSIFIED    EXHIBIT 60

S/2020/482

La SMB Sarl déplore la malfaisance des autorités juridico-militaires créées ci-haut qui déploient régulièrement des unités en connivence avec certains creuseurs fraudeurs pour faciliter l'évasion des minerais au sein du PE 4731. Soulignons qu'à ce jour, il se dégage une récidive dans le chef de ces fraudeurs en dépit de différentes plaintes déposées et sans suite (dont copies en annexe). Notons également qu'un individu nommé SHAMAMBA BARIGABIRE, membre actif de la Cooperamma, fait la loi et est à la base de cette situation chaque d'association des malfaiteurs dans l'organisation de la fraude et contrebande minières des substances minérales extraites du PE 4731 de la SMB.

En outre, nous fustigeons dans le temps le déploiement de deux commandements parallèles sur notre permis d'exploitation ce qui constitué un risque pouvant entacher notre chaîne d'approvisionnement.

Vu que, la SMB Sarl contribue efficacement au trésor public, Elle vous saurait gré de vous engager de manière efficiente en vue d'éradiquer ce désastre et de permettre à notre société d'émerger en travaillant dans un bon climat des affaires, gage du développement.

Une enquête honnête et crédible est ça ce fait nécessaire pour établir l'origine de fonds de ces entités de traitement sans chaîne crédible d'approvisionnement en complicité avec ces fraudeurs de la cooperamma.

Confiant de la suite favorable que vous réserverez à l'examen de la présente, nous vous prions, d'agréer, Excellence Monsieur le Ministre Des Mines, l'expression de nos honnêtes et respectueuses salutations.



Don MANANGACHUCHU
Directeur Gérant

11, Avenue du Golf Q Katindo-Caacha/Goma/Nord-Kivu
Tél : (+243)811342401- (+243)99400545110
RR 103 Goma
Site : www.smbsarl.com
E-mail : info@smb-sarl.com
République Démocratique du Congo

Generated by CamScanner

UNCLASSIFIED          EXHIBIT 60

S/2020/482

**COOPERAMMA letter negating accusations of mineral fraud made by SMB (see SMB letter above)**

**Lettre COOPERAMMA niant les accusations de fraude minière faites par SMB (voir lettre SMB ci-dessous)**

### COOPERATIVE DES EXPLOITANTS ARTISANAUX MINIERS DE MASISI
#### « COOPERAMMA-C.A »
Id.Nat; 5-83-N09365A
N° RCCM: CD/GOMA/RCCM/16-B-0421
N° Impôt A1309307G
Arrêté ministériel : 0447/CAB.MIN/MINES/01/2012

Goma, le 02 Mars 2020

N/Réf : COOPERAMMA/CMM/VP-CA/ZNV/2020

A Son Excellence Monsieur le Ministre
National des Mines
A Kinshasa/Gombe

**Concerne** : Lettre d'information N/Réf 045/SMB/GM-NK/02/2020 relatif au Vol et Détournement de minerais extraits du PE 4731 par certains creuseurs œuvrant dans le PE 4731
**Notre réaction**

Excellence Monsieur le Ministre,

Nous avons l'avantage, au nom et pour le compte de la Coopérative des Exploitants Artisanaux Miniers de Masisi COOPERAMMA-CA en sigle, une société coopérative régie par l'Acte Uniforme du 15 Décembre 2010 relatif aux Droits des sociétés coopératives regroupant les exploitants artisanaux miniers agréée par l'Arrêté Ministériel n° 0447/CAB.MIN/MINES/01/2012 et enregistrée au Registre de commerce et crédit mobilier sous le N° CD/GOMA/RCCM/16-B-0421, de venir respectueusement auprès de votre Excellence pour vous présenter ce dont l'objet est repris en concerne.

En effet, vous avez été saisi en date du 24 février 2020 par la Société Minière de Bisunzu. A travers sa correspondance, la SMB a écrit aux deuxième et troisième paragraphe ce qui suit : « En effet, au



**Adresses** : Avenue PACIFICATION1 n°377, Quartier KYESHERO, Ville de GOMA, Province du NORD-KIVU
Tél # (+243)99210S060- (+243)81925D518- (+243)808309335
Site : www.cooperamma.org
E-mail : officemanagerSMB@gmail.com - coop.cooperamma@gmail.com
République Démocratique du Congo

          UNCLASSIFIED

UNCLASSIFIED                                          EXHIBIT 60

S/2020/482

Société Minière de Bisunzu, SMB Sarl en sigle, a l'obligation de vous informer qu'elle constate avec amertume un manque d'approvisionnement des minerais causant ainsi un énorme préjudice à sa productivité depuis quelques mois suite au vol et détournement des minerais extraits de son périmètre couvert par le PE 4731 par certains membres de la COOPERAMMA, qui protègent la mort à tout creuseur qui oserait apporter les minerais dans les entrepôts de la SMB. Ces individus sont auteurs de plusieurs cas des fraudes enregistrés par la CNLFM en apportant ou faussant l'origine des minerais extraits du PE de la SMB vers les sites non productifs du PE voisin pour ainsi d'une part, alimenter certains comptoirs de la place tels que CDMC et SOGECOM ou d'autre part ; les font traverser vers les pays voisins et ce, en connivence avec certaines autorités militaires du Nord Kivu dont l'Auditeur Supérieur Militaire Ordinaire le Colonel NKULU et l'Auditeur Militaire Opérationnel le Colonel NDAKA. »

Votre Excellence cette fameuse lettre d'information qui est en réalité une dénonciation calomnieuse car adressée en ampliation à une autorité judiciaire dont l'Auditeur Général des Forces Armées de la RDC constitue une manœuvre de plus de la part de la SMB Sarl pour couvrir la situation de violation des droits humains sur le site couvert par le PE 4731 et incidemment pour détourner votre attention loin de la fraude qu'elle organise.

Pour votre rappel, lors de la réunion présidée par vous à votre cabinet le samedi 15 février 2020, nous vous avons présenté la situation de notre production et nous avons pris le soin de vous signaler quelles sont les raisons qui font que la production est entrain de diminuer. La Société Minière de Bisunzu, SMB Sarl est la seule responsable de cette baisse de production suite aux multiples violations des droits humains qui du reste sont documentées et à l'insolvabilité criante dont elle fait preuve. La documentation qui vous a été fournie à l'occasion de la dernière réunion organisée à votre cabinet est assez éloquente sur cette question.

Adresses : Avenue PACIFICATION1 n°277, Quartier KYESHERO, Ville de GOMA, Province du NORD-KIVU