

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

DRC-31659

Erich C. Ferrari
Ferrari & Associates
655 15th St., N.W.
Suite 240
Washington, DC 20005

Dear Mr. Ferrari:

As you are aware, on March 17, 2022, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated your client, Alain Francois Viviane Goetz (Mr. Goetz), pursuant to Executive Order (E.O.) 13413 of October 27, 2006, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," as amended by E.O. 13671 of July 8, 2014, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo" (E.O. 13413 as so amended, "the Order") for being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo ("DRC") or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC; for being a leader of African Gold Refinery Limited ("AGR"); and for having acted or purported to act for or on behalf of, directly or indirectly, AGR. Accordingly, OFAC placed Mr. Goetz on OFAC's Specially Designated Nationals and Blocked Persons List (SDN List).

Pursuant to 31 C.F.R. § 501.807 and OFAC's guidance on "Filing a Petition for Removal from an OFAC List," a person may seek administrative reconsideration of their designation by submitting arguments or evidence that the person believes establishes that an insufficient basis exists for the designation or that the circumstances resulting in the designation no longer apply. Designated persons may also propose remedial steps, such as corporate reorganization, resignation from positions in a blocked entity, or similar steps that the person believes would negate the basis for designation. In a letter dated March 17, 2022, and received after the designation decision described above, your client requested a stay of any potential designation of, or other related action targeting, Mr. Goetz by OFAC. In a letter dated December 6, 2022, OFAC informed you that OFAC had determined to treat your March 17 submission as a request for delisting pursuant to 31 C.F.R. § 501.807. On February 28, 2023, you submitted a delisting petition supplement.

After reviewing the evidence in the record regarding your client's designation, including material you submitted, OFAC has determined that your client has not provided credible arguments or evidence establishing that an insufficient basis exists for the designation or that all the circumstances resulting in the designation no longer apply.

Specifically, you asserted that OFAC fails to specify conduct linking Mr. Goetz to rebel groups purportedly operating in the DRC; that allegations against AGR with respect to conflict gold are not credible due to the combination of Mr. Goetz's advocacy efforts and AGR's due diligence processes and audit results; that Mr. Goetz's links to refining conflict gold at AGR are the result of unfounded allegations; and that OFAC has used outdated information in its designation. Additionally, you asserted that Mr. Goetz is no longer affiliated with AGR.

OFAC agrees that, based on the information in your submission, Mr. Goetz no longer meets the criteria for designation pursuant to the Order for being a leader of AGR. But the other grounds for which Mr. Goetz was designated remain valid.

It is undisputed that AGR is an entity whose property and interests in property are blocked pursuant to the Order. Mr. Goetz therefore meets the criteria for designation pursuant to the Order for having acted or purported to act for or on behalf of, directly or indirectly, AGR. For example, in a March 2014 conditions letter to the Ugandan President, Mr. Goetz requested that "gold traders who do not have official documents should be allowed to sell gold to this refinery [AGR], but be made to pay a penalty fee." Additionally, in a November 2017 meeting with a U.S. Embassy Kampala economic officer, Mr. Goetz represented AGR as its CEO.

In addition, AGR has sourced illicit gold from mines in regions of DRC that are controlled by armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki, that are involved in destabilizing activities in South Kivu, DRC. Mr. Goetz, including through direct or indirect ownership or control of AGR during the relevant periods, having held leadership positions in AGR when this activity occurred, and his prior involvement in AGR's gold trading activities, meets the criteria for designation pursuant to the Order for being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

Nothwithstanding the claims in your submission, after a thorough review of available evidence, OFAC assesses that allegations of Mr. Goetz's links to refining conflict gold at AGR are credible, and OFAC has relied on information that is more recent than that of 2017 while assessing his petition for delisting. Mr. Goetz has a long history of involvement in the illicit gold trade, and a history of obfuscating his ownership and control of AGR and other entities. OFAC further assesses that Mr. Goetz currently owns and controls companies that may enable him to continue engaging in the illicit gold trade. In addition, OFAC assesses that Mr. Goetz has not taken any responsibility for his past actions with respect to his involvement in the conflict gold trade, which casts doubt that Mr. Goetz has undergone a change in circumstances with respect to his original designation.

Finally, the U.S. Department of State (State) has provided foreign policy guidance recommending that OFAC deny Mr. Goetz's petition for delisting. According to the foreign policy guidance, State understands that Mr. Goetz has presented information to OFAC purporting to show that he is no longer an owner of or affiliated with AGR. State notes that Mr. Goetz has been an integral and essential part of the conflict gold trade in the DRC since the 1990s through the activities of several companies and associates. Foreign policy considerations related to the ongoing conflict in Eastern DRC, other areas in which the United States is acting

2

against the illicit gold trade, and Uganda lead to a recommendation of denial for delisting absent a documented change in behavior beyond what Mr. Goetz has provided to date. Even if Mr. Goetz purports to have formally distanced himself from AGR, Mr. Goetz's recent statements and submissions continue his previous line of thinking and action continues. Mr. Goetz fails to provide any indications that his acceptance or understanding of risk with respect to the gold trade has changed or adjusted in response to the reporting or actions taken against him. Mr. Goetz has provided no basis to believe that his views or approach to sourcing gold from high-risk or conflict areas has changed. Whether his business is conducted via AGR or other entities, his statements demonstrate that his ongoing and likely future role in this trade and the broader policy concerns connected thereto remain a significant concern. Throughout the decades, Mr. Goetz has denied any awareness of, or refused to accept any responsibility for the role of gold in conflict in the DRC.

According to the aforementioned foreign policy guidance, in order to demonstrate changed behavior that would justify delisting, Mr. Goetz should first demonstrate full acceptance and acknowledgment of responsibility for his decades-long pattern of past actions and their connection to the conflict in the region, including sharing information about his activities and others involved in the gold trade, and then identify tangible commitments to contributing to positive change in the DRC, as well as the gold sector throughout the region. Delisting Mr. Goetz without this level of acknowledgment and changed behavior would undermine actions the United States is taking both in Eastern Congo and other contexts related to the conflict and illicit gold trade, in particular with respect to the activities of armed groups and criminal networks active across the continent.

Mr. Goetz has proposed a Terms of Removal Agreement (TOR) that includes provisions relating to compliance procedures, reporting requirements, periodic audits, and other provisions. However, any additional insight offered to OFAC through the implementation of these proposed steps would not undermine the criteria for designation. Furthermore, Mr. Goetz's past obfuscation undermine his credibility and OFAC's trust in the materials that would be provided by Mr. Goetz under the requirements of a TOR. Additionally, OFAC may be constrained in its ability to enforce the requirements of a TOR as it relates to entities that are domiciled outside of the United States.

Consequently, your client's request is denied, and Mr. Goetz's name will remain on OFAC's SDN List pursuant to E.O. 13413 as amended by E.O. 13671.

If, in the future, your client decides to pursue the reconsideration process again, your client will need to submit a new request, and provide OFAC new evidence as well as any other information that OFAC may request in order to process your client's request. For expediency purposes, please direct all questions and correspondence to OFAC via the following email: OFAC.Reconsideration@treasury.gov. You may also write OFAC at the following:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, DC 20220

DRC-34996 0003

Thank you for your cooperation.

Sincerely,

Andrea M. Gacki

Digitally signed by Andrea M.
Gacki
Date: 2023.06.30 21:00:10 -04'00'

Andrea M. Gacki
Director
Office of Foreign Assets Control

4



~~SECRET~~ 

## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

DRC-31659

### OFFICE OF FOREIGN ASSETS CONTROL

### EVIDENTIARY MEMORANDUM

MEMORANDUM FOR:  Andrea M. Gacki
Director
Office of Foreign Assets Control

THROUGH:       Ripley Quinby
Deputy Associate Director
Office of Global Targeting

▮

Assistant Director
Narcotics, Africa, and Western Hemisphere Division

▮

Acting Section Chief
Africa and Western Hemisphere Section

FROM:          ▮

Sanctions Investigator
Africa and Western Hemisphere Section

SUBJECT:       (U//FOUO) Democratic Republic of the Congo: Denial of delisting
request of **ALAIN FRANCOIS VIVIANE GOETZ\***

## I.  (U) INTRODUCTION

(U//FOUO) This memorandum provides a basis to deny the delisting petition of **ALAIN FRANCOIS VIVIANE GOETZ\***[1] (**GOETZ\*** or "the Petitioner") from the Specially Designated Nationals and Blocked Persons List (SDN List).  On March 17, 2022, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated **GOETZ\*** pursuant to Executive Order (E.O.) 13413, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," (E.O. 13413) [Exhibit 1], as amended by E.O. 13671, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo" (E.O. 13671) [Exhibit 2] (as so amended, "the Order"), for (1) being responsible for or complicit in, or having engaged in, directly or

---

[1] (U) The names of persons proposed for denial will appear in **BOLD CAPITAL** letters followed by a bold asterisk (\*).  Names in ALL CAPS followed by an asterisk denotes a person whose property and interests in property are blocked.

Classified By: ▮

Derived From: ▮

Declassify On: ▮

~~SECRET~~ ▮

DRC-34996 0005

SECRET

indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC; (2) being a leader of AFRICAN GOLD REFINERY LIMITED*[2] (AGR*) an entity whose property and interests in property are blocked pursuant to the Order; and (3) having acted or purported to act for or on behalf of, directly or indirectly, AGR*, an entity whose property and interests in property are blocked pursuant to the Order. [Exhibit 10, pp. 1–2]. The original evidentiary memorandum DRC-17840 is attached. [Exhibit 3].

(U) On March 17, 2022, counsel for **GOETZ\*** submitted a letter to OFAC requesting a stay of any potential designation of, or other related action targeting, **GOETZ\*** by OFAC. [Exhibit 4] Counsel for **GOETZ\*** sent OFAC a summons dated May 3, 2022, attaching a complaint dated April 29, 2022 in the U.S. District Court for the District of Columbia challenging OFAC's designation of **GOETZ\***. [Exhibit 13] On December 6, 2022, OFAC informed counsel for **GOETZ\*** that OFAC had determined to treat **GOETZ\***'s March 17, 2022, submission as a petition for delisting. [Exhibit 11, p. 2] **GOETZ\*** submitted a supplement to such delisting petition on February 28, 2023. [Exhibit 13, p. 2]

(U) **GOETZ\*** appears on the SDN List as follows:

GOETZ, Alain Francois Viviane (a.k.a. GOETZ, Alain; a.k.a. GOZ, Alen), The Palm Jumeirah 0-35, 65919, Dubai, United Arab Emirates; Villa 39, Frond N, The Palm Jumeirah, Dubai, United Arab Emirates; DOB 24 Apr 1965; alt. DOB 20 Apr 1965; POB Antwerp, Belgium; nationality Belgium; citizen Turkey; Gender Male; Passport EP985086 (Belgium) issued 08 May 2018 expires 07 May 2025; alt. Passport 50641895930 (Turkey) expires 10 Jul 2030; Identification Number 784196536027277 (United Arab Emirates) (individual) [DRCONGO] (Linked To: AFRICAN GOLD REFINERY LIMITED). [Exhibit 10, p. 2]

(U//FOUO) Following a thorough investigation and careful consideration of the information and arguments submitted by **GOETZ\***, as well as additional information available to OFAC, this evidentiary memorandum recommends denying his petition for removal from the SDN List regarding two bases for designation. **GOETZ\*** has failed to establish that OFAC lacked a sufficient basis for OFAC's March 17, 2022 designation of **GOETZ\*** pursuant to E.O. 13413, as amended, or that circumstances resulting in such designation of **GOETZ\*** no longer apply. Foreign policy guidance (FPG) provided by the Department of State was used in calculating OFAC's determination. Additionally, OFAC has determined that **GOETZ\*** no longer meets the criteria for designation for being a leader of AGR*.

---

[2] (U) On March 17, 2022, OFAC designated AFRICA GOLD REFINERY LIMITED* pursuant to E.O. 13413, as amended, for being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC. [Exhibit 10, p. 2]

SECRET



~~SECRET~~

(U) Below is a summary of OFAC's basis for designating **GOETZ\*** followed by information available to OFAC that supports a determination that **GOETZ\***'s delisting petition should be denied.

## II. (U) **BASIS FOR DESIGNATION**

(U) The evidence supporting OFAC's designation of **GOETZ\*** is set forth in detail in the evidentiary memorandum available in Exhibit 3. A summary of that evidence includes the following:

- (U) *GOETZ\* is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC*

(U//~~FOUO~~) **GOETZ\*** established AGR\* in 2014, had directly or indirectly owned AGR\* since then, was ▮▮▮▮▮ and/or chief executive officer (CEO) of AGR\* until at least ▮▮▮▮▮, and was involved in AGR\*'s gold trading activities until at least 2017. [Exhibit 3, p. 15]

[Exhibit 3, p. 21]

(U) **GOETZ\*** was involved in AGR\*'s activities while AGR\* has engaged in the illicit trade in gold of the DRC since at least 2016. [Exhibit 3, p. 17]

(U//~~FOUO~~)

[Exhibit 3, p. 15]

(U) Through his involvement in AGR\*, **GOETZ\*** is responsible for or complicit in, or has engaged in, directly or indirectly, support to armed groups in the DRC that are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC. [Exhibit 3, pp. 15–23]

- (U) *GOETZ\* has acted or purported to act for or on behalf of, directly or indirectly, AGR\*, an entity whose property and interests in property are blocked pursuant to the Order.*

(U//~~FOUO~~) **GOETZ\*** represented AGR\* as its CEO in November 201▮ PENDING CONSULTATION

[Exhibit 3, p. 25]

DRC-34996 0007    ~~SECRET~~

SECRET

(U) **GOETZ\*** made a request to the Ugandan president on behalf of AGR\* in March 2014. [Exhibit 3, p. 25]

(U//SBU) **GOETZ\*** also represented AGR\* at a meeting in 2017 with representatives of the U.S. Department of State. [Exhibit 3, p. 25]

- (U) *GOETZ\* is a leader of AGR \*, an entity whose property and interests in property are blocked pursuant to the Order.*

(U//FOUO)

3

[Exhibit 3, p. 24]

(U//SBU) **GOETZ\*** was identified as the CEO of AGR\* as of November 2017. [Exhibit 3, pp. 24–25]

(U) **GOETZ\*** was identified as the CEO and majority shareholder of AGR\* as of February 21, 2017. [Exhibit 3, p. 25]

## III. (U) **PETITION REQUEST**

1. (U) **Summary of Communication**

(U) On March 17, 2022, following **GOETZ\***'s designation, OFAC received a stay of designation from **GOETZ\***'s counsel. [Exhibit 4]

(U) Counsel for **GOETZ\*** sent OFAC a summons dated May 3, 2022, attaching a complaint dated April 29, 2022 in the U.S. District Court for the District of Columbia, challenging OFAC's designation of **GOETZ\***. [Exhibit 45]

(U) On December 6, 2022, OFAC informed counsel for **GOETZ\*** that OFAC would treat the March 17, 2022 submission as a request for delisting pursuant to 31 C.F.R. § 501.807. [Exhibit 11, p. 2]

(U) On February 28, 2023, counsel for **GOETZ\*** submitted to OFAC a petition supplement. [Exhibit 5]

(U) On March 21, 2023, OFAC sent **GOETZ\***'s attorney a questionnaire. [Exhibit 6]  On April 11, 2023, the attorney responded to this questionnaire. [Exhibit 8]

(U) On April 25, 2023, OFAC sent **GOETZ\***'s attorney a second questionnaire. [Exhibit 7]

---

[3] (U) On March 17, 2022, OFAC designated AGR INTERNATIONAL LIMITED\* pursuant to E.O. 13413, as amended, for being owned or controlled by, directly or indirectly, **GOETZ\***. [Exhibit 10, p. 2]

SECRET

SECRET ███████████

(U) On May 9, 2023, the attorney reached out to OFAC requesting a 10-day extension to respond to this questionnaire. OFAC granted this extension. [Exhibit 34]

(U) On May 19, 2023, the attorney responded to this second questionnaire. [Exhibit 9]

(U) On June 9, 2023, the attorney provided a supplemental submission to this questionnaire. [Exhibit 12]

2. (U) **Summary of Petitioner's Arguments**

(U) In his March 17, 2022 submission, **GOETZ\*** asserts that he has remained an advocate for fully transparent gold supply chains and for the urgent adoption of rigorous global standards for the production, transport, and trading of gold and other precious metals. Furthermore, **GOETZ\*** states that as OFAC is aware, the illicit gold trade from the DRC has funded conflicts in the region and has led to the exploitation of natural resources and the internal displacement and death of millions of Congolese people. [Exhibit 4, p. 3]

(U) **GOETZ\*** claims that has he found himself the subject of recent allegations by nongovernmental organizations ("NGOs") that, according to **GOETZ\***, appear to be based on unsubstantiated third-party accounts from known smugglers and business competitors, and misunderstandings of his business profile and work. **GOETZ\*** further states that false media and unsupported media reporting has linked him to refining conflict gold from the DRC at the AGR\*. However, **GOETZ\*** claims that he has not sourced or refined illegally smuggled conflict gold from the DRC at AGR\* and that AGR\* is the only established and visible gold refinery in the region that has signed an agreement with the DRC to establish a traceability system for sourcing gold. Further, GOETZ\* claims that the allegations against AGR\* with respect to conflict gold are not credible due to AGR\*'s due diligence measures and audit results. [Exhibit 4, pp. 3–4].

(U) **GOETZ\*** acknowledges media articles alleging that AGR\* received noncompliance notices from the Ugandan government on licensing, disclosure, and registration violations, but **GOETZ\*** claims that AGR\* is a fully licensed company and operates legitimately within the framework of Ugandan law. [Exhibit 4, p. 4]

(U) Additionally, **GOETZ\*** claims that the allegations against AGR\* are irrelevant, as, **GOETZ\*** is no longer a shareholder in AGR\* nor is he involved in AGR\*'s management at any level; **GOETZ\*** is currently serving only in a limited role as a consultant. [Exhibit 4, p. 4] According to a November 5, 2018 Memorandum of Agreement between AGR\* and **GOETZ\***'s duties as a consultant include promoting and developing AGR\* and assisting the company in safeguarding and furthering its business interests with regard to compliance standards of the Relevant Business in the Territory. **GOETZ\*** claims that he "no longer owns nor [*sic*] controls [AGR\*]". [Exhibit 4, p. 5]

(U) **GOETZ\*** also denies allegations that he laundered large sums of money from Venezuela through AGR\* in 2019. [Exhibit 4, p. 5]

SECRET ████████████████

SECRET ███████████████

(U) In a February 28, 2023 submission, the Petitioner provided additional arguments and information in support of his petition for delisting. In this submission, the Petitioner argues that there is insufficient basis for **GOETZ***'s designation with respect to OFAC's determination that **GOETZ*** is "responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC." [Exhibit 5, p. 6] Specifically, the Petitioner states that the administrative record[4] disclosed to **GOETZ*** failed to specify conduct linking **GOETZ*** to rebel groups purportedly operating in the DRC. Instead, the Petitioner claims that OFAC attributes purported sanctionable conduct by AGR* to **GOETZ*** without showing how **GOETZ*** himself was involved in that activity. [Exhibit 5, p. 6]

(U) Additionally, **GOETZ*** claims that with respect to all three bases for designation, much of OFAC's evidence linking **GOETZ*** to AGR is "until at least 2017" or "as of 2017." **GOETZ*** claims that this calls into question OFAC's fact-finding procedures as to how OFAC gathered and assessed the information underlying **GOETZ***'s designation. GOETZ* further claims that a significant amount of the sourcing is from 2018 or before, and that sources published after 2018 "are unreliable as [**GOETZ***] had already sold his shares in [AGR*] and was no longer involved in the company's management by that point in time." [Exhibit 5, pp. 6–7]

(U) Finally, the Petitioner asserts that OFAC does not evidence any ongoing conduct by **GOETZ*** and does not provide supporting documents demonstrating that **GOETZ*** currently owns or controls AGR*, which negates OFAC's determination that **GOETZ*** is a leader of AGR*. According to the Petitioner, **GOETZ*** divested from AGR* in February 2018 and resigned as AGR*'s CEO in November 2018. Furthermore, the supplement states that **GOETZ*** further distanced himself from AGR* thereafter by resigning as an AGR* director in January 2019, divesting from AGR INTERNATIONAL* (Seychelles) on June 7, 2021, and resigning from AGR INTERNATIONAL* on the same day. The Petitioner claims that the fact that OFAC did not update its information regarding **GOETZ***'s links to AGR* demonstrates that OFAC's fact-finding procedures in this matter were inadequate and rendered an insufficient basis for the determination underlying **GOETZ***'s designation. [Exhibit 5, p. 7]

(U//FOUO) **GOETZ*** proposes certain remedial measures that could negate the bases for designation and be incorporated into a Terms of Removal Agreement (TOR). **GOETZ*** states: "By proposing remedial measures, Goetz makes no representation regarding the validity of OFAC's allegations about him nor the factual bases it relied upon to designate him." [Exhibit 5, pp. 7, 10] Additionally, **GOETZ***'s counsel cites past TOR agreements as examples of agreements that memorialized certain remedial steps by the petitioning party in exchange for removal from the SDN List. [Exhibit 5, pp. 4–5]

(U) The following is a summary of the TOR criteria proposed by **GOETZ***'s attorney. **GOETZ*** will:

---

[4] (U) OFAC provided the Petitioner's attorney with his administrative record on January 31, 2023. [Exhibit 14]

~~SECRET~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

- (U) Provide OFAC with documentation, annually for five years, of his current sources of income and of the entities that he currently owns or controls. [Exhibit 5, p. 7]
- (U) Provide OFAC with certification, annually for five years, that he is not engaged in any sanctionable activity or is in violation of U.S. sanctions-related laws or regulations, and that he is not acting for or on behalf of any person on the SDN List or entities that are owned or controlled by persons on the SDN List. [Exhibit 5, p. 8]
- (U) Undergo a sanctions audit on an annual basis for a period of five years by an independent third party. [Exhibit 5, p. 8]
- (U) Provide documentation, annually for five years, of all senior management positions, advisory roles, or board seats that he holds at any company starting from the time of execution of the TOR. [Exhibit 5, p. 8]
- (U) Will inform OFAC prior to him registering, operating, or working for a business or entity or otherwise intends to be similarly affiliated with the management, administration, or operational activities of a business or entity. [Exhibit 5, p. 9]
- (U) Implement and provide certain internal procedures on compliance with certain laws or regulations, and provide OFAC with certain information relating to compliance at companies that he owns or controls or has an ownership interest in. [Exhibit 5, p. 9]
- (U) Provide OFAC with certain operational reports and documents, annually for five years, for all businesses and entities that he owns or controls. [Exhibit 5, p. 9]
- (U) For a period of five years, provide information to OFAC about transactions that he may conduct or facilitate with SDNs or certain SDN-related entities. [Exhibit 5, p. 9]
- (U) Provide written certification to OFAC that he will fully and expeditiously respond to OFAC information requests regarding compliance with the TOR and/or general compliance with sanctions regulations, for a five-year period. [Exhibit 5, p. 9]
- (U) Provide OFAC with a full and complete list of the sources of gold for the companies in which he maintains a majority interest or controls. [Exhibit 5, p. 10]
- (U) Undergo an annual audit by an independent third party. [Exhibit 5, p. 10]

(U) In exchange for implementing the above-mentioned TOR measures, **GOETZ\*** requests OFAC to remove him from the SDN List; to not simultaneously re-designate him under another sanctions authority; and to not impose any sanctions consequences against non-U.S. persons for their involvement in transactions ordinarily incident to execution of these remedial measures. [Exhibit 5, p. 10]

## IV. (U) **BASIS FOR DENIAL**

(U) Pursuant to 31 C.F.R. § 501.807, a person may seek administrative reconsideration by OFAC of a designation by submitting arguments or evidence establishing that (1) an "'insufficient basis exists for the designation'" or (2) the "'circumstances resulting in the designation no longer apply.'" Designated persons may also propose remedial steps, such as corporate reorganization, resignation from positions in a blocked entity, or similar steps, that the person believes would negate the basis for designation. *Id.*

(U~~/FOUO~~) As detailed below, the State Department has provided Foreign Policy Guidance (FPG) recommending that OFAC deny **GOETZ\***'s petition for removal from the SDN List.

7

**SECRET** ████████████████████

Additionally, despite **GOETZ***'s arguments, **GOETZ*** still meets two of the three original bases for designation pursuant to the Order, namely, **GOETZ*** (1) is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC and (2) has acted or purported to act for or on behalf of, directly or indirectly, AGR*, an entity whose property and interests in property are blocked pursuant to the Order. Finally, OFAC has reason to doubt that **GOETZ***'s claims of changed behavior truly constitute a change in circumstances.

(U) **Correction:** Classification marking for this paragraph should be (U~~//FOUO~~)

In light of this information, OFAC has determined that the Petitioner has failed to demonstrate that removal from the SDN List is warranted. Specifically, Petitioner has failed to demonstrate that the circumstances resulting in his designation no longer apply or that insufficient basis exists for the designation pursuant to 31 C.F.R. § 501.807.

(U) OFAC concedes that there is no longer a basis for designation for **GOETZ*** being a leader of AGR*.

(U) Therefore, OFAC has determined that Petitioner's request to be removed from the SDN List should be denied.

1.  (U) **Foreign policy guidance**

(U//~~SBU~~) The Department of State (State) recommends on foreign policy grounds that the Department of the Treasury's OFAC deny **GOETZ***'s removal from the SDN List. [Exhibit 14, p. 1]

(U//~~SBU~~) The Department of State recommends on foreign policy grounds that the Department of the Treasury's Office of Foreign Assets Control (OFAC) deny Alain Goetz's removal from the Specially Designated National List (SDN List) given his refusal to acknowledge his role in illicit gold trade in the DRC and because he has failed to demonstrate a change in behavior related to these activities that would warrant his removal. [Exhibit 14, p. 1]

(U//~~SBU~~) According to the June 29, 2023 State foreign policy guidance letter (FPG), State understands that Mr. Goetz has presented information to OFAC purporting to show that he is no longer an owner of or affiliated with AGR. State notes that Mr. Goetz has been an integral and essential part of the conflict gold trade in the DRC since the 1990s through the activities of several companies and associates, and his activities have been documented by the UN Group of Experts (GOE) since the late 2000s and early 2010s. His role as a buyer and trader of gold during the DRC's civil wars in the 1990s helped create the ecosystem that exists today where gold is used by numerous armed groups to fund conflicts and violence. This situation has resulted in the death of tens of thousands of people and led to the injury and displacement of millions of others in Eastern DRC and the surrounding region. In an interview with a Belgian newspaper in 2019, Mr. Goetz described his activities in the 1990s engaging with actors, such as

~~SECRET~~ ████████████████

SECRET ████████████████

Laurent Kabila during his armed rebellion, as "more fun" than gold trading had become in the late 2010s. [Exhibit 14, pp. 2–3]

(U) Correction: Classification marking for this paragraph should be (U//SBU)

(SBU) Foreign policy considerations related to the ongoing conflict in Eastern DRC, other areas in which the United States is acting against the illicit gold trade, and Uganda lead to a recommendation of denial for delisting absent a documented change in behavior beyond what Mr. Goetz has provided to date. Mr. Goetz's history with the conflict gold trade dates to the 1990s; in many ways, Mr. Goetz helped to create the conflict gold trade through his failures to conduct appropriate levels of due diligence given the heightened risks in the region, which resulted in sourcing gold from various rebel movements in that period. This is pattern of trade, specifically willingness to accept gold from sources without regard to risk, helped to establish the illicit routes through which gold would move from the Eastern DRC during the periods of conflict following the rule of the late President Mobutu. Numerous armed groups have exploited this trade and sales to the Goetz network to earn millions of dollars that have been used to carry out horrific armed attacks that have left tens of thousands of innocent people dead, millions injured and displaced, and led to a prolonged period of instability in the region—instability that continues today. [Exhibit 14, p. 5]

(U) Correction: Classification marking for this paragraph should be (U//SBU)

(SBU) Unfortunately, the role of gold in the multifaceted conflict in the DRC continues, and financing of the gold trade continues to result in the deaths of thousands of innocent civilians. The 2022 GOE report provides extensive documentation on the current role of gold in the complex web of conflict in eastern DRC, continuing to demonstrate that gold is exported to Uganda and elsewhere in the region. INTERPOL reported in 2021 on the structure of the illicit gold trade in the region, focusing in particular on the way that gold moves from mine sites in the DRC to Uganda and Rwanda and then on to the UAE. The State Department's Human Rights Report for the DRC has also consistently referenced the role of gold in conflict in the DRC, including the most recent report released in March 2023. [Exhibit 14, p. 6]

(U) Correction: Classification marking for this paragraph should be (U//SBU)

(SBU) Throughout the decades, Mr. Goetz has denied any awareness of, or refused to accept any responsibility for, such activity. His submissions to OFAC make only a passing reference to the concerns related to the conflict in the DRC or the role of gold in particular. For his part, as noted below, Mr. Goetz has described the decades of brutal and tragic conflict in the DRC as "pockets of violence" exaggerated by NGOs. In addition, in the above-referenced 2018 interview with the Belgian newspaper, Mr. Goetz acknowledged being aware that gold is a "filthy business" and that numerous concerns exist in areas from which his refinery was sourcing gold. He stated that it was not the responsibility of him or his companies to address these concerns. [Exhibit 14, p. 6]

(U) Correction: Classification marking for this paragraph should be (U//SBU)

(SBU) Even if he purports to have formally distanced himself from AGR, Mr. Goetz's recent statements and submissions continue his previous line of thinking and action continues. Mr. Goetz fails to provide any indications that his acceptance or understanding of risk with respect to the gold trade has changed or adjusted in response to the reporting or actions taken against him. Rather than identify how the approach of AGR has strengthened in response to the consistent GOE and other reporting on the serious risks related to the gold trade, Mr. Goetz's submissions to OFAC simply ask the agency to accept his word and declare that he has always used the appropriate level of due diligence and KYC practices in place. As a result, Mr. Goetz has

9

SECRET ████████████████

~~SECRET~~ ███

provided no basis to believe that his views or approach to sourcing gold from high-risk or conflict areas has changed. Whether his business is conducted via AGR or other entities, his statements demonstrate that his ongoing and likely future role in this trade and the broader policy concerns connected thereto remain a significant concern. De listing Goetz without his acknowledgment of his complicity in the consequences of the illicit gold trade and evidence of material changes in his approach and behavior would undermine U.S. foreign policy. Additionally, it would send a clear signal that undermining civil society, the UN GOE, and others reporting on him is an acceptable approach. It would also demonstrate that a decades-long pattern of engagement in high-risk trade with actors connected to armed groups in an area affected by destructive conflict does not need to be fully addressed, or even appropriately recognized, prior to delisting. [Exhibit 14, p. 7]

(U) **Correction:** Classification marking for this paragraph should be (U//~~SBU~~)

~~(SBU)~~ In order to demonstrate changed behavior that would justify delisting, Mr. Goetz should first demonstrate full acceptance and acknowledgment of responsibility for his decades-long pattern of past actions and their connection to the conflict in the region, including sharing information about his activities and others involved in the gold trade, and then identify tangible commitments to contributing to positive change in the DRC, as well as the gold sector throughout the region. Delisting Mr. Goetz without this level of acknowledgment and changed behavior would undermine actions the United States is taking both in Eastern Congo and other contexts related to the conflict and illicit gold trade, in particular with respect to the activities of armed groups and criminal networks active across the continent. [Exhibit 14, p. 7–8]

### 2. (U) **Failure to meet Criteria in C.F.R. § 501.807**

(U) **GOETZ\*** has failed to establish that OFAC lacked a sufficient basis for OFAC's March 17, 2022 designation of **GOETZ\*** pursuant to E.O. 13413, as amended, or that circumstances resulting in such designation of **GOETZ\*** no longer apply. In fact, **GOETZ\***'s original designation was appropriate, many of the arguments presented in the Petitioner's March 17, 2022 submission do not undermine the basis for designation, and the petitioner has not shown himself to be trustworthy enough for OFAC to enter into a proposed TOR as a way of negating **GOETZ\***'s bases for designation. Additionally, OFAC may be constrained in its ability to enforce the requirements of a TOR as it relates to entities that are domiciled outside of the United States.

- (U) *GOETZ\*'s designation for being responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC is appropriate.*

(U) The Petitioner argues that OFAC has failed to link **GOETZ\*** to rebel groups operating in the DRC, which negates **GOETZ\***'s designation under the abovementioned basis. [Exhibit 5, p. 6] However, OFAC appropriately met the criteria for designation under the above-mentioned prong by demonstrating an indirect link between **GOETZ\*** and the rebel groups operating in the DRC:

10

SECRET ████████████████████

(U) According to the designation evidentiary, **GOETZ\*** incorporated AGR\* in 2014. **GOETZ\*** had directly or indirectly owned AGR\* since 2014 and was ████ and/or CEO of AGR\* until at least ████████ **GOETZ\*** was involved in AGR\*'s gold trading activities until at least 2017. [Exhibit 3, pp. 15–17]

(U) AGR\* has engaged in illicit trade in DRC gold since at least 2016 and **GOETZ\*** was involved in AGR\*'s activities. [Exhibit 3, pp. 17–20]

(U//FOUO) ████████████████████████ 5 ████████████

[Exhibit 3, p. 21]

████████████████ [Exhibit 3, p. 15]

(U) Through his involvement in AGR\*, **GOETZ\*** is responsible for or complicit in, or has engaged in, directly or indirectly, support to armed groups, such as the Mai-Mai Yakutumba and the Raia Mutomboki[6] through the illicit trade in gold of the DRC. [Exhibit 3, pp. 20–21]

(U) Additional information, acquired after the designation, further supports OFAC's determination that **GOETZ\*** is linked to rebel groups in the DRC, in part due to his ties to AGR\*.

