Exhibit 5

**THE REPUBLIC OF UGANDA**

CERTIFIED TRUE COPY

**IN THE MATTER OF THE COMPANIES ACT CAP 1/2012**

URSB

**AND**

**IN THE MATTER OF AFRICAN GOLD REFINERY LIMITED** MAR 2020

Tumwine Anita
**REGISTRAR**

**SPECIAL RESOLUTION**

Minutes of the meeting of African Gold Refinery Limited held on 10th day of January, 2019 at the office of the company, wherein the following were present: Alain Goetz and Cherry Ann Dacdac Mandia. And their being requisite quorum the proceedings of the meeting commenced.

i.   The meeting commenced with the appointment of new directors in the company, Mr. Majd Mohammed Abdulaziz Mousa and Mr. Nasser Ibrahim Mousa Al Hindi. As such Mr. Alain Goetz ceases to be a director in the company.

ii.  By unanimous approval it was agreed that his name be deleted to reflect the current directors in the company for the efficient management of the company.

iii. There being no other business the meeting was closed with a vote of thanks to the chair.

DATED at Kampala this 10th day of January 2019

**ALAIN GOETZ**
**DIRECTOR**

**CHERRY ANN DACDAC MANDIA**
**DIRECTOR**

Drawn & filed by
Tem Advocates & Solicitors
Plot 11A, Acacia Avenue Kololo
P.O. Box 6800 Kampala.

DRG-34998.0225

Exhibit 5

# Annex

# B

DRC-34996 0226

# Exhibit 5

## CERTIFICATE OF AUTHENTICITY

I, the undersigned **Mr. Sammy Freminot** Notary Public by authority of Government duly admitted and sworn and practising at Anse Royale, Mahé, Republic of Seychelles do hereby certify in respect of the attached originals listed below pertaining to the company **AGR International Ltd.,** Certificate Nº: **200304,** as follows:

> ➤ Certificate of Incumbency dated 7th day of July 2021, is signed by Ms. Rea Barreau who is known to me;

> ➤ Certificate of Good Standing dated 7th day of July 2021, issued by the Financial Services Authority;

**IN FAITH AND TESTIMONY WHEREOF** an Act being required, I have granted the same under my hand and seal of office to serve and avail as occasion may require.

**THUS DONE AND PASSED** at Victoria on this 19th day of July 2021.

.......................................

r. Sammy Freminot
OTARY PUBLIC

DRC-04996 0227

Exhibit 5

## APOSTILLE

### (Convention de la Haye du 5 Octobre 1961)

1.  Country:     REPUBLIC OF SEYCHELLES

    This public document

2.  has been signed by        S. FREMINOT

3.  acting in the capacity of    NOTARY

4.  bears the seal/stamp of    SAMMY A FREMINOT

    NOTARY PUBLIC, MAHE, REPUBLIC OF SEYCHELLES

### Certified

5.  at    VICTORIA        6.    19TH JULY 2021

7.  by    J. ESTICOT, REGISTRAR, SUPREME COURT

8.  No.   9567  OF 2021

9.  Seal/Stamp            10. Signature

Exhibit 5

# CERTIFICATE OF INCUMBENCY

# AGR International Ltd.

Company Number 200304

### AAA International Services Ltd, hereby certifies that:

1. The above company has been duly incorporated under the International Business Companies Act 2016 on the 6th day of December 2017.

2. The Registered Agent of the company is AAA International Services Limited with effect from 6th day of December 2017.

3. The Registered Office of the company is situated at House of Francis, Room 303, Ile Du Port, Mahe, Seychelles.

4. The Authorised Capital of the Company is US$150,000.00 divided into 150,000 shares of US$1.00 each.

5. We keep the registers of the company at our offices at House of Francis, Room 303, Ile Du Port, Mahe, Seychelles.

6. The following person was appointed Director of the company by Resolution of Subscriber in Writing dated the 7th day of June 2021:

   **MR. PUTHEN PURAYIL THAMPAN SHINU CHEEKKULATHU**
   Address: Bldg. 295, Road 5708, Bap Albahrain Avenue, Central Manama 0304, Capital Governorate, Bahrain

7. We have no records whatsoever in our office which show any further appointments or changes in the Board of Directors.

8. The shareholder named below was issued Registered Shares by Resolution of Director in Writing dated the 7th day of June 2021:

   **Certificate No. 2**     for 150,000 shares of US$1.00 each issued to
   **MR. PUTHEN PURAYIL THAMPAN SHINU CHEEKKULATHU**

9. In so far as is evidenced by the documents filed with the Registrar, the Company is in good legal standing.

*Given at Victoria, Seychelles on this 7th day of July 2021.*

**AAA International Services Ltd**
herein represented by Ms. Rea Barreau
Authorised Signatory

DRC-34996 0229



# Republic of Seychelles
## INTERNATIONAL BUSINESS COMPANIES ACT, 2016
### (Act 15 of 2016)

### Certificate of Good Standing

## AGR International Ltd.

### Company Number  200304
### Incorporated On: 6th December 2017

This is to certify that:

1. The above company has been duly incorporated under the International Business Companies Act, 2016.

2. The name of the company is still on the Register of the International Business Companies and the Company has paid all fees, license fees and penalties due and payable under the provisions of the International Business Companies Act, 2016.

3. The Company has not submitted, to the Registrar, Articles of Merger or Consolidation that have not yet become effective.

4. The Company has not submitted, to the Registrar, Articles of Arrangement that have not yet become effective.

5. The Company is not in the process of being wound-up or dissolved.

6. No proceedings have been instituted to strike the name of the company off the said Register.

7. In so far as is evidenced by the documents filed with the Registrar, the Company is in good legal standing.

Given at Victoria, Seychelles on this 7th day of July 2021

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES




Exhibit 5

# Annex
# C

DRC-34996 0231

# Exhibit 5

**Date:** 7th June 2021

**To:**

Whom It May Concern
AAA International Services Limited
Victoria Seychelles

RE: RESIGNATION LETTER

Dear Sir / Madam,

Following the transfer of all my shares that I previously held in AGR International Ltd ("the Company") to Mr. Puthen Purayil Thampan Shinu Cheekulathu and therefore having ceased to have any share or ownership in the Company, this is to formally inform you that I have decided to and do hereby resign as Director of AGR International Ltd effective the 7th day of June 2021.

All powers and responsibilities to run the company are now acquired by the continuing directors and therefore with effect from the date of this resignation I shall not be responsible for any undertakings, duties, liabilities, responsibilities whatsoever and howsoever relating to AGR.

I acknowledge that I have no claim whatsoever against the company (and or any of its subsidiaries) but to the extent that any such claim exists or may exist I irrevocably waive such claim and release the company (and or any of its subsidiaries) from liability whatsoever in any respect.

It was great serving as a director and I sincerely wish the company continuing success in the days ahead.

Kind Regards,

.....................................

Alain Goetz

# Exhibit 6



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID: DRC-31659                                                    March 21, 2023

Erich C. Ferrari, Esq.
Ferrari & Associates, P.C.
655 15th St., NW
Suite 420
Washington, DC 20005

Dear Mr. Ferrari:

This letter responds to your initial submission, dated March 17, 2022, as supplemented by the delisting petition dated February 28, 2023, submitted to the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury on behalf of your client, Alain Goetz (Mr. Goetz) for reconsideration of your client's designation pursuant to Executive Order (E.O.) 13413 of October 31, 2006 "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," as amended by E.O. 13671 of July 8, 2014 "Taking Additional Steps to Address the National Emergency With Respect to the Conflict in the Democratic Republic of the Congo."

In order to assist OFAC in properly evaluating your petition, we ask that you provide detailed, narrative responses to the following questions. Please provide your responses in a signed, original statement submitted with documentation in support of the answers given. Original statements and documents prepared in a language other than English should be accompanied by English translations.

1.  Personal Identifying Data: Please provide the following identifying information, and include copies of all supporting documentation (birth certificates, passports, registrations, national identity card, etc.) for Mr. Goetz:

    a.  Full name and any alternate names or aliases;
    b.  Date of birth and place of birth;
    c.  Current residence and business addresses and phone numbers;
    d.  Previous and alternate addresses; and
    e.  Copies of current and previous passports and passport numbers, places and dates of issue, expiration dates, and copies of any visas, including United States Visas.

2.  U.S. Accounts and Assets: Please detail any interest Mr. Goetz holds in any financial accounts in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

3.  Property Interests: Does Mr. Goetz hold any interest in real property in the United States? If so, please detail these interests.

1

# Exhibit 6

4. <u>Legal Proceedings</u>: Has Mr. Goetz ever been, or is he currently, the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including the United States? If so, please describe these legal proceedings and their status, and provide all supporting official documentation.

5. Please provide an accounting of Mr. Goetz's sources of income.

6. Please provide a full and complete list of companies that Goetz owns or controls, including companies that Mr. Goetz exercises control over through other individuals or entities.

7. Please describe Mr. Goetz's current and past relationship to the following companies:
   a. Agor DMCC
   b. AGR Limited
   c. AGR International Ltd.
   d. Alaxy
   e. CG-Vastgoed Invest
   f. Goetz Gold LLC
   g. Premier Gold Refinery LLC
   h. Orofino NV
   i. WWG Diamonds
   j. Aldabra Limited
   k. Tony Goetz NV
   l. Industrial Refining Company
   m. Aldango Limited
   n. Belgian Precious Metals Industries (BPMI)
   o. Aldbra Ltd
   p. Alaxy BVBA
   q. European Guarantee Agency International
   r. GSS NV
   s. Asteco SA
   t. Worldwide Consulting
   u. Argor International SA

8. For each of the companies identified in questions 6 and 7, please provide the following:
   a. Incorporation documents
   b. List of directors, company officers, and shareholders.
   c. If a company is no longer owned or controlled by Mr. Goetz, please provide documentation as to when Mr. Goetz relinquished control, to whom he relinquished control (and how Mr. Goetz is associated with these individuals or entities), and what persons currently have ultimate beneficial ownership of these companies.

2

# Exhibit 6

9. Please detail any business relationships that Mr. Goetz is currently engaged in or has ever engaged in, for each of the following individuals:
   a. Majd Mohammed Abdulaziz Mousa
   b. Nasser Ibrahim Mousa Al Hindi
   c. Cherry Ann Dacdac Mandia
   d. Puthen Purayil Thampan Shinu Cheekkulathu
   e. Sylvain Goetz
   f. Axel Goetz
   g. Sandra Weyler
   h. Ann Guillaume Emerentia Hilkmann (or Ann Hilkmann)

10. Please describe Mr. Goetz's activities as a consultant on behalf of African Gold Refinery Ltd. Please provide associated documentation of these activities.

11. Please provide a share sale or share purchase agreement identifying Mr. Goetz as divesting his ownership of shares in AGR International Ltd.


We may pose additional questions and documentary requests as we proceed. Please direct all communications regarding your case to OFAC at the address or e-mail listed below, referring to Case ID: DRC-31659. Please note that OFAC encourages the use of the e-mail address as it serves as the more expeditious method of communication.

> Office of Foreign Assets Control
> U.S. Department of the Treasury
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, D.C. 20220
> Email: OFAC.Reconsideration@treasury.gov

Please respond to the questions above by the agreed upon deadline of April 11, 2023.

Thank you for your cooperation in this matter.

> Sincerely,
>
>
> OFAC Reconsideration

3

# Exhibit 8 Part 1



655 15th St, NW
Suite 420
Washington, D.C. 20005
Tel. 202-280-6370
Fax. 877-448-4885

April 11, 2023

**SENT VIA EMAIL (OFAC.Reconsideration@treasury.gov)**

Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220

Re:    **Response to OFAC's March 21, 2023 Questionnaire**[1]
       *Alain Goetz—Case ID DRC-31659*

Dear Petitions Coordinator:

On March 21, 2023, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued a questionnaire to Alain Goetz in response to his petition seeking removal of his designation under Executive Order ("E.O.") 13413, as amended. Mr. Goetz provides his timely response to that questionnaire below in accordance with the case processing schedule that OFAC and Mr. Goetz agreed to in *Goetz v. Gacki et al.*, No. 1:22-cv-01204-JEB before the United States District Court for the District of Columbia.

## I.    Procedural Background

On March 17, 2022, Mr. Goetz submitted a request to OFAC to stay any sanctions action under consideration targeting him. Later that day, OFAC announced its designation of Mr. Goetz under E.O. 13413, as amended. Specifically, OFAC designated Mr. Goetz based on its determination that 1) Mr. Goetz is responsible for or complicit in, or has engaged in, directly or indirectly, support to persons, including armed groups, involved in activities that threaten the peace, security, or stability of the Democratic Republic of the Congo ("DRC") or that undermine democratic processes or institutions in the DRC, through the illicit trade in natural resources of the

---

[1] Because this submission contains business information and/or other information of a sensitive nature, undersigned counsel requests that OFAC treat this correspondence as confidential. If OFAC believes that it is required to release this document or information contained in it to the public pursuant to the Freedom of Information Act or any other law, please notify undersigned counsel as soon as possible.

# Exhibit 8 Part 1

DRC; 2) being a leader of African Gold Refinery Limited ("AGR"); and 3) having acted or purported to act for or on behalf of, directly or indirectly, AGR.[2]

On April 29, 2022, Mr. Goetz filed a lawsuit challenging OFAC's decision to designate him under E.O. 13413, as amended, due to OFAC's failure to consider Mr. Goetz's March 17, 2022 submission before designating him.[3] On December 6, 2022, OFAC notified undersigned counsel that it will treat Mr. Goetz's March 17, 2022 submission as a delisting request under 31 C.F.R. § 501.807, rather than a request for stay of designation.

On January 31, 2023, OFAC disclosed the administrative record upon which Mr. Goetz's designation under E.O. 13413, as amended, was based. In response, Mr. Goetz provided a supplemental submission on February 28, 2023 with additional arguments and information to further support his delisting request and which directly relate to information contained in the administrative record. On March 21, 2023, OFAC sent a questionnaire to Mr. Goetz, to which he responds below.

## II.   Responses to OFAC's March 21, 2023 Questionnaire

1. Personal Identifying Data: Please provide the following identifying information, and include copies of all supporting documentation (birth certificates, passports, registrations, national identity card, etc.) for Mr. Goetz:

   a.   Full name and any alternate names or aliases;

   **RESPONSE**: Mr. Goetz's full name is Alain François Viviane Goetz. Alen Goz is an alternate name.

   b.   Date of birth and place of birth;

   **RESPONSE**: DOB: ▮▮▮▮▮▮ POB: Deurne, Antwerp, Belgium.[4]

   c.   Current residence and business addresses and phone numbers;

   **RESPONSE**: Residential address: Sienna Lake, Villa 6, Jumeirah Golf Estates, Dubai, UAE. Business address: N/A. Phone number: ▮▮▮▮▮▮

---

[2] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Alain Goetz and a Network of Companies Involved in the Illicit Gold Trade* (Mar. 17, 2022), https://home.treasury.gov/news/press-releases/jy0664; 87 Fed. Reg. 16552 (Mar. 23, 2022).

[3] *Goetz v. Gacki et al.*, No. 1:22-cv-01204-JEB (D.D.C.).

[4] Annex A–Birth Certificate.

DRC-34996 0240

Exhibit 8 Part 1

    d.   Previous and alternate addresses; and

**RESPONSE**: Previous UAE addresses: Villa N39, The Palm Jumeirah, Dubai, UAE; Villa A40, The Palm Jumeirah, Dubai, UAE.[5]

Previous Belgium addresses: Erikadreef 2/A, 2900 Schoten, Belgium; Ruiterslaan 25, 2110 Wijnegem, Belgium.

    e.   Copies of current and previous passports and passport numbers, places and dates of issue, expiration dates, and copies of any visas, including United States Visas.

**RESPONSE**: Please see Annex C for a summary of Mr. Goetz's passport and visa information, including passport numbers, places and dates of issue, and expiration dates. Please see Annex D for copies of Mr. Goetz's current and previous passports; and Annex E for Mr. Goetz's current and previous visas.

2.   U.S. Accounts and Assets: Please detail any interest Mr. Goetz holds in any financial accounts in the United States, including names and addresses of financial institutions, types of accounts, and account numbers.

    **RESPONSE**: Mr. Goetz does not hold any financial accounts in the United States.

3.   Property Interests: Does Mr. Goetz hold any interest in real property in the United States? If so, please detail those interests.

    **RESPONSE**: Mr. Goetz does not own or hold any interest in real property in the U.S.

4.   Legal Proceedings: Has Mr. Goetz ever been, or is he currently, the subject of any legal proceedings (including but not limited to civil and criminal investigations, indictments, arrests, warrants for arrests, or convictions) in any jurisdiction worldwide, including the United States? If so, please describe these legal proceedings and their status, and provide all supporting official documentation.

    **RESPONSE**: In January 2020, a Belgian court convicted Mr. Goetz and others of money laundering and fraud in relation to certain cash payments involving gold during 2010-2011.[6] In relevant part, the court found that Mr. Goetz sold gold (through Tony

---

[5] Annex B–UAE National Identity Cards.

[6] Annex F–Belgian Court Verdict.

DRC-34996 0241

# Exhibit 8 Part 1

Goetz NV/Industrial Refining Company) to traders for cash in 2010-2011 in excess of 15,000 EUR.

Currently, Belgian traders in precious metals are prohibited from paying for precious metals in cash pursuant to article 67 § 2 of the Act of 18 September 2017, which imposes cash restrictions (maximum 15,000 EUR) on traders selling goods; however, the anti-money laundering regulations have been amended several times over the past few decades. Mr. Goetz understands that in 2010-2011, there was no general ban on traders purchasing precious metals in cash and that such practice was common during that period. The court suspended his jail term, and Mr. Goetz has paid the confiscated amount of money to the Belgian government; thus, this case is considered closed, and Mr. Goetz has not had any issues with the Belgian government since.

On December 8, 2022, the European Union ("EU") sanctioned Mr. Goetz purportedly based on OFAC's designation of Goetz under E.O. 13413, as amended.[7]

Aside from the above proceedings, and the instant delisting matter and litigation with OFAC, Goetz is unaware of any other legal proceedings involving him.

5.  Please provide an accounting of Mr. Goetz's sources of income.

    **RESPONSE**: Mr. Goetz does not have any current source of income. He currently relies on the savings that he has accumulated over the course of his career to manage his living expenses.

6.  Please provide a full and complete list of companies that Goetz owns or controls, including companies that Mr. Goetz exercises control over through other individuals or entities.

    **RESPONSE**: Mr. Goetz owns and/or controls the following companies:

    1) Aldabra Limited (shareholder and director);
    2) Aldbra Limited (shareholder and director);
    3) Aldango Limited (indirect shareholder through Aldabra Limited);

---

[7] Indeed, the EU's published basis for designating Mr. Goetz appears to track the language in OFAC's press release announcing Goetz's E.O. 13413, as amended, designation. *See, e.g.*, Council Implementing Regulation (EU) 2022/2397 of 8 December 2022 implementing Regulation (EC) No 1183/2005 concerning restrictive measures in view of the situation in the Democratic Republic of the Congo, 2022 O.J. (L 316) 6 ("Since 2016, African Gold Refinery Ltd has received, purchased, refined and traded illicit gold originating from mines in the DRC that are controlled by non-governmental armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki, which are involved in destabilising activities in South Kivu province.").

DRC-34996 0242

# Exhibit 8 Part 1

4) WWG Diamonds (shareholder and director); and

5) Belgian Precious Metals Industries ("BPMI") (shareholder and director).[8]

7. Please describe Mr. Goetz's current and past relationship to the following companies:

a. Agor DMCC

**RESPONSE**: Mr. Goetz was a shareholder and Managing Director of Agor DMCC from 2007 until its liquidation in September 2022. Mr. Goetz does not have a current relationship with Agor DMCC.

b. AGR Limited

**RESPONSE**: As previously noted, Mr. Goetz was a shareholder in AGR from 2015 until February 2018; its CEO until November 2018; and a director at AGR until January 2019. Goetz then served as a Consultant for the company. Mr. Goetz does not have a current relationship with AGR.

c. AGR International Ltd.

**RESPONSE**: Mr. Goetz was a shareholder and director of AGR International Ltd. from 2017 until June 7, 2021, at which time he resigned as director and sold his shares to Mr. Puthen Purayil Thampan Shinu Cheekkulathu. Mr. Goetz does not have a current relationship with AGR International Ltd.

d. Alaxy

**RESPONSE**: Mr. Goetz is a shareholder and a director for this company. The company is currently undergoing liquidation, which was initiated in February 2023.

e. CG-Vastgoed Invest

**RESPONSE**: Mr. Goetz was a shareholder in CG-Vastgoed from 2008-2022 and sold his shares to Sylvain Goetz. Mr. Goetz does not have a current relationship with CG-Vastgoed Invest.

---

[8] Mr. Goetz is also a shareholder and director of Alaxy BVBA and Orofino NV; however, those companies are currently undergoing liquidation. *See* Annex G–Alaxy Liquidation; Annex H–Orofino Liquidation.

5

# Exhibit 8 Part 1

f.  Goetz Gold LLC

**RESPONSE**: Mr. Goetz previously held 49% of the shares in Goetz Gold LLC from 2013 until May 7, 2020, at which time he sold his shares to Meryl Mongaya Secapuri. Mr. Goetz does not have a current relationship with Goetz Gold LLC.

g.  Premier Gold Refinery LLC

**RESPONSE**: Mr. Goetz previously held 49% of the shares of Premier Gold Refinery LLC from 2017 until May 7, 2020, when he sold his shares to Meryl Mongaya Secapuri. Mr. Goetz was also previously a consultant for this company but no longer has any relationship with Premier Gold Refinery LLC.

h.  Orofino NV

**RESPONSE**: Mr. Goetz is a shareholder and director of Orofino NV. The company is currently undergoing liquidation, which was initiated in February 2023.

i.  WWG Diamonds

**RESPONSE**: Mr. Goetz holds 50% of the shares and is a director of WWG Diamonds.

j.  Aldabra Limited

**RESPONSE**: Mr. Goetz is the sole shareholder and a director of Aldabra Limited.

k.  Tony Goetz NV

**RESPONSE**: Tony Goetz NV has been renamed to "Industrial Refining Company." Please see the answer to question 7(l) below.

l.  Industrial Refining Company

**RESPONSE**: Mr. Goetz was a director of Industrial Refining Company (previously Tony Goetz & Zonen) from May 13, 1999 until August 24, 2004. Mr. Goetz was Managing Director of the company from January 17, 2002 until August 24, 2004, and then served as a consultant but no longer maintains any relationship with Industrial Refining Company.

DRC-34996 0244

# Exhibit 8 Part 1

m. Aldango Limited

**RESPONSE**: Mr. Goetz indirectly holds 50% of the shares through Aldabra Ltd., of which he is the sole shareholder. Ngali Mining Ltd. holds the remaining 50% of the shares. Mr. Goetz ceased his involvement in the company's activities in 2020.

n. Belgian Precious Metals Industries (BPMI)

**RESPONSE**: Mr. Goetz is a shareholder and director of BPMI, and was also previously a director of BPMI from March 3, 2003 until August 24, 2004.

o. Aldbra Ltd

**RESPONSE**: Mr. Goetz is a shareholder and director of the company.

p. Alaxy BVBA

**RESPONSE**: Please see the answer to question 7(d) above.

q. European Guarantee Agency International

**RESPONSE**: Mr. Goetz was a shareholder of the European Guarantee Agency International from 2001 until he sold his shares to Sylvain Goetz on October 29, 2022. Mr. Goetz was director from May 15, 2001 until August 24, 2004. Mr. Goetz does not have a current relationship with the company.

r. GSS NV

**RESPONSE**: Mr. Goetz was previously a shareholder and director of GSS NV but sold his shares several years ago. Mr. Goetz does not currently have a relationship with the company.

s. Asteco SA

**RESPONSE**: Mr. Goetz was a director of Asteco SA until 2018. Mr. Goetz does not currently have a relationship with the company.

DRC-34996 0245

# Exhibit 8 Part 1

t. Worldwide Consulting

**RESPONSE**: Mr. Goetz has not held any positions with Worldwide Consulting.

u. Argor International SA

**RESPONSE**: Mr. Goetz was previously a shareholder and director of Argor International SA until October 2018. Mr. Goetz does not have a current relationship with the company.

8. For each of the companies identified in questions 6 and 7, please provide the following:

a. Incorporation documents

**RESPONSE**: To the extent that Mr. Goetz has the requested documents in his possession, please see the following attachments for incorporation and related documents:
• Annex I for Agor DMCC;
• Annex J for AGR Limited;
• Annex K for AGR International Ltd;
• Annex L for Alaxy;
• Annex M for CG-Vastgoed Invest;
• Annex N for Goetz Gold LLC;
• Annex O for Premier Gold Refinery LLC;
• Annex P for Orofino NV;
• Annex Q for WWG Diamonds;
• Annex R for Aldabra Limited;
• Annex S for Tony Goetz NV;
• Annex T for Industrial Refining Company (Tony Goetz NV name change to Industrial Refining Company);
• Annex U for Aldango Limited;
• Annex V for BPMI;
• Annex W for Aldbra Ltd;
• Annex X for European Guarantee Agency International;
• Annex Y for GSS NV; and
• Annex Z for Argor International SA.

8

# Exhibit 8 Part 1

b. List of directors, company officers, and shareholders.

**RESPONSE**: To the extent that Mr. Goetz is in possession or control of the requested information, please see Annex AA for a list of known directors, company officers, and shareholders for the companies identified in questions 6 and 7.

c. If a company is no longer owned or controlled by Mr. Goetz, please provide documentation as to when Mr. Goetz relinquished control, to whom he relinquished control (and how Mr. Goetz is associated with these individuals or entities), and what persons currently have ultimate beneficial ownership of these companies.

**RESPONSE**: Mr. Goetz objects to this question insofar as "what persons currently have ultimate beneficial ownership of these companies" calls for information and documentation in the possession of third parties for which Mr. Goetz is not the custodian of records.

To the extent that Mr. Goetz can respond, please see:
• Annex BB for Agor DMCC;
• Annex CC for AGR Limited;
• Annex DD for AGR International Ltd;
• Annex EE for Goetz Gold;
• Annex FF for Premier Gold Refinery;
• Annex GG for Industrial Refining Company;
• Annex HH for BPMI;
• Annex II for European Guarantee Agency International;
• Annex JJ for Asteco SA; and
• Annex KK for Argor International SA.

9. Please detail any business relationships that Mr. Goetz is currently engaged in or has ever engaged in, for each of the following individuals:

a. Majd Mohammed Abdulaziz Mousa

**RESPONSE**: Mr. Goetz does not have a current business relationship with Majd Mohammed Abdulaziz Moussa. Mr. Moussa replaced Mr. Goetz as a director of AGR Limited on January 10, 2019.

DRC-34996 0247

# Exhibit 8 Part 1

b. Nasser Ibrahim Mousa Al Hindi

**RESPONSE**: Mr. Goetz does not have a business relationship with Nasser Ibrahim Mousa Al Hindi; however, Al Hindi replaced Mr. Goetz as a director of AGR Limited on January 10, 2019.

c. Cherry Ann Dacdac Mandia

**RESPONSE**: Cherry Ann Dacdac Mandia is Mr. Goetz's former employee.

d. Puthen Purayil Thampan Shinu Cheekkulathu

**RESPONSE**: On June 7, 2021, Puthen Purayil Thampan Shinu Cheekkulathu purchased Mr. Goetz's shares in AGR International Ltd. and took over his position as director. Mr. Goetz understands that Mr. Cheekkulathu is the UBO of AGR International Ltd. They do not currently have a business relationship.

e. Sylvain Goetz

**RESPONSE**: Mr. Goetz and Sylvain Goetz were previously business partners; however, there is no current business relationship between them.

f. Axel Goetz

**RESPONSE**: Mr. Goetz does not have a business relationship with Axel Goetz.

g. Sandra Weyler

**RESPONSE**: Mr. Goetz does not have a business relationship with Sandra Weyler.

h. Ann Guillaume Emerentia Hilkmann (or Ann Hilkmann)

**RESPONSE**: Mr. Goetz does not have a business relationship with Ann Hilkmann.

10. Please describe Mr. Goetz's activities as a consultant on behalf of African Gold Refinery Ltd. Please provide associated documentation of these activities.

