Exhibit 8 Part 2

Bij later onderzoek – in het kader van een buitenlandse opdracht – wordt in de boekhoudkundige stukken van de firma ▮▮▮▮▮▮▮ vastgesteld dat in de betrokken periode 56 transacties werden uitgevoerd voor een totaalbedrag van 6.003.645,39 EURO.

Op datum van 12.02.2013 werden er in de boekhouding van ▮▮▮▮▮▮▮▮▮ geen transacties aangetroffen op naam van negentiende beklaagde. In de boekhouding van de firma GOETZ worden daarentegen nog 199 aankoopborderellen aangetroffen met manuele vermelding *"FERRE LOZANO"* waarbij een totaalbedrag van 2.672.625,88 EURO in contanten werd uitbetaald.

Documenten waaruit de herkomst van het door de firma ▮▮▮▮▮▮▮ verkochte goud kon worden achterhaald, bleken evenmin voorhanden te zijn.

Uit deze vaststellingen blijkt duidelijk dat de verkopen van oud goud die door negentiende beklaagde bij de firma GOETZ werden gedaan op naam van de firma ▮▮▮▮▮▮▮ quasi volledig werden vereffend via bankoverschrijving en dat deze verkopen ook terug te vinden waren in de voorhanden zijnde boekhoudkundige stukken.

De verkopen die door negentiende beklaagde *"als particulier"* werden gemaakt, werden daarentegen in contanten verrekend en waren – althans niet op 12.02.2013 – in de boekhoudkundige stukken van de firma ▮▮▮▮▮▮▮ terug te vinden.

In besluiten stellen negentiende t/m éénentwintigste beklaagde dat hen niets verweten kan worden en dat thans alle voornoemde transacties – regelmatig naar Spaans recht – in de boekhouding van de firma ▮▮▮▮▮▮▮ zouden zijn verwerkt.

De rechtbank dient vast te stellen dat de argumentatie die wordt opgebouwd in de besluiten van negentiende t/m éénentwintigste beklaagde geen verklaring geeft voor de vaststelling dat een deel van de aankopen van de firma GOETZ op naam van de firma gebeurde, via bancaire overschrijving en verwerkt werd in de boekhouding van ▮▮▮▮ ▮▮▮▮▮ en een ander deel anoniem op naam van negentiende beklaagde ▮▮▮▮▮ *"als particulier"* gebeurde waarbij deze transacties in contanten werden vereffend en – alvast op het tijdstip van het onderzoek – niet in de boekhouding van ▮▮▮▮▮▮▮ waren opgenomen.

Op het tijdstip van het onderzoek weigerde twintigste beklaagde ▮▮▮▮ alvast iedere medewerking. Uit de stukken blijkt dat twintigste beklaagde ▮▮▮ slechts sinds 14 juli 2011 aangesteld werd als zaakvoerder. Beweren dat twintigste beklaagde bijgevolg geen kennis heeft gehad van de transacties die voorafgaandelijk hieraan werden uitgevoerd, is volstrekt ongeloofwaardig. Te meer daar tal van deze transacties nog niet boekhoudkundig verwerkt waren.

DRC-34996 0351

# Exhibit 8 Part 2

De enige plausibele verklaring voor deze bewering van twintigste beklaagde ligt volgens de rechtbank in het feit dat het nooit de bedoeling was om deze transacties ook daadwerkelijk boekhoudkundig te verwerken.

Wel dient de rechtbank vast te stellen dat de thans geviseerde transacties van éénentwintigste beklaagde werden uitgevoerd door negentiende beklaagde zonder dat er enige duidelijk rol van twintigste beklaagde wordt aangetoond. Nu twintigste beklaagde op het tijdstip van de geviseerde transacties ook niet formeel, als zaakvoerder, hierbij enige betrokkenheid kon hebben gehad, dient hij voor de hem ten laste gelegde feiten te worden vrijgesproken.

Zelfs in de visie van negentiende en éénentwintigste beklaagde dat transacties van de eerste jaarhelft van 2011 nog later verwerkt konden worden, bijv. in de boekjaren 2012, 2013 en 2014, dient er documentatie voorhanden te zijn van deze transacties, minstens van de hoeveelheden goud die door de firma ▓▓▓▓▓▓▓ aan negentiende beklaagde ▓▓▓▓ waren ter beschikking gesteld, en welke bedragen er reeds door negentiende beklaagde ▓▓▓▓▓ aan de firma ▓▓▓ waren ter beschikking gesteld (maar naar Spaans recht pas in later boekhoudkundige jaren zouden verwerkt worden) nu anders noch in hoofde van de firma ▓▓▓▓▓▓ noch in hoofde van negentiende beklaagde ▓▓▓▓▓ enige controle en afrekening mogelijk zou worden gemaakt.

Beweren dat deze stukken voorhanden waren maar door de speurders niet werden onderzocht oordeelt de rechtbank op basis van de dossierstukken hieromtrent eveneens ongeloofwaardig.

De rechtbank dient bijgevolg vast te stellen dat op het tijdstip van de geviseerde verrichtingen, en op het tijdstip van de buitenlandse opdracht en onderzoek bij beklaagden, er geen enkel spoor kon worden aangetroffen van de zgn. anonieme *"particuliere"* transacties noch van de overeenstemmende geldstromen in contanten.

Dat jaren later het één en ander boekhoudkundig werd geregulariseerd, doet geen afbreuk aan de onregelmatigheid van de transacties op het tijdstip van de feiten.

Alleszins staat het vast dat negentiende t/m éénentwintigste beklaagde professionele handelaars in oud goud zijn. Wanneer zij op regelmatige basis naar België komen om hier handel te drijven – op basis van de onderzoeksgegevens quasi wekelijks waarbij voor niet minder dan 6 kg edele metalen werden verkocht – mag van beklaagden verwacht worden dat zij nazicht doen naar alhier geldende verplichtingen daaromtrent.

# Exhibit 8 Part 2

De bepalingen van de Wet van 11 januari 1993 waren ook op negentiende en éénentwintigste beklaagde van toepassing en dienen door hen gevolgd te worden.

Niettemin blijkt uit de dossiergegevens dat negentiende beklaagde ▬▬▬ in opdracht van éénentwintigste beklaagde ▬▬▬▬▬ geruime tijd en voor aanzienlijke bedragen edele metalen heeft verkocht waarbij deze in strijd met de bepalingen van de Wet van 11 januari 1993 in contanten werden vereffend.

Teneinde dit mogelijk te maken, werd er ook valsheid in geschriften gepleegd. Ook bij de verkopen door negentiende beklaagde werd ten onrechte voorgehouden dat de verkopen een particulier karakter hadden en werden verkopen voor hogere bedragen systematisch opgesplitst in verkopen onder de 15.000 EURO.

Dat negentiende beklaagde zich hiervan · bewust was blijkt uit de gecapteerde telefoongesprekken waarbij gesproken werd over transacties op naam van ▬▬▬▬ ▬▬▬▬ hetgeen verkopen in contanten impliceerde. Medewerkers van de firma GOETZ meldden trouwens telefonisch uitdrukkelijk aan een bediende van de firma ▬▬▬ ▬▬▬▬ dat uitbetalingen voor *"private"* verkopen door negentiende beklaagde niet via de bank zouden worden betaald.

De tenlasteleggingen C. XIV en G. XIV oordeelt de rechtbank dan ook bewezen in hoofde van negentiende en éénentwintigste beklaagde.

Uit het strafdossier blijkt verder dat op het tijdstip van de feiten niet kon worden achterhaald wat de herkomst was van de edele metalen die door negentiende beklaagde *"als particulier"* werden aangeboden. Ook thans blijft dit volstrekt onduidelijk en wordt er slechts beweerd dat het in consignatie gegeven goud zou betreffen. Naar het oordeel van de rechtbank wordt enige legale herkomst niet aannemelijk gemaakt zodat de transacties die door negentiende beklaagde -- anoniem en in contanten -- werden verricht weldegelijk witwasverrichtingen betreffen zodat ook de tenlastelegging D. XVIII in hoofde van negentiende en éénentwintigste beklaagde bewezen zijn.

Uit hetgeen voorafgaat volgt dat negentiende beklaagde de lastens hem weerhouden tenlasteleggingen wetens en willens heeft gepleegd. Verder pleegde negentiende beklaagde deze misdrijven in het kader van de werking van éénentwintigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

# Exhibit 8 Part 2

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend konden zijn, is de
tenlastelegging D. XVIII ook in hunnen hoofde bewezen.

De rechtbank spreekt twintigste beklaagde, om redenen hiervoor vermeld, vrij voor de
tenlasteleggingen C. XIV, D. XVIII en G. XIV.

    ● *Betreffende tweeëntwintigste beklaagde* ▮▮▮▮▮▮▮▮▮

Bij nazicht van de administratieve stukken binnen de firma GOETZ worden voor het jaar
2011 een heel aantal transacties (164 stuks) aangetroffen waarbij door tweeëntwintigste
beklaagde oud goud werd verkocht voor een totaalbedrag van 2.246.154,64 EURO.

Tweeëntwintigste beklaagde weigerde mee te werken aan een buitenlandse opdracht maar
verschafte via zijn advocaat wel toelichting bij zijn activiteiten.

Hieruit kan worden afgeleid dat tweeëntwintigste beklaagde mogelijk samenwerkte met de
firma ▮▮▮▮▮▮▮▮ en via deze vennootschap oud goud verkocht aan de firma GOETZ.

Deze transacties kunnen echter niet overeenstemmen met de 164 aankoopborderellen die
op naam van tweeëntwintigste beklaagde werden aangetroffen waarbij wederom vermeld
werd dat het *"particuliere"* transacties betrof waarbij op de aankoopborderellen geen BTW-
nummer werd vermeld.

Uit de eigen stukken die door de raadsman van tweeëntwintigste beklaagde werden
voortgebracht blijkt dat deze transacties niet overeenstemmen met voornoemde 164
transacties die op naam van tweeëntwintigste beklaagde werden teruggevonden.

Dit impliceert dat deze 164 transacties niet werden afgesloten met of voor de firma ▮▮▮
▮▮▮▮▮▮. Het betreffen bijgevolg transacties die buiten de boekhoudkundige
administratie van deze firma werden uitgevoerd en waarbij zowel de aankoop van het oude
goud, de financiering ervan als de verwerking van de verkoopprijs buiten de reguliere
boekhouding is gebeurd.

Enige legale herkomst van het verkochte oud goud wordt dan ook niet aangetoond en kan
worden uitgesloten.

# Exhibit 8 Part 2

Nu tweeëntwintigste beklaagde als professioneel verkoper van oud goud op de hoogte diende te zijn van de geldende verplichtingen in België, en uit de voorliggende stukken duidelijk blijkt dat hij deze heeft miskend, zijn de tenlasteleggingen C. XII en G. XII bewezen in zijnen hoofde.

Nu iedere legale herkomst van het aangeboden goud dat als *"particulier"* werd aangeboden, kan worden uitgesloten, is ook de tenlastelegging D. XVI bewezen t.a.v. tweeëntwintigste beklaagde.

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. XVI ook t.a.v. hen bewezen.

● *Betreffende drieëntwintigste beklaagde* ████████████

Bij de firma GOETZ werden aankoopborderellen aangetroffen op naam van drieëntwintigste beklaagde waaruit bleek dat door drieëntwintigste beklaagde bij 124 transacties (als particulier met manuele identificatie) voor een totaal bedrag van 1.660.253,88 EURO aan goud werd verkocht.

In het kader van een buitenlandse opdracht weigerde drieëntwintigste beklaagde mee te werken aan het onderzoek. Hij weigerde enige verklaring af te leggen en kon geen documenten voorleggen m.b.t. het door hem verkochte goud.

Drieëntwintigste beklaagde verkocht ruim 47 kg goud zonder dat hiervoor enige verklaring kan worden gegeven. Volgens de Duitse autoriteiten was drieëntwintigste beklaagde van opleiding *"circusartiest"* en op het tijdstip van de feiten reeds geruime tijd werkzoekende.

Bij huiszoeking in de woning van drieëntwintigste beklaagde werd in de garage een afzuigsysteem aangetroffen dat mogelijk dienstig kon zijn bij het smelten van metalen.

De rechtbank dient vast te stellen dat er geen enkele verklaring voorhanden is hoe drieëntwintigste beklaagde – een reeds geruime tijd werkloze circusartiest – in een half jaar tijd in slaagde om 47 kg goud te verzamelen en voor meer dan anderhalf miljoen EURO in contanten kon verkopen bij de firma GOETZ.

De tenlastelegging D. XII is dan ook bewezen in hoofde van drieëntwintigste beklaagde. Dit is eveneens het geval in hoofde van eerste, tweede en derde beklaagde. De rechtbank stelt vast dat drieëntwintigste beklaagde niet aan enige reguliere juwelenhandelaar kon worden gekoppeld en blijkbaar uitsluitend is opgetreden als *"particuliere"* verkoper daar waar dit

volgens eerste t/m derde beklaagde niet mogelijk zou zijn geweest. Bijgevolg wisten eerste t/m derde beklaagde dat het door drieëntwintigste beklaagde aangeboden goud geen legale herkomst kon hebben gehad.

Gelet op de hoeveelheid goud die door drieëntwintigste beklaagde op korte termijn werd aangeboden, oordeelt de rechtbank het niet aannemelijk dat dit particuliere verkopen betroffen. Bijgevolg omzeilde ook drieëntwintigste beklaagde de verplichtingen van de witwaswetgeving mits het plegen van valsheid in geschriften en zijn de tenlasteleggingen C. VIII en G. VIII eveneens bewezen.

- ● Betreffende vierentwintigste beklaagde ████████ en vijfentwintigste beklaagde ████████

Vierentwintigste beklaagde ████ de zaakvoerder van vijfentwintigste beklaagde ████ ████ die een juwelierswinkel uitbaat waarbij ook oud goud wordt ingekocht.

Onder de tenlastelegging C. III en G. III worden vierentwintigste en vijfentwintigste beklaagde vervolgd voor de verkoop van partijen oud goud waarbij aanzienlijke hoeveelheden oud goud, m.n. respectievelijk voor 388.748,86 EURO en 136.650,66 EURO, werden opgesplitst in meerdere transacties onder de 15.000 EURO waardoor voornoemde bedragen in contanten konden worden uitbetaald.

In besluiten betwisten vierentwintigste en vijfentwintigste beklaagde de tenlastelegging G. III niet. De rechtbank stelt vast dat uit de voorliggende stukken blijkt dat vierentwintigste en vijfentwintigste beklaagde – als professionele handelaars-verkopers – inderdaad de bepalingen van de Wet van 11 januari 1993 hebben miskend en bij voornoemde transacties, die het bedrag van 15.000 EURO ver overtroffen, toch in contanten hebben vereffend.

Hiertoe werden op twee verschillende data, m.n. 14.01.2010 en 29.03.2010, meerdere aankoopborderellen opgesteld met telkens verkopen onder de 15.000 EURO.

Vierentwintigste en vijfentwintigste beklaagde zijn daarenboven reeds geruime tijd actief in het verhandelen van oud goud en juwelen zodat mag worden aangenomen dat zij bekend zijn met de op hen rustende verplichtingen.

De tenlastelegging G. III is dan ook bewezen. De rechtbank stelt vast dat de uitbetaling in contanten reeds geschiedde op 11 december 2009 zodat de incriminatieperiode als volgt moet worden aangepast: "C. III ... tussen 10 december 2009 en 30 maart 2010".

# Exhibit 8 Part 2

De tenlastelegging C. III wordt door vierentwintigste en vijfentwintigste beklaagde wel betwist.

Uit de besluiten van vierentwintigste en vijfentwintigste beklaagde vloeit voort dat zij betwisten zich schuldig te hebben gemaakt aan enige valsheid in geschriften nu door het opsplitsen van voornoemde transacties van 14.01.2010 en 29.03.2010 de waarheid niet zou zijn vermomd en er ook geen voordeel zou zijn behaald nu deze transacties weldegelijk in de boekhouding van vijfentwintigste beklaagde werden opgenomen.

Vierentwintigste en vijfentwintigste beklaagde verliezen hierbij uit het oog dat het opsplitsen in deeltransacties onder de 15.000 EURO net noodzakelijk was om de feiten zoals vermeld onder de tenlastelegging G. III te kunnen plegen.

De rechtbank verwijst naar hetgeen hieromtrent voorheen reeds werd gezegd en waaruit blijkt dat dit systeem door eerste t/m derde beklaagde net werd opgezet om hun klanten — waaronder vierentwintigste en vijfentwintigste beklaagde — te plezieren.

Dat ook vierentwintigste beklaagde zich hierbij vragen stelde, blijkt uit zijn eigen verklaringen. Geconfronteerd met de systematische opsplitsing van grotere loten aangekocht goud, stelde vierentwintigste beklaagde in zijn verhoor van 19 november 2012: *"... ik heb mij hieromtrent vragen gesteld. Ik vermoed dat ik aan één van de loketbediende de reden heb gevraagd. Men vertelde mij dat dit nu zo moest. ..."*

De reden dat het zo moest, bestond echter in het gegeven dat de inbreuk op de witwaswetgeving, zoals omschreven onder de tenlastelegging G. III, verdoezeld diende te worden.

Ondanks het gegeven dat hij zich hierbij vragen stelde, werkten vierentwintigste en vijfentwintigste beklaagde mee aan het zodus opgezette systeem.

De tenlastelegging C. III is bijgevolg eveneens bewezen.

Bijkomend wordt vierentwintigste beklaagde ███ onder de tenlasteleggingen C. V. b, D. VI en G. V. b vervolgd voor twee transacties die werden gesloten met de firma GOETZ op 26.05.2011 en 30.05.2011. Het betreft transacties waarbij door vierentwintigste beklaagde op 26.05.2011 voor minstens 5 kg oud goud bij de firma GOETZ zou zijn verkocht en op 30.05.2011 oud goud voor een bedrag van minstens 60.000 EURO.

Wat de transactie van 26.05.2011 betreft, werd er op telefoontap vastgesteld dat vierentwintigste beklaagde een telefoongesprek voerde met de firma GOETZ waarin hij stelde *"die morgen iets te hebben binnengebracht met vraag om binnen een uur vijf of zeven te kunnen krijgen"*. (zie Deel XI, kaft 24, st. 338, verhoor d.d. 19.11.2012)

Geconfronteerd met dit telefoongesprek bevestigde vierentwintigste beklaagde dat hij hiermee de tegenwaarde in contanten van vijf of zeven kg oud goud wenste op te halen. Hij verduidelijkte dat het hierbij oud goud betrof van zijn Spaanse firma, ████████████.

Geconfronteerd met de melding van de speurders dat in de boekhouding van firma GOETZ voor de desbetreffende transacties geen aankoopborderellen op naam van de firma ████████████ konden worden aangetroffen, stelt vierentwintigste beklaagde dat er *"voorlopig een 'particulier' document"* werd opgesteld.

De rechtbank verwijst naar hetgeen voorafgaat en stelt vast dat de verklaring van vierentwintigste beklaagde hieromtrent een bevestiging vormt van het gegeven dat verkopen die in contanten geregeld dienden te worden, geboekt werden als een *"particuliere"* verkoop.

In besluiten stelt beklaagde dat deze verkoop verantwoord wordt door stukken die hem werden overgemaakt door de firma ████████████ en die aan het strafdossier werden gevoegd.

De rechtbank stelt vast dat de verbalisanten vermelden dat uit de voorgelegde stukken (Deel XI, kaft 24, st. 468) blijkt dat in de desbetreffende periode er inderdaad voor ongeveer 4 kg fijn goud door de firma GOETZ aan ████████████ werd uitbetaald.

Bij nazicht van deze stukken blijken deze verkopen echter vereffend te zijn geworden via bankverrichting vanuit de firma GOETZ naar de firma ████████████ toe zodat deze nooit betrekking kunnen hebben op de transactie van 26.05.2011 waaromtrent vierentwintigste beklaagde zelf verklaarde dat deze in contanten werd vereffend.

Deze vaststellingen bevestigen nog maar eens dat reguliere verkopen door verkopers-handelaars veelal werden uitgevoerd via girale betaling waarbij deze verkopen ondersteund kunnen worden door de nodige boekhoudkundige stukken, daar waar verkopen buiten de boekhouding om werden gemaskeerd door verkopen als *"particulier"* met betaling in contanten én waarbij deze transacties niet terug te vinden zijn in de boekhouding van de verkoper-handelaar.

DRC-34996 0358

# Exhibit 8 Part 2

Vierentwintigste beklaagde kan hiervan niet onbekend zijn nu hij aandeelhouder is van de firma ▓▓▓▓▓▓▓▓▓ en hij deze firma oprichtte op vraag van zijn goede vriend, een zekere ▓▓▓▓▓▓▓▓.

De tenlasteleggingen C. V. b. 1, D. VI. a en G. V. b. (in zoverre dit betrekking heeft op de feiten als omschreven onder de tenlastelegging C. V. b. 1) zijn dan ook bewezen t.a.v. vierentwintigste beklaagde.

Uit hetgeen voorafgaat volgt dat vierentwintigste beklaagde de lastens hem weerhouden tenlasteleggingen C. III en G. III wetens en willens heeft gepleegd. Verder pleegde vierentwintigste beklaagde deze misdrijven in het kader van de werking van vijfentwintigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde niet onwetend kunnen zijn geweest van het gegeven dat deze verkopen niet legaal waren, is de tenlastelegging D. VI. a ook lastens eerste, tweede en derde beklaagde bewezen.

De tenlasteleggingen C. V. b. 2 en D. VI. b hebben betrekking op de verkoop van een partij goud voor een bedrag van 60.000 EURO. Deze tenlastelegging is eveneens gebaseerd op een gecapteerd telefoongesprek waarbij vierentwintigste beklaagde informeert naar het voorhanden zijn van een bedrag van 60.000 EURO in het kader van de verkoop van een partij goud.

Uit de verklaringen van vierentwintigste beklaagde blijkt dat deze transactie niet door hemzelf werd uitgevoerd maar dat vierentwintigste beklaagde louter telefonisch informeerde naar de afhandeling van deze transactie.

Enig element waaruit het tegendeel zou blijken, kan niet in het strafdossier worden teruggevonden.

Deze transactie kon verder niet geïdentificeerd worden in de administratie van de firma GOETZ. Enige bijkomende informatie omtrent deze transactie is dan ook niet voorhanden.

# Exhibit 8 Part 2

De rechtbank oordeelt het niet bewezen dat vierentwintigste beklaagde actief mee bij deze transactie betrokken was en het voeren van een telefoongesprek waarbij loutere informatie wordt opgevraagd, oordeelt de rechtbank niet voldoende om vierentwintigste beklaagde als mededader van deze transactie te beschouwen.

Vierentwintigste beklaagde dient bijgevolg te worden vrijgesproken voor de tenlasteleggingen C. V. b. 2, D. VI. b en G. V. b. (in zoverre dit betrekking heeft op de feiten als omschreven onder de tenl. C. V. b. 2). Bij gebreke aan enige nadere identificatie van deze transactie dienen ook eerste, tweede en derde beklaagde hiervoor te worden vrijgesproken.

- Betreffende zesentwintigste beklaagde ███████████████ en zevenentwintigste beklaagde ███████████████

Zesentwintigste beklaagde ███████████ en zevenentwintigste beklaagde ████████████ baten samen een éénmanszaak uit te Tessenderlo waarbij de aan- en verkoop van oude edele metalen tot hun professionele activiteiten behoort.

Onder de tenlasteleggingen C. V. c, D. VII en G. V. c worden zesentwintigste en zevenentwintigste beklaagde vervolgd voor de verkoop van 9 kg goud die niet werd geregistreerd in de boekhouding van hun handelsactiviteiten, waarbij de prijs in contanten werd uitbetaald en waarbij de transactie zou zijn geregistreerd via zgn. anonieme aankoopborderellen.

In besluiten betwisten zesentwintigste en zevenentwintigste beklaagde de hen ten laste gelegde feiten. Zij stellen: (zie p. 24, punten 12 en 13):

> "...
>
> *12. Dit alles kan maar tot één conclusie leiden: er zijn nooit – buiten die ene onschuldige – particuliere aankoopborderellen – noch manueel geïdentificeerd, noch niet geïdentificeerd – met betrekking tot concluanten opgesteld!*
>
> *13. Deze conclusie leidt dan logisch gezien weer tot een andere: er zijn in de periode van de incriminatie geen contante verkopen van edele metalen gebeurd door concluanten aan de firma NV TONY GOETZ.*
>
> ..."

Deze beweringen van zesentwintigste en zevenentwintigste beklaagde zijn evenwel niet verenigbaar met de objectieve onderzoeksresultaten van het strafdossier.

Exhibit 8 Part 2

Zo werden er minstens dertien telefoongesprekken onderschept waaruit duidelijk blijkt dat zesentwintigste en zevenentwintigste beklaagde op de hoogte waren van het systeem dat bij de firma GOETZ werd gehanteerd, waarbij ofwel officiële verkopen konden worden verwerkt via bankoverschrijving ofwel anonieme verkopen via betaling in contanten, en dat zij hier ook gebruik van maakten.

Zo werd door zesentwintigste en zevenentwintigste beklaagde in een telefoongesprek van 30.05.2011 aan de firma GOETZ gevraagd: "... willen jullie dit storten want dit is officieel."

Op 15.06.2011 wordt dan weer telefonische gemeld: "... Ja goeiedag met ▬▬▬▬▬▬ ▬▬▬▬▬▬, ik had graag goud gefixeerd twee kilo cash ...".

In een telefoongesprek van 17.06.2011 vraagt de bediende van de firma GOETZ: "... Is dit voor bank via bank?" waarop geantwoord wordt: "Nee, cash, cash".

Verder bevestigen zowel tweede beklaagde Alain GOETZ, evenals het winkelpersoneel van de firma GOETZ, dat er met zesentwintigste en zevenentwintigste beklaagde weldegelijk goudtransacties werden geregeld in contanten.

Bij verhoor verklaarde zevenentwintigste beklaagde trouwens dat zij in haar telefoongesprekken met de firma GOETZ weldegelijk op de hoogte was van het gehanteerde 'jargon' en dat wanneer zij geld reserveert voor verkopen met contante betaling, er cash geld voor haar zou klaar liggen bij de firma GOETZ.

Uit hetgeen voorafgaat blijkt dat zgn. anonieme *"particuliere"* verkopen door handelaars-verkopers bij de firma GOETZ steeds werden afgehandeld via zgn. anonieme aankoopborderellen onder de 15.000 EURO.

Dat er op naam (via zgn. manuele identificatie) van zesentwintigste en zevenentwintigste beklaagde geen anonieme aankoopborderellen konden worden teruggevonden, impliceert op zich geenszins dat deze er niet zijn geweest.

Het volstrekt anonieme karakter ervan (zonder manuele identificatie) impliceert net de niet traceerbaarheid ervan.

Zevenentwintigste beklaagde verklaarde op 23.08.2012 trouwens zelf dat bij verkopen in contanten bij de firma GOETZ er steeds een aankoopborderel wordt opgesteld (DEEL XI, kaft 23, st. 244) en dat bij grotere verkopen deze aankoopborderellen steeds werden opgesplitst in bedragen onder de 15.000 EURO. (DEEL XI, kaft 23, st. 242).

# Exhibit 8 Part 2

Zevenentwintigste beklaagde gaf verder aan dat deze aankoopborderellen ook in haar boekhouding aanwezig moeten zijn geweest. Zevenentwintigste beklaagde stelde tot slot dat de ontvangen bedragen in contanten ook steeds worden ingeschreven in haar kasboek.

Wanneer de speurders aan de hand van boekhoudkundige stukken (die voordien reeds werden aangetroffen bij huiszoeking) aantonen dat de geviseerde transacties in contanten niet aan de hand van aankoopborderellen in de boekhouding worden verantwoord en er geen melding van wordt gemaakt in het kasboek van zes- en zevenentwintigste beklaagde, heeft zevenentwintigste beklaagde daar geen verklaring voor.

Hierop stellen de verbalisanten de volgende vraag aan zevenentwintigste beklaagde:

*"...*

*Uit het onderzoek blijkt dat er bij uitbetaling in contanten telkens 'particuliere aankoopborderellen' door de NV TONY GOETZ worden opgesteld d.w.z. aankoopborderellen zonder identificatie van de verkoper. Was dit in dit geval ook zo? Hebt u deze documenten bewaard of hebt u deze vernietigd? Indien u ze vernietigd heeft, waarom heeft u dit gedaan? Gebeurde dit dan op eigen initiatief?*

*..."*

Hierop antwoordt zevenentwintigste beklaagde:

*"Dat zou kunnen. Ik weet niet wat ik hieromtrent moet antwoorden. Ik kan ze u niet tonen. Ik zeg niet dat ik dergelijke aankoopborderellen niet zou hebben gekregen, ik kan ze u gewoon niet tonen, ... ik geef toe, ik heb ze vernietigd. Ik kan u echt niet zeggen waarom ik dit heb gedaan. Ik heb dit op eigen initiatief gedaan."*

Zowel de vragen van de verbalisanten, als de antwoorden van zevenentwintigste beklaagde hierop zijn duidelijk en viseren duidelijk de aankoopborderellen zoals omschreven onder de tenlastelegging C. Stellen dat hiermee andere documenten worden bedoeld – zoals zes- en zevenentwintigste beklaagde in besluiten aanhalen – is eenvoudigweg ongeloofwaardig.

Zes- en zevenentwintigste beklaagde zijn professionele goudhandelaars zodat er mag worden vanuit gegaan dat zij op de hoogte zijn van de op hen rustende verplichtingen, dit onder meer in het kader van de Wet van 11 januari 1993.

Uit het voorgaande volgt dat zes- en zevenentwintigste beklaagde deze verplichtingen hebben miskend en als handelaars-verkopers transacties boven de 15.000 EURO in contanten hebben vereffend. Eveneens staat het vast dat hiervoor valsheid in geschriften werd gepleegd ingevolge het opstellen van anonieme en opgesplitste aankoopborderellen.

De tenlasteleggingen C. V. c en G. V. c zijn dan ook bewezen in hoofde van zesentwintigste en zevenentwintigste beklaagde.

Uit het strafrechtelijk onderzoek is gebleken dat de geviseerde transacties in contanten niet in de boekhouding van zes- en zevenentwintigste beklaagde werden teruggevonden. Ook de herkomst van het verkochte goud blijkt bijgevolg niet uit de voorliggende boekhouding zodat de transacties weldegelijk de omzetting van een illegaal vermogen vormt en de tenlastelegging D. VII eveneens bewezen is in hoofde van zesentwintigste en zevenentwintigste beklaagde.

Nu ook eerste t/m derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. VII eveneens in hunnen hoofde bewezen.

- *Betreffende achtentwintigste beklaagde* ▬▬▬ *en negenentwintigste beklaagde B*▬▬▬▬▬

Achtentwintigste beklaagde, en zijn vennootschap, negenentwintigste beklaagde, komen in beeld wanneer wordt vastgesteld dat achtentwintigste beklaagde bij de firma GOETZ geld reserveert voor de uitbetaling in contanten van ongeveer 3 kg goud.

Bij verhoor bevestigt achtentwintigste beklaagde – na confrontatie met de gecapteerde telefoongesprekken – dat hij bij de firma GOETZ 3 kg goud had verkocht, hiervoor in contanten werd uitbetaald en de verschillende verkregen aankoopborderellen vervolgens had weggegooid. Achtentwintigste beklaagde bevestigde eveneens dat hij de ontvangen bedragen vervolgens – buiten de boekhouding – opnieuw had ingebracht in zijn zaak.

Achtentwintigste beklaagde is een professioneel handelaar-verkoper van juwelen en edele metalen en kan zich niet verschuilen achter het gegeven dat hij geen kennis zou hebben gehad van de verplichtingen ingevolge de witwaswetgeving die op hem rusten.

Het staat vast dat achtentwintigste beklaagde 3 kg goud verkocht en hiervoor een bedrag van 99.000 EURO in contanten werd betaald. Hij pleegde hiermee een inbreuk op de bepalingen van de Wet van 11 januari 1993 zodat de tenlastelegging G. V. d bewezen is. Dat hiertoe valsheid in geschriften werd gepleegd door het opstellen van anonieme

# Exhibit 8 Part 2

aankoopborderellen en opgesplitste verkopen onder de 15.000 EURO wordt niet betwist zodat ook de tenlastelegging C. V. d bewezen is.

Achtentwintigste beklaagde verkocht 3 kg goud waarvan de herkomst totaal niet te achterhalen valt. Nu de verkoop van het goud buiten de boekhouding van negentwintigste beklaagde werd gehouden, kan het niet anders dan dat ook de aankoop en boekhoudkundige verwerking ervan niet namens negentwintigste beklaagde en evenmin met fondsen van negenentwintigste beklaagde werd uitgevoerd. Nu de legale herkomst van het verkochte goud moet worden uitgesloten, is de tenlastelegging D. VIII eveneens bewezen.

Uit hetgeen voorafgaat volgt dat achtentwintigste beklaagde de lastens hem weerhouden tenlasteleggingen wetens en. willens heeft gepleegd. Verder pleegde achtentwintigste beklaagde deze misdrijven in het kader van de werking van negentwintigste beklaagde waarbij de opbrengst van de transacties terug in de vennootschap zou zijn ingebracht, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. VIII eveneens t.a.v. hen bewezen.

- ● *Betreffende  dertigste  beklaagde* ▇▇▇▇▇▇ ▇▇▇▇▇▇▇ *en  éénendertigste beklaagde* ▇▇▇▇▇▇▇▇

Dertigste beklaagde is zaakvoerder van éénendertigste beklaagde waarbinnen hij een handel in uurwerken en sieraden uitoefent.

In het kader van het strafrechtelijk onderzoek worden er telefoongesprekken gecapteerd waaruit blijkt dat dertigste beklaagde ▇▇▇▇▇▇▇▇ in juni 2011 bij de firma GOETZ een reservatie maakt voor de verkoop van ong. één kg goud in contanten.

Bij verhoor van dertigste beklaagde op 26.09.2012 stelt hij voorheen bij de firma GOETZ inderdaad oud goud te hebben verkocht maar sinds een drietal jaar beroep te doen op de firma ▇▇▇▇▇▇▇. Dertigste beklaagde stelt in het jaar 2011 geen transacties te hebben gedaan met de firma GOETZ. (DEEL XI, kaft 26, st. 50)

# Exhibit 8 Part 2

Geconfronteerd met de telefoongesprekken die werden gecapteerd en de vraag van dertigste beklaagde om vereffening in geld, stelt dertigste beklaagde dat hij mogelijk het aangeboden goud enkel heeft laten analyseren zonder het te verkopen. Hierbij zouden er dan wel analysedocumenten en of facturen aanwezig moeten zijn.

Bij nazicht van de aankoopborderellen bij de firma GOETZ konden geen aankoopborderellen op naam van dertigste beklaagde of éénendertigste beklaagde worden aangetroffen.

Ook in de boekhouding van éénendertigste beklaagde waren dergelijke stukken niet voorhanden.

Uit het verhoor van de heer ▬▬▬▬▬ – boekhouder van éénendertigste beklaagde – blijkt dat deze geen documenten, facturen, borderellen of andere stukken van de firma GOETZ heeft verwerkt.

Andere boekhoudkundige stukken – o.a. m.b.t. persoonlijke leningen van dertigste beklaagde aan éénendertigste beklaagde of andere transacties, m.n. de verkoop van ong. 1 kg oud goud aan de firma ▬▬▬▬▬ – zijn niet relevant voor de beoordeling van de transacties tussen dertigste beklaagde en de firma GOETZ zoals deze blijkt uit de gecapteerde telefoongesprekken.

In besluiten betwisten beklaagden de geviseerde transactie zoals omschreven onder de tenlastelegging D. IX niet langer.

Dertigste en éénendertigste beklaagde zijn reeds geruime tijd actief in het verhandelen van juwelen en edele metalen. Van hen mag verwacht worden dat zij in kennis zijn van de verplichtingen die rusten op verkopers-handelaars ingevolge de Wet van 11 januari 2011.

Dat dertigste beklaagde hiervan op de hoogte was en deze welbewust wilde omzeilen blijkt duidelijk uit de gecapteerde telefoongesprekken waarbij hij aandringt op een vereffening *"in geld"* hetgeen impliceert dat dit een afwijking op de normale gang van zaken is.

Het kan niet anders dan dat voor de door dertigste beklaagde geviseerde verkoop bij de firma GOETZ aankoopborderellen werden opgesteld, zgn. *"particulier"* waarbij deze werden opgesplitst in bedragen onder de 15.000 EURO om een verkoop in contanten mogelijk te maken.

Ook hiervan kunnen dertigste en éénendertigste beklaagde niet onwetend zijn geweest.

# Exhibit 8 Part 2

Uit het onderzoek is gebleken dat de herkomst van het aangeboden goud totaal onduidelijk is, ook de bestemming van de ontvangen gelden in contanten kan op geen enkele wijze verantwoord worden.

In die omstandigheden wordt een legale herkomst van het verkochte goud geenszins geloofwaardig gemaakt en betreft de verkoop van het aangeboden goud een illegale transactie.

Op basis van het voorgaande oordeelt de rechtbank de tenlasteleggingen C. V. e, D. IX en G. V. e bewezen in hoofde van dertigste beklaagde.

Uit hetgeen voorafgaat volgt dat dertigste beklaagde de lastens hem weerhouden tenlasteleggingen wetens en willens heeft gepleegd. Verder pleegde dertigste beklaagde deze misdrijven in het kader van de werking van éénendertigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde niet onwetend konden zijn van het illegaal karakter van het onder de tenlastelegging D. IX omschreven feit, is deze tenlastelegging ook in hunnen hoofde bewezen.

- ***Strafmaat***

De feiten zijn ernstig en de in hoofde van de onderscheiden beklaagden weerhouden feiten vermengen zich als zijnde gepleegd met eenzelfde strafbaar opzet zodat slechts één bestraffing moet worden opgelegd.

De handelingen van beklaagden wijzen op een verminderd normbesef, een frauduleuze ingesteldheid en een gebrek aan respect voor de rechten van de Schatkist. Beklaagden organiseerden een systeem, of werkten hieraan mee, waarbij aanzienlijke financiële transacties aan het oog van iedere controle werden onttrokken waardoor niet enkel gestolen goederen werden verkocht maar vooral op grote schaal de verkoop van goederen aan het oog van de fiscus werd onttrokken.

# Exhibit 8 Part 2

Ingevolge hun handelen boden beklaagden misdadigers de mogelijkheid om hun gestolen goederen anoniem te verkopen waarbij iedere controle van de financiële stromen onmogelijk werd gemaakt. T.a.v. die handelaars die bij de verkoop van edele metalen wel de toepasselijke regelgeving stipt opvolgen, traden beklaagden concurrentievervalsend op.

Bij het bepalen van de strafmaat zal de rechtbank rekening houden met de rol van eenieder bij voormeld fraudesysteem, de omvang van de transacties die in hoofde van iedere individuele beklaagde werd weerhouden, ieders persoonlijkheid zoals deze blijkt uit de gegevens van het strafdossier en de pleidooien ter terechtzitting, en ieders strafrechtelijk verleden.

De rechtbank stelt vast dat de in hoofde van achtste beklaagde ▒▒▒▒▒▒▒▒▒▒▒ weerhouden feiten zoals omschreven onder de tenlastelegging D. IV de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor hij reeds werd veroordeeld bij het in kracht van gewijsde gegaan arrest van het hof van beroep te Luik d.d. 17 februari 2015, arrest waarvan afschrift aan het strafdossier werd gevoegd zodat met de reeds uitgesproken straf dient rekening te worden gehouden overeenkomstig art. 65 SW. Gelet op de aard en de omvang van de reeds opgelegde bestraffing legt de rechtbank thans geen bijkomende bestraffing op.

De rechtbank stelt vast dat de in hoofde van negende beklaagde ▒▒▒▒▒▒▒▒ weerhouden feiten zoals omschreven onder de tenlastelegging D. IV de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor hij reeds werd veroordeeld bij het in kracht van gewijsde gegaan arrest van het hof van beroep te Luik d.d. 8 september 2015, arrest waarvan afschrift aan het strafdossier werd gevoegd zodat met de reeds uitgesproken straf dient rekening te worden gehouden overeenkomstig art. 65 SW. Gelet op de aard en de omvang van de reeds opgelegde bestraffing legt de rechtbank thans geen bijkomende bestraffing op.

In besluiten stellen meerdere beklaagden dat in deze de redelijke termijn waarbinnen de strafvordering dient te worden uitgeoefend overschreden is zodat met toepassing van art. 21ter Vt. Sv. een eenvoudige schuldigverklaring dient te worden uitgesproken voor de weerhouden feiten.

Hoewel uit hetgeen voorafgaat blijkt dat in deze de rechten van verdediging van beklaagden geenszins onherstelbaar werden geschonden, noch dat er bij de voortgang van het strafonderzoek of de regeling van de rechtspleging abnormale periodes van vertraging konden worden vastgesteld, kan de rechtbank niet anders dan vaststellen dat beklaagden thans vervolgd worden voor feiten die zich tien jaar geleden hebben voorgedaan en waarbij het strafonderzoek meer dan zeven jaar in beslag heeft genomen.

# Exhibit 8 Part 2

Bij het bepalen van de strafmaat zal de rechtbank dan ook rekening houden met deze overschrijding van de redelijke termijn en in voorkomend geval toepassing maken van art. 21*ter* Vt. Sv.

De rechtbank zal – in de mate dat kan worden vastgesteld dat de in hoofde van beklaagden weerhouden feiten eerder beperkt zijn, in de zin van loutere gebruikers met, relatief, beperkte transacties – de eenvoudige schuldigverklaring uitspreken.

Hiermede rekening houdende zal de rechtbank in hoofde van vierentwintigste beklaagde ▉▉▉▉▉▉▉, vijfentwintigste beklaagde ▉▉▉▉▉▉▉▉, zesentwintigste beklaagde ▉▉▉▉▉▉▉, zevenentwintigste beklaagde ▉▉▉▉▉▉▉, achtentwintigste beklaagde D▉▉▉ ▉▉▉▉▉, negenentwintigste beklaagde ▉▉▉▉▉▉▉▉ dertigste beklaagde N▉▉▉▉▉▉▉▉T, éénendertigste beklaagde ▉▉▉▉▉▉▉ tweeëndertigste beklaagde N▉▉▉▉▉▉▉ en drieëndertigste beklaagde ▉▉▉▉▉▉▉ de loutere schuldigverklaring uitspreken voor de lastens hen weerhouden feiten.

In zoverre door beklaagden om de gunst van de opschorting werd verzocht, oordeelt de rechtbank het toestaan ervan geen gepaste maatregel in hoofde van beklaagden nu zij hiermede onvoldoende geconfronteerd zouden worden met de ernst van de in hunnen hoofde weerhouden feiten.

Het opleggen van de hierna bepaalde gevangenisstraf en geldboete aan eerste t/m derde beklaagde, zesde beklaagde, tiende t/m negentiende beklaagde, en éénentwintigste t/m drieëntwintigste beklaagde, oordeelt de rechtbank noodzakelijk gelet op de aard en de ernst van de in hunnen hoofde weerhouden feiten en dit teneinde beklaagden te wijzen op de ernst van hun handelingen en hen ertoe aan te zetten zich in de toekomst te beteren.

In hoofde van eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ zal de rechtbank tevens een beroepsverbod uitspreken conform de bepalingen van het K.B. nr. 22 van 24 oktober 1934 nu het door hen opgezette systeem funest was voor de eerlijke concurrentie binnen de handelssector waarin zij actief waren.

Gelet op het ontradende karakter van een uitgestelde bestraffing en nu eerste beklaagde Sylvain GOETZ, tweede beklaagde Alain GOETZ, derde beklaagde NV TONY GOETZ, zesde beklaagde ▉▉▉▉▉▉▉, zeventiende beklaagde ▉▉▉▉▉▉▉ negentiende beklaagde▉▉▉▉▉▉▉ en éénentwintigste beklaagde▉▉▉▉▉▉▉ hiervoor nog in aanmerking komen, zal voor zowel de op te leggen gevangenisstraf als geldboete uitstel van tenuitvoerlegging worden toegestaan.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                    p. 101
Dossiernr 10A028432                    vleugel D, 8de verdieping                    Vonnisnr    /

Ook voor het op te leggen beroepsverbod in hoofde van eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ zal de rechtbank uitstel van tenuitvoerlegging toestaan.

Met het oog op de maximalisatie van het ontradend karakter van dergelijke uitgestelde bestraffing koppelt de rechtbank de uitsteltermijn aan de maximaal voorziene duur.

Tiende t/m zestiende beklaagde, achttiende, tweeëntwintigste en drieëntwintigste beklaagde zijn niet ter terechtzitting verschenen zodat de rechtbank niet kan peilen naar hun inzichten en intenties.

- ### *Verbeurdverklaring*

Onder de tenlastelegging D worden beklaagden vervolgd voor feiten van witwassen in het kader van het verhandelen van edele metalen.

Het staat vast dat beklaagden, zoals hierna bepaald, vermogensvoordelen hebben genoten ingevolge de in hunnen hoofde weerhouden witwashandelingen.

Nu beklaagden niet mogen genieten van de vruchten van de door hen gepleegde misdrijven, zal de rechtbank deze verbeurd verklaren. Nu een uitgestelde verbeurdverklaring beklaagden in het bezit zou laten van de door hen gerealiseerde illegale vermogensvoordelen, zal de rechtbank hier niet toe overgaan.

Behoudens onder de tenlasteleggingen D. I, D. II en D. IV wordt er niet aangetoond dat het verhandelde goud uit een misdrijf afkomstig is. Het merendeel van de onderliggende transacties betreffende de tenlastelegging D zijn immers handelingen die boekhoudkundig niet verwerkt werden en waarop bijgevolg illegale vermogensvoordelen werden gerealiseerd.

Het voorwerp van de in hoofde van beklaagde weerhouden witwashandelingen, hetzij de verkochte edele metalen, hetzij de uitbetaalde fondsen in contanten, zijn, behoudens hetgeen hierna vermeld wordt, niet meer in het vermogen van de beklaagden aan te treffen.

De rechtbank zal bijgevolg het verkochte/aangekochte goud niet als het voorwerp van het witwasmisdrijf beschouwen maar zal, zoals hierna bepaald, het illegaal verkregen vermogensvoordeel ingevolge het witwasmisdrijf vaststellen en verbeurd verklaren.

## Exhibit 8 Part 2

Wat de tenlasteleggingen D. IV betreft, stelt de rechtbank vast in hoofde van zevende, achtste en negende beklaagde reeds uitspraak werd gedaan omtrent de verbeurdverklaring van de door hen verkregen illegale vermogensvoordelen zodat de rechtbank hier geen bijkomende verbeurdverklaring zal uitspreken. In hoofde van eerste t/m derde beklaagde betreft de transactie een omzetting van het voorwerp van het misdrijf in hoofde van zevende t/m negende beklaagde, zodat de rechtbank ook hier enkel het verkregen illegale vermogensvoordeel zal verbeurd verklaren.

Bij het bepalen van het illegaal verkregen vermogensvoordeel verwijst de rechtbank naar de besluiten van achtentwintigste beklaagde ▓▓▓▓▓▓▓▓R en negenentwintigste beklaagde ▓▓▓▓▓▓▓▓'S.

Achtentwintigste en negenentwintigste beklaagde stellen dat het door hen verkochte goud voor 75% van de verkoopwaarde werd aangekocht. Hierop dient volgens achtentwintigste en negenentwintigste beklaagde een belastingheffing te worden toegepast van 33,34% om het illegaal verkregen vermogensvoordeel te bepalen.

Op deze wijze zal de rechtbank voor alle beklaagden, behoudens eerste, tweede, derde en zesde beklaagde het illegaal vermogensvoordeel bepalen. In hoofde van negentiende beklaagde (▓▓▓▓▓▓▓O) en éénentwintigste beklaagde (▓▓▓▓▓▓▓▓) zal de rechtbank (zoals volgens henzelf van toepassing in Spanje) een belastingheffing van 25% hanteren.

Op basis hiervan verklaart de rechtbank verbeurd:

Lastens tiende beklaagde ▓▓▓▓▓▓▓▓▓▓, als illegaal vermogensvoordeel, een bedrag van 890.900,57 EURO (tenlastelegging D. III. a) en een bedrag van 625.723,15 EURO. (tenl. D. III. b)

Lastens elfde beklaagde ▓▓▓▓▓▓▓▓▓▓A en twaalfde beklaagde ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓, ieder voor de helft, als illegaal vermogensvoordeel een bedrag van 730.608,50 EURO (tenlastelegging D. X)

Lastens dertiende beklaagde ▓▓▓▓▓▓▓▓▓▓, als illegaal vermogensvoordeel, een bedrag van 536.578,13 EURO (tenlastelegging D. XIV)

Lastens veertiende beklaagde ▓▓▓▓▓▓▓ en vijftiende beklaagde ▓▓▓▓▓▓▓▓, ieder voor de helft, als illegaal vermogensvoordeel, een bedrag van 550.467,65 EURO (tenl. D. XVII. a), een bedrag van 247.022,05 EURO (tenl. D. XVII. b), een bedrag van 26.766,60 EURO (tenl. D. XVII. c) en een bedrag van 128.470,62 EURO (tenl. D. XVII. d).



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen     p. 108
Dossiernr 10A028432                     vleugel D, 3de verdieping          Vonnisnr

Lastens zestiende beklaagde ███████, als illegaal vermogensvoordeel, een bedrag van 432.144,80 EURO (tenl. D. XIII).

Lastens zeventiende beklaagde ███████, als illegaal vermogensvoordeel, een bedrag van 341.504,09 EURO (tenl. D. XV).

Lastens achttiende beklaagde ███████, als illegaal vermogensvoordeel, een bedrag van 221.982,34 EURO (tenl. D. XI).

Lastens negentiende beklaagde ███████ en éénentwintigste beklaagde ███████ ieder voor de helft, als illegaal vermogensvoordeel, een bedrag van 167.039,12 EURO (tenl. D. XVIII. a) en een bedrag van 3.102,07 EURO (tenl. D. XVIII. b).

Lastens tweeëntwintigste beklaagde ███████ als illegaal vermogensvoordeel, een bedrag van 187.216,99 EURO. (tenl. D. XVI)

Lastens drieëntwintigste beklaagde ███████ als illegaal vermogensvoordeel, een bedrag van 138.382,16 EURO (tenl. D. XII).

Lastens vierentwintigste beklaagde ███████ als illegaal vermogensvoordeel, een bedrag van 13.752,75 EURO (tenl. D. VI. a).

Lastens zesentwintigste beklaagde ███████ en zevenentwintigste beklaagde ███████, ieder voor de helft, als illegaal vermogensvoordeel, de som van 25.605,95 EURO (tenl. D. VII).

Lastens achtentwintigste beklaagde ███████ en negentwintigste beklaagde ███████, ieder voor de helft, als illegaal vermogensvoordeel, de som van 8.251,65 EURO (tenl. D. XIII).

Lastens dertigste beklaagde ███████ en éénendertigste beklaagde ███████, ieder voor de helft, als illegaal vermogensvoordeel, de som van 2.875,58 EURO (tenl. D. IX).

In hoofde van zesde beklaagde ███████ stelt de rechtbank vast dat ingevolge de heromschrijving van de tenlastelegging D. V zoals hiervoor bepaald, het niet langer mogelijk is om exact vast te stellen bij welke transacties hij juist betrokken is geweest.

Daarenboven stelt de rechtbank vast dat zesde beklaagde voornamelijk is opgetreden als tussenpersoon bij de verkoop van goud van derden.

In die omstandigheden kan het door zesde beklaagde verwezenlijkte illegaal vermogensvoordeel niet langer integraal op basis van de dossiergegevens worden bepaald.

Nu zesde beklaagde in besluiten zelf aangeeft minstens een som van 8.000 EURO te hebben ontvangen in gevolge de lastens hem weerhouden misdrijven, dient deze som verbeurd te worden verklaard.

Daarenboven werd beklaagde op 22 juni 2011 aangetroffen met op zich een som van 500.300 EURO in contanten, en 5 zilverstaven van 1 kg, gelden en goederen die afkomstig waren van de verkoop van illegaal goud bij de firma GOETZ.

Deze goederen werden in beslag genomen en nu zij rechtstreeks afkomstig zijn uit de geviseerde, en in hoofde van eerste, tweede, derde en zesde beklaagde weerhouden witwasverrichtingen dienen deze goederen verbeurd te worden verklaard.

Later werd tevens een som van 13.343,61 EURO en 164.528,41 EURO gerecupereerd bij eerste t/m derde beklaagde die beide eveneens de saldi betroffen van verkopen van illegaal goud die door zesde beklaagde bij de firma GOETZ werden verkocht.

Ook deze sommen vormen het voorwerp van de weerhouden witwasmisdrijven en dienen verbeurd te worden verklaard.

Eerste beklaagde Sylvain GOETZ, tweede beklaagde Alain GOETZ en derde beklaagde NV TONY GOETZ zijn groothandelaars in de aankoop van oud goud. Uit de voorliggende stukken blijkt verder dat eerste t/m derde beklaagde het door hen aangekochte goud onmiddellijk doorverkochten aan een Belgische bankinstelling, met name ▋▋▋▋▋▋▋.

In besluiten stelt derde beklaagde dat zij het door haar aangekochte goud doorverkocht aan de ▋▋▋▋▋▋ tegen dagkoers, te verminderen met 50 EURO per verkochte kilo, hetzij de commissie waartegen de bank haar kosten dekte.

Anderzijds blijkt uit de dossiergegevens dat eerste t/m derde beklaagde bij de aankoop van oud goud in contanten, een standaardkost aanrekenden aan de verkoper van 100 EURO per aangekochte kilo goud.

DRC-34996 0372

Exhibit 8 Part 2

Nu de kosten van ~~█████████~~ verrekend werden bij de verkoop van het goud, dient de aangerekende 'commissie' door eerste t/m derde beklaagde weldegelijk als een illegaal vermogensvoordeel te worden beschouwd dat integraal werd aangewend in de werking van derde beklaagde.

Uit de voorliggende dossiergegevens (zie de tenl. C. I en C. V en de berekeningen van het Openbaar Ministerie in haar conclusie op p. 71 en 72) blijkt dat eerste t/m derde beklaagde in de periode 2010 en 2011 minstens 32.697,47 kg goud aankochten en, rekening houdende met een 'winst' van 100 EURO per kilogram goud, een illegaal vermogen realiseerde van 3.269.747,00 EURO. In hoofde van eerste t/m derde beklaagde dient dit illegaal vermogen, ieder voor één derde, verbeurd te worden verklaard.

### 3. OP BURGERRECHTELIJK VLAK

- #### *Betreffende de burgerlijke partijen*

De rechtbank stelt vast dat de – in de dagvaarding tot dagstelling – vermelde burgerlijke partijen, m.n. de ~~████ ████████ SERVICES~~ en de heer ~~████████ ███████~~ IC ter terechtzitting geen vordering hebben gesteld. Het past hiervan akte te verlenen.

- #### *De vrijwillig tussenkomende partijen*

Met verzoekschrift dat werd neergelegd op de zitting van 19 december 2019 hebben de heer ~~████████████████~~, mevr. ~~██████████~~er en mevr. De~~██████████~~r zich in huidig geschil als vrijwillig tussenkomende partij gemeld.

De vordering van de vrijwillig tussenkomende partijen strekt ertoe: *"... ten belope van 324.770 EUR de vrijgave aan verzoekers te bevelen van de lastens de heer* ~~████~~ *in beslag genomen gelden."*

In het voorliggende verzoekschrift stellen de vrijwillig tussenkomende partijen dat zij de rechtmatige eigenaars zijn van een deel, met name het bedrag van 324.770 EURO, van de totale geldsom ten belope van 500.000 EURO dat op 22 juni 2011 op de persoon van zesde beklaagde (~~████████ ████████~~ werd aangetroffen en in beslag werd genomen.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen          p. 106
Dossiernr 10A028432                    vleugel D, 3de verdieping          Vonnisnr  /

Vrijwillig tussenkomende partijen stellen dat deze geldsom de tegenwaarde vormt van 9,4 kg goud – afkomstig uit de nalatenschap van wijlen mevr. ▆▆▆▆▆▆, overleden op 3 juni 2009 – die vrijwillig tussenkomende partijen aan zesde beklaagde zouden hebben overhandigd met het oog op de verkoop ervan bij de firma GOETZ.

Zowel uit het voorliggende verzoekschrift, als uit het strafdossier, blijkt dat de vrijwillig tussenkomende partijen hun vordering steunen op:

1. de verklaringen van zesde beklaagde A▆▆▆▆▆▆▆;
2. de eigen verklaringen van de heer ▆▆▆▆▆▆ en de door hem voorgebrachte stukken n.a.v. dit verhoor;
3. de contacten met het Openbaar Ministerie en de bevoegde diensten inzake de heffing van successierechten met het oog op de teruggave van de in beslag genomen gelden.

Wat de verklaringen van zesde beklaagde betreft, stelt de rechtbank vast dat deze verklaringen in eerste instantie bijzonder onduidelijk zijn en verder niet meer zijn dan dat, nl. verklaringen die zonder enig document of anderszins gestaafd worden.

Zo stelt zesde beklaagde in conclusie zelf (p. 9, besluiten zesde beklaagde) dat de samenwerking tussen hemzelf en diegene voor wie hij goud verkocht *"in goed vertrouwen"* verliep waarbij er geen documenten werden opgesteld.

Verder blijken de verklaringen van ▆▆▆▆▆▆ en deze van de vrijwillig tussenkomende partijen omtrent het ter verkoop overhandigde goud niet met elkaar te kloppen.

Zo stellen vrijwillig tussenkomende partijen in hun verzoekschrift dat het 5 kg fijn goud betrof, zgn. lingots of goudstaven, en 4,4 kg gouden munten.

Onmiddellijk na zijn aanhouding verklaarde zesde beklaagde ▆▆▆▆▆▆R dat de op hem aangetroffen som van 500.000 EURO de tegenwaarde betrof voor 2 kg staven fijn goud, 4 kg Zwitserse en andere vreemde munten en 10 kg oud goud.

De rechtbank stelt vast dat de verklaringen van zesde beklaagde en deze van de heer ▆▆▆▆▆omtrent het verkochte goud niet met elkaar overeenstemmen.

Exhibit 8 Part 2

De verklaring van vrijwillig tussenkomende partij ████R die hij op 18 juni 2013 aflegde, brengt evenmin veel duidelijkheid. De heer ██████ brengt hierbij een weinig geloofwaardig verhaal naar voor waarin hij stelt dat het goud aan zijn in het jaar 2009 overleden echtgenote toebehoorde, het goud in hun appartement was opgeborgen in een kluis waarvan hij de code niet had, deze kluis pas in 2011 geopend kon worden waarna het pas in juni 2011 aan zesde beklaagde A██████ ████████zou zijn overhandigd om dit te verkopen.

Niet enkel de herkomst van dit goud is onduidelijk, ook de financiële toestand van vrijwillig tussenkomende partij ██████laat niet toe de herkomst van dit goud te verklaren. Zo stelt hij zelf in zijn verklaring van 18 juni 2013 (Deel ████ kaft 9, st. 16) een inkomen te genieten van 1.200 EURO per maand, over ongeveer 7.000 EURO banktegoeden te beschikken en verder over geen roerende of onroerende goederen te beschikken. Vrijwillig tussenkomende partij ██████ geeft aan te wonen in een huurhuis, dan wel een woning die hem gratis ter beschikking wordt gesteld door de Joodse Gemeenschap.

Dat vrijwillig tussenkomende partij niettemin kon beschikken over meer dan 10 kg goud met een waarde van meer dan 300.000 EURO valt in die omstandigheden te betwijfelen.

Zesde beklaagde A██████ ████████ stelde verder dat hij — m.b.t. het beweerdelijk door partij ██████ aangeboden goud — communiceerde via een Frans telefoonnummer. Bij onderzoek bleek dit nummer toe te behoren aan een zekere ████████, blijkbaar een kennis van partij ██████ in Frankrijk. Waarom zesde beklaagde met deze ███ zou communiceren omtrent goud dat van partij ██████ afkomstig zou zijn, werd niet duidelijk gemaakt.

Het strafdossier (DEEL ██████) kaft p, st. 1 en 2) bevat verder twee brieven die uitgaan van de raadsman van partij ██████ en gedateerd zijn op 17.01.2012 en 15.10.2012, en die gericht zijn aan zesde beklaagde waarin gemeld wordt dat er door partij ██████aan zesde beklaagde 5 kg fijn goud en 4,4 kg gouden munten werden overhandigd om deze te laten affineren, maar dat deze goederen door zesde beklaagde niet aan partij V██████ouden zijn teruggegeven.

Het affineren van goud betreft het zuiveren ervan en het verwijderen van andere stoffen zoals bijv. zilver en koper.

Uit deze brieven kan niet worden opgemaakt dat aan zesde beklaagde ████████ ████████ ook de opdracht zou zijn gegeven om dit goud te verkopen, nu de goederen aan partij ██████dienden te worden teruggeven.

Ook onderzoek bij de firma GOETZ zelf — dat gevoerd werd enkele uren nadat zesde

# Exhibit 8 Part 2

beklaagde, ▇▇▇▇▇▇▇▇ werd aangetroffen in het bezit van 500.000 EURO dat zogenaamd (gedeeltelijk) de tegenwaarde zou vormen van de 9,4 kg goud die door partij ▇▇▇▇▇ aan zesde beklaagde zou zijn uithandigd, kon op geen enkele wijze uitsluitsel brengen omtrent de partij goud die door zesde beklaagde werd verkocht en waarvoor hem 500.000 EURO in contanten werd uitbetaald.

Tot slot verwijst de rechtbank naar het gegeven dat op huidig tijdstip, meer dan 10 jaar na het overlijden van wijlen mevr.▇▇▇▇▇▇▇▇▇▇uit wiens erfenis de 9,4 kg goud afkomstig zou zijn, geen enkel officieel stuk voorligt waaruit blijkt dat de erfenis van wijlen ▇▇▇ ▇▇▇▇▇▇▇▇▇▇ 9,4 kg goud zou hebben bevat.

In die omstandigheden oordeelt de rechtbank dat de vrijwillig tussenkomende partijen niet het bewijs leveren dat zij de rechtmatige eigenaars zijn geweest van 9,4 kg goud, dat door zesde beklaagde ▇▇▇▇▇▇▇▇zou zijn verkocht en waarvan de tegenwaarde zich zou hebben bevonden in de 500.000 EURO in contanten die op 22 juni 2011 werd aangetroffen op zesde beklaagde.

De vordering van de vrijwillig tussenkomende partijen dient dan ook als ongegrond te worden afgewezen.

**TOEGEPASTE WETTEN**

De rechtbank houdt rekening met de volgende artikelen die de bestanddelen van de misdrijven en de strafmaat bepalen, en het taalgebruik in gerechtszaken regelen:

artikelen 152bis, 162, 182, 185, 186, 189bis, 191, 194, 195 van het Wetboek van Strafvordering,
artikelen 1, 3, 5, 6, 7, 7bis van het Strafwetboek,
artikelen 11, 12, 14, 31, 32, 34, 35, 36, 37 en 41 der wet van 15 juni 1935, gewijzigd door de wet van 3 mei 2003;
de verordeningen van de Raad van de ministers nr. 974/98 dd. 3/5/1998 en nr. 1103/97 dd. 17/6/1997 en de wetten van 26/06/2000 en 30/06/2000 betreffende de invoering van de euro,
artikelen 28, 29 der wet van 1 augustus 1985,
artikel 1 van de wet van 5 maart 1952,
Wet van 19 maart 2017 tot oprichting van een Begrotingsfonds voor de juridische tweedelijnsbijstand,
artikel 91 van het Koninklijk Besluit van 28 december 1950,
artikelen 3, 4 en 21ter der wet van 17 april 1878,
artikel 8 der wet van 29 juni 1964
bij toepassing van de artikelen en wetsbepalingen zoals aangehaald in de hierboven vermelde tenlastelegging D, F, G en H,
en bij toepassing van de artikelen 25, 38, 40, 41bis, 42, 43bis, 65, 66, 79, 80, 99bis, 193, 196, 197, 213, 214 en 505 van het Strafwetboek.

# Exhibit 8 Part 2

The Court:

Adversarially with respect to:

- First defendant Sylvain GOETZ
- Second defendant Alain GOETZ
- Third defendant NV TONY GOETZ
- Fourth defendant XXX
- Fifty defendant XXX
- Sixth defendant XXX
- Seventh defendant XXX
- Eigth defendant XXX
- Nineth defendant XXX
- Seventeenth defendant XXX
- Nineteenth defendant XXX
- Twentieth defendant XXX
- Twenty first defendant XXX
- Twenty fourth defendant XXX
- Twenty fifth defendant XXX
- Twenty sixth defendant XXX
- Twenty seventh defendant XXX
- Twenty eight defendant XXX
- Twenty nineth defendant XXX
- Thirtieth defendant XXX
- Thirty first defendant XXX
- Thirty second defendant XXX
- Thirty third defendant XXX
- Thirty fourth defendant XXX

And the voluntarily intervening parties

- XXX
- XXX
- XXX

DRC-34996 0377

# Exhibit 8 Part 2

And by default in respect of:

- Tenth defendant XXX
- Eleventh defendant XXX
- Twelfth defendant XXX
- Thirteenth defendant XXX
- Fourteenth defendant XXX
- Fifteenth defendant XXX
- Sixteenth defendant XXX
- Eighteenth defendant XXX
- Twenty second defendant XXX
- Twenty third defendant XXX

And the civil parties:

- XXX
- XXX

<u>Criminal</u>

The court redrafts the indictments C.V.a., D.V. and G.lii as aforementioned

<u>Ten aanzien van Sylvain Goetz, eerste beklaagde</u>

Spreekt eerste beklaagde Sylvain GOE1Z vrij voor de tenlastelegging A, C. *V.* b. 2, D. *VI.* b en

G. *V.* b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging

C. *V.* b. 2). ,.

Veroordeelt eerste beklaagde Sylvain GOE1Z voor de vermengde feiten van de tenlastelegging C, uitgezonderde de ,tenlasteleggIng C. *V.* b. 2, de tenlastelegging D, uitgezonderd de tenlastelegging D. *VI.* b en G, uitgezonderd de tenlastelegging G. *V.* b (in zoverre deze betrekkIng heeft op de feiten als vermeld onder de tenlastelegging C. *V.* b. 2):

tot een gevangenisstraf van 18 maanden

en tot een geldboete van 5500,00 EUR, zijnde 1000,00 EUR, verhoogd met 45 opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelljke termijn door een gevangenisstraf van 90 dagen.

DRC-34996 0378

# Exhibit 8 Part 2

Verleent uitstel van uitvoering voor een termijn van 5 jaren wat betreft deze gevangenisstraf.
Verleent uitstel .van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete,

Legt aan eerste beklaagde Sylvain GOETZ een beroepsverbod op conform art. 1 van het K.B. nr. 22 van 24 oktober 1934 voor .een termijn van 5 jaar, met uitstel voor een termijn van 5 Jaar.

Verklaart verbeurd lastens eerste beklaagde Sylvain GOETZ,-als Illegaal vermogensvoordeel, een derde van de som van 3.269.74'7,00 EURO.

Veroordeelt Sylvain Goetz tot betaling van:

* - een bijdrage van 1 maal 200,00 EUR, zijnde de som *van* 1 maal 25,00 EUR verhoogd met 70 opdeclemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders
* - een bijdrage val\ 20,00 EUR aan bet Begrotingsfonds voor juridische tweedelijnsbijstand
* - een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding.bedraagt 53,58 EUR

de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>In respect of Alain Goetz, second defendant</u>

Dismisses second defendant Alain GOETZ for the indictment A, C. V. b. 2, D. VI. b and G. V. b (insofar as it relates to the facts stated under indictment C. V. b. 2).

Sentences second defendant Alain GOETZ for the commingled facts of indictment C, except the indictment C. V. b. 2, indictment D, except the indictment D. VI. b and G, except the indictment G. V. b (Insofar as it relates to the facts as mentioned under the indictment C. V. b. 2):

to a term of imprisonment of 18 months

and to a fine of 5500.00 EUR, being 1000.00 EUR, increased by 45 surcharges.

DRC-34996 0379

# Exhibit 8 Part 2

Fine replaceable in the absence of payment within the statutory time limit by 90 days' imprisonment.

Grants a stay of execution for a term of 5 years as to this imprisonment.

Grants a stay of execution for a period of 3 years with regard to this fine,

Imposes on second defendant Alain GOETZ a professional ban in accordance with art. 1 of R.D. no. 22 of October 24, 1934 for a term of 5 years; with postponement for a term of 5 years.

Declares forfeited on behalf of second defendant Alain GOETZ, as an illegal asset, one third of the sum of 3,269,747.00 EURO.

Orders Alain Goetz to pay:

- a contribution of 1 time 200,00 EUR, being the sum of 1 time 25,00 EUR increased by 70 surcharges, to finance the fund to help victims of intentional acts of violence and occasional rescuers

- a contribution of EUR 20,00 to the Secondary Legal Assistance Budget Fund

- a fixed allowance for management costs in criminal cases. This fee amounts to EUR 53.58

- the costs of criminal proceedings to date budgeted at 1/34 x 18223.60 = EUR 535.99

Ten aanzien van Naamloze vennootschap TONY GOETZ, derde beklaagde

Spreekt derde beklaagde NV TONY GOETZ vrij voor de tenlastelegging A, C, V. b, 2, D, VI. b en G. V. b (In zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b, 2).

V eroordeeit derde beklaagde NV TONY GOETZ voor de vermengde feiten van de tenlastelegging C, uitgezonderde de tenlastelegging C. V, b. 2, de tenlastelegging D, uitgezonderd de tenlastelegging D. VI. b en G, uitgezonderd de tenlastelegging G. y. b (In zoverre deze betrekking heeft op de feiten als vermeid onder de tenlastelegging C. V. b. 2):

tot een geldboete van 99000,00 EUR, zijnde 18000,00 EUR, verhoogd met 45 opdeclemen.

# Exhibit 8 Part 2

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens derde beklaagde NV TONY GOETZ, als illegaal vermogensvoordeel, één derde van de som van 3.269.747,00 EURO.

Veroordeelt Naamloze vennootschap TONY GOETZ tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

- 

__Ten aanzien van ▆▆▆▆▆▆▆▆▆ vierde beklaagde__

Spreekt vierde beklaagde ▆▆▆▆▆▆▆▆ vrij voor de haar ten laste gelegde feiten B, C, D en G en stelt haar buiten zaken zonder kosten.

__Ten aanzien van ▆▆▆▆▆▆▆▆▆ra, vijfde beklaagde__

Spreekt vijfde beklaagde A▆▆▆▆▆▆▆▆▆▆▆▆ vrij voor de haar ten laste gelegde feiten B, C, D en G en stelt haar buiten zaken zonder kosten.

__Ten aanzien van ▆▆▆▆▆▆▆▆r, zesde beklaagde__

Veroordeelt zesde beklaagde ▆▆▆▆▆▆▆▆ voor de vermengde feiten van de tenlastelegging C. II, C. V. a (zoals heromschreven), D. V (zoals heromschreven), F, G. II, G. V. a en H:

   tot een gevangenisstraf van 9 maanden

   en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

# Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verleent uitstel van uitvoering voor een termijn van 5 jaren wat betreft deze gevangenisstraf.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verlklaart verbeurd lastens zesde beklaagde vermogensvoordeel, de som van 8.000 EURO.

Veroordeelt XXX tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor Juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

oOOo

Declares forfeiture as an object of the in behalf of first defendant Sylvain GOETZ, second defendant Alain GOETZ, third defendant NV TONY GOETZ and sixth defendant XXX money laundering offences

- the sum of 500,300 EURO, paid into an accounting of the COJV;
- five silver bars of 1(kg, deposited in a safe of the COIV;
- the sum of 13,343.61 EURO, deposited in an account of the COIV;
- the sum of 164,528.41 EURO, deposited in an account of the COIV.

Exhibit 8 Part 2

<u>Ten aanzien van ████████████, zevende beklaagde</u>

Stelt het verval van de strafvordering vast in hoofde van zevende beklaagde ████████ ██████████LO m.b.t. de tenlastelegging D. IV ingevolge het adagium *ne bis in idem.*

<u>Ten aanzien van ████████████, achtste beklaagde</u>

Past art. 65 SW toe in hoofde van achtste beklaagde ████████████C en stelt vast dat de huidige feiten de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten vervat in het arrest van het hof van beroep te Luik d.d. 17 februari 2015 en legt hem hoofdens de tenlastelegging D. IV geen bijkomende bestraffing op.

Veroordeelt ████████████ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ████████ negende beklaagde</u>

Past art. 65 SW toe in hoofde van negende beklaagde ████████████ en stelt vast dat de huidige feiten de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten vervat in het arrest van het hof van beroep te Luik d.d. 8 september 2015 en legt hem hoofdens de tenlastelegging D. IV geen bijkomende bestraffing op.

Veroordeelt ████████ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                              p. 116
Dossiernr 10A028422                          vleugel D, 3de verdieping              Vonnisnr    /

Ten aanzien van S_____E, tiende beklaagde

Veroordeelt tiende beklaagde S_____ voor de vermengde feiten C. I en C. IV,
D. III, G. I en G. IV:

> tot een gevangenisstraf van 9 maanden

> en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
> opdeciemen.

> Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
> gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens tiende beklaagde S_____E, als illegaal
vermogensvoordeel, een bedrag van 890.900,57 EURO en een bedrag van 625.723,15 EURO.

Veroordeelt S_____ tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
  met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
  opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
  EUR

Ten aanzien van _____, elfde beklaagde

Veroordeelt elfde beklaagde _____A voor de vermengde feiten C. VI, D.
X en G. VI:

> tot een gevangenisstraf van 9 maanden

> en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
> opdeciemen.

> Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
> gevangenisstraf van 90 dagen.

DRC-34996 0384

# Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                                            p. 117
Dossiernr 10A028432                        vleugel D, 3de verdieping                                  Vonnisnr      /

Verklaart verbeurd lastens elfde beklaagde ████████████████A, als illegaal
vermogensvoordeel, de helft van het bedrag van 730.608,50 EURO.

Veroordeelt ██████████████████A tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
  met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
  opzettelijke geweldaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18229,60 = 535,99
  EUR

Ten aanzien van ████████████████████A, twaalfde beklaagde

Veroordeelt twaalf beklaagde ████████████████████ voor de vermengde feiten C. VI, D.
X en G. VI:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens twaalfde beklaagde ████████████████A, als illegaal
vermogensvoordeel, de helft van het bedrag van 730.608,50 EURO.

Veroordeelt J████████████████A tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
  met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
  opzettelijke geweldaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028422                    vleugel D, 8 de verdieping                    Vonnisnr          p. 118

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
EUR

**Ten aanzien van ▬▬▬▬▬▬▬▬R, dertiende beklaagde**

Veroordeelt dertiende beklaagde ▬▬▬▬▬▬▬▬▬▬▬▬▬ voor de vermengde feiten
C. X, D. XIV en G. X:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
opdecimen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens dertiende beklaagde ▬▬▬▬▬▬▬▬▬▬R, als illegaal
vermogensvoordeel, een bedrag van 536.578,13 EURO.

Veroordeelt ▬▬▬▬▬▬▬▬R tot betaling van:

— een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
met 70 opdecimen, ter financiering van het Fonds tot hulp aan de slachtoffers van
opzettelijke gewelddaden en de occasionele redders

— een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
tweedelijnsbijstand

— een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
53,58 EUR

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
EUR

**Ten aanzien van ▬▬▬▬▬▬, veertiende beklaagde**

Veroordeelt ▬▬▬▬▬▬▬voor de tenlasteleggingen C.XIII, D.XVII, G.XIII vermengd:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
opdecimen.

Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens veertiende beklaagde ▓▓▓▓▓▓, als illegaal vermogensvoordeel, de helft van een bedrag van 550.467,65 EURO, de helft van een bedrag van 247.022,05 EURO, de helft van een bedrag van 26.766,60 EURO en de helft van een bedrag van 128.470,62 EURO.

Veroordeelt ▓▓▓▓▓ tot betaling van:

— een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

— een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

— een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ▓▓▓▓▓▓, vijftiende beklaagde</u>

Veroordeelt vijftiende beklaagde ▓▓▓▓▓▓ voor de vermengde feiten C. XIII, D. XVII en G. XIII:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.
Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens vijftiende beklaagde ▓▓▓▓▓▓, als illegaal vermogensvoordeel, de helft van een bedrag van 550.467,65 EURO, de helft van een bedrag van 247.022,05 EURO, de helft van een bedrag van 26.766,60 EURO en de helft van een bedrag van 128.470,62 EURO.

Veroordeelt ▮▮▮▮▮▮▮▮▮ tot betaling van:

 – een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
   met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
   opzettelijke gewelddaden en de occasionele redders

 – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
   tweedelijnsbijstand

 – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
   53,58 EUR

 – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
   EUR

Ten aanzien van ▮▮▮▮▮▮▮▮ zestiende beklaagde

Veroordeelt zestiende beklaagde▮▮▮▮▮▮▮ voor de vermengde feiten C. IX, D. XIII en G. IX:

   tot een gevangenisstraf van 9 maanden

   en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
   opdeciemen.

   Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
   gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens zestiende beklaagde ▮▮▮▮▮▮T, als illegaal vermogensvoordeel,
een bedrag van 432.144,80 EURO.

Veroordeelt ▮▮▮▮▮IT tot betaling van:

 – een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
   met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
   opzettelijke gewelddaden en de occasionele redders

 – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
   tweedelijnsbijstand

 – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
   53,58 EUR

 – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
   EUR

# Exhibit 8 Part 2

Ten aanzien van ████████████ zeventiende beklaagde

Veroordeelt zeventiende beklaagde ████████████ voor de vermengde feiten C. XI, D. XV en G. XI:

       tot een gevangenisstraf van 6 maanden

       en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

       Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

       Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze gevangenisstraf.
       Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens zeventiende beklaagde ████████████, als illegaal vermogensvoordeel, een bedrag van 341.504,09 EURO.

Veroordeelt ████████████ tot betaling van:

   – een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

   – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

   – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

   – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

DRC-34996 0389

# Exhibit 8 Part 2

<u>Ten aanzien van [REDACTED], achttiende beklaagde</u>

Veroordeelt achttiende beklaagde [REDACTED] voor de vermengde feiten C. VII, D. XI en G. VII:

   tot een gevangenisstraf van 6 maanden

   en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

   Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.


Verklaart verbeurd lastens achttiende beklaagde [REDACTED]L, als illegaal vermogensvoordeel, een bedrag van 221.982,34 EURO

Veroordeelt [REDACTED] tot betaling van:

   – een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweldddaden en de occasionele redders

   – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

   – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

   – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR


<u>Ten aanzien van [REDACTED], negentiende beklaagde</u>

Veroordeelt negentiende beklaagde [REDACTED] voor de vermengde feiten C. XIV, D. XVIII en G. XIV:

   tot een gevangenisstraf van 6 maanden

   en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

# Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze gevangenisstraf.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens negentiende beklaagde ████ ████, als illegaal vermogensvoordeel, de helft van een bedrag van 167.039,12 EURO en de helft van een bedrag van 3.102,07 EURO.

Veroordeelt ████ tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ████ twintigste beklaagde

Spreekt twintigste beklaagde ████ vrij voor de hem ten laste gelegde feiten C. XIV, D. XVIII en G. XIV en stelt hem buiten zaken zonder kosten.

## Ten aanzien van Sl████ eenentwintigste beklaagde

Veroordeelt éénentwintigste beklaagde ████ voor de vermengde feiten C. XIV, D. XVIII en G. XIV:

tot een geldboete van 8250,00 EUR, zijnde 1500,00 EUR, verhoogd met 45 opdeciemen.

DRC-34996 0391

# Exhibit 8 Part 2

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens éénentwintigste beklaagde ███████████████ als illegaal vermogensvoordeel, de helft van een bedrag van 167.039,12 EURO en de helft van een bedrag van 3.102,07 EURO.

Veroordeelt ████████████████ tot betaling van:

    &ndash; een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

    &ndash; een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

    &ndash; een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

    &ndash; de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

### Ten aanzien van ██████████████ tweeëntwintigste beklaagde

Veroordeelt tweeëntwintigste beklaagde ██████████████ voor de vermengde feiten C. XII, D. XVI en G. XII :

    tot een gevangenisstraf van 6 maanden

    en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

    Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens tweeëntwintigste beklaagde ██████████████ als illegaal vermogensvoordeel, een bedrag van 187.216,99 EURO.

Veroordeelt ██████████████ tot betaling van:

    &ndash; een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

    &ndash; een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

# Exhibit 8 Part 2

— een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ▓▓▓▓▓▓▓, drieëntwintigste beklaagde

Veroordeelt drieëntwintigste beklaagde ▓▓▓▓▓▓▓▓▓ voor de vermengde feiten C. VIII, D. XII en G. VIII:

    tot een gevangenisstraf van 6 maanden

    en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

    Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens drieëntwintigste beklaagde ▓▓▓▓▓▓▓▓ als illegaal vermogensvoordeel, een bedrag van 138.382,16 EURO.

Veroordeelt ▓▓▓▓▓▓▓ tot betaling van:

— een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

— een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

— een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ▓▓▓▓▓▓▓, vierentwintigste beklaagde

Spreekt vierentwintigste beklaagde ▓▓▓▓▓▓▓▓ rij voor de hem ten laste gelegde feiten C. V. b. 2, D. VI. b en G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2).

# Exhibit 8 Part 2

Verklaart vierentwintigste beklaagde (                          eenvoudig schuldig aan de hem ten laste gelegde feiten C. III, C. V. b. 1, D. VI. a, G. III (met heromschreven incriminatieperiode) en G. V. b. (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 1).

Verklaart verbeurd lastens vierentwintigste beklaagde                          als illegaal vermogensvoordeel, een bedrag van 13.752,75 EURO.

Veroordeelt                          tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

**Ten aanzien van                          vijfentwintigste beklaagde**

Verklaart vijfentwintigste beklaagde                          eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. III en G. III (met heromschreven incriminatieperiode).

Veroordeelt                          tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

**Ten aanzien van                          zesentwintigste beklaagde**

# Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                              p. 127
Dossiernr 10A028432                                    vleugel D, 3de verdieping                    Vonnisar    /

Verklaart zesentwintigste beklaagde ▇▇▇▇▇▇▇▇▇ eenvoudig schuldig aan de aan
hem ten laste gelegde feiten C. V. c, D. VII en G. V. c.

Verklaart verbeurd lastens zesentwintigste beklaagde ▇▇▇▇▇▇▇▇ als illegaal
vermogensvoordeel, de helft van een bedrag van 25.605,95 EURO.

Veroordeelt ▇▇▇▇▇▇▇▇ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
  EUR

<u>Ten aanzien van</u>▇▇▇▇▇▇▇▇<u>, zevenentwintigste beklaagde</u>

Verklaart zevenentwintigste beklaagde ▇▇▇▇▇▇▇ eenvoudig schuldig aan de aan
haar ten laste gelegde feiten C. V. c, D. VII en G. V. c.

Verklaart verbeurd lastens zevenentwintigste beklaagde ▇▇▇▇▇▇▇▇, als illegaal
vermogensvoordeel, de helft van een bedrag van 25.605,95 EURO.

Veroordeelt ▇▇▇▇▇▇▇▇ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
  EUR

<u>Ten aanzien van</u>▇▇▇▇▇▇<u>achtentwintigste beklaagde</u>

DRC-34996 0395

# Exhibit 8 Part 2

Verklaart achtentwintigste beklaagde ███████████ eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. V. d, D. VIII en G. V. d.

Verklaart verbeurd lastens achtentwintigste beklaagde ███████, als illegaal vermogensvoordeel, de helft van een bedrag van 8.251,65 EURO.

Veroordeelt ██████████tot betaling van:

  – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

  – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

  – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ████████ negenentwintigste beklaagde

Verklaart negenentwintigste beklaagde████████S eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. V. d, D. VIII en G. V. d.

Verklaart verbeurd lastens negenentwintigste beklaagde ███████ als illegaal vermogensvoordeel, de helft van een bedrag van 8.251,65 EURO.

Veroordeelt ██████████ tot betaling van:

  – . een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

  – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

  – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

DRC-34996 0396

# Exhibit 8 Part 2

Ten aanzien van ███████████, dertigste beklaagde

Verklaart dertigste beklaagde █████████████UT eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. V. e, D. IX en G. V. e.

Verklaart verbeurd lastens dertigste beklaagde ████████████████, als illegaal vermogensvoordeel, de helft van een bedrag van 2.875,58 EURO.

Veroordeelt █████████████tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van███████████E, eenendertigste beklaagde

Verklaart éénendertigste beklaagde███████████E eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. V. e, D. IX en G. V. e.

Verklaart verbeurd lastens éénendertigste beklaagde ███████████ als illegaal vermogensvoordeel, de helft van een bedrag van 2.875,58 EURO.

Veroordeelt ███████████tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

# Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 20A028432                                                                 p. 190
                                        vleugel D, 3de verdieping                  Voorzitr    /

## Ten aanzien van N▮▮▮▮▮▮▮▮, tweeëndertigste beklaagde

Verklaart tweeëndertigste beklaagde N▮▮▮▮▮▮▮ eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. II en G. II.

Veroordeelt ▮▮▮▮▮▮▮▮▮▮ tot betaling van:

− een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

− een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

− de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ▮▮▮▮▮▮▮▮, drieëndertigste beklaagde

Verklaart drieëndertigste beklaagde ▮▮▮▮▮▮▮▮ eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. II en G. II.

Veroordeelt ▮▮▮▮▮▮▮ tot betaling van:

− een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

− een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

− de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van ▮▮▮▮▮▮▮▮, vierendertigste beklaagde

Spreekt vierendertigste beklaagde ▮▮▮▮▮▮▮▮▮▮ vrij voor de hem ten laste gelegde feiten F en H en stelt hem buiten zaken zonder kosten.

Legt de overige kosten van de strafvordering ten laste van de Staat.

# Exhibit 8 Part 2

Burgerrechtelijk

- Stelt vast dat partijen XXX en de heer XXX in het kader van huidige procedure geen vordering hebben gesteld.
- Verklaart de vordering van de vrijwillig tussenkomende partijen XXX en mevrouw XXX ontvankelijk maar ongegrond

Veroordeelt de vrijwillig tussenkomende partijen tot hun eigen kosten.

Houdt de burgerlijke belangen ambtshalve aan.

oOOo

This judgment has been rendered by the Antwerp Court of First Instance, Antwerp Division, ACS Chamber:

- G. Segers, Judge, President of the Chamber

- Mr Declerck, Judge

- A. Beliens, judge

and pronounced in open court on January 30, 2020 by the president, in the presence of a magistrate of the public prosecutor's office,

with the assistance of registrar J. Soete

Exhibit 8 Part 2

ork: Van Wambeke

10 V



| Vonnisnummer / Griffienummer |
| 2020/ 554 |
| Repartoriumnummer / Europees |
| Datum van uitspraak |
| 30 januari 2020 |
| Naam van de beklaagde(n) |
| Goetz Sylvain |
| Systeemnummer parket<br>10RA28432<br>Dossiernummer<br>10A028432<br>Notitienummer parket<br>AN/A/27/F1/22815/2010 |

## rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
### Kamer AC5

# Vonnis

| Aangeboden op |
| Niet te registreren |

# Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028492                              vleugel D, 8de verdieping                    Vonisnr    /        p. 2

Inzake het Openbaar Ministerie en

BURGERLIJKE PARTIJ(EN) :

1) ~~████████████~~

en

2) ~~████████████████~~
handelend in hoedanigheid van gevolmachtigde van de stichting "~~████~~
beide woonstkeuze doende op het adres van ~~████████████████~~,
kantoorhoudende te 1000 Brussel, Boulevard de l'Empereur 3

burgerlijke partijen, die verstek laten gaan

burgerlijke partijstellingen bij akte verleden door onderzoeksrechter J-L. Doyen te
Luik, op 12 december 2011, het onderzoek niet geopend zijnde ingevolge deze
aanstellingen

tegen:

1)Sylvain Goetz, RRN 64052051768
zonder gekend beroep
geboren te Deurne (Ant.) op 20 mei 1964
van Belgische nationaliteit
wonende te 2970 Schilde, Boerendreef 16

000688

beklaagde, bijgestaan door Meester Vercauteren Sven, advocaat te 2000
Antwerpen, Amerikalei 187/302 en   Meester Verbist Johan, advocaat te
Antwerpen.

2) Alain, François Viviane Goetz, RRN 65042448393
zelfstandige
geboren te Deurne (Ant.) op 24 april 1965
van Belgische nationaliteit
thans verblijvende te  Dubai (Verenigde Arabische Emiraten), villa 35, Frond P, Palm
Jumeirah PO BOX 65919

000689

beklaagde, vertegenwoordigd door Meester Vercauteren Sven, advocaat te 2000
Antwerpen, Amerikalei 187/302 en   Meester Verbist Johan, advocaat te
Antwerpen.

# Exhibit 8 Part 2



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028432                                        visugel D, 3de verdieping                        Voorsizr    /         p. 3

000721    3) NV. **TONY GOETZ**, met KBOnr. 0426598575
met maatschappelijke zetel gevestigd te 2018 Antwerpen, Jacob Jacobsstraat 58

beklaagde, vertegenwoordigd door Meester Luyten Bert, advocaat te Antwerpen
en Meester Loix Philippe, advocaat te Antwerpen.

4) ~~Wendy Martens, RRN~~
bediende administratief werk
~~~~
~~~~
000690
van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Spriet Bart, advocaat te Herenthout.

5) Ana, ~~Maria-Nves~~ ~~~~
Bediende
~~~~
000691
~~~~
van Portugese nationaliteit

beklaagde, vertegenwoordigd door Meester Sas Toon, advocaat te Antwerpen in
eigen naam en loco Meester Vanden branden Joke, advocaat te Antwerpen.

6) ~~~~
zonder gekend beroep
~~~~
000692
~~~~
van Belgische nationaliteit

beklaagde, bijgestaan door Meester Loodts Lieve, advocaat te Antwerpen en
Meester Maes John, advocaat te Antwerpen.

7) ~~~~
zelfstandige
~~~~
000693
~~~~
van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Freya    Parmentier, advocaat te
Antwerpen.

DRC-34996 0402

Exhibit 8 Part 2



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                      p. 4
Dossiernr 10A028482                                    vleugel D, 3de verdieping           Vonnisnr    /

8) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
arbeider
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
van Belgische nationaliteit

beklaagde, die persoonlijk verschijnt.

000694

9) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Electricien
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,
van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Crowet Julle, advocaat te 1082 Sint-
Agatha-Berchem, Avenue Charles-Quint 584/9, loco Meester Buisseret Nathalie,
advocaat te Sint-Agatha-Berchem.

000695

10) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
zonder gekend beroep
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
niet ingeschreven
van Senegalese nationaliteit

beklaagde, die verstek laat gaan.

000696

11) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
zonder gekend beroep
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
niet ingeschreven
van Spaanse nationaliteit

beklaagde, die verstek laat gaan.

000697

DRC-34996 0403



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 1DA028432                          vleugel D, 3de verdieping                          Vonnisnr    /                p. 5

12)
zonder gekend beroep

000698

niet ingeschreven
van Spaanse nationaliteit

beklaagde, die verstek laat gaan.

13)
zelfstandig handelaar

000699

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

14)
zonder gekend beroep

000700

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, die verstek laat gaan.

15)
zonder gekend beroep

000701

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, die verstek laat gaan.

16)
zonder gekend beroep

000702

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

# Exhibit 8 Part 2

000703

17)
zonder gekend beroep

niet ingeschreven
van Nederlandse nationaliteit

beklaagde, vertegenwoordigd door Meester Delva Thibaud, advocaat te Antwerpen.

000704

18)
zonder gekend beroep

thans verblijvende te 28036 Madrid (Madrid), Calle Francisco Hij Morgall 2803 Pi
1
niet ingeschreven
van Chileense nationaliteit

beklaagde, die verstek laat gaan.

000705

19)
zonder gekend beroep

niet ingeschreven
van Spaanse nationaliteit

beklaagde, bijgestaan door Meester Boons Simon, advocaat te Antwerpen en Meester Van De Wal Hans, advocaat te Antwerpen.

000706

20)
zaakvoerder

niet ingeschreven
(zie schrijven advocaat, deel XIV, kaft briefwisseling)
van Spaanse nationaliteit

beklaagde, vertegenwoordigd door Meester Boons Simon, advocaat te Antwerpen en Meester Van De Wal Hans, advocaat te Antwerpen.



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 19A028492                          vleugel D, 3de verdieping          Vonnisnr     p. 7

000707    21) ▮▮▮▮▮▮▮▮▮▮

beklaagde, vertegenwoordigd door Meester Boons Simon, advocaat te Antwerpen
en Meester Van De Wal Hans, advocaat te Antwerpen.

000708    22)▮▮
juwelenhandelaar

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

000709    23)▮▮▮▮▮▮
zonder gekend beroep

niet ingeschreven
van Duitse nationaliteit

beklaagde, die verstek laat gaan.

000710    24)▮▮▮▮▮
zelfstandige

van Belgische nationaliteit

beklaagde, bijgestaan door Meester De Jonge Hannah, advocaat te Antwerpen en
Meester Marneffe Frank, advocaat te Antwerpen.

000711    25)▮▮▮▮▮

beklaagde, vertegenwoordigd door Meester Gevers Erik, advocaat te Antwerpen.

# Exhibit 8 Part 2



26)
goudsmit juwelier

000712

van Belgische nationaliteit

beklaagde, bijgestaan door Meester Mens Francis, advocaat te Tessenderlo en Meester Lippens Sophie, advocaat te Aalst.

27)
werkend vennoot

000713

van Belgische nationaliteit

beklaagde, bijgestaan door Meester Mens Francis, advocaat te Tessenderlo en Meester Lippens Sophie, advocaat te Aalst.

28)
zonder gekend beroep

000714

van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Croes Valerie, advocaat te 8020 Oostkamp, Hertsbergsestraat 4, loco Meester Maus Michel, advocaat te Oostkamp.

29)

000715

beklaagde, vertegenwoordigd door Meester Croes Valerie, advocaat te 8020 Oostkamp, Hertsbergsestraat 4, loco Meester Maus Michel, advocaat te Oostkamp.

30)
zaakvoerder

000716

van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester Beerlandt Hans, advocaat te Kortrijk.

31)

000717

# Exhibit 8 Part 2

beklaagde, vertegenwoordigd door Meester Beerlandt Hans, advocaat te Kortrijk.

000718    32) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
zonder beroep
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
van Belgische nationaliteit

beklaagde, vertegenwoordigd door  Meester Vandewalle Frank, advocaat te Antwerpen.

000719    33) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
zaakvoerder
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
van Nederlandse nationaliteit

beklaagde, vertegenwoordigd door Meester Vandewalle Frank, advocaat te Antwerpen.

000720    34) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
diamanthandelaar
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
niet ingeschreven
van Belgische nationaliteit

beklaagde, vertegenwoordigd door Meester  L. Loodts en meester Maes John, advocaten  te Antwerpen.

## TENLASTELEGGING(EN)

Als dader of mededader in de zin van artikel 66 van het strafwetboek;
Te Antwerpen en/of elders in het gerechtelijk arrondissement Antwerpen

De hierna genoemde misdrijven in hoofde van de hierna genoemde personen de opeenvolgende en voortgezette uitvoering zijnde van eenzelfde misdadig opzet;

Hetzij door de misdaad of het wanbedrijf te hebben uitgevoerd of aan de uitvoering rechtstreeks te hebben meegewerkt, hetzij door enige daad tot de uitvoering zodanige hulp te hebben verleend dat de misdaad of het wanbedrijf zonder zijn bijstand niet had kunnen worden gepleegd;

# Exhibit 8 Part 2

## A.De eerste (GOETZ Sylvain), de tweede (GOETZ Alain) en de derde (NV TONY GOETZ)

### tussen 31 december 2009 en 18 november 2011

Wetens en willens deel uitgemaakt te hebben als leidend persoon van een criminele organisatie, zijnde een gestructureerde vereniging van meer dan twee personen die duurt in de tijd, met als oogmerk het in onderling overleg plegen van misdaden en wanbedrijven die strafbaar zijn met gevangenisstraf van drie jaar of een zwaardere straf, om direct of indirect vermogensvoordelen te verkrijgen,

namelijk een criminele organisatie gericht op het direct of indirect verkrijgen van vermogensvoordelen door het aanbieden en uitvoeren van een fraudesysteem dat, middels het systematisch plegen van valsheid in geschriften en het gebruik van valse stukken (cf. tenlastelegging C), professionele handelaren, verkoopagenten en -commissionairs en/of criminelen (in het bijzonder dieven en helers), in staat stelt grote hoeveelheden goud, dat al dan niet geheel van illegale herkomst is, als "particulier goud" te verkopen tegen betaling in contanten, om alzo de herkomst van het goud en/of de werkelijke bestemmeling van de in contanten uitbetaalde verkoopprijzen te verdoezelen en/of om alzo te doen uitschijnen dat de bepalingen van de wet van 11 januari 1993 tot voorkoming van het gebruik van het financiële stelsel voor het witwassen van geld en de financiering van terrorisme werden nageleefd, de NV TONY GOETZ zich zelf hoe dan ook een direct vermogensvoordeel toekennende van in totaal minstens 3.394.006 EUR onder de vorm van een op de koopprijs ingehouden "commissie" van 100,00 EUR per kilo goud tegen contante betaling aangekocht door de NV TONY GOETZ;

B̶.̶ ̶▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬)

### tussen 31 december 2009 en 18 november 2011,

Wetens en willens deel te hebben genomen aan het nemen van welke beslissing dan ook in het raam van de activiteiten van een criminele organisatie, zijnde een gestructureerde vereniging van meer dan twee personen die duurt in de tijd, met als oogmerk het in onderling overleg plegen van misdaden en wanbedrijven die strafbaar zijn met gevangenisstraf van drie jaar of een zwaardere straf, om direct of indirect vermogensvoordelen te verkrijgen, wetende dat deze deelname bijdraagt tot de oogmerken van deze organisatie;

namelijk in het raam van de activiteiten van de criminele organisatie bedoeld onder tenlastelegging A, zoals gepreciseerd;

## C. De eerste (GOETZ Sylvain), de tweede (GOETZ Alain), de derde (NV TONY GOETZ), de vierde ▬▬▬▬▬▬▬▬▬▬ en de vijfde ▬▬▬▬▬▬▬▬▬▬▬)

Met bedrieglijk opzet of met het oogmerk om te schaden, valsheid in handels-, bank-, of

# Exhibit 8 Part 2

private geschriften te hebben gepleegd, hetzij door valse handtekeningen, hetzij door namaking of vervalsing van geschriften of handtekeningen, hetzij door overeenkomsten, beschikkingen, verbintenissen of schuldbevrijdingen valselijk te hebben opgemaakt of door ze achteraf in de akten in te voegen, hetzij door toevoeging of vervalsing van bedingen, verklaringen of feiten die deze akten ten doel hadden op te nemen en vast te stellen en met hetzelfde bedrieglijk opzet of met het oogmerk om te schaden gebruik gemaakt te hebben van de valse akte of van het valse stuk wetende dat het vervalst was;

namelijk door de boekhouding van de NV TONY GOETZ te hebben vervalst en/of te hebben laten vervalsen door te hebben opgesteld of te hebben doen opstellen en te hebben opgenomen of te hebben laten opnemen in de boekhouding van hierna bedoelde aankoopborderellen en gerelateerde stukken, waarbij aankopen van grote loten edelmetaal (in de regel goud) door de NV TONY GOETZ van professionele handelaren in edele metalen, verkoopagenten of -commissionairs worden voorgesteld als particuliere verkopen en/of op papier worden opgesplitst in verschillende kleinere aankopen, door telkens de vermelding op het aankoopborderel dat de verkoper een "PARTIKULIER" betreft en/of dat het aankoop betreft van individuele loten edelmetaal tegen een prijs telkens lager dan 15.000,00 EUR, terwijl de verkopers in werkelijkheid handelaren in edele metalen of verkoopagenten of -commissionairs betreffen en/of de prijs van de werkelijke tussen partijen doorgevoerde verkoop in de regel 15.000,00 EUR (ruim) overstijgt, met het bedrieglijk opzet om een fraudesysteem aan te bieden en uit te voeren dat professionele handelaren, verkoopagenten en -commissionairs en/of criminelen (in het bijzonder dieven en helers), in staat stelt edelmetaal (in de regel goud) als zogenaamd "particulier" goud of ander edelmetaal te verkopen tegen betaling in contanten en/of waarbij op papier de betalingen in kleinere bedragen beneden de 15.000,00 EUR worden opgesplitst, om alzo de herkomst van het goud en/of de werkelijke bestemmeling van de in contanten uitbetaalde verkoopprijzen te verdoezelen en/of om alzo te doen uitschijnen dat de bepalingen werden nageleefd van artikel 10ter van de wet van 11 januari 1993 tot voorkoming van het gebruik van het financiële stelsel voor het witwassen van geld en de financiering van terrorisme, ingevoegd bij artikel 19 van de wet van 12 januari 2004, in werking getreden op 2 februari 2004 (publicatie in BS van 23 januari 2004), gewijzigd en hernummerd tot artikel 21 bij artikel 24 van de wet van 18 januari 2010, in werking getreden op 5 februari 2010, en/of om hoe dan ook een concurrentievervalsende en marktverstorende werkwijze op te zetten en ten uitvoer te (laten) brengen,  de NV TONY GOETZ zich zelf hoe dan ook een direct voordeel toekennende in de vorm van een op de koopprijs ingehouden "commissie" van 100,00 EUR per kilo goud, commissie welke door de verkopers aan de NV TONY GOETZ enkel verschuldigd was bij de verkoop van goud tegen uitbetaling in contanten,

I. tussen 3 januari 2010 en 31 december 2010, meermaals, onder meer op hierna vermelde data,

minstens 42.713 aankoopborderellen en gerelateerde stukken  voor een totaalbedrag van minstens 586.463.318,24 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van individuele loten edelmetaal (in de regel goud) van een verkoper met de hoedanigheid van "PARTIKULIER" en telkens met een verkoopprijs van minder dan 15.000,00 EUR terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028492                    vleugel D, 8de verdieping                    Vonnisnr    /                    p. 12

aanzienlijk hoger ligt dan 15.000,00 EUR,

zoals blijkt uit het vergelijkend nazicht van de boekhoudkundige computerdata en -listings
van de NV TONY GOETZ in verband met de aankoopborderellen voor het jaar 2010 zoals
omschreven in proces-verbaal 860/2012 (zie deel VI, kaft 12.2, st. 62-72),

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, behoudens hierna
vermelde stukken,

waaronder in het bijzonder:

a. en de tiende ~~beklaagde werd vrijgesproken~~

**1. op 11 maart 2010, meermaals,**

aankoopborderellen LL-8756 tot en met LL-8775 voor een totaalbedrag van 287.804,83 EUR,
telkens voor de aankoop van een lot goud van "PARTIKULIER", nader geïdentificeerd als
~~████████████~~; om alzo de feiten van witwas omschreven onder tenlastelegging
D.III.a.i te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht in kopie neergelegd zijnde ter griffie der
overtuigingsstukken onder staat nummer OS 2691/2011 (zie deel I, kaft B) en zich in kopie in
het dossier bevindende onder bijlage 3 aan proces-verbaal 27475/2010 (zie deel I, kaft 2.1, st.
133-223, i.h.b. 177-199);

**2. op 30 april 2010, meermaals,**

aankoopborderellen LL-14954, LL-14956 tot en met LL-14972 en LL-14974 tot en met LL-
14979 voor een totaalbedrag van 348.185,80 EUR, telkens voor de aankoop van een lot
goud van "PARTIKULIER", nader geïdentificeerd als ~~████████████~~, om alzo de
feiten van witwas omschreven onder tenlastelegging D.III.a.ii te kunnen plegen en/of te
verdoezelen,

de stukken van valsheid beticht zich in digitale vorm bevindend op cd-rom welke werd
neergelegd ter griffie der overtuigingstukken onder staat nummer OS 1354/2011 (in het
kader van de uitvoering van het internationaal rechtshulpverzoek AN.IRC.737-10-AO) en zich
in kopie in het dossier bevindende onder bijlage 3 aan proces-verbaal 2848/2011 (zie deel II,
kaft 2.3, st. 190-191 en st. 360-830, i.h.b. 785-790, 792-807 en 809);

**3. tussen 22 juli 2010 en 15 september 2010, meermaals,**

74 aankoopborderellen voor een totaalbedrag van 1.008.823,84 EUR, telkens voor de
aankoop van een lot goud van "PARTIKULIER", nader geïdentificeerd hetzij als ~~████████~~hetzij
als ~~████████████~~ of hetzij zonder nadere identificatie, zoals opgenomen in de
tabel in bijlage 4 aan proces-verbaal 3911/2013 (deel XII, kaft 28.5, st. 34-147, i.h.b st. 136-
144) , om alzo de feiten van witwas omschreven onder tenlastelegging D.III.a.iii te kunnen

plegen en/of te verdoezelen,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 4935/2013 (deel I, kaft C);

II.en de zesde ~~(............. ...........)~~ de tweeëndertigste (~~..............  .......~~) én de drieëndertigste (~~..........  ........~~)

hierna vermelde aankoopborderellen voor een totaalbedrag van 5.826.830,77 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud met een verkoopprijs van minder dan 15.000,00 EUR van hetzij ▮▮▮▮▮▮▮▮▮▮▮ zonder vermelding van een ondernemingsnummer, hetzij van ▮▮▮▮▮▮▮▮▮ of van ▮▮▮▮▮▮▮ met vermelding van ondernemingsnummer 0895.507.760 (i.e. ondernemingsnummer van ▮▮▮▮▮▮▮▮▮▮), hetzij van ▮▮▮▮▮▮▮▮▮ met vermelding van ondernemingsnummer 0406.978.148 (i.e. ondernemingsnummer van ▮▮▮▮▮▮▮▮▮), terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals blijkt uit de tabellen opgenomen in bijlagen 2, 3 en 5 aan proces-verbaal 15256/11, in samenlezing met de stukken opgenomen als bijlage 4 aan proces-verbaal 14052/11 (zie dossier AN45.F1.13332/2011, kaft 6, st.191-215, i.h.b. 192-195 en 198-207 en st. 34-190, i.h.b. 34-94),

a. tussen 4 januari 2010 en 7 januari 2010, meermaals, op hierna vermelde data,

telkens voor de aankoop van een lot fijn goud van ▮▮▮▮▮▮▮▮▮, zonder vermelding van een ondernemingsnummer,

1. op 5 januari 2010, meermaals,

aankoopborderellen LL-376 tot en met LL-388 (13) voor de aankoop van 5,831 kg fijn goud voor een totaalbedrag van 142.633,62 EUR,

2. op 6 januari 2010, meermaals,

aankoopborderellen LL-631, LL-632 en LL-635 voor de aankoop van 1,575 kg fijn goud voor een totaalbedrag van 38.550,86 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 2 (dossier 45.F1.13332/2011, kaft B);

b. tussen 20 januari 2010 en 22 juni 2010, meermaals, op hierna vermelde data,

telkens voor de aankoop van een lot fijn goud van ▮▮▮▮▮▮▮▮▮, met vermelding van ondernemingsnummer 0895.507.760, voor een totale hoeveelheid van

1. op 21 januari 2010, meermaals,

## Exhibit 8 Part 2

aankoopborderellen LL-2556 tot en met LL-2558 voor de aankoop van 1,457 kg fijn goud voor een totaalbedrag van 36.741,08 EUR, .

2. tussen 26 januari 2010 en 29 januari 2010, meermaals, op 27 januari 2010 en 28 januari 2010,

aankoopborderellen LL-3421, LL-3562 en LL-3563 voor de aankoop van 1,326 kg fijn goud voor een totaalbedrag van 32.950,60 EUR,

3. op 4 februari 2010, meermaals,

- aankoopborderellen LL-4151 tot en met LL4153 voor de aankoop van 1,4 kg fijn goud voor een totaalbedrag van 34.930,00 EUR,

- aankoopborderellen LL-4154 tot en met LL-4156 voor de aankoop van 1,272 kg fijn goud voor een totaalbedrag van 31.520,16 EUR,

4. op 9 februari 2010, meermaals,

- aankoopborderellen LL-4763 en LL-4769 voor de aankoop van 0,623 kg fijn goud voor een totaalbedrag van 15.571,03 EUR,

- aankoopborderellen LL-4774 tot en met LL-4776 voor de aankoop van 1,599 kg fijn goud voor een totaalbedrag van 39.918,28 EUR,

5. op 10 februari 2010, meermaals,

aankoopborderellen LL-4818, LL-4819, LL-4821 en LL-4822 voor de aankoop van 2 kg fijn goud voor een totaalbedrag van 50.980,00 EUR,

6. op 11 februari 2010, meermaals,

aankoopborderellen LL-5249 en LL-5251 tot en met LL-5253 voor de aankoop van 2 kg fijn goud voor een totaalbedrag van 50.060,50 EUR,

7. op 15 februari 2010, meermaals,

aankoopborderellen LL-5454 en LL-5457 en LL-5458 voor de aankoop van 1,721 kg fijn goud voor een totaalbedrag van 43.124,08 EUR,

8. tussen 16 februari 2010 en 24 februari 2010, meermaals, op 17 februari 2010, 18 februari 2010 en 23 februari 2010,

aankoopborderellen LL-5763 tot en met LL-5767, LL-6039, LL-6043, LL-6367 en LL-6368 voor

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen          p. 15
Dossiernr 10A028432                Vleugel D, 3de verdieping                Vonnisnr   /

de aankoop van 4,128 kg fijn goud voor een totaalbedrag van 104.562,24 EUR,

**9. op 5 maart 2010, meermaals,**

aankoopborderellen LL-8014 tot en met LL-8017 voor de aankoop van 2 kg fijn goud voor
een totaalbedrag van 53.101,33 EUR,

**10. op 15 maart 2010, meermaals,**

aankoopborderellen LL-9172, LL-9174 en LL-9175 voor de aankoop van 1,464 kg fijn goud
voor een totaalbedrag van 38.440,73 EUR,

**11. op 8 juni 2010, meermaals,**

aankoopborderellen LL-20226, LL-20227 en LL-20230 tot en met LL-2037 (10) voor de
aankoop van 5 kg fijn goud voor een totaalbedrag van 150.000,00 EUR,

**12. op 21 juni 2010, meermaals,**

aankoopborderellen LL-22991 tot en met LL-22995 voor de aankoop van 2 kg fijn goud voor
een totaalbedrag van 64.200,00 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken
onder staat nummer OS 11511/2011, nr. 2 (dossier 45.F1.13332/2011, kaft B);

**c. tussen 24 februari 2010 en 7 september 2010, meermaals, op hierna vermelde data,**

telkens voor de aankoop van een lot sloopgoud van ▓▓▓▓▓▓▓▓, met vermelding van
ondernemingsnummer 0895.507.760,

**1. op 25 februari 2010, meermaals,**

aankoopborderellen LL-6909 tot en met LL-6911 voor de aankoop van 2,002 kg sloopgoud
voor een totaalbedrag van 37.510,57 EUR,

**2. op 3 maart 2010, meermaals,**

aankoopborderellen LL-7624 tot en met LL-7628 voor de aankoop van 3 kg sloopgoud voor
een totaalbedrag van 57.780,00 EUR,

**3. op 11 maart 2010, meermaals,**

aankoopborderellen LL-8777 tot en met LL-8783 voor de aankoop van 5 kg sloopgoud voor

Exhibit 8 Part 2

een totaalbedrag van 93.350,00 EUR,

4. op 22 maart 2010, meermaals,

aankoopborderellen LL-10281 tot en met LL-10288 voor de aankoop van 4 kg sloopgoud voor een totaalbedrag van 75.280,00 EUR,

5. op 15 april 2010, meermaals,

aankoopborderellen LL-13128 tot en met LL-13137 voor de aankoop van 5 kg sloopgoud voor een totaalbedrag van 97.300,00 EUR,

6. op 22 april 2010, meermaals,

aankoopborderellen LL-14022 tot en met LL-14029 voor de aankoop van 5 kg sloopgoud voor een totaalbedrag van 98.250,00 EUR,

7. op 4 mei 2010, meermaals,

aankoopborderellen LL-15206 tot en met LL-15214 voor de aankoop van 5,999kg sloopgoud voor een totaalbedrag van 123.360,01 EUR,

8. op 25 mei 2010, meermaals,

aankoopborderellen LL-17806 tot en met LL-17808 en LL-17813 tot en met LL-17819 (10) voor de aankoop van 5 kg sloopgoud voor een totaalbedrag van 111.150,00 EUR,

9. op 8 juni 2010, meermaals,

aankoopborderellen LL-20216 tot en met LL-20225 voor de aankoop van 5 kg sloopgoud voor een totaalbedrag van 120.100,00 EUR,

10. op 21 juni 2010, meermaals,

aankoopborderellen LL-22955, LL-22958 tot en met LL-22960 en LL-22986 tot en met LL-22990 voor de aankoop van 5 kg sloopgoud voor een totaalbedrag van 117.300,00 EUR,

11. op 16 juli 2010, meermaals,

aankoopborderellen LL-26731 tot en met LL-26744 en LL-26746 tot en met LL-26748 voor de aankoop van 10 kg sloopgoud voor een totaalbedrag van 249.240,00 EUR,

12. op 22 juli 2010, meermaals,

aankoopborderellen LL-27293, LL-27294 en LL-27296 voor de aankoop van 1,950 kg sloopgoud voor een totaalbedrag van 41.964,00 EUR,

DRC-34996 0415

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028432                          Vleugel D, 3de verdieping                          Vonnisnr          p. 17

**13. op 2 augustus 2010, meermaals,**

aankoopborderellen LL-28154 tot en met LL-28158 en LL28160 tot en met LL-28162 voor de
aankoop van 5 kg sloopgoud voor een totaalbedrag van 104.501,00 EUR,

**14. op 6 september 2010, meermaals,**

aankoopborderellen LL-30723 en LL-30725 tot en met LL-30727 voor de aankoop van 2 kg
sloopgoud voor een totaalbedrag van 44.860,50 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken
onder staat nummer OS 11511/2011, nr. 2 (dossier 45.F1.13332/2011, kaft B);

**d. tussen 28 december 2010 en 22 januari 2011, meermaals, op hierna vermelde data,**

telkens voor de aankoop van een lot sloopgoud v▮▮▮▮▮▮▮▮, met vermelding van
ondernemingsnummer 0895.507.760,

**1. op 29 december 2010, meermaals,**

aankoopborderellen LL-46360, LL-46361, LL-46363 tot en met LL-46366, LL-46368 tot en
met LL-46374 en LL-46376 tot en met LL-46380 (18) voor de aankoop van 10 kg sloopgoud
voor een totaalbedrag van 247.717,10 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken
onder staat nummer OS 11511/2011, nr. 2 (dossier 45.F1.13332/2011, kaft B);

**2. op 30 december 2010, meermaals,**

aankoopborderellen LL-46676 tot en met LL-46689, LL-46914 tot en met LL-46917, LL-46919
tot en met LL-46925, LL46928, LL46931, LL-46935, LL46939, LL-46942 en LL-46949 voor de
aankoop van 18,315 kg sloopgoud voor een totaalbedrag van 451.924,25 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken
onder staat nummer OS 11511/2011, nr. 2 (dossier 45.F1.13332/2011, kaft B);

**3. op 4 januari 2011, meermaals,**

aankoopborderellen LL-1100003 tot en met LL-1100017 (15) voor de aankoop van 9,002 kg
sloopgoud voor een totaalbedrag van 221.185,78 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken
onder staat nummer OS 11511/2011, nr. 3 (dossier 45.F1.13332/2011, kaft B);

Exhibit 8 Part 2

**4. op 6 januari 2011, meermaals,**

aankoopborderellen LL-0 (met volgnummer 021), LL-1100503 tot en met LL-1100514, LL-1100516 en LL-1100540 tot en met LL-1100556 (31) voor de aankoop van 18,4 kg sloopgoud voor een totaalbedrag van 447.187,28 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 3 (dossier 45.F1.13332/2011, kaft B);

**5. op 21 januari 2011, meermaals,**

aankoopborderellen LL-1103593, LL-1103595, LL-1103596, LL-1103599, LL-1103601 tot en met LL-1103621 (25) voor de aankoop van 15,072 kg sloopgoud voor een totaalbedrag van 335.836,13 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 3 (dossier 45.F1.13332/2011, kaft B);

**e. tussen 31 januari 2011 en 1 juni 2011, meermaals, op hierna vermelde data,**

telkens voor de aankoop van een lot fijn goud van ●●●●●●●●●●, met vermelding van ondernemingsnummer 0406.978.148,

1. op 1 februari 2011, meermaals,

aankoopborderellen LL-1105725 tot en met LL-1105746 (22) voor de aankoop van 9,57 kg fijn goud voor een totaalbedrag van 297.782,61 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B);

**2. tussen 3 februari 2011 en 9 februari 2011, meermaals, op 4 februari 2011 en 8 februari 2011,**

aankoopborderellen LL-1106747 tot en met LL-1106756, LL-1106758 tot en met LL-1106763, LL-1106765, LL-1106767 tot en met LL-1106774, LL-1106776 en LL-1106944 tot en met LL-1106947 (30) voor de aankoop van 13,432 kg fijn goud voor een totaalbedrag van 420.349,63 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B);

**3. tussen 10 februari 2011 en 17 februari 2011, meermaals, op 11 februari 2011 en 16**

## februari 2011,

aankoopborderellen LL-1107726 tot en met LL-1107732 en LL-1108709 voor de aankoop van 3,31 kg fijn goud voor een totaalbedrag van 105.667,15 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B);

## 4. op 10 maart 2011, meermaals,

aankoopborderellen LL-1114439 en LL-1114442 voor de aankoop van 0,853 kg fijn goud voor een totaalbedrag van 27.822,85 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B);

## 5. op 24 maart 2011, meermaals,

aankoopborderellen LL-1118375 tot en met LL-1118386, LL-1118389 en LL-1118390 voor de aankoop van 5,9 kg fijn goud voor een totaalbedrag van 189.567,01 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B);

## 6. tussen 2 mei 2011 en 6 mei 2011, meermaals, op 3 mei 2011 en 5 mei 2011

aankoopborderellen LL-1127516 tot en met LL-1127528 en LL-1128030 (14) voor de aankoop van 5,892 kg fijn goud voor een totaalbedrag van 196.797,13 EUR,

de stukken niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer OS 11511/2011, nr. 5 (dossier 45.F1.13332/2011, kaft B) en zich in kopie in het dossier bevindend als bijlage 4 aan proces-verbaal 14052/2011 (dossier 45.F1.13332/2011, kaft 6, st. 34-190, i.h.b. st. 75-88);

## 7. op 17 mei 2011, meermaals,

aankoopborderellen LL-1130158, LL-1130160, LL-1130162, LL-1130164, LL-1130168 tot en met LL-1130178, LL-1130180, LL-1130182 en LL-1130183 (17) voor de aankoop van 7,524 kg fijn goud voor een totaalbedrag van 254.580,28 EUR,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in kopie in het dossier bevindend als bijlage aan proces-verbaal 14052/2011 (dossier 45.F1.13332/2011, kaft 6, st. 34-190, i.h.b. st. 58-74);

## 8. op 31 mei 2011, meermaals,

aankoopborderellen LL-1133192, LL-1133194, LL-1133198 tot en met LL-1133201 en LL-1133203 tot en met LL-1133209 (13) voor de aankoop van 5,284 kg fijn goud voor een totaalbedrag van 183.126,85 EUR,

de stukken van valsheid betlcht niet neergelegd zijnde ter griffie, doch zich in kopie in het dossier bevindend als bijlage aan proces-verbaal 14052/2011 (dossier 45.F1.13332/2011, kaft 6, st. 34-190, i.h.b. st. 45-57);

III. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

a. op 14 januari 2010, meermaals,

aankoopborderellen LL-1503 tot en met LL-1505, LL-1508 tot en met LL-1517, LL-1522 tot en met LL-1527, LL-1533 tot en met LL-1545, LL-1548 en LL-1549 (34), voor een totaalbedrag van 388.748,86 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van de ▬▬▬▬▬▬▬ met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in kopie in het dossier bevinden als bijlage aan proces-verbaal 20823/2012 (zie deel XI, kaft 24, st. 6-263, i.h.b. 165-167, 171-173, 175-187, 192-201 en 204-209);

b. op 29 maart 2010, meermaals,

aankoopborderellen LL-10939 tot en met LL-10946, telkens voor de aankoop van 596 gr sloopgoud, en LL-10948 voor de aankoop van 334,659 gr sloopgoud van de ▬▬▬ ▬▬▬▬▬▬▬ voor een totaalbedrag van 136.650,66 EUR, in contanten uitbetaald door de NV TONY GOETZ,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in kopie in het dossier bevinden als bijlage aan proces-verbaal 20823/2012 (zie deel XI, kaft 24, st. 6-263, i.h.b. 136-144);

IV. en de tiende (▬▬▬▬▬▬▬▬▬▬▬),
tussen 4 januari 2011 en 2 juli 2011, meermaals,

minstens 536 aankoopborderellen voor een totaalbedrag van minstens 7.507.176,34 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud met een verkoopprijs van minder dan 15.000,00 EUR van "PARTIKULIER" ▬▬▬▬▬▬▬ ▬▬▬▬E, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in tabel 1 in bijlage 2 aan proces-verbaal 12188/2012, aangevuld met de bevindingen vervat in proces-verbaal 3911/2013 (zie deel VI, kaft 12.4, st. 61-83, i.h.b. 62-76 en deel XII, kaft 28.5, st. 34-141, i.h.b. st. 145), om alzo de feiten van witwas omschreven onder tenlastelegging D.III.b mede te kunnen plegen en/of te verdoezelen

# Exhibit 8 Part 2

De stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op dvd-rom welke werd neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (zie deel I, kaft C);

**V. tussen 2 januari 2011 en 17 november 2011, meermaals, onder meer op hierna vermelde data,**

minstens 35.490 aankoopborderellen en gerelateerde stukken voor een totaalbedrag van minstens 513.622.018,49 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van individuele loten edelmetaal (in de regel goud) van een niet nader bepaalde verkoper met de hoedanigheid van "PARTIKULIER" en telkens met een verkoopprijs van minder dan 15.000,00 EUR terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals blijkt uit het nazicht van de aankoopborderellen van de NV TONY GOETZ voor het jaar 2011 (zie proces-verbaal 23859/2011, deel VI, kaft 12.3, st. 1-53),

de stukken (m.n. de aankoopborderellen) van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 der overtuigingsstukken (deel I, kaft D);

waaronder in het bijzonder:

**a. en de zesde (▬▬▬▬▬▬▬▬,**
**tussen 2 januari 2011 en 25 juni 2011, meermaals, op niet nader bepaalde data,**

Niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een niet nader bepaald totaalbedrag, met betrekking tot de aankoop van in totaal minstens 923 kg goud, zoals afgeleid uit de samenlezing van de tabellen opgenomen in bijlage 5 aan proces-verbaal 923/2012 (deel VIII, kaft 15, st. 1-28, i.h.b. 4-8) met de tabel opgenomen in bijlage 1 aan proces-verbaal 14052/2011 (dossier AN45.F1.13332/2011, kaft 6, st. 34-190, i.h.b. 185-186) en met de stukken opgenomen als bijlage 5 aan proces-verbaal 13655/2011 (dossier AN45.F1.13332/2011, kaft 6, st. 1-25, i.h.b. 4-9), om alzo de feiten van witwas omschreven onder tenlastelegging D.V mede te kunnen plegen en/of te verdoezelen,

Een deel van de gerelateerde stukken (m.n. werkbonnen) zoals opgenomen in de tabel in bijlage 5 aan proces-verbaal 923/2012 niet als van valsheid beticht neergelegd zijnde ter griffie der overtuigingsstukken onder staat nummer 1046/2012, nr. 5 (zie deel VIII, kaft 15, st. 1-2);

**b. en de vierentwintigste (▬▬▬▬▬▬▬▬**

**1. op 26 mei 2011, meermaals,**

niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een niet nader

bepaald totaalbedrag, met betrekking tot de aankoop van minstens 5 kg goud,
zoals blijkt uit de uitgeschreven telefoongesprekken gevoegd als bijlage 28 aan proces-
verbaal 15859/2011 (deel IV, kaft 6, st. 233-492, i.h.b. 361-363) in samenlezing met de
analyses vervat in proces-verbaal 15186/2012 (deel VI, kaft 12.4, st. 158-165) en in proces-
verbaal 19504/11 (deel V, kaft 7, st. 663-690), om alzo de feiten van witwas omschreven
onder tenlastelegging D.VI.a mede te kunnen plegen en/of te verdoezelen;

<u>2. op 30 mei 2011, meermaals,</u>

niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een totaalbedrag
van minstens 60.000,00 EUR, met betrekking tot de aankoop van een lot goud van het niet
nader bepaalde "▐▐▐▐▐▐▐▐▐▐",
zoals blijkt uit het uitgeschreven telefoongesprek gevoegd als bijlage 19 aan proces-verbaal
15859/2011 (deel IV, kaft 6, st. 233-492, i.h.b. 401-402) in samenlezing met de analyses
vervat in proces-verbaal 19504/11 (deel V, kaft 7, st. 663-690) en in proces-verbaal
23689/2012 (deel XI, kaft 24, st. 346-388), om alzo de feiten van witwas omschreven onder
tenlastelegging D.VI.b mede te kunnen plegen en/of te verdoezelen;

<u>c. en de zesentwintigste (▐▐▐▐▐▐▐▐▐▐ en de zevenentwintigste (▐▐▐▐▐▐▐▐▐▐
▐▐▐▐),</u>
<u>tussen 8 juni 2011 en 1 juli 2011, meermaals, op niet nader te bepalen data,</u>

niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een totaalbedrag
van minstens 307.210,00 EUR, met betrekking tot diverse aankopen van in totaal minstens 9
kg goud van de éénmanszaak ▐▐▐▐▐▐▐▐▐▐, waarbij deze stukken niet werden
opgenomen in de boekhouding van de éénmanszaak ▐▐▐▐▐▐▐,
zoals blijkt uit de samenlezing van de vergelijkende analyses vervat in proces-verbaal
17094/2012 (deel XI, kaft 23, st. 150-188) en proces-verbaal 15045/2012 (deel VI, kaft 12.4,
st. 144-15), om alzo de feiten van witwas omschreven onder tenlastelegging D.VII mede te
kunnen plegen en/of te verdoezelen;

<u>d. en de achtentwintigste (▐▐▐▐▐▐▐▐▐▐ en de negenentwintigste (▐▐▐▐▐▐▐▐▐▐),</u>
<u>tussen 16 mei 2011 en 11 juni 2011, meermaals, op niet nader te bepalen datum,</u>

niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een niet nader
bepaald totaalbedrag, met betrekking tot de aankoop van in totaal 3 kg goud van de ▐▐▐▐
▐▐▐▐▐▐, waarbij deze stukken niet werden opgenomen in de boekhouding van de ▐▐▐▐
▐▐▐▐▐▐,
zoals blijkt uit het uitgeschreven telefoongesprek gevoegd als bijlage 46 aan proces-verbaal
15859/2011 (deel IV, kaft 6, st. 233-492, i.h.b. st. 305-306) in samenlezing met de analyse
vervat in proces-verbaal 20731/2011 (deel V, kaft 7, st. 224-245) en het verhoor gevoegd als
bijlage 2 aan proces-verbaal 20189/2012 (deel XI, kaft 25, st. 262-277, i.h.b. 265-272), om
alzo de feiten van witwas omschreven onder tenlastelegging D.VIII mede te kunnen plegen
en/of te verdoezelen;

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                    p. 29
Dossiernr 10A028432                              Vleugel D, 3de verdieping              Vonnisnr    /

**e, en de dertigste (**████████████**) en de eenendertigste (**████████████**)
op 21 juni 2011, meermaals**

niet nader te bepalen aankoopborderellen en gerelateerde stukken voor een niet nader
bepaald totaal bedrag, met betrekking tot de aankoop van in totaal minstens 1,046 kg goud
van de ████████████ waarbij deze stukken niet werden opgenomen in de boekhouding van
de ████████████ ,
zoals blijkt uit de samenlezing van de analyse vervat in proces-verbaal 19788/2011 (deel V,
kaft 7, st. 145-165) en de bevindingen vervat in proces-verbaal 19296/2012 (deel XI, kaft 26,
st. 10-31), om alzo de feiten van witwas omschreven onder tenlastelegging D.IX mede te
kunnen plegen en/of te verdoezelen;

**VI. en de elfde (**████████████████████**) en de twaalfde (**████████████**José
Luis),
tussen 2 januari 2011 en 20 september 2011, meermaals, onder meer op hiernavermelde
data,**

minstens 621 aankoopborderellen voor een totaalbedrag van minstens 8.765.548,95 EUR, in
contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud
van "PARTIKULIER" ████████████ met een verkoopprijs van minder dan 15.000,00 EUR,
terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt
dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal
12187/2012 (deel VI, kaft 12.4, st. 1-26), om alzo de feiten van witwas omschreven onder
tenlastelegging D.X mede te kunnen plegen en/of te verdoezelen

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm
bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer
8394/2014 (deel I, kaft D);

waaronder in het bijzonder, zoals afgeleid uit informatie bekomen van de Nederlandse
autoriteiten (zie onder meer kopie van het Nederlands rechtshulpverzoek d.d. 3 mei 2012:
deel XII, kaft 28.2, st. 173-202, i.h.b. st. 198):

**a. op 17 januari 2011,**

aankoopborderellen LL-1102326 tot en met LL-1102348 voor een totaalbedrag van minstens
228.400,00 EUR,

**b. op 2 februari 2011,**

aankoopborderellen LL-1105825 tot en met LL-1105844 voor een totaalbedrag van minstens
266.309,50 EUR,

**c. op 9 februari 2011,**

DRC-34996 0422

aankoopborderellen LL-1107055 tot en met LL-1107079 voor een totaalbedrag van minstens 300.000 EUR,

<u>d. op 30 mei 2011,</u>

aankoopborderellen LL-1132714 tot en met LL-1132758 voor een totaalbedrag van minstens 371.045,04 EUR,

<u>VII. en de achtiende (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉),</u>
<u>tussen 3 januari 2011 en 2 juli 2011, meermaals, onder meer op hierna vermelde data</u>

minstens 134 aankoopborderellen voor een totaalbedrag van minstens 2.663.255,37 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" ▉▉▉▉▉▉▉▉▉▉▉▉, met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12710/2012 (deel XII, kaft 28.3, st. 1-14), waarbij de met deze stukken gepaard gaande inkomsten door ▉▉▉▉▉▉▉▉▉▉▉ niet werden vermeld in diens belastingaangifte in de personenbelasting met betrekking tot het boekjaar (cfr. 'ejercicio') 2011 (zie proces-verbaal 1692/2013, deel XII, kaft 28.3, st. 443-484), om alzo de feiten van witwas omschreven onder tenlastelegging D.XI mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

waaronder in het bijzonder:

<u>a. op 27 april 2011,</u>

aankoopborderellen LL-1125929 tot en met LL-1125934 en LL-1125936 voor een totaalbedrag van 100.000 EUR,

<u>b. op 3 mei 2011,</u>

aankoopborderellen LL-1127507 tot en met LL-1127512 en LL-112514 voor een totaalbedrag van 100.001 EUR,

<u>c. op 10 mei 2011,</u>

aankoopborderellen LL-1128797 tot en met LL-1128800 voor een totaalbedrag van 50.000,01 EUR,

<u>d. op 19 mei 2011,</u>

aankoopborderellen LL-1130620 tot en met LL-1130626 voor een totaalbedrag van 100.000 EUR,

### e. op 27 mei 2011,

aankoopborderellen LL-1132601 tot en met LL-1192604 voor een totaalbedrag van 50.000 EUR,

### f. op 9 juni 2011,

aankoopborderellen LL-1134451 tot en met LL-1134458 voor een totaalbedrag van 99.999,98 EUR,

### g. op 16 juni 2011,

aankoopborderellen LL-1135421 tot en met LL-1135427 voor een totaalbedrag van 99.999,99 EUR,

### h. op 23 juni 2011,

aankoopborderellen LL-1137017 tot en met LL-1137024 voor een totaalbedrag van 100.000 EUR,

### VIII. en de drieëntwintigste (███████████████),
### tussen 20 januari 2011 en 16 juni 2011, meermaals,

minstens 124 aankoopborderellen voor een totaalbedrag van minstens 1.660.253,88 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" ███████ met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12713/2012 (deel VI, kaft 12.4, st. 211-219), om alzo de feiten en witwas omschreven onder tenlastelegging D.XII mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

### IX.en de zestiende (███████████),
### tussen 23 januari 2011 en 21 juni 2011, meermaals,

minstens 375 aankoopborderellen voor een totaalbedrag van minstens 5.184.700,71 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" ██████ met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12192/2012

Exhibit 8 Part 2

(deel VI, kaft 12.4, st. 185-200), om alzo de feiten van witwas omschreven onder tenlastelegging D.XIII mede te kunnen plegen en/of te verdoezelen,

de stukken als van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

X. en de dertiende <span style="background:black">████████████████</span>
tussen 23 januari 2011 en 23 juni 2011, meermaals,

minstens 466 aankoopborderellen voor een totaalbedrag van minstens 6.437.650,06 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" <span style="background:black">██████</span> met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12190/2012 (deel VI, kaft 12.4, st. 166-184), om alzo de feiten van witwas omschreven onder tenlastelegging D.XIV mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

XI. en de zeventiende <span style="background:black">████████████</span>
tussen 30 januari 2011 en 28 juni 2011, meermaals,

minstens 306 aankoopborderellen voor een totaalbedrag van minstens 4.097.229,59 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" <span style="background:black">████████</span> met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12709/2012 (deel VI, kaft 12.4, st. 84-102), om alzo de feiten van witwas omschreven onder tenlastelegging D.XV mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

XII. en de tweeëntwintigste (<span style="background:black">████████████</span>),
tussen 7 februari 2011 en 14 april 2011, meermaals,

minstens 164 aankoopborderellen voor een totaalbedrag van minstens 2.246.154,64 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" <span style="background:black">████████</span> (<span style="background:black">████</span>) met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 12711/2012 (deel VI, kaft 12.4, st. 201-210), om alzo de feiten van witwas omschreven

# Exhibit 8 Part 2

onder tenlastelegging D.XVI mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

<u>XIII. en de veertiende (</u>&#9608;&#9608;&#9608; <u>en de vijftiende (</u>&#9608;&#9608;&#9608;&#9608; in

<u>a. tussen 21 februari 2011 en 25 juni 2011, meermaals,</u>

minstens 486 aankoopborderellen voor een totaalbedrag van minstens 6.604.290,90 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" &#9608;&#9608;&#9608; met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel 1 in bijlage 2 aan proces-verbaal 12185/2012 (deel VI, kaft 12.4, st. 27-60), om alzo de feiten van witwas omschreven onder tenlastelegging D.XVII.a mede te kunnen plegen en/of te verdoezelen,

<u>b. tussen 24 februari 2011 en 1 juni 2011, meermaals,</u>

minstens 218 aankoopborderellen voor een totaalbedrag van minstens 2.963.671,84 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" &#9608;&#9608; met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel 2 in bijlage 2 aan proces-verbaal 12185/2012 (deel VI, kaft 12.4, st. 27-60), om alzo de feiten van witwas omschreven onder tenlastelegging D.XVII.b mede te kunnen plegen en/of te verdoezelen,

<u>c. tussen 10 maart 2011 en 25 juni 2011, meermaals,</u>

minstens 24 aankoopborderellen voor een totaalbedrag van minstens 321.135,00 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" &#9608;&#9608;&#9608; met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel 4 in bijlage 2 aan proces-verbaal 12185/2012 (deel VI, kaft 12.4, st. 27-60), om alzo de feiten van witwas omschreven onder tenlastelegging D.XVII.c mede te kunnen plegen en/of te verdoezelen,

<u>d. tussen 31 maart 2011 en 28 juni 2011, meermaals,</u>

minstens 113 aankoopborderellen voor een totaalbedrag van minstens 1.541.339,16 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" &#9608;&#9608;&#9608; met een verkoopprijs van minder dan 15.000,00 EUR,

terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel 3 in bijlage 2 aan proces-verbaal 12185/2012 (deel VI, kaft 12.4, st. 27-60), om alzo de feiten van witwas omschreven onder tenlastelegging D.XVII.d mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D);

XIV. en de negentiende (███████████████), de twintigste (██████████████) en de eenentwintigste (███████████).

a.tussen 1 april 2011 en 29 juni 2011, meermaals, op niet nader bepaalde data,

minstens 199 aankoopborderellen voor een totaalbedrag van minstens 2.672.625,88 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" (████████████████) en telkens met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, zoals opgenomen in de tabel in bijlage 2 aan proces-verbaal 14401/2012 (deel VI, kaft 12.4, st. 106-122), waarbij deze stukken niet werden opgenomen in de boekhouding van ████████████, om alzo de feiten van witwas omschreven onder tenlastelegging D.XVIII.a mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer 8394/2014 (deel I, kaft D),

b. op 5 juli 2011, meermaals,

minstens aankoopborderellen LL-1139015, LL-1139022, LL-1139145 en LL-1139160 voor een totaalbedrag van 49.633,18 EUR, in contanten uitbetaald door de NV TONY GOETZ, telkens voor de aankoop van een lot goud van "PARTIKULIER" (███████████████ (SL) en telkens met een verkoopprijs van minder dan 15.000,00 EUR, terwijl de werkelijke prijs van de tussen partijen doorgevoerde verkoop aanzienlijk hoger ligt dan 15.000,00 EUR, waarbij deze stukken niet werden opgenomen in de boekhouding van ██████████, om alzo de feiten van witwas omschreven onder tenlastelegging D.XVIII.b mede te kunnen plegen en/of te verdoezelen,

de stukken van valsheid beticht niet neergelegd zijnde ter griffie, doch zich in digitale vorm bevindend op cd-rom neergelegd ter griffie der overtuigingsstukken onder staat nummer

# Exhibit 8 Part 2

8394/2014 (deel I, kaft D) en zich tevens in kopie in het dossier bevindend als bijlage 3 aan proces-verbaal 8359/2013 (deel XII, kaft 28.4, st. 51-125, i.h.b. st. 84-88);

**D. De eerste (GOETZ Sylvain), de tweede (GOETZ Alain), de derde (NV TONY GOETZ), de vierde (▇▇▇▇▇▇▇▇) en de vijfde (▇▇▇▇▇▇▇▇▇▇▇▇▇),**

Bij inbreuk op art. 505 lid 1,3° en 4° van het strafwetboek, zoals gewijzigd door de wet van 10 mei 2007 houdende diverse maatregelen inzake de heling en inbeslagneming, zaken bedoeld in artikel 42,3° van het Strafwetboek, te hebben omgezet of overgedragen met de bedoeling de illegale herkomst ervan te verbergen of te verdoezelen of een persoon die betrokken is bij een misdrijf waaruit deze zaken voortkomen, te helpen ontkomen aan de rechtsgevolgen van zijn daden en/of de aard, oorsprong, vindplaats, vervreemding, verplaatsing of eigendom van de in artikel 42,3° van het strafwetboek bedoelde zaken, te hebben verheeld of verhuld, ofschoon zij op het ogenblik van de aanvang van ·deze handelingen, de oorsprong van die zaken kende of moesten kennen, te weten,

**I. tussen 31 januari 2010 en 23 juni 2010, in meerdere malen, onder meer op hierna vermelde data,**
(zie dossier LI27.F1.7206/10, waarvan gedeeltelijke kopie gevoegd als bijlage 2 aan proces-verbaal 22962/2011, deel III, kaft 2.8, st. 1-280, en vonnis Rb. Luik d.d. 14 november 2011)

een niet nader te bepalen hoeveelheid goud, doch geraamd op 8 kg, voor een niet nader bepaald totaalbedrag, doch geraamd op 182.400 EUR (aan 22,8 EUR/gr goud),

waaronder in het bijzonder:

**a. op 18 juni 2010,**

800 gr goud voor een totaalbedrag van 18.725,6 EUR,

**b. op 22 juni 2010,**

400 gr goud voor een totaalbedrag van 9.120 EUR,

**II. op 10 maart 2010, in meerdere malen,**
(zie dossier AN11.LB.32777/2010, waarvan gedeeltelijke kopie gevoegd in bijlagen 1-10 aan proces- verbaal 26412/2010, deel I, kaft 2.1, st. 5-132)

een niet nader te bepalen totale hoeveelheid goud, doch geraamd op 2/3e van 1.150 gr (766,66 gr), voor een niet nader te bepalen totaalbedrag, doch geraamd op 2/3e van 24.600 EUR (16.400 EUR);

**III. en de tiende (▇▇▇▇▇▇▇▇▇▇▇▇▇▇),**

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                      p. 30
Oosslernr 10A028432                     vleugel D, 3de verdieping                    Vonolsnr     /

**a. tussen 4 maart 2010 en 15 september 2010, in meerdere malen, onder meer op hiernavermelde data,**

Een totaalbedrag van minstens 10.688.669,06 EUR, waaronder in het bijzonder:

**i. op 11 maart 2010,**

10,745 kg goud voor een bedrag van 287.804,83 EUR, zoals omschreven onder tenlastelegging C.I.a,1,

II. op 30 april 2010, in meerdere malen,

12,62 kg goud voor een bedrag van 348.185,80 EUR, zoals omschreven onder tenlastelegging C.I.a.2,

**iii. tussen 22 juli 2010 en 15 september 2010, in meerdere malen,**

een niet nader bepaalde hoeveelheid van minstens 30 kg goud voor een totaalbedrag van 1.008.823,84 EUR, zoals omschreven onder tenlastelegging C.I.a.3,

**b. tussen 4 januari 2011 en 2 juli 2011, in meerdere malen,**

een niet nader bepaalde hoeveelheid van minstens 202 kg goud voor een totaalbedrag van 7.507.176,34 EUR, zoals omschreven onder tenlastelegging C.IV,

**IV. en de zevende (██████████████), de achtste (███████████████) en de negende (███████████),** (zie dossier LI17.F1.12243/10, waarvan gedeeltelijke kopie gevoegd als bijlage 1 aan proces-verbaal 22962/11, deel III, kaft 2.8, st. 1-282, en zie de burgerlijke partijstelling te Luik: AN27.98.721/13 en proces-verbaal 100481/15, deel III, kaft 2.8, st. 354-367 en deel XIV, st. 214-259 en 307-312)

op 17 juni 2010, in meerdere malen,

een totale hoeveelheid van 31,4 kg goud voor een totaalbedrag van minstens 1.000.400,00 EUR;

**V. en de zesde (████████████████),**
**tussen 2 januari 2011 en 25 juni 2011, in meerdere malen, op niet nader bepaalde data,**

een totale hoeveelheid van 923 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 28.613.000,00 EUR, zoals omschreven onder tenlastelegging C.V.a,

**VI. en de vierentwintigste (██████████████),**

# Exhibit 8 Part 2

a. <u>Op 26 mei 2011,</u>

5 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 165.000,00 EUR, zoals omschreven onder tenlastelegging C.V.b.1,

b. <u>Op 30 mei 2011,</u>

een niet nader bepaalde hoeveelheid van minstens 1,8 kg goud voor een totaalbedrag van 60.000,00 EUR, zoals omschreven onder tenlastelegging C.V.b.2,

<u>VII. en de zesentwintigste █████████████ en de zevenentwintigste ████████
████████,</u>
<u>tussen 8 juni 2011 en 1 juli 2011, in meerdere malen, op niet nader bepaalde data,</u>

een totale hoeveelheid van 9 kg goud voor een totaal bedrag van 307.210,00 EUR, zoals omschreven onder tenlastelegging C. V.c,

<u>VIII.    en de achtentwintigste (████████ en de negenentwintigste (████████
S),</u>
<u>tussen 16 mei 2011 en 11 juni 2011, in meerdere malen, op niet nader bepaalde data,</u>

een totale hoeveelheid van 3 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 99.000,00 EUR, zoals omschreven onder tenlastelegging C.V.d,

<u>IX. en de dertigste (████████████ en de eenendertigste (████████████),</u>
<u>op 21 juni 2011,</u>

1,046 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 34.500,00 EUR, zoals omschreven onder tenlastelegging C.V.e,

<u>X. en de elfde (████████ S) en de twaalfde (████████████████),</u>
<u>tussen 2 januari 2011 en 20 september 2011, in meerdere malen, onder meer op 17 januari</u>
<u>2011, 2 februari 2011, 9 februari 2011 en 30 mei 2011,,</u>

een niet nader bepaalde hoeveelheid van minstens 200 kg goud voor een totaalbedrag van 8.765.548,95 EUR, zoals omschreven onder tenlastelegging C.VI,
(zie onder meer de kennisgeving door de Spaanse autoriteiten, deel XII, kaft 28.4, st. 32-37 en vertaling: st. 44-48),

<u>XI. en de achtiende (████████████████████),</u>
<u>tussen 3 januari 2011 en 2 juli 2011, in meerdere malen, onder meer op 27 april 2011, 3 mei</u>
<u>2011, 10 mei 2011, 19 mei 2011, 27 mei 2011, 9 juni 2011, 16 juni 2011 en 23 juni 2011,</u>

een niet nader bepaalde hoeveelheid van minstens 76 kg goud voor een totaalbedrag van 2.663.255,37 EUR, zoals omschreven onder tenlastelegging C.VII,

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                          p. 82
Dossiernr  10A028492                          vleugel D, 8de verdieping                    Vonnisnr    /

XII. en de drieëntwintigste (▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
tussen 20 januari 2011 en 16 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 47 kg goud voor een totaalbedrag van
1.660.253,88 EUR, zoals omschreven onder tenlastelegging C.VIII,

XIII. en de zestiende (▮▮▮▮▮▮▮▮▮)
tussen 23 januari 2011 en 21 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 148 kg goud voor een totaalbedrag van
5.184.700,71 EUR, zoals omschreven onder tenlastelegging C.IX,

XIV. en de dertiende (▮▮▮▮▮▮▮▮▮▮▮▮),
tussen 23 januari 2011 en 23 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 183 kg goud voor een totaalbedrag van
6.437.650,06 EUR, zoals omschreven onder tenlastelegging C.X,

XV. en de zeventiende(▮▮▮▮▮▮▮)
tussen 30 januari 2011 en 28 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 117 kg goud voor een totaalbedrag van
4.097.229,59 EUR, zoals omschreven onder tenlastelegging C.XI,

XVI. en de tweeëntwintigste (▮▮▮▮▮▮▮),
tussen 7 februari 2011 en 14 april 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 64 kg goud voor een totaalbedrag van
2.246.154,64 EUR, zoals omschreven onder tenlastelegging C.XII,

XVII. en de veertiende (▮▮▮▮▮▮) en de vijftiende (▮▮▮▮▮▮▮▮▮),

a. tussen 21 februari 2011 en 25 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 188 kg goud voor een totaalbedrag van
6.604.290,90 EUR, zoals omschreven onder tenlastelegging C.XIII.a,

b. Tussen 24 februari 2011 en 1 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 84 kg goud voor een totaalbedrag van
2.963.671,84 EUR, zoals omschreven onder tenlastelegging C.XIII.b,

c. Tussen 10 maart 2011 en 25 juni 2011, in meerdere malen.

een niet nader bepaalde hoeveelheid van minstens 9 kg goud voor een totaalbedrag van
321.135,00 EUR, zoals omschreven onder tenlastelegging C.XIII.c,

d. <u>Tussen 31 maart 2011 en 28 juni 2011, in meerdere malen,</u>

een niet nader bepaalde hoeveelheid van minstens 44 kg goud voor een totaalbedrag van
1.541.339,16 EUR, zoals omschreven onder tenlastelegging C.XIII.d,

XVIII. en de negentiende (̶̶̶̶̶̶̶̶̶̶̶̶), de twintigste (̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶) en
de eenentwintigste (̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶)

a. <u>Tussen 1 april 2011 en 29 juni 2011, in meerdere malen,</u>

een niet nader bepaalde hoeveelheid van minstens 76 kg goud voor een totaalbedrag van
2.672.625,88 EUR, zoals omschreven onder tenlastelegging C.XIV.a,

b. <u>Op 5 juli 2011,</u>

1,445 kg goud voor een totaalbedrag van 49.633,18 EUR, zoals omschreven onder
tenlastelegging C.XIV,b,

E...

F. <u>De zesde (̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶) en de vierendertigste (̶̶̶̶̶̶̶̶̶̶̶̶̶),
tussen 31 december 2009 en 23 juni 2011, meermaals,</u>

Bij inbreuk op de artikelen 1 en 2 § 1 van de wet van 6 juli 1976 tot beteugeling van het
sluikwerk met handels- of ambachtskarakter, strafbaar gesteld bij artikel 5 van voormelde
wet, sluikwerk te hebben uitgeoefend of gebruik te hebben gemaakt van de diensten van
iemand die sluikwerk verricht,

namelijk door in strijd met voornoemde wetsbepalingen, hetzij als verkoopagent of
-commissionair, hetzij in eigen naam en voor eigen rekening, verrichtingen te hebben
gesteld inzake handel in edele metalen;

G. <u>De eerste (GOETZ Sylvain), de tweede (GOETZ Alain), de derde (NV TONY GOETZ), de
vierde (̶̶̶̶̶̶̶̶̶̶̶̶̶̶ NV) en de vijfde (̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶),</u>

Bij inbreuk op de artikelen 10ter en 23 (oud) en de artikelen 21 en 41 (nieuw) van de wet
van 11 januari 1993 tot voorkoming van het gebruik van het financiële stelsel voor het
witwassen van geld en de financiering van terrorisme, de prijs van de tussen partijen
doorgevoerde verkoop door een handelaar van een goed ter waarde van 15.000,00 EUR of
meer in contanten te hebben vereffend;

de feiten sedert 5 februari 2010, ingevolge de wet van 18 januari 2010 (B.S. 26.i.2010),

Exhibit 8 Part 2

omschreven zijnde als volgt:

Bij inbreuk op de artikelen 21 en 41 van de wet van 11 januari 1993 tot voorkoming van het gebruik van het financiële stelsel voor het witwassen van geld en de financiering van terrorisme, de prijs van de tussen partijen doorgevoerde verkoop door een handelaar van één of meerdere goederen voor een bedrag van 15.000,00 EUR of meer, ongeacht of de verkoop plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan, in contanten te hebben vereffend;

de feiten thans, ingevolge de wet van 29 maart 2012 (B.S. 06.IV.2012), omschreven zijnde als volgt:

Bij inbreuk op de artikelen 21 en 41 van de wet van 11 januari 1993 tot voorkoming van het gebruik van het financiële stelsel voor het witwassen van geld en de financiering van terrorisme, de prijs van de tussen partijen doorgevoerde verkoop door een handelaar van één of meerdere goederen voor een bedrag van 5.000 EUR of meer, ongeacht of de verkoop plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan, in contanten te hebben vereffend,

de feiten thans, ingevolge de wet van 18 september 2017 (B.S. 06.X.2017), omschreven zijnde als volgt:

Bij inbreuk op de artikelen 67 en 137 van de wet van 18 september 2017 tot voorkoming van het witwassen van geld en de financiering van terrorisme en tot beperking van het gebruik in contanten, buiten het geval van openbare verkoop uitgevoerd onder toezicht van een gerechtsdeurwaarder, als persoon die geen consument is, bij aan koop van een andere persoon van oude metalen, koperkabels of goederen die edele stoffen bevatten, een bedrag in contanten te hebben betaald, of een betaling of een schenking voor meer dan 3.000 euro of de tegenwaarde ervan in een andere munteenheid, ongeacht of dit kadert in een verrichting of een geheel van verrichtingen waartussen een verband lijkt te bestaan, in contanten te hebben verricht of ontvangen,

met name wat betreft de hierna vermelde verrichtingen:

i. tussen 3 januari 2010 en 31 december 2010, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.I betrekking hebben,

waaronder in het bijzonder:

en de tiende ██████████████
tussen 10 maart 2010 en 15 september 2010, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.I.a betrekking hebben:

II. en de zesde [redacted], de tweeëndertigste [redacted] en de drieëndertigste [redacted],
tussen 4 januari 2010 en 1 juni 2011, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.II betrekking hebben,

III. en de vierentwintigste [redacted] en de vijfentwintigste [redacted],
tussen 13 januari 2010 en 30 maart 2010, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.III betrekking hebben,

IV. en de tiende [redacted],
tussen 4 januari 2011 en 2 juli 2011, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.IV betrekking hebben,

V. tussen 2 januari 2011 en 17 november 2011, meermaals, onder meer op hierna vermelde data,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V betrekking hebben, waaronder in het bijzonder:

a. en de zesde [redacted],
tussen 2 januari 2011 en 25 juni 2011, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V.a betrekking hebben,

b. en de vierentwintigste [redacted],
tussen 25 mei 2011 en 31 mei 2011, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V.b betrekking hebben,

c. en de zesentwintigste [redacted] en de zevenentwintigste [redacted]
tussen 8 juni 2011 en 1 juli 2011, meermaals,

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V.c betrekking hebben,

d. en de achtentwintigste [redacted] en de negenentwintigste [redacted],

# Exhibit 8 Part 2

<u>tussen 16 mei 2011 en 11 juni 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V.d betrekking hebben,

<u>e, en de dertigste (█████████████) en de eenendertigste (█████████████)</u>
<u>op 21 juni 2011,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.V.e betrekking hebben,

<u>VI. en de elfde (█████████████████) en de twaalfde (███████████████</u>
<u>█████)</u>
<u>tussen 2 januari 2011 en 20 september 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.VI betrekking hebben,

<u>VII. en de achttiende (██████████████████),</u>
<u>tussen 3 januari 2011 en 2 juli 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.VII betrekking hebben,

<u>VIII. en de drieëntwintigste (████████████),</u>
<u>tussen 20 januari 2011 en 16 juni 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.VIII betrekking hebben,

<u>IX. en de zestiende (██████████)</u>
<u>tussen 23 januari 2011 en 21 juni 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.IX betrekking hebben,

<u>X. en de dertiende (███████████████████),</u>
<u>tussen 23 januari 2011 en 23 juni 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.X betrekking hebben,

<u>XI. en de zeventiende (████████████████),</u>
<u>tussen 30 januari 2011 en 28 juni 2011, meermaals,</u>

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.XI betrekking

Exhibit 8 Part 2

hebben,

**XII. en de tweeëntwintigste (~~████████████~~),**
**tussen 7 februari 2011 en 14 april 2011, meermaals,**

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.XII
betrekking hebben,

**XIII. en de veertiende (~~████████~~) en de vijftiende (~~████████████~~),**
**tussen 21 februari 2011 en 28 juni 2011, meermaals,**

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.XIII
betrekking hebben,

**XIV. en de negentiende (~~████████████~~), de twintigste (~~████████████~~) en**
**de eenentwintigste (~~████████████~~),**
**tussen 1 april 2011 en 6 juli 2011, meermaals,**

de verrichtingen waarop de valse stukken omschreven onder tenlastelegging C.XIV
betrekking hebben,

**H. De zesde (~~████████████~~) en de vierendertigste (~~████████████~~)**
**tussen 31 december 2009 en 23 juni 2011, meermaals,**

Bij inbreuk op de artikelen 2, 3, 4, 5, 6 en 33 van de wet tot oprichting van een
Kruispuntbank van Ondernemingen, tot modernisering van het handelsregister, tot
oprichting van erkende ondernemingsloketten en houdende diverse bepalingen, strafbaar
gesteld bij de artikelen 62 § 2, 1° en 63 van dezelfde wet, als persoon gehouden tot
inschrijving in het handelsregister activiteiten te hebben uitgeoefend zonder de inschrijving
in het handelsregister te hebben aangevraagd,

De feiten ingevolge de inwerkingtreding van het Boek III van het Wetboek van Economisch
Recht vanaf 9 mei 2014 omschreven zijnde als volgt :

Bij inbreuk op de artikelen I.2, III.15, III.16, III.17, III.18 en III.49 van het Wetboek van
Economisch Recht, strafbaar gesteld bij de artikelen XV.69, XV.70 en XV.77, 1° van hetzelfde
wetboek, als persoon gehouden zich met de handelshoedanigheid of niet
handelshoedanigheid naar privaat recht in te schrijven in de Kruispuntbank van
Ondernemingen activiteiten te hebben uitgeoefend zonder daarvoor de inschrijving
gevraagd te hebben van deze hoedanigheid,

namelijk activiteiten als verkoopagent of-commissionair en/of als handelaar in eigen naam
en voor eigen rekening,

DRC-34996 0436

# Exhibit 8 Part 2



en inzake van de vrijwillig tussenkomende partijen:

000722

van Franse nationaliteit

000723

van Franse nationaliteit

000724

van Franse nationaliteit

vrijwillig tussenkomende partijen , vertegenwoordigd door Meester Vermeulen Erhard, advocaat te 2000 Antwerpen, Léon Stynenstraat 75/C, loco Meester Vandewalle Frank, advocaat te Antwerpen

**PROCEDURE**

De rechtbank neemt kennis van de beschikking van de raadkamer van deze rechtbank van 26/04/2018 waarin verzachtende omstandigheden werden aangenomen.

De behandeling en de debatten van de zaak hadden plaats in openbare terechtzitting.

De rechtspleging verliep in de Nederlandse taal, behalve wat het vertaald gedeelte betreft dat geschiedde.

De rechtbank heeft als tolk aangesteld Koeck Christiane Josephine, teneinde de beklaagde ▓ bij te staan voor vertaling van alles wat gezegd wordt van het Frans naar het Nederlands en omgekeerd en die de door de wet voorziene eed heeft afgelegd.

De rechtbank heeft als tolk aangesteld Provinciael Ernest, teneinde de beklaagde ▓ bij te staan voor vertaling van alles wat gezegd wordt van het Spaans naar het Nederlands en omgekeerd en die de door de wet voorziene eed heeft afgelegd.

De rechtbank nam kennis van de stukken van de rechtspleging en hoorde alle aanwezige partijen.

Beklaagde(n) ▓ ▓ ▓ ▓ ▓ rschenen hoewel ze rechtsgeldig werd(en) gedagvaard.

DRC-34996 0437

# Exhibit 8 Part 2

## 1. PROCEDURE

### *Betreffende de schending van het vermoeden van onschuld*

In besluiten werpen eerste t/m vijfde beklaagde op dat de strafvordering in hunnen hoofde onontvankelijk moet worden verklaard wegens de schending van het vermoeden van onschuld. Concreet verwijzen deze beklaagden naar een persartikel dat werd gepubliceerd (zie st. 16, bundel eerste en tweede beklaagde GOETZ, gepubliceerd in het dagblad DE TIJD op 18.09.2015 met titel *"Parket vervolgt grootste goudsmelterij"*) in een Belgische krant.

In eerste instantie dient de rechtbank vast te stellen dat in deze niet vaststaat wie verantwoordelijk is voor het doorspelen van enige informatie uit het strafdossier aan de journalist die voornoemd krantenartikel schreef.

Verder verwijst de rechtbank naar de besluiten van eerste en tweede beklaagde (met verwijzing naar een arrest van het Europees Hof van de Rechten van de Mens d.d. 29.08.1997) waaruit blijkt dat de beoordeling van de schending van het vermoeden van onschuld *in concreto* dient te gebeuren.

In de voorliggende uitspraak van het Europees Hof werd blijkbaar vastgesteld dat de betrokken journalist de beklaagde had bekritiseerd omwille van de door de beklaagde gevoerde verdediging en verder had deze journalist ook duidelijk standpunt ingenomen omtrent de schuld van de beklaagde.

In die omstandigheden oordeelde het Europees Hof dat het vermoeden van onschuld hierdoor geschonden werd.

Daarenboven blijkt uit hetzelfde arrest dat een schending van het vermoeden van onschuld tevens met zich dient te brengen dat de beschuldigde hierdoor minstens het risico loopt geen eerlijk proces te zullen genieten.

De rechtbank verwijst naar de inhoud van voornoemd krantenartikel (zoals geciteerd op pagina 60 van de conclusies van eerste en tweede beklaagde) en dient vast te stellen dat in dit artikel weliswaar vermeldingen worden gemaakt aangaande de feiten waarvoor beklaagden thans vervolgd worden maar geenszins een kritische houding wordt aangenomen t.a.v. beklaagden noch dat er standpunt wordt ingenomen omtrent de schuld of onschuld van beklaagden.

DRC-34996 0438

# Exhibit 8 Part 2

Daarenboven blijkt uit niets dat met deze publicatie het recht op een eerlijk proces in hoofde van beklaagden geschonden zou zijn geworden. De rechtbank verwijst hierbij naar het tijdsverloop, het persartikel dateert van meer dan vier jaar geleden, en werd daarenboven gepubliceerd in een zakenkrant met een specifiek lezerspubliek.

In die omstandigheden stelt de rechtbank vast dat het vermoeden van onschuld in deze niet geschonden werd, evenmin als het recht op een eerlijk proces in hoofde van beklaagden.

- _Betreffende de schending van het recht van verdediging – verhoor van beklaagden zonder bijstand van een advocaat_

In besluiten werpen vierde, vijfde, zesentwintigste, zevenentwintigste en achtentwintigste beklaagde op dat de door hen afgelegde verhoren (waar inderdaad geen bijstand van een advocaat werd voorzien) niet kunnen worden aangewend in huidige procedure wegens schending van de rechten van verdediging.

De omstandigheid dat verklaringen werden afgelegd tijdens een politieverhoor zonder mogelijkheid van bijstand van een advocaat, heeft evenwel niet automatisch voor gevolg dat het definitief onmogelijk is om de zaak van een beklaagde op een eerlijke wijze te behandelen.

In eerste instantie stelt de rechtbank vast dat er uit niets blijkt dat er bij het afleggen van de verhoren door vierde, vijfde, zesentwintigste en zevenentwintigste beklaagde op enigerlei wijze sprake is geweest van misbruik of dwang waardoor beklaagden tegen hun wil enige verklaring hebben afgelegd.

In besluiten geeft zevenentwintigste beklaagde █████████ aan dat zij onder druk zou zijn gezet door de politiediensten om welbepaalde verklaringen af te leggen. Dit blijkt niet uit de voorliggende stukken.

De rechtbank verwijst vooreerst naar het gegeven dat zevenentwintigste beklaagde schriftelijk werd uitgenodigd voor verhoor op 23.08.2012 (Deel XI, kaft 23, st. 249) waarbij zij in kennis werd gesteld van haar rechten met name het recht om zichzelf niet te beschuldigen, haar zwijgrecht en het recht om voorafgaandelijk aan het verhoor een advocaat te raadplegen.

Op 23.08.2012 bood zevenentwintigste beklaagde zich ook vrijwillig aan voor verhoor. Ook uit de inhoud van het verhoor kan de rechtbank niet afleiden dat zevenentwintigste beklaagde op enigerlei wijze onder druk zou zijn gezet om enige verklaring af te leggen waar zij niet achter stond.

Het tegendeel blijkt zelfs. Wanneer de verbalisanten naar onderschepte telefoongesprekken verwijzen en zevenentwintigste beklaagde om verduidelijking verzoeken, antwoordt zij: *"Dit is inderdaad een gesprek tussen mijzelf en de bediende van de NV TONY GOETZ. Wat ik bedoelde met de uitspraak 'willen jullie dit storten want dit is officieel' weet ik niet. Ik had dit geld nodig om klanten te betalen. U zegt mij dat dit geen echt antwoord is op de vraag. Maar ik wens verder niets toe te voegen."*

Hieruit blijkt duidelijk dat wanneer zevenentwintigste beklaagde geen verklaring wilde afleggen, zij dit ook niet deed hetgeen door de verbalisanten gerespecteerd en genoteerd werd.

Ook achtentwintigste beklaagde ▇▇▇▇▇ stelt in besluiten dat de door hem afgelegde politionele verklaringen niet in huidige procedure kunnen worden aangewend nu deze verklaringen werden afgelegd zonder bijstand van een advocaat.

Achtentwintigste beklaagde werd op 14.11.2012 verhoord. (DEEL XI, kaft 25, st. 271) Hij werd hiertoe voorafgaandelijk schriftelijk uitgenodigd waarbij hij in kennis werd gesteld van zijn rechten, o.a. het recht om voorafgaandelijk overleg te hebben met een advocaat. Tussen achtentwintigste beklaagde en de politiediensten volgde hierop emailcorrespondentie teneinde een juiste datum voor het verhoor vast te leggen.

Tevens blijkt uit het voorliggende verhoor dat achtentwintigste beklaagde geenszins op enigerlei wijze door de politie onder druk werd gezet of dat zijn rechten van verdediging zouden zijn geschonden.

Bovendien stelt de rechtbank vast dat achtentwintigste beklaagde in besluiten ook de inhoud van zijn verklaring bij de politiediensten op geen enkele wijze betwist.

In die omstandigheden kan de rechtbank niet vaststellen dat de rechten van verdediging in hoofde van achtentwintigste beklaagde *in concreto* geschonden zijn.

Daarnaast stelt de rechtbank vast dat alle beklaagden zich, ten tijde van hun verhoor, en tijdens het onderzoek, niet in een kwetsbare positie bevonden, zodat zij zich in volle vrijheid en, indien gewenst, met bijstand van een raadsman hebben kunnen verdedigen.

Tot slot, en ten overvloede, zal de rechtbank ook niemand veroordelen op basis van zijn of haar loutere verklaringen die werden afgelegd zonder bijstand van een advocaat.

DRC-34996 0440

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                                    p. 42
Dossiernr 10A028432                              vleugel D, 3de verdieping                        Voenisnr     /

In die omstandigheden blijft het eerlijk karakter van het proces gevrijwaard (zie in dezelfde
zin: Cass. 23.11.2010, P.10.1428.N) en werden de rechten van verdediging niet geschonden.

- *Betreffende de schending van het recht op verdediging ingevolge het tijdsverloop
sinds de feiten*

● *Betreffende vierde beklaagde ▬▬▬▬▬ en vijfde beklaagde ▬▬▬▬▬
▬▬▬▬*

Vierde beklaagde ▬▬▬▬▬ en vijfde beklaagde ▬▬▬▬▬ werpen op
dat hun recht op een eerlijk proces onherstelbaar is geschonden door het tijdsverloop van
het voorliggende strafrechtelijk onderzoek.

Meer concreet stellen beklaagden dat aan hen handelingen worden verweten die
plaatsvonden in de jaren 2010 en 2011 daar waar zij in het kader van de rechtspleging
slechts werden opgeroepen voor de Raadkamer te Antwerpen op 3 oktober 2016.

Ingevolge dit tijdsverloop zouden vierde en vijfde beklaagde thans in de onmogelijkheid zijn
om na te gaan of zij op welbepaalde dagen tijdens de hen ten laste gelegde
incriminatieperiode aan het werk waren dan wel vakantie hadden.

De rechtbank stelt vast dat beklaagden niet hun onschuld dienen te bewijzen. Het komt het
Openbaar Ministerie toe het bewijs van de aan beklaagden ten laste gelegde feiten te
bewijzen. In voorkomend geval zal de rechtbank – voor zover dit bewijs niet door het
Openbaar Ministerie wordt geleverd – beklaagde hiervan vrijspreken.

Daarnaast blijkt – hetgeen verder nog besproken wordt – zowel uit het strafdossier als uit
de door het Openbaar Ministerie neergelegde conclusie dat aan beklaagden niet zozeer
specifieke handelingen worden verweten, m.n. het individueel aan- en verkopen van goud,
maar wel hun individuele, en noodzakelijke, bijdrage bij het opzetten van een systeem van
aan- en verkopen van goud dat door het Openbaar Ministerie als malafide wordt aangeduid.

De rechtbank kan dan ook geen onherstelbare schending van het recht van verdediging in
hoofde van vierde en vijfde beklaagde vaststellen zodat de strafvordering ook om deze
reden niet onontvankelijk kan worden verklaard.

● *Betreffende zeventiende beklaagde* ▬▬▬▬▬▬▬

DRC-34996 0441

Exhibit 8 Part 2

Zeventiende beklaagde stelt dat in zijnen hoofde de redelijke termijn, waarbinnen hij mag verwachten dat de strafvordering wordt uitgeoefend, is overschreden waardoor zijn rechten van verdediging dermate geschonden zouden zijn geworden dat de uitoefening van de strafvordering in zijnen hoofde onontvankelijk zou moeten worden verklaard.

De vraag of de redelijke termijn waarbinnen de strafvordering moet worden uitgeoefend, overschreden is, dient *in concreto* beantwoord te worden.

In deze staat het vast dat zeventiende beklaagde in december 2012 in kennis werd gesteld van het tegen hem ingestelde strafrechtelijk onderzoek. Beklaagde weigerde toen hieraan mee te werken. (zie DEEL XIII, kaft 30, onderkaft B, st. 20)

De rechtbank kan niet anders dan vaststellen dat thans meer dan acht jaar zijn verstreken sinds het tijdstip waarop zeventiende beklaagde in deze zaak voor het eerst werd verontrust.

De rechtbank verwijst echter ook naar de omvang (met vierendertig beklaagden), de complexiteit (technische inbreuken in de fiscale en financiële sfeer) en het internationaal karakter (met ambtelijke opdrachten in verschillende landen) van het gevoerde strafonderzoek.

Ondanks het tijdsverloop dient de rechtbank verder vast te stellen dat het strafonderzoek steeds een normaal verloop heeft gekend. Er kunnen geen periodes worden aangeduid waarbij het onderzoek om onverklaarbare redenen zou hebben stilgelegen.

Hoewel de redelijke termijn op zich mogelijk geschonden werd, kan de rechtbank in hoofde van zeventiende beklaagde desondanks geen inbreuken op zijn rechten van verdediging vaststellen.

Zo werd zeventiende beklaagde in 2012 in kennis gesteld van het lastens hem lopende onderzoek en werd zijn beslissing om iedere medewerking te weigeren gerespecteerd.

Zeventiende beklaagde stelt thans dat hij onmogelijk nog enig verweer kan voeren nu de boekhoudkundige stukken van zijn vennootschap – die hij naar eigen zeggen slechts zeven jaar dient te bewaren – verloren zouden zijn gegaan.

De rechtbank stelt vast dat het gegeven dat de boekhouding van beklaagde in beslag zou zijn genomen (in het kader van een in Duitsland gevoerd strafrechtelijk onderzoek) en deze boekhoudkundige stukken hierbij verloren zouden zijn gegaan, door geen enkel stuk

# Exhibit 8 Part 2

aannemelijk worden gemaakt en slechts loutere, en naar het oordeel van de rechtbank ongeloofwaardige, beweringen van zeventiende beklaagde betreffen.

Ook het gegeven dat beklaagde boekhoudkundige stukken slechts zeven jaar dient te bewaren en deze dus thans niet meer tot zijn beschikking heeft, oordeelt de rechtbank volstrekt ongeloofwaardig. Wanneer beklaagde in 2012 in kennis wordt gesteld van het gegeven dat er een strafrechtelijk onderzoek lastens hem ingesteld wordt en in 2016, in het kader van de regeling van de rechtspleging wordt opgeroepen om te verschijnen voor de raadkamer te Antwerpen, kan en mag van hem verwacht worden dat hij stukken ter zijner verdediging zal bewaren.

Enige schending van de redelijke termijn in hoofde van zeventiende beklaagde die het verval van het recht tot uitoefening van de strafvordering met zich heeft gebracht kan door de rechtbank dan ook niet worden vastgesteld.

## 2. OP STRAFRECHTELIJK VLAK

- ### *Algemeen*

In het kader van een ander strafrechtelijk onderzoek naar de diefstal van goud en juwelen wordt vastgesteld dat een deel van de buit werd verkocht via de goudsmelter TONY GOETZ NV, in deze derde beklaagde.

Hierbij werd vastgesteld dat het aangeboden goud door de firma GOETZ werd aangenomen zonder verdere vragen naar de herkomst ervan te stellen en zonder dat er enige administratieve verplichting diende te worden uitgevoerd. Het goud werd onmiddellijk gesmolten, gewogen en in contanten uitbetaald.

Eerste en tweede beklaagde GOETZ zijn broers, hoofdaandeelhouder in derde beklaagde waarbij eerste beklaagde tevens de gedelegeerd bestuurder is van de firma GOETZ.

Vierde beklaagde ▮▮▮▮▮▮ en vijfde beklaagde ▮▮▮▮▮▮▮▮▮ zijn tewerkgesteld binnen de firma GOETZ.

Zesde t/m vierendertigste beklaagde zijn allen klanten van de firma GOETZ.

Eerste t/m vijfde beklaagde worden vervolgd voor het opzetten van een grootschalig fraudesysteem waarbij hun klanten de mogelijkheid werd geboden om grote hoeveelheden goud en andere edele metalen anoniem, en met vergoeding in contanten, te verkopen. ·

Zesde t/m vierendertigste beklaagde worden vervolgd omdat ze van het systeem van eerste t/m vijfde beklaagde gebruik zouden hebben gemaakt.

Uit het onderzoek is gebleken dat tijdens de voorliggende incriminatieperiode (d.i. in de jaren 2010 en 2011) door de firma GOETZ aanzienlijke aankopen van edele metalen werden verricht waarbij de verkopers – die nochtans als handelaars waren gekend – geïdentificeerd werden als 'particulieren' waarbij de aangekochte goederen veelal in contanten werden betaald.

Tevens is gebleken dat daar waar de aangekochte goederen de waarde van 15.000 EURO overschreden, de aankoop systematisch werd opgesplitst in verschillende deelaankopen van minder dan 15.000 EURO.

Dat dit systeem frequent werd aangewend, blijkt uit het gevoerde onderzoek waarbij werd vastgesteld dat er door de firma GOETZ in de periode van 05.01.2011 t/m 16.11.2011 voor een bedrag van 785.977.175,94 EURO oude edele metalen werden aangekocht waarbij een bedrag van 651.960.942,59 EURO (hetzij meer dan 80% van de totale transacties) in contanten werd uitbetaald.

Beklaagde betwisten in grote mate de hen ten laste gelegde feiten.

- ### *Betreffende de tenlasteleggingen in het algemeen*

  ● *De tenlastelegging C*

Onder deze tenlastelegging worden de onderscheiden beklaagden vervolgd voor feiten van valsheid in geschriften.

Beklaagden wordt hierbij verweten *"aankoopborderellen en gerelateerde stukken"* te hebben opgesteld dan wel te hebben doen opstellen en dit bij de aankoop/verkoop van oud goud waarbij de verkopers werden voorgesteld als particulieren, daar waar het handelaars betrof, en de bedragen op de aankoopborderellen telkenmale werden opgesplitst in bedragen onder de 15.000 EURO.

# Exhibit 8 Part 2

Beklaagden zouden hierbij gehandeld hebben om de herkomst van het aangekochte, dan wel verkochte, oud goud te verdoezelen, om de bepalingen van de Wet van 11 januari 1993 te omzeilen, dan wel om een concurrentievervalsend systeem op te zetten.

De rechtbank zal hierna in hoofde van iedere individuele beklaagde nagaan of, en in voorkomend geval in welke mate, beklaagden zich hieraan schuldig hebben gemaakt.

**●** *De tenlastelegging D*

Onder de tenlastelegging D worden beklaagden vervolgd voor feiten van witwassen.

Aan beklaagden wordt verweten edele metalen, met een illegale herkomst, te hebben omgezet of overgedragen met de bedoeling de illegale herkomst ervan te verbergen (art. 505 lid 1, 3° SW) dan wel de aard van deze zaken te verhullen (art. 505 lid, 4° SW).

Uit de gegevens van het strafdossier blijkt dat het Openbaar Ministerie aan beklaagden verwijt dat zij transacties (aan- of verkoop) hebben verricht van edele metalen die van een misdrijf afkomstig waren, dan wel dat het transacties betreft waarbij de fiscale regels niet werden gevolgd en die volgens het Openbaar Ministerie *'buiten de boekhouding'* werden uitgevoerd.

De rechtbank zal verder nagaan of, en indien zo, in welke mate iedere individuele beklaagde zich aan deze tenlasteleggingen heeft schuldig gemaakt.

Wat betreft de verwijzing naar transacties die *'buiten de boekhouding'* werden uitgevoerd, stelt de rechtbank vast dat de geviseerde transacties aan- en verkopen betreffen van partijen edele metalen, door handelaars-verkopers, waarbij de aankoopprijs in contanten werd uitbetaald.

Uit de elementen van het strafdossier blijkt dat aan beklaagden wordt verweten dat zij transacties hebben uitgevoerd *"als particulier"* waarbij enorme bedragen in contanten werden uitbetaald zonder dat op enigerlei wijze deze transacties boekhoudkundig werden verwerkt.

De boekhoudkundige verwerking van deze transacties bij derde beklaagde NV TONY GOETZ gebeurde anoniem; slechts de globale verkopen *"particulier"* werden geboekt en individuele verrichtingen konden enkel worden teruggevonden aan de hand van aankoopborderellen *"particulier"* waarbij op informele wijze een identificatie van de leverancier/klant werd doorgevoerd.

# Exhibit 8 Part 2

Bij deze zgn. *"particuliere"* verkopers van goud werden weinig tot geen boekhoudkundige verwerkingen van de transacties aangetroffen.

In zoverre vaststaat dat verkopen van edelen metalen aan de NV TONY GOETZ op professionele basis gebeurden, zonder dat deze transacties boekhoudkundig werden verwerkt, dient de rechtbank vast te stellen dat deze weldegelijk plaatsvonden op basis van zgn. fiscale misdrijven.

In tegenstelling tot hetgeen beklaagden voorhouden, vonden deze fiscale misdrijven geenszins uitsluitend plaats na de verkoop van de edele metalen. Het spreekt voor zich dat verkopen van oud goud *'buiten de boekhouding'* geschiedt met oud goud dat ook *'buiten de boekhouding'* werd aangekocht en dit met financiële middelen die eveneens *'buiten de boekhouding'* beschikbaar zijn. In het geval van frequente of opeenvolgende verkopen van oud goud *'buiten de boekhouding'* worden de opeenvolgende transacties daarenboven mede gefinancierd met de illegale vermogensvoordelen die uit vroegere illegale transacties voortvloeien.

In die omstandigheden vormen verkopen van oud goud *"buiten de boekhouding"* weldegelijk een omzetten van illegale vermogensvoordelen.

● *De tenlasteleggingen G*

Onder de tenlastelegging G worden beklaagden vervolgd voor inbreuken op de zgn. preventieve verplichtingen van de witwaswetgeving zoals opgenomen in de Wet van 11 januari 1993, dit ingevolge het plegen van valsheden in geschriften zoals opgenomen onder de tenlastelegging C.

Ter terechtzitting stellen eerste t/m vijfde beklaagde dat zij niet vervolgd kunnen worden voor de feiten zoals vermeld onder de tenlastelegging G nu de wettelijke bepalingen in deze enkel van toepassing zouden zijn op de verkopers van de geviseerde transactie daar waar zijzelf in deze transactie zijn opgetreden als aankopers.

Art. 10*ter* van de Wet van 11 januari 1993 bepaalde destijds:

> *"De prijs van de verkoop door een handelaar van een goed ter waarde van 15.000 EUR of meer mag niet in contanten worden vereffend."*

Exhibit 8 Part 2

Deze wetsbepaling werd heromschreven zodat vanaf 05.02.2010 art. 21 van de Wet van 11 januari 1993 het volgende bepaalt:

> "De prijs van de verkoop door een handelaar van één of meerdere goederen voor een bedrag van 15.000 euro of meer, mag niet in contanten worden vereffend, ongeacht of de verkoop plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan."

Na wijzigingen bij Wet van 29.03.2012 en 15.07.2013 bepaalt art. 21 van de Wet van 11 januari 1993 het volgende:

> "De prijs van de verkoop door een handelaar van één of meerdere goederen evenals de prijs van één of meerdere dienstprestaties geleverd door een dienstverstrekker, voor een bedrag van 5.000 euro of meer, mag niet in contanten worden vereffend uitgezonderd voor een bedrag dat 10 % van de prijs van de verkoop of de dienstprestatie niet overstijgt, en voor zover dit bedrag niet hoger is dan 5.000 euro, ongeacht of de verkoop of de dienstprestatie plaatsvindt in één verrichting of via meerdere verrichtingen waartussen een verband lijkt te bestaan.
>
> De prijs van de aankoop, door een handelaar in edele metalen, van één of meerdere goederen voor een bedrag van 5.000 euro of meer, mag slechts in contanten worden vereffend voor een bedrag dat niet hoger is dan 10 % van de aankoopprijs en voor zover dat bedrag niet hoger is dan 5.000 euro ongeacht of de aankoop plaatsvindt in één of meer verrichtingen of via meerdere verrichtingen waartussen een verband lijkt te bestaan.
>
> ..."

Volgens eerste t/m vijfde beklaagde toont voormelde wetsevolutie duidelijk aan dat hun handelingen, als kopers, op het tijdstip van de incriminatieperiode niet strafbaar zouden zijn geweest.

De rechtbank deelt deze visie niet.

Bij iedere verkooptransactie is er uiteraard minstens één partij die optreedt als koper.

Terecht stellen eerste t/m vijfde beklaagde dat voornoemde wetsbepalingen, hetzij art. 10ter en art. 21 (zoals van toepassing tot de wetswijziging van 15.07.2013) principieel de verkopers bij handelstransacties viseren.

Exhibit 8 Part 2

Uit niets blijkt echter dat derden – in deze kopers – niet mee vervolgd kunnen worden wanneer zij als mededader hebben meegewerkt aan inbreuken die door de zgn. verkopers zouden zijn begaan.

Het is deze situatie die door het Openbaar Ministerie aan eerste t/m vijfde beklaagde wordt verweten. Zij worden ervan verdacht een systeem in het leven te hebben geroepen waardoor de overige medebeklaagden (de verkopers bij de geviseerde transacties) in de mogelijkheid werden gesteld om inbreuken op de Wet van 11 januari 1993 te plegen.

De rechtbank meent dat ingevolge deze zienswijze haar saisine niet wordt geschonden.

De inbreuken van de tenlastelegging G worden inderdaad gesteund door de overeenkomstige valsheden die in de tenlastelegging C worden vermeld.

Het loutere feit dat deze valsheden betrekking hebben op aankoopborderellen, impliceert geenszins dat enkel aankopen en geen verkopen zouden zijn geviseerd.

Het door eerste t/m vijfde beklaagde in het leven geroepen systeem waarvan de overige medebeklaagden – trouwens wél als verkopers – gebruik hebben gemaakt, strekte er immers net toe iedere papierstroom te vermijden.

De door eerste t/m vijfde beklaagde opgestelde aankoopborderellen zijn hierbij de enige overgebleven documenten die de ver- en aankoop van oud goud aantonen.

Eerste t/m vijfde beklaagde voeren verder aan dat hun handelingen als koper, geen inbreuk kunnen vormen op de bepalingen van art. 10*ter* nu hun handelingen als koper geen deelnemingshandelingen zouden kunnen zijn in hoofde van de verkoper.

De rechtbank verwijst naar de bepalingen van art. 10*ter* van de Wet van 11 januari 1993 waarin vermeld wordt dat de prijs *"van een verkoop door een handelaar"* *"van een goed ter waarde van 15.000 EUR of meer"* niet in contanten *"vereffend mag worden"*.

Deze bepalingen is in algemene bewoordingen opgesteld en viseert geenszins expliciet de handelingen van de verkoper in de zin dat het de verkoper is die de prijs niet mag ontvangen in contanten, maar wel de gehele transactie die niet vereffend mag worden in contanten.

DRC-34996 0448

# Exhibit 8 Part 2

Handelingen van derden, bijv. handelaars-kopers, worden dan ook geenszins uitgesloten uit de werking van art. 10*ter* van de Wet van 11 januari 1993.

Dergelijke visie ontneemt geenszins iedere betekenis aan de wetswijziging van 15.07.2013.

Door expliciet ook de handelaar-koper een verbod op te leggen om transacties van meer dan 5.000 EURO in contanten te vereffenen worden immers ook de transacties met particulieren geviseerd hetgeen voorheen niet het geval was.

Tot slot stellen eerste t/m vijfde beklaagde dat zij niet kunnen deelnemen aan de '*onachtzaamheid*' van derden, in deze de overige medebeklaagden.

Het openbaar ministerie voert aan dat er in deze geen sprake is van enige onachtzaamheid maar dat eenieder in deze opzettelijk en met kennis van zaken heeft gehandeld.

De rechtbank zal hierna, per individuele beklaagde, nagaan of en in welke mate beklaagden zich met het vereiste opzet aan de hen individueel ten laste gelegde feiten schuldig hebben gemaakt.

Tot slot stellen eerste en tweede beklaagde dat de stelling dat zij als mededader beschouwd kunnen worden van inbreuken op de bepalingen van art. 10*ter* van de wet van 11 januari 1993 een inbreuk vormt op het wettelijkheidsbeginsel zoals van toepassing in strafzaken en zoals gewaarborgd door de artikelen 12 en 14 GW.

De rechtbank verwijst in eerste instantie naar hetgeen hiervoor reeds werd gesteld omtrent de strekking van art. 10*ter* van de Wet van 11 januari 1993.

De rechtbank verwijst verder naar de zowel door het Openbaar Ministerie als eerste en tweede beklaagde in besluiten gestelde overweging in de parlementaire voorbereidingen betreffende de Wet van 5 april 2007 waarin gesteld werd:

> "*Degene die strafbaar worden gesteld zijn in eerste instantie de verkopers-handelaars, maar ook de kopers-handelaars, die als professioneel immers op de hoogte moeten zijn van het verbod van artikel 10ter, dat voorziet in een algemeen verbod voor alle handelaars.*"

DRC-34996 0449

(

Dat beklaagden van dit verbod op de hoogte waren blijkt eveneens uit hun eigen besluiten. De rechtbank verwijst naar de verklaringen van eerste en tweede beklaagde waaruit blijkt dat er via de firma GOETZ geen edelmetalen werden aangekocht van particulieren maar steeds van personen die verbonden waren aan ondernemingen.

Dit blijkt ook uit de eigen besluiten van eerste en tweede beklaagde (zie randnummer 72 en 73) waarin gesteld wordt dat de klanten van de firma GOETZ weliswaar handelaar waren maar niettemin *"als particulier"* wensten te verkopen.

Het blijkt ook uit de verdere stelling van eerste en tweede beklaagde (zie randnummer 77) dat wanneer deze *"particuliere klanten"* toch als *"handelaar-verkoper"* zouden worden beschouwd, de transacties werden opgesplitst in bedragen onder de 15.000 EURO zodat ook in dat geval het verbod van art. 10*ter* niet van toepassing zou zijn.

In die omstandigheden kan bezwaarlijk worden aanvaard dat eerste en tweede beklaagde niet in kennis konden zijn van het gegeven dat hun handelingen mogelijk strafbaar waren gesteld.

De rechtbank oordeelt het wettigheidsbeginsel in deze dan ook niet geschonden en oordeelt het evenmin noodzakelijk hieromtrent een vraag te stellen bij het Grondwettelijk Hof.

- *Beoordeling in hoofde van de onderscheiden beklaagden*

● *Betreffende eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ*

1. *De tenlastelegging C*

Eerste en tweede beklaagde waren destijds de drijvende krachten achter de firma NV TONY GOETZ. Zij waren verantwoordelijk voor het beheer van deze vennootschap en voor de wijze waarop er zaken werden gedaan.

De rechtbank verwijst naar de resultaten van de telefoontaps en de verklaringen van eerste en tweede beklaagde waaruit blijkt dat zij welbewust en overwogen een systeem in het leven hebben geroepen waarbij op anonieme wijze aanzienlijke hoeveelheden oud goud werden aangekocht en enorme hoeveelheden cash geld in omloop werden gebracht.

DRC-34996 0450

# Exhibit 8 Part 2

| rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen | | p. 52 |
|---|---|---|
| Dossiernr 10A028432 | vleugel D, 8de verdieping | Vonnisnr / |

De rechtbank verwijst naar de gegevens van het strafdossier waaruit blijkt dat er door derde beklaagde NV TONY GOETZ in twee jaar tijd (hetzij de jaren 2010 en 2011) voor meer dan één miljard EURO aan contante aankopen werden verricht.

Onder de tenlastelegging C worden eerste en tweede beklaagde vervolgd voor feiten van valsheid in geschriften.

Beklaagden werpen op dat zij nooit gehandeld hebben teneinde enig fraudesysteem op te zetten.

Uit de inhoud van het strafdossier, doch ook uit de eigen conclusies van eerste en tweede beklaagde, waarover verder meer, blijkt het tegendeel.

Vooreerst staat het vast dat eerste en tweede beklaagde een zeer groot aantal aankooptransacties uitvoerden waarbij *"particuliere"* aankoopborderellen werden opgesteld en deze aankopen ook boekhoudkundig verwerkt werden onder de noemer *"particuliere aankopen"*.

Dat deze documenten niet overeenstemden met de waarheid, blijkt uit de eigen verklaringen van eerste en tweede beklaagde die stelden dat er via de NV TONY GOETZ nooit werd aangekocht van particulieren maar steeds van handelaars in goud.

De stelling van eerste en tweede beklaagde die in besluiten wordt ontwikkeld en waarbij wordt voorgehouden dat handelaars, als particulier, oud goud konden verkopen dat zij nog in persoonlijk bezit hadden, is volstrekt ongeloofwaardig.

De enorme hoeveelheden oud goud, de frequentie van de transacties én het gegeven dat er steeds in contanten moest worden afgerekend, maken het bijzonder ongeloofwaardig om te stellen dat handelaars *"als particulier"* hun persoonlijk oud goud bij de firma van eerste en tweede beklaagde zouden hebben verkocht.

In zijn verhoor van 20 juli 2010, n.a.v. verkopen die werden gedaan door een zekere Ardan ▇▇▇▇▇▇, verklaarde eerste beklaagde dat een handelaar, die verkopen wil verrichten *"als particulier"* het *"aangekochte goud"* wel moest hebben geboekt *"in zijn politieboek."*

Het politieboek is hierbij een administratie instrument dat door inkopers van oud goud wordt gehanteerd om hun verkopers te identificeren en dat consulteerbaar moet zijn door de politiediensten.

DRC-34996 0451

# Exhibit 8 Part 2

Door tweede beklaagde Alain GOETZ werden verder verklaringen voorgelegd, opgesteld op naam van zesde beklaagde ~~waarin~~ waarin deze verklaarde dat al het oud goud dat door deze persoon werd aangeboden, was ingeschreven in zijn *"politieboek"*.

Hieruit blijkt dat eerste en tweede beklaagde heel goed wisten dat handelaars die *"als particulier"* wensten te verkopen geenszins ten persoonlijke titel goud wensten te verkopen maar dit steeds deden in het kader van hun handelsactiviteit.

Door niettemin een systeem te hanteren waarbij professionele handelaars op anonieme basis, en in contanten, handel kunnen drijven, creëerden eerste en tweede beklaagde de basis waarbij zgn. *"verkopen in het zwart"* konden worden uitgevoerd.

Door zowel op de door hen uitgegeven aankoopborderellen als in het boekhoudkundig systeem van NV TONY GOETZ deze aankopen te verwerken als zijnde aankopen van particulieren, hebben eerste en tweede beklaagde zich weldegelijk schuldig gemaakt aan het plegen van valsheden in geschriften.

Dat eerste en tweede beklaagde ten tijde niet wettelijk verplicht waren om hun klanten te identificeren doet hieraan geen afbreuk. Welbewust kozen beklaagden er immers voor om verkopers-handelaars (die volgens eigen verklaring van beklaagden geïdentificeerd werden aan de hand van hun BTW-nummer) te registreren als anonieme particulieren waardoor weldegelijk de waarheid werd vermomd en waarvan eerste en tweede beklaagde zich zeer bewust waren.

Ook het gegeven dat op de *"particuliere"* aankoopborderellen manuele gegevens werden aangebracht die de mogelijke verkopers zouden kunnen identificeren, doet hieraan geen afbreuk. Niet enkel is dit systeem niet waterdicht, vele verkopers (zoals hierna blijkt) betwisten deze identificatie ook en ontkennen de overeenstemmende transacties te hebben verricht.

Dit gegeven wordt trouwens bevestigd door tweede beklaagde in zijn verklaring van 16 april 2012 waarin hij stelt: *"... U kan mij eender welk aankoopborderel overhandigen hetwelk enkel de vermelding "PARTIKULIER" draagt en ik zal u zeggen wie hier achter schuil gaat."*

Wanneer handelaar-verkopers *"schuilgaan"* achter de vermelding *"particulier"* impliceert dit dat hiermee de waarheid wordt verheeld.

Exhibit 8 Part 2

Het is slechts op basis van deze aankoopborderellen, in combinatie met andere onderzoekselementen, zoals de resultaten van de telefoontaps en de betrapping van zesde beklaagde ~~▬▬▬▬▬▬~~ met 500.000 EURO in contanten op zich, dat welbepaalde verkopers konden worden geïdentificeerd.

Buiten het gegeven dat verkoper-handelaars in de kwestieuze aankoopborderellen werden aangeduid als *"particulieren"* staat het vast dat eerste en tweede beklaagde ook systematisch alle aankopen waarbij de uit te betalen geldsom het bedrag van 15.000 EURO oversteeg, opsplitsten in meerdere transacties waarbij meerdere aankoopborderellen werden uitgeschreven voor een bedrag van 15.000 EURO of lager.

Zo verklaarde vierde beklaagde ~~▬▬▬▬▬▬~~ op 21 november 2011 dat één transactie van 50.000 EURO werd opgesplitst in drie transacties van 15.000 EURO en één transactie van 5.000 EURO.

Dat ook hiermede de waarheid werd verdoezeld, blijkt uit de eigen besluiten van eerste en tweede beklaagde. De rechtbank verwijst naar het randnummer 77 waarin eerste en tweede beklaagde aangeven dat transacties van meer dan 15.000 EURO werden opgesplitst in transacties van 15.000 EURO of minder om redenen dat wanneer voornoemde *"particuliere"* verkopers *"door de ene of de andere toezichthoudende instelling"* toch beschouwd zouden worden als een verkoper-handelaar, deze transactie niettemin buiten het toepassing gebied van art. 10*ter* van de Wet van 11 januari 1993 zou vallen.

Tot slot staat het vast dat eerste en tweede beklaagde middels deze *"dienstverlening"* naar hun klanten toe ook persoonlijk gewin nastreefden. In zijn verhoor van 16 april 2012 verklaarde tweede beklaagde Alain GOETZ dat de dagelijkse handel in contanten -- nadat voormeld systeem van *"particuliere"* aankopen was afgeschaft -- was teruggevallen naar een omzet van 300.000 EURO per dag daar waar in het oude systeem tot 3.000.000 EURO per dag, of meer, werd omgezet.

De tenlasteleggingen C. I t/m C. XIV -- behoudens de tenlastelegging C. V. b. 2, zie verder -- zijn dan ook bewezen t.a.v. eerste en tweede beklaagde.

-    *De tenlastelegging G*

Uit hetgeen voorafgaat blijkt duidelijk dat eerste en tweede beklaagde, als professionele aankopers van edele metalen, op de hoogte waren van de verplichtingen, in het kader van de Wet van 11 januari 1993, die rustten op de handelaars-verkopers.

DRC-34996 0453

# Exhibit 8 Part 2

Welbewust ontwikkelden eerste en tweede beklaagde een systeem waardoor handelaars-verkopers deze verplichtingen konden omzeilen.

De rechtbank verwijst hierbij opnieuw naar het systeem van *"particuliere"* verkopen door handelaars-verkopers en de systematische opdeling van verkopen boven het bedrag van 15.000 EURO naar meerdere verkopen onder het bedrag van 15.000 EURO.

Tweede beklaagde Alain GOETZ verklaarde trouwens uitdrukkelijk dat dit systeem in het leven werd geroepen *"om de klant te plezieren".* (zie zijn verhoor van 12 april 2012)

Eerste en tweede beklaagde handelden bijgevolg bewust en met het oogmerk om hun klanten, professionele handelaars-verkopers, toe te laten de beperkingen van de Wet van 11 januari 1993 te omzeilen.

Uit hetgeen volgt (zie de beoordeling inzake zesde t/m vierendertigste beklaagde) zal blijken dat ook de professionele handelaars-verkopers niet onbekend konden zijn met de verplichtingen die op hen rustten ingevolge de Wet van 11 januari 1993.

Nu eerste en tweede beklaagde welbewust meewerkten aan een systeem dat deze handelaar-verkopers toeliet de verplichtingen van de Wet van 11 januari 1993 te omzeilen, dienen zij beschouwd te worden als mededaders aan deze inbreuken.

De tenlastelegging G. I t/m G. XIV (de tenlastelegging G. V. b. heromschreven, zie verder) zijn bewezen t.a.v. eerste en tweede beklaagde.

- *De tenlastelegging D*

Onder de tenlastelegging D. I worden eerste en tweede beklaagde vervolgd voor feiten van witwassen m.b.t. diverse aankopen van edelmetaal, voor een totaal van 8 kg goud, die zij uitvoerden met een zekere ██████████.

In het kader van een ander strafrechtelijk onderzoek werd deze persoon verhoord waarbij hij op 7 juli 2010 verklaarde. (Kaft III, onderkaft 2.8, st. 5)

"...

DRC-34996 0454

*U vraagt mij om opnieuw te verduidelijken hoe ik de aangekochte juwelen van de hand heb gedaan.*

*Na ontvangst van de juwelen en na de stenen te hebben verwijderd, smolt ik het goud en maakte ik een kleine goudstaaf. Met deze goudstaaf ging ik naar Antwerpen, naar de firma GOETZ. Ik heb nooit elders verkocht dan bij deze vennootschap.*

*U deelt mij mee dat u hebt vastgesteld dat ik dit jaar geen verkopen heb geregistreerd bij deze firma.*

*Dat verbaast mij niet. Ik leg u uit hoe dat in zijn werk ging. Wanneer ik naar Antwerpen ging verkocht ik mijn goudstaaf bij de firma GOETZ. Ik moest een papier ondertekenen waarvan ik een kopie ontving. Wat mij betreft, bewaarde ik deze papieren niet. Ik weet niet wat de bestemming was van dit document bij de firma GOETZ. Ik ontving geen andere documenten voor deze transactie. Ik moest deze som registreren in mijn boekhouding maar ik deed het niet gelet op de twijfelachtige herkomst van deze fondsen.*

*..."*

Later zal blijken dat de door de heer ▉▉▉▉ aangekochte juwelen gestolen goederen betroffen (zie het gevoegde vonnis Rb. Luik d.d. 14 november 2011).

De rechtbank verwijst naar hetgeen voorafgaat en oordeelt het irrelevant of eerste en tweede beklaagde nu al dan niet wisten dat het door de heer ▉▉▉▉ aangeboden goud van diefstal afkomstig was.

Ingevolge de door eerste en tweede beklaagde bewust opgezette werkwijze werd de heer ▉▉▉▉ in staat gesteld om goud van twijfelachtige herkomst op anonieme wijze, en buiten iedere boekhoudkundige registratie om, in ruil voor contanten te verkopen.

Slechts ingevolge dit systeem van eerste en tweede beklaagde was de heer ▉▉▉▉ in staat om de illegale herkomst van het goud, en de registratie ervan in zijn boekhouding, te verdoezelen.

Ook in de boekhouding van de firma van eerste en tweede beklaagde werd deze individuele transactie niet geregistreerd nu deze mee opging in de zgn. dagelijkse aankopen van *"particulieren".*

Dat hierdoor ook de boekhouding van de firma GOETZ niet bewijskrachtig was, blijkt uit de voorliggende dossierstukken (Deel II, kaft 2.4, st. 3 – 67) waarbij de firma GOETZ een fiscaal akkoord afsloot m.b.t. de aanslagjaren 2005 t.e.m. 2009 omdat was gebleken dat de boekhouding niet bewijskrachtig was doordat *"de geboekte verrichtingen (...) niet controleerbaar (blijken) te zijn"* en *"het fictieve en willekeurige karakter van de boekingen met betrekking tot de aankopen particulieren"*.

In die omstandigheden oordeelt de rechtbank de tenlastelegging D. I bewezen in hoofde van eerste en tweede beklaagde.

•

Onder de tenlastelegging D. II worden eerste en tweede beklaagde vervolgd voor de aankoop van ong. 1 kg goud van een zekere ███████████ waarbij uit het strafdossier blijkt dat dit goud door de heer ███████ verkregen werd ingevolge een overval op de heer ███████. (zie Deel I, kaft 2.1, st. 5 -132).

De heer ███████ verklaarde hierbij dat de buit door hem werd verkocht bij de firma GOETZ waarbij aan hem geen identiteitsgegevens werden gevraagd, er niets werd geregistreerd en de verkoopprijs, middels drie afzonderlijke transacties, in contanten werd uitbetaald.

Omtrent deze transactie werd ook eerste beklaagde verhoord. (zie deel I, kaft 2.1, st. 21 – 25)

Uit dit verhoor blijkt dat:

- de heer ███████ niet door eerste beklaagde wordt herkend;
- slechts één van de aanwezige personeelsleden de heer (███████ 'meent' te herkennen als zijnde verbonden aan een goudwinkel zonder deze te kunnen specifiëren;
- de heer ███████ mogelijk verbonden is aan de firma ███████;
- in het jaar 2010 geen aankopen van goud werden geregistreerd op naam van de heer ███████ noch op naam van de firma ███████
- op datum van de verkoop, hetzij in de periode van 10 tot 12 maart 2010, talrijke aankoopborderels gericht zijn aan *"Particulier"* voor een hoeveelheid goud van rond de 500 gram zodat het onmogelijk is om de individuele verkoper van dit goud te identificeren.

DRC-34996 0456

Exhibit 8 Part 2

Deze feitelijke elementen tonen perfect de reikwijdte, en het malafide karakter, van het door eerste en tweede beklaagde op poten gezet systeem aan.

In volstrekte anonimiteit, zelfs zonder dat de verkoper door eerste en tweede beklaagde of één van hun werknemers herkend wordt, slaagt een malafide persoon erin om gestolen juwelen bij de firma van eerste en tweede beklaagde te verkopen zonder dat er van deze transactie enig spoor kan worden teruggevonden.

Het kan niet anders dan dat eerste en tweede beklaagde wisten dat hun systeem op dergelijke wijze zou worden gebruikt. Tweede beklaagde verklaarde trouwens zelf dat het systeem werd gehanteerd *"om de klanten te plezieren"*.

In die omstandigheden oordeelt de rechtbank ook de tenlastelegging D. II bewezen in hoofde van eerste en tweede beklaagde.

*

Voor wat betreft de beoordeling van de tenlastelegging D. III t/m D. XVIII verwijst de rechtbank naar de beoordeling van deze feiten in hoofde van de overige medebeklaagden waarbij telkens ook de betrokkenheid van eerste en tweede beklaagde bij deze feiten mee besproken zal worden.

- *De tenlastelegging A*

Onder deze tenlastelegging worden eerste en tweede beklaagde – samen met hun firma, derde beklaagde NV TONY GOETZ – vervolgd nu zij, wetens en willens, als leidend persoon, deel zouden hebben uitgemaakt van een criminele organisatie.

Een criminele organisatie betreft:

- een vereniging van twee of meer personen die in de tijd is opgezet;
- met het onmiddellijke doel, misdaden en wanbedrijven van een zekere ernst te plegen;
- waarbij het criminele karakter van de organisatie getypeerd wordt door de gehanteerde middelen om haar objectieven te bereiken.

Uit hetgeen voorafgaat blijkt dat het door eerste en tweede beklaagde opgezette systeem van anonieme en opgedeelde aankopen van edele metalen weldegelijk kan leiden tot het plegen van misdrijven.

De rechtbank stelt evenwel vast dat de handelingen van eerste en tweede beklaagde, de
aan- en verkoop van edele metalen, op zich een legitieme bedrijfsvoering betreft en het
voormelde systeem van anonieme aankopen op zich niet werd opgezet om het bestaan van
deze transacties te rechtvaardigen. Zo blijkt bijv. dat er via de firma GOETZ ook veelvuldig
legitieme, o.a. via girale betalingen, transacties werden uitgevoerd.

Verder kan uit het voorliggende strafdossier niet worden afgeleid dat het voormelde
systeem door eerste en tweede beklaagde werd ingesteld met het misdadig opzet om
gestolen goederen te kunnen helen.

Evenmin blijkt uit het strafdossier dat het systeem van anonieme aankopen uitsluitend werd
opgericht om aan- en verkopen buiten de boekhouding te kunnen verrichten. Het staat
immers vast dat, minstens een deel van, de aankopen die de firma GOETZ in contanten
uitbetaalde ook daadwerkelijk verwerkt werd in de boekhouding van de firma GOETZ.

In die omstandigheden dient de rechtbank te besluiten dat het bewijs niet geleverd wordt
dat eerste en tweede beklaagde zich schuldig hebben gemaakt aan inbreuken op de
bepalingen van art. 324*bis* en 324*ter* SW zodat zij voor de tenlastelegging A moeten worden
vrijgesproken.

● *Betreffende derde beklaagde NV TONY GOETZ*

Derde beklaagde TONY GOETZ wordt voor dezelfde misdrijven vervolgd als haar
zaakvoerders, m.n. eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ.

Wat hiervoor werd gesteld in hoofde van eerste en tweede beklaagde, geldt eveneens voor
derde beklaagde.

Bijgevolg dient derde beklaagde te worden vrijgesproken voor het haar ten laste gelegde
feit A.

Wat de beoordeling inzake de tenlasteleggingen C, D en G betreft, verwijst de rechtbank
naar hetgeen hiervoor, inzake de beoordeling in hoofde van eerste en tweede beklaagde
werd gesteld, en naar hetgeen hieromtrent verder nog zal worden gesteld.

Eerste en tweede beklaagde zijn de juridische, dan wel feitelijke, leidinggevenden van
derde beklaagde NV TONY GOETZ. Eerste en tweede beklaagde staan beide in voor de
algemene werking binnen derde beklaagde en zijn verantwoordelijk voor het instellen van
voornoemd systeem van anonieme aankopen van edele metalen.

DRC-34996 0458

Derde beklaagde is de vennootschap waarbinnen de bedrijfsactiviteiten worden uitgevoerd.

De strafrechtelijke aansprakelijkheid van de rechtspersoon geldt voor alle misdrijven die gepleegd werden ter verwezenlijking van het doel, ter waarneming van haar belang of voor haar rekening.

Wat deze materiële toerekening betreft, dient vastgesteld te worden dat er enkel sprake kan zijn van een strafrechtelijke aansprakelijkheid indien er een verband bestaat tussen het misdrijf en de rechtspersoon.

Daarnaast is ook voor de rechtspersoon het intentioneel element van het misdrijf een constitutief bestanddeel van het misdrijf.

Wat de materiële toerekening betreft is het in deze duidelijk dat er een intrinsiek verband is tussen de weerhouden misdrijven enerzijds en de verwezenlijking van het doel van de rechtspersoon en de waarneming van de belangen van de rechtspersoon anderzijds.

Het staat vast dat het doel van derde beklaagde, een vennootschap die een commerciële activiteit uitbaat, erop gericht is winst te maken waarbij het gehanteerde malafide systeem van anonieme aankopen erop gericht was handelaars-verkopers die hiervan gebruik wensten te maken aan te trekken waardoor de omzet, en waarschijnlijk ook de winstcijfers, van derde beklaagde stegen.

Wat het intentioneel element van het misdrijf betreft, moet aangetoond worden dat het misdrijf voortkomt uit een opzettelijke beslissing genomen binnen de rechtspersoon of dat er een nalatigheid is op het niveau van de rechtspersoon die in causaal verband staat met het misdrijf.

Het is duidelijk dat er in deze sprake is van zulke nalatigheid die in verband staat met de bewezen geachte feiten vermeld onder de tenlasteleggingen C, D en G aangezien er gedurende een lange periode handelstransacties werden verricht die duidelijk afweken van het normale handelsverkeer – dit zelfs nadat derde beklaagde door de fiscale diensten in kennis was gesteld van het gegeven dat dergelijke werkwijze de bewijskracht van de door haar gevoerde boekhouding ondermijnde – zodat het niet anders kan dan dat er in hoofde van de vennootschap duidelijk sprake was van het gedogen van deze malafide praktijken.

Derde beklaagde heeft inderdaad nagelaten maatregelen te nemen die noodzakelijk waren en van haar konden worden verwacht om het plegen van de misdrijven in haar schoot te voorkomen.

DRC-34996 0459

De strafrechtelijke verantwoordelijkheid van derde beklaagde staat dan ook vast.

De cumulatieve veroordeling van de natuurlijke personen (eerste en tweede beklaagde) en de rechtspersoon (derde beklaagde) is slechts mogelijk wanneer de inbreuken die door de natuurlijke personen gepleegd zijn wetens en willens begaan zijn.

Om na te gaan of er al dan niet een mogelijke cumulatie van de strafrechtelijke aansprakelijkheden is, moet nagegaan worden of de kwestieuze strafbare handeling *in concreto* al dan niet wetens en willens werd gepleegd.

De rechtbank verwijst naar hetgeen hieromtrent voordien reeds werd gesteld. Eerste en tweede beklaagde stelden welbewust een systeem in waarvan zij wisten dat het, minstens gedeeltelijk, door handelaars-verkopers zou worden misbruikt. Zoals tweede beklaagde het stelde, werd dit systeem opgezet *"om de klanten te plezieren"*. Het staat dan ook vast dat eerste en tweede beklaagde de inbreuken wetens en willens pleegden.

Zowel de natuurlijke personen (eerste en tweede beklaagde) als de rechtspersoon (derde beklaagde) dienen dan ook veroordeeld te worden.

De tenlasteleggingen C. I t/m C. XIV – behoudens de tenlastelegging C. V. b. 2, zie verder –, D. I en D. II, en G. I t/m G. XIV – de tenlastelegging G. V. b. zoals heromschreven, zie verder – zijn bewezen in hoofde van derde beklaagde.

Voor de verdere beoordeling inzake de tenlastelegging D in hoofde van derde beklaagde verwijst de rechtbank verder naar hetgeen volgt.

● *Betreffende vierde beklaagde ~~Mandy MERTENS~~ en vijfde beklaagde ~~Omer ANNYS CARNAVIERS~~*

Onder de tenlastelegging B worden vierde beklaagde ~~Mandy MERTENS~~ en vijfde beklaagde ~~Omer ANNYS CARNAVIERS~~ vervolgd voor het wetens en willens deelnemen aan het nemen van welke beslissing dan ook in het raam van de activiteiten van een criminele organisatie.

De rechtbank verwijst naar hetgeen voorheen werd gesteld waaruit blijkt dat in deze het bestaan van een criminele organisatie niet kon worden vastgesteld.

# Exhibit 8 Part 2

Vierde en vijfde beklaagde dienen bijgevolg te worden vrijgesproken voor de feiten van de tenlastelegging B.

In besluiten stellen vierde en vijfde beklaagde verder dat in hun hoofde niet het vereiste deelnemingsopzet kan worden vastgesteld opdat zij schuldig kunnen worden bevonden aan de hen ten laste gelegde feiten C, D en G.

Hieromtrent stelt de rechtbank vast dat het niet betwist wordt dat vierde en vijfde beklaagde werknemers zijn van derde beklaagde NV TONY GOETZ.

Evenmin wordt het betwist dat vierde en vijfde beklaagde, mede, de commerciële handelingen binnen de firma GOETZ afhandelen en daadwerkelijk instaan voor de aankoop van edele metalen en de uitbetaling van de aankoopprijs.

Tot slot staat het vast dat vierde en vijfde beklaagde handelden op instructie van eerste en tweede beklaagde.

Op basis van het strafdossier oordeelt de rechtbank het niet bewezen dat vierde en vijfde beklaagde, buiten iedere gerede twijfel om, wetens en willens hebben gehandeld met het oogmerk om de misdrijven te plegen zoals omschreven onder de tenlasteleggingen C, D en G.

Vooreerst merkt de rechtbank op dat de geviseerde handelingen op zich – de aankoop van edele metalen en de uitbetaling van de aankoopprijs in contanten – geen misdrijf uitmaken.

Verder verwijst de rechtbank naar de technische aard van de gepleegde misdrijven, die hun oorsprong vinden in de bepalingen van de Wet van 11 januari 1993, waarbij eventuele inbreuken op deze bepalingen, zoals blijkt uit hetgeen hieromtrent voorheen reeds werd gesteld en uit het verloop van de regeling van de rechtspleging, geenszins een evidentie vormen.

Tot slot verwijst de rechtbank naar het gegeven dat – in zoverre de tenlasteleggingen zgn. transacties *"buiten de boeken"* viseren – uit niets blijkt dat vierde en vijfde beklaagde ook verantwoordelijk waren voor de boekhoudkundige verwerking van de door hen uitgevoerde aankooptransacties. ⸋

Het gegeven dat vierde en vijfde beklaagde mogelijk de hiërarchische leiding hadden over het team van toogbedienden dat bij de firma GOETZ werkzaam was, wijzigt op zich niets aan het gegeven dat ook vierde en vijfde beklaagde enkel maar handelden op instructie van hun werkgever, waarbij deze handelingen hun schijnbaar regelmatig konden voorkomen.

DRC-34996 0461

Ook het gegeven dat vierde en vijfde beklaagde hebben meegewerkt aan het opstellen van het document *"Client intake and purchase procedure"* impliceert op zich evenmin dat vierde en vijfde beklaagde wetens en willens criminele handelingen hebben gesteld.

Zo staat de bijdrage van vierde en vijfde beklaagde bij het opstellen van dit document geenszins vast – vierde en vijfde beklaagde stellen dat zij enkel de praktische gang van zaken hebben aangegeven, hetgeen op zich niet ongeloofwaardig is – daarenboven blijkt het document slechts te zijn opgesteld in de loop van het jaar 2010 (tijdstip van de thans meest geviseerde transacties) en volgens tweede beklaagde Alain GOETZ (zie zijn verhoor 16 april 2012) werden de erin vervatte richtlijnen slechts toegepast vanaf het begin 2011 (tijdstip waarop de thans gehanteerde incriminatieperiode teneinde loopt).

Tot slot blijkt uit de elementen van het strafdossier dat welbepaalde aankopen, voornamelijk van zgn. grote klanten, persoonlijk door eerste en/of tweede beklaagde werden afgehandeld waarbij de tussenkomst van vierde en vijfde beklaagde per definitie uitgesloten werd.

In die omstandigheden kan niet met afdoende zekerheid worden vastgesteld dat vierde en vijfde beklaagde, bij de uitvoering van hun werkzaamheden binnen de firma GOETZ, niet ter goeder trouw zouden hebben gehandeld zodat zij dienen te worden vrijgesproken voor de hen ten laste gelegde feiten C, D en G.

- Betreffende zesde beklaagde ~~Alexander TIGHLER~~, tweeëndertigste beklaagde ~~Aaron FRIEDMAN~~, drieëndertigste beklaagde ~~Chaim SCHEER~~ en vierendertigste beklaagde ~~Jacob FRIEDMAN~~

   o **Zesde beklaagde**

Zesde beklaagde ~~Alexander TIGHLER~~ is geen onbekende in het Joodse juweliersgebeuren in Antwerpen en erkende te zijn opgetreden als koerier waarbij hij namens het Antwerpse juweliersbedrijf ~~~~, en naar eigen zeggen ook voor particuliere klanten, oud goud en edele metalen verkocht aan de firma GOETZ.

In het kader van de telefoontap op de lijnen van de firma GOETZ werd er vastgesteld dat er door zesde beklaagde meerdere telefoongesprekken werden gevoerd met medewerkers van de firma GOETZ betreffende de verkoop van oud goud.

Op 22 juni 2011 werd zesde beklaagde aan een controle onderworpen, en dit onmiddellijk nadat hij de kantoren van de firma GOETZ had verlaten. Hierbij werd op zesde beklaagde meer dan 500.000 EURO in contanten aangetroffen alsmede vijf zilverstaven van 1 kg.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen    p. 64
Dossiernr: 10A028492    vleugel D, 3de verdieping    Vonnisnr /

Bij verhoor stelde zesde beklaagde dat de som van 500.000 EURO afkomstig was uit de verkoop van twee kg fijn goud, vier kg gouden munten en tien kg oud goud.

Bij nazicht – onder meer via verhoor van eerste en tweede beklaagde en op basis van de summiere boekhoudkundige stukken die nog aanwezig waren – blijkt dat zesde beklaagde een frequent bezoeker was van de firma GOETZ en oud goud kwam verkopen.

In besluiten erkent zesde beklaagde dat hij geenszins als particulier verkopen heeft verricht aan de firma GOETZ ook al werden deze als zodanig administratief verwerkt bij diverse transacties.

Ook bij zesde beklaagde zelf waren er geen administratieve sporen terug te vinden van de door hem uitgevoerde verkopen van edele metalen aan de firma GOETZ. In zijn verhoor op 23 juni 2011 stelde zesde beklaagde: "... Als ik het goud ophaal om naar de NV TONY GOETZ te brengen, worden er geen documenten opgemaakt. ..."

Dit systeem leidt ertoe dat er geenszins een waterdichte controle bestaat, noch omtrent de hoeveelheid goud die door zesde beklaagde werd verkocht bij de firma GOETZ, noch omtrent de personen voor wie zesde beklaagde deze verkopen uitvoerde.

In besluiten erkent zesde beklaagde dat dit geen normale werkwijze kan zijn.

Onder de tenlastelegging C. II wordt zesde beklaagde vervolgd voor feiten van valsheid in geschriften waarbij telkenmale de verkoop van edele metalen namens de firma ▓▓▓▓▓▓ werd opgesplitst in transacties onder de som van 15.000 EURO zodat deze in contanten vereffend kon worden.

Het betreffen transacties waarbij beklaagde telkenmale (op niet minder dan 46 dagen) aanzienlijke hoeveelheden (veelal meerdere kilo's) oud goud aanbood bij de firma GOETZ en dit uitdrukkelijk namens de firma ▓▓▓▓▓▓.

In besluiten betwist beklaagde deze tenlastelegging niet.

De rechtbank verwijst naar hetgeen voorheen reeds werd gezegd omtrent het door eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ opgezette systeem van anonieme verkopen en de mogelijkheid om transacties boven de 15.000 EURO om te zetten naar transacties onder de 15.000 EURO om betalingen in contanten mogelijk te maken, en oordeelt de tenlastelegging C. II bewezen in hoofde van zesde beklaagde.

DRC-34996 0463

Onder de tenlastelegging C, V. a wordt zesde beklaagde bijkomend vervolgd voor het laten opstellen van aankoopborderellen bij de firma NV GOETZ voor in totaal 923 kg goud.

Het betreft aankoopborderellen die door zesde beklaagde bij de firma NV GOETZ zouden zijn opgesteld waarbij zesde beklaagde in persoonlijke naam goud zou hebben verkocht.

In eerste instantie stelt de rechtbank vast dat de voorgehouden aankoopborderellen zelf niet konden worden teruggevonden.

De tenlastelegging steunt op andere documenten, zgn. werkbonnen, waarop de afkorting "FRIEDM" of "FRIED" werd aangebracht.

Wanneer oud goud bij de firma GOETZ werd binnengebracht werd dit eerst omgesmolten tot goudstaven. Hiervoor werd een werkbon opgesteld. De goudstaaf werd vervolgens door de firma GOETZ aan de verkoper overhandigd die vervolgens de keuze had om de kostprijs voor het smelten te betalen en de goudstaaf bij zich te houden, dan wel de goudstaaf aan de firma GOETZ te verkopen. Hiervoor werden dan één of meerdere aankoopborderellen opgesteld.

Het wordt niet betwist dat zesde beklaagde in het Antwerpse juweliersmilieu gekend is onder de naam ~~zkenmeier FRIEDMANN~~ Zesde beklaagde is immers de schoonzoon van vierendertigste beklaagde ~~Ruben FRIEDMANN~~ een gekend juwelier te Antwerpen en de neef van tweeëndertigste beklaagde ~~Mozes FRIEDMANN~~

Zesde beklaagde werd verder door zowel eerste beklaagde Sylvain GOETZ als door tweede beklaagde Alain GOETZ aangeduid als de persoon die schuilgaat achter de afkortingen "FRIEDM" of "FRIED" die door de firma GOETZ werden opgesteld.

Dat eerste en tweede beklaagde zich hierin niet vergissen, volgt verder uit de eigen verklaringen van zesde beklaagde die stelde dat hij een goede werkrelatie had met de firma GOETZ, deze firma veelvuldig bezocht en waarbij hem een gunstregime werd toegekend waardoor hij lange wachttijden ter plaatse kon vermijden.

Kort na het aantreffen van zesde beklaagde op 22 juni 2011 bespreken de verbalisanten de activiteiten van zesde beklaagde met eerste en tweede beklaagde. Hierbij worden aan de verbalisanten een aantal werkbonnen overhandigd (zie DEEL ~~VIERDUIM~~ kaft 6, st. 6) waaruit blijkt dat er in de periode 01.05.2011 tot 24.06.2011 niet minder dan 21 werkbonnen werden opgesteld met de vermelding "FRIEDM" of "FRIED" voor een totaal van 267,50 kg goud.

BIJ huiszoeking op de firma GOETZ wordt verder een zwarte kaft aangetroffen (DEEL VIII,
kaft 15, st. 26) met werkbonnen met vermelding *"FRIEDM"* waaruit blijkt dat in de periode
01.01.2011 tot 30.04.2011 voor in totaal 656 kg goud werd verkregen uit het oud goud dat
werd binnengebracht.

Op basis van hetgeen voorafgaat oordeelt de rechtbank het bewezen dat zesde beklaagde in
de periode van 01.01.2011 tot 24.06.2011 voor in totaal 923 kg oud goud bij de firma GOETZ
heeft aangeboden met het oog op zgn. affinage, hetzij omsmelting in goudstaven.

Uit de verklaring van tweede beklaagde Alain GOETZ op 22.06.2011 blijkt echter evenzeer
dat het alzo omgesmolten goud niet integraal door zesde beklaagde aan de firma GOETZ
werd verkocht. Tweede beklaagde geeft duidelijk aan dat het goud gedeeltelijk ook aan
andere goudhandelaars werd verkocht.

Bijgevolg staat het niet vast dat er door de firma GOETZ ook voor in totaal 923 kg goud aan
aankoopborderellen zouden zijn opgesteld.

In zijn diverse politionele verhoren stelde zesde beklaagde dat hij gedurende vijfentwintig
weken, wekelijks voor 20 à 22 kg goud bij de firma GOETZ zou hebben verkocht. Zesde
beklaagde stelt verder dat hij hierbij een "commissie" kreeg van 10 à 20 EURO per verkochte
kg goud en in totaal een 8.000 EURO's aan "commissies" verwierf.

Op basis van de eigen verklaringen van zesde beklaagde ████████ ████████ mag er bijgevolg
van worden uitgegaan dat door hem voor minstens 500 kg goud bij de firma GOETZ werd
verkocht waarbij overeenkomstige aankoopborderellen werden opgesteld.

De tenlastelegging C. V. a is bijgevolg bewezen in hoofde van zesde beklaagde mits volgende
heromschrijving: *"Niet nader te bepalen aankoopborderellen en gerelateerde stukken voor
een niet nader bepaald totaalbedrag, met betrekking tot de aankoop van in totaal 500 kg
goud."*

Onder de tenlastelegging D. V wordt zesde beklaagde verder vervolgd voor het witwassen
van een hoeveelheid goud van 923 kg met een geschatte waarde van 28.613.000 EURO.

Uit de eigen verklaringen van zesde beklaagde blijkt dat hij op geen enkele wijze de
herkomst van de door hem verkregen partijen oud goud kan aantonen. Gelet op de omvang
van de hoeveelheid aangeboden goud, de frequentie van de bezoeken van zesde beklaagde
aan de firma GOETZ (tot twee- à driemaal per week) en het feit dat zesde beklaagde
duidelijk professioneel actief was, oordeelt de rechtbank het ongeloofwaardig dat het door

zesde beklaagde aangeboden goud effectief afkomstig was van particuliere verkopers.

Het door zesde beklaagde aangeboden goud was duidelijk afkomstig uit het professionele handelscircuit waarbij ingevolge het anonieme karakter van de verwerving van dit oud goud door zesde beklaagde, het anonieme karakter van de verkoop ervan bij de firma GOETZ en de afrekening in contanten van de diverse transacties, het niet anders kan dan dat deze verkopen kaderen in de zgn. transacties "buiten de boekhouding".

Zelfs wanneer aanvaard wordt dat het goud afkomstig is van niet aangegeven erfenissen, zoals zesde beklaagde zelf aangeeft in conclusies, staat het vast dat met deze transacties op onrechtmatige wijze successierechten worden ontdoken.

De tenlastelegging D. V is bijgevolg bewezen in hoofde van zesde beklaagde mits aanpassing van de tenlastelegging – in navolging van hetgeen werd gesteld omtrent de tenlastelegging C. V. a – als volgt: "een totale hoeveelheid van minstens 500 kg goud voor een niet nader bepaald totaal bedrag, doch geraamd op minstens 15.500.000 EUR, zoals omschreven onder de tenlastelegging C. V. a".

De tenlastelegging D. V (zoals heromschreven) is eveneens bewezen in hoofde van eerste, tweede en derde beklaagde.

Het is voor de rechtbank duidelijk dat eerste, tweede en derde beklaagde zich niet kunnen beroepen op onwetendheid, noch op enige goede trouw; wanneer dergelijke hoeveelheden oud goud aankopen van een – voor hen gekende professionele handelaar in oud goud – maar niettemin stellen dat het "particulieren" verkopen betreffen die in contanten vereffend kunnen worden en waarbij geen enkel spoor van de oorsprong van het aangekochte goud, noch van de bestemming van de uitbetaalde contante gelden, kan worden achterhaald.

Eerste, tweede en derde beklaagde verleenden hierbij onmiskenbaar de noodzakelijke faciliteiten om zesde beklaagde toe te laten om op een onregelmatige wijze grote hoeveelheden edele metalen te verhandelen.

Onder de tenlastelegging F wordt zesde beklaagde vervolgd voor inbreuken op de wetgeving tot beteugeling van sluikwerk door in strijd met de wettelijke bepalingen ter zake verrichtingen te hebben gesteld inzake handel in edele metalen.

Onder de tenlastelegging H wordt zesde beklaagde vervolgd voor inbreuken op de Wet tot oprichting van een Kruispuntbank door als persoon gehouden tot inschrijving in het

# Exhibit 8 Part 2

handelsregister deze inschrijving niet te hebben aangevraagd en niettemin als handelaar te zijn opgetreden.

De rechtbank verwijst naar hetgeen hiervoor gesteld werd omtrent de aard, omvang en het professionele karakter van de door zesde beklaagde gestelde handelingen. Vast staat dat zesde beklaagde zich hiertoe niet administratief in orde heeft gesteld.

De tenlasteleggingen F en H worden door zesde beklaagde niet ernstig betwist en de rechtbank oordeelt deze bewezen in zijnen hoofde.

Onder de tenlasteleggingen G. II en G. V. a wordt zesde beklaagde vervolgd voor inbreuken op de bepalingen van de Wet van 11 januari 1993.

Nu zesde beklaagde in de geviseerde incriminatieperiode duidelijk een professionele verkoper-handelaar in edele metalen was, valt hij onder het toepassingsgebied van de Wet van 11 januari 1993.

Als professionele verkoper kon zesde beklaagde van deze bepalingen niet onwetend zijn.

Het kan dan ook niet anders dan dat zesde beklaagde bewust gebruik heeft gemaakt van het door de firma GOETZ aangeboden systeem om de verplichting van deze wetgeving naast zich neer te leggen.

De tenlasteleggingen G. II en G. V. a zijn dan ook bewezen.

o *Tweeëndertigste en drieëndertigste beklaagde*

Tweeëndertigste beklaagde ~~ffffffffff~~ en drieëndertigste beklaagde ~~ffffffffff~~ worden – samen met zesde beklaagde ~~ffffffffff~~ – vervolgd voor inbreuken op de Wet van 11 januari 1993 (tenl. G) en feiten van valsheid in geschrifte (tenl. C).

Tweeëndertigste en drieëndertigste beklaagde zijn juridisch en/of feitelijk zaakvoerder van de firma's ~~ffffffffff~~ en ~~ffffffffff~~.

Het wordt niet betwist dat tweeëndertigste en drieëndertigste beklaagde beroep hebben gedaan op zesde beklaagde om het door hen aangekochte oud goud te laten omsmelten en verkopen bij de firma GOETZ.

DRC-34996 0467

# Exhibit 8 Part 2

In eerste instantie stelt de rechtbank vast dat er geen enkele documentatie voorhanden is waaruit kan blijken welke hoeveelheden oud goud door tweeëndertigste en drieëndertigste beklaagde aan zesde beklaagde werden overhandigd voor verkoop bij de firma GOETZ.

In zoverre de teruggevonden aankoopborderellen en aanverwante stukken bij de firma GOETZ op naam van ~~GOLD & OUD~~ en ~~GOUD IS GELD~~ overeenstemmen met de boekhoudkundige gegevens van deze firma's, bevestigen tweeëndertigste en drieëndertigste beklaagde dat dit goud betreft dat zij aan zesde beklaagde hadden overhandigd voor de verkoop ervan.

In zoverre de documenten van de firma GOETZ niet overeenstemmen met de boekhoudkundige gegevens van ~~GOLD & OUD en GOUD IS GELD~~ stellen tweeëndertigste en drieëndertigste beklaagde dat de naam van hun firma's door zesde beklaagde zou zijn misbruikt. Het betreft hierbij een hoeveelheid geaffineerd fijn goud van in totaal 12,79 kg.

Enige controle van deze beweringen is eenvoudigweg niet mogelijk bij gebreke aan stukken hiertoe.

Vast staat wel dat tweeëndertigste en drieëndertigste, via zesde beklaagde, in de periode van 04.01.2010 tot 31.12.2010 voor meer dan 3 miljoen EURO aan oud goud aan de firma GOETZ hebben verkocht.

De diverse transacties worden aangeduid in de tenlastelegging C. II waaruit blijkt dat er dagelijks meerdere kilo's goud werden verkocht waarbij de transacties gebeurden via opgesplitste aankoopborderellen – allen bedragen onder de 15.000 EURO – zodat deze aankopen cash konden worden betaald.

De stelling van tweeëndertigste en drieëndertigste beklaagde dat het meerdere verkopen per dag betreffen van verscheidene partijen aangeboden oud goud wordt ontkracht door de opeenvolgende nummering van de aankoopborderellen.

Tweeëndertigste en drieëndertigste beklaagde argumenteren verder dat zij er geen belang bij hadden dat de door hen verkochte partijen oud goud werden opgesplitst in verschillende aankopen onder de 15.000 EURO, dat dit gebeurde op initiatief van de firma GOETZ en dat zij gedwongen waren om hieraan mee te werken omdat de firma GOETZ in Antwerpen en in de ruime omgeving de enige goudsmelter was waar zij terecht konden.

Exhibit 8 Part 2

De rechtbank stelt vast dat tweeëndertigste en drieëndertigste beklaagde professionele handelaar-verkopers van oud goud zijn. De op hen rustende verplichtingen ingevolge de Wet van 11 januari 1993 konden hun dan ook niet onbekend zijn.

Niettemin staat het vast dat tweeëndertigste en drieëndertigste beklaagde deze verplichtingen schonden en geruime tijd, via zesde beklaagde, partijen oud goud hebben verkocht, met te vereffenen bedragen ver boven de 15.000 EURO, waarbij de bepalingen van de Wet van 11 januari 1993 systematisch werden miskend.

Dat tweeëndertigste en drieëndertigste beklaagde hiertoe verplicht werden door de firma GOETZ, oordeelt de rechtbank ongeloofwaardig.

Dat tweeëndertigste en drieëndertigste beklaagde ook beroep konden doen op andere goudsmelters blijkt uit hun eigen verklaringen waarin zij aangeven sinds maart 2011 samen te werken met een andere goudsmelter, m.n. de firma ███████.

Verder blijkt uit hetgeen voorafgaat dat het systeem van opgesplitste aankoopborderellen enkel werd gehanteerd wanneer de klant een uitbetaling in contanten wenste. Tweeëndertigste en drieëndertigste beklaagde hadden ook kunnen opteren voor een girale vereffening van de door hen aangeboden transacties waarbij er nooit enige opdeling van aankoopborderellen zou zijn gebeurd.

Tweeëndertigste en drieëndertigste beklaagde streefden echter duidelijk een contante betaling na bij de verkoop van het door hen aangeboden oud goud waardoor welbewust de bepalingen van de Wet van 11 januari 1993 geschonden dienen te worden en er welbewust werd geparticipeerd in het systeem dat hiertoe door de firma GOETZ werd aangeboden.

De tenlasteleggingen C. II en G. II zijn dan ook bewezen in hoofde van tweeëndertigste en drieëndertigste beklaagde.

     o  Vierendertigste beklaagde

Vierendertigste beklaagde ███████████ is de schoonvader van zesde beklaagde.

Vierendertigste beklaagde was eveneens aanwezig op 22 juni 2011 toen de verbalisanten zesde beklaagde, aan de woning van vierendertigste beklaagde, aan een controle onderwierpen en op hem een som van 500.000 EURO aantroffen.

# Exhibit 8 Part 2

Op afgeluisterde telefoongesprekken werd tevens vastgesteld dat er tussen zesde en vierendertigste beklaagde gesprekken werden gevoerd die betrekking hadden op transacties van oud goud bij de firma GOETZ.

Vierendertigste beklaagde wordt, samen met zesde beklaagde, vervolgd voor inbreuken op de sluikwetgeving en de registratie van handelaars zoals omschreven onder de tenlasteleggingen F en H.

Uit de voorliggende elementen van het strafdossier blijkt dat vierendertigste beklaagde mogelijk voor zijn schoonzoon wat hand- en spandiensten verleende maar het gegeven dat hij samenwerkte met zesde beklaagde en eveneens, zonder hiertoe de noodzakelijke administratieve verplichtingen te hebben vervuld, is opgetreden als professioneel verkoper-handelaar blijkt niet afdoende uit de elementen van het strafdossier.

Bijgevolg dient vierendertigste beklaagde te worden vrijgesproken voor de tenlasteleggingen F en H.

- ● *Betreffende zevende beklaagde* ████████████O, *achtste beklaagde* ████ ██ ████████ *en negende beklaagde* ████████

Op 17 juni 2010 verkoopt zevende beklaagde ███████D, via twee transacties, bij de firma GOETZ een partij goud van 31,4 kg waarbij hem door de firma GOETZ een bedrag van 1.000.400 EURO wordt uitbetaald in contanten.

Bij nazicht blijkt de door zevende beklaagde aangeboden partij goud van diefstal afkomstig te zijn. Zevende, achtste en negende beklaagde werden hiervoor bij arrest van 17.02.2015 (na verzet bij arrest van 08.09.2015 in hoofde van negende beklaagde) reeds veroordeeld.

Na onderzoek blijkt dat:

- · voormelde verkoop niet geïdentificeerd kan worden in de boekhoudkundige stukken van de firma GOETZ;

- · · de uitbetaling van de verkoopprijs gebeurde aan de hand van niet minder dan 66 aankoopborderellen van minder dan 15.000 EURO;

- · er bij de firma GOETZ een zgn. identificatiefiche wordt aangetroffen op naam van zevende beklaagde (████████ waarbij deze gekoppeld wordt aan de juwelierszaak ████████;

- · deze identificatiefiche waarschijnlijk werd opgesteld op de dag van de transactie zelf.

Exhibit 8 Part 2

Thans worden zevende, achtste en negende beklaagde – samen met eerste t/m vijfde beklaagde – onder de tenlastelegging D. IV vervolgd voor feiten van witwassen van deze partij goud.

Uit het voorliggende arrest van het hof van beroep te Luik d.d. 17.02.2015 (DEEL XIV, st. 416) blijkt dat achtste en negende beklaagde veroordeeld werden voor de diefstal van de verkochte partij goud en zevende beklaagde voor de heling ervan.

Zevende beklaagde, die bijgevolg reeds voor feiten van heling van het gestolen goud werd veroordeeld, kan thans niet meer voor dezelfde feiten vervolgd worden zodat de rechtbank op basis van het adagium *"ne bis in idem"* het verval van de strafvordering m.b.t. de tenlastelegging D. IV in hoofde van zevende beklaagde dient vast te stellen.

Wat achtste en negende beklaagde betreft, stelt de rechtbank vast dat zij door het hof van beroep te Luik geenszins veroordeeld werden voor feiten van witwassen.

Nu achtste en negende beklaagde in de voorliggende arresten van het hof van beroep te Luik niet veroordeeld werden voor de heling van voorhoemde partij goud en art. 505 SW uitdrukkelijk bepaalt dat het zgn. tweede en derde witwasmisdrijf (waarvoor achtste en negende beklaagde thans vervolgd worden) ook gepleegd kan worden door de daders van het basismisdrijf, kan de rechtbank in hoofde van achtste en negende beklaagde het verval van de strafvordering niet vaststellen.

De tenlastelegging D. IV is bewezen in hoofde van achtste en negende beklaagde nu vast staat dat zij het door hen gestolen goud door zevende beklaagde hebben laten verkopen bij de firma GOETZ zoals hiervoor omschreven.

Uit de elementen van het strafdossier blijkt dat de feiten waarvoor achtste en negende beklaagde thans vervolgd worden de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor zij reeds veroordeeld werden bij de in kracht van gewijsde gegane arresten van het hof van beroep te Luik d.d. 17.02.2015 en 08.09.2015 waardoor er met de reeds uitgesproken straffen dient rekening te worden gehouden.

De rechtbank zal in hoofde van achtste en negende beklaagde dan ook toepassing maken van art. 65, tweede lid, SW.

Op basis van de gegevens van het strafdossier blijkt dat zevende, achtste en negende beklaagde zonder enig probleem, zonder enige formele identificatie en zonder dat er enig

Exhibit 8 Part 2

spoor van de transactie bleef bestaan, het gestolen goud konden verkopen bij de firma GOETZ en betaling in contanten konden ontvangen, en dit ingevolge het door eerste, tweede en derde beklaagde opgezette malafide systeem dat hiervoor reeds besproken werd.

Het is voor de rechtbank duidelijk dat eerste, tweede en derde beklaagde zich niet kunnen beroepen op onwetendheid, noch op enige goede trouw, wanneer zij van een hun onbekende verkoper-handelaar een zeer grote hoeveelheid goud aankopen, hiervoor meer dan 1 miljoen EURO in contanten uitbetalen en deze aankoop dienen op te splitsen in meer dan 60 afzonderlijke transacties teneinde de wettelijke verplichtingen te omzeilen.

Eerste, tweede en derde beklaagde verleenden hierbij onmiskenbaar de noodzakelijke faciliteiten om zevende, achtste en negende beklaagde toe te laten de vruchten van hun misdadig handelen om te zetten in een praktisch bruikbaar illegaal vermogen.

De tenlastelegging D. IV is bijgevolg eveneens bewezen t.a.v. eerste, tweede en derde beklaagde.

● *Betreffende tiende beklaagde S███████████████*

Bij nazicht van de aankoopborderellen bij de firma GOETZ voor de jaren 2010 en 2011 werd vastgesteld dat, aan de hand van een zgn. manuele identificatie, 528 afzonderlijke transacties aan tiende beklaagde konden worden toegeschreven.

Tiende beklaagde is gevestigd te Spanje waar hij een juwelierszaak uitbaat, genaamd "███████████████".

Er werd vastgesteld dat er ook 33 transacties plaatsvonden op naam van de firma ████████████████".

De verbalisanten stellen hierbij vast dat de verkopen van edele metalen op naam van de firma "████████████" (voor een bedrag van 1.803.423,57 EURO), hoofdzakelijk werden betaald via bankoverschrijving. De verkopen van edele metalen op naam van tiende beklaagde zelf (voor een bedrag van 7.390.985,33 EURO) werden hoofdzakelijk in contanten vereffend.

In het kader van een rogatoire opdracht in Spanje weigert tiende beklaagde een verklaring af te leggen. Bij huiszoeking worden nog bijkomende aankoopborderellen, afkomstig van de firma GOETZ, aangetroffen.

Bij bankonderzoek kunnen geen stortingen in contanten (gelet op de aanzienlijke verkopen in contanten van tiende beklaagde bij de firma GOETZ) worden aangetroffen.

In de boekhouding van de firma ████████████████" kunnen de verbalisanten slechts 5 facturen aantreffen waarbij deze vennootschap goud inkocht en dit voor een bedrag van 84.566 EURO.

Tot slot ontvangen de verbalisanten melding van de Spaanse autoriteiten dat tiende beklaagde op 25.03.2011 in Spanje werd aangetroffen in het bezit van een contante geldsom van 457.300 EURO, klaarblijkelijk de som die hem werd uitbetaald voor verkoop van goud bij de firma GOETZ.

Tiende beklaagde had bij binnenkomst in Spanje het bezit van deze fondsen niet aangegeven en de door tiende beklaagde voorgebrachte stukken m.b.t. de herkomst van deze fondsen werd door de Spaanse autoriteiten niet aanvaard. Aan tiende beklaagde zou hiervoor een boete zijn opgelegd van 238.310 EURO.

Uit dit alles volgt dat de verkopen die tiende beklaagde uitvoerde bij de firma GOETZ als zgn. *"particuliere"* klant geenszins particuliere verkopen kunnen betreffen, enerzijds gelet op de omvang ervan, en anderzijds kunnen deze verkopen geen regulier karakter hebben gehad nu ze geenszins werden verwerkt in de reguliere bedrijfsvoering van de firma "S████████ ████████".

Bij gebreke aan enige aanvaardbare legale herkomst van het door tiende beklaagde aangeboden goud, oordeelt de rechtbank de tenlasteleggingen C. I en C. IV, D. III, G. I en G. IV bewezen in hoofde van tiende beklaagde.

Eerste t/m derde beklaagde konden niet onwetend zijn van het malafide karakter van deze zgn. *"particuliere"* verkopen die door tiende beklaagde werden uitgevoerd. Eerste, tweede en derde beklaagde wisten immers dat tiende beklaagde verbonden was aan de firma '████████████████' zodat de aanzienlijke hoeveelheden goud die tiende beklaagde anoniem verkocht als *"particuliere"* verkoper geenszins enige legale herkomst konden hebben.

Nu eerste t/m derde beklaagde niettemin bewust dit systeem opzetten en tiende beklaagde in de mogelijkheid stelden om anoniem en via contante betaling aanzienlijke hoeveelheden goud te verkopen, is de tenlastelegging D. III eveneens bewezen in hoofde van eerste t/m derde beklaagde.

DRC-34996 0473

# Exhibit 8 Part 2

● *Betreffende elfde beklaagde C███████████████████n en twaalfde beklaagde J███████████████████*

Het onderzoek naar de aankoopborderellen bij de firma GOETZ bracht aan het licht dat 642 aankoopborderellen verwezen naar een Spaanse vennootschap, de firma "███████████████ ██" waarbij deze vennootschap voor een totaalbedrag van 12.949.220,54 EURO oud goud aan de firma GOETZ had verkocht waarbij slechts een bedrag van 3.583.671,59 EURO via de bank zou zijn overgeschreven en het restant, via het systeem van *"particuliere verkopen"* in contanten zou zijn uitbetaald.

In het kader van een ambtelijke opdracht in Spanje worden elfde en twaalfde beklaagde bevraagd waarbij elfde beklaagde stelt – binnen twee vennootschapsstructuren en achttien goudwinkels – voornamelijk oud goud in te kopen en twaalfde beklaagde aangeeft – vooral via de firma GOETZ – het goud te verkopen.

Twaalfde beklaagde stelt hierbij niet over een boekhouding te beschikken m.b.t. de verkopen die in contanten werden uitbetaald. Tot tweemaal toe werd twaalfde beklaagde op de luchthaven van Rotterdam aangetroffen met aanzienlijke bedragen in contanten (respectievelijk 228.400 EURO en 370.000 EURO) die niet waren aangegeven voor overbrenging.

De Spaanse autoriteiten geven aan dat uit het gevoerde onderzoek blijkt dat elfde en twaalfde beklaagde een deel van hun handelsactiviteiten buiten de controle van de Schatkist hebben ontplooid om zo de betaling van belasting te ontduiken. Enkel de bedragen die via de bank worden overgeschreven zouden geregistreerd worden. Het grootste deel van de verkopen gebeurde evenwel in contanten.

Hieruit volgt dat elfde en twaalfde beklaagde weldegelijk gebruik hebben gemaakt van het door eerste t/m derde beklaagde opgezette systeem om aan- en verkopen van oud goud te kunnen verrichten buiten de reguliere boekhouding om.

Elfde en twaalfde beklaagde pleegden hierbij bewust valsheid in geschriften (tenl. C. VI), miskenden de bepalingen van de witwaswetgeving (tenl. G. VI) en maakte zich schuldig aan feiten van witwassen (tenl. D. X).

Ook eerste t/m derde beklaagde konden hiervan niet onwetend zijn. Het door elfde en twaalfde beklaagde aangeboden oud goud werd immers aangeboden namens een Spaanse vennootschap (conform de manuele identificatie op de diverse aankoopborderellen) maar werd slechts gedeeltelijk betaald via bankoverschrijving en verder via (anonieme) betaling in contanten.

# Exhibit 8 Part 2

De enige plausibele reden hiertoe was om deze verkoop buiten de boekhouding van de
vennootschap te laten. Ook eerste t/m derde beklaagde konden hier niet onwetend van zijn
maar verleenden niettemin bewust hun medewerking hieraan.

De tenlastelegging D. X is eveneens bewezen in hoofde van eerste t/m derde beklaagde.

● *Betreffende dertiende beklaagde* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dertiende beklaagde blijkt verbonden te zijn met de Duitse vennootschap ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮.

In het kader van een buitenlandse opdracht wordt er een huiszoeking uitgevoerd op de
maatschappelijke zetel van deze vennootschap. Hierbij worden documenten aangetroffen
die wijzen op verkopen bij de firma GOETZ voor een totaalbedrag van 1.761.741,57 EURO
die via banktransacties werden vereffend.

In de boekhouding van de firma GOETZ worden bijkomende aankoopborderellen
aangetroffen, die niet konden worden teruggevonden bij de firma ▮▮▮, voor bijkomende
verkopen bij de firma GOETZ – hetzij *"particuliere"* verkopen op naam van *"Berkan"* – voor
een totaalbedrag van 6.497.650,06 EURO.

Bij verhoor wenste dertiende beklaagde voor deze vaststelling geen verklaringen af te
leggen. Evenmin wenste dertiende beklaagde verklaringen af te leggen omtrent de
vaststelling – op basis van de telefoontap – dat dertiende beklaagde zgn. verkopen in
contanten bij de firma GOETZ had gereserveerd. Tot slot wilde dertiende beklaagde ook niet
toelichten hoe dergelijke reservaties boekhoudkundig werden verwerkt.

Dertiende beklaagde ontkende trouwens de aankoopborderellen met vermelding *"Berkan"*
ooit te hebben gezien.

Opnieuw wordt duidelijk dat eerste t/m derde beklaagde een systeem hebben opgezet dat
derden, verkopers-handelaars in edele metalen, toeliet zgn. verkopen *"buiten de
boekhouding"* uit te voeren en dat hiervan intensief gebruik werd gemaakt.

De verkopen die door dertiende beklaagde op naam van zijn firma worden gemaakt, en die
via bankoverschrijving worden vereffend, zijn allen terug te vinden in de administratie van
de firma ▮▮▮.

De verkopen die door dezelfde dertiende beklaagde worden uitgevoerd, zgn. in zijn
particuliere hoedanigheid, worden met omzeiling van de vigerende bepalingen in contanten
uitbetaald, worden niet opgenomen in de boekhouding van ▇▇ en wanneer dertiende
beklaagde met deze transacties wordt geconfronteerd, ontkent hij flagrant hierbij betrokken
te zijn geweest.

Zowel dertiende beklaagde, als eerste t/m derde beklaagde, handelden hierbij met kennis
van zaken zodat de tenlasteleggingen C. X, D. XIV en G. X in hunnen hoofde bewezen zijn.

- *Betreffende veertiende beklaagde* ▇▇▇▇▇▇*en vijftiende beklaagde* ▇▇▇▇
  ▇▇▇▇ "

Veertiende en vijftiende beklaagde zijn broers van Irakese afkomst.

Bij verhoor geeft vijftiende beklaagde aan dat hij in het kader van de goudhandel is
opgetreden als hulpje van zijn broer, in deze veertiende beklaagde. Veertiende beklaagde
zelf heeft zich nooit aangeboden bij de politiediensten en kon niet worden verhoord.

Uit het gevoerde onderzoek is gebleken dat de gebroeders ▇▇▇▇ blijkbaar opereerden via
de ▇▇▇▇ en later via de firma ▇▇▇▇ Uit de verklaring van vijftiende beklaagde
volgt echter dat deze firma's geen winkel uitbaatten maar dat veertiende beklaagde
*"gewoon van huis naar zijn klanten"* ging.

Uit het onderzoek (bij de firma GOETZ) is gebleken dat veertiende en vijftiende beklaagde in
2011 minstens 841 transacties met de firma GOETZ doorvoerden en dit voor een
totaalbedrag van 11.430.436,90 EURO.

Door vijftiende beklaagde werden stukken voorgelegd waaruit verkopen bleken bij de firma
GOETZ voor een bedrag van 221.833,01 EURO. Het restant van de verkopen – die bleken uit
manuele identificatie op zgn. *"particuliere"* aankoopfiches – werd door vijftiende beklaagde
eenvoudigweg ontkend.

Enig boekhoudkundig stuk omtrent de verwerking van deze aan- en verkopen van oud goud
door de gebroeders ▇▇▇▇ werd niet voorgelegd. Wel gaf vijftiende beklaagde aan dat zijn
broer problemen zou hebben met de Nederlandse belastingdiensten en om die reden zou
uitwijken naar Dubai.

# Exhibit 8 Part 2

In voormelde omstandigheden is het duidelijk dat noch de door veertiende en vijftiende beklaagde verrichte aankopen, noch de door hen verrichte verkopen een legitiem karakter kunnen hebben gehad.

Enige boekhoudkundige verwerking is niet voorhanden. Vijftiende beklaagde verklaart zelf dat dit geleid heeft tot problemen met de Nederlandse belastingdiensten.

Veertiende en vijftiende beklaagde verkochten – vanuit Nederland – op korte tijd voor een enorm bedrag, in contanten, aan oud goud bij de firma GOETZ. Zij kunnen niet geloofwaardig voorhouden dat zij niet wisten dat hiermee de geldende witwaswetgeving werd geschonden, dat de administratieve verplichtingen (middels anonieme en opgesplitste verkopen) niet werden gevolgd en hierdoor illegale vermogensvoordelen werden omgezet dan wel verborgen.

De tenlasteleggingen C. XIII, D. XVII en G. XIII zijn dan ook bewezen in hoofde van veertiende en vijftiende beklaagde.

De rechtbank verwijst naar hetgeen hiervoor reeds werd vermeld en stelt vast dat ook eerste t/m derde beklaagde niet onwetend konden zijn omtrent het onregelmatig karakter van deze transacties zodat de tenlastelegging D. XVII ook ten aanzien van hen bewezen is.

● *Betreffende zestiende beklaagde* ███████

Bij onderzoek in de boekhoudkundige stukken van de firma GOETZ werden 375 afzonderlijke transacties aangetroffen voor een totaalbedrag van 5.184.700,71 EURO. Op deze transacties werd zestiende beklaagde geïdentificeerd als *"Partikulier – ███ .."*.

In Duitsland werd zestiende beklaagde verhoord. Hij verklaarde hierbij inderdaad oud goud aan te kopen en te verkopen, hij stelde te werken via een vennootschap ███████████ en stelde slechts enkele keren kleine hoeveelheden goud aan de firma GOETZ te hebben verkocht.

De aankoopborderellen met vermelding *"Partikuler – ███ ..."* zou hij nog nooit hebben gezien.

Zestiende beklaagde stelde nooit contante gelden te hebben ontvangen, kon geen documenten voorleggen m.b.t. het bij de firma GOETZ verkochte goud en wilde geen verklaring afleggen omtrent de herkomst van het goud, noch omtrent de bestemming van de ontvangen gelden.

# Exhibit 8 Part 2

Bij huiszoeking op het adres van de firma ▮▮▮▮▮▮werden in een kluis enkele kilo's oud goud aangetroffen alsmede een som van 70.000 EURO in contanten. Zestiende beklaagde kon of wilde geen verklaring geven omtrent de herkomst van deze goederen en gelden.

Zestiende beklaagde werd in Duitsland – trouwens in het bijzijn van dertiende beklaagde ▮▮▮▮▮▮▮ – ook aangetroffen terwijl hij een som van 134.000 EURO in contanten op zich droeg.

De rechtbank stelt vast dat de door zestiende beklaagde uitgevoerde transacties, in voormelde omstandigheden, geen legale herkomst kunnen hebben gehad.

De hem tenlastegelegde feiten C. IX, D. XIII en G. IX zijn dan ook bewezen.

Ook hier kunnen eerste t/m derde beklaagde niet onwetend zijn geweest omtrent het illegale karakter van de door zestiende beklaagde gestelde handelingen zodat de tenlastelegging D. XIII ook in hoofde van eerste t/m derde beklaagde bewezen is.

 ⬤ *Betreffende zeventiende beklaagde* ▮▮▮▮▮▮▮▮▮

Zeventiende beklaagde is een Nederlands staatsburger. Bij onderzoek in de systemen van de firma GOETZ worden 306 transacties aangetroffen – voor een totaalbedrag van 4.097.229,59 EURO – met een manuele identificatie die naar zeventiende beklaagde verwijst.

Wanneer de verbalisanten met de Nederlandse autoriteiten contact opnemen, wordt hen gemeld dat zeventiende beklaagde zich in een Duitse gevangenis bevindt en dit n.a.v. een onderzoek naar belastingfraude t.a.v. hemzelf en zijn onderneming▮▮▮▮▮▮.

In het kader van een ambtelijke opdracht melden de Duitse gerechtelijke diensten op 12.12.2012 dat zeventiende beklaagde iedere medewerking aan het dossier weigert te verlenen en geen verklaring aan de Belgische politiediensten wenst af te leggen.

Thans stelt zeventiende beklaagde in besluiten dat hij van voornoemde 306 transacties geen weet heeft. Hij stelt slechts één kilogram oud goud via de firma GOETZ te hebben verkocht en dit middels een drietal transacties.

Exhibit 8 Part 2

De rechtbank oordeelt deze bewering ongeloofwaardig. Op zich is er geen enkele reden waarom de firma GOETZ transacties aan zeventiende beklaagde zou toeschrijven wanneer deze niet daadwerkelijk zouden hebben plaatsgevonden.

Verder beweert zeventiende beklaagde slechts sporadisch met de firma GOETZ te hebben samengewerkt, doch enige toelichting hierbij wordt niet verschaft.

De rechtbank verwijst naar hetgeen hieromtrent voordien reeds werd gesteld omtrent de door zeventiende beklaagde gehanteerde boekhouding.

Op basis van de bij de firma GOETZ aangetroffen aankoopborderellen met manuele identificatie van zeventiende beklaagde, oordeelt de rechtbank het weldegelijk bewezen dat zeventiende beklaagde veelvuldig en voor aanzienlijke bedragen oud goud bij de firma GOETZ heeft verkocht.

Zeventiende beklaagde was destijds professioneel handelaar in oud goud te Nederland. Uit het onderzoek blijkt dat zeventiende beklaagde hiertoe aanzienlijke transacties sloot. Van zeventiende beklaagde mag bijgevolg verwacht worden dat hij zich laat informeren omtrent de geldende verplichtingen ter zake. Zeker wanneer – zoals in deze – zeventiende beklaagde vanuit Nederland waar hij oud goud aankoopt, met dit goud naar België komt om het hier te verkopen en vervolgens, met de tegenwaarde in contanten op zak, terugkeert naar Nederland.

Van enige verschoonbare rechtsdwaling kan in hoofde van zeventiende beklaagde dan ook geen sprake zijn.

De objectieve informatie van het strafdossier, alsmede de eigen verklaringen van zeventiende beklaagde in conclusie, overtuigen de rechtbank van het gegeven dat zeventiende beklaagde op het tijdstip van de feiten, en op grote schaal, goud aan- en verkocht zonder dat hierbij van enige officiële handelstransactie sprake is geweest.

De transacties betreffen bijgevolg weldegelijk illegale vermogensvoordelen.

Zeventiende beklaagde miskende hierbij bewust de op hem rustende verplichtingen inzake de witwaswetgeving en nam deel aan valsheid in geschriften teneinde deze verplichtingen te omzeilen en een anoniem karakter te verschaffen aan de door hem uitgevoerde verkopen.

DRC-34996 0479

# Exhibit 8 Part 2

De tenlasteleggingen C. XI, D. XV en G. XI zijn dan ook bewezen t.a.v. zeventiende beklaagde.

Met verwijzing naar hetgeen hieromtrent voorheen reeds werd gesteld, oordeelt de rechtbank de tenlastelegging D. XV eveneens bewezen in hoofde van eerste t/m derde beklaagde.

● *Betreffende achttiende beklaagde* ███████████████████████.

Bij analyse van de aankoopborderellen van de firma GOETZ werden 134 transacties aangetroffen, met manuele identificatie en uitbetaling in contanten voor een totaalbedrag van 2.633.255,37 EURO.

Voor het jaar 2011 werden er transacties teruggevonden voor een totaalbedrag van 8.314.009,95 EURO waarvan een totaalbedrag van 5.650.754,58 EURO via bankoverschrijving werd vereffend.

Naar aanleiding van de telefoontap wordt vastgesteld dat achttiende beklaagde een tiental telefoongesprekken met de firma GOETZ voert waarbij er handelstransacties besproken worden.

In het kader van een buitenlandse opdracht wordt achttiende beklaagde verhoord, waarbij er geen duidelijkheid wordt verschaft omtrent de redenen waarom een gedeelte van de uitgevoerde transacties anoniem en via contante betaling geregeld diende te worden.

Bij de controle van de belastingaangifte voor het jaar 2012 werd vastgesteld dat er een bedrag van 5.399.435 EURO werd aangegeven als inkomsten uit de transacties met de firma GOETZ, hetzij ongeveer de omvang van de transacties die giraal werden vereffend.

Van de Spaanse autoriteiten vernemen de speurders dat achttiende beklaagde te Spanje het voorwerp uitmaakt van een onderzoek inzake witwas, oplichting en valsheid in geschriften.

Uit hetgeen voorafgaat volgt dat achttiende beklaagde bewust gebruik maakte van de diensten van de firma GOETZ om transacties te kunnen uitvoeren die buiten de officiële administratieve verwerking van zijn handelsactiviteiten werden gehouden.

Hiertoe verkocht achttiende beklaagde, zgn. als particulier, voor meer dan tweeëneenhalf miljoen EURO oud goud aan de firma Goetz waarbij deze transacties werden opgesplitst om

DRC-34996 0480

een uitbetaling in contanten mogelijk te maken.

Achttiende beklaagde, als professioneel handelaar in oud goud die -- naar eigen zeggen van tweede beklaagde Alain GOETZ -- in de betrokken periode wekelijks naar België afzakte om oud goud te verkopen, handelde bewust en duidelijk met de intentie om het door hem vergaarde goud gedeeltelijk *"buiten de boekhouding om"* te verhandelen.

Bewust pleegde achttiende beklaagde hierbij valsheid in geschriften en miskende hij de verplichtingen van de witwaswetgeving. Het illegale karakter van het verhandelde goud staat daarbij vast zodat achttiende beklaagde zich eveneens schuldig maakte aan het hem ten laste gelegde witwasmisdrijf.

Ook eerste t/m derde beklaagde konden van dit alles niet onbekend zijn en werkten niettemin bewust mee aan de handelingen van achttiende beklaagde.

De tenlasteleggingen C. VII, D. XI en G. VII zijn dan ook bewezen in hoofde van achttiende beklaagde waarbij de tenlastelegging D. XI eveneens bewezen is in hoofde van eerste t/m derde beklaagde.

 • *Betreffende negentiende beklaagde&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;O, twintigste beklaagde &#9608;&#9608;&#9608;&#9608;&#9608;&#9608; en éénentwintigste beklaagde&#9608;&#9608;&#9608;&#9608;&#9608;*

Eénentwintigste beklaagde&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; is een vennootschap naar Spaans recht die te Spanje actief is in de aan- en verkoop van edele metalen. Twintigste beklaagde&#9608;&#9608;&#9608;R is de zaakvoerder van éénentwintigste beklaagde. Negentiende beklaagde &#9608;&#9608;&#9608; is zgn. speciaal gevolmachtigde van éénentwintigste beklaagde en degene die zich steeds in persoon aanbood bij de firma GOETZ om aldaar edele metalen te verkopen.

In het kader van de tapmaatregel die in huidig strafonderzoek werd uitgevaardigd, wordt vastgesteld dat er een vijfentwintigtal keer wordt getelefoneerd tussen negentiende beklaagde en de firma GOETZ waarbij gesproken wordt over verkopen van oud goud in contanten.

In eerste instantie worden bij de firma GOETZ -- voor de periode 2011 -- 51 transacties gevonden met manuele vermelding "&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;" voor een totaalbedrag van 5.524.037,60 EURO die grotendeels via bancaire overschrijving werden vereffend.

Bij later onderzoek — in het kader van een buitenlandse opdracht — wordt in de boekhoudkundige stukken van de firma ███████ vastgesteld dat in de betrokken periode 56 transacties werden uitgevoerd voor een totaalbedrag van 6.003.645,39 EURO.

Op datum van 12.02.2013 werden er in de boekhouding van ███████ geen transacties aangetroffen op naam van negentiende beklaagde. In de boekhouding van de firma GOETZ worden daarentegen nog 199 aankoopborderellen aangetroffen met manuele vermelding *"FERRE LOZANO"* waarbij een totaalbedrag van 2.672.625,88 EURO in contanten werd uitbetaald.

Documenten waaruit de herkomst van het door de firma ███████ verkochte goud kon worden achterhaald, bleken evenmin voorhanden te zijn.

Uit deze vaststellingen blijkt duidelijk dat de verkopen van oud goud die door negentiende beklaagde bij de firma GOETZ werden gedaan op naam van de firma ███████ quasi volledig werden vereffend via bankoverschrijving en dat deze verkopen ook terug te vinden waren in de voorhanden zijnde boekhoudkundige stukken.

De verkopen die door negentiende beklaagde *"als particulier"* werden gemaakt, werden daarentegen in contanten verrekend en waren — althans niet op 12.02.2013 — in de boekhoudkundige stukken van de firma ███████ terug te vinden.

In besluiten stellen negentiende t/m éénentwintigste beklaagde dat hen niets verweten kan worden en dat thans alle voornoemde transacties — regelmatig naar Spaans recht — in de boekhouding van de firma ███████ zouden zijn verwerkt.

De rechtbank dient vast te stellen dat de argumentatie die wordt opgebouwd in de besluiten van negentiende t/m éénentwintigste beklaagde geen verklaring geeft voor de vaststelling dat een deel van de aankopen van de firma GOETZ op naam van de firma gebeurde, via bancaire overschrijving en verwerkt werd in de boekhouding van ███████ en een ander deel anoniem op naam van negentiende beklaagde ███ *"als particulier"* gebeurde waarbij deze transacties in contanten werden vereffend en — alvast op het tijdstip van het onderzoek — niet in de boekhouding van ███████ waren opgenomen.

Op het tijdstip van het onderzoek weigerde twintigste beklaagde ███ alvast iedere medewerking. Uit de stukken blijkt dat twintigste beklaagde ███ slechts sinds 14 juli 2011 aangesteld werd als zaakvoerder. Beweren dat twintigste beklaagde bijgevolg geen kennis heeft gehad van de transacties die voorafgaandelijk hieraan werden uitgevoerd, is volstrekt ongeloofwaardig. Te meer daar tal van deze transacties nog niet boekhoudkundig verwerkt waren.

# Exhibit 8 Part 2

De enige plausibele verklaring voor deze bewering van twintigste beklaagde ligt volgens de rechtbank in het feit dat het nooit de bedoeling was om deze transacties ook daadwerkelijk boekhoudkundig te verwerken.

Wel dient de rechtbank vast te stellen dat de thans geviseerde transacties van éénentwintigste beklaagde werden uitgevoerd door negentiende beklaagde zonder dat er enige duidelijk rol van twintigste beklaagde wordt aangetoond. Nu twintigste beklaagde op het tijdstip van de geviseerde transacties ook niet formeel, als zaakvoerder, hierbij enige betrokkenheid kon hebben gehad, dient hij voor de hem ten laste gelegde feiten te worden vrijgesproken.

Zelfs in de visie van negentiende en éénentwintigste beklaagde dat transacties van de eerste jaarhelft van 2011 nog later verwerkt konden worden, bijv. in de boekjaren 2012, 2013 en 2014, dient er documentatie voorhanden te zijn in deze transacties, minstens van de hoeveelheden goud die door de firma ▓▓▓▓▓▓▓▓ aan negentiende beklaagde ▓▓▓▓▓▓ waren ter beschikking gesteld, en welke bedragen er reeds door negentiende beklaagde ▓▓▓▓▓▓ aan de firma ▓▓▓▓▓▓▓▓▓▓ waren ter beschikking gesteld (maar naar Spaans recht pas in later boekhoudkundige jaren zouden verwerkt worden) nu anders noch in hoofde van de firma ▓▓▓▓▓▓▓▓ noch in hoofde van negentiende beklaagde ▓▓▓▓▓ enige controle en afrekening mogelijk zou worden gemaakt.

Beweren dat deze stukken voorhanden waren maar door de speurders niet werden onderzocht oordeelt de rechtbank op basis van de dossierstukken hieromtrent eveneens ongeloofwaardig.

De rechtbank dient bijgevolg vast te stellen dat op het tijdstip van de geviseerde verrichtingen, en op het tijdstip van de buitenlandse opdracht en onderzoek bij beklaagden, er geen enkel spoor kon worden aangetroffen van de zgn. anonieme *"particuliere"* transacties noch van de overeenstemmende geldstromen in contanten.

Dat jaren later het één en ander boekhoudkundig werd geregulariseerd, doet geen afbreuk aan de onregelmatigheid van de transacties op het tijdstip van de feiten.

Alleszins staat het vast dat negentiende t/m éénentwintigste beklaagde professionele handelaars in oud goud zijn. Wanneer zij op regelmatige basis naar België komen om hier handel te drijven -- op basis van de onderzoeksgegevens quasi wekelijks waarbij voor niet minder dan 6 kg edele metalen werden verkocht -- mag van beklaagden verwacht worden dat zij nazicht doen naar alhier geldende verplichtingen daaromtrent.

De bepalingen van de Wet van 11 januari 1993 waren ook op negentiende en éénentwintigste beklaagde van toepassing en dienden door hen gevolgd te worden.

Niettemin blijkt uit de dossiergegevens dat negentiende beklaagde ███████ in opdracht van éénentwintigste beklaagde ████████████ geruime tijd en voor aanzienlijke bedragen edele metalen heeft verkocht waarbij deze in strijd met de bepalingen van de Wet van 11 januari 1993 in contanten werden vereffend.

Teneinde dit mogelijk te maken, werd er ook valsheid in geschriften gepleegd. Ook bij de verkopen door negentiende beklaagde werd ten onrechte voorgehouden dat de verkopen een particulier karakter hadden en werden verkopen voor hogere bedragen systematisch opgesplitst in verkopen onder de 15.000 EURO.

Dat negentiende beklaagde zich hiervan bewust was blijkt uit de gecapteerde telefoongesprekken waarbij gesproken werd over transacties op naam van ████████████ hetgeen verkopen in contanten impliceerde. Medewerkers van de firma GOETZ meldden trouwens telefonisch uitdrukkelijk aan een bediende van de firma ███████ dat uitbetalingen voor *"private"* verkopen door negentiende beklaagde niet via de bank zouden worden betaald.

De tenlasteleggingen C. XIV en G. XIV oordeelt de rechtbank dan ook bewezen in hoofde van negentiende en éénentwintigste beklaagde.

Uit het strafdossier blijkt verder dat op het tijdstip van de feiten niet kon worden achterhaald wat de herkomst was van de edele metalen die door negentiende beklaagde *"als particulier"* werden aangeboden. Ook thans blijft dit volstrekt onduidelijk en wordt er slechts beweerd dat het in consignatie gegeven goud zou betreffen. Naar het oordeel van de rechtbank wordt enige legale herkomst niet aannemelijk gemaakt zodat de transacties die door negentiende beklaagde – anoniem en in contanten – werden verricht weldegelijk witwasverrichtingen betreffen zodat ook de tenlastelegging D. XVIII in hoofde van negentiende en éénentwintigste beklaagde bewezen zijn.

Uit hetgeen voorafgaat volgt dat negentiende beklaagde de lastens hem weerhouden tenlasteleggingen wetens en willens heeft gepleegd. Verder pleegde negentiende beklaagde deze misdrijven in het kader van de werking van éénentwintigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

DRC-34996 0484

# Exhibit 8 Part 2

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend konden zijn, is de tenlastelegging D. XVIII ook in hunnen hoofde bewezen.

De rechtbank spreekt twintigste beklaagde, om redenen hiervoor vermeld, vrij voor de tenlasteleggingen C. XIV, D. XVIII en G. XIV.

● **_Betreffende tweeëntwintigste beklaagde_** ▓▓▓▓▓▓▓▓▓

Bij nazicht van de administratieve stukken binnen de firma GOETZ worden voor het jaar 2011 een heel aantal transacties (164 stuks) aangetroffen waarbij door tweeëntwintigste beklaagde oud goud werd verkocht voor een totaalbedrag van 2.246.154,64 EURO.

Tweeëntwintigste beklaagde weigerde mee te werken aan een buitenlandse opdracht maar verschafte via zijn advocaat wel toelichting bij zijn activiteiten.

Hieruit kan worden afgeleid dat tweeëntwintigste beklaagde mogelijk samenwerkte mét de firma ▓▓▓▓▓▓ en via deze vennootschap oud goud verkocht aan de firma GOETZ.

Deze transacties kunnen echter niet overeenstemmen met de 164 aankoopborderellen die op naam van tweeëntwintigste beklaagde werden aangetroffen waarbij wederom vermeld werd dat het *"particuliere"* transacties betrof waarbij op de aankoopborderellen geen BTW-nummer werd vermeld.

Uit de eigen stukken die door de raadsman van tweeëntwintigste beklaagde werden voortgebracht blijkt dat deze transacties niet overeenstemmen met voornoemde 164 transacties die op naam van tweeëntwintigste beklaagde werden teruggevonden.

Dit impliceert dat deze 164 transacties niet werden afgesloten met of voor de firma ▓▓▓▓▓▓▓▓▓. Het betreffen bijgevolg transacties die buiten de boekhoudkundige administratie van deze firma werden uitgevoerd en waarbij zowel de aankoop van het oude goud, de financiering ervan als de verwerking van de verkoopprijs buiten de reguliere boekhouding is gebeurd.

Enige legale herkomst van het verkochte oud goud wordt dan ook niet aangetoond en kan worden uitgesloten.

DRC-34996 0485

# Exhibit 8 Part 2

Nu tweeëntwintigste beklaagde als professioneel verkoper van oud goud op de hoogte diende te zijn van de geldende verplichtingen in België, en uit de voorliggende stukken duidelijk blijkt dat hij deze heeft miskend, zijn de tenlasteleggingen C. XII en G. XII bewezen in zijnen hoofde.

Nu iedere legale herkomst van het aangeboden goud dat als *"particulier"* werd aangeboden, kan worden uitgesloten, is ook de tenlastelegging D. XVI bewezen t.a.v. tweeëntwintigste beklaagde.

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. XVI ook t.a.v. hen bewezen.

- *Betreffende drieëntwintigste beklaagde* ███████████

Bij de firma GOETZ werden aankoopborderellen aangetroffen op naam van drieëntwintigste beklaagde waaruit bleek dat door drieëntwintigste beklaagde bij 124 transacties (als particulier met manuele identificatie) voor een totaal bedrag van 1.660.253,88 EURO aan goud werd verkocht.

In het kader van een buitenlandse opdracht weigerde drieëntwintigste beklaagde mee te werken aan het onderzoek. Hij weigerde enige verklaring af te leggen en kon geen documenten voorleggen m.b.t. het door hem verkochte goud.

Drieëntwintigste beklaagde verkocht ruim 47 kg goud zonder dat hiervoor enige verklaring kan worden gegeven. Volgens de Duitse autoriteiten was drieëntwintigste beklaagde van opleiding *"circusartiest"* en op het tijdstip van de feiten reeds geruime tijd werkzoekende.

Bij huiszoeking in de woning van drieëntwintigste beklaagde werd in de garage een afzuigsysteem aangetroffen dat mogelijk dienstig kon zijn bij het smelten van metalen.

De rechtbank dient vast te stellen dat er geen enkele verklaring voorhanden is hoe drieëntwintigste beklaagde – een reeds geruime tijd werkloze circusartiest – er in een half jaar tijd in slaagde om 47 kg goud te verzamelen en voor meer dan anderhalf miljoen EURO in contanten kon verkopen bij de firma GOETZ.

De tenlastelegging D. XII is dan ook bewezen in hoofde van drieëntwintigste beklaagde. Dit is eveneens het geval in hoofde van eerste, tweede en derde beklaagde. De rechtbank stelt vast dat drieëntwintigste beklaagde niet aan enige reguliere juwelenhandelaar kon worden gekoppeld en blijkbaar uitsluitend is opgetreden als *"particuliere"* verkoper daar waar dit

# Exhibit 8 Part 2

volgens eerste t/m derde beklaagde niet mogelijk zou zijn geweest. Bijgevolg wisten eerste t/m derde beklaagde dat het door drieëntwintigste beklaagde aangeboden goud geen legale herkomst kon hebben gehad.

Gelet op de hoeveelheid goud die door drieëntwintigste beklaagde op korte termijn werd aangeboden, oordeelt de rechtbank het niet aannemelijk dat dit particuliere verkopen betroffen. Bijgevolg omzeilde ook drieëntwintigste beklaagde de verplichtingen van de witwaswetgeving mits het plegen van valsheid in geschriften en zijn de tenlasteleggingen C. VIII en G. VIII eveneens bewezen.

 • *Betreffende vierentwintigste beklaagde ▬▬▬▬ en vijfentwintigste beklaagde ▬▬▬▬▬*

Vierentwintigste beklaagde i▬▬ de zaakvoerder van vijfentwintigste beklaagde▬▬ ▬▬▬ die een juwelierswinkel uitbaat waarbij ook oud goud wordt ingekocht.

Onder de tenlastelegging C. III en G. III worden vierentwintigste en vijfentwintigste beklaagde vervolgd voor de verkoop van partijen oud goud waarbij aanzienlijke hoeveelheden oud goud, m.n. respectievelijk voor 388.748,86 EURO en 136.650,66 EURO, werden opgesplitst in meerdere transacties onder de 15.000 EURO waardoor voornoemde bedragen in contanten konden worden uitbetaald.

In besluiten betwisten vierentwintigste en vijfentwintigste beklaagde de tenlastelegging G. III niet. De rechtbank stelt vast dat uit de voorliggende stukken blijkt dat vierentwintigste en vijfentwintigste beklaagde – als professionele handelaars-verkopers – inderdaad de bepalingen van de Wet van 11 januari 1993 hebben miskend en bij voornoemde transacties, die het bedrag van 15.000 EURO ver overtroffen, toch in contanten hebben vereffend.

Hiertoe werden op twee verschillende data, m.n. 14.01.2010 en 29.03.2010, meerdere aankoopborderellen opgesteld met telkens verkopen onder de 15.000 EURO.

Vierentwintigste en vijfentwintigste beklaagde zijn daarenboven reeds geruime tijd actief in het verhandelen van oud goud en juwelen zodat mag worden aangenomen dat zij bekend zijn met de op hen rustende verplichtingen.

De tenlastelegging G. III is dan ook bewezen. De rechtbank stelt vast dat de uitbetaling in contanten reeds geschiedde op 11 december 2009 zodat de incriminatieperiode als volgt moet worden aangepast: *"C. III ... tussen 10 december 2009 en 30 maart 2010".*

# Exhibit 8 Part 2

De tenlastelegging C. III wordt door vierentwintigste en vijfentwintigste beklaagde wel betwist.

Uit de besluiten van vierentwintigste en vijfentwintigste beklaagde vloeit voort dat zij betwisten zich schuldig te hebben gemaakt aan enige valsheid in geschriften nu door het opsplitsen van voornoemde transacties van 14.01.2010 en 29.03.2010 de waarheid niet zou zijn vermomd en er ook geen voordeel zou zijn behaald nu deze transacties weldegelijk in de boekhouding van vijfentwintigste beklaagde werden opgenomen.

Vierentwintigste en vijfentwintigste beklaagde verliezen hierbij uit het oog dat het opsplitsen in deeltransacties onder de 15.000 EURO net noodzakelijk was om de feiten zoals vermeld onder de tenlastelegging G. III te kunnen plegen.

De rechtbank verwijst naar hetgeen hieromtrent voorheen reeds werd gezegd en waaruit blijkt dat dit systeem door eerste t/m derde beklaagde net werd opgezet om hun klanten – waaronder vierentwintigste en vijfentwintigste beklaagde – te plezieren.

Dat ook vierentwintigste beklaagde zich hierbij vragen stelde, blijkt uit zijn eigen verklaringen. Geconfronteerd met de systematische opsplitsing van grotere loten aangekocht goud, stelde vierentwintigste beklaagde in zijn verhoor van 19 november 2012: *"... Ik heb mij hieromtrent vragen gesteld. Ik vermoed dat ik aan één van de loketbediende de reden heb gevraagd. Men vertelde mij dat dit nu zo moest. ..."*

De reden dat het zo moest, bestond echter in het gegeven dat de inbreuk op de witwaswetgeving, zoals omschreven onder de tenlastelegging G. III, verdoezeld diende te worden.

Ondanks het gegeven dat hij zich hierbij vragen stelde, werkten vierentwintigste en vijfentwintigste beklaagde mee aan het zodus opgezette systeem.

De tenlastelegging C. III is bijgevolg eveneens bewezen.

Bijkomend wordt vierentwintigste beklaagde ████ onder de tenlasteleggingen C. V. b, D. VI en G. V. b vervolgd voor twee transacties die werden gesloten met de firma GOETZ op 26.05.2011 en 30.05.2011. Het betreft transacties waarbij door vierentwintigste beklaagde op 26.05.2011 voor minstens 5 kg oud goud bij de firma GOETZ zou zijn verkocht en op 30.05.2011 oud goud voor een bedrag van minstens 60.000 EURO.

Exhibit 8 Part 2

Wat de transactie van 26.05.2011 betreft, werd er op telefoontap vastgesteld dat vierentwintigste beklaagde een telefoongesprek voerde met de firma GOETZ waarin hij stelde *"die morgen iets te hebben binnengebracht met vraag om binnen een uur vijf of zeven te kunnen krijgen"*. (zie Deel XI, kaft 24, st. 338, verhoor d.d. 19.11.2012)

Geconfronteerd met dit telefoongesprek bevestigde vierentwintigste beklaagde dat hij hiermee de tegenwaarde in contanten van vijf of zeven kg oud goud wenste op te halen. Hij verduidelijkte dat het hierbij oud goud betrof van zijn Spaanse firma, ▮▮▮▮▮▮▮▮▮▮▮.

Geconfronteerd met de melding van de speurders dat in de boekhouding van firma GOETZ voor de desbetreffende transacties geen aankoopborderellen op naam van de firma ▮▮▮▮▮▮▮▮▮ konden worden aangetroffen, stelt vierentwintigste beklaagde dat er *"voorlopig een 'particulier' document"* werd opgesteld.

De rechtbank verwijst naar hetgeen voorafgaat en stelt vast dat de verklaring van vierentwintigste beklaagde hieromtrent een bevestiging vormt van het gegeven dat verkopen die in contanten geregeld dienden te worden, geboekt werden als een *"particuliere"* verkoop.

In besluiten stelt beklaagde dat deze verkoop verantwoord wordt door stukken die hem werden overgemaakt door de firma ▮▮▮▮▮▮▮▮▮▮en die aan het strafdossier werden gevoegd.

De rechtbank stelt vast dat de verbalisanten vermelden dat uit de voorgelegde stukken (Deel XI, kaft 24, st. 468) blijkt dat in de desbetreffende periode er inderdaad voor ongeveer 4 kg fijn goud door de firma GOETZ aan ▮▮▮▮▮▮▮▮▮▮ werd uitbetaald.

Bij nazicht van deze stukken blijken deze verkopen echter vereffend te zijn geworden via bankverrichting vanuit de firma GOETZ naar de firma ▮▮▮▮▮▮▮▮▮▮toe zodat deze nooit betrekking kunnen hebben op de transactie van 26.05.2011 waaromtrent vierentwintigste beklaagde zelf verklaarde dat deze in contanten werd vereffend.

Deze vaststellingen bevestigen nog maar eens dat reguliere verkopen door verkopers-handelaars veelal werden uitgevoerd via girale betaling waarbij deze verkopen ondersteund kunnen worden door de nodige boekhoudkundige stukken, daar waar verkopen buiten de boekhouding om werden gemaskeerd door verkopen als *"particulier"* met betaling in contanten én waarbij deze transacties niet terug te vinden zijn in de boekhouding van de verkoper-handelaar.

# Exhibit 8 Part 2

Vierentwintigste beklaagde kan hiervan niet onbekend zijn nu hij aandeelhouder is van de firma ████████████ en hij deze firma oprichtte op vraag van zijn goede vriend, een zekere ████████████.

De tenlasteleggingen C. V. b. 1, D. VI. a en G. V. b. (in zoverre dit betrekking heeft op de feiten als omschreven onder de tenlastelegging C. V. b. 1) zijn dan ook bewezen t.a.v. vierentwintigste beklaagde.

Uit hetgeen voorafgaat volgt dat vierentwintigste beklaagde de lastens hem weerhouden tenlasteleggingen C. III en G. III wetens en willens heeft gepleegd. Verder pleegde vierentwintigste beklaagde deze misdrijven in het kader van de werking van vijfentwintigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde niet onwetend kunnen zijn geweest van het gegeven dat deze verkopen niet legaal waren, is de tenlastelegging D. VI. a ook lastens eerste, tweede en derde beklaagde bewezen.

De tenlasteleggingen C. V. b. 2 en D. VI. b hebben betrekking op de verkoop van een partij goud voor een bedrag van 60.000 EURO. Deze tenlastelegging is eveneens gebaseerd op een gecapteerd telefoongesprek waarbij vierentwintigste beklaagde informeert naar het voorhanden zijn van een bedrag van 60.000 EURO in het kader van de verkoop van een partij goud.

Uit de verklaringen van vierentwintigste beklaagde blijkt dat deze transactie niet door hemzelf werd uitgevoerd maar dat vierentwintigste beklaagde louter telefonisch informeerde naar de afhandeling van deze transactie.

Enig element waaruit het tegendeel zou blijken, kan niet in het strafdossier worden teruggevonden.

Deze transactie kon verder niet geïdentificeerd worden in de administratie van de firma GOETZ. Enige bijkomende informatie omtrent deze transactie is dan ook niet voorhanden.

De rechtbank oordeelt het niet bewezen dat vierentwintigste beklaagde actief mee bij deze transactie betrokken was en het voeren van een telefoongesprek waarbij loutere informatie wordt opgevraagd, oordeelt de rechtbank niet voldoende om vierentwintigste beklaagde als mededader van deze transactie te beschouwen.

Vierentwintigste beklaagde dient bijgevolg te worden vrijgesproken voor de tenlasteleggingen C. V. b. 2, D. VI. b en G. V. b. (in zoverre dit betrekking heeft op de feiten als omschreven onder de tenl. C. V. b. 2). Bij gebreke aan enige nadere identificatie van deze transactie dienen ook eerste, tweede en derde beklaagde hiervoor te worden vrijgesproken.

- ● *Betreffende zesentwintigste beklaagde* ▆▆▆▆▆▆▆ *en zevenentwintigste beklaagde* ▆▆▆▆▆▆▆▆

Zesentwintigste beklaagde ▆▆▆▆ en zevenentwintigste beklaagde ▆▆▆▆▆ baten samen een éénmanszaak uit te Tessenderlo waarbij de aan- en verkoop van oude edele metalen tot hun professionele activiteiten behoort.

Onder de tenlasteleggingen C. V. c, D. VII en G. V. c worden zesentwintigste en zevenentwintigste beklaagde vervolgd voor de verkoop van 9 kg goud die niet werd geregistreerd in de boekhouding van hun handelsactiviteiten, waarbij de prijs in contanten werd uitbetaald en waarbij de transactie zou zijn geregistreerd via zgn. anonieme aankoopborderellen.

In besluiten betwisten zesentwintigste en zevenentwintigste beklaagde de hen ten laste gelegde feiten. Zij stellen: (zie p. 24, punten 12 en 13):

> "...
>
> *12. Dit alles kan maar tot één conclusie leiden: er zijn nooit – buiten die ene onschuldige – particuliere aankoopborderellen – noch manueel geïdentificeerd, noch niet geïdentificeerd – met betrekking tot concluanten opgesteld!*
>
> *13. Deze conclusie leidt dan logisch gezien weer tot een andere: er zijn in de periode van de incriminatie geen contante verkopen van edele metalen gebeurd door concluanten aan de firma NV TONY GOETZ.*
>
> ..."

Deze beweringen van zesentwintigste en zevenentwintigste beklaagde zijn evenwel niet verenigbaar met de objectieve onderzoeksresultaten van het strafdossier.

DRC-34996 0491

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                              p. 93
Dossiernr 10A028492                              vleugel D, 3de verdieping                    Vonnisnr    /

Zo werden er minstens dertien telefoongesprekken onderschept waaruit duidelijk blijkt dat
zesentwintigste en zevenentwintigste beklaagde op de hoogte waren van het systeem dat
bij de firma GOETZ werd gehanteerd, waarbij ofwel officiële verkopen konden worden
verwerkt via bankoverschrijving ofwel anonieme verkopen via betaling in contanten, en dat
zij hier ook gebruik van maakten.

Zo werd door zesentwintigste en zevenentwintigste beklaagde in een telefoongesprek van
30.05.2011 aan de firma GOETZ gevraagd: "... willen jullie dit storten want dit is officieel."

Op 15.06.2011 wordt dan weer telefonisch gemeld: "... Ja goeiedag met ▬▬▬▬▬
▬▬▬▬, ik had graag goud gefixeerd twee kilo cash ...".

In een telefoongesprek van 17.06.2011 vraagt de bediende van de firma GOETZ: "... Is dit
voor bank via bank?" waarop geantwoord wordt: "Nee, cash, cash".

Verder bevestigen zowel tweede beklaagde Alain GOETZ, evenals het winkelpersoneel van
de firma GOETZ, dat er met zesentwintigste en zevenentwintigste beklaagde weldegelijk
goudtransacties werden geregeld in contanten.

Bij verhoor verklaarde zevenentwintigste beklaagde trouwens dat zij in haar
telefoongesprekken met de firma GOETZ weldegelijk op de hoogte was van het gehanteerde
'jargon' en dat wanneer zij geld reserveert voor verkopen met contante betaling, er cash
geld voor haar zou klaar liggen bij de firma GOETZ.

Uit hetgeen voorafgaat blijkt dat zgn. anonieme "particuliere" verkopen door handelaars-
verkopers bij de firma GOETZ steeds werden afgehandeld via zgn. anonieme
aankoopborderellen onder de 15.000 EURO.

Dat er op naam (via zgn. manuele identificatie) van zesentwintigste en zevenentwintigste
beklaagde geen anonieme aankoopborderellen konden worden teruggevonden, impliceert
op zich geenszins dat deze er niet zijn geweest.

Het volstrekt anonieme karakter ervan (zonder manuele identificatie) impliceert net de niet
traceerbaarheid ervan.

Zevenentwintigste beklaagde verklaarde op 23.08.2012 trouwens zelf dat bij verkopen in
contanten bij de firma GOETZ er steeds een aankoopborderel wordt opgesteld (DEEL XI, kaft
23, st. 244) en dat bij grotere verkopen deze aankoopborderellen steeds werden opgesplitst
in bedragen onder de 15.000 EURO. (DEEL XI, kaft 23, st. 242).

DRC-34996 0492

Zevenentwintigste beklaagde gaf verder aan dat deze aankoopborderellen ook in haar boekhouding aanwezig moeten zijn geweest. Zevenentwintigste beklaagde stelde tot slot dat de ontvangen bedragen in contanten ook steeds worden ingeschreven in haar kasboek.

Wanneer de speurders aan de hand van boekhoudkundige stukken (die voordien reeds werden aangetroffen bij huiszoeking) aantonen dat de geviseerde transacties in contanten niet aan de hand van aankoopborderellen in de boekhouding worden verantwoord en er geen melding van wordt gemaakt in het kasboek van zes- en zevenentwintigste beklaagde, heeft zevenentwintigste beklaagde daar geen verklaring voor.

Hierop stellen de verbalisanten de volgende vraag aan zevenentwintigste beklaagde:

*"...*

*Uit het onderzoek blijkt dat er bij uitbetaling in contanten telkens 'particuliere aankoopborderellen' door de NV TONY GOETZ worden opgesteld d.w.z. aankoopborderellen zonder identificatie van de verkoper. Was dit in dit geval ook zo? Hebt u deze documenten bewaard of hebt u deze vernietigd? Indien u ze vernietigd heeft, waarom heeft u dit gedaan? Gebeurde dit dan op eigen initiatief?*

*..."*

Hierop antwoordt zevenentwintigste beklaagde:

*"Dat zou kunnen. Ik weet niet wat ik hieromtrent moet antwoorden. Ik kan ze u niet tonen. Ik zeg niet dat ik dergelijke aankoopborderellen niet zou hebben gekregen, ik kan ze u gewoon niet tonen, ... ik geef toe, ik heb ze vernietigd. Ik kan u echt niet zeggen waarom ik dit heb gedaan. Ik heb dit op eigen initiatief gedaan."*

Zowel de vragen van de verbalisanten, als de antwoorden van zevenentwintigste beklaagde hierop zijn duidelijk en viseren duidelijk de aankoopborderellen zoals omschreven onder de tenlastelegging C. Stellen dat hiermee andere documenten worden bedoeld – zoals zes- en zevenentwintigste beklaagde in besluiten aanhalen – is eenvoudigweg ongeloofwaardig.

Zes- en zevenentwintigste beklaagde zijn professionele goudhandelaars zodat er mag worden vanuit gegaan dat zij op de hoogte zijn van de op hen rustende verplichtingen, dit onder meer in het kader van de Wet van 11 januari 1993.

DRC-34996 0493

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                    p. 95
Dossiernr 10AO28432                          vleugel D, 3de verdieping            Vonnisnr  /

Uit het voorgaande volgt dat zes- en zevenentwintigste beklaagde deze verplichtingen hebben miskend en als handelaars-verkopers transacties boven de 15.000 EURO in contanten hebben vereffend. Eveneens staat het vast dat hiervoor valsheid in geschriften werd gepleegd ingevolge het opstellen van anonieme en opgesplitste aankoopborderellen.

De tenlasteleggingen C. V. c en G. V. c zijn dan ook bewezen in hoofde van zesentwintigste en zevenentwintigste beklaagde.

Uit het strafrechtelijk onderzoek is gebleken dat de geviseerde transacties in contanten niet in de boekhouding van zes- en zevenentwintigste beklaagde werden teruggevonden. Ook de herkomst van het verkochte goud blijkt bijgevolg niet uit de voorliggende boekhouding zodat de transacties weldegelijk de omzetting van een illegaal vermogen vormt en de tenlastelegging D. VII eveneens bewezen is in hoofde van zesentwintigste en zevenentwintigste beklaagde.

Nu ook eerste t/m derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. VII eveneens in hunnen hoofde bewezen.

- Betreffende achtentwintigste beklaagde ████ en negenentwintigste beklaagde B████

Achtentwintigste beklaagde, en zijn vennootschap, negenentwintigste beklaagde, komen in beeld wanneer wordt vastgesteld dat achtentwintigste beklaagde bij de firma GOETZ geld reserveert voor de uitbetaling in contanten van ongeveer 3 kg goud.

Bij verhoor bevestigt achtentwintigste beklaagde – na confrontatie met de gecapteerde telefoongesprekken – dat hij bij de firma GOETZ 3 kg goud had verkocht, hiervoor in contanten werd uitbetaald en de verschillende verkregen aankoopborderellen vervolgens had weggegooid. Achtentwintigste beklaagde bevestigde eveneens dat hij de ontvangen bedragen vervolgens – buiten de boekhouding – opnieuw had ingebracht in zijn zaak.

Achtentwintigste beklaagde is een professioneel handelaar-verkoper van juwelen en edele metalen en kan zich niet verschuilen achter het gegeven dat hij geen kennis zou hebben gehad van de verplichtingen ingevolge de witwaswetgeving die op hem rusten.

Het staat vast dat achtentwintigste beklaagde 3 kg goud verkocht en hiervoor een bedrag van 99.000 EURO in contanten werd betaald. Hij pleegde hiermee een inbreuk op de bepalingen van de Wet van 11 januari 1993 zodat de tenlastelegging G. V. d bewezen is. Dat hiertoe valsheid in geschriften werd gepleegd door het opstellen van anonieme

DRC-34996 0494

Exhibit 8 Part 2

aankoopborderellen en opgesplitste verkopen onder de 15.000 EURO wordt niet betwist zodat ook de tenlastelegging C. V. d bewezen is.

Achtentwintigste beklaagde verkocht 3 kg goud waarvan de herkomst totaal niet te achterhalen valt. Nu de verkoop van het goud buiten de boekhouding van negentwintigste beklaagde werd gehouden, kan het niet anders dan dat ook de aankoop en boekhoudkundige verwerking ervan niet namens negentwintigste beklaagde en evenmin met fondsen van negenentwintigste beklaagde werd uitgevoerd. Nu de legale herkomst van het verkochte goud moet worden uitgesloten, is de tenlastelegging D. VIII eveneens bewezen.

Uit hetgeen voorafgaat volgt dat achtentwintigste beklaagde de lastens hem weerhouden tenlasteleggingen wetens en willens heeft gepleegd. Verder pleegde achtentwintigste beklaagde deze misdrijven in het kader van de werking van negentwintigste beklaagde waarbij de opbrengst van de transacties terug in de vennootschap zou zijn ingebracht, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde hiervan niet onwetend kunnen zijn geweest, is de tenlastelegging D. VIII eveneens t.a.v. hen bewezen.

> ● *Betreffende dertigste beklaagde* ███████ *en éénendertigste beklaagde* ███████

Dertigste beklaagde is zaakvoerder van éénendertigste beklaagde waarbinnen hij een handel in uurwerken en sieraden uitoefent.

In het kader van het strafrechtelijk onderzoek worden er telefoongesprekken gecapteerd waaruit blijkt dat dertigste beklaagde ███████ in juni 2011 bij de firma GOETZ een reservatie maakt voor de verkoop van ong. één kg goud in contanten.

Bij verhoor van dertigste beklaagde op 26.09.2012 stelt hij voorheen bij de firma GOETZ inderdaad oud goud te hebben verkocht maar sinds een drietal jaar beroep te doen op de firma ███████. Dertigste beklaagde stelt in het jaar 2011 geen transacties te hebben gedaan met de firma GOETZ. (DEEL XI, kaft 26, st. 50)

Exhibit 8 Part 2

Geconfronteerd met de telefoongesprekken die werden gecapteerd en de vraag van dertigste beklaagde om vereffening in geld, stelt dertigste beklaagde dat hij mogelijk het aangeboden goud enkel heeft laten analyseren zonder het te verkopen. Hierbij zouden er dan wel analysedocumenten en of facturen aanwezig moeten zijn.

Bij nazicht van de aankoopborderellen bij de firma GOETZ konden geen aankoopborderellen op naam van dertigste beklaagde of éénendertigste beklaagde worden aangetroffen.

Ook in de boekhouding van éénendertigste beklaagde waren dergelijke stukken niet voorhanden.

Uit het verhoor van de heer ████████ – boekhouder van éénendertigste beklaagde – blijkt dat deze geen documenten, facturen, borderellen of andere stukken van de firma GOETZ heeft verwerkt.

Andere boekhoudkundige stukken – o.a. m.b.t. persoonlijke leningen van dertigste beklaagde aan éénendertigste beklaagde of andere transacties, m.n. de verkoop van ong. 1 kg oud goud aan de firma ████████ – zijn niet relevant voor de beoordeling van de transacties tussen dertigste beklaagde en de firma GOETZ zoals deze blijkt uit de gecapteerde telefoongesprekken.

In besluiten betwisten beklaagden de geviseerde transactie zoals omschreven onder de tenlastelegging D. IX niet langer.

Dertigste en éénendertigste beklaagde zijn reeds geruime tijd actief in het verhandelen van juwelen en edele metalen. Van hen mag verwacht worden dat zij in kennis zijn van de verplichtingen die rusten op verkopers-handelaars in gevolge de Wet van 11 januari 2011.

Dat dertigste beklaagde hiervan op de hoogte was en deze welbewust wilde omzeilen blijkt duidelijk uit de gecapteerde telefoongesprekken waarbij hij aandringt op een vereffening *"in geld"* hetgeen impliceert dat dit een afwijking op de normale gang van zaken is.

Het kan niet anders dan dat voor de door dertigste beklaagde geviseerde verkoop bij de firma GOETZ aankoopborderellen werden opgesteld, zgn. *"particulier"* waarbij deze werden opgesplitst in bedragen onder de 15.000 EURO om een verkoop in contanten mogelijk te maken.

Ook hiervan kunnen dertigste en éénendertigste beklaagde niet onwetend zijn geweest.

DRC-34996 0496

# Exhibit 8 Part 2

Uit het onderzoek is gebleken dat de herkomst van het aangeboden goud totaal onduidelijk is, ook de bestemming van de ontvangen gelden in contanten kan op geen enkele wijze verantwoord worden.

In die omstandigheden wordt een legale herkomst van het verkochte goud geenszins geloofwaardig gemaakt en betreft de verkoop van het aangeboden goud een illegale transactie.

Op basis van het voorgaande oordeelt de rechtbank de tenlasteleggingen C. V. e, D. IX en G. V. e bewezen in hoofde van dertigste beklaagde.

Uit hetgeen voorafgaat volgt dat dertigste beklaagde de lastens hem weerhouden tenlasteleggingen wetens en willens heeft gepleegd. Verder pleegde dertigste beklaagde deze misdrijven in het kader van de werking van éénendertigste beklaagde, een gegeven waarvan deze laatste niet onwetend kon zijn.

In die omstandigheden zijn de bewezen misdrijven zowel aan de natuurlijke personen als aan de rechtspersoon toe te rekenen en dienen zij beiden veroordeeld te worden.

Nu ook eerste, tweede en derde beklaagde niet onwetend konden zijn van het illegaal karakter van het onder de tenlastelegging D. IX omschreven feit, is deze tenlastelegging ook in hunnen hoofde bewezen.

## *Strafmaat*

De feiten zijn ernstig en de in hoofde van de onderscheiden beklaagden weerhouden feiten vermengen zich als zijnde gepleegd met eenzelfde strafbaar opzet zodat slechts één bestraffing moet worden opgelegd.

De handelingen van beklaagden wijzen op een verminderd normbesef, een frauduleuze ingesteldheid en een gebrek aan respect voor de rechten van de Schatkist. Beklaagden organiseerden een systeem, of werkten hieraan mee, waarbij aanzienlijke financiële transacties aan het oog van iedere controle werden onttrokken waardoor niet enkel gestolen goederen werden verkocht maar vooral op grote schaal de verkoop van goederen aan het oog van de fiscus werd onttrokken.

DRC-34996 0497

Ingevolge hun handelen boden beklaagden misdadigers de mogelijkheid om hun gestolen goederen anoniem te verkopen waarbij iedere controle van de financiële stromen onmogelijk werd gemaakt. T.a.v. die handelaars die bij de verkoop van edele metalen wel de toepasselijke regelgeving stipt opvolgen, traden beklaagden concurrentievervalsend op.

Bij het bepalen van de strafmaat zal de rechtbank rekening houden met de rol van eenieder bij voormeld fraudesysteem, de omvang van de transacties die in hoofde van iedere individuele beklaagde werd weerhouden, ieders persoonlijkheid zoals deze blijkt uit de gegevens van het strafdossier en de pleidooien ter terechtzitting, en ieders strafrechtelijk verleden.

De rechtbank stelt vast dat de in hoofde van achtste beklaagde ████████████████ weerhouden feiten zoals omschreven onder de tenlastelegging D. IV de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor hij reeds werd veroordeeld bij het in kracht van gewijsde gegaan arrest van het hof van beroep te Luik d.d. 17 februari 2015, arrest waarvan afschrift aan het strafdossier werd gevoegd zodat met de reeds uitgesproken straf dient rekening te worden gehouden overeenkomstig art. 65 SW. Gelet op de aard en de omvang van de reeds opgelegde bestraffing legt de rechtbank thans geen bijkomende bestraffing op.

De rechtbank stelt vast dat de in hoofde van negende beklaagde ██████████ weerhouden feiten zoals omschreven onder de tenlastelegging D. IV de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten waarvoor hij reeds werd veroordeeld bij het in kracht van gewijsde gegaan arrest van het hof van beroep te Luik d.d. 8 september 2015, arrest waarvan afschrift aan het strafdossier werd gevoegd zodat met de reeds uitgesproken straf dient rekening te worden gehouden overeenkomstig art. 65 SW. Gelet op de aard en de omvang van de reeds opgelegde bestraffing legt de rechtbank thans geen bijkomende bestraffing op.

In besluiten stellen meerdere beklaagden dat in deze de redelijke termijn waarbinnen de strafvordering dient te worden uitgeoefend overschreden is zodat met toepassing van art. 21ter Vt. Sv. een eenvoudige schuldigverklaring dient te worden uitgesproken voor de weerhouden feiten.

Hoewel uit hetgeen voorafgaat blijkt dat in deze de rechten van verdediging van beklaagden geenszins onherstelbaar werden geschonden, noch dat er bij de voortgang van het strafonderzoek of de regeling van de rechtspleging abnormale periodes van vertraging konden worden vastgesteld, kan de rechtbank niet anders dan vaststellen dat beklaagden thans vervolgd worden voor feiten die zich tien jaar geleden hebben voorgedaan en waarbij het strafonderzoek meer dan zeven jaar in beslag heeft genomen.

Exhibit 8 Part 2

Bij het bepalen van de strafmaat zal de rechtbank dan ook rekening houden met deze overschrijding van de redelijke termijn en in voorkomend geval toepassing maken van art. 21ter Vt. Sv.

De rechtbank zal – in de mate dat kan worden vastgesteld dat de in hoofde van beklaagden weerhouden feiten eerder beperkt zijn, in de zin van loutere gebruikers met, relatief, beperkte transacties -- de eenvoudige schuldigverklaring uitspreken.

Hiermede rekening houdende zal de rechtbank in hoofde van vierentwintigste beklaagde ▓▓▓▓▓▓▓▓, vijfentwintigste beklaagde ▓▓▓▓▓▓▓▓, zesentwintigste beklaagde ▓▓▓▓▓▓▓▓, zevenentwintigste beklaagde ▓▓▓▓▓▓▓▓, achtentwintigste beklaagde D▓▓▓▓▓▓▓▓ negenentwintigste beklaagde ▓▓▓▓▓▓▓▓ dertigste beklaagde N▓▓▓▓▓▓▓▓T, éénendertigste beklaagde ▓▓▓▓▓▓▓▓ tweeëndertigste beklaagde N▓▓▓▓▓▓ en drieëndertigste beklaagde ▓▓▓▓▓▓▓▓ de loutere schuldigverklaring uitspreken voor de lastens hen weerhouden feiten.

In zoverre door beklaagden om de gunst van de opschorting werd verzocht, oordeelt de rechtbank het toestaan ervan geen gepaste maatregel in hoofde van beklaagden nu zij hiermede onvoldoende geconfronteerd zouden worden met de ernst van de in hunnen hoofde weerhouden feiten.

Het opleggen van de hierna bepaalde gevangenisstraf en geldboete aan eerste t/m derde beklaagde, zesde beklaagde, tiende t/m negentiende beklaagde, en éénentwintigste t/m drieëntwintigste beklaagde, oordeelt de rechtbank noodzakelijk gelet op de aard en de ernst van de in hunnen hoofde weerhouden feiten en dit teneinde beklaagden te wijzen op de ernst van hun handelingen en hen ertoe aan te zetten zich in de toekomst te beteren.

In hoofde van eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ zal de rechtbank tevens een beroepsverbod uitspreken conform de bepalingen van het K.B. nr. 22 van 24 oktober 1934 nu het door hen opgezette systeem funest was voor de eerlijke concurrentie binnen de handelssector waarin zij actief waren.

Gelet op het ontradende karakter van een uitgestelde bestraffing en nu eerste beklaagde Sylvain GOETZ, tweede beklaagde Alain GOETZ, derde beklaagde NV TONY GOETZ, zesde beklaagde ▓▓▓▓▓▓▓▓, zeventiende beklaagde ▓▓▓▓▓▓▓▓ negentiende beklaagde ▓▓▓▓▓▓▓▓ en éénentwintigste beklaagde▓▓▓▓▓▓▓▓ hiervoor nog in aanmerking komen, zal voor zowel de op te leggen gevangenisstraf als geldboete uitstel van tenuitvoerlegging worden toegestaan.

# Exhibit 8 Part 2

Ook voor het op te leggen beroepsverbod in hoofde van eerste beklaagde Sylvain GOETZ en tweede beklaagde Alain GOETZ zal de rechtbank uitstel van tenuitvoerlegging toestaan.

Met het oog op de maximalisatie van het ontradend karakter van dergelijke uitgestelde bestraffing koppelt de rechtbank de uitsteltermijn aan de maximaal voorziene duur.

Tiende t/m zestiende beklaagde, achttiende, tweeëntwintigste en drieëntwintigste beklaagde zijn niet ter terechtzitting verschenen zodat de rechtbank niet kan peilen naar hun inzichten en intenties.

- _Verbeurdverklaring_

Onder de tenlastelegging D worden beklaagden vervolgd voor feiten van witwassen in het kader van het verhandelen van edele metalen.

Het staat vast dat beklaagden, zoals hierna bepaald, vermogensvoordelen hebben genoten ingevolge de in hunnen hoofde weerhouden witwashandelingen.

Nu beklaagden niet mogen genieten van de vruchten van de door hen gepleegde misdrijven, zal de rechtbank deze verbeurd verklaren. Nu een uitgestelde verbeurdverklaring beklaagden in het bezit zou laten van de door hen gerealiseerde illegale vermogensvoordelen, zal de rechtbank hier niet toe overgaan.

Behoudens onder de tenlasteleggingen D. I, D. II en D. IV wordt er niet aangetoond dat het verhandelde goud uit een misdrijf afkomstig is. Het merendeel van de onderliggende transacties betreffende de tenlastelegging D zijn immers handelingen die boekhoudkundig niet verwerkt werden en waarop bijgevolg illegale vermogensvoordelen werden gerealiseerd.

Het voorwerp van de in hoofde van beklaagde weerhouden witwashandelingen, hetzij de verkochte edele metalen, hetzij de uitbetaalde fondsen in contanten, zijn, behoudens hetgeen hierna vermeld wordt, niet meer in het vermogen van de beklaagden aan te treffen.

De rechtbank zal bijgevolg het verkochte/aangekochte goud niet als het voorwerp van het witwasmisdrijf beschouwen maar zal, zoals hierna bepaald, het illegaal verkregen vermogensvoordeel ingevolge het witwasmisdrijf vaststellen en verbeurd verklaren.

Exhibit 8 Part 2

Wat de tenlasteleggingen D. IV betreft, stelt de rechtbank vast in hoofde van zevende, achtste en negende beklaagde reeds uitspraak werd gedaan omtrent de verbeurdverklaring van de door hen verkregen illegale vermogensvoordelen zodat de rechtbank hier geen bijkomende verbeurdverklaring zal uitspreken. In hoofde van eerste t/m derde beklaagde betreft de transactie een omzetting van het voorwerp van het misdrijf in hoofde van zevende t/m negende beklaagde, zodat de rechtbank ook hier enkel het verkregen illegale vermogensvoordeel zal verbeurd verklaren.

Bij het bepalen van het illegaal verkregen vermogensvoordeel verwijst de rechtbank naar de besluiten van achtentwintigste beklaagde ████████████R en negenentwintigste beklaagde ████████████R'S.

Achtentwintigste en negentwintigste beklaagde stellen dat het door hen verkochte goud voor 75% van de verkoopwaarde werd aangekocht. Hierop dient volgens achtentwintigste en negenentwintigste beklaagde een belastingheffing te worden toegepast van 33,34% om het illegaal verkregen vermogensvoordeel te bepalen.

Op deze wijze zal de rechtbank voor alle beklaagden, behoudens eerste, tweede, derde en zesde beklaagde het illegaal vermogensvoordeel bepalen. In hoofde van negentiende beklaagde █████████O en éénentwintigste beklaagde ████████████ zal de rechtbank (zoals volgens henzelf van toepassing in Spanje) een belastingheffing van 25% hanteren.

Op basis hiervan verklaart de rechtbank verbeurd:

Lastens tiende beklaagde ████████████████, als illegaal vermogensvoordeel, een bedrag van 890.900,57 EURO (tenlastelegging D. III. a) en een bedrag van 625.723,15 EURO. (tenl. D. III. b)

Lastens elfde beklaagde ████████████████A en twaalfde beklaagde ████████████ ██████████, ieder voor de helft, als illegaal vermogensvoordeel een bedrag van 730.608,50 EURO (tenlastelegging D. X)

Lastens dertiende beklaagde ████████████████, als illegaal vermogensvoordeel, een bedrag van 536.578,13 EURO (tenlastelegging D. XIV)

Lastens veertiende beklaagde █████████████ en vijftiende beklaagde ████████████, ieder voor de helft, als illegaal vermogensvoordeel, een bedrag van 550.467,65 EURO (tenl. D. XVII. a), een bedrag van 247.022,05 EURO (tenl. D. XVII. b), een bedrag van 26.766,60 EURO (tenl. D. XVII. c) en een bedrag van 128.470,62 EURO (tenl. D. XVII. d).

# Exhibit 8 Part 2



rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                      p. 103
Dossiernr  10A028492                            vleugel D, 3de verdieping              Vonnisnr      /

Lastens zestiende beklaagde ⬛⬛⬛, als illegaal vermogensvoordeel, een bedrag van 432.144,80 EURO (tenl. D. XIII).

Lastens zeventiende beklaagde ⬛⬛⬛, als illegaal vermogensvoordeel, een bedrag van 341.504,09 EURO (tenl. D. XV).

Lastens achttiende beklaagde ⬛⬛⬛, als illegaal vermogensvoordeel, een bedrag van 221.982,34 EURO (tenl. D. XI).

Lastens negentiende beklaagde ⬛⬛⬛ en éénentwintigste beklaagde ⬛⬛⬛ ieder voor de helft, als illegaal vermogensvoordeel, een bedrag van 167.039,12 EURO (tenl. D. XVIII. a) en een bedrag van 3.102,07 EURO (tenl. D. XVIII. b).

Lastens tweeëntwintigste beklaagde ⬛⬛⬛, als illegaal vermogensvoordeel, een bedrag van 187.216,99 EURO. (tenl. D. XVI)

Lastens drieëntwintigste beklaagde ⬛⬛⬛ als illegaal vermogensvoordeel, een bedrag van 138.382,16 EURO (tenl. D. XII).

Lastens vierentwintigste beklaagde ⬛⬛⬛ als illegaal vermogensvoordeel, een bedrag van 13.752,75 EURO (tenl. D. VI. a).

Lastens zesentwintigste beklaagde ⬛⬛⬛ en zevenentwintigste beklaagde ⬛⬛⬛, ieder voor de helft, als illegaal vermogensvoordeel, de som van 25.605,95 EURO (tenl. D. VII).

Lastens achtentwintigste beklaagde ⬛⬛⬛ en negentwintigste beklaagde ⬛⬛⬛, ieder voor de helft, als illegaal vermogensvoordeel, de som van 8.251,65 EURO (tenl. D. XIII).

Lastens dertigste beklaagde ⬛⬛⬛ en éénendertigste beklaagde ⬛⬛⬛, ieder voor de helft, als illegaal vermogensvoordeel, de som van 2.875,58 EURO (tenl. D. IX).

In hoofde van zesde beklaagde ⬛⬛⬛ stelt de rechtbank vast dat ingevolge de heromschrijving van de tenlastelegging D. V zoals hiervoor bepaald, het niet langer mogelijk is om exact vast te stellen bij welke transacties hij juist betrokken is geweest.

# Exhibit 8 Part 2

Daarenboven stelt de rechtbank vast dat zesde beklaagde voornamelijk is opgetreden als tussenpersoon bij de verkoop van goud van derden.

In die omstandigheden kan het door zesde beklaagde verwezenlijkte illegaal vermogensvoordeel niet langer integraal op basis van de dossiergegevens worden bepaald.

Nu zesde beklaagde in besluiten zelf aangeeft minstens een som van 8.000 EURO te hebben ontvangen in gevolge de lastens hem weerhouden misdrijven, dient deze som verbeurd te worden verklaard.

Daarenboven werd beklaagde op 22 juni 2011 aangetroffen met op zich een som van 500.300 EURO in contanten, en 5 zilverstaven van 1 kg, gelden en goederen die afkomstig waren van de verkoop van illegaal goud bij de firma GOETZ.

Deze goederen werden in beslag genomen en nu zij rechtstreeks afkomstig zijn uit de geviseerde, en in hoofde van eerste, tweede, derde en zesde beklaagde weerhouden witwasverrichtingen dienen deze goederen verbeurd te worden verklaard.

Later werd tevens een som van 13.343,61 EURO en 164.528,41 EURO gerecupereerd bij eerste t/m derde beklaagde die beide eveneens de saldi betroffen van verkopen van illegaal goud die door zesde beklaagde bij de firma GOETZ werden verkocht.

Ook deze sommen vormen het voorwerp van de weerhouden witwasmisdrijven en dienen verbeurd te worden verklaard.

Eerste beklaagde Sylvain GOETZ, tweede beklaagde Alain GOETZ en derde beklaagde NV TONY GOETZ zijn groothandelaars in de aankoop van oud goud. Uit de voorliggende stukken blijkt verder dat eerste t/m derde beklaagde het door hen aangekochte goud onmiddellijk doorverkochten aan een Belgische bankinstelling, met name ▆▆▆▆▆▆▆▆.

In besluiten stelt derde beklaagde dat zij het door haar aangekochte goud doorverkocht aan de ▆▆▆▆▆▆▆▆ tegen dagkoers, te verminderen met 50 EURO per verkochte kilo, hetzij de commissie waartegen de bank haar kosten dekte.

Anderzijds blijkt uit de dossiergegevens dat eerste t/m derde beklaagde bij de aankoop van oud goud in contanten, een standaardkost aanrekenden aan de verkoper van 100 EURO per aangekochte kilo goud.

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen
Dossiernr 10A028492                                vleugel D, 3de verdieping                    Vonnisnr    /                    p. 105

Nu de kosten van ████████ verrekend werden bij de verkoop van het goud, dient de aangerekende 'commissie' door eerste t/m derde beklaagde weldegelijk als een illegaal vermogensvoordeel te worden beschouwd dat integraal werd aangewend in de werking van derde beklaagde.

Uit de voorliggende dossiergegevens (zie de tenl. C. I en C. V en de berekeningen van het Openbaar Ministerie in haar conclusie op p. 71 en 72) blijkt dat eerste t/m derde beklaagde in de periode 2010 en 2011 minstens 32.697,47 kg goud aankochten en, rekening houdende met een 'winst' van 100 EURO per kilogram goud, een illegaal vermogen realiseerde van 3.269.747,00 EURO. In hoofde van eerste t/m derde beklaagde dient dit illegaal vermogen, ieder voor één derde, verbeurd te worden verklaard.

### 3. OP BURGERRECHTELIJK VLAK

- #### *Betreffende de burgerlijke partijen*

De rechtbank stelt vast dat de – in de dagvaarding tot dagstelling – vermelde burgerlijke partijen, m.n. de ████████ ROMAN SERVICES en de heer A████ ██ ██████C ter terechtzitting geen vordering hebben gesteld. Het past hiervan akte te verlenen.

- #### *De vrijwillig tussenkomende partijen*

Met verzoekschrift dat werd neergelegd op de zitting van 19 december 2019 hebben de heer ████████████, mevr. ████████r en mevr. De████████r zich in huidig geschil als vrijwillig tussenkomende partij gemeld.

De vordering van de vrijwillig tussenkomende partijen strekt ertoe: *"... ten belope van 324.770 EUR de vrijgave aan verzoekers te bevelen van de lastens de heer ████r in beslag genomen gelden."*

In het voorliggende verzoekschrift stellen de vrijwillig tussenkomende partijen dat zij de rechtmatige eigenaars zijn van een deel, met name het bedrag van 324.770 EURO, van de totale geldsom ten belope van 500.000 EURO dat op 22 juni 2011 op de persoon van zesde beklaagde ███████████ werd aangetroffen en in beslag werd genomen.

Vrijwillig tussenkomende partijen stellen dat deze geldsom de tegenwaarde vormt van 9,4 kg goud – afkomstig uit de nalatenschap van wijlen mevr. ████████████, overleden op 3 juni 2009 – die vrijwillig tussenkomende partijen aan zesde beklaagde zouden hebben overhandigd met het oog op de verkoop ervan bij de firma GOETZ.

Zowel uit het voorliggende verzoekschrift, als uit het strafdossier, blijkt dat de vrijwillig tussenkomende partijen hun vordering steunen op:

1. de verklaringen van zesde beklaagde █████████████;

2. de eigen verklaringen van de heer ████████████ en de door hem voorgebrachte stukken n.a.v. dit verhoor;

3. de contacten met het Openbaar Ministerie en de bevoegde diensten inzake de heffing van successierechten met het oog op de teruggave van de in beslag genomen gelden.

Wat de verklaringen van zesde beklaagde betreft, stelt de rechtbank vast dat deze verklaringen in eerste instantie bijzonder onduidelijk zijn en verder niet meer zijn dan dat, nl. verklaringen die zonder enig document of anderszins gestaafd worden.

Zo stelt zesde beklaagde in conclusie zelf (p. 9, besluiten zesde beklaagde) dat de samenwerking tussen hemzelf en diegene voor wie hij goud verkocht *"in goed vertrouwen"* verliep waarbij er geen documenten werden opgesteld.

Verder blijken de verklaringen van ████████████ en deze van de vrijwillig tussenkomende partijen omtrent het ter verkoop overhandigde goud niet met elkaar te kloppen.

Zo stellen vrijwillig tussenkomende partijen in hun verzoekschrift dat het 5 kg fijn goud betrof, zgn. lingots of goudstaven, en 4,4 kg gouden munten.

Onmiddellijk na zijn aanhouding verklaarde zesde beklaagde ████████████ dat de op hem aangetroffen som van 500.000 EURO de tegenwaarde betrof voor 2 kg staven fijn goud, 4 kg Zwitserse en andere vreemde munten en 10 kg oud goud.

De rechtbank stelt vast dat de verklaringen van zesde beklaagde en deze van de heer ████████ omtrent het verkochte goud niet met elkaar overeenstemmen.

DRC-34996 0505

De verklaring van vrijwillig tussenkomende partij ██████R die hij op 18 juni 2013 aflegde, brengt evenmin veel duidelijkheid. De heer ████████ brengt hierbij een weinig geloofwaardig verhaal naar voor waarin hij stelt dat het goud aan zijn in het jaar 2009 overleden echtgenote toebehoorde, het goud in hun appartement was opgeborgen in een kluis waarvan hij de code niet had, deze kluis pas in 2011 geopend kon worden waarna het pas in juni 2011 aan zesde beklaagde ███████████████zou zijn overhandigd om dit te verkopen.

Niet enkel de herkomst van dit goud is onduidelijk, ook de financiële toestand van vrijwillig tussenkomende partij ██████laat niet toe de herkomst van dit goud te verklaren. Zo stelt hij zelf in zijn verklaring van 18 juni 2013 (Deel ████████ kaft 9, st. 16) een inkomen te genieten van 1.200 EURO per maand, over ongeveer 7.000 EURO banktegoeden te beschikken en verder over geen roerende of onroerende goederen te beschikken. Vrijwillig tussenkomende partij ██████ geeft aan te wonen in een huurhuis, dan wel een woning die hem gratis ter beschikking wordt gesteld door de Joodse Gemeenschap.

Dat vrijwillig tussenkomende partij niettemin kon beschikken over meer dan 10 kg goud met een waarde van meer dan 300.000 EURO valt in die omstandigheden te betwijfelen.

Zesde beklaagde ████████████ stelde verder dat hij – m.b.t. het beweerdelijk door partij ██████ aangeboden goud – communiceerde via een Frans telefoonnummer. Bij onderzoek bleek dit nummer toe te behoren aan een zekere █████████, blijkbaar een kennis van partij █████ in Frankrijk. Waarom zesde beklaagde met deze ███ zou communiceren omtrent goud dat van partij ██████ afkomstig zou zijn, werd niet duidelijk gemaakt.

Het strafdossier (DEEL ████████ kaft p, st. 1 en 2) bevat verder twee brieven die uitgaan van de raadsman van partij ██████ en gedateerd zijn op 17.01.2012 en 15.10.2012, en die gericht zijn aan zesde beklaagde waarin gemeld wordt dat er door partij ██████aan zesde beklaagde 5 kg fijn goud en 4,4 kg gouden munten werden overhandigd om deze te laten affineren, maar dat deze goederen door zesde beklaagde niet aan partij V██████ouden zijn teruggegeven.

Het affineren van goud betreft het zuiveren ervan en het verwijderen van andere stoffen zoals bijv. zilver en koper.

Uit deze brieven kan niet worden opgemaakt dat aan zesde beklaagde ███████████ ook de opdracht zou zijn gegeven om dit goud te verkopen, nu de goederen aan partij ██████ dienden te worden teruggeven.

Ook onderzoek bij de firma GOETZ zelf – dat gevoerd werd enkele uren nadat zesde

Exhibit 8 Part 2

beklaagde, ██████████████ werd aangetroffen in het bezit van 500.000 EURO dat zogenaamd (gedeeltelijk) de tegenwaarde zou vormen van de 9,4 kg goud die door partij ██████ aan zesde beklaagde zou zijn overhandigd, kon op geen enkele wijze uitsluitsel brengen omtrent de partij goud die door zesde beklaagde werd verkocht en waarvoor hem 500.000 EURO in contanten werd uitbetaald.

Tot slot verwijst de rechtbank naar het gegeven dat op huidig tijdstip, meer dan 10 jaar na het overlijden van wijlen mevr.██████████████uit wiens erfenis de 9,4 kg goud afkomstig zou zijn, geen enkel officieel stuk voorligt waaruit blijkt dat de erfenis van wijlen ████ ██████████████ 9,4 kg goud zou hebben bevat.

In die omstandigheden oordeelt de rechtbank dat de vrijwillig tussenkomende partijen niet het bewijs leveren dat zij de rechtmatige eigenaars zijn geweest van 9,4 kg goud, dat door zesde beklaagde ██████████████zou zijn verkocht en waarvan de tegenwaarde zich zou hebben bevonden in de 500.000 EURO in contanten die op 22 juni 2011 werd aangetroffen op zesde beklaagde.

De vordering van de vrijwillig tussenkomende partijen dient dan ook als ongegrond te worden afgewezen.

**TOEGEPASTE WETTEN**

De rechtbank houdt rekening met de volgende artikelen die de bestanddelen van de misdrijven en de strafmaat bepalen, en het taalgebruik in gerechtszaken regelen:

artikelen 152bis, 162, 182, 185, 186, 189bis, 191, 194, 195 van het Wetboek van Strafvordering,
artikelen 1, 3, 5, 6, 7, 7bis van het Strafwetboek,
artikelen 11, 12, 14, 31, 32, 34, 35, 36, 37 en 41 der wet van 15 juni 1935, gewijzigd door de wet van 3 mei 2003;
de verordeningen van de Raad van de ministers nr. 974/98 dd. 3/5/1998 en nr. 1103/97 dd. 17/6/1997 en de wetten van 26/06/2000 en 30/06/2000 betreffende de invoering van de euro,
artikelen 28, 29 der wet van 1 augustus 1985,
artikel 1 van de wet van 5 maart 1952,
Wet van 19 maart 2017 tot oprichting van een Begrotingsfonds voor de juridische tweedelijnsbijstand,
artikel 91 van het Koninklijk Besluit van 28 december 1950,
artikelen 3, 4 en 21ter der wet van 17 april 1878,
artikel 8 der wet van 29 juni 1964
bij toepassing van de artikelen en wetsbepalingen zoals aangehaald in de hierboven vermelde tenlastelegging D, F, G en H,
en bij toepassing van de artikelen 25, 38, 40, 41bis, 42, 43bis, 65, 66, 79, 80, 99bis, 193, 196, 197, 213, 214 en 505 van het Strafwetboek.

# Exhibit 8 Part 2

**De rechtbank:**

**Op tegenspraak t.a.v.:**

- **Eerste beklaagde Sylvain GOETZ**
- **Tweede beklaagde Alain GOETZ**
- **Derde beklaagde NV TONY GOETZ**
- **Vierde beklaagde ▓▓▓▓▓▓▓▓**
- **Vijfde beklaagde ▓▓▓▓▓▓▓▓▓▓▓**
- **Zesde beklaagde ▓▓▓▓▓▓▓**
- **Zevende beklaagde ▓▓▓▓▓▓▓▓▓▓**
- **Achtste beklaagde ▓▓▓▓▓▓▓▓**
- **Negende beklaagde ▓▓▓▓▓▓**
- **Zeventiende beklaagde ▓▓▓▓▓▓▓▓**
- **Negentiende beklaagde ▓▓▓▓▓▓▓**
- **Twintigste beklaagde ▓▓▓▓▓▓**
- **Eénentwintigste beklaagde ▓▓▓▓▓▓▓▓▓**
- **Vierentwintigste beklaagde ▓▓▓▓▓▓▓▓**
- **Vijfentwintigste beklaagde ▓▓▓▓▓▓▓▓**
- **Zesentwintigste beklaagde ▓▓▓▓▓▓▓▓**
- **Zevenentwintigste beklaagde ▓▓▓▓▓▓▓▓**
- **Achtentwintigste beklaagde ▓▓▓▓▓▓▓**
- **Negenentwintigste beklaagde ▓▓▓▓▓▓▓▓**
- **Dertigste beklaagde ▓▓▓▓▓▓▓▓**
- **Eénendertigste beklaagde ▓▓▓▓▓▓**
- **Tweeëndertigste beklaagde ▓▓▓▓▓▓▓**
- **Drieëndertigste beklaagde ▓▓▓▓▓▓▓**
- **Vierendertigste beklaagde ▓▓▓▓▓▓▓▓**

- **En de vrijwillig tussenkomende partijen:**
  - o ▓▓▓▓▓▓▓▓▓▓
  - o ▓▓▓▓▓▓▓
  - o ▓▓▓▓▓▓▓▓

en bij verstek t.a.v.:

- Tiende beklaagde ███████
- Elfde beklaagde ███████████
- Twaalfde beklaagde ██████████
- Dertiende beklaagde ██████████████R
- Veertiende beklaagde A██████████
- Vijftiende beklaagde ████████████
- Zestiende beklaagde █████████████
- Achttiende beklaagde ███████████████
- Tweeëntwintigste ███████████████
- Drieëntwintigste beklaagde ███████

- En de burgerlijke partijen:
  o ████████████████
  o ████████████

- *Strafrechtelijk*

De rechtbank heromschrijft de tenlasteleggingen  C.V.a., D.V. en G.III zoals voormeld.

## Ten aanzien van Sylvain Goetz, eerste beklaagde

Spreekt eerste beklaagde Sylvain GOETZ vrij voor de tenlastelegging A, C. V. b. 2, D. VI. b en G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2).

Veroordeelt eerste beklaagde Sylvain GOETZ voor de vermengde feiten van de tenlastelegging C, uitgezonderd de tenlastelegging C. V. b. 2, de tenlastelegging D, uitgezonderd de tenlastelegging D. VI. b en G, uitgezonderd de tenlastelegging G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2):

tot een gevangenisstraf van **18 maanden**

en tot een geldboete van **5500,00 EUR**, zijnde 1000,00 EUR, verhoogd met 45 opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Exhibit 8 Part 2

Verleent uitstel van uitvoering voor een termijn van 5 jaren wat betreft deze gevangenisstraf.

Verleent uitstel van ûitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Legt aan eerste beklaagde Sylvain GOETZ een beroepsverbod op conform art. 1 van het K.B. nr. 22 van 24 oktober 1934 voor een termijn van 5 jaar, met uitstel voor een termijn van 5 jaar.

Verklaart verbeurd lastens eerste beklaagde Sylvain GOETZ, als illegaal vermogensvoordeel, één derde van de som van 3.269.747,00 EURO.

Veroordeelt Sylvain Goetz tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

**Ten aanzien van Alain Goetz, tweede beklaagde**

Spreekt tweede beklaagde Alain GOETZ vrij voor de tenlastelegging A, C. V. b. 2, D. VI. b en G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2).

Veroordeelt tweede beklaagde Alain GOETZ voor de vermengde feiten van de tenlastelegging C, uitgezonderde de tenlastelegging C. V. b. 2, de tenlastelegging D, uitgezonderd de tenlastelegging D. VI. b en G, uitgezonderd de tenlastelegging G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2):

tot een gevangenisstraf van 18 maanden

en tot een geldboete van 5500,00 EUR, zijnde 1000,00 EUR, verhoogd met 45 opdeciemen.

DRC-34996 0510

# Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verleent uitstel van uitvoering voor een termijn van 5 jaren wat betreft deze gevangenisstraf.
Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Legt aan tweede beklaagde Alain GOETZ een beroepsverbod op conform art. 1 van het K.B. nr. 22 van 24 oktober 1934 voor een termijn van 5 jaar, met uitstel voor een termijn van 5 jaar.

Verklaart verbeurd lastens tweede beklaagde Alain GOETZ, als illegaal vermogensvoordeel, één derde van de som van 3.269.747,00 EURO.

Veroordeelt Alain Goetz tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

## Ten aanzien van Naamloze vennootschap TONY GOETZ, derde beklaagde

Spreekt derde beklaagde NV TONY GOETZ vrij voor de tenlastelegging A, C. V. b. 2, D, VI. b en G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2).

Veroordeelt derde beklaagde NV TONY GOETZ voor de vermengde feiten van de tenlastelegging C, uitgezonderd de tenlastelegging C. V. b. 2, de tenlastelegging D, uitgezonderd de tenlastelegging D. VI. b en G, uitgezonderd de tenlastelegging G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2):

tot een geldboete van 99000,00 EUR, zijnde 18000,00 EUR, verhoogd met 45 opdeciemen.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens derde beklaagde NV TONY GOETZ, als illegaal vermogensvoordeel, één derde van de som van 3.269.747,00 EURO.

Veroordeelt Naamloze vennootschap TONY GOETZ tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

-

**Ten aanzien van ████████████ vierde beklaagde**

Spreekt vierde beklaagde ████████████ vrij voor de haar ten laste gelegde feiten B, C, D en G en stelt haar buiten zaken zonder kosten.

**Ten aanzien van A████████████ra, vijfde beklaagde**

Spreekt vijfde beklaagde A███████████████████ vrij voor de haar ten laste gelegde feiten B, C, D en G en stelt haar buiten zaken zonder kosten.

**Ten aanzien van ████████████r, zesde beklaagde**

Veroordeelt zesde beklaagde ████████████ voor de vermengde feiten van de tenlastelegging C. II, C. V. a (zoals heromschreven), D. V (zoals heromschreven), F, G. II; G. V. a en H:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verleent uitstel van uitvoering voor een termijn van 5 jaren wat betreft deze gevangenisstraf.
Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens zesde beklaagde ████████████R, als illegaal vermogensvoordeel, de som van 8.000 EURO.

Veroordeelt ████████████tot betaling van:

–   een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

–   een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

–   een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

–   de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

oOOo

Verklaart verbeurd als voorwerp van de in hoofde van eerste beklaagde Sylvain GOETZ, tweede beklaagde Alain GOETZ, derde beklaagde NV TONY GOETZ en zesde beklaagde ████████████, weerhouden witwasmisdrijven:

-   de som van 500.300 EURO, gestort op een rekening van het COIV;
-   vijf zilverstaven van 1 kg, gedeponeerd in een kluis van het COIV;
-   de som van 13.343,61 EURO, gestort op een rekening van het COIV;
-   de som van 164.528,41 EURO, gestort op een rekening van het COIV.

oOOo

# Exhibit 8 Part 2

<u>Ten aanzien van ████████████████, zevende beklaagde</u>

Stelt het verval van de strafvordering vast in hoofde van zevende beklaagde ████████ ████████LO m.b.t. de tenlastelegging D. IV ingevolge het adagium *ne bis in idem*.

<u>Ten aanzien van ████████████████, achtste beklaagde</u>

Past art. 65 SW toe in hoofde van achtste beklaagde ████████████████C en stelt vast dat de huidige feiten de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten vervat in het arrest van het hof van beroep te Luik d.d. 17 februari 2015 en legt hem hoofdens de tenlastelegging D. IV geen bijkomende bestraffing op.

Veroordeelt ████████████████ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ████████negende beklaagde</u>

Past art. 65 SW toe in hoofde van negende beklaagde ████████ en stelt vast dat de huidige feiten de opeenvolgende en voortgezette uitvoering zijn van een zelfde misdadig opzet met de feiten vervat in het arrest van het hof van beroep te Luik d.d. 8 september 2015 en legt hem hoofdens de tenlastelegging D. IV geen bijkomende bestraffing op.

Veroordeelt ████████tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

# Exhibit 8 Part 2

<u>Ten aanzien van S████████E, tiende beklaagde</u>

Veroordeelt tiende beklaagde S██████████voor de vermengde feiten C. I en C. IV, D. III, G. I en G. IV:

> tot een gevangenisstraf van 9 maanden

> en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

> Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens tiende beklaagde S████████E, als illegaal vermogensvoordeel, een bedrag van 890.900,57 EURO en een bedrag van 625.723,15 EURO.

Veroordeelt S████████tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van █████████████, elfde beklaagde</u>

Veroordeelt elfde beklaagde ██████████████A voor de vermengde feiten C. VI, D. X en G. VI:

> tot een gevangenisstraf van 9 maanden

> en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

> Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

# Exhibit 8 Part 2

Verklaart verbeurd lastens elfde beklaagde ██████████████A, als illegaal vermogensvoordeel, de helft van het bedrag van 730.608,50 EURO.

Veroordeelt ██████████████A tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ██████████████A, twaalfde beklaagde</u>

Veroordeelt twaalf beklaagde ██████████████voor de vermengde feiten C, VI, D, X en G. VI:

    tot een gevangenisstraf van 9 maanden

    en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

    Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens twaalfde beklaagde ██████████████A, als illegaal vermogensvoordeel, de helft van het bedrag van 730.608,50 EURO.

Veroordeelt J██████████████A tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

# Exhibit 8 Part 2

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ▓▓▓▓▓▓▓▓▓R, dertiende beklaagde

Veroordeelt dertiende beklaagde ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ voor de vermengde feiten C. X, D. XIV en G. X:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens dertiende beklaagde ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓R, als illegaal vermogensvoordeel, een bedrag van 536.578,13 EURO.

Veroordeelt ▓▓▓▓▓▓▓▓▓R tot betaling van:

— een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

— een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

— een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

— de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van A▓▓▓▓▓▓R, veertiende beklaagde

Veroordeelt ▓▓▓▓▓▓voor de tenlasteleggingen C.XIII, D.XVII, G.XIII vermengd:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45 opdeciemen.

# Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens veertiende beklaagde ███████████, als illegaal
vermogensvoordeel, de helft van een bedrag van 550.467,65 EURO, de helft van een bedrag
van 247.022,05 EURO, de helft van een bedrag van 26.766,60 EURO en de helft van een
bedrag van 128.470,62 EURO.

Veroordeelt ████████████ tot betaling van:

  – een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
    met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
    opzettelijke gewelddaden en de occasionele redders

  – een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
    tweedelijnsbijstand

  – een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
    53,58 EUR

  – de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
    EUR

**Ten aanzien van ████████████, vijftiende beklaagde**

Veroordeelt vijftiende beklaagde ████████████ voor de vermengde feiten C. XIII, D. XVII en
G. XIII:

    tot een gevangenisstraf van 9 maanden

    en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
    opdeciemen.
    Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
    gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens vijftiende beklaagde ████████████, als illegaal
vermogensvoordeel, de helft van een bedrag van 550.467,65 EURO, de helft van een bedrag
van 247.022,05 EURO, de helft van een bedrag van 26.766,60 EURO en de helft van een
bedrag van 128.470,62 EURO.

Exhibit 8 Part 2

rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen                                    p. 120
Dossiernr 10A028432                          vleugel D, 3de verdieping          Vonnisnr    /

Veroordeelt ████████████ tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
  met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
  opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
  EUR

**Ten aanzien van** ████████ **zestiende beklaagde**

Veroordeelt zestiende beklaagde ████████ voor de vermengde feiten C. IX, D. XIII en G. IX:

tot een gevangenisstraf van 9 maanden

en tot een geldboete van 4125,00 EUR, zijnde 750,00 EUR, verhoogd met 45
opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een
gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens zestiende beklaagde ████████T, als illegaal vermogensvoordeel,
een bedrag van 432.144,80 EURO.

Veroordeelt ████████IT tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd
  met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van
  opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische
  tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt
  53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99
  EUR

# Exhibit 8 Part 2

Ten aanzien van ▮▮▮▮▮▮▮▮▮ zeventiende beklaagde

Veroordeelt zeventiende beklaagde ▮▮▮▮▮▮▮▮▮▮ voor de vermengde feiten C. XI, D. XV en G. XI:

> tot een gevangenisstraf van 6 maanden

> en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

> Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

> Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze gevangenisstraf.
> Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens zeventiende beklaagde ▮▮▮▮▮▮▮▮▮, als illegaal vermogensvoordeel, een bedrag van 341.504,09 EURO.

Veroordeelt ▮▮▮▮▮▮▮▮▮▮ tot betaling van:

- een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

DRC-34996 0520

## Exhibit 8 Part 2

Ten aanzien van ████████████████, achttiende beklaagde

Veroordeelt achttiende beklaagde ████████████████ voor de vermengde feiten C. VII, D. XI en G. VII:

    tot een gevangenisstraf van 6 maanden

    en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

    Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens achttiende beklaagde ████████████████, als illegaal vermogensvoordeel, een bedrag van 221.982,34 EURO

Veroordeelt ████████████████ tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ████████████, negentiende beklaagde

Veroordeelt negentiende beklaagde ████████████ voor de vermengde feiten C. XIV, D. XVIII en G. XIV:

    tot een gevangenisstraf van 6 maanden

    en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

# Exhibit 8 Part 2

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze gevangenisstraf.

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens negentiende beklaagde ███████████, als illegaal vermogensvoordeel, de helft van een bedrag van 167.039,12 EURO en de helft van een bedrag van 3.102,07 EURO.

Veroordeelt ███████████ tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke gewelddaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

__Ten aanzien van ██████████████ twintigste beklaagde__

Spreekt twintigste beklaagde █████████████vrij voor de hem ten laste gelegde feiten C. XIV, D. XVIII en G. XIV en stelt hem buiten zaken zonder kosten.

__Ten aanzien van SU█████████████ eenentwintigste beklaagde__

Veroordeelt éénentwintigste beklaagde ████████████L voor de vermengde feiten C. XIV, D. XVIII en G. XIV:

tot een geldboete van 8250,00 EUR, zijnde 1500,00 EUR, verhoogd met 45 opdeciemen.

DRC-34996 0522

Verleent uitstel van uitvoering voor een termijn van 3 jaren wat betreft deze geldboete.

Verklaart verbeurd lastens éénentwintigste beklaagde ( ~~~~~~~~ ) als illegaal vermogensvoordeel, de helft van een bedrag van 167.039,12 EURO en de helft van een bedrag van 3.102,07 EURO.

Veroordeelt ~~~~~~~~ tot betaling van:

–  een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

–  een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

–  een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

–  de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

**Ten aanzien van** ~~~~~~~~ **tweeëntwintigste beklaagde**

Veroordeelt tweeëntwintigste beklaagde ~~~~~~~~ voor de vermengde feiten C. XII, D. XVI en G. XII :

tot een gevangenisstraf van 6 maanden

en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens tweeëntwintigste beklaagde ~~~~~~~~ als illegaal vermogensvoordeel, een bedrag van 187.216,99 EURO.

Veroordeelt ~~~~~~~~ tot betaling van:

–  een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweiddaden en de occasionele redders

–  een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

# Exhibit 8 Part 2

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ██████████, drieëntwintigste beklaagde</u>

Veroordeelt drieëntwintigste beklaagde ████████████ voor de vermengde feiten C. VIII, D. XII en G. VIII:

tot een gevangenisstraf van 6 maanden

en tot een geldboete van 2750,00 EUR, zijnde 500,00 EUR, verhoogd met 45 opdeciemen.

Boete vervangbaar bij gebreke van betaling binnen de wettelijke termijn door een gevangenisstraf van 90 dagen.

Verklaart verbeurd lastens drieëntwintigste beklaagde ████████████ als illegaal vermogensvoordeel, een bedrag van 138.382,16 EURO.

Veroordeelt ████████████ tot betaling van:

– een bijdrage van 1 maal 200,00 EUR, zijnde de som van 1 maal 25,00 EUR verhoogd met 70 opdeciemen, ter financiering van het Fonds tot hulp aan de slachtoffers van opzettelijke geweldaden en de occasionele redders

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ██████████, vierentwintigste beklaagde</u>

Spreekt vierentwintigste beklaagde ████████████ vrij voor de hem ten laste gelegde feiten C. V. b. 2, D. VI. b en G. V. b (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 2).

DRC-34996 0524

Exhibit 8 Part 2

Verklaart vierentwintigste beklaagde ⬛⬛⬛⬛⬛⬛⬛ eenvoudig schuldig aan de hem ten laste gelegde feiten C. III, C. V. b. 1, D. VI. a, G. III (met heromschreven incriminatieperiode) en G. V. b. (in zoverre deze betrekking heeft op de feiten als vermeld onder de tenlastelegging C. V. b. 1).

Verklaart verbeurd lastens vierentwintigste beklaagde ⬛⬛⬛⬛⬛⬛⬛ als illegaal vermogensvoordeel, een bedrag van 13.752,75 EURO.

Veroordeelt ⬛⬛⬛⬛⬛⬛⬛ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ⬛⬛⬛⬛⬛⬛⬛ vijfentwintigste beklaagde

Verklaart vijfentwintigste beklaagde ⬛⬛⬛⬛⬛⬛⬛ eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. III en G. III (met heromschreven incriminatieperiode).

Veroordeelt ⬛⬛⬛⬛⬛⬛⬛ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ⬛⬛⬛⬛⬛⬛⬛ zesentwintigste beklaagde

Verklaart zesentwintigste beklaagde ████████████████ eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. V. c, D. VII en G. V. c.

Verklaart verbeurd lastens zesentwintigste beklaagde ████████████ als illegaal vermogensvoordeel, de helft van een bedrag van 25.605,95 EURO.

Veroordeelt ████████████ tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ████████████, zevenentwintigste beklaagde

Verklaart zevenentwintigste beklaagde ████████████ eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. V. c, D. VII en G. V. c.

Verklaart verbeurd lastens zevenentwintigste beklaagde ████████████, als illegaal vermogensvoordeel, de helft van een bedrag van 25.605,95 EURO.

Veroordeelt ████████████ tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

Ten aanzien van ████████████ achtentwintigste beklaagde

# Exhibit 8 Part 2

Verklaart achtentwintigste beklaagde ████████████ eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. V. d, D. VIII en G. V. d.

Verklaart verbeurd lastens achtentwintigste beklaagde ███████████, als illegaal vermogensvoordeel, de helft van een bedrag van 8.251,65 EURO.

Veroordeelt ███████████ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

### Ten aanzien van ██████████ negenentwintigste beklaagde

Verklaart negenentwintigste beklaagde ██████████S eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. V. d, D. VIII en G. V. d.

Verklaart verbeurd lastens negenentwintigste beklaagde ████████████ als illegaal vermogensvoordeel, de helft van een bedrag van 8.251,65 EURO.

Veroordeelt ███████████ tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

# Exhibit 8 Part 2

<u>Ten aanzien van ██████████████, dertigste beklaagde</u>

Verklaart dertigste beklaagde ███████████UT eenvoudig schuldig aan de aan hem ten laste gelegde feiten C. V. e, D. IX en G. V. e.

Verklaart verbeurd lastens dertigste beklaagde ████████████████, als illegaal vermogensvoordeel, de helft van een bedrag van 2.875,58 EURO.

Veroordeelt N████████████tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van█████████E, eenendertigste beklaagde</u>

Verklaart éénendertigste beklaagde██████████E eenvoudig schuldig aan de aan haar ten laste gelegde feiten C. V. e, D. IX en G. V. e.

Verklaart verbeurd lastens éénendertigste beklaagde ██████████ als illegaal vermogensvoordeel, de helft van een bedrag van 2.875,58 EURO.

Veroordeelt ████████████tot betaling van:

– een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

– een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

– de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

# Exhibit 8 Part 2

<u>Ten aanzien van M⬛⬛⬛⬛⬛ tweeëndertigste beklaagde</u>

Verklaart tweeëndertigste beklaagde ⬛⬛⬛⬛⬛ eenvoudig schuldig aan de aan hem ten laste gelegde felten C. II en G. II.

Veroordeelt ⬛⬛⬛⬛⬛⬛t betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ⬛⬛⬛⬛⬛, drieëndertigste beklaagde</u>

Verklaart drieëndertigste beklaagde ⬛⬛⬛⬛⬛ eenvoudig schuldig aan de aan haar ten laste gelegde felten C. II en G. II.

Veroordeelt ⬛⬛⬛⬛⬛tot betaling van:

- een bijdrage van 20,00 EUR aan het Begrotingsfonds voor juridische tweedelijnsbijstand

- een vaste vergoeding voor beheerskosten in strafzaken. Deze vergoeding bedraagt 53,58 EUR

- de kosten van de strafvordering tot op heden begroot op 1/34 x 18223,60 = 535,99 EUR

<u>Ten aanzien van ⬛⬛⬛⬛⬛, vierendertigste beklaagde</u>

Spreekt vierendertigste beklaagde ⬛⬛⬛⬛⬛ij voor de hem ten laste gelegde felten F en H en stelt hem buiten zaken zonder kosten.

Legt de overige kosten van de strafvordering ten laste van de Staat.

# Exhibit 8 Part 2

-     *Burgerrechtelijk*

- ⬤ Stelt vast dat partijen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮en de heer ▮▮▮▮▮▮▮▮▮▮ in het kader van huidige procedure geen vordering hebben gesteld.

- ⬤ Verklaart de vordering van de vrijwillig tussenkomende partijen ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ en mevr. ▮▮▮▮▮▮▮▮ontvankelijk maar ongegrond.

Veroordeelt de vrijwillig tussenkomende partijen tot hun eigen kosten.

Houdt de burgerlijke belangen ambtshalve aan.

oOOo

Dit vonnis is gewezen  door de rechtbank van eerste aanleg Antwerpen, afdeling Antwerpen, kamer AC5:
- G. Segers, rechter, voorzitter van de kamer
- M. Declerck,  rechter
- A. Bellens, rechter
en uitgesproken in openbare terechtzitting op 30 januari  2020 door de voorzitter,
in aanwezigheid van een magistraat van het openbaar ministerie,
met bijstand van griffier J. Soete.

J. Soete            A. Bellens            M. Declerck            G. Segers

Exhibit 8 Part 2

# Annex
# G

# Exhibit 8 Part 2

**General Declaration**
**by the shareholders of**
**Alaxy BVBA**
**22 February 2023**

The undersigned:

The private limited liability company, ALAXY, having its registered office at Jacobstraat 56, 2018 Antwerp, Belgium, and with company number 0478.862.274, validly represented for this purpose by Sandra Weyler and Alain Goetz, hereinafter referred to as: the "Shareholders".

Whereas:

a) The Shareholders hold all issued and outstanding shares in the capital of the Company;

b) the Company is in a state of absence of any economic activity and that there is no prospect of resuming any economic activity in the future;

c) all debts to third parties have been settled by the Shareholders and thus the Company has no outstanding debts

d) the Shareholders of the Company hereby wish to resolve for a voluntary termination of the partnership.

Do hereby declare the following:

The decision to voluntarily dissolve and liquidate the Company.

The Shareholders hereby give their approval to appoint a company auditor for the dissolution and liquidation of the Company.

Thus resolved and signed at Dubai, February 22, 2023, by:


Sandra WEYLER                                    Alain GOETZ

# Exhibit 8 Part 2

**Algemene Verklaring**
**door de aandeelhouders van**
**Alaxy BVBA**
**22 februari 2023**

<u>Ondergetekenden:</u>

De besloten vennootschap met beperkte aansprakelijkheid, **ALAXY**, met zetel te Jacobstraat 56, 2018 Antwerpen, België, en met ondernemingsnummer 0478.862.274, ten deze rechtsgeldig vertegenwoordigd door Sandra Weyler en Alain Goetz, hierna te noemen: de "Aandeelhouders".

<u>Overwegende dat:</u>

a) De Aandeelhouders alle geplaatste en uitgegeven aandelen houden in het kapitaal van de Vennootschap;

b) de Vennootschap in een toestand verkeert van afwezigheid van enig economisch activiteit en dat er geen vooruitzicht is dat er enig economische activiteit hernomen zal worden in de toekomst;

c) alle schulden aan derden vereffend zijn door de Aandeelhouders en de Vennootschap aldus geen uitstaande schulden heeft.

d) de Aandeelhouders van de Vennootschap hierbij wensen te besluiten tot een vrijwillige stopzetting van de venootschap.

<u>Verklaren hierbij het volgende:</u>

De beslissing tot vrijwillige ontbinding en vereffening van de Vennootschap.

De aandeelhouders geven hiermee hun goedkeuring om een bedrijfsrevisor aan te stellen voor de ontbinding en vereffening van de Vennootschap.

Aldus besloten en getekend te Dubai, 22 februari 2023, door:

Sandra WEYLER

Alain GOETZ

DRC-34996 0533

Exhibit 8 Part 2

# Annex
# H

DRC-34996 0534

# Exhibit 8 Part 2

**General Declaration**

**by the shareholders of**

**Orofino NV**

**22 February 2023**

<u>The undersigned:</u>

The private limited liability company, ALAXY, having its registered office at Jacobstraat 56, 2018 Antwerp, Belgium, and with company number 0478.862.274, validly represented for this purpose by Sandra Weyler and Alain Goetz, hereinafter referred to as: the "Shareholders".

<u>Whereas:</u>

    a) The Shareholders hold all issued and outstanding shares in the capital of the Company;

    b) the Company is in a state of absence of any economic activity and that there is no prospect of

    resuming any economic activity in the future;

    c) all debts to third parties have been settled by the Shareholders and thus the Company has no

    outstanding debts

    d) the Shareholders of the Company hereby wish to resolve for a voluntary termination of the

    partnership.

<u>Do hereby declare the following:</u>

The decision to voluntarily dissolve and liquidate the Company.

The Shareholders hereby give their approval to appoint a company auditor for the dissolution and liquidation of the Company.

Thus resolved and signed at Dubai, February 22, 2023, by:

Sandra WEYLER                                                                 Alain GOETZ

# Exhibit 8 Part 2

**Algemene Verklaring**
**door de aandeelhouders van**
**Orofino NV**
**22 februari 2023**

Ondergetekenen:

De besloten vennootschap met beperkte aansprakelijkheid, **OROFINO**, met zetel te Jacobstraat 56, 2018 Antwerpen, België, en met ondernemingsnummer 0892.529.761, ten deze rechtsgeldig vertegenwoordigd door Alaxy BVBA en Alain Goetz, hierna te noemen: de "Aandeelhouders".

Overwegende dat:

   a) De Aandeelhouders alle geplaatste en uitgegeven aandelen houden in het kapitaal van de Vennootschap;

   b) de Vennootschap in een toestand verkeert van afwezigheid van enig economisch activiteit en dat er geen vooruitzicht is dat er enig economische activiteit hernomen zal worden in de toekomst;

   c) alle schulden aan derden vereffend zijn door de Aandeelhouders en de Vennootschap aldus geen uitstaande schulden heeft.

   d) de Aandeelhouders van de Vennootschap hierbij wensen te besluiten tot een vrijwillige stopzetting van de venootschap.

Verklaren hierbij het volgende:

De beslissing tot vrijwillige ontbinding en vereffening van de Vennootschap.

De aandeelhouders geven hiermee hun goedkeuring om een bedrijfsrevisor aan te stellen voor de ontbinding en vereffening van de Vennootschap.

Aldus besloten en getekend te Dubai, 22 februari 2023, door:

Alain GOETZ (Namens Alaxy BVBA)            Sandra WEYLER (Names Alaxy BVBA)

Alain GOETZ

DRC-34996 0536

Exhibit 8 Part 2

# Annex
# I

DRC-34996 0537

# Exhibit 8 Part 2



مـركـز دبـى للسـلـع المـتـعـددة
## DUBAI MULTI COMMODITIES CENTRE
GOVERNMENT OF DUBAI   حكـومـة دبـى

شـهـــــــادة تـــــأسـيـــــس

# CERTIFICATE OF REGISTRATION

**Certificate No.   0885**

The Registrar of Companies of The Dubai
Multi Commodities Centre Authority
hereby certifies that:

### Agor DMCC

Is formed as a Company with Limited
Liability this day **28-Nov-2006** and that all
the Requirements under the provisions of
law No. (4) of 2001 & order dated May
1st, 2002 in respect of Establishing Dubai
Multi Commodities Centre and its
amendments has been satisfied.

Issued under the seal of Dubai Multi
Commodities Centre Authority.

**رقم الشهادة   0885**

يشهد مسجل الشركات بمركز سلطة دبي للسلع
المتعددة بأن:

أغور م.د.م.س

تأسست كشركة ذات مسؤولية محدودة في اليوم
28 –نوفمبر–2006 وأن جميع متطلبات القانون
رقم (4) لسنة 2001 والأمر الصادر في الأول
من مايو 2002 بشأن إنشاء سلطة مركز دبي
للسلع المتعددة وتعديلاته قد تم استيفاؤها.

صدر تحت ختم سلطة مركز دبي للسلع المتعددة.

Amer Mùsa Al Jaghbeer

LEGAL REGISTRAR

**DMCC**
TRUE COPY OF ORIGINAL
Staff Name :
Signature :
Date :               E - 3

عامـر موسـى الجغبـر

المسجـل الـقـانـونـى

DRC-34996 0538

# Exhibit 8 Part 2



مـركـز ديــى للسلــع الـمـتـعـددة
**DUBAI MULTI COMMODITIES CENTRE**
GOVERNMENT OF DUBAI    حكــومــة ديـــى

## شــهــادة أسـهـم
## SHARES CERTIFICATE

Certificate No.   01

Number of Share   200

### Company Name
Agor DMCC

### Shareholder
*Alain F. V. Goetz*

### Address
Erikadreef 2A, 2900 Schoten, Belgium.
This is to certify that: **Mr. Alain F. V. Goetz**

is the registered holder(s) of **200** shares, total value of AED. **200,000**, each share value is AED. **1,000**

Paid in the above Named Company, subject to the Memorandum and Articles of Association and the DMCC company regulations No. 1/03.

Dated **18/02/2007**

No Transfer of any of the above mentioned Share(s) can be registered until this certificate has been deposited at the registrar office

No Transfer of any of the above mentioned Share(s) is/are permitted without written approval of Dubai Metals and Commodities Center's Legal Registrar.

*Director - Government Services & Legal Registrar*

*Company Seal*

أغــــور م.م.م.س.
**AGOR DMCC**
Dubai · United Arab Emirates

DRC-34996 0539

Exhibit 8 Part 3

# Annex
# J

DRC-34996 0540

# Exhibit 8 Part 3



THE REPUBLIC OF UGANDA

180334

# Certificate of Incorporation

(Under section 16(1) of the Companies Act)

I CERTIFY that ......**AFRICAN GOLD REFINERY LIMITED**...............................................................

........................................................................................................................................................

has this day been incorporated with Limited Liability.

Dated at Kampala, this ...................**18TH**.................................... day

of ........**MARCH**........... the year ...........**2014**.............................................................

**MUGABE/ROBERT**

**ASST.**      Registrar of Companies

Printed by Uganda Printing and Publishing Corporation

DRC-34996 0541

Exhibit 8 Part 3

CERTIFIED TRUE COPY

THE COMPANIES ACT 2012

●●●●●●●

COMPANY LIMITED BY SHARES

●●●●●●●

AMENDED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

AFRICAN GOLD REFINERY LIMITED

●●●●●●●●

Amended this..............2nd..... day of.........Dec..............2015

**Drawn By:**
*Tem Advocates & Solicitors*
*Plot 3 Parliament Avenue*
*1st floor Raja Chambers*
*P. O. Box 6800*
*Kampala.*

# Exhibit 8 Part 3

CERTIFIED TRUE COPY

## THE COMPANIES ACT 2012

### COMPANY LIMITED BY SHARES

### AMENDED MEMORANDUM OF ASSOCIATION

### Of

### AFRICAN GOLD REFINERY LIMITED

1. The name of the Company is "AFRICAN GOLD REFINERY LIMITED".

2. The registered office of the Company will be situated in the Republic of Uganda.

3. The objects for which the Company is established are:

   a) To establish and operate an industrial plant and refinery to process minerals and metals of all types including but limited to; gold, diamonds, iron, silver, Cotton and others.

   b) To establish and operate a state of the art gold refinery and an investment company in strategic minerals.

   c) To prospect, explore, develop and work claims or mines, drill and sink shafts or wells and raise, pump, dig and quarry for gold, silver, minerals, ores, diamonds and precious stones, Oil, Petroleum, natural gas, coal, earth, and other substances.

   d) To prospect, explore, develop, maintain and work all or any lands, wells, mines or mining rights, minerals, ores, works or other properties from time to time in the possession of the company; to erect all necessary or convenient refineries, mills, machinery, laboratories, workshops, dwelling-houses for workmen and others, and other building and installations, and to aid in or subscribe towards or subsidies any such objects.

   e) To purchase, take on lease or in exchange, or acquire by mining set or license, concession, grant or otherwise any land, mineral rights, buildings, easements, rights and privileges,

2 | P a g e

# Exhibit 8 Part 3

machinery, plant and other effect which the company may consider useful for any of its purposes.

f) To employ and pay mining experts, agents, and other persons, partnerships, companies or corporation, and to organize, equip and dispatch expedition for prospecting, exploring, reporting on, surveying, working and developing land and properties, whether owned by this company or not, and to make advances to and pay for or contribute to the expenses of, and otherwise assist persons or companies prospecting, acquiring, settling on, farming, building on, mining, or otherwise developing any lands and properties, or desirous of so doing.

g) To search for minerals, mines and grant licenses for mining in or over any land in which the company may be interested, and to lease any such land works and to construct or contribute to the construction of piers, wharves docks, railways and roads.

h) To carry on the business of mining, smelting and refining company, and to purchase or hire vessels and vehicles, to acquire or erect building and works and to construct or contribute to the construction of piers, wharves, docks, railways and roads.

i) To purchase or otherwise acquire real or personal property of all kinds in Uganda and elsewhere, and in particular land, oil wells, gold mine refineries,   mines, mining and drilling right,minerals,orer,buildings,machinery,plant,stores,patent,licen ces,concessions,rights of way, light or water, and any rights or privileges which it may seem convenient to obtain for the purposes of or in connection with business of the company, and to manage, develop, sell, exchange ,lease, mortgage, or otherwise deal with the whole or any part of such property or rights.

j) To carry on business as land and mine owners, miners, metallurgists, metalworkers, builders and contractors, engineers, manufacturers, farmers, vehicle and equipment

3 | P a g e

DRC-34996 0544

# Exhibit 8 Part 3

proprietors, traders, ship owners, ship brokers, importers and exporters, and to buy, sell and del in property of all kind.

k) To purchase or otherwise acquire any freehold or leasehold property for any estate or interest whosever, and any privileges or easements over or in respect of any property.

l) To carry out the works of general contractors, construction, renovations, road repairs and construction, compound designing and landscaping, clearing of premises, fumigation and general maintenance of buildings/properties.

m) To purchase or otherwise acquire and to manufacture and deal in bricks, stone and other building materials of any kind, and all implements, machinery, vehicles, scaffolding and other equipments and articles used by builders and constructor

n) To engage 1 the business of import and export of all commodities e.g. hardware, cement and industrial machinery.

o) To purchase or otherwise acquire lands, houses, offices, workshops, buildings and premises for the purpose of that business.

p) To carry on business of logistics management and haulage.

q) To carry on all or any of the business of manufacturers and workers in cement, concrete, lime plaster, clay, gravel, sand, minerals and artificial stone, and aggregates and builders' requisites of all kinds, and of engineers, ship, barge, lighter and truck owners, quarry owners, builders, general contractors and carriers.

r) To carry on the business of plumbing, mechanical engineers and manufactures, workers and dealers in plumbing and plumbing apparatus or goods to which plumbing or any other service in applied.

4 | P a g e

DRC-34996 0545

# Exhibit 8 Part 3

s) To operate motor transport of all kinds, including the leasing or hiring of cars, Lorries, trucks, tractors, and breakdown vehicles.

t) To purchase or otherwise acquire houses, offices, workshop, buildings and premises and any fixed and movable machinery, tools, engines, boilers, plant, implements, patterns, stock-in-trade, patents and patent rights convenient for any of the above activities.

u) To carry on the warehousing, marketing, distribution and procurements.

v) To engage in industrial manufacturing of consumer goods with the company and to lend money upon the security of such goods.

w) To issue warrants    to persons warehousing goods with the company and to lend money upon the security of such goods.

x) To invest any money of the company in such investments and other property as may from time to time be thought fit, and hold, sell or otherwise dispose of any such investment.

y) To give credit to such persons on such terms as may seem expedient and in particular to customer and others having dealings with the company and to give guarantees or become security for any such persons.

z) To borrow or raise money in such manner as the company shall think fit, and in particular by the issue of debentures, stock(perpetual) or otherwise, and to ensure the repayment of any money borrowed, raised or owed by mortgage, lien or charge upon the whole or any companies assets.

aa) To invest any monies of the company not immediately required for the purpose of the business of the company in such investments(other than shares in the company or its holding company, if any)and in such manner as may or otherwise deal with such instruments.

5 | P a g e

DRC-34996 0546

# Exhibit 8 Part 3

bb) To establish or promote, procure or participate in establishing or promoting any company the establishment or promotion of which shall be considered desirable in the interest of the company and to subscribe for, underwrite purchase or otherwise acquire the shares stocks and securities of any company.

cc) To give any remuneration or other compensation or reward for services rendered or to be rendered in placing or procuring subscription of or otherwise assisting in the issue or any shares, debenture or other securities of the company or in or about the formation of the company or the conduct of its business.

dd) To enter into any arrangements for sharing profits, union of interest, or co-operation, in concern or otherwise with any person, or firm or company or corporation carrying on or engaged in or about to carry on or engage in any business or transactions which the company may deem capable of being conveniently carried on in connection with the above or calculated directly or enhance the value of or render profitable any of the company property and /or whereby the company would benefit.

ee) To enter into any arrangements with any governments or authorities, (municipal, local or otherwise) or any corporation, companies or person that may seem conductive to the company object or any of them and to obtain from any Government, authority, corporations which the company may think with any such charter contracts, decrees, rights, privileges and concessions and to present and advocate the view and policies of the company to governments and other authorities.

ff) To act as agents or brokers and as trustees for any person, firm, organization or company and to undertake and perform subcontracts and also to act in any of the business of the company through others.

DRC-34996 0547

# Exhibit 8 Part 3

gg) To support and subscribe to any charitable or public object and any institution society or club which may be for the benefit of the company or its employee or may be connected with any town or place where the company gratuities or charitable aid to any person or persons who may have served the company or to wives, children and other relatives of such persons to make payments towards, insurance and to form and contribute to provident and to benefit funds for the benefit of any persons employed by the company.

hh) To amalgamate with any company having objects altogether or in part similar to those of this company.

ii) To give guarantee and/or become sureties for any person or persons, firm or firms, corporation or corporations whether incorporated for moneys raised and or firm or corporation or for any persons or firm corporation for any purpose whatsoever for the performance, discharge and fulfilment of such obligations and guarantees.

jj) To procure the company to be registered or recognised in any other territory, colony, place and in any foreign country or place.

kk) To do all such other things as may be deemed incidental or conducive to the attainment of the above objects or any of them. And it is hereby declared that the word company in the clause shall be deemed to include any partnership or other body or persons whether incorporated or not incorporated and whether domiciled in Uganda or elsewhere and the intention clause shall except where otherwise expressly stated in such paragraph independent of a main object and shall be in no way limited by any other paragraph

ll) To carry out any legally accepted business in Uganda

DRC-34996 0548

# Exhibit 8 Part 3

1.  The liability of the Members is limited.

2.  The share capital of the Company is Uganda Shillings Three Billion Five hundred Fifty Eight Million Nine Hundred and Eighty Thousand Shillings (UGX .3,558,980,000) divided into One Thousand (1,000) ordinary shares of Uganda Shillings Three Million Five Hundred fifty eight thousand Nine hundred eighty thousand (UGX.3,558,980) each, with powers of the Company to increase or reduce such capital and divide any shares in its capital for the time being into several classes and to attach thereto respectively any preferential, deferred, qualified or other rights, privileges, restrictions or conditions and to issue all or any part of such original, increased or reduced capital with or subject to such preferential, deferred, qualified or other rights, privileges, restrictions or conditions

We, the several persons whose names, addresses and occupations are hereunto subscribed are desirous of being formed into a Company in pursuance of the Memorandum of Association and we respectively agree to take the number of shares in the capital of the Company set opposite our respective names.

| NAME, POSTAL ADRESS AND OCCUPATION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY EACH SUBSCRIBER | SIGNATURES OF SUBSCRIBER |
|---|---|---|
| **ALAIN FRANCOIS V.GOETZ JACOB JACOBSSTRAAT 58 2018 ANTWERP, BELGIUM BUSINESS EXECUTIVE** | 999 | |
| **MOSES SADOORI P.O. BOX 8520 KAMPALA BUSINESS EXECUTIVE** | 1 | |

8 | P a g e

# Exhibit 8 Part 3

Dated at Kampala this ___Q8ᵗʰ___ Day of November 2015

## WITNESS TO THE ABOVE SIGNATURES:

Signature: _____

Name in Full: _____

Postal Address: _____

Occupation: _____

*Sharon Tem*
LLB(MUK) DIP LP. (LDC)
ADVOCATE
P.O. Box 8800, Kampala
Tel: 0772 388-384, Email: tem@lawyer.com

9 | P a g e

DRC-34996 0550

Exhibit 8 Part 3

**THE COMPANIES ACT 2012**

**COMPANY LIMITED BY SHARES**

**AMENDED ARTICLES OF ASSOCIATION**

Of

**AFRICAN GOLD REFINERY LIMITED**

The company is a PRIVATE COMPANY and accordingly;

(a) The right to transfer shares is restricted in the manner hereinafter prescribed.

(b) Words importing the singular number only shall include the plural number, and vice versa.

**PRELIMINARY**

1.  The regulations contained in table "A" of the First Schedule to the Companies Act, shall apply to this Company in so far as they are applicable to a private company subject to the modifications and special provisions herein contained.

2.  In these Articles, if not inconsistent with the subject or context:

    (a)  **"Act"** shall mean the Companies Act 1/2012;

    (b)  **"Articles"** shall mean these Articles of Association as now framed or as from time to time altered by Special Resolution;

    (c)  **"Board"** shall mean the Board of Directors of the Company or the Directors present at a duly convened meeting of the Directors at which a quorum is present;

    (d)  **"Company"** shall mean **AFRICAN GOLD REFINERY LIMITED**;

    (e)  **"Debenture"** shall include debenture stock;

    (f)  **"Director"** shall include an alternate director;

    (g)  **"Uganda"** shall mean the Republic of Uganda;

    (h)  **"Member"** shall mean a shareholder in the Company;

    (i)  **"Month"** shall mean a calendar month;

    (j)  **"Paid up"** shall mean paid up or credited as paid up;

10 | Page

CERTIFIED TRUE COPY

WILLIAM DRAKU

REGISTRAR OF COMPANIES
KAMPALA

# Exhibit 8 Part 3

(j)  "**Paid up**" shall mean paid up or credited as paid up;

(k)  "**Seal**" shall mean the common seal of the Company;

(l)  "**Secretary**" shall mean any person appointed by the Board to perform any of the duties of the Secretary;

(m)  "**Shillings**" and "**UGX**" shall mean Uganda shillings;

(n)  the expression "**in writing**" or "**written**" shall include words written, printed, lithographed or represented or reproduced in any other mode in visible form;

(o)  words signifying the singular number only shall include the plural number and vice versa;

(p)  words signifying the masculine gender only shall include the feminine gender;

(q)  words importing persons shall include corporations;

(r)  Reference to any provision of the Act shall be construed as a reference to such provision as modified or re-enacted by any act for the time being in force.

3.  Subject to the last preceding Article, any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRIVATE COMPANY

1.  The Company is a Private Company and accordingly:

(a) No invitation shall be issued to the public to subscribe for any shares, debentures or debenture-stock or other securities of the Company;

(b) The number of members for the time being of the Company (exclusive of the employees of the Company) shall not exceed one hundred provided however for the purpose of this provision where two or more persons hold one or more shares in the Company jointly they shall be treated as a single member.

(c) The right to transfer the shares of the Company shall be restricted as herein after provided.

## SHARES

2.  No part of the funds of the Company shall directly or indirectly be employed in the purchase of or in loans upon the security of the Company's shares, but nothing in this regulation shall

11 | P a g e

DRC-34996 0552

# Exhibit 8 Part 3

prohibit transactions mentioned in the provision to section 63 of the Companies Act.

3.  Subject to the provisions of the above mentioned article the shares shall be under the control of the directors who may allot or otherwise dispose of the same to such persons and on such terms and conditions as they think fit.

4.  Every person whose name is entered as a member in the register of members shall without payment, be entitled to a certificate under the seal of the Company specifying the share or shares held by the member and the amount paid up provided that in respect of a share or shares held jointly by several persons, the Company shall not be bound to issue more than one certificate and delivery of a certificate to one of several joint holders shall be sufficient delivery to all.

5.  Every certificate shall specify the number of the shares in respect of which it is issued and the amount paid by the person named on the certificate.

## LIEN

6.  The Company shall have a first and paramount lien upon the shares not being fully paid up shares for all monies, whether immediately payable or not called or payable at a fixed time in respect of that share and articles 11 to 14 of Table "A" shall apply to all shares on which the Company has a lien.

7.  Subject to any special condition on the allotment of shares, all calls on shares shall be made by and at the discretion of the Directors and shall be payable at such time and place and by instalments or otherwise as the Directors may appoint and articles 15 to 21 of Table "A" shall apply.

## TRANSFER OF SHARES

8.  The transfer of any share in the Company shall require the approval of the Board.

9.  Every shareholder or trustee in bankruptcy or other legal representative of a shareholder who may desire to sell or transfer any shares of the Company shall give notice in writing to the Directors that he desires to make such sale or transfer;

DRC-34996 0553

Exhibit 8 Part 3

such notice shall constitute the Board his agent for the sale of such shares to any member or members of the Company at a price to be agreed upon between the party giving such notice and the Board.

10. In the event that the shareholder and directors fail to agree on the price of the shares, then the matter shall be submitted to two independent arbitrators one to be appointed by the shareholder and the other by the Directors under the laws of arbitration for the time being in force in Uganda and the decision of the two arbitrators shall be final and binding.

11. Upon the determination of the price for such shares in accordance with Articles 9 or 10 above, the Board shall forthwith give notice to all of the shareholders of the company (other than the selling member) stating the number and price of such shares and inviting the interested shareholders to state in writing, within twenty one days from the date of such notice, their interest to purchase any of the shares, and the number of shares.

12. At the expiration of such twenty one days, the Board shall apportion such shares amongst the shareholder(s)who shall have expressed their desire to purchase the same and as far as may be necessary, may apportion the shares on a pro-rata basis according to the number of shares already held by the respective shareholders or if only one shareholder expresses the desire to purchase shares, then the whole of such shares shall be sold to the shareholder, provided that no shareholder shall be obliged to take more than the maximum number of such shares stated in their answer to the said notice. The selling shareholder, upon such apportionment by the Board and the payment of the agreed price by the purchasing shareholder(s) shall be bound to transfer the shares to the respective purchasing shareholders or to the single shareholder as the case may be.

13. In the event of failure by the selling shareholder to transfer such shares, the Directors may execute a transfer on behalf of the selling shareholder and may give a good receipt for the purchase price of such shares and may register the purchasing shareholder(s)as holders thereof and issue to them certificate(s)for the same and thereupon the purchasing

13 | P a g e

DRC-34996 0554

# Exhibit 8 Part 3

shareholder(s) shall become indefeasibly entitled thereto. The selling shareholder shall in such case be bound to deliver up his certificate or certificates for the said shares and on delivery shall be entitled to receive the said purchase price without interest.

14. In the event of the whole or any part of such shares offered for sale to the members by the selling shareholder remaining unsubscribed under the preceding Articles for a period of 60 days from the date of the notice referred to in Article 10 hereof, the selling member shall be at liberty to transfer the shares or the balance not so sold to persons who are not shareholders provided that he shall not sell them for a price less than the sum at which the same shares have been offered for sale to the members aforesaid.

15. The Directors may refuse to register any transfer of a share:

    (a) Where the Company has a lien on the shares;

    (b) Where the Directors are not of the opinion that it is desirable to admit the proposed transferee to membership. The Directors shall not be bound to give any reason for such refusal. However the Directors shall not unreasonably withhold their approval.

    Sub-article (b) above shall not apply where the proposed transferee is already a member.

16. The company shall not, except as ordered by a Court of competent jurisdiction or as required by statute be bound by or be compelled in any way to recognize any trust or any other right in respect of a share than an absolute right thereto in the registered holder thereof for the time being, or of other rights such as the right to transmission conferred by articles 29 to 32 of Table "A".

17. Save as aforesaid articles 22, 23, 25, to 28 of Table "A" shall apply.

DRC-34996 0555

# Exhibit 8 Part 3

## TRANSMISSION OF SHARES

**18.** Subject to article 2 (d) hereof, articles 29 to 32 (both inclusive) of Table "A" shall apply.

## FORFEITURE OF SHARES

**19.** Articles 33 to 39 of Table "A" shall apply except that:

(a)    The forfeiture of a share shall include all dividends declare in respect of the forfeited shares and not actually paid before, the forfeiture; and

## ALTERATION OF CAPITAL

Article 44 to 46 of table "A" shall apply. The Directors may also subject to the provisions of the Company accept surrender of shares

## GENERAL MEETINGS

**20.** A general meeting shall be held once at least in every calendar year at such time (not being more than fifteen months after holding the last preceding general meeting) and at such place as may be determined by the Directors. Such general meetings shall be called "ordinary meeting" and all other meetings of the Company shall be called "extra ordinary meetings".

Subject to the provisions of the Act relating to special resolutions, twenty one days' notice at least (exclusive of the day on which the notice is served or deemed to be served but inclusive of the day for which notice is given) specifying the place the day and the hour of meeting and in the case of special business the general nature of that business shall be given in a manner as may be prescribed by the Company in general meeting to such persons as are under the regulations of the Company, entitled to receive such notices from the Company.

**21.** The Directors shall in accordance with section 139 of the Companies Act convene an extra ordinary meeting.

15 | P a g e

DRC-34996 0556