# Exhibit 9 Part 2

## 2. PURCHASE AND SALE

2.1 Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller hereby sells, assigns, transfers, conveys and delivers to the Buyer, and the Buyer hereby purchases, acquires and accepts from the Seller, free and clear of Encumbrances all of the Seller's right, title and interest in, at the time of Closing, the Shares.

2.2 The Seller hereby irrevocably waives any restrictions on transfer to the extent possible (including any of its rights of pre-emption) which may exist in relation to the Shares, whether existing under the articles of association (or local equivalent) of the Company or otherwise.

## 3. PURCHASE PRICE

3.1 The purchase price of the Shares is EUR 8,818,200.- (Eight Million Eight Hundred Eighteen Thousand Two Hundred Euro).

## 4. CLOSING

4.1 Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "**Closing**") held at Frond N, villa 39, Palm Jumeirah, PO Box 64701, Dubai for the Seller and 16 Boerendreef, 2970 Schilde, Belgium for the Buyer. This Agreement is effective when all the Parties have signed it which is determined by the latest date stated with the Parties' signatures (the "**Closing Date**"). Except to the extent expressly set forth in this Agreement to the contrary, and notwithstanding the actual occurrence of the Closing at any particular time on the Closing Date, the Closing shall be deemed to occur and be effective as of 12:01 a.m. GMT on the Closing Date.

4.2 The Seller and the Buyer will deliver to the registered depository of the share certificates a declaration of sale.

4.3 Each document of transfer or assumption referred to in this Section 4.2 (or in any related definition set forth in Article 1) that is not attached as an Exhibit or a Schedule to this Agreement shall be in customary form (including with respect to the jurisdiction to which it pertains) and shall be reasonably satisfactory in form and substance to the parties thereto, but shall not contain any representations, warranties, covenants or agreements other than those specifically contemplated in or referred to in this Agreement.

## 5 NOTICES

5.1 All notices and communications among the Parties shall be made in writing and in the English language by e-mail, delivery in person (including courier service) or registered airmail letter to the appropriate correspondence addresses set forth below: .

**The Buyer:**

Sylvain Goetz
16 Boerendreef
2970 Schilde, Belgium
email: sylvain@goetz.be

**The Seller:**

Alain Goetz
PO Box 64701
Palm Jumeirah, Frond N. Villa
Deira, Dubai, UAE
e-mail: alaingoetz@agor.com

with a copy to:

**WGL AVOCATS**
296-298 Route de Longwy
L-1940 Luxembourg
email: mgolinvaux@wgl-advocats.lu

Page 4 of 11

# Exhibit 9 Part 2

or to such other address as any Party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated, personally delivered or mailed. Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph: provided however, that such notification shall only be effective on the date specified in such notice or five (5) business days after the notice is given, whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

5.2    Any such notice shall be deemed to be served and received.

(a) if left at any such address, at the same time when it is so left:

(b) if sent by post, forty-eight (48) hours after posting within the same country or seven (7) days after posting internationally:

(c) if sent by facsimile transmission, at the time of dispatch of the facsimile transmission to the correct facsimile number:

(d) if sent by email, at the time of delivery of the email: and

(e) if sent by courier, on the second day following the day of placing it with the relevant courier services, as the case may be.

## 6    COUNTERPARTS. EFFECTIVENESS

6.1    This Agreement may be executed in two or more consecutive counterparts (including by facsimile and/or e-mail attached PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy or otherwise) to the other Parties.

## 7.    GOVERNING LAW

7.1    The execution, validity, interpretation and implementation of this Agreement and the settlement of disputes thereunder shall be governed by the laws of Dubai, United Arab Emirates. Any and all disputes arising out of or in connection with this Agreement shall be finally settled by the DIFC Courts in Dubai, United Arab Emirates.

## 8    ASSIGNMENT

8.1    No Party to this Agreement may assign any of its rights and obligations under this Agreement without the prior written consent of the other party hereto.

## 9    PARTIES IN INTEREST

9.1    This Agreement and all the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder.

## 10    ENTIRE AGREEMENT

10.1    This Agreement (including the Schedules and Exhibits attached hereto or delivered in connection herewith) constitutes the entire agreement among the Parties hereto with respect to the matters covered by this Agreement and thereby, and supersede all previous written, oral or implied understandings among them with respect to such matters.

Page 5 of 11

DRC-34996 0932

**Exhibit 9 Part 2**

## 11  FURTHER ASSURANCE

11.1 After Closing, each of the Parties shall do, execute and deliver or procure to be done, executed and delivered, at the reasonable request and expense of the other Party, all such further acts, deeds, documents, instruments of conveyance, assignment and transfer and things as may be necessary to give effect to the terms of this Agreement.

## 12  AMENDMENT AND MODIFICATION

12.1 This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

## 13  WAIVER

13.1 Any of the terms or conditions of this Agreement may be waived at any time by the party or parties hereto entitled to the benefit thereof, but only by a writing signed by the Party or Parties waiving such terms or conditions.

## 14  SEVERABILITY

14.1 If any term, provisions, covenant or restriction of this Agreement is held by a court of competent jurisdiction (i.e. including an arbitral tribunal) or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions completed by this Agreement is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

## 15  INTERPRETATION

15.1 Unless otherwise indicated to the contrary in this Agreement by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the word "including" means "including without limitation".

15.2 The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

## 16  REPRESENTATIONS AND WARRANTIES

16.1 All representations and warranties from the Seller to the Buyer in connection with the transfer of the Shares are set forth in Schedule 1.

16.2 All representations and warranties from the Buyer to the Seller in connection with the transfer of the Shares are set forth in Schedule 2.

16.3 Each Party irrevocably and unconditionally waives any right it may have to claim    damages    for    any misrepresentation, or breach of any warranty, not contained in this Agreement or any such collateral or supplemental agreement unless such misrepresentation or warranty was made fraudulently.

16.4 Each Party irrevocably and unconditionally waives any right it may have to rescind this Agreement.

DRC-34996 0933

# Exhibit 9 Part 2

16.5 The Buyer confirms that, as at the time of entering into this Agreement, it has no knowledge (whether actual, constructive or imputed) of any fact, matter or circumstance which might lead to any Claim against the Seller and irrevocably and unconditionally waives any right to any Claim where it has any such knowledge on or before the Closing Date.

## 17    GOVERNING LANGUAGE

17.1 The English language shall be the definitive and controlling text of this Agreement, notwithstanding the translation of this Agreement into any other language.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year shown in the execution page hereof.

DRC-34996 0934

---

**SCHEDULE 1**
**SELLER'S REPRESENTATIONS AND WARRANTIES**

---

## 1. RELATIONSHIP BETWEEN SCHEDULE 1 AND OTHER PROVISIONS OF THE AGREEMENT

1.1  In case of any conflict between on the one hand any of the following provisions and on the other hand the previous provisions of this Agreement, the previous provisions shall prevail.

1.2  The following provisions are an integral part of the Agreement. All capitalized terms are defined in the Agreement.

## 2. GENERAL REPRESENTATIONS AND WARRANTIES of the SELLER

The Seller hereby represents and warrants to the Buyer that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

2.1  Capacity of the Seller, and the Company.

The Seller has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

2.3  Absence of certain conflicts.

To the Seller's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of any Company; (b) require the payment or the incurring of any obligation on the part of the Company or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which the Company is a party or the Shares may be bound, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Seller or the Shares or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to the Company, the Shares or any of its operations or property.

2.4  Title to Shares.

The Appendix to this Agreement sets forth the whole of the Seller's shares or interest in the Company (being the Shares) or in any subsidiary of the Company (and to the extent the Seller shall have any additional interest or shares in the Company, the same shall be included as Shares and transferred to the Buyer at Closing with no additional cost to the Buyer). The Shares have been duly authorized and validly issued and are fully paid and non-assessable. None of the Shares were issued in violation of any applicable Law. The Seller has, and shall convey to the Buyer, good and marketable title to the Shares. The Shares are and shall be conveyed to the Buyer free and clear of all Encumbrances, charges, demands or adverse claims or other restrictions on the exercise of any of the attributes of ownership. The Seller has full voting power over the Shares, subject to no proxy, shareholders' agreement, voting trust or other agreement relating to the voting of any of the Shares other than the articles of association of the Company. As of the Closing Date no person will have any preemptive right to purchase the Shares other than as set forth in this Agreement and/or the articles of association of the Company.

2.5  Litigation.

There are no legal proceedings now in progress, pending or, to the Seller's knowledge, threatened against the Seller which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer. The Seller is not subject to any order, writ, injunction or decree of any court or any Governmental Authority which could adversely affect the validity and enforceability of the transfer of the Shares to the Buyer.

No Group Company is involved in any pending or, to the Seller's knowledge, threatened legal disputes, administrative proceedings or administrative inquiries nor are there any circumstances known to the Seller

DRC-34996 0935

which might reasonably be expected to provide a basis for such litigation, or which might have a substantial negative impact on any Group Company's financial situation, unless disclosed.

2.6  Proper and valid organization.

The Company is a corporation that is duly organized and validly existing under the applicable laws of the Grand Duchy of Luxembourg and was properly constituted. It has its actual centre of administration at its registered office and it has no branches or representative offices, whether in the Grand Duchy of Luxembourg or abroad; and it has all requisite corporate power and authority under applicable laws to carry on the business presently conducted by it.

The Company has at all times acted, in all material respects, in accordance with its respective articles of association and the laws and regulations of the Grand Duchy of Luxembourg.

2.7  Books and records.

The Company's books and records are up to date. All board meetings and shareholders meetings have been held in compliance with the applicable law and the respective minutes of the board meetings and shareholder meetings are kept and available at the Company's registered office.

2.9  No insolvency proceedings.

No insolvency or similar proceedings have been commenced or, to the Seller's knowledge, applied for in respect of the Company. The Company is not unable to pay its due debts.

2.10  Further assurances.

From time to time on or after the Closing Date, the Seller and the Buyer will execute and deliver to each other all such further assignments, endorsements and other documents as are reasonably requested in order to complete the transfer of the Shares to the Buyer, to enable the Buyer to exercise full rights as the sole owner of the Shares and to otherwise carry out the transactions contemplated by this Agreement.

2.13  Ownership rights.

Without limitation, to the extent the Seller shall have ownership interests or rights in the Company other than the Shares, such additional interests shall be conveyed to the Buyer at Closing without additional consideration due from the Buyer.

DRC-34996 0936

# Exhibit 9 Part 2

---

**SCHEDULE 2**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

---

The Buyer hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof and shall be true as of the Closing Date:

1. Buyer capacity

    a) The Buyer has the full legal right and capacity to enter into this Agreement and perform its obligations hereunder.

    b) The Buyer declares that it has the right and full power to enter into and perform this Agreement and that, to the Buyer's knowledge, it does not thereby violate any laws of the Grand Duchy of Luxembourg (or regulation or ruling therefore) or foreign court to which it may be subject or any agreement to which it is a party.

2. Authorization by the Seller – Enforceability.

    a) The Buyer has taken all actions necessary for the execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer. Assuming the due authorization, execution and delivery by the Seller, this Agreement constitutes a valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.

3. Absence of certain conflicts.

    a) To the Buyer's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) conflict with or result in a breach of any provision of the organizing documents of the Buyer; (b) require the payment or the incurring of any obligation on the part of the Buyer or result in a loss of rights or default (or give rise to any right of termination, cancellation or acceleration), with or without notice or lapse of time, under any of the provisions of any contract, agreement or instrument to which the Buyer is a party, (c) breach or otherwise constitute a default under any agreement or undertaking binding on the Buyer or (d) violate any judgment, decree, order, injunction, or any statute, law, regulation or rule of any court or any federal, regional, provincial, municipal or other domestic or foreign Governmental Authority applicable to the Buyer or any of its operations or property.

DRC-34996 0937

# Exhibit 9 Part 2

**EXECUTION PAGE**

THE SELLER

Mr Alain Goetz
Date: 16 10 18

Sworn to and subscribed before
me this 30 ot o lo 20 8 by Mr. Sylvain
                                         GOETZ
Pieter HERMAN
Notary Public at Antwerp

THE BUYER

Name: Sylvain Goetz
Date: 16/10/18

P 00262575                    P 00262575

| LEGALISATIE - LÉGALISATION - LEGALISATION |
|---|
| Gezien voor de legalisatie van de handtekening van :<br>Vu pour légalisation de la signature de :<br>Gesehen zur Legalisation der Unterschrift von :<br><br>**Goetz Alain** |
| Onder nr./Sous le n°/Unter Nr. :   *2158414498351800* |
| Te/A /in : *Abu Dhabi/Abou Dhabi/Abu Dhabi*    Op/Le/ Am : *16/10/2018* |
| Ondertekening/Signature/Unterschrift<br><br>Carmen Sureda - Castello<br>CONSUL |
| Document/Document/Dokument : *Gebruik voor andere overheid/Usage pour autre autorité/Für die Verwendung einer anderen Behörde* |

Prijs/Prix/ Preis :   *20* EUR / *80*    AED

Deze legalisatie waarborgt de authenticiteit van de inhoud van het document niet.
Cette légalisation ne garantit pas l'authenticité du contenu du document.
Diese Legalisation dient nicht dem Beweis der Authentizität des Inhalts des Dokuments.
Deze legalisatie controleren? Vérifier cette légalisation? Diese Legalisation überprüfen?
http://legalweb.diplomatie.be



DRC-34996 0938

# Exhibit 9 Part 2

DRC-34996 0939

Exhibit 9 Part 2

# Annex

# J

DRC-34996 0940

# Exhibit 9 Part 2

*Question 13.*

*On page 10 of your April 11, 2023 questionnaire response, you state that Mr. Goetz and Sylvain Goetz were previously business partners. Please describe the nature of the business partnership(s). In your response, please indicate the dates of their partnership, names of any entities in which Mr. Goetz and Sylvain Goetz had a mutual business interest and describe the activities of those entities.*

**a.    BPMI**

On February 25, 2003, Mr. Goetz and Sylvain Goetz were both appointed as directors of BPMI, and also as managing directors. Mr. Goetz resigned from his position as (managing) director on 24 August 2004.

The registered activity of BPMI is: wholesale trade of metals and metal ores.

| In general | |
|---|---|
| Enterprise number: | 0477.587.325 |
| Status of the entity: | Active |
| Number of the establishment unit: | 2.098.114.667 |
| Status of the establishment unit: | Active |
| Start date: | June 19, 2002 |
| Name of the establishment unit: | B.P.M.I. - BPMI<br>Name in Dutch, since June 19, 2002 |
| Address of the establishment unit: | Simonsstraat 42<br>2018 Antwerpen<br>Since April 7, 2017 |
| Phone number: | No information found in the CBE. |
| Fax: | No information found in the CBE. |
| Email address: | No information found in the CBE. |
| Web address: | No information found in the CBE. |

| Authorisations |
|---|
| No data included in CBE. |

| Version of Nacebel codes for activities 2008[1] |
|---|
| Main activity: 46.720 - Wholesale trade of metals and metal ores<br>Since October 29, 2014 |

**b.    CG-Vastgoed Invest**

In September 2008, Mr. Goetz and Sylvain Goetz established CG-Vastgoed Invest.

The registered activities of CG-Vastgoed invest are: (1) activities of holding companies and (2) buying and selling of own real estate.

# Exhibit 9 Part 2

They were both shareholders of the company until October 2022, when Mr. Goetz sold all of his shares to Sylvain Goetz.

| In general | |
|---|---|
| Enterprise number: | 0806.408.906 |
| Status of the entity: | Active |
| Number of the establishment unit: | 2.173.775.839 |
| Status of the establishment unit: | Active |
| Start date: | September 17, 2008 |
| Name of the establishment unit: | CG-Vastgoed Invest<br>Name in Dutch, since September 17, 2008 |
| Address of the establishment unit: | Jacob Jacobsstraat 58<br>2018 Antwerpen<br>Since September 17, 2008 |
| Phone number: | No information found in the CBE. |
| Fax: | No information found in the CBE. |
| Email address: | No information found in the CBE. |
| Web address: | No information found in the CBE. |

| Authorisations |
|---|
| No data included in CBE. |

| Version of Nacebel codes for activities 2008[1] |
|---|
| Main activity: 64.200 - Activities of holding companies<br>Since September 17, 2008 |
| Main activity: 68.100 - Buying and selling of own real estate<br>Since September 17, 2008 |

## c. EGAI

Mr. Goetz and Sylvain Goetz are co-founders of EGAI, established on May 15, 2001. They were both shareholders until October 2022, when Mr. Goetz sold his shares to Sylvain Goetz.

The registered activities of EGAI are: (1) rental and leasing of other machinery, equipment, and tangible goods, (2) engineering and technical consulting activities, except surveying activities, and (3) other technical control and analysis activities.

## d. Tony Goetz NV / Industrial Refining Company

Mr. Goetz and Sylvain Goetz were both directors from May 13, 1999. They also shared the position of managing director from January 17, 2002 until June 27, 2002.

As of May 3, 2004, they share again the position of (managing) director, until June 30, 2004.

# Exhibit 9 Part 2

The registered activity of Industrial Refining Company is: wholesale trade of metals and metal ores.



| In general | |
|---|---|
| Enterprise number: | 0426.696.875 |
| Status: | Active |
| Legal situation: | Normal situation<br>Since December 28, 1984 |
| Start date: | December 28, 1984 |
| Name: | Industrial Refining Company<br>Name in Dutch, since July 3, 2020 |
| Abbreviation: | IRC<br>Name in Dutch, since July 8, 2020 |
| Registered seat's address: | Van Leriusstraat 25<br>2018 Antwerpen<br>Since September 14, 2011<br>Ex officio striked off address since May 13, 2022[1] |
| Phone number: | No data included in CBE. |
| Fax: | No data included in CBE. |
| Email address: | No data included in CBE. |
| Web Address: | No data included in CBE. |
| Entity type: | Legal person |
| Legal form: | Public limited company<br>Since December 28, 1984 |
| Number of establishment units (EU): | 1 Information and activities for each establishment unit |

| Functions | | | |
|---|---|---|---|
| Director | Goetz , Sylvain | | Since September 10, 2019 |
| Managing Director | Goetz , Sylvain | | Since September 10, 2018 |

| Entrepreneurial skill – Travelling- Fairground operator |
|---|
| No data included in CBE. |

| Characteristics |
|---|
| Subject to VAT<br>Since February 1, 1993 |
| Enterprise subject to registration<br>Since November 1, 2015 |

| Authorisations |
|---|
| No data included in CBE. |

| Version of the Nacebel codes for the VAT activities 2008[2] |
|---|
| VAT 2008 46.720 - Wholesale trade of metals and metal ores<br>Since January 1, 2008 |

### e.    Argor International SA

Mr. Goetz and Sylvain Goetz had a mutual interest in Argor International SA, via their shareholding, until October 2018, when Mr. Goetz sold his shares.

Exhibit 9 Part 2

# Annex
# K

DRC-34996 0944

# Exhibit 9 Part 2

Mr. Alain GOETZ
Frond N, Villa 39
Palm Jumeirah, P.O. Box 64701
Dubai, United Arab Emirates

ARGOR INTERNATIONAL S.A.
296-298, route de Longwy
L-1940 Luxembourg

**Registered Mail**                                    Dubai, 31 October 2018

**At the attention of**: Managing Board

Madam, Sir,

I have the honor to inform you that for reasons of personal convenience, I am unable to continue as a director in your company.

I therefore ask you to accept my resignation with immediate effect and to grant me full and complete discharge for the exercise of my mandate.

Please accept, Sir, Madam, the expression of my best wishes.

# Exhibit 11



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

December 6, 2022

Erich C. Ferrari
Ferrari and Associates, P.C.
1455 Pennsylvania Ave, NW
Suite 400
Washington, DC 20004

Re: Alain Goetz

Mr. Ferrari:

As you are aware, on March 17, 2022, the U.S. Department of the Treasury's Office of Foreign
Assets Control (OFAC) designated your client, Alain Goetz, as a Specially Designated National
and Blocked Person (SDN) pursuant to the International Emergency Economic Powers Act, 50
U.S.C. §§ 1701–1708, and Executive Order 13413 (Oct. 27, 2006), "Blocking Property of
Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo," as
amended by Executive Order No. 13671 (July 8, 2014), "Taking Additional Steps to Address the
National Emergency with Respect to the Conflict in the Democratic Republic of the Congo."
Specifically, your client was designated for being a leader of African Gold Refinery Ltd., for
having acted or purported to act for or on behalf of, directly or indirectly, African Gold Refinery
Ltd., and for being responsible for or complicit in, or having engaged in, directly or indirectly,
support to persons, including armed groups, involved in activities that threaten the peace,
security, or stability of the DRC or that undermine democratic processes or institutions in the
DRC, through the illicit trade in natural resources of the DRC.

Pursuant to 31 C.F.R. § 501.807 and OFAC's guidance on "Filing a Petition for Removal from
an OFAC List," a person may seek administrative reconsideration of their designation by
submitting arguments or evidence that the person believes establishes that an insufficient basis
exists for the designation or that the circumstances resulting in their designation no longer apply.
Designated persons may also propose remedial steps, such as corporate reorganization,
resignations from positions in a blocked entity, or similar steps that the person believes would
negate the basis for designation.

We are in receipt of the materials you sent on March 17, 2022, the same date as your client's
designation. We are also aware of the lawsuit your client has filed arguing that OFAC violated
the Administrative Procedure Act by failing to consider your March 17 submission prior to his
designation. *See Goetz v. Gacki, et al.*, No. 1:22-cv-01204 (D.D.C.). Contrary to the allegations
of your client's lawsuit, OFAC did not receive the materials you sent on Mr. Goetz's behalf until
after OFAC's Director had already designated Mr. Goetz, even though that designation had not
yet been publicly announced. As a result, OFAC was not in possession of the submitted

# Exhibit 11

materials before it designated your client. We understand there have been settlement discussions between the parties to the lawsuit, but that they have not been successful. *See* ECF No. 9.

At this time, and in an exercise of our administrative discretion in these specific circumstances, we have determined to treat your March 17 submission as a request for delisting pursuant to 31 C.F.R. § 501.807. In connection with this petition, we will be providing you a redacted version of the administrative record of Mr. Goetz's March 17 designation. Should you wish to submit additional material in support of your client's delisting, please do so within 30 days. If you need additional time, please submit a request for extension. As we consider your client's petition, we may also have additional questions for your client. If so, we will reach out to you at that time. All communications related to your client's delisting petition should be directed to OFAC.Reconsideration@treasury.gov. You may also write OFAC at the following:

> U.S. Department of the Treasury
> Office of Foreign Assets Control
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, D.C. 20220

Thank you for your cooperation.

> Sincerely,
>
>
> Andrea M. Gacki
> Director
> Office of Foreign Assets Control

2

# Exhibit 12



655 15th St, NW
Suite 420
Washington, D.C. 20005
Tel. 202-280-6370
Fax. 877-448-4885

June 9, 2023

**SENT VIA EMAIL (OFAC.Reconsideration@treasury.gov)**

Office of Global Targeting
Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220

**Re:**   **SDN Delisting Petition Supplement—Executive Order 13413, as amended[1]**
*Alain Goetz—Case ID DRC-31659*

Dear OFAC Reconsideration:

On March 17, 2022, Alain Goetz ("Petitioner") submitted a request to the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") requesting to stay any sanctions action under consideration that would target him. Later that day, OFAC announced its designation of Petitioner under Executive Order ("E.O.") 13413, as amended, and included his name on OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").[2]

On April 29, 2022, Petitioner filed a lawsuit challenging OFAC's decision to designate him under E.O. 13413, as amended, due to OFAC's failure to consider Petitioner's March 17, 2022 submission prior to designating him.[3] On December 6, 2022, OFAC notified undersigned counsel that it would treat Petitioner's March 17, 2022 submission as a delisting request under 31 C.F.R. § 501.807, rather than a request for stay of designation.

---

[1] Because this submission contains business information and/or other information of a sensitive nature, undersigned counsel requests that OFAC treat this correspondence as confidential. If OFAC believes that it is required to release this document or information contained in it to the public pursuant to the Freedom of Information Act or any other law, please notify undersigned counsel as soon as possible.

[2] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Alain Goetz and a Network of Companies Involved in the Illicit Gold Trade* (Mar. 17, 2022), https://home.treasury.gov/news/press-releases/jy0664; Notice of OFAC Sanctions Actions, 87 Fed. Reg. 16552 (Mar. 23, 2022).

[3] *Goetz v. Gacki et al.*, No. 1:22-cv-01204-JEB (D.D.C.).

# Exhibit 12

On January 31, 2023, OFAC disclosed the unclassified version of the administrative record compiled in support of Petitioner's designation under E.O. 13413, as amended. In response, Petitioner provided a submission on February 28, 2023, which supplemented his request for a stay of designation with arguments and information supporting that request, and which directly addressed information contained in the disclosed administrative record. On March 21, 2023, OFAC sent a questionnaire to Petitioner seeking additional, clarifying, and corroborating information with respect to the arguments and information contained in Petitioner's request and supplemental submission, to which he responded on April 11, 2023. On April 25, 2023, OFAC issued a second questionnaire to Petitioner, to which he responded on May 19, 2023.

In accordance with OFAC's delisting procedures,[4] Petitioner provides this submission to further support his delisting request. Specifically, Petitioner provides additional information responsive to OFAC's March 21, 2023 and April 25, 2023 questionnaires. This information was recently discovered by undersigned counsel when reviewing additional information and documentation obtained from the client and co-counsel.

## I.    Response to Question #11 of OFAC's March 21, 2023 Questionnaire

Question #11 of OFAC's March 21, 2023 Questionnaire asked Petitioner to provide a share sale or share purchase agreement identifying Petitioner as divesting his ownership of shares in AGR International Limited ("AGR International"). In response, Petitioner provided a certificate dated June 7, 2021, reflecting that Puthen Cheekkulathu is the registered proprietor of AGR International's shares.

In addition to the certificate provided in Petitioner's April 11, 2023 response to OFAC's March 21, 2023 Questionnaire, Petitioner attaches Annex A, which is a share transfer document further evidencing the transfer of his shares in AGR International to Puthen Cheekkulathu.

## II.    Response to Question #12 of OFAC's April 25, 2023 Questionnaire

Question #12 of OFAC's April 25, 2023 Questionnaire asked Petitioner to detail the capacity in which Cherry Ann Dacdac Mandia served as Petitioner's former employee, along with the dates of service; and to detail any other business relationships that they were involved in. Petitioner responded in his May 19, 2023 submission that Ms. Mandia was AGR Limited's Office Manager and held an administrative role there from January 2017 until the time Petitioner left the company, and that Ms. Mandia currently serves as a director of Aldbra Limited and is primarily responsible for administrative duties in that role.

---

[4] 31 C.F.R. § 501.807.

DRC-34996 0951

# Exhibit 12

In addition to this response, Petitioner notes that Ms. Mandia was also a director of AGR International during Petitioner's time at the company, until he sold his shares to Mr. Cheekkulathu on June 7, 2021. Please see Annex B for documentation supporting this representation.

## III.    Conclusion

Petitioner provides the information in this submission to supplement his previous responses to OFAC's questionnaires. Accordingly, in light of the information above and in prior submissions, Petitioner respectfully requests that OFAC remove his E.O. 13413, as amended, designation and his name from the SDN List as soon as possible.

Please forward all correspondence regarding this submission to:

Erich C. Ferrari
Ferrari & Associates
655 15th St., N.W.
Suite 420
Washington, D.C. 20005
Email: ferrari@falawpc.com

Petitioner thanks OFAC for its consideration and looks forward to its response.

Sincerely,

Erich C. Ferrari

3

Exhibit 12

# Annex

# A

DRC-34996 0953

## Exhibit 12    13

## SHARE TRANSFER

**AN AGREEMENT DATED THIS 7th day of June 2021.**

For the consideration stated below the "Transferor" named do hereby transfer to the "Transferee" named, the Shares specified below subject to the several conditions on which the said Shares are now held by the "Transferor", and the "Transferee" do hereby agree to accept and hold the said    150,000    Shares subject to the conditions aforesaid.

---

**Name of Company: AGR International Ltd.**  **Company Nº: 200304**

---

| | Figures | Words |
|---|---|---|
| **Number of Shares transferred:** | 150,000 | **One Hundred and Fifty Thousand** |
| **Description of Shares:** | 150,000 shares of US$1.00 | **One Hundred and Fifty Thousand shares of One United States Dollar** |

---

| | Figures | Words |
|---|---|---|
| **Total Consideration:** | US$150,000.00 | **One Hundred and Fifty Thousand United States Dollars** |

---

**TRANSFEROR:**                          **WITNESS:**

**Name:  ALAIN FRANCOIS V. GOETZ**        Name:  CHERRRY ANN MANDIA DACDAC

**Address: VILLA 39, FROND N PALM JUMEIRAH** Address: Dubai, UAE
**DUBAI, UNITED ARAB EMIRATES**

---

**TRANSFEREE:**                          **WITNESS:**

**Name: MR. PUTHEN PURAYIL THAMPAN SHINU** Name:  KRYSTEL DE CASTRO
**CHEEKKULATHU**
**Address: FT 511 S8K Blg @ Muhaisnah 4 Ft 511** Address: Dubai, UAE
**56D Street, P.O. Box 47888, Dubai**

Exhibit 12

# Annex

# B

DRC-34996 0955

# Exhibit 12    **17**

### THE INTERNATIONAL BUSINESS COMPANIES ACT, 2016

### RESOLUTION OF DIRECTOR IN WRITING

## AGR International Ltd.
### Company № : 164950

I, the undersigned, being the Director of the above company, hereby declare as follows:

1.  It is resolved that the following person be and is hereby appointed the Director of the company with immediate effect:

    **MR. PUTHEN PURAYIL THAMPAN SHINU CHEEKKULATHU**
    Address: FT 511 SBK Blg @ Muhaisnah 4 Ft 511 56D Street, P.O. Box 47888, Dubai

2.  It is resolved that my appointment as director of the company be and is hereby terminated with immediate effect and that I have no claim whatsoever against the company for compensation for loss of office or otherwise.

3.  It is hereby noticed that the following share transfer was presented to the company:

    One Hundred and Fifty Thousand (150,000) shares of US$1.00 each from
    **ALAIN FRANCOIS V. GOETZ** to **MR. PUTHEN PURAYIL THAMPAN SHINU CHEEKKULATHU**

4.  It is resolved that the following registered share certificates are being cancelled with immediate effect:

    **Certificate № . 1**          for 150,000 shares of US$1.00 each issued to
                                   ALAIN FRANCOIS V. GOETZ

5.  It is resolved that the director of the company be and is hereby authorised to issue new registered share certificate as follows:

    **Certificate № . 2**          for 150,000 shares of US$1.00 each issued to
                                   MR. PUTHEN PURAYIL THAMPAN SHINU CHEEKKULATHU

Dated this 7th day of June 2021.

..................................................
**MS. CHERRY ANN MANDIA DACDAC**
**DIRECTOR**
**AGR International Ltd.**

# Exhibit 14



**United States Department of State**
*Washington, D.C. 20520*

~~SENSITIVE BUT UNCLASSIFIED~~                    June 30, 2023

## MEMORANDUM

**TO:**        Andrea Gacki
              Director
              Office of Foreign Assets Control
              Department of the Treasury

**FROM:**      ██ ███████
              Director
              Office of Economic Sanctions Policy and Implementation
              Bureau of Economic and Business Affairs

**SUBJECT:**   **Denial of Alain Goetz's Petition for Removal from the SDN List**

**Recommendation:**

(~~SBU~~) The Department of State recommends on foreign policy grounds that the Department of the Treasury's Office of Foreign Assets Control (OFAC) **deny** Alain Goetz's removal from the Specially Designated National List (SDN List) given his refusal to acknowledge his role in illicit gold trade in the DRC and because he has failed to demonstrate a change in behavior related to these activities that would warrant his removal.

**Background:**

(~~SBU~~) On March 17, 2022, the U.S. Department of the Treasury sanctioned Alain Goetz, the African Gold Refinery (AGR) in Uganda, and a network of companies involved in the illicit movement of gold valued at hundreds of millions of dollars per year from the Democratic Republic of the Congo (DRC).  The illicit movement of gold provides revenue to numerous armed

# Exhibit 14

groups that threaten the peace, security, and stability of the DRC and causes immense human suffering in the DRC and across the region.  The action was taken pursuant to Executive Order (E.O.) 13413, as amended by E.O. 13671, which targets, among other things, individuals and entities involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC.  The action demonstrated the U.S. commitment to disrupting the illicit mineral trade and encouraging mining sector transparency as a means of curbing funding to armed groups responsible for horrific acts of violence.

(U) On December 8, 2022, the European Union (EU) designated Goetz for "exploiting the armed conflict, instability and insecurity in the DRC through the illicit exploitation and trade of natural resources."[1]  In addition to U.S. sanctions, Mr. Goetz remains subject to EU sanctions, which were imposed just six months ago, and is reportedly subject to ongoing investigations by both Belgian and United Arab Emirates (UAE) authorities (in addition to past investigations of Goetz and his companies by Ugandan and Rwandan authorities).  Additionally, his companies have previously been convicted by a Belgian court for money laundering schemes related to the gold trade[2] and in April 2023 he was reportedly required to pay 558 million euros in back taxes.[3]

(SBU) State understands that Mr. Goetz has presented information to OFAC purporting to show that he is no longer an owner of or affiliated with AGR. State notes that Mr. Goetz has been an integral and essential part of the conflict gold trade in the DRC since the 1990s through the activities of several companies and associates, and his activities have been documented by the UN Group of Experts (GOE) since the late 2000s and early 2010s.  His role as a buyer and trader of gold during the DRC's civil wars in the 1990s helped create the ecosystem that exists today where gold is used by

---

[1] See https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ%3AL%3A2022%3A316I%3AFULL
[2] Reuters Staff, *Court Convicts Belgian Gold Refinery Tony Goetz of Money Laundering* (Feb 5. 2020), available at: https://www.reuters.com/article/us-gold-refining-tony-goetz-idUSKBN1ZZ2JW.
[3] Antwerp Gold Trader Must Pay Half a Billion Euros in Unpaid Tax, available at: https://www.brusseltimes.com/438461/antwerp-gold-trader-must-pay-half-a-billion-euros-in-unpaid-tax

DRC-34996 0962

# Exhibit 14

SENSITIVE BUT UNCLASSIFIED
-3-

numerous armed groups to fund conflicts and violence. This situation has resulted in the death of tens of thousands of people and led to the injury and displacement of millions of others in Eastern DRC and the surrounding region.[4] In an interview with a Belgian newspaper in 2019, Mr. Goetz described his activities in the 1990s engaging with actors, such as Laurent Kabila during his armed rebellion, as "more fun" than gold trading had become in the late 2010s.[5]

(SBU) Mr. Goetz's first employee in the region, Kisoni Kambale, and one of the companies through which the two men worked in the 1990s and 2000s were among a group of individuals and entities sanctioned by the UN Security Council[6] and United States[7] in March 2007 for their role in the conflict gold trade, the first ever sanctions for this type of trade in the DRC. The GOE has been documenting the primary role that gold plays in conflict finance in the DRC since 2005[8], and both the United States and other jurisdictions have developed specific legal and regulatory approaches to attempt to address this trade because of the human toll, with sanctions playing an important role.[9] Gold remains a prominent feature in GOE and other reporting on conflict finance in the DRC as multiple conflicts and

---

[4] Southern Africa Revenue Watch, *Congo's Golden Web*, at pp. 40-41, 67 (May 2014), available at: https://ccsi.global/wp-content/uploads/2019/08/Congo-s-Golden-Web_compressed-1.pdf
[5] Kaspar Goethals, *Gold is a Dirty Business, Even if I Do Say So Myself*, De Standaard (Apr. 20, 2019), available at: https://www.standaard.be/cnt/dmf20190503_04370790
[6] https://press.un.org/en/2007/sc8987.doc.htm
[7] https://ofac.treasury.gov/recent-actions/20070330
[8] *Report of the Group of experts submitted pursuant to resolution 1596* (2005)(July 26, 2025), available at https://documents-dds-ny.un.org/doc/UNDOC/GEN/N05/411/18/PDF/N0541118.pdf?OpenElement
[9] *See, e.g.*, Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. The Sense of Congress to that provision stated:

> (a) SENSE OF CONGRESS ON EXPLOITATION AND TRADE OF CONFLICT MINERALS ORIGINATING IN THE DEMOCRATIC REPUBLIC OF THE CONGO.—It is the sense of Congress that the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance conflict characterized by extreme levels of violence in the eastern Democratic Republic of the Congo, particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein, warranting the provisions of section 13(p) of the Securities Exchange Act of 1934, as added by subsection (b).

SENSITIVE BUT UNCLASSIFIED

DRC-34996 0963

Exhibit 14

numerous armed groups continue to plague Eastern Congo and destabilize East Africa more generally.[10]

(SBU) The United States is not the only jurisdiction to be concerned with the conflict and DRC's illicit gold trade. Other jurisdictions have also acted against Mr. Goetz and his network of companies for their role in that trade. This includes:

- The European Union designating Mr. Goetz on December 8, 2022, for "exploiting the armed conflict, instability and insecurity in the DRC through the illicit exploitation and trade of natural resources."
- The United Arab Emirates Financial Intelligence Unit describing the Goetz case, through an anonymized summary, in its October 2022 "Strategic Analysis Report" for Dealers in Precious Metals and Stones, identifying nine red flags related to his trading practices and indicating that the case had been referred to "the relevant police department."[11]
- The Belgian Federal Prosecutor's office has been reviewing the Goetz case for several years, based in part on the 2020 conviction by a Belgian court of Mr. Goetz and others in a money laundering case unrelated to his activities in the DRC. In April 2023, the Belgian Special Tax Inspectorate reportedly issued a demand for 558 million euros in unpaid taxes, noted to be an "exceptionally high amount" for that authority.
- Though no direct action has been taken by the UN Security Council Mr. Goetz or his companies, his associates were sanctioned by the Security Council in 2007, and the UN Group of Experts has collected information and reported specifically on Mr. Goetz and his activities since at least 2009 as part of its ongoing focus on the gold trade.

---

[10] *See, e.g., Final report of the Group of Experts submitted in accordance with paragraph 9 of resolution 2641 (2022)*(June 13, 2023), available at: documents-dds-ny.un.org/doc/UNDOC/GEN/N23/123/80/PDF/N2312380.pdf?OpenElement; *DR Congo: Killings, Rapes by Rwanda-Backed M23 Rebels*, Human Rights Watch (June 13, 2023), available at: https://www.hrw.org/news/2023/06/13/dr-congo-killings-rapes-rwanda-backed-m23-rebels;
[11] UAE Financial Intelligence Unit, *Dealers in Precious Metals and Stones: Strategic Analysis Report*, pp. 16-17 (Oct. 2022), available at https://amluae.com/wp-content/uploads/2022/11/Strategic-Analysis-Report-DPMS-October-2022.pdf

# Exhibit 14

-5-

(SBU) Foreign policy considerations related to the ongoing conflict in Eastern DRC, other areas in which the United States is acting against the illicit gold trade, and Uganda lead to a recommendation of denial for delisting absent a documented change in behavior beyond what Mr. Goetz has provided to date.  Mr. Goetz's history with the conflict gold trade dates to the 1990s; in many ways, Mr. Goetz helped to create the conflict gold trade through his failures to conduct appropriate levels of due diligence given the heightened risks in the region, which resulted in sourcing gold from various rebel movements in that period.  This pattern of trade, specifically willingness to accept gold from sources without regard to risk, helped to establish the illicit routes through which gold would move from the Eastern DRC during the periods of conflict following the rule of the late President Mobutu.  Numerous armed groups have exploited this trade and sales to the Goetz network to earn millions of dollars that have been used to carry out horrific armed attacks that have left tens of thousands of innocent people dead, millions injured and displaced, and led to a prolonged period of instability in the region – instability that continues today.

(SBU) The GOE began extensive documentation of the role of gold in funding the myriad armed groups active in the DRC in 2005, and the reporting has continued consistently ever since.  The first sanctions imposed by the UN Security Council, matched by OFAC, came in 2007, focusing in part on Mr. Goetz's associates, and sanctions have remained an important tool to address the conflict gold trade.  Starting in the 2010s, a range of legal and regulatory measures have been adopted to complement the use of sanctions to address this trade, such as Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act requiring supply chain assessment of gold and other minerals being sourced from the DRC and its neighbors; the EU has adopted an analogous measure.

(SBU) Unfortunately, the role of gold in the multifaceted conflict in the DRC continues, and financing of the gold trade continues to result in the deaths of thousands of innocent civilians.  The 2022 GOE report provides extensive documentation on the current role of gold in the complex web of conflict in

# Exhibit 14

eastern DRC, continuing to demonstrate that gold is exported to Uganda and elsewhere in the region.[12] INTERPOL reported in 2021 on the structure of the illicit gold trade in the region, focusing in particular on the way that gold moves from mine sites in the DRC to Uganda and Rwanda and then on to the UAE.[13] The State Department's Human Rights Report for the DRC has also consistently referenced the role of gold in conflict in the DRC, including the most recent report released in March 2023.[14]

(SBU) Throughout the decades, Mr. Goetz has denied any awareness of, or refused to accept any responsibility for, such activity. His submissions to OFAC make only a passing reference to the concerns related to the conflict in the DRC or the role of gold in particular. For his part, as noted below, Mr. Goetz has described the decades of brutal and tragic conflict in the DRC as "pockets of violence" exaggerated by NGOs. In addition, in the above-referenced 2018 interview with the Belgian newspaper, Mr. Goetz acknowledged being aware that gold is a "filthy business" and that numerous concerns exist in areas from which his refinery was sourcing gold. He stated that it was not the responsibility of him or his companies to address these concerns. In 2017, Mr. Goetz told a Ugandan newspaper he did not recognize the concept of conflict gold, "I am 30 years in this business. And I am one of the leading experts on gold in this region. I have never seen one gram of conflict gold, and I will not recognize it. If I see one gram of normal gold and one gram of what they call conflict gold, I don't see the difference."[15]

(SBU) Even if he purports to have formally distanced himself from AGR, Mr. Goetz's recent statements and submissions continue his previous line of thinking and action continues. Mr. Goetz fails to provide any indications

---

[12] *Final report of the Group of Experts submitted in accordance with paragraph 6 of resolution 2582* (2021)(June 14, 2022), available at: https://documents-dds-ny.un.org/doc/UNDOC/GEN/N22/338/70/PDF/N2233870.pdf?OpenElement.

[13] INTERPOL, et al, *Illegal Gold Mining in Central Africa* (May 2021), available at: https://www.interpol.int/News-and-Events/News/2021/Central-Africa-Criminals-are-cashing-in-on-COVID-19-surge-in-gold-prices.

[14] https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/democratic-republic-of-the-congo/

[15] Jeff Mbanga, *Conflict Gold is Just Normal Gold, Says Mineral Expert*, The Observer (March 15, 2017), available at: https://www.observer.ug/business/51777-conflict-gold-is-just-normal-gold-says-mineral-expert.html

# Exhibit 14

that his acceptance or understanding of risk with respect to the gold trade has changed or adjusted in response to the reporting or actions taken against him. Rather than identify how the approach of AGR has strengthened in response to the consistent GOE and other reporting on the serious risks related to the gold trade, Mr. Goetz's submissions to OFAC simply ask the agency to accept his word and declare that he has always used the appropriate level of due diligence and KYC practices in place. As a result, Mr. Goetz has provided no basis to believe that his views or approach to sourcing gold from high-risk or conflict areas has changed. Whether his business is conducted via AGR or other entities, his statements demonstrate that his ongoing and likely future role in this trade and the broader policy concerns connected thereto remain a significant concern. Delisting Goetz without his acknowledgment of his complicity in the consequences of the illicit gold trade and evidence of material changes in his approach and behavior would undermine U.S. foreign policy. Additionally, it would send a clear signal that undermining civil society, the UN GOE, and others reporting on him is an acceptable approach. It would also demonstrate that a decades-long pattern of engagement in high-risk trade with actors connected to armed groups in an area affected by destructive conflict does not need to be fully addressed, or even appropriately recognized, prior to delisting.

(SBU) In order to demonstrate changed behavior that would justify delisting, Mr. Goetz should first demonstrate full acceptance and acknowledgment of responsibility for his decades-long pattern of past actions and their connection to the conflict in the region, including sharing information about his activities and others involved in the gold trade, and then identify tangible commitments to contributing to positive change in the DRC, as well as the gold sector throughout the region. Delisting Mr. Goetz without this level of acknowledgment and changed behavior would undermine actions the United States is taking both in Eastern Congo and other contexts related to

DRC-34996 0967

# Exhibit 14

SENSITIVE BUT UNCLASSIFIED
-8-

the conflict and illicit gold trade, in particular with respect to the activities of armed groups and criminal networks active across the continent.[16]

(SBU) In sum, Mr. Goetz requests that OFAC and the U.S. Government accept his presentation of documents indicating he is not associated with AGR now and his word that he has never been connected to the illicit gold trade in the past, and that he is engaged in no activity of concern at this time. Given that he has (a) never acknowledged that this illicit trade exists and (b) that he has been convicted of money laundering, demanded to pay more than half a billion in back taxes, and the subject of investigations by the UAE, Belgian Prosecutor, and multiple jurisdictions in Africa, Mr. Goetz's delisting should only proceed once there is more than his word regarding his role in the illicit trade and actions taken to change the destructive behavior he has been connected to and financing for decades.

---

[16] See, e.g., *Africa Gold Advisory*, available at: https://www.state.gov/the-united-states-issues-an-advisory-focused-on-the-gold-sector-across-sub-saharan-africa/; https://home.treasury.gov/news/press-releases/jy1581.

SENSITIVE BUT UNCLASSIFIED

# Exhibit 14

SENSITIVE BUT UNCLASSIFIED



SENSITIVE BUT UNCLASSIFIED

Exhibit 15

UNCLASSIFIED

**(U) US moves to freeze Uganda's pot of gold**



UNCLASSIFIED

DRC-34996 0970

Exhibit 15

UNCLASSIFIED



(U) **BODY**

(U) What you need to know:

(U) The United States Treasury Department's sanction regime on the Entebbe-based African Gold Refinery Ltd, and its Belgian co-founder/director, **Alain Goetz**—announced late Thursday evening (Ugandan time)—came two days after Russia scuttled a vote to sanction the same company at the UN Security Council.

(U) Diplomatic sources in New York and Kampala intimated to Sunday Monitor that on March 15, France brought a proposal to the UN Security Council (UNSC) sanctions committee.

(U) ALSO READ:US sanctions **Alain Goetz** over illicit DR Congo gold trade

(U) France hoped to have the committee chaired by its former colony—Gabon—give the green light to add the African Gold Refinery Ltd (AGRL) and its directors to the sanctions list.

(U) At the UNSC, Russia and China—which often vote together—invoked a "technical hold" on the proposal that had the support of the US, France, the UK, and United Arab Emirates (UAE) as the co-designating states.

(U) In UN corridors, technical hold functions as a pause on a proposal and is moved on the grounds that the technicality of the proposal has not been sufficiently examined.

(U) ALSO READ:How new mining law will affect you

(U) Article 41 of the United Nations Charter gives the UNSC—the world body's most powerful organ—the authority to use a variety of measures, including sanctions to enforce its decisions. The sanctions are generally supported by a committee, as well as panels/groups of experts or other mechanisms to monitor implementation of the sanctions.

(U) Protest vote

(U) The repertoire of sanctions range from comprehensive economic and trade sanctions to more targeted measures such as arms embargoes, travel bans, and financial or commodity restrictions.

(U) ALSO READ:Govt gives in, proposes new levy for gold exports

(U) Russia's protest vote was, in all likelihood, a reciprocation for Uganda's "abstain" vote during the UN General Assembly's emergency session on March 2 to call out Moscow for its invasion of Ukraine.

UNCLASSIFIED

UNCLASSIFIED

(U) Following the failed UNSC bid, the US moved in unilaterally to impose sanctions against AGRL, which since its launch in 2017, has been under immense international scrutiny.

(U) This was especially so after revelations that the company imported gold from sanctioned Venezuela and acted as a conduit for conflict gold from the DR Congo and South Sudan.

(U) The decision by Washington, diplomatic sources hinted, was also informed by the likelihood that several high-ranking Ugandan government officials are involved in the murky gold trade that turned the wheels of the refinery's operations.

(U) ALSO READ:Karamoja struggling to benefit from a rich mineral resource

(U) In a statement issued on Thursday evening, the US Treasury Department indicated that AGRL is one of Mr Goetz's companies engaging in gold sourced from regions controlled by armed groups engaged in conflict in the DR Congo.

(U) "These armed groups and their commanders attacked civilians and are implicated in atrocities, including ethnic massacres, rape, and forced recruitment of children. Conflict gold provides the largest source of revenue to armed actors in eastern DRC, including armed groups which profit through illegal taxation, raiding of mines, and collaboration with smugglers," the statement reads in part.

(U) ALSO READ:Uganda loses Shs400b in gold tax in two months

(U) According to the Treasury Department, Mr Goetz's operations span three countries in Uganda, UAE, and his home country Belgium, where he was convicted of money laundering and fraud in connection with his gold trade in 2020.

(U) The UAE, available records show, was among the key destinations for the refined gold from Uganda.

(U) What does this mean?

(U) Specifically, the sanctions—which ideally mean the global financial system tightening noose around AGRL while all its US-based assets will be frozen—come as a slap in the face of President Museveni.

(U) Mr Museveni has been vocal about local value addition in mineral ore as part of the government's wide-ranging efforts to revive the once vibrant mining sub-sector that collapsed in the 1990s.

(U) Twice, the President decreed against exportation of mineral ore—tungsten, iron, gold, cobalt, phosphate, granite, salt, and copper—in raw form, arguing that the country was losing a lot of money in wasted value addition.

(U) He, however, later made a U-turn on the decision following intensive lobbying and complaints by the different investors.

(U) AGRL, which started operations in 2014 before being commissioned in February 2017 (the first of its kind in Sub-Saharan Africa), immediately became a key player in gold trade amid a welter of concerns from local and international actors.

UNCLASSIFIED

Exhibit 15

UNCLASSIFIED

(U) Its $15m (Shs53.6b) refinery reportedly employed about 75 people.

(U) Technocrats at Amber House, the seat of the Ministry of Energy, told Sunday Monitor that they "are evaluating the implications" of the latest development "in consultation with the Attorney General" and will provide a substantive position in due course.

(U) ALSO READ:Illegal miners face Shs1b fine

(U) Contacted by the Associated Press (AP), Mr Goetz denied the Treasury Department's allegations.

(U) The Belgian national denied having recent business ties with the DR Congo where the lucrative mining —especially in the mostly lawless eastern region—is in the hands of rapacious warlords and international mining cartels.

(U) "I have not been to [Congo] in more than 20 years," he told AP.

(U) He added: "I have not kept any active contacts within [Congo] either."

(U) He further warned that sanctions against AGRL would hurt efforts to improve transparency in the gold business by potentially offering informal traders "a safe haven", again.

(U) "International organisations can now easily verify information and quote figures because of the transparency that I laid a foundation for with the launch of African Gold Refinery," he said.

(U) "This transparency is what the US has just placed at great risk with these sanctions," he added.

(U) The UN Security Council first attempted to close in on conflict gold floating around the restive Great Lakes region in 2009 when it cited two companies—Simba Gold Refinery and Bullion Gold Refinery—for smuggling gold out of the region.

(U) ALSO READ:New mining law has potential to curb illicit financial flows – sector analysts

(U) After its commissioning in 2017, AGRL emphasised that it was neither a gold buyer nor seller; but rather a refiner, and specifically offering four services: refining, melting, assaying and logistics. The company, however, came under scrutiny over where it sourced its raw material.

(U) In 2016, AGRL revealed that out of gold exports worth $300m (Shs1 trillion) from Uganda, it accounted for roughly $200m (Shs715b).

(U) This, as the Ministry of Energy, and the Uganda Revenue Authority, on several occasions, struggled to explain the mismatch between Uganda's gold export certificates and royalties declared. Soon gold—which Uganda produces less—overtook coffee as the country's top export.

(U) Not all that glitters is gold

(U) Mr Goetz was one of the company's founding directors in 2014, according to Uganda Registration Services Bureau filings, alongside Rwandan national Alphone Ktarebe, Barnabas Taremwa, Richard Kaijuka—both Ugandans—and Heizel Adanta, a Pilipino.

UNCLASSIFIED

DRC-34996 0973

6/22/2023, 5:47 PM

Firefox

**Exhibit 15**

UNCLASSIFIED

(U) But over the years, according to the filings, the company's directors kept changing—including in 2019 when

(U) Mr Goetz sold his shareholding in the company but continued signing documents.

(U) From day one of commissioning of the refinery, concerns abound over the possibility of bloodied gold floating from wherever to Entebbe.

(U) In 2017, Mr Goetz told this newspaper that he was aware of "the many controversies surrounding the regional gold trade" and was working hard to address them.

(U) Later in 2018, he acknowledged that AGR refines about 150 kilogrammes of gold from the DR Congo weekly, or approximately 8.5 tonnes a year, valued at $496m (Shs1.7trillion).

(U) This represents almost all of Uganda's gold exports.

(U) The DR Congo is considered the wealthiest country in the world in terms of natural resources, with an estimated evaluation of $24 trillion—equivalent to the Gross Domestic Product (GDP) of Europe and the United States combined.

(U) Whereas it has huge deposits of any mineral one can think of—diamonds, gold, coltan, uranium, tin, copper, cobalt, oil, tungsten, tin, and many others— its citizens struggle within a country that has the second lowest nominal GDP in the world. The DRC is also the epicentre of what many consider to be an African world war.

(U) AGRL once reasoned that the "dramatic increase in export figures recently is a direct result of [its] high levels of transparency."

(U) The company also claimed to maintain zero tolerance to smuggling.

(U) The disclosures on the origin of the refinery's gold still remained farfetched, while at the same time the Bank of Uganda's research department in-charge of import statistics between 2016 and 2021 maintained that it did not know the origin of the gold that Uganda keeps importing.

(U) In early 2019 when Uganda's merchandise exports rose sharply to $604.4m (Shs2.1 trillion) up from $296.3m (Shs1 trillion) the previous month, with gold exports increasing by 421.5 percent from the previous month to $363.4m (Shs1.3 trillion).

(U) The Wall Street Journal published an expose detailing how an unusual gold amounts were sneaked into Uganda from Venezuela.

(U) Part of that country's central bank's reserves were sold off by its cash-strapped president Nicolas Maduro.

(U) The operation was designed to evade US sanctions on the Venezuelan government with the gold arriving in Uganda in two consignments aboard planes owned by a Russian chartered company, the WSJ revealed.

UNCLASSIFIED

## Exhibit 15

UNCLASSIFIED

(U) Later, a police investigation into the "unusually large consignments" seized 3.6 tonnes of the Venezuelan gold in a raid on AGRL.

(U) The company was now officially on the international watch list, which culminated into Thursday's sanctions.

(U) Uganda's permanent representative to the UN says:

(U) Uganda's permanent representative to the UN,Ambassador Adonia Ayebare. FILE PHOTO

(U) > "I confirm that the issue of AGRL was taken to UN Security Council on Tuesday, March 15. Our position is that AGR is adding value to gold that used to be exported raw, and fetched low price. And AGRL does due diligence on sourcing. The only way for Uganda to grow is if it exports high value-added products and that is what AGR is doing in the region," Adonia Ayebare, Uganda's permanent representative to the UN.

### (U) **SOURCE DESCRIPTOR**

(U) Kampala Daily Monitor Online in English -- Website of popular daily owned by Monitor Publications, a subsidiary of Kenya's Nation Media Group, and Uganda's second-largest publication; coverage includes reporting from across the political spectrum but commentaries tend to be critical of the ruling party resulting in several government crackdowns; international news coverage includes balanced reporting on the United States, China, and Russia, with greater focus on US-related activities; URL: https://www.monitor.co.ug



(U) What you need to know: The United States Treasury Department's sanction regime on the Entebbe-based African Gold Refinery Ltd, and its Belgian co-founder/director, **Alain Goetz**—announced late Thursday evening (Ugandan time)—came two days after Russia...

UNCLASSIFIED

Firefox

Exhibit 15

UNCLASSIFIED



UNCLASSIFIED

DRC-34996 0976

6/22/2023, 5:47 PM

UNCLASSIFIED

(U)



UNCLASSIFIED

DRC-34996 0981

**Exhibit 17**

UNCLASSIFIED



(U) Uganda's status as a prominent gold exporter, albeit with no large gold deposits, came to a sudden end in June 2020 when the government introduced a new tax on the precious metal. However, authorities still hope to attract large volumes of gold back into the country.

(U) The country's gold export boom, which started around 2015, coincided with the opening of Africa Gold Refinery, the largest gold refinery in East Africa, located less than a kilometre from Entebbe International Airport in Entebbe city.

(U) The end of the gold export boom also coincided with the reported quiet departure of **Alain Goetz**, the Belgian businessman who sold 99 percent of the shares he owned in the refinery, but stayed around, according to documents obtained by *The Africa Report* from Uganda Registration Service Bureau. Goetz had brought gold into Uganda from as far as South America.

(U) The government's attempt to revive the gold trade boom by removing the tax and woo gold dealers back into the country could be impeded by last week's sanctioning of Goetz and the refinery by the US treasury department.

(U) The treasury department said: "more than 90 percent of DRC gold is smuggled to regional states, including Uganda and Rwanda, where it is then often refined and exported to international markets, particularly the UAE."

(U) For instance, in the financial year ending June 2015, Uganda exported gold worth less than $1m. However, by the end of the next financial year in 2016, the value of gold exports had steeply increased to $204m. In the financial year ending June 2021, Uganda exported gold worth $2.2bn, which was more than 40 percent of the value of the country's total exports.

### (U) A new tax introduced, then removed

(U) When Uganda's President Yoweri Museveni officially opened Africa Gold Refinery in 2017, he ordered the removal of tax on gold mined locally, as well as on gold in transit. The government was hardly collecting any tax from the dealers. Last year, Muhereza Woods, a legal consultant for Africa Gold Refinery, said the company had paid USh3.4bn (slightly less than $1m) in taxes since 2015.

(U) In 2021, as gold trade flourished, the government thought it was the best time to cash in on the boom through taxes. A mining law was amended to introduce a 5 percent levy on refined gold and 10 percent on unprocessed gold, effective 1 July 2021. Gold traders protested and Museveni gave in. In a new mining and minerals bill passed by parliament in February this year, the government removed the gold tax. The bill awaits assent by Museveni to become a law.

UNCLASSIFIED

UNCLASSIFIED

(U) Nevertheless, the boom ended with the introduction of new taxes. In June 2020, Uganda exported gold worth $165m. The following month, there were no gold exports; and by January 2022, no gold exports had been recorded, according to statistics from the Bank of Uganda.

(U) Don Bwesigye, executive director of the Africa Centre for Energy and Mineral Policy (ACEMP) in Kampala, says Uganda became an attractive transit for gold smuggled from the Democratic Republic of Congo and Sudan: first because it was good business for dealers who were not paying tax, and secondly, because of laxity in laws.

(U) "High and unfriendly tax regimes force the industry to resort to tax evasion through smuggling. South Sudanese dealers use the Ugandan route because there are no systems in their country. Congolese use Uganda because of the high taxes in (the) DRC Congo," he tells *The Africa Report.*

(U) Bwesigye says the Ugandan government should not be surprised that when it raised taxes, it indirectly forced dealers to look for alternate friendly routes. "Look at the gold data of our neighbours, Kenya, Tanzania and Rwanda. You will notice a spike in their exports within the same period of time," he says.

(U) **Implications**

(U) In December 2021, Bank of Uganda – in its monthly report – disclosed a 30.4 percent reduction in merchandise export "on account of a $356.2m (100 percent) decrease in gold export earnings caused by the levy imposed on gold". The central bank also reported a decrease of import bill, mentioning gold as one of the contributing factors. However, the bank has no record of gold imports.

(U) Though statistics from Bank of Uganda don't show where gold is being exported, an analysis reveals that much of it was going to the United Arab Emirates because exports to the country drastically decreased with the end of the gold boom. Uganda's exports to the country reduced from $167m in June 2020 to $1.3m in July.

(U) Moses Kaggwa, the director of economic affairs at Uganda's Ministry of Finance tells *The Africa Report* that disappearance of gold exports has impacted Uganda's balance of trade. But Paul Corti Lakuma, an economist, describes gold trade figures as a book-keeping entry. "These are entries where you don't even see the money," he says. He adds that there is no need to worry given that gold money was not owned by Ugandans.

(U) Lakuma says the losses that Uganda incurred were linked to logistics, salaries and other fees that the government or other Ugandans could have earned from gold processing and exporting companies. He says the government should have done a comparative analysis of the earnings it was making before introducing the tax and what it would earn after.

(U) Kaggwa says the tax will be revisited after Museveni assents to the new mining law. "We will make regulations on the levies that are going to exports which we will agree with exporters."

(U) **SOURCE DESCRIPTOR**

(U) Paris The Africa Report in English -- Website of quarterly magazine established in 2005, published by Jeune Afrique Media Group, providing reporting, analysis on Africa's political, economic, social landscape; URL: https://www.theafricareport.com

UNCLASSIFIED

DRC-34996 0983

Exhibit 17

UNCLASSIFIED



UNCLASSIFIED

Firefox

Exhibit 30

UNCLASSIFIED

**(U) No shine in Uganda's gold**



UNCLASSIFIED

Firefox

Exhibit 30

UNCLASSIFIED



(U) > Vanishing mineral exports dent economic recovery

(U) Kampala, Uganda | THE INDEPENDENT | Uganda's non-formal export sector has maintained a downward trajectory year-on-year, according to the latest July 2022 figures from Bank of Uganda (BoU). The effect has been a dent on the otherwise emerging signs of recovery in exports buoyed by impressive gains around the coffee sector.

(U) The year-on-year (YoY) figures show that the nation earned US$1 billion from non-coffee exports in the fourth quarter of FY2020/21 but that dropped 30% to US$700 million in Q4 of FY2021/22. And a comparison of the monthly figures from the central bank shows the downward trend has persisted in the first three months of FY2022/23.

(U) The news is likely to worsen because, according to the figures, the growing gap is a result of the almost 100% disappearance of contribution from what has been Uganda's leading export commodity; gold.

(U) After suddenly popping up on Uganda's export radar in 2017, Gold exports were on an upward push from the calendar year 2019 (US$1.2 billion) to 2020 (Us$1.8 billion). But they dropped to US$1 billion in 2021 and appear unlikely to recover soon despite the government's efforts to shore up interest in the sector with reports of huge new deposit findings.

(U) Year on Year to July 2022, the monthly value of gold exports has been zero, according to the Bank of Uganda figures.

(U) Analysts have blamed the government's introduction in the 2021/22 FY of a 5% levy on every kilogram of refined gold exported and a 10% levy on every kilogram of unprocessed gold for export. The move came into effect in July 2021.

(U) But there appear to be other underlying factors for the disappearance of Uganda's gold exports, including a proposed law to ban the export of unprocessed gold and the failure to fill the gaping hole left after the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) in March sanctioned **Alain Goetz**, the promoter of Uganda's largest gold refinery.

(U) Uncertain taxes and policies

(U) The Ministry of Finance in April 2021 proposed to Parliament to amend the Mining Act, 2003, to impose a US$200 export levy per kilogram on processed gold and unprocessed minerals. Gold dealers were reportedly unhappy with the new tax regime and stopped all legal gold exports. Parliament also rejected it saying the charge would be hard to implement.

(U) The government under the Mining and Minerals Bill 2021 is proposing a levy of $100 for every

UNCLASSIFIED

Firefox

**Exhibit 30**

UNCLASSIFIED

kilogramme of exported gold and the establishment of a national mining company; the Uganda National Mining Company, which will hold 15% free equity in all large and medium mining ventures, as well as have the right to buy up to 20% of extra shares in the mining ventures at the commercial rate.

(U) The government is promoting the new law as its way of providing a "robust, predictable and transparent legal regime" that will improve mining and mineral administration and business processes, ensure efficient collection and management of mineral revenues, promote value addition to minerals and increase mineral trade. But gold traders and analysts are wary. Many say the law introduces the threat of nationalisation.

(U) Meanwhile, the flip flop around the tax regime has spread uncertainty around the formal gold sector. But the fever has spread because of another factor, the announcement that the Uganda government has introduced a law to ban the export of unprocessed gold.

(U) President Museveni first publicly mooted a ban on the export of unprocessed and semi-processed-minerals in February 2015 while speaking at a parliamentary caucus meeting for his ruling party, the NRM. He called exporting unprocessed minerals a "historical mistake".

(U) In late February 2017, a joint Belgian-Ugandan venture gold refinery, African Gold Refinery (AGR), officially opened for business at a colorful event officiated by President Yoweri Museveni in Entebbe. The refinery had been in operation reportedly since 2014 and was said to be a US$20 million facility with a capacity to process 150 kilogrammes of gold per day.

(U) The promoters, led by the Belgian **Alain Goetz** as chief executive officer, said AGR hoped to process gold from across Central and Eastern Africa. In 2020, Uganda imported Gold in a semi-manufactured form worth US$1.4 billion and exported the same form of gold worth US$ 1.8 billion.

(U) Uganda blacklisted

(U) But on March 17, 2022, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), sanctioned **Alain Goetz**, the African Gold Refinery, and a network of other companies.

(U) They were accused of involvement "in the illicit movement of gold valued at hundreds of millions of dollars per year from the Democratic Republic of the Congo (DRC)".

(U) "The illicit movement of gold provides revenue to armed groups that threaten the peace, security, and stability of the DRC," the Treasury Department statement said.

(U) The U.S. said it was targeting, among other things, individuals and entities involved in activities that threaten the peace, security, or stability of the DRC or that undermine democratic processes or institutions in the DRC.

(U) "Conflict gold provides the largest source of revenue to armed groups in eastern DRC where they control mines and exploit miners," said Under Secretary of the Treasury for Terrorism and Financial Intelligence Brian E. Nelson. He added that **Alain Goetz** and his network have contributed to armed conflict by receiving DRC gold without questioning its origin.

(U) But at the time, Goetz said his listing seems to be based on misinformation. He explains that he wrote

UNCLASSIFIED

Exhibit 30

UNCLASSIFIED

to the Secretary of the US Treasury, Janet Yellen, in April 2021, when such allegations were first brought up, and clearly demonstrated why such a move would be unfair, unjust, and uncalled for.

(U) "As we explained then and we will repeat here, the petition to sanction me and my corporate networks by Senator Cory A. Booker, Senator Benjamin L. Cardin, and Richard J. Durbin were based on unfounded accusations published by various non-governmental organisations (NGOs).

(U) Signs of hope?

(U) The government appears determined to shore up the floundering sector which at one point contributed about 45% of export value. In July the Government announced that exploration surveys had revealed vast gold deposits estimated to be around 31 million tonnes.

(U) Wagagai Gold Mining Company, a Chinese firm, which already had an operation in Uganda appears to be the front-runner for the likely new concessions. Gold dealings are secretive but the Uganda Investment Authority has previously said Wagagai is a big player with investments nearing US$$200 million.

(U) The Wagagai mine and refinery were in February granted a 'free port zone' under the Uganda Free Zone Authority (UFZA). Free Zones are designated areas in Uganda where duty-free goods are stored, manufactured, and or processed for export. This means the Wagagai business venture will be exempt from import and export tax. This could resurrect a sector in limbo.

(U) But some analysts have counseled caution regarding the size of the government's announced gold reserves. They say based on aerial surveys to make such pronouncements is premature. They instead recommend further validity including using geophysical and geochemical surveys and analyses.

(U) ****

(U) **SOURCE DESCRIPTOR**

(U) Kampala The Independent Online in English -- Website of weekly publication owned by prominent Ugandan journalist and editor Andrew Mwenda; provides news and commentary on Ugandan and regional events:

URL: https://independent.co.ug/



UNCLASSIFIED

Exhibit 30

UNCLASSIFIED



UNCLASSIFIED

DRC-34996 1077

**Exhibit 31**



**Date:** 14th May 2021

**To:**

The Honorable Janet Yellen
Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington D.C. 20220

**Received
Treas Exec
Sec**

Digitally signed by
Received Treas Exec
Sec
Date: 2021.07.07
18:23:15 -04'00'

Respected Honorable Secretary Janet Yellen,

This is in connection to the letter from Honorable Senator Cory A. Booker and Honorable Senator Benjamin L. Cardin to your office dated: 16th April 2021 regarding their recommendation to sanction Mr. Alain Goetz and his corporate networks regarding accusations of illicitly sourced gold from the DRC, seen by Honorable Sen. Booker and Honorable Sen. Cardin as a potent resolve to the conflict in Eastern DRC. With full certainty, we firmly believe that Honorable Sen. Booker and Honorable Sen. Cardin's baseless recommendation to sanction Alain Goetz and his companies is a result of lack of intensive research and objective fact-finding. We must consider all these allegations linking Alain Goetz to conflict gold trade in the DRC were never proven in any court of law.

Thus, the recommended sanction of Honorable Senators Booker and Cardin are truly unfair and unjust to not only Alain Goetz who has already stepped down as CEO in 2018, but to the employees and hundreds of families who are relying on this industry for their livelihood. These recommendations, if done without fair and objective review, might result in a decision which will be detrimental not only to the company and hundreds of employees but to the entire industry at large.

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Hope Ocida  LL.B  (Hons) (MAK) DIP. LP (LDC)  - 0775598888
Associate: Joseph Kisuule LL.B (Hons) (KIU)  - 0772974551
Law Clerk: Mwenyi  Akimu  Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
DRG1349091072r .com

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

Exhibit 31



It is worth mentioning that Alain Goetz's initiatives in the region through the setting up of gold refineries and formation of a legitimate company has improved the transparency in the trade and boosted the tax revenue of countries. In addition, this company operates in accordance with the national, regional and international regulatory frameworks.

For instance: Today, it is easier for Uganda to track how much gold is being processed, traded and exported because of African Gold Refinery – AGR's efforts enable the authorities to capture and monitor the gold flow; the official figures are available for all to see, needless to say that all the taxes are being paid to the government. Through this, other neighboring countries are adapting how to put their own regulatory systems in place.

Honorable Senators Booker and Cardin had also mentioned the gold originated from Venezuela; the Uganda Higher Authority level had cleared this matter over two years ago. Pertinent to Uganda's Attorney General letter dated 26th March 2019 (enclosed herewith) as per his study and all the documentations provided, he dispelled AGR from any suspicion of smuggling yet the company has been advised to avoid further involvement in Venezuela gold in the future, and AGR respected the Attorney General's remark without hesitations.

In line with the meeting with U.S. Treasury Department and AGR's Top Management at AGR premise on 1st October 2019 headed by Mr. Robert Lovely, Mr. Jack Skopowski and Mr. Mark Keith Muhumuza, the parties further agreed and AGR assured that the company will cease and desist from engaging any transaction that may be linked to the gold from Venezuela.

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Hope Odda  LLB  (Hons) (MAK) DIP. LP (LDC)  - 0775598888
Associate: Joseph Kisuule LLB (Hons) (KIU)  - 0772974551
Law Clerk: Mwenyi Akimu  Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Email: tem@lawyer.com

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

Exhibit 31



Against this backdrop, more often and specifically in recent years, it is unfortunate that Alain Goetz has been the target of numerous attacks by some non-governmental organizations (NGOs) and media. Their accusations often appeared partisan and not necessarily based on a genuine desire to describe things as they really are. We cannot help but wonder why these NGO's keep targeting Africa, particularly Uganda. What is their motivation for their actions? Are they being financed by politicians or competitors whose selfish motives hinder behind.

By listening to these NGO's, Africa is risking the potential to gain more investors, which in turn, would generate more jobs for the locals. Above all, we are putting the whole African continent in a bad light in the international business community- the root cause why hunger, poverty, unemployment and diseases continue to be rampant in our side of the world.

African countries need more support than criticism, more investors and investments as any other country to boost their economy; neither they nor their investors should be discriminated against, only because they are operating in the African continent.

As a lady of wisdom, equity and fair judgment, we render our full trust and confidence that our good Secretary of the Treasury will side with what is right, equitable and just regarding this matter.

Sincerely Yours

Sharon Tem

**Copy:**

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Hope Ocida  LLB  (Hons) (MAK) DIP. LP (LDC)  - 0775598888
Associate: Joseph Kisuule LLB (Hons) (KIU)  - 0772974551
Law Clerk: Mwenyi  Akimu   Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
DRC+243867 7080
Email: tem@lawyer.com

Exhibit 31

**tem**
*Tem Advocates & Solicitors*

Honorable Natalie E. Brown
Ambassador to Uganda
U.S. Embassy
Kampala, Uganda

Honorable Arthur Kafeero
Ambassador
Ministry of Foreign Affairs
Kampala, Uganda

Honorable Adonia Ayebare
Ambassador / Permanent Representative
Permanent Mission of Uganda to the United Nations
New York, U.S.A.

Honorable Senator Cory A. Booker
Senator
United States of America

Honorable Senator Benjamin L. Cardin
Senator
United States of America

Honourable Frank Mugenyi
Coordinator
African Minerals Development Center (AMDC)
African Union Specialized Agency.

Managing Advocate: Sharon Tem LL.B (Hons) (MAK) DIP. LP (LDC) - 0772368361
Advocate: Nanteza Hasfa LL.B (Hons) (MAK) DIP. LP (LDC) - 0703651506
Advocate: Hope Ocida  LLB  (Hons) (MAK) DIP. LP (LDC)  - 0775598888
Associate: Joseph Kisuule LLB (Hons) (KIU)  - 0772974551
Law Clerk: Mwenyi Akimu  Dip . Law (LDC) - 0701316370
Administrative Secretary Maturu Monica - 0785750633

Attorneys at Law
Trade Mark & Patent Agents
Investment & Legal Consultants
Property Managers
Receivers & Liquidators
Company Secretaries

P.O. Box 6800 Kampala –Uganda
Plot 11 A Acacia Avenue Kololo
Office Tel: 0392176659
Tel: 0393176081
Email: tem@lawyer.com

Exhibit 31

TELEGRAMS "ADMINISTER
DIRECT LINES
MINISTER S OFFICE              041-343401
SOLICITOR GENERAL S OFFICE    041-343411
UNDER SECRETARY S OFFICE      011-342561
AO DIRECTOR CIVIL LITIGATION  011-33170+
GENERAL LINES                 041-2355109
Fax                           041-254029
Fb. Civil Litigation          041-345100

In um correspondence on AD357/212/01



**ATTORNEY GENERAL'S CHAMBERS**
**P O BOX 7183,**
**Kampala, Uganda**

26th March, 2019

The Commandant,
Police Minerals Protection Unit,
P.O. Box 7183
Entebbe.

**RE: PRELIMINARY REPORT ON THE ALLEGED SUSPECTED SMUGGLED GOLD BY AFRICAN GOLD REFINERY (AGR) VIDE GEF 01/2019.**

Reference is made to your letter dated 21st March, 2019 in which you forwarded to me a preliminary investigation report dated 19th March, 2019 in relation to the above subject matter, for my advice as per H.E the President's directive on 20th March, 2019 at Kyankwazi on the above matter.

As instructed by H.E the President on 25th March, 2019, at State House Entebbe, I advise you as follows;

I gather from your report that you received intelligence information about suspected gold smuggled into Uganda from Venezuela by African Gold Refinery Ltd (AGR), which is alleged to have occurred between 2nd and 4th March, 2019.

African Gold Refinery Ltd operates as a bonded ware house with License No. WO408 under the East African Customs Management Act, 2004 (EACMA). Under section 48 of the EACMA, bonded warehouses may be exempted from payment of duty on first importation into the bonded warehouse. Pursuant to the Directive of H.E the President dated 26th April 2017 Reference PO/1, communicated to Ministry of Energy and Mineral Development and the letter from Uganda Revenue Authority (URA) to AGR dated 5th June 2018, Reference CUST/T/3/16, Government granted AGR bonded facility exemption from import duty in accordance with section 164 Part XIII of the East African Community Customs Management Act, 2004.

Accordingly, URA granted clearance of the two consignments on 1st March 2019 ad 4th March 2019 respectively in line with the exemption already granted by Government and also issued release orders for the

DRC-34996 1082

# Exhibit 31

consignments. This is also in line with section 117(2) of the Mining Act 2003 that requires an importer of minerals to make a declaration to a customs officer of minerals imported into the country. This, in my opinion dispels the suspicion of smuggling.

In light of the above, you are directed to withdraw your officers deployed at AGR premises and release any gold that may have been seized or impounded during this investigation.

Concerning the current sanctions imposed by the United States Government on Venezuela, in view of the principle of comity, by copy of this letter, AGR is instructed henceforth, save for the gold comprising of the consignments that have been the subject of investigation, cease and desist from any further importation of gold from Venezuela, until further notice.

William Byaruhanga, SC
**ATTORNEY GENERAL**

Cc: The Principal Private Secretary to H.E the President (for onward transmission to H.E the President)

Cc: The Hon. Deputy Attorney General

Cc: The Inspector General of Police

Cc: The Chief Executive Officer, African Gold Refinery Ltd

DRC-34996 1083

Official Journal L 316I/2022

https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ...

**Exhibit 33**

ISSN 1977-0677

# Official Journal

# L 316I

of the European Union



| English edition | Legislation | Volume 65<br>8 December 2022 |
| --- | --- | --- |

Contents

*II   Non-legislative acts*

page

INTERNATIONAL AGREEMENTS

\*   **Council Implementing Regulation (EU) 2022/2397 of 8 December 2022 implementing Regulation (EC) No 1183/2005 concerning restrictive measures in view of the situation in the Democratic Republic of the Congo**

**1**

DECISIONS

\*   **Council Implementing Decision (CFSP) 2022/2398 of 8 December 2022 implementing Decision 2010/788/CFSP concerning restrictive measures in view of the situation in the Democratic Republic of the Congo**

**7**

**EN**

Acts whose titles are printed in light type are those relating to day-to-day management of agricultural matters, and are generally valid for a limited period.

The titles of all other Acts are printed in bold type and preceded by an asterisk.

---

**II Non-legislative acts**

**INTERNATIONAL AGREEMENTS**

| 8.12.2022 | EN | Official Journal of the European Union | LI 316/1 |
| --- | --- | --- | --- |

## COUNCIL IMPLEMENTING REGULATION (EU) 2022/2397

### of 8 December 2022

DRC-34996 1087

https://eur-lex.europa.eu/legal-co... HTML/?uri=OJ...

**Exhibit 33**

## implementing Regulation (EC) No 1183/2005 concerning restrictive measures in view of the situation in the Democratic Republic of the Congo

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union,

Having regard to Council Regulation (EC) No 1183/2005 of 18 July 2005 concerning restrictive measures in view of the situation in the Democratic Republic of the Congo (¹), and in particular Article 9(2) thereof,

Having regard to the proposal from the High Representative of the Union for Foreign Affairs and Security Policy,

Whereas:

(1) On 18 July 2005, the Council adopted Regulation (EC) No 1183/2005.

(2) Further to an evaluation of the relevant circumstances and in view of the gravity of the situation in the Democratic Republic of the Congo, the Council considers that eight persons should be added to the list of persons, entities and bodies set out in Annex Ia to Regulation (EC) No 1183/2005.

(3) Annex Ia to Regulation (EC) No 1183/2005 should therefore be amended accordingly,

HAS ADOPTED THIS REGULATION:

### Article 1

Annex Ia to Regulation (EC) No 1183/2005 is amended as set out in the Annex to this Regulation.

### Article 2

This Regulation shall enter into force on the date of its publication in the *Official Journal of the European Union.*

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Brussels, 8 December 2022.

*For the Council*
*The President*
V. RAKUŠAN

(¹) OJ L 193, 23.7.2005, p. 1.

### ANNEX

The following persons are added to the list set out in Section A ('Persons') of Annex Ia to Regulation (EC) No 1183/2005:

Persons

DRC-34996 1088

https://eur-lex.europa.eu/legal-co... EXHIBIT 33 ...ML/?uri=OJ...

| | Name | Identifying information | Grounds for listing | Date of listing |
|---|---|---|---|---|
| '10 | Ruvugayimikore PROTOGÈNE | a.k.a. Ruhinda; Gaby Ruhinda; Zorro Midende <br><br> DOB: ▮ <br> Gender: Male <br> Function or profession: Leader of the Democratic Forces for the Liberation of Rwanda - *Forces Combattantes Abacunguzi* (FDLR-FOCA); Leader of the Maccabé group (formerly *Commando de recherche et d'action en profondeur* (CRAP)) of the FDLR-FOCA | Ruvugayimikore Protogène is a leader of the Democratic Forces for the Liberation of Rwanda - *Forces Combattantes Abacunguzi* (FDLR-FOCA), a non-governmental armed group operating in the Eastern DRC. He leads, in particular, the Maccabé group (formerly known as the *Commando de recherche et d'action en profondeur* (CRAP)) of the FDLR-FOCA. <br><br> The FDLR-FOCA, including the Maccabé group, contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including attacks on civilians, killings, violence against children, rapes and other acts of sexual violence. <br><br> Owing to his leading position in the FDLR-FOCA, Ruvugayimikore Protogène is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | 8.12.2022 |
| 11 | Meddie NKALUBO | a.k.a. Mohammed Ali Nkalubo; Abul Jihad; Punny Boy <br><br> DOB: ▮ <br> Nationality: Uganda <br> Gender: Male <br> Function or profession: Senior Allied Democratic Forces leader | Meddie Nkalubo is a senior leader of the Allied Democratic Forces (ADF), a non-governmental armed group operating in Uganda and the Eastern DRC. He has been identified as holding various | 8.12.2022 |

DRC-34996 1089

https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ... **Exhibit 33**

| | | | | responsibilities in the ADF, including communication and propaganda, recruitment, fabrication of arms, and rapprochement with ISIL (Da'esh). | |
|---|---|---|---|---|---|
| | | | | The ADF contributes to the armed conflict, instability and insecurity in the DRC (particularly in the Ituri and North Kivu provinces), in particular through violence and serious human rights abuses, including attacks against civilians, killings and abduction. | |
| | | | | Owing to his senior leading position and various responsibilities in the ADF, Meddie Nkalubo is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
| 12 | Justin BITAKWIRA | a.k.a. Bihona-Hayi DOB: ▉ POB: Lemera, DRC Nationality: DRC Gender: Male Function or profession: Politician, former National Minister and President of the Alliance for the Republic and National Consciousness | | Justin Bitakwira is a Congolese politician, former government Minister and member of the political party "Union for the Congolese Nation". In his public speeches, he has repeatedly incited violence and encouraged discrimination and hostility towards the Banyamulenge community, which has been targeted and attacked by armed groups. Those inflammatory speeches and narratives contribute to fuelling the conflict and violence in the DRC, in particular in the Hauts-Plateaux region characterised by inter-communal conflicts. | 8.12.2022 |

DRC-34996 1090

Official Journal L 316I/2022                    https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ...

Exhibit 33

| | | | Justin Bitakwira is therefore responsible for sustaining the armed conflict, instability and insecurity in the DRC, through inciting violence. | |
|---|---|---|---|---|
| 13 | Joseph Nganzo Olikwa TIPI | a.k.a. Colonel Tipi Ziro Ziro, Joseph Ngadjole, Joseph Nganzole Olikwa<br><br>DOB: ▮▮▮▮<br>POB: Bunia Fataki, DRC<br>Nationality: DRC<br>Gender: Male<br>Rank: Colonel of the FARDC<br>Position: Deputy Commander of the 12th Rapid Reaction Brigade in Minembwe, former Commander of the 312th battalion of the 31st Main Defence Brigade<br><br>▮▮▮▮▮▮▮▮ | Joseph Nganzo Olikwa Tipi was Commander of the 312th battalion of the 31st Main Defence Brigade of the Armed Forces of the Democratic Republic of the Congo (FARDC) until January 2022.<br><br>Forces of the 312th battalion under his command and responsibility have committed attacks on civilians and serious human rights violations, in particular rapes of women between June and December 2021.<br><br>Joseph Nganzo Olikwa Tipi remains a high-ranking officer in the FARDC, as Colonel and Deputy Commander of the 12th Rapid Reaction Brigade in Minembwe (South Kivu).<br><br>Owing to his functions, he bears responsibility for recent human rights violations committed by the FARDC.<br><br>Joseph Nganzo Olikwa Tipi is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. | 8.12.2022 |
| 14 | Désiré LONDROMA NDJUKPA | a.k.a. Désiré Lokana Lokanza<br>Gender: Male<br>Function or profession: CODECO URDPC Defence Officer ('charge of defence') | Désiré Londroma Ndjukpa is a leader of the Cooperative for Development of the Congo / Union of Revolutionaries for the Defence of the Congolese People (CODECO URDPC), | 8.12.2022 |

DRC-34996 1091

Official Journal L 316I/2022    https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ... **Exhibit 33**

| | | | identified as its defence officer ('charge of defence'), and co-leader of its political wing. | |
| | | | The CODECO URDPC is a non-governmental armed group operating in the Eastern DRC and contributing to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including killings, sexual violence and attacks on civilians such as attacks on internally displaced persons camps between mid-November 2021 and February 2022, targeting in particular the Hema community. | |
| | | | Owing to his leading position in the CODECO URDPC, Londroma Ndjukpa is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
| 15 | Willy NGOMA | a.k.a. Major Willy Ngoma Gender: Male Function or profession: Spokesperson of the March 23 Movement / Congolese Revolutionary Army (M23/ARC) | Willy Ngoma holds the leading position of spokesperson of the March 23 Movement / Congolese Revolutionary Army (M23/ARC), a non-governmental armed group operating in the Eastern DRC. | 8.12.2022 |
| | | | The M23/ARC contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including killings, attacks and sexual violence against civilians. | |

DRC-34996 1092

https://eur-lex.europa.eu/legal-co... Exhibit 33 ML/?uri=OJ...

| | | | Owing to his leading position in the M23/ARC, Willy Ngoma is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
|---|---|---|---|---|
| 16 | William YAKUTUMBA | DOB: ▓▓▓ POB: Lunbondia, South-Kivu, DRC Nationality: DRC Gender: Male Function or profession: leader of the *Coalition Nationale du Peuple pour la Souverainité du Congo* (CNPSC); founder and leader of the Mai-Mai Yakutumba militia | William Yakutumba is the Secretary-General and Commander of the *Coalition Nationale du Peuple pour la Souverainité du Congo* (CNPSC), a coalition of the so-called Mai-Mai militias in South Kivu province of the DRC. He is the founder and leader of one of the largest militias of that coalition, the Mai-Mai Yakutumba. The Mai-Mai Yakutumba contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including massacres of village populations, attacks on civilians, rapes and other acts of sexual violence. The Mai-Mai Yakutumba also controls gold mines in the Eastern DRC, together with CNPSC members who control the mining routes. They profit from the illicit exploitation of and trade in gold. The Mai-Mai Yakutumba uses profits gained through that trade to finance its armed activities. Owing to his leading position in the CNPSC and in the Mai-Mai Yakutumba militia, William Yakutumba is therefore | 8.12.2022 |

DRC-34996 1093

| | | | involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining and exploiting the armed conflict, instability and insecurity in the DRC, including through the illicit exploitation and trade of natural resources. | |
|---|---|---|---|---|
| 17 | Alain François Viviane GOETZ | DOB: ▮▮▮ POB: Deurne, Antwerp, Belgium Nationality: Belgian Gender: Male | Alain Goetz is a businessman, who is the beneficial owner and former director of African Gold Refinery Ltd, registered in Uganda. Since 2016, African Gold Refinery Ltd has received, purchased, refined and traded illicit gold originating from mines in the DRC that are controlled by non-governmental armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki, which are involved in destabilising activities in South Kivu province. Alain Goetz is therefore exploiting the armed conflict, instability and insecurity in the DRC through the illicit exploitation and trade of natural resources. | 8.12.2022' |

## DECISIONS

8.12.2022    | EN |        Official Journal of the European Union                    LI 316/7

## COUNCIL IMPLEMENTING DECISION (CFSP) 2022/2398

### of 8 December 2022

**implementing Decision 2010/788/CFSP concerning restrictive measures in view of the situation in the Democratic Republic of the Congo**

DRC-34996 1094

https://eur-lex.europa.eu/legal-co...   Exhibit 33 ...ML/?uri=OJ...

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on European Union, and in particular Article 31(2) thereof,

Having regard to Council Decision 2010/788/CFSP of 20 December 2010 concerning restrictive measures in view of the situation in the Democratic Republic of the Congo (¹) and in particular Article 6(2) thereof,

Having regard to the proposal from the High Representative of the Union for Foreign Affairs and Security Policy,

Whereas:

(1) On 20 December 2010, the Council adopted Decision 2010/788/CFSP.

(2) On 12 December 2016, the Council adopted Decision (CFSP) 2016/2231 (²) in response to the obstruction of the electoral process and the related human rights violations in the Democratic Republic of the Congo (DRC). Decision (CFSP) 2016/2231 amended Decision 2010/788/CFSP and introduced additional restrictive measures.

(3) Further to an evaluation of the relevant circumstances and in view of the gravity of the situation in the DRC, the Council considers that eight persons should be added to the list of persons and entities set out in Annex II to Decision 2010/788/CFSP.

(4) Decision 2010/788/CFSP should therefore be amended accordingly,

HAS ADOPTED THIS DECISION:

### Article 1

Annex II to Decision 2010/788/CFSP is amended as set out in the Annex to this Decision.

### Article 2

This Decision shall enter into force on the date of its publication in the *Official Journal of the European Union*.

Done at Brussels, 8 December 2022.

*For the Council*
*The President*
V. RAKUŠAN

---

(¹) OJ L 336, 21.12.2010, p. 30.

(²) Council Decision (CFSP) 2016/2231 of 12 December 2016 amending Decision 2010/788/CFSP concerning restrictive measures against the Democratic Republic of the Congo (OJ L 336I, 12.12.2016, p. 7).

---

### ANNEX

The following persons are added to the list set out in Section A ('Persons') of Annex II to Decision 2010/788/CFSP:

**Persons**

DRC-34996 1095

**Exhibit 33**

| | Name | Identifying information | Grounds for listing | Date of listing |
|---|---|---|---|---|
| '10 | Ruvugayimikore PROTOGÈNE | a.k.a. Ruhinda; Gaby Ruhinda; Zorro Midende <br> DOB: ▮ <br> Gender: Male <br> Function or profession: Leader of the Democratic Forces for the Liberation of Rwanda - *Forces Combattantes Abacunguzi* (FDLR-FOCA); Leader of the Maccabé group (formerly *Commando de recherche et d'action en profondeur* (CRAP)) of the FDLR-FOCA | Ruvugayimikore Protogène is a leader of the Democratic Forces for the Liberation of Rwanda - *Forces Combattantes Abacunguzi* (FDLR-FOCA), a non-governmental armed group operating in the Eastern DRC. He leads, in particular, the Maccabé group (formerly known as the *Commando de recherche et d'action en profondeur* (CRAP)) of the FDLR-FOCA. <br><br> The FDLR-FOCA, including the Maccabé group, contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including attacks on civilians, killings, violence against children, rapes and other acts of sexual violence. <br><br> Owing to his leading position in the FDLR-FOCA, Ruvugayimikore Protogène is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | 8.12.2022 |
| 11 | Meddie NKALUBO | a.k.a. Mohammed Ali Nkalubo; Abul Jihad; Punny Boy <br> DOB: ▮ <br> Nationality: Uganda <br> Gender: Male <br> Function or profession: Senior Allied Democratic Forces leader | Meddie Nkalubo is a senior leader of the Allied Democratic Forces (ADF), a non-governmental armed group operating in Uganda and the Eastern DRC. He has been identified as holding various responsibilities in the ADF, including communication | 8.12.2022 |

DRC-34996 1096

Official Journal L 316I/2022    https://eur-lex.europa.eu/legal-co...HTML/?uri=OJ... **Exhibit 33**

| | | | | and propaganda, recruitment, fabrication of arms, and rapprochement with ISIL (Da'esh). The ADF contributes to the armed conflict, instability and insecurity in the DRC (particularly in the Ituri and North Kivu provinces), in particular through violence and serious human rights abuses, including attacks against civilians, killings and abduction. Owing to his senior leading position and various responsibilities in the ADF, Meddie Nkalubo is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
| 12 | Justin BITAKWIRA | a.k.a. Bihona-Hayi DOB: ▉ POB: Lemera, DRC Nationality: DRC Gender: Male Function or profession: Politician, former National Minister and President of the Alliance for the Republic and National Consciousness | Justin Bitakwira is a Congolese politician, former government Minister and member of the political party "Union for the Congolese Nation". In his public speeches, he has repeatedly incited violence and encouraged discrimination and hostility towards the Banyamulenge community, which has been targeted and attacked by armed groups. Those inflammatory speeches and narratives contribute to fuelling the conflict and violence in the DRC, in particular in the Hauts-Plateaux region characterised by inter-communal conflicts. Justin Bitakwira is therefore responsible for sustaining the armed conflict, | 8.12.2022 |

DRC-34996 1097                                                                6/23/23, 1:13 AM

| | | | instability and insecurity in the DRC, through inciting violence. | |
|---|---|---|---|---|
| 13 | Joseph Nganzo Olikwa TIPI | a.k.a. Colonel Tipi Ziro Ziro, Joseph Ngadjole, Joseph Nganzole Olikwa<br>DOB:<br>POB: Bunia Fataki, DRC<br>Nationality: DRC<br>Gender: Male<br>Rank: Colonel of the FARDC<br>Position: Deputy Commander of the 12th Rapid Reaction Brigade in Minembwe, former Commander of the 312th battalion of the 31st Main Defence Brigade<br>Military ID: 1-77-96-32692-76 | Joseph Nganzo Olikwa Tipi was Commander of the 312th battalion of the 31st Main Defence Brigade of the Armed Forces of the Democratic Republic of the Congo (FARDC) until January 2022.<br>Forces of the 312th battalion under his command and responsibility have committed attacks on civilians and serious human rights violations, in particular rapes of women between June and December 2021.<br>Joseph Nganzo Olikwa Tipi remains a high-ranking officer in the FARDC, as Colonel and Deputy Commander of the 12th Rapid Reaction Brigade in Minembwe (South Kivu).<br>Owing to his functions, he bears responsibility for recent human rights violations committed by the FARDC.<br>Joseph Nganzo Olikwa Tipi is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. | 8.12.2022 |
| 14 | Désiré LONDROMA NDJUKPA | a.k.a. Désiré Lokana Lokanza<br>Gender: Male<br>Function or profession: CODECO URDPC Defence Officer ('charge of defence') | Désiré Londroma Ndjukpa is a leader of the Cooperative for Development of the Congo / Union of Revolutionaries for the Defence of the Congolese People (CODECO URDPC), identified as its defence officer ('charge of defence'), and co-leader of its political wing.<br>The CODECO URDPC is a | 8.12.2022 |

DRC-34996 1098

Official Journal L 316I/2022                https://eur-lex.europa.eu/legal-co... **Exhibit 33** ...ML/?uri=OJ...

| | | | non-governmental armed group operating in the Eastern DRC and contributing to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including killings, sexual violence and attacks on civilians such as attacks on internally displaced persons camps between mid-November 2021 and February 2022, targeting in particular the Hema community.<br><br>Owing to his leading position in the CODECO URDPC, Londroma Ndjukpa is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
| 15 | Willy NGOMA | a.k.a. Major Willy Ngoma<br>Gender: Male<br>Function or profession: Spokesperson of the March 23 Movement / Congolese Revolutionary Army (M23/ARC) | Willy Ngoma holds the leading position of spokesperson of the March 23 Movement / Congolese Revolutionary Army (M23/ARC), a non-governmental armed group operating in the Eastern DRC.<br><br>The M23/ARC contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including killings, attacks and sexual violence against civilians.<br><br>Owing to his leading position in the M23/ARC, Willy Ngoma is therefore involved in planning, directing or committing acts | 8.12.2022 |

DRC-34996 1099

Official Journal L 316I/2022

https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=OJ...

Exhibit 33

| | | | that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining the armed conflict, instability and insecurity in the DRC. | |
|---|---|---|---|---|
| 16 | William YAKUTUMBA | DOB: ▮ POB: Lunbondia, South-Kivu, DRC Nationality: DRC Gender: Male Function or profession: leader of the *Coalition Nationale du Peuple pour la Souverainité du Congo* (CNPSC); founder and leader of the Mai-Mai Yakutumba militia | William Yakutumba is the Secretary-General and Commander of the *Coalition Nationale du Peuple pour la Souverainité du Congo* (CNPSC), a coalition of the so-called Mai-Mai militias in South Kivu province of the DRC. He is the founder and leader of one of the largest militias of that coalition, the Mai-Mai Yakutumba.<br><br>The Mai-Mai Yakutumba contributes to the armed conflict, instability and insecurity in the DRC, in particular through violence and serious human rights abuses, including massacres of village populations, attacks on civilians, rapes and other acts of sexual violence.<br><br>The Mai-Mai Yakutumba also controls gold mines in the Eastern DRC, together with CNPSC members who control the mining routes. They profit from the illicit exploitation of and trade in gold. The Mai-Mai Yakutumba uses profits gained through that trade to finance its armed activities.<br><br>Owing to his leading position in the CNPSC and in the Mai-Mai Yakutumba militia, William Yakutumba is therefore involved in planning, directing or committing acts that constitute serious human rights violations or abuses in the DRC. He is also responsible for sustaining | 8.12.2022 |

DRC-34996 1100

Official Journal L 316I/2022    https://eur-lex.europa.eu/legal-co...EN/TXT/HTML/?uri=OJ...  Exhibit 33

| | | | | |
|---|---|---|---|---|
| | | | and exploiting the armed conflict, instability and insecurity in the DRC, including through the illicit exploitation and trade of natural resources. | |
| 17 | Alain François Viviane GOETZ | DOB: ▮▮▮▮ POB: Deurne, Antwerp, Belgium Nationality: Belgian Gender: Male | Alain Goetz is a businessman, who is the beneficial owner and former director of African Gold Refinery Ltd, registered in Uganda. Since 2016, African Gold Refinery Ltd has received, purchased, refined and traded illicit gold originating from mines in the DRC that are controlled by non-governmental armed groups, including the Mai-Mai Yakutumba and Raia Mutomboki, which are involved in destabilising activities in South Kivu province. Alain Goetz is therefore exploiting the armed conflict, instability and insecurity in the DRC through the illicit exploitation and trade of natural resources. | 8.12.2022' |

DRC-34996 1101



COPYRIGHT STATEMENT

© SARW and OSISA, May 2010

This publication was funded by the Southern Africa Resource Watch (SARW) and the Open Society Initiative for Southern Africa (OSISA).

Copyright is vested in SARW and OsiSA. This publication may be reproduced in whole or in part, as long as it is correctly attributed.

Coordination of research and authorship: Enrico Carisch

Researchers: Lucien Babimba, Jean-Marie Barongo, Kennedy Kihangi Bindu, Augustin Byamungu, Richard Etale, Franck Kabwe, Gabriel Kamundala, Nelly Labala, Jacques Makandju, Hortence Megabe, Alexis Muhima, Raoul Kitungano Mulendwa

With assistance by Nick Elebe, Georges Mukuli, and Richard Lee
Special thanks for review and comments: Pascal Kambale
Overall supervision: Dr. Claude Kabemba

DRC-34996 1109

Exhibit 35

## TABLE OF CONTENTS

**5** List of acronyms

**6** I. EXECUTIVE SUMMARY

**8** II. INTRODUCTION

**8** Researching the legality of gold commerce
**10** Who is benefitting from Congo's gold?

**18** III. SELLING CONGO'S GOLD
– WHO IS WHO?

**18** The value of Congo's gold

**18** A. Industrial gold miners
**21** .... Banro Corporation
**23** .... SOKIMO
**24** .... Concessions 38
**25** .... Concessions 39
**25** .... Concessions 40
**26** .... SOKIMO joint ventures
**26** .... Concession 40:
SOKIMO Anglo Gold Ashanti Joint
Venture for the AGK Project
**27** .... Concession 38
SOKIMO–Randgold Resources
AngloGold Ashanti Joint Venture
for the Kibali Project
**27** .... Concession 38
SOKIMO – Mineral Invest
International (MII)
**28** .... Concession 38
SOKIMO – Kilo Goldmines
Limited Joint Ventures
**28** .... Concession 38
SOKIMO – Cardinal Resources for a
Connections Options Agreement
**30** .... Concession 39
SOKIMO – Mwona Africa
for the Zani-Kodo Project
**30** .... Concession 39
SOKIMO – Bon Genie K. Mining
Option Contract for Gada project
**30** .... Comptoir SOKIMO
– Mikuba Mining
**31** Other exploration agreements
**31** .... Erongo Energy
**31** .... Casa Mining
**32** .... Loncor Resources
**32** .... Regal Resources – Afrimines
Resources – Pangimines SPRL

**33** B. The current state of
artisanal gold mining
**33** .... Overview
**33** .... The value of smuggled artisanal gold
**35** .... The undocumented trade around
semiindustrial and small-scale
gold production
**35** .... Artisanal gold trading networks
**38** .... Bhimji-Family
**40** .... Tony Goetz & Zone
**42** .... Machanga Limited
**45** .... Farrel Trade and Investment
Corporation
**45** .... Ushindi Exports / Skyhawk
International Ltd
**46** .... Nilesh Lodhia - Madat

**47** IV. THE ROLE OF
NEIGHBOURING COUNTRIES,
REBEL GROUPS AND
MILITIAS IN THE
COMMERCIALISATION OF GOLD

**47** Uganda - gold trade war?
**47** Second Congo War 1998-2003
**48** Gold exploitation by UPDF officers
**49** Uganda and the Mouvement pour
la Libération du Congo (MLC)
**49** Uganda and the Union des Patriotes
Congolais (UPC)/Forces Patriotiques
pour la Libération du Congo (FPLC)
**49** Uganda - Forces Arm ées du Peuple
Congolais (FAPC)Artisanal gold
mining in a legal vacuum
**49** Rwanda 's Congo Desk
**50** Forces démocratiq ues de libération du
Rwanda (FDLR) - Congrès National
pour la Défense du Peuple (CNDP)
**51** Forces Arm ées de la République
Démocratiq ue du Congo (FARDC)

**53** V. PAST ACTORS OF THE ILLEGAL
TRADE, SMUGGLING AND
REFINING OF ARTISANAL GOLD

**53** Gold refining companies
**53** .... Johnson Matthey
**54** .... Metalor
**54** .... Rand Refinery
**55** .... Argor Heraeus
**56** United Arab Emirates, an international

hub with historic ties to Congo
**56** Gold refining companies in the UAE
**57** ... Emirates Gold
**58** .... Al Ghaith Gold
**58** ....ARY Aurum Plus
**58** .... Kaloti Jewellery
**58** .... Al Wathba Jewellers
**58** .... Saakshi Jewellers
**58** .... Hazel Trading
**58** .... TLI Global
**59** ....Gold refining companies in Sudan
**59** .... Sudan Khartoum Refinery
**59** Gold traders
**59** ....Marc Rich and Company,
and Jonathan Graff
**61** Gold traders in Province Orientale
**61** ....Coped and Karmali
**62** ... local gold traders
**63** ... Dieudonné Ozia Mazio
**63** Gold traders in South Kivu
**63** ...Evariste Nshamamba
**65** ...Mange Namuhanda
**66** ...Zulfa Karim Panju
**67** Gold traders in North Kivu
**67** ...Dr Kisoni Kambale
**68** ...Glory Minerals
**68** ... AR Gold
**69** Gold traders in Burundi
**69** ... Mutaka Sefu Ruganyira
**71** ... Comptoir Asmani Ntahangwa
**71** Gold traders in Uganda
**71** ... Uganda Commercial Impex (UCI)
**73** Gold trader in Belgium
**73** ... Guy Liongola
**73** Gold trader in Sweden
**73** ... Guld & Juvel Invest Sverige AB

**74** VI. CONCLUSIONS AND
RECOMMENDATION

**75** Addicted to War

**76** Recommendations

**79** Annex 1: Methodology

**81** Endnotes

DRC-34996 1110


*Conflict Gold to Criminal Gold*   1





Exhibit 35




DRC-34996 1113
Conflict Gold to Criminal Gold

Exhibit 35

## LIST OF ACRONYMS

| | |
|---|---|
| AFDL | Alliance des Forces Démocratiques pour la Libération du Congo-Zaïre |
| AFFIMET | Affinage de Métaux |
| AGAI | Anglo Gold Ashanti |
| AIM | Alternative Investment Market |
| ANR | Agence Nationale de Renseignements |
| APC | Armée Populaire Congolaise |
| BELGIAKOR | Société Mines d'Or Belgika |
| CAMII | Cadastre Minière |
| CEEC | Centre d'Evaluation, d'Expertise et de Certification |
| CFL | Chemins de Fer du Congo Supérieur des Grands Lacs Africains |
| COLOMINES | Société Colonial Minière |
| COONORI | Coopérative des Négociants d'Or de l'Ituri |
| COPED | Congo Performance Développement |
| CNDP | Congrès National pour la Défense du Peuple |
| DGM | Direction Générale de Migration |
| DMCC | Dubai Multi Commodity Centre |
| FAPC | Forces Armées du Peuple Congolais |
| FARDC | Forces Armées de la République Démocratique du Congo |
| FAZ | Forces Armée Zaïroises |
| FDLR-FOCA | Forces démocratiques de libération du Rwanda - Forces Combattantes Abacunguzi |
| FEC | Fédération des Enterprise du Congo |
| FECODI | Fédération Congolaise de l'Or et du Diamant |
| FLC | Front pour la Libération du Congo (merged RCD-ML + MLC) |
| FNI | Front des Nationalistes et Intégrationnistes |
| FPJC | Front Populaire pour la Justice au Congo |
| FPLC | Forces Patriotiques pour la Libération du Congo |
| FPRI | Front de Résistance Patriotique en Ituri |
| FORMINIÈRE | Société Internationale Forestière et Minière du Congo |
| FRF | Forces Républicaines Fédéralistes |
| GDP | Gross Domestic Product |
| KIMIN | Kilo-Moto Mining International |
| MLC | Mouvement pour la Libération du Congo |
| MGL | Compagnie Minière des Grands Lacs Africains |
| MPR | Mouvement Populaire de la Révolution |
| OKIMO | Office des Mines d'Or de Kilo-Moto |
| ONUB | Opération des Nations Unis au Burundi |
| PARECO | Patriotes Résistants Congolais |
| PUSIC | Parti pour l'Unité et la Sauvegarde de l'Intégrité du Congo |
| RCD | Rassemblement Congolais pour la Démocratie |
| RCD-ML | Rassemblement Congolais pour la Démocratie-Mouvement de Libération |
| RPA | Rwandan Patriotic Army |
| RUD | Rally for Unity and Democracy |
| SOKIMO | Société de l'Office des Mines d'Or de Kilo-Moto |
| SOMICO | Société Minière du Congo |
| SOMINKI | Société Minière du Kivu |
| UCI | Uganda Commercial Impex |
| UPC | Union des Patriotes Congolais |
| UPDF | Ugandan People's Defence Forces |

DRC-34996 1114



*Conflict Gold to Criminal Gold*

Exhibit 35

## EXECUTIVE SUMMARY

In 2011, the Southern Africa Resource Watch (SARW) launched a regional monitoring and research project to assess the physical, social and economic security risks – as well as the socio-economic, humanitarian and commercial conditions – faced by gold mining communities in the provinces of North and South Kivu, Maniema and Orientale in the Democratic Republic of Congo (DRC). Two previous reports – *From Conflict Gold to Criminal Gold* (2012) and *The High Cost of Congo's Gold* (2013) – included detailed research and analysis on the changing nature of the gold industry in eastern Congo and its negative impact on miners, their families and communities.

This report completes the ground-breaking series by describing all aspects of the commercialization of Congolese gold – including gold that is produced by industrial, semi-industrial and artisanal mining operations, and gold that is traded and refined by small merchants, well-capitalised trading groups and powerful refineries.

SARW initiated this research project at a time when Congo's mining environment was improving, propelled by a number of exceptional conditions, including a gold super cycle, which saw prices on world markets rise to over US$1950 per ounce in 2011 and 2012; the establishment of peace in most major gold mining regions in eastern Congo; and the restructuring of government agencies mandated to support gold mining and trading.

However, in April 2013, while this report was being drafted, the gold price declined precipitously, eroding profit margins for all gold mining activities and disrupting the global gold production industry. The challenge faced by the DRC government to maximize benefits from the nation's gold resources has now become harder. Nevertheless, progress is visible with the inauguration of industrial gold production at Banro's Twangiza mine and at the Kibali project managed by Randgold Resources.

Despite these positive developments, international investors in gold

projects in Congo remain cautious due to its problematic political risk profile. This SARW report highlights issues that are most detrimental to the Congo's reputation and to the ability of the Congolese to benefit from their significant gold endowments, including:

THIS SARW REPORT HIGHLIGHTS ISSUES THAT ARE MOST DETRIMENTAL TO THE CONGO'S REPUTATION

- Widespread corruption at all levels of the Congolese government, which is a major enabler of activities that are either outrightly criminal or in violation of existing regulations governing industrial, small-scale and artisanal gold extraction and trade;

- The illegal trade and exportation of gold, which accounts for most of the gold extracted by Congo's hundreds of semi-industrial and hundred of thousands of artisanal miners – with traders not paying the appropriate fees and taxes, exporting gold without the required certification and payment of export duties, or only paying duties on a small portion of their total turn-over by significantly underreporting the true scale of their gold trading;

- Routine contravention of their licences by semi-industrial and industrial permit holders, which delay significant investments that they are contractually obliged to make so as to boost their stock market performance by inflating

their gold reserve portfolio, which can be divested whenever the need arises;

- Aiding and abetting the smuggling and illegal trading of Congo's gold by neighbouring countries, specifically Burundi and Uganda, which continue to pretend that their actions have no impact on DRC's illegal gold trade, while their economies benefit; and

- The inadequacy of existing international and multilateral instruments, including UN sanctions, ICGLR protocols, OECD guidelines and other multi-stakeholder initiatives, which have failed to encourage the necessary international collabouration to stop the criminal networks that are trading Congo's gold. Even where compelling evidence exists that trading and refining companies are implicated in the illegal trade of Congo's gold, no meaningful interventions or investigations occur – a grievous betrayal of various states' commitments under current UN sanctions and other international treaties.

DRC-34996 1115
Conflict Gold to Criminal Gold

# Exhibit 35

## SUMMARY OF RECOMMENDATIONS

Based on the findings from its lengthy research and analysis, SARW urges Congolese policy-makers to consider the following recommendations, which are designed to strengthen overall compliance with current laws and to maximize the collection of past, present and future revenues.

### 1.
#### INVESTIGATE OVER A DECADE OF LOST REVENUES AND ENFORCE RESTITUTION

The Congolese authorities must investigate how much legitimate revenue has been lost since the country inaugurated its current Mining Law in 2002 and ensure that those responsible refund the national Treasury as soon as possible. A special, 'restitution' task force could be created or the existing Anti-Fraud Brigade could be empowered with an amended mandate. The body in charge of the restitution effort should also make use of all international legal assistance treaties, as well as request support from INTERPOL, the World Customs Organization and other international law.

### 2.
#### PROSECUTE ALL THOSE INVOLVED IN THE ILLEGAL PRODUCTION, TRADE AND EXPORTATION OF GOLD

The authorities – perhaps using the same 'restitution' task force or Anti-Fraud Brigade – should investigate and prosecute everyone implicated in the theft of raw gold, the trade and export of illegally-obtained gold, smuggling gold, underreporting gold exports, and all violations of legally granted concession rights.

### 3.
#### AUDIT SOKIMO'S REVENUE AND MANAGEMENT SYSTEMS

The Congolese parliament must demand that the state-owned gold company, SOKIMO, undergoes full revenue and management system audits to ensure greater transparency and accountability.

### 4.
#### CONDUCT REGULAR AUDITS OF GOLD EXPLORATION PERMIT HOLDERS

The authorities should conduct audits of industrial exploration permit holders at regular intervals to ascertain whether they are accurately reporting their progress and to ensure that public officials maintain control of their scheduled activities.

### 5.
#### TIGHTEN BORDER CONTROLS AND STRENGTHEN SEARCH AND SEIZURE MANDATES

Border control agencies should coordinate their efforts with the Centre for Evaluation, Expert Analysis and Certification of Precious Minerals (CEEC) to enforce compliance with certification rules and the payment of export taxes. Border control agents must begin routine body and cargo searches and strengthen their search and seizure procedures.

### 6.
#### LAUNCH DIPLOMATIC INITIATIVE TO SECURE SUPPORT FOR RESTITUTION AND INTENSIFIED LAW ENFORCEMENT

The Congolese foreign ministry should launch a bilateral and multilateral diplomatic initiative to ensure international compliance with, and support for, the country's efforts to secure restitution and pursue current criminal activities across international borders. The Congolese authorities should specifically work with the governments of:

- *Uganda, Burundi, Kenya, Rwanda, Tanzania, and Sudan to screen gold importers to ensure that they are not connected with criminal activities and gold smuggling, and that they do not aid and abet people or companies that seek to evade Congolese tax and customs duties;*
- *The United Arab Emirates, India, Lebanon, Turkey, Switzerland, Belgium, UK and other gold processing and trading states to remind them of their obligations to screen consignments of gold from central Africa to ensure that they are not connected with criminal activities and gold smuggling, and that they do not aid and abet evaders of Congolese tax and customs duties; and*
- *The UK, Canada, South Africa, Australia, Sweden and other states where gold mining companies operating in the Congo apply for a listing or are listed on their stock exchanges to ensure that these enterprises are adhering to the corporate social responsibility standards imposed by their respective stock exchanges, and that they are not involved in, or tolerant of, corrupt or criminal practices in the Congo.*

## INTRODUCTION

### RESEARCHING THE LEGALITY OF GOLD COMMERCE

Since the Congo achieved independence in 1960, its gold has financed numerous rebellions and enriched militia leaders, warlords, renegade military officers and corrupt political leaders. In times of war or violent instability, regions that are rich in gold have often been the scene of fierce fighting, while in periods of peace under a legitimate government, these areas have tended to see a surge in crime. The failure of the Congolese government's efforts to regularise artisanal gold mining is the subject of the first report in the unique research series commissioned by the Southern Africa Resource Watch (SARW) on the gold industry in the Democratic Republic of Congo (DRC), which was entitled *From Conflict Gold to Criminal Gold* and was released in 2012. The second report, *The High Cost of Congolese Gold*, was published in 2013 and describes the devastating impact of artisanal gold mining on families and communities.

The key points of these two reports are:

- The term conflict-mineral can no longer be applied to most gold produced in the DRC because the majority of gold mining regions are no longer under threat of attack or occupation by illegal armed groups. Nevertheless, artisanal and small-scale miners still struggle to survive in the face of criminal – and often violent – extortion by various state and government agents, including members of the military, security and intelligence services.

- Miners are also forced to pay a second group of coercers, who are members of the so-called traditional tribal leadership structures. Elevated to their current positions by Belgian colonial rulers to help with the forced recruitment of tens of thousands of labourers, the Bwami[5] have retained the power to collect community taxes in many gold mining regions.

- A secondary form of extortion of artisanal gold miners results from monopolised trading networks, which allow traders to underpay the miners' for their gold and overcharge them for everything they sell.

- The combined effects of this extortion by government agents, traditional leaders and trade monopolies have left artisanal gold miners, their families and communities battling for survival, just as they did during the major wars in Congo when the gold mining areas were menaced by militias and warlords.

- The systematic extortion of artisanal gold miners imposes a high humanitarian cost. Years of acute hunger, poverty and deprivation have torn husbands and wives apart, deadened parents to their children' needs, turned sons into violent vagrants and forced daughters to earn a living any way they can.

This third and last report contains research into all the commercial aspects related to gold extraction and trade in the Congo. Unlike its predecessors, it no longer focuses solely on the woes of the artisanal sector but also details the mining companies, parastatals, trading entities and other countries that are intimately involved in the gold business in eastern DRC – and share responsibility for its current state.

Incorporating all these issues into one report required an investigation of the historical roots of the current abusive nature of gold extraction and trade in DRC. What emerged was an extremely complex political-economic relationship between the Congolese and some of their neighbours, which has evolved over many decades.

For example, artisanal mining was illegal until 1981, forcing artisanal gold miners and traders to smuggle gold across the borders. Later, Laurent-Désiré Kabila and his rebel friends oversaw the exploitation and export of artisanal for many years, which the government of President Mobutu considered to be illegal. But when Kabila took power, he began promoting the concept that Congo's natural resources – particularly its gold – were being 'illegally exploited' by foreigners. He expressed this view at the UN Security Council in January 2000 when he alleged that his country's natural resources were being "systematically plundered by the Rwandan, Ugandan and Burundian occupiers"[2] – a claim that has permeated all international discussion on the issue since then and is still believed by many both within Congo and the international community.

DRC-34996 1117

However, the definition of what precisely constitutes 'illegal exploitation' has remained murky with many differing interpretations. Anthropologists like Janet McGaffney and Vwakyanakazi Mukohya, who studied eastern Congo's trade in the 1970s interpreted the 'illegal' gold trade as part of the 'second economy'.[4] They believed that this alternative view gave a much clearer picture of the real conditions experienced by people compared to the recordings in official government accounts – and also showed how proceeds from this illegal activity helped to fund perfectly legitimate projects and interests. However, many modern activists take a different position. Some believe that Congolese "villagers are rounded up by armed groups and marched to the mines,"[5] situating illegality squarely within crimes against humanity, which include the enslavement of Congolese. On the other hand, PACT – the American not-for-profit company that works on behalf of USAID and other Western development agencies – relegates the issue of 'illegality' to the context of mere government regulations. On its website, PACT states that the Congo's minerals and natural resources "can also attract unregulated exploitation, particularly in the volatile east of the country, rife with political tensions and armed conflicts."[6] PACT's approach is consistent with many Western states, which have imposed regulations that are intended to ensure greater transparency in the trading chains that deliver 'conflict minerals' to their markets.[6]

SARW will apply the concept of legality as much as possible in a contemporaneous Congolese legal context, while reflecting the dramatic changes that have taken place in recent decades. For example, until the 1981 liberalization of the mining sector that legalised artisanal mining in the Congo, no legal instrument existed to grant individual mining licenses. Effectively all gold mining, trade and

exports were restricted to government-approved industrial concessions. Similar constraints existed during the entire colonial period. Artisanal mining and the export of any artisanally-mined raw gold were prohibited, and violators were sometimes punished severely. In the current context, there are two drivers behind the criminalisation of gold production and trading:

- National Law prohibiting the extraction, trading and exportation of gold without proper licensing; and

- International Law through the imposition of sanctions under UN Security Council resolution 1533 (2004) and 1596 (2005) and subsequent amendments. These UN resolutions authorise the imposition of a travel ban and targeted financial sanctions against any individual, company or other entity that is a funding or otherwise economically assisting any illegal armed groups – thus, banning trade in gold that is extracted from regions under the control by these groups. The implementation of these sanctions has become somewhat moot in recent years since most of the illegal armed groups have now been disbanded. Instead, the question now is whether the UN sanctions should be imposed on members of the DRC's military, police and national intelligence organisations, who extort gold miners or assist gold smugglers. As the first SARW report 'From Conflict Gold to Criminal Gold' makes clear, these individuals are now the true menace.

The SARW researchers have wrestled with the complexities of what constitutes legal forms of extraction, trade and exportation. They soon realised that an overly simplistic, one-dimensional evaluation of who or what is right and wrong would not serve the Congolese people. For example, defending the 'traditional right' of artisanal gold

miners may bolster some vague sense of justice, but would ignore:

- History –
  since the Congolese were not gold miners before they were forced into it by the Belgian colonial powers;
- The views of many women and girls – who are opposed to their husbands, sons and brothers mining as the second SARW report proved;
- Sound economic policies – such as the promotion of industrial mining as a readily available tool to meet the country's needs;
- Poperty rights – that are often legally granted to investors interested in commercially exploiting minerals; and
- Common sense – because the history of artisanal mining in Congo – replete with tragedy, conflict, extortion and starvation – does not inspire confidence that the future will be any better.

At the same time, these reasons do not invalidate the real interests and rights of artisanal gold miners, which must be addressed immediately, including:

- Protection from all forms of extortion, abuse and illegal taxation;

- Temporary protection of current artisanal gold mining activities and zones until – with the help of the state and other donors – secure and permanent homes, prosperity and sustainable livelihoods are available outside industrial mining zones;

- The establishment of fair and secure gold trading conditions to ensure that artisanal miners receive a fair price for their gold; and

- Non-mining support to start the transition of artisanal mining families and communities into more sustainable and healthier livelihoods.