Exhibit 35

## WHO IS BENEFITTING FROM CONGO'S GOLD?

Establishing the legal claims to Congo's gold only sets the stage for the ultimate issue the SARW was attempting to discover – who is benefitting from Congo's gold? As the two previous SARW reports demonstrated, the question is complex because benefits from gold come in many different forms beyond the most direct exchange of raw gold nuggets for cash. Throughout Congo's history, the possession of, or control over, gold or gold mining areas has conferred political, military and economic power – even to those who never physically touch any gold. Without ever digging for gold, individuals and companies routinely leverage their legally-granted rights to extract unproven gold deposits into investments worth millions of dollar on the world's stock exchanges. At the other end of the spectrum, public and private donors from the international community are very willing to contribute money towards the betterment of the lives of artisanal gold miners – the SARW project is an example of this.

Keeping these factors in mind, this report will address the many ways that gold does – or does not – enrich or benefit the Congolese people. Since SARW researched the multidimensional nature of the gold business, this report looks at the many levels and layers of benefits – regardless of whether they are legitimate or not.

Brief history of the exploitation of Congolese gold:
From the colonial period to the end of the second republic

The lessons from the 'Who is Who' chapter (see below) are that the Congolese economy suffers from three major shortcomings in relation to the exploitation of gold:

• Companies with legal title to explore or exploit gold deposits are not deploying capital and expertise with the desirable effectiveness and speed to maximize salaries, taxes, and royalties, and to enhance local economies;





DRC-34996 1119
*Conflict Gold to Criminal Gold*

Exhibit 35

- Too many small-scale miners are not operating with legal permits and are therefore not contributing to the Congolese economy by paying taxes, export duties or fees for mining permits; and

- Artisanal gold miners tend to pay exorbitant fees and taxes that never reach the state's coffers due to the widespread corruption and criminalisation of government officials working in the sector, while a very high percentage gold traders export their gold without paying statutory taxes or export duties.This dysfunctional system – full of regulatory infractions and criminal endeavours – is not a recent creation. It was similar during both the Congolese and Mobutu eras, including the use of minerals to fund conflicts. Indeed, forced labour, the lack of transparent and accountable mining contracts, corruption, the birth of artisanal gold mining in a legal vacuum, the rise of Nande trading networks to form an alternative – or, as some call it, illegal – economy, grand theft by generals, senior politicians, warlords and rebel-leaders, the calculated trade war unleashed by regulatory changes in Uganda, illegal gold exploitation by Rwandan, Ugandan and other foreign military officers in alliance with Congolese militias, and militias imposing their own administrative and taxation systems in 'liberated' gold mining regions are all interwoven into Congo's long history of gold extraction. It is no surprise that from these corrupted roots new types of crime and criminals keep on sprouting. While history should not serve as an excuse, understanding the past may help to enhance today's policy and regulatory responses. For this purpose, SARW's report now provides a more detailed description of past humanitarian, environmental and commercial mechanisms.

### Conflict gold or criminal gold?

In 1903, the Congolese were still suffering heavily under King Leopold's homicidal ghosts when two Australian explorers discovered the gold along the Angola River at Moto in today's Ituri District. Soon after, the Belgian parliament voted to annex the Congo to turn it into a proper colony of the Belgian State. This should have been the beginning of a more humane and promising era since annexation involved the adoption of a Colonial Charter in which the Belgian State stipulated unequivocally that "Nobody can be forced to work on behalf of and for the profit of companies or privates." Unfortunately, Belgium's parliament also stipulated that the economic development of, and social services for, the colony had to be funded by revenues raised in the Congo.

Following the enactment of these new laws, working Congolese were supposed to receive a wage but exploiting

the Congo's natural resources required a huge labour force. Massive numbers had to be hired to construct the necessary roads, ports, mines, colonial administrations centres, and other infrastructure – and once their work had begun, they needed to be housed and fed. This required industrial farming and livestock-raising, which in turn necessitated the hiring of another sizeable contingent of farmers, shepherds and herdsmen. Because of the lack of adequate roads or riverine shipping facilities, food and supplies had to be carried by men over long distances to the mines, while raw minerals had to be moved to the trading centres. Again, an army of porters was required. But how could the colonial administration pay for the wages of tens of thousands of new farm labourers, porters and mine workers when it had not yet raised any revenues?

So the colony's civil servants came up with an ingenious answer: they imposed a head tax on all Congolese men. This strategy, they assumed, would solve two problems. Firstly, the tax would greatly incentivise all Congolese to seek employment. And secondly, taxes would provide the revenues necessary to pay wages. However, the colonial administrators had forgotten that most Congolese – deeply traumatized by King Leopold's ruthless reign – had no desire to work under the Belgians. And just when the need to bring in new, more willing workers became imperative to the success of eastern Congo's gold mines, an epidemic of sleeping sickness raced through the country, wiping out whole villages and discouraging even those willing to work from travelling.

So the colonial authorities came up with a new scheme to 'facilitate' the payment of the head tax by offering men the possibility of paying their taxes with unpaid labour. In practical terms, it was the reintroduction of King Leopold's 'prestations'[7] – the legalised extortion of Congolese labourers. When the Congolese did not embrace this 'slavery-for-wages' offer with the expected enthusiasm, more serious measures such as the reintroduction of compulsory work became inevitable.

The Belgian colonial authorities partly justified their dramatic return to King Leopold's odious practices by blaming the additional increase in the labour force that was necessitated by the advent of World War I. The colonial administration had to fulfil its treaty obligations under a mutual military assistance pact with its allies and so it had to organise a military excursion against neighbouring German-occupied Tanganyika and Cameron. Where would the authorities find the men that could be uniformed, trained and fight against the Germans? The only answer was to forcibly recruit tens of thousands of Congolese into military service in order to create the 17,000 strong Force

Exhibit 35

# THE COLONIAL ADMINISTRATION HAD FUNDED ITS CONFLICT AGAINST COLONIAL GERMANY WITH GOLD AND DIAMONDS – ESTABLISHING THE HISTORIC FOUNDATION FOR TODAY'S CONCEPT OF 'CONFLICT MINERALS'

Publique and to man the huge supply and logistics operations necessary to sustain the deployment of these troops. And with the forced recruitments came compulsory labour and the use of the chicotte[8] – all mandated with highly detailed amendments to the Colonial Charter and Labour Laws.

To finance this additional expense, the authorities pressed ahead with the production of gold and other high-value export goods, such as diamonds from Kasai. "It was a remarkable and unexpected economic phenomenon that the Belgian Congo achieved during the war," marvelled Jacques Crokaert. He described[9] how gold production at the Kilo Mines kept the colonial treasury in good standing with its international creditors – recounting how gold production in Ituri and Uélé had more than doubled from 929 kg in 1914 to 2364 kg in 1918, while diamond exports had increased during the same period from 15,000 to 164,000 carats. The Belgian authorities had met the financial challenges with bravura – and a lot of Congolese sweat and blood. Indeed, the colonial administration had funded its conflict against colonial Germany with gold and diamonds – establishing the historic foundation for today's concept of 'conflict minerals'.

Not only was Congo's gold now inexorably connected with war, the exploitation of the mineral was also linked with painful abuses. Unleashing the Force Publique – many recruited from the non-Congolese Africans who had served in the brutal security forces of King Leopold's reign, and led by Belgian officers – brought a reign of terror into gold mining regions. Villagers were beaten, raped, and killed, while whole villages were torched when traditional chiefs did not provide sufficient workers for the gold mines.

### Forced labour in gold mining

The net profits realised from the mines in 1920 were 22 million Belgian Francs. According to contemporaneous US estimates[10] for gold discovered in the Kilo region, the annual take was around 10,000 kilogram at Kilo and around 4,000 kilogram at Moto. However, the most revealing data in the US report was that only 10 percent of these profits were "expended on road construction and general development". Spending money on building road infrastructure that could support vehicular traffic was more expensive than operating long columns of unpaid Congolese porters and workers.

Recruiters for the Kilo-Moto mines and for the supporting agricultural and transport operations fanned out regularly, reinforced with soldiers from the Force Publique, to demand quotas of workers from all the Bwami of surrounding villages and Chiefdoms. The reward for compliant Mwami was bonuses for each worker surrendered. The more cooperative a Mwami, the more presents he could expect. On the other hand, a Mwami who did not deliver workers or whose villagers absconded after they were recruited, would be punished, sometimes beaten[11] and replaced.

Because these forms of incentivised labour recruitment were so critically important to the colonial administration, the preferred strategy was the appointment of a new class of acquiescent chiefs, usually referred to as Chefs Médaillés. The Belgian authorities could then delegate the dirty work of forcing villagers to work to these pliable, new 'traditional' leaders. And their rewards were significant; these new Mawmi not only acted in a traditional role and collected income from their communities but they were also heads of the newly-

Exhibit 35

created administrative districts or Chefferies, which meant extra revenues, taxes and fees.

Officially, the colonial authorities had abandoned their role as labour recruiters by the late 1920s. But this did not lead to much positive change. It merely delegated the authority via exemptions and other forms of special permits to companies and local authorities to secure the necessary labour. Nevertheless, some positive change did gradually take place as the number of permanently employed Congolese expanded. Once integrated into the long-term industrial workforce at Kilo-Moto, the quality and quantity of their food improved, minimal health-care services became available, the connection with their home villages weakened, and the influence of their Mwami waned. Many of the employees would eventually settle in 'Centres Extracoutumiers' – special sections of mining towns, which were established by the colonial authorities.

Lack of transparent and accountable
ownership of gold mining companies

When the Congolese finally achieved independence in 1960, they may have gained a measure of political freedom, but economically the umbilical cord through which Belgium and Belgian investors had sucked the Congo dry for decades was not severed. It took another six years and very drastic measures by Mobutu to finally gain economic control over the major mining companies, including the gold mines at Kilo-Moto. Even then, whether ownership was truly unencumbered remains unclear and part of an opaque history.[12]

A few years after gold mining began at Kilo and Moto, the Régie Industrielle des Mines de Kilo-Moto was created under the colonial regime, with the entire share capital fully owned by the Belgian State\ and its colonial authorities. By 1926, the company was 'denationalized', turned into a stock company with its headquarters in Brussels and re-named the Société des Mines d'Or de Kilo-Moto (SOKIMO). However, the Belgian State through its colonial administration still maintained both capital and managerial control. Another important mining company was the Compagnie Minière des Grands Lacs Africains (MGL), which emerged in 1923 as a subsidiary of the government-controlled railroad Compagnie des Chemins de Fer du Congo Superieur des Grand Lacs Africains (CFL).

The transport company also invested in other gold mining companies, such as the American-Belgian joint-venture Société Mines d'Or Belgika (Belgiakor) and the Mines d'Or de Kindu. There were a number of other companies that where not principally established to mine gold but nevertheless dabbled in it, including a Belgian-American venture, the Société

Internationale Forestière et Minière du Congo (Forminière), and the Société Colonial Minière (Colomines), which was formed by private investors and engaged in gold mining through its Société Minière du Congo Belge (Mincobel).

Subsequently, even more convoluted transactions transferred ownership to private sector shareholders or individual investors (see sections on Sokimo Concessions, Concession 38, Concession 39, and Concession 40). In the end, Mobutu's government enacted the Bakajika Law in June 1966 to finally secure full Congolese control over its land and natural resources. The law gave ownership of all assets above and below the ground to the state, ensuring that the government could claim all public mineral rights – and, in effect, cancelled all previous mining concessions. When Belgium rejected demands to surrender assets associated with its colonial companies, Mobutu broke off negotiations on June 13, 1966, freezing and seizing all major mining assets.

Two days later, the now nationalised Régie Industrielle des Mines de Kilo-Moto was re-established as L'Office des Mines d'Or de Kilo-Moto (OKIMO) and its official headquarters were moved from Brussels to Kinshasa, although the original Belgian office continued to operate for many years as a sales office for OKIMO. Nevertheless, the handover from Belgium to the new Congolese owners were still not complete. Original company documents, and reports and analysis of test-drilling – all of which are critical to the successful management of a mining company – continued to be stored in a private archive in Brussels owned and controlled by Belgian interests.[13]

The acquisition and transfer of gold mining companies did not become more transparent or accountable after the Cold War ended when Mobutu was no longer a protected ally of the West. Under pressure from the World Bank and the International Monetary Fund (IMF) to privatise the country's mining sector, Mobutu allowed Western mining conglomerates to take their pick. The two areas with the richest gold deposits, which had historically seen the most industrial extraction, were swiftly sold off to Canadian buyers.

• The Canadian company, Barrick Gold secured the richest parts of OKIMO's concessions with conditions that were never disclosed.

• In South Kivu and Maniema, five gold deposits as well as vast areas containing other minerals that were operated by the Société Zaïroise Minière et Industrielle du Kivu (SOMINKI) were sold in a non-transparent manner to a consortium led by British mining magnate Algy Cluff to establish the Canadian company Banro Corporation.



*Conflict Gold to Criminal Gold*

Exhibit 35

### Corruption and conflict

One of the Belgian legacies that the Congolese had to overcome was the lack of évolués,[14] which resulted in a shortage of Congolese with professional training, managerial experience, higher-level financial skills and, most importantly, ownership of well-capitalised and sizeable businesses. Colonial monopolies imposed by the Belgians to maximize the profitability of their investments had barred Congolese from acquiring these skills. They had also reserved all exploration, exploitation and commercialiation of gold for non-Congolese. Even tribal leaders faced severe punishment if they were caught extracting gold. Workers in the mines were body-searched daily.

The government of the independent Congo relaxed these constraints, although in practice nepotism and escalating corruption replaced the old barriers to individual entrepreneurship and left 'Système D'[15] as the only pragmatic way to preserve a business. In addition, under the new Congolese administration, gold extraction continued, in principle, to be restricted to government operators[16] – just as it was under colonial rule.

But legal and administrative restraints paled in comparison to the disruptions caused by Congo's internal tensions. The first five years after independence were marred by the kidnapping and assassination of the first democratically-elected Prime Minister, Patrice Lumumba, threats of secession by the country's richest and most industrialised province of Katanga, and country-wide military mutinies due to the lack of salaries and supplies. The period ended with the Simba rebellion, led by Pierre Mulele, Gaston Soumialot and Christophe Gbenye.

US, Belgian and other foreign mercenaries beat the rebels in bloody battles, paving the way for national elections. When the government again fell into paralysis, Mobutu took control of the country in a bloodless coup. Years later, Mulele was butchered by Mobutu security agents. Soumialot had retreated to rebel hideouts in South Kivu, while Gbenye went into exile with 1500 pounds of gold that he had looted from the safe of the Moto mining operations around Watsa.

The brutal settlement of this internal conflict was the clarion call for a new age in Congo's gold industry. For rebel sympathizers, loyalty to the government made as little sense as it did under the colonial regime. Widespread political instability, a panoply of rebels and militias, and intensifying criminalisation of the gold mining regions compounded the increasingly calamitous state of the country's infrastructure. The longer the Mobutu regime was in power, the more the railway lines, riverine shipping services and roads deteriorated.

Travelling from the gold mining regions in the east to Kisangani or Kinshasa turned into an intolerably arduous task. While it once took just 2-3 days to travel by road from Goma to Kisangani, by the late 1980s it required 2 weeks – and during rainy seasons, traversing the country became unthinkable.[17]

**By end of the 1970s, aging machinery, lack of spare parts and corruption had seriously undermined eastern DRC's gold production. OKIMO's industrial production collapsed, followed by the implosion of MLG's operations. As mechanised gold mining came to a halt, the government liberalised laws to permit artisanal gold mining. The management of OKIMO was now left with no revenues except for the taxes and fees they could extract from thousands of artisanal miners spreading over the parastatal's vast concessions.**

### Artisanal gold mining in a legal vacuum

During these tumultuous times, the gold price on world markets suddenly soared. Until 1970, the price for one troy ounce of gold had held steady between US$30-40 (see table 1) but then it started to rise dramatically, peaking at US$615 in 1980. This spike in value meant that anybody in a position to extract gold – legally or not – saw their income rise twenty-fold.

The internal migration of farmers willing to abandon their fields and try their luck as artisanal gold miners picked up dramatically. Areas around artisanal gold mining were transformed to take advantage of the spending habits of the miners. For example, the Congolese researcher Mukohya Vwakyanakazi reported[18] how Bunyatenge in western North Kivu sprouted 12 small shops, 8 kiosks, 2 small hotels, 3 private medical dispensaries, 3 small bars offering commercial beverages, 4 bars offering homemade brews, and 1 market, and saw up to 80 prostitutes visiting the village on Sundays. None of these commercial outlets existed prior to the artisanal gold mining boom, except a government-run dispensary and four small shops owned and operated during colonial times by MGL.

The rising value of gold was irresistible. Even soldiers deserted and joined many other employees of state agencies and private companies who absconded from their posts to dig for gold in remote mining areas. Semi-permanent artisanal gold mining camps shot up all over gold-rich, north-eastern Congo, usually encompassing up to 60 miners plus their families. The camps soon resembled traditional villages except that they were much more vigilant in their self-defense. Beating back a police action against a camp in Ituri, one group became so irate about the government's intervention that they attacked Mongbwalu, the principal mining town of OKIMO. They occupied the town of 30,000 inhabitants until a military force arrived.[19]

Exhibit 35



Price of Gold
in US Dollar

Table 1:
Gold price development
from 1900 -2013

Source: the underlying data is a
compilation of several datasets,
including World Gold Council for
prices from 1883-1994, and London
PM fix for the period 1995-2013
as published by Kitco.com

Years

Rapacious government agents and soldiers took Mobutu's
System D to heart. It unleashed their worst instincts. Members
of the army, police, intelligence and security services roamed
and looted gold mining communities freely and with impunity.
To defend themselves, many artisanal gold miners acquired
arms or formed alliances with armed militias. After the
brutal defeat of the Mulele rebellion, it was not difficult to
find splinter groups with deep-seated resentments against
Mobutu, his military and his young MPR-thugs. Soon, the
militarisation of mining regions spiralled out of control.

As allegiance to Mobutus' state began to make less
and less sense to many inhabitants of gold-rich areas
in eastern Congo, business-savvy Congolese, armed
opponents to his regime and thriving artisanal
communities in remote locations congealed into a
powerful alliance of shared interests. Gold offered a
relatively easy path to cash, prosperity and personal
independence. Rebels, even if they lost on the
battleground, could still win influence by gaining control
over gold production and trade.[20] Many artisanal gold
miners – already alienated from the state by the abuses
of its representatives – started claiming that they were
simply exercising their inalienable right as Congolese to
extract their country's gold and other natural wealth. The
black market economy and smuggling expanded rapidly.
The illegal exploitation and trade of gold was an act of
self-defense against the villainous state and its predatory
agents, which liberalised and empowered communities.[21]

Nande's alternative economy

Due to their relative isolation and their poor integration
into Belgian-Congolese colonial structures as well as their
resistance to mass recruitment into the colonial industrial or
military-security projects, the Nande had retained a degree
of social and economic independence.[22] They excelled early
on as traders of salt and as diligent cultivators – even after
the colonial authorities intruded with new cash crops, such
as coffee and tea, and non-indigenous variations of grains and
vegetables. Frequently dodging and eluding state-imposed
restrictions on trade and exports, Nande traders ventured
beyond their traditional territory as early as in the 1920s to
connect with markets in Goma, Kisangani and Kinshasa as well
as eastwards into Uganda, Rwanda and Kenya.

Their illegal trading and smuggling began with coffee, which
was long the region's most profitable agricultural product.
Coffee planters from the Lubero and Beni area produced
about 31 tons per season and the Nande traders' share was at
least 22 tons.[23] Following the Nande, even some Belgian coffee
planters began to illegally sell their harvests across the nearby
borders to Indian traders from Uganda and Rwanda.

Mobutu's System D forced many wage-earners to adopt new ways
of protecting their income from tax-collectors who were acting
increasingly like a criminal racket. Increasingly, the Nande sought
protection by turning eastwards to Uganda, Rwanda and Kenya
and their trading networks in Kampala, Kigali, Butare, Nairobi,

## Exhibit 35

Mombasa and Dar-es-Salam. By 1979, they had built a "near monopoly"[24] in the shipping of produce from Kivu to Kisangani and onwards to Kinshasa. They traded any Congolese product fit for export and any foreign product wanted by the Congolese.

Fuelling the growing Nande trade was gold[25] – illegal in the eyes of the agents of both the Belgian colonial and Mobutu governments – but extraordinarily enriching for those who did not get caught. Small groups of local artisanal miners had started to dig illegally for gold as early as in the 1930s. Unlike any other group in eastern Congo, the Nande knew how to connect with these gold producers and the many who followed them to the gold fields of Manguredjipa and Lubero, the semi-depleted OKIMO concessions in Ituri and Uélé, and more recently discovered deposits at Tshopo. Gold could be hidden easily, was a welcome form of payment everywhere, and enabled the purchase of consumer goods that were otherwise not available to the Congolese. Barter trade linked to gold was soon so formalised that standardised equivalences were widely embraced (see Table 2).

| 1 YAMAHA MOTORCYCLE | 10 kg ivory | 1 ton coffee | 20 kg gold |
|---|---|---|---|
| 1 PICK-UP TRUCK | 100 kg ivory | 10 tons coffee | 200 kg gold |
| 1 MERCEDES TRUCK | 1. ton ivory | 40 tons coffee | 800 kg gold |
| 1 BICYCLE | 0.5 kg ivory | 150-200 kg coffee | 1 kg gold |

*Table 2:*
*Equivalency of vehicles with ivory, coffee and gold*
Source: The Real Economy of Zaire, the contribution of smuggling and other unofficial activities to national wealth, Janet MacGaffey with Vwakyanakazi Mukohya, Rukarangira wa Nkera, Brooke Grundfes Schoepf, Makwala ma Mavambu yo Beda, and Walu Engundu, University of Pennsylvania Press, Philadelphia, 1991, page 53

In the post-independence period, all gold mining turned into what Congo researchers started to call the 'Second Economy'[26]. The characteristics of this economy include many daily transactions of varying degrees of illegality, ranging from bartering goods and services against gold, exploiting gold deposits that are legally licensed to another party, and smuggling. Before the first and second Congo Wars in 1996-1997 and 1998-2003, researchers attempted to understand how this clandestine economy compared to the legitimate one. While confirming the significance in broad terms,[27] researchers were only able to estimate that these alternative economic activities might represent anywhere from 30 to more than 50 percent of GDP. Their problem was that the underlying GDP statistics were notoriously unreliable – as were estimates of the true national gold production, including illegal and unrecorded exports.

### Mobutu's Generals and Gold Pillage

In Congo's rich history of kleptocrats, Mobutu's former Army General Chief of Staff and Commander of the Civil Guard, General Philemon Baramoto Kpama Kata enjoys a special place. As the head of the Civil Guard, Baramoto was supposed to organize the border control. Instead, he created a secretive military police, rumored to comprise around 10,000 specially trained and equipped Ngbandi – Mobutu's ethnic group. Thanks to his military might, he ruled for a significant period of time over all the gold and diamond mines in Orientale Province, particularly the richest gold mines in Ituri and Uélé. A month before Mobutu's exit from the Congo in 1996, Baramoto entered into a joint venture with Barrick Gold Corporation. As part of the deal, the company agreed to modernise Bunia airport, where Baramoto's base was located. For the company, an improved airport facilitated rotations of its staff and equipment to and from the mining sites at Mongbwalu and Watsa. However, for Baramoto upgrading Bunia airport to allow international air traffic meant that it was easier for him to import weapons from international suppliers[28] or intervene on behalf of clandestine Angolan and Sudanese allies. The improved facilities also offered the general a direct link abroad for his illegal gold and diamond exports, and any other items he wanted to take with him into exile.

Baramoto's looting sprees are legendary, particular during the last months of the Mobutu presidency. He is reported to have stolen his own soldiers' pay,[29] and to have rented his soldiers as private security guards in Kinshasa. He even sold his force's last remaining fighter jets to arms dealers.[30] In May 1997, when the fall of Mobutu's regime was sealed, Baromoto left the Congo on his private jet to seek refuge in South Africa[31] – from where, in the comfort of his villa in Sandton, he continued to organise rebellions against new Kabila regime. The precise quantity of gold and other assets that Baramoto stole was never established by any authority.

Contemporaneous news reports

estimated that his personal wealth, when he arrived in South Africa, amounted to over US$100 million. But he was far from the only Mobutuist to flee with the country's treasures. According to Kabila's foreign minister, Bizimi Karaha, Mobutu's gang of generals had actually stolen as much as US$10 billion – some of which was in South Africa and being used to foment rebellion.

Laurent-Désiré Kabila and the Gold Trade

Laurent-Désiré Kabila was one of the few surviving leaders of the Mulele revolt (or Simba rebellion) of 1964, who managed

Exhibit 35

to sneak back into the Congo.[32] In 1967, he crossed Lake Tanganyika and installed himself in Kibamba with just three collaborators and 16 combatants, who shared a total of three small firearms. There he founded the Parti de la Révolution Populaire, and created his first underground camps, where he recruited and trained locals for his rebel force. Initially, Kabila succeeded beyond expectations.[33] Already familiar with the land and its people from his prior revolutionary activities, his mixture of authoritarian militarism and Maoist-inspired idealism greatly appealed to the predominantly Bembe population. At the peak of his popularity and success, Kabila controlled an area that stretched from Lake Tanganyika into today's north-eastern Katanga and eastern Maniema, including most of Fizi as well as parts of Mwenga, Shabunda, Kbambare, Nyunzu, Kalemie and Kasongo.

Initially, Kabila also switched successfully between his role as a rebel leader in the bush, a hard-drinking charmer who was at ease in the hotel bars of African and European capitals, and a brash negotiator with Chinese and African leaders, Mobutu's intermediaries and the American government. However, over time, the idealism waned and the socialist ideologue, who had provided well for his troops and the locals, increasingly turned into a self-centered and despotic chieftain. Internal dissent with his autocratic leadership escalated and Kabila responded with callous and random violence against the local population and even his own combatants. Many researchers claim that by the late 1970s he was no longer interested in maintaining his rebel holdout for the sake of revolution but for mere personal economic gain. And indeed, Kabila did control a large swathe of fertile agricultural land dotted with some of the richest gold deposits in South Kivu.

Surrounded by a tight family and loyal comrades in arms, Kabila managed to remain an enigma for most of his time in the underground. Rumours circulated that he had died when, in fact, he was running a thriving business in Dar-es-Salaam, where he was known as Francois Mutware.[34] Under this alias he operated a business trading in food, consumer goods, ivory, minerals and, in particular, gold. Kabila paid for Tanzania's hospitality in two ways: for President Julius Nyerere, who despised Mobutu, Kabila was a potential tool of revenge against the Congolese dictator; and for the Tanzanian Intelligence services, he was a reliable informer and operative.[35]

### ADFL and the gold trade

History washed Kabila to the surface in 1996 when the post-genocide government of Rwanda interpreted Mobutu's refugee policy in relation to the Hutu genocidaires in eastern Congo and their attacks on Rwanda and Tutsi communities in Congo as

> **The true size of Congo's gold exports was now concealed by Goetz's remarkable success, for which no accounting – official or unofficial – exists.**

too great a threat. But to wage war inside Congo, Paul Kagame, Rwanda's de-facto president and commander-in-chief,[36] required Congolese partners. Of the four potential leaders invited to Kigali, Kabila was not necessarily the most likely candidate to emerge as chief of the rebel Alliance of Democratic Forces for the Liberation of Congo (ADFL). However, his network of high-level political supporters paid off. President Yoweri Museveni of Uganda and President Nyerere both pushed for Kabila's to be put in charge. Even so, his position as undisputed leader was not finally confirmed until the war in Congo was well underway.

Meanwhile, economic experts organised the ADFL's institutional structure. Professor Mawampanga Mwana Nanga[37] was put in charge of its finances, while Kambale Mututule[38] assumed responsibility for mining and Baby Mbayi organised its economic policies.

The ADFL leaders were keen on fostering economic activities in 'liberated' territories. In the mining sector, gold and diamonds promised quick revenues if only trading companies would contribute the necessary capital. Happily for them, the enterprising Belgian gold dealer, Alain Goetz, was already buying large quantities of gold through his network of Congolese gold buyers, who purchased gold from hundreds of artisanal gold mining communities around eastern Congo. Presumably, many of the suppliers smuggled their gold to his Affimet buying office in Bujumbura, depriving Mobutu's state of the 3-5 percent export duties. The ADFL gave Goetz the right to export all the gold that his suppliers brought to him for a 1.5 percent export duty. The impact that Goetz and others who exported Congo's gold had on the official Congolese gold industry was very significant. Ten years before the AFDL revolt – just as Goetz was starting his business – the US Congressional Research Service reported that Congo's two gold mining parastatals, OKOMO and SOMINKI, accounted for about 900 kilograms out of a total of more than 2,000 kilograms of official exports in 1988. By 1997, after the AFDL rebellion had succeeded and after Goetz had developed a fully-functional gold buying operation in eastern Congo, official receipts for gold exports had dropped to less than 100 kilogram per month.[39] The true size of Congo's gold exports was now concealed by Goetz's remarkable success, for which no accounting – official or unofficial – exists.

## Exhibit 35

## SELLING CONGO'S GOLD
## - WHO IS WHO?

### THE VALUE OF GOLD TO THE CONGO

This section has two objectives. Firstly, it will introduce a labyrinthine cast of characters and describe how they do (or do not) live up to their corporate responsibilities to the Congolese state and people. For example, large international conglomerates may maximize the cost per ton of mined ore and inject hundreds of millions of dollars into their project, while skimping on their environmental, social and governance pledges. Junior mining companies may delay investments in their Congolese concessions, while heavily mining international stock markets. And buyers of artisanal raw gold or government officials may show up at humanitarian multi-stakeholder events, while tightening their trade monopolies through which the majority of artisanal miners are exploited.

Secondly, it will look into artisanal mining and how much the Congolese state loses from this industry.

### INDUSTRIAL GOLD MINERS

**Since President Joseph Kabila signed the new Mining Law on 11 July 2002, the DRC government has issued thousands of permits for the exploration and exploitation of mining rights. Dozens – if not hundreds – of these concession agreements extend the right to benefit from gold deposits but the license holders have so far undertaken few, if any, credible exploration efforts. Indeed, only a handful of companies are exploiting their rights in a manner that makes industrial productions a likely outcome. SARW has focused on these projects because they promise the most immediate economic benefits for the Congolese. Only Banro Corporation's Twangiza and Namoya mines, and Randgold's Kibali project are currently pouring gold, while a few others should reach industrial production within the next years.**

These companies are conducting sample drillings and analysis to justify applying to the government for exploitation permits and investing in the construction of industrial production facilities. However, most companies are still in an early to intermediate gold exploration stage and, with gold prices having declined from their historic highs of US$1950 per ounce, some of these companies are struggling to find investors willing to continue funding their preliminary fieldwork.





## Exhibit 35





Conflict Gold to Criminal Gold

# Exhibit 35

INDUSTRIAL GOLD EXTRACTION

**The Canadian Fraser Institute annually conducts the world's most authoritative survey of international investors' perceptions of the risk of investing in mining. The result of annual studies and surveys such as the Fraser Institute's impacts on the value of a country's gold more significantly than any other factor because it is generated by the views – and impacts the views – of thousands of executives who make investment decisions. They perceive mining industry risks in relation to two key factors: the quality of the mineral endowment and the public policies of a country.**

For example, international investors may regard a country's gold deposits as too risky if its gold is too scarce, or is buried too deep in the ground or underneath impenetrable layers of hard rock. Their views on these issues shape the Current Mineral Potential index. But the Fraser Institute study also looks at 15 political and security issues in each country, reflecting the regulatory and taxation requirements, social conditions and corruption. These form the basis of the Policy Potential Index.

Ideally, a mineral-rich country would rank very high in both measures, showing beneficial political and regulatory conditions in combination with rich and easily accessible mineral deposits. A resource-rich country that is in a post-conflict transition, such as the DRC, should show a steady improvement in its Policy Potential, reflecting how overall conditions are moving towards greater peace, stability and profitability.

Unfortunately, the survey tells us a different story (Table 3) about the DRC's potential to attract international investments. Since the signing of the Global and Inclusive Peace Accord in December 2002, Congo has consistently ranked highly on the Mineral Potential Index but it has has remained near the bottom of the Policy Potential Index – both of which rank the DRC in comparison with all the other surveyed states. Only during 2007-2008, after the country's first elections, did Congo's ranking on the Policy Potential Index show a noticeable improvement but within a year it had plunged back down the rankings.

Converting these index numbers into country rankings (Table 4), where the best country is 100 and the worst is 1, shows the precarious situation of the Congo even better: high evaluations for its mineral deposits are nullified by very high political and regulatory risks.

| YEAR | 2003 2004 | 2004 2005 | 2005 2006 | 2006 2007 | 2007 2008 | 2008 2009 | 2009 2010 | 2010 2011 | 2011 2012 | 2012 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| **MINERAL POTENTIAL** | 32/53 | 46/64 | 56/64 | 49/65 | 38/68 | 47/71 | 56/72 | 70/79 | 55/93 | 83/96 |
| **POLICY POTENTIAL INDEX** | 41/53 | 63/64 | 62/64 | 57/65 | 38/68 | 63/71 | 63/71 | 77/79 | 76/93 | 93/96 |

*Table 3:*
*Ranking of the DRC in comparison with all surveyed states*
Source: raw data are results reported in the annual Fraser Institute
Surveys and converted by SARW for comparability

| YEAR | 2003 2004 | 2004 2005 | 2005 2006 | 2006 2007 | 2007 2008 | 2008 2009 | 2009 2010 | 2010 2011 | 2011 2012 | 2012 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| **MINERAL POTENTIAL** | 60.4 | 71.9 | 87.5 | 75.4 | 55.9 | 67.1 | 77.8 | 88.7 | 59.1 | 86.5 |
| **POLICY POTENTIAL INDEX** | 22.6 | 1.6 | 3.1 | 12.3 | 44.1 | 11.3 | 5.6 | 2.5 | 18.3 | 3.1 |

*Table 4:*
*DRC ranking on a scale of 1 (worst) to 100 (best)*
Source: raw data are results reported in the annual Fraser Institute
Surveys and converted by SARW for comparability



DRC-34996 1129
Conflict Gold to Criminal Gold

# Exhibit 35

Under these circumstances it should come as no surprise that the DRC's gold mining industry is far from living up to its high potential. Most foreign investors are too afraid to dig for gold in the Congo. Those who are adventurous enough to accept the bigger risks demand a correspondingly large reward. If they succeed, they take a major share of the profits home and leave the Congolese with little.

However, certain mining companies profit by indulging in irresponsible exploitation practices. For example, junior mining companies sometimes have no intention of moving efficiently towards industrial production. There are a number of companies that are currently based in the Congo, which spend as little money as possible to maintain their legal gold mining rights. Using these rights, they list their companies on international stock exchanges, hype the value of their deposits, and raise considerable funds from investors without ever spending any significant money on the exploration or exploitation of their gold deposits.

An even more complex challenge is the need for increased vigilance by regulators to monitor the financial viability of license holders. The fact that AngloGold Ashanti ran out of financial steam even before its preparations for industrial production were completed sends ominous signals. If companies want to obtain exclusive rights to exploit DRC's gold, the Congolese have the right to demand sound financial performances from their management. They should sufficiently capitalise their projects and this must be reflected in key financial indicators, such as favourable long-term debt to equity ratios, or debt to assets and debt to capital proportions.

International gold producing companies cannot be allowed to accumulate concessions around the globe that promise impressive gold deposits merely to titillate investors. These companies must plan their capital requirements to

sustain operations on an all-in cost basis[40] for all their concessions. It is unfair to local communities when 'their' gold mining companies shut down operations the moment gold prices drift from unrealistic record highs back towards more sustainable averages.

## Banro Corporation

Between early 1995 and early 1997 – just months before the first Congo War erupted – a group of British-Canadian investors negotiated a number of deals with the Mobutu regime, which secured them control over the assets of state-owned SOMINKI.[41] They paid approximately CAN$ 21 million for Congo's second largest state-owned gold mining company with four active mining operations, plus significant infrastructure to support thousands of employees. Banro, as the company was called, was another brainchild of legendary British mining tycoon, Algy Cluff. While he is no longer personally involved in Banro, the official founder, Arnold T. Kondrat, and senior executive, Peter Cowley, continue to be major shareholders and members of the Board of Directors.

Their plans to mine the gold in the SOMINKI concessions immediately ran into a hailstorm of problems, including the rebellion against Mobutu, the subsequent change of government and the resumption of hostilities during the second Congo War. And then, in July 1998, Kabila revoked Banro's rights and conferred its assets on a new company by the name of SOMICO. Unsurprisingly, an international legal contest ensued – a contest that was somewhat ironic given that for most of the second Congo War Kabila's government had lost control of Banro's concession lands to the rebel RCD. Only in 2002, once Joseph Kabila had succeeded his father as president and become leader of the Transitional Government was a settlement reached – and Banro was finally able to begin its exploration programme.

Banro has focused on four sites. In October 2011, it inaugurated industrial gold production for the first time at its Twangiza mines. On 31 December 2013, it began industrial production at its Namoya mines. The remaining two sites at Lugushwa and Kamituga are still under exploration and commercial production seems unlikely to commence for a long time.

To avoid using their own money, Banro's founders had always pursued a strategy of securing financing from international capital markets. For the initial acquisition of the SOMINKI assets, Banro issued 3 million new, common shares and sold them on the world's stock markets. Subsequently, they went back to the financial markets on numerous occasions to maintain liquidity in order to fund their exploration programmes, research work and the development of their industrial plants, and to pay the salaries of local and international employees, and the bonuses of executives and directors. A few times, when conditions were advantageous, Banro also incurred debts. However, the bondholders have usually been offered the option of converting their bonds at advantageous rates into Banro shares.

This strategy makes sense for the few major shareholders who provide Banro with its entrepreneurial drive. They never had to invest their own money to grow their company, and have been paid continuously while managing the company's projects in a phased manner. Progressing in gradual steps reduces the company's risks and is in tune with the international markets' willingness to invest further capital into the company. However, minority shareholders, who trust Banro's management on the basis of risk-benefit speculation, carry the real risks.

Needless to say, the interests of any gold mining company's management and shareholders are distinctly different from those of the Congolese people. Citizens

DRC-34996 1130



Exhibit 35

want companies who raise sufficient capital to explore and develop all available gold deposits as quickly as possible, while respecting the environment as much as possible and paying sufficient taxes to the state. This increased capital inflow would benefit the Congolese economy by rapidly increasing job opportunities and ramping up regional development. Quicker industrialisation of Congo's gold deposits would also lead to faster delivery of the legally-mandated social and environmental contributions to mining communities, which all mining companies are duty bound to provide in exchange for their mining permits.

Most mining companies like to portray the social and infrastructural aspect of their projects as an expression of their corporate social responsibility. For this purpose, Banro established the Banro Foundation to help ease the relocation of many artisanal mining families, for whom they planned to build new houses, schools and clinics. Banro also creates other benefits for local communities when it builds roads and other infrastructure projects that are necessary for industrial mining since these can also serve the local populations.

Indeed, at first glance it is tempting to view Banro's social and environmental contributions as an outstanding example of corporate social responsibility. However, SARW has noted a number of Congolese criticisms of the company's operations. One major point of contention is that unlike most other gold mining companies operating in the DRC, Banro negotiated a 10-year income tax holiday, which begins the day a mine becomes operational. Additionally, Banro pays a modest royalty of less than 5 percent of net profits.

It was also noted that these significant tax advantages should have enabled the company to progress rapidly towards sustainable, industrialised operations. Yet, the company is bogged down on a number of fronts:[42]

BANRO NEGOTIATED A 10-YEAR INCOME TAX HOLIDAY, WHICH BEGINS THE DAY A MINE BECOMES OPERATIONAL.

1. At Twangiza, the relocation of families to a new hillside community in Chinjira is causing serious problems. SARW recorded a host of complaints including: the size of the newly-built houses bears no relation to the size of the families they are meant to accommodate; the location of the new community at an altitude of 1000 metres has exposed the inhabitants to a climate they are not used to and for which the houses were not built; the lack of drinking water in the new location; the 90 minute walk to the nearest market; the insufficient cash compensations received from the company for the relocations; and the fact that the relocated people do not receive the title to their houses, which many feel is the final act aimed at pauperizing these artisanal miners and their families.

2. SARW researchers have observed how tension has been increasing for years in the Namoya region because of what local civil society leaders consider Banro's heavy-handed and non-transparent communications policies, which have left far too many artisanal miners in the dark about the company's relocation plans. This problem was exacerbated in 2012 when Banro announced its plans to build its Namoya mining facilities exactly where four artisanal villages were located, which led to various disputes about the precise number of affected miners and the amount of compensation owed to them.

3. While Banro's Kamituga site is a long way from being ready for industrial mining, the local population is extremely upset by attempts to stop the large artisanal mining activities in the area. In this region, artisanal communities are more structured, including the division of labour among men and women. Unusually, the men have granted many women the right to pound ore into powder from which they will wash out the gold more easily. Many of these women have formed organisations commonly referred to as 'Les Femmes Twangaises', 'Mamans Bizalou' or 'Wazeweka'. SARW estimated that at least 1000 of these well-organised women strongly object to being displaced and accuse Banro of offering no provisions to head off long-term relocation problems.

DRC-34996 1131

Conflict Gold to Criminal Gold

## Exhibit 35

Another problematic aspect of the company's future prospects in the Congo is the lack of preparation by senior management – well compensated individuals, who have years of experience in dealing with Congo's political-military hazards – for the spasms of violence that can occur periodically in eastern Congo. The latest case in point is the short-lived capture of Goma, the capital of North Kivu, by the M23 rebels in November 2012. From the company's point of view, any chance that the M23 would have turned into a material threat to its mining operations, which are hundreds of kilometres to the south of the M23's area of operations, was extremely far fetched. However, the media's often unsubstantiated reporting of the M23 rebellion, particularly in relation to the role of gold, put an end to the company's positive narrative about the real progress at its Twangiza and Namoya mines. Banro executives offered no corrections or clarifications to the avalanche of ill-judged reporting. And so – based on dubious knowledge of the political risks in the Congo and the lack of response from Banro's management team, CIBC World Markets and BMO Capital both downgraded Banro's stock from 'sector outperformer' to 'sector performer'.[43]

These events occurred just as gold was losing some of its record lustre on world markets, hugely inflating Banro's challenges. During the critical three weeks of the M23's sudden advance on Goma, Banro's value declined by 35 percent with its share price falling from over US$4 to under US$2. And the end of the M23 rebellion made no difference since Banro's shares have never recovered and are now trading at historic lows of less than US$1.

The collapse of Banro's value has raised concerns about whether the company will be able to fulfil its obligation to develop the four mining sites under its control as speedily as possible. For the Congolese,



**Table 5:**
*Decline of Banro share price during and after M23 rebellion (October 2012-April 2013)*
Source: Daily Share price quotes as reported by Toronto Stock Index

this issue is of vital importance. After all, the company is entrusted with developing some of the most valuable gold deposits in the DRC. It obtained the right to its concessions at what many people believe was far too low a price so the very least the Congolese deserve in return is the full and undivided attention of a competent management team.

If Banro – due to a lack of focus on the value of its equity – suffers from a diminished ability to raise sufficient funds on the international capital markets to conduct its business as efficiently and quickly as possible, then the Congolese people will not enjoy the gains that were promised and this could easily stir up even greater tensions between the company and communities. And in the minds of many Congolese, this dangerous outcome is no longer just a hypothetical threat – given the suspension of the AGK project, a joint venture between SOKIMO and AngloGold Ashanti.

SOKIMO

SOKIMO,[44] or OKIMO as it was originally known, was created as a wholly state-owned mining conglomerate during the Belgian colonial administration. OKIMO operated the famous gold mines at Kilo, Moto and Zani. Auxeltra Beton, a partnership between Group Empain and the Société Belge des Bétons, managed the operations of these mines.

In today's terms, OKIMO's possessions would rank as the 117th largest country in the world. As unwieldy and complicated as this huge territory was for a single company to manage, it remained whole until a few years ago.

In 2007, President Kabila's government challenged the terms of most of the existing Congolese mining agreements and ordered the Mining Cadastre (CAMI) to break up the 83,000 square km concession into smaller

Exhibit 35

permit areas. SOKIMO now controls three principal concessions, which it develops jointly with international mining companies into industrial projects. The northeastern section of the SOKIMO territory is now designated as Concession 38 and encompasses the Moto mines, which are its primary active asset.

Concession 39 contains the historic Zani and Kodo mines, while Concession 40 incorporates Kilo. A number of other smaller concessions together with a vast section called the 'Exclusive Research Zones' make up the rest of SOKIMO's gold mining responsibilities.

But the revision of the territorial holdings of Congo's gold parastatal is but one of the many long-overdue corrections that are needed in the way gold is produced in the DRC. The principal challenge remains the same as it has been since the Congo became independent – how to ensure that all Congolese people benefit in a sustainable manner from the extraction of their gold. Initially, that objective seemed impossible. With the advent of independence in 1960, the Congolese gained political freedom but not economic freedom from Belgium because the former colonial power maintained ownership over most of the country's profitable enterprises, notably OKIMO. Despite serious efforts by Congolese delegations to negotiate the surrender of these important national assets, it would take Mobutu's Zairianization project to transfer ownership of these key assets into Congolese hands. Many people consider Zairianization a failure that in some instances necessitated the retrocession of certain assets that had already been repatriated. Nevertheless, Mobutu maintained sufficient Congolese control over OKIMO – perhaps only for his personal enrichment – to allow the long and arduous process of full repatriation.

SOKIMO's future as a wholly state-owned company is uncertain. At one

point, senior managers expected to list the company on the Alternative Investment Market of the London Stock Exchange. At the 2011 Mining Indaba in Cape Town, DRC Mines Minister Martin Kabwelulu announced plans to split the company into three operating sectors. However, nothing was subsequently heard about these plans and a few months later the long-time CEO, Willy Bafoa, left the company in the wake of rumors about cost overruns and unpaid salaries.[45] His deputy Chrysostom Vahamwiti Musyayir left at the same time but soon was appointed Minister of Agriculture.

For the past two years, SOKIMO has been led by interim CEO Michel Makaba Mbumba. He is one of the longest-serving employees of OKIMO/SOKIMO, having been involved in its management since the late 1970s. He is overseeing a growing number of joint-ventures, which involve SOKIMO's three principal concessions – 38, 39 and 40.

## Concessions 38

This section of the Auxeltra-managed OKIMO territory is the first to be turned into a joint-venture. In 1996, just a few months before the first Congo War began, Mobutu followed the World Bank's call to privatise state assets by granting a Canadian mining company, Barrick Gold, exclusive exploration rights in this concession. The terms of the deal were not disclosed and no bidding took place. As the war raged, Barrick started to look for partners to

either share responsibility for its new concession or take over the property. Eventually, it declared Force Majeur, withdrew its international staff, and on 31 January 1998 relinquished its license to the Kabila government – leaving the valuable concession once again in the hands of OKIMO.

Extremely cash-strapped, the new government rapidly began soliciting offers from investors and by the end of March 1998, OKIMO had signed an exploration agreement for the northern section of concession 38 with a partnership made up of Orgaman Holding and the Caledonia Mining Corporation, an experienced Canadian mining company. However, Caledonia never fulfilled its contractual obligations so Orgaman replaced its non-performing partner with a new entity by the name of Border Energy PTY Ltd and together they established a Congolese operating company named Borgakim Mining SPRL, which then acted as the official licensee. Subsequently, OKIMO signed a number of other agreements for smaller portions of Concession 38 – usuall in a non-transparent manner – with companies named Kibali, Gorumbwa, Blue Rose Investments, Tangold, Rambi Mining, and Amani.

In 2005, Victor Kasongo Shomari was appointed CEO of OKIMO. He reviewed all existing joint-venture agreements and began to suspect that Borgakim, Gorumbwa, Kibali, Blue Rose, Amani, Tangold and Rambi were all related

> He... began to suspect that Borgakim, Gorumbwa, Kibali, Blue Rose, Amani, Tangold and Rambi were all related to each other and part of a secretive strategy



DRC-34996 1133

*Conflict Gold to Criminal Gold*

# Exhibit 35

to each other and part of a secretive strategy, possibly orchestrated by the principals of Border Energy. The problem was that neither OKIMO nor the Ministry of Mines were officially informed about any possible collusion between these companies or that, in effect, Border Energy's investors might actually control around 60 percent of the entire concession 38. The mystery unravelled when Border Energy turned out to be a wholly owned subsidiary of Australian mining upstart Moto Goldmines, one of many ventures linked to Sir Samuel Jonah, who acted as the lead in the partnership with Orgaman. The Ghanaian mining executive and investor was at the time also President of AngloGold Ashanti. [46]

Resolving the management of concession 38 required re-negotiation due to the Orgaman-Borgakim-Moto Goldmines charade. However, the task turned out to be more difficult than expected because the Damseau family, the owners of Orgaman, trotted out old debts that they were owed by the Congolese state. They claimed principal debts plus compound interest amounting to US$23,481,684[47] relating to various loans that previous OKIMO managers had drawn from the Damseau family since 1987. This resulted in a tug-of-war between the repayment of dubious debts and Moto Goldmines' clandestine accumulation of control over the Congo's richest gold deposit.

In the end, Moto Goldmines increased its control of the concession to 70 percent by acquiring the 10 percent stake Orgaman held in Borgakim. It paid US$34.6 million in shares (comprising 9,319,211 common Moto shares valued at CAN$2.93 each) and approximately US$7.5 million in cash.[48] Jonah also took the opportunity to personally buy another 2,717,874 Moto shares at Can$2.78. Meanwhile, OKIMO retained 30 percent in non-

dilutive interests. However, only eight months later, Moto Goldmines agreed to sell its 70 percent interests to Randgold Resources for Can$4.84 per share.[49] The price resulted in a 76 percent gain for Orgaman and the Damseau family and a 65 percent win for Jonah. Once again, the shuffling of claims for Congo's gold had made a few people rich without benefitting the Congolese, although at least OKIMO was now rid of its debts.

Randgold Resources took over the historic Moto mines in a joint venture with AngloGold Ashanti. Immediately after the transaction was completed, both companies offered to increase their interests by each buying 10 percent of OKIMO's remaining shares. That deal was completed within weeks, leaving Randgold and AngloGold Ashanti with 45 percent each and SOKIMO with 10 percent. Rangold is the operator of the Kibali project, as it is now called.

## Concessions 39

OKIMO's joint ventures signed during the second Congo War for this concession suffer from serious transparency and accountability issues. Gold prospecting rights were given to Mwana Africa Congo Gold for an area that included the Zani Kodo gold mine. Another contract went to the Dubai-based ASC-Goldagem, while Bandy Investments, a company that purported to be a South African investment firm, received exclusive rights to yet another section of the concession. A long list of rights for semi-industrial dredging or other alluvial mining operations were also signed away during that period.

But years later, many of these licensees had still not exercised their rights. They had neither produced any gold nor initiated any exploration, resulting

in a loss of income to OKIMO and the state. Many of the license holders were eventually forced to relinquish their titles. Bandy Investments, for example, turned out to be owned by Niko Shefer, a notorious South African character with past criminal convictions and shady mining-industry involvements in a number of African countries. Bandy returned its licenses immediately when inquires were made.

## Concessions 40

Of all the OKIMO territory, concession 40 has probably suffered the most egregious troubles. In 1982, Orgaman bought Auxeltra's contract with OKIMO for this concession. Orgaman is a sprawling agro-construction group controlled by the Belgian Damseau family that is active in today's Congo.

In 1987, the Damseaus transferred their interests to the Luxembourg registered KIMIN (Kilomoto Mining International) and for a short period of time shared control with the Brazilian construction conglomerate Andrade Gutierrez. In 1991, Orgaman Holding took back full control only to share partnership rights again with MINDEV & Associés[50] in 1992. Eventually, KIMIN 0 meaning the Damseau family – partnered with Ashanti Goldfield Kilo for control of what is today's concession 40.

However, in November 1998 a ministerial Decree excluded KIMIN. Now, the sole surviving joint venture partner[51] of OKIMO was AngloGold Ashanti, itself created in a merger between AngloGold and Ashanti. AngloGold Ashanti assumed responsibility for the development of the Kilo gold mines principally located around Mongbwalu – with disappointing results, as the people in Ituri have found out during the past 12 months.

*Conflict Gold to Criminal Gold*

Exhibit 35

SOKIMO JOINT-VENTURES

Concession 40:
SOKIMO Anglo Gold Ashanti Joint
Venture for the AGK Project

Ashanti Goldfields acquired the right to
explore the gold mining sites around the
historic Kilo gold mine in 1998, in the midst
of the second Congo War. Eventually,
various questions regarding its original
contract needed to be resolved, which led
to a revision of the contract after 2007.

Long before, even before the Global and
All Inclusive Agreement was signed in
December 2002 to create the basis for
peace and stability in the Congo, the UN
Panel of Experts on the illegal exploitation
of natural resources challenged Ashanti
Goldfields' business practices. In its October
2002 report, the Panel levelled allegations
against the company for violations of
the OECD Guidelines for Multinational
Enterprises. How the accusations were
resolved was not disclosed.

Two years later, after Ashanti Goldfields
had merged with AngloGold, the
project, which was now operating
under the title of Ashanti Goldfields
Kilo – AGK – was again targeted by UN
investigators. Now, the evidence for
violations of UN arms embargo during
the start-up phase was serious. And the
threat of UN sanctions was real, which
would have threatened the financial
viability of the company. Preparations
for exploratory work at the AGK mining
sites had started in 2004 with the
deployment of an exploration team in
Mongbwalu. Company and external
security experts had allegedly assessed
security conditions. However, by early
2005, Human Rights Watch and the UN
sanctions monitoring team had reported
how the South African gold mining
company's international and national
staff were quickly compromised by the
unstable security conditions in and
around Mongbwalu. These employees

were forced into various meetings
with Floribert Ndjabu, the warlord of
the Lendu-based FNI militia. Among
other contributions, they felt compelled
to provide Ndjabu with a house in
Mongbwalu and medical treatment for
his FNI combatants at the AngloGold
Ashanti clinic as well as paying various
taxes, fees and salaries to members
of FNI. UN investigators reported
clear-cut facts: "Based on its conduct
AngloGold Ashanti could arguably be in
violation of the arms embargo through
its direct payment and assistance." [82]

For a year and half, while the security
situation in AngloGold Ashanti
concession territory improved
considerably, the Security Council
sanctions committee actively considered
whether the company should be put
under sanctions. The likely consequence
would have been a UN assets freeze,
which could have seriously disrupted
the company's ability to conduct its
business in Congo and around the
world. In the end, heavy lobbying of key
Security Council member states helped
to avert the threat of sanctions and
AngloGold Ashanti was able to advance
its project in Ituri.

In 2009, after a full contract review by the
state forced major changes, AngloGold
Ashanti retained an 86.22% interest in the
AGK project, with OKIMO holding the
remaining 13.78%. However, AngloGold
Ashanti had to cede significant portions
of its original territory back to OKIMO.
The AGK project was now focused to the
Kilo Regional Exploration area on 5,487
km2, located within Concession 40. And
to exploit it, the company built mining
camp, improved access roads, conducted
an Environmental Impact Study and
compiled an Environmental Management
Plan for the project.

Assisted by the American-sponsored NGO
PACT, which administers the massive
US$80 million PROMINE initiative funded

by the World Bank, DFID, USAID and
other donors, AGK seemed to take its social
responsibility quite serious. Even before
the government had issued permits for the
building of an actual gold mine, AGK had
improved the 60 km road from Bunia to
Mongbwalu, paving the way for an influx
of artisanal miners. It also refurbished the
old hydropower station to give Bunia at
least a partial supply of electricity.

The company's strategy was to build
modest mines at Adidi and Kanga as
quickly as possible to exploit 2.5 million
confirmed ounces of gold. With the
capital generated by this mine, AGK
would develop a number of additional
mining sites without depending on
external funds.

The firm aimed to start pouring gold
at the Adidi and Kanga mines by the
end of 2013. According to a company
announcement released at end of 2011,
approximately 600 employees were
working on the project. However, the
company's optimism was never widely
shared in the Mongbwalu and Bunia
region. Many locals did not understand
what the company was doing. Dozens
of artisanal gold mining communities
lived in constant fear that they would be
evicted. Community activists together
with some local political representatives
convened periodical meetings to brief
the population but, as SARW researchers
noted, relevant information was tightly
controlled by a few hand-picked civil
society leaders and the local population
had no access to published information.
But they would not have understood
them any way since virtually all company
information was published in English,
which is not spoken in Concession 40.
A few publications were translated
into French but most of the inhabitants
of Concession, who speak Swahili or
Kinande, are not fluent in French. Poor
corporate communication is problematic
for any company. But the sudden
announcement in April 2013 of the

Conflict Gold to Criminal Gold

Exhibit 35

# THE PANEL LEVELLED ALLEGATIONS AGAINST THE COMPANY FOR VIOLATIONS OF THE OECD GUIDELINES FOR MULTINATIONAL ENTERPRISES.

suspension of the AGK project by the new CEO, Srinivasan Venkatakrishnan, was a stunning blow to the already arduous lives of Ituri's people. By building a far flung portfolio of projects and maintaining its increasingly cost-intensive, deep-shaft mines in South Africa, AngloGold Ashanti's cost structure was no longer sustainable when the global gold price declined by over 20 percent. The new senior management was forced to slash expenses. Productions sites whose all-in costs leave no room for profits, such as the Adidi and Kanga mines, and other exploration plans in Ituri were slashed. These disappointments must lead to questions whether SOKIMO or the responsible officers at the Ministry of Mines had any ability to detect the possibility of a default by its AGK partner.

However, the most deplorable fact is that for the past two years, SARW has attempted to obtain clarification from the company's senior executives about their community-relations practices and the general progress of its AGK project. Despite repeated phone calls and emailed requests for information, the company never responded. It would have been an opportunity to provide some advance warning about its difficulties with the AGK project. After the suspension of the AGK project, a meeting with the Vice-President for Corporate Affairs was finally arranged. A detailed list of questions and issues were presented with the agreement that competent individuals at the organisation would respond. After a number of delays, a formal decision was announced that AngloGold Ashanti did not wish to continue this dialogue.

Concession 38
SOKIMO-Randgold Resources
AngloGold Ashanti Joint Venture
for the Kibali Project

Once the complex ownership history was untangled and replaced with the 45:45:10 percent joint-venture between Randgold Resources, AngloGold Ashanti and SOKIMO (described above in the section on 'Concessions 38'), the Kibali project has progressed very well. Under development and operational management by Randgold, Kibali poured its first gold on 24 September 2013 – well ahead of its scheduled inauguration in early 2014 and within four years of Randgold taking over the Motogold project. Unlike the ill-fated AGK project, Randgold has succeeded thanks to excellent planning, and has delivered a very good financial performance.

Currently debt free, Randgold has spent about US$630 million developing the mine and will undoubtedly invest substantially more to finalise Phases 1 and 2. The current facility has a processing capacity of seven million tones of ore with which Randgold expects to produce around 600,000 ounces of gold per year. The entire industrial facility, ore crushers and a metallurgical plant are driven by four hydropower stations and a back-up thermal power station when rainfall is low. Randgold CEO Mark Bristow indicated that in the course of 2014, the project will provide employment to more than 2,500 people on site – almost all of them Congolese nationals. Already, the majority of its senior management are Congolese under General Manager Louis Watumba.

The number of displaced local artisanal miners is very significant and Randgold has stated that their planned relocation – involving moving 17,000 people – is by far the largest such programme that it has ever undertaken. So far, over half of the 14 villages have been relocated. At Kokiza, for example, 20 schools, police stations, clinics and churches are now in use. Hundreds of farmers have also received compensation.

Local civil society groups report little substantive information about negative relocations or environmental impacts. In part this may be because the Kibali management team appears to pay particular attention to its communication strategies by, among other efforts, releasing all pertinent news in French. However, if Randgold's 2012 Sustainability Report is a true measure of its future disclosure practices and actual performance in relation to key humanitarian and environmental concerns, then the Congolese can rest assured that this SOKIMO partner appears to take its corporate responsibilities seriously.

Concession 38
SOKIMO – Mineral Invest
International (MII)

Based on two contracts signed in 2010 and 2011, Mineral Invest International controled 65 percent of the joint-venture firm, Wanga Mining Company, which controled five permit areas west of the Kibali project. MII was still in early stage exploration, far from initiating a feasibility study. Senior management

Conflict Gold to Criminal Gold



## Exhibit 35

of MII had no mining experience but initially, the company hired a CEO who was previously active in Central Africa. At the end of the MII engagement only a sordid and intransparent story remains, with the Swedish executives and shareholder never acknowledged any responsibilities to the Congoles they wronged.

According to the advocacy group Swedewatch, Jonas Falk, an alleged drug smuggler, may have contributed part of the initial capital for MII. The advocacy group also alleges that the first Operations Manager, Joachim Andersson, was a close acquaintance of Falk and that they served time in prison together. Under the leadership of Andersson, MII did engage in 'commission trades' of 72 kg of gold, although the exploration permit did not entitle the company to trade or export gold. To confuse things further, MII management excused this illegal activity by alleging that the trades were actually undertaken by a subsidiary by the name of SIM SARL. That company, the MII spokesperson claimed, did have all appropriate trading licenses. However, the identity of SIM SARL has not been verified and there was no disclosure by either MII or SOKIMO that this gold trading had been officially reported to the Ministry of Mines or that it had been conducted illegally.

In the first half of 2013 after hectic mergers and acquisitions, MII lost control over its already fledgling finances. Because MII could no longer abide by its financial and disclosure obligations, the Stockholm Stock Exchange ordered a trading halt on 8 July 2013. In early January 2014, the company was delisted from the Stockholm exchange and in an extraordinary shareholder meeting a new Board of Directors was elected. These events made it clear that MII no longer has the financial or managerial

resources – if it ever possessed such capacities – to develop and operate a gold mining project in the Congo. Based on the allegations published by Swedewatch, the Congolese should have investigated the company and possibly reviewed whether the trades with artisanal gold were in compliance with MII's exploration rights for Wanga. However, rumours have it that MII enjoyed protection from the highest levels of Congolese politics. At the same time, no authority in Sweden appears to take any action to prevent further financial adventurism at the cost of Congolese.

Concession 38
SOKIMO – Kilo Goldmines
Limited Joint Ventures

Kilo Goldmines, a company registered and traded on the Toronto and Frankfurt Stock Exchanges, obtained exploration permits for gold and iron ore deposits in March 2011. The 12 permits are situated roughly in a triangle south of the Kibali project, extending from Mambasa to Nia Nia. The company is engaged in a joint venture with Rio Tinto for all iron ore exploration, while its gold deposits are split into four projects. For the development of one on these deposits, Kilo entered into a partnership with Rangold Resources. Based on its exploration activities, Kilo's management considers the Adumbi deposit, which forms part of its Somituri Project as the one with the highest gold potential.

After two years of exploration work, the company is still far from developing a feasibility study, let alone obtaining approval for an exploitation programme. In order to meet its social, environmental and governance obligations, Kilo has created the KGL Community Fund and the KGL Foundation to administer

it. It prioritised community projects, such as rebuilding schools in Pygmy communities and improving water and sanitary installations. Unsurprisingly, given the early stage of Kilo projects, the company's socio-economic projects are very modest in size so far and will not have much of an impact on the quality of life of local communities.

Concession 38
SOKIMO – Cardinal Resources for a
Connections Options Agreement

On 30 April 2012, Connections SPRL, a Congolese registered subsidiary of Cardinal Resources Limited, entered into an options agreement with SOKIMO for two gold exploration permits. The two areas are located west of the Kibali project and used to be part of the exploration programme under Moto Goldmines until Randgold Resources acquired its assets. Under the terms of the agreement, Cardinal had to pay an Option Fee of US$50,000 to acquire the right to a 60 percent interest in a joint venture to be established in the Congo. On exercise of the option, Cardinal is required to pay a further US$500,000 to actually exercise the Option Agreement.

Connections SPRL was originally affiliated with, and funded by, Cardinal Resources Limited, which is registered on the Australian Stock Exchange. However, at the end of 2012, Cardinal was taken over by Ridge Resources, although the company continues to operate under its original name. The Chairman of Cardinal Resources is Klaus Eckhof, who already had significant opportunities to explore and develop the site during his previous tenure as CEO of Moto Goldmines.

The Ministry of Mines has so far not disclosed the contract with Connections SPRL, nor is it clear whether the change of its ultimate owners from Cardinal to Ridge Resources was disclosed to the Congolese State.

Exhibit 35




DRC-34996 1138



Exhibit 35

**The lack of public disclosure and accountability raises serious questions about SOKIMO's rationale for entering into this agreement, which forfeited all but one percent of potential gold trading income.**

Concession 39
SOKIMO – Mwana Africa
for the Zani-Kodo Project

Mwana Africa emerged from a reverse take-over of African Gold Plc by a group of private investors headed by its Congolese CEO, Kalan Mpinga. An agricultural economist and the son of a former Prime Minister under Mobutu, Mpinga is a consummate political insider in the Congo. Thanks to his career with Anglo American, he is also well connected with the international mining industry.

In June 2005, Mwana Africa signed an agreement to hold 80 percent in a joint venture with SOKIMO for the Zani Kodo mines in concession 39. Unfortunately, progress in terms of studies and test-drillings has been exceedingly slow. The company has announced significant inferred content at some of its drilling sites but eight years after receiving its exploitation licenses the date for the construction of a gold production facility remains unknown. And yet, as the Kibali project has demonstrated, even large-

scale gold exploitation programmes – along with with the related social and infrastructural benefits to local communities – can be realised in a relatively short period of time.

However, the company appears to take its corporate social responsibilities rather lightly, given that it has not issued a sustainability report nor has it offered any concrete information about the commitments it has made to Congolese communities. Even with a prominent Congolese heading the company, the value of the SOKIMO-Mwana partnership to the Congolese people is proving elusive.

Concession 39
SOKIMO – Bon Genie K. Mining
Option Contract for Gada project

The option contract was signed in June 2011 and confers on BK Mining the right to conduct exploration in six permit areas. However, the names of the management and actual financier of BK Mining have not been identified beyond its Congolese partner, Gode Muluaka Ngoki. The company has also made no public declarations about its capitalisation and intentions. Unsurprisingly, given this extraordinary void of transparency and accountability, local populations have no information to help them assess their future prospects.

Comptoir SOKIMO
– Mikuba Mining

SOKIMO still has another sizeable gold mining interest in the form of tens of thousands of artisanal miners digging for gold in the 'Zones d'Exploration Exclusive', the portions of its territory that it has not rented out to one of its industrial joint ventures. These zones became a pivotal source of income for the parastatal company after 1981 when the Mobutu government lost

the ability to operate OKIMO as an industrial enterprise.

In response to that crisis, existing laws were liberalised to officially allow the registration of independent artisanal gold mining. OKIMO has now started to sell artisanal mining permits – and impose additional taxes on artisanal rawgold production. In 2009, after an extensive negotiation with AngloGold Ashanti, OKIMO took back about 30 percent of Concession 40. This is now part of its exclusive exploration zones.

Historically, total fees and costs born by artisanal miners roughly equated to 30 percent of the value of their rawgold. To collect its share, OKIMO deployed officials throughout its vast concession to supervise the artisanal miners and maintain checkpoints along principal roads as well as buying agents in artisanal gold mining villages. Judging by the negligible amount of recorded gold revenues for taxes or exports over the past 30 years under both the Mobutu and Kabila governments, it is fair to say that the system never worked particularly well.

In May 2010, CEO Willy Bafoa signed a contract with a businessman by the name of Renzo Biogetti, and his company Mikuba Mining to manage Comptoir OKIMO/SOKIMO in Bunia. Biogeti is part of a Lebanese family that has lived and operated manufacturing and trading businesses in Kinshasa, Lumubashi and elsewhere in the Congo for many years. According to SARW research, members of SOKIMO's finance department were looking for an external manager to operate a SOKIMO comptoir in Bunia. They wanted the comptoir in order to benefit from artisanal miners operating on SOKIMO's land. Possibly, this comptoir would compensate for lost fees and taxes that were supposed to be collected from the miners but never seemed to arrive in SOKIMO's treasury.

# Exhibit 35

The contract gave Mikuba Mining exclusive rights over a 10-year period to operate SOKIMO's gold buying agency in Bunia. In exchange for this right, Mikuba was contracted to pay SOKIMO a management fee of 1 percent. Under this arrangement, the Ministry of Mines issued a license for the SOKIMO comptoir to allow operations to begin on 21 May 2010 for a one-year period. In May 2011, Biogeti chose not to renew the license. He now claims that SOKIMO never delivered on its promise that Mikuba would be able to buy very significant quantities of artisanal raw gold. In conversations with SARW, Biogeti stated that he was promised hundreds of kilogrammes and even tons of raw gold per year. According to him, very little was actually sold to him.

Neither Mikuba nor SOKIMO have ever publicly disclosed how much gold they bought and exported during this partnership. Repeated requests for this and other information – in writing and during phone conversations with Biogeti, his lawyer, and the senior management of SOKIMO – were never answered with specific data. The lack of public disclosure and accountability raises serious questions about SOKIMO's rationale for entering into this agreement, which forfeited all but one percent of potential gold trading income. And what skills and expertise did Mikuba bring to the deal? Biogeti admitted to SARW that he has no track record in gold trading.

Doubts about the underlying economic rationale are justified. At the time when SOKIMO entered into this agreement, Coped and Karmali Trading Company, two other Comptoirs, were licensed to do business in Bunia. Their combined official exports between 2010 and 2011 were a laughably low 163 kg. Perhaps part of the unresolved issues can be deduced from an order[53] issued on 1 June 2013 by the Congo's Agency for Customs and Excise Taxes. Among other companies, 'Comptoir Sokimo Bunia' was granted 15 days from the date of the order to appear at the Customs headquarters in Kinshasa to settle its tax debts.

To date, a written request from SARW for answers to 9 key questions that was sent on 10 June 2013 to Michel Makasa Mbumba, the current General Manager of SOKIMO, remains ignored. Repeated calls to his office to provide answers were ignored as well. This perplexing lack of transparency and accountability by SOKIMO's senior management needs to be interpreted in the context of the 2009 changes that saw the Kabila government convert SOKIMO from a parastatal into a public company. Currently, it is assumed that the Ministry of Portfolio still retains all equity. But it is also understood that the changes were made as part of preparatory explorations with European investment banks to publicly list SOKIMO on the Alternative Investment Market of London's Stock Exchange. With sizeable gold deposits and joint-venture agreements with respected international gold mining companies to extract them, the combined performance of SOKIMO's assets place it, in size, well within the top 20 African gold mining groups.

Based on peer-comparisons with companies with similar profiles, an initial public offering (IPO) of SOKIMO's securities at a major stock exchange could fix its value at hundreds of millions of US dollars. Depending on how many shares the Board of Directors of SOKIMO actually authorised for sale, the benefit to the Congolese people could range from a few dozen to more than one hundred million US dollars. As explained in the introduction to this section, the potential market capitalisation of SOKIMO depends greatly not only on the size and accessibility of its gold deposits but also on investors' perceptions of government policies and management integrity.

## OTHER EXPLORATION AGREEMENTS

### Erongo Energy

Erongo Energy Limited is registered and traded on the Australian Stock Exchange and has acquired a 70 percent interest in nine permits located in Maniema Province. Seven of these areas are already well researched and, based on previous exploration results, have promising gold deposits. Erongo is also exploring whether it wants to secure 60 percent of the Giro Gold Project located west of the Kibali deposits or the area currently covered by the SOKIMO-Connections options agreement.

Erongo's projects are in a very early exploration and test-drilling phase – despite the availability of a host of historic test results. The company has so far made no announcements about when it intends to commence feasibility studies, which might lead to active gold production.

### Casa Mining

The company was formed in 2009 to take advantage of gold mining opportunities in the DRC, particularly in the Masisi region of South Kivu and the Kampene properties in Maniema. However, Casa Mining only has indirect involvement with both permits through option agreements.

In its first report, SARW indicated that FARDC military forces harass artisanal mining populations in that region. Casa is working with Leda Mining, and its parent company Anvil Mining, which was acquired by Chinese mining company MMG Limited. As part of this agreement, Casa is participating in an exploration and sample drilling campaign. The Leda concessions are traditionally heavily mined by artisanal miners and belonged historically to Hewa Bora, Laurent-Désiré Kabila's rebel

Exhibit 35

retreat (see Kabila, First Congo War and gold production).

Casa also is active in Kampene within Maniema Province through an exploration license held by a private DRC-registered company, Bitmak Company Sprl. No exploration activities have yet been reported on these properties.

The implications of Casa Mining's multilayered structures are unclear, in particular regarding any liability issues. It is particularly mystifying how Casa Mining can announce on its website that it has completed a socio-economic study, stakeholder analysis and environmental review – but does not publish any of these documents.

## Loncor Resources

Outside of the SOKIMO joint ventures and Banro's concessions, Loncor Resources controls the Congo's next largest and potentially most profitable gold deposits. The company has secured 53 permit areas in North Kivu and 13 concessions in Orientale Province. However, due to localised instability caused by bands of Mai-Mai and FDLR, Loncor has chosen to invoke Force Majeur on most of its properties. Indeed, 49 of its permits in North Kivu are currently held inactive because of Force Majeure. On balance, the company retains a large number of titles, whose contractual date of relinquishment is postponed. On its website, Loncor does not provide any indications that most of its properties are not performing assets. It is also peculiar that Loncor considers many of its North Kivu properties subject to Force Majeur while SARW visited these sites multiple times and saw tens of thousands of gold diggers working in these regions.

Its most advanced exploration results come from the Manguredjipa area, a historic gold mining region that was operated by Minière des Grands Lacs during the Belgian colonial regime. According to its website, Loncor Resources has conducted airborne radiometric and geophysical surveys since 2008. It also conducted a series of test drillings in its Manguredjipa permits. Loncor has also found other potentially rich gold occurrences around Lubero. Similarly, the Ngayu project, which is situated to the south-west of the AGK and Kibali project areas, is believed to have rich gold mineralisation potential.

Loncor Resources is owned and managed by the same group of investors who control Banro Corporation. Recently, American gold mining company Newmont Mining acquired a 19.8 percent equity stake in Loncor, while the management maintains a 24.4 percent holding. Following the same managerial approach as it does with Banro's operations, Loncor is funding and operating a Foundation to manage its corporate social responsibility programme.

The most urgent question, from the perspective of the Congolese, is whether Loncor Resources makes the most effective use of its disproportionally large portfolio of permits. It is in the interest of the Congolese living within the close to 20,000 km2 of Loncor's concessions that the rich gold deposits are rapidly turned into revenue generating operations, which provide employment, tax revenues and infrastructure development. An important test of Locnor's resolve to move forward towards production has started with the recent announcement of FDLR's leadership to disarm[34]. Therefor a principal reason for Loncor's invocation of Force Majeur should now cease to exist. Orderly progress in exploration and exploitation activities should now become possible.

## Regal Resources – Afrimines Resources – Pangimines SPRL

Over the last 2-3 years, Australian Stock Exchange-listed Regal Resources has entered into joint ventures with two Congolese companies, Afrimines Resources SPRL and Pangimines SPRL, in order to develop a total of 18 gold mining permits. The Regal-Afrimines venture relates to 14 sites in South Kivu, the Regal-Pangimines deal to 4 sites in Maniema, which are to the west and southwest of Banro's Namoya property. For each of these ventures Regal Resources has acquired 70 percent equity control of the various operational companies that the venture partners have set up.

While the ownership of Regal Resources is disclosed according to the requirements of the Australian Stock Exchange, the identity of Afrimines beneficial owners has not been disclosed. The SARW research has identified a Technical Director of Afrimines by the name of Yenga.

The Regal Resources venture between Regal and Pangimines is mired in even deeper mysteries. Pangimines' shareholders have not been disclosed but SARW research discovered that Pangimines was also engaged in a venture with Mopala Metals (owned by the Mopala Foundation). They had formed Oromanix Sprl to develop the Maniema permits. Regardless of what the complex corporate structures are trying to hide, the overriding fact is that the Congolese Cadastre does not recognize valid rights for Regal.

According to official Congolese Mining Cadaster information, Regal Resources and its Congolese partners originally set up two operational entities. Regal and Pangimines set up Regal Maniema for four permits (numbers 3279, 3280, 4484, 4486), which have now expired. Regal

Exhibit 35

## THE CURRENT STATE OF ARTISANAL GOLD MINING

### Overview

**close to 100 percent of Congo's artisanally extracted gold is still smuggled across its borders after which it enters the international gold trading and refining networks.**

Years after the all-encompassing Congolese wars came to an end around 2004-2005, the perception that Congolese gold extraction and trade is still steeped in the bloody morass of conflict persists around the globe. However, as the first SARW report 'From Conflict Gold to Criminal Gold' documented, the conflict-minerals narrative no longer applies to gold because there are hardly any gold mining regions under the control of illegal militias. But abuses and exploitation are as prevalent as ever in all Congolese artisanal gold mining areas. The difference is that today's humanitarian and socio-economic devastation is caused by the criminal exploitation of renegade political, military and commercial elites. As was the case during the first and second Congo Wars, close to 100 percent of Congo's artisanally extracted gold is still smuggled across its borders after which it enters the international gold trading and refining networks.

**Three illegal acts are involved in almost all cases of Congolese artisanal gold trading:**

- Trading and export is conducted by individuals and companies that lack the appropriate Congolese licenses to trade and export gold;
- Individuals and companies underreport – or do not report at all – their gold exports; and
- Border control officials and internal security agencies – including OFIDA, OCC and DGM – turn a blind eye to the smuggling, and it is often alleged but never proven that these officials collaborate in return for hefty bribes.

SARW considers the failure of the border control and security agencies to counter gold smuggling to be the most grievous of all the current wrongs that underpin Congo's illegal gold trade because it requires very little effort to correct. Anyone who doubts the culpability of the border and security agencies should ask why not a single major case of gold smuggling has been uncovered by these law enforcement agencies in recent years.[55] This underachievement is all the more remarkable given that very large quantities of gold that are smuggled regularly through the same, border crossings or via a few, well-known air connections. SARW research has confirmed the long-suspected smuggling routes used by most gold traders – namely border crossings at Aru/Arua and Mahagi in Oriental Province and Kasese in North Kivu, as well as Goma-Giseny, Bukavu-Cyangugu and Uvira-Bujumbura in addition to direct flights from Bunia to Entebbe.

### The value of smuggled artisanal gold

and Afrimines set up Regal SK (Regal South Kivu) for five permits (numbers 4796, 4794, 4809, 4808, 4807), the last four of which expired in February 2014 (permits 4796, 4809, 4808, 4807).

Despite the fact that its exploration permits expired in 2011 and 2012, SARW researchers are looking into activities attributed to a company referred to locally as 'Regal'. According to our research, Regal had recruited military forces to push long-established artisanal gold mining communities off what Regal claims its its property. Of course, since the exploration permits have expired, this claim is erroneous. According to local researchers, 10 artisanal miners were killed during violent confrontations on 3 April 2013.

Estimating the quantity of illegal exports of artisanal gold can be very challenging. Finding reliable data in the statistics of the various government agencies in charge of supervising gold exports or collecting tax and duty payments is a frustrating – and largely futile – task. The Central Bank, the customs agencies, the Ministry of Mines, OKIMO/SOKIMO and the provincial mining divisions simply do not have consistent year-by-year data. Meanwhile, CEEC – the agency established to evaluate, certify and control mineral exports – only deployed agents in eastern Congo after 2006.

DRC-34996 1142



*Conflict Gold to Criminal Gold*

# Exhibit 35

Although the CEEC data is by far the most reliable, its officials readily admit that they capture a very small percentage of the Congo's actual gold outflow. It is a widely accepted observation that there is not a single year in the entire history of independent Congo during which the majority of Congo's gold was exported legally.

The Ministry of Mines recently released statistical records reflecting gold production and official exports from 2004-2012 (see Table 6). Some of this data is based on CEEC certifications. However, the document does not explain the source of the production data or how it was collected – and production data is notoriously difficult to collect because of the lack of a reliable governmental presence in the gold mining regions.

With no reliable, long-term production or export data, SARW has to base its estimates on historical production data, an analysis of neighbouring countries'

gold trading statistics, individual gold trading companies' data, and a healthy dose of guesstimation. SARW has already provided explanations for its estimates in its first report 'From Conflict Gold to Criminal Gold' and, after subsequent research, maintains that even under the most adverse circumstances annual exports of artisanal Congolese gold has never been less than around 10 metric tons. This output was achieved under the worst conditions, when low world market gold prices, ubiquitous violence targeted at artisanal gold miners, and extended rains depressed artisanal production.

Under the much more favorable conditions that have predominated during recent years – with gold reaching a record high of US$1950 per troy ounce during the second half of 2011, comparatively low violence and relatively good access to gold mining regions even during rainy seasons – artisanal gold exports have multiplied. SARW believes that annual production exceeded 20 tons

over the past 5-6 years and that it may have been as high as 30 tons in some years. Gold traders in neighbouring countries, who receive much of the artisanal gold output, privately confirmed these estimates. A caveat should be noted: all estimates are based on rawgold, or doré gold quality, meaning the purity of exported gold ranges from 80-95 percent.

While the observation that much of Congo's gold is smuggled out of the country is not in doubt, the actual economic damage to the Congo of illegal gold smuggling is often exaggerated. The loss is restricted to the export duties and other fees that the government imposes on gold comptoirs. In the past, these duties usually amounted to about 5 percent. With the recent reduction in Congo's export duties on gold, the loss of revenue to the state has now shrunk to 1.5-3 percent. Table 4 provides an approximation of the losses suffered by the state.

| YEAR | PRODUCTION IN KILOGRAMMES | EXPORTS IN KILOGRAMMES | DIFFERENCE BETWEEN PRODUCTION AND EXPORTS | |
|---|---|---|---|---|
| | | | Quantity in kilogrammes | Percentage |
| 2003 | - | - | - | - |
| 2004 | 714.96 | 12.00 | 702.96 | 98% |
| 2005 | 592.17 | 613.00 | -20.83 | -4% |
| 2006 | 328.09 | 95.00 | 233.09 | 71% |
| 2007 | 143.73 | 121.60 | 22.13 | 15% |
| 2008 | 119.57 | 70.31 | 49.26 | 41% |
| 2009 | 166.61 | 220.14 | -53.53 | -32% |
| 2010 | 151.13 | 177.90 | -26.77 | -18.00 |
| 2011* | 309.41 | 213.36 | 96.05 | 31% |
| 2012* | 2'812.62 | 2'411.30 | 401.32 | 14% |

*Table 6: Ministry of Mines gold production and export data*

Source: Statistiques Minieres de 2003 a 2012 - September 2013; Ministry Of Mines of the DRC
http://www.mines-rdc.cd/fr/documents/Statistiques/stat_min_2003_2012.pdf
* The significant spikes for 2011 and particularly 2012 reflect the start of gold exports
by Banro's Twangiza mine – the Congo's first industrial production site.



DRC-34996 1143
Conflict Gold to Criminal Gold

# Exhibit 35

| QUANTITY OF EXPORTED GOLD | 1.5 PERCENT TAXES AND FEES | 3 PERCENT TAXES AND FEES | 5 PERCENT TAXES AND FEES |
|---|---|---|---|
| 10 metric tons equaling 321 507.466 troy ounces | US$5.7 million | US$11.5 million | US$19.3 million |
| 20 metric tons equaling 643 014.931 troy ounces | US$11.5 million | US$23 million | US$38.6 million |
| 30 metric tons equaling 964 522.397 troy ounces | US$17.1 million | US$34.5 million | US$57.9 million |

*Table 7*: State Revenue losses from gold smuggling

Source: SARW calculations based on the assumption that the exported rawgold has a gold content of 85 percent and is traded at an average gold price of US$1400 per troy ounce

## The undocumented trade around semi-industrial and small-scale gold production

Semi-industrial and small-scale gold producers represent one of the most rapidly expanding – but also least transparent and most crime-ridden – sectors of the gold industry. Throughout eastern Congo there are dozens of shadowy entrepreneurs who have set up dredging and excavating sites, where they operate industrial-sized pumps with a few dozen workers. According to SARW research, most of these operators do not report their gold production and exports to the Mining Divisions of their provincial governments – as stipulated by law.

Fametal Mining serves as an example of how these companies operate. In early 2012, it became known in Bunia that a group of Chinese were operating powerful dredging equipment in the Ituri River in Nia Nia near the Komanda community in Mambasa Territory. According to the provincial authorities, the group was operating under a company named Fametal, which had not been registered and which had not obtained a small-scale mining license. Civil society groups reported that 39 workers of unknown origin or nationality operated the equipment. Widely varying estimates about Fametal's gold production were published in news reports some alleging 5 grams per week, others as much as 5 kilogrammes per week.

When inspectors from the provincial bureau of mines ordered Fametal to cease and desist, the Chinese operators resisted. After a several days of resistance, the provincial authorities were told by 'men of great influence from Kinshasa' that Fametal was operating with permits obtained in the capital. The province was ordered not to interfere in Fametal's operation.

Further research revealed that Fametal is part of a group of Chinese-owned, Swiss and French companies with offices in Paris. Fametal is operating in the mining sector of at least ten African countries. In addition to Fametal Mining and Resource Group, the conglomerate includes WM Investment and CRAA International Trade Group. Its CEO and Fametal President is Wang Bin. The company's website claims that it has acquired 12 permits for gold exploration or mining from the government of the DRC.[86] However, the Ministry of Mines does not recognise any agreement with Fametal or CRAA International.

When SARW researched the situation along rivers in Ituri district, it found that several dozen unregistered and unlicensed small-scale miners had operated there from 2011-2013. At least 25 operators, most of them either Chinese or Congolese-Chinese owned, were operating along the Chari River in Irumu Territory alone. None of them had their rawgold evaluated or taxed by the CEEC, as the law demands. The mining division has no data about their production. According to the division's agents, they have received no cooperation from the operators and attempts to enforce the law by the mining police usually result in phone calls from 'somebody' in Kinshasa.

## Artisanal gold trading networks

The illegal Congolese trading networks are connected with counterparts based in the neighbouring and nearby states of Burundi, Tanzania, Rwanda, Uganda and Kenya. These in turn trade the illegally obtained artisanal gold on to international gold refiners in the United Arab Emirates, and many other countries.

Most of the current illegal gold trading networks evolved from investors who had begun to exploit Congo's gold riches before the first Congo War started in 1996. Until the threat of sanctions by the UN Security Council interrupted the trade,

*Conflict Gold to Criminal Gold*

## Exhibit 35

the majority of Congo's illegal gold trade was based on three Indian clans, a Belgian trader, their networks of Congolese employees and traders, and their international buyers in Europe and North-America:

**1.**

The Indian Bhimji family set up the first regional gold trading enterprise in the 1960s in Kampala to solicit gold from Ituri and Haut-Uélé as well as other parts of Orientale Province. After many setbacks and internal problems, the family business continues to function and is now run by the third generation.

**2.**

According to family lore, the Pattni family has been involved with Congo's gold for even longer as they started as jewellers and dealers in gold and precious stones in Kenya over 100 years ago. Congolese traders visiting Nairobi began selling them gold in the 1950s – and possibly even earlier. The Pattnis were also the financiers of Machanga Limited in Kampala and the Machanga office in Bujumbura. Once Machanga closed after the imposition of UN sanctions, Farrel Trading and Investment in Bujumbura was created with shareholders that had participated in the Machanga Bujumbura operation. New – and as of yet unproven – allegations have emerged that most of Machanga's original suppliers of Congolese raw gold have been selling to Ushindi Express and Skyhawk International Ltd, both companies based in Kenya, since 2009.

**3.**

Key Congolese gold traders, including Evariste Nshamamba in Bukavu, Mutoka Sefu Ruganyira in Bujumbura, and Glory Minerals in Butembo, began their work with Affimet, a trading and refining operation set up by Alain Goetz of the Antwerp-based gold refining company, Tony Goetz and Zonen. Goetz started his gold operations in Bujumbura in the 1980s. Both Nshamamba and Mutoka Sefu were former employees and suppliers, while another, Dr Kisoni Kambale was killed in July 2007 but replaced by some of his relatives.

**4.**

An additional network emerged shortly before the first Congo War when the Lodhia family set up Uganda Commercial Impex (UCI) in Kampala to take advantage of their relationships with Nande traders. The original Lodhia family is no longer trading gold from the DRC after their company was placed under financial sanctions in March 2007. However, Nilesh Lodhia – who is a relative and former employee of UCI and is facing criminal prosecutions – and his partners, Madadali Sultanali Pirani (locally known as Madat), Hiren Jogia and Om, have taken over some of UCI's former supplier network. Niles Lodhia is now operating from his new base in India.

In addition to these long-established trading chains, many new actors have entered the Congo gold market in recent years. Many of the new entrants were able to push out old traders, thanks to their alliances with more powerful officials from the military or security services. Others are suspected of obtaining export licenses solely in order to establish supplier networks for a short period of time so as to gain entry into local markets. Once their permits have expired, they continue trading and exporting illegally. Prominent examples of these new groups are:

- In Bukavu, Mange Namuhanda has become a major gold exporter without ever obtaining the requisite license. Mange is collaborating closely with the highest military and security officers in South Kivu; and

- In Goma, the AR Gold comptoir was operated for one year only but its principals – Sibetain Alibahai, M. Anapulam and Tolani Ramesh Kumar – were never present. Authorities believe they that have continued to buy gold from their suppliers but now do so illegally.

However, control of Congo's major gold trading chains has been affected most prominently by the extraordinary volatility of the price of gold on world markets. Many of the major buyers in eastern Congo, Kampala, and Bujumbura constantly invest almost all of their operating capital to maximize their profits. But when gold prices decline significantly, such aggressive business practices may result in serious liquidity problems, if not bankruptcy.

This is precisely what happened to Evariste Nshamamba, who has operated the gold comptoir Etablissment Namukaya in Bukavu for more than 10 years. As always, on 10th April his agents were instructed to buy as much artisanal gold as his capital base permitted. But on that day gold prices dropped precipitously and the losses extended until 16th April. During the 6-day period, gold lost 12 percent of its value – falling by just under US$200 per ounce, from US$1575 to US$1380.

By the time Nshamamba had travelled to Bujumbura and Kampala to sell his gold, his buyers would not pay a high enough price for him to cover his costs. Further compounding his problem was that he had traded with money from third party investors. In a few days, the financial basis for his decade-long gold trading operation was wiped out. Other gold traders suffered similarly when the value of gold failed to recover and extended its losing streak into late 2013.

Exhibit 35



GOLD USD/OZ -412.10 -24.88     01 JAN, 2014- 01 FEB, 2014

*Table 5: Gold Price in US$
from 1 January 2013 - 1
February 2014*
Source: Kitco.com

# THESE GOLD TRADERS ONLY SUCCEED BECAUSE THEY ARE OFFERING ARTISANAL GOLD MINERS HEAVILY DISCOUNTED PRICES – SHIFTING THE MARKET RISKS UPSTREAM TO THE MOST VULNERABLE ACTORS IN THE GOLD TRADING CHAIN

The immediate consequence was that small gold traders, who were not fully invested during the price drops, still had their capital intact and so gained importance. The gap left by Nsamamba was quickly filled with local négociants, such as Buganda Bagalwa, Baba Kabongo and Kulimushi Chihonge, and traders known only as 'Kenya', 'Kubonage' and 'Fungaroho'. According to very preliminary observations by SARW researchers, these gold traders only succeed because they are offering artisanal gold miners heavily discounted prices – shifting the market risks upstream to the most vulnerable actors in the gold trading chain and forcing artisanal miners to once again absorb

the heaviest economic blows. These new dynamics will require extensive new field research to ascertain to what extent the ultimate victims of the global gold market's gyrations are the artisanal miners.

The following list of prominent gold dealers does not necessarily cover the current cast of actors involved in Congo's artisanal gold trade. The velocity of the trade, gold price fluctuations and competitive pressures can bring about sudden changes. While formerly powerful gold traders lose their capital over night because of sudden price drops, up and coming local traders can rise equally rapidly.

DRC-34996 1146



*Conflict Gold to Criminal Gold*

# Exhibit 35



### Bhimji-Family[57]

Like most Central and East African gold dealers of Indian origin, the Bhimji family migrated to East Africa from the Indian region of Gudjarat. For many centuries the male descendants of the family have been Soni, the Hindu caste for goldsmith. A. P. Bhimji initially settled in Kenya and worked as a goldsmith. Naturally, he also traded in gold, refining it himself in order to fashion jewellery. Through this trade, Bhimji became acquainted with the most intrepid Congolese dealers who travelled long distances to sell their gold and purchase goods to be imported to their Congolese homes. During the 1960s he moved to Kampala where he started his gold trading business called Jewelarama. He was a pioneer – no other Indian gold trader had set up shop in Uganda to tap into the rich supplies from the Congo, southern Sudan and Ethiopia.

The Bhimji family prospered greatly during these years. On average, Jewelarama exported over 30 kg of gold per week – too much for Bhimji to refine himself - so he sent it to the Johnson Matthey refinery outside London. However, misfortune struck in January 1971 when Idi Amin led a military coup to seize power from President Milton Obote. He installed himself as president and in August 1972 declared war on Asian immigrants and British-owned businesses. By end of that year, he had expropriated Indian and British businesses, and forced the Indian population out of Uganda. Cut off from their gold suppliers, the Bhimji family resettled in the UK and invested their wealth in London's real estate, which was just about to boom.

Once again, they did very well. Within a few years they had earned sufficient capital to acquire and operate hotels. By the 1980s, the Bhimji family were owners of prestigious hotels such as the Hotel Henry VIII and the 500-room Barbican Hotel. However, new financial calamities – due to an innocent entanglement in a fraud case - ruined the family in the early 1990s.

Around the same time, political and economic stability returned to Uganda. More importantly, Minster of Trade Richard Kaijuka implemented an extensive economic liberalisation programme – an important component of which was the elimination of customs duties on the importation of gold. For gold traders this represented a gain of over 3 percent. With such a fortunate turn of events, the Bhimji clan returned to Kampala to resume their original trade. Now operating under the trade name A. P. Bhimji, their gold exports soon exceeded the volumes the family business had achieved 20 years earlier. Weekly shipments shot up to 85 kg, which all went to a London-based intermediary who sold the gold to Johnson Matthey. However, a tax scandal involving Johnson Mattey managers soon brought an end to Bhimji's London refining arrangement.

From then on, Bhimji sold its gold to Metalor in Switzerland. When the first Congo War started A. P. Bhimji was in an economic sweet spot since he was the only gold trader in Kampala when the Ugandan army (UPDF) began pillaging the Congo. According to the government's trade statistics for these war years, Uganda exported over US$110 million worth of

Exhibit 35

# WEEKLY SHIPMENTS SHOT UP TO 85 KG, WHICH ALL WENT TO A LONDON-BASED INTERMEDIARY WHO SOLD THE GOLD TO JOHNSON MATTHEY.

gold. At an average price of US$370-380 per ounce, Uganda's exports amounted to around 9 metric tons of gold.

Unlike the practice of future combatants, as observed during the second Congo War, competition among the warring parties for Congo's natural resources was low during the first Congo War. The same was true for gold traders. Only one other gold trader, Uganda Commercial Impex had only just started business, almost entirely limited to trade with the Nande. And Machanga, the company that would eventually evolve into the most significant gold trader in Kampala, was not yet established.

During the second Congo War, the picture changed radically. It is widely acknowledged that powerful UPDF officers pillaged some of Congo's resources. However, it is not known whether the same officers who pillaged gold from the Congo also smuggled it out of Uganda themselves or whether they used Kampala's gold traders. Therefore, it is difficult to assess whether Bhimji's weekly gold exports included any of the pillaged gold at all. In theory, with 85 kg of exports per week, the family would have met – and sometimes exceeded – the quantities that are reflected in Uganda's official statistics. However, Sameer Bhimji adamantly maintains that his family never dealt with officers of the military – and neither the UN Resource Panel of Experts nor the Porter Commission, which was mandated to investigate the

veracity of the pillaging charges against UDPF officers by the UN Resource Panel, mentioned Bhimji.

Bhimji's gold trade was traditionally focused on suppliers from Aru and Ariwara in Uélé, its hinterlands, and some parts of Ituri, including Bunia. One of their major gold suppliers was Dieudonné Ozia Mazio, a major general, trader and chef of the local chapter of FEC Aru. Many others went with him to Bhimji's Kampala buying office, often travelling on local buses, carrying a few hundred grams of rawgold per week. The supply from Bunia was even stronger and, according to Sameer Bhimji, Bunia's gold supplies used to be cheaper on average. In other words, throughout Congo's bloodiest wars, Bhimji's gold supply was predominantly from those parts of eastern Congo that were the most heavily embattled and occupied by a succession of the most corrupt warlords and militias.

Intra-family rivalries divided the Bhimjis during the course of the second Congo War. These internal problems degraded the family's trading capital, and virtually wiped it out between 2000-2002. Needless to say, new competitors moved quickly to fill the void left by the Bhimjis, taking over many of their major suppliers.

Eventually, the Bhimjis managed to recapitalise their business, but too much had changed and their gold business remained depressed. In the end, it was probably good luck that when UN sanctions monitoring commenced

in 2004 and 2005, Bhimji conducted minimal to no business at all. They evaded most attention and were never considered for UN sanctions. However, by 2005 and 2006, the company had come back from the dead and had started exporting to Emirates Gold and Al Ghurair Giga Gold Refinery in Dubai. On average, Bhimji exported between half to one metric ton of rawgold per year. One part of the family under Vinulate Bhimji also attempted to establish itself in Bukavu. But the initiative failed. Meanwhile, his brother Jayanti Bhimji suffered a fatal accident and died.

Nowadays, the family business has been renamed Midas All Minerals Ltd and is led by Sameer Bhimji, a young man who grew up in London with little exposure to the gold trade. In late 2012, a consignment of 15 kilogrammes of rawgold was stolen at Entebbe airport by employees of the airfreight handling service ENHAS. The stolen gold was never recovered. While Sameer Bhimji was struggling to overcome this financial loss, the gold price imploded in early 2013, further undermining the Bhimji's gold business.

Meanwhile, the UN Panel of Experts reports that Bhimji – as an individual and through his company Midas All Minerals – is buying and exporting gold from the DRC illegally.[58] Sameer Bhimji denies these allegations and also objects to the fact that he was not given an opportunity to respond to these claims by unidentified informants.

DRC-34996 1148



*Conflict Gold to Criminal Gold*

# Exhibit 35

## Tony Goetz & Zone[59]

According to the May 1995 issue of African Business, the deadly potential of central African gold dealing was well understood long before Congo's mineral-rich lands turned into an international battleground. The magazine reported that the shooting of Ernest Kabushemeye, the Burundian Minister of Mines, on 1st March 1995 was probably due to Hutu-Tutsi tensions but that he had almost certainly also fallen victim to the brutal competition between Burundi's gold dealers. They had become very important resellers of Congo's gold, as Zaire's Minister of Mines, Mutombo Bakafwa Nsenda, had alleged when he stated that Burundi was fraudulently exporting about 10 tons of gold annually.



Zaire, he said, officially exported barely two tons a year, while possessing much greater gold reserves. The politician's suspicions were confirmed by Tony Goetz, the Belgian managing director of Burundi's largest gold refining company, Affinage de Métaux, which is better known by its abbreviation Affimet. He told journalists that 80 percent of the gold he exported from Burundi to Antwerp originated in Zaire, with the remaining 19 percent coming from either Tanzania or Uganda. Only 1 percent was produced locally.

Competition in the central African gold trade had turned vicious when Alain Goetz[60] – the son of the founder of the Antwerp-based gold refinery Tony Goetz & Zone – made his first forays into Africa's gold trade in 1987. The problems escalated in February 1993 when the Burundian government offered 'free zone' status to foreign firms wishing to invest in the country. Affimet's rivals, IMAG and Ashons, had to pay US$60,000 each to the national treasury to obtain their gold trading licenses, 1.5 percent customs duties on the value of their gold exports, and another tax of 0.75 percent for laboratory analysis and chemical controls. These overheads did not burden Affimet because Goetz had taken advantage of the 'free zone' status to open a refinery in Bujumbura. He

also succeeded with an application for tax-exempt status, which was granted in early February 1993.

With Affimet taking advantage of the rules, Goetz gained a massive market share. By 1994, he was exporting 7 tons of gold, far exceeding his competitors' combined export of 2.6 tons. In early 1995, Affimet also announced its intention to create a 332 million Burundian franc jewelry plant, and an offshore bank, the African Bank of Commerce, with a capitalization of US$1.2m - proving how lucrative the Burundian trade in illegally-exported Congolese gold had become.

However, the Belgian did face frequent interventions from Burundian politicians, who were allied to his competitors and who, for example, withdrew Affimet's license and its free zone privileges. In what was rumored in Burundi as possible retribution by Affimet, two thugs attacked the manager of IMAG, Munir Bashir. Civil wars in Burundi and later the first Congo War also affected Goetz's gold business. The imposition of a comprehensive trade embargo turned some members of Burundian government hostile and they targeted Goetz with demands for bribes. When he did not comply, he was forced to move his buying

operation across the border to Goma in the DRC. There he got lucky.

By May 1997, Mobutu had been ousted and Laurent-Désiré Kabila had proclaimed himself the Congo's new president. Goetz's gold trade had flourished during the rebellion thanks to a deal he agreed with the ADFL's economic team. They granted him a license to trade gold and export it from their 'liberated' territory. To streamline his business, he had created regional buying offices, which were initially called Congo Comptoir but were later renamed Congocom. Each of these subsidiaries applied for, and received, their own gold export licenses from the ADFL. They were free to export gold through any border crossing they chose in exchange for payment of 1.5 percent of the export value of the gold to AFDL collection agents. Inevitably, after an initial few exports, the representatives of the other border services, such as Office de Control or OIFDA, pressed Congocom agents for 'tax payments' as well.

No other company is known to have been able to arrange the same gold export licenses during this period. Without competition, Goetz set up a Congocom branch in each newly 'liberated' Congolese gold trading town – with an exclusive contract for the agent he put in charge. Initially, he hired trusted suppliers from his Affimet operation in Bujumbura. His first employee was Kisoni Kambale from Butembo, who Goetz installed as the manager of Congocom Goma. Evariste Nshamamba from Bukavu, who was another of the original gold suppliers for Affimet, became Goetz's man in Congocom Bukavu. Other gold traders were set up with Congocom Bunia, Uvira and Isiro. Eventually, Goetz expanded to Kisangani, Mbuyi-Mai, Chikapa, Lubumbashi and Kinshasa.

To reduce the risks involved in transporting his gold purchases and



DRC-34996 1149
*Conflict Gold to Criminal Gold*

# Exhibit 35

agents, he also launched an air transport company, City Connexion Airlines, based in Bujumbura. By August 1998, he could safely provide scheduled air services for his gold and agents across his growing network, encompassing Beni, Bunia, Entebbe/Kampala, Goma, Kigali and Kigoma. Thanks to an air link to Kigali, he was also in a position to safely fly all the collected Congolese rawgold to Kigali and from there on a Sabena flight directly to Belgium. In Antwerp, he processed the rawgold in his family's refinery as long as the Affimet refinery in Bujumbura remained inoperable.

By mid-1998, when the second Congo War broke out, Goetz was still benefitting from his original licenses issued by ADFL. After all, the protagonists were largely the same as during the previous war, except that they were now operating as a new militia, the RCD. However, some of these combatants turned out to be far more 'independent' and less controllable. At one point, a gang of Tutsis and Banyamulengas ransacked the Congocom headquarters in Goma and stole 35 kg of rawgold. In another incident 80 kg was stolen in Bukavu, although Goetz was able to recover it.

Eventually, business became too dangerous in the Congo but after the Burundian government had paid Goetz compensation to settle his lawsuit at the International Tribunal for Settlement in Washington friendly relations blossomed again – and Affimet resumed its operations in Bujumbura. However, peace with the authorities in Bujumbura lasted barely two years. In 2000, some officials claimed that Goetz had not complied with his contractual obligations and they blocked Affimet's account at the Central Bank of Burundi. In response, Goetz initiated legal actions in Belgium and had the Burundian government's bank accounts

frozen. Now, Goetz's safety in Burundi could no longer be ensured and he was forced to return to Belgium. Before he left, he disbanded Affimet and sold the building and his trading operation to his employee, Mutoka Sefu Ruyangira.

Given his involvement in Congo's gold trade, Alain Goetz did periodically attract interest from UN investigators even after he had returned to Antwerp. Eventually, he opened another gold trading company in Dubai, Agor Ltd. Although he has consistently denied any involvement with Congolese gold traders, the suspicion persists that either directly or through his old surrogates, Goetz maintains links with Congo's gold traders. Several documented transactions or attempted transactions appear to show that Goetz does still have links – however sporadic – with Congolese gold dealers. The first notable case is the attempt by Bukavu-mineral trader, Zulfa Karim Panju, to sell 51.298 kilogrammes of rawgold to the Tony Goetz & Zonen Refinery in Antwerp. Upon Panju's arrival in Belgium on 18th November 2002, a Belgian magistrate prevented the sale and confiscated the gold.[61]

Another mystifying case involves the September 2009 statement by Goetz that he had purchased 3 kilogrammes of gold from Leonide Mupepele, Director General of CEEC in August 2008. According to a statement by Mupepele, Goetz had bought a second consignment, sent by courier, of an undisclosed quantity of gold.[62] However, the Mupepele affair was never fully explored. Only the Kinshasa newspapers commented in sarcastic terms about how the head of the country' regulatory watchdog for honest dealings in minerals could possibly have ended up with gold worth more than US$100,000. Goetz told SARW that Mupepele submitted samples to him that originated from the Bas-Congo area.

While this may very well be the case, the more important questions remain unanswered: who was the ultimate beneficiary of these transactions? And why did Goetz accept gold from a man that should have triggered very careful due diligence?

The January 2009 report by the UN raised another puzzling issue regarding Goetz's relationship with his former suppliers and employees. In 2009, Mutoka Sefu Ruyangira, Goetz's first employee at the Affimet refinery in Bujumbura, changed his gold trading company from Gold Link Burundi to Berkenrode BVBA. The change raised suspicions with UN investigators who knew that Goetz owned a company by the same name in Antwerp. The UN obtained a notarised document provided by Samra Sefu, the daughter of Mutoka, stating that Berkenrode BVBA's address was 56 Jacobs Jacobsstraat, Antwerp – a property immediately adjacent to Berkenrode, which was owned by Goetz.[63]

According to Goetz's version of these developments, his Belgian-registered company Berkenode originally owned the Affimet building in Bujumbura. In 2000, he sold that building to Mutoka. Unbeknown to him, Mutoka bought the building in the name of a Burundian company that he owned, named Berkenode BVBA. Goetz states that Mutoka did this without his approval or knowledge and for the simple reason of avoiding Burundian transfer taxes.

Extrapolating from published information, Goetz must have purchased rawgold through his Bujumbura- and Goma-based operations from 1987 until 2000/2001 and subsequently have accepted walk-in suppliers to his Antwerp refinery to this day. SARW estimates that the total gold intake during this period must significantly exceed 100 tons of rawgold.



# Exhibit 35



### Machanga Limited

Machanga Limited first came to public attention in a 2005 investigative report[64] by Human Rights Watch and a report by the UN Group of Experts on the DRC[65]. The reports alleged that some of the gold trading the company was engaged in between 2004-2005 was furthering the financial interests of illegal armed groups in the DRC and, as such, violated the financial aspects of the arms embargo that was imposed on the DRC with UN Resolution 1533 (2004). The company was put under targeted financial sanctions at the end of March 2007.[66] According to its general manager Rajendra Kumar Vaya (or Raju as he is commonly known), Machanga was closed as a business, but he and his family continue to operate other gold trading enterprises.

## IT IS UNLIKELY THAT THESE PREDICATE CONDITIONS CAN BE PROVEN

UN investigators regularly express their suspicions that individuals affiliated with Machanga continue to trade illegally in gold from the Congo.[67] The principal subject of these allegations is Raju, who is assumed to be the head and financial beneficiary of Machanga. The allegations require more detailed analysis given their potentially serious implications. For example, as recently as July 2013, Raju was denied entry into countries of the European Union. However, under the current sanctions regime, only Machanga is subject to restrictions – not Raju. Therefore, he is legally entitled to pursue any legal business activity he pleases, including trading in gold, as long as his activities do not contravene the UN resolutions against providing financial assistance to illegal armed groups operating in the DRC.

The same distinction must be considered in connection with allegations of new gold deals undertaken by Raju. These allegations must meet the obvious evidentiary threshold that any trade is benefitting illegal armed actors, as the UN Sanctions Committee on the DRC defines it. It is unlikely that these predicate conditions can be proven given that SARW's report 'From Conflict Gold to Criminal Gold' shows how virtually no important gold mining region is being – or has recently been – held by militias. However, if the transactions occurred after November 2010, possible disregard for due diligence guidelines set forth under paragraph 8 and 9 of resolutions 1952 (2010) could be brought to bear as well. The alleged transaction chain records must be documented with solid evidence.

SARW has attempted to shed more light on the true culpability of the principals involved with Machanga. So far the facts have eluded investigators because the extended family members behind Machanga and their other gold trading companies remain carefully disguised. But tensions between Raju and his family have compelled him to make broad allegations about the owners and investors of Machanga and related gold trading companies. However, when assessing Raju's statements and explanations, it is necessary to take into account his doubtful credibility and frequent contradictions.

According to his version of events, Raju established Machanga as an employee and with the financial support of a cast of characters from his extended family, all of whom are based in Kenya. He identified a number of individuals as his original investors and claimed that they were the actual owners of Machanga.



# Exhibit 35

The same individuals were also the subject of a series of newspaper articles that appeared in Nairobi in mid-2013. In these articles, questions were raised about the origin of substantial quantities of gold traded by Skyhawk International Ltd and Ushindi Exports.[66]

The articles identify Sunil K Vaya, Bhupendra Gordhandas, Vishal Rasiklal, Rameshkumar Vithaldas Gagada, Jitendra Chandulal and Arvindkumar Pattni as principals or shareholders of Ushindi Express, while Frank Ng'ang'a Gikonyo and Dhanek Vishal Rasiklal are identified in relation to Skyhawk International Limited. The article questioned how the two companies could have exported tons of rawgold when Kenya's indigenous gold industry only produced negligible quantities. According to Raju, the source of this gold was the supply network he had built in the Congo and that his relatives were now trying to take away from him.

Raju is a member of the successful Pattni family of jewelers and gold traders. Like the Bhimji and the Lodhia families, their competitors in Kampala, they are Soni and originally came from Gujarat in India. Once they had settled in Nairobi over 100 years ago, the family resumed its traditional craft of manufacturing jewelry for which they also bought and traded gold and precious stones. Even during pre-independence times, Congolese traders found their way to Nairobi to sell smuggled gold and they would sell to jewellers, including the Pattnis. Once the family recognised the potential profits involved in buying cheaper gold from Congo, they pursued this new source of gold with great determination.

Over the years, the build a network of suppliers and, according to Kenyan customs' records, members of the extended Pattni family went to the Congo themselves at times. In one

documented case, they smuggled over 32 kilogrammes of rawgold from eastern Congo. For this purpose, they would charter a small aircraft from Safari Air located near Nairobi, fly straight to Bunia, buy whatever quantities of gold their local suppliers could offer, and return to Nairobi with their bounty the same day.

However, while many of the Pattnis owned successful businesses, Raju's immediate family branch did not share the same fortunes. Ever since he turned 17, Raju traded gold as an employee of his affluent relatives, while searching for his own golden opportunity. According to him, it was some of his relatives – Nagin and Arvind Kumar Pattni (Arvindkumar Pattni) as well as Jitendra Jitu (Jitendra Chandulal) – who offered him the chance to build a gold buying agency in Tanzania. They paid for his bus ticket and provided him with a very modest amount of start-up capital. But Raju did not succeed.

So they tried again by sending him to Ethiopia, only for him to fail once again. Finally, in November 1999, he travelled to Kampala to prepare the registration in January 2000 of Machanga Limited. This time he succeeded because Nagin and Arvind Pattni backed Machanga Limited with a bank guaranteed US$100,000 for an account with Kampala Stanhope Finance. In exchange, they reserved 45 percent of Machanga's shares for themselves, invited a close friend who took another 45 percent, and left Raju with 10 percent.

Machanga's gold trade took off quickly, generating a growing capital base and profits, which the shareholders distributed along their equity of 45:45:10. The success was partly due to Bhimji's internal problems and lack of capital. Raju exploited these weaknesses and pursued Bhimji's Congolese suppliers by teaming up with local brokers. He hired men

by the name of Etaka and Ojuku Omwiti as well as others – all of whom were Ugandans with excellent connections to the hundreds of small Congolese gold dealers arriving daily in Kampala looking to sell small quantities of rawgold. Raju offered his intermediaries US$100-300 bonus payments for each Congolese gold supplier they brought to Machanga.

The system worked beyond Raju's expectations. Towards the end of his first business year, Raju had already reached, in his own words, an export capacity of 30 kg of rawgold per week. By 2002, Machanga had won most of the important suppliers of Bhimji, including Ozia Mazio from Aru, who supplied 15-16 kg each week from the gold rich areas in Aru and Mahagi Territory, which Commandant Jérôme Kakwavu, leader of the FAPC controlled at the time (for more on Ozia Mazio see below).

As Raju succeeded in syphoning off much of the gold from Congo's Orientale Province and North Kivu, he also sought to develop his buying capacity in Bujumbura, which Alain Goetz had abandoned two years earlier. He sent his brother Vitul to connect with local buyers and very quickly Machanga became the biggest buyer on the Bujumbura market. He never doubted that the majority of that gold was smuggled from South Kivu into Burundi. His business grew to be so considerable that it inspired false government reporting.

The US Geological Service, for example, stated in its annual survey of Burundi's mineral business that Machanga exported a total of 2,771 kg of gold in its first year of operation in 2003 but the following year it described Machanga Limited as the country's leading gold producer.[69] However, Machanga never produced a single ounce. It only bought gold and then exported it.



Exhibit 35

Their growing success emboldened them to set up a Machanga subsidiary in Burundi. They established a bank account with Interbank in Bujumbura and, using profits from their Kampala business, they deposited US$500,000 as capital for the new operation. The shareholding structure changed because Safiq Diwani, a local businessman, joined them with 20 percent of equity. Raju took 10 percent, Nagin and Arvind shared 35 percent and another 35 percent was reserved for the family. Machanga Bujumbura commenced operation on 8th February 2003 with his younger brother Vipul managing its affairs.

SARW attempted to verify Raju's statements about his equity partnership with Arvin and Nagin Pattni as well as with Jitendra Jitu. They declined to be interviewed. Arvin Pattni replied with a short phone message that categorically denied any equity position with Machanga or any of Raju's other companies. However, while SARW was attempting to communicate with these individuals, the Kenyan Criminal Investigations Department opened an inquiry following allegations by Member of Parliament Elias Bare Shill relating to questionable gold transactions by three gold trading companies, including Ushindi Exports and Skyhawk International Ltd. More importantly, local experts of Kampala's gold trading companies confirmed to SARW that Raju was indeed financed by his family.

Despite the competition between Machanga and Bhimji, Raju profited from an introduction by his rival to Metalor, a large international refinery based in Neuchâtel, Switzerland. The gold refinery was eager to accept regular rawgold shipments from central Africa. The relationship alerted another international gold trader, Jonathan Graff of Hussar Limited, who – attracted by Machanga's rapidly growing business – offered to buy all of its supply.

From 2002-2003, Raju sold Hussar 10-12 consignments of gold and shipped them, according to Graff's instructions, to Rand Refinery in South Africa. As Raju would later explain, he stopped dealing with Graff because he was never compensated for the equivalent of US$12,000 silver-content in his doré gold.[70]

Raju then resumed his exclusive deliveries to Metalor. But that too came to an abrupt halt with the 2005 reports by Human Rights Watch and the UN, and the threat of sanctions against any participant in the Congolese gold trading chain. Metalor suspended its relationship with Machanga.

Raju barely missed a beat. Less than two weeks after Metalor's suspension, Machanga had already shipped gold to Dubai-based Emirates Gold. Unfazed by the negative publicity, the company expanded its trade relentlessly. By early 2007, Raju estimated that he controlled virtually all of Bujumbura's gold supplies, 25-30 percent of Sudan's artisanal gold, and 1.2-1.3 tones of gold from Uganda, which is to say from Congo. He did indicate that he handled some Ugandan gold produced by the Ugandan Busitema Mining Company. However, once again, Raju's credibitiy does not hold up. Documents reviewed by SARW clearly show that Busitema produced very small quantities of gold at the time, and it exported them directly to Dubai's refineries.

Machanga sold close to 10 tones of rawgold to Emirates Gold from June 2005 until March 2007. At that point, the UN imposed sanctions on Machanga and UCI saw Emirates stop accepting gold from Central African suppliers – leaving Raju without a reliable buyer and refiner for his supplies. Allegedly, his relatives/investors blamed him for the problem and withdrew their support.

Raju told SARW that by 2007, before the UN sanctions were imposed, he had paid

several million dollars to his Kenyan relatives in order to buy out their equity investment in Machanga. Effectively, this would have made Raju the sole responsible equity holder in relation to any further business conducted by Machanga Limited – except that he claimed to have shut Machanga down since the UN sanctions prevented it from operating as a business.

In the meantime, UN investigators continued to speculate that Raju was still buying and exporting gold to Dubai by using cut-outs or front men – all of whom were still part his extended family. One was Jigar Kumar, a distant cousin of Raju, who was assumed to work at the Asia Exchange Centre in Dubai. Asia Exchange Centres operate throughout the seven Emirates, offering a broad range of retail financial services. It is unconfirmed whether they are licensed to buy and sell gold by the government. As is frequently the case with the authorities of the United Arab Emirates (UAE), they did not intervene or assist with information relating to the whereabouts or trading activities of Jigar Kumar. It is still unclear whether Kumar was also a client of Emirates Gold, as UN investigators suspect.[71] Raju has denied that Jigar Kumar ever traded gold on his behalf or worked at the Asia Exchange Centre and had described him as a small jeweler who does not have the capacity to engage in substantial gold transactions.

Other reports seem to indicate that Raju resumed trading gold through Mineral Impex Uganda.[72] UN experts claim that Raju replied to these allegations by claiming that the gold that was traded by this new company came from South Sudan. Nevertheless, the UN continues to suspect that Raju is a buyer of conflict gold, in particular from FRPI-controlled mines in Bavi via local traders and via the Etablissment Namukaya and Mutoka Ruyangira's Bujumbura trade.[73] Raju denies all these allegations.

## Exhibit 35

**As is frequently the case with the authorities of the United Arab Emirates (UAE), they did not intervene or assist with information relating to the whereabouts or trading activities of Jigar Kumar.**



### Farrel Trade and Investment Corporation

With Machanga's considerable success in monopolising most of the gold that came to the markets in Bujumbura, its financiers allegedly intended to establish a separate business operation in Burundi. According to Raju, the Machanga shareholders took US$500,000 from their Kampala profits to capitalise their new Burundi gold-buying agency. They deposited the funds into an Interbank account for their newly formed Farrel Trade and Investment Corporation. Raju claims that he took 10 percent of the equity in the new company, 35 percent was allocated to Nagin and Arvind, 35 percent was held by an undisclosed third party, and Safiq Diwani, a Bujumbura businessman, took 20 percent. The company was officially registered in late 2006 and commenced business with its first gold shipment to Dubai in January 2007.

**A few months later, its sister company Machanga Limited was placed under UN sanctions, making business for anyone affiliated with it very difficult. Farrel managed to conduct a few more shipments of doré gold to Emirates Gold in Dubai. However, 10 months into its operations, in October 2007, the investors decided to shut its doors.**



### Ushindi Exports and Skyhawk International Ltd

A UN report of 2008 stated that it had followed up a disclosure by Emirates Gold in Dubai that it had purchased gold from Kenyan-based Ushindi Exports.[74] Raju confirmed to the UN that Ushindi is a company owned by his Kenyan-based relatives. He also stated that he had 'split from his partners in Bujumbura'. The implication of Raju's statement was supposed to be that there was no link between his gold trade and Ushindi, despite the family connections.


*Conflict Gold to Criminal Gold*

# Exhibit 35

Following information published by the Registrar of Companies of Kenya, it appeared as though Franck Ng'ang'a Gikonyo and Dhanek Vishal Rasikhlala were acting as directors of Skyhawk International Limited and Arvind Pattni and Ramesh Kumar Vithaldas Gagada were the directors of Ushindi Exports Limited. However, Raju claimed that another of his affluent Nairobi relatives by the name of Jitu Jitendra was actually in charge of Ushindi Exports and Skyhawk International Ltd. To SARW, he described both companies as deliberate efforts by his relatives to exploit the network of gold suppliers he had built up with Machanga Limited. Allegedly, Jitu systematically solicited established suppliers and gold sellers from eastern Congo, South Sudan, Uganda and Ethiopia in order to try and build another formidable Central African artisanal rawgold network.

Beginning in June 2013, the actual extent of the gold trade conducted by these two companies has become the subject of considerable controversy in Kenya.

A Member of Parliament, Barre Shill, alleged that Skyhawk International Limited and Ushindi Exports were exporting 1,200kg of gold bars every month – far more than Kenyan gold production statistics show for the national output. Moreover, if this output were correct, Jitu's companies would have been exporting about 14–15 metric tons of rawgold, which exceeds the officially registered production from all of Central Africa.

The non-transparent gold trade of these two companies has created other intrigues. Shill's allegations triggered an investigation by Kenya's Criminal Investigations Department (CID), which wants to prosecute the Commissioner of Mines for facilitating trade in gold that is suspected of being part of a wider money-laundering and terrorism-financing ring. CID director Ndegwa Muhoro told parliament that the source of gold that Skyhawk International Limited and Ushindi Exports Limited have been exporting "remains a mystery." However, the recipients of the gold are not a mystery. The consignments were always destined for Dubai to other relatives of the family by the name of Sunil K Vaya and Bhupendra Gordhandas.



Nilesh Lodhia - Madat

Nilesh Lodhia worked for many years with his relatives who had founded Uganda Commercial Impex in Kampala. He was a trusted gold trader whose name appeared on receipts and cargo documents of UCI as frequently as the name of Kunal Lodhia, the son of the UCI founder, who had been operating the business. After the UN imposed sanctions on UCI at the end of March 2007, the Lodhia family registered UCI as a dormant company and soon afterwards the relationship with Nilesh unraveled. According to Kunal Lodhia, in 2007 he fired Nilesh, who left UCI but continued to trade gold. Kunal also alleged that Nilesh faced legal issues in Uganda and was eventually evicted from the country by the authorities.

Rumours and allegations about his activities were often confused with long-held suspicions that UCI of the Lodhia family continued trading in gold. UN investigators reported, for example,[79] that Nilesh Lodhia was in contact with Kahinda Muhiwa, a partner of the Butembo-based Glory Minerals. The UN's allegation was based on an analysis of phone records and therefore did not reveal what end these phone calls served. Eventually, it became evident that he was building his own gold trading network. Over the past two years, he has partnered with new gold traders, all originating from India, who had large sums of capital available.

Thanks to his assistance and brokerage services, Madadali Sultanali Pirani (locally known as Madat) and his company Silver Minerals have now evolved into the largest gold dealers in Kampala. Other major debutants into Kampala's gold market include Hiren Jogia and a man known only as Om. They have taken over most of UCI's suppliers within the Nande trading network. But Nilesh Lodhia, still affected by his Ugandan eviction, did sneak back into Kampala at times until he was thrown out again. Officially, he is now operating from a new, undisclosed base in India.

# Exhibit 35

## THE ROLE OF NEIGHBOURING COUNTRIES, REBEL GROUPS AND MILITIAS IN THE COMMERCIALISATION OF GOLD

### UGANDA – GOLD TRADE WAR?

The massive expansion of informal or rebel-controlled exports, and smuggling of Congo's gold was no coincidence. After Yoweri Museveni had gained power in Uganda, he looked for opportunities to modernise his country's economy. Among other measures, his advisors consulted widely with East Africa's gold trading companies, particularly traders of Indian origin who operated from Kenya and Tanzania. His Minster of Trade, Richard Kaijuka, proposed and implemented an extensive economic liberalisation programme. Among other steps, Uganda abolished taxes on the import and export of all forms of gold in 1993. At the time, Congo's convoluted taxation and fee structure imposed at least a 5 percent charge on assessed export value. Effectively, Uganda had created an immediate windfall of at least 5 percent for anybody willing to smuggle gold from the Congo into Uganda. A secondary and more beneficial effect was that gold traders were no longer obliged to disclose to Ugandan customs officials whether they imported gold. This helped to avoid extortion or outright theft by corrupt customs officials. These regulatory improvements had a rapid and positive effect on Uganda's economy.

Whether the Central Bank and other reporting agencies actually operated with reliable data or not is questioned by many who are knowledgeable about the gold trade. For example, the significant change in reported export values in recent years (2010 and 2011) from the Central Bank for the Ministry of Energy and Mines requires urgent verification. Nevertheless, the long-term trend speaks volumes, rising from no statistically relevant exports to substantial amounts.[76]

Beginning in 2000, annual exports, calculated on the basis of the corresponding gold price, range from 4-7 tons. Total export value for the entire 20-year period amounts to US$817 million. Based on Congolese border control receipts, it is certain that almost the entire trade involved gold that originated in the Congo and was smuggled into Uganda. The first prominent export spike with a value of over US$110 million occurred in 1996-1997 – the year when Uganda joined Rwanda and the AFDL in the first Congo War. Given that year's average gold price of US$350 per 99.999 percent refined troy ounce, Uganda must have reaped around 9 tons of gold from the Congo.

### Second Congo War 1998-2003

The power of coincidence has placed all major gold deposits close to the borders of Uganda and Rwanda. When these countries and their Congolese allies, the RCD and MLC, launched the second Congo War, the gold mines were among their first targets for occupation. Over time as increasing disagreements split Uganda and Rwanda, the partnerships changed, turning today's friend into an enemy and yesterday's enemy into an ally. The Congolese rebel movements also split repeatedly and switched sides to the highest bidder in order to ensure supplies and political backing. As the combatants turned on each other, the fight for control of gold mining areas became more lethal than the fight for the overthrow of the Kabila government – the original objective of the war.

One of the uglier chapters of the war came with the battle for Mongbwalu. Between 2002 and 2004, the UPC and FNI fought each other incessantly, killing at least 2000 civilians.[77]

| YEAR | GOLD IN US$ MILLIONS | YEAR | GOLD IN US$ MILLIONS |
|------|------|------|------|
| 1992 | 0.000 | 2002 | 56.668 |
| 1993 | 0.000 | 2003 | 48.180 |
| 1994 | 0.960 | 2004 | 58.490 |
| 1995 | 12.440 | 2005 | 73.025 |
| 1996 | 35.150 | 2006 | 122.578 |
| 1997 | 110.537 | 2007 | 58.246 |
| 1998 | 25.453 | 2008 | 51.041 |
| 1999 | 27.946 | 2009 | 2.063 |
| 2000 | 39.393 | 2010* | 32.607 |
| 2001 | 58.487 | 2011* | 4.543 |

**Table 6:** *Bank of Uganda / Uganda Customs Service gold statistics*
Source: Central Bank of Uganda; *2010 & 2011
Source: Uganda Energy and Mines

DRC-34996 1156

*Conflict Gold to Criminal Gold* 47

Exhibit 35

## Another element of the occupation strategy was raising taxes and the cost of permits for artisanal miners

Bunia, which was the next largest town in the region and just 75 kilometres to the south, fared little better. Between 1996 and 2005, control of Bunia changed repeatedly as the following table shows:

| TIME UNDER OCCUPATION | OCCUPANTS OF BUNIA |
|---|---|
| Until December 1996 | FAZ with Baramoto as commander hold Bunia |
| 25 December 1996 | AFDL takes control |
| August 1998 | RCD |
| October 1999 | RCD-ML / UPDF (while control over RCD-ML changed from Wamba dia Wamba to Mbusa Nyamwisi) |
| August 2002 | UPC / UPDF |
| August 2003 | UPC / Rwand |
| 2003 until January 2005 | UPC-L (led by Bosco Taganda) until integration into FARDC (at some times sections of the region were also held by FNI) |

***Table 7:** Occupations of Bunia*

Source: SARW research

### Gold exploitation by UPDF officers

Even President Yoweri Museveni's specially appointed Judicial Commission of Inquiry[78] singled out senior officers of the UPDF, including General James Kazini, General Salim Saleh and others, for abusive use of their official positions to further their personal business interests. However, the report, which is frequently referred to as the 'Porter Report', also denied the existence of a government policy or strategy to loot and pillage the Congo as other reports alleged.[79] If not outrightly stated, this intention is strongly insinuated in a number of reports by the UN Panel of Experts on the illegal exploitation of natural resources and other forms of wealth in the DRC.[80]

In a later stage of the conflict, the UN Panel also accused Uganda's military trained and equipped Congolese militias of destabilising the Congo's governance and economy. The implication again was that widespread looting and pillaging was official Ugandan policy. While the Porter Commission did not find evidence for such a scenario, the evidence is unambiguous that UPDF airplanes and other assets were regularly used to transport thousands of Ugandans, who followed the military into the Congo to trade, and to move goods and commodities to and from the Congo. Whether these transport services were – as President Museveni claimed to the Porter Commission – part of Ugandan humanitarian assistance to the Congo or were intended to serve the business interests of renegade military officers and their cronies is beside the point because they facilitated the plunder of DRC's resources.

The UPDF deployed in the richest gold mining regions of the Congo, including the areas around the Moto and Zani-Kodo mines and numerous smaller but still rich deposits in Irumu, Djugu, Mahagi, Aru and Faradje. The UPDF often partnered with Congolese militias to extort and beat miners, exact slave labour from whole communities, and violently intimidate OKIMO administrators. Far too often Congolese would be killed. A typical strategy used by the UPDF, the Rwandan Defence Forces and their Congolese militias to enforce labour details was by misappropriating 'Salongo'.[81] Another element of the occupation strategy was raising taxes and the cost of permits for artisanal miners or négociants (small traders). In exchange for fee ranging from US$5-20 for artisanal miners and US$50-100 for traders, they would issue 'formal' permits. Often, the rebel movements used their own stamps over existing permit forms that they had pillaged from the Congolese government's local agencies.

Further evidence for Uganda's support for some Congolese militias has been detailed by successive UN Expert Groups, various studies undertaken by advocacy groups[82] and investigations conducted by the International Criminal Court. The principal militia leaders that at one point or another acted in alliance with the UPDF include Jean Pierre Bemba, Thomas Lubanga, Bosco Ntaganda, Mbusa Nyamwisi, Germain Katanga, Mathieu Ngudjolo and Jérôme Kakwavu.



DRC-34996 1157

*Conflict Gold to Criminal Gold*

# Exhibit 35

## UGANDA AND THE MOUVEMENT POUR LA LIBÉRATION DU CONGO (MLC)

Unlike his father, Jeannot Bemba Saolona, Jean Pierre Bemba was not satisfied with merely being one of Congo's richest businessman and a periodical crony to mercurial Congolese presidents. Bemba wanted to be president himself, regardless of whether his past as a businessman/playboy frolicking mostly in Belgium and Portugal had prepared him well for his new role as a rebel leader. However, he correctly understood that the Congolese viewed the RCD leaders operating in North and South Kivu as Rwandan puppets, while many also believed that Kabila was a pawn of Rwandan interests. And so did President Yoweri Museveni of Uganda when he militarily and strategically backed Bemba's MLC. With heavy support from the UPDF, Bemba's MLC occupied northeastern Congo, which included control of OKIMO's mines in Watsa and Zani Kodo.

Initially, Ugandan officers looted rawgold that had been stored in depots for eventual export. Gold mining operations in Durba and Gorumbwa were also a key target of the first attack. UPDF officers took charge of on-going production by replacing OKIMO staff and forcing local miners to dig for gold. Untrained and impatient, Ugandan officers blasted through existing shafts and tunnels, causing casualties and eventually destroying well-engineered mining facilities. As their brute-force methods resulted in less success than they had hoped for, some Ugandan officers cooperated with rebel RCD and RCD-ML commanders and later, when the politics of the war changed, with commanders of the UPC.

## UGANDA AND THE UNION DES PATRIOTES CONGOLAIS (UPC) / FORCES PATRIOTIQUES POUR LA LIBÉRATION DU CONGO (FPLC)

Thomas Lubanga Dyilo had created the Union des Patriotes Congolais with members of his Gegere-Hema tribe, who found themselves in disagreement with spin-off groups from the RCD – their erstwhile alliance. UPC's military arm was the FPLC, which was led by Bosco Ntaganda. Military assistance from the Ugandan government turned the FPLC into a dominant force when Jean Pierre Bemba's Mouvement pour la Libération du Congo became a political party and a participant in the peace process. In August 2002, the FPLC/UPC conquered Bunia and held the gold mining town until 2003. During this period, UPC agents took control of all governmental offices and, as an occupation force, extorted taxes and licenses fees from comptoirs, négociants and artisanal miners. Gold produced during this time was bought from Ugandan-- and UK-based traders, who refined it in South-Africa or Switzerland and sold it on world markets.

As an ally of the UPDF, the UPC acted as a quasi government, requisitioning OKIMO's properties and equipment, and coercing its management in Bunia and elsewhere into assisting with the pillaging of gold. For example, the equipment for OKIMO's hydropower plant in Bunia was disassembled and taken to Uganda. This not only left the town without electricity but also disabled any electricity-powered gold mining equipment. The UPC also appointed chief administrators for mining and trade. Using this 'official' bureaucracy, UPC agents collected fees and taxes from everybody in the occupied territories, in particular artisanal gold miners and traders, who were operating within OKIMO's permit zones.

Eventually, the UPC split into several factions. While Lubanga's group (UPC-L) remained militarily the strongest, the Parti pour l'Unité et la Sauvegarde de l'Intégrité du Congo (PUSIC) benefitted from controlling the area west of Lake Albert, where traditional Congolese-Ugandan border networks facilitated the gold trade.

## UGANDA - FORCES ARMÉES DU PEOPLE CONGOLAIS (FAPC)

While Rwanda and Uganda had their individual models for exploiting the Congo, it never precluded the Congolese rebels from pillaging gold production as well. A particularly extreme example was Commandant Jérôme Kakwavu, who initially entered the war as a leader of the UPC. However, he did not want to be embroiled in the increasingly brutal battle between the UPC and the Front des Nationalistes et Intégrationnistes (FNI). He decided to become independent and launch the FAPC, by integrating various disgruntled fighters without any ethnic or regional allegiances or political ambitions. Indeed, Commandant Jérôme's FAPC never tried to be anything more than a marauding force, using extreme brutality to extort artisanal miners. Human Rights Watch reported a number of particularly violent acts that FAPC combatants committed to intimidate mining communities.[83]

## RWANDA'S CONGO DESK

While Uganda's invasion of Congo's gold fields is memorialised in its gold trading statistics, Rwanda's disclosure of the scale of its gold trade was dreadful then and still is today. Complete official statistics on gold production, imports and exports have never been publicly released. In the past, senior government officials justified this omission by claiming that there was no gold trade either in or through Rwanda. Only in recent years, as a result of its treaty obligations with the International Conference on the Great Lakes Region (ICGLR), did Rwanda begin to publish export figures, reporting a very modest 190 kg of gold in 1998 and 200 kg in 1999. Over the next 8 years, Rwanda claims not to have exported any gold at all, while exports between 2008 and 2010 were officially between 3kg-40kg.



Exhibit 35

However, given its history of invading the Congo twice in less than ten years, concealing proper annual mineral trade statistics, and publishing only fragmentary or incoherent information, Rwanda's official declaration should not be trusted. Indeed, at the time, the government announced that the costs for invading and occupying the Congo would be paid for with revenues raised in the Congo. Rwanda should disclose the precise nature of the activities of its 'Congo Desk', which was set up within the external military intelligence branch of the Rwandan Patriotic Army (RPA) and served as the economic planning and implementation centre for the occupation.

How the Congo Desk supported the RPA's revenue raising mandate has never been established with sufficient detail. Over time, researchers have pieced together various fragments of information to create a theory that is now widely accepted as the most realistic scenario. According to this model, senior RPA intelligence officers were in charge of the desk as well as acting as officers of companies created for the purpose of benefitting from Congo's agricultural and natural resources. The most reliable reference is from a UN Panel of Experts report⁴⁴ that cites "faxes sent from the offices of RPA Major Dan Munyuza on behalf of Maniema Mining Company" in connection with coltan dealings, which also involved RPA Chief of Staff, General James Kaberebe. The same report references Munyuza again as the 'Principal officer' of Great Lakes General Trade, with an address in Kigali, without providing insights about the nature of the company.

However, various eyewitnesses and experts have reported how RPA soldiers and officers ensured that anybody wanting to engage in business involving agricultural products, diamonds or coltan operated with Rwandan-issued licenses, and also paid taxes and any other applicable fees, including customs duties. In addition to these administrative functions, the RPA also collected gold and other natural resources for its own accounts. A twice-weekly air link from Bunia to Kigali was established to transport all the requisitioned gold and other loot.

But there were some diverging guidelines, which were highlighted, for example, in the report of the joint Uganda-Rwanda probe committee that was established by Ugandan President Yoweri Museveni following a violent confrontation between military units of the two allies in late 1998. Among the various points discussed was a question posed by RCD leader, Ernest Wamba dia Wamba, about how to promote economic development in the Congo. Among the responses the presiding Rwandan Minister, Patrick Mazimhaka, and Uganda's Minister for Regional Cooperation, Amama Mbabazi, stipulated without any ambiguity that: "The management of economic activities is a responsibility of the Congolese in order to support the liberation struggle and no member of either the UPDF or RPA was to engage in any business."

## FORCES DÉMOCRATIQUES DE LIBÉRATION DU RWANDA (FDLR) - Congrès National pour la Défense du Peuple (CNDP)

The massive carnage of the second Congo war continued until 2003 and, in some areas, even longer. At the same time the gold trade flourished. How else could local populations survive? The traditional livelihoods of farming and livestock-raising were a magnet for hungry militias looking to loot well-stocked villages. Combatants would carry off whatever food they could find.

For artisanal gold miners on the other hand, working in the shadow of militias was a fact of life established long before even the first Congo War. And this did not change when Laurent-Désiré Kabila was assassinated in January 2001, or when his son Joseph emerged as the compromise candidate to lead the transitional government, or when the Global and All-Inclusive Agreement was signed in 2002, paving the way towards national elections in 2006. The transitional government included most major warring parties within a new national military force, the Forces Armées de la République Démocratique du Congo (FARDC). A World Bank-sponsored draft of a new Mining Law also came into force after Joseph Kabila signed it in mid-2002. However, all these changes made little initial difference to the lives – or safety – of artisanal gold miners or to the smuggling of gold.

But when Uganda and Rwanda withdrew from Ituri, the leaders of the Ituri militias were either arrested by the International Criminal Court or put under house arrest in Kinshasa. And after the Ituri Peace Commission succeeded in calming down the situation, most gold mining areas in Orientale Province and the Grand Nord of North Kivu entered 2004 in a period of relative peace. Gradually, the industrialisation of the mining region began, although gold smuggling into Uganda and Burundi continued.

In South Kivu, the situation was more complex. The creation of the Forces Démocratiques de Libération du Rwanda - Forces Combattantes Abacunguzi (FDLR-FOCA) in 2003 by remnants of the Interahamwe and other Hutu opponents of the Rwandan government represented a new powder keg. Its political leaders, Ignace Murwanashyaka and Callixte Mbarushimana, are now facing prosecution in Europe, while Major-General Sylvestre Mudacumura is still believed to lead the rebels from secret positions within the Congo. The FDLR leadership has always maintained a public posture that trading illegal minerals is a violation of the organisation's charter. However, SARW research has confirmed that FDLR bands frequently threaten small, isolated gold mining areas – for example in Kalehe or around eastern Maniema.

Exhibit 35

UNTIL HE SURRENDERED TO THE AMERICAN EMBASSY IN MARCH 2013, **HE MANAGED TO CONTROL SUBSTANTIAL GOLD TRADING NETWORKS,** INCLUDING A SCHEME TO DEFRAUD FOREIGN BUYERS WITH FAKE GOLD.

Meanwhile, in late 2006, Laurent Nkunda created the CNDP with several thousand ex-FARDC troops, mostly Tutss, and took up positions in Masisi. Soon, a violent three-way confrontation between CNDP, FARDC and FDLR ensued, which only ended in 2009 after Nkunda was detained by Rwandan troops and Bosco Ntaganda agreed to a ceasefire on behalf of the CNDP. However, the ICC had a warrant out for Ntaganda based on atrocities committed during the Ituri war. Until he surrendered to the American Embassy in March 2013, he managed to control substantial gold trading networks, including a scheme to defraud foreign buyers with fake gold.

### FORCES ARMÉES DE LA RÉPUBLIQUE DÉMOCRATIQUE DU CONGO (FARDC)

Congo's long history of abuses in relation to its gold industry came full circle during the past few years. As was the case at the start of the colonial era, the military and security forces that were supposed to protect citizens and gold miners became their most dangerous threat. With peace spreading – although it was occasionally interrupted by violence involving remnants of the FLDR, Maï-Maï groups and the M23 rebels – the most constant threat in gold mining regions were the regular military forces, the FARDC, as well as intelligence and security services, such as the Agence Nationale de Renseignements (ANR) and Direction Générale de Migration (DGM).

By far the most rapacious leader – until his suspension in 2012 – was Major General Gabriel Amisi Kumba,

also known as Tango Four. During his long career, from an officer in Mobutu's army to Joseph Kabila's army Chief of Staff, Amisi always secured positions of power over mining regions. Having switched sides to join the rebel AFDL in 1996, he then sided with the RCD during the second Congo War where he served in senior logistics, intelligence and field command positions. Once he was integrated into the FARDC, he was appointed commander of the 8th Military Region in North Kivu, giving him the power to decide whether or not to intervene militarily against anybody who illegally exploited minerals. Amisi is most notorious for remaining inactive for a number of years while the unintegrated 85th Brigade under Colonel Samy Matumo ruthlessly exploited the Congo's richest cassiterite mining region in Walikale Territory. In 2010, the BBC aired a documentary that accused Amisi of having helped Geminaco to gain control over the Omate gold mine in Walikale – with the BBC claiming to have evidence that the general received 25 percent of its monthly production in return.

When Amisi finally reassigned Colonel Samy, he put him in charge of the 112th FARDC Regiment in the Fizi district, where significant artisanal gold mining exists. Casa Mining Limited has acquired six gold research permits for the region in between Fizi and Misis – as part of a joint venture with Chinese mining giant, MMG Limited, which had acquired the previous venture partner Anvil Mining.

DRC-34996 1160





Exhibit 35



DRC-34996 1161
Conflict Gold to Criminal Gold



# Exhibit 35

## KEY REGIONAL AND INTERNATIONAL PLAYERS IN THE COMMERCIALISATION OF GOLD

Part of the tapestry that tells the story of the commercialisation of Congo's gold includes many more actors who have played at one time – or are still playing – a key role. The actions of the individuals and companies described in this section should, perhaps, be looked at through the mitigating lens of the extraordinary evolution in legal and ethical standards witnessed over the past 20 years.

## GOLD REFINING COMPANIES

Johnson Matthey

Johnson Matthey has been in existence for close to 200 years and has grown into one of the world's most ubiquitous and prolific gold refining companies. Very early on it its history, it was named the Bank of England's official gold assayer and refiner. A subsidiary of Johnson Matthey was one of the five members of the 'London Gold Fixing' system, through which the price of gold was determined on a twice daily basis. Johnson Matthey's representative was forced to resign years ago following a financial scandal.

Because of its tightly intertwined business with the British Empire, Johnson Matthey was the refinery of choice for many gold traders from colonised countries. Indian traders traditionally refined their doré gold bullion that was smuggled from the Congo with Johnson Matthey. Meanwhile, as merchants from Ituri and Haut Uélé travelled hundreds of miles eastwards towards the trading hubs of British Colonial Uganda and Kenya, their rawgold nuggets were inevitably fed into the network of Johnson Matthey's buying agents. The Bhimji family was only following historical precedents when – as the first official gold buying agency of Kampala in the 1960s – it established a regular business relationship with the British firm.

However, scandal struck in the midst of a formidable growth spurt in the Central African gold smuggling business. Back in London it turned out that Johnson Matthey's buying operation was embroiled in a tax-evasion scheme. The effects of that scandal were exacerbated by the decision of Ugandan dictator

Exhibit 35

Idi Amin to expropriate businesses belonging to Indian families and evict their owners as well as nationalise all British-owned companies – all of which severely hampered Johnson Matthey's gold supply from Central Africa. Congolese artisanal gold had to travel by far more circuitous routes via traders in Kenya, Rwanda or Tanzania and onwards to Europe.

In 1992, Uganda's new leader President Yoweri Museveni liberalised gold trading and customs regulations. It reopened Uganda for the gold trade, and lured back Bhimji and a succession of competitors. However, many of these traders had already established relationships with other international gold refining companies by then. Indeed, only in the late 1990s did Zulfa Karim Panju from Bukavu start to ship weekly consignments of as much as 100 kg to the Johnson Matthey refinery in Hertfordshire to the north of London.

Metalor

Metalor, a global refining company with its headquarters in Neuchâtel Switzerland, has a similarly long history as a gold refiner. Martin de Pury established the 'Preliminary Rolling Factory' in the heart of the Swiss watch-manufacturing region in 1853. Eventually, the company was taken over by a leading Swiss Bank and operated as Métaux Précieux SA Metalor. During the restructuring of the Swiss banking industry in 1998, Metalor was sold. The company is now privately held with the board of directors represented by Astorg Partners, France's oldest private equity firm, and the Swiss investment fund Bellevue Group.

After Uganda liberalised its gold trade in the early 1990s, new Indian gold traders moved into the business. They chose Metalor as their refiner for competitive reasons and because of Johnson Matthey's tax evasion problems. The weekly consignments arriving in Neuchâtel grew rapidly after the first Congo War broke out in 1996 when Uganda's military and Alain Goetz controlled most of Congo's gold supply. When Goetz lost control over his Bujumbura-based gold buying network in 2000, Metalor once again was the beneficiary. Now, all doré gold from Uélé and Ituri districts as well as from the Nande trading networks and even from South Kivu ended up with the refinery in Neuchâtel.

For a few years, the Kampala based companies AP Bhimji..., Uganda Commercial Impex and Machanga Limited were the main suppliers to Metalor along with newcomers operating from Burundi and Rwanda. Only in May 2005, after Human Rights Watch and the UN Group of Experts reported the linkages between conflict gold, the Kampala gold traders and Swiss refineries did Metalor stop accepting deliveries.

Rand Refinery

As Africa's oldest and most prestigious gold refinery - and, indeed, the world's largest single-site gold refinery - it is only natural that most African gold producers and traders would gravitate towards Rand Refinery, based on the outskirts of Johannesburg. Yet Rand Refinery refined very little Congolese gold even going back to the times of Mobutu. The two most significant buyers and exporters of Congolese gold during the 1980s and 1990s had other refining solutions. Bhimji shipped its supplies to Europe, while Alain Goetz built and operated his own refinery in Bujumbura, and as a fallback option could use his family-owned processing plant in Antwerp. The Rand Refinery_ only received Congolese rawgold through Jonathan Graff, once he had secured regular supply via UCI.

Soon after Graff had established his trading company, Hussar Limited, in July 1997, and his gold buying programme with UCI - and very intermittently with Bhimji and Machanga - had begun, the shipping instructions were always for the doré gold to go to Rand Refinery. It lasted for almost seven years with a weekly average of between 70-150 kg of rawgold arriving at the Rand Refinery. Only in 2004 when South Africa's adjusted its laws and due diligence regulations to align with the evolving international standards of anti-money laundering, anti-terrorism financing and other financial crime-fighting measures did the arrangement came to an end. Customer due diligence for so called designated non-financial businesses and professions (DNFBPs) had to match the FATF-40 recommendations.

The new legal requirements for financial intermediaries forced Rand Refinery in 2004 to demand from its 'dealers in precious metals' that they answer a 6-page questionnaire as mandated by the government of South Africa. The much more vigorous 'Know-Thy-Customer' procedures required the disclosure of the origin and ownership of all gold consignments.

Hussar declined to provide all the answers and Graff started to look elsewhere for a gold refinery. All shipments of potentially problematic gold from the DRC to Rand Refinery stopped in early 2004. The separation came at a fortuitous moment in time for Rand Refinery. Only a few months later, UN investigators received a mandate to explore how trading in the Congo's natural resources might enrich illegal armed groups and militias. But de facto, Rand Refinery was no longer part of the questionable supply chain.

# Exhibit 35

Argor Heraeus

Of all the international gold refineries, Argor Heraeus had the most limited involvement with doré gold from the Congo or Central Africa. However, since it accepted deliveries from Jonathan Graff's Hussar Limited a few months before UN sanctions monitors began to track the flow of Congo's conflict gold, Argor placed itself at the centre of international attention and suffered the greatest reputational damage.

Switzerland's share of global gold refining is around 70 percent. Argor is not Switzerland's largest gold refining company and Hussar's supply from the Congo contributed less than 1 percent of Argor's annual revenues. Hussar was only accepted because Graff had previously been a client and was known to Argor's management. Nevertheless, too much time had lapsed to allow Argor to resume business without a new background check. Somehow, Hussar passed Argor Heraeus's due diligence and instructed UCI to divert their regular South African shipments to Switzerland.

Whether Argor Heraeus did not ask not enough questions or whether Hussar's declarations were incomplete was never disclosed. It is certain that the Swiss refinery knew throughout the 15-month period during which it accepted Hussar's doré gold that UCI was the intermediary and seller of the gold. It was also an agreed condition that Hussar would release 90 percent of the payment immediately upon receipt of faxed or emailed proof of shipment. The proof consisted not only of the actual shipping manifest, but also of pro-forma invoices with a detailed list of each lot, including a code for each supplier. The documented doré gold shipments between April 2004 and May 2005 arriving at Argor from UCI amounted to approximately 3,292 kg.

UN sanctions monitors had fully outlined the supply chain from Kisoni Kambale, including his arrangements with FNI militia leaders, via UCI and onwards to Hussar, which sold the refined gold via the London Bullion Market. Argor's appeared in the spotlight because it refined Hussar's rawgold. As this was the first concrete case where the UN could document an entire supply chain that contravened the financial aspects of the arms embargo against the Congo it received a lot of public attention.

At the heart of the ensuing discussion was whether gold trading companies and their refiners should be expected to inquire about the true origin of rawgold. In this particular case the issue was whether Hussar's allegation that it did not know about UCI's sourcing network in the Congo was credible. The

**UN sanctions monitors had fully outlined the supply chain from Kisoni Kambale, including his arrangements with FNI militia leaders, via UCI and onwards to Hussar, which sold the refined gold via the London Bullion Market.**

logical extension of the question was whether Argor Heraeus could - or should - have known the origin of Hussar's rawgold.

The refinery's claim of innocence may have been credible because no document available to Argor stated in plain English that Hussar's gold originated in Congo. On the other hand, well-versed international gold experts could not possibly assume that Hussar's supply of over 3 tons of gold during a 15-month period had legally originated from Uganda. Even widely accessible industry resources, such as the country reports issued by the United States Geological Survey, reported a total gold output from Uganda in 2004 and 2005 that did not exceed 1.5 tons of gold - half of what Hussar delivered to Argor Heraeus... The lack of curiosity by Hussar and Argor was matched only by the shrillness of their subsequent claims of innocence.

As the section under Graff will show, he could have stopped the trade at the end of 2004 when UN investigators approached him and registered their concerns about his gold trade for the first time. He could and should have informed Argor about these troubling circumstances.

DRC-34996 1164

## Exhibit 35

UNITED ARAB EMIRATES,
AN INTERNATIONAL
HUB WITH HISTORIC TIES TO CONGO

Dubai's role in the commercialisation of Congo's gold is very similar to Belgium's. It has deep historic ties and many commercial aspects are still shrouded in mystery. For this reason, there is a special section discussing Dubai's political-economical environment. Along with other trading hubs of the Omani Empire, Dubai's importance as a destination for Congolese rawgold has a long and varied history. Already in the 1960s, when gold smuggling and commerce with the trading hubs of East Africa and the Gulf states brought Congolese and Indian trading clans together, the Persian Gulf was their meeting place. Congolese rawgold was accepted as currency to pay for consumer goods and foodstuffs that African merchants wanted to import to eastern Congo. When the union of the seven Emirates was sealed in the early 1970s to create today's UAE, Dubai was already legendary for its freewheeling governmental supervision over trade and finance.

Its gold souk is located in Deira, one of the two historic districts of the rapidly growing city. The Souk came into existence in the 1940s. It has grown phenomenally and now hosts over 300 gold traders and jewellers, most of them sufficiently capitalized to buy whatever quantities of gold a Congolese walk-in supplier may offer. The gold market's success is based on Dubai's historic policies that enforce very few restraints on trade and financial transactions, a high degree of security, and the complete exemption of any taxes or fees. Gold dealers from India, Iran and the Far East – all attempting to escape their home countries' steep taxation and burdensome regulations – prefer to trade through Dubai's Souk rather than through their home countries.

For example, it is substantially more profitable for Indian traders to smuggle huge quantities of old jewelry to Dubai where they reprocess and refine it into gold bars and new jewelry for resale in India rather than to process the gold at home. The first indication that conflict gold from the Congo might also be sold to the UAE emerged in late 2004 during interviews with Rajendra Kumar Vaya of Machanga. At the time, he mentioned that he would obtain from his Dubai-based buyers pre-financing for his gold purchases in the Congo. Almost a year later, the UN began to investigate UAE-based gold refineries. Initially, the effort was focused on an assessment of industry standards for due diligence on the sources and supply chains of rawgold originating from Central Africa. As part of this effort refiners in a number of states were interviewed. In Dubai, the refineries Emirates Gold and Al Ghurair Giga Gold as well as the government's supervisory agency, the Dubai Multi Commodity Centre (DMCC), were the primary interlocutors.

The discussions focused specifically on due diligence procedures that would be applied to gold consignments originating from Central African countries. The visits also served to convey the potential risks associated with such trade. The DMCC's representatives assured the UN that it was working with its members to ensure that proper checks were always carried out prior to business being transacted, particularly with countries where militant groups operated or money-laundering practices were known to prevail. In other words, DMCC indicated that Dubai's compliance standards imposed adequate vigilance on its gold refiners against supply chains that might benefit illegal armed groups.

Periodically, the DMCC publicly released various gold import data sets per country of origin, including for the all four quarters of 2004 and the first quarter of 2005 (see table 8).

| COUNTRY | Q1 OF 2004 | Q2 OF 2004 | Q3 OF 2004 | Q4 OF 2004 | Q4 OF 2004 | Q1 OF YEAR 2005 |
|---------|-----------|-----------|-----------|-----------|-----------|-----------------|
| Burundi | 0 | 0 | 0 | 0 | 0 | 1.90 |
| DR Congo | 80.72 | 0 | 38.00 | 2.00 | 138.72 | 2.10 |
| Kenya | 215.93 | 143.33 | 384.04 | 227.20 | 970.50 | 217.19 |
| Rwanda | 0 | 0 | 0 | 0 | 0 | 0 |
| Rwanda | 371.96 | 432.89 | 407.60 | 408.47 | 1 620.92 | 393.10 |

***Table 8:*** *Country of Central African origins for Dubai's gold refineries*
Source: DMCC



DRC-34996 1165
*Conflict Gold to Criminal Gold*

## Exhibit 35

> **Gold dealers from India, Iran and the Far East – all attempting to escape their home countries' steep taxation and burdensome regulations – prefer to trade through Dubai's Souk rather than through their home countries.**

Contemporaneous records from the DMCC demonstrate how the gold refining industry of Dubai was taking off during 2004/2005. The officially DMCC-recognised refineries - Al Gaith Gold, Al Ghurair Giga Gold, Ary Aurum Plus and Emirates Gold - commenced operations in new facilities in the vicinity of the emerging Dubai International Financial Centre. Emirates Gold had operated since the early 1990s but it now moved to a new state-of-the-art refinery within Dubai's financial district.

Even before the newly built refineries started operation in 2004, Dubai's gold trade was already flourishing.

| YEAR | QUANTITY IN KILOGRAM | | YEAR | QUANTITY IN KILOGRAM | |
|------|--------|--------|------|--------|--------|
| | Import | Export | | Import | Export |
| 2001 | 409 528 | 72319 | 2003 | 373 771 | 121 715 |
| 2002 | 375 638 | 63710 | 2004 | 503 463 | 260 909 |

***Table 9:*** *Dubai's growing gold refining industry*
Source: DMCC

These numbers are evidence of the traditionally strong business and refining capability of the jewellers operating out of Dubai's gold souk. At the time, most were operating with little or no government supervision. Indeed, they benefitted - and continue to benefit to this day - from the lack of import restrictions or customs duties on gold. This distinct advantage over most regional competitors has led to tensions, including with the world's largest gold markets, such as India.

DRC-34996 1166

### Emirates Gold (UAE)

During the UN visit to Emirates Gold at the end of June 2005, managing director Mohamed Shakarchi was told about the nature of the UN sanctions and the financial aspects related to the trade in gold from Congo's militia-controlled zones. To further elaborate the point the UN representative highlighted the contents of UN report S/2005/30, which named the three Kampala-based trading firms UCI, Machanga and A.P. Bhimji Ltd and described the evidence that their gold trade involved sellers from the war zones of eastern Congo. The report also disclosed how their gold dealings provided financing to armed groups and their leaders, which was probably a contravention of the UN sanctions on the DRC. Shakarchi declared repeatedly and unequivocally that he would never accept gold from supply chains connected with war zones. He also stated that due to the nature of the gold trade, clients are accepted after they file detailed information about themselves and their business, as well as recommendations by trusted industry contacts. He made it clear that he would not do business with an unknown supplier.

But in early 2007, almost two years after the initial UN interview with the principal of Emirates Gold, the true extent of the refinery's Congolese gold links were revealed... It turned out that Emirates Gold had started to accept gold from Machanga Limited, UCI and Bhimji on 15 June 2005 – around the same time as officials of Emirates Gold and the DMCC had assured the UN that "proper checks were always carried out with sellers of raw gold, particularly if such materials might originate from countries in which armed groups operate".

Exhibit 35

Eventually, Emirates Gold disclosed that from 15 June 2005 until it stopped buying due to UN sanctions, the refinery had bought a total of 327,113 ounces of artisanal gold from Machanga Ltd (Kampala and Bujumbura). Assuming that the scrap gold's purity was around 80-85 percent, this represents an approximate market value of US$150-180 million. Subsequently, the UN reported how Emirates Gold also accepted gold from Farrel Trade and Investment Corporation, which was based in Bujumbura and linked to Machanga's principals.

One year later, the UN in its report S/2008/773 alleged that Emirates Gold did at least one more gold transaction with Machanga in October 2007. There is also an open question regarding an Emirates Gold accounting for UCI, which according to the UN shows an ongoing trading relationship a month after Shakarchi had blocked the company's accounts. UCI claimed that these transactions did not reflect new gold deliveries, but referred to the refining of old stock still held by Emirates.

Another unresolved issue is whether Jigar Kumar, who was nominally working for Asia Exchange Centre in Dubai, was actually acting as a front for Machanga, and possibly others trading illegal gold from the Congo. According to UN report S/2009/603, the name Kumar was listed on Emirates Gold clients list for the year 2008.

Some gold traders had confirmed to the UN that he is in fact a relative of Rajendra Kumar Vaya of Machanga, a fact which Raju eventually confirmed to SARW. However, Raju also stated that Kumar is a distant relative with very modest means and that he would not have had the financial capacity to participate in gold transactions. The Dubai authorities of Dubai have never responded to this allegation and Shakarchi of Emirates Gold provided the dubious explanation that the entry in his company's register was a mistake.

### Al Ghaith Gold (UAE)

Al Ghaith Gold Refinery never fully realised the ambitious plans it announced in 2004. The UN did contact the management of the company in June 2005. However, Al Ghaith stated that it was not yet operational and that it accepted only modest quantities of gold for refining from the local market.

### ARY Aurum Plus (UAE)

A similar story involves Ary Aurum. In 2004, the gold refining and trading group had announced plans to build a high-volume refinery. However, a year later, when the UN contacted the manager of the operation, the refinery was still not fully operational and did not acquire gold from African clients.

### Kaloti Jewellery (UAE)

According to UN report S2008/773, Mutoka informed the UN that he sold gold to Kaloti Jewellery, located in Dubai after he had previously sold directly to Emirates Gold. Later he retracted part of this statement regarding his transactions with Emirates. The UN report S/2009/603 states that in 2008 Kaloti Jewellery refused to accept gold from Mutoka.

Kaloti Jewellery confirmed their decision to reject any offer of gold from East or Central Africa in 2011 (S/2011/738). The same report further outlined the procedures under which Kaloti accepts gold. It requires a supplier to produce all relevant documents, including the airway bill, commercial invoice and certificate of origin prior to the arrival of any shipment. Kaloti further explained that it required the consignments to be sealed and locked by customs officials at Dubai airport to allow time for the verification of documents. Only then could the consignment be transferred to the refinery.

Kaloti Jewellery is part of the Kaloti Group, which offers services along the entire gold supply and trading chain. As part of its broad footprint in precious minerals, Kaloti is a member of leading commodity exchanges, including New York's NYMEX and COMEX, and Chicago's CBOT, and is an associate member of the London Bullion Market Association.

### Al Wathba Jewellers (UAE

One UAE-based buyer was allegedly Al Wathba Jewellers at 9 Block 5, Souk al-Markazi, King Faisal Road, Sharjah.

### Saakshi Jewellers (UAE)

This outfit is alleged to be a Dubai-based buyer of gold according to CEEC documentation by gold exporters from the DRC. The company could not be located nor any evidence uncovered about its actual existence and operations.

### Hazel Trading (UAE)

This outfit is alleged to be a Dubai-based buyer of gold according to CEEC documentation by gold exporters from the DRC. The company could not be located nor any evidence uncovered about its actual existence and operations.

### TLI Global (UAE)

This is a new Dubai-based refinery. To date, there appears no indication that TLI has bought gold from the DRC.



DRC-34996 1167
*Conflict Gold to Criminal Gold*

## Exhibit 35

GOLD TRADERS

### Marc Rich and Company, and Jonathan Graff

**there is currently a reluctance to refine in Khartoum due to doubts about whether Sudan would pay fairly in US dollars**

### Sudan Khartoum Refinery

The announcement in late 2012 by the government of Sudan that it was inaugurating the Sudan Gold Refinery Company Ltd. introduced an intriguing new player into Central Africa's conflict gold scenario. Sudan's refinery has a modest refining capacity of 270 tons of gold per year. However, it should not be taken for granted that the operation will not rapidly expand as demand increases. The establishment of the refinery follows a concerted effort by the government to rejuvenate many of its ancient gold mining sites, both with industrial partners as well as with about half a million artisanal miners. For this purpose, the government has already licensed more than 85 companies to explore for gold in more than 120 locations, concentrated in North Darfur and in Red Sea State.

So far, no evidence has been published about Sudan's new national gold refinery receiving and processing gold from eastern DRC. According to the report of the UN Group of Experts, the Kampala-based gold traders Silver Minerals and Mineral Impex Uganda reported the source of significant quantities of gold as being South Sudan.

While a number of gold dealers in the region have indicated that the Sudan Khartoum Refinery would be a viable alternative, there is currently a reluctance to refine in Khartoum due to doubts about whether Sudan would pay fairly in US dollars for gold deliveries and due to rumours that frequent technical difficulties have caused delays and quality control issues. On the other hand, the Sudanese authorities' tight grip on all economic activities in Sudan and Khartoum's ability to repel and frustrate monitors of the UN and other international organisations are well known to Central African gold dealers.

Shortly before the Congo Wars erupted, representatives of the Swiss-based trading conglomerate owned by Marc Rich, Pincus Green and Alec Hackel had made a foray into Kampala's gold trade. Scouts for Marc Rich visited the Ugandan Ministry of Mines in their search for a steady gold supply of at least 85 kg per week. The Ministry referred them to AP Bhimji and UCI - the only two gold dealers in town at the time. Both Bhimji and UCI agreed to deliver rawgold to Marc Rich's Novarco (UK) Limited for a few trial shipments. Soon, the two Ugandan companies grew unhappy with the trading terms and resumed their direct trade with Metalor, their erstwhile Swiss gold refiner.

However, shortly afterwards, Jonathan Graff, who was also associated with Marc Rich, appeared in Kampala and offered slightly better terms and prompter payments to UCI. He also offered that the gold could be shipped to Rand Refinery in South Africa. UCI agreed to the terms and regular shipments commenced. Soon, UCI's management realised that Graff no longer worked for Rich and that he was setting up his own outfit to benefit from UCI and other, even more substantial suppliers of gold from all over the world.

In order to pursue these business opportunities, Graff and unnamed others registered a company in the off-shore jurisdiction of St Helier, Jersey. In order to disguise the actual ownership, only two entities by the name of Hugo Nominees Limited and Hugo Investments Holdings Limited went on record to register the actual trading company, Hussar Investments Limited. While Hussar Limited appears on paperwork related to gold trading with UCI, a second company with the name of Hussar Services was operating from a London address, sometimes on behalf of Hussar Limited. Thanks to his own admissions, Graff's leading management role in Hussar's gold business is not in doubt, but he has never disclosed how much equity he controls and whether he holds the majority. There are indications that Graff did not act alone and that his departure from the Marc Rich Group may be more troubled than meets the eye. Although most documents appear to be sealed, a legal action in the Jersey High Court_ brought by five plaintiffs associated with Marc Rich's companies against Hussar Limited and other defendants does hint at strained relationships.

*Conflict Gold to Criminal Gold*

Exhibit 35

The first time the existence of Hussar as a buyer of gold from the Congo became public was through the 2005 reports of the UN Group of Experts and again in 2006 when the report also named the presumed principal, Jonathan Graff. Curiously, his existence was already known in 2004 among Belgian intelligence agents operating in Kinshasa, who promptly fingered him to anybody in the international community who cared to intervene. The agents showed shipping documents indicating that Hussar Limited was the owner of approximately 1.5 metric tons of raw gold originating from Mongbwalu and destined for a South African refinery. The documentation was obviously doctored for no other purpose but to focus attention on Graff. Hussar's actual shipments at the time involved around U$1-1.5 million worth of gold - far less than the 1.5 tons in the documents, which would have been worth around US$20 million.

The initial publication by the UN and the almost simultaneous Human Rights Watch report "The Curse of Gold" triggered widespread interest in the matter. Extensive monitoring and investigations were started by the UN experts, who were mandated by the Security Council to identify possible funding sources for illegal armed groups operating within the DRC in contravention of UN resolutions 1493 (2003) and 1533 (2004). These investigations found that Hussar was the buyer of gold that originated in militia-occupied mining regions in Ituri, Haut Uélé and elsewhere in eastern DRC and travelled through circuitous routes to Kampala.

According to numerous transaction records and SARW interviews with all involved parties, Hussar obtained raw gold shipments worth around US$1 million from UCI every 10 days. After January 2000, when Machanga opened its doors in Kampala, Graff also attempted to build a business relationship with the new gold trading company's manager, Rajendra Kumar Vaya. However, Raju was not interested in a regular arrangement. And after a few shipments during 2002 and 2003 period, Raju accused Graff of stealing Machanga's income from the silver that Rand Refinery would typically extract from his doré gold.

Notwithstanding this setback, Hussar obtained regular weekly shipments from Uganda beginning in 1999 and lasting until late May 2005. The records show how dozens of Congolese traders sold their rawgold to UCI. By far the most significant trader was Kisoni Kambale, Alain Goetz's erstwhile gold supplier, who had operated Goetz's first Congocom buying agency in Goma.

From the beginning of the trading relationship, Hussar had arranged for all gold to be shipped to a gold refinery based in South Africa. Under the Financial Intelligence Center Act

of 2001, South Africa imposed more stringent obligations on banks and financial intermediaries (including gold refineries) to verify the identity of their clients as well as the source of their assets. According to the refinery, Hussar was not willing to divulge this information and preferred to take its business elsewhere. Hussar on the other hand denies this account and claims that South Africa's customs control delayed the shipments unduly.

Either way, Rand Refinery had made Graff aware of the due diligence requirements. Therefore, Graff was aware that more scrutiny in relation to the true origin of his gold supplies was about to become a global industry standard. Yet shortly after he ceased working with Rand, he managed to hire refining services from Argor Heraeus in Switzerland in mid-2004. Graff later claimed that his supplier UCI had never disclosed the true origin of his raw gold. If this claim were true, it would amount to an admission by Graff that he never asked where the gold came from and that he had never conducted even minimal due diligence. On top of that, even the most cursory check of widely available sources of information would have shown that Uganda could not possibly have supplied gold from domestic sources in the quantities that Hussar bought from UCI during those years.

Graff's claims of innocence sounded hollower and hollower in December 2004 - only 6 months into this relationship with Argor - when a UN investigator contacted him to discuss his gold transactions. During this communication, he was advised that he was most likely buying gold that benefitted illegal armed groups in eastern DRC and that had been smuggled out of Congo into Uganda. According to Graff, he was taken aback by these assertions and demanded an explanation from UCI.

However, he continued doing business with no interruption to the weekly schedule or reduction in the quantities of rawgold refined in Switzerland. In addition, he did not notify the refinery of any concerns in May 2005 when UN sanctions monitors interviewed him and his staff in London. On this occasion, the monitors registered their concerns vigorously and also contacted Argor's senior management.

In a flurry of activity, Graff sent accusatory letters to UCI in an overly transparent attempt to conceal his negligence. Argor also officially suspended his account and left him with little choice but to stop buying Congolese gold. Notwithstanding the evidence, Graff succeeded in convincing the UK authorities in charge of investigating and prosecuting possible UN sanctions violations that he never

Exhibit 35

knew the true origin of the gold, that he had no obligation to determine the true origin and that he was innocent.

Indeed, while the British Foreign Office played a decisive role in sanctioning some Congolese and Ugandan gold traders, it also protected Graff according to a diplomatic cable that was leaked years later.[85] According to this confidential communication, the UK mission to the UN sanctions committee on the DRC conveyed to its French and US counterparts the view that Hussar had already been punished because of the reputational damage it had suffered, that Graff could reasonably claim to have been unaware that Hussar's activities might be considered to be in breach of the arms embargo, and that he had co-operated fully with the UN experts.

Another astonishing result of his alleged innocence was that he was allowed to block payment of an outstanding balance of more that US$700,000 that Hussar owed to UCI. Upon request, Hussar Limited confirmed that since September 2005 - long before UCI was placed on the list of individuals and entities subject to targeted financial sanctions and a travel ban - Hussar had retained US$780,057 that was due to UCI.... It remains a puzzle how a private company such as Hussar could possibly assume governmental powers to freeze accounts without proper authorisation and long before the UN adopted an asset freeze – and to do so in impunity.



GOLD TRADERS IN
PROVINCE ORIENTALE

Coped and Karmali

In theory, trading artisanal rawgold in Bunia should be a major business sector given the prolific production by tens of thousands miner working in Ituri and surrounding territories, as well as other gold mining regions to the north of Kisangani. However, the bizarre reality is that there is not one single legally registered gold exporter (comptoir) in the entire province. In the middle of 2012, the last legal comptoir was shut down and even before that the two functioning comptoirs, Coped and Karmali, registered dismally low quantities of gold.

Coped (Congo Performance Développement) was the only officially licensed comptoir until 20 July 2012 when it suspended its operations after its premises in Bunia were robbed. Coped was registered by the wife of an Indian gold merchant by the name of Arif Mulge and a Kenyan by the name of Mohamed Mulendinah. Mulge was attacked on 20 July 2012 in his office in Bunia and 418 grams of gold with a value of US$15,987 along with US$22,000 in cash were stolen. The attackers have not been identified and Coped's principals, possibly due to lack of capital, are no longer interested in operating the gold comptoir.

The Karmali Trading Company was officially licensed as a comptoir on 18 March 2011. However, less than 10 months later, its two Indian owners - two brothers of the Kinshasa-based Hasanali family - decided not to renew their one-year permit, citing "financial-economic constraints connected with world market prices".

Once its license expired in March 2012, the owners of Karmali left Bunia. However, government officials believe that the owners used their short-term engagement in Bunia to scope out the market in order to continue a clandestine operation once they had secured the confidence of gold sellers. Government officials have mentioned allegations that the owners were acting in concert with the principals of the Sofibanque Group, which is engaged in retail banking, money remittance and currency exchange in Kinshasa.

| 2009 | 83 kg of gold | 2011 | 58 kg of gold |
| 2010 | 105 kg of gold | 2012 (until August) | 8 kg of gold |

**Table 10:** *Certification by CEEC Bunia statistics*
Source: CEEC Bunia

The total of 254 kg that Bunia's gold traders reported for their exports during this three and a half year period compares very poorly with the long-term exports for this region. A possible explanation could be that other comptoirs in the region picked up most of the gold from Bunia but the nearest comptoir that might buy gold from the Ituri region is Glory Comptoir in Butembo, which has reported an equally dismal average of 10 kg of gold per year. The most logical explanation is that Karmal, Coped and SOKIMO were massively underreporting their true exports. This would explain why the neighbouring country – Uganda – shows in its own statistics approximately 1 ton of gold for the comparable time period.

# Exhibit 35

local gold traders

Another obvious signal of the deeply corrupted state of
affairs is the Mining Division for Ituri, which should
register and assist the district's artisanal and small-scale
miners as well as all négociants. It is either perplexing
incompetence or astounding greed that saw the Division
register 411 négociants in 2012 but only 259 artisanal miners.
The only possible explanation for this impossible situation
- more small traders than actual gold producers - is that the
Division's agents are ignoring thousands of artisanal miners
because pursuing the permit fees for négociants is more
lucrative and easier.

Remedies for the malaise observed in Ituri's gold sector
should be offered by SAESSCAM, the agency within the
national Ministry of Mines that supports and oversees
artisanal miners. Unfortunately, in addition to its very broad
mandate to support, educate and assist the informal mining
sector, SAESSCAM is also tasked by provincial decrees to
collect a sales tax from the artisan miners and négociants.
The revenue is used to cover the costs of all government
agencies with a mandate to operate within the extractive
industry. The overall tax amounts to 10 percent of the value
of the gold each miner extracts and 1 percent of the trade
conducted by négociants. Provincial decrees_ define the
specific tax-collection duties of SAESSCAM agents and how
the revenues are divided among the government services.
Oriental Province adopted a law that regulates the division
of artisanal gold taxations among the various services. The
list is almost identical to those in use by other provincial
administrations for their tax collections.

| GOVERNMENT SERVICES ENTITLED TO SHARE IN THE ARTISANAL SALES TAXES | ALLOCATION OF ARTISANAL SALES TAX |
| --- | --- |
| Provincial Government | 35% |
| SAESSCAM | 25% |
| Division des Mines | 15% |
| Territorial administration | 10% |
| Collectivité | 5% |
| Cooperative of Miners | 5% |
| CEEC | 2.5% |
| Polimines | 2.5% |

***Table 11:*** *Government Services and taxation*
*of artisanal gold miners in Bunia*
Source: Provincial Decree (No 01/MMA/019/CAS/PROGOU/P. 0/2009)

Revenue sharing is also mandated in connection with a 1
percent sales tax raised of the value of all gold traded by the
négociants.

| GOVERNMENT SERVICES ENTITLED TO SHARE IN THE NÉGOCIANTS SALES TAXES | ALLOCATION OF ARTISANAL SALES TAX |
| --- | --- |
| Provincial Government | 30% |
| SAESSCAM | 40% |
| Division des Mines | 20% |
| CEEC | 5% |
| FECODI | 5% |

***Table 12:*** *Government Services and taxation*
*of gold négociants in Bunia*
Source: Provincial Decree (No 01/MMA/019/CAS/PROGOU/P. 0/2009)

According to SAESSCAM agents from Bunia the tax collections
never succeeded. In part, the very low number of registered
artisanal miners caused the problem. However, the laziness
of the agents, who simply do not want to leave their offices
and visit the artisanal mining sites, was a far more important
factor. Of course, they have also learned their lessons the hard
way. Whenever they tried to collect taxes in the past, many
artisanal miners told them to leave. Instead, SAESSCAM
agents concluded that they would focus on collecting a flat
rate of US$50 per month from négociants. Inevitably, the
traders rejected this figure and after much back and forth
a compromise of US$10 per month was worked out. While
no reliable records exist, SAESSCAM now appears
to collet around US$400 per month from approximately 40
négociants registered in Bunia plus another US$1400 collected
outside Bunia.

These obviously unsatisfactory tax-revenues led the
SAESSCAM officers in Ituri to conclude that they must
raise the headcount of the organisation's staff. They have
now tripled the staffing for the three SAESSCAM offices by
'hiring' additional but unpaid inspectors. In fact, they simply
brought in their relatives and friends to work in an official
capacity, even when no official ministerial allocations existed.
Their reasoning is that more staff will help to improve the
collection of taxes. However, the other government services,
which should legally share in these revenues, have not
received their income. And worst of all, Bunia's SAESSCAM
agents are not carrying out any of their other mandated
support and education functions.



DRC-34996 1171
*Conflict Gold to Criminal Gold*

Exhibit 35

Dieudonné Ozia Mazio

Historically, the town of Aru, which is located on the eastern edge of the province bordering Uganda, has always served as an important trading outpost connecting much of northeastern Orientale Province. Gold from the nearby mines around Zani Kodo as well as from the more distant ones in Durba, Gorumbwa and Moto has usually transited through to Uganda via Aru. One of the first regular gold smuggling routes, which pre-dated Congo's independence, led through Aru to Kampala and onwards to Nairobi, where Indian gold buyers welcomed Congolese traders.

In the 1980s and 1990s, the gold trade with Kampala – in particular supplying A.P. Bhimji – was an important factor in the rise of Ozia Mazio to his position as the leading merchant of the region and the FEC chief of the territory. With growing power in trade and politics, Mazio was feared for his particularly crude and brutal actions against adversaries and lower-ranking competitors. Once militia activities started during the two Congo Wars, Ozia Mazio quickly arranged alliances with militia leaders and warlords that enhanced his power and exclusive access to artisanal gold mining regions. The Kampala gold traders soon took note of him because he consistently supplied the largest quantities of rawgold.

The most vicious chapter in his story began when Commandant Jérôme Kakwavu and FAPC took control of the gold-rich mining areas of Uélé. He became the quartermaster of FAPC thanks to an exclusive business relationship with Commandant Jérôme. In order to exert maximum control over the entire border trade, Mazio and Jérôme coerced the 80 members of the local FEC. The net effect of this scheme was that Jérôme would collect 20 percent of the value of all imports and up to 70 percent of all tax revenues collected in Aru for the year 2004.[84] Traders were left with no choice but to participate in a 'pre-financing' scheme benefitting Jérôme, which was nothing more than a clumsy pretext to extort money from the traders. As the architect of the extortion scheme, Mazio was rewarded with exclusive access to the richest gold production regions under the protection of Jérôme. Other compliant traders gained access to other areas. Depending on his cash reserves, he was able to export between 15-18 kg of rawgold every 10 days to Kampala. During the Second Congo War he had switched from his traditional buyer A. P. Bhimji to Machanga Limited.

In November 2005, the UN Security Council imposed targeted financial sanctions and a travel ban on Ozia Mazio. Unfortunately, Mazio – like most Congolese at the time – did not have bank accounts within the DRC and therefore the UN assets freeze only minimally restricted his trading activities. Uganda, which could have intervened by requiring its gold trading companies to block trading accounts he held with them, did nothing. Under these circumstances, he continued buying and smuggling gold with virtual impunity. To avoid detection and circumvent the travel ban, he now sent his son either to Kampala or directly to new buyers he had found in the Gold Souk of Dubai. Mazio died on 23 September 2008 in Ariwara.



GOLD TRADERS IN
SOUTH KIVU

Evariste Nshamamba

Of all the prominent Congolese gold traders, Evariste Nshamamba managed to stay in business the longest. His earliest significant part in the gold trade started when Alain Goetz recruited him to operate Congocom in Bukavu. Ever since that time he was able to maintain his position as the most significant single buyer from the artisanal gold miners of South Kivu and Maniema – until the April 2013 drop in the gold price wiped out his capital.

Like his mentor Alain Goetz, Nshamamba has also operated a transportation business in support of his gold trade. After Goetz was forced to leave the region, Nshamamba took over the Congocom operation, renamed it the Etablissment Namukaya and kept operating. During that period, the RCD militias controlled Bukavu and imposed their taxes on all businesses. Nshamamba built an important regional air-cargo company called CongoCom Air. In addition, he offered bus connections via Ngomo Express, for example from Bukavu to Bujumbura and Kigali. His transportation infrastructure enabled Nshamamba to securely transport gold – and gold suppliers - from the hinterlands to his headquarters in Bukavu and smuggle it onwards to his buyers either via Rwanda to Belgium or to Bujumbura.

Over the 13 years of his gold trading career, it never seemed to matter to Nshamamba whether gold mining regions were occupied by government forces, militias, FDLR or Mayi-Mayi bands. He told SARW that he never bothered to visit a single mining area.[87] UN investigations took note of him around 2005 but despite intense efforts, could not

DRC-34996 1172

Exhibit 35




DRC-34996 1173
Conflict Gold to Criminal Gold

# Exhibit 35

find sufficient hard evidence linking him with illegal financing of militias. The same evidentiary problems persisted for years with his alleged smuggling of gold across the border to Bujumbura.

An important aspect of his protection from investigations was his organisational set-up, which was designed to keep potential problems at arms length. Etablissment Namukaya was confined to Bukavu. But Congocom maintained independent local airfreight agents, who also operated as gold négociants, in many bush towns across South Kivu and Maniema in the midst of artisanal gold mining areas. Dozens of smaller, local négociants came from gold mines to these agents to sell their small bits of gold. Since these independent agents consolidated supplies and arranged for periodical gold transports to Etablissment Namukaya in Bukavu, Nshamamba never had to cooperate directly with armed groups.

On the other side of the supply chain, officials of the Provincial Division of Mines did suspect that Etablissment Namukaya's reported gold exports only represented a fraction of its true business. The majority of his gold trade, they maintained, was traded under the table and regularly smuggled across the borders on board his buses. It is interesting to note that the smuggling allegations were part of the provincial and national authorities' reporting for many years. Yet, there is not a single known instance of border control authorities searching for, discovering or seizing a consignment of gold from any vehicle that belonged to Nshamamba.

At times Etablissment Namukaya also operated a subsidiary office in Bujumbura at Av de la Mission in the Bâtiment Bata. It was reported in Bukavu that Nshamamba was spending considerable time in Canada and in the USA – an allegation that he denies. But he does own

a home across the border form Bukavu in the Rwandan town of Cyangugu.

After April 2013, when the price of gold on world markets dropped by about 12 percent within a few days, Nshamamba and many other gold traders came under heavy financial pressure. In Nshamamba's case, the price drop was created even greater complications because he maintained such complex financial relationships with his suppliers and his buyers. As a result, Nshamamba lost his liquidity. He told SARW in several interviews while he was spending weeks in Kampala trying to raise capital, that he was bankrupt. SARW has confirmed that Etablissment Namukaya was shut down along with most of his other businesses.

## Mange Namuhanda

While Etablissment Namukaya is a legally registered comptoir that appeared to regularly underreport its gold purchases and exports, Mange Namuhanda remains an enigma to most in Bukavu. He has not registered his company and government representatives do not even offer estimates of his illegal exports. The few individuals in Bukavu who are knowledgeable about his gold trade never volunteer information about 'Mange' as Namuhanda is commonly called. The earliest informant identified him in 2006 – describing him as a partner of Mutoka Sefu, the Bujumbura-domiciled buyer for most of South Kivu's artisanal gold. However, there are many questions about whether this alleged collaboration between Mange and Mutoka is really true.

Mange was – and still is – too feared, even by government investigators, advocacy groups and competitors, to discuss him. Up to now, the UN has never properly interrogated Mange. But in light of the information that UN investigators have uncovered so far, fear of reprisals are well justified.

SARW research confirmed Mange's wide-reaching gold buying operations through interviews with artisanal gold miners, and local gold traders or their respective associations. According to these informants, Mange's buying agents have been purchasing gold in regular intervals from artisanal mining sites in and around Kamituga and Kalehe from late 2012. Artisanal gold miners know that his buyers enjoy a privileged relationship with FARDC officers, and that they expect discounted prices for their gold. According to research reports by the UN Group of Experts, Mange is also buying from Walungu, Shabunda, Itombwe and Mwenga. In these regions he is also know to operate in close collaboration with officers of FARDC.

But the liaison with FARDC is not the only evidence for Mange's sanctions-busting gold trade. The UN identified transactions involving Neo Bisimwa, who bought rawgold from Maï-Maï Pareco General Rutambuka Ntabitondeye in Kalehe on behalf of Mange. At the time, Ntabitondeye was registered as a négociant with the Provincial Mining Division – leaving open the question of whether he traded as a private individual or in the advancement of financial interests of his illegal militia. If the latter were supported with evidence, the General's trade would qualify him for targeted UN sanctions.

Mange was also identified[**] as the preferred trader and exporter of all gold that FARDC General Pacifique Masunzu, commander of the tenth military region, and his deputy, Colonel Baudouin Nakabaka, syphoned off from South Kivu. Allegedly, Colonel Nakabaka wrestled control over many gold mines from FDLR and Maï-Maï groups, whereas General Masunzu secured access to the ones hidden in the Itombwe range, frequently referred to as the Haute Plateau.

## Exhibit 35

Meanwhile, FARDC Colonel Rugo Heshima of the 321st brigade had coerced the supply of 35 local traders and their network of artisanal miners in and around Kamituga and Lugushwa. The traders worked under the Colonel's guidance and protection. At times, they even received pre-financing of up to US$10,000 in order to maximize the gold output to Mange.

According to government officials Mange has never declared any of his gold transactions or exports in flagrant contravention of all Congolese and international laws and regulations. For the time being, officials in Kinshasa and of the provincial authorities do not appear prepared to pick a fight with Mange's military allies.

### Zulfa Karim Panju

Panju is a Canadian citizen who was born in Bujumbura but has lived all his live in the Congo to run the trading company his father had founded almost 50 years ago. Comptoir Panju imported rice, sugar, flower, clothing, and garments from Holland, China, Pakistan and the United States. By 1999 Panju obtained a license for a Comptoir to legally export gold. He applied for the licenses from the Kinshasa government[89] despite that Bukavu at the time was in control of RCD and the regulatory confusions resulting from Rwanda's and Uganda's invasion of the Congo. Very soon his monthly exports averaged 100 kg of gold for which he paid taxes and duties in accordance with international laws.

Rwanda's military forces occupied Bukavu and Goma and other areas in the Congo and the RCD acted as the administrator of many of the occupied zones. Whether or not the occupying forces established conditions that, in compliance with precedents of international law,[90] would allow

for the imposition of compulsory taxations remains untested. As a result of the legal ambiguities caused by the war, some companies that operated within the occupied territories became subject to a multitude of politically motivated repercussions. Panju was singled out with particular vehemence by the Belgian judicial authorities and ended up being the most prominent victim of a serious miscarriage of justice. It was only recently that Belgian authorities abandoned their case against him. They never apologised for this persecution and never explained why Panju had been targeted when there were many other businesspeople in the Kivus, including many of Belgian descent, who were far more culpable than he was.

Panju's problems with the Belgians began on 18 November 2002, when he personally transported a consignment of 51 kg of rawgold to Belgium, where he intended to sell it to Alain Goetz's family operation, Tony Goetz & Zonen Refinery in Antwerp. In previous years, Panju had regularly traded similar volumes of gold – most of it gathered from South Kivu's artisanal mining sites. Normally, he sold the gold to Johnson Matthey in the UK, although on some occasions he also sent the gold to the Metalor plant in the USA. However, on this occasion, he opted to take his gold to Belgium and the authorities seized his consignment – as well as over US$3 million in cash in Panju's personal and trading accounts in a Belgian bank.

The Belgian magistrate alleged that Panju was engaged in a commercial relationship with Madama Aziza Kulsum Galamani, a well-known member – and rumoured financier – of the RCD.

Consequently, Panju was considered to be a supporter of, and conduit of finances to, the RCD. The case was

never tried by a Belgian court of law. Yet, the public prosecutor ordered Panju to be held for several weeks and blocked all his assets. While the Belgian magistrate persecuted Panju, many other enterprises based in Bukavu continued their mineral businesses and paid taxes to the RCD. Many of them were either exporting to Belgium or used Belgium-based brokers to sell gold, coltan, cassiterite and other minerals.

Finally, when Panju returned to Bukavu, he concentrated on trading cassiterite and formally declined the renewal of his gold comptoir license in 2006. The Belgian magistrate's case - along with Panju's US$ 3 million - was stuck, although the alleged financial relationship between Panju and Aziza Galamani was soon revealed to be an erroneous interpretation of banking documents. The charge of supporting an illegal armed group held no water under international legal precedents. On the other hand, if the Belgians intended to establish new legal standards, they could have prosecuted many other enterprises, including their own citizens or state owned-companies, such as Sabena Cargo.[91] All of them were involved at the time in direct or indirect commercial activities that benefitted the RCD. But it was Panju's reputation and business that were singled out during 10 years of incessant international harassment. Indeed, hundreds of NGOs, international advocacy groups and academics celebrated the case in their reports and studies as a 'model' intervention against corporate sinners.

In April 2013, Belgium unblocked all his funds and dropped the case against Panju. No public announcement or explanation has been given so far as to why the Belgian State would single out and malign one person with such impunity.

# Exhibit 35



GOLD TRADERS IN
NORTH KIVU

Dr Kisoni Kambale

Dr Kisoni Kambale came to be Butembo's most respected gold dealer-smuggler by way of marriage. He had studied at the University of Lubumbashi, taught at the local school in Ruthsuru in North Kivu and worked as an Assistant Professor in Nairobi. His breakthrough came when he married Nzanzu Mbusa Jeanne, the daughter of a prominent family of merchants from Beni and Butembo. By 1988, Kisoni was in the gold trading business and travelled at regular intervals to Bujumbura, where Alain Goetz was just building up Affimet. Sometimes, Kisoni also travelled to Dubai – not just to sell gold but also to place orders for a wide variety of merchandise on behalf of his in-laws and other Butembo-Beni trading operations. Even among the enterprising Nande, the young Kisoni stood out for his easy-going style, English language skills and willingness to travel. Soon he was known throughout the gold mining regions as Kidubai (Kinande for 'the one who goes to Dubai') and his comptoir was known as Maison Kidubai.

During the last 10 years of Mobutu's dictatorship, Kisoni excelled at the Nande trading stratagems. With increasing mobility, his trading range expanded. Many times he would represent the interests of other Butembo traders to sell North Kivu coffee or place orders abroad for commodities and consumer goods that would be imported to Butembo. However, his

success caused internal frictions with his in-laws when his trades increasingly monopolised the family capital, pre-empting any meaningful transactions by his wife's family. Kisoni did not meddle for long with these family matters and agreed to become independent and raise his own capital.

He had every reason to be confident about his strength. He was the president of FEC in Butembo, and thanks to work with a wide network of Nande merchants, his reputation as their pre-eminent gold trader and 10 years of successful trading with Affimet in Bujumbura, he was very well established. When the first Congo War started, Alain Goetz was ready to establish buying offices all over the Congo and Kisoni was his first agent. In 1997, they opened Congo Comptoir in Goma, and one shortly afterwards in Butembo. Goetz introduced the first foundry to Congocom, enabling Kisoni to refine the artisanal rawgold and increase its purity from no more than 85 percent to as much as 98 to 99 percent. When the second Congo War broke out, Emmanuel Kamanzi,[92] the finance chief of RCD, appointed Kisoni to collect the OFIDA duties at the Kasindi border crossing.

Goetz introduced the first foundry to Congo Comptoir enabling Kisoni to refine the artisanal rawgold that usually has a purity of no more than 85 percent to as much as 98 to 99 percent. When the second Congo War broke out, Emmanuel Kamanzi[90], the finance chief of RCD appointed Kisoni to collect the OFIDA duties at Kasindi border crossing.

By 2000, when Alain Goetz was forced to leave Central Africa, Kisoni had accumulated sufficient capital to continue Congocom under his own name. Only now, there was no longer any refinery in Bujumbura and Kisoni had to find new buyers. Coincidentally, the efficient trade by the Kampala

gold traders Bhimji and UCI offered an economical alternative instead of travelling regularly to Dubai. In his comfortable Lexus 4x4 the trip from Butembo to Kasindi, through the border crossing to Uganda and onwards to Kampla took only 5-6 hours. The true obstacle were the ominous risks that thieves and government agents presented to his security and the greed of customs agents – which had to be factored into his operation's costs of doing business.

And he prospered significantly during the War. Like his mentor Alain Goetz, Kisoni had arrangements with the leaders of the combatants. Through his wife he was related to Antipas Mbusa Nyamwisi, the leader of RCD-K. Kisoni was already the RCD's tax collector, but Nyamwisi expanded his responsibilities to include the collection of business taxes and license fees throughout the occupied territories.[93]

Illuminating the economic scale of Kisoni's role as tax collector, the UN Panel of Experts refers to a very credible source that stated that, "Nyamwisi skims up to US$400,000 off the tax revenues collected from the Beni customs post at the Ugandan border."[94] While Nyamwisi joined the peace process and was rewarded with a ministerial appointment during the transitional government under Joseph Kabila, Kisoni successfully sought new militia alliances. Until the Congolese government finally re-established its authority over much of eastern DRC in late 2005, he had an exclusive arrangement with the FNI. The militia occupied the gold mining town of Mongbwalu and managed the gold mining industry by controlling the Provincial Mining Division, and the artisanal miners through the l'Encadrement Général des Exploitants Artisanaux. To monetise the gold assets in his occupied zone, FNI leader Floribert Ndjabu urgently required commercial channels. Kisoni

## Exhibit 35

provided this service and also imported commodities into his territory. He could offer this service because in 2003 Kisoni had acquired an Antonov 28 cargo plane in Dubai, together with a service contract and 6-month contracts for 2 pilots from Kirgizstan. Butembo Airlines amortised the US$30,000 cost for the services and the US$100,000 purchase price for the plane with ease.

Indeed, the gold trade was exceedingly profitable, according to Kisoni's own descriptions. Whenever he arrived in FNI territories, Kisoni was required to pay US$100 in landing fees and to hand over 1.5 percent customs duties on the gold he exported. The price that artisanal miners obtained was not Kisoni's concern because he always purchased the gold from FNI officers.

Every 10 days, Kisoni acquired sufficient quantities of gold to drive personally to his UCI buyers in Kampala. According to him, he would always be able to sell at least 50 kg. To make his trips even more profitable, he also acted as buying agents for other Butembo traders, earning commissions and fees in the process. UCI records confirm that Kisoni delivered approximately 50 kg of rawgold every 10 days.[95] They also show that he was consistently their most prolific gold supplier. However, because UCI was the principal supplier of Hussar Limited, which had come to the attention of UN investigators, Kisoni's direct gold business with FNI militia leaders and warlords was the final nail in coffin for the entire supply chain. By the end of March 2007, the UN Security Council imposed targeted financial sanctions on Kisoni, including an assets freeze and a travel ban. The same fate also befell his buyers, the Kampala-based UCI. But these measures did not stop Kisoni from buying gold.

Even before Kisoni was put under sanctions, he had knowingly operated in violation of Congolese law since he had never applied for a legal permit to export gold. Despite repeated warnings, he flaunted the law. Finally, Vice-Minister of Mines Victor Kasongo travelled from Kinshasa to Butembo to personally inform him about the consequences of his illegal actions. Kasongo confiscated all old RCD-permits with which Kisoni had continued to justify his gold exports. But just a few months after this visit, Kisoni and his wife had registered a new comptoir under CongoMet. In November 2006, they started to export gold via UCI in Kampala to Emirates Gold in Dubai.

Proof of Kasoni's continued involvement in the illegal gold trade came in the most unlikely manner. On 5 July 2007, a gang of six Ugandan and Kenyan assassins murdered Kisoni in his office in Butembo. A few days later, when they were caught, the police found 22 kg of rawgold with a value of about US$400,000, which the murderers admitted to have stolen from Kisoni. Clearly, sanctions had not deterred Kisoni and his backers from the gold trade.

Together with the owners of UCI, Kisoni and his wife had also tried to set up Aurum Africa with Siva Reddy, a UCI employee acting as manager. However, the Aurum Africa project did not get off the ground because the Congolese government did not grant it an export license. In October 2010, Kisoni's wife Nzanzu Mbusa, together with her new husband Kasindi Vuku and other partners, registered Glory Minerals as an official gold comptoir. Subsequently, she has withdrawn from the company.

### Glory Minerals

In October 2010, Dr Kisoni Kambale's widow, Nzanzu Mbusa, her new husband Kasindi Vuku, Edouard and Dido Kambale, and Epa Muhimdo formed Glory Minerals. They commenced gold exports to Emirates Gold in Dubai.[96] Government officials assume that Gory Minerals adopted the same strategy as most gold comptoirs in the Congo of underreporting their exports.[97] And with only 2.3 kg of official gold exports in 2011, Glory does seem to have headed for the lowest historical reporting record of any comptoir.

### AR Gold

Exports from North Kivu in 2012 were depressed in part because of the temporary suspension of exports that was imposed in April. The purpose of the export ban was to encourage the complete clearing of all mineral ore stocks accumulated by traders and exporters within Congo. The measure became necessary in order to eliminate any possibility in future of old stockpiles 'contaminating' the export of properly certified, newly produced minerals. The ban made good sense in the context of the DRC's and the ICGLR's certification mechanism for cassiterite and wolframite. On the other hand there was no possible impact on the legalisation of gold exports since no supervisory structures were in place to oversee and certify gold production.

According to CEEC Goma, the only legally active gold comptoir in Goma during 2012 was RA Gold, which had been in operation for just a year. The license to operate comptoir AR Gold was originally approved in Bukavu in 2011. However, the comptoir never operated in Bukavu. Instead, during 2011, it set up an operating office in Goma. Up to August 2012, when the one-year permit to operate AR Gold was due to expire, the company had officially exported around 25 kg of gold. Authorities suspect, as they do with all other comptoirs in the Congo, that the principals were exporting much larger quantities without CEEC certification.[98]

Sibetein Alibhai and his brother Mohamed Aquil Ali also operate Alfa Gems Corporation in Mozambique as a subsidiary of the Costa Rica registered



DRC-34996 1177
*Conflict Gold to Criminal Gold*

# Exhibit 35

Grupo Alfa. Grupo Alfa is a property development company, originally situated at Centro Comercial Plaza Heredia, in Heredia, Costa Rica. It is undetermined whether this group is selling its gold in the UAE as well. Repeated attempts to reach Sibetein at his offices did not succeed.



GOLD TRADERS IN
BURUNDI

Mutoka Sefu Ruganyira

Burundi has a long tradition of incentivising smuggling to syphon off Congo's gold supplies. Alain Goetz's Affimet had a major consolidating effect on what was previously a diversified industry involving several buyers but no refiners. Once Goetz was forced to leave the country in 2000, his former employee Mutoka Sefu Ruganyira was able to continue the virtual monopoly. But during the past two years, a new generation of traders has managed to gain a foothold.

**Mutoka Sefu has also managed to this day to obscure the true quantities, sources and destinations of his gold**

The notoriously poor records of the State do not provide reliable information. Table 14 shows the recent reports of all companies currently engaged in gold exports from Burundi. It should be noted that the data disclosed does represent a significantly lower output compared with the long-range trading results, including the data reported by the Burundian government to the ICGLR.

Of all the enigmatic traders connected to Congo's gold, Mutoka has managed to stay longest in the business and hidden from any official or international oversight. Most importantly, Mutoka Sefu has also managed to this day to obscure the true quantities, sources and destinations of his gold.[99] The first time his veil was slightly lifted was in 2006 when UN investigators tracked the flow of gold from Evariste Nshamamba from Bukavu, as well as from Mzee Mazee and Rama Mwite from Uvira. Given the easy access to Bujumbura from Bukavu and Uvira, and Bujumbura's historical role as one of Central Africa's major gold trading hubs, which began well before Alain Goetz set up Affimet in the 1980s, Mutoka enjoyed virtually a monopoly. Coincidentally, he established an excellent relationship with Raju, who established Matchanga Limited in Kampala around the same time. In the coming years, Mutoka, Raju and younger brother Vitul Kumar worked very closely and very successfully together.

Attempts to uncover Mutoka's dealings were thwarted by his reputation for being very closely allied to powerful agents of the state. Burundians did not want to be seen cooperating with any international investigators. Even national and international staff of the UN peacekeeping mission to Burundi declined to assist in monitoring or investigating his activities. They feared reprisals from Mutoka's powerful backers. It was only n 2009 when a UN report finally revealed the power behind Mutoka – General Adolphe Nshimirimmana, the Director General of the Burundian intelligence services.[100]

The heightened UN attention provoked Mutoka to seek advice from Alain Goetz in Antwerp to find out how best to respond. The choice of going to Goetz was no coincidence. After all, Mutoka had been the very first employee of

| COMPANY | TAXED VALUE OF EXPORTED GOLD | QUANTITY OF EXPORTED GOLD |
|---|---|---|
| Ntahangwa SPRL | 189 616 410 FBU | 958 kg |
| S. C. E. E. M. B | 58 259 810 FBU | 280 kg |
| East African Mining | 30 961 476 FBU | 151.73 kg |
| Omni Distribution | 3 460 346 FBU | 15.15 kg |
| Koranishaka | 8 419 997 FBU | 49.91 kg |
| Golden Gold | 1 848 211 FBU | 11.36 kg |
| Total | 727 248 633 FBU | 1,465.55 kg |

**Table 14:** Burundian gold exporters s for 2012 (January-August) in Burundian Franc (the exchange rate fluctuated over the past year from 1400 to 1500 FBU per 1 US$)

Source: ICGLR

Exhibit 35

Goetz's gold buying and Affimet refining operation in Bujumbura. Goetz taught him the gold business and in 2000, when the Belgian could no longer remain in Central Africa, he offered Mutoka an opportunity to acquire the Affimet building In Bujumbura along with whatever remained of its operation.

Until today, it remains unclear who provided the operating capital for Mutoka's company Gold Link Burundi Trading and successor companies, such as Farrell Trade. It is unlikely that Mutoka was able to save enough money during his employment with Affimet to be able to buy the building and equipment as well as have several hundred thousand dollars in trading capital available. Raju, who just had started with a line of credit for US$100,000 could not have helped him much, since he was struggling as well.

In any event, Mutoka managed to monopolise most of the raw gold coming out of South Kivu, as well as buying whatever quantities were sold by Burundi's indigenous artisanal miners.[101]

Under strong UN pressure, Mutoka once volunteered that he bought on average 7 kg of Congolese gold per month from small traders – a figure which almost certainly understated the true dimension of his business. He also admitted to regularly buying the exports from Etablissment Namukaya as well as from Mange, the two most prolific gold traders of Bukavu – a claim that was almost certainly an exaggeration. Given Burundi's notoriously unreliable gold import-export and domestic production statistics, the true size of Mutoka's business can only be estimated. Taking into account the historical trading figures going back to Alain Goetz's Affimet and information provided by Machanga as well as the refineries in Dubai, an estimate of 1-3 tons of gold per year is reasonable. Much of this was bought by the Kampala start-up, Machanga Limited, during Mutoka's first years in business.

By 2005, Gold Link also started to ship close to 1 metric ton of doré gold to Emirates Gold in Dubai per year, while maintaining his supply to Machanga. In fact, he was such an important source of gold to Machanga, that its manager stationed his brother Vipul Kumar in Bujumbura to buy and transport gold on a weekly basis. Gold Link Burundi Trading flourished even after the UN started to report his activities. According to UN report S/2008/773, the company exported "hundreds of kilograms of gold to Dubai between January to August 2008, where it was sold to Emirates Gold and Kaloti Jewellery."

Mutoka's position was so powerful that he was able to attract his financier to partner with him. Industry insiders, who have conducted business with Mutoka over many years, consider it a certainty that the formation of Farrel Trade and Investment Corporation was a joint venture between Machanga's investors and Mutoka. The same industry sources allege that Farrel's failure – it shut its doors just 10 months after starting to trade – was caused by disagreements among its investors.

UN investigators suspected that Mutoka remained an important gold supplier to trading operators affiliated with Machanga Limited even after the Ugandan gold trader was put under sanctions in March 2007. According to telephone logs, Mutoka seemed to have been in very frequent contact with Jigar Kumar – an individual the UN investigator believed to be a close relative of the people associated with Machanga Ltd.

In January 2009, Mutoka established another new company by the name of Berkenrode BVBA. There are indications that he may have utilised the new name for exports as early as 16 September 2008. The UN found documentation for 912 kg of gold for the period between January and September 2009, which corresponds to all of the declared Burundian gold exports minus 2 kg. According to the export declarations, all gold went to the UAE. According to a notarized document provided by Ms Samra Sefu, the daughter of Mutoka, Berkenrode BVBA's address is 56 Jacobs Jacobsstraat, Antwerp – immediately next door to another company by the name of Berkenrode, which is owned by Tony Goetz and Zonen. In the latest twist, Mutoka has now stated that he sold Berkenrode to Ntahangwa Sprl, a new gold trading group, and that he is no longer involved in any gold trading.[102]

Mutoka declared to the UN that since his principal buyer in Dubai, Kaloti Jewellery, no longer bought gold from him after 2008, he shipped smaller consignments and sold it to anybody willing to buy on Dubai's gold souk. He explained this strategy as an attempt to avoid detection by Dubai customs. According to official Burundian export statistics, Mutoka did not export any gold in the year 2011.

Part of the answer for this sudden change is simply the changes in his companies – going from Burundi Gold Link to Berkenrode and possibly to his latest corporate iteration, Ntahangwa Mining. Another reason for the fluctuation in Mutoka's trade is that he lost 50 kg of rawgold to theft. Two of his associates, who he usually entrusted to transport gold to Dubai, had absconded to Niger and there are no indications that the police have recovered his gold.



# Exhibit 35

### Comptoir Asmani Ntahangwa

According to information released in 2011 by Burundi's mining authorities, a new gold trader by the name of Asmani Ntahangwa started operations and exported 490 kg of gold that year. But once again, Burundi's confusing and contradictory gold export statistics raise doubts. In 2010, Burundi reported a total of 249 kg gold exports. However, the import data for the UAE for the same year indicate less than 1 kg gold originating from Burundi.

At this point, SARW was not able to identify the financiers behind Ntahangwa. According to the UN Group of Experts, Ntahangwa is the new company of Mutoka Sefu Ruganyira.



### GOLD TRADERS IN UGANDA

### Uganda Commercial Impex (UCI)

The company' founder, Jamnadas V. Lodhia, moved from Kenya to Kampala during the 1990s shortly after Uganda's trade liberalisation cut costs for gold traders by about 5 percent compared to the gold trade in the Congo. From its previous trading activity in Kenya, the Lodhia family already enjoyed long-standing relationships with Nande traders. When UCI opened for business in Kampala, their Nande clients were even more motivated to supply Lodhia because he was now less than a one-day trip away from their commercial capital, Butembo. Consequently, UCI had a reliable gold supply even before the first Congo war broke out.

Like Bhimji, UCI entered into an agreement with Metalor in Switzerland to refine all of its gold. Even before the war broke out in 1996, representatives of Marc Rich's Novarco started negotiations with all gold traders in Kampala. In the end it was UCI that agreed to supply between 80 and 150 kg of rawgold per week in return for slightly improved terms compared to those offered by Metalor. But it was Jonathan Graff, a former of agent of Marc Rich, who negotiated a deal with UCI for its entire supply of doré gold. For the first seven years of the trading relationship, Graff wanted his gold to be refined with Rand Refinery in South Africa.

Unlike its competitors, UCI has been more transparent and accountable about its business since the UN started to follow Graff's conflict gold trade in 2005. Lodhia showed researchers comprehensive client files and delivery records to explain in detail how his business worked. He was upfront in identifying the volume of his business between 2004 and 2005 with approximately 3 tons of raw gold per year. He categorically denied having accepted gold from military officers of the UPDF or from Congolese combatants. Neither the UN Panel of Experts on natural resources (that operated between 2000-2003) nor the Porter Commission named UCI in its reports for dealings with UPDF officers.

However, the question is academic because UCI's supply during the period from August 1998 to the end of 2003 – which covers the Second Congo War – was exclusively from regions in the Congo controlled by militias or illegal armed groups. In other words, UCI could not have received gold that did not benefit militias. And even after that war period, many gold traders operated under arrangements with leaders of militias. The best example was Kisoni Kambale, who cooperated first with RCD and then with FNI until 2005. Kisoni Kambale was UCI's most important supplier.

In 2002, Uganda's government honoured UCI with the President's Export Award for best performance in the gold trade sector, placing its competitor Machanga Ltd in second place. Shortly afterwards, in 2004, UCI came to the attention of the international community through investigations by Human Rights Watch and the UN Group of Experts. They responded to allegations against Jonathan Graff by European diplomats based in Kinshasa. When the UN started to track Graff's gold supplies, the trail led to Ozia Mazio, Dr Kisoni Kambale and the Kampala companies Machanga and UCI.

However, UCI stood out among its peers for acting not merely as buyer of Congolese gold but also for offering extensive additional services to its clients – many of whom brought only modest quantities of gold to Kampala, were not fluent in English and were not able to maintain bank accounts for international payments in their own name. Following the traditional role of gold as a powerful monetising instrument for eastern Congo, Lodhia accepted traders who used gold as a currency against which they wanted to purchase goods and foodstuffs from all over the world.

He facilitated such trade, issued orders for a wide variety of goods depending on his suppliers' wishes, and made the payments through his bank accounts. In other words, Lodhia acted as a bank and trade facilitator for many small

Exhibit 35

THE BRITISH GOVERNMENT HAS NOT
RELEASED INFORMATION ABOUT WHETHER
THESE FUNDS ARE NOW UNDER THE
CONTROL OF THE BRITISH GOVERNMENT OR
WHETHER THAT MONEY WILL BE RELEASED
ONCE THE SANCTIONS ARE LIFTED.

Congolese merchants in addition to buying their gold. In a sense, Lodhia furnished an important service to many Congolese by very efficiently converting their gold into the goods and foodstuffs they needed.

This valuable service was not taken into considerations when the UN started to deliberate over the imposition of targeted sanctions. Already in November 2005 the Security Council had fired its first warning shot when it imposed sanctions against the Congolese gold trader Ozia Mazio. By end of March 2007, Kisoni Kambale was added to the list together with Machanga – and UCI. According to Lodhia, this decision by the Security Council blocked their bank accounts.

As a result of the UN assets freeze, Emirates Gold was requested by the authorities of the UAE to withhold credits to UCI in the amount of US$2,052,622. However, Jonathan Graff's Hussar Limited inexplicably took it upon itself to 'block' US$780,057.52 long before financial sanctions were imposed. Hussar explained its action by alleging that UCI had not disclosed the true origin of its gold and assumed the exercise of legal powers to seize UCI's funds. To date, the British government has not released information about whether these funds are now under the control of the British government or whether that money will be released once the sanctions are lifted.

Part of UCI's problem is that Lodhia's efforts to get delisted from the UN sanctions have failed, in part because the Sanctions Committee appears to believe those who claim that UCI and the Lodhia family continue to deal in illegal gold through front companies.

One began to operate immediately after UCI was sanctioned, when Lodhia applied for a legal permit to

operate a comptoir in the DRC under the name Aurum Africa. Kisoni Kambale was supposed to be one of the partners in that enterprise and UCI employee Siva Reddy was to manage the new enterprise. The Congolese Ministry of Mines declined to issue a license. Allowing a Ugandan businessmen to legally trade in large quantities of Congolese gold was considered political untenable.

UN investigators reported in S/2009/603 that Nilesh Lodhia, an employee of UCI, was in contact with Kahinda Muhiwa, a partner in the Butembo-based Glory Minerals. The UN report did not establish what end these phone calls served nor did it establish whether Nilesh Lodhia was actually still operating on behalf of UCI. A UN report from 2012 closed that information gap by establishing that Nilesh Lodiah is operating on his own account.

There is a larger problem that has been left unaddressed by the UN. Changes in the security environment of the Congo's gold mining regions have eliminated the current version of UN sanctions as a basis for effective actions against the illegal exploitation of natural resources. Because sanctions were imposed against UCI and not against its principals, it is hard to imagine how any of the activities cited during recent years by the Group of Experts might be construed as sanctionable. Under the current sanctions regime, evidence must either prove that the sanctioned companies are still active – which at best leads to additional efforts to implement the current sanctions – or that specific individuals are engaged in trading gold that benefits illegal armed groups. The problem with this scenario is that – with a few, very localised exceptions – the Congo's major gold mining areas have been free of militias over the past few years.



DRC-34996 1181
*Conflict Gold to Criminal Gold*

Exhibit 35



GOLD TRADER IN
BELGIUM

Guy Liongola

Guy Liongola's gold trading was discovered accidentally during a UN
investigation in Bukavu in early 2006. His name had appeared on the
register of CEEC as an occasional buyer of gold shipments. UN report
S 2007/423 stated that he had bought 34.933 kg of gold between August
2006 and February 2007. Further evidence for Liongola's involvement
with gold from the DRC was reported in S/2009/603, originating from the
Etablissment Namukaya. An analysis of telephone logs also revealed that
Liongola was in contact with Mutoka Sefu 22 time between January and
September 2009.

Attempts to obtain a statement from Liongola regarding his gold
importation business did not succeed. His whereabouts where identified
as Tessenderlo, Belgium. When the Belgian government was asked to
provide assistance, it did not produce any information on this case.



GOLD TRADER IN
SWEDEN

Guld & Juvel Invest Sverige AB

UN investigators[101] identified the Swedish company Guld & Juvel, together
with one of its agents by the name of Hans Thornell, as the consignee of
a fraudulent gold shipment originating in Beni. The transaction involved
100 kg of gold exported by two individuals named as Teturi and Elota. An
exporting company named JSR Mining – most likely fictitious – was also
part of the transaction.

DRC-34996 1182



Exhibit 35

## CONCLUSION



DRC-34996 1183

Exhibit 35



The commercialisation of Congo's gold suffers from a multitude of ills, as this third SARW report demonstrates. Some industrial enterprises do not push ahead with the development of their gold mining concessions with the desirable expediency, and too many leverage their gold exploration licenses to maximize gains on global stock markets without investing comparable capital into their mining projects. The semi-industrial production of gold is out of bounds and fraught with corruption. Beyond the security and social problems of the artisanal sector, which were already addressed in SARW's previous two reports, "From Conflict Gold to Criminal Gold" and "The High Cost of Congolese Gold", only a minimal quantity of artisanal rawgold is legally certified and cleared by CEEC for export.

Finally, the government's supervision of the industrial and semi-industrial sectors of the gold industry is poor – and even worse in relation to the export of artisanal rawgold. CEEC agents regularly report massive shortfalls to Kinshasa with clear indications about the identity of the key smugglers and their methodology. Yet in its three reports, SARW has recorded various instances when members of military and police institutions, the internal intelligence service, or the border control agencies only use this information to either extract bribes from gold smugglers or partner with illegal traders. As long as national politicians will not muster the will to stop these abuses, CEEC will not be able to carry out its mandate and help to regularise Congo's mineral exports.

However, there have been two major positive developments in recent times – the inauguration of industrial gold production by Banro at its Twangiza and Namoya mines, and by the Kibali joint venture in its first phase, open-pit mine. Once these two operators reach full production at all their mining sites that are currently under development, they will have combined, high-grade gold deposits of approximately 20 million ounces with a value of US$20–24 billion.[104] Unfortunately, none of the other license holders have indicated when they will be ready to produce gold or build gold mining facilities – although most of them obtained their concession agreements years ago.

This slow rate of converting exploration projects into industrialised production projects is unacceptable. Company management may prefer to titillate investors by accumulating many concessions across the globe and amassing impressive tonnages of gold resources but the Congolese need gold mining to monetise the country's natural resources as efficiently as possible. If these companies are not able to raise sufficient capital from investors, the government of the Congo should be marketing the privilege to explore gold reserves in the Congo more actively to stimulate greater competition.

There are considerable direct and indirect benefits that operating gold mining companies can deliver in the form of taxes, royalties and social contributions to local communities. Estimates by gold mining companies and economists hover around 50 percent after 'all-in-costs'[105] are deducted. Accelerating the development of industrial gold mining should therefore be an obvious priority for politicians and regulators mandated to promote the Congo's economy. Part of promoting the rapid industrialisation of the gold sector should include supporting measures to effectively regulate and legalise semi-industrial and artisanal gold mining. Companies that have acquired legitimate titles to gold deposit areas cannot be expected to tolerate the extraction of their gold. It is even less realistic for semi-industrial and artisanal exploitation to take place on corporate concessions when their rawgold only feeds criminal trading networks.

## ADDICTED TO WAR

The international and national policy-making and advocacy community can assist in fast-tracking the industrialisation of the gold sector, while creating alternative livelihood for tens of thousands of artisanal miners. But international donors and their advocacy communities can no longer hold on to the out-dated conflict narrative that ignores the current needs of artisanal gold miners. The conflict narrative should be understood as an addiction to a funding cycle that has largely run its course. While violence persists – and at intolerably high levels in some parts of eastern Congo – the evidence for a nexus between minerals and militia leaders has worn thin. Policy-makers must be weaned off the conflict narrative and presented with evidence about what really ails the extractive sector in eastern Congo now.[106] This will help to allow creative thinking about new solutions.

DRC-34996 1184

# RECOMMENDATIONS

In order to stimulate thinking by policy makers and use this to enhance the benefits of its gold mining industry, SARW offers the following recommendations.

## 1.
### Investigate over a decade of lost revenues and enforce restitution

SARW's three reports on the gold trade in eastern Congo provide compelling evidence of how criminal individuals and networks, operating within and outside the Congo, have committed – and still are committing – export fraud. They also extract and trade gold from concessions they do not own, while officials from the government, military and security services all steal gold. It is necessary to respond to these current crimes – but also to the crimes of the past. SARW proposes that investigations should be launched as soon as possible into the past loss of gold revenues due to the Congolese treasury, which have accumulated since the implementation of Congo's current Mining Law in 2002, so as to gain restitution from those responsible. Criminal or civil prosecutions should also be initiated before the end of the statue of limitations, which might prevent future restitutions.

SARW proposes the formation of a special, 'restitution' task force under the Ministry of Justice, which would be supported by all other relevant ministries, or that the mandate of the existing Anti-Fraud Brigade could be amended to empower its restitution work. Legal efforts should not only focus on the DRC. The body in charge of the restitution effort should also make use of all international legal assistance treaties, as well as request support from INTERPOL, the World Customs Organization, and other international law-enforcement partners to ensure that all parties involved in illegal trading chains are held to account for the losses suffered by the Congolese.

## 2.
### Prosecute all those involved in the illegal production, trade and exportation of gold

The authorities – perhaps using the same 'restitution' task force or Anti-Fraud Brigade – should investigate and prosecute everyone implicated in the theft of raw gold, the trade and export of illegally-obtained gold, smuggling gold, underreporting gold exports, and all violations of legally granted concession rights. The task force should pay particular attention to the bribery of public officials. The task force should make use of all international legal assistance treaties, including seeking assistance from INTERPOL and the World Customs Organization and its regional offices.

## 3.
### Audit SOKIMO's revenue and management systems

Gathering the income from taxation, fees, and exports of artisanal gold extracted from territories entrusted to SOKIMO, as well as the management and accounting systems employed for this task, appear to be dysfunctional. There appears to be no public accounting for SOKIMO's revenues, and no statements of external auditors confirming or denying SOKIMO's accounting results. The Congolese parliament must demand that the state-owned gold company, SOKIMO, undergoes full revenue and management system audits to ensure greater transparency and accountability – and that these audits should be undertaken and published on an annual basis. As long as SOKIMO is a state-owned enterprise, the minister who bears ultimate responsibility should be held accountable if SOKIMO's management is derelict in this regard.

## 4.
### Conduct regular audits of gold exploration permit holders

The stark differences in the performance of corporate partners in the development of the Congo's richest gold deposits should be a wakeup call to the Ministry of Mines. It cannot be in the interest of the Congolese people that some companies are able to hoard very large concessions without showing any visible progress towards industrialised exploitation within five years. SARW proposes that the authorities should conduct audits of industrial exploration permit holders at regular intervals to ascertain whether they are accurately reporting their progress and to ensure that public officials maintain control of their scheduled exploration activities. Part of the audits should include reviews and analysis of the joint-venture partners' ability to raise sufficient capital to build industrialised mining facilities.

## 5.
## Tighten border controls and strengthen search and seizure mandates

Border control agencies should coordinate their efforts with the Centre for Evaluation, Expert Analysis and Certification of Precious Minerals (CEEC) to enforce compliance with certification rules and the payment of export taxes. Border control agents must begin routine body and cargo searches and strengthen their search and seizure procedures.

As long as virtually all artisanal raw gold is exported illegally from the DRC, border control agencies must accept the blame and the need to strengthen their coordination with other law-enforcement agencies as well as their search and seizure procedures. SARW proposes that border control agencies should coordinate their efforts with the CEEC to facilitate real-time information exchanges and enforcement actions to ensure compliance with certification rules and the payment of export taxes. Furthermore, border control agents – supported by police and wherever possible in the presence of CEEC agents – should conduct routine body and cargo searches at all crossing points along Congo's eastern borders, as well as at all airports with direct flights to Entebbe, Nairobi, Kigali, Mwanza, Dar es Salaam, Bujumbura, or any other regional destinations, as well as on all seaports connecting to neighbouring states.

## 6.
## Launch diplomatic initiatives to secure support for restitution and intensified law enforcement efforts

The illegal trade of Congolese gold implicates neighbouring states as well as those who accept raw gold deliveries from Central Africa without imposing due diligence on their national gold traders and refiners. The Congolese foreign ministry should launch a bilateral and multilateral diplomatic initiative to ensure international compliance with, and support for, the country's efforts to secure restitution and pursue current criminal activities across international borders. The Congolese authorities should specifically work with the governments of:

- Uganda, Burundi, Kenya, Rwanda, Tanzania, and Sudan to screen gold importers to ensure that they are not connected with criminal activities and gold smuggling, and that they do not aid and abet people or companies that seek to evade Congolese tax and customs duties;

- The United Arab Emirates, India, Lebanon, Turkey, Switzerland, Belgium, UK and other gold processing and trading states to remind them of their obligations to screen consignments of gold from central Africa to ensure that they are not connected with criminal activities and gold smuggling, and that they do not aid and abet evaders of Congolese tax and customs duties; and

- The UK, Canada, South Africa, Australia, Sweden and other states where gold mining companies operating in the Congo apply for a listing or are listed on their stock exchanges to ensure that these enterprises are adhering to the corporate social responsibility standards imposed by their respective stock exchanges, and that they are not involved in, or tolerant of, corrupt or criminal practices in the Congo.

## Exhibit 35





Exhibit 35



DRC-34996 1188

## ANNEX 1

### METHODOLOGY

SARW's research was initiated in September 2011. Twelve Congolese experts and researchers were initially brought together in Goma to develop a research agenda and agree on a methodology. Following these preparatory steps, the researchers commenced their monitoring of artisanal and small-scale gold mining communities in the provinces of Maniema, Orientale, North- and South-Kivu.

Concurrently with the field research, they also conducted research on some of the commercial actors and their government counterparts. For export-related data, SARW used those collected by the relevant government agencies.

In order to ensure a complete and accurate representation of all actors concerned, SARW attempted to interview all traders and companies currently active in eastern Congo or linked with the region's on-going gold extraction. In some instances, the interactions stretched over many weeks, and whenever possible exchanges were conduced by email or other forms of electronic communication. Some individuals or companies declined to comment, or limited themselves to the sparsest statements. Wherever companies following security exchange regulations have issued public statements with regards to pertinent events, SARW reflected this public record and where necessary, requested follow-up information.

Beyond reflecting the current situation of the described actors, this report also refers extensively to historic studies and contemporaneous reporting researched in Congolese and other archives. Among frequently cited documents, which are commonly considered important elements of the public record on Congo's gold industry, are reports issued by various UN agencies, including the reports of the Group of Experts established under UN Security Council Resolution 1533 (2004). As a member of the UN Group of Experts, and consultant to the Ministry of Mines of the DRC and the ICGLR, the author of this SARW report was at time mandated to provide information to policy decision makers, including to those shaping measures against the illegal exploitation of natural resources and those imposing UN and other targeted sanctions.

Exhibit 35



 DRC-34996 1189
Conflict Gold to Criminal Gold

# Exhibit 35

## ENDNOTES

**1.** Bwami is a term that, among other meanings, is the plural of Mwami, which is used in some Bantu languages to signify a leader. While some Congolese societies use the term to describe a King, others use it to signify a leader with occult powers.

**2.** UN Security Council 24 January 2000, Transcript of 4092 Meeting S/PV.4092

**3.** 'The real economy of Zaire, the contribution of smuggling and other unofficial activities to national wealth' by Janet MacGaffey, Vwakyanakazi Mukohya, Rukarangira wa Nkera, Brooke Grundfest Schoepf, Makwala ma Mavambu ye Beda, Walu Engundu, University of Pennsylvanai Press, 1991

**4.** https://www.freetheslaves.net/congo Homepage of the US organisation "Free the Slaves" makes the claim under the subtitle: Types of slavery in DRC mining zones: (website accessed on 26 September 2013)

**5.** http://pactworld.org/dr-congo Homepage describing PACT's engagement in the natural resource sector in eastern DRC (website accessed on 26 September 2013)

**6.** An example is Section 1502 of the US Dodd Frank Act, which requires companies with reporting obligations under the US Security and Exchange Commission to disclose to the public if they import and use coltan (columbine-tantalite), cassiterite, wolframite and gold from the DRC. In other jurisdictions, notably the European Union and Canada, advanced drafts of similar regulations and guidelines are under review.

**7.** Generally understood to be a payment system but under King Leopold II it was used to coerce Congolese leaders (Mwami) to assist in the requisition of workers, porters, food, and construction materials

**8.** A bull whip made of hippopotamus hide. Sometimes nails were attached to its end to cause particularly deep and painful wounds. The use of the chicotte was a legal and frequently applied disciplinary measure in the Congo Free State, which could lead to the loss of limbs, ears or noses.

**9.** See "Le Développement Économique du Congo Belge pendant la Guerre" by Jacques Crokaert, published by Goemaere, Imprimeur du Roi, Belgium, 1921

**10.** Referring to an October 1923 bulletin by the US Department of Commerce quoting assessments about the Belgian Congo's mineral potential. The bulletin was quoted in the New York Times 22 October 1923: Belgian Congo rich in minerals.

**11.** David Northrup describes in considerable detail the labour conditions at the gold mines of that period in "Beyond the Bend in the River", Ohio University, Monographs in International Studies, Africa Series, No. 52, Athens, Ohio 1988

**12.** The framework for the political and economic separation between Belgium and its Congolese colony was subject of the "Roundtables" held in Brussels during the final months before actual independence. However, the Congolese participants were not prepared to counter the calculated Belgian strategies to confuse, minimise, and delay their true obligations to the Congolese. Therefore the Congo became independent but was

robbed of the economic and financial backbone essential to operate an emerging state.

**13.** The Archives of the Gold Mines of Kilo-Moto by Agayo Bakonzi, in African Studies Association, Vol 9, 1982, pages 355-358

**14.** The term used for those Congolese who had achieved higher educational degrees. At independence in 1960, there were only 20 Congolese with university degrees, while just 749 were enrolled in university education and 445 in post-secondary school professional training.

**15.** During the Motubo area, various terms were used to describe off-the books transactions, corruption or black-market activities. 'Système D' was the short term for 'L'économie de débrouillardise', 'Affaires personnelles' or to refer to Mobutu's frequent advice: "Débrouillez-vous!"

**16.** Vwakyanakazi, Mukohya: Creuseurs d'or et crise socio-economique au Nord-Kivu en Repulique du Zaire ; Africa : Rivista Trimestrale di Studi e Documentatzione dell Instituto Italion per l'Africa e l'oriente ; Anno 47, No. 3 Septembre 1992, pp 375-391, Published by Istituto Italiano per l'Africa e l'Orientale

**17.** Entrepreneurs and Parasites by Janet McGaffey, Cambridge University Press 1987, specifically page 161 recounts how the collapse of the infrastructure results in transportation delays and added costs to trade

**18.** Mukohya Vwakyanakazi published his research in African Traders in Butembo, Eastern Zaire (1960-1980), University of Wisconsin-Madison, 1982, and is widely quoted about the emergence of semi-permanent villages by illegal gold miners in Kivu in Janet MacGaffey's, Entrepreneurs and Parasites, Cambridge University Press, 1987

**19.** Vwakyanakazi, Mukohya: African Traders in Butembo, Eastern Zaire (1960-1980), University of Wisconsin-Madison, 1982, pp. 334

**20.** A spectacular example is Laurent-Désiré Kabila's gold business during his 30 years of refuge in South Kivu (see below)

**21.** Patience Kabamba explains in his book 'Business of Civil War' (Council for the Development of Social Science Research in Africa, 2013) how "the Zairian state's parasitic relationship to its people…has allowed the Nande actors to bail themselves out of the state's life."

**22.** The consequences of Nande's relative isolation from Congo's governing bodies and what it meant for their political and economic autonomy was observed by many researchers, including Janet McGaffey in Entrepreneurs and Parasites (Cambridge University Press, 1987): "However, this distance from the central government also meant that the Nande were to some extend beyond its control." Or more recently, Patience Kabamba remarked in Business of Civil War (Council for the Development of Social Science Research in Africa, 2013, p 12): "The Nande had never had good relations with the Congo's central government, and since Independence have constantly worked outside the state structure."

**23.** The Real Economy of Zaire: The Contribution of Smuggling and Other Unofficial Activities to National Wealth by Janet MacGaffey and Vwakyanakazi Mukohya, University of Pennsylvania Press, November 1991

**24.** Entrepreneurs and Parasites: The struggle for indigenous capitalism in Zaire by Janet MacGaffey, Cambridge University Press, 1987

*Conflict Gold to Criminal Gold* 31

# Exhibit 35

**25.** Janet MacGaffey states, "It was general knowledge in the town of Butembo in 1980 that the basis for the prosperity of many Nande businesses was the illegal gold trade, which brought plentiful supplies of otherwise unobtainable imports." Entrepreneurs and Parasites: The struggle for indigenous capitalism in Zaire, Cambridge University Press, 1987, page 147

**26.** The best developed thesis on this subject was presented by Janet MacGaffey in Entrepreneurs and Parasites: The struggle for indigenous capitalism in Zaire, Cambridge University Press, 1987

**27.** Jacques Depelchin questioning Janet MacGaffey's notion of a Second Economy illustrates the range of thinking on this issue that went on during the early 1980s among scholars: "…it seems quite clear that the phenomenon is so widespread that what she calls the second economy makes sense only when viewed as an apparently marginal but actual central aspect of the Zairian economy. It would seem that the distinction the author injects results from her acceptance of the moralistic analysis of those political scientists who posit a division between genuine capitalists and fake capitalists – the political aristocracy." From the Congo Free State to Zaire (1885-1974) by Jacques Depelchin, Codesria Book Series 1992, page 62

**28.** Sovereignty and personal rule in Zaire, by William Reno, African Studies Quartlery, Volume 1, Issue 3 (1997)

**29.** A Continent for the taking, by Howard W. French, Alfred A. Knopf, New York 2004, page 207

**30.** Dancing in the glory of monsters, by Jason K. Stearns, Public Affairs, New York 2011, pages 116-117

**31.** Africa's World War: Congo, the Rwandan genocide, and the making of a continental catastrophe, by Gerard Prunier, Oxford University Press, New York 2009

**32.** Much of the content about Kabila in Fizi is taken from Cosma Wilungula Balongelwa: Fizi 1967-1986; Le Maquis Kabila, Institut African Cedaf, Brussles and Editions L'Harmattan, Paris, 1997

**33.** Che Guevara, who had come to the Lake Tanganyika region to assist the Mulelist rebellion in 1965, most authentically assessed expectations about Kablia's leadership potential. His interactions with the rebels and with Kabila in particular were disappointing. While he saw in Kabila a man with the potential to lead the masses, he also questioned his reliability and his commitment to the revolution. The African dream: The diaries of the revolutionary war in the Congo by Ernesto Guevara; Grove Press 2001

**34.** Cosma Wilungula Balongelwa revealed Kablia's pseudonym in: Fizi 1967-1986; Le Maquis Kabila, Institut African Cedaf, Brussles and Editions L'Harmattan, Paris, 1997. The study was conducted in 1987 but published only 10 years later, when Kabila succeeded in his war against Mobutu and installed himself as President. No other source for the pseudonym is known. However, the existence of the business and extensive gold trading in Dar-es-Salaam is widely known among contemporary associates of Kabila.

**35.** Africa's World War: Congo, the Rwandan genocide, and the making of a continental catastrophe, Gerard Prunier, Oxford University Press 2009

**36.** Paul Kagame was officially elected President in April 2000

**37.** After the war, Kabila appointed Mawampanga Mwana Nanga as Minister of Finance. Less than a year later, Nanga was demoted to Minister of Agriculture and then appointed Ambassador to Zimbabwe, a position he still holds. In 2002, he was suspended for a short time after the UN Panel of Experts recommended that a travel ban and financial restrictions should be imposed on him for his shareholdings in COSLEG - the Zimbabwean company which enriched itself by expoliting Congolese natural resources during the Second Congo war.

**38.** After the he seized power, Kabila named Mututule Minister without Portfolio and later Minister of State Enterprises. However, Mututule's career barely lasted one year. In May 1998, he was arrested for alleged mismanagement of public funds. No report of the investigation has ever been published but Mututule has never held an official position again.

**39.** The Great Gold Rush in Zaire, New York Times, Howard French, 18 April 1997, page A6

**40.** Sustainable all-in cost basis reporting is a standard that is advocated by many investors, some leading gold producers and is under discussion with the World Gold Council. The all-in cost standard forces companies not just to report the cost per ton of ore but also to factor in all other costs, such as concession fees, taxes, royalties and overheads.

**41.** Société Zairoise Minière et Industrielle du Kivu (SOMINKI) was created in 1976 to merge 9 mining companies, some of which dated back to the early 1900s. It controlled a vast amount of infrastructure in Kivu province, including its own 6 hydro-electric plants, hundreds of kilometres of roads, numerous airstrips and maintenance facilities, and employed over 5,000 people for which it provided housing, medical care, education and recreation. When it was taken over, SOMINKI controlled 47 mining concessions covering 1,003,372 hectares and had 10 mining permits covering an area of 23,770 hectares with total holdings of 10,271 square kilometres within a 100,000 square kilometre area. The company operated an underground gold mine and 300 tons per day processing plant along with a number of alluvial and eluvial gold and cassiterite (tin) mining operations, producing approximately 10,000 ounces of gold and 650 tons of tin, which generated revenues of US$6,200,000 in 1995. More importantly, its underdeveloped gold deposits had been examined by independent consulting geologists CME & Company of Vancouver, which found that:

1) Mobale - an underground mine in production since 1923 that has produced in excess of 800,000 ounces of gold with more than 8,000 ounces in 1995. The 300 ton per day gravity flotation mill was operating at less than 20% capacity due to lack of investment capital. Previous engineering studies suggested the proven, probable and possible reserves could surpass its total historical production.

2) Twangiza - proven and probable open pit mineable oxide reserves were estimated at 5.5 million tons of 4.3 g/t or 759,000 troy ounces of gold with possible mineable sulphide reserves of 2.7 million tons or 148,000 troy ounces of gold. Geological potential was previously estimated at 1.2 million troy ounces of gold at a depth below 2100m and along the strike of the 4-kilometer mineralised trend.

3) Namoya – former underground mine that produced 128,000 troy ounces of gold from 1955-1961. Minerable sulfide reserves were estimated at over 300,000 troy ounces.

DRC-34996 1191
Conflict Gold to Criminal Gold

# Exhibit 35

4) Lugushwa - proven, probable and possible reserves were 30,000 troy ounces with a potential primary resource of over 300,000 troy ounces. Resource on two of the known hard rock occurrences totalled 3,000,000 tons of 4.5 grams per ton or 434,000 troy ounces of gold and 2,500,000 tons of 4 grams per ton or 321,500 troy ounces of gold.

The deposits within the Namoya-Twangiza trend include at least 10 known deposits discovered from surface geochemical prospecting. The belt represents an area equivalent in size to the Ashanti belt and displays similar characteristics in frequency of deposit and mineralogical associations. Little or no modern exploration technology has been applied to the evaluation of this area's potential. (Source: company press release from 1996)

**42.** The substance that led to the tensions described in the following 3 examples was studied and monitored by SARW researchers, as well as other representatives of local civil society groups and the media

**43.** Media release: CIBC Downgrades Banro to 'Sector Performer' on Instability In Northeastern DRC, November 21, 2012

**44.** OKIMO, as the original parastatal was called, ceased to exist in 2009 when the government transformed it into a public company and renamed it SOKIMO. In the text, OKIMO and SOKIMO will be used to reflect changes over time.

**45.** Digitalcongo.net reported on 20 July 2012 under "Crise à l'OKIMO, l'ancien ADG Bafoa au banc des accuses"; http://www.digitalcongo.net/article/85405 accessed on 2 October 2013; and Radio Okapi: La Sokimo rejette les accusations de mauvaise gestion proférées par un député provincial 11 October 2012

**46.** Jonah was originally CEO of Ashanti Goldfields Corporation before he engineered the merger with AngloGold to create AngloGold Ashanti

**47.** Initially, the credit was over US$1.2 million but this was subsequently increased to US$4 million, and later another US$140,000 was added. No interest was paid on this principal debt of US$41.4 million for 15 years.

**48.** Moto Goldmines Limited via Market Wire of January 31, 2008: News Releases Moto Goldmines Agrees to Increase Interest in the Moto Gold Project and to Placement to Sam Jonah.

**49.** Moto accepts Randgold offer, pays Red Back termination fee; Creamer Media Mining Weekly 5th August 2009

**50.** MINDEV International NV was a Luxembourg-registered partnership

**51.** In 1997, during the fog of the AFDL war against Mobutu, there was brief interlude when Russel Ressources claimed the concession rights. However, those rights were rescinded.

**52.** Paragraph 134 of the report of the UN Group of Experts S/2005/30

**53.** COMMUNIQUE DE PRESSE/ Direction Générale des Douanes et Accises, D.G.D.A. published in the Groupe Observateur - Quotidien d'Information Générales en RD Congo on Friday 21 June 2013

**54.** See for example Radio Okapi: Sud-Kivu : Les rebelles des FDLR reportent leur reddition; 1 June, 2014, at: http://radiookapi.net/actualite/2014/06/01/sud-kivu-les-rebelles-des-fdlr-renvoient-leur-reddition-pour-ce-lundi/#.U5DuryjwZpd accessed on 5 June 2014

**55.** It is debatable whether the February 2011 arrest of American, Nigerian and French gold smugglers in Goma represents an exception to this observation. Firstly, it was not border control agencies that

intervened in this case; and secondly, the case appears to be another example of competitive thievery among different groups of FARDC renegades as well as an attempt to stop ICC-wanted and UN-sanctioned Bosco Ntaganda.

**56.** For further information on Fametal see the company's website: http://www.craainternational.com/English/website/Famatel%20Sommaire/index.html

**57.** The content in this section was obtained during extensive phone interviews and email exchanges with Sameer Bhimji in early May 2013, as well as various interviews with other participants in the gold trade.

**58.** See UN Group of Experts report S/2014/42

**59.** The following section results from reviews of original documentation by the author as well as extensive exchanges with Alain Goetz from April to May 2013.

**60.** The following content is taken from Goetz's testimony to the Belgian Senat's 'Commission d'enquête parlementaire Grands Lacs' on 6 December 2002 2002 and from a personal interview with Alain Goetz on 5 May 2007

**61.** The incident was widely reported by Belgian and international media, as well as in UN Group of Experts report S/2007/423, paragraph 82

**62.** The UN Group of Experts reported the case under paragraph 157 of their report S/2009/603

**63.** The UN Group of Experts reported the case in their report S/2009/603

**64.** The Curse of Gold, Human Rights Watch, May 2005

**65.** Reports of the UN Group of Experts on the DRC, S/2005/30, S/2007/423, S/2008/773, S/2009/603, S/2012/348

**66.** As a member of the UN Group of Experts, the author of this report was at the time directly involved in researching the gold trade by Machanga. Much of the evidence that was presented to the Security Council Sanctions Committee for the DRC, which imposed the sanctions, was obtained from Rajendra Kumar Vaya and other officials of Machanga

**67.** The latest allegations were published in UN Group of Experts report S/2014/42

**68.** See for example The Standard: Two firms exported Sh5b gold this year, August 6th 2013 by Paul Wafulu. http://www.standardmedia.co.ke/?articleID=2000090230&story_title=Kenya%3A%20Two%20firms%20exported%20Sh5b%20gold%20this%20year%2C%20dossier%20claims

**69.** USGS Yearbook 2005 erroneously describes Machanga as Burundi's leading producer of gold, which was stated as amounting to 3905 kg

**70.** It is customary that suppliers receive credits for the small quantities of silver that refiners can commonly isolate in rawgold or doré gold.

**71.** See UN Group of Experts report S/2009/738

**72.** See UN Group of Experts report S/2012/843

**73.** See for example the report by the UN Group of Experts S/2012/843

**74.** See UN Group of Experts report S/2008/773

**75.** See UN Group of Experts report S/2009/603

**76.** At the time, Uganda had just started to identify its gold deposits with the help of foreign partners, including the Anglo-Uganda Corporation for the Kamalenge gold mine, as well as other deposits at Tira and Kisita.

# Exhibit 35

More recent discoveries show promising deposits in the Kitaka-Buhweju, Hoima, Kaliro-Ivukula and Aboke-Aloi regions. However, minor artisanal gold mining has historically taken place in the Buhweju, Kigezi, Busia-Bugiri, and Mubende-Kiboga goldfields. Artisanal exploitation was most sustained in the Karamoja area but given its close proximity to Kenya, most of that production was traditionally smuggled across the border to be sold to Kenya's gold dealers.

**77.** The Curse of Gold, Human Rights Watch, May 2005

**78.** For the full report see Judicial Commission of Inquiry into allegations about illegal exploitation of natural resources and other forms of wealth of the DRC 2001, Final Report published by the Ministry of Foreign Affairs of Uganda in November 2002

**79.** Most notably the ones from the UN Panel of Experts, such as S/2001/357, S/2001/1072 and, most notably, S/2002/1146

**80.** See reports by the UN Panel under S/2001/49; S2001/357; S2001/1072; S/2002/565; S/2002/1146; S/2003/1027

**81.** Salongo is the Lingala term for obligatory civil work that is a common practice in many Central African countries. It emerged after independence as a way to return to a traditional form of communal efforts and solidarity in resolving significant challenges.

**82.** A particularly noteworthy study is The Curse of Gold by Human Rights Watch, published in May 2005

**83.** The Curse of Gold by Human Rights Watch, published in May 2005

**84.** Report S/2002/1146 by the UN Panel of Experts on the illegal exploitation of natural resources and other forms of wealth in the DRC

**85.** See Wikileaks: https://wikileaks.org/plusd/ cables/06USUNNEWYORK1228_a.html last accessed in 5 June 2014

**86.** see report of the UN Group of Experts S/2005/30 and S/2005/436

**87.** Most of the details regarding his business Evariste Nshamamba related to SARW in several telephone interviews during April and May 2013 and ongoing email exchanges with the author. For further information about Etablissement Namukaya and UN investigations, see reports by the UN Group of Experts S/2007/423, S/2008/773, S/2009/603, S/2011/345, S/2011/738, S/2012/843

**88.** See report of the UN Group of Experts on the DRC S/2009/603

**89.** Arrête Départemental Numéro 065/RCD/CAB/DTME/2001, issued on 27 august 2001 and renewed with Arrête 018/RCD/CAB/DTME/2002

**90.** See for example Convention with Respect to the Laws and Customs of War on Land (Hague II) of 29 July 1899 that entered into force on 4 September 1900:

Article 48

If, in the territory occupied, the occupant collects the taxes, dues, and tolls imposed for the benefit of the State, he shall do it, as far as possible, in accordance with the rules in existence and the assessment in force, and will in consequence be bound to defray the expenses of the administration of the occupied territory on the same scale as that by which the legitimate Government was bound.

Article 49

If, besides the taxes mentioned in the preceding Article, the occupant levies other money taxes in the occupied territory, this can only be for

military necessities or the administration of such territory.

Article 50

No general penalty, pecuniary or otherwise, can be inflicted on the population on account of the acts of individuals for which it cannot be regarded as collectively responsible.

Article 51

No tax shall be collected except under a written order and on the responsibility of a Commander-in-Chief.

This collection shall only take place, as far as possible, in accordance with the rules in existence and the assessment of taxes in force.

For every payment a receipt shall be given to the taxpayer.

**91.** Report of the UN Panel of Experts on the illegal exploitation of natural resources and other forms of wealth in the DRC, S/2001/357

**92.** Interview with Kabangi Monulphe in Butembo on September 2012

**93.** ibid

**94.** UN Panel of Experts on the illegal exploitation of natural resources and other forms of wealth in the DRC, S/2001/1072

**95.** Information about Kisoni's family, business, murder and how his heirs have taken over the gold trade resulted from many interactions with individuals mentioned in this account, including the principals of UCI and Kisoni, by the UN Group of Experts and Human Rights Watch. Publicly available reports reflect this research for example in "The Curse of Gold" by HRW published May 2005 and Reports by the UN Group of Experts S/2005/30, S/2005/436, S/2006/53, S/2007/423, S/2008/43, S/2008/773, S/2009/603, and S/2011/345

**96.** Interview with Kabangi Monulphe in Butembo on September 2012 who is the legal advisor to Glory Minerals

**97.** Interview with government officials who wish to remain anonymous

**98.** Information obtained from senior government officials and regulators who prefer to remain anonymous

**99.** The high degree of discretion allowed Mutoka Sefu even to secure a supplier contract for the UN Peacekeeping Mission in August 2006 for $45 000 under contract number 7NUB-207030

**100.** UN report S/2009/603

**101.** Official statistics and estimates of Burundi's artisanal gold production widely diverge, but based on long-term observations by gold refiners it is likely that the national production varies between . 5 to 1 metric ton per year.

**102.** See UN Group of Experts report S/2014/42

**103.** See UN report by the UN Group of Experts S/2011/738 and Annex 142 of the same report

**104.** The 20 million ounce estimate is based on announcements by Banro and Kibali; and the US$20-24 billion value estimate is based on a per-ounce world market price of US$1000-1200.

**105.** Sustainable all-in cost basis reporting is a standard that is advocated by many investors, some leading gold producers and is under discussion with the World Gold Council. The all-in cost standard forces companies not just to report the cost per ton of ore, but to factor in all other costs, such as concession fees, taxes, royalties and overheads.

**106.** see for example the discussion in this report about Banro's share price collapse during the M23 attack against Goma



DRC-34996 1193
*Conflict Gold to Criminal Gold*

Exhibit 35



The mission of the Southern Africa Resource Watch (SARW) is to ensure that extraction of natural resources in southern Africa contributes to sustainable development, which meets the needs of the present without compromising the ability of future generations to meet their needs.

SARW aims to monitor corporate and state conduct in the extraction and beneficiation of natural resources in the region; consolidate research and advocacy on natural resources extraction issues; shine a spotlight on the specific dynamics of natural resources in the region and building a distinctive understanding of the regional geo-political dynamics of resource economics; provide a platform of action, coordination and organization for researchers, policy makers and social justice activists to help oversee and strengthen corporate and state accountability in natural resources extraction; and, highlight the relationship between resource extraction activities and human rights and advocate for improved environmental and social responsibility practices.

SARW focuses on 10 southern Africa countries but is also working to build a strong research and advocacy network with research institutions, think tanks, universities, civil society organizations, lawyers and communities in southern Africa, the African continent and beyond that are interested in the extractive industries as it relates to revenue transparency, corporate social responsibility, human rights and poverty eradication.

www.gold.sarwatch.org

DRC-34996 1194



6/15/23, 2:18 PM                    How 7.4 Tons of Venezuela's Gold Landed in Africa—and Vanished - WSJ

**Exhibit 37**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/how-7-4-tons-of-venezuelas-gold-landed-in-africaand-vanished-11560867792

# How 7.4 Tons of Venezuela's Gold Landed in Africa —and Vanished

Secret deliveries to a refinery in Uganda expose a global underground economy many suspect is helping Nicolás Maduro cling to power

*By Gabriele Steinhauser and Nicholas Bariyo*

June 18, 2019 10:23 am ET

ENTEBBE, Uganda—The government of Venezuelan President Nicolás Maduro is selling off his country's gold reserves. Some of it has passed through a secretive operation in East Africa, a gambit that evades U.S. sanctions.

On two early-March flights, at least 7.4 tons of gold with a market value over $300 million moved from Venezuela to a refinery in Uganda, say officials in Venezuela and Uganda, a foreign diplomat and Venezuelan opposition lawmakers, who have concluded Mr. Maduro's government exported the ingots.

The gold arrived on a Russian charter jetliner in two shipments at the international airport in Entebbe, says Ugandan national-police spokesman Fred Enanga. The accompanying paperwork identified the ingots, some with stamped labels partially scratched off, as Venezuelan central-bank property, says a senior Ugandan police officer who saw the bars and documents. Flight records show the trips originated in Caracas, Venezuela.

The shipments expose one link in a global underground economy many suspect is helping Mr. Maduro cling to power by bypassing the U.S.-dominated international finance system. Washington has recognized opposition leader Juan Guaidó as Venezuela's legitimate president, slapped financial and other sanctions on Venezuelan officials and institutions, and threatened penalties for others doing business with the regime.

DRC-34996 1229

**Exhibit 37**



Refining gold at AGR. PHOTO: ESTHER RUTH MBABAZI FOR THE WALL STREET JOURNAL

The standoff between the two leaders is reverberating beyond Venezuela, with some 50 countries joining the U.S. in backing Mr. Guaidó while others side with Mr. Maduro. What was once Latin America's richest economy is starving, its oil sales have dwindled and citizens are suffering through dayslong power outages and shortages of basic goods.

Gold sales, U.S. and other officials say, are one of the government's final financial lifelines.

The gold that arrived in Entebbe passed through African Gold Refinery Ltd., or AGR, in a compound about 500 yards from the old runway before being exported to the Middle East, Ugandan police say.

The refinery started operations in 2015. Some of the gold it processed was allegedly smuggled from conflict-torn eastern Congo and other African nations, according to officials with Ugandan police, the country's Financial Intelligence Authority and regional smugglers.

Gold from AGR has made its way into supply chains at U.S. companies including General Motors Co., General Electric Co. and Starbucks Corp., the firms' filings for 2018 with the Securities and Exchange Commission show, despite U.S. measures to discourage use of so-called conflict minerals from Congo.

GM prohibits suppliers from using forced or involuntary labor or engage in corrupt business practices, a spokesman says. GE declined to comment. Starbucks didn't respond to requests for comment.

**Exhibit 37**

## Gilded Age

Uganda doesn't mine much gold of its own, but the heavy metal has become its leading export.

Sources: Uganda Bureau of Statistics (production); Bank of Uganda (exports)

AGR General Manager Cherry Anne Dacdac says the company hasn't processed smuggled or conflict gold and declines to comment on the March shipments. She says all AGR's business is legal and that in a March 26 management meeting it agreed it won't accept transactions related to Venezuela.

AGR has processed and exported more than 38 tons of gold since it started operations, Ms. Dacdac says. The scale of its operation helped drive gold in 2018 to overtake coffee as the leading export from Uganda, which mines little of it.

The refinery appears to act with support from Ugandan President Yoweri Museveni, court and other documents reviewed by the Journal suggest. A spokesman for Mr. Museveni says the president "backs the plant just as he does all other investors" in his quest to transform Uganda's economy.

The Maduro government's prior gold sales have been an open point of contention. Between late 2017 and Feb. 1, 2019, the central bank sold at least 73.3 tons of gold, with a market value of around $3 billion, to companies in the United Arab Emirates and Turkey, the National Assembly's finance commission announced in February.

The White House on Nov. 1 announced sanctions intended to stop Venezuelan gold sales. Since then, several dozen more tons have been removed from the central bank and secretly exported, say opposition lawmakers and a person familiar with the bank's reserves. The bank for weeks was left without power and water.

"It's a fire sale," says one of the lawmakers, Ángel Alvarado, who is on the finance commission. "The regime is scraping the barrel, selling off anything of value to keep itself afloat."

How 7.4 Tons of Venezuela's Gold Landed in Africa—and Vanished - WSJ

**Exhibit 37**



Venezuelan President Nicolás Maduro with gold ingots at a 2018 cryptocurrency conference in Caracas. PHOTO: CARLOS BECERRA/BLOOMBERG NEWS

A U.S. Treasury Department official says: "Treasury is committed to holding accountable those operating corruptly in Venezuela's gold sector."

Spokesmen for Venezuela's central bank and Information Ministry didn't respond to requests for comment. The Maduro government has said little publicly about its gold sales and routinely dismisses sanctions and accusations of wrongdoing as part of an international campaign to besmirch Caracas.

## Mr. Goetz's gold

AGR was founded in 2014 by Alain Goetz, 54, a Belgian businessman who has worked more than three decades in the African gold trade.



AGR, roughly 500 yards from the old Entebbe runway. PHOTO: ESTHER RUTH MBABAZI FOR THE WALL STREET JOURNAL

DRC-34996 1232

How 7.4 Tons of Venezuela's Gold Landed in Africa—and Vanished - WSJ **Exhibit 37**

Gold is almost impossible to trace to its origin once refined. The United Nations says gold is the primary mineral financing militias and parts of the military in eastern Congo, funding a conflict that has killed millions.

Even before the Venezuelan shipments, AGR had drawn the scrutiny of Ugandan authorities for processing gold allegedly smuggled from conflict zones in Congo, as well as from South Sudan and Zimbabwe, much of which later leaves the country as Ugandan gold, according to Ugandan police, the country's Financial Intelligence Authority, regional smugglers and Congolese mining officials.



Ugandan President Yoweri Museveni, in white, with Alain Goetz and gold flakes at AGR in 2017. PHOTO: GAEL GRILHOT/AGENCE FRANCE-PRESSE/GETTY IMAGES

Sydney Asubo, executive director of the Financial Intelligence Authority, Uganda's government body in charge of combating money laundering, says the agency reported the smuggling activities to authorities and requested prosecution. No charges have been filed, he says, pending the conclusion of an investigation of AGR by Uganda's Inspectorate of Government over suspicions of tax evasion, smuggling and money laundering. Ali Munira, a spokeswoman for the Inspectorate, which is charged with investigating corruption and other abuses, confirms there is an investigation but declined to comment on details.

Mr. Goetz and AGR's Ms. Dacdac say they have complied with Ugandan and other laws. Mr. Goetz denies there are probes. Ms. Dacdac says she isn't aware of any investigations by the Financial Intelligence Authority or Inspectorate.