(U//SBU 

---

[5] (U//FOUO) Aldango Ltd is a Rwanda-based gold refinery partially owned by **GOETZ\*** since 2019. [Exhibit 36, p. 23]
[6] (U//FOUO) ████████████████████ [Exhibit 3, p. 13]

SECRET ████████████████

SECRET ███████

[Exhibit 23, pp. 2, 6–8]



(U//SBU

Exhibit 25, p. 2]

(U//FOUO) According to January 17, 2023 *Jeune Afrique*[7] article ███████, the DRC and UAE have just signed a commercial partnership that could jeopardize trafficking that finances insecurity in eastern DRC. Illegal gold transfers fuel the plunder of certain African nations, as well as their lasting political destabilization. Described as a geological scandal for its almost indecent natural resources, the DRC has not escaped the predation conflicts that accompany natural wealth. In the eyes of those who were not yet aware, the American sanctions against **GOETZ\*** revealed the financing of Congolese armed groups through the illegal export of precious metal. **GOETZ\***'s business revealed transactions that were more or less opaque in the UAE, Rwanda, and Uganda. [Exhibit 26, p. 2]

(U) Based on the information described above, OFAC assesses that **GOETZ\*** is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

- (U) *Evidence Linking **GOETZ\*** to Refining Conflict Gold at AGR Are Credible*

(U) The Petitioner claims that has he found himself the subject of recent allegations by nongovernmental organizations ("NGOs") that, according to **GOETZ\***, appear to be based on unsubstantiated third-party accounts from known smugglers and business competitors, and misunderstandings of his business profile and work. The Petitioner also claims that false and unsupported media reporting has linked **GOETZ\*** to refining conflict gold from the DRC at AGR\*. [Exhibit 4, p. 3] However, information in the original evidentiary from multiple non-media sources offer evidence of **GOETZ\***'s links to refining conflict gold at AGR\*. [Exhibit 3, pp. 15–23]

---

[7] (U//FOUO ███████████ ██████ Exhibit 26, p. 3]

SECRET ███████

12

SECRET

(U) According to a December 8, 2022 notice in the *Official Journal of the European Union*, on December 8, 2022, the EU sanctioned **GOETZ\*** as a businessman who is the beneficial owner and former director of AGR\*. Since 2016, AGR\* has received, purchased, refined, and traded illicit gold originating from mines in the DRC that are controlled by non-governmental armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki, which are involved in destabilizing activities in South Kivu province. **GOETZ\*** is therefore exploiting the armed conflict, instability, and insecurity in the DRC through the illicit exploitation and trade of natural resources. [Exhibit 33, pp. 1, 8]

(U) According to an October 2022 UAE Financial Intelligence Unit (FIU) strategic analysis report, UAE authorities offer a case examples from their database. The first case involves trading in conflict gold and laundering it through the abuse of financial institutions and designated non-financial businesses and professions. The subject is a foreign national and the owner of different businesses in different industries, including an entity licensed for gold trade in the UAE. The subject, with a family member, created a gold-smuggling system across borders. While the subject had no criminal record in the UAE, the UAE FIU found that the subject and a family member were convicted in the past in a European country of creating an unlawful system for customers to sell gold anonymously to a refinery for cash. A suspended sentence of 18 months was imposed in said country. The UAE FIU received a request for information from another European FIU counterpart. The request might have resulted from the court case and adverse media. This European FIU indicated suspicious transactions noted through its correspondent banking system involving the subject and a refinery owned by the subject's family member and different counterparties in the UAE. This was in addition to a family-based refinery in an African country. The European country FIU considered the possibility of unlicensed financial agent activities, fraudulent account usage and/or money laundering. According to the concerned customs department in the UAE, the subject was importing different types of products, including gold, silver, platinum bars, gold bullion and coins, jewelry, banknotes in circulation, and relevant industrial spare parts. The import value during the span of six years[8] was estimated to be 26 billion UAE dirhams (AED) (including 12 billion in merely one year) from high-risk jurisdictions known for conflict gold. To launder the money, the subject had different bank accounts (obtained in the four currencies of AED, euros, pounds sterling, and U.S. dollar) in several financial institutions (banks and exchange houses) in the UAE. These accounts had a high turnover volume, including multiple incoming transfers followed by immediate outgoing transfers for no reason. Moreover, based on the UAE FIU database, it was suspected that the subject used a UAE third party to conduct payments to high-risk countries in Africa, with two suspicious transaction reports having previously been received from reporting entities in the UAE and referred by the UAE FIU to the concerned law enforcement agency. Ultimately, the UAE FIU concluded that the subject might have been laundering money gained from illicit gold through bringing and selling some of this gold to different companies in the UAE. Money laundering activities included utilizing financial institutions in the UAE to move money within and across borders, taking many loans from banks while paying the loans off within a short

---

[8] (U) This report does not provide any indication of what this six year time span is, but based on the documents' timeframe of January 2021–June 2022, OFAC assesses that this six year timespan ranges from 2017 to 2022.

DRC-34996 0017    SECRET

SECRET ████████████████

timeframe, and as well as purchasing multiple luxury properties that are collectively worth millions of AED. Consequently, the UAE FIU disseminated the case to the relevant police department for further investigation into the subject. [Exhibit 42, pp. 4, 20–21] Based on the similarities of the subject of this investigation with those of **GOETZ\*** contained in the February 5, 2020 Reuters article, namely the conviction with a family member, the family refinery, and the African refinery [Exhibit 42, pp. 1–3], OFAC assesses that the subject of this UAE FIU investigative case is **GOETZ\***.

(U) According to a May 2014 Southern Africa Resource Watch report, competition in the central African gold trade had turned vicious when **GOETZ\*** made his first forays into Africa's gold trade in 1987. With *Affinage de Metaux* (Affimet) taking advantage of the rules, **GOETZ\*** gained a massive market share. By 1994, he was exporting 7 tons of gold, far exceeding his competitors' combined export of 2.6 tons. In early 1995, Affimet also announced its intention to create a 332 million Burundian franc jewelry plant and an offshore bank with a capitalization of $1.2 million—proving how lucrative the Burundian trade in illegally-exported Congolese gold had become. By 1997, Goetz's gold trade had flourished during the rebellion thanks to a deal he agreed with the *Alliance des Forces Démocratiques pour la Libération du Congo-Zaïre* (ADFL)'s economic team. [Exhibit 35, p. 7] They granted **GOETZ\*** a license to trade gold and export it from their 'liberated' territory. To streamline his business, **GOETZ\*** had created regional buying offices. Each of these subsidiary buying offices applied for, and received, their own gold export licenses from the ADFL. By mid-1998, when the second Congo War broke out, **GOETZ\*** was still benefitting from his original licenses issued by ADFL. After all, the protagonists were largely the same as during the previous war, except that they were now operating as a new militia, the *Rassemblement Congolais pour la Démocratie* (RCD). [Exhibit 35, p. 7] Given his involvement in Congo's gold trade, **GOETZ\*** did periodically attract interest from UN investigators even after he had returned to Antwerp, Belgium. Eventually, he opened another gold trading company in Dubai, AGOR DMCC\*.[9] Although **GOETZ\*** has consistently denied any involvement with Congolese gold traders, the suspicion persists that either directly or through his old surrogates, **GOETZ\*** maintains links with Congo's gold traders. Several documented or attempted transactions appear to show that **GOETZ\*** does still have links — however sporadic — with Congolese gold dealers. [Exhibit 35, pp. 42–43]

(U//FOUO) 

---

[9] On March 17, 2022, OFAC designated AGOR DMCC\*, also known as Agor Ltd, pursuant to E.O. 13413, as amended. [Exhibit 10, p. 2]

14

SECRET ████████████████████

████████████████████████████████████████

[Exhibit 36, p. 13]

(U//FOUO)

████████████████████████████████████████

[Exhibit 36, p. 15]

(U//FOUO)

████████████████████████████████████████

[Exhibit 36, p. 15]

(U) This additional information, though not recent, shows that OFAC's original designation was appropriate and that **GOETZ***'s insistence that he has not been involved in conflict gold at AGR* is incorrect.

- (U) *Refutations of Allegations of the Petitioner's Laundering Gold from Venezuela through AGR* Do Not Undermine the Bases for Designation*

(U) Though involvement with respect to Venezuelan gold was not part of the basis for designation, in his March 17, 2022 request for a stay of designation, **GOETZ*** denies the allegations of laundering Venezuelan gold, noting that he has never been involved, in any capacity nor at any point, with sourcing, refining, or selling gold from Venezuela. [Exhibit 4, p. 5]

(U) According to a June 18, 2019 Dow Jones Morningstar article, in early-March 2019, AGR* imported 7.4 tons of Venezuelan gold of which 3.8 tons were then re-exported to GOETZ GOLD*. **GOETZ*** said some of the particular Venezuelan gold passed through GOETZ GOLD* but that it came from a company outside Venezuela and didn't break U.S. sanctions because the contracts were signed before November 1, 2018. [Exhibit 3, p. 14]

---

[10] On March 17, 2022, OFAC designated GOETZ GOLD LLC*, also known as PGR Gold Trading LLC. [Exhibit 10, p. 2]
[11] (U//FOUO) ████████████████████
[Exhibit 36, p. 23]

DRC-34996 0019          SECRET ████████████████████

~~SECRET~~ █████████████████████████

(U) According to a June 18, 2019 *Wall Street Journal* article, on March 2, 2019, an airplane owned by a Russian charter company landed at Entebbe airport after a flight from Caracas, Venezuela. Police and private security gathered on the tarmac to receive the cargo from the jetliner which carried no passengers, says a person who witnessed its arrival. Airport handlers removed heavy parcels wrapped in brown cardboard, which didn't pass through the airport's regular customs procedures, said a Ugandan police spokesman. Less than an hour after landing, the packages, under a private security escort, reached the AGR* compound just across the airport access road. Inside the cardboard were 3.8 tons of Venezuelan gold. Another 3.6 tons on the same airliner from Caracas arrived at AGR* two days later. By the time the police's minerals unit, tipped off over the unusually large consignments, raided AGR* on March 7, 2019, the first lot was gone, exported to the Middle East with its final destination listed as Turkey. The senior Ugandan police officer and GOETZ* say the gold was sent to GOETZ GOLD* in Dubai. Ugandan police seized the other 3.6 tons, ingots stamped with labels identifying them as CENTRAL BANK OF VENEZUELA*[12] property. Some labels appeared scratched, as if someone had tried to disguise their origin. GOETZ* and AGR*'s general manager say police never raided the refinery and never seized any gold. It wasn't the first time authorities identified Venezuelan gold handled by GOETZ*. In 2018, the CENTRAL BANK OF VENEZUELA* was selling gold to three trading firms in Turkey and the UAE, according to a February 2018 announcement by the Venezuelan parliament's finance commission, including GOETZ GOLD*, which bought 21.9 tons. GOETZ* says some of that particular Venezuelan gold passed through GOETZ GOLD* but that it came from a company outside Venezuela and didn't break U.S. sanctions because contracts were signed before November 1, 2018. Two months[13] later in Uganda, as police say that the seized Entebbe gold shipment sat in custody, relief came from President Museveni. In a letter dated March 26, 2019, a copy of which the *Wall Street Journal* reviewed, Uganda's attorney general ordered the police mineral-protection unit to release the gold and withdraw officers from AGR*.[14] The order to release the gold came from President Museveni. "AGR is instructed henceforth," the letter said, to "cease and desist from any further importation of gold from Venezuela, until further notice," citing U.S. sanctions. [Exhibit 37, pp. 3, 6–8]

(U) Given █████████████████████████████████████████████████████████
█████████████ [Exhibit 3, p. 14], statements by Ugandan government officials [Exhibit 37, pp. 3, 6–8], and GOETZ*'s representation of AGR* in a managerial role [Exhibit 39, p. 3], OFAC assesses that GOETZ*'s claims are not true and provides additional evidence that he is not credible enough to delist or to be party to a TOR.

- (U) *GOETZ*'s Acknowledgment of Media Articles alleging that AGR* received Noncompliance Notices from the Ugandan government and his Claims that AGR* is a Fully Licensed Company and Operates Legitimately within the Framework of Ugandan Law Do Not Undermine the Bases for Designation.*

---

[12] (U) On April 17, 2019, OFAC designated the CENTRAL BANK OF VENEZUELA* pursuant to E.O. 13850, for operating in the financial sector of the Venezuelan economy

[13] (U) Based on the March 7, 2019 raid [Exhibit 37, p. 7], OFAC assesses two months later is probably a reference to May 2019.

[14] (U) This letter appears to contradict GOETZ*'s claim that the police never raided AGR* nor seized any gold.

SECRET

- (U) ***GOETZ\*'s Claims of Advocacy for Transparency in Gold Supply Chains and Description of AGR\*'s Due Diligence Measures Are Undermined by Reporting Available to OFAC.***

(U) According to the Petitioner's March 17, 2022 submission, **GOETZ\*** has not sourced nor refined illegally smuggled conflict gold from the DRC at AGR\*.  Further, the **GOETZ\*** states that allegations against AGR\* with respect to conflict gold are not credible given AGR\*'s due diligence measures relating to gold traceability, which he details in the submission, and audit results, which he mentions in the submission. [Exhibit 4, p. 4]

(U) According to a June 2017 Global Witness report, the chairman of AGR\*, Richard Henry Kaijuka, when asked where the gold came from, said "wherever it comes, it is not our business." "But they bring it on our doorstep" he swiftly added "with all the documents that may be required."  A former director told Global Witness that they are receiving gold from Congo and South Sudan but the company has declined to provide precise figures on origin.  AGR\* should have been required to document and publish details of careful supply chain due diligence efforts to ensure that the gold they process does not contribute to conflict or human rights violations. The due diligence process is designed to enable responsible trade from high-risk areas to continue, while spotting red flags such as the risk of conflict financing.  In a letter dated January 2017, AGR\* stated that all suppliers have the necessary authorization to operate as miners or mineral dealers and they need to sign a statement that the gold they supply is not conflict gold.  They also state that they check that suppliers are not listed on any official sanctions lists and that "AGR is establishing a robust compliance system in line with the Organization for Economic Co-operation and Development guidelines."  AGR\* did not provide Global Witness with due diligence reports or proof of origin for the gold as it had requested. [Exhibit 38, pp. 12, 16, 37–38]

(U) According to a March 20, 2022 *Daily Monitor*[15] article ▮▮▮▮▮▮▮ ▮▮▮▮ AGR\*, since its launch in 2017, has been under immense international scrutiny.  This was especially so after revelations that AGR\* imported gold from sanctioned Venezuela and acted as a conduit for conflict gold from the DRC and South Sudan.  In 2016, AGR\* revealed that out of gold exports worth $300 million from Uganda, it accounted for roughly $200 million. This, as the Ministry of Energy and the Uganda Revenue Authority, on several occasions, struggled to explain the mismatch between Uganda's gold export certificates and royalties declared.  In 2017, **GOETZ\*** indicated that he was aware of "the many controversies surrounding the regional gold trade" and was working hard to address them.  Later in 2018, he acknowledged that AGR\* refines about 150 kilograms (kg) of gold from the DRC weekly, or approximately 8.5 tons a year, valued at $496 million.  This represents almost all of Uganda's gold exports.  AGR\* once reasoned that the "dramatic increase in export figures recently is a

---

[15] (U ▮▮▮▮▮▮▮▮▮▮



[Exhibit 15, p. 6]

SECRET

SECRET ██████████

direct result of [its] high levels of transparency." AGR* also claimed to maintain zero tolerance to smuggling. The disclosures on the origin of AGR*'s gold still remained farfetched, while at the same time the Bank of Uganda's research department in charge of import statistics between 2016 and 2021 maintained that it did not know the origin of the gold that Uganda keeps importing. The *Daily Monitor* article also references that the *Wall Street Journal* published an expose detailing how unusual gold amounts were sneaked into Uganda from Venezuela. The operation was designed to evade U.S. sanctions on the Venezuelan government with the gold arriving in Uganda in two consignments aboard planes owned by a Russian chartered company. Later, a police investigation into the "unusually large consignments" seized 3.6 tons of the Venezuelan gold in a raid on AGR*. [Exhibit 15, pp. 3–6]

(U//FOUO) According to a March 25, 2022 Africa Intelligence[16] article ████, Uganda, which obtains a large part of the $2 billion it earns from gold exports from AGR* owned by **GOETZ***, reacted violently to the U.S. sanctions. Uganda has accused OFAC of having acted on the basis of false accusations made by the NGO, The Sentry, without proof. **GOETZ*** made the same argument in a statement on his own account, even though **GOETZ*** has been mentioned regularly for more than 20 years in reports on gold trafficking. More recently, documents from the United Nations, The Sentry, and other organizations have claimed that gold from the DRC and Venezuela has been sent illegally to AGR*. [Exhibit 16, pp. 2–3]

(U) According to a March 25, 2022 *Africa Report*[17] article ████, Uganda's status as a prominent gold exporter, albeit with no large gold deposits, came to a sudden end in June 2020 when the government introduced a new tax on the precious metal. The end of the gold export boom also coincided with the reported quiet departure of **GOETZ***, who sold 99 percent of the shares he owned in AGR*, but stayed around, according to documents obtained by *Africa Report* from Uganda Registration service Bureau. [Exhibit 17, p. 2]

(U//FOUO) According to an April 1, 2022 Africa Intelligence article ████, the Ugandan state's revenues from the transit of gold have dried up in early 2022. This was intrinsically linked to the DRC, and especially its eastern provinces. Eighty percent of gold transiting via Uganda come from those DRC provinces. The ore is refined in Kampala, Uganda, before being shipped to buyers all over the world, or simply re-exported in raw form, taking advantage of infrastructure and lower taxes. Despite the presence of gold deposits in many parts of Uganda, gold mining remains minimal in the country. [Exhibit 18, p. 2]

(U//FOUO) According to an April 4, 2022 *Independent*[18] article ████, in 2017, AGR* ran into trouble as a string of Ugandan authorities, including the Inspector General of Government,

---

[16] (U//FOUO) ███████████████████████████████████████
████████████ [Exhibit 16, p. 3] █████████████████████████

[17] (U) ██████████████████████████████████████████████
[Exhibit 17, p. 3]
[18] (U//FOUO) ████████████████████████████████████████
███████████████████████████████████████████████████

SECRET ██████████

SECRET <span style="background:black">████████████</span>

the Financial Intelligence Authority, and the Director of Public Prosecutions, came after AGR* in relation to a number of irregularities, including money laundering. AGR* ignored most of the written requests from these authorities about compliance with the confidence that it was protected by President Museveni, who has rolled out the red carpet for foreign investors regardless of their reputations. AGR* is said to have run into more trouble when it ousted its board chairman, former Energy Minister Richard Kaijuka, who attempted to subject **GOETZ\*** and AGR* to corporate governance regulations. There were reports that Museveni came to the defense of **GOETZ\*** after several accusations from key players in the mining industry. These included the Directorate of Geological Surveys and Mines, who award licenses to companies like AGR*. [Exhibit 19, p. 5]

(U//FOUO) According to an August 10, 2022 *Africa Confidential*[19] article <span style="background:black">████</span>, **GOETZ\***'s AGR* in Uganda, launched in February 2017, processes gold that appears to have been smuggled into the country, some of it originating from armed groups in eastern DRC and other conflict zones.[20] The continued smuggling of DRC's gold into Uganda, identified once again by the UN Group of Experts (GOE) on the DRC as a serious threat to regional security and stability, raises questions over the intentions of Uganda's leadership. The GOE's latest report shows a close correlation between the recorded value of minerals (excluding petroleum) imported into Uganda and Ugandan gold exports, suggesting that most Ugandan gold exports are, in fact, Congolese.[21] Uganda's Gold Refiners, Exporters and Dealers Association, whose members are the country's five gold refiners, including AGR*, all insisted to the UN GOE that Uganda is a gold-producing country and that they sourced their gold internally or from trusted suppliers. Yet, the latest figures from the Ugandan Bureau of Statistics record just over three tons of gold production for 2020. That is a far shout from Uganda's 2021 gold exports, which stood at 21 tons. [Exhibit 20, pp. 2, 5]

(U//SBU) According to a November 28, 2022 State cable from Embassy Abu Dhabi, in a diplomatic note dated October 6, 2022, the Ministry of Foreign Affairs confirmed the UAE government had opened an investigation into the activities of **GOETZ\*** and PGR GOLD TRADING LLC*. The ministry indicated no suspicious activities have been identified to date, although investigations were continuing. [Exhibit 21, p. 2]

(U//SBU) According to the same November 28, 2022 State cable above, in October 2022, the UAE Financial Intelligence Unit (FIU) released a Strategic Analysis Report entitled Dealers in Precious Metals and Stones. The report reviewed risks, mitigation efforts, typologies, and other UAE-related activities. The report included a detailed case study derived from the FIU database as Case Example One involving an unnamed individual with activities, assets, and patterns



<span style="background:black">█████</span> Exhibit 19, p. 6 <span style="background:black">█████████</span>

[Exhibit 20, p. 6]

[20] (U//FOUO) This statement appears to have been published by *Africa Confidential* in their December 2017 edition.
[21] (U//FOUO) This statement appears to have been published by *Africa Confidential* in their June 2020 edition.

SECRET <span style="background:black">████████</span>

SECRET

closely resembling **GOETZ***.  The Case Example text referenced multiple suspicious transaction reports and relevant risk indicators associated with the individual, and indicated an ongoing criminal investigation by UAE law enforcement. [Exhibit 21, p. 2]

(U) According to a January 23, 2023 *Africa Report* article          , Belgian gold dealer **GOETZ*** was sanctioned by the European Union (EU) in December 2022 for trade in smuggled gold from DRC.  **GOETZ*** has United Arab Emirates citizenship and that is where he has been based for years.  **GOETZ*** told Africa Report that he has not tried going to Belgium.  Even so, a source in Belgium, who keeps track of **GOETZ***'s activities, says **GOETZ*** tried to enter Belgium, but was denied access.  **GOETZ*** established his base in Uganda in 2014 after setting up AGR*.  Four years later, gold had become Uganda's leading export earner.  Gold was being snuck into Uganda from neighboring countries, then refined and exported.  Various NGOs wrote reports pinning **GOETZ*** for being a key player in smuggling of gold from DRC.  **GOETZ*** has been furious at the NGOs, which were at the center of reports that led to the sanctions.  He argues that it should not be the nonprofits, but rather countries where these minerals come from, that conduct investigations into the trade of precious minerals.  He says the countries involved should be the ones to make recommendations on what can be done better.  During the interview for this article, **GOETZ*** stated that "AGR* introduced a culture of transparency and payment of the right amount of tax.  AGR* operations were in accordance with national, regional, and international regulatory frameworks.  In the end, the government of Uganda was able to track down how much gold was processed, traded, and exported, all thanks to AGR*'s efforts.  Uganda Revenue Authority even placed one of its officials to trace each gram of gold that was coming and leaving the factory."  **GOETZ*** operated AGR* with an open-door policy.  In certain instances, journalists have been able to access **GOETZ*** through Whatsapp.  Furthermore, the same article states that **GOETZ*** does this simply because he has nothing to hide.  "Through AGR*, we were able to prove that gold could be responsibly sourced, taxed for the benefit of the economy and to the locals.  AGR* was always committed to cooperating with regulators and government authorities." [Exhibit 22, pp. 3–4]  OFAC assesses that GOETZ*'s claims that AGR* had introduced a culture of transparency and responsible sourcing is not credible given the evidence presented in the original designation package that AGR* has engaged in the illicit trade of gold since at least 2016. [Exhibit 3, pp. 17–20]

(U) OFAC assesses that the above-mentioned claims that AGR*'s due diligence methods prevent AGR* from sourcing or refining illegally smuggled gold are not credible, given the evidence that OFAC has presented above and in the original designation evidentiary that AGR* has engaged in the illicit trade of gold since at least 2016. [Exhibit 3, pp. 17–20]

(U//FOUO)

[Exhibit 3, p. 15]

- (U) ***GOETZ***'s was the ultimate beneficial owner and/or shareholder and/or director of AGR* from 2014 through 2021, during which AGR* was engaged in the illicit trading activities that supported armed groups in the DRC.*

20

SECRET

SECRET

(U) According to an April 11, 2023 questionnaire response, **GOETZ\*** provided a Memorandum of Association for AGR INTERNATIONAL\*, dated December 6, 2017, which indicated that AGR INTERNATIONAL\* has an authorized share capital of $150,000.00 divided into 150,000 shares of USS 1.00 each. [Exhibit 8. part 3, p. 32] In the same response, on December 6, 2017, **GOETZ\*** is identified as the registered proprietor of 150,000 shares of AGR INERNATIONAL\*. [Exhibit 8, part 3, p. 48] OFAC assesses that at the time of AGR INTERNATIONAL\*'s association, GOETZ\* was the owner of AGR INTERNATIONAL\*.

(U) According to a February 28, 2023 Delisting Supplement, **GOETZ\*** divested from AGR INTERNATIONAL\* on June 7, 2021. [Exhibit 5, p. 7]  **GOETZ\*** provided supporting documentation for this claim in a June 7, 2021 Share Transfer document, which states that 150,000 shares of AGR INTERNATIONAL\* were transferred from **GOETZ\*** to Mr. Puthen Purayil Thampan Shinu Cheekkulathu. [Exhibit 12, p. 7]

(U) In the March 17, 2022 submission, **GOETZ\*** provides a February 8, 2018 Share Purchase and Sale Agreement between **GOETZ\*** and AGR INTERNATIONAL\*, in which AGR INTERNATIONAL\* purchased 99 out of 100 shares of AGR\* from **GOETZ\***. [Exhibit 4, part 2, pp. 2–3]

(U) OFAC assesses that because **GOETZ\*** was the majority owner of AGR INTERNATIONAL\* from December 6, 2017 until June 7, 2021 and AGR INTERNATIONAL\* was the majority owner of AGR\* from at least February 8, 2018[22] then **GOETZ\*** was the majority owner of AGR\* from February 2018 until June 7, 2021.



[Exhibit 27, p. 3]

(U) According to a May 14, 2021 letter from Sharon Tem, managing advocate at Tem Advocates & Solicitors, sent to the Secretary of the Treasury on behalf of **GOETZ\***, **GOETZ\*** had already stepped down as CEO in 2018 and, in line with the October 1, 2019 meeting with Treasury and AGR\*'s Top Management at AGR\*'s premises, AGR\* assured that the company would cease and desist from engaging in any transaction that may be linked to the gold from Venezuela. [Exhibit 31, p. 2]



---

[22] (U) In a response to the second questionnaire. **GOETZ\*** stated that between February 2018 and June 2021. AGR INTERNATIONAL\* was the majority shareholder of AGR\*. [Exhibit 9, p. 4]

21

SECRET

SECRET

[Exhibit 39, pp. 2–3]  Based on the letter to Treasury above which claims **GOETZ\*** stepped down as CEO in 2018 and AGR\*s top management meeting with Treasury officials at AGR\*'s premises [Exhibit 31, p. 2] [Exhibit 39, pp. 2–3], OFAC assesses that **GOETZ\*** continued to manage and maintain some control over AGR\*, despite his efforts to obfuscate such management or ownership, to at least mid-2021.

(U) According to a June 18, 2019 *Wall Street Journal* article, **GOETZ\*** claimed that he sold AGR\*. [Exhibit 37, p. 6]  This assertion was misleading; as explained above, as of June 8, 2019, **GOETZ\*** was the majority owner of AGR\* through his ownership of AGR INTERNATIONAL\*.

(U) According to same March 20, 2022 *Daily Monitor* article above from ███, based on Uganda Registration Services Bureau filings, **GOETZ\*** was one of AGR\*'s founding directors, alongside several Rwandan nationals.  But over the years, according to the filings, AGR\*'s directors kept changing—including in 2019 when **GOETZ\*** sold his shareholding in AGR\* but continued signing documents. [Exhibit 15, pp. 4–5]  OFAC assesses that **GOETZ\*** continuing to sign documents for AGR\* shows he nominally maintained some control over AGR\* despite his statements he sold his shareholdings.

(U//FOUO) According to the same March 25, 2022 Africa Intelligence article above ███, U.S. sanctions have put Uganda, where **GOETZ\***'s AGR\* is based, in a difficult position. **GOETZ\*** faces sanctions against several of his companies.  Such is the case for his Ugandan company AGR\*.  In 2021, UAE-based Aldabra, controlled by **GOETZ\***, was accused of tax evasion by Rwanda in an affair concerning the Aldango Gold Refinery (Aldango) it operates in Kigali, Rwanda.  Aldango, which was originally set up as a joint venture with Rwandan state investment company Ngali Holdings, has since been seized by the Rwandan authorities, provoking a dispute between Aldabra and the Rwandan state. [Exhibit 16, p. 2]

(U//FOUO) According to the same April 1, 2022 Africa Intelligence article above ███, **GOETZ\***'s AGR\* is the largest gold refinery in the country.[23]  AGR\* controls a large part of the gold trade in Uganda and **GOETZ\***'s relations with the authorities are good.  Rwanda had already decided in 2021 to end its relationship with **GOETZ\***, who for a time controlled the Kigali gold refinery Aldango, a subsidiary of **GOETZ\***'s Emirati company Aldabra.[24] [Exhibit 18, p. 3]

(U) The above-mentioned pattern of obfuscation provides reason for OFAC to doubt the credibility of **GOETZ\***'s multiple claims with regard to AGR\*, his criticism of those attempting to hold him accountable for his actions, and his claims regarding transparency and due diligence.

---

[23] (U//FOUO) This statement appears to have been published by Africa Intelligence on February 3, 2022, more than a month prior the U.S. designation of **GOETZ\***.

[24] (U//FOUO) This portion appears to have been published by Africa Intelligence on August 30, 2021.

SECRET

22

~~SECRET~~ ██████████████████████

- (U) *All bases for designation relied on information regarding **GOETZ***'s links to **AGR*** pre and post 2017*

(U) **GOETZ*** calls OFAC's fact-finding procedures into question as much of the evidence linking **GOETZ*** to AGR* is "'until at least 2017'" or "'as of 2017.'" However, in the original designation package, OFAC demonstrated **GOETZ***'s ties to AGR* post 2017:

- (U/~~FOUO~~ █████████████████████████████████████
  ██████████████████████ [Exhibit 3, pp. 15, 24]
- (U/~~FOUO~~) **GOETZ*** is identified as the CEO of AGR* as of October 2018████████████████ [25]
  [Exhibit 3, pp.15–16]
- (U/~~FOUO~~ ██████████████████
  ██████████ Exhibit 3, p. 25]

(U) Information available to OFAC following GOETZ*'s designation further demonstrates that GOETZ* links were present beyond 2017.

(U) **GOETZ*** served as a consultant for AGR* until at least June 2021. [Exhibit 9, p. 3]

(U) In the March 17, 2022 stay of designation submission, **GOETZ*** stated that he currently only serves at AGR* in a limited role as a consultant/promoter. [Exhibit 4, part 1, p. 4] **GOETZ*** provided a copy of this consultancy agreement as part of this submission. [Exhibit 4, part 2, pp. 14–20] In **GOETZ***'s May 19, 2023 response to OFAC's April 25, 2023 questionnaire, **GOETZ*** walked back this statement by stating that he felt a sense of duty to AGR* to rebut allegations made against AGR*. [Exhibit 9, p. 3]

(U) According to a September 27, 2022 *Independent* article ██████, after the March 17, 2022 designation of **GOETZ***, **GOETZ*** said his listing seems to be based on misinformation. **GOETZ*** explains that he wrote to Treasury Secretary, Janet Yellen, in April 2021,[26] when such allegations were first brought up, and clearly demonstrated why imposing sanctions would be unfair, unjust, and uncalled for. "As we explained then and we will repeat here, the petition to sanction me and my corporate networks by Senator Cory A. Booker, Senator Benjamin L. Cardin, and Richard J. Durbin were based on unfounded accusations published by various NGOs." [Exhibit 30, pp. 3–4]

---

[25] (U/~~FOUO~~ ██████████
███████████████████████████████████████
██████████████ Exhibit 3, pp. 15–16]
[26] (U) Treasury's Executive Secretary's office was unable to find an April 2021 letter from **GOETZ***, but the office did find a May 14, 2021 letter addressed to Secretary Yellen, received on July 7, 2021, from Tem Advocates & Solicitors, which expounds on the same arguments presented by **GOETZ*** in the above article. [Exhibit 31]

~~SECRET~~ ████████████████

~~SECRET~~ ████████████████████████

(U) According to a May 14, 2021 letter from Tem Advocates & Solicitors on behalf of **GOETZ\***
and his companies,[27] Managing advocate Sharon Tem claims that **GOETZ\*** had already stepped
down as CEO in 2018. The letter also claims that **GOETZ\***'s initiatives in the region improved
the transparency in the trade and boosted the tax revenue of countries. AGR* operates in
accordance with the national, regional, and international regulatory frameworks. It is easier for
Uganda to track how much gold is being processed, traded, and exported because of AGR*—
AGR*'s efforts enable the authorities to capture and monitor the gold flow; the official figures
are available for all to see, needless to say that all the taxes are being paid to the government. In
line with the meeting with Treasury and AGR*'s Top Management at AGR premises on
October 1, 2019, the parties further agreed and AGR* assured that the company would cease and
desist from engaging any transaction that may be linked to the gold from Venezuela.
[Exhibit 31, pp. 1–2]

(U) According to a December 8, 2022 Actualite.cd[28] article ████████████, on December 8,
2022, **GOETZ\*** was sanctioned by the EU and is a foreign businessman and director[29] of AGR*.
[Exhibit 32, p. 2]

- (U) *GOETZ\*'s involvement in AGR extended past 2018.*

(U) **GOETZ\*** further claims that a significant amount of the sourcing is from 2018 or before,
and that sources published after 2018 "are unreliable as [GOETZ\*] had already sold his shares
in [AGR\*] and was no longer involved in the company's management by that point in time."
[Exhibit 5, p. 7] However, as demonstrated above, **GOETZ\*** himself provides submissions
demonstrating his involvement with AGR* until 2022. Furthermore, GOETZ* does not provide
any evidence as to why sources published after 2018 are unreliable.

- (U) *The Proposed TOR is Insufficient to Negate Two of the Three Bases for the Designation
of GOETZ\* and GOETZ\*'s Pattern of Past Obfuscation Undermines his Credibility with
Respect to Fulfilling the Conditions of the TOR*

(U) As summarized above, the TOR proposes anti-money laundering and compliance policies,
regular reporting requirements, audits of **GOETZ\***'s owned and controlled entities, as well as
other modifications. [Exhibit 5, pp. 7–10] However, these proposed steps do not address the
underlying behavior that triggered **GOETZ\***'s designation. Although insight into **GOETZ\***'s
current and future affiliations may satisfy OFAC's ability to assess **GOETZ\***'s designation
under one of the three bases for which he is designated — being a leader of AGR* — this insight
does not undermine the criteria for designation related to **GOETZ\***'s past behavior which serves
as the bases for designation for (1) being responsible for or complicit in, or having engaged in,

---

[27] (U) OFAC assesses this reference to **GOETZ\***'s companies includes, at a minimum, AGR*, Aldango, and
Aldabra.
[28] (U ████████████████████████████████
████ [Exhibit 32, p. 2]
[29] (U) The *Official Journal of the European Union* actually lists **GOETZ\*** as the beneficial owner and former
director of AGR*. [Exhibit 33, p. 8]

(U)
Correction:
Classification
marking for
footnote 28
should be
(U//FOUO)

DRC-34996 0028

SECRET ████████████████████

directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo (DRC) or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC and (2) having acted or purported to act for or on behalf of, directly or indirectly, AGR*, a person designated pursuant to E.O. 13413. Furthermore, **GOETZ***'s past instances of obfuscation, as demonstrated above, undermine his credibility and OFAC's trust in the materials that would be provided by **GOETZ*** under the requirements of a TOR. Additionally, OFAC may be constrained in its ability to enforce the requirements of the TOR as it relates to entities that are domiciled outside of the US.

- (U) *GOETZ*'s pattern of obfuscating his ownership and control over AGR* and other entities, as demonstrated in Section 2 with respect to AGR*, casts overall doubt on his claims that he severed his connection to AGR*.*



[Exhibit 28, pp. 3–5]

[Exhibit 29, pp. 3, 5].

- (U) *GOETZ* has the means to continue participating in the illicit gold trade.*

(U) According to **GOETZ***'s April 11, 2023 questionnaire response, GOETZ* continues to own or control several companies, including Aldabra Limited, Aldango, and Belgian Precious Metals Industries. Aldabra Limited and Aldango are affiliated with the gold refinery industry in Rwanda in fact, **GOETZ*** states that Aldango is a currently operational gold refinery in Rwanda under the name Gasabo Gold Refinery Ltd. [Exhibit 9, part 1, p. 6] [Exhibit 9, part 1, p. 7]. Belgian Precious Metals Industries activities consist, at least in part, of the sale the wholesale of metals and metal ores, respectively. [Exhibit 44, p. 3] OFAC assesses that GOETZ*'s current



[Exhibit 28, p. 4]

[Exhibit 29, p. 3]

**SECRET** ███████████████████████

ownership and control of gold and metals companies provides GOETZ* with the means to continue operating in the illicit gold trade.

- (U) ***GOETZ\* has not taken responsibility for actions leading to his designation***

(U) According to **GOETZ\***'s Twitter account, between December 2022 and June 2023, **GOETZ\*** continues to denounce the NGOs who have accused him of being involved in the illicit gold trade for fabricating reports to appease their donors. **GOETZ\*** also claims that some donors are complicit in the criminal schemes of the NGOs and support these scandalous activities. **GOETZ\*** also claims that United States sanctions are reckless and based on trumped up evidence. The EU is creating a very dangerous precedent on how it draws up its sanctions list for businesses in Africa. Like a lazy researcher, the EU depends on Google, scanning through fake stories and botched-up NGO reports to see whose name it can put on the sanctions list. This is abuse of the fundamental rights of the citizens. Recently, EU offered financial support to the armies of Rwanda and DRC as the tension in DRC rages on. And yet the EU knows that this support is used to support the different militias at the war front. It is high time Africa called out the double-faced hypocrisy of the United States and EU when it comes to issuing sanctions related to the conflict in the DRC. When a lie is told many times, it is taken as gospel truth. Perhaps, no country has suffered from a big lie like DRC's mines being unfairly linked to conflict. Instead of blaming the miners, the suppliers of weapons to the militias in DRC must be stopped. For decades, DRC has witnessed pockets of violence. Some NGOs continue to exploit this conflict by publishing fake reports to hoodwink naïve donors. No credible institution should put its reputation on the line by depending on sham reports written by organizations such as The Sentry. By all accounts, The Sentry acts like a mafia NGO that is a public relations machinery tool for Hollywood actors pretending to care for Africa. [Exhibit 40, pp. 1, 3, 7–9, 21, 23] As **GOETZ\***'s claims are false and OFAC assesses that GOETZ* has not taken responsibility for how the illicit gold trade affects conflict and instability in the DRC.

- (U) **GOETZ\***'s designation has supported international cooperation efforts. A delisting may undermine those international cooperation efforts.

(U//SBU) According to State's FPG, numerous jurisdictions have taken action against **GOETZ\*** and his network of companies. This includes:

- The European Union designated **GOETZ\*** on December 8, 2022, for "exploiting the armed conflict, instability and insecurity in the DRC through the illicit exploitation and trade of natural resources."

- The United Arab Emirates Financial Intelligence Unit described the GOETZ* case, through an anonymized summary, in its October 2022 "Strategic Analysis Report" for Dealers in Precious Metals and Stones, identifying nine red flags related to his trading

26

DRC-34996 0030

SECRE█████████████

practices and indicating that the case had been referred to "the relevant police department."[32]

- The Belgian Federal Prosecutor's office has been reviewing the GOETZ* case for several years, based in part on the 2020 conviction by a Belgian court of GOETZ* and others in a money laundering case unrelated to his activities in the DRC. In April 2023, as noted above, the Belgian Special Tax Inspectorate reportedly issued a demand for 558 million euros in unpaid taxes, noted to be an "exceptionally high amount" for that authority.

- Though no direct action has been taken by the Security Council to date against GOETZ* or his companies, his associates were sanctioned by the Council in 2007, and the GOE has collected information and reported specifically on GOETZ* and his activities since at least 2009 as part of its ongoing focus on the gold trade.

3. (U) **GOETZ\* no longer meets the criteria for designation for being a leader of AGR\***

(U) **GOETZ\*** is no longer a shareholder, director, CEO, or consultant for AGR* or AGR INTERNATIONAL*. [Exhibit 8, p. 5]

## V. (U) **CONCLUSION**

(U) Information provided by the Petitioner, as well as other information available to OFAC, fails to establish that circumstances resulting in the designation of **GOETZ\*** under the two of the three bases (listed below) for designation no longer apply:

1. For being responsible for or complicit in, or having engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.
2. For acting or purporting to act for or on behalf of, directly or indirectly, AGR*.

(U) In reaching this conclusion, OFAC has carefully considered the arguments made by **GOETZ\***, including **GOETZ\***'s assertions that:

(U) There is a lack of a direct connection between **GOETZ\*** and support to armed groups operating in the DRC;

(U) AGR* has not sourced conflict gold due to the combination of **GOETZ\***'s advocacy for transparency in the gold supply chain and AGR*'s due diligence measures and audit results;

---

[32] (U) UAE Financial Intelligence Unit, *Dealers in Precious Metals and Stones: Strategic Analysis Report*, pp. 16–17 (Oct. 2022), available at https://amluae.com/wp-content/uploads/2022/11/Strategic-Analysis-Report-DPMS-October-2022.pdf.

27

SECRE█████████████

SECRET

(U) **GOETZ\***'s links to refining conflict gold at AGR\* are the result of unfounded media allegations;

(U) OFAC has used outdated information in its designation argument;

(U) The proposed TOR negates the bases for **GOETZ\***'s designation.

(U//FOUO) However, information provided by the Petitioner, as well as other information available to OFAC, does establish that circumstances resulting in the designation of **GOETZ\*** under the basis of being a leader of AGR\* no longer apply.

(U) In reaching this conclusion, OFAC has carefully considered the arguments made by **GOETZ\***, including **GOETZ\***'s assertions that **GOETZ\*** is no longer a shareholder, director, CEO, or consultant for AGR\* or AGR INTERNATIONAL\* [Exhibit 8, p. 5] and that he "no longer owns nor [*sic*] controls [AGR\*]" [Exhibit 4, p. 5] and has determined that **GOETZ\*** no longer meets the above-mentioned basis of being a leader of AGR\*.

## VI. (U) RECOMMENDATION

(U) Based upon evidence currently available to OFAC, as well as the information and arguments submitted by **GOETZ\***, OFAC has determined that, while **GOETZ\*** no longer meets the criteria for designation for one basis pursuant to E.O. 13413, as amended, **GOETZ\*** continues to meet the criteria for designation for two bases pursuant to E.O. 13413, as amended. Therefore, the reconsideration request and removal from the SDN List of **GOETZ\*** under these bases should be denied.

(U) Recommendation: That you sign the attached letter to the attorney representing the Petitioner, informing him of OFAC's decision to deny the request of **GOETZ\*** for reconsideration and removal from the SDN List under two bases, but conceding that one basis for **GOETZ\***'s original designation no longer applies.

(U) Approve: _____ Disapprove: _____ Let's Discuss: _____

SECRET

DRC-34996 0032

SECRET

## (U) **LIST OF EXHIBITS**

Exhibit 1: (U) Executive Order 13413 of October 27, 2006, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," 71 Fed. Reg. 210 (October 31, 2006), Overall classification is U.

Exhibit 2: (U) Executive Order 13671 of July 8, 2014, "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo," 79 Fed. Reg. 132 (July 10, 2014), Overall classification is U.

(U) **Correction**: Classification marking for Exhibit 3 should be (U//FOUO)

Exhibit 3: (U) OFAC Evidentiary Memorandum, ALAIN FRANCOIS VIVIANE GOETZ, et al, Designation, DRC-17840, March 17, 2022, Overall classification is U//SBU.

Exhibit 4: (U) Letter, Ferrari and Associates to OFAC, Request for Stay of Designation, March 17, 2022, Overall classification is U.

Exhibit 5: (U) Letter, Ferrari and Associates to OFAC, SDN Delisting Petition Supplement – executive Order 13413, as amended, February 28, 2023, Overall classification is U.

Exhibit 6: (U) Letter, First Questionnaire from OFAC to Ferrari Associates, Case ID DRC-31659, March 21, 2023, Overall classification is U.

Exhibit 7: (U) Letter, Second Questionnaire from OFAC to Ferrari and Associates, Case ID DRC-31659, April 25, 2023, Overall classification is U.

Exhibit 8: (U) Letter, Ferrari and Associates Response to First OFAC Questionnaire, Case ID DRC-31659, April 11, 2023, Overall classification is U.

Exhibit 9: (U) Letter, Ferrari and Associates Response to Second OFAC Questionnaire, Case ID DRC-31659, May 19, 2023, Overall classification is U.

Exhibit 10: (U) Notice of OFAC Sanctions Actions Pursuant, 87 Fed Reg. 16552 (March 23, 2022), Overall classification is U.

Exhibit 11: (U) Letter, OFAC to Ferrari and Associates, December 6, 2022, Overall classification is U.

Exhibit 12: (U) Letter, Ferrari and Associates to OFAC, SDN Delisting Petition Supplement, June 9, 2023, Overall classification is U.

SECRET

SECRET ████████

(U)
**Correction**:
Classification
marking for
Exhibit 14
should be
(U/~~SBU~~)

Exhibit 13:    (U) Joint Motion for Scheduling Order, In the Matter of Alain Goetz v. Andrea M. Gacki, Director, Office of Foreign Assets Control, *et al.*, 1:22-cv-1204 (JEB), December 28, 2022, Overall classification is U.

Exhibit 14:    (U) State Department, Foreign Policy Guidance, June 30, 2023, Overall classification is U.

Exhibit 15:    (U) *Daily Monitor*, US Moves to Freeze Uganda's Pot of Gold, ████████ ████████, March 20, 2022, Overall classification is U.

Exhibit 16:    (U/~~FOUO)~~ Africa Intelligence, US Treasury Unlikely to Let Alain Goetz's Aldabra Off hook Over Gold Trafficking Allegations, ████████ ████████, March 25, 2022, Overall classification is U/~~FOUO.~~

Exhibit 17:    (U) *Africa Report*, Uganda: Sudden Disappearance of Gold Exports Hits the Economy, ████████████, March 25, 2022, Overall classification is U.

Exhibit 18:    (U/~~FOUO~~ Africa Intelligence, Will US Sanctions Crush Museveni's Ambitions for Congolese Gold?, ████████████, April 4, 2022, Overall classification is U/~~FOUO.~~

Exhibit 19:    (U/~~FOUO~~ *Independent*, Targeting of Top Officials by U.S. Puts Country in Diplomatic Minefield, ████████████, April 4, 2022, Overall classification is U/~~FOUO.~~

Exhibit 20:    (U/~~FOUO~~ *Africa Confidential*, Once Silenced, Twice Shy, ████████ ████████, August 10, 2022, Overall classification is U/~~FOUO.~~

Exhibit 21:    (U/~~SBU~~) ████████████, Overall classification is U/~~SBU.~~

Exhibit 22:    (U) *Africa Report*, DRC, Uganda: 'If There Is Any Evidence To Prove That I Smuggled Gold, I'd Like To See It,' Says Alain Goetz, ████████ ████████, January 23, 2023, Overall classification is U.

Exhibit 23:    (U/~~SBU~~) 22 KINSHASA 316, 080817Z APR 22, Overall classification is U/~~SBU.~~

Exhibit 24:    (U/~~FOUO~~ Africa Intelligence, Ebola Ravages Gold Sector, ████████ ████████, November 1, 2022, Overall classification is U/~~FOUO.~~

30

SECRET ████████

~~SECRET~~ ██████████████████

Exhibit 25:    (U/~~SBU~~) 22 BRUSSELS 1850, 121129Z DEC 22, Overall classification is U/~~SBU~~.

Exhibit 26:    (U/~~FOUO~~) *Jeune Afrique*, Can the DRC and the United Arab Emirates really counter the "blood gold"?, ██████████████, January 17, 2023, Overall classification is U/~~FOUO~~.

Exhibit 27:    (U/~~FOUO~~) ████████████████████ Overall classification is ~~S~~.

Exhibit 28:    (U/~~FOUO~~) ████████████████ Overall classification is ~~S~~.

Exhibit 29:    (U/~~FOUO~~) ████████████████ Overall classification is ████.

Exhibit 30:    (U) *Daily Monitor*, No shine in Uganda's gold, ██████ ███████████, September 27, 2022, Overall classification is U.

Exhibit 31:    (U) Letter, Tem Advocates & Solicitors to the Secretary of Treasury, May14, 2021, Overall classification is U.

Exhibit 32:    (U) Actualite.cd, EU Sanctions eight DR Congolese and a Belgian, █████ ████████████, December 8, 2022, Overall classification is U.

Exhibit 33:    (U) *Official Journal of the European Union*, Volume 65, December 8, 2022, Overall classification is U.

Exhibit 34:    (U) OFAC, Email Exchange, May 10, 2023, Overall classification is U.

Exhibit 35:    (U) *Southern Africa Resource Watch*, May 2014, Conflict Gold to Criminal Gold, Overall classification is U.

Exhibit 36:    (U/~~FOUO~~) ████████████████████████ Overall classification is U/~~FOUO~~.

Exhibit 37:    (U) *Wall Street Journal*, How 7.4 Tons of Venezuela's Gold Landed in Africa–and Vanished, June 18, 2019, Overall classification is U.

Exhibit 38:    (U) Global Witness, Under-Mined, June 2017, Overall classification is U.

DRC-34996 0035    ~~SECRE~~ ████████████

SECRET ██████████████████████

Exhibit 39:      (█ ████████████████████ ████ Overall classification is
                 █ ████████████████

Exhibit 40:      (U) Twitter, Alain Goetz account, Posts between December 2022 and June
                 2023, https://twitter.com/goetz_alain, Overall classification is U.

Exhibit 41:      (U) Reuters, Court convicts Belgian gold refinery Tony Goetz of money
                 laundering, February 5, 2020, Overall classification is U.

Exhibit 42:      (U) UAE Financial Intelligence Unit, Dealers in Precious Metals and
                 Stones, Strategic Analysis Report, October 2022, Overall classification is
                 U.

Exhibit 43:      (U) Notice of OFAC Sanctions Actions Pursuant, 84 Fed Reg. 23161
                 (May 21, 2019), Overall classification is U.

(U)
Correction:   Exhibit 44:      Orbis, Belgian Precious Metals Industries, BE0477567325, Overall
Classification                  classification is U.
marking for
Exhibits 44    Exhibit 45:      United States District Court, Summons in a Civil Action, May 5, 2022,
and 45 should                   Overall classification is U.
be
(U)

SECRET ████████████████

# Exhibit 1



Tuesday,
October 31, 2006

## Part VIII

## The President

Executive Order 13413—Blocking
Property of Certain Persons Contributing
to the Conflict in the Democratic
Republic of the Congo

Notice of October 27, 2006—Continuation
of National Emergency Regarding the
Proliferation of Weapons of Mass
Destruction

DRC-34996 0037

# Exhibit 1

DRC-34996 0038

# Exhibit 1

64105

Federal Register

Vol. 71, No. 210

Tuesday, October 31, 2006

# Presidential Documents

Title 3—

The President

## Executive Order 13413 of October 27, 2006

## Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 5 of the United Nations Participation Act, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code,

I, GEORGE W. BUSH, President of the United States of America, determine that the situation in or in relation to the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities that continue to threaten regional stability and was addressed by the United Nations Security Council in Resolution 1596 of April 18, 2005, Resolution 1649 of December 21, 2005, and Resolution 1698 of July 31, 2006, constitutes an unusual and extraordinary threat to the foreign policy of the United States and hereby declare a national emergency to deal with that threat. To address that threat, I hereby order:

**Section 1.** (a) Except to the extent that section 203(b)(1), (3), and (4) of the IEEPA (50 U.S.C. 1702(b)(1), (3), and (4)) may apply, or to the extent provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, including their overseas branches, of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order; and

(ii) any person determined by the Secretary of the Treasury, after consultation with the Secretary of State:

(A) to be a political or military leader of a foreign armed group operating in the Democratic Republic of the Congo that impedes the disarmament, repatriation, or resettlement of combatants;

(B) to be a political or military leader of a Congolese armed group that impedes the disarmament, demobilization, or reintegration of combatants;

(C) to be a political or military leader recruiting or using children in armed conflict in the Democratic Republic of the Congo in violation of applicable international law;

(D) to have committed serious violations of international law involving the targeting of children in situations of armed conflict in the Democratic Republic of the Congo, including killing and maiming, sexual violence, abduction, and forced displacement;

(E) to have directly or indirectly supplied, sold, or transferred to the Democratic Republic of the Congo, or been the recipient in the territory of the Democratic Republic of the Congo of, arms and related materiel, including military aircraft and equipment, or advice, training, or assistance, including financing and financial assistance, related to military activities;

**Exhibit 1**

(F) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the activities described in subsections (a)(ii)(A) through (E) of this section or any person listed in or designated pursuant to this order; or

(G) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person listed in or designated pursuant to this order.

(b) I hereby determine that, to the extent section 203(b)(2) of the IEEPA (50 U.S.C. 1702(b)(2)) may apply, the making of donations of the type of articles specified in such section by, to, or for the benefit of any person listed in or designated pursuant to subsection (a) of this section would seriously impair my ability to deal with the national emergency declared in this order, and I hereby prohibit such donations as provided by subsection (a) of this section.

(c) The prohibitions in subsection (a) of this section include but are not limited to (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person listed in or designated pursuant to subsection (a) of this section, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 2.** (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 3.** For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 4.** For those persons listed in or designated pursuant to this order who might have a constitutional presence in the United States, I find that, because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to subsection 1(a) of this order.

**Sec. 5.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by the IEEPA and the UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government, consistent with applicable law. All executive agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order and, where appropriate, to advise the Secretary of the Treasury in a timely manner of the measures taken. The Secretary of the Treasury shall ensure compliance with those provisions of section 401 of the NEA (50 U.S.C. 1641) applicable to the Department of the Treasury in relation to this order.

**Sec. 6.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to submit the recurring and final reports to the Congress on the national emergency declared in this order, consistent

# Exhibit 1

with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of the IEEPA (50 U.S.C. 1703(c)).

**Sec. 7.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized, subsequent to the issuance of this order, to determine, and to take necessary action to give effect to that determination, that circumstances no longer warrant the blocking of the property and interests in property of, or the prohibiting of transactions with, a person listed in the Annex to this order.

**Sec. 8.** This order is not intended to, and does not, create any right, benefit, or privilege, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

**Sec. 9.** This order is effective at 12:01 a.m. eastern standard time on October 30, 2006.

THE WHITE HOUSE,
*October 27, 2006*.

Billing code 3195–01–P

DRC-34996 0041

Exhibit 1

**64108**    Federal Register / Vol. 71, No. 210 / Tuesday, October 31, 2006 / Presidential Documents

<div align="center">

Annex

</div>

<u>Individuals</u>



1.  Laurent Nkunda [born ████████ Founder, National Congress for the People's Defense, 2006; Senior Officer, Rally for Congolese Democracy-Goma (RCD-G), 1998-2006; Officer, Rwandan Patriotic Front, 1992-1998]

2.  Ignace Murwanashyaka [born ████████ President, Forces Democratiques pour la Liberation du Rwanda (FDLR)]

3.  Khawa Panga Mandro [born ████████ former President, Party for Unity and Safeguarding of the Integrity of Congo (PUSIC)]

4.  Viktor Anatolijevitch Bout [born ████████ Owner, Great Lakes Business Company, Compagnie Aérienne des Grands Lacs; Bukavu Aviation Transport, and Business Air Services]

5.  Sanjivan Singh Ruprah [born ████████ Businessman]

6.  Dimitri Igorevich Popov [born ████████ General Manager, Great Lakes Business Company and Compagnie Aérienne des Grands Lacs]

7.  Douglas Mpano [born ████████ Manager, Great Lakes Business Company and Compagnie Aérienne des Grands Lacs]

[FR Doc. 06-9020
Filed 10-30-06; 12:12 pm]
Billing code 4810-25-C

DRC-34996 0042

Exhibit 2



# FEDERAL REGISTER

| | |
|---|---|
| Vol. 79 | Thursday, |
| No. 132 | July 10, 2014 |

Part VI

## The President

Executive Order 13671—Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo

Exhibit 2

DRC-34996 0044

# Exhibit 2

39949

Federal Register

Vol. 79, No. 132

Thursday, July 10, 2014

# Presidential Documents

Title 3—

**The President**

Executive Order 13671 of July 8, 2014

**Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 5 of the United Nations Participation Act (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, in order to take additional steps to deal with the national emergency with respect to the situation in or in relation to the Democratic Republic of the Congo declared in Executive Order 13413 of October 27, 2006, in view of multiple United Nations Security Council Resolutions including, most recently, Resolution 2136 of January 30, 2014, and in light of the continuation of activities that threaten the peace, security, or stability of the Democratic Republic of the Congo and the surrounding region, including operations by armed groups, widespread violence and atrocities, human rights abuses, recruitment and use of child soldiers, attacks on peacekeepers, obstruction of humanitarian operations, and exploitation of natural resources to finance persons engaged in these activities, hereby order:

**Section 1.** Subsection (a) of section 1 of Executive Order 13413 is hereby amended to read as follows:

"(a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order; and

(ii) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(A) to be a political or military leader of a foreign armed group operating in the Democratic Republic of the Congo that impedes the disarmament, demobilization, voluntary repatriation, resettlement, or reintegration of combatants;

(B) to be a political or military leader of a Congolese armed group that impedes the disarmament, demobilization, voluntary repatriation, resettlement, or reintegration of combatants;

(C) to be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following in or in relation to the Democratic Republic of the Congo:

(1) actions or policies that threaten the peace, security, or stability of the Democratic Republic of the Congo;

(2) actions or policies that undermine democratic processes or institutions in the Democratic Republic of the Congo;

(3) the targeting of women, children, or any civilians through the commission of acts of violence (including killing, maiming, torture, or rape or other sexual violence), abduction, forced displacement, or

Exhibit 2

attacks on schools, hospitals, religious sites, or locations where civilians are seeking refuge, or through conduct that would constitute a serious abuse or violation of human rights or a violation of international humanitarian law;

(4) the use or recruitment of children by armed groups or armed forces in the context of the conflict in the Democratic Republic of the Congo;

(5) the obstruction of the delivery or distribution of, or access to, humanitarian assistance;

(6) attacks against United Nations missions, international security presences, or other peacekeeping operations; or

(7) support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo or that undermine democratic processes or institutions in the Democratic Republic of the Congo, through the illicit trade in natural resources of the Democratic Republic of the Congo;

(D) except where intended for the authorized support of humanitarian activities or the authorized use by or support of peacekeeping, international, or government forces, to have directly or indirectly supplied, sold, or transferred to the Democratic Republic of the Congo, or been the recipient in the territory of the Democratic Republic of the Congo of, arms and related materiel, including military aircraft and equipment, or advice, training, or assistance, including financing and financial assistance, related to military activities;

(E) to be a leader of (i) an entity, including any armed group, that has, or whose members have, engaged in any of the activities described in subsections (a)(ii)(A) through (a)(ii)(D) of this section or (ii) an entity whose property and interests in property are blocked pursuant to this order;

(F) to have materially assisted, sponsored, or provided financial, material, logistical, or technological support for, or goods or services in support of (i) any of the activities described in subsections (a)(ii)(A) through (a)(ii)(D) of this section or (ii) any person whose property and interests in property are blocked pursuant to this order; or

(G) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."

**Sec. 2.** New subsection (d) is hereby added to section 1 of Executive Order 13413 to read as follows:

"(d) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order."

**Sec. 3.** Section 2 of Executive Order 13413 is hereby amended to read as follows:

"Sec. 2. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited."

**Sec. 4.** The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and the UNPA, as may be necessary to carry out the purposes of this order and Executive Order 13413, as amended by this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law.

**Exhibit 2**

**Sec. 5.** All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order and Executive Order 13413, as amended by this order.

**Sec. 6.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*July 8, 2014.*

[FR Doc. 2014–16360
Filed 7–9–14; 11:15 am]
Billing code 3295–F4

DRC-34996 0047

# Exhibit 4

 **FERRARI**
**& ASSOCIATES**

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

March 17, 2022

**SENT VIA EMAIL (Andrea.Gacki@treasury.gov)**

Andrea Gacki
Director
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220

Re:     **Request for Stay of Designation—Alain Goetz**[1]

Dear Ms. Gacki:

By means of this letter, Alain Goetz, a Belgian gold and precious metals expert, respectfully requests a stay of any potential designation of, or other related action targeting, him by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). This stay is requested in order for OFAC to review the information in this letter, and to allow additional arguments and evidence to be provided to OFAC in supplemental letters, showing that Mr. Goetz does not meet the criteria for designation under any relevant U.S. sanctions laws.

Mr. Goetz understands that certain parties have called upon OFAC and the U.S. government to sanction him pursuant to U.S. sanctions authorities. Mr. Goetz asserts, however, that information in his possession, and that has already otherwise been provided to and is in the possession of OFAC, will demonstrate that any allegations purportedly supporting such an action are false and/or that the circumstances are no longer applicable. Accordingly, Mr. Goetz requests that OFAC consider the information contained herein—as well as that to be presented in forthcoming submissions—as part of any pending designation action targeting him and include that information in any administrative record being created in support of such action.

---

[1] Because this submission contains business information and other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence as confidential. If OFAC believes that it is required to release this document or information contained in it to the public pursuant to the Freedom of Information Act or any other law, please notify undersigned counsel as soon as possible.

# Exhibit 4

## I.    Basis for Request for Stay of Designation

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, provides that persons are permitted to appear before an agency or its employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.[2]

As noted above, Mr. Goetz believes that OFAC may possibly be undertaking an agency proceeding or other similar action relating to a potential designation of him under Executive Order ("E.O.") 13413, as amended, E.O. 13818, or another U.S. sanctions program administered by OFAC. For this reason, Mr. Goetz now appears before OFAC via written submission to provide information that may be relevant to any such proceeding or action. Mr. Goetz is provided this right pursuant to the APA. Thus, OFAC must consider his submission as part of any ongoing proceeding with respect to a potential designation action and should refrain from finalizing any pending agency action until such time as Mr. Goetz can submit arguments and evidence to show why such action is not warranted by the facts.

This letter, as well as any subsequent submissions, should be considered by OFAC and incorporated into any administrative record being created to support a designation action. As OFAC is aware, the administrative record underlying a designation action should "include 'all documents and materials that the agency directly or indirectly consider[s],'"[3] as well as documents and materials "that may have influenced the agency's decision[.]"[4] OFAC is not entitled to "skew the record in its favor by excluding pertinent but unfavorable information from the administrative record" nor can the agency exclude information "on the grounds that it did not 'rely' on the excluded information" when rendering its decision.[5] Indeed, a properly designated administrative record should "include[] evidence contrary to the agency's position," provided that such evidence was before the agency.[6]

For these reasons, Mr. Goetz respectfully requests that OFAC include this letter, as well as any subsequent submissions, into any administrative record being created in support of a sanctions investigation for his possible designation. Mr. Goetz also requests that OFAC consider all exculpatory information in its possession, including information that may have been received as

---

[2] 5 U.S.C. § 555(b).

[3] *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4-5 (D.D.C. 2006) (quoting *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)).

[4] *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citation omitted) (noting that a complete administrative record is not limited to those documents and materials "on which the agency relied in its final decision.").

[5] *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006).

[6] *Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65 (D.D.C. 2002).

DRC-34996 0090

# Exhibit 4

part of other agency proceedings such as delisting matters, requests for a stay of designation, or other matters of which it is aware.

## II.    Information for OFAC's Consideration

### A.    *Refining Gold in Central Africa*

As noted above, Mr. Goetz is a Belgian gold and precious metals expert. Mr. Goetz operated within the gold industry for most of his career—from establishing refineries to reforming business processes and standards. As evidenced by his speeches and contributions to regional and international precious metals conferences over the past decade, Mr. Goetz has remained a strong advocate for fully transparent gold supply chains. Indeed, Mr. Goetz has advocated for the urgent adoption of rigorous global standards for the production, transport, and trading of gold and other precious metals. He has, however, found himself the subject of recent allegations by non-governmental organizations ("NGOs") that appear to be based on unsubstantiated third-party accounts from known smugglers and business competitors, and misunderstandings of his business profile and work. Mr. Goetz believes that, if left unaddressed, these inaccurate accounts could continue to have devastating effects on the African gold sector and the people dependent on it.

As OFAC is aware, illicit gold trade from the Democratic Republic of the Congo ("DRC") has funded conflicts in the region and has led to the exploitation of natural resources and the internal displacement and death of millions of Congolese people. In recent years, false and unsupported media reporting has linked Mr. Goetz to refining conflict gold from the DRC at the African Gold Refinery ("AGR") in Uganda. Mr. Goetz, however, has not sourced nor refined illegally smuggled conflict gold from the DRC at AGR. Indeed, AGR is the only established and visible gold refinery in the region that has signed an agreement with the DRC to establish a traceability system for sourcing gold, which includes, among other things, sharing information and statistical data with Le Centre d'Expertise d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses ("CEED"), a public institution of the DRC.[7]

In addition, the allegations against AGR with respect to conflict gold are not credible given AGR's due diligence measures relating to gold traceability which are in place both now, as well as during the time of the alleged conduct. For instance, AGR regulates its business practices and activities in accordance with the Organization for Economic Cooperation and Development ("OECD") and International Conference for the Great Lakes Region ("ICGLR") guidelines. Indeed, AGR has maintained a robust upstream supplier mapping system that handles client intake with detailed Know Your Customer ("KYC") procedures and evaluates gold sources by obtaining and verifying the supplier's legal documents.[8] Documents subject to verification include

---

[7] Annex A–CEEC and AGR Collaboration Agreement.

[8] Annex B–AGR Account Opening KYC Form.

3

# Exhibit 4

certificates of incorporation, trading licenses, mining licenses, mineral dealer's licenses, memoranda of association and articles, proofs of address, and audited financial statements, along with requiring a minimum commercial track record of six months.[9] AGR refuses any business relationship with suppliers who are unable to furnish these requisite documents.[10]

Furthermore, AGR's compliance department supervises company and regulatory compliance procedures, which were routinely audited by independent consultants.[11] Finally, all client-facing employees at AGR are trained in anti-bribery compliance to eliminate any risk of corruption and money laundering associated with sourcing gold.[12] Given AGR's policies and procedures in place since at least the time of the alleged conduct, the sourcing and/or refining conflict gold is unlikely to have occurred at any point in the gold supply chain, and neither AGR nor its auditors have identified such dealings.

Additionally, some media articles have recently alleged that AGR received noncompliance notices from the Ugandan government on licensing, disclosure, and registration violations. To clarify, AGR received a letter from Uganda's Financial Intelligence Agency ("FIA") in 2017 requesting a copy of AGR's operating license for FIA registration purposes; however, AGR was subsequently cleared from investigations involving purported noncompliance with the Anti-Money Laundering Act of 2013, as amended.[13] Indeed, AGR is a fully licensed company and operates legitimately within the framework of Ugandan law.

Notwithstanding these allegations, and their lack of credibility, those allegations are irrelevant as Mr. Goetz is no longer a shareholder nor is he involved in AGR's management at any level. Currently, he only serves in a limited role as a consultant/promoter.[14] Moreover, Mr. Goetz is committed to preventing the sourcing, refining, and selling of conflict gold. Indeed, as evidenced by his cooperation with the United Nations and The Sentry, Mr. Goetz has worked with intergovernmental organizations and NGOs to clarify information underlying the historic

---

[9] *Id.*

[10] Annex C–AGR's Onboarding Process; Annex D–AGR's Client Acceptance Policy.

[11] Annex C–AGR's Onboarding Process; Annex D–AGR's Client Acceptance Policy; Annex E–AGR's Precious Metals Supply Chain Policy; Annex F–AGR's AML/CTF Compliance Requirements; Annex G–AGR Country List. These procedures are further elaborated in AGR's correspondence with the United Nations Security Council. Annex H–2018 Correspondence with the U.N. Security Council; Annex I–2019 Correspondence with the U.N. Security Council.

[12] Annex J–AGR's Anti-Bribery Policy Compliance Handbook; Annex K–Acknowledgement of AGR's Anti-Bribery Policy.

[13] Annex L–Letter from the FIA.

[14] Mr. Goetz sold his shares in AGR in February 2018 and resigned as the company's CEO in November 2018. Annex M–Goetz Sale of AGR Shares Agreement; Annex N–AGR Memorandum of Agreement. Further, Mr. Goetz no longer is involved in the management or ownership of Tony Goetz NV ("Tony Goetz") and currently only serves as a consultant in the company. Annex O–Legal Opinion Regarding Alain Goetz and Tony Goetz Allegations.

4

# Exhibit 4

allegations, to engage in further dialogue in the mutual interest of improving oversight of the gold mining and refining sectors.[15]

Accordingly, far from meeting the criteria for designation under E.O. 13413, as amended, E.O. 13818, or another OFAC sanctions authority, Mr. Goetz has acted contrary to the designation criteria of those authorities, and in a manner which aligns with U.S. interests *vis-a-vis* the global gold trade.[16] Furthermore, he no longer owns nor controls AGR—the entity which has been the primary target of those allegations.

### ii.    Venezuelan Gold Allegations

Mr. Goetz has been alleged to have laundered $300 million worth of gold from Venezuela through AGR in 2019. Mr. Goetz completely denies these allegations as he has never been involved, in any capacity nor at any point, with sourcing, refining, or selling gold from Venezuela. Indeed, Mr. Goetz has previously rejected Venezuelan gold from private suppliers in the past. Further, Mr. Goetz believes that AGR was linked to those allegations based on an erroneous inference by the media arising from a separate and unrelated allegation concerning Venezuelan gold being imported to Uganda by an unidentified refinery.

Mr. Goetz also asserts that there was no investigation or court order against AGR involving Venezuelan gold, as has been alleged by some reports. Indeed, the Police Minerals Protection Unit in Uganda had suspected potential sanctions violations involving Venezuela, but the Attorney General cleared AGR from such allegations.[17] Indeed, Mr. Goetz understands that there are no pending investigations in any jurisdiction worldwide against AGR in connection to this or any other matter. Moreover, and as noted above, those allegations are irrelevant to Mr. Goetz as he sold his shares in AGR in February 2018 and resigned as the company's CEO in November 2018—well before the alleged conduct took place.

---

[15] *See, e.g.*, The Sentry, *The Golden Laundromat, The Conflict Gold Trade from Eastern Congo to the United States and Europe*, n.105 (Oct. 2018); U.N. Security Council, *Final Report of the Group of Experts on the Democratic Republic of the Congo*, S/2017/672 (Aug. 10, 2017). Mr. Goetz notes that he provided the U.N. Group of Experts with copies of AGR's KYC procedures, as well as client intake process and supply chain due diligence guidelines to Mr. Zobel Behalal following his meeting with them at AGR on May 12, 2017. Further, the report notes that AGR representatives met and corresponded with them on several occasions to answer questions about their operations and refinery in 2017. Mr. Goetz understands that AGR remains committed to disclose their list of gold suppliers to the U.N. Group of Experts, however, a Memorandum of Understanding has not yet been signed.

[16] The U.S. Department of State has dedicated an office, the Division for Counter Threat Finance and Sanctions, in part to support "due diligence guidelines intended to help industry develop a responsible minerals trade from conflict-affected and high-risk areas in the African Great Lakes Region." *See* U.S. Dep't of State, Threat Finance Countermeasures, *Conflict Minerals, available at* https://www.state.gov/conflict-minerals/.

[17] Annex P–Preliminary Report on AGR's Alleged Suspected Smuggled Gold.

DRC-34996 0093

# Exhibit 4

Accordingly, there is no basis to designate Mr. Goetz in response to these allegations under a Venezuela-related executive order, nor any other OFAC-administered sanctions authority. The allegations are wholly false, and—even if accepted as true—the purported conduct occurred after Mr. Goetz had already divested and resigned from AGR.

## III.   **Conclusion**

For the foregoing reasons, Mr. Goetz respectfully requests that OFAC stay any pending designation action that may target him and consider the information contained in this letter, as well as any arguments and evidence to be submitted in subsequent letters. As noted above, if there is an ongoing agency proceeding with respect to him, Mr. Goetz has a right under the APA to submit written evidence to OFAC that must be considered by the agency and incorporated into any administrative record being compiled in support of an agency action.

Finally, Mr. Goetz is available to respond to any questions OFAC may have or to engage in any dialogue necessary to OFAC's consideration of the request contained in this submission or with respect to any potential designation action. Mr. Goetz looks forward to cooperating with OFAC to ensure that its sanctions investigation does not yield any unwarranted or unlawful result.

Please forward all correspondence relating to this request to the following:

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
ferrari@falawpc.com

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

6

Exhibit 4

# Annex A

DRC-34996 0095

Exhibit 4



**MAKERERE UNIVERSITY**

P. O. Box 7062,
Kampala Uganda
website: www.clcs.mak.ac.ug

Tel: +256 - 414 - 530106
Email: celacos@chuss.mak.ac.ug

### COLLEGE OF HUMANITIES AND SOCIAL SCIENCES (CHUSS)
### CENTRE FOR LANGUAGE AND COMMUNICATION SERVICES

*Your Ref:*

*Our Ref:*

*CLCSDC/B002/15/02/2019*

# COLLABORATION AGREEMENT

### BETWEEN

### LE CENTRE D'EXPERTISE D'EVALUATION ET DE CERTIFICATION DES SUBSTANCES MINERALES PRECIEUSES ET SEMI-PRECIEUSES (CEEC)

(CENTER OF EXPERTISE FOR EVALUATION AND CERTIFICATION OF PRECIOUS AND SEMI-PRECIOUS MINERAL SUBSTANCES), a Public Law Institution in the Democratic Republic of Congo

### AND

### AFRICAN GOLD REFINERY (AGR) LTD

### ENTEBBE, UGANDA

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

**COORDINATOR**

DRC-34996 0096

# Exhibit 4

Le Centre d'Expertise d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses (CEEC), a Public Institution, established by the Decree no 011/28 of 07th June 2011 concerning the Constitution, whose registered office in the Democratic Republic of Congo, Kinshasa Town, number 3989, Avenue des Cliniques, Commune de la Gombe, represented by Mister Alexis MIKANDJI PENGE, Director, the duly authorized representative in accordance with the legal provisions regarding exercising the supervisory powers;

Herein consistently referred to as the "CEEC: on the one hand

And

**AFRICAN GOLD REFINERY LTD**, whose registered office is located at Sebugwawo Road Entebbe Kampala, Uganda, registered under number: M103/M106, P.O. Box 37574, herein represented by Mister Alain GOETZ, duly authorized

Herein referred to as "AGR", on the other hand:

Both herein referred to as **"Parties"**;

## HAVING PREVIOUSLY STATED THAT:

The Democratic Republic of Congo and the Republic of Uganda, Countries of residence for the parties, are signatories to the Security, stability and development Pact of 15th December 2006 in the Great lakes Region as well as all the agreements and memoranda signed with the purpose of enforcing article 9 of the said pact recommending putting in place a mechanism for certification in order to combat illicit trafficking of mineral resources;

CEEC is the certification authority for mineral substances which, ahead of time, together with other authorized public departments ensure compliance with the above-mentioned Pact as well as international engagements aimed at combating illicit trafficking of mineral substances;

CEEC makes every effort and undertakes various actions to direct the trade of the minerals from DRC towards the official channels that are transparent and traceable;

The CEEC authorities support and encourage all attempts aimed at building capacities in that domain;

CEEC plans to pursue its efforts directed towards progressive implementation of mechanisms of traceability of ores in the DRC territory, in collaboration and with the assistance of Public and Private, national and international Organizations without exclusivity;

CEEC and AGR reaffirm their intentions to work together to achieve their common goals, particularly the one of establishing a well monitored and controlled supply chain of ores in the DRC, particularly gold.

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

# Exhibit 4

African Gold Refinery Ltd (AGR) runs precious metal refinery plant in Entebbe, Republic of Uganda, in accordance with the processes and procedures of conformity with the rules of Organization of the Economic Cooperation and Development (OCDE);

AGR, as an enterprise operating in the Great lakes Region, is bound by legal provisions as well as international measures adopted to implement the above-mentioned pact;

AGR is an initiative that was established basing on recommendations of OCDE and the International Conference on the Great lakes Region (ICGLR) focused on avoiding blacklisting all African minerals, but rather encouraging operators in the sector to invest in Africa in the projects which tend to create opportunities for sustainable supply in accordance with the directives of the OCDE; in accordance with guidelines of OCDE

Given that its refinery is largely supplied by gold flows from the artisanal sector of the countries of the region around Uganda including the DRC, AGR intends to collaborate with the CEEC and, subsequently, with any other national, provincial or national, provincial or local public institution and department working for a chain of custody in charge of gold.

The parties recognize that the signing of this Collaborative Agreement will be a major step in the fight against smuggling and illegal border trade in minerals, as well as a means of channeling revenue to appropriate Offices, and that it is essential that adequate legal support be put in place by the parties;

The purpose of this Collaborative Agreement is to serve as a legal basis for the parties to observe a sustainable supply of minerals by creating the terms and conditions for collaboration between them in order to:

1) To monitor, within the framework of due diligence, before and afterwards the traceability gold flows from the artisanal sector of the Democratic Republic of Congo to the level of the AGR refining facilities located in the Republic of Uganda

2) Share information and statistical data in order to enable CEEC to identify and sensitize the operators in the chain of custody about the channeling into the official gold channels of the artisanal sector

3) Set up in the DRC, a network of points of gold purchase, following a business plan to be established by mutual agreement in order to channel to the refinery of AGR all the material flows captured

4) Collaborate technically and logically for purposes of implementing the clauses of this Collaborative Agreement

Article 2: Obligations of the parties

The parties undertake herein to:

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

# Exhibit 4

1) Avail to AGR the official versions of all the legal and regulatory provisions implementing the requirements of the agreements and protocols made pursuant to the Pact on Security, Stability and Development in the Great Lakes Region of 15 December 2006 and other relevant international, national and local instruments for sustainable supply of minerals

2) Furnish AGR with:

   a) Specimens of all traceability instruments for mineral substances exported from the DRC;

   b) The list of its staff involved in the traceability process at the Directorate and provincial entities as well as their telephone and electronic contact (e-mail, fax, etc.)

   c) Specimen signatures of persons authorized to sign certificates or any other document covering the legal export of gold on behalf of the CEEC

   d) Authorizations and facilitations necessary for the opening of the points of purchase of gold in the territory of the DRC, in partnership.

B) Regarding AGR

1) Provide CEEC with multifaceted technical assistance particularly financial and logistical in order to build its capacities in its statutory missions, in particular the mastery of traceability of artisanal ores and the fight against fraud;

2) Facilitate access to CEEC facilities and all documentation related to gold purchases to the LICC, in accordance with the terms and conditions to be agreed upon, to ensure compliance of the GIA system with the identification of gold flows to international requirements of sustainable supply of minerals from conflict or high-risk areas;

3) Provide the CEEC with all information necessary for the identification of operators in the chain of custody operating in the sector and any other information useful for the implementation of its obligations under the clauses of this Collaborative Agreement

C) Regarding the two parties:

1) Appoint each a focal point who will be responsible for the implementation of this Collaborative Agreement;

2) Within three months of the approval of this collaborative agreement, prepare a roadmap with an operational plan for the implementation of their obligations;

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

# Exhibit 4

**Article 3.** MONITORING AND EVALUATION

The parties agreed to meet periodically, every three months, to assess the efficiency and execution of this Collaborative Agreement

**Article 4:** GOOD FAITH

The parties agreed that execution of this Collaborative Agreement shall be effected in good faith.

**Article 5:** CONFIDENTIALITY

The parties herein agreed to keep the content of this Agreement and all the information thereof, which was and which shall be shared.

This information shall not be divulged to any parties other than the Legal advisor, actors, experts and Officers, except in the case of legal, regulatory or judicial requisition, and unless such disclosure facilitates the sustainable supply and legitimate trade of minerals in Africa

**Article 6:** BINDING NATURE OF THE MEMORANDUM

This Agreement is itself binding in nature and mandatory and defining for the parties

**Article 7:** DURATION, ANTICIPATED TERMINATION, AMENDMENT, STETTLEMENT OF DISPUTES

This Collaborative Agreement has been signed for a period of five (5) years with effect from the time of signing it, and it is renewable by tacit renewal, except in writing by one of the parties and will remain in effect until amended or terminated at the initiative of one of the parties or by mutual agreement expressed in a written amendment.

The party which wishes to terminate or amend the terms of this Agreement after the first year of its signing, shall notify the other party of its intention in writing and the two parties shall meet within ninety (90) days after reception of the notification to discuss and strike an agreement to be recorded in a written addendum

**Article 8:** RESOLUTION OF DISPUTES

In the event of dispute or disagreement pertaining to this Agreement, the parties herein agree to attempt a negotiated settlement and, where appropriate, the diligent party may resort to arbitration mechanisms before one of the arbitration courts in the DRC or Uganda or before the International Center for the Settlement of Investment Disputes (ICSID)

**Article 9:** ADDRESS, CONTACT

For the purpose of this Memorandum, the respective addresses of the parties shall be:

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

# Exhibit 4

> For AFRICAN GOLD REFINERY LTD, at the Head Office at Entebbe, Kampala, Sebugwawo, P.O. Box 37574, Ouganda
> C/O Mister Alain Goetz, Directeur Général

> For Centre d'Expertise, Evaluation et Certification ses Substances minérales Précieuses et semi-précieuses (C.E.E.C) at Kinshasa, Democratic Republic of Congo, au numéro 3989 Avenue des Cliniques, Commune de la Gombe
> C/o Mister Alexis MIKANDJI PENGE, Directeur Général

All notification delivered d for purposes of this Memorandum of Association shall be considered as received, either:

- ✓ delivered at the Registered Office and considered having been duly received by the recipient on the date of reception
- ✓ Send by e-mail to the addresses which the parties shall share and considered having been received by the recipient on the same date of delivery

Drawn and signed in two copies by

Date of signature

For African Gold Refinery

Date of signature

For CEEC

Alexis MIKANDJI

*Translated from French by SKN, Centre for Language and Communication Services, Makerere University*

DRC-34996 0101

Exhibit 4

# ACCORD DE COLLABORATION

## ENTRE

## LE CENTRE D'EXPERTISE D'EVALUATION ET DE CERTIFICATION DES SUBSTANCES MINERALES PRECIEUSES ET SEMI-PRECIEUSES (CEEC), Etablissement public de droit de la République Démocratique du Congo

## ET

## AFRICAN GOLD REFINERY (AGR) LTD ENTEBBE, OUGANDA



# Exhibit 4

2

Entre

***Le Centre d'Expertise, d'Evaluation et de Certification des Substances Minérales Précieuses et Semi-Précieuses,*** en sigle *«CEEC »,* ***Etablissement public,*** *créé par le Décret* n° 011/28 du 07 juin 2011 *portant ses statuts,* ayant son siège social en République Démocratique du Congo, Ville de Kinshasa, au numéro 3989, Avenue des Cliniques, Commune de la Gombe, représenté aux fins des présentes par Monsieur Alexis MIKANDJI PENGE, Directeur Général, dûment habilités aux fins des présentes conformément aux dispositions légales sur l'exercice du pouvoir de tutelle ;

Ci-après invariablement dénommé « **CEEC** », d'une part

Et

**AFRICAN GOLD REFINERY LTD,** dont le siège est à Sebugwano Road Entebbe Kampala, Ouganda, enregistrée sous le numéro M103/M106, P.O.Box 37574, ici représentée par monsieur Alain GOETZ, dument autorisé,

Ci-après invariablement dénommée « AGR », d'autre part ;

Toutes deux ci-après collectivement désignées les « **Parties** » ;

## ETANT PREALABLEMENT EXPOSE QUE :

La République Démocratique du Congo et la République d'Ouganda, Etats de localisation des parties, sont signataires du Pacte sur la sécurité, la stabilité et le développement dans la Région des Grands Lacs du 15 décembre 2006 ainsi que de tous les accords et protocoles signés en vue de la mise en œuvre de l'article 9 dudit pacte recommandant l'institution d'un mécanisme de certification pour lutter contre le trafic illicite des ressources naturelles;

Le CEEC est l'autorité de certification des substances minérales qui, en amont, assure avec les autres services publics habilités, le respect du pacte précité ainsi que des engagements internationaux de la République Démocratique du Congo en vue de lutter contre le trafic illicite des substances minérales ;

Le CEEC déploie de grands efforts et mène diverses actions pour canaliser le commerce des minerais de la RDC vers des circuits officiels, transparents et traçables ;

Les autorités du CEEC soutiennent et appuient toute initiative visant à renforcer ses capacités dans ce domaine ;

Le CEEC entend poursuivre ses efforts tendant à la mise en place progressive de mécanismes de traçabilité des minerais extraits sur le territoire de la RDC, en coopération et avec l'aide des organismes publics et privés, nationaux et internationaux, sans exclusive ; 

# Exhibit 4

3

Le CEEC et AGR confirment leurs intentions de travailler ensemble pour atteindre leurs objectifs communs, notamment celui de parvenir à créer une chaine d'approvisionnement mieux suivie et contrôlée des minerais extraits en RDC, spécialement de l'or.

African Gold Refinery Ltd (AGR) exploite une raffinerie de métaux précieux à Entebbe, en République d'Ouganda en respectant les processus et procédures de conformité avec les règles de l'Organisation de Coopération et Développement Economique (OCDE);

AGR, en tant qu'entreprise opérant dans la sphère de la Région des Grands Lacs, est liée par les dispositions légales ainsi que des mesures internationales prises en exécution du pacte susmentionné;

AGR est une initiative fondée sur les recommandations de l'OCDE et de la Conférence Internationale sur la Région des Grands Lacs (CIRGL) qui vise notamment à éviter de mettre dans une liste noire les minerais africains dans leur ensemble, mais plutôt d'inciter les opérateurs du secteur à investir en Afrique dans des projets qui tendent à créer des opportunités pour un approvisionnement responsable, en conformité avec les directives de l'OCDE ;

Compte tenu du fait que sa raffinerie est approvisionnée en grande partie par les flux d'or provenant de la filière artisanale des pays de la région autour de l'Ouganda dont la RDC, AGR entend collaborer avec le CEEC et, par la suite, avec tout autre institution et service public national, provincial ou local œuvrant pour une chaîne de possession responsable de l'or ;

Les deux parties reconnaissent que la signature du présent Accord de collaboration sera un grand pas franchi dans la lutte contre la contrebande et le commerce frontalier illicite des minerais, en même temps qu'un moyen de canalisation des recettes vers les circuits officiels, et qu'il est indispensable qu'un accompagnement juridique adéquat soit mis en place par les parties ;

### DE CE QUI PRECEDE, LES DEUX PARTIES ONT CONVENU DE CE QUI SUIT :

### Article 1er : De l'objet

Le présent protocole d'accord a pour objet notamment de servir de base juridique aux parties pour observer une chaine d'approvisionnement responsable en minerais en créant les modalités de collaboration entre elles pour :

1) Suivre, dans le cadre de devoir de diligence raisonnable, la traçabilité, en amont et en aval des flux d'or de la filière artisanale de la République Démocratique du Congo identifiés au niveau des installations de raffinage de AGR localisées en République de l'Ouganda;

# Exhibit 4

4

2) échanger les informations et données statistiques afin de permettre au CEEC d'identifier et de sensibiliser les opérateurs de la chaîne de possession pour la canalisation dans les circuits officiels de l'or de la filière artisanale ;

3) installer en République Démocratique du Congo, suivant un plan d'affaires à élaborer de commun accord, un réseau de points d'achats d'or afin de canaliser vers la raffinerie de AGR tous les flux matières captés ;

4) collaborer sur le plan technique et logistique pour la mise en œuvre des clauses du présent Accord de collaboration.

**Article 2 : Des obligations des parties**

Les parties s'engagent à:

(A) En ce qui concerne le CEEC  à :

1) Mettre à la disposition de AGR les versions officielles de toutes  les dispositions légales et règlementaires mettant en œuvre les exigences découlant des accords et protocoles pris en exécution du Pacte sur la sécurité, la stabilité et le développement dans la Région des Grands Lacs du 15 décembre 2006 ainsi d'autres instruments internationaux, nationaux et locaux relatifs à l'approvisionnement responsable en minerais;

2) Fournir à AGR :

a) les spécimens de tous les instruments de traçabilité des substances minérales à l'exportation de la République Démocratique du Congo ;

b) la liste de son personnel impliqué dans le processus de traçabilité à la Direction Générale et au niveau des entités provinciales ainsi que leurs coordonnées téléphoniques et électroniques (e-mail, télécopie,...)

c) les spécimens de signatures des personnes habilitées à signer au nom du CEEC les certificats ou tout autre document couvrant l'exportation légale d'or ;

d) les autorisations et facilitations nécessaires à l'ouverture, en partenariat, des points d'achat d'or sur le territoire de la République Démocratique du Congo ;

**Exhibit 4**

5

(B) En ce qui concerne AGR :

1) Fournir au CEEC une assistance technique multiforme notamment financière et logistique, en vue de renforcer ses capacités dans ses missions statutaires notamment la maitrise de la traçabilité des minerais de production artisanale et la lutte contre la fraude ;

2) faciliter au CEEC, suivant les modalités à convenir, l'accès à ses installations et à toute la documentation en rapport avec les achats d'or pour s'assurer de la conformité du système AGR d'identification des flux d'or aux exigences internationales d'approvisionnement responsable en minerais provenant des zones de conflit ou à haut risque ;

3) fournir au CEEC toutes informations utiles pour l'indentification des opérateurs de la chaine de possession opérant dans le secteur et toute autre information utile pour la mise en œuvre de ses obligations découlant des clauses du présent Accord de collaboration ;

(C) En ce qui concerne les deux parties :

1) Désigner chacune un point focal qui seront chargés de la mise en œuvre du présent Accord de collaboration ;

2) élaborer dans les trois mois de l'approbation du présent accord de collaboration une feuille de route assortie d'un plan opérationnel pour la mise en œuvre de leurs obligations ;

**Article 3** : DU SUIVI ET EVALUATION

Les parties conviennent de se rencontrer périodiquement, chaque trois mois, pour évaluer l'efficacité et le niveau de l'exécution du présent protocole d'accord.

**Article 4** : DE LA BONNE FOI

Les parties conviennent que l'exécution du présent accord se déroulera constamment dans un esprit de bonne foi.

# Exhibit 4

6

**Article 5** : DE CONFIDENTIALITE

Les parties conviennent de garder confidentiels le contenu de cet accord et toutes les informations y relatives qui ont été et qui seront échangées.

Ces informations ne peuvent être divulguées à des tiers autres que les conseillers, agents, experts, et professionnels des parties, sauf en cas de réquisition légale, réglementaire ou judiciaire, et sauf si pareille divulgation contribue à faciliter l'approvisionnement responsable et le commerce légitime des minerais en Afrique.

**Article 6** : DU CARACTERE CONTRAIGNANT

Cet accord de collaboration engage par lui-même et a un caractère obligatoire et définitif pour les parties.

**Article 7** : DUREE, RESILIATION ANTICIPEE, MODIFICATION, REGLEMENT DES DIFFERENDS

Le présent Accord de collaboration est conclu pour une durée de cinq (5) ans à compter de sa signature, et il est renouvelable par tacite reconduction, sauf avis écrit de l'une des parties et restera en vigueur jusqu'à ce que modifié ou résilié à l'initiative d'une des parties ou par consentement mutuel exprimé dans un avenant écrit.

La partie qui désire résilier ou modifier les termes du présent accord après la première année de sa signature, notifiera par écrit son intention à l'autre partie et les deux parties se rencontreront dans les Nonante (90) jours à dater de la réception de la notification pour en conférer et trouver un accord à consigner dans un avenant écrit.

**Article 8** : REGLEMENT DES DIFFERENDS

En cas de contestation ou désaccord portant sur le présent accord, les parties s'engagent à tenter un règlement négocié et le cas échéant la partie diligente pourra recourir aux mécanismes d'arbitrage devant l'une des juridictions d'arbitrage de la République Démocratique du Congo ou de l'Ouganda ou devant le Centre International de Règlement des différends des Investissements (ICSID/CIRDI).

**Article 9** : DU DOMICILE. CONTACT

Aux fins de cet Accord de collaboration, les adresses respectives des parties seront :

> **Pour AFRICAN GOLD REFINERY LTD,** au siège social à Entebbe Kampala, Sebugwano, P.O.Box 37574, Ouganda
> A l'Attention de Monsieur Alain Goetz, Directeur Général

# Exhibit 4

7

> ➤ **Pour le Centre d'Expertise, d'Evaluation et de Certification des substances minérales précieuses et semi-précieuses (C.E.E.C.)**, à Kinshasa, en République Démocratique du Congo, au numéro 3989, Avenue des Cliniques, Commune de la Gombe
> A l'Attention de Monsieur Alexis MIKANDJI PENGE, Directeur Général.

Toute notification remise aux termes de cet Accord de collaboration sera considérée comme reçue, soit :

✓ Déposée au siège et considérée comme avoir été dûment reçue par le destinataire à la date de la réception ;

✓ Transmise par e-mail aux adresses que s'échangeront les parties et considérée avoir été reçue par le destinataire le même jour de l'expédition.

Ainsi établi et signé en deux exemplaires par :

Date de signature :                                   Date de signature :

**Pour African Gold Refinery**                        Pour le CEEC

Exhibit 4

# Annex
# B

DRC-34996 0109

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

## Corporate Account Opening Form

- Full Legal Title of Corporate Account  / Name as per the passport (for Individual):

_____

- Date of Incorporation and Expiry / Date and Place of Birth:

_____

- Country of Incorporation / Nationality:

_____

- Registered Office Address / Permanent Address:

_____

- Correspondence Address and Contact Details:

_____

_____

- Principle place of Business:

_____

- Nature of Business / Occupation:

_____

- Source of Funds:

_____

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

Type of Activity, Volume & Purpose:

- Account Type: Corporate ☐   Sole Proprietorship ☐   Individual ☐

- Details of all Beneficial Owners:

| Full Name + % of shares | Country of Residence | Passport Details Issuer, Number and Expiry |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

- Authorised Signatories:

| Full Name | Passport Details Issuer, Number, Expiry | Specimen Signature |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

DRC-34996 0111    **AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806  |  P.O.Box 37574, No. M103/M106,**

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

I hereby confirm that the African Gold Refinery Terms and Conditions have been duly noted and that all of the terms and conditions contained therein have been understood and accepted.

Signature _____

Name _____

Date _____

AFRICAN GOLD REFINERY LIMITED

+256 392 174 806  |  P.O.Box 37574, No. M103/M106,

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

## Corporate Account Opening Approval Form

▪ Full Legal Title of Corporate Account / Name as per the passport (for Individual):

_____

NEO Account Number          _____

Gold Trading Limit          _____

Silver Trading Limit        _____

Initial Margin %            _____

Margin Call %               _____

Close Out %                 _____

Borrowing Rate %            _____
(Currency / Metal)

Order Execution Charge      _____

Account Transfer Charge     _____

## Authorisation


_____          _____

"A" Signatory Authorisation 1     "A" Signatory Authorisation 2

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

**NOTE: NEW Account opening and Number to be recorded AFTER authorization.**

### Required Documentation for Corporate Account Opening / Renewal

**A.**    Proof of legal existence of Applicant Company:
- Trade License (if relevant in country of incorporation)
- Certificate of Incorporation
- Memorandum and Articles of Association
- Shareholders Register

**B.**    Proof of Applicant Company's physical address in country of origin and physical address within the UAE (when applicable):
- Original utility bill; or
- Copy of lease/purchase agreement; or
- Original statement from a financial institution

**C.**    Contact details of Applicant Company:
- Office telephone number(s); and
- Office fax number(s); and
- Office email address; and
- Website address

**D.**    Identities and Addresses of all controlling individuals of the Applicant Company and its assets (shareholders, beneficial owners, partners):
- Copy of passport
- Original utility bill; or
- Copy of lease/purchase agreement

**E.**    Identities and Addresses of all authorised signatories of the Applicant Company (if different to those at D above)
- Declaration by the authorised signatories that the beneficial owners mentioned in D are the sole beneficial owners of the Applicant Company

**F.**    Identities and Addresses of all persons authorized to deal on behalf of the Applicant Company (if different to those at **D** and **E** above)

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0114    **+256 392 174 806 | P.O.Box 37574, No. M103/M106,**
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
**www.agr-afr.com**

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

G.  Identities and Addresses, (if different to those at D, E and F above) of:
- Individuals holding Powers of Attorney from Applicant Company; and
- Third Party mandate holders of Applicant Company

H.  First class bank reference whereby the Applicant Company has been known to the issuing bank for at least two years:

I.  Last (2) two years audited Applicant Company accounts

J.  Six (6) months company track record, in the gold business.
- Indicate your experience in the gold sector, with reference contact details.
- Explain your experience in the region.
- Provide last 3 statements of gold transactions with supporting documents *(i.e. import and export documents, refining and assay reports, etc.)*

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0115    +256 392 174 806  |  P.O.Box 37574, No. M103/M106, Sebugwawo Road, Entebbe Kampala, Uganda,  |  admin@agr-afr.com
www.agr-afr.com

Exhibit 4

# Annex C

DRC-34996 0116

**Exhibit 4**

 AFRICAN GOLD REFINERY LIMITED

# AFRICAN GOLD REFINERY LTD

## PRECIOUS METAL CUSTOMER ONBOARDING PROCESS

**PROSPECT CUSTOMER**

**1ST VERIFICATION**
Owner: **Key Account Manager**
-checks legal existence of prospect
-Reputation of the prospect
-Field of activity of the prospect
-Nature of business activity
-Risk (country, origin of PM, sanctions lists...)

**2ND VERIFICATION**
Owner: **Compliance Department**
-checks information provided by key account manager on the preliminary report

**DUE DILIGENCE SENT TO PROSPECT**
Owner: **Key Account Manager**
-KYC questionnaire
-Declaration regarding the origin of funds and goods
-Power of Attorney & specimen of signatures
-Supply Chain Due Diligence Policy
-Documentary evidence

**3RD VERIFICATION**
Owner: **Compliance Officer**
-Sanction screening and risk profiling of prospect
-Apply enhanced due diligence for high-risk prospect.

**CLIENT VALIDATION**
Owner: **Compliance Committee**
-Decision based on a report submitted by the Compliance Officer to the Compliance Committee.
-Account only opened by unanimous consent of the Compliance Committee.

**OPENING OF ACCOUNT**
Owner: Compliance Officer
-Instruct controller of the business unit to open the account on NEO (risk classification and potential restrictions communicated by the Compliance Officer and reflected on client profile)
-Instructs accounts to open metal account of the client (subject to prior acceptance of the account by the Compliance Department.

Exhibit 4

# Annex
# D

DRC-34996 0118

Exhibit 4



# CLIENT ACCEPTANCE POLICY

2017

AFRICAN GOLD REFINERY LTD

Sebugwawo Road, Entebbe, Kampala, Uganda

DRC-34996 0119

 AFRICAN GOLD REFINERY LIMITED

# AFRICAN GOLD REFINERY LTD

## CLIENT ACCEPTANCE POLICY

### 1.    GENERAL

In order to protect itself and its employees from becoming a target regarding violation of national and international laws and applications such as money laundering and terrorism financing, African Gold Refinery Ltd ("AGR") implements effectively and keeps current continuously Know-Your-Customer (KYC) Procedures and Client Acceptance Policy in purchase and customer acceptance procedures regarding precious metals.

The entire personnel meticulously monitor and implements compliance processes and procedures within the scope of supply chain process and the processes are monitored and audited by Compliance Department.

AGR undertakes the principle that in all activities it participates in, cooperates in and develops regarding the supply of precious metals in terms of gold refining that precious metals come from legitimate and ethical sources and that they do not constitute any criminal elements and that they are not associated with armed conflict or human rights violations.

The principles of Customer Acceptance Policy that was implemented in order to protect AGR and its employees from becoming a target in the violation of national and international laws, money laundering and terrorism financing was based on these parameters:

    a. Country of origin of precious metals,
    b. Risk of conducting business with customer,
    c. Risk of product or service provided,
    d. Value of commercial transactions and type/duration of relations with customer.

Customer risk profile is created in accordance with the above parameters and is updated at least once a year. Risk profiles of repeat customers are updated in a more comprehensive manner with inspections such as on-site regular company visits and controlling the validity of administrative procedures.

In regard to administrative procedures, customers must at least provide evidence on the below issues:

    a. Detailed explanation of areas of business and activity,
    b. References from other companies in the industry, to be inquired and confirmed by Compliance Officer,
    c. Detailed evidence on the source of goods.

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## 2. SCOPE

These instructions define Gold Supply Chain Customer Due Diligence processes, Customer Definition System requirements and how Risk Analysis shall be conducted in this regard, in accordance with Gold Supply Chain risks and it is implemented by all commercial units of AGR.

## 3. RISK MANAGEMENT

AGR has adopted the principle of supporting all national and international efforts on the fight against money laundering, terrorism financing and other related crimes and to obey all national and international laws, other legal arrangements and regulations.

To this purpose, AGR aims to manage supply chain process and risks in a more effective and accurate manner by implementing risk based "Know Your Customer KYC procedures - Customer Due Diligence".

AGR makes an effort for effective risk analysis and management by applying ethical business principles in accordance with the law and all national and international certifications to which it is subject by managing all commercial relations with its customers using precautions and methods to prevent money laundering and terrorism financing, in order to not place the company in a condition, despite unintentionally, of being involved in money laundering or terrorism financing and other related crimes and in order to remove the risk of harming commercial standing.

AGR executes audits in order to create awareness for all personnel in this regard and refresh knowledge with training provided and to monitor and control applications by way of Compliance Unit and Compliance Committee.

### Definition of risks in gold supply chain

By putting in action the Gold Supply Chain Responsibility Policy it has prepared to meet the requirements of associations such as London Bullion Market Association (LBMA) and in accordance with OECD's Due Diligence Guide in High Risk Areas and Areas Affected by Conflict AGR has adopted an effective internal management system and risk monitoring methods.

Supply Chain Monitoring System where supply information on each refined party is gathered and kept was created, information was recorded and saved, refreshment of information and applications on subject was ensured with personnel training and a Compliance Officer was appointed for each unit in order to start all Due Diligence processes for customers with appropriate and effective methods.

Obtaining necessary documents and legal documents from customers within the scope of Due Diligence by way of customer information form and customer risk evaluation following necessary inspections and as a result making customer risk classification and deciding whether to start commercial relations are all within applications developed. Risk evaluation in supply change begins with the

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

determination of supply provision source. Different risk evaluations are done for different sources.

AGR demands documentation of business and commercial relations by conducting a detailed identification scan on customer in order to make an effective risk evaluation to start from the first exit point where gold is provided. At this stage, whether customer has tendencies and efforts in regards to money laundering, fraud, or terrorism financing and such illegal tendencies is researched, business and financial data are controlled to access details and customer risk analysis is developed with documents such as mining license, mine capacity, data on mining applications, documents determining the origin of mine, gold import/export licenses and additional documents obtained from both the mine and small scale establishments. For high-risk category customers, additional precautions are taken and on-site visits and research for the verification of information are done.

AGR demands officially approved, notarized power of attorney declaration from customers contacting via power of attorney and in case any forgery or deception is detected, reports the situation to related authorities.

Situations such as customers to be entered into trade with being reluctant about providing necessary documents, obtaining gold from countries or centers placed under suspicious status by OECD and other related agencies, not being able to document the source of mine, trying for large sums of money transfer, not willing to carry out transactions over bank in a registered and documented manner and such are evaluated within the suspicious operations category.

In order to monitor risks that might occur during the transportation of precious metals, controls are done by way of documents regarding their weight, transport and insurance; thus allowing for monitoring the transport stage of the goods.

Each new customer within supply chain is considered high risk and is monitored and each year regular customer visits are done to decide whether business relations shall continue.

### a. Risk of ore/gold source

Goods from that customer or country are accepted or declined based on the information obtained as a result of country investigation (www.countrywatch.com). Source of ore is verified in each operation in order to eliminate or minimize commercial risk.

Existing or possible embargos, bribery, Financial Action Task Force (FATF) rankings, political stability and such parameters are considered by Compliance Department to continuously monitor risky countries and if that country is deemed negative or suspicious as a result of the evaluation done, gold is either directly not accepted or it is accepted or declined after being controlled by the Compliance Officer.

DRC-34996 0122

**Exhibit 4**

**AGR**    AFRICAN GOLD REFINERY LIMITED

**b.  Customer risk**

Except for private investors known for gold investment products (investment bars, bullions, etc.) persons privately buying and selling precious ores/metals are not serviced.

AGR minimizes its risk of conducting business with non-boda fide persons and only works with professional customers. Business is not done with customers who employ child labor in breach of local laws.

A risk profile (low risk, medium risk or high risk) for each customer during the evaluation of forms and it is regularly revised.

Each customer is given a reference number (customer ID/Account Code) to this purpose and procedures are started and a customer file containing forms and documents that need to be declared is kept.

If there is an anomalous increase in the amount of precious metals purchased routinely from such regular customers, additional due diligence is done on the determination of the source of precious metals and the plausibility of customer explanation.

All operations between AGR and its customers are monitored and pursued by Compliance Officer and the functionality of Customer Acceptance Policy is checked. The results of these observations are reported to management once every 3 months. Risk profile of each customer is re-evaluated as a result of this reporting and revised if necessary. With independent external audits done each year, compliance process of the previous year is monitored and reported.

**c.  Guarantee of no affiliation with illegal activities**

Customers must guarantee that they are not affiliated with illegal affairs such as money laundering, tax fraud and others. The source of all precious metals and money under their control should be verified. Customer should also prove that it abides by local laws regarding the employment of child labor.

Any doubt, no matter how small, regarding the above issues requires the immediate severing of relations with that customer or not starting such relations at all.

**d.  Risk of service provided**

Each party of goods purchased is meticulously inspected by AGR. All operations are subject to goods purchase and compliance procedures. First time customers must go through a full acceptance process. A separate compliance program is applied to existing customers.

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

Customers from whom regular goods acceptance is decided are subject to internal audits on-site by AGR. During these on-site audits, customers must at least provide additional evidence such as the detailed explanation of their business and activity areas and the source of their goods, in terms of administrative procedures.

| Risk Categories | Definition | Due Diligence to be applied |
|---|---|---|
| Low Risk **A**<br><br>Low Risk Profile Customer | Gold with clean source from secure regions with secure transport routes<br><br>Customer with strong documents and records<br><br>Risk-free / secure regions / countries | Basic Due Diligence |
| Medium Risk **B**<br><br>Medium Risk Profile Customer | Gold from high-risk regions or regions affected by conflict and gold with risk transport routes<br><br>High number of undocumented, unregistered commercial operations<br><br>Reasonable and well meaning customers<br><br>Low risk-Partially secure regions / countries | Enhanced Due Diligence |
| High Risk **C**<br><br>High-risk Profile customer | Gold from high-risk regions or regions affected by conflict and gold with risk transport routes<br><br>High number of undocumented, unregistered commercial operations<br><br>Reasonable and well meaning customers<br><br>High-risk- Unsecured regions /countries | Enhanced Due Diligence |

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## 4.    CUSTOMER ACCEPTANCE POLICIES

Activity and operations are monitored on the basis of information, documents, references, purity/assay results, etc. given by customer by sample goods reception with whom commercial relations shall be started and in case of any inconsistency, Compliance Officer is immediately contacted. Customer identification documents are verified by sanctions screening solutions, and whether findings are accurate is researched and verified by on-site visit and audit in addition to administrative procedures (existence of mining, refining or production facilities, accuracy of capacity and market information provided by customer, on-site verification of information including situations for which customer acts as intermediary). Whether commerce shall continue with that country or customer is decided as a result of all these. If after on-site audit, the information and documents presented to us and issues determined during on-site audit coincide, this customer is placed under regular customer status and regular goods purchase is decided.

All professional customers must declare the below documents and fill out the customer information form:

1.  Passport photocopy – shareholder, UBO, authorized representative (color) - minimum
2.  If representative, notarized power of attorney- minimum
3.  Documents showing the recent financial status of company
4.  Documents showing bank accounts
5.  Last electricity invoice of company
6.  Precious ore selling license
7.  Mining license
8.  Gold import/export license
9.  Documents on the weight of precious metal
10. Documents regarding carat/assay results - minimum
11. Commercial registration documents
12. Partnership structure
13. Documents regarding area of activity
14. Documents regarding company authorized representatives
15. Information on mine capacity
16. Information/document on mining applications

Checking and verification of forms and documents are done after they are received. If customer or company cannot be verified, operations are immediately halted and service is terminated.

**In case of doubt:**

In case of doubt, Compliance Officer requests additional information and documents regarding ID verification and operations continue if no problems arise after ID verification.

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

If suspicions continue after control and verification cannot be done, operations are halted and commerce with that customer is terminated.

**Customer ID determination stages:**

Stage 1: Customers who wish to contact via internet in order to start business relations print and fill out the Pre-KYC form on www.agr-afr.com before AGR Know Your Customer-KYC processes and scan the signed document to contact Compliance Unit via email after adding the additional documents required and filling out Compliance Contact form at compliance@agr-afr.com.

Stage 2: If the information in the Pre-KYC Form is compatible with the policy and procedures of AGR customer is sent KYC form to complete including all documents regarding customer identification system and detailed information on opening up account after evaluation. Customer attaches the related documents to the form and either sends or hand delivers to company.

Full Due Diligence and Risk analysis procedures take approximately 3-5 business days. By using sanction screening platform, all customers' ID verification and country inquiry including the research on the source of gold (www.countrywatch.com) are done and as a result, a comprehensive risk evaluation of that customer and source of gold is completed.

After deciding whether to form business relations with the customer, procedures are started by informing the customer of the result. All information on customer is kept private and confidential within these rules of ethics. The information that should not be shared is not shared with third parties or institutions.

Company Compliance Officer and related departments monitor and control all these procedures. Goods acceptance from customer does not begin unless all verification such as ID documents, references, analysis results, etc. are complete. In case of inconsistencies in documents and information, Compliance Officer is informed rapidly or by using compliance transition points system.

Stage 3: Following Full Due Diligence procedures, a metal account is opened for each customer and a reference number (customer code) is provided. From customer acceptance on, all procedures are monitored in the system with this customer code, gold containing precious metals sent to refining belonging to customer are monitored in compliance with lot numbering system and thus all commercial transactions, refining and exits after production of gold or gold containing precious ores are taken under monitoring from the origin of these metals. All these stages of the process are monitored with the internal audits by related units and Compliance Committee.

Compliance agreement form is signed with customers accepted into commercial relations and their declarations are obtained regarding being compatible with AGR's Compliance procedures, Gold Supply Chain Responsibility Policy and Due Diligence processes. Customer Declaration Form to be used by customers purchasing scrap from counters in declaring the source of goods.

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## 5.    ORIGIN OF THE GOLD

All customers deal with questions regarding the source of gold (whether counter customers' goods are savings or inheritance, etc.) at the stage of starting commercial relations within the framework of customer identification system and at goods purchase/acceptance counters and they should provide clear and net answers to these questions.

The high level of amount and value of operations also means that risk is low and monitoring and verification of operations in process hold an equal amount of high importance.

Goods from that customer or country are either accepted or declined based on the information obtained as a result of country investigation. Source of ore is verified at each operation.

AGR keeps record of a list of all gold exporting countries. Products that originate from these countries will either (i) not be accepted by AGR, or will (ii) only be accepted after explicit permission of the Compliance Officer.

The list is updated on a permanent basis using various parameters such as:

-   Existing or imminent embargoes;
-   Corruption;
-   FATF Ratings
-   Political (in)stability;

Based upon these parameters, each country is given a particular grade. The list is divided into three categories A, B and C. See Annex of country list.

AGR will decide whether to accept products that originate from countries categorized under C. In case of negative decision of AGR, no products will be accepted.

For products that originate from countries categorized under category B, the explicit permission of the Compliance Officer is needed, before any purchase of such products by AGR will be accepted.

During the intake procedure, these particular products and the seller in question will be vigorously screened by AGR.

Products with origin in countries categorized under A will be accepted by AGR in accordance with its regular intake procedure.

If evaluation results are compatible with the declarations of customer on the source of gold, evaluation stage is completed and goods acceptance begins.

# Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

If there is an inconsistency between evaluation results and customer's declarations regarding the source of gold, related customer representative calls the Compliance Officer and requests assistance for evaluation.

a. **Investment gold or refined gold:** The accuracy of document and explanations of customers that wish to provide goods to AGR as a one-time deal is diligently researched and determined. In case customer explanations regarding the origin of small amounts investment goods such as jewelry, coins, bars are found plausible and in keeping with their initial statement, the acceptance of such goods (savings, inheritance, etc.) is done directly from purchasing counter.

b. **Unrefined, scrap gold:** The source of gold with customers that wish to provide goods to AGR as a one-time deal is determined during the interview to be held with that customer and is thus evaluated. Customer declarations are taken on the source of gold (inheritance, savings, etc.), carat and analysis results of the goods to be purchased is checked and whether it is considered jewelry is determined based on the silver and copper ration within.

c. **Gold from areas of Conflict/problem regions:** If the source of gold provided by customer is within areas defined as areas of conflict by UN or OECD, goods from those countries and (in certain risky situations declared) goods from surrounding countries are not accepted – except for approvals of United Nations or OECD and such official establishments. If any customer declares having goods from such areas and research indicates to that area or under suspicious conditions, Compliance Officer must be contacted.

d. **In case of doubt:** In case of doubt, Compliance Officer requests additional information and documents regarding ID verification and operations continue if no problems arise after ID verification. If suspicious continue on the source of goods/gold after control and verification cannot be done, operations are halted and commerce with that customer is terminated.

**Regular customers**

AGR calls customers from whom it accepts ores/gold regularly as regular customers. Regular customers are subject to internal audit by AGR.

These audits are in the form of more comprehensive administrative procedures and regular company visits. During these on-site audits, customers must at least provide evidence on the following issues in regard to administrative procedures:

1. Detailed explanation of areas of business and activity,
2. References from other companies in the industry, to be inquired and confirmed by Compliance officer,
3. Detailed evidence on the source of goods,
4. Evidence and documents regarding that child labor is not employed.

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

Sample goods acceptance may begin after verification process. If provided information and those detected during on-site audit are compatible, that customer/company is placed under regular customer status and trade begins. Despite being accepted as regular customer, periodic customer visits are not neglected and customer information verification procedures are executed at the same periods.

**6.    SANCTIONS COMPLIANCE**

AGR is committed to complying with the sanction laws and regulations passed by the Republic of Uganda, the United Nations Security Council, the European Union and the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) as well as applicable sanction laws in the jurisdictions in which AGR operate. Under the sanction laws, individuals and entities are prohibited from entering into financial transactions or provide financial assistance or services in relation to sanctioned individuals, entities or activities.

As such, AGR does not open accounts, continue customer relationships, provide products or services, execute or facilitate transactions (directly or indirectly) or engage in any activity involving sanctioned individuals, entities, countries or territories, subject to the extent permissible by sanction laws. AGR may also, in its sole discretion, decide not to process or to facilitate transactions or to provide products and services even where permissible by sanction laws, if these activities fall outside the risk appetite of the Company. Currently, the sanctioned countries and regions are the Crimea region in Ukraine, Cuba, Iran, North Korea, Sudan and Syria.

**7.    INTERNAL CONTROL MECHANISMS**

Non-Compliance Notification System has been installed as a communication mechanism to transfer any non-compliance deemed as risk within gold supply chain process to upper management and Compliance Access Points have been formed to this extent. Information is refreshed by creating awareness with planned personnel compliance training done during the year. By way of appointed unit compliance officers, setbacks in the application of supply process stages in related units, procedures and processes that should be done and within compliance system and supply chain as well as possible risks are taken under control and negative developments are reported and all these issues are discussed during periodic meetings of Compliance Committee.

AGR has created an internal audit system for customers with whom it is in regular commercial relations. It controls at various periods during the year with on-site audits and administrative applications its regular customers and thus provides the security and reliability of trade.

In this regard, the following are done:

a.  Verification of detailed explanation on the activities done as company,

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

b. Research on and verification of companies listed as references by Compliance officer,

c. Verification of detailed documents on the proof of origin of goods,

d. Audit and control on the guarantee of not employing child labor.

## 8.    MONITORING BY THE COMPLIANCE OFFICER

In order to run a proper Client Acceptance Policy, AGR Compliance Officer monitors all transactions made between the customers and AGR.

The results of this monitoring will be reported on a semi-annual basis to the Board of Directors of AGR. Based upon the results presented by the Compliance Officer, and after the consideration of these results by the Board of Directors, the risk profiles of each client will be evaluated, and if needed, be adjusted.

Every year, the Compliance Officer will draft a report regarding all compliance issues of the previous year (staff education, countries products originate from, number of atypical transactions, number of new clients with a risk profile..).

## 9.    METHOD OF APPLICATION

Customer Acceptance Policy is valid on the date of issue. All possible changes are published with revision number by Compliance Officer. Unit officers/managers are responsible to ensure that all unit employees understand clearly the principles of these directives and its method of application, providing an operation style to fulfil all requirements of instructions and procedure and to execute inter-unit applications in this regard.

- 0 -

# Annex

# E

DRC-34996 0131

Exhibit 4



# AFRICAN GOLD REFINERY LIMITED

Responsible Precious Metals Supply Chain Policy

| Prepared by: | Legal and Compliance Officer | Heizel Adante |
|---|---|---|
| Approved by: | Managing Director | Alphonse Katarebe |
| Effective Date | 04 January 2016 | |

**Exhibit 4**

| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| AGR | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 1 of 4 |

## AFRICAN GOLD REFINERY LIMITED
## Supply Chain Policy for a Responsible Global Supply Chain of Mineral from Conflict-Affected and High-Risk Areas

**AFRICAN GOLD REFINERY LIMITED** recognizes and takes very seriously the risk of significant adverse impacts which may be associated with extracting, trading, handling, and exporting minerals from conflict-affected and high-risk areas, and recognizes that we have responsibility to respect human rights and not contribute to conflict, we commit to adopt, widely disseminate and incorporate in contracts and/or agreements with suppliers the following policy on responsible sourcing of minerals from conflict-affected and high-risk areas, as representing a common reference for conflict-sensitive sourcing practices and supplier's risk awareness from the point of extraction until end user.

As part of our commitment to sourcing ethically responsible precious metals, we have established a Responsible Precious Metals Supply Chain Policy which is based on the following principles: Know Your Customer (KYC), Anti-Money Laundering (AML) and Combatting Financing of Terrorism (CFT). AGR's Responsible Precious Metals Supply Chain Policy is implemented through a comprehensive management system that encompasses strict risk-based due diligence approach. AGR risk management system policy has been designed and implemented to ensure that our commitments and operating procedures are rigorously in line with the OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict Affected and High-Risk Areas and International Conference for the Great Lakes Region ("ICGLR") Policy and Procedures.

By applying this Responsible Precious Metals Supply Chain Policy, AGR participates and cooperates in global effort to combat money laundering, terrorism financing, armed conflict, and human rights abuses. AGR condemns formally any human rights abuse and any child right abuse and expect from all actors in the supply chain to be in line with these fundamentals. Our policy prohibits any employee from offering or receiving of a bribe. In addition, AGR requires from all partners in the supply chain, a clear, transparent and full compliance with local and international regulations, to ensure that our precious metals sourcing is legitimate, conflict free, ethical and social responsible. An on-going training program is performed on a regular basis in order to bring all counterparties and all relevant employees up to date on standards and due diligence, know-your-customer (KYC) best practices.

We strongly recommend our suppliers to operate in accordance with the OECD and International Conference for the Great Lakes Region ("ICGLR") Policy and Procedures.

As part of our responsibility, AGR is committed to:

1. Neither tolerate, nor by any means profit from, contribute to, assist with or facilitate the commission by any party of serious abuses associated with the extraction, transport, trade, handling or export of minerals as indicated in Annex II of the OECD Guideline, any transactions arising from:



**Exhibit 4**

| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
|  | | | |
| | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 2 of 4 |

    (i) Any form of torture, cruel, inhuman and degrading treatment;

    (ii) Any form of forced or compulsory labour;

    (iii) The worst forms of child labour;

    (iv) Other gross human violations and abuses such as widespread sexual violence; and/or

    (v) War crimes or other serious violations of international humanitarian law, crimes against humanity, or genocide.

    (vi) To bride or to be bribed.

2. Not to enter into any business relationship, or immediately suspend or discontinue engagement with counterparties supplying precious metals where we identify a reasonable risk that they are sourcing from, or are linked to, any party committing serious abuses as defined above. AGR 's intention is also to engage the Counterparty to ascertain the circumstances of identified risks and violations, how the Counterparty has handled these (through mitigation and remedy actions), and how the Counterparty has introduced reasonable control measures to prevent and better mitigate such risks in the future.

3. Not to tolerate any direct or indirect support to non-state armed groups through the extraction, transport, trade, handling or export of precious metals. This includes, but is not limited to, procuring minerals from, making payment to or otherwise providing logistical assistance or equipment to non-state armed groups or their affiliates who:

    (i) illegally control mine sites or otherwise control transportation routes, points where minerals are traded and upstream actors in the supply chain; and/or

    (ii) illegally tax or extort money or minerals at points of access to mine sites, along transportation routes, or at point where minerals are traded; and/or

    (iii) illegally tax or extort from intermediaries, export companies or international traders.

4. Not to enter into any business relationship, or immediately suspend or discontinue engagement with upstream suppliers, where we identify a reasonable risk that they are sourcing from, or are linked to, any party providing direct or indirect support to non-state armed groups as defined above.

5. Eliminate, in accordance with paragraph 10 of Annex II of the OECD Guidance, direct or indirect support to public or private security forces who illegally control mine sites, transportation routes and upstream actors in the supply chain; illegally tax or extort money or minerals at points of access to mine sites, along transportation routes, or at

**Exhibit 4**



| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| AGR | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 3 of 4 |

point where minerals are traded; or illegally tax or extort from intermediaries, export companies or international traders.

6. Recognize that the role of public or public security forces at the mine sites and/or surrounding areas and/or along transportation routes should be solely to maintain the rule of law, including safeguarding human rights, providing security to mine workers, equipment and facilities, and protecting the mine site or transportation routes from interference with legitimate extraction and trade.

7. Support efforts, or take steps, to engage with central or local authorities, international organizations and civil society organizations to contribute to workable solutions on how transparency, proportionality and accountability in payments made to public security forces for the provision of security could be improved.

8. Not to enter into any business relationship immediately suspend or discontinue engagement with any upstream participant/s should we identify a reasonable risk that the supply chain directly or indirectly supports illegally acting public or private security forces.

9. Not offer, promise, give, or demand any bribes, and resist the solicitation of bribes to conceal or disguise the origin of precious metals, to misinterpret taxes, fees and royalties paid to governments for the purposes of extraction, trade, handling, transport and export.

10. Support efforts, and/or take steps, to contribute to the effective elimination of money laundering as well as terrorism financing where we identify a reasonable risk of such illegal practices resulting from, or connected to, the extraction, transport, trade, handling or export of precious metals at points of access to mine sites, along transportation routes or at points where precious metals are traded by upstream participants in the supply chain. In this regard, we will immediately report to the relevant authorities any suspicion of any illegal financial transactions we identify.

11. Contribute and participate in the promotion of Responsible Sourcing of Precious Metals to our suppliers by (i) creating a long term association with suppliers and established strong relationship with our customers; (ii) supporting our suppliers of gold to adhere with the provision of this policy and encourage them to impart or convey it to its staff and their supply chain; (iii) disseminating the precious metal gold guidance by local and international bodies in which this policy was created such as the ICGLR, LBMA and OECD.

12. Systematically perform enhanced due diligence practices, including the Know-Your-Customer (KYC) process, following a risk-based approach, before entering a business relationship with any precious metals supplying counterparties. Conduct, utilizing a risk-based approach, appropriate scrutiny and monitoring of (i) the transactions undertaken through the course of the relationship; and (ii) the governance structures in place to prevent any risk of illegal activities. Implement a management strategy to respond to identified risks.



**Exhibit 4**



| | AFRICAN GOLD REFINERY LIMITED | Doc No. | AGRCM-04 |
|---|---|---|---|
| AGR | RESPONSIBLE PRECIOUS METALS SUPPLY CHAIN POLICY | Date | 04 January 2016 |
| | | Pages | Page 4 of 4 |

13. Adequately store and maintain all records and documentation relating to the precious metals supply chain in order to demonstrate appropriate and on-going due diligence has been performed, storage of such information should be for a minimum of 5 years.

14. Train relevant staff and educate its employees through formal education, trainings or seminars and conferences with the provision of this policy and the responsible sourcing of precious metals. AGR requires all its staff involved in the gold supply chain to strictly comply with this policy and implement it in the management system.

15. Require our Counterparties and, in particular, all Counterparties supplying precious metals, to mutually cooperate by committing to, and acknowledging in writing, compliance with a supply chain policy consistent with OECD Due Diligence Guidelines.

AGR has put in place the following email address admin@agr-afr.com allowing our employees, stakeholders and counterparties to raise their questions and concerns related to the supply chain policy or newly identified risk.

- 0 -

DRC-34996 0136

Exhibit 4

# Annex
# F

DRC-34996 0137

# Exhibit 4



## AFRICAN GOLD REFINERY LIMITED



## AML/CFT Compliance Requirements

Exhibit 4

# Annex
# G

DRC-34996 0139

# Exhibit 4

DRC-34996 0140

Exhibit 4

# Annex
# H

DRC-34996 0141



6th November 2018

**Mr. David Biggs**
**Senior Secretary**
**Security Council Committee established pursuant to Resolution 1533 (2004) Concerning the DRC**

**Re: <u>UNRELENTING INVESTIGATIONS OF THE AFRICAN GOLD REFINERY</u>**

We represent the **AFRICAN GOLD REFINERY (AGR)**.

We are in receipt of your further communication referenced S/AC.43/2018/GE/OC.63 addressed to the CEO of African Gold Refinery. We note with displeasure the continuous investigations, interrogations and questioning of AGR's operations despite the fact that we have on several occasions attended to your requests for information, provided all relevant documentation, and closely cooperated with the Group of Experts to the best of our ability.

We strongly believe that AGR is a target of discrimination as there are over 25 gold refineries based in Switzerland and U.A.E who are sourcing gold from the Great Lakes region whilst it's AGR alone under forensic investigation and attack.

Such acts of prejudiced investigation has serious detrimental effects in the industry and simply helping out the elicit gold traders /smugglers to make it as a tool in order to cease and shut-down a legitimate company like AGR as it is AGR's main objective is to address the issues of gold trafficking,

As far as we are concerned, AGR is the only established and visible gold refinery in the region that has signed an agreement with the DRC's agency CEEC in order to set up a traceability system for gold coming from the DRC and assist halt the smuggling ring. This definitely eliminates any undocumented gold from the DRC.

Nonetheless, your recent communication is exactly the same communication addressed to our client referenced S/AC.43/2017/GE/OC.38 from **Mr. Mohamed Kanja Sesay** the acting Secretary security council committee established pursuant to Resolution1533 (2004) concerning the DRC. Refer to our communication dated **12th June 2017** addressed to him in the same regard. <u>We reiterate our communication therein.</u>

Managing Advocate: Sharon Tom LL B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nantoza Husfa LL.B (Hons) (MAK) DIP. LP (LDC) - 070165 1506
Advocate: Ogwang Raymond  LLB  (Hons) (MAK) DIP. LP (LDC)   0773137618
Advocate: Banduru Diana LLB (Hons) (UCU) DIP. LP. (LDC)   0785007241
Law Clerk: Mwenyi  Akiru  Dip. Law (LDC) - 0701316370
Administrative Secretary Mulun Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Email: tem@lawyer.com



As you have rightly quoted we take recognizance of resolution 2360 (2017), as renewed by resolution 2424 (2018) and aver that, should you require any further information from AGR then you should rightly channel your requests to the government of Uganda through the Ministry of Foreign Affairs; we will gladly give all the necessary and relevant information if any through the sovereign republic of Uganda.

AGR requires equity and fairness from the Group of Experts as they carry out their investigative mandate across all gold actors in the industry.

AGR upholds responsible sourcing as its primary objective.

**P.S.** Mr. Goetz is formally leaving his role as AGR's - Chief Executive Officer. Thus, kindly address your future correspondences to Mr. Alphonse Katarebe who will serve as his successor.

Yours faithfully

**Tem Advocates & Solicitors**

**C.C African Gold Refinery**

**C.C Ministry of Foreign Affairs**

**C.C Ministry of Finance**

**C.C Ministry of Energy and Mineral Development**

Managing Advocate: Sharon Tem LLB (Hons) (MAK) DIP LP (LDC) - 0772368361
Advocate: Nanteza Hasta LLB (Hons) (MAK) DIP LP (LDC) - 0703651506
Advocate: Ogwang Raymond LLB (Hons) (MAK) DIP LP (LDC) - 0773137618
Advocate: Banguru Diana LLB (Hons) (UCE) DIP LP (LDC) - 0785007241
Law Clerk: Mwenyi Aximu Dip , Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Email: tem@lawyer.com

Exhibit 4

# Annex
# I

DRC-34996 0144

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

**Date:** 20th December 2019

**To:**
David Biggs
Senior Secretary
Security Council Committee
Established pursuant to
Resolution 1533 (2004)
Concerning the DRC

Dear Mr. Biggs,

Foremost, please accept our sincere appreciation and gratitude to you and the entire team at the Security Council committee for your enormous efforts and support towards the sector. We also wish to thank the Group of Experts on the Democratic Republic of Congo for visiting AGR premises and meeting with the AGR team on the 26th October 2019. AGR door is always open and AGR's entire team is here to cooperate in fulfilling the Security Council's mandate.

As requested, we wish to categorically respond to all the queries presented in your letter referenced S/AC/43/2019/GE/OC.91 dated 22 November 2019 as follows:

A Copy of Company's Supply Chain Due Diligence in accordance with guidelines established by the ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD);

A Copy of Company's Supply Chain Due Diligence report for 2018 and or 2019 in accordance with guidelines established by the ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD);

Page 1 of 5

**AFRICAN GOLD REFINERY LIMITED**

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

DRC-34996 0145



Exhibit 4

# AFRICAN GOLD REFINERY LIMITED

As far as AGR is concerned, the Implementation of the Pact on Security, Stability and Development in the Great Lakes Region had already been signed in December 2017 whilst it is important to note that ICGLR Mechanism is not implemented yet in Uganda.

Even though, AGR is not waiting for that schemes or initiatives to be executed as AGR has self-assessment tool in place to measure the customer, suppliers or any transaction as an integral part of AGR's responsible sourcing practices. AGR has strict KYC procedures and questionnaires that every customer, supplier and client must adhere to, which are reviewed by the Legal and compliance team thereafter submit with their recommendations for approval or rejection to the management. AGR operates under the stringent guidelines of compliance in accordance with ICGLR Regional Certification Mechanism and the Organization for Economic Cooperation and Development (OECD). The copies of AGR's main Supply Chain and Due Diligence policies are enclosed herewith however, we are not able to share them all through email due to heavy files. In fact, sets of documents have already been handed-over to the Group of Experts on the DRC during their visit in AGR on 12th May 2017 and if in case a second copy will be required it can be collected from AGR premises at any moment.

If not included in the 2018 and/or 2019 supply chain due diligence report, evidence of African Gold Refinery Ltd.'s supply chain due diligence checks undertaken for the year including on second tier suppliers.

Following the steps set out in ICGLR (International Conference for the Great Lakes Region) and the OECD (Organization for Economic Cooperation and Development) African Gold Refinery is undertaking risk assessment to any potential and existing customer or supplier, this risk assessment covers conflict-related risks:

To do so, AGR is collecting detailed and quantitative information on suppliers, prospective suppliers and points where the minerals are traded.

Provided below is the overview of AGR's risk assessment:

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0146

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

# Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

| DATE: | ENTITY | INDIVIDUAL | INQUIRY | Legal & Compliance Remarks |
|---|---|---|---|---|
| 28.12.2016 | | Christopher Haun | Assaying & Smelting 5 kgs nuggets | Insufficient Documents |
| 18.03.2017 | | Meteku David | Interested to buy 20 - 30kgs daily | Insufficient Documents |
| 31.03.2017 | New Kush Exploration & Mining | Laurence Craig Brown | To discuss the terms of refining the products from South Sudan | South Sudan Origin; (High Risk Area) |
| 15.05.2017 | | Luis Miguel Landero | Would like to sell gold | No documents provided |
| 24.05.2017 | JH Import & Export Trade LTDA | Jossicleudo Sampaio De Melo | Seeking For Partnership | No documents provided |
| 06.07.2017 | CM Alvesta Enterprises | Tacy Musubao Caleb | Opening an Account | Incorporated in Uganda but Directors are from DRC (High Risk Area) |
| 06.07.2019 | Mbulula John's | John M'bulula | Buying Gold | Insufficient Documents |
| 25.07.2019 | | Daniel Llinas | Opening an Account | USA based company with investments in DRC; No document has been provided |
| 01.08.2019 | Starsky Group | Erick Murilla | Smelting of 5 tons upon account opening confirmation | Based on our meeting with Mr. Erick Murilla on 01 August 2019; gold will be sourcing from the DRC (High Risk Area) |
| 15.08.2019 | | Brian Wheeler | Requires 100kgs supply monthly | No documents provided |
| 21.08.2019 | Brazania Limited | Nikolas Octavio | Opening an Account | Insufficient Documents |
| 29.08.2017 | Financial Engineering & Property Limited | Adam Zarasota | Opening an Account | Insufficient Documents |
| 29.08.2017 | Simnati Sarl | Cedric Kabongo | Opening an Account | Insufficient Documents |
| 31.08.2017 | TechnoMinerals Ltd | Roberto Calamai | Opening an Account | Insufficient Documents |

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0147

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

| | | | | |
|---|---|---|---|---|
| 03.09.2019 | | Juan Jimenez | Selling 5-10 Tons of Gold from Tanzania | Draft contract is inadequate to start business relations |
| 12.09.2017 | Shipping GL Uganda Limited | Patrick Katayi | Importing Gold | Gold from Europe to be imported to Uganda (Potential Money Laundering) |
| 15.09.2017 | Dragon Progress Holding Limited | Champlain Solo | Opening an Account | Company has been incorporated in June 2017; no proven track record in the sector |
| 28.09.2017 | | Nadav Palmach | Opening an Account | Walk-in Potential Customer/ Only Passport copy is provided |
| 26.10.2017 | Borderless Trading Limited | Jette Scott | Opening an Account | Insufficient Documents |
| 15.11.2017 | | Ben Young | Supply in Tanzania & DRC | No documents provided |
| 28.12.2017 | | Evgeny Titov | Interested in supplying Jewelry from Sokolov | Not in line with AGR business activities |
| 13.04.2018 | AA Int'l Consulting | Aime Shabani | Supply of 10kgs/month from the Great Lake Region & beyond | No proven track record |
| 22.05.2018 | STAR TAHINA LIMITED | Yossi Gabay | Opening an Account | Lack of information provided during the meeting |
| 24.05.2018 | | Mikhael Levy | Opening an Account | Insufficient Documents |
| 06.06.2018 | KLS Trading Int'l Limited | | Inquiring for metal trade in Zambia & Hong Kong | Incomplete KYC application |
| 12.06.2018 | Flas Gold Mine - Tza | Festo Mvwango | Opening an Account | Insufficient Documents |
| 27.06.2018 | Ocean Impex Limited | Winnie Nalukwago | Opening an Account | Unknown source of gold |
| 09.09.18 | | Shmuel Minski | Opening an Account | Insufficient Documents |
| 12.12.2018 | Goldex Global (u)Limited | Amos Bakeine | Opening an Account | No proven track record |

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0148

+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com

# Exhibit 4



# AFRICAN GOLD REFINERY LIMITED

| 26.02.2019 | Investor Link Mineral Ltd | Ian Haruperi | Opening an Account | Source of Gold is from Zambia (consider as High Risk Area) |
|---|---|---|---|---|
| 17.07.2019 | | Xavier Mugisha | Opening an Account | Insufficient Documents |
| 05.08.2019 | Kenger Khan Diamond Gold Trading DMCC | | Interested in buying gold | Incomplete KYC application |
| 19.10.2019 | | Maria | Delivery of 5kgs of nuggets | Hidden identity; fake gold dealers |

On the issue of Mr. Alain Goetz's capacity in the company, AGR is confirming that he stepped down as Chief Executive Officer in November 2018 and has since then moved to his charitable foundation and related humanitarian works in Uganda and abroad.

As part of AGR's full cooperation with the Group of Experts, our legal team is in consultation with the related stakeholders and its suppliers to develop a comprehensive opinion on developing a Memorandum of Understanding (MOU) between AGR and the UN Group of Experts so that AGR can ably share the requested details without facing any legal battles in courts of law for breach of confidentiality and disclosure clauses between AGR and its suppliers. We hope this will be worked upon by mid of year 2020.

We wish to thank you once again and unequivocally emphasize that we are always willing to cooperate with the Group of Experts in executing its mandate.

Regards,

AGR Management

**AFRICAN GOLD REFINERY LIMITED**

DRC-34996 0149

**+256 392 174 806 | P.O.Box 37574, No. M103/M106,**
**Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com**
www.agr-afr.com

Exhibit 4

# Annex J

# Exhibit 4



# AFRICAN GOLD REFINERY LIMITED

# ANTI-
# BRIBERY
# POLICY &
# COMPLIANCE
# HANDBOOK

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com**

*Highly Responsible Sourcing of Gold*

DRC-34996 0151

1

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

**CEO Statement**

It is African Gold Refinery's (AGR) policy to conduct all of our business in an honest and ethical manner. We take a zero-tolerance approach to bribery and corruption and are committed to acting professionally, fairly and with integrity in all our dealings wherever we operate. We are committed to implementing and enforcing effective systems to counter bribery.

AGR is committed to compliance with anti-bribery laws that are applicable to the organization.

This policy and controls stated below apply to all individuals working at all levels and grades, including senior managers, directors, employees (whether permanent, fixed-term or temporary), consultants, contractors, and any other person providing services to us or working on behalf of us.

AGR is committed to continual improvement; the policies and controls described in this document represent our first step towards establishing, implementing and maintaining a robust anti-bribery management system in accordance to ISO 37001 Standard.

Alain Goetz

CEO

DRC-34996 0152

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## TABLE OF CONTENTS

I.   What is a bribe? ..................................................... 4

II.  Anti-bribery compliance function ............................ 4

III. Risk Identification and Risk .................................... 5

IV. Operational Controls .......................................... 6

V.   Reporting, Monitoring, and Evaluation .................... 12

VI. Documented information ...................................... 18

Anti-Bribery Policy &
Compliance Handbook

3

Exhibit 4



AFRICAN GOLD REFINERY LIMITED

## I. What is a bribe?

A bribe is a financial or other advantage offered or given:

- ▶ to anyone to persuade them to or reward them for performing their duties improperly or;
- ▶ to any public official with the intention of influencing the official in the performance of his/her duties.



## II. Anti-bribery compliance function

Top management shall establish a compliance function within AGR, and shall appoint the appropriate personnel to carry out the various compliance roles and responsibilities.
The compliance function personnel shall be independent and have the relevant competencies, skills and qualifications.

DRC-34996 0154

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## III. Risk Identification and Risk Assessment

*High Risks*

### 1- Bribery and Money Laundering related to the sourcing of gold

Given the nature of AGR's business and the jurisdictions of operation, sourcing of gold ranks as the highest risk where bribery or money laundering could occur. Therefore, AGR shall implement strict procedures and operational controls, in line with the OECD requirements, to ensure that we minimise this risk. The relevant operational controls are stated below under 'Operational Controls'.

### 2- Gifts, hospitality, donations and similar benefits

AGR shall implement procedures which are designed to prevent the offer, provision or acceptance of gifts, hospitality, donations and similar benefits where the offer, provision or acceptance is or could reasonably be perceived as bribery. Such benefits include:

a. gifts, entertainment and hospitality

b. political or charitable donations

c. client or public official travel

d. promotional expenses

e. sponsorship

f. community benefits

g. training

h. club memberships

i. personal favours given in a business context.

DRC-34996 0155

# Exhibit 4



AFRICAN GOLD REFINERY LIMITED

### 3- Conflict of Interest

AGR's personnel may have connections such as family, financial or other connection directly or indirectly related to their line of work which may result in personnel facilitating or failing to prevent or report bribery. AGR shall implement procedures to prevent internal and external, actual or potential conflicts of interest.



*Lower Risk*

### 4- Bribery of AGR's personnel (inbound bribery)

Bribery of AGR's personnel is most likely to occur in relation to personnel who are able to make or influence decisions on behalf of AGR (e.g. a procurement manager who can award contracts, a supervisor who can approve work done, a manager who can appoint personnel or approve salaries or bonuses, a clerk who prepares documents for granting of licenses, permits etc.). AGR shall implement controls to prevent inbound bribery.

The identification and assessment of risks shall be reviewed at least once annually.

# Exhibit 4



## AFRICAN GOLD REFINERY LIMITED

**IV. Operational Controls**

**The following controls shall be implemented to mitigate the risks explained earlier.**

**1- Risks related to the sourcing of gold**

AGR is committed to refraining from sourcing, trading, purchasing, using and selling gold in circumstances that might contribute directly or indirectly to financing criminal networks or non-state armed groups, perpetrating human rights abuses and other crimes, violating labour rights, as well as undermining political and socio-economic stability in the country of origin.

Corruption and money laundering in the gold trade are often associated with the illegal trafficking of gold, environmental violations, human rights abuses or war crimes, and/or finance of criminal networks or non-state armed groups. AGR's Due Diligence Management

System - based on the OECD Due Diligence Guidance on Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas and the Gold Supplement to the OECD Due Diligence Guidance – along with this document shall be implemented and maintained to eliminate the risks of corruption and money laundering associated with the sourcing of gold.

DRC-34996 0157

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

## 2- Gifts, hospitality, donations and similar benefits

AGR prohibits the offer, provision or acceptance of gifts, hospitality, donations and similar benefits where the offer, provision or acceptance is or could reasonably be perceived as bribery. Where such benefits are necessary and perceived as bribery, the following controls shall be strictly followed:

### Gifts and hospitality

Gifts and hospitality shall be limited to a maximum expenditure of the equivalent of US $100 per person.

The frequency of gifts and hospitality shall be limited to once per year for the same person unless otherwise approved by member of the management team. Where the frequency is

higher than once per year, a rational for such shall be presented and documented.

The timing of gifts and hospitality shall not be during or immediately after tender negotiations.

The recipient of a gift or hospitality shall not be in a position to award contracts or approve permits, certificates or payments.

No-one within AGR can receive a gift or hospitality greater than a value which they are permitted to give.

Where there are legal requirements, in a certain location, that conflict with the above, such legal requirements shall take precedence.

All gifts and hospitality shall be approved by the relevant member of the management team and shall be effectively documented.

Anti-Bribery Policy &
Compliance Handbook

8

DRC-34996 0158



Exhibit 4



AFRICAN GOLD REFINERY LIMITED

Any exceptions to the above requirements shall be approved by a member of the management team, the rational for such exceptions shall be explained and effectively documented.

**Political or charitable donations, sponsorship, promotional expenses and community benefits**

In relation to political or charitable donations, sponsorship, promotional expenses and community benefits, AGR prohibits payments which are intended to influence, or could reasonably be perceived to influence, a tender or other decision in favour of AGR.

AGR will undertake and document due diligence on the political party, charity or other recipient to ensure that they are legitimate and are not being used as a channel for bribery (this could include, for example, searches on the internet or other appropriate enquiries to ascertain whether the managers of the political party of charity have a

reputation for bribery or similar criminal conduct, or are connected with the AGR's business or customers).

Payments related to political or charitable donations, sponsorship, promotional expenses and community benefits shall be approved by the relevant member of the management team. Such payments shall be permitted by applicable law and regulations and publicly disclosed if required by law.

Contributions during or immediately after contract negotiations shall be avoided.

Anti-Bribery Policy &
Compliance Handbook

9

DRC-34996 0159

Exhibit 4



AFRICAN GOLD REFINERY LIMITED

**Customer representative or public official travel**

In relation to client representative or public official travel:

payment shall be permitted by the procedures of the customer or public body, and by applicable law and regulations;

if the travel is necessary for the proper undertaking of the duties of the customer representative or public official;

a relevant member of the management team shall approve the payment;

AGR ensures where possible that the public official's supervisor or employer or anti-bribery compliance function is notified of the travel and hospitality to be provided;

Payments shall be restricted to the necessary travel, accommodation and meal expenses directly associated with a reasonable travel itinerary;

associated entertainment shall be limited to AGR's gifts and hospitality policy;

paying the expenses of family members or friends is prohibited;

paying of holiday or recreational expenses is prohibited.

**3- Conflict of Interest**

Conflict of interest may occur when delegating to personnel the responsibility or authority for the making of decisions in relation to which there is a risk of bribery. The decision process and the level of authority of the decision-maker(s) shall be free of actual or potential conflicts of interest.

Delegation of decision-making will not exempt top management of their duties and responsibilities, nor it will transfer to the delegated personnel potential legal responsibilities.

DRC-34996 0160

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

All personnel shall report any actual or potential conflict of interest such as family, financial or other connection directly or indirectly related to their or their colleagues' line of work. Situations where personnel may facilitate or fail to prevent or report bribery include and are not limited to:

- ▶ Sales personnel is/are related to a customer's procurement manager.
- ▶ A line manager has a personal financial interest in a competitor's business.
- ▶ Accounting and/or compliance personnel have family or strong personal relations with suppliers, customers or external auditors.

Employment and performance review procedures shall take in consideration potential or actual conflict of interest.

All records of any circumstances of actual or potential conflict of interest shall be maintained.

## 4- Bribery of the AGR's personnel (inbound bribery)

The measures necessary to prevent, detect and address the risk of personnel bribing others on behalf of the AGR ("outbound bribery") may be different from the measures used to prevent, detect and address the risk of bribery of the AGR's personnel ("inbound bribery"). For example, the ability to identify and mitigate inbound bribery risk may be significantly restricted by the availability of information that is not under the control of the AGR (e.g. employee personal bank account and credit card transaction data), applicable law (e.g. privacy law), or other factors. As a result, the number and types of controls available to AGR to mitigate the risk of outbound bribery will outweigh the number of controls it can implement to mitigate the risk of inbound bribery.

DRC-34996 0161

Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

Bribery of AGR's personnel is most likely to occur in relation to personnel who are able to make or influence decisions on behalf of AGR (e.g. a procurement manager who can award contracts, a supervisor who can approve work done, a manager who can appoint personnel or approve salaries or bonuses, a compliance personnel who verifies the source of gold, a clerk who prepares documents for granting of licenses, permits etc.).

As the bribe is likely to be accepted by personnel outside of the scope of AGR's systems of controls, the ability of AGR to prevent or detect these bribes can be limited.

To mitigate the risk of inbound bribery, the following controls shall be implemented:

a. Clearly communicate to all personnel, and anyone working on behalf of AGR, that AGR's policy strictly prohibits solicitation and acceptance of bribes.

b. Any bribery concerns shall be reported to the compliance function and/or the appropriate member(s) of the management team. Such reporting shall not result in retaliation under any circumstances.

c. AGR's gifts and hospitality policy/ controls stated above apply to AGR's personnel, and anyone working on behalf of AGR.

d. AGR's anti-bribery policy shall be publicly available and communicated to AGR's business associates; as a minimum, the policy shall be posted on the company's website to help to set expectations with business associates, so as to decrease the likelihood that business associates will offer, or AGR's personnel will solicit or accept, a bribe.

e. Only approved suppliers shall be used. Competitive bidding shall be applied and at least two signatures shall be obtained for contract awards, work approvals etc.

Anti-Bribery Policy &
Compliance Handbook

12

DRC-34996 0162

# Exhibit 4



AFRICAN GOLD REFINERY LIMITED

## V. Reporting, Monitoring, and Evaluation

**Raising concerns, reporting and whistleblowing**

AGR considers raising concerns, reporting or whistleblowing by personnel about attempted, suspected and actual or potential bribery to be its first line of defense against bribery risks. All personnel and anyone working on behalf of AGR shall report, either directly or through an appropriate third party, to the management any suspected and actual or potential bribery.

Except to the extent required to progress an investigation or by law, reports shall be treated confidentially so as to protect the identity of the reporter and of others involved or referenced in the report.

AGR strictly prohibits retaliation, and protects personnel from retaliation, after personnel have in good faith or on the basis of a reasonable belief raised or reported a concern about attempted, actual, potential or suspected bribery or breaches of the anti-bribery policy or controls.

**Investigating and dealing with bribery**

Any reported, detected or reasonably suspected bribery, or breach of the anti-bribery policy or controls shall be assessed and, where appropriate, investigated.

An appropriate action shall be taken in the event that the investigation reveals bribery, or breach of the anti-bribery policy or controls.

AGR empowers and enables investigators and require co-operation in the investigation by relevant personnel. AGR requires that the status and results of the investigation are reported to the compliance function and top management, as appropriate.

DRC-34996 0163

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

The investigations should be carried out by, and reported to, personnel who are not part of the role or function being investigated. AGR may appoint another organization to conduct the investigation and report the results to personnel who are not part of the role or function being investigated.

How to investigate and deal with a particular issue will depend on the circumstances. Every situation is different, and AGR's response should be reasonable and proportionate to the circumstances. A report of a major issue of suspected bribery would require a far more urgent, significant and detailed action than a minor breach of anti-bribery controls.

The compliance function should preferably be the recipient of any reports of suspected or actual bribery or breach of anti-bribery controls. If the reports go in the first instance to another person, then these reports should be passed on to the compliance function as soon as possible unless the compliance function is implicated in the

bribery to be investigated, in such event, the matter shall be reported directly to the top management.

Minor issues are dealt with by the compliance function, with a periodic summary report of all minor issues being made to top management.

Major issues are reported straight away by the compliance function to top Major issues are reported straight away by the compliance function to top management for top management decision on how to respond.

Upon identification of any issue, top management or the compliance function (as appropriate) should then assess the known facts and potential severity of the issue. If they do not already have sufficient facts on which to make a decision, they should commence an investigation.

DRC-34996 0164

# Exhibit 4

 **AFRICAN GOLD REFINERY LIMITED**

The investigation should be carried out by a person who was not involved in the issue. It could be the compliance function, internal auditor, another appropriate manager or an appropriate third party. The person investigating should be given appropriate authority, resources and access by top management to enable the investigation to be effectively carried out. The person investigating should preferably have had training or prior experience in conducting an investigation. The investigation should promptly establish the facts and collect all necessary evidence, for example:

- ▶ making enquiries to establish the facts;
- ▶ collecting together all relevant documents and other evidence;
- ▶ obtaining witness evidence;
- ▶ where possible and reasonable, requesting reports on the issue to be made in writing and signed by the individuals making them.

In undertaking the investigation and any follow up action, the relevant factors should be considered including:

- ▶ applicable laws (legal advice may need to be taken);
- ▶ the safety of personnel;
- ▶ the risk of defamation when making statements;
- ▶ the protection of people making reports and of others involved or referenced in the report;
- ▶ potential criminal and civil liability, financial loss and reputational damage for AGR and individuals;
- ▶ any legal obligation, or benefit to AGR, to report to the authorities;
- ▶ keeping the issue and investigation confidential until the facts have been established;
- ▶ the need for top management to require the full co-operation of personnel in the investigation.

Anti-Bribery Policy &
Compliance Handbook

15

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

The results of the investigation should be reported to top management or the compliance function as appropriate.

Once the investigation has completed, and/or sufficient information to make a decision were obtained, then appropriate follow up actions shall be implemented. Depending on the circumstances and the severity of the issue, these could include one or more of:

▶ terminating, withdrawing from, or modifying the AGR's involvement in, a project, transaction or contract;

▶ repaying or reclaiming any improper benefit obtained;

▶ disciplining responsible personnel (which, depending on the severity of the issue, could range from a warning for a minor offence to dismissal for a serious offence);

▶ reporting the matter to the authorities;

▶ if bribery has occurred, taking action to avoid or deal with any possible consequent legal offences (e.g. false accounting which may occur where a bribe is falsely described in the accounts, a tax offence where a bribe is wrongly deducted from income, or money-laundering where the proceeds of a crime are dealt with).

Anti-bribery procedures/controls should be reviewed to examine whether the issue arose because of some inadequacy in the procedures and, if so, immediate and appropriate steps should be taken to improve the procedures/controls.

DRC-34996 0166

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

**Internal audit**

Internal audits shall be conducted at least once annually to verify compliance with AGR's anti-bribery policies and controls. These audits shall be reasonable, proportionate, and risk based.

Internal audits shall be independent and impartial. Personnel conducting the internal audits shall not audit their own work. Internal auditors shall be trained and knowledgeable about conducting internal audits.

Internal audits shall be documented and records shall be maintained.

**Top management review**

Top management shall review AGR's anti-bribery policies and controls, at least annually, to ensure its continuing suitability, adequacy and effectiveness.

The top management review shall include consideration of:

- ▶ the status of actions from previous management reviews;
- ▶ changes in external and internal factors that are relevant to the anti-bribery policies and controls;
- ▶ information on the performance of the anti-bribery system, including trends in:
- a. nonconformities and corrective actions;
- b. audit results;
- c. reports of bribery;
- d. investigations;

DRC-34996 0167

# Exhibit 4

 AFRICAN GOLD REFINERY LIMITED

The outputs of the top management review shall include decisions related to continual improvement opportunities and any need for changes to the anti-bribery policies and controls.

A summary of the results of the top management review shall be documented and records shall be maintained.

DRC-34996 0168

Exhibit 4



AFRICAN GOLD REFINERY LIMITED



## VI. Documented information

All information related to the implementation and reviews of AGR's anti-bribery policies and controls shall be documented and maintained. The documented information include and are not limited to:

- ► Payments and expenses
- ► Approvals and exceptions and rational for exceptions
- ► Reports of suspected and actual briberies
- ► Records of investigations
- ► Internal audits
- ► Corrective actions
- ► Reviews including management reviews
- ► Reports of potential or actual conflict of interest
- ► Competencies and training.

DRC-34996 0169

# Exhibit 4

DRC-34996 0170

Exhibit 4

# Annex K

**Exhibit 4**

 AFRICAN GOLD REFINERY LIMITED

## Policy Receipt Acknowledgement for AGR's Anti-Bribery Policy & Compliance Handbook

I hereby acknowledge that I have received a copy of the AGR Compliance Handbook and agree to abide by the policy guidelines as a condition of my employment and my continuing employment at Your Company.

I understand that if I have questions, at any time, regarding this Policy, I will consult with my immediate supervisor or the compliance department.

I hereby acknowledge that I have received the AGR Compliance Handbook and I undertake to review it thoroughly and to comply with the AGR policy and controls.

Employee Signature: _____

Employee Printed Name: _____

Date: _____

**AFRICAN GOLD REFINERY LIMITED**

**+256 392 174 806 | P.O.Box 37574, No. M103/M106,
Sebugwawo Road, Entebbe Kampala, Uganda, | admin@agr-afr.com
www.agr-afr.com**

DRC-34996 0172

*Highly Responsible Sourcing of Gold*

Exhibit 4

# Annex L

DRC-34996 0173

Tel:  Director  + 266-0414-332504

General  +256-414-332500

+ 256-414-332601

Toll Free:  0800112300



Office of the Director of Public Prosecut
Workers House, 12 & 11 Floors
Plot 1, Pilkington Road,
P.O. Box 1550,
Kampala (Uganda)
admin@dpp.go.ug
www.dpp.go.ug

Exhibit 4

Our Ref:HQS-CO-00-2020                    Date: 01 February, 2021

Director CID
KIBULI.

**RE:    CID HQTRS GEF 202/2018**
**UGANDA VS:  AFRICA GOLD REFINERY LTD**

Reference is made to the above.

The Office of the Director of Public Prosecutions (ODPP) received a letter from Financial Intelligence Authority (FIA) vide Ref: FIA.DOA.25.10.17 dated 11th October 2017, recommending possible prosecution of African Gold Refinery Limited (AGR) for violation of Anti-Money Laundering Act 2013, specifically, Second Schedule, section 133 (2) which lists dealers in precious metals and gems as accountable persons.

The Act imposes an obligation on accountable persons to register with FIA and thereafter file a number of documents including, but not limited to: registration certificates, operating licences, audits of anti-money laundering systems and policies among others.    Apparently, AGR had failed/refused to comply hence the recommendation for the company's prosecution.

On that basis, the ODPP vide a letter Ref: ADM/104/01 to the AIGP at CID Headquarters, requested for investigations to be carried out into the activities of AGR with the view of establishing the legitimacy of the company's operations as well as its compliance with the Requirements of the Anti-Money laundering Act, 2013 as amended.

Investigations were accordingly conducted and a detailed report was made whose findings were that AGR had consequently registered with FIA as accountable persons on 15th February 2020.

Exhibit 4

In light of the above, AGR had discharged its obligations to FIA, hence the company has no case to answer.

Let the file be closed and put away.

Elem – Ogwal
FOR: DIRECTOR OF PUBLIC PROSECUTIONS

2

Exhibit 4

# Annex
# M

DRC-34996 0176

# Exhibit 4

---

*Share Purchase and Sale Agreement*

---

*between*

Mr Alain Goetz

*and*

AGR International Limited

08 February 2018







# Exhibit 4

**THIS SHARE PURCHASE AND SALE AGREEMENT** (this "*Agreement*") is entered into on 08th of February 2018 in Entebbe, Uganda

*between*

(1) **AGR INTERNATIONAL LTD,** a company duly incorporated under the International Business Companies Act 0f 2016 with registered office address at Global Gateway 8, Rue de la Perle, Providence, Mahe, Seychelles, represented herein by its sole shareholder and director, Mr. Majd Mohammed Abdulaziz Mousa (the "**Buyer**").

(2) **Mr. Alain Goetz,** Belgium national, having its residential address at Frond N, villa 39, Palm Jumeirah, PO Box 64701, Dubai (the "**Seller**"),

and

(3) **AFRICAN GOLD REFINERY LIMITED**, a company organized under the laws of the Republic of Uganda, having its corporate address at Sebugwawo Road, Entebbe Kampala, Uganda (the "**Company**")

(individually a "*Party*" and together the "*Parties*").

## RECITALS

*Whereas,*

a) The Company is a private limited company incorporated in the Republic of Uganda with an authorised share capital of Five Million Ugandan Shillings (UGX 5,000,000) divided into 100 ordinary shares with a par value of Fifty Thousand Ugandan Shillings (UGX 50,000), of which 100 ordinary shares of have been fully paid-up or credited as fully paid-up.

b) The Seller owns 99% of the issued and outstanding share capital (being 99 shares) in the Company.

c) The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the Seller, an aggregate of 99 shares (the "**Shares**") of stock of the Seller in the Company, upon the terms and conditions set forth in this Agreement.

Now, Therefore, in consideration of the mutual covenants and undertakings contained herein, the receipt and sufficiency of which the Parties to this Agreement hereby acknowledge and subject to the terms and conditions herein set forth, and with the intent to be legally bound by the terms hereof, the Parties hereto agree as follows:

## I. DEFINITIONS AND INTERPRETATION

1.1 Unless otherwise indicated, the following terms in this Agreement shall have the meanings set forth below:

| "**Accounting Policies**" | means the accounting practices carried out, in all material aspects, in accordance with IFRS (or other internationally accepted accounting principles), as applicable in the Republic of Uganda. |
|---|---|
| "**Agreement**" | means this agreement, as varied, amended or supplemented from time to time by the parties; |
| "**Business Day**" | means a day excluding Saturdays, Sundays and public holidays (including announced ungazetted public holidays), on which banking and financial institutions are open for business in the Republic of Uganda for transaction of business of the nature required or contemplated by this Agreement; |
| "**Buyer**" | shall have the meaning set forth in the _____ this Agreement; |

DRC-34996 0178

# Exhibit 4

| | |
|---|---|
| "Claim" | means any claim arising under or in connection with this Agreement (or any related document). |
| "Closing" | shall have the meaning set forth in Section 4.1. |
| "Closing Date" | shall have the meaning set forth in Section 4.1. |
| "Company" | means AFRICAN GOLD REFINERY LIMITED, a private limited company incorporated in the Republic of Uganda and having its registered office at Sebugwawo Road, Entebbe Kampala Uganda; |
| "Encumbrance" | means any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement. |
| "Governmental Authority" | means any government or political subdivision, whether federal, state, local or foreign, or any agency, commission, instrumentality or other authority of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator. |
| "MOA" | means the Memorandum & Articles of Association of the Company that has been lodged with the Register of Companies in the Republic of Uganda; |
| "Parties" or "Party" | means the parties or any party to this Agreement, their heirs, estates, personal representatives, successors in title and permitted assigns; |
| "Seller" | shall have the meaning set forth in the Recitals to this Agreement. |
| "Shares" | shall have the meaning set forth in the Recitals to this Agreement. |
| "Share Purchase Price" | shall have the meaning set forth in Section 3.1. |
| "Transfer Terms" | means that all the Option Shares shall be transferred free from any encumbrances or any restriction in dealings together with all title, rights, benefits and interests attaching thereto as at the Exercise Date. |
| "UGX" | means the currency of the Republic of Uganda, the Uganda Shillings |
| "USD" | means the United States Dollar |

1.2 Words and expressions denoting the singular include the plural and vice versa.

1.3 Words and expressions denoting the whole include any part.

1.4 Words and expressions denoting any gender include all genders.

1.5 Words and expressions applicable to a natural person include any person.

1.6 A person includes its estate, heirs, personal representatives, successors in title and any other person for the time being deriving title under it.

1.7 A day, month or year means a day, month or year, as the case may be, reckoned according to the Gregorian calendar.

1.8 A statute or statutory provision includes a reference to:-

    a) (a) that statute or statutory provision; and

    b) (b) all statutory instruments or orders made pursuant to it;

    as from time to time amended, extended, re-enacted or consolidated.

1.9 Any word or expression used in this Agreement which is defined in the Act shall have the meaning ascribed to them in the said Act.

1.10 A document includes the same as from time to time varied in any manner or however or howsoever and any document from time to time issued or executed supplemental, in addition or in substitution to it.

DRC-34996 0179

# Exhibit 4

1.11 Headings and sub-headings are inserted for convenience only and have no legal effect.

1.12 Unless prohibited by law, no rule of construction applies to the disadvantage of the Party responsible for the preparation of this Agreement.

## 2. PURCHASE AND SALE

2.1 Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller hereby sells, assigns, transfers, conveys and delivers to the Buyer, and the Buyer hereby purchases, acquires and accepts from the Seller, free and clear of Encumbrances all of the Seller's right, title and interest in, at the time of Closing, the Shares.

2.2 The Seller hereby irrevocably waives any restrictions on transfer to the extent possible (including any of its rights of pre-emption) which may exist in relation to the Shares, whether existing under the articles of association (or local equivalent) of the Company or otherwise.

## 3. PURCHASE PRICE

3.1 The purchase price of the Shares is USD 2,200,000.00 (Two Million Two Hundred Thousand United States Dollar).

## 4. CLOSING

4.1 Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "Closing") held at the Company's office address on the date hereof (the "Closing Date"). Except to the extent expressly set forth in this Agreement to the contrary, and notwithstanding the actual occurrence of the Closing at any particular time on the Closing Date, the Closing shall be deemed to occur and be effective as of 12:01 PM on the Closing Date.

4.2 Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall deliver to the Buyer:

    c) copies of the resolutions (or local equivalent) of the board of directors (or local equivalent) and, where required, the stockholder(s) of the Seller, authorizing and approving the transactions contemplated by this Agreement, certified by the respective corporate secretary (or local equivalent) or a director to be true and complete and in full force and effect and unmodified as of the Closing;

    d) the share certificates relating to the Shares;

    e) the share register of the Company;

    f) a duly completed stock transfer form transferring the Shares to the Seller.

4.3 Each document of transfer or assumption referred to in this Section 4.2 (or in any related definition set forth in Article 1) that is not attached as an Exhibit or a Schedule to this Agreement shall be in customary form (including with respect to the jurisdiction to which it pertains) and shall be reasonably satisfactory in form and substance to the parties thereto, but shall not contain any representations, warranties, covenants or agreements other than those specifically contemplated in or referred to in this Agreement.

4.4 Upon the terms and subject to the conditions of this Agreement, at the Closing, the Parties shall sign the transfer of the Shares in the share register of the Company.

## 5 NOTICES

5.1 All notices and communications among the Parties shall be made in writing and in the English language by e-mail, delivery in person (including courier service) or registered airmail letter to the appropriate correspondence addresses set forth below:

The Buyer:

AGR INTERNATIONAL LTD
Global Gateway 8, Rue de la Perle.
Providence, Mahe, Seychelles
Attention to: Majd Mohammed Abdulaziz Mousa

 

DRC-34996 0180

# Exhibit 4

**The Seller:**

Alain Goetz
PO Box 64701
Palm Jumeirah, Frond N, Villa 039
Dubai, United Arab Emirates

with a copy to:

**TEM ADVOCATES & SOLICITORS**
P.O. Box 6800, Kampala Uganda
Plot 11-A Acacia Avenue Kololo

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph; provided however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

5.2  Any such notice shall be deemed to be served and received,

  (a) if left at any such address, at the same time when it is so left;

  (b) if sent by post, forty-eight (48) hours after posting within the same country or seven (7) days after posting internationally;

  (c) if sent by facsimile transmission, at the time of despatch of the facsimile transmission to the correct facsimile number;

  (d) if sent by email, at the time of delivery of the email; and

  (e) if sent by courier, on the second day following the day of placing it with the relevant courier services, as the case may be.

## 6    COUNTERPARTS. EFFECTIVENESS

6.1  This Agreement may be executed in two or more consecutive counterparts (including by facsimile and/or e-mail attached PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy or otherwise) to the other Parties.

## 7.    GOVERNING LAW

7.1  The execution, validity, interpretation and implementation of this Agreement and the settlement of disputes thereunder shall be governed by the laws of the Republic of Uganda. Any and all disputes arising out of or in connection with this Agreement shall be finally settled by the Courts in the Republic of Uganda.

## 8    ASSIGNMENT

8.1  No Party to this Agreement may assign any of its rights and obligations under this Agreement without the prior written consent of the other party hereto; provided, however, either party may assign its rights and obligations to one or more of its respective Wholly-Owned Subsidiaries (it being understood that such assignment shall not be permitted if it would delay or impair the consummation of the transactions contemplated hereby); provided, further, that, no such assignment shall relieve the assigning party of any of its obligations hereunder.

# Exhibit 4

## 9  PARTIES IN INTEREST

9.1 This Agreement and all the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder.

## 10  ENTIRE AGREEMENT

10.1 This Agreement (including the Schedules and Exhibits attached hereto or delivered in connection herewith) constitutes the entire agreement among the Parties hereto with respect to the matters covered by this Agreement and thereby, and supersede all previous written, oral or implied understandings among them with respect to such matters.

## 11  FURTHER ASSURANCE

11.1 After Closing, each of the Parties shall do, execute and deliver or procure to be done, executed and delivered, at the reasonable request and expense of the other Party, all such further acts, deeds, documents, instruments of conveyance, assignment and transfer and things as may be necessary to give effect to the terms of this Agreement.

## 12  AMENDMENT AND MODIFICATION

12.1 This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

## 13  WAIVER

13.1 Any of the terms or conditions of this Agreement may be waived at any time by the party or parties hereto entitled to the benefit thereof, but only by a writing signed by the Party or Parties waiving such terms or conditions.

## 14  SEVERABILITY

14.1 If any term, provisions, covenant or restriction of this Agreement is held by a court of competent jurisdiction (i.e. including an arbitral tribunal) or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions completed by this Agreement is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

## 15  INTERPRETATION

15.1 Unless otherwise indicated to the contrary in this Agreement by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the word "including" means "including without limitation".

15.2 The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Page 5

DRC-34996 0182

# Exhibit 4

## 16    REPRESENTATIONS AND WARRANTIES

16.1   All representations and warranties from the Seller to the Buyer in connection with the transfer of the Shares are set forth in Schedule 1.

16.2   All representations and warranties from the Buyer to the Seller in connection with the transfer of the Shares are set forth in Schedule 2.

16.3   Each Party irrevocably and unconditionally waives any right it may have to claim damages for any misrepresentation, or breach of any warranty, not contained in this Agreement or any such collateral or supplemental agreement unless such misrepresentation or warranty was made fraudulently.

16.4   Each Party irrevocably and unconditionally waives any right it may have to rescind this Agreement.

16.5   The Buyer confirms that, as at the time of entering into this Agreement, it has no knowledge (whether actual, constructive or imputed) of any fact, matter or circumstance which might lead to any Claim against the Seller and irrevocably and unconditionally waives any right to any Claim where it has any such knowledge on or before the Closing Date.


## 17    GOVERNING LANGUAGE

17.1   The English language shall be the definitive and controlling text of this Agreement, notwithstanding the translation of this Agreement into any other language.


IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.







Page 6 of 10

DRC-34996 0183

# Exhibit 4

---

**SCHEDULE 1**
**SELLER'S REPRESENTATIONS AND WARRANTIES**

---

### 1. RELATIONSHIP BETWEEN SCHEDULE 1 AND OTHER PROVISIONS OF THE AGREEMENT

1.1   In case of any conflict between on the one hand any of the following provisions and on the other hand the previous provisions of this Agreement, the previous provisions shall prevail.

1.2   The following provisions are an integral part of the Agreement. All capitalized terms are defined in the Agreement.

### 2. GENERAL REPRESENTATIONS AND WARRANTIES of the SELLER

The Seller hereby represents and warrants to the Buyer that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

2.1   Capacity of the Seller, and the Company.

The Seller and the Company has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

True, correct and complete copies of all organizing documents of the Seller have been provided to the Buyer.

The Seller declares that the Company has the right and full power to enter into and perform this Agreement and that, to the Seller's knowledge, each of them does not thereby violate any applicable law or any court or arbitration decision rendered by any court (of the jurisdiction of its incorporation or otherwise) to which it may be subject or any agreement to which it is a party.

2.2   Authorization by the Company – Enforceability.

The Company has taken all actions necessary for the execution, delivery and performance of this Agreement by each of them and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company. Assuming the due authorization, execution and delivery by the Buyer, this Agreement constitutes a valid and binding obligation of the Company enforceable against each of them in accordance with its terms.

2.3   Absence of certain conflicts.

To the Seller's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of the Company; (b) require the payment or the incurring of any obligation on the part of the Company or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which a Company is a party or the Shares may be bound, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Seller or the Shares or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to a Company, the Shares or any of its operations or property.

2.4   Title to Shares.

The Appendix to this Agreement sets forth the whole of the Seller's shares or interest in the Company (being the Shares) or in any subsidiary of the Company (and to the extent the Seller shall have any additional interest or shares in the Company, the same shall be included as Shares and transferred to the Buyer at Closing at no additional cost to the Buyer). The Shares have been duly authorized and validly issued and are fully paid and non-assessable. None of the Shares were issued in violation of any applicable Law. The Seller has shall convey to the Buyer, good and marketable title to the Shares. The Shares are and shall be a the Buyer free and clear of all Encumbrances, charges, demands or adverse claims or other the exercise of any of the attributes of ownership. The Seller has full voting power over the S to no proxy, shareholders' agreement, v agreement relating to the voting Shares other than the articles of associa the Company. As of the Closing Date no person wi

DRC-34996 0184

# Exhibit 4

preemptive right to purchase the Shares other than as set forth in this Agreement and/or the articles of association of the Company.

2.5 Litigation.

There are no legal proceedings now in progress, pending or, to the Seller's knowledge, threatened against the Seller which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer. The Seller is not subject to any order, writ, injunction or decree of any court or any Governmental Authority which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer.

The Company is not involved in any pending or, to the Seller's knowledge, threatened legal disputes, administrative proceedings or administrative inquiries nor are there any circumstances known to the Seller which might reasonably be expected to provide a basis for such litigation, or which might have a substantial negative impact on the Company's financial situation, unless disclosed.

2.6 Proper and valid organization.

The Company is a corporation that is duly organized and validly existing under the applicable laws of the Republic of Uganda and was properly constituted. It has its actual centre of administration at its registered office and it has no branches or representative offices, whether in Uganda or abroad; and it has all requisite corporate power and authority under applicable laws to carry on the business presently conducted by it.

The Company has at all times acted, in all material respects, in accordance with its respective articles of association and the laws and regulations of the Republic of Uganda.

2.7 Books and records.

The Company's books and records are up to date. All board meetings and shareholders meetings have been held in compliance with the applicable law and the respective minutes of the board meetings and shareholder meetings are kept and available at the Company's registered office.

2.9 No insolvency proceedings.

No insolvency or similar proceedings have been commenced or, to the Seller's knowledge, applied for in respect of the Company. The Company is not unable to pay its due debts.

2.10 Further assurances.

From time to time on or after the Closing Date, the Seller and the Buyer will execute and deliver to each other all such further assignments, endorsements and other documents as are reasonably requested in order to complete the transfer of the Shares to the Buyer, to enable the Buyer to exercise full rights as the sole owner of the Shares and to otherwise carry out the transactions contemplated by this Agreement.

2.13 Ownership rights.

Without limitation, to the extent the Seller shall have ownership interests or rights in the Company other than the Shares, such additional interests shall be conveyed to the Buyer at Closing without additional consideration due from the Buyer.





Page 8 of 10

# Exhibit 4

---

**SCHEDULE 2**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

---

The Buyer hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

1. Buyer capacity

   a) The Buyer has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

   b) The Buyer declares that it has the right and full power to enter into and perform this Agreement and that, to the Buyer's knowledge, it does not thereby violate any laws of the Republic of Uganda (or regulation or ruling therefore) or foreign court to which it may be subject or any agreement to which it is a party.

2. Authorization by the Buyer – Enforceability.

   a) The Buyer has taken all actions necessary for the execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer. Assuming the due authorization, execution and delivery by the Seller, this Agreement constitutes a valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.

3. Absence of certain conflicts.

   a) To the Buyer's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of the Buyer; (b) require the payment or the incurring of any obligation on the part of the Buyer or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which the Buyer is a party, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Buyer or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to the Buyer or any of its operations or property.







Page 9 of 10

DRC-34996 0186

# Exhibit 4

## EXECUTION PAGE

Name: Alain Goetz

Title:

Authorised for and on behalf of Seller

AGR INTERNATIONAL LTD

Name: Majd Mohammed Abdulaziz Mousa

Title: Director

Authorised for and on behalf of Buyer



Page 10 of 10

Exhibit 4

# Annex N

DRC-34996 0188

Exhibit 4

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (the "Agreement") is made and entered into by and between:

**AFRICAN GOLD REFINERY LTD.**, a limited liability company incorporated under the laws of the Republic of Uganda with principal office address at Sebugwawo Road, Entebbe, P.O. Box 37574 Kampala, Uganda (hereinafter referred to as the "Company");

and

**ALAIN GOETZ**, national of Belgium, residing at Palm Jumeirah, Dubai, United Arab Emirates (hereinafter referred to as the "Consultant").

The Company and the Consultant are hereinafter individually referred to as a "Party" and collectively referred to as the "Parties".

WHEREAS

A.     The Company is a well reputed gold and metal processing company, who is familiar and experiences in gold and metal processing (hereinafter referred to as the "Relevant Business");

B.     The Consultant has experience in doing business in the African Region, in particular in the Republic of Uganda (hereinafter referred to as the "Territory"). The Consultant represents to have knowledge of the local circumstances and market conditions and to have good and interesting contacts within the different institutions regarding the Relevant Business in the Territory;

C.     The Company is desirous of appointing the Consultant as its Promoter for the purposes of promoting and developing the Relevant Business in the Territory and to assist the Company in safeguarding and furthering its business interests with regard to compliance standards of the Relevant Business in the Territory;

D.     The Consultant is desirous of acting as the Promoter of the Company for the purposes of promoting and developing the Relevant Business in the Territory and to assist the Company in safeguarding and furthering its interests with regard to compliance standards of the Relevant Business in the Territory.

NOW, IT IS HEREBY AGREED AS FOLLOWS:

## 1. RECITALS

The above Recitals shall be deemed an integral part of this Agreement.

## 2. APPOINTMENT AND DURATION

2.1.     Subject to and upon the terms and conditions of this Agreement, the Company hereby appoints the Consultant as its Promoter to assist the

1 | P a g e                                                    PRIVATE AND CONFIDENTIAL

DRC-34996 0189

# Exhibit 4

Company in safeguarding and furthering its interests with regard to compliance standards of the Relevant Business in the Territory.

2.2.    The Agreement shall commence on **10ᵗʰ of November 2018** (hereinafter referred to as the "Commencement Date") and subject to Clause 8, shall be effective and in force for an initial period of five (5) years (hereinafter referred to as the "Initial Period").

## 3. OBJECT OF THE AGREEMENT AND PROMOTER'S DUTIES

Pursuant to its obligation to provide assistance to the Company under Clause 2 and always subject to Clause 4, the Consultant shall:

3.1.    Develop, manage, coordinate, network, implement and monitor a public relations and communications strategy and associated products and activities with various audiences, with objective of promoting awareness and understanding of AGR and its activities including regulatory compliance.

3.2.    Inform the Company on the gold market situation and evolutions in the Territory as well as on new legislation and regulations bearing significant influence to tendering and/or execution of operations in the Territory.

3.3.    Inform in timely manner the Company of all and any relevant issues, data and information relating to the Relevant Business enabling the Company to evaluate the same.

3.4.    Provide the Company with such advice, information and guidance as the Company may require in relation to tendering for and the processing and award of contracts for Relevant Business in the Territory (hereinafter referred to as a "Contract").

3.5.    Introduce any natural person and/or companies to the Company as may be of assistance in award of a Contract.

3.6.    Assist and advice the Company generally, when required, on all aspects of its negotiations for the award of a Contract.

3.7.    After the award of such Contract as aforesaid, assist the Company as it may reasonably require to ensure the smooth operation thereof.

3.8.    At all times, use its best endeavours generally to promote the business of the Company and foster relationships and connections which may benefit the Company in its business and affairs in the Territory.

3.9.    Suggest to or upon request of the Company, prepare and assist visits for quality contacts in relation to the Relevant Business.

3.10.    Assist and advice the Company in relation to obtaining or renewing any required registration in the Territory and regulatory compliance of the Company as per international standards.

2 | Page                                    PRIVATE AND CONFIDENTIAL

# Exhibit 4

3.11.   Assist and advice the Company in relation to its dealings with government of any tier, ministries, departments, municipalities and other offices and agencies thereof or allied thereto in the Territory.

3.12.   Advice the Company generally as required in connection with local maters in relation to the Relevant Business in the Territory.

## 4. RESTRICTIONS AND LIMITATIONS ON THE PROMOTER'S DUTIES

4.1.   It is the intention that the Relevant Business accepted by the Company in the Territory shall be contractually awarded to the Company as principal unless the Company in any particular case in its absolute discretion decides otherwise and the Consultant in the performance of its duties hereunder shall have due regard therefore and shall raise no objection thereto.

4.2.   The Consultant is not entitled to oblige the Company to bid for tenders or to accept an order, a letter of intent, a letter of award or alike from a client introduced to it by the Consultant.

4.3.   The Consultant shall not, without the express prior written authority of the Company, have any power or authority under the Agreement (and shall not hold himself out as having power or authority):

   4.3.1.   To sign the Contract or accept orders, a letter of intent, a letter of award, or alike, to settle Company's entitlement to debts, or to accept money on behalf of the Company;

   4.3.2.   To give any guarantees or warranties to clients or potential clients;

   4.3.3.   To commit the Company to any binding obligations;

   4.3.4.   To commit the Company otherwise in any way.

## 5. REMUNERATION AND REIMBURSEMENT OF INCIDENTAL EXPENSES

5.1.   As remuneration for the provision of the services by the Consultant, the Company shall pay to the Consultant a fee calculated as provided in the Schedule hereto. Such fee shall be deemed to cover all of the Consultant's operating expenses relative to the provision of its services under the Agreement and the Consultant shall, as a rule, not be entitled to any further or other remuneration or compensation whatsoever, be it reimbursement of expenses, fees, costs or otherwise in respect of its performance under the Agreement, except if and to the extent mutually agreed upon, beforehand and in writing between both Parties.

## 6. EXCLUSIVITY

6.1.   The relationship contemplated by the Agreement regarding the Relevant Business has an exclusive character and the Consultant undertakes not to establish a similar association with any other person or Company in the

3 | P a g e

PRIVATE AND CONFIDENTIAL

# Exhibit 4

Territory in respect of the Relevant Business while the Agreement continue in full force and effect.

6.2.    The Consultant shall not, directly or indirectly, in part or in whole, alone or together with any third party, prepare or submit or take par in the preparation or submission of a tender proposal or any other offer in relation to the Contract other than in accordance with the stipulations of the Agreement.

6.3.    The Consultant shall not act, either individually or as a prospective, former or actual member of the Company to participate or take any action which could conflict, or materially hinder the performance of its responsibilities under the Agreement.

6.4.    The Consultant represents and warrants that by entering into this Agreement it shall not be in breach of or default under any agreement to which it is a party, or which is binding on it.

6.5.    Nothing herein shall affect or restrict, however, the Company's freedom of action in respect of any business undertaken or sought by the Company outside the Territory, or any other business other than the Relevant Business undertake or sought by the Company inside the Territory.

## 7. CONFIDENTIALITY

7.1.    All information acquired by a Party from the other Party, including prices and commercial or technical information, shall be treated as confidential by the recipient and shall not be used other than for the purpose contemplated by the Agreement without the prior consent in writing of such other Party unless such information:

    7.1.1.    Is or later becomes public knowledge other than by a breach of the foregoing paragraph, or;

    7.1.2.    Is in the possession of the recipient with the right to disclose prior to receiving it from the other Party;

    7.1.3.    Is independently received by the recipient from a third party having the right to disclose.

7.2.    These confidentiality obligations shall survive the expiry or termination of the Agreement.

## 8. TERMINATION

8.1.    Notwithstanding anything to the contrary expressed or implied elsewhere herein, the Agreement may be terminated forthwith (without prejudice to the accrued rights and/or remedies of the Parties):

    8.1.1.    By either Party in the event of a material breach by the other of the terms and conditions of the Agreement provided that, if such breach

PRIVATE AND CONFIDENTIAL

DRC-34996 0192

# Exhibit 4

is capable or remedy, then the same shall take effect until the Party not in breach shall have given 14 days' notice to the other requiring the breach to be remedied and that the other shall not have remedied the same within that period;

8.1.2.   By either Party by giving notice in writing to the other in the event that the other becomes insolvent, bankrupt or goes into liquidation for the purpose of amalgamation or reconstruction), or enters into an arrangement or composition with its creditors;

8.1.3.   By the Company in the event that the Consultant ceases to be empowered or able to perform its services under the Agreement in the Territory.

8.2.   This Agreement may also be terminated upon mutual written agreement of the Parties.

## 9.  EXTENT OF COMPANY'S LIABILITY

9.1.   The obligations of the Company under this Agreement shall be limited to the payment of fees in respect of relevant Contracts as provided in Clause 5 and the Schedule hereto.

9.2.   The Consultant shall have no right to claim a commission, as described in Clause 5, or any other compensation whatsoever in the event:

9.2.1.   The Company decided not to bid or to accept such introduced to it by the Consultant which the Company may decline for any reason, or

9.2.2.   For any reason whatsoever a Contract is not awarded to the Company or not paid to the Company.

9.3.   Nor shall any compensation be payable by virtue of the termination of this Agreement in accordance with Clause 8 hereof.

## 10. ASSIGNMENT

10.1.   Neither of the Parties shall without the written consent of the other Party assign, charge, subcontract or otherwise encumber the Agreement or any of its rights or obligations as hereunder.

10.2.   The Company shall have the right to assign this Agreement in whole or in part to any of its holding, associated, affiliated or subsidiary companies.

## 11. NOTICES

11.1.   Any communication by either Party shall be in writing and shall be deemed to have been sufficiently made:

11.1.1. On the next business day after the same shall have been delivered by hand to the respective Party at the address hereinafter specified; or

5 | P a g e                                    PRIVATE AND CONFIDENTIAL

# Exhibit 4

11.1.2.  Five business days after being posted by registered airmail post to the address hereto specified; or

11.1.3.  On the next business day after the same shall have been transmitted by mail or email to the respective Party at the address herein specified.

11.2.  For the purposes of this clause, a "business day" shall be a day on which banks are open for business in the country which the relevant communication is addressed.

## 12. MISCELLANEOUS

12.1.  The headings used in this Agreement are for convenience only and shall not be used to interpret the meaning or construction of the Agreement or any party thereof.

12.2.  All references to times or dates herein shall be construed with reference to the Gregorian calendar.

12.3.  This Agreement supersedes any previous agreements, arrangements or understandings between the Parties relating to the Relevant Business in the Territory.

12.4.  The relationship established hereby shall extend only to the Territory and shall be applicable only to the Relevant Business.

12.5.  Nothing herein shall be construed as creating a partnership between the Parties or as establishing an agency relationship and the Consultant specifically undertakes not to make representations to the contrary. For the avoidance of doubt, nothing herein shall be deemed to constitute a contract of employment.

12.6.  Nothing contemplated in this Agreement shall be construed as in any way limiting or restricting the freedom of action of any holding subsidiary, associated or affiliated company of the Company to establish separately in the Territory.

12.7.  The Parties shall at all times comply with the laws, decrees and regulations of the Territory.

12.8.  The Parties shall, in relation to this Agreement, act towards each other in the utmost good faith.

12.9.  In the event that the Company considers that the Relevant Business could, to its advantage, be developed by a close or modified association with the Consultant, then at the request of the Company both Parties will meet to attempt to work out a mutually acceptable revised basis for their cooperation and if successful in this regard the arrangements herein contained will thereupon be modified accordingly by formal written agreement signed by the Parties.

6 | P a g e                                    PRIVATE AND CONFIDENTIAL

Exhibit 4

12.10. If the Agreement is to be translated into any other language, the English language version of the Agreement shall always prevail.

## 13. GOVERNING LAW AND DISPUTE RESOLUTION

13.1. This Agreement shall be governed and interpreted in accordance with the English laws.

13.2. Parties shall use their best efforts to settle amicably any dispute arising out of or in connection with the interpretation, breach or enforcement of the Agreement.

13.3. In the event a Party is of the opinion that an amicable settlement cannot be reached, the despite shall be finally settled under the Rules of the London Court International Arbitration (LCIA) by three (3) arbitrators appointed in accordance with said Rules. The venue of arbitration shall be in DIFC-LCIA. The arbitration shall be conducted in the English language.

The Parties have caused the Agreement to be executed in two (2) parts by their duly authorized representatives this 5ᵗʰ day of November 2018. Each Party recognizes having reached one (1) original.

Agreed and Signed
For and on behalf of the Company

African Gold Refinery

Agreed and Signed
For and on behalf of the Consultant

Alain Goetz

PRIVATE AND CONFIDENTIAL

DRC-34996 0195

Exhibit 4

# Annex

# O

DRC-34996 0196

**Exhibit 4**

# L A U R I U S

ANTWERP – BRUSSELS

**To Whom It May Concern:**

Antwerp, 03 March 2020

Dear Sir, Madam,

Bert Luyten [1]
Dirk Wellens [1]
Michael Bollen [2]
David Ryckaert [3]
Karen Vermaere [1]
Arnaud Vanitterbeek [2]
Bob Roels [1]
Philippe Loix [1]
Eline Verelst [1]
Gerrit Hendrikx [1]
Stephanie Joris [1]
Ayse Özkan [1]
Lancelot Clément de Cléty [1]
Matthias Verschaffel [1]
Rainier Van Ghysegheim [1]
Zeno Vanregemorter [1]
Sandro Christiaens [1]
Claudia Bijnens [1]
Charlotte Wilmssen [1]
Quinten Hermans [1]

Conc.    :    Mr. Alain Goetz - Questions regarding judgement of 30 January 2020
Our ref. :    00004694

I act as Belgian local counsel to Industrial Refining Company NV (formerly known as "Tony Goetz NV" – hereinafter "TG") and Mr. Alain Goetz.

During the legal proceedings I represented TG before the court of first instance in Antwerp, which resulted in a judgement of 30 January 2020.

Mr. Alain Goetz requested me to provide a clarification of the standpoint of TG and as well himself regarding this judgment.

The facts underlying the court's decision mainly concern cash payments by TG that took place in 2010 and 2011. At this time, Mr. Alain Goetz was still a director of TG, a company of integrity that does not cooperate in any wat in the illegal trade of gold or other precious metals and conducts its activities in accordance with all applicable rules and regulation.

TG has been an **all-Belgian** company for more than 30 years, with all its industrial activities exclusively located in Belgium and all employees exclusively employed in Belgium. All employees of TG comply with strict guidelines with regard to the acceptance of gold and verification of the origin of the gold and the identity of the suppliers. Worthy to note also that TG does and did not import or accept gold originating from conflict zones, nor from Venezuela, Uganda, Congo or Dubai (UAE).

We believe that the judgment is erroneous. Neither Mr. Alain Goetz nor TG breached any anti-money laundering regulations or other legislations in force at that time.

Belgian traders in precious metals are currently prohibited from paying precious metals in cash and this follows from article 67 §2 of the Act of 18 September 2017 on the prevention of money laundering and terrorist financing and on restricting the use of cash.

LAURIUS CV

Werf & Vlasnatie, Oudeleeuwenrui 19, B-2000 Antwerp T +32 3 260 88 00 - F +32 3 260 88 10
Kunstlaan / Avenue des Arts 56, B-1000 Brussels T +32 2 313 87 87 - F +32 2 313 87 88
VAT BE 0880.655.773
[1] Antwerp bar - [2] Brussels bar - [3] BV

www.laurius.be

# Exhibit 4

## LAURIUS

ANTWERP - BRUSSELS

However, the anti-money laundering regulations have been amended several times over the past decades. In 2010-2011, there was no general ban on cash payments by traders when purchasing precious metals. Indeed, the anti-money laundering regulations only imposed cash restrictions (max. €15,000) on the trader who sold a good. This means specifically that the AML regulations prohibiting cash payments were not applicable in case TG purchased precious metals. Moreover, the fact that purchase was settled in case does not imply that the origin of the funds or the purchased goods were *ipso facto* illegal.

It was therefore widespread that cash payments were made in Belgium in the gold industry for amounts in excess of 15.000 EUR. This widespread practice was based on the then existing Belgian legislation and was confirmed by various authorities. The Belgian legislation was amended in 2013 and TG has always complied with the relevant legislation in force.

Nevertheless, TG and Mr. Alain Goetz were convicted by the judgement of 30 January 2020 of money laundering in relation to certain purchases with cash payments to its customers in the period 2010-2011.

TG and Mr. Alain Goetz were hereby amongst others sentenced to a fine (up to EUR 5,500 for Mr. Alain Goetz and up to EUR 99,000 for TG) with deferment of execution for a period of three years, suspended jail term and professional ban for a period of five years and certain amounts were confiscated.

TG and Mr. Alain Goetz contest these facts and uphold that the company did not violate any law, having regard to the facts on which it is based and the regulatory framework in force at the time.

They are invariably convinced that neither he nor any person or company associated with TG has infringed any rules of any kind.

TG and Mr. Alain Goetz emphasize that this discussion does not concern the company's activities since 2012.

To date, no dispute exists as to the legitimacy of TG's activities either before or after this period. Furthermore, TG's activities are regularly monitored by the competent authorities.

Despite its conviction, TG and Mr. Alain Goetz decided not to lodge an appeal and opted to look to the future rather than to the past.

TG and Mr. Alain Goetz therefore paid the confiscated amount of money (EUR 1,089,915.67 each) to the Belgian State (see attachment 1). In addition, account should be taken of the forfeiture of the alleged wealth benefits opposed in the above-mentioned judgment. This means that all alleged illicit gains have disappeared from their assets. The legitimacy of the remaining assets is therefore certain.

Finally, in order to be complete that I point out that at the moment Mr. Alain Goetz is no longer part of TG's management or its shareholding (see attachment 2).

# Exhibit 4

# LAURIUS

ANTWERP - BRUSSELS

Please note that this letter is merely for information purposes and is not to be relied upon by any other person than our client and cannot be used or for any other purpose, nor is it to be quoted or made public in any way without our prior written consent.

We are at your disposal for further information.

Best regards,

Bert Luyten

Attachment 1: Proof of payment
Attachment 2: Dismissal of board of directors and UBO-register

DRC-34996 0199

# Exhibit 4

## Proof of Payment

GOETZ ALAIN | 6145618-66 ✕ 🗐      standaardprinter : PQAB2ZX0 on

     

**Verrichting raadplegen**

terug naar overzicht

| | |
|---|---|
| rekening<br>**BE63 7330 0776 7506 EUR** | tegenrekening<br>**0245H8661110** |

**GOETZ ALAIN**

oorspronkelijke rekening

producttype
**KBC-Rekening**

omschrijving
**OVERSCHRIJVING NAAR 27-05**
**BE95 6792 0033 0258**
**BANKIER BEGUNSTIGDE: PCHQBEBBXXX**
**KANT. NFI BRUSSEL 1**
**010374090685**
**DOORGEGEVEN OP 27-05-2020**
**MET KBC BUSINESS DASHBOARD**

**KBC B BETALINGSSYST. & DIENSTEN**
**DRINGENDE UITGAANDE VERRICHTINGEN VIA TARGET - BE**
oorspronkelijke tegenrekening
**BE95 6792 0033 0258**
**PCHQBEBBXXX**
verrichtingbedrag
**-1 089 915,67**

verrichtingsdatum
**27-05-2020**
valutadatum
**27-05-2020**
boekingsdatum
**27-05-2020**

producttype
**SEPA Credit Transfer**
gebeurtenistype
**overschrijvingen via KBC-online for business**
opdrachtschematype
**individuele overschrijving niet ionen**

registratiekanaal
**met Online for Business**
registratie-user

telefoon registratie-user

afschrift
**2020 026**
weergave in cliëntcommunicatie
☑
bijlage
☐

geïntervenieerd
☐
geforceerd
**niet forceren (standaard)**





Bld Word 18.1

In de bijlagen bij het Belgisch Staatsblad bekend te maken kopie na neerlegging ter griffie van de akte



*18150794*

Rechtbank van Koophandel
Antwerpen

03 OKT. 2018

Griffie
afdeling ANTWERPEN

<div style="writing-mode:vertical">Bijlagen bij het Belgisch Staatsblad - 12/10/2018 - Annexes du Moniteur belge</div>

Ondernemingsnr : **0426 588 575**
**Benaming**
(voluit) : **TONY GOETZ**
(verkort) :

Rechtsvorm : **NAAMLOZE VENNOOTSCHAP**

Volledig adres v.d. zetel : **JACOB JACOBSSTRAAT 58 TE 2018 ANTWERPEN**

**Onderwerp akte** : **ONTSLAG EN BENOEMING RAAD VAN BESTUUR EN GEDELEGEERD BESTUURDER**

De Bijzondere Algemene vergadering der Aandeelhouders van 10 september 2018 heeft unaniem beslist om ontslag te geven aan alle bestuurders, te weten:

1.ALAXY BVBA, met maatschappelijke zetel te 2018 Antwrpen, Jacob Jacobsstraat 58, gekend onder het ondernemingsnummer 0478.862.274 en met vaste vertegenwoordiger WEYLER Sandra, voornoemd;
2.CG-VASTGOED INVEST NV, met maatschappelijke zetel te 2018 Antwerpen, gekend onder ondernemingsnummer 0806.408.906 en met vaste vertegenwoordiger GOETZ Alain, voornoemd.

Tot nieuwe bestuurders worden met éénparigheid van stemmen benoemd voor de wettelijke maximumtermijn van zes jaar:

1.GOETZ Sylvain, wonende te 2970 Schilde, Boerendreef 16;
2.WORLD WIDE CONSULTING BVBA, met maatschappelijke zetel te 2018 Antwerpen, Jacob Jacobsstraat 58, gekend onder het ondernemingsnummer 0478.862.175 en met vaste vertegenwoordiger GOETZ Sylvain, voornoemd.

Zij aanvaarden hun mandaat.
Er wordt bevestigd dat het mandaat van bestuurder onbezoldigd is en blijft.

De Raad van bestuur van 10 september 2018 heeft unaniem beslist om De Heer GOETZ Sylvain, voornoemd te benoemen tot gedelegeerd bestuurder, die aanvaardt. Het mandaat van gedelegeerd bestuurder is onbezoldigd.

GOETZ Sylvain
Gedelegeerd Bestuurder

Op de laatste blz. van Luik B vermelden : **Recto** : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n(en) bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen

**Verso** : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

DRC-34996 0201

# Exhibit 4

Federale
Overheidsdienst
**FINANCIEN**
THESAURIE



## Informatie over de uiteindelijke begunstigde (UBO) Industrial Refining Company

Pagina 1/2

Gedrukt door: **Luyten Bert**
**LAURIUS**
**23/09/2020**

### GEGEVENS OVER DE ENTITEIT

| | |
|---|---|
| KBO-nummer of identificator: | 0426598575 |
| Aanmaakdatum: | 28/12/1984 |
| Naam van de onderneming: | Industrial Refining Company |

| | |
|---|---|
| Status: | Normale toestand |
| Rechtsvorm: | Naamloze vennootschap |

### ADRES VAN DE ENTITEIT

| | | | |
|---|---|---|---|
| Straat: | Jacob Jacobsstraat | N°: 58 | Bus: NA |
| Postcode: | 2018 | Gemeente: Antwerpen | |
| Land: | België | | |

### AANVULLENDE INFORMATIE

| Soort | Namen | % (kapitaal) | % (vote) | Aard van de controle |
|---|---|---|---|---|
| | Industrial Refining Company | 100,000 | 100,000 | |
| | ARGOR INTERNATIONAL | 100,000 | 100,000 | Cat.1 : Stemrechten of deelneming in het kapitaal |
| | Goetz Sylvain | 75,100 | 75,100 | Cat.1 : Stemrechten of deelneming in het kapitaal |
| | Others | 24,900 | 24,900 | |

---

Dit uittreksel uit het UBO-register bevat de informatie die momenteel beschikbaar is voor de betreffende rechtspersoon of structuur. Het bevestigt op geen enkele manier de juistheid of volledigheid van de informatie met betrekking tot UBO's van de betrokken juridische entiteit of structuur.

WWW.FIN.BELGIUM.BE
THESAURIE - FEDERALE OVERHEIDSDIENST FINANCIEN    .be

# Exhibit 4



**Federale Overheidsdienst FINANCIEN**

THESAURIE




**UBO** *register*

Informatie over de uiteindelijke begunstigde (UBO) Industrial Refining Company

Pagina 2/2

**Gedrukt door:** Luyten Bert
LAURIUS
23/09/2020

## LIJST VAN DE EFFECTIEVE BEGUNSTIGDE

| UITEINDELIJKE BEGUNSTIGDE(N) | AARD VAN DE CONTROLE | NAAM VAN DE ONDERNEMING | AANVANG VAN DE CONTROLE |
|---|---|---|---|
| Goetz Sylvain | Cat.1 : Stemrechten of deelneming in het kapitaal | ARGOR INTERNATIONAL | 16/11/2006 |

 Juridische entiteit

 Andere

 Persoon/Uiteindelijke begunstigde

 Groepering van uiteindelijke begunstigden

Dit uittreksel uit het UBO-register bevat de informatie die momenteel beschikbaar is voor de betreffende rechtspersoon of structuur. Het bevestigt op geen enkele manier de juistheid of volledigheid van de informatie met betrekking tot UBO's van de betrokken juridische entiteit of structuur.

WWW.FIN.BELGIUM.BE
THESAURIE - FEDERALE OVERHEIDSDIENST FINANCIEN    .be

Change of Company Name

**Exhibit 4.** Mod PDF 18.01



**Luik B** In de bijlagen bij het Belgisch Staatsblad bekend te maken kopie na neerlegging van de akte ter griffie

| Voor-behouden aan het Belgisch Staatsblad | *20335982* |  Neergelegd 30-07-2020 Griffie |
|---|---|---|

Ondernemingsnr : **0426598575**
Naam
(voluit) **TONY GOETZ**
(verkort) **TG**
Rechtsvorm : **Naamloze vennootschap**
Volledig adres v.d. zetel **Jacob Jacobsstraat 58**
**2018 Antwerpen**

<u>Onderwerp akte :</u>    BENAMING, ONTSLAGEN, BENOEMINGEN, STATUTEN (VERTALING, COORDINATIE, OVERIGE WIJZIGINGEN)

Uittreksel afgeleverd vr registratie om neer te leggen ter griffie van de Ondernemingsrechtbank te Antwerpen, afdeling Antwerpen.
Uit een proces-verbaal verleden voor Meester Paul Wellens, notaris, met zetel te Mortsel, op 8 juli 2020, blijkt dat werd gehouden een buitengewone algemene vergadering van "TONY GOETZ" naamloze vennootschap, gevestigd te 2018 Antwerpen, Jacob Jacobsstraat 58, ingeschreven in het rechtspersonenregister te Antwerpen, afdeling Antwerpen onder het nummer BE 0426.598.575, en dat onder meer volgende besluiten werden genomen:
I. De vergadering beslist de naam van de vennootschap te wijzigen in **Industrial Refining Company**, afgekort "**IRC**"
Bijgevolg beslist de vergadering beslist om de eerste zin van Artikel 1: te vervangen door de volgende tekst:
"De vennootschap heeft de vorm van een naamloze vennootschap.
Haar naam luidt: **Industrial Refining Company**, afgekort "**IRC**".
II. In toepassing van artikel 39, §1, eerste en derde lid van de wet van 23 maart 2019 tot invoering van het WVV en houdende diverse bepalingen (1), besluit de algemene vergadering om de statuten aan te passen aan de bepalingen van het WVV.
III. Als gevolg van de voorgaande besluit, besluit de algemene vergadering volledig nieuwe statuten aan te nemen, die in overeenstemming zijn met het WVV, zonder evenwel een wijziging aan te brengen in haar voorwerp.
De algemene vergadering verklaart en besluit dat de tekst van de nieuwe statuten als volgt luidt:
**NAAM EN RECHTSVORM**
De vennootschap heeft de vorm van een naamloze vennootschap.
Haar naam luidt: **Industrial Refining Company**, afgekort "**IRC**".
Deze naam moet steeds – op alle akten, facturen, aankondigingen, bekendmakingen, brieven, orders, websites en andere stukken al dan niet in elektronische vorm, uitgaande van de vennootschap – vermeld worden, evenals de woorden 'naamloze vennootschap', in het Frans 'société anonyme', of het letterwoord 'NV', in het Frans 'SA'.
**ZETEL**
De zetel is gevestigd in het Vlaamse Gewest.
De vennootschap mag, bij besluit van haar bestuursorgaan, administratieve zetels, agentschappen, ateliers, opslagplaatsen en bijhuizen oprichten of opheffen wanneer en waar zij het nodig acht, zowel in België als in het buitenland.
**VOORWERP VAN DE VENNOOTSCHAP**
De vennootschap heeft tot voorwerp:
De groothandel in goudsmeedwerk en juwelen, diverse recuperatieproducten, meer bepaald oude juwelen, kleinhandel in goud- en zilverwerk en juwelen, oude kleren en tweedehandse goederen: meer bepaald oude juwelen.
Groothandel en kleinhandel in edele metalen en aanverwanten.
Groothandel en kleinhandel in monetair goud.

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

*Op de laatste blz. van Luik B vermelden :*    <u>Voorkant</u> : *Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen.*
<u>Achterkant</u> : *Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").*

DRC-34996 0204

# Exhibit 4 <small>Mod PDF 19.01</small>

Voorbehouden aan het Belgisch Staatsblad

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

**Luik B** - vervolg

De vennootschap kan alle handels-, financiële, industriële, roerende en onroerende verrichtingen doen die de verwezenlijking van het maatschappelijk voorwerp rechtstreeks of onrechtstreeks in de hand werken.

Zij kan door middel van inschrijving, inbreng, fusie, opslorping, samenwerking, financiële tussenkomst of afspraak deelnemen in alle andere Belgische of buitenlandse vennootschappen, instellingen of ondernemingen, zonder onderscheid, ongeacht of zij opgericht zijn of nog moeten opgericht worden, wier maatschappelijk voorwerp gelijk is, verwant, verknocht of analoog aan het hare of waarvan de deelname of samenwerking kan bijdragen tot de verwezenlijking van haar doel. Zij kan zich ten gunste van dezelfde vennootschappen borgstellen of haar aval verlenen, optreden als haar agent of vertegenwoordiger, voorschotten toestaan, kredieten verlenen, hypothecaire of andere zekerheden verstrekken.

## DUUR
De vennootschap is opgericht voor een onbepaalde duur.

## KAPITAAL VAN DE VENNOOTSCHAP
Het kapitaal bedraagt twintig miljoen euro (20.000.000 EUR), verdeeld in honderd vijfentwintig (125) aandelen met fractiewaarde.

## BESTUUR EN VERTEGENWOORDIGING
### Samenstelling van het bestuursorgaan
De vennootschap wordt bestuurd door één of meer bestuurders, natuurlijke personen of rechtspersonen, al dan niet aandeelhouder, benoemd voor ten hoogste zes jaar door de algemene vergadering van aandeelhouders. Indien zij worden benoemd in de statuten, hebben zij de hoedanigheid van statutair bestuurder en is hun mandaat van onbepaalde duur.

De bestuurders worden geacht hun mandaat onbezoldigd uit te oefenen tenzij anders bepaald in de benoemingsbeslissing van de algemene aandeelhoudersvergadering.

De bestuurder wiens mandaat een einde heeft genomen, blijft, als het aantal bestuurders daalt onder het bij de toepasselijke wettelijke bepalingen voorziene minimum, in functie tot zolang de algemene vergadering, om welke reden ook, niet in zijn vervanging voorziet.

De raad van bestuur kan onder zijn leden een voorzitter benoemen. Bij ontstentenis van benoeming of bij afwezigheid van de voorzitter wordt het voorzitterschap waargenomen door de bestuurder aangeduid onder de aanwezige bestuurders door de raad van bestuur.

### Bestuursbevoegdheid
Het bestuursorgaan is bekleed met de meest uitgebreide macht om alle handelingen te verrichten die nodig of dienstig zijn voor het bereiken van het voorwerp van de vennootschap, met uitzondering van die handelingen aan de algemene vergadering voorbehouden door de wet.

Ingeval er twee bestuurders zijn zullen zij gezamenlijk het bestuur voeren.

Indien er drie of meer bestuurders zijn, vormen deze een college, dat een voorzitter aanstelt en verder handelt zoals een raadsvergadering.

Het bestuursorgaan mag het dagelijks bestuur van de vennootschap delegeren aan één of meer (rechts)personen, al dan niet aandeelhouders. Wordt een bestuurder belast met het dagelijks bestuur dan draagt hij de titel van "gedelegeerd-bestuurder". Wordt een niet-bestuurder belast met het dagelijks bestuur dan draagt hij de titel van directeur of algemeen directeur of elke andere titel waarmee hij/zij in het benoemingsbesluit wordt aangeduid.

Het bestuursorgaan, evenals de gevolmachtigden voor het dagelijks bestuur binnen het kader van dit bestuur, mogen eveneens specifieke bevoegdheden aan één of meer personen van hun keus toekennen.

### Vertegenwoordigingsbevoegdheid van het bestuursorgaan
Het bestuursorgaan vertegenwoordigt de vennootschap jegens derden en in rechte als eiser of als verweerder. De vennootschap wordt jegens derden en in rechte als eiser of als verweerder tevens geldig vertegenwoordigd, door elke bestuurder, afzonderlijk handelend.

Binnen het kader van het dagelijks bestuur, is de vennootschap tevens geldig vertegenwoordigd door (een) gevolmachtigde(n) tot dit bestuur.

De vennootschap is bovendien, binnen het kader van hun mandaat, geldig verbonden door bijzondere gevolmachtigden.

Bovendien kan de vennootschap in het buitenland vertegenwoordigd worden door iedere persoon uitdrukkelijk daartoe aangesteld door de raad van bestuur.

## ALGEMENE VERGADERING
De gewone algemene vergadering van aandeelhouders, jaarvergadering genoemd, moet ieder jaar worden bijeengeroepen de *derde vrijdag van de maand juni om zestien (16.00) uur* .

Indien die dag een wettelijke feestdag is, wordt de vergadering op de eerstvolgende werkdag gehouden.

Te allen tijde kan een bijzondere algemene vergadering worden bijeengeroepen om te beraadslagen en te besluiten over alle aangelegenheden die tot haar bevoegdheid behoren en die een wijziging van de statuten inhouden.

*Op de laatste blz. van Luik B vermelden :*     <u>Voorkant</u> : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n
bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen

<u>Achterkant</u> : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

**Exhibit 4** Mod PDF 19.01

Voor-
behouden
aan het
Belgisch
Staatsblad

**Luik B** - vervolg

Te allen tijde kan ook een buitengewone algemene vergadering worden bijeengeroepen, om over een wijziging van de statuten te beraadslagen en te besluiten.

De gewone, de bijzondere en de buitengewone algemene vergaderingen worden gehouden in de zetel van de vennootschap, of op een andere plaats aangewezen in de oproeping.

Telt de vennootschap slechts één aandeelhouder, dan oefent hij de bevoegdheden uit die een algemene vergadering zijn toegekend. Hij kan deze niet overdragen. De beslissingen van de enige aandeelhouder die handelt als algemene vergadering worden vermeld in een register dat op de zetel van de vennootschap wordt bijgehouden.

*Bijeenroeping - Bevoegdheid - Verplichting*

Het bestuursorgaan en, in voorkomend geval, de commissaris kunnen zowel een gewone algemene vergadering als een bijzondere of een buitengewone algemene vergadering bijeenroepen. Zij moeten de jaarvergadering bijeenroepen op de bij de statuten bepaalde dag. Zij zijn verplicht de algemene vergadering binnen de drie weken bijeen te roepen wanneer aandeelhouders die een tiende van het aantal uitgegeven aandelen vertegenwoordigen, dat vragen, met ten minste de door de betrokken aandeelhouders voorgestelde agendapunten.

De oproepingen tot een algemene vergadering vermelden de agenda en geschieden door middel van een aankondiging die ten minste vijftien dagen voor de vergadering geplaatst wordt in het Belgisch Staatsblad en in een nationaal verspreid blad. Ingeval een nieuwe oproeping nodig is en de datum van de tweede vergadering werd vermeld in de eerste oproeping, moet de aankondiging voor de tweede vergadering ten minste zeventien dagen voor de vergadering geplaatst worden in het Belgisch Staatsblad en in een nationaal verspreid blad. Indien de agenda van de gewone algemene vergadering zich beperkt tot de behandeling van de jaarrekening, het jaarverslag en, in voorkomend geval, het verslag van de commissaris en de stemming over de kwijting te verlenen aan de bestuurders en, in voorkomend geval, aan de commissaris(sen), is evenwel geen aankondiging in een nationaal verspreid blad vereist. Om tot de vergadering toegelaten te worden, moeten de houders van aandelen aan toonder, uiterlijk vijf dagen voor de datum van de vergadering hun aandelen deponeren op de zetel van de vennootschap.

Op elke algemene vergadering wordt een aanwezigheidslijst bijgehouden.

*Toelating tot de algemene vergadering*

Het bestuursorgaan kan eisen dat teneinde aan de algemene vergadering te kunnen deelnemen:
- de eigenaars van aandelen op naam, ten minste vijf werkdagen vóór de datum van de algemene vergadering, het bestuursorgaan schriftelijk dienen in te lichten van hun intentie aan de vergadering deel te nemen, alsook van het aantal aandelen waarmee zij aan de stemming wensen deel te nemen.
- de eigenaars van gedematerialiseerde aandelen, ten minste vijf werkdagen vóór de datum van de algemene vergadering, op de zetel van de vennootschap op de plaatsen aangegeven in de oproeping een door de erkende rekeninghouder of door de vereffeningsinstelling opgesteld attest dienen neer te leggen, waarbij de onbeschikbaarheid van de gedematerialiseerde aandelen tot op de datum van de algemene vergadering wordt vastgesteld.
Bestuurders en commissarissen zijn vrijgesteld van deze formaliteit.

*Stemrecht*

Elk aandeel geeft recht op één stem.

*Buitengewone algemene vergadering - Statutenwijziging*

De buitengewone algemene vergadering moet worden gehouden ten overstaan van een notaris. Zij kan over een voorgestelde statutenwijziging slechts dan op rechtsgeldige wijze beraadslagen en besluiten, wanneer de aanwezige of vertegenwoordigde aandeelhouders ten minste de helft van het kapitaal vertegenwoordigen.

Is de laatste voorwaarde niet nageleefd, dan is een tweede bijeenroeping nodig en de nieuwe vergadering beraadslaagt en besluit op geldige wijze, ongeacht het door de aanwezige of vertegenwoordigde aandeelhouders vertegenwoordigde deel van het kapitaal.

Een wijziging is alleen dan aangenomen, wanneer zij drie/vierde van de uitgebrachte stemmen heeft verkregen, waarbij onthoudingen in de teller noch in de noemer worden meegerekend.

*Notulen van de algemene vergadering*

De notulen van een algemene vergadering worden ondertekend door de leden van het bureau en door de aandeelhouders die erom verzoeken; kopieën voor derden worden ondertekend door één of meer vertegenwoordigingsbevoegde leden van het bestuursorgaan.

**BOEKJAAR**

Het boekjaar van de vennootschap gaat in op *1 januari en eindigt op 31 december* van het zelfde jaar.

**BESTEMMING VAN DE WINST**

Jaarlijks houdt de algemene vergadering een bedrag in van ten minste een twintigste van de nettowinst voor de vorming van een reservefonds; de verplichting tot deze afneming houdt op wanneer het reservefonds een tiende van het kapitaal heeft bereikt.

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

*Op de laatste blz. van Luik B vermelden :*    *Voorkant* : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n
bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen

*Achterkant* : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

# Exhibit 4
Mod PDF 19.01

**Voor-behouden aan het Belgisch Staatsblad**

**Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge**

**Luik B** - vervolg

Het saldo staat ter beschikking van de algemene vergadering, die ieder jaar over zijn aanwending zal beslissen.

## ONTBINDING - VEREFFENING

### Verliezen

Wanneer ten gevolge van geleden verlies het netto-actief gedaald is tot minder dan de helft van het kapitaal, moet het bestuursorgaan de algemene vergadering oproepen tot een vergadering, te houden binnen twee maanden nadat het verlies is vastgesteld, of krachtens wettelijke of statutaire bepalingen had moeten worden vastgesteld, om te beraadslagen en te besluiten over de ontbinding van de vennootschap of over in de agenda aangekondigde maatregelen om de continuïteit van de vennootschap te vrijwaren. Tenzij het bestuursorgaan de ontbinding van de vennootschap voorstelt, zet het in een bijzonder verslag uiteen welke maatregelen het voorstelt om de continuïteit van de vennootschap te vrijwaren. Dat verslag wordt in de agenda vermeld en vijftien dagen vóór de algemene vergadering op de zetel van de vennootschap ter beschikking van de aandeelhouders gesteld.

Op dezelfde wijze wordt gehandeld wanneer het netto-actief ten gevolge van geleden verlies gedaald is tot minder dan een/vierde van het kapitaal, met dien verstande dat de ontbinding plaatsheeft wanneer zij wordt goedgekeurd door een vierde van de uitgebrachte stemmen, waarbij onthoudingen in teller noch in de noemer worden meegerekend.

Wanneer het netto-actief is gedaald tot beneden eenenzestigduizend vijfhonderd euro (€ 61.500,00), kan iedere belanghebbende of het openbaar ministerie de ontbinding van de vennootschap voor de rechtbank vorderen. In voorkomend geval kan de bevoegde ondernemingsrechtbank aan de vennootschap een bindende termijn toestaan om haar toestand te regulariseren.

### Ontbinding

De vennootschap kan op elk moment ontbonden worden door beslissing van de algemene vergadering, met inachtneming van de vereisten voor statutenwijziging.

### Onmiddellijke sluiting van de vereffening

Een ontbinding en de sluiting van de vereffening in één akte zijn mogelijk onder de voorwaarden van artikel 2:80 WVV.

### Benoeming van vereffenaars

Zijn er geen vereffenaars benoemd of aangewezen, dan worden de bestuurders die op het tijdstip van de ontbinding in functie zijn, ten aanzien van derden van rechtswege als vereffenaars beschouwd. De algemene vergadering van de ontbonden vennootschap kan te allen tijde en bij gewone meerderheid van stemmen, één of meer vereffenaars benoemen, of ontslaan. Enkel indien uit de staat van actief en passief opgemaakt overeenkomstig artikel 2:71, § 2, tweede lid WVV, blijkt dat niet alle schuldeisers volledig kunnen worden terugbetaald, moet de benoeming van de vereffenaars in de statuten of door de algemene vergadering aan de voorzitter van de bevoegde ondernemingsrechtbank ter bevestiging worden voorgelegd. Deze bevestiging is evenwel niet vereist indien uit die staat van actief en passief blijkt dat de vennootschap enkel schulden heeft ten aanzien van haar aandeelhouders en alle aandeelhouders die schuldeiser zijn van de vennootschap schriftelijk bevestigen akkoord te gaan met de benoeming.

### Verdeling netto-actief

Onverminderd de rechten van de bevoorrechte schuldeisers, betaalt de vereffenaar alle schulden naar evenredigheid en zonder onderscheid tussen opeisbare en niet opeisbare schulden, onder aftrek, wat deze betreft, van het disconto.

Indien uit die rekeningen blijkt dat niet alle schuldeisers integraal kunnen worden terugbetaald, legt de vereffenaar vooraleer de vereffening wordt gesloten, bij eenzijdig verzoekschrift overeenkomstig de artikelen 1025 en volgende van het Gerechtelijk Wetboek het plan voor de verdeling van de activa onder de verschillende categorieën schuldeisers ter goedkeuring voor aan de bevoegde ondernemingsrechtbank.

Deze verplichting tot het ter goedkeuring voorleggen van het plan van verdeling aan de rechtbank geldt niet wanneer de schuldeisers die niet integraal werden terugbetaald, aandeelhouders van de vennootschap zijn en al deze aandeelhouders schriftelijk akkoord gaan met het plan van verdeling en afstand doen van het voorleggen van het plan van verdeling.

Na betaling van de schulden en van alle kosten van de vereffening, of consignatie van de nodige gelden om die te voldoen, en, indien er aandelen zijn die niet zijn volgestort, na herstelling van het evenwicht tussen de aandelen, hetzij door bijkomende volstorting te eisen lastens de niet voldoende volgestorte aandelen, hetzij door voorafgaandelijke terugbetalingen te doen in voordeel van de aandelen die in een grotere verhouding zijn volgestort, verdeelt de vereffenaar onder de aandeelhouders de gelden of waarden die gelijk verdeeld kunnen worden; hij overhandigt hun de goederen die hij voor nadere verdeling heeft moeten overhouden. Het te verdelen actief wordt verdeeld onder alle aandeelhouders naar verhouding van het aantal aandelen dat zij bezitten en de goederen die nog in natura voorhanden zijn worden op dezelfde wijze verdeeld.

IV. De algemene vergadering besluit de opdracht te geven aan de ondergetekende notaris om de

---

*Voorkant* : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n
bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen

*Achterkant* : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

DRC-34996 0207

# Exhibit 4
Mod PDF 19.01

Voor-
behouden
aan het
Belgisch
Staatsblad

**Luik B**  - vervolg

coördinatie van de statuten op te maken en te ondertekenen, in overeenstemming met het vorige besluit, en de neerlegging daarvan in het vennootschapsdossier te verzorgen.

**V.** De algemene vergadering verklaart dat het adres van de zetel is gevestigd te *2018 Antwerpen, Jacob Jacobsstraat 58.*

**VI.** De algemene vergadering besluit de bestuurder, hierna vermeld, ontslag te geven uit zijn functie: de besloten vennootschap **WORLD WIDE CONSULTING**, met zetel te 2018 Antwerpen, Jacob Jacobsstraat 56, vertegenwoordigd door haar vaste vertegenwoordiger de heer Goetz Sylvain.

De vergadering verleent, door een bijzondere stemming, volledige en algehele kwijting aan de ontslagnemende bestuurder voor het mandaat uitgeoefend in het maatschappelijk jaar begonnen op 1 januari 2020 tot op heden.

VOOR ONTLEDEND UITTREKSEL (get.) notaris Paul Wellens

Tegelijk hiermee neergelegd:

Afschrift van het proces-verbaal

Gecoördineerde statuten

Bijlagen bij het Belgisch Staatsblad - 03/08/2020 - Annexes du Moniteur belge

Op de laatste blz. van Luik B vermelden :

*Voorkant* : Naam en hoedanigheid van de instrumenterende notaris, hetzij van de perso(o)n bevoegd de rechtspersoon ten aanzien van derden te vertegenwoordigen

*Achterkant* : Naam en handtekening (dit geldt niet voor akten van het type "Mededelingen").

DRC-34996 0208

Exhibit 4

# Annex P

DRC-34996 0209

# Exhibit 4

TELEGRAMS "ADMINISTER"
DIRECT LINES
MINISTER S OFFICE          041-343101
SOLICITOR GENERAL S OFFICE  041-343941
UNDER SECRETARY S OFFICE    041-342261
AG DIRECTOR CIVIL LITIGATION 041-231706
GENERAL LINES              041-230518 9
Fax                        041-254829
Fax  Civil Litigation       041-345100

In any correspondence on ADM7/212/01



**ATTORNEY GENERAL'S CHAMBERS**
**P O BOX 7183,**
**Kampala, Uganda**

26th March, 2019

The Commandant,
Police Minerals Protection Unit,
P.O. Box 7183
Entebbe.

## RE: PRELIMINARY REPORT ON THE ALLEGED SUSPECTED SMUGGLED GOLD BY AFRICAN GOLD REFINERY (AGR) VIDE GEF 01/2019.

Reference is made to your letter dated 21st March, 2019 in which you forwarded to me a preliminary investigation report dated 19th March, 2019 in relation to the above subject matter, for my advice as per H.E the President's directive on 20th March, 2019 at Kyankwazi on the above matter.

As instructed by H.E the President on 25th March, 2019, at State House Entebbe, I advise you as follows;

I gather from your report that you received intelligence information about suspected gold smuggled into Uganda from Venezuela by African Gold Refinery Ltd (AGR), which is alleged to have occurred between 2nd and 4th March, 2019.

African Gold Refinery Ltd operates as a bonded ware house with License No. WO408 under the East African Customs Management Act, 2004 (EACMA). Under section 48 of the EACMA, bonded warehouses may be exempted from payment of duty on first importation into the bonded warehouse. Pursuant to the Directive of H.E the President dated 26th April 2017 Reference P0/1, communicated to Ministry of Energy and Mineral Development and the letter from Uganda Revenue Authority (URA) to AGR dated 5th June 2018, Reference CUST/T/3/16, Government granted AGR bonded facility exemption from import duty in accordance with section 164 Part XIII of the East African Community Customs Management Act, 2004.

Accordingly, URA granted clearance of the two consignments on 1st March 2019 ad 4th March 2019 respectively in line with the exemption already granted by Government and also issued release orders for the

DRC-34996 0210

# Exhibit 4

consignments. This is also in line with section 117(2) of the Mining Act 2003 that requires an importer of minerals to make a declaration to a customs officer of minerals imported into the country. This, in my opinion dispels the suspicion of smuggling.

In light of the above, you are directed to withdraw your officers deployed at AGR premises and release any gold that may have been seized or impounded during this investigation.

Concerning the current sanctions imposed by the United States Government on Venezuela, in view of the principle of comity, by copy of this letter, AGR is instructed henceforth, save for the gold comprising of the consignments that have been the subject of investigation, cease and desist from any further importation of gold from Venezuela, until further notice.

William Byaruhanga, SC
**ATTORNEY GENERAL**

Cc: The Principal Private Secretary to H.E the President (for onward transmission to H.E the President)

Cc: The Hon. Deputy Attorney General

Cc: The Inspector General of Police

Cc: The Chief Executive Officer, African Gold Refinery Ltd

DRC-34996 0211

**Exhibit 5**



655 15th St., NW
Suite 420
Washington, D.C. 20005
Tel. 202-280-6370
Fax. 877-448-4885

February 28, 2023

**SENT VIA EMAIL (OFAC.Reconsideration@treasury.gov)**

Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
Freedman's Bank Building
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

Re:   **SDN Delisting Petition Supplement—Executive Order 13413, as amended**[1]
      *Alain Goetz—DRC-17840*

Dear Petitions Coordinator:

On March 17, 2022, Alain Goetz submitted a request to the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") to stay any sanctions action under consideration targeting him. That submission included arguments and documentation negating certain allegations raised in media reporting that Goetz believed may have been considered and/or relied upon by OFAC in a designation action against him. Despite this, OFAC designated Goetz that same day under Executive Order ("E.O.") 13413, as amended, and included his name in OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").[2]

On April 29, 2022, Goetz filed a lawsuit challenging OFAC's decision to designate him under E.O. 13413, as amended, due to OFAC's failure to consider Goetz's March 17, 2022 submission prior to designating him.[3] On December 6, 2022, in response to the litigation, OFAC notified undersigned counsel that it will treat Goetz's March 17, 2022 submission as a request for delisting under 31 C.F.R. § 501.807, rather than a request for stay of designation.

---

[1] Because this submission contains business information and other information of a sensitive nature, undersigned counsel requests that OFAC treat this correspondence as confidential. If OFAC believes that it is required to release this document or information contained in it to the public pursuant to the Freedom of Information Act or any other law, please notify undersigned counsel as soon as possible.

[2] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Alain Goetz and a Network of Companies Involved in the Illicit Gold Trade* (March 17, 2022), https://home.treasury.gov/news/press-releases/jy0664.

[3] *Goetz v. Gacki et al.*, No. 1:22-cv-01204-JEB.

DRC-34996 0212

# Exhibit 5

In accordance with the case processing schedule that OFAC and Goetz agreed to in the aforementioned litigation, Goetz provides this timely submission containing additional arguments and information to further support his initial request for stay of designation which OFAC is now treating as a petition for removal.[4]

## I.    Procedural Background

On January 31, 2023, OFAC disclosed the administrative record upon which Goetz's designation under E.O. 13413, as amended, was based. In designating Goetz, OFAC made three determinations in support of its designation action:

1) Goetz is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of Congo ("DRC") or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC;

2) Goetz is a leader of African Gold Refinery Limited ("AGR"), an entity whose property and interests in property are blocked under E.O. 13413, as amended; and

3) Goetz has acted or purported to act for or on behalf of, directly or indirectly, AGR.

With respect to the first determination, OFAC concluded that:

a. Goetz incorporated AGR in 2014, has directly or indirectly owned AGR since then, was [redacted] and/or chief executive officer of AGR until at least [redacted] and was involved in AGR's gold trading activities until at least 2017;

b. AGR has engaged in the illicit trade in gold of the DRC since at least 2016, and Goetz was involved in AGR's activities;

c. Through his involvement in AGR, Goetz is responsible for or complicit in, or has engaged in, directly or indirectly, support to Mai-Mai Yakutumba, Raia Mutomboki, and [redacted] through the illicit trade in gold of the DRC;

d. Mai-Mai Yakutumba, Raia Mutomboki, [redacted] and DRC rebel groups, are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC; and

---

[4] *See also* 31 C.F.R. § 501.807.

DRC-34996 0213

# Exhibit 5

e. Goetz is responsible for or complicit in, or has engaged in, directly or indirectly, support to other DRC rebel groups that are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC.

With respect to the second and third determinations, the unredacted portions of the evidentiary memorandum do not reveal whether OFAC made any additional conclusion(s) related to the respective determinations.

As noted above, on March 17, 2022, Goetz submitted a request that OFAC stay any designation action against him as the information and documents in that submission would rebut any allegations of sanctionable conduct. That request further noted that, in any event, the circumstances supporting such a designation are no longer applicable insofar as Goetz is no longer a shareholder nor otherwise involved in AGR's management at any level.

## II.    **Legal Background**

### A.    *Executive Order 13413, as Amended and the Democratic Republic of the Congo Sanctions Regulations*

In relevant part, E.O. 13413, as amended by E.O. 13671, imposes sanctions and blocks persons determined: (1) to be responsible for or complicit in, or to have engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC; (2) to be a leader of an entity whose property and interests in property are blocked under the Order; and (3) to have materially assisted, sponsored, or provided financial, material, logistical, or technological support for, or goods or services in support of, a person whose property and interests in property are blocked under the Order.[5]

Under the Democratic Republic of the Congo Sanctions Regulations ("DRCSR"), 31 C.F.R. Part 547, which in part implement E.O. 13413,[6] persons listed in or designated under E.O. 13413, as amended, are identified on OFAC's SDN List with the identifier "[DRCONGO]."[7] The DRCSR also incorporates the procedures of Part 501 governing delisting from OFAC's SDN List; thus, persons blocked under the DRCSR may seek administrative reconsideration of their status as blocked persons pursuant to 31 C.F.R. § 501.807.[8]

---

[5] E.O. 13671; E.O. 13413 Sec. 1(a).
[6] 74 Fed. Reg. 25441 (May 28, 2009).
[7] Note 1 to 31 C.F.R. § 547.201(a).
[8] 31 C.F.R. § 547.101; Note 3 to 31 C.F.R. § 547.201.

3

# Exhibit 5

### B.     Procedures Governing Delisting from the SDN List

OFAC promulgates and administers procedures by which persons blocked pursuant to its regulations and identified on the SDN List may seek the rescission of their designation and their removal from the SDN List.[9] These procedures contemplate three avenues to petition for removal: (1) "submit arguments or evidence that the person believes establishes that [an] insufficient basis exists for the designation"; (2) "assert that the circumstances resulting in the designation no longer apply"; and (3) "propose remedial steps . . . which the person believes would negate the basis for designation."[10] Examples of such steps include corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps that would negate the basis for the designation.[11]

When considering a petition for removal based on a change of circumstances, OFAC's regulations require it to consider whether the circumstances leading to the designation "continue to apply," regardless of whether the legal basis for designation has been negated.[12] Therefore, if a designee petitions for removal based on an asserted change of circumstances, OFAC cannot deny the delisting petition on the basis of prior conduct alone—even where such prior conduct satisfies the executive order's designation criteria. Rather, OFAC must still determine whether the circumstances which led to the designee's designation continue to apply; and in issuing a denial OFAC must sufficiently explain why it determined that the circumstances continue to exist.[13]

As part of the delisting process, OFAC reviews the information and arguments submitted by the designated person and may seek clarifying, corroborating, or other additional information relevant to its consideration of the delisting petition.[14] Following review of the delisting request and additional information provided in response to any questionnaires, OFAC will provide a written decision to the designated person.[15]

### C.     Terms of Removal Agreements

OFAC commonly enters into Terms of Removal Agreements ("TOR") with parties seeking delisting which memorialize certain remedial steps undertaken by the party seeking delisting in exchange for removal from the SDN List. These agreements allow OFAC to achieve its objectives

---

[9] 31 C.F.R. § 501.807.

[10] *Id.*

[11] *Id.*

[12] *See id.*

[13] *See* 5 U.S.C. § 555(e) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.").

[14] 31 C.F.R. § 501.807(b).

[15] 31 C.F.R. § 501.807(d).

4

Exhibit 5

with respect to the designation by effecting a change in circumstances, consistent with OFAC's regulations and past practices.

For example, OFAC has entered into a Terms of Removal Agreement with En+ Group, an entity previously designated under E.O. 13661 and E.O. 13662. En+ Group's terms of removal included ongoing auditing, reporting, and certifications by En+ Group to OFAC.[16] Separately, OFAC has also entered into a Terms of Removal Agreement with parties designated under other sanctions programs, including, for example, under E.O. 13382, such as with Deutsche Forfait, a German company. In exchange for the rescission of its designation, Deutsche Forfait agreed to: (1) refrain from business relations or other connections from SDNs; (2) ensure that its shareholders do not maintain business relations or other connections with SDNs; and (3) implement a U.S. sanctions compliance program.[17]

### D.    OFAC Guidance and Policy Statements

The U.S. Department of the Treasury has consistently stated that sanctions are used to change behavior.[18] Indeed, OFAC has often explained that the effectiveness and integrity of its sanctions derive, at least in part, from its willingness to remove persons from the SDN List, and that "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."[19] OFAC's Associate Director of Targeting has also indicated that sanctions are used to address "ongoing or imminent threats" and that sanctions are used judiciously to "ensure the integrity of sanctions, to not harm the innocent, and to ensure that sanctions are reversible and [OFAC] swiftly delist[s] people from sanctions when the legal basis no longer applies."[20]

---

[16] En+ Group Press Release, *En+ Group Announces its Removal from OFAC's SDN List* (Jan. 28, 2019), https://enplusgroup.com/en/media/news/press/en-group-announces-its-removal-from-ofac-s-sdn-list/.

[17] *See Unblocking of Two Entities Blocked Pursuant to Executive Order 13382 of June 28, 2005 and Updating the Listing of One Individual Blocked Pursuant to Executive Order 13382 of June 28, 2005*, 79 Fed. Reg. 64013 (Oct. 27, 2014), https://www.federalregister.gov/documents/2014/10/27/2014-25462/unblocking-of-two-entities-blocked-pursuant-to-executive-order-13382-of-june-28-2005-and-updating; Deutsche Forfait Press Release, *DF Deutsche Forfait AG Removed from OFAC Sanctions List Without Having to Pay a Fine* (Oct. 17, 2014).

[18] *See e.g., The Treasury 2021 Sanctions Review*, October 2021, pg. 4, https://home.treasury.gov/system/files/136/Treasury-2021-sanctions-review.pdf.

[19] U.S. Dep't of the Treasury, Office of Foreign Assets Control, *Filing a Petition for Removal from an OFAC List*, http://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list; Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Alain Goetz and a Network of Companies Involved in the Illicit Gold Trade* (March 17, 2022), https://home.treasury.gov/news/press-releases/jy0664.

[20] EUROPOL, *Cooperating at an Int'l Level in Protecting Communities from Organised and Serious Crime* (Apr. 12, 2022), https://www.youtube.com/watch?v=YFPie-d9_FY.

DRC-34996 0216

# Exhibit 5

### III.    **Basis for Delisting**

In addition to the information presented in Goetz's March 17, 2022 submission, Goetz asserts that there is an insufficient basis for his designation insofar as OFAC has not alleged sanctionable conduct by Goetz in the evidentiary memorandum with respect to dealing in conflict gold with rebel groups in the DRC. Second, Goetz offers a separate, alternative argument by proposing remedial measures which, if adopted, would negate the basis for his designation under E.O. 13413, as amended.

### A.    *Insufficient Basis for Designation*

Goetz asserts that there is an insufficient basis for his designation with respect to the OFAC's determination that Goetz is" responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the DRC."

First, the administrative record disclosed to Goetz fails to specify conduct linking Goetz to rebel groups purportedly operating in the DRC; which therefore does not afford Goetz a meaningful opportunity to rebut OFAC's allegations. Indeed, OFAC does not tie Goetz to any conduct with respect to those groups, much less allege any ongoing conduct by Goetz; and many of the exhibits that OFAC relied upon in the designation action do not even mention Goetz. Instead, OFAC attributes purported sanctionable conduct by one party (AGR) to Goetz without showing how Goetz himself was involved in that activity.

A prime example of this is Conclusion #3—i.e., that through his involvement in AGR, Goetz is responsible for or complicit in, or has engaged in, directly or indirectly, support to Mai-Mai Yakutumba, Raia Mutomboki, and [redacted] through the illicit trade in gold of the DRC. The findings disclosed in support of that conclusion make no reference to Goetz specifically. Additionally, Conclusion #4—i.e., that Mai-Mai Yakutumba, Raia Mutomboki, [redacted] and DRC rebel groups, are involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC—fails to make any reference to Goetz or conduct by Goetz. As no links are established between the information in those paragraphs and the conclusions they purportedly support, OFAC's determinations are merely conclusory statements which fail to link any facts to the conclusion asserted.

Second, with respect to all three determinations, much of OFAC's evidence linking Goetz to AGR is "until at least 2017" or "as of 2017." In other words, OFAC's findings and conclusions are based on sources that describe alleged activities until 2017, which calls into question OFAC's fact-finding procedures as to how OFAC gathered and assessed the information underlying

6

# Exhibit 5

Goetz's designation under E.O. 13413, as amended. Indeed, and along the same lines, a significant amount of the sourcing is from 2018 or before. For those sources published after 2018 (e.g., The Sentry's February 2021 report), they are unreliable as Goetz had already sold his shares in AGR and was no longer involved in the company's management by that point in time.

Furthermore, OFAC does not evidence any ongoing conduct by Goetz nor provide supporting documents demonstrating that Goetz currently owns or controls AGR, thereby negating Determination #2—that Goetz is a leader of AGR. As previously evidenced, Goetz divested from AGR in February 2018 and resigned as the company's CEO in November 2018—over three years before his designation. Furthermore, Goetz further distanced himself from AGR thereafter by resigning as a director in January 2019;[21] divesting from AGR International (Seychelles) on June 7, 2021—over nine months before his designation;[22] and resigning from his position in AGR International (Seychelles) the same day.[23] The fact that OFAC did not update its information regarding Goetz's links to AGR demonstrates that OFAC's fact-finding procedures in this matter were inadequate and rendered an insufficient basis for the determination underlying Goetz's designation under E.O. 13413, as amended.

In short, OFAC relied upon outdated evidence to support its designation against Goetz without any attempt to update, corroborate, or verify the information. Further, as OFAC's findings and conclusions do not link Goetz to sanctionable conduct with rebel groups in the DRC, there was and remains an insufficient basis to designate him under E.O. 13413, as amended. Accordingly, OFAC should reconsider its designation action against Goetz, rescind his designation, and remove his name from the SDN List.

## B.    *Proposed Terms of Removal*

As an alternative basis for rescission of his designation and removal from the OFAC SDN List, Goetz proposes the following remedial measures for OFAC's consideration which would negate the bases for his designation, and could be incorporated into a TOR:[24]

1.  Within 30 days of the execution of a TOR, and annually thereafter for a period of five years, Goetz will provide documentation evidencing his current sources of income, including pension payments, dividend payments, revenue generated from real estate investments, and any other sources of income;

---

[21] Annex A- Resignation from AGR BoD.

[22] Annex B-Share Transfer AGR Intl.

[23] Annex C-Resignation from AGR Int'l Letter.

[24] By proposing remedial measures, Goetz makes no representation regarding the validity of OFAC's allegations about him nor the factual bases it relied upon to designate him. Goetz is open to considering any additional terms or conditions that would merit the recission of his designation under E.O. 13413, as amended.

7

# Exhibit 5

2. Within 30 days of the execution of a TOR, and annually thereafter for a period of five years, Goetz will provide documentation identifying entities that he owns or controls, irrespective of whether said entities are generating income for Goetz or not. Goetz will also provide the names, addresses, line of business, percentage of ownership interest (if applicable), and details regarding his role in each entity to the extent that he is on the board, manages, and/or serves as an advisor for the entity;

3. Within 30 days of the execution of a TOR and annually thereafter, starting one year after removal from the SDN List and for a period of five years, Goetz will provide OFAC with certification that Goetz is not engaged in any sanctionable dealings, either independently or with any persons (meaning individual or entities) on the SDN List, and any person that is owned or controlled by, or acts for or on behalf of, any person on the SDN List, and any person whose property and interest in property are blocked under any U.S. sanctions laws;

4. Within 30 days of the execution of a TOR and annually, starting one year after removal from the SDN List and for a period of five years, Goetz will provide OFAC with certification that he is not in violation of, and will not engage in any violation of, any applicable U.S. sanctions or anti-money laundering laws, Executive Orders, and regulations;

5. Within 30 days of the execution of a TOR and annually, starting one year after removal from the SDN List and for a period of five years, Goetz will provide OFAC with certification that he is not acting for or on behalf of any person on the SDN List or any entity that is owned or controlled by a person on the SDN List;

6. Goetz will undergo a sanctions audit on an annual basis for a period of five years by an independent third party, which would be scoped to review his personal finances (bank account statements) and those of the companies that he owns or controls, and provide the results of the audits to OFAC;

7. Within 30 days of the execution of a TOR, and annually thereafter for a period of five years, Goetz will provide documentation of all senior management positions, advisory roles, or board seats held by Goetz starting from the time of the execution of the TOR, including the name, description, address, and corporate registration number of each entity, as well as a description of Goetz's relationship to or position in each entity and employment-related contracts;

DRC-34996 0219

# Exhibit 5

8. Effective immediately following the execution of a TOR and for a period of five years following removal from the SDN List, if Goetz intends to register, operate, or work for a business or entity; or otherwise intends to be similarly affiliated with the management, administration, or operational activities of a business or entity, including but not limited to membership on the board of directors or an advisory board of any entity, Goetz will immediately notify OFAC prior to engaging in any such activity;

9. To the extent permitted by relevant law, including legal requirements local to the jurisdiction in which the business or entity is domiciled, Goetz will implement and provide the internal procedures on compliance with the laws and regulations administered by OFAC and other applicable anti-money laundering authorities, that will be used to screen employees, customers, and vendors/suppliers for any business he owns or controls. Goetz will also provide the name, title, phone numbers, email address, date of birth, address, and business units of the persons responsible for implementation of any compliance programs for any business or entity that Goetz owns or controls, or has an ownership interest in. Goetz will provide a copy of all compliance manuals and training materials for any business or entity that Goetz owns or controls, or has an ownership interest in;

10. Goetz will, annually, for a period of five years from execution of a TOR, provide OFAC will all operational reports and documents including municipal registration, meeting minutes, records related to income and expenses, and a list of supplier and customer names for all businesses or entities that he owns or controls, or has an ownership interest in;

11. Effective immediately following the execution of a TOR and for a period of five years following removal from the SDN List, if Goetz conducts transactions or facilitates any transactions with a person on the SDN List or an entity owned or controlled by a person on the SDN List, or later discovers that he conducted or facilitated such transactions, Goetz will provide the names, addresses, phone numbers, email address, and date of birth of all parties involved in the transactions and a description of the relationships between or among those parties, how the transactions were authorized, and provide the names, titles, emails, dates of birth, and business units of all individuals who authorized and facilitated the transactions. If the transactions were not authorized, Goetz agrees to explain the circumstances regarding how the transactions took place. If there are no such transactions or facilitation of transactions, Goetz agrees to provide a certified statement of this fact;

12. Within 30 days of the execution of a TOR, Goetz will provide written certification that he will fully and expeditiously respond to any request for information from OFAC

9

# Exhibit 5

regarding compliance with the TOR and/or general compliance with sanctions regulations for a five-year period following Goetz's removal from the SDN List. If OFAC contacts Goetz or appointed representative, Goetz will expeditiously develop an accurate and truthful response and submit that response to OFAC within 30 days;

13. Goetz will provide OFAC with a full and complete list of the sources of gold for the companies in which he maintains a majority interest or controls, including the names of suppliers and corresponding KYC procedures and other intake paperwork upon request within 30 days of such request; and

14. Goetz will undergo an annual audit by an independent third party to ensure that the policies and procedures in the companies in which he maintains a majority interest or controls conform to nationally and internationally recognized due diligence frameworks, such as the Organization for Economic Cooperation and Development ("OECD") Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas.

In exchange for these measures, Goetz requests that OFAC remove him from the SDN List; to not simultaneously re-designate him under another sanctions authority; and not impose any sanctions consequences against non-U.S. persons for their involvement in transactions ordinarily incident to execution of these remedial measures.

Consistent with OFAC's Procedures Governing Delisting from the Specially Designated Nationals and Blocked Persons List and OFAC's guidance on seeking removal from an OFAC List, these proposed remedial measures would demonstrate that the bases for Goetz's designation have been negated. As a result, the adoption and execution of these remedial measures would warrant the rescission of Goetz's designation under E.O. 13413, as amended.

For instance, by refraining from engaging in sanctionable dealings these measures will ensure that Goetz does not maintain any direct or indirect ownership interest in, or hold any position, formal or otherwise, including consulting and promoting roles, with AGR. Further, providing OFAC with a full and complete list of sources of gold for the companies that he owns or controls, will allow OFAC to verify that gold sourced by any of the companies that Goetz owns or controls is not sourced from rebel groups in the DRC. Moreover, under these measures the companies that Goetz owns and controls will enhance their due diligence policies and procedures in accordance with internationally recognized standards, which will ensure that his companies are transparent and are able to identify and trace gold at all levels of the supply chain.

In addition, the proposed remedial measures would provide transparency over Goetz's activities and finances—both personal and those of his current and future companies. Indeed,

10

# Exhibit 5

OFAC would receive extensive information and documentation of his sources of income and information and documentation of entities he owns and controls as result of these remedial measures. Finally, implementing sanctions compliance policies and procedures to include screening employees, customers, and vendors/suppliers against OFAC's SDN List would ensure compliance with U.S. sanctions by those otherwise outside of U.S. jurisdiction, in furtherance of U.S. policy goals.

In sum, the remedial measures proposed by Goetz would ensure that OFAC has a means to both identify and trace Goetz's business activities, and to evidence that no support or assistance would be provided, directly or indirectly, to rebel groups dealing in conflict gold in the DRC. Moreover, these proposed remedial measures contain reporting requirements that would allow OFAC to monitor Goetz's activities to ensure that these remedial measures are implemented, and that he is not engaged in sanctionable conduct now or in the future.

Goetz's proposal to enter into a TOR that would memorialize these aforementioned remedial measures would also be consistent with OFAC's regulations and past practices and demonstrates the effectiveness of U.S. sanctions. Accordingly, the removal of his name from the OFAC SDN List would serve as a prime example of how OFAC swiftly removes blocked persons from the SDN List when parties conform their behavior in line with the United States' policy goals.

## IV.    **Conclusion**

For the reasons above, and those detailed in his March 17, 2022 submission, Goetz asserts that there is an insufficient basis for his designation; but even if the allegations are accepted as true—they are not—the basis for his designation no longer exists due to a change in the circumstances giving rise to his designation. In any event, Goetz has proposed remedial measures that would further reinforce his commitment to not engaging in any sanctionable conduct, and provide OFAC assurances that he is not engaged in such conduct. Accordingly, OFAC is respectfully requested to rescind Goetz's designation under E.O. 13413, as amended, and remove his name from the SDN List or agree to a TOR that will lead to the removal of his designation.

Please forward all correspondence relating to this request to:

Erich C. Ferrari
Ferrari & Associates
655 15th St., NW
Suite 420
Washington, D.C. 20005
Email: ferrari@falawpc.com

11

# Exhibit 5

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

DRC-34996 0223

Exhibit 5

# Annex

# A

DRC-34996 0224