**RESPONSE**: Mr. Goetz is not currently engaged in consulting activities at AGR. He was, however, formerly a Consultant at AGR who was retained to develop, manage, and implement AGR's public relations strategy; inform the company on legal and

DRC-34996 0248

# Exhibit 8 Part 1

market developments in the gold industry; advise the company on tendering for award of contracts; business development and promotion of AGR's activities; and advising the company on regulatory compliance and interacting with government regulators.[9]

11. Please provide a share sale or share purchase agreement identifying Mr. Goetz as divesting his ownership of shares in AGR International Ltd.

**RESPONSE**: Please see Annex MM for documentation evidencing Mr. Goetz's divestment of his ownership of shares in AGR International Ltd.

## III.    Conclusion

Mr. Goetz respectfully requests that OFAC rescind his E.O. 13413, as amended, designation and remove his name from the SDN List. As demonstrated in his submissions to OFAC, there is an insufficient basis for his designation, and the alleged circumstances underlying his designation no longer apply. In any event, Mr. Goetz has proposed adopting remedial measures that would negate the basis of his designation and provide OFAC with assurances that he is not engaged in sanctionable conduct.

If OFAC requires additional, clarifying, or corroborating information to adjudicate Mr. Goetz's delisting request, OFAC is respectfully requested to request that information as soon as possible. Please forward all correspondence regarding this questionnaire response to:

Erich C. Ferrari
Ferrari & Associates
655 15th St., N.W.
Suite 420
Washington, D.C. 20005
Email: ferrari@falawpc.com

Mr. Goetz thanks OFAC for its consideration and looks forward to its response.

Sincerely,

Erich C. Ferrari

---

[9] *See* Annex LL–AGR-Goetz Memorandum of Agreement.

11

Exhibit 8 Part 1

# Annex
# A

DRC-34996 0250

# Exhibit 8 Part 1

## LEGALISATIE - LEGALISATION - LEGALISATION

Gezien voor de legalisatie van de handtekening van :
Vu pour légalisation de la signature de :
Gesehen zur Legalisation der Unterschrift von :
*IBZ [ DABS / BAEC / DPSU ]*

Onder Nr./Sous le n°/Unter Nr. : *190928733873*

Te/A/In : *Brussel/Bruxelles/Brüssel*          Op/Le/Am : *26-Sep-19*

| Stempel/Sceau/Stempel: | Ondertekening/Signature/Unterschrift. |
|---|---|
|  | Digitally signed by FPS Foreign Affairs Belgium |
| Document/Document/Dokument | *Document burgerlijke stand - DABS/Document Etat civil - BAEC/Personenstandsurkunden - DPSU* |

Prijs/Prix/Preis: *20.00* EUR

Deze legalisatie waarborgt de authenticiteit de inhoud van het document niet.
Cette légalisation ne garantit pas l'authenticité du contenu du document.
Diese st dient nicht dem Beweis des Authentizität des Inhalts des Dokuments.
Ongeldige elektronische handtekening?          Deze legalisatie controleren?
Signature électronique invalide?          Vérifier cette légalisation?
Ungültige elektronische Unterschrift?          Diese Legalisation überprüfen?
elegalisation.diplomatie.be/help          legalweb.diplomatie.be

DRC-34996 0251

# Exhibit 8 Part 1

| 1 | Staat / Etat / Staat / Country<br><br>BELGIE / BELGIQUE / BELGIEN / BELGIUM | 2 | Dienst van de burgerlijke stand van / Service de l'état civil de / Standesamtsbehörde / Civil Registry Office of<br><br>Deurne (Antwerpen) |
|---|---|---|---|
| 3 | Uittreksel uit de geboorteakte nr.<br>Extrait de l'acte de naissance n°<br>Auszug aus dem Geburtseintrag Nr.<br>Extract from birth registration n° | | ▉▉▉▉▉ |
| 4 | Geboortedatum en -plaats<br>Date et lieu de naissance<br>Tag und Ort er Geburt<br>Date and place of birth | | Jo  Mo  An<br>▉▉ ▉▉ ▉▉▉   Deurne (Antwerpen) |
| 5 | Naam / Nom / Name / Name<br><br>Goetz | | |
| 6 | Voornamen / Prénoms / Vornamen / Forenames<br><br>Alain, François, Viviane | | |

| 7 | Geslacht / Sexe / Geschlecht / Sex | M | 8 | Vader / Père / Vader / Father | 9 | Moeder / Mère / Mutter / Mother |
|---|---|---|---|---|---|---|
| 5 | Naam / Nom / Name / Name | | Goetz | | Pooters | |
| 6 | Voornamen / Prénoms Vornamen / Forenames | | Antoine, François | | Theresia, Josephina | |

| 10 | Andere vermeldingen van de akte / Autres énonciations de l'acte<br>Andere Angaben aus dem Eintrag / Other particulars of the registration | |
|---|---|---|
| | | |

| 11 | Datum van afgifte<br>Date de délivrance<br>Tag der Ausstellung<br>Date of issue | Jo  Mo  An<br>[2][6] [0][9] [2][0][1][9] | Handtekening en zegel<br>Signature et sceau<br>Unterschrift und Siegel<br>Signature and seal |
|---|---|---|---|

.be

Elektronisch ondertekend door de Databank Akten Burgerlijke Stand.
Signature électronique de la Base de données Actes Etat Civil.
Elektronisch von der Civil Records Database signiert.
Electronically signed by the Civil Records Database.

Symbolen - Symboles - Zeichen - Symbols - Símbolos - Σύμβολα - Simboli - Símbolos - İşaretler - Simboli
Jo: Dag / Jour / Tag / Day / Día / Ημέρα / Giorno / Dia / Gün / Dan
Mo: Maand / Mois / Monat / Month / Mes / Mήν / Mese / Mês / Ay / Mesec
Mr: Jaar / Année / Jahr / Year / Año / Έτος / Anno / Ano / Yıl / Godina
M: Mannelijk / Masculin / Männlich / Masculine / Masculino / Άρρεν / Maschile / Masculino / Erkek / Muški
F: Vrouwelijk / Féminin / Weiblich / Feminine / Femenino / Θήλυ / Femminile / Feminino / Kadın / Ženski
Mar: Huwelijk / Mariage / Eheschließung / Marriage / Matrimonio / Γάμος / Matrimonio / Casamento / Evlenme / Zaključenje braka
Sc: Scheiding van tafel en bed / Séparation de corps / Trennung von Tisch und Bett / Legal separation / Separación personal / Χωρισμός από τραπέζης και κοίτης / Separazione personale / Separação de pessoas e bens / Ayrılık / Fizička rastava
Div: Echtscheiding / Divorce / Scheidung / Divorce / Divorcio / Διαζύγιο / Divorzio / Divórcio / Boşanma / Razvod
A: Nietigverklaring / Annulation / Nichtigerklärung / Annulment / Anulación / Ακύρωσις / Annullamento / Anulação / İptal / Poništenje
D: Overlijden / Décès / Tod / Death / Defunción / Θάνατος / Morte / Óbito / Ölümü / Smrt
Dm: Overlijden van de man / Décès du mari / Tod des Ehemanns / Death of the husband / Defunción del marido / Θάνατος τοῦ συζύγου / Morte del marito / Óbito do marido / Kocanın ölümü / Smrt muža
Df: Overlijden van de vrouw / Décès de la femme / Tod der Ehefrau / Death of the wife / Defunción de la mujer / Θάνατος τῆς συζύγου / Morte della moglie / Óbito da mulhe / Kadının ölümü / Smrt žene

DRC-34996 0252

# Exhibit 8 Part 1

UITTREKSEL AFGEGEVEN INGEVOLGE DE OVEREENKOMST ONDERTEKEND TE WENEN OP 8 SEPTEMBER 1976
EXTRAIT DELIVRÉ EN APPLICATION DE LA CONVENTION SIGNÉE À VIENNE LE 8 SEPTEMBRE 1976
AUSZUG AUSGESTELLT GEMÄSS DEM ÜBEREINKOMMEN VON WIEN VOM 8 SEPTEMBER 1976
EXTRACT ISSUES IN PERSUANCE OF THE CONVENTION SIGNED AT VIENNA ON SEPTEMBER 8 1976
CERTIFICACION EXPEDIDA EN APLICACION DEL CONVENIO FIRMADO EN VIENA EL 8 DE SEPTIEMBRE DE 1976
ΑΠΟΣΠΑΣΜΑ ΧΟΡΗΓΟΥΜΕΝΟΝ ΚΑΤ ΕΦΑΡΜΟΓΗΝ ΤΗΣ ΣΥΜΒΑΣΕΩΣ ΤΗΣ ΒΙΕΝΝΗΣ ΤΗΣ 8 ΣΕΠΤΕΜΒΡΙΟΥ 1976
ESTRATTO RILASCIATO IN APPLICAZIONE DELLA CONVENZIONE FIRMATA A VIENNA IL 8 SETTEMBRE 1976
CERTIDÃO EMITIDA AO ABRIGO DA CONVENÇÃO ASSINADA EM VIENA AOS 8 DE SETEMBRO DE 1976
VIYANADA 8 EYLÜL 1976 TARIHINDE IMZALANAN SÖZLEŞME UYARINCA VERILEN ÖRNEK
IZVOD IZDAT NA OSNOVU PRIMENE KONVENCIJE POTPISANE U BEČU 8 SEPTEMBRA 1976

| 1 | Staat / Country / Estado / Κράτος / Stato / Staat / Estado / Devlet / Drũava |
|---|---|
| 2 | Standesamtsbehörde / Civil Registry Office of / Registro civil de / Ληξιαρχική Αρχή τοὖ (ἠ τῆς ἠ τῶν) / Servizio dello stato civile / Dienst van de burgerlijke stand van / Serviços do registo civil de / Nũfus Idaresi / Matična služba |
| 3 | Auszug aus dem Geburtseintrag Nr / Extract from birth registration no / Certificacion del acta de nacimiento N° / Ἀπόσπασμα ληξιαρχικῆς πράξεως γεννήσεως ἀριθ / Estratto dell'atto di nascita n. / Uittreksel uit de geboorteakte nr. / Certidão do assento de nascimento n° / Doğum sicil örneği No. / Izvod iz matične knjige rodjenih br. |
| 4 | Tag und Ort der Geburt / Date and place of birth / Fecha y lugar de nacimiento / Χρονολογία καί τόπος γεννήσεως / Data e luogo di nascita / Geboortedatum en plaats / Data e lugar do nascimento / Doğum yeri ve tarihi / Datum i mesto rodjenja |
| 5 | Name / Name / Apellidos / 'Επώνυμον / Cognome / Naam / Apelidos / Soyadı / Prezime |
| 6 | Vornamen / Forenames / Nombre propio / 'Ονόματα / Prenomi / Voornamen / Nome próprio / Adı / Ime |
| 7 | Geschlecht / Sex / Sexo / Φῦλον / Sesso / Geslacht / Sexo / Cinsiyeti / Pol |
| 8 | Vater / Father / Padre / Πατήρ / Padre / Vader / Pai / Baba / Otac |
| 9 | Mutter / Mother / Madre / Μήτηρ / Madre / Moeder / Mãe / Ana / Majka |
| 10 | Andere Angaben aus dem Eintrag / Other particulars of the registration / Otros datos del acta / 'Έτεραι ἐγγραφαί τῆς πράξεως / Altre enunciazioni dell'atto / Andere vermeldingen van de akte / Outros elementos do assento / İşleme ait diğer bilgiler / Drugi podaci iz izvoda |
| 11 | Tag der Austellung, Unterschrift, Siegel / Date of issue, signature, seal / Fecha de expedición, firma, sello / × Χρονολογία ἐχδόσεως, ὑπογραφή, σφραγίς / Data di rilascio, firma, bollo / Datum van afgifte, handtekening, zegel / Data de emissão, assinatura, selo / Veriliş tarihi, imza, mühür / Datum izdavanja, potpis, pečat |

* Volgens de artikelen 3, 4, 5 en 7 van deze Conventie:

- De gegevens worden geschreven in Latijnse drukletters ; zij kunnen bovendien worden geschreven in de letertekens van de taal die gebruikt is bij het opmaken van de akte waarop zij betrekking hebben.

- De data worden geschreven in Arabische cijfers met aanduiding van achtereenvolgens de dag, de maand en het jaar. De dag en de maand worden aangeduid door twee cijfers, het jaar door vier cijfers. De negen eerste dagen van de maand en de negen eerste maanden van het jaar worden aangeduid door de cijfers 01 tot en met 09.

- De naam van ledere plaats wordt steeds gevolgd door de naam van de Staat waar deze plaats is gelegen als deze Staat niet de Staat is waar het uittreksel wordt afgegeven.

- De symbolen MAR, SC, Div, A, D, DM en DI worden gevolgd door de datum en de plaats van het feit. Het symbool MAR wordt bovendien gevolgd door de naam en de voornamen van de echtgenoot.

- Indien de tekst van de akte het niet mogelijk maakt een vakje of een deel van een vakje in te vullen, wordt het door strepen onbruikbaar gemaakt.

- De toevoeging van andere vakjes of symbolen moet vooraf ter goedkeuring worden voorgelegd aan de Internationale Commissie voor de Burgerlijke Stand.



https://certif.belgium.be/extract/db316974-cb39-4663-bb43-592f8602be0e-DABS

Exhibit 8 Part 1

# Annex B

DRC-34996 0254

# Exhibit 8 Part 1





```
ILARE09869872417841965360272 77
6504245M3001259BEL<<<<<<<<<<<4
GOETZ<<ALAIN<FRANCOIS<V<<<<<<<
```

DRC-34996 0255

# Exhibit 8 Part 1





```
ILARE07377075197841965360272 77
6504245M1806140BEL<<<<<<<<<<<8
GOETZ<<ALAIN<FRANCOIS<V<<<<<<<
```

DRC-34996 0256

# Exhibit 8 Part 1





ILARE05890261257841196536027277
6504245M1507012BEL<<<<<<<<<<2
ALAIN<FRANCOIS<VIVIANE<GOETZ<<

Exhibit 8 Part 1

# Annex
# C

DRC-34996 0258

# Exhibit 8 Part 1

| BELGIAN PASSPORT | UAE VISA | TURKISH PASSPORT |
|---|---|---|
| | INVESTOR<br>26-Jan-20<br>25-Jan-30 | |
| | INVESTOR<br>26-Jan-20<br>25-Jan-30 | |
| | MANAGING DIRECTOR/ AGOR DMCC<br>13-Jun-18<br>12-Jun-21 | |
| | MANAGING DIRECTOR/AGOR DMCC<br>15-Jun-15<br>14-Jun-18 | |
| | MANAGING DIRECTOR/AGOR DMCC<br>02-Jul-12<br>01-Jul-15 | |

Exhibit 8 Part 1

# Annex
# D

DRC-34996 0260

Exhibit 8 Part 1

ENKELE BEVEILIGINGSELEMENTEN DIE WIJ U AANRADEN NA TE ZIEN.
QUELQUES ÉLÉMENTS DE SÉCURITÉ QUE NOUS VOUS RECOMMANDONS DE CONTRÔLER.
EINIGE SICHERHEITSELEMENTE, DEREN KONTROLLE WIR EMPFEHLEN.
SOME SECURITY ELEMENTS THAT WE RECOMMEND YOU TO CHECK.

GOETZ
ALAIN

ES985402
0: qublication of

BELGIË    BELGIQUE    BELGIEN    BELGIUM

Type / Type
Typ / Type
**P**

Land van afgifte / Pays émetteur
Ausstellungsland / Issuing country
**BEL**

Paspoortnummer / N° du passeport
Pass.Nr / Passport no

1. Naam / Nom / Name / Surname
**GOETZ**

2. Voornamen / Prénoms / Vornamen / Given names
**ALAIN FRANÇOIS V.**

3. Nationaliteit / Nationalité
Staatsangehörigkeit / Nationality
**BELG**



4. Geboortedatum / Date de naissance
Geburtsdatum / Date of birth

5. Geslacht / Sexe
Geschlecht / Sex
**M - M**

6. Geboorteplaats / Lieu de naissance
Geburtsort / Place of birth
**DEURNE (ANT.)**

7. Datum van afgifte / Date de délivrance
Ausstellungsdatum / Date of issue
**06 12 2021**

9. Instantie / Autorité
Behörde / Authority
**ABU DHABI**

8. Geldig tot / Data d'expiration
Gültig bis / Date of expiry
**05 12 2028**

10. Handtekening van de houder / Signature du titulaire
Unterschrift des Passinhabers / Holder's signature



P<BELGOETZ<<ALAIN<FRANCOIS<V<<<<<<<<<<<<<<<<
ES985402<2BEL6504245M2812058<<<<<<<<<<<<<<02

DRC-34996 0261

**Exhibit 8 Part 1**



# Exhibit 8 Part 1



BELGIË   BELGIQUE   BELGIEN   BELGIUM

Type / Type / Land van afgifte / Pays émetteur / Paspoortnummer / N° du paspoort
Type / Type   Ausstellungsland / Issuing country

P   BEL

1. Naam / Nom / Name / Surname
GOETZ

2. Voornamen / Prénoms / Vornamen / Given names
ALAIN FRANÇOIS V.

3. Nationaliteit / Nationalité   4. Geboortedatum / Date de naissance
Staatsangehörigkeit / Nationality   Geburtsdatum / Date of birth
BELG

5. Geslacht / Sexe   6. Geboorteplaats / Lieu de naissance
Geschlecht / Sex   Geburtsort / Place of birth
M - M   DEURNE (ANT.)

7. Datum van afgifte / Date de délivrance   8. Instantie / Autorité
Ausstellungsdatum / Date of issue   Behörde / Authority
15 09 2016   ABU DHABI

9. Geldig tot / Date d'expiration   10. Handtekening van de houder / Signature du titulaire
Gültig bis / Date of expiry   Unterschrift des Passinhabers / Holder's signature
14 09 2023

P<BELGOETZ<<ALAIN<FRANCOIS<V<<<<<<<<<<<<<<<<<
EN332634<6BEL6504245M2309143<<<<<<<<<<<<<<02

DRC-34996 0263

# Exhibit 8 Part 1



INSLUE BEVEILIGINGSGEGEVENS DIE WIJ U ADVISEREN NA TE ZIEN.
QUELQUES ELEMENTS DE SÉCURITÉ QUE NOUS VOUS RECOMMANDONS DE CONTRÔLER.
EINIGE SICHERHEITSELEMENTE, DEREN KONTROLLE WIR EMPFEHLEN.
SOME SECURITY ELEMENTS THAT WE RECOMMEND YOU TO CHECK.

EKS22985

ALAIN FRANÇOIS V.
GOETZ

**BELGIE  BELGIQUE  BELGIEN  BELGIUM**

| | | |
|---|---|---|
| Type / Type Type / Type **P** | Land van afgifte / Pays émetteur Ausstellungsland / Issuing country **BEL** | Paspoortnummer / N° de passeport |
| 1 Naam / Nom Name / Surname **GOETZ** | | |
| 2 Voornamen / Prénoms Vornamen / Given names **ALAIN FRANÇOIS V.** | | |
| 3 Nationaliteit / Nationalité Staatsangehörigkeit / Nationality **BELG** | | |
| 4 Geboortedatum / Date de naissance Geburtsdatum / Date of birth | 6 Geboorteplaats / Lieu de naissance Geburtsort / Place of birth **DEURNE (ANT.)** | |
| 5 Geslacht **M** / Sexe Geschlecht / Sex **M – M** | 8 Instantie / Autorité Behörde / Authority **ABU DHABI** | |
| 7 Datum van afgifte / Date de délivrance Ausstellungsdatum / Date of issue **18 02 14** | 10 Handtekening van de houder Signature du titulaire Unterschrift des Passinhabers Holder's signature | |
| 9 Geldig tot / Date d'expiration Gültig bis / Date of expiry **17 02 19** | ALF | |

```
P<BELGOETZ<<ALAIN<FRANCOIS<V<<<<<<<<<<<<<<<<
EK253682<2BEL6504245M1902178<<<<<<<<<<<<<<<8
```

DRC-34996 0264

**Exhibit 8 Part 1**



ENKELE BEVEILIGINGSGEGEVENS DIE WIJ U ADVISEREN NA TE ZIEN.
QUELQUES ÉLÉMENTS DE SÉCURITÉ QUE NOUS VOUS RECOMMANDONS DE CONTRÔLER.
EINIGE SICHERHEITSELEMENTE, DEREN KONTROLLE WIR EMPFEHLEN.
SOME SECURITY ELEMENTS THAT WE RECOMMEND YOU TO CHECK.

## BELGIE BELGIQUE BELGIEN BELGIUM

Type / Type
Typ / Type

Land van afgifte / Pays émetteur
Ausstellungsland / Issuing country

Paspoortnummer / N° du passeport
Pass-Nr / Passport no

**P**

**BEL**

1. Naam / Nom
Name / Surname

**GOETZ**

2. Voornamen / Prénoms
Vornamen / Given names

**ALAIN FRANÇOIS VIVIANE**

3. Nationaliteit / Nationalité
Staatsangehörigkeit / Nationality

**BELG**

4. Geboortedatum / Date de naissance
Geburtsdatum / Date of birth

6. Geboorteplaats / Lieu de naissance
Geburtsort / Place of birth



**Deurne (Ant.)**

5. Geslacht / Sexe
Geschlecht / Sex

9. Instantie / Autorité
Behörde / Authority

**M—M**

**LUXEMBURG (STAD)**

7. Datum van afgifte / Date de délivrance
Ausstellungsdatum / Date of issue

10. Handtekening van de houder
Signature du titulaire
Unterschrift des Passinhabers
Holder's signature


**03 05 10**

8. Geldig tot / Date d'expiration
Gültig bis / Date of expiry


**02 05 15**



```
P<BELGOETZ<<ALAIN<FRANCOIS<VIVIANE<<<<<<<<<
EI062637<8BEL6504245M1505029<<<<<<<<<<<<<00
```

DRC-34996 0265

# Exhibit 8 Part 1



TÜRKİYE CUMHURİYETİ / REPUBLIC OF TURKEY

PASAPORT
PASSPORT

P    TUR

G02

ALEN

E/M

TUR

50641895930

DEURNE/BELÇİKA

TC DUBAİ BK

13 HAZ/JUN 2021

10 TEM/JUL 2030

P<TURGOZ<<ALEN<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
U243729258TUR6504245M300710350641895930<<<80

DRC-34996 0268

Exhibit 8 Part 1

# Annex
# E

DRC-34996 0267

# Exhibit 8 Part 1



VISAS
38

دولة الامارات العربية المتحدة
**UNITED ARAB EMIRATES**

استوفيت الرسوم

دبي
**DUBAI**

إقــامــة
**RESIDENCE**

إقامة طويلة    رقم الهوية
784196536027277

201/2020/3114170

الاسم
الان فرانكويس فيفيان جويتز
**ALAIN FRANCOIS VIVIANE GOETZ**

مستثمر
**INVESTOR**

الكفيل لنفسه
**Self Sponsor**

2020/01/26



2030/01/25



Residence Permit becomes invalid if bearer resides out of the U.A.E. for more than six months.

DRC-34996 0268

# Exhibit 8 Part 1



DRC-34996 0269

# Exhibit 8 Part 1

دولة الامارات العربية المتحدة
**UNITED ARAB EMIRATES**

اقـامــة
**RESIDENCE**

استوفيت الرسوم

تجديد



الرقم الموحد
**U.I.D. No**

جهة الاصدار : دبـي
**DUBAI** Place of Issue

الملـف **201/2012/7113882** File

عدد المرافقين
Accompanied by

رقم الجواز **EK253682** Passport No

الاســـم الان فر انكويس فيفيان جويتز
**ALAIN FRANCOIS VIVIANE GOETZ** Name

المهنة مدير ادار ه
**MANAGING DIRECTOR** Profession

الكفيل أغور – دبى للسلع
**AGOR-DMCC** Sponsor

تاريخ الانتهاء **2018/06/14** Expiry Date

تاريخ إصدار **2015/06/15** Issue Date



التوقيع
Sign.

تقبر الإقامة لاغية اذا تجاوز حاملها الاقامة خارج دولة الامارات مدة ستة اشهر.
**Residence Permit becomes invalid if bearer resides out of the U.A.E. for more than six months.**

DRC-34996 0270



VISAS
14

دولة الامارات العربية المتحدة
**UNITED ARAB EMIRATES**

إقامة
**RESIDENCE**

استوفيت الرسوم

جديد

الرقم الموحد
U.I.D. No

201/2012/7113882    الملف
File

محل الإصدار    بطاقة الإصدار
DUBAI    Place of Issue

رقم الجواز
EI062637    Passport No

ألان فرانكوبس فيفيان جويتز    الاسم
ALAIN FRANCOIS VIVIANE GOETZ    Name

المهنة    مدير
MANAGING DIRECTOR    Profession

الكفيل    مركز دبي للسلع المتعدد ه
DUBAI MULTI COMMODITIES CENTRE    Sponsor

تاريخ انتهاء الإقامة    تاريخ إصدار الإقامة
2015/07/01    Expiry Date    2012/07/02    Issue Date

أشور فيه
Sign.

تصبح الإقامة لاغية إذا غاب عنها حاملها خارج دولة الامارات مدة ستة أشهر
Residence Permit becomes invalid If bearer resides out of the U.A.E. for more than six months.

DRC-34996 0271

Exhibit 8 Part 1



UNITED ARAB EMIRATES     دولة الإمارات العربية المتحدة

**RESIDENCE**     إقـــامـــة

استـــوفيت الرسـوم     جديد

جهة الإصدار : دبى     الملـف : 201/2007/7037820

مـعه المرافقين :     الاسـم : الـعـيـن الـى فى جـريـتـر

رقم الجواز : G070971

المـهـنة : مدير تنفيذى

الكفيـل : مركز دبى للملـح المتعدد

تاريخ إسكان الإقامة : 2007/03/12

2010/03/11 تاريخ الانتهاء :

التوقيع :

تعتبر الإقامة لاغية إذا تجاوز حاملها الإقامة خارج دولة الإمارات مدة ستة أشهر.
Residence Permit becomes invalid if bearer resides out of the U.A.E. for more than six months.

DRC-34996 0272

# Annex
# F

DRC-34996 0273

Exhibit 8 Part 2

 orR: Van Wambeke

-10 V



| Vonnisnummer / Griffienummer |
|---|
| 2020/ 554 |
| Repertoriumnummer / Europees |
| Datum van uitspraak |
| 30 januari 2020 |
| Naam van de beklaagde(n) |
| Goetz Sylvain |
| Systeemnummer parket 10RA28432 Dossiernummer 10A028432 Notitienummer parket AN/A/27/F1/22815/2010 |

# rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
## Kamer AC5

# Vonnis

| Aangeboden op |
|---|
| Niet te registreren |

# Exhibit 8 Part 2

Regarding PUBLIC PROSECUTION and

CIVIL PARTIES :

1.) XXX

and

2) XXX
handelend in hoedanigheid van gevolmachtigde van de stichting XXX
beide woonstkeuze doende op het adres van XXX kantoorhoudende te 1000 Brussel, Boulevard de l'Empereur 3

burgerlijke partijen, die verstek laten gaan

burgerlijke partijstellingen bij akte verleden door onderzoeksrechter J-L Doyen te Luik, op 12 december 2011, het onderzoek niet geopend zijnde ingevolge deze aanstellingen

against:

1) Sylvain **Goetz**, RRN 64052051768 zonder gekend beroep
geboren te Deurne (Ant.) op 20 mei 1964
van Belgische nationaliteit
wonende te 2970 Schilde, Boerendreef 16

beklaagde, bijgestaan door Meester· Vercauteren Sven, advocaat te 2000 Antwerpen, Amerikalei 187/302 en Meester Verblst Johan, advocaat te Antwerpen.

2) Alain, Francois Viviane **Goetz**, ▮▮▮▮▮
self-employed
▮▮▮▮▮▮▮
of Belgian nationality

Currently residing at Dubai (United Arab Emirates), villa 35, Frond P, Palm Jumeirah PO BOX 65919

Defendant, represented by Meester Vercauteren Sven, lawyer at 2000 Antwerpen, Amerikalei 187/302 en Meester Verblst Johan, lawyer at Antwerpen.

# Exhibit 8 Part 2

Regarding PUBLIC PROSECUTION and

CIVIL PARTIES :

1.) XXX

and

2) XXX
handelend In hoedanigheid van gevolmachtigde van de stichting XXX
beide woonstkeuze doende op het adres van XXX kantoorhoudende te 1000 Brussel, Boulevard de l'Empereur 3

burgerlijke partljen, die verstek laten gaan

burgerlijke partljstellingen bij akte verleden door onderzoeksrechter J-L Doyen te Lulk, op 12 december 2011, het
onderzoek niet geopend zljnde ingevolge deze aanstellingen

against:

1)Sylvain **Goetz**, RRN 64052051768 zonder gekend beroep
geboren te Deurne (Ant.) op 20 mei 1964
van Belgische nationalltelt
wonende te 2970 Schilde, Boerendreef 16

beklaagde, bijgestaan door Meester· Vercauteren Sven, advocaat te 2000 Antwerpen, Amerlkalei 187/302 en
Meester Verbist Johan, advocaat te Antwerpen.

2) Alain, Francois Viviane **Goetz,** ▮▮▮▮▮▮▮▮
self-employed
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
of Belgian nationality

Currently residing at Dubai (United Arab Emirates), villa 35, Frond P, Palm Jumelrah PO BOX 65919

Defendant, represented by Meester Vercauteren Sven, lawyer at 2000 Antwerpen, Amerlkalei 187/302 en Meester
Verbist Johan, lawyer at Antwerpen.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028432                                    vleugel D, 3de verdieping                    Vonnisnr    /                    p. 3

3) NV. TONY GOETZ, met KBOnr. 0426598575
000721    met maatschappelijke zetel gevestigd te 2018 Antwerpen, Jacob Jacobsstraat 58

beklaagde, vertegenwoordigd door Meester Luyten Bert, advocaat te Antwerpen
en Meester Loix Philippe, advocaat te Antwerpen.

4) ~~Wendy Marianne~~
bediende administratief werk
~~—~~

van Belgische nationaliteit

000690

beklaagde, vertegenwoordigd door Meester Spriet Bart, advocaat te Herenthout.

5) Ana, ~~Maria Alves~~
Bediende
~~—~~

van Portugese nationaliteit

000691

beklaagde, vertegenwoordigd door Meester Sas Toon, advocaat te Antwerpen in
eigen naam en loco Meester Vanden branden Joke, advocaat te Antwerpen.

6) ~~—~~
zonder gekend beroep
~~—~~

van Belgische nationaliteit

000692

beklaagde, bijgestaan door Meester Loodts Lieve, advocaat te Antwerpen en
Meester Maes John, advocaat te Antwerpen.

7) ~~Emanuela~~
zelfstandige
~~—~~

van Belgische nationaliteit

000693

beklaagde, vertegenwoordigd door Meester Freya    Parmentier, advocaat te
Antwerpen.

## Exhibit 8 Part 2



rechtbank van aerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr: 10A028482                    vleugel D, 3de verdieping          Vonnis/    p. 4

8) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
arbeider

000694  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆

van Belgische nationaliteit

beklaagde, die persoonlijk verschijnt.

9) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
Electricien

000695  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Crowet Julie, advocaat te 1082 Sint-Agatha-Berchem, Avenue Charles-Quint 584/9, loco Meester Buisseret Nathalie, advocaat te Sint-Agatha-Berchem.

10) ▆▆▆▆▆▆▆▆▆▆▆▆
zonder gekend beroep

000696  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
niet ingeschreven
van Senegalese nationaliteit

beklaagde, die verstek laat gaan.

11) ▆▆▆▆▆▆▆▆▆▆▆
zonder gekend beroep

000697  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
niet ingeschreven
van Spaanse nationaliteit

beklaagde, die verstek laat gaan.

# Exhibit 8 Part 2



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen    p. 5
Dossiernr 10A028492                              vleugel D, 3de verdieping              Vonnisnr    /

12) ▬▬▬▬▬▬▬▬▬▬▬▬
zonder gekend beroep

000698    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Spaanse nationaliteit

beklaagde, die verstek laat gaan.

13) ▬▬▬▬▬▬▬▬▬▬▬
zelfstandig handelaar

000699    ▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

14) ▬▬▬▬▬▬,
zonder gekend beroep

000700    ▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, die verstek laat gaan.

15) ▬▬▬▬▬▬▬
zonder gekend beroep

000701    ▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, die verstek laat gaan.

16) ▬▬▬▬▬▬,
zonder gekend beroep

000702    ▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

DRC-34996 0278

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028492                               vleugel D, 5de verdieping                      Voorllne    /    p. 6

17)▮▮▮▮▮▮▮▮▮▮▮▮▮
zonder gekend beroep

**000703** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, vertegenwoordigd door Meester Delva Thibaud, advocaat te
Antwerpen.

18)▮▮▮▮▮▮▮▮▮▮▮▮
zonder gekend beroep

**000704** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

1
niet ingeschreven
van Chileense nationaliteit

beklaagde, die verstek laat gaan.

19)▮▮▮▮▮▮▮▮▮▮▮
zonder gekend beroep

**000705** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
van Spaanse nationaliteit

beklaagde, bijgestaan door Meester Boons Simon, advocaat te Antwerpen en
Meester Van De Wal Hans, advocaat te Antwerpen.

20)▮▮▮▮▮▮▮▮▮▮▮
zaakvoerder

**000706** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

niet ingeschreven
(zie schrijven advocaat, deel XIV, kaft briefwisseling)
van Spaanse nationaliteit

beklaagde, vertegenwoordigd door Meester Boons Simon, advocaat te Antwerpen
en Meester Van De Wal Hans, advocaat te Antwerpen.



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028452                                    vleugel D, 3de verdieping          Vonnisnr  /          p. 7

**000707**  21) ▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓

beklaagde, vertegenwoordigd door Meester Boons Simon, advocaat te Antwerpen
en Meester Van De Wal Hans, advocaat te Antwerpen.

**000708**  22) ▓▓▓▓▓▓▓▓▓▓▓
juwelenhandelaar
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

**000709**  23) ▓▓▓▓▓▓▓▓▓▓▓▓
zonder gekend beroep
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

**000710**  24) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
zelfstandige
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

van Belgische nationaliteit

beklaagde, bijgestaan door Meester De Jonge Hannah, advocaat te Antwerpen en
Meester Marneffe Frank, advocaat te Antwerpen.

**000711**  25) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

beklaagde, vertegenwoordigd door Meester Gevers Erik, advocaat te Antwerpen.

DRC-34996 0280

Exhibit 8 Part 2



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 1DA028432                                    vleugel D, 3de verdieping                                    Voonlsnr                    p. 6

26)
·goudsmit juwelier

000712

van Belgische nationaliteit

beklaagde, bijgestaan door Meester Mens Francis, advocaat te Tessenderlo en
Meester Lippens Sophie, advocaat te Aalst.

27)
werkend vennoot

000713

van Belgische nationaliteit

beklaagde, bijgestaan door Meester Mens Francis, advocaat te Tessenderlo en
Meester Lippens Sophie, advocaat te Aalst.

28)
zonder gekend beroep

000714

van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Croes Valerie, advocaat te 8020
Oostkamp, Hertsbergsestraat 4, loco Meester Maus Michel, advocaat te Oostkamp.

29)

000715

beklaagde, vertegenwoordigd door Meester Croes Valerie, advocaat te 8020
Oostkamp, Hertsbergsestraat 4, loco Meester Maus Michel, advocaat te Oostkamp.

30)
zaakvoerder

000716

van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Beerlandt Hans, advocaat te Kortrijk.

000717

31)

# Exhibit 8 Part 2

beklaagde vertegenwoordigd door Meester Beerlandt Hans, advocaat te Kortrijk

32) XXX
zonder beroep

Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Vandewalle Frank, advocaat te

Antwerp en.

33) XXX

zaakvoerder

van Nederlandse nationaliteit

beklaagde, vertegenwoordigd door Meester Vandewalle Frank, advocaat te Antwerpen.

34) XXX
diamanthandelaar
XXX

niet ingeschreven
van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester L. Loodts en meester Maes John, advocaten te Antwerpen.


**INDICTMENT(S).**

As perpetrator or co-perpetrator in the zin of article 66 of, the criminal code;

In Antwerp and/or elsewhere in the judicial district of Antwerp


The misdrijven below on behalf of the persons listed below the successive and continued uitvoering zijn of the same misdadig intent;

Either by having carried out the crime or the offence or by having directly assisted in the carrying out of the crime or the offence, or by having assisted in the carrying out of the crime or the offence by any act such that the crime or offence could not have been committed without his assistance

A.The first (GOETZ Sylvain), the second (GOETZ Alain) and the third (NV TONY GOETZ) between December 31, 2009 and November 18, 2011

# Exhibit 8 Part 2

To have knowingly and intentionally participated as a leading person of a criminal organisation, being a structured association of more than two persons lasting In time,'for the purpose of committing in crimes and misdemeanors punishable by imprisonment of three Years or a more severe penalty, in order to obtain directly or Indirectly pecuniary benefits,

namely, a criminal organization aimed at directly or indirectly obtaining pecuniary gains through the instigation and execution of a fraudulent scheme which, through the systematic commission of forgery and the use of false documents (cf. indictment C), enables professional traders, sales agents and commissioners and/or criminals (in particular thieves and receivers) to sell large quantities of gold, which may or may not be entirely of illegal origin, as "private gold" against payment In cash, to obscure the origin of the gold and/or the true destination of sales prices paid in cash and/or to acts as if the provisions of the Law of 11 January 1993 preventing the use of the financial system for money laundering and the financing of terrorism were complied with, TONY GOETZ NV granted itself in any event a direct pecuniary advantage totalling granted itself a total of at least EUR 3,394,006 in the form of a "commission" of EUR 100.00 per kilo of gold purchased by TONY GOETZ NV against cash payment, held on the purchase price

**XXX** 

tussen 31 december 2009 en 18 november 2011,

Wetens en willens deel te hebben genomen aan het nemen van welke beslissing dan ook In het raam van de activiteiten van een criminele organisatie, zijnde een gestructureerde vereniging van meer clan twee personen die duurt In de tijd, met als oogmerk het in onderling overleg plegen van misdaden en wanbedrijven die strafbaar zijn met gevangenisstraf van drie Jaar of een zwaardere straf, om direct of indirect

vermogensvoordelen te verkrijgen, wetende dat deze deelname bijdraagt tot de oogmerken van deze organisatie;

namelijk in het raam *van* de activiteiten van de criminele organisatie bedoeld onder tenlastelegging A, zoals gepreciseerd;

## C. The first (GOETZ Sylvain), the second (GOETZ Alain), the third (NV TONY GOETZ), the fourth XXX and the fifth XXX

With fraudulent intent or with intent to cause damage, to have committed forgery of commercial, banking or private documents, either by forging or falsifying documents or signatures, or by making contracts, promises or discharges of debts, or by subsequently inserting such forgeries, statements or facts which were intended to form the subject-matter of such documents, or by the addition or falsification of words, statements or facts, or by the subsequent insertion in the instruments or bỳ the addition or falsification of terms, statements or facts which the instruments were drawn up for the purpose of recording and establishing, and by using with the same fraudulent intention or with intent to cause damage

Of the false deed or of the false document knowing that it was forged;

namely by having falsified and/or caused to be falsified the accounts of the SA TONY GOETZ by having drawn up or caused to be drawn up and by having included or caused to be included in the accounts of hierna said purchase orders and related documents, whereby purchases of large lots of precious metals (in general gold) by TONY GOETZ NV from professional dealers in precious metals, sales agents or commission agents were presented as

DRC-34996 0283

# Exhibit 8 Part 2

more private sales and/or were split up into several smaller purchases, each time with the statement on the purchase order form that the seller was a ; and/or that it concerns purchases of several lots of precious metals at prices lower than EUR 15,000.00, whereas the sellers are in fact dealers in precious metals or sales agents or commissioners and/or the price of the actual sale between the parties usually exceeds EUR 15, 000,00 EUR, with the fraudulent intent to perpetrate and implement a fraudulent scheme that enables professional traders, sales agents and comissionals and/or criminals (in particular thieves and receivers), Enables precious metal (usually gold) to be sold as so-called "private" gold or other precious metal against payment in cash and/or whereby on papler the payments are split into klelnere amounts below EUR 15,000.00, in order to disguise the origin of the gold and/or the real destination of the sales prices paid in cash and/or in order to make it appear that the provisions of Article 10ter of the Law of 11 January 1993 on preventing the use of the flanking system for money laundering and the financing of terrorism have been complied with, inserted by Article 19 of the Law of 12 January 2004, which came into force on 2 February 2004 (published in the Official Gazette of 23 January 2004), amended and renumbered as Article 21 by Article 24 of the Law of 18 January 2010, which came into force on 5 February 2010, and/or to set up and implement (or cause to be set up and implemented), in any manner whatsoever, a method of working that distorts competition and distorts the market, granting to TONY GOETZ SA itself, in any case, a direct advantage in the form of a "commission" retained on the purchase price of EUR 100.00 per kilo of gold, commission which was owed by the sellers to TONY GOETZ SA only in the case of a cash payment for the sale of gold,

## I. between 3 January 2010 and 31 December 2010, multiple times, on the following dates

At least 42.713 purchase orders and related items for a total amount of at least 586.463.318,24 EUR, paid in cash by the SA TONY GOETZ, each time for the purchase of individual lots of precious metals (As a rule gold) from a vendor with the capacity of "PARTIKULIER" and each time with -a sales price of less than 15.000,00 EUR while the actual price of the sale carried out between the parties is considerably higher than 15.000,00 EUR,

as appears from the comparative overview of the accounting data and listings of TONY GOETZ NV in relation to the purchase orders for the year 2010 as described in official report 860/2012 (see part VI, cover 12.2, st. 62-72),

the documents accused of forgery nlet having been filed at grIffie, except as hereinafter mentioned,

including In particular:

## a. and the tenth XXX

## 1. on 11 March 2010, multiple:

purchase orders LL-8756 to LL-8775 for a total amount of EUR 287,804.83, each time for the purchase of one' iot of gold from 'PARTIKULIER', further identified as being for the purpose of committing and/or concealing the acts of 'money laundering' described in indictment D.111.a.1, '

the documents accused of forgery have been deposited in copy at the Registry of the Evidence under State number OS 2691/2011 (see part II, cover B) and are in copy in the file under annex 3 to official report 27475/2010 (page part I, cover 2.1, item 133-223, 1.h.b. 177-199)

## 2. On 30 April 2010, multiple

# Exhibit 8 Part 2

purchase orders LI-14954, LL-14956 to LL-14972 and LL-14974 to LI- 14979 for a total amount of 348.185,80 EUR, each time for the purchase of a lot of gold from "PARTIKULIER", further identified as XXX, in order to be able to commit and/or conceal the money laundering offences described in indictment D.111.a.II,

the documents accused of forgery are in digital form on CD-ROM deposited at the Clerk of the conviction under State number OS 1354/2011 (In the framework of the execution of the international mutual legal assistance request AN.IRC.737-10- AO) and located In copy In the file under annex 3 to minutes 2848/2011 {see part II, cover 2.3, st. 190-191 and st. 360-830, l.h.b. 785-790, 792-807 and 809);

### 3. between 22 July 2010 and 15 September 2010, multiple

74 purchase orders for a total amount of EUR 1,008,823.84, each time for the purchase of a lot of gold from "PARTIKULIER", further identified either as XXX or as XXX or without further identificatle, as listed in the table in Annex 4 to official report 3911/2013 (part XII, cover 28.5, st. 34-147, l.h.b. st 136- 144) , in order to be able to commit and/or conceal the facts of money laundering described in indictment D.III.a.111 D.III.a.111,

the documents not being accused of forgery have been deposited at the offence file under state number OS 4935/2013 (part I, cover C);

### II. and the sixth XXX, the thirty second XXX and the thirty third XXX

The purchase orders listed below for a total amount of EUR 5,826,830.77, paid in cash by TONY GOETZ SA, each time for the purchase of a gold lot with a salesrljs of less than EUR 15. 000.00 EUR from hetzlj without mentioning a company number, either from XXX or from XXX mentioning company number 0895.507.760 (i.e. company number of XXX ), hetzlj from XXX mentioning company number 0406. 978.148 (I.e. company number of XXX), while the actual price of the sale carried out between the parties is considerably higher than EUR 15,000.00, as can be seen from the tables included in annexes 2, 3 and 5 to official report 15256/11, In .,reading together with the documents included as annex 4 to official report 14052/11 (see file AN45.F1,:13332/2011, cover '6, st.191-215, l.h.b. 192-195 and 198-207 and st. 34-190, 1.h.b, 34-94)

### a. between 4 January 2010 and 7 January 2010, multiple, on the following dates

each time for the purchase of a lot of fine gold from XXX without specifying a company number

### 1. On 5 January 2010, multiple

purchase orders LL-376 to LL-388 (13) for the purchase of 5.831 kg of fine gold for a total amount of EUR 142,633.62

### 2. On 6 January 2010, multiple

purchase orders LL-631, LL-632 and LL-635 for the purchase of 1.575 kg of fine gold for a total amount of EUR 38,550.86,

the documents not having been lodged as false declarations at the Registry of the convictions under state number OS 11511/2011, no 2 (file 45.Fi.13332/2011, cover B)

### b. between 20 January 2010 and 22 June 2010, multiple, on the following dates

# Exhibit 8 Part 2

each time for the purchase of one lot of fine gold from XXX bearing company number 0895.597, for a total quantity of

1. On 21 January 2010, multiple

purchase orders LL-2556 to LL-2558 for the purchase of 1.457 kg of fine gold for a total amount of EUR 36,741.08

2. between 26 January and 29 January 2010, multiple, on 27 January 2010 and 28 January 2010

purchase order numbers LL-3421, LL-3562 and LL-3563 for the purchase of 1.326 kg of fine gold for a total amount of EUR 32,950.60

3. on 4 February 2010, multiple

- purchase orders LL-4151 to LL-4153 for the purchase of 1.4 kg of fine gold for a total amount of EUR 34,930.00, -

- purchase order numbers LL-4154 to LL-4156 for the purchase of 1.272 kg of fine gold for a total amount of EUR 31,520.16

4. on 9 February 2010, multiple

- purchase orders LL-4763 and LL'4769 for the purchase of 0.623 kg of fine gold for a total amount of EUR 15,571.03,

- purchase orders LL-4774 through LL-4776 for the purchase of 1.599 kg of fine gold .

for a total amount of EUR 39,918.285.

On 10 February 2010, multiple

purchase orders LL-4818, LL-4819, LL-4821 and LL-4822 for the purchase of 2 kg of fine gold for a total amount of EUR 50,980.00

6. on 11 February 2010, multiple

purchase orders LL-5249 and LL-5251 to LL-5253 for the purchase of 2 kg of fine gold for a total amount of EUR 50,060.50

7. on 15 February 2010, multiple

purchase orders LL-5454 and LL-6457 and LL-5458 for the purchase of 1.721 kg of fine gold for a total amount of EUR 43,124.08

8. between 16 February 2010 and 24 February 2010, multiple, on 17 February 2010, 18 February 2010 and 23 February 2010

purchase orders LL-5763 through LL-5767, LL-6039, LL-6043, ll-6367 and LL-6368 for the purchase of 4.128 kg of fine gold for a total amount of EUR 104,562.24

9. on 5 March 2010, multiple

DRC-34996 0286

# Exhibit 8 Part 2

purchase orders LL-8014 to LL-8017 for the purchase of 2 kg of fine gold for a total amount of EUR 53,101.33

10. On 15 March 2010, multiple

purchase orders LL-9172, LL-9174 and LI-9175 for the purchase of 1.464 kg of fine gold for a total amount of EUR 38,440.73,

11. On 8 June 2010, multiple

purchase orders LL-20226, LL-20227 and LL-20230 to LL-2037 (10) for the purchase of 5 kg of fine gold for a total amount of EUR 150,000.00

12. On 21 June 2010, multiple

purchase orders LL-22991 to LL-22995 for the purchase of 2 kg of fine gold for a total amount of EUR 64,200.00,

the documents not having been lodged as counterfeit at the Registry of Evidence under State number OS 11511/2011, No. 2 (File 45.Fl.13332/2011, cover B)

c. between 24 February 2010 and 7 September 2010, multiple, on the following dates

each time for the purchase of a lot of scrap gold from XXX, quoting company number 0895.507.760,

1. on 25 February 2010, multiple

purchase orders LL-6909 to LL-6911 for the purchase of 2,002 kg of scrap gold, for a total amount of EUR 37,510.57

2. on 3 March 2010, multiple

purchase order numbers ll-7624 to LL-7628 for the purchase of 3 kg of scrap gold for a total amount of EUR 57,780.00

3. on 11 March 2010, multiple

purchase order numbers LL-8777 to ll-8783 for the purchase of 5 kg of scrap gold for a total amount of EUR 93,350.00

4. on 22 March 2010, multiple

purchase order numbers LL-10281 to LL-10288 for the purchase of 4 kg of scrap gold for a total amount of EUR 75,280.00

5. on 15 April 2010, multiple

purchase order numbers LL-13128 to LL-13137 for the purchase of 5 kg of scrap gold for a total amount of EUR 97,300.00

6. on 22 April 2010, multiple

# Exhibit 8 Part 2

purchase order numbers LL-14022 to Ll-14029 for the purchase of 5 kg of scrap gold for a total amount of EUR 98,250.00

7. on 4 May 2010, multiple

purchase orders LL-15206 to LL-15214 for the purchase of 5.999kg of scrap gold for a total amount of EUR 123,360.01

8. on 25 May 2010, multiple

purchase orders LL-17806 to Ll-17808 and LL-17813 to Ll-17819 {10) for the purchase of 5 kg of scrap gold for a total amount of 111,150.00 EU

9. on 8 June 2010, multiple

purchase orders LL-20216 to LL-20225 for the purchase of 5 kg of scrap gold for a total amount of EUR 120,100.00

10. on 21 June 2010, multiple

purchase orders LL-22955, LL-22958 to LL-22960 and LL-22986 to LL- 22990 for the purchase of 5 kg of scrap gold for a total amount of EUR 117,300.00

11. on 16 July 2010, multiple

purchase orders LL-26731 to Ll-26744 and ll-26746 to LL-26748 for the purchase of 10 kg of scrap gold for a total amount of EUR 249,240.00

12. on 22 July 2010, multiple

purchase orders LL-27293, ll-27294 and LL-27296 for the purchase of 1,950 kg of scrap gold for a total amount of EUR 41,964.00

13. on 2 August 2010, multiple

purchase orders ll-28154 to ll-28158 and LL28160 to ll-28162 for the purchase of 5 kg of scrap gold for a total amount of EUR 104,501.00

14. on 6 September 2010, multiple

purchase orders LL-30723 and Ll-30725 to Ll-30727 for the purchase of 2 kg of scrap gold for a total amount of EUR 44,860.50,

the documents have not been declared to be false and have been filed in the register of criminal files under State No. OS 11511/201i, No. 2 (File No. 45.Fl.13332/2011, cover B).

d. between 28 December 2010 and 22 January 2011, multiple, on the following dates

Each time for the purchase of one lot of scrap gold from XXX with company number 0895.507. 760

1. on 29 December 2010, multiple

# Exhibit 8 Part 2

purchase order forms II-46360, LL-46361, LI-46363 to LI-46366, LI-46368 to II-46374 and LL-46376 to LL-46380 (18) for the purchase of 10 kg of scrap gold for a total amount of EUR 247,717.10,

the documents not having been lodged as false declarations at the Registry of Evidence under state number OS 11511/20ii, no. 2 (file 45.FI.13332/2011, cover B

## 2. on 30 December 2010, multiple

purchase order forms II-46676 to II-46689, LI-46914 to II-46917, II-46919 to II-46925, LL-46928, LL46931, II-46935, II46939, LL-46942 and LI-46949 for the purchase of 18.315 kg of scrap gold for a total amount of EUR 451,924.25,

the documents not having been filed as forgery at the Registry of Evidence under state number OS 11511/2011, No. 2 (file 45.FI.13332/2011, cover B);

## 3. on 4 January 2011, multiple

purchase order forms LL-1100003 to LI-1100017 (15) for the purchase of 9.002 kg of scrap gold for a total amount of EUR 221,185.78,

the documents not having been filed as forgery at the Registry of Evidence under State No. OS 11511/2011, No. 3 (File 45.FI.13332/2011, cover B);

## 4. on 6 January 2011, multiple

purchase orders II-O (with serial number 021), LL-1100503 to LL-1100514, LL- 1100516 and LL-1100540 to LL-1100556 (31) for the purchase of 18.4 kg of scrap gold for a total amount of EUR 447,187 28,

the documents not having been lodged as falsified at the Registry of Evidence under State number OS 11511/2011, no. 3 (file 45.FI.13332/2011, cover B)

## 5. on 21 January 2011, multiple

purchase orders LL-1103593, tl-1103595; LL-1103596, LL-1103599, LL-1103601 to LL-1103621 (25) for the purchase of 15.072 kg of scrap gold for a total amount of EUR 335,836.13,

the documents not having been lodged as forgery at the Registry of Evidence under state number OS 11511/2011, No. 3 (file 45.FI.13332/2011, cover B)

e. between 31 January 2011 and 1 June 2011, multiple, on the following dates:

each time for the purchase of a lot of fine gold from XXX with company number 0406.978.148,

1. on 1 February 2011, multiple

purchase order numbers LL-1105725 to LL-1105746 (22) for the purchase of 9.57 kg of fine gold for a total amount of EUR 297. 782.61,

the documents not having been filed as of forgery at the Registry of Evidence under state number OS 11511/2011, No. 5 (file 45.FI.13332/2011, cover B);

# Exhibit 8 Part 2

2. between 3 February 2011 and 9 February 2011, multiple, on 4 February 2011 and 8 February 2011

purchase orders ll-1106747 to ll-1106756, LL-1106758 to LL-1106763, LL-1106765, LL-1106767 to LL-1106774, LL-1106776 and LL-1106944 to LL- 1106947 (30) for the purchase of 13.432 kg of fine gold for a total amount of EUR 420,349.63,

the documents not having been lodged as forgery at the Registry of Evidence under State No. OS 11511/2011, No. 5 (File 45.Fl.13332/2011, cover B)

3. between 10 February 2011 and 17 February 2011, multiple, on 11 February 2011 and 16 February 2011

purchase orders LL-1107726 to LL-1107732 and LL-1108709 for the purchase of 3.31 kg of fine gold for a total amount of EUR 105,667.15, - l

the documents not having been lodged as counterfeit at the Registry of Evidence under state number os 11511/2011, no. 5 (file 45.Fl.13332/2011, cover B)

4. on 10 March 2011, multiple

purchase orders LL-1114439 and LL-1114442 for the purchase of 0.853 kg of fine gold for a total amount of EUR 27,822.85, -

the documents not having been lodged as forgery at the Registry of Evidence under State No. OS 11511/2011, No. 5 (File 45.Fl, 13332/2011, cover B);

5. on 24 March 2011, multiple

purchase orders LL-1118375 to LL-1118386, LL-1118389 and LL-1118390 for the purchase of 5.9 kg of fine gold for a total amount of EUR 189,567.01,

the documents not having been deposited as forgery at the Registry of Evidence under state number OS 11511/201i, No. 5 (File 45.F:l.13332/2011, cover B);6. between 2 May 2011 and 6 may 2011, multiple, on 3 May 2011 and 5 May 2011

purchase orders LL-1127516 to LL-1127528 and LL-1128030 (14) for the purchase of 5.892 kg of fine gold for a total amount of EUR 196,797.13,

the documents not accused of forgery having been deposited at the Registry of Evidence under state number OS 11511/2011, no. 5 (file 45.Fl.13332/2011, cover B) and located in copy In the file as annex 4 to process report 14052/2011 (file 45.Fl.13332/2011, cover 6, st. 34-190, l.h.b, st. 75-88);

7. on 17 May 2011, multiple

purchase order forms LL-1130158, LL-1130160, LL-1130162, LL-1130164, LL-1130168 to LL-1130178, LL-1130180, LL-1130182 and LL-1130183 (17) for the purchase of 7.524 kg of fine gold for a total amount of EUR 254,580.28,

the documents accused of forgery were not lodged at the Registry, but are in the case file as an annex to the minutes 14052/2011 (file 45.Fl.13332/2011, cover 6, item 34-190, in particular item 58-74)

8. on 31 May 2011, multiple

# Exhibit 8 Part 2

purchase orders LL-1133192, LL-1133194, LL-1133198 to LL-1133201 and LL- 1133203 to LL-1133209 (13) for the purchase of 5.284 kg of fine gold for a total amount of EUR 183,126.85, '

the documents accused of forgery were not lodged with the Registry, but are in the case file as an annex to official report 14052/2011 (file 45.Fl.13332/2011, cover 6, st. 34-190, l.h.b. st. 45-57)

III. XXX

a.   On 14 January 2010, multiple

purchase orders LL-1503 through LL-1505, LL-1508 through LL-1517, LL:1s22 through LL-1527, LL-1533 through LL-1545, LL1548 and LL-1549 (34), for a total amount of 388. 748.86 EUR, Paid in cash by the SA TONY GOETZ, each time for the purchase of a lot of gold from the XXX with a sale price of less than 15,000.00 EUR, while the actual price of the sale carried out between the parties is significantly higher than 15,000.00 EUR, '

the documents accused of forgery were not filed at the Registry, but are in copy In the file are attached to minutes 20823/2012 (zle part XI, cover 24, 'st. 6-263, 1.h.b. 165-167, 171-173, 175-187, 192-201 and 204-209)

b.   On 29 March 2010, multiple

purchase orders LL-10939 through LL-10946, each for the purchase of 596 gr of scrap gold, and LL-10948 for the' purchase of 334,659 gr of scrap gold from -the XXX for a total amount of EUR 136,650.66, paid in cash by the NV TONY GOETZ,
the documents accused of forgery were not deposited at the Registry, but are in the file as an annex to official report 20823/2012 {see Part XI, cover 24, item 6-263, in particular 136-144)

IV. and the tenth XXX
between 4 January 2011 and 2 July 2011, multiple

At least 536 purchase orders totaling at least EUR 7,507,176.34, Paid in cash by SA TONY GOETZ, each time for the purchase of a lot of gold with a selling price of less than EUR 15,000.00 from "PARTIKULIER. XXX, while the actual prljs of the sale carried out between the parties is significantly higher than EUR 15,000.00, as listed in Table 1 In bljlage 2 to official report 12188/2012, supplemented by the findings contained in official report 3911/2013 (see part VI, cover 12. 4, st. 61-83, l.h.b. 62-76 and part Xii, cover 28.5, st. 34-147, l.h.b. st. 145), in order to be able to commit and/or conceal the facts of money laundering described in indictment D.HI,b.

The documents accused of forgery have not been filed with the court registry, but are in digital form on dvd-rom which has been filed with the court registry of the conviction under state number 8394/2014 (see part I, cover C)

V. between 2 January 2011 and 17 November 2011, multiple, on the following dates

At least 35.490 purchase orders and related items for a total amount of at least EUR 513,622,018.49, Paid in cash by the SA TONY GOETZ, each time for the purchase of individual lots of precious metals (generally gold) from an unspecified seller in the capacity of "PARTIKULIER" and each time with a salesrljs of less than 15. 000.00 while the actual price of the sale carried out between the parties is considerably higher than EUR 15,000.00, as evidenced by a review of the purchase orders of d(l NV TONY GOETZ.for the year 2011 {see official report 23859/2011, part VI, cover 12.3, st. 1-53),

the documents (in particular the purchase orders) accused of forgery have not been filed with the court registry but are in digital form on CD-ROM filed with the court under State number 8394/2014 of the conviction papers (part I, cover D);

# Exhibit 8 Part 2

including in particular:

a. and the sixth XXX

between 2 January 2011 and 25 June 2011, multiple, on non-determined dates

Unspecified purchase orders and related documents for an unspecified total amount, relating to the purchase of a total of at least 923 kg of gold, as derived from the concatenation of the tables contained in annex 5 to official report 923/2012 (part VIII, lrnft 15, st. 1-28, l.h.b. 4-8) with the table included In annex 1 to official report 14052/2011 (file AN45.F1.13332/2011, cover 6, st. 34-190, l.h.b. 185-186) and with the documents included as annex 5 to official report 13655/2011 (file AN45.F1.13332/2011, cover 6, st. 1-2~, 1.h.b. 4-9}, so as to be able to co-commit and/or conceal the facts of money laundering described under indictment D.V,

Part of the related documents (in particular work orders) as listed in the table in Appendix 5 to official report 923/2012 not filed as forgery are filed at the office of the offender and state number 1046/2012, no. 5 (see part VIII, cover 15, item 1-2);

b. and the twenty fourth XXX

1. On 26 May 2011, multiple

Unspecified purchase orders and related documents for an unspecified total amount, relating to the purchase of a total of at least 5 kg of gold, as shown by the transcribed telephone conversations appended as appendix 28 to official report 15859/2011 (part IV, cover 6, st. 233-492, 1.h.b. 361-363) In conjunction with the documents contained in official report 15186/2012 (part VI, cover 12.4, st. 158-165) and In official report 19504/11 (part V, cover 7, st. 663-690), for the offenses of money laundering described under the indictment D.VI.a. commit and/or cover up

2. On 30 May 2011, multiple

Unspecified purchase orders and related documents for an unspecified total amount, for a total amount of at least 60.000,00 EUR in relation to the purchase of a lot of gold from the unspecified XXX

as appears from the transcribed telephone conversation appended as appendix 19 to official report 15859/2011 (part IV, cover 6, st. 233-492, in particular 401-402} in conjunction with the analyzes contained in official report 19504/11 (part V, cover 7, items 663-690) and in official report 23689/2012 (part XI, cover 24, items 346-388}, in order to be able to communicate the acts of money laundering described under the indictment D.VI.b perpetrate and/or cover up

c. and the twenty sixth XXX and the twenty seventh XXX

between 8 June 2011 and 1 July 2011, multiple, on non-determined dates

unspecified purchase orders and related documents for a total amount of at least EUR 307,210.00, relating to various purchases totaling at least 9 kg of gold from the sole proprietorship, whereby these documents were not included in the accounts of the sole proprietorship or,

as appears from the joint reading of the comparative analyzes contained in official report 17094/2012 (vol. XI, cover 23, st. 150-188) and official report 15045/2012 (vol. VI, cover 12.4, st. 144-15) , in order to be able to co-commit and/or cover up the acts of money laundering described under charge D.VII;

d. and the twenty eighth XXX and the twenty ninth XXX

between 16 May 2011 and 11 June 2011, multiple, on a non-determined date

undetermined purchase orders and related documents for an unspecified total amount, relating to the purchase of a total of 3 kg of gold from XXX, whereby these documents were not included in the accounts of the -XXX

as appears from the transcribed telephone conversation attached as appendix 46 to the official report 15859/2011 (vol. IV, cover 6, st. 233-492, l.h.b. st. 305-306) In conjunction with the analysis contained in official report 20731/2011 (part V, cover 7, st. 224-245) and the interrogation attached as appendix 2 to official report 20189/2012 (part XI, cover 25, st. 262-277, 1. h.b. 265-272), in order to co-commit and/or cover up the acts of money laundering described under charge D.VIII;

2. and the thirtieth XXX and the thirty first XXX

On 21 June 2011, multiple

undetermined purchase orders and related documents for an unspecified total amount, relating to the purchase of at least 1,046 kg of gold from XXX in total, these documents were not included in the accounts of the

as appears from the joint reading of the analysis contained in official report 19788/2011 (part V, cover 7, st. 145-165) and the findings contained in official report 19296/2012 (part XI, cover 26, st. 10 -31), in order to be able to co-commit and/or cover up the acts of money laundering described under charge D.IX

VI and the eleventh XXX and the twelfth XXX

between 2 January 2011 and 20 September 2011, multiple, on the following dates

at least 621 purchase orders for a total amount of at least 8,765,548.95 EUR, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from PARTICULIER XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included In the table in appendix 2 to official report 12187/2012 (part VI, cover 12.4, st. 1-26), in order to include the offenses of money laundering described under to be able to commit and/or cover up the indictment D.X

the documents of false hero have not been deposited in the registry, but are in digital form located on CD-ROM deposited at the Registry of Conviction Documents under state number 8394/2014 (part I, cover D);

including In particular, as extracted from the information obtained from the Dutch authorities (see, among other things, copy of the Dutch request for legal assistance dated 3 May 2012: part XII, cover 28.2, st. 173-202, 1.h.b. st. 198):

a. on 17 January 2011

purchase orders LL-1102326 until LL-1102348 for a total amount of at least 228.400;00 EUR

b. On 2 February 2011

purchase orders LL-1105825until LL-1105844 for a total amount of at least 266.309,50 EUR

# Exhibit 8 Part 2

c. on 9 February 2011

purchase orders **LL-1107055** until LL-1107079 for a total amount of at least 300.000 EUR

d. on 30 May 2011

purchase orders LL-1132714 until LL-1132758for a total amount of at least 371.045,04EUR

VII. and the eighteenth XXX

Between 3 January 2011 and 2 July 2011, multiple, on the following dates

at least 134 purchase orders for a total amount of at least EUR 2,663,255.37, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a selling price of less than EUR 15,000.00, while the actual price of the sale effected between the parties is considerably higher than EUR 15,000.00, as included in the table in appendix 2 to official report 12710/2012 (part XII, cover 28.3, items 1-14), whereby the associated income by XXX was not stated in his personal income tax return with regard to the financial year (cfr. 'ejerciclo') 2011 (see official report 1692/2013, part XII, cover 28.3, st. 443-484), to to be able to co-commit and/or cover up the acts of money laundering described under charge D.XI,

the documents accused of forgery have not been filed with the registry, but are in digital form on CD-ROM filed with the registry of convictions under state number 8394/2014 (part I, cover D);

including in particular:

a. on 27 April 2011

purchase orders **LL-1125929** until LL-1125934 and LL-1125936 for a total amount of 100.000,00 EUR

b. on 3 May 2011

purchase orders LL-1127507 until LL-1127512 and LL-112514 for a total amount of 100.001,00 EUR

c. on 10 May 2011

purchase orders LL-1128797 until LL-1128800 for a total amount of 50.000,01 EUR

d. on 19 May 2011

purchase orders LL-1130620 until LL-1130626 for a total amount of 100.000,00 EUR

e. On 27 May 2011

purchase orders LL-1135421 until LL-1137024 for a total amount of 50.000,0 EUR

f. On 9 June 2011

purchase orders LL-1134451 until LL-1134458 for a total amount of at least 99.999,98 EUR

# Exhibit 8 Part 2

g. on 16 June 2011

purchase orders LL-1135421 until LL-1135427 for a total amount of at least 99.999,99 EUR

h. on 23 June 2011

purchase orders LL-1137017 until LL-1137024 for a total amount of at least 100.000,0 EUR

VIII. and the twenty third XXX

Between 20 January 2011 and 16 June 2011, multiple

At least 124 purchase orders for a total amount of at least 1.660.253,88 EUR paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between parties is significantly higher than EUR 15,000.00 , as included in the table in appendix 2 to official report 12713/2012 (part VI, cover 12.4, st. 211-219), in order to be able to co-commit and/or cover the offenses of money laundering described under charge D.XII.,

the documents accused of forgery have not been filed with the registry, but are in digital form on CD-ROM filed with the registry of convictions under state number 8394/2014 (part I, cover DJ;)

IX. and the sixteenth XXX

Between 23 January 2011 and 21 June 2011, multiple

At least 375 purchase orders for a total amount of at least EUR 5,184,700.71, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the transport between parties is considerably higher than EUR 15,000.00, as included in the table in appendix 2 to official report 12192/2012 (part VI, cover 12.4, items 185-200), in order to to be able to commit and/or cover up acts of money laundering described under charge D.XIII,

the documents as of false hero have not been deposited at the registry, but are deposited in digital form on CD-ROM at the registry of the conviction documents under state number 8394/2014 (part I, cover D);

X. and the thirteenth XXX

Between 23 January 2011 and 23 June 2011, multiple

At least 466 purchase orders for a total amount of at least EUR 6,437,650.06, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included in the table in appendix 2 to official report 12190/2012 (part VI, cover 12.4, items 166-184), in order to acts of money laundering described under, to be able to commit and/or cover up indictment D.XIV,

the documents of false hero accused have not been deposited with the court, but have been deposited in digital form on CD-ROM with the Registry of Conviction Documents under state number 8394/2014 (part I, cover D);

XI. and the seventeenth XXX

Between 30 January 2011 and 28 June 2011

# Exhibit 8 Part 2

At least 306 purchase orders for a total amount of EUR 4,097,229.59 million, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included in the table in appendix 2 to official report 12709/2012 (part VI, cover 12.4, st. 84-102), in order to of money laundering described under to be able to commit and/or cover up indictment D.XV,

the documents of false hero are not deposited with the court registry, but are deposited in partial form on CD-ROM with the registry of the transfer documents under state number 8394/2014 (part I, cover D);

XII and the twenty second XXX

Between 7 February 2011 and 14 April 2011, multiple

At least 164 purchase orders for a total amount of at least EUR 2,246,154.64, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between parties is considerably higher than EUR 15,000.00, as included in the table in appendix 2 to official report 12711/2012 (part VI, cover 12.4, items 201-210), in order to be able to commit and/or conceal acts of money laundering described under charge D.XVI,

the documents of false hero accusations have not been deposited at the clerk's office, but have been deposited in digital form on CD-ROM at the clerk's office of the conviction documents under number 8394/2014 (part I, cover D);

XIII. and the fourteenth XXX and the fifteenth XXX

a. between 21 February 2011 and 25 June 2011, multiple

at least 486 purchase orders for a total amount of at least EUR 6,604,290.90, Paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included in table 1 in appendix 2 to official report 12185/2012 (part VI, cover 12.4, st. 27-60), in order to to be able to co-commit and/or cover up the acts of money laundering described under charge D.XVII.a,

b. between 24 February 2011 and 1 June 2011, multiple

at least 218 purchase orders for a total amount of at least EUR 2,963,671.84, paid in cash by NV TONY GOETZ, in each case for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included: in the label 2 In appendix 2 to official report 12185/2012 (part VI, cover 12.4, st. 27-60), in order to to be able to co-perpetrate and/or conceal acts of money laundering described under charge D.XVII,b,

c. between 10 March 2011 and 25 June 2011, multiple

at least 24 purchase orders for a total amount of at least EUR 321,135.00, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, as included in table 4 in appendix 2 to official report 12185/2012 (part VI, cover 12.4, st. 27-60), in order to of money laundering described under

to be able to co-perpetrate and/or cover up charges D.XVII.c,

Exhibit 8 Part 2

d. between 31 March 2011 and 28 June 2011, multiple

at least 113 purchase orders for a total amount of at least EUR 1,541,339.16, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is significantly higher than EUR 15,000.00, as included in table 3 in appendix 2 to official report 12185/2012 (part VI, cover 12.4, items 27-60), in order to to be able to commit and/or conceal acts of money laundering described under indictment D.XVII.d,

the documents accused of falsehood have not been deposited for the registry, but are in digital form on CD-ROM deposited for the registry of the conviction documents under state number 8394/2014 (part I, cover D);

XIV. and the nineteenth XXX and the twentieth XXX and the twenty first XXX

a. between 1 April 2011 and 29 June 2011, multiple, on non-determined dates

at least 199 purchase orders for a total amount of at least EUR 2,672,625.88, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX and each time with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is significantly higher than EUR 15,000.00, as included in the table In appendix 2 to official report 14401/2012 (part VI, cover 12.4, st. 106-122), whereby these documents were not included in the accounts of , in order to co-commit and/or cover up the acts of money laundering described under indictment D.XVIIII.a,

the documents of false hero are not deposited at the registry, but are deposited in digital form on CD-ROM at the registry of the convictions under state number 8394/2014 (part I, cover D).

b. on 5 July 2011, multiple

at least purchase orders LL-1139015, LL-1139022, LL-1139145 and LL-1139160 for a total amount of EUR 49,633.18, paid in cash by NV TONY GOETZ, each time for the purchase of a lot of gold from "PARTIKULIER" XXX and each time with a sales price of less than EUR 15,000.00, while the actual price of the sale made between the parties is considerably higher than EUR 15,000.00, where these documents were not included in the accounts of under charge D.XVIIII.b to be able to commit and/or cover up,

the documents accused of forgery have not been deposited at the registry, but have been deposited in digital form on CD-ROM in the griffle of the convictions under number 8394/2014 (part I, cover D) and are also included in copy in the file as an appendix 3 to official report 8359/2013 (vol. XII, cover 28.4, st. 51-125, l.h.b. st. 84-88);

D. The first (GOETZ Sylvain), the second (GOETZ Alain), the third (NV TONY GOETZ), the fourth XXX and the fifth XXX

In case of infringement of Art. 505 paragraphs 1,3 and 4• of the Penal Code, as amended by the law of 10 May 2007 on various measures relating to the handling and seizure, matters referred to in Article 42,3 of the Penal Code, with the intention of having transposed or transferred conceal or obscure their illegal origin or assist any person involved in a crime from which these matters arise to evade the legal consequences of his acts and/or the nature, origin, location, alienation, transfer or property of the In article 42.3" of the Penal Code, to have concealed or disguised, although at the time of the commencement of this actions, knew or should know the origin of those things, namely,

I. between 31 January 2010 and 23 June 2010, multiple, on the following dates

# Exhibit 8 Part 2

(see file LI27.F1.7206/10, of which a partial copy is attached as appendix 2 to official report 22962/2011, part III, cover 2.8, st. 1-280, and judgment of the Court of Liège dated 14 November 2011)

an undetermined amount of gold, but estimated at 8 kg, for an unspecified total amount, but estimated at EUR 182,400 (at EUR 22.8/gr gold),

including in particular:

a. On 18 June 2010

800 grams of gold for a total amount of 9.120 EUR

b. On 22 June 2010

400 grams of gold for a total amount of 18.725,6 EUR

II. on 10 March 2010, multiple

(see file ANII.LB.32777/2010, of which partial copy added in appendices 1-10 to official report 264j.2/2010, part I, cover 2.1, st. 5-132)

an undetermined total amount of gold, but estimated at 2/3 of 1,150 gr (766.66 gr), for an undetermined total amount, but estimated at 2/3 of EUR 24,600 (EUR 16,400);

III. and the tenth XXX

a. between 4 March 2010 and 15 September 2010, multiple, on the following dates

A total amount of at least 10.688.669,06 EUR, and in particular:

I. On 11 March 2010

10,745 kg of gold for an amount of 287.804,83 EUR, as described under indictment C.I.a.1

II. on 30 April 2010, multiple

12,62 kg of gold for an amount of 348.1855,80 EUR, as described under indictment C.I.a.2

III. between 22 July 2010 and 15 September 2010, multiple

an unspecified amount of at least 30 kg of gold for a total amount of EUR 1,008,823.84, as described under indictment C.I.a.3

b. between 4 January 2011 and 2 July 2011, multiple

an unspecified amount of at least 202 kg of gold for a total amount of EUR 7,507,176.34, as described under indictment C.IV,

IV. and the seventh XXX and the eighth XXX and the nineth XXX

# Exhibit 8 Part 2

(see file ll17.F1.12243/10, waarvan gedeeltelijke kopie gevoegd als bijlage 1 aan proces-verbaal 22962/11, deel lll, kaft 2.8, st. 1-282, en zie de burgerlljke partijstelling te Luik: AN27.98.721/13 en proces-verbaal 100481/15, deel lll, kaft 2.8, st. 354-367 en deel XIV, st. 214-259 en 307-312)

On 17 June 2010, multiple

A total volume of 31,4 kg gold for a total amount of at least 1.000.400,00 EUR

V. and the sixth XXX

Between 2 January 2011 and 25 June 2011, multiple time, on non determined dates

A total volume of 923 kg of gold for an unspecified total amount, but estimated at a minimum of EUR 28,613:00,00, as described under the indictment C.V.a

VI. and the twenty fourth XXX

a. On 26 May 2011

5 kg of gold for an unspecified total amount, but estimated at a minimum of EUR 165.000,00, as described under the indictment C.V.b.1

b. On 30 May 2011

an unspecified amount of at least 1.8 kg of gold for a total amount of EUR 60,000.00, as described under charge C.V.b.2,

VII. and the twenty sixth XXX and the twenty seventh XXX

Between 8 June 2011 and 1 July 2011, multiple, on non determined dates

A total volume of 9 kg of gold for a total amount of 307.210,00 EUR, as described under indictment C.V.c.

VIII. and the twenty eighth XXX and the twenty nineth XXX

Between 16 May 2011 and 11 June 2011, multiple, on non determined dates

A total volume of 3 kg of gold for an unspecified total amount, but estimated at a minimum of EUR 99,000.00, as described under the indemnification C.V.d,

IX. and the thirtieth XXX and the thirty first XXX on 21 June 2011

1.046 kg of gold for an unspecified total amount, but estimated at a minimum of EUR 34,500.00, as described under charge C.V.e,

X. and the eleventh XXX and the twelfth XXX between 2 January 2011 and 20 September 2011, multiple times, including 17 January 2011, 2 February 2011, 9 February 2011 and 30 May 2011

an unspecified quantity of at least 200 kg of gold for a total amount of EUR 8,765,548.95, as described under indictment C.VI,

# Exhibit 8 Part 2

(see also the notification by the Spanish authorities, vol. XII, cover 28.4, st. 32-37 and translation: st, 44-48),

XI. and the eighteenth XXX between 3 January 2011 and 2 July, multiple times, including 27 April 2011, 3 May 2011, 10 May 2011, 19 May 2011, 27 May 2011, ( June 2011, 16 June 2011 and 23 June 2011

an unspecified amount of at least 76 kg of gold for a total amount of 2,663,255.37 EUR, as described under indictment C.VII,

XII. and the twenty third XXX

Between 20 January 2011 and 16 June 2011, multiple

an unspecified amount of at least 47 kg of gold for a total amount of EUR 1,660,253.88, as described under charge C.VIII,

XIII. and the sixteenth XXX

Between 23 January 2011 and 21 June 2011, multiple

an unspecified amount of at least 148 kg of gold for a total amount of EUR 5,184,700.71, as described under charge C.IX,

XIV. and the thirteenth XXX

Between 23 January 2011 and 23 June 2011, multiple

an unspecified quantity of at least 183 kg of gold for a total amount of 6,437,650.06 EUR, as described under charge C.X, .

XV. and the seventeenth XXX

Between 30 January 2011 and 28 June 2011, multiple

an unspecified quantity of at least 117 kg of gold for a total amount of EUR 4,097,229.59, as described under charge C.XI,

XVI. and the twenty second XXX

Between 7 February 2011 and 14 April 2011, multiple

an unspecified quantity of at least 64 kg of gold for a total amount of EUR 2,246,154.64, as described under charge C.XII,

XVII. and the fourteenth XXX and the fifteenth XXX

a. between 21 February 2011 and 25 June 2011, multiple

an unspecified amount of at least 188 kg of gold for a total amount of EUR 6,604,290.90, as described under charge C.XIII.a,

b. between 24 February 2011 and 1 June 2011, multiple

an unspecified amount of at least 84 kg of gold for a total amount of EUR 2,963,671.84, as described under charge C.XIII.b,

c. Between 10 March 2011 and 25 June 2011, multiple

an unspecified quantity of at least 9 kg of gold for a total amount of EUR 321,135.00, as described under other charges C.XIIJ.c

d. Between 31 March 2011 and 28 June 2011, multiple

an unspecified amount of at least 44 kg of gold for a total amount of EUR 1,541,339.16, as described under charge C.XIII.d,

XVIII. and the nineteenth XXX, twentieth XXX and twenty first XXX

a. Between 1 April 2011 and 29 June 2011, multiple

an unspecified amount of at least 76 kg of gold for a total amount of EUR 2,672,625.88, as described under indictment C,XIV,a,

b. on 5 July 2011

1,445 kg of gold for a total amount of 49.633,19 EUR, as described under indictment C.XIV, b

E...

F. The sixth XXX and the thirty fourth XXX

Between 31 December 2009 and 23 June 2011, multiple

In the event of an infringement of Articles 1 and 2 § 1 of the Act of 6 July 1976 on the suppression of surreptitious work of a commercial or craft nature, punishable by Article 5 of the aforementioned Act, to have practiced surreptitious work or to have made use of the parts of someone who does surreptitious work

namely by contravening the aforementioned legal provisions, either as a sales agent or commissioned, either in his own name and for his own account, to have carried out transactions with regard to trade in precious metals;

G. The first (GOETZ Sylvain), the second (GOETZ Alain), the third (NV TONY GOETZ), the fourth XXX and the fifth XXX

In violation of Articles 10ter and 23 (old) and Articles 21 and 41 (new) of the Law of January 11, 1993 on the prevention of the use of the financial system for money laundering and the financing of terrorism, to have settled in cash the price of the sale, carried out between the parties, by a trader of a good with a value of EUR 15,000.00 or more;

the facts since February 5, 2010, In pursuance of the law of January 18, 2010 (B.S. 26.1.2010),

defined as follows:

DRC-34996 0301

# Exhibit 8 Part 2

In breach of Articles 21 and 41 of the Law of 11 January 1993 on preventing the use of the financial system for money laundering and the financing of terrorism, to have paid in cash the price of the sale carried out between parties by a dealer of one or more goods for an amount of EUR 15,000.00 or more, regardless of whether the sale takes place in a single operation or in several operations which seem to be linked;

the facts now, in accordance with the law of March 29, 2012 (B.S. 06.IV.2012), described as follows:

In violation of Articles 21 and 41 of the Law of 11 January 1993 on the prevention of the use of the financial system for money laundering and the financing of terrorism, to have settled in cash the price of the sale, effected between the parties, by a trader of one or more goods for an amount of EUR 5,000 or more, regardless of whether the sale takes place in one transaction or through several transactions between which there seems to be a connection,

the facts now; pursuant to the law of September 18, 2017 (B.S. 06.X.2017), described as follows:

In violation of articles 67 and 137 of the law of September 18, 2017 to prevent money laundering and the financing of terrorism and to limit the use in cash, outside the case of public sale ultimated under the supervision of a bailiff, as a person who is not a consumer, on purchase from another person of old metals, copper cables or goods containing precious substances, to have paid an amount in cash, or a payment or a donation for more than 3. 000 euros or its equivalent in another currency, whether or not it is part of a transaction or a set of transactions between which there appears to be a connection, having made or received in cash,

with particular reference to the transactions mentioned below:

I. between 3 January 2010 and 31 December 2010, multiple

the transactions to which the false documents described under indictment C.I relate

In particular:

And the tenth XXX

Between 10 March 2010 and 15 September 2010, multiple

the transactions to which the false documents described under indictment C.I.a. relate:

II. and the sixth XXX, thirty second XXX and the thirty third XXX

Between 4 January 2010 and 1 June 2011, multiple

the transactions to which the false documents described under indictment C.II relate

III. and the twenty fourth XXX and the twenty fifth XXX

Between 13 January 2010 and 30 March 2010, multiple

the transactions to which the false documents described under indictment C.III relate

IV. and the tenth XXX

Between 4 January 2011 and 2 July 2011, multiple

DRC-34996 0302

Exhibit 8 Part 2

the transactions to which the false documents described under indictment C.IV relate

V. between 2 January 2011 and 17 November 2011, on the following dates

the transactions to which the false documents described under indictment C.V relate

a. and the sixth XXX

between 2 January 2011 and 25 June 2011, multiple

the transactions to which the false documents described under indictment C.V.a relate

b. and the twenty fourth XXX

between 25 May 2011 and 31 May 2011, multiple

the transactions to which the false documents described under indictment C.V.b relate

c. and the twenty sixth XXX and the twenty seventh XXX

between 8 June 2011 and 1 July 2011, multiple

the transactions to which the false documents described under indictment C.V.c relate

d. and the twenty eighth XXX and the twenty nineth XXX

between 16 May 2011 and 11 June 2011, multiple

the transactions to which the false documents described under indictment C.V.d relate

e. and the thirtieth XXX and the thirty first XXX

on 21 June 2011

the transactions to which the false documents described under indictment C.V.e relate

VI. and the eleventh XXX and the twelfth XXX

Between 2 January 2011 and 20 September 2011, multiple

the transactions to which the false documents described under indictment C.VI relate

VII. and the eighteenth XXX

Between 3 January 2011 and 2 July 2011, multiple

the transactions to which the false documents described under indictment C.VII relate

VIII. and the twenty third XXX

# Exhibit 8 Part 2

Between 20 January 2011 and 16 June 2011, multiple

the transactions to which the false documents described under indictment C.VIII relate

IX. and the sixteenth XXX

Between 23 January 2011 and 21 June 2011, multiple

the transactions to which the false documents described under indictment C.IX relate

X. and the thirteenth XXX

Between 23 January 2011 and 23 June 2011, multiple

the transactions to which the false documents described under indictment C.X relate

XI. and the seventeenth XXX

Between 30 January 2011 and 28 June 2011, multiple

the transactions to which the false documents described under indictment C.XI relate

XII. and the twenty second XXX

Between 7 February 2011 and 14 April 2011, multiple

the transactions to which the false documents described under indictment C.XII relate

XIII. and the fourteenth XXX and the fifteenth XXX

Between 21 February 2011 and 28 June 2011, multiple

the transactions to which the false documents described under indictment C.XIII relate

XIV. and the nineteenth XXX the twentieth XXX and the twenty first XXX

Between 1 April 2011 and 6 July 2011, multiple

the transactions to which the false documents described under indictment C.XIV relate

H. The sixth XXX and the thirty fourth XXX

between 31 December 2009 and 23 June 2011, multiple

In violation of Articles 2, 3, 4, 5, 6,.and 33 of the law establishing a Crossroads Bank for Enterprises, modernizing the commercial register, establishing accredited business offices and containing various provisions, punishable to Articles 62 § 2, 1- and 63 of the same law, as a person required to register in the commercial register to have exercised activities without having applied for registration in the commercial register,

# Exhibit 8 Part 2

The facts pursuant to the entry into force of the Book III of the Code of Economic Law from 9 May 2014 defined as follows:

In violation of Articles 1.2, 111.15, 111.16, 111.17, 111.18 and 111.49 of the Code of Economic Law, made punishable by Articles XV.69, XV.70 and XV.77, of the same Code, as a person held with the commercial capacity or noncommercial capacity under private law to register in the Kruispuntbank van Ondernemingen activities without having requested the registration of this capacity,

namely activities as a sales agent or commission agent and/or as a trader In their own name and for their own account

# Exhibit 8 Part 2

and regarding the voluntary intervening parties

     XXX

     Of French nationality

     XXX

     Of French nationality

     XXX

     Of French nationality

     Voluntary intervening parties, represented by Meester Vermeulen Erhard, lawyer at 2000 Antwerp, Leon Stynenstraat 75/C, loco Meester Vandewall Frank, lawyer at Antwerp

PROCEDURE

De rechtbank neemt kennis van de beschikking van de raadkamer van deze rechtbank van 26/04/2018 waarin verzachtende omstandigh~den werden aangenomen.

De behandeling en de debatten van de zaak hadden plaats in open bare terechtzitting.

De rechtspleging verliep In de Nederlandse taal, behalve wat het vertaald gedeelte betreft dat geschiedde.

De rechtbank heeft als tolk aangesteld I<oeck Christiane Josephine, tenelnde de beklaagde bl) te staan voor vertaling van alles wat gezegd wordt van het Frans naar

het Nederlands en omgekeerd en die de door de wet voorziene eed heeft afgelegd.

De rechtbank heeft als tolk aangesteld Provinciael Ernest, tenelnde de beklaagd, 127;;IC iJ te staan voor vertaling van alles wat gezegd wordt van het Spaans naar het

Nederlands en omgekeerd en die de door de wet voorziene eed heeft afgelegd.

De rechtbank nam kennis van de stukken van de rechtspleging en hoorde alle aanwezige partijen.

BeklaagdeXXX, zijn niet verschenen hoewel ze rechtsgeldig warden gedagvaard.

# Exhibit 8 Part 2

## 1. PROCEDURE

*Betreffende de schending van het vermoeden van onschuld*

In besluiten werpen eerste t/m vijfde beklaagde op dat de strafvordering in hunnen hoofde onontvankelijk moet worden verklaard wegens de schending van het vermoeden van onschuld. Concreet verwijzen deze beklaagden naar een persartikel dat werd gepubliceerd (zie st. 16, bundel eerste en tweede beklaagde GOETZ, gepubliceerd in het dagblad DE TIJD op 18.09.2015 met titel *"Parket vervolgt grootste goudsmelterij"*) in een Belgische krant.

In eerste instantie dient de rechtbank vast te stellen dat in deze niet vaststaat wie verantwoordelijk is voor het doorspelen van enige informatie uit het strafdossier aan de journalist die voornoemd krantenartikel schreef.

Verder verwijst de rechtbank naar de besluiten van eerste en tweede beklaagde (met verwijzing naar een arrest van het Europees Hof van de Rechten van de Mens d.d. 29.08.1997) waaruit blijkt dat de beoordeling van de schending van het vermoeden van onschuld *in concreto* dient te gebeuren.

In de voorliggende uitspraak van het Europees Hof werd blijkbaar vastgesteld dat de betrokken journalist de beklaagde had bekritiseerd omwille van de door de beklaagde gevoerde verdediging en verder had deze journalist ook duidelijk standpunt ingenomen omtrent de schuld van de beklaagde.

In die omstandigheden oordeelde het Europees Hof dat het vermoeden van onschuld hierdoor geschonden werd.

Daarenboven blijkt uit hetzelfde arrest dat een schending van het vermoeden van onschuld tevens met zich dient te brengen dat de beschuldigde hierdoor minstens het risico loopt geen eerlijk proces te zullen genieten.

De rechtbank verwijst naar de inhoud van voornoemd krantenartikel (zoals geciteerd op pagina 60 van de conclusies van eerste en tweede beklaagde) en dient vast te stellen dat in dit artikel weliswaar vermeldingen worden gemaakt aangaande de feiten waarvoor beklaagden thans vervolgd worden maar geenszins een kritische houding wordt aangenomen t.a.v. beklaagden noch dat er standpunt wordt ingenomen omtrent de schuld of onschuld van beklaagden.

Daarenboven blijkt uit niets dat met deze publicatie het recht op een eerlijk proces in hoofde van beklaagden geschonden zou zijn geworden. De rechtbank verwijst hierbij naar het tijdsverloop, het persartikel dateert van meer dan vier jaar geleden, en werd daarenboven gepubliceerd in een zakenkrant met een specifiek lezerspubliek.

In die omstandigheden stelt de rechtbank vast dat het vermoeden van onschuld in deze niet geschonden werd, evenmin als het recht op een eerlijk proces in hoofde van beklaagden.

- _Betreffende de schending van het recht van verdediging – verhoor van beklaagden_
_zonder bijstand van een advocaat_

In besluiten werpen vierde, vijfde, zesentwintigste, zevenentwintigste en achtentwintigste beklaagde op dat de door hen afgelegde verhoren (waar inderdaad geen bijstand van een advocaat werd voorzien) niet kunnen worden aangewend in huidige procedure wegens schending van de rechten van verdediging.

De omstandigheid dat verklaringen werden afgelegd tijdens een politieverhoor zonder mogelijkheid van bijstand van een advocaat, heeft evenwel niet automatisch voor gevolg dat het definitief onmogelijk is om de zaak van een beklaagde op een eerlijke wijze te behandelen.

In eerste instantie stelt de rechtbank vast dat uit niets blijkt dat er bij het afleggen van de verhoren door vierde, vijfde, zesentwintigste en zevenentwintigste beklaagde op enigerlei wijze sprake is geweest van misbruik of dwang waardoor beklaagden tegen hun wil enige verklaring hebben afgelegd.

In besluiten geeft zevenentwintigste beklaagde ⬛⬛⬛⬛⬛⬛⬛ aan dat zij onder druk zou zijn gezet door de politiediensten om welbepaalde verklaringen af te leggen. Dit blijkt niet uit de voorliggende stukken.

De rechtbank verwijst vooreerst naar het gegeven dat zevenentwintigste beklaagde schriftelijk werd uitgenodigd voor verhoor op 23.08.2012 (Deel XI, kaft 23, st. 249) waarbij zij in kennis werd gesteld van haar rechten met name het recht om zichzelf niet te beschuldigen, haar zwijgrecht en het recht om voorafgaandelijk aan het verhoor een advocaat te raadplegen.

Op 23.08.2012 bood zevenentwintigste beklaagde zich ook vrijwillig aan voor verhoor. Ook uit de inhoud van het verhoor kan de rechtbank niet afleiden dat zevenentwintigste beklaagde op enigerlei wijze onder druk zou zijn gezet om enige verklaring af te leggen waar zij niet achter stond.

DRC-34996 0308

# Exhibit 8 Part 2

Het tegendeel blijkt zelfs. Wanneer de verbalisanten naar onderschepte telefoongesprekken verwijzen en zevenentwintigste beklaagde om verduidelijking verzoeken, antwoordt zij: *"Dit is inderdaad een gesprek tussen mijzelf en de bediende van de NV TONY GOETZ. Wat ik bedoelde met de uitspraak 'willen jullie dit storten want dit is officieel' weet ik niet. Ik had dit geld nodig om klanten te betalen. U zegt mij dat dit geen echt antwoord is op de vraag. Maar ik wens verder niets toe te voegen."*

Hieruit blijkt duidelijk dat wanneer zevenentwintigste beklaagde geen verklaring wilde afleggen, zij dit ook niet deed hetgeen door de verbalisanten gerespecteerd en genoteerd werd.

Ook achtentwintigste beklaagde ▇▇▇▇▇▇S stelt in besluiten dat de door hem afgelegde politionele verklaringen niet in huidige procedure kunnen worden aangewend nu deze verklaringen werden afgelegd zonder bijstand van een advocaat.

Achtentwintigste beklaagde werd op 14.11.2012 verhoord. (DEEL XI, kaft 25, st. 271) Hij werd hiertoe voorafgaandelijk schriftelijk uitgenodigd waarbij hij in kennis werd gesteld van zijn rechten, o.a. het recht om voorafgaandelijk overleg te hebben met een advocaat. Tussen achtentwintigste beklaagde en de politiediensten volgde hierop emailcorrespondentie teneinde een juiste datum voor het verhoor vast te leggen.

Tevens blijkt uit het voorliggende verhoor dat achtentwintigste beklaagde geenszins op enigerlei wijze door de politie onder druk werd gezet of dat zijn rechten van verdediging zouden zijn geschonden.

Bovendien stelt de rechtbank vast dat achtentwintigste beklaagde in besluiten ook de inhoud van zijn verklaring bij de politiediensten op geen enkele wijze betwist.

In die omstandigheden kan de rechtbank niet vaststellen dat de rechten van verdediging in hoofde van achtentwintigste beklaagde *in concreto* geschonden zijn.

Daarnaast stelt de rechtbank vast dat alle beklaagden zich, ten tijde van hun verhoor, en tijdens het onderzoek, niet in een kwetsbare positie bevonden, zodat zij zich in volle vrijheid en, indien gewenst, met bijstand van een raadsman hebben kunnen verdedigen.

Tot slot, en ten overvloede, zal de rechtbank ook niemand veroordelen op basis van zijn of haar loutere verklaringen die werden afgelegd zonder bijstand van een advocaat.

# Exhibit 8 Part 2

In die omstandigheden blijft het eerlijk karakter van het proces gevrijwaard (zie in dezelfde zin: Cass. 23.11.2010, P.10.1428.N) en werden de rechten van verdediging niet geschonden.

- _Betreffende de schending van het recht op verdediging ingevolge het tijdsverloop sinds de feiten_

- **Betreffende vierde beklaagde ▬▬▬▬▬▬ en vijfde beklaagde ▬▬▬▬▬ ▬▬▬▬▬▬▬**

Vierde beklaagde ▬▬▬▬▬▬▬ en vijfde beklaagde ▬▬▬▬▬▬▬ werpen op dat hun recht op een eerlijk proces onherstelbaar is geschonden door het tijdsverloop van het voorliggende strafrechtelijk onderzoek.

Meer concreet stellen beklaagden dat aan hen handelingen worden verweten die plaatsvonden in de jaren 2010 en 2011 daar waar zij in het kader van de rechtspleging slechts werden opgeroepen voor de Raadkamer te Antwerpen op 3 oktober 2016.

Ingevolge dit tijdsverloop zouden vierde en vijfde beklaagde thans in de onmogelijkheid zijn om na te gaan of zij op welbepaalde dagen tijdens de hen ten laste gelegde incriminatieperiode aan het werk waren dan wel vakantie hadden.

De rechtbank stelt vast dat beklaagden niet hun onschuld dienen te bewijzen. Het komt het Openbaar Ministerie toe het bewijs van de aan beklaagden ten laste gelegde feiten te bewijzen. In voorkomend geval zal de rechtbank – voor zover dit bewijs niet door het Openbaar Ministerie wordt geleverd – beklaagde hiervan vrijspreken.

Daarnaast blijkt – hetgeen verder nog besproken wordt – zowel uit het strafdossier als uit de door het Openbaar Ministerie neergelegde conclusie dat aan beklaagden niet zozeer specifieke handelingen worden verweten, m.n. het individueel aan- en verkopen van goud, maar wel hun individuele, en noodzakelijke, bijdrage bij het opzetten van een systeem van aan- en verkopen van goud dat door het Openbaar Ministerie als malafide wordt aangeduid.

De rechtbank kan dan ook geen onherstelbare schending van het recht van verdediging in hoofde van vierde en vijfde beklaagde vaststellen zodat de strafvordering ook om deze reden niet onontvankelijk kan worden verklaard.

- **Betreffende zeventiende beklaagde ▬▬▬▬▬▬▬▬**

Zeventiende beklaagde stelt dat in zijnen hoofde de redelijke termijn, waarbinnen hij mag verwachten dat de strafvordering wordt uitgeoefend, is overschreden waardoor zijn rechten van verdediging dermate geschonden zouden zijn geworden dat de uitoefening van de strafvordering in zijnen hoofde onontvankelijk zou moeten worden verklaard.

De vraag of de redelijke termijn waarbinnen de strafvordering moet worden uitgeoefend, overschreden is, dient *in concreto* beantwoord te worden.

In deze staat het vast dat zeventiende beklaagde in december 2012 in kennis werd gesteld van het tegen hem ingestelde strafrechtelijk onderzoek. Beklaagde weigerde toen hieraan mee te werken. (zie DEEL XIII, kaft 30, onderkaft B, st. 20)

De rechtbank kan niet anders dan vaststellen dat thans meer dan acht jaar zijn verstreken sinds het tijdstip waarop zeventiende beklaagde in deze zaak voor het eerst werd verontrust.

De rechtbank verwijst echter ook naar de omvang (met vierendertig beklaagden), de complexiteit (technische inbreuken in de fiscale en financiële sfeer) en het internationaal karakter (met ambtelijke opdrachten in verschillende landen) van het gevoerde strafonderzoek.

Ondanks het tijdsverloop dient de rechtbank verder vast te stellen dat het strafonderzoek steeds een normaal verloop heeft gekend. Er kunnen geen periodes worden aangeduid waarbij het onderzoek om onverklaarbare redenen zou hebben stilgelegen.

Hoewel de redelijke termijn op zich mogelijk geschonden werd, kan de rechtbank in hoofde van zeventiende beklaagde desondanks geen inbreuken op zijn rechten van verdediging vaststellen.

Zo werd zeventiende beklaagde in 2012 in kennis gesteld van het lastens hem lopende onderzoek en werd zijn beslissing om iedere medewerking te weigeren gerespecteerd.

Zeventiende beklaagde stelt thans dat hij onmogelijk nog enig verweer kan voeren nu de boekhoudkundige stukken van zijn vennootschap – die hij naar eigen zeggen slechts zeven jaar dient te bewaren – verloren zouden zijn gegaan.

De rechtbank stelt vast dat het gegeven dat de boekhouding van beklaagde in beslag zou zijn genomen (in het kader van een in Duitsland gevoerd strafrechtelijk onderzoek) en deze boekhoudkundige stukken hierbij verloren zouden zijn gegaan, door geen enkel stuk

aannemelijk worden gemaakt en slechts loutere, en naar het oordeel van de rechtbank ongeloofwaardige, beweringen van zeventiende beklaagde betreffen.

Ook het gegeven dat beklaagde boekhoudkundige stukken slechts zeven jaar dient te bewaren en deze dus thans niet meer tot zijn beschikking heeft, oordeelt de rechtbank volstrekt ongeloofwaardig. Wanneer beklaagde in 2012 in kennis wordt gesteld van het gegeven dat er een strafrechtelijk onderzoek lastens hem ingesteld wordt en in 2016, in het kader van de regeling van de rechtspleging wordt opgeroepen om te verschijnen voor de raadkamer te Antwerpen, kan en mag van hem verwacht worden dat hij stukken ter zijner verdediging zal bewaren.

Enige schending van de redelijke termijn in hoofde van zeventiende beklaagde die het verval van het recht tot uitoefening van de strafvordering met zich heeft gebracht kan door de rechtbank dan ook niet worden vastgesteld.


### 2. OP STRAFRECHTELIJK VLAK


-   _Algemeen_


In het kader van een ander strafrechtelijk onderzoek naar de diefstal van goud en juwelen wordt vastgesteld dat een deel van de buit werd verkocht via de goudsmelter TONY GOETZ NV, in deze derde beklaagde.

Hierbij werd vastgesteld dat het aangeboden goud door de firma GOETZ werd aangenomen zonder verdere vragen naar de herkomst ervan te stellen en zonder dat er enige administratieve verplichting diende te worden uitgevoerd. Het goud werd onmiddellijk gesmolten, gewogen en in contanten uitbetaald.

Eerste en tweede beklaagde GOETZ zijn broers, hoofdaandeelhouder in derde beklaagde waarbij eerste beklaagde tevens de gedelegeerd bestuurder is van de firma GOETZ.

Vierde beklaagde ████████████ en vijfde beklaagde ████████████████ zijn tewerkgesteld binnen de firma GOETZ.

Zesde t/m vierendertigste beklaagde zijn allen klanten van de firma GOETZ.

Eerste t/m vijfde beklaagde worden vervolgd voor het opzetten van een grootschalig fraudesysteem waarbij hun klanten de mogelijkheid werd geboden om grote hoeveelheden goud en andere edele metalen anoniem, en met vergoeding in contanten, te verkopen. ·

Zesde t/m vierendertigste beklaagde worden vervolgd omdat ze van het systeem van eerste t/m vijfde beklaagde gebruik zouden hebben gemaakt.

Uit het onderzoek is gebleken dat tijdens de voorliggende incriminatieperiode (d.i. in de jaren 2010 en 2011) door de firma GOETZ aanzienlijke aankopen van edele metalen werden verricht waarbij de verkopers – die nochtans als handelaars waren gekend – geïdentificeerd werden als 'particulieren' waarbij de aangekochte goederen veelal in contanten werden betaald.

Tevens is gebleken dat daar waar de aangekochte goederen de waarde van 15.000 EURO overschreden, de aankoop systematisch werd opgesplitst in verschillende deelaankopen van minder dan 15.000 EURO.

Dat dit systeem frequent werd aangewend, blijkt uit het gevoerde onderzoek waarbij werd vastgesteld dat er door de firma GOETZ in de periode van 05.01.2011 t/m 16.11.2011 voor een bedrag van 785.977.175,94 EURO oude edele metalen werden aangekocht waarbij een bedrag van 651.960.942,59 EURO (hetzij meer dan 80% van de totale transacties) in contanten werd uitbetaald.

Beklaagde betwisten in grote mate de hen ten laste gelegde feiten.

- *Betreffende de tenlasteleggingen in het algemeen*

● *De tenlastelegging C*

Onder deze tenlastelegging worden de onderscheiden beklaagden vervolgd voor feiten van valsheid in geschriften.

Beklaagden wordt hierbij verweten *"aankoopborderellen en gerelateerde stukken"* te hebben opgesteld dan wel te hebben doen opstellen en dit bij de aankoop/verkoop van oud goud waarbij de verkopers werden voorgesteld als particulieren, daar waar het handelaars betrof, en de bedragen op de aankoopborderellen telkenmale werden opgesplitst in bedragen onder de 15.000 EURO.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                          p. 46
Dossiernr: 10A028432                    ·         vleugel D, 3de verdieping              Vonnisnr    /

Beklaagden zouden hierbij gehandeld hebben om de herkomst van het aangekochte, dan
wel verkochte, oud goud te verdoezelen, om de bepalingen van de Wet van 11 januari 1993
te omzeilen, dan wel om een concurrentievervalsend systeem op te zetten.

De rechtbank zal hierna in hoofde van iedere individuele beklaagde nagaan of, en in
voorkomend geval in welke mate, beklaagden zich hieraan schuldig hebben gemaakt.

   ● *De tenlastelegging D*

Onder de tenlastelegging D worden beklaagden vervolgd voor feiten van witwassen.

·Aan beklaagden wordt verweten edele metalen, met een illegale herkomst, te hebben
omgezet of overgedragen met de bedoeling de illegale herkomst ervan te verbergen (art.
505 lid 1, 3° SW) dan wel de aard van deze zaken te verhullen (art. 505 lid, 4° SW).

Uit de gegevens van het strafdossier blijkt dat het Openbaar Ministerie aan beklaagden
verwijt dat zij transacties (aan- of verkoop) hebben verricht van edele metalen die van een
misdrijf afkomstig waren, dan wel dat het transacties betreft waarbij de fiscale regels niet
werden gevolgd en die volgens het Openbaar Ministerie *'buiten de boekhouding'* werden
uitgevoerd.

De rechtbank zal verder nagaan of, en indien zo, in welke mate iedere individuele beklaagde
zich aan deze tenlasteleggingen heeft schuldig gemaakt.

Wat betreft de verwijzing naar transacties die *'buiten de boekhouding'* werden uitgevoerd,
stelt de rechtbank vast dat de geviseerde transacties aan- en verkopen betreffen van
partijen edele metalen, door handelaars-verkopers, waarbij de aankoopprijs in contanten
werd uitbetaald.

Uit de elementen van het strafdossier blijkt dat aan beklaagden wordt verweten dat zij
transacties hebben uitgevoerd *"als particulier"* waarbij enorme bedragen in contanten
werden uitbetaald zonder dat op enigerlei wijze deze transacties boekhoudkundig werden
verwerkt.

De boekhoudkundige verwerking van deze transacties bij derde beklaagde NV TONY GOETZ
gebeurde anoniem; slechts de globale verkopen *"particulier"* werden geboekt en individuele
verrichtingen konden enkel worden teruggevonden aan de hand van aankoopborderellen
*"particulier"* waarbij op informele wijze een identificatie van de leverancier/klant werd
doorgevoerd.

Exhibit 8 Part 2

Bij deze zgn. *"particuliere"* verkopers van goud werden weinig tot geen boekhoudkundige verwerkingen van de transacties aangetroffen.

In zoverre vaststaat dat verkopen van edelen metalen aan de NV TONY GOETZ op professionele basis gebeurden, zonder dat deze transacties boekhoudkundig werden verwerkt, dient de rechtbank vast te stellen dat deze weldegelijk plaatsvonden op basis van zgn. fiscale misdrijven.

In tegenstelling tot hetgeen beklaagden voorhouden, vonden deze fiscale misdrijven geenszins uitsluitend plaats na de verkoop van de edele metalen. Het spreekt voor zich dat verkopen van oud goud *'buiten de boekhouding'* geschiedt met oud goud dat ook *'buiten de boekhouding'* werd aangekocht en dit met financiële middelen die eveneens *'buiten de boekhouding'* beschikbaar zijn. In het geval van frequente of opeenvolgende verkopen van oud goud *'buiten de boekhouding'* worden de opeenvolgende transacties daarenboven mede gefinancierd met de illegale vermogensvoordelen die uit vroegere illegale transacties voortvloeien.

In die omstandigheden vormen verkopen van oud goud *"buiten de boekhouding"* weldegelijk een omzetten van illegale vermogensvoordelen.

* *De tenlasteleggingen G*

Onder de tenlastelegging G worden beklaagden vervolgd voor inbreuken op de zgn. preventieve verplichtingen van de witwaswetgeving zoals opgenomen in de Wet van 11 januari 1993, dit ingevolge het plegen van valsheden in geschriften zoals opgenomen onder de tenlastelegging C.

Ter terechtzitting stellen eerste t/m vijfde beklaagde dat zij niet vervolgd kunnen worden voor de feiten zoals vermeld onder de tenlastelegging G nu de wettelijke bepalingen in deze enkel van toepassing zouden zijn op de verkopers van de geviseerde transactie daar waar zijzelf in deze transactie zijn opgetreden als aankopers.

Art. 10*ter* van de Wet van 11 januari 1993 bepaalde destijds:

"De prijs van de verkoop door een handelaar van een goed ter waarde van 15.000 EUR of meer mag niet in contanten worden vereffend."

Deze wetsbepaling werd heromschreven zodat vanaf 05.02.2010 art. 21 van de Wet van 11 januari 1993 het volgende bepaalt:

> *"De prijs van de verkoop door een handelaar van één of meerdere goederen voor een bedrag van 15.000 euro of meer, mag niet in contanten worden vereffend, ongeacht of de verkoop plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan."*

Na wijzigingen bij Wet van 29.03.2012 en 15.07.2013 bepaalt art. 21 van de Wet van 11 januari 1993 het volgende:

> *"De prijs van de verkoop door een handelaar van één of meerdere goederen evenals de prijs van één of meerdere dienstprestaties geleverd door een dienstverstrekker, voor een bedrag van 5.000 euro of meer, mag niet in contanten worden vereffend uitgezonderd voor een bedrag dat 10 % van de prijs van de verkoop of de dienstprestatie niet overstijgt, en voor zover dit bedrag niet hoger is dan 5.000 euro, ongeacht of de verkoop of de dienstprestatie plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan.*
>
> *De prijs van de aankoop, door een handelaar in edele metalen, van één of meerdere goederen voor een bedrag van 5.000 euro of meer, mag slechts in contanten worden vereffend voor een bedrag dat niet hoger is dan 10 % van de aankoopprijs en voor zover dat bedrag niet hoger is dan 5.000 euro ongeacht of de aankoop plaatsvindt in één of meer verrichtingen of via meerdere verrichtingen waartussen een verband lijkt te bestaan.*
>
> *..."*

Volgens eerste t/m vijfde beklaagde toont voormelde wetsevolutie duidelijk aan dat hun handelingen, als kopers, op het tijdstip van de incriminatieperiode niet strafbaar zouden zijn geweest.

De rechtbank deelt deze visie niet.

Bij iedere verkooptransactie is er uiteraard minstens één partij die optreedt als koper.

Terecht stellen eerste t/m vijfde beklaagde dat voornoemde wetsbepalingen, hetzij art. 10ter en art. 21 (zoals van toepassing tot de wetswijziging van 15.07.2013) principieel de verkopers bij handelstransacties viseren.

Exhibit 8 Part 2

Uit niets blijkt echter dat derden – in deze kopers – niet mee vervolgd kunnen worden wanneer zij als mededader hebben meegewerkt aan inbreuken die door de zgn. verkopers zouden zijn begaan.

Het is deze situatie die door het Openbaar Ministerie aan eerste t/m vijfde beklaagde wordt verweten. Zij worden ervan verdacht een systeem in het leven te hebben geroepen waardoor de overige medebeklaagden (de verkopers bij de geviseerde transacties) in de mogelijkheid werden gesteld om inbreuken op de Wet van 11 januari 1993 te plegen.

De rechtbank meent dat ingevolge deze zienswijze haar saisine niet wordt geschonden.

De inbreuken van de tenlastelegging G worden inderdaad gesteund door de overeenkomstige valsheden die in de tenlastelegging C worden vermeld.

Het loutere feit dat deze valsheden betrekking hebben op aankoopborderellen, impliceert geenszins dat enkel aankopen en geen verkopen zouden zijn geviseerd.

Het door eerste t/m vijfde beklaagde in het leven geroepen systeem waarvan de overige medebeklaagden – trouwens wél als verkopers – gebruik hebben gemaakt, strekte er immers net toe iedere papierstroom te vermijden.

De door eerste t/m vijfde beklaagde opgestelde aankoopborderellen zijn hierbij de enige overgebleven documenten die de ver- en aankoop van oud goud aantonen.

Eerste t/m vijfde beklaagde voeren verder aan dat hun handelingen als koper, geen inbreuk kunnen vormen op de bepalingen van art. 10*ter* nu hun handelingen als koper geen deelnemingshandelingen zouden kunnen zijn in hoofde van de verkoper.

De rechtbank verwijst naar de bepalingen van art. 10*ter* van de Wet van 11 januari 1993 waarin vermeld wordt dat de prijs *"van een verkoop door een handelaar" "van een goed ter waarde van 15.000 EUR of meer"* niet in contanten *"vereffend mag worden"*.

Deze bepalingen is in algemene bewoordingen opgesteld en viseert geenszins expliciet de handelingen van de verkoper in de zin dat het de verkoper is die de prijs niet mag ontvangen in contanten, maar wel de gehele transactie die niet vereffend mag worden in contanten.

Handelingen van derden, bijv. handelaars-kopers, worden dan ook geenszins uitgesloten uit de werking van art. 10*ter* van de Wet van 11 januari 1993.

Dergelijke visie ontneemt geenszins iedere betekenis aan de wetswijziging van 15.07.2013.

Door expliciet ook de handelaar-koper een verbod op te leggen om transacties van meer dan 5.000 EURO in contanten te vereffenen worden immers ook de transacties met particulieren geviseerd hetgeen voorheen niet het geval was.

Tot slot stellen eerste t/m vijfde beklaagde dat zij niet kunnen deelnemen aan de '*onachtzaamheid*' van derden, in deze de overige medebeklaagden.

Het openbaar ministerie voert aan dat er in deze geen sprake is van enige onachtzaamheid maar dat eenieder in deze opzettelijk en met kennis van zaken heeft gehandeld.

De rechtbank zal hierna, per individuele beklaagde, nagaan of en in welke mate beklaagden zich met het vereiste opzet aan de hen individueel ten laste gelegde feiten schuldig hebben gemaakt.

Tot slot stellen eerste en tweede beklaagde dat de stelling dat zij als mededader beschouwd kunnen worden van inbreuken op de bepalingen van art. 10*ter* van de wet van 11 januari 1993 een inbreuk vormt op het wettelijkheidsbeginsel zoals van toepassing in strafzaken en zoals gewaarborgd door de artikelen 12 en 14 GW.

De rechtbank verwijst in eerste instantie naar hetgeen hiervoor reeds werd gesteld omtrent de strekking van art. 10*ter* van de Wet van 11 januari 1993.

De rechtbank verwijst verder naar de zowel door het Openbaar Ministerie als eerste en tweede beklaagde in besluiten gestelde overweging in de parlementaire voorbereidingen betreffende de Wet van 5 april 2007 waarin gesteld werd:

> "*Degene die strafbaar worden gesteld zijn in eerste instantie de verkopers-handelaars, maar ook de kopers-handelaars, die als professioneel immers op de hoogte moeten zijn van het verbod van artikel 10ter, dat voorziet in een algemeen verbod voor alle handelaars.*"

Dat beklaagden van dit verbod op de hoogte waren blijkt eveneens uit hun eigen besluiten. De rechtbank verwijst naar de verklaringen van eerste en tweede beklaagde waaruit blijkt dat er via de firma GOETZ geen edelmetalen werden aangekocht van particulieren maar steeds van personen die verbonden waren aan ondernemingen.

Dit blijkt ook uit de eigen besluiten van eerste en tweede beklaagde (zie randnummer 72 en 73) waarin gesteld wordt dat de klanten van de firma GOETZ weliswaar handelaar waren maar niettemin *"als particulier"* wensten te verkopen.

Het blijkt ook uit de verdere stelling van eerste en tweede beklaagde (zie randnummer 77) dat wanneer deze *"particuliere klanten"* toch als *"handelaar-verkoper"* zouden worden beschouwd, de transacties werden opgesplitst in bedragen onder de 15.000 EURO zodat ook in dat geval het verbod van art. 10ter niet van toepassing zou zijn.

In die omstandigheden kan bezwaarlijk worden aanvaard dat eerste en tweede beklaagde niet in kennis konden zijn van het gegeven dat hun handelingen mogelijk strafbaar waren gesteld.

De rechtbank oordeelt het wettigheidsbeginsel in deze dan ook niet geschonden en oordeelt het evenmin noodzakelijk hieromtrent een vraag te stellen bij het Grondwettelijk Hof.

- *Beoordeling in hoofde van de onderscheiden beklaagden*

● *Betreffende eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ*

*1. De tenlastelegging C*

Eerste en tweede beklaagde waren destijds de drijvende krachten achter de firma NV TONY GOETZ. Zij waren verantwoordelijk voor het beheer van deze vennootschap en voor de wijze waarop er zaken werden gedaan.

De rechtbank verwijst naar de resultaten van de telefoontaps en de verklaringen van eerste en tweede beklaagde waaruit blijkt dat zij welbewust en overwogen een systeem in het leven hebben geroepen waarbij op anonieme wijze aanzienlijke hoeveelheden oud goud werden aangekocht en enorme hoeveelheden cash geld in omloop werden gebracht.

DRC-34996 0319

# Exhibit 8 Part 2

| | | |
|---|---|---|
| rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen | | p. 52 |
| Dossiernr 10A028452 | vleugel D, 3de verdieping | Voorlshr / |

De rechtbank verwijst naar de gegevens van het strafdossier waaruit blijkt dat er door derde beklaagde NV TONY GOETZ in twee jaar tijd (hetzij de jaren 2010 en 2011) voor meer dan één miljard EURO aan contante aankopen werden verricht.

Onder de tenlastelegging C worden eerste en tweede beklaagde vervolgd voor feiten van valsheid in geschriften.

Beklaagden werpen op dat zij nooit gehandeld hebben teneinde enig fraudesysteem op te zetten.

Uit de inhoud van het strafdossier, doch ook uit de eigen conclusies van eerste en tweede beklaagde, waarover verder meer, blijkt het tegendeel.

Vooreerst staat het vast dat eerste en tweede beklaagde een zeer groot aantal aankooptransacties uitvoerden waarbij *"particuliere"* aankoopborderellen werden opgesteld en deze aankopen ook boekhoudkundig verwerkt werden onder de noemer *"particuliere aankopen"*.

Dat deze documenten niet overeenstemden met de waarheid, blijkt uit de eigen verklaringen van eerste en tweede beklaagde die stellen dat er via de NV TONY GOETZ nooit werd aangekocht van particulieren maar steeds van handelaars in goud.

De stelling van eerste en tweede beklaagde die in besluiten wordt ontwikkeld en waarbij wordt voorgehouden dat handelaars, als particulier, oud goud konden verkopen dat zij nog in persoonlijk bezit hadden, is volstrekt ongeloofwaardig.

De enorme hoeveelheden oud goud, de frequentie van de transacties én het gegeven dat er steeds in contanten moest worden afgerekend, maken het bijzonder ongeloofwaardig om te stellen dat handelaars *"als particulier"* hun persoonlijk oud goud bij de firma van eerste en tweede beklaagde zouden hebben verkocht.

In zijn verhoor van 20 juli 2010, n.a.v. verkopen die werden gedaan door een zekere ~~Ardan~~ ~~▇▇▇▇▇▇~~, verklaarde eerste beklaagde dat een handelaar, die verkopen wil verrichten *"als particulier"* het *"aangekochte goud"* wel moest hebben geboekt *"in zijn politieboek."*

Het politieboek is hierbij een administratie instrument dat door inkopers van oud goud wordt gehanteerd om hun verkopers te identificeren en dat consulteerbaar moet zijn door de politiediensten.

DRC-34996 0320

Door tweede beklaagde Alain GOETZ werden verder verklaringen voorgelegd, opgesteld op naam van zesde beklaagde ~~~~~~~~~~~ waarin deze verklaarde dat al het oud goud dat door deze persoon werd aangeboden, was ingeschreven in zijn *"politieboek"*.

Hieruit blijkt dat eerste en tweede beklaagde heel goed wisten dat handelaars die *"als particulier"* wensten te verkopen geenszins ten persoonlijke titel goud wensten te verkopen maar dit steeds deden in het kader van hun handelsactiviteit.

Door niettemin een systeem te hanteren waarbij professionele handelaars op anonieme basis, en in contanten, handel kunnen drijven, creëerden eerste en tweede beklaagde de basis waarbij zgn. *"verkopen in het zwart"* konden worden uitgevoerd.

Door zowel op de door hen uitgegeven aankoopborderellen als in het boekhoudkundig systeem van NV TONY GOETZ deze aankopen te verwerken als zijnde aankopen van particulieren, hebben eerste en tweede beklaagde zich weldegelijk schuldig gemaakt aan het plegen van valsheden in geschriften.

Dat eerste en tweede beklaagde ten tijde niet wettelijk verplicht waren om hun klanten te identificeren doet hieraan geen afbreuk. Welbewust kozen beklaagden er immers voor om verkopers-handelaars (die volgens eigen verklaring van beklaagden geïdentificeerd werden aan de hand van hun BTW-nummer) te registreren als anonieme particulieren waardoor weldegelijk de waarheid werd vermomd en waarvan eerste en tweede beklaagde zich zeer bewust waren.

Ook het gegeven dat op de *"particuliere"* aankoopborderellen manuele gegevens werden aangebracht die de mogelijke verkopers zouden kunnen identificeren, doet hieraan geen afbreuk. Niet enkel is dit systeem niet waterdicht, vele verkopers (zoals hierna blijkt) betwisten deze identificatie ook en ontkennen de overeenstemmende transacties te hebben verricht.

Dit gegeven wordt trouwens bevestigd door tweede beklaagde in zijn verklaring van 16 april 2012 waarin hij stelt: *".. U kan mij eender welk aankoopborderel overhandigen hetwelk enkel de vermelding "PARTIKULIER" draagt en ik zal u zeggen wie hier achter schuil gaat."*

Wanneer handelaar-verkopers *"schuilgaan"* achter de vermelding *"particulier"* impliceert dit dat hiermee de waarheid wordt verheeld.

Exhibit 8 Part 2

Het is slechts op basis van deze aankoopborderellen, in combinatie met andere onderzoekselementen, zoals de resultaten van de telefoontaps en de betrapping van zesde beklaagde ~~met~~ met 500.000 EURO in contanten op zich, dat welbepaalde verkopers konden worden geïdentificeerd.

Buiten het gegeven dat verkoper-handelaars in de kwestieuze aankoopborderellen werden aangeduid als *"particulieren"* staat het vast dat eerste en tweede beklaagde ook systematisch alle aankopen waarbij de uit te betalen geldsom het bedrag van 15.000 EURO oversteeg, opsplitsten in meerdere transacties waarbij meerdere aankoopborderellen werden uitgeschreven voor een bedrag van 15.000 EURO of lager.

Zo verklaarde vierde beklaagde ~~Wendy Wantana~~ op 21 november 2011 dat één transactie van 50.000 EURO werd opgesplitst in drie transacties van 15.000 EURO en één transactie van 5.000 EURO.

Dat ook hiermede de waarheid werd verdoezeld, blijkt uit de eigen besluiten van eerste en tweede beklaagde. De rechtbank verwijst naar het randnummer 77 waarin eerste en tweede beklaagde aangeven dat transacties van meer dan 15.000 EURO werden opgesplitst in transacties van 15.000 EURO of minder om redenen dat wanneer voornoemde *"particuliere"* verkopers *"door de ene of de andere toezichthoudende instelling"* toch beschouwd zouden worden als een verkoper-handelaar, deze transactie niettemin buiten het toepassing gebied van art. 10*ter* van de Wet van 11 januari 1993 zou vallen.

Tot slot staat het vast dat eerste en tweede beklaagde middels deze *"dienstverlening"* naar hun klanten toe ook persoonlijk gewin nastreefden. In zijn verhoor van 16 april 2012 verklaarde tweede beklaagde Alain GOETZ dat de dagelijkse handel in contanten – nadat voormeld systeem van *"particuliere"* aankopen was afgeschaft – was teruggevallen naar een omzet van 300.000 EURO per dag daar waar in het oude systeem tot 3.000.000 EURO per dag, of meer, werd omgezet.

De tenlasteleggingen C. I t/m C. XIV – behoudens de tenlastelegging C. V. b. 2, zie verder – zijn dan ook bewezen t.a.v. eerste en tweede beklaagde.

-     *De tenlastelegging G*

Uit hetgeen voorafgaat blijkt duidelijk dat eerste en tweede beklaagde, als professionele aankopers van edele metalen, op de hoogte waren van de verplichtingen, in het kader van de Wet van 11 januari 1993, die rustten op de handelaars-verkopers.

Exhibit 8 Part 2

Welbewust ontwikkelden eerste en tweede beklaagde een systeem waardoor handelaars-verkopers deze verplichtingen konden omzeilen.

De rechtbank verwijst hierbij opnieuw naar het systeem van *"particuliere"* verkopen door handelaars-verkopers en de systematische opdeling van verkopen boven het bedrag van 15.000 EURO naar meerdere verkopen onder het bedrag van 15.000 EURO.

Tweede beklaagde Alain GOETZ verklaarde trouwens uitdrukkelijk dat dit systeem in het leven werd geroepen *"om de klant te plezieren"*. (zie zijn verhoor van 12 april 2012)

Eerste en tweede beklaagde handelden bijgevolg bewust en met het oogmerk om hun klanten, professionele handelaars-verkopers, toe te laten de beperkingen van de Wet van 11 januari 1993 te omzeilen.

Uit hetgeen volgt (zie de beoordeling inzake zesde t/m vierendertigste beklaagde) zal blijken dat ook de professionele handelaars-verkopers niet onbekend konden zijn met de verplichtingen die op hen rustten ingevolge de Wet van 11 januari 1993.

Nu eerste en tweede beklaagde welbewust meewerkten aan een systeem dat deze handelaar-verkopers toeliet de verplichtingen van de Wet van 11 januari 1993 te omzeilen, dienen zij beschouwd te worden als mededaders aan deze inbreuken.

De tenlastelegging G. I t/m G. XIV (de tenlastelegging G. V. b. heromschreven, zie verder) zijn bewezen t.a.v. eerste en tweede beklaagde.


-    *De tenlastelegging D*


Onder de tenlastelegging D. I worden eerste en tweede beklaagde vervolgd voor feiten van witwassen m.b.t. diverse aankopen van edelmetaal, voor een totaal van 8 kg goud, die zij uitvoerden met een zekere ████████████.

In het kader van een ander strafrechtelijk onderzoek werd deze persoon verhoord waarbij hij op 7 juli 2010 verklaarde. (Kaft III, onderkaft 2.8, st. 5)

# Exhibit 8 Part 2

*U vraagt mij om opnieuw te verduidelijken hoe ik de aangekochte juwelen van de hand heb gedaan.*

*Na ontvangst van de juwelen en na de stenen te hebben verwijderd, smolt ik het goud en maakte ik een kleine goudstaaf. Met deze goudstaaf ging ik naar Antwerpen, naar de firma GOETZ. Ik heb nooit elders verkocht dan bij deze vennootschap.*

*U deelt mij mee dat u hebt vastgesteld dat ik dit jaar geen verkopen heb geregistreerd bij deze firma.*

*Dat verbaast mij niet. Ik leg u uit hoe dat in zijn werk ging. Wanneer ik naar Antwerpen ging verkocht ik mijn goudstaaf bij de firma GOETZ. Ik moest een papier ondertekenen waarvan ik een kopie ontving. Wat mij betreft, bewaarde ik deze papieren niet. Ik weet niet wat de bestemming was van dit document bij de firma GOETZ. Ik ontving geen andere documenten voor deze transactie. Ik moest deze som registreren in mijn boekhouding maar ik deed het niet gelet op de twijfelachtige herkomst van deze fondsen.*

*…"*

Later zal blijken dat de door de heer ▮▮▮▮▮ aangekochte juwelen gestolen goederen betroffen (zie het gevoegde vonnis Rb. Luik d.d. 14 november 2011).

De rechtbank verwijst naar hetgeen voorafgaat en oordeelt het irrelevant of eerste en tweede beklaagde nu al dan niet wisten dat het door de heer ▮▮▮▮▮ aangeboden goud van diefstal afkomstig was.

Ingevolge de door eerste en tweede beklaagde bewust opgezette werkwijze werd de heer ▮▮▮▮▮ in staat gesteld om goud van twijfelachtige herkomst op anonieme wijze, en buiten iedere boekhoudkundige registratie om, in ruil voor contanten te verkopen.

Slechts ingevolge dit systeem van eerste en tweede beklaagde was de heer ▮▮▮▮▮ in staat om de illegale herkomst van het goud, en de registratie ervan in zijn boekhouding, te verdoezelen.

Ook in de boekhouding van de firma van eerste en tweede beklaagde werd deze individuele transactie niet geregistreerd nu deze mee opging in de zgn. dagelijkse aankopen van *"particulieren"*.

Exhibit 8 Part 2

Dat hierdoor ook de boekhouding van de firma GOETZ niet bewijskrachtig was, blijkt uit de voorliggende dossierstukken (Deel II, kaft 2.4, st. 3 – 67) waarbij de firma GOETZ een fiscaal akkoord afsloot m.b.t. de aanslagjaren 2005 t.e.m. 2009 omdat was gebleken dat de boekhouding niet bewijskrachtig was doordat *"de geboekte verrichtingen (...) niet controleerbaar (blijken) te zijn"* en *"het fictieve en willekeurige karakter van de boekingen met betrekking tot de aankopen particulieren".*

In die omstandigheden oordeelt de rechtbank de tenlastelegging D. I bewezen in hoofde van eerste en tweede beklaagde.

Onder de tenlastelegging D. II worden eerste en tweede beklaagde vervolgd voor de aankoop van ong. 1 kg goud van een zekere ▮▮▮▮▮▮▮ waarbij uit het strafdossier blijkt dat dit goud door de heer ▮▮▮▮▮ verkregen werd ingevolge een overval op de heer ▮▮▮▮▮. (zie Deel I, kaft 2.1, st. 5 -132).

De heer ▮▮▮▮▮ verklaarde hierbij dat de buit door hem werd verkocht bij de firma GOETZ waarbij aan hem geen identiteitsgegevens werden gevraagd, er niets werd geregistreerd en de verkoopprijs, middels drie afzonderlijke transacties, in contanten werd uitbetaald.

Omtrent deze transactie werd ook eerste beklaagde verhoord. (zie deel I, kaft 2.1, st. 21 – 25)

Uit dit verhoor blijkt dat:

- de heer ▮▮▮▮▮ niet door eerste beklaagde wordt herkend;
- slechts één van de aanwezige personeelsleden de heer ▮▮▮▮▮ 'meent' te herkennen als zijnde verbonden aan een goudwinkel zonder deze te kunnen specifiëren;
- de heer ▮▮▮▮▮ mogelijk verbonden is aan de firma ▮▮▮▮▮;
- in het jaar 2010 geen aankopen van goud werden geregistreerd op naam van de heer ▮▮▮▮▮ noch op naam van de firma ▮▮▮▮;
- op datum van de verkoop, hetzij in de periode van 10 tot 12 maart 2010, talrijke aankoopborderels gericht zijn aan *"Particulier"* voor een hoeveelheid goud van rond de 500 gram zodat het onmogelijk is om de individuele verkoper van dit goud te identificeren.

DRC-34996 0325

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                      p. 58
Dossiernr 10A028432                          vleugel D, 3de verdieping                Vonnisnr    /

Deze feitelijke elementen tonen perfect de reikwijdte, en het malafide karakter, van het door eerste en tweede beklaagde op poten gezet systeem aan.

In volstrekte anonimiteit, zelfs zonder dat de verkoper door eerste en tweede beklaagde of één van hun werknemers herkend wordt, slaagt een malafide persoon erin om gestolen juwelen bij de firma van eerste en tweede beklaagde te verkopen zonder dat er van deze transactie enig spoor kan worden teruggevonden.

Het kan niet anders dan dat eerste en tweede beklaagde wisten dat hun systeem op dergelijke wijze zou worden gebruikt. Tweede beklaagde verklaarde trouwens zelf dat het systeem werd gehanteerd *om de klanten te plezieren*.

In die omstandigheden oordeelt de rechtbank ook de tenlastelegging D. II bewezen in hoofde van eerste en tweede beklaagde.

Voor wat betreft de beoordeling van de tenlastelegging D. III t/m D. XVIII verwijst de rechtbank naar de beoordeling van deze feiten in hoofde van de overige medebeklaagden waarbij telkens ook de betrokkenheid van eerste en tweede beklaagde bij deze feiten mee besproken zal worden.

- *De tenlastelegging A*

Onder deze tenlastelegging worden eerste en tweede beklaagde – samen met hun firma, derde beklaagde NV TONY GOETZ – vervolgd nu zij, wetens en willens, als leidend persoon, deel zouden hebben uitgemaakt van een criminele organisatie.

Een criminele organisatie betreft:

- een vereniging van twee of meer personen die in de tijd is opgezet;
- met het onmiddellijke doel, misdaden en wanbedrijven van een zekere ernst te plegen;
- waarbij het criminele karakter van de organisatie getypeerd wordt door de gehanteerde middelen om haar objectieven te bereiken.

Uit hetgeen voorafgaat blijkt dat het door eerste en tweede beklaagde opgezette systeem van anonieme en opgedeelde aankopen van edele metalen weldegelijk kan leiden tot het plegen van misdrijven,

De rechtbank stelt evenwel vast dat de handelingen van eerste en tweede beklaagde, de aan- en verkoop van edele metalen, op zich een legitieme bedrijfsvoering betreft en het voormelde systeem van anonieme aankopen op zich niet werd opgezet om het bestaan van deze transacties te rechtvaardigen. Zo blijkt bijv. dat er via de firma GOETZ ook veelvuldig legitieme, o.a. via girale betalingen, transacties werden uitgevoerd.

Verder kan uit het voorliggende strafdossier niet worden afgeleid dat het voormelde systeem door eerste en tweede beklaagde werd ingesteld met het misdadig opzet om gestolen goederen te kunnen helen.

Evenmin blijkt uit het strafdossier dat het systeem van anonieme aankopen uitsluitend werd opgericht om aan- en verkopen buiten de boekhouding te kunnen verrichten. Het staat immers vast dat, minstens een deel van, de aankopen die de firma GOETZ in contanten uitbetaalde ook daadwerkelijk verwerkt werd in de boekhouding van de firma GOETZ.

In die omstandigheden dient de rechtbank te besluiten dat het bewijs niet geleverd wordt dat eerste en tweede beklaagde zich schuldig hebben gemaakt aan inbreuken op de bepalingen van art. 324*bis* en 324*ter* SW zodat zij voor de tenlastelegging A moeten worden vrijgesproken.

● *Betreffende derde beklaagde NV TONY GOETZ*

Derde beklaagde TONY GOETZ wordt voor dezelfde misdrijven vervolgd als haar zaakvoerders, m.n. eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ.

Wat hiervoor werd gesteld in hoofde van eerste en tweede beklaagde, geldt eveneens voor derde beklaagde.

Bijgevolg dient derde beklaagde te worden vrijgesproken voor het haar ten laste gelegde feit A.

Wat de beoordeling inzake de tenlasteleggingen C, D en G betreft, verwijst de rechtbank naar hetgeen hiervoor, inzake de beoordeling in hoofde van eerste en tweede beklaagde werd gesteld, en naar hetgeen hieromtrent verder nog zal worden gesteld.

Eerste en tweede beklaagde zijn de juridische, dan wel feitelijke, leidinggevenden van derde beklaagde NV TONY GOETZ. Eerste en tweede beklaagde staan beide in voor de algemene werking binnen derde beklaagde en zijn verantwoordelijk voor het instellen van voornoemd systeem van anonieme aankopen van edele metalen.

DRC-34996 0327

# Exhibit 8 Part 2

Derde beklaagde is de vennootschap waarbinnen de bedrijfsactiviteiten worden uitgevoerd.

De strafrechtelijke aansprakelijkheid van de rechtspersoon geldt voor alle misdrijven die gepleegd werden ter verwezenlijking van het doel, ter waarneming van haar belang of voor haar rekening.

Wat deze materiële toerekening betreft, dient vastgesteld te worden dat er enkel sprake kan zijn van een strafrechtelijke aansprakelijkheid indien er een verband bestaat tussen het misdrijf en de rechtspersoon.

Daarnaast is ook voor de rechtspersoon het intentioneel element van het misdrijf een constitutief bestanddeel van het misdrijf.

Wat de materiële toerekening betreft is het in deze duidelijk dat er een intrinsiek verband is tussen de weerhouden misdrijven enerzijds en de verwezenlijking van het doel van de rechtspersoon en de waarneming van de belangen van de rechtspersoon anderzijds.

Het staat vast dat het doel van derde beklaagde, een vennootschap die een commerciële activiteit uitbaat, erop gericht is winst te maken waarbij het gehanteerde malafide systeem van anonieme aankopen erop gericht was handelaars-verkopers die hiervan gebruik wensten te maken aan te trekken waardoor de omzet, en waarschijnlijk ook de winstcijfers, van derde beklaagde stegen.

Wat het intentioneel element van het misdrijf betreft, moet aangetoond worden dat het misdrijf voortkomt uit een opzettelijke beslissing genomen binnen de rechtspersoon of dat er een nalatigheid is op het niveau van de rechtspersoon die in causaal verband staat met het misdrijf.

Het is duidelijk dat er in deze sprake is van zulke nalatigheid die in verband staat met de bewezen geachte feiten vermeld onder de tenlasteleggingen C, D en G aangezien er gedurende een lange periode handelstransacties werden verricht die duidelijk afweken van het normale handelsverkeer – dit zelfs nadat derde beklaagde door de fiscale diensten in kennis was gesteld van het gegeven dat dergelijke werkwijze de bewijskracht van de door haar gevoerde boekhouding ondermijnde – zodat het niet anders kan dan dat er in hoofde van de vennootschap duidelijk sprake was van het gedogen van deze malafide praktijken.

Derde beklaagde heeft inderdaad nagelaten maatregelen te nemen die noodzakelijk waren en van haar konden worden verwacht om het plegen van de misdrijven in haar schoot te voorkomen.

DRC-34996 0328

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                          p. 63
Dossiernr 3OA028432                              vleugel D, 8 de verdieping              Vonnisnr    /

De strafrechtelijke verantwoordelijkheid van derde beklaagde staat dan ook vast.

De cumulatieve veroordeling van de natuurlijke personen (eerste en tweede beklaagde) en
de rechtspersoon (derde beklaagde) is slechts mogelijk wanneer de inbreuken die door de
natuurlijke personen gepleegd zijn wetens en willens begaan zijn.

Om na te gaan of er al dan niet een mogelijke cumulatie van de strafrechtelijke
aansprakelijkheden is, moet nagegaan worden of de kwestieuze strafbare handeling *in
concreto* al dan niet wetens en willens werd gepleegd.

De rechtbank verwijst naar hetgeen hieromtrent voordien reeds werd gesteld. Eerste en
tweede beklaagde stelden welbewust een systeem in waarvan zij wisten dat het, minstens
gedeeltelijk, door handelaars-verkopers zou worden misbruikt. Zoals tweede beklaagde het
stelde, werd dit systeem opgezet *"om de klanten te plezieren"*. Het staat dan ook vast dat
eerste en tweede beklaagde de inbreuken wetens en willens pleegden.

Zowel de natuurlijke personen (eerste en tweede beklaagde) als de rechtspersoon (derde
beklaagde) dienen dan ook veroordeeld te worden.

De tenlasteleggingen C. I t/m C. XIV – behoudens de tenlastelegging C. V. b. 2, zie verder –,
D. I en D. II, en G. I t/m G. XIV – de tenlastelegging G. V. b.  zoals heromschreven, zie verder
– zijn bewezen in hoofde van derde beklaagde.

Voor de verdere beoordeling inzake de tenlastelegging D in hoofde van derde beklaagde
verwijst de rechtbank verder naar hetgeen volgt.

● *Betreffende vierde beklaagde ▓▓▓▓▓▓▓▓▓S en vijfde beklaagde ▓▓▓▓▓▓▓▓▓*
*▓▓▓▓▓▓▓:*

Onder de tenlastelegging B worden vierde beklaagde ▓▓▓▓▓▓▓▓▓6 en vijfde beklaagde
▓▓▓▓▓▓▓▓▓▓▓▓A vervolgd voor het wetens en willens deelnemen aan het nemen van
welke beslissing dan ook in het raam van de activiteiten van een criminele organisatie.

De rechtbank verwijst naar hetgeen voorheen werd gesteld waaruit blijkt dat in deze het
bestaan van een criminele organisatie niet kon worden vastgesteld.

DRC-34996 0329

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen    p. 61
Dossiernr 10A028432                          vleugel D, 3de verdieping          Vonnisar    /

Vierde en vijfde beklaagde dienen bijgevolg te worden vrijgesproken voor de feiten van de tenlastelegging B.

In besluiten stellen vierde en vijfde beklaagde verder dat in hun hoofde niet het vereiste deelnemingsopzet kan worden vastgesteld opdat zij schuldig kunnen worden bevonden aan de hen ten laste gelegde feiten C, D en G.

Hieromtrent stelt de rechtbank vast dat het niet betwist wordt dat vierde en vijfde beklaagde werknemers zijn van derde beklaagde NV TONY GOETZ.

Evenmin wordt het betwist dat vierde en vijfde beklaagde, mede, de commerciële handelingen binnen de firma GOETZ afhandelen en daadwerkelijk instaan voor de aankoop van edele metalen en de uitbetaling van de aankoopprijs.

Tot slot staat het vast dat vierde en vijfde beklaagde handelden op instructie van eerste en tweede beklaagde.

Op basis van het strafdossier oordeelt de rechtbank het niet bewezen dat vierde en vijfde beklaagde, buiten iedere gerede twijfel om, wetens en willens hebben gehandeld met het oogmerk om de misdrijven te plegen zoals omschreven onder de tenlasteleggingen C, D en G.

Vooreerst merkt de rechtbank op dat de geviseerde handelingen op zich – de aankoop van edele metalen en de uitbetaling van de aankoopprijs in contanten – geen misdrijf uitmaken.

Verder verwijst de rechtbank naar de technische aard van de gepleegde misdrijven, die hun oorsprong vinden in de bepalingen van de Wet van 11 januari 1993, waarbij eventuele inbreuken op deze bepalingen, zoals blijkt uit hetgeen hieromtrent voorheen reeds werd gesteld en uit het verloop van de regeling van de rechtspleging, geenszins een evidentie vormen.

Tot slot verwijst de rechtbank naar het gegeven dat – in zoverre de tenlasteleggingen zgn. transacties *"buiten de boeken"* viseren – uit niets blijkt dat vierde en vijfde beklaagde ook verantwoordelijk waren voor de boekhoudkundige verwerking van de door hen uitgevoerde aankooptransacties. *

Het gegeven dat vierde en vijfde beklaagde mogelijk de hiërarchische leiding hadden over het team van toogbedienden dat bij de firma GOETZ werkzaam was, wijzigt op zich niets aan het gegeven dat ook vierde en vijfde beklaagde enkel maar handelden op instructie van hun werkgever, waarbij deze handelingen hun schijnbaar regelmatig konden voorkomen.

Exhibit 8 Part 2

Ook het gegeven dat vierde en vijfde beklaagde hebben meegewerkt aan het opstellen van het document *"Client intake and purchase procedure"* impliceert op zich evenmin dat vierde en vijfde beklaagde wetens en willens criminele handelingen hebben gesteld.

Zo staat de bijdrage van vierde en vijfde beklaagde bij het opstellen van dit document geenszins vast – vierde en vijfde beklaagde stellen dat zij enkel de praktische gang van zaken hebben aangegeven, hetgeen op zich niet ongeloofwaardig is — daarenboven blijkt het document slechts te zijn opgesteld in de loop van het jaar 2010 (tijdstip van de thans meest geviseerde transacties) en volgens tweede beklaagde Alain GOETZ (zie zijn verhoor 16 april 2012) werden de erin vervatte richtlijnen slechts toegepast vanaf het begin 2011 (tijdstip waarop de thans gehanteerde incriminatieperiode teneinde loopt).

Tot slot blijkt uit de elementen van het strafdossier dat welbepaalde aankopen, voornamelijk van zgn. grote klanten, persoonlijk door eerste en/of tweede beklaagde werden afgehandeld waarbij de tussenkomst van vierde en vijfde beklaagde per definitie uitgesloten werd.

In die omstandigheden kan niet met afdoende zekerheid worden vastgesteld dat vierde en vijfde beklaagde, bij de uitvoering van hun werkzaamheden binnen de firma GOETZ, niet ter goeder trouw zouden hebben gehandeld zodat zij dienen te worden vrijgesproken voor de hen ten laste gelegde feiten C, D en G.

- *Betreffende zesde beklaagde* ~~Alexander TÜRKER~~, *tweeëndertigste beklaagde* ~~Johann FRIEDMAN~~, *drieëndertigste beklaagde* ~~Avrom SCHOSEL~~ *en vierendertigste beklaagde* ~~Barbara FRIEDMAN~~

  o  **Zesde beklaagde**

Zesde beklaagde ~~Alexander TÜRKER~~ is geen onbekende in het Joodse juweliersgebeuren in Antwerpen en erkende te zijn opgetreden als koerier waarbij hij namens het Antwerpse juweliersbedrijf ~~_____~~, en naar eigen zeggen ook voor particuliere klanten, oud goud en edele metalen verkocht aan de firma GOETZ.

In het kader van de telefoontap op de lijnen van de firma GOETZ werd er vastgesteld dat er door zesde beklaagde meerdere telefoongesprekken werden gevoerd met medewerkers van de firma GOETZ betreffende de verkoop van oud goud.

Op 22 juni 2011 werd zesde beklaagde aan een controle onderworpen, en dit onmiddellijk nadat hij de kantoren van de firma GOETZ had verlaten. Hierbij werd op zesde beklaagde meer dan 500.000 EURO in contanten aangetroffen alsmede vijf zilverstaven van 1 kg.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                p. 64
Dossiernr  10A028432                        vleugel D, 3de verdieping                Vonnisnr       /

Bij verhoor stelde zesde beklaagde dat de som van 500.000 EURO afkomstig was uit de verkoop van twee kg fijn goud, vier kg gouden munten en tien kg oud goud.

Bij nazicht – onder meer via verhoor van eerste en tweede beklaagde en op basis van de summiere boekhoudkundige stukken die nog aanwezig waren – blijkt dat zesde beklaagde een frequent bezoeker was van de firma GOETZ en oud goud kwam verkopen.

In besluiten erkent zesde beklaagde dat hij geenszins als particulier verkopen heeft verricht aan de firma GOETZ ook al werden deze als zodanig administratief verwerkt bij diverse transacties.

Ook bij zesde beklaagde zelf waren er geen administratieve sporen terug te vinden van de door hem uitgevoerde verkopen van edele metalen aan de firma GOETZ. In zijn verhoor op 23 juni 2011 stelde zesde beklaagde: *"... Als ik het goud ophaal om naar de NV TONY GOETZ te brengen, worden er geen documenten opgemaakt. ..."*

Dit systeem leidt ertoe dat er geenszins een waterdichte controle bestaat, noch omtrent de hoeveelheid goud die door zesde beklaagde werd verkocht bij de firma GOETZ, noch omtrent de personen voor wie zesde beklaagde deze verkopen uitvoerde.

In besluiten erkent zesde beklaagde dat dit geen normale werkwijze kan zijn.

Onder de tenlastelegging C. II wordt zesde beklaagde vervolgd voor feiten van valsheid in geschriften waarbij telkenmale de verkoop van edele metalen namens de firma ▬▬▬▬▬▬▬▬ werd opgesplitst in transacties onder de som van 15.000 EURO zodat deze in contanten vereffend kon worden.

Het betreffen transacties waarbij beklaagde telkenmale (op niet minder dan 46 dagen) aanzienlijke hoeveelheden (veelal meerdere kilo's) oud goud aanbood bij de firma GOETZ en dit uitdrukkelijk namens de firma ▬▬▬▬▬▬.

In besluiten betwist beklaagde deze tenlastelegging niet.

De rechtbank verwijst naar hetgeen voorheen reeds werd gezegd omtrent het door eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ opgezette systeem van anonieme verkopen en de mogelijkheid om transacties boven de 15.000 EURO om te zetten naar transacties onder de 15.000 EURO om betalingen in contanten mogelijk te maken, en oordeelt de tenlastelegging C. II bewezen in hoofde van zesde beklaagde.

DRC-34996 0332

Onder de tenlastelegging C. V. a wordt zesde beklaagde bijkomend vervolgd voor het laten opstellen van aankoopborderellen bij de firma NV GOETZ voor in totaal 923 kg goud.

Het betreft aankoopborderellen die door zesde beklaagde bij de firma NV GOETZ zouden zijn opgesteld waarbij zesde beklaagde in persoonlijke naam goud zou hebben verkocht.

In eerste instantie stelt de rechtbank vast dat de voorgehouden aankoopborderellen zelf niet konden worden teruggevonden.

De tenlastelegging steunt op andere documenten, zgn. werkbonnen, waarop de afkorting "FRIEDM" of "FRIED" werd aangebracht.

Wanneer oud goud bij de firma GOETZ werd binnengebracht werd dit eerst omgesmolten tot goudstaven. Hiervoor werd een werkbon opgesteld. De goudstaaf werd vervolgens door de firma GOETZ aan de verkoper overhandigd die vervolgens de keuze had om de kostprijs voor het smelten te betalen en de goudstaaf bij zich te houden, dan wel de goudstaaf aan de firma GOETZ te verkopen. Hiervoor werden dan één of meerdere aankoopborderellen opgesteld.

Het wordt niet betwist dat zesde beklaagde in het Antwerpse juwellersmilieu gekend is onder de naam ~~alexander FRIEDMAN~~ Zesde beklaagde is immers de schoonzoon van vierendertigste beklaagde ~~Ruben FRIEDMAN~~ een gekend juwelier te Antwerpen en de neef van tweeëndertigste beklaagde ~~Morris FRIEDMAND~~

Zesde beklaagde werd verder door zowel eerste beklaagde Sylvain GOETZ als door tweede beklaagde Alain GOETZ aangeduid als de persoon die schuilgaat achter de afkortingen "FRIEDM" of "FRIED" die door de firma GOETZ werden opgesteld.

Dat eerste en tweede beklaagde zich hierin niet vergissen, volgt verder uit de eigen verklaringen van zesde beklaagde die stelde dat hij een goede werkrelatie had met de firma GOETZ, deze firma veelvuldig bezocht en waarbij hem een gunstregime werd toegekend waardoor hij lange wachttijden ter plaatse kon vermijden.

Kort na het aantreffen van zesde beklaagde op 22 juni 2011 bespreken de verbalisanten de activiteiten van zesde beklaagde met eerste en tweede beklaagde. Hierbij worden aan de verbalisanten een aantal werkbonnen overhandigd (zie DEEL ~~ONDERZOEK~~ kaft 6, st. 6) waaruit blijkt dat er in de periode 01.05.2011 tot 24.06.2011 niet minder dan 21 werkbonnen werden opgesteld met de vermelding "FRIEDM" of "FRIED" voor een totaal van 267,50 kg goud.

Bij huiszoeking op de firma GOETZ wordt verder een zwarte kaft aangetroffen (DEEL VIII, kaft 15, st. 26) met werkbonnen met vermelding *"FRIEDM"* waaruit blijkt dat in de periode 01.01.2011 tot 30.04.2011 voor in totaal 656 kg goud werd verkregen uit het oud goud dat werd binnengebracht.

Op basis van hetgeen voorafgaat oordeelt de rechtbank het bewezen dat zesde beklaagde in de periode van 01.01.2011 tot 24.06.2011 voor in totaal 923 kg oud goud bij de firma GOETZ heeft aangeboden met het oog op zgn. affinage, hetzij omsmelting in goudstaven.

Uit de verklaring van tweede beklaagde Alain GOETZ op 22.06.2011 blijkt echter evenzeer dat het alzo omgesmolten goud niet integraal door zesde beklaagde aan de firma GOETZ werd verkocht. Tweede beklaagde geeft duidelijk aan dat het goud gedeeltelijk ook aan andere goudhandelaars werd verkocht.

Bijgevolg staat het niet vast dat er door de firma GOETZ ook voor in totaal 923 kg goud aan aankoopborderellen zouden zijn opgesteld.

In zijn diverse politionele verhoren stelde zesde beklaagde dat hij gedurende vijfentwintig weken, wekelijks voor 20 à 22 kg goud bij de firma GOETZ zou hebben verkocht. Zesde beklaagde stelt verder dat hij hierbij een "commissie" kreeg van 10 à 20 EURO per verkochte kg goud en in totaal een 8.000 EURO's aan "commissies" verwierf.

Op basis van de eigen verklaringen van zesde beklaagde ▓▓▓▓▓▓▓▓▓▓▓ mag er bijgevolg van worden uitgegaan dat door hem voor minstens 500 kg goud bij de firma GOETZ werd verkocht waarbij overeenkomstige aankoopborderellen werden opgesteld.

De tenlastelegging C. V. a is bijgevolg bewezen in hoofde van zesde beklaagde mits volgende heromschrijving: *"Niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een niet nader bepaald totaalbedrag, met betrekking tot de aankoop van in totaal 500 kg goud."*

Onder de tenlastelegging D. V wordt zesde beklaagde verder vervolgd voor het witwassen van een hoeveelheid goud van 923 kg met een geschatte waarde van 28.613.000 EURO.

Uit de eigen verklaringen van zesde beklaagde blijkt dat hij op geen enkele wijze de herkomst van de door hem verkregen partijen oud goud kan aantonen. Gelet op de omvang van de hoeveelheid aangeboden goud, de frequentie van de bezoeken van zesde beklaagde aan de firma GOETZ (tot twee- à driemaal per week) en het feit dat zesde beklaagde duidelijk professioneel actief was, oordeelt de rechtbank het ongeloofwaardig dat het door

Exhibit 8 Part 2

zesde beklaagde aangeboden goud effectief afkomstig was van particuliere verkopers.

Het door zesde beklaagde aangeboden goud was duidelijk afkomstig uit het professionele handelscircuit waarbij ingevolge het anonieme karakter van de verwerving van dit oud goud door zesde beklaagde, het anonieme karakter van de verkoop ervan bij de firma GOETZ en de afrekening in contanten van de diverse transacties, het niet anders kan dan dat deze verkopen kaderen in de zgn. transacties *"buiten de boekhouding"*.

Zelfs wanneer aanvaard wordt dat het goud afkomstig is van niet aangegeven erfenissen, zoals zesde beklaagde zelf aangeeft in conclusies, staat het vast dat met deze transacties op onrechtmatige wijze successierechten worden ontdoken.

De tenlastelegging D. V is bijgevolg bewezen in hoofde van zesde beklaagde mits aanpassing van de tenlastelegging – in navolging van hetgeen werd gesteld omtrent de tenlastelegging C. V. a – als volgt: *"een totale hoeveelheid van minstens 500 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 15.500.000 EUR, zoals omschreven onder de tenlastelegging C. V. a"*.

De tenlastelegging D. V (zoals heromschreven) is eveneens bewezen in hoofde van eerste, tweede en derde beklaagde.

Het is voor de rechtbank duidelijk dat eerste, tweede en derde beklaagde zich niet kunnen beroepen op onwetendheid, noch op enige goede trouw, wanneer dergelijke hoeveelheden oud goud aankopen van een – voor hen gekende professionele handelaar in oud goud – maar niettemin stellen dat het *"particulieren"* verkopen betreffen die in contanten vereffend kunnen worden en waarbij geen enkel spoor van de oorsprong van het aangekochte goud, noch van de bestemming van de uitbetaalde contante gelden, kan worden achterhaald.

Eerste, tweede en derde beklaagde verleenden hierbij onmiskenbaar de noodzakelijke faciliteiten om zesde beklaagde toe te laten om op een onregelmatige wijze grote hoeveelheden edele metalen te verhandelen.

Onder de tenlastelegging F wordt zesde beklaagde vervolgd voor inbreuken op de wetgeving tot beteugeling van sluikwerk door in strijd met de wettelijke bepalingen ter zake verrichtingen te hebben gesteld inzake handel in edele metalen.

Onder de tenlastelegging H wordt zesde beklaagde vervolgd voor inbreuken op de Wet tot oprichting van een Kruispuntbank door als persoon gehouden tot inschrijving in het

Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                    p. 68
Dossiernr 19A028492                          Vleugel D, 3de verdieping            Vonnisnr    /

handelsregister deze inschrijving niet te hebben aangevraagd en niettemin als handelaar te zijn opgetreden.

De rechtbank verwijst naar hetgeen hiervoor gesteld werd omtrent de aard, omvang en het professionele karakter van de door zesde beklaagde gestelde handelingen. Vast staat dat zesde beklaagde zich hiertoe niet administratief in orde heeft gesteld.

De tenlasteleggingen F en H worden door zesde beklaagde niet ernstig betwist en de rechtbank oordeelt deze bewezen in zijnen hoofde.

Onder de tenlasteleggingen G. II en G. V. a wordt zesde beklaagde vervolgd voor inbreuken op de bepalingen van de Wet van 11 januari 1993.

Nu zesde beklaagde in de geviseerde incriminatieperiode duidelijk een professionele verkoper-handelaar in edele metalen was, valt hij onder het toepassingsgebied van de Wet van 11 januari 1993.

Als professionele verkoper kon zesde beklaagde van deze bepalingen niet onwetend zijn.

Het kan dan ook niet anders dan dat zesde beklaagde bewust gebruik heeft gemaakt van het door de firma GOETZ aangeboden systeem om de verplichting van deze wetgeving naast zich neer te leggen.

De tenlasteleggingen G. II en G. V. a zijn dan ook bewezen.

> o *Tweeëndertigste en drieëndertigste beklaagde*

Tweeëndertigste beklaagde ▨▨▨▨▨▨▨▨ en drieëndertigste beklaagde ▨▨▨▨▨▨▨ worden – samen met zesde beklaagde ▨▨▨▨▨▨▨ – vervolgd voor inbreuken op de Wet van 11 januari 1993 (tenl. G) en feiten van valsheid in geschrifte (tenl. C).

Tweeëndertigste en drieëndertigste beklaagde zijn juridisch en/of feitelijk zaakvoerder van de firma's ▨▨▨▨▨▨▨ en ▨▨▨▨▨▨▨

Het wordt niet betwist dat tweeëndertigste en drieëndertigste beklaagde beroep hebben gedaan op zesde beklaagde om het door hen aangekochte oud goud te laten omsmelten en verkopen bij de firma GOETZ.

DRC-34996 0336

Exhibit 8 Part 2

In eerste instantie stelt de rechtbank vast dat er geen enkele documentatie voorhanden is waaruit kan blijken welke hoeveelheden oud goud door tweeëndertigste en drieëndertigste beklaagde aan zesde beklaagde werden overhandigd voor verkoop bij de firma GOETZ.

In zoverre de teruggevonden aankoopborderellen en aanverwante stukken bij de firma GOETZ op naam van ~~GOLD~~ ~~REFILE~~ en ~~GOUD~~ ~~IS~~ ~~GELD~~ overeenstemmen met de boekhoudkundige gegevens van deze firma's, bevestigen tweeëndertigste en drieëndertigste beklaagde dat dit goud betreft dat zij aan zesde beklaagde hadden overhandigd voor de verkoop ervan.

In zoverre de documenten van de firma GOETZ niet overeenstemmen met de boekhoudkundige gegevens van ~~GOLDREFILE~~ ~~en~~ ~~GOUD~~ ~~IS~~ ~~GELD~~ stellen tweeëndertigste en drieëndertigste beklaagde dat de naam van hun firma's door zesde beklaagde zou zijn misbruikt. Het betreft hierbij een hoeveelheid geaffineerd fijn goud van in totaal 12,79 kg.

Enige controle van deze beweringen is eenvoudigweg niet mogelijk bij gebreke aan stukken hiertoe.

Vast staat wel dat tweeëndertigste en drieëndertigste, via zesde beklaagde, in de periode van 04.01.2010 tot 31.12.2010 voor meer dan 3 miljoen EURO aan oud goud aan de firma GOETZ hebben verkocht.

De diverse transacties worden aangeduid in de tenlastelegging C. II waaruit blijkt dat er dagelijks meerdere kilo's goud werden verkocht waarbij de transacties gebeurden via opgesplitste aankoopborderellen — allen bedragen onder de 15.000 EURO — zodat deze aankopen cash konden worden betaald.

De stelling van tweeëndertigste en drieëndertigste beklaagde dat het meerdere verkopen per dag betreffen van verscheidene partijen aangeboden oud goud wordt ontkracht door de opeenvolgende nummering van de aankoopborderellen.

Tweeëndertigste en drieëndertigste beklaagde argumenteren verder dat zij er geen belang bij hadden dat de door hen verkochte partijen oud goud werden opgesplitst in verschillende aankopen onder de 15.000 EURO, dat dit gebeurde op initiatief van de firma GOETZ en dat zij gedwongen waren om hieraan mee te werken omdat de firma GOETZ in Antwerpen en in de ruime omgeving de enige goudsmelter was waar zij terecht konden.

DRC-34996 0337

Exhibit 8 Part 2

De rechtbank stelt vast dat tweeëndertigste en drieëndertigste beklaagde professionele handelaar-verkopers van oud goud zijn. De op hen rustende verplichtingen ingevolge de Wet van 11 januari 1993 konden hun dan ook niet onbekend zijn.

Niettemin staat het vast dat tweeëndertigste en drieëndertigste beklaagde deze verplichtingen schonden en geruime tijd, via zesde beklaagde, partijen oud goud hebben verkocht, met te vereffenen bedragen ver boven de 15.000 EURO, waarbij de bepalingen van de Wet van 11 januari 1993 systematisch werden miskend.

Dat tweeëndertigste en drieëndertigste beklaagde hiertoe verplicht werden door de firma GOETZ, oordeelt de rechtbank ongeloofwaardig.

Dat tweeëndertigste en drieëndertigste beklaagde ook beroep konden doen op andere goudsmelters blijkt uit hun eigen verklaringen waarin zij aangeven sinds maart 2011 samen te werken met een andere goudsmelter, m.n. de firma ██████████

Verder blijkt uit hetgeen voorafgaat dat het systeem van opgesplitste aankoopborderellen enkel werd gehanteerd wanneer de klant een uitbetaling in contanten wenste. Tweeëndertigste en drieëndertigste beklaagde hadden ook kunnen opteren voor een girale vereffening van de door hen aangeboden transacties waarbij er nooit enige opdeling van aankoopborderellen zou zijn gebeurd.

Tweeëndertigste en drieëndertigste beklaagde streefden echter duidelijk een contante betaling na bij de verkoop van het door hen aangeboden oud goud waardoor welbewust de bepalingen van de Wet van 11 januari 1993 geschonden dienden te worden en er welbewust werd geparticipeerd in het systeem dat hiertoe door de firma GOETZ werd aangeboden.

De tenlasteleggingen C. II en G. II zijn dan ook bewezen in hoofde van tweeëndertigste en drieëndertigste beklaagde.

      o  Vierendertigste beklaagde

Vierendertigste beklaagde ████████████████ is de schoonvader van zesde beklaagde.

Vierendertigste beklaagde was eveneens aanwezig op 22 juni 2011 toen de verbalisanten zesde beklaagde, aan de woning van vierendertigste beklaagde, aan een controle onderworpen en op hem een som van 500.000 EURO aantroffen.

Op afgeluisterde telefoongesprekken werd tevens vastgesteld dat er tussen zesde en vierendertigste beklaagde gesprekken werden gevoerd die betrekking hadden op transacties van oud goud bij de firma GOETZ.

Vierendertigste beklaagde wordt, samen met zesde beklaagde, vervolgd voor inbreuken op de sluikwetgeving en de registratie van handelaars zoals omschreven onder de tenlasteleggingen F en H.

Uit de voorliggende elementen van het strafdossier blijkt dat vierendertigste beklaagde mogelijk voor zijn schoonzoon wat hand- en spandiensten verleende maar dat het gegeven dat hij samenwerkte met zesde beklaagde en eveneens, zonder hiertoe de noodzakelijke administratieve verplichtingen te hebben vervuld, is opgetreden als professioneel verkoper-handelaar blijkt niet afdoende uit de elementen van het strafdossier.

Bijgevolg dient vierendertigste beklaagde te worden vrijgesproken voor de tenlasteleggingen F en H.

● *Betreffende zevende beklaagde* ▌▌▌▌▌▌O, *achtste beklaagde* ▌▌▌▌ ▌▌▌▌*en negende beklaagde* ▌▌▌▌

Op 17 juni 2010 verkoopt zevende beklaagde ▌▌▌▌O, via twee transacties, bij de firma GOETZ een partij goud van 31,4 kg waarbij hem door de firma GOETZ een bedrag van 1.000.400 EURO wordt uitbetaald in contanten.

Bij nazicht blijkt de door zevende beklaagde aangeboden partij goud van diefstal afkomstig te zijn. Zevende, achtste en negende beklaagde werden hiervoor bij arrest van 17.02.2015 (na verzet bij arrest van 08.09.2015 in hoofde van negende beklaagde) reeds veroordeeld.

Na onderzoek blijkt dat:

- voormelde verkoop niet geïdentificeerd kan worden in de boekhoudkundige stukken van de firma GOETZ;
- de uitbetaling van de verkoopprijs gebeurde aan de hand van niet minder dan 66 aankoopborderellen van minder dan 15.000 EURO;
- er bij de firma GOETZ een zgn. identificatiefiche wordt aangetroffen op naam van zevende beklaagde ▌▌▌▌ waarbij deze gekoppeld wordt aan de juwelierszaak ▌▌▌▌;
- deze identificatiefiche waarschijnlijk werd opgesteld op de dag van de transactie zelf.

Thans worden zevende, achtste en negende beklaagde – samen met eerste t/m vijfde beklaagde – onder de tenlastelegging D. IV vervolgd voor feiten van witwassen van deze partij goud.

Uit het voorliggende arrest van het hof van beroep te Luik d.d. 17.02.2015 (DEEL XIV, st. 416) blijkt dat achtste en negende beklaagde veroordeeld werden voor de diefstal van de verkochte partij goud en zevende beklaagde voor de heling ervan.

Zevende beklaagde, die bijgevolg reeds voor feiten van heling van het gestolen goud werd veroordeeld, kan thans niet meer voor dezelfde feiten vervolgd worden zodat de rechtbank op basis van het adagium *"ne bis in idem"* het verval van de strafvordering m.b.t. de tenlastelegging D. IV in hoofde van zevende beklaagde dient vast te stellen.

Wat achtste en negende beklaagde betreft, stelt de rechtbank vast dat zij door het hof van beroep te Luik geenszins veroordeeld werden voor feiten van witwassen.

Nu achtste en negende beklaagde in de voorliggende arresten van het hof van beroep te Luik niet veroordeeld werden voor de heling van voornoemde partij goud en art. 505 SW uitdrukkelijk bepaalt dat het zgn. tweede en derde witwasmisdrijf (waarvoor achtste en negende beklaagde thans vervolgd worden) ook gepleegd kan worden door de daders van het basismisdrijf, kan de rechtbank in hoofde van achtste en negende beklaagde het verval van de strafvordering niet vaststellen.

De tenlastelegging D. IV is bewezen in hoofde van achtste en negende beklaagde nu vast staat dat zij het door hen gestolen goud door zevende beklaagde hebben laten verkopen bij de firma GOETZ zoals hiervoor omschreven.

Uit de elementen van het strafdossier blijkt dat de feiten waarvoor achtste en negende beklaagde thans vervolgd worden de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor zij reeds veroordeeld werden bij de in kracht van gewijsde gegane arresten van het hof van beroep te Luik d.d. 17.02.2015 en 08.09.2015 waardoor er met de reeds uitgesproken straffen dient rekening te worden gehouden.

De rechtbank zal in hoofde van achtste en negende beklaagde dan ook toepassing maken van art. 65, tweede lid, SW.

Op basis van de gegevens van het strafdossier blijkt dat zevende, achtste en negende beklaagde zonder enig probleem, zonder enige formele identificatie en zonder dat er enig

Exhibit 8 Part 2

spoor van de transactie bleef bestaan, het gestolen goud konden verkopen bij de firma GOETZ en betaling in contanten konden ontvangen, en dit ingevolge het door eerste, tweede en derde beklaagde opgezette malafide systeem dat hiervoor reeds besproken werd.

Het is voor de rechtbank duidelijk dat eerste, tweede en derde beklaagde zich niet kunnen beroepen op onwetendheid, noch op enige goede trouw, wanneer zij van een hun onbekende verkoper-handelaar een zeer grote hoeveelheid goud aankopen, hiervoor meer dan 1 miljoen EURO in contanten uitbetalen en deze aankoop dienen op te splitsen in meer dan 60 afzonderlijke transacties teneinde de wettelijke verplichtingen te omzeilen.

Eerste, tweede en derde beklaagde verleenden hierbij onmiskenbaar de noodzakelijke faciliteiten om zevende, achtste en negende beklaagde toe te laten de vruchten van hun misdadig handelen om te zetten in een praktisch bruikbaar illegaal vermogen.

De tenlastelegging D. IV is bijgevolg eveneens bewezen t.a.v. eerste, tweede en derde beklaagde.

●  *Betreffende tiende beklaagde S████████ ██████ GOETZ*

Bij nazicht van de aankoopborderellen bij de firma GOETZ voor de jaren 2010 en 2011 werd vastgesteld dat, aan de hand van een zgn. manuele identificatie, 528 afzonderlijke transacties aan tiende beklaagde konden worden toegeschreven.

Tiende beklaagde is gevestigd te Spanje waar hij een juwelierszaak uitbaat, genaamd "████████████████████".

Er werd vastgesteld dat er ook 33 transacties plaatsvonden op naam van de firma ████████ ████████████".

De verbalisanten stellen hierbij vast dat de verkopen van edele metalen op naam van de firma "████████████████" (voor een bedrag van 1.803.423,57 EURO), hoofdzakelijk werden betaald via bankoverschrijving. De verkopen van edele metalen op naam van tiende beklaagde zelf (voor een bedrag van 7.390.985,33 EURO) werden hoofdzakelijk in contanten vereffend.

In het kader van een rogatoire opdracht in Spanje weigert tiende beklaagde een verklaring af te leggen. Bij huiszoeking worden nog bijkomende aankoopborderellen, afkomstig van de firma GOETZ, aangetroffen.

DRC-34996 0341

Exhibit 8 Part 2

Bij bankonderzoek kunnen geen stortingen in contanten (gelet op de aanzienlijke verkopen in contanten van tiende beklaagde bij de firma GOETZ) worden aangetroffen.

In de boekhouding van de firma ▮▮▮▮▮▮▮▮▮▮▮▮▮" kunnen de verbalisanten slechts 5 facturen aantreffen waarbij deze vennootschap goud inkocht en dit voor een bedrag van 84.566 EURO.

Tot slot ontvangen de verbalisanten melding van de Spaanse autoriteiten dat tiende beklaagde op 25.03.2011 in Spanje werd aangetroffen in het bezit van een contante geldsom van 457.300 EURO, klaarblijkelijk de som die hem werd uitbetaald voor verkopen van goud bij de firma GOETZ.

Tiende beklaagde had bij binnenkomst in Spanje het bezit van deze fondsen niet aangegeven en de door tiende beklaagde voorgebrachte stukken m.b.t. de herkomst van deze fondsen werd door de Spaanse autoriteiten niet aanvaard. Aan tiende beklaagde zou hiervoor een boete zijn opgelegd van 238.310 EURO.

Uit dit alles volgt dat de verkopen die tiende beklaagde uitvoerde bij de firma GOETZ als zgn. *"particuliere"* klant geenszins particuliere verkopen kunnen betreffen, enerzijds gelet op de omvang ervan, en anderzijds kunnen deze verkopen geen regulier karakter hebben gehad nu ze geenszins werden verwerkt in de reguliere bedrijfsvoering van de firma "▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

Bij gebreke aan enige aanvaardbare legale herkomst van het door tiende beklaagde aangeboden goud, oordeelt de rechtbank de tenlasteleggingen C. I en C. IV, D. III, G. I en G. IV bewezen in hoofde van tiende beklaagde.

Eerste t/m derde beklaagde konden niet onwetend zijn van het malafide karakter van deze zgn. *"particuliere"* verkopen die door tiende beklaagde werden uitgevoerd. Eerste, tweede en derde beklaagde wisten immers dat tiende beklaagde verbonden was aan de firma ▮▮▮▮▮▮▮▮▮▮▮▮▮ zodat de aanzienlijke hoeveelheden goud die tiende beklaagde anoniem verkocht als *"particuliere"* verkoper geenszins enige legale herkomst konden hebben.

Nu eerste t/m derde beklaagde niettemin bewust dit systeem opzetten en tiende beklaagde in de mogelijkheid stelden om anoniem en via contante betaling aanzienlijke hoeveelheden goud te verkopen, is de tenlastelegging D. III eveneens bewezen in hoofde van eerste t/m derde beklaagde.

Exhibit 8 Part 2

● *Betreffende elfde beklaagde Q̶̶̶̶̶̶̶̶̶̶̶̶A en twaalfde beklaagde*
*J̶̶̶̶̶̶̶̶̶̶̶A*

Het onderzoek naar de aankoopborderellen bij de firma GOETZ bracht aan het licht dat 642 aankoopborderellen verwezen naar een Spaanse vennootschap, de firma "▬▬▬▬▬ ▬" waarbij deze vennootschap voor een totaalbedrag van 12.349.220,54 EURO oud goud aan de firma GOETZ had verkocht waarbij slechts een bedrag van 3.583.671,59 EURO via de bank zou zijn overgeschreven en het restant, via het systeem van *"particuliere verkopen"* in contanten zou zijn uitbetaald.

In het kader van een ambtelijke opdracht in Spanje worden elfde en twaalfde beklaagde bevraagd waarbij elfde beklaagde stelt – binnen twee vennootschapsstructuren en achttien goudwinkels – voornamelijk oud goud in te kopen en twaalfde beklaagde aangeeft – vooral via de firma GOETZ – het goud te verkopen.

Twaalfde beklaagde stelt hierbij niet over een boekhouding te beschikken m.b.t. de verkopen die in contanten werden uitbetaald. Tot tweemaal toe werd twaalfde beklaagde op de luchthaven van Rotterdam aangetroffen met aanzienlijke bedragen in contanten (respectievelijk 228.400 EURO en 370.000 EURO) die niet waren aangegeven voor overbrenging.

De Spaanse autoriteiten geven aan dat uit het gevoerde onderzoek blijkt dat elfde en twaalfde beklaagde een deel van hun handelsactiviteiten buiten de controle van de Schatkist hebben ontplooid om zo de betaling van belasting te ontduiken. Enkel de bedragen die via de bank worden overgeschreven zouden geregistreerd worden. Het grootste deel van de verkopen gebeurde evenwel in contanten.

Hieruit volgt dat elfde en twaalfde beklaagde weldegelijk gebruik hebben gemaakt van het door eerste t/m derde beklaagde opgezette systeem om aan- en verkopen van oud goud te kunnen verrichten buiten de reguliere boekhouding om.

Elfde en twaalfde beklaagde pleegden hierbij bewust valsheid in geschriften (tenl. C. VI), miskenden de bepalingen van de witwaswetgeving (tenl. G. VI) en maakte zich schuldig aan feiten van witwassen (tenl. D. X).

Ook eerste t/m derde beklaagde konden hiervan niet onwetend zijn. Het door elfde en twaalfde beklaagde aangeboden oud goud werd immers aangeboden namens een Spaanse vennootschap (conform de manuele identificatie op de diverse aankoopborderellen) maar werd slechts gedeeltelijk betaald via bankoverschrijving en verder via (anonieme) betaling in contanten.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                      p. 76
Dossiernr 10A028492                                    vleugel O, 3de verdieping            Vonnist    /

De enige plausibele reden hiertoe was om deze verkoop buiten de boekhouding van de
vennootschap te laten. Ook eerste t/m derde beklaagde konden hier niet onwetend van zijn
maar verleenden niettemin bewust hun medewerking hieraan.

De tenlastelegging D. X is eveneens bewezen in hoofde van eerste t/m derde beklaagde.

● *Betreffende dertiende beklaagde* ▮▮▮▮▮▮▮▮▮▮▮▮

Dertiende beklaagde blijkt verbonden te zijn met de Duitse vennootschap ▮▮▮
▮▮▮▮▮▮▮▮.

In het kader van een buitenlandse opdracht wordt er een huiszoeking uitgevoerd op de
maatschappelijke zetel van deze vennootschap. Hierbij worden documenten aangetroffen
die wijzen op verkopen bij de firma GOETZ voor een totaalbedrag van 1.761.741,57 EURO
die via banktransacties werden vereffend.

In de boekhouding van de firma GOETZ worden bijkomende aankoopborderellen
aangetroffen, die niet konden worden teruggevonden bij de firma ▮▮▮, voor bijkomende
verkopen bij de firma GOETZ – hetzij *"particuliere"* verkopen op naam van *"Berkan"* – voor
een totaalbedrag van 6.437.650,06 EURO.

Bij verhoor wenste dertiende beklaagde voor deze vaststelling geen verklaringen af te
leggen. Evenmin wenste dertiende beklaagde verklaringen af te leggen omtrent de
vaststelling – op basis van de telefoontap – dat dertiende beklaagde zgn. verkopen in
contanten bij de firma GOETZ had gereserveerd. Tot slot wilde dertiende beklaagde ook niet
toelichten hoe dergelijke reservaties boekhoudkundig werden verwerkt.

Dertiende beklaagde ontkende trouwens de aankoopborderellen met vermelding *"Berkan"*
ooit te hebben gezien.

Opnieuw wordt duidelijk dat eerste t/m derde beklaagde een systeem hebben opgezet dat
derden, verkopers-handelaars in edele metalen, toelaat zgn. verkopen *"buiten de
boekhouding"* uit te voeren en dat hiervan intensief gebruik werd gemaakt.

De verkopen die door dertiende beklaagde op naam van zijn firma worden gemaakt, en die
via bankoverschrijving worden vereffend, zijn allen terug te vinden in de administratie van
de firma ▮▮▮.

De verkopen die door dezelfde dertiende beklaagde worden uitgevoerd, zgn. in zijn particuliere hoedanigheid, worden met omzeiling van de vigerende bepalingen in contanten uitbetaald, worden niet opgenomen in de boekhouding van ▬▬ en wanneer dertiende beklaagde met deze transacties wordt geconfronteerd, ontkent hij flagrant hierbij betrokken te zijn geweest.

Zowel dertiende beklaagde, als eerste t/m derde beklaagde, handelden hierbij met kennis van zaken zodat de tenlasteleggingen C. X, D. XIV en G. X in hunnen hoofde bewezen zijn.

* Betreffende veertiende beklaagde ▬▬▬▬▬ en vijftiende beklaagde ▬▬▬▬ ▬▬▬▬▬ "

Veertiende en vijftiende beklaagde zijn broers van Irakese afkomst.

Bij verhoor geeft vijftiende beklaagde aan dat hij in het kader van de goudhandel is opgetreden als hulpje van zijn broer, in deze veertiende beklaagde. Veertiende beklaagde zelf heeft zich nooit aangeboden bij de politiediensten en kon niet worden verhoord.

Uit het gevoerde onderzoek is gebleken dat de gebroeders ▬▬▬▬ blijkbaar opereerden via de ▬▬▬▬▬ en later via de firma ▬▬▬▬▬ Uit de verklaring van vijftiende beklaagde volgt echter dat deze firma's geen winkel uitbaatten maar dat veertiende beklaagde *"gewoon van huis naar zijn klanten"* ging.

Uit het onderzoek (bij de firma GOETZ) is gebleken dat veertiende en vijftiende beklaagde in 2011 minstens 841 transacties met de firma GOETZ doorvoerden en dit voor een totaalbedrag van 11.430.436,90 EURO.

Door vijftiende beklaagde werden stukken voorgelegd waaruit verkopen bleken bij de firma GOETZ voor een bedrag van 221.833,01 EURO. Het restant van de verkopen – die bleken uit manuele identificatie op zgn. *"particuliere"* aankoopfiches – werd door vijftiende beklaagde eenvoudigweg ontkend.

Enig boekhoudkundig stuk omtrent de verwerking van deze aan- en verkopen van oud goud door de gebroeders ▬▬▬▬ werd niet voorgelegd. Wel gaf vijftiende beklaagde aan dat zijn broer problemen zou hebben met de Nederlandse belastingdiensten en om die reden zou uitwijken naar Dubai.

In voormelde omstandigheden is het duidelijk dat noch de door veertiende en vijftiende beklaagde verrichte aankopen, noch de door hen verrichte verkopen een legitiem karakter kunnen hebben gehad.

Enige boekhoudkundige verwerking is niet voorhanden. Vijftiende beklaagde verklaart zelf dat dit geleid heeft tot problemen met de Nederlandse belastingdiensten.

Veertiende en vijftiende beklaagde verkochten – vanuit Nederland – op korte tijd voor een enorm bedrag, in contanten, aan oud goud bij de firma GOETZ. Zij kunnen niet geloofwaardig voorhouden dat zij niet wisten dat hiermee de geldende witwaswetgeving werd geschonden, dat de administratieve verplichtingen (middels anonieme en opgesplitste verkopen) niet werden gevolgd en hierdoor illegale vermogensvoordelen werden omgezet dan wel verborgen.

De tenlasteleggingen C. XIII, D. XVII en G. XIII zijn dan ook bewezen in hoofde van veertiende en vijftiende beklaagde.

De rechtbank verwijst naar hetgeen hiervoor reeds werd vermeld en stelt vast dat ook eerste t/m derde beklaagde niet onwetend konden zijn omtrent het onregelmatig karakter van deze transacties zodat de tenlastelegging D. XVII ook ten aanzien van hen bewezen is.

    ● *Betreffende zestiende beklaagde* ▬▬▬

Bij onderzoek in de boekhoudkundige stukken van de firma GOETZ werden 375 afzonderlijke transacties aangetroffen voor een totaalbedrag van 5.184.700,71 EURO. Op deze transacties werd zestiende beklaagde geïdentificeerd als *"Partikuller –* ▬▬*.."*.

In Duitsland werd zestiende beklaagde verhoord. Hij verklaarde hierbij inderdaad oud goud aan te kopen en te verkopen, hij stelde te werken via een vennootschap ▬▬▬ en stelde slechts enkele keren kleine hoeveelheden goud aan de firma GOETZ te hebben verkocht.

De aankoopborderellen met vermelding *"Partikuller –*▬▬ *..."* zou hij nog nooit hebben gezien.

Zestiende beklaagde stelde nooit contante gelden te hebben ontvangen, kon geen documenten voorleggen m.b.t. het bij de firma GOETZ verkochte goud en wilde geen verklaring afleggen omtrent de herkomst van het goud, noch omtrent de bestemming van de ontvangen gelden.

# Exhibit 8 Part 2

Bij huiszoeking op het adres van de firma ▮▮▮▮▮▮▮▮werden in een kluis enkele kilo's oud goud aangetroffen alsmede een som van 70.000 EURO in contanten. Zestiende beklaagde kon of wilde geen verklaring geven omtrent de herkomst van deze goederen en gelden.

Zestiende beklaagde werd in Duitsland – trouwens in het bijzijn van dertiende beklaagde ▮▮▮▮▮▮ – ook aangetroffen terwijl hij een som van 134.000 EURO in contanten op zich droeg.

De rechtbank stelt vast dat de door zestiende beklaagde uitgevoerde transacties, in voormelde omstandigheden, geen legale herkomst kunnen hebben gehad.

De hem tenlastegelegde feiten C. IX, D. XIII en G. IX zijn dan ook bewezen.

Ook hier kunnen eerste t/m derde beklaagde niet onwetend zijn geweest omtrent het illegale karakter van de door zestiende beklaagde gestelde handelingen zodat de tenlastelegging D. XIII ook in hoofde van eerste t/m derde beklaagde bewezen is.

- ● *Betreffende zeventiende beklaagde* ▮▮▮▮▮▮▮▮▮▮

Zeventiende beklaagde is een Nederlands staatsburger. Bij onderzoek in de systemen van de firma GOETZ worden 306 transacties aangetroffen – voor een totaalbedrag van 4.097.229,59 EURO – met een manuele identificatie die naar zeventiende beklaagde verwijst.

Wanneer de verbalisanten met de Nederlandse autoriteiten contact opnemen, wordt hen gemeld dat zeventiende beklaagde zich in een Duitse gevangenis bevindt en dit n.a.v. een onderzoek naar belastingfraude t.a.v. hemzelf en zijn onderneming ▮▮▮▮▮▮.

In het kader van een ambtelijke opdracht melden de Duitse gerechtelijke diensten op 12.12.2012 dat zeventiende beklaagde iedere medewerking aan het dossier weigert te verlenen en geen verklaring aan de Belgische politiediensten wenst af te leggen.

Thans stelt zeventiende beklaagde in besluiten dat hij van voormelde 306 transacties geen weet heeft. Hij stelt slechts één kilogram oud goud via de firma GOETZ te hebben verkocht en dit middels een drietal transacties.

De rechtbank oordeelt deze bewering ongeloofwaardig. Op zich is er geen enkele reden waarom de firma GOETZ transacties aan zeventiende beklaagde zou toeschrijven wanneer deze niet daadwerkelijk zouden hebben plaatsgevonden.

Verder beweert zeventiende beklaagde slechts sporadisch met de firma GOETZ te hebben samengewerkt, doch enige toelichting hierbij wordt niet verschaft.

De rechtbank verwijst naar hetgeen hieromtrent voordien reeds werd gesteld omtrent de door zeventiende beklaagde gehanteerde boekhouding.

Op basis van de bij de firma GOETZ aangetroffen aankoopborderellen met manuele identificatie van zeventiende beklaagde, oordeelt de rechtbank het weldegelijk bewezen dat zeventiende beklaagde veelvuldig en voor aanzienlijke bedragen oud goud bij de firma GOETZ heeft verkocht.

Zeventiende beklaagde was destijds professioneel handelaar in oud goud te Nederland. Uit het onderzoek blijkt dat zeventiende beklaagde hiertoe aanzienlijke transacties sloot. Van zeventiende beklaagde mag bijgevolg verwacht worden dat hij zich laat informeren omtrent de geldende verplichtingen ter zake. Zeker wanneer – zoals in deze – zeventiende beklaagde vanuit Nederland waar hij oud goud aankoopt, met dit goud naar België komt om het hier te verkopen en vervolgens, met de tegenwaarde in contanten op zak, terugkeert naar Nederland.

Van enige verschoonbare rechtsdwaling kan in hoofde van zeventiende beklaagde dan ook geen sprake zijn.

De objectieve informatie van het strafdossier, alsmede de eigen verklaringen van zeventiende beklaagde in conclusie, overtuigen de rechtbank van het gegeven dat zeventiende beklaagde op het tijdstip van de feiten, en op grote schaal, goud aan- en verkocht zonder dat hierbij van enige officiële handelstransactie sprake is geweest.

De transacties betreffen bijgevolg weldegelijk illegale vermogensvoordelen.

Zeventiende beklaagde miskende hierbij bewust de op hem rustende verplichtingen inzake de witwaswetgeving en nam deel aan valsheid in geschriften teneinde deze verplichtingen te omzeilen en een anoniem karakter te verschaffen aan de door hem uitgevoerde verkopen.

DRC-34996 0348

# Exhibit 8 Part 2

De tenlasteleggingen C. XI, D. XV en G. XI zijn dan ook bewezen t.a.v. zeventiende beklaagde.

Met verwijzing naar hetgeen hieromtrent voorheen reeds werd gesteld, oordeelt de rechtbank de tenlastelegging D. XV eveneens bewezen in hoofde van eerste t/m derde beklaagde.

● *Betreffende achttiende beklaagde* ██████████████████████████

Bij analyse van de aankoopborderellen van de firma GOETZ werden 134 transacties aangetroffen, met manuele identificatie en uitbetaling in contanten voor een totaalbedrag van 2.633.255,37 EURO.

Voor het jaar 2011 werden er transacties teruggevonden voor een totaalbedrag van 8.314.009,95 EURO waarvan een totaalbedrag van 5.650.754,58 EURO via bankoverschrijving werd vereffend.

Naar aanleiding van de telefoontap wordt vastgesteld dat achttiende beklaagde een tiental telefoongesprekken met de firma GOETZ voert waarbij er handelstransacties besproken worden.

In het kader van een buitenlandse opdracht wordt achttiende beklaagde verhoord, waarbij er geen duidelijkheid wordt verschaft omtrent de redenen waarom een gedeelte van de uitgevoerde transacties anoniem en via contante betaling geregeld diende te worden.

Bij de controle van de belastingaangifte voor het jaar 2012 werd vastgesteld dat er een bedrag van 5.399.435 EURO werd aangegeven als inkomsten uit de transacties met de firma GOETZ, hetzij ongeveer de omvang van de transacties die giraal werden vereffend.

Van de Spaanse autoriteiten vernemen de speurders dat achttiende beklaagde te Spanje het voorwerp uitmaakt van een onderzoek inzake witwas, oplichting en valsheid in geschriften.

Uit hetgeen voorafgaat volgt dat achttiende beklaagde bewust gebruik maakte van de diensten van de firma GOETZ om transacties te kunnen uitvoeren die buiten de officiële administratieve verwerking van zijn handelsactiviteiten werden gehouden.

Hiertoe verkocht achttiende beklaagde, zgn. als particulier, voor meer dan tweeëneenhalf miljoen EURO oud goud aan de firma Goetz waarbij deze transacties werden opgesplitst om

# Exhibit 8 Part 2

een uitbetaling in contanten mogelijk te maken.

Achttiende beklaagde, als professioneel handelaar in oud goud die – naar eigen zeggen van tweede beklaagde Alain GOETZ – in de betrokken periode wekelijks naar België afzakte om oud goud te verkopen, handelde bewust en duidelijk met de intentie om het door hem vergaarde goud gedeeltelijk *"buiten de boekhouding om"* te verhandelen.

Bewust pleegde achttiende beklaagde hierbij valsheid in geschriften en miskende hij de verplichtingen van de witwaswetgeving. Het illegale karakter van het verhandelde goud staat daarbij vast zodat achttiende beklaagde zich eveneens schuldig maakte aan het hem ten laste gelegde witwasmisdrijf.

Ook eerste t/m derde beklaagde konden van dit alles niet onbekend zijn en werkten niettemin bewust mee aan de handelingen van achttiende beklaagde.

De tenlasteleggingen C. VII, D. XI en G. VII zijn dan ook bewezen in hoofde van achttiende beklaagde waarbij de tenlastelegging D. XI eveneens bewezen is in hoofde van eerste t/m derde beklaagde.



- *Betreffende negentiende beklaagde* ▬▬▬▬▬*O, twintigste beklaagde* ▬▬▬▬ *en éénentwintigste beklaagde* ▬▬▬▬

Éénentwintigste beklaagde ▬▬▬▬▬▬ is een vennootschap naar Spaans recht die te Spanje actief is in de aan- en verkoop van edele metalen. Twintigste beklaagde ▬▬R is de zaakvoerder van éénentwintigste beklaagde. Negentiende beklaagde ▬▬▬ is zgn. speciaal gevolmachtigde van éénentwintigste beklaagde en degene die zich steeds in persoon aanbood bij de firma GOETZ om aldaar edele metalen te verkopen.

In het kader van de tapmaatregel die in huidig strafonderzoek werd uitgevaardigd, wordt vastgesteld dat er een vijfentwintigtal keer wordt getelefoneerd tussen negentiende beklaagde en de firma GOETZ waarbij gesproken wordt over verkopen van oud goud in contanten.

In eerste instantie worden bij de firma GOETZ – voor de periode 2011 – 51 transacties gevonden met manuele vermelding "▬▬▬▬▬▬ voor een totaalbedrag van 5.524.037,60 EURO die grotendeels via bancaire overschrijving werden vereffend.