**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALAIN GOETZ,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 22-1204 (JEB) |
| **LISA M. PALLUCONI,** *et al.*, | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

The rebel angel Mammon, according to Milton, spent his numbered days in heaven forever "bent" over "admiring" the "riches of" its "pavement, trodden gold." John Milton, <u>Paradise Lost</u>, bk. I, ll. 681–82 (Modern Library ed. 2007) (1667). Unsurprisingly, then, upon his descent, he set about mining the riches of his new home, dispatching "his crew" of fallen angels to "open[] into [a] hill a spacious wound and dig[] out ribs of gold." <u>Id.</u>, ll. 688–90. His work was soon copied — by man. It was Mammon's voracious example, the poet's tale recounts, that first "taught" the human race how to "rifle[] the bowels of their mother Earth for treasures better hid." <u>Id.</u>, ll. 685–88.

If the United States is to be believed, Plaintiff Alain Goetz played a similar role in the Great Lakes region of Africa. In the Government's telling, not only did he enrich himself by trading conflict gold, but "by his suggestion," <u>id.</u>, l. 685, he demonstrated to others how it could be done — thereby helping construct the market that today funds the ruthless armed groups ravaging Eastern Democratic Republic of Congo. Goetz, a Belgian who now lives in Dubai, first began buying and selling gold mined in Eastern DRC during the country's brutal civil wars of the

1

1990s.  <u>See</u> ECF No. 40-3 (App. Pt. 3) at ECF p. 5 (2023 Evidentiary Memorandum) at 8–9.
According to the Office of Foreign Assets Control and the State Department, he quickly became
an integral player in the trade, infamous for sourcing much of his gold from rebel groups.  <u>See id.</u>
His "pattern of trade," the Government believes, left a devastating imprint: his eagerness to buy
gold from anyone, regardless of its source, helped create the illicit network of gold smugglers,
traders, and exporters that today provide the primary source of revenue for the area's murderous
armed factions.  <u>See id.</u>

After apparently leaving the Great Lakes region for some years, Goetz returned in the
mid-2010s, when he established his company African Gold Refinery (AGR) in Uganda.  <u>See id.</u>
at 3.  OFAC believes that from at least 2014 through 2017, Goetz used AGR to buy, refine, and
export gold mined in areas of Eastern DRC controlled by armed groups.  <u>See id.</u>  Pursuant to an
executive order that permits sanctioning those who provide indirect support to such groups,
OFAC placed Goetz on its Specially Designated Nationals and Blocked Persons List (SDN List)
in March 2022, even though by then he had nominally stepped down from leading AGR.  Doing
so froze any of Goetz's assets that were subject to U.S. jurisdiction and prohibited U.S. persons
from transacting with him.

Graveled by his designation, Plaintiff has filed two delisting petitions, one at the time of
his designation and a second one in mid-2023.  OFAC denied both.  In this suit against OFAC
and its Acting Director, Lisa M. Palluconi, Goetz challenges the second denial as arbitrary and
capricious under the Administrative Procedure Act.  Both he and the Government have filed
Motions for Summary Judgment.  Because OFAC's denial was not arbitrary, the Court will grant
the Government's Motion.

I.    **Background**

A.  <u>Statutory Scheme</u>

Since our nation's infancy, many of its leaders have viewed economic sanctions as "the most likely means of obtaining our objects without war."  James Madison, "Political Observations," National Archives (Apr. 20, 1795).  In 1977, amidst the Cold War, Congress passed the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, which grants the President broad discretion to impose economic sanctions on foreign entities and individuals in the event of a national emergency.  See <u>Fulmen Co. v. OFAC</u>, 547 F. Supp. 3d 13, 17 (D.D.C. 2020) (citing 50 U.S.C. § 1702(a)(1)(B)); <u>see also</u> <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 677 (1981).  The President may declare such a national emergency "when an extraordinary threat to the United States arises that originates in substantial part in a foreign state."  <u>Holy Land Found. for Relief & Dev. v. Ashcroft</u>, 333 F.3d 156, 159 (D.C. Cir. 2003).

In 2006, President George W. Bush issued Executive Order 13413, "declar[ing] a national emergency to deal with" the threat posed by "the situation in . . . the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities" and "constitutes an unusual and extraordinary threat to the foreign policy of the United States."  Exec. Order No. 13413, 71 Fed. Reg. 64105 (Oct. 27, 2006).  Eight years later, President Barack Obama amended that Executive Order "in light of the continuation of activities that threaten the peace, security, or stability of the Democratic Republic of the Congo and the surrounding region, including operations by armed groups, widespread violence and atrocities, human rights abuses, recruitment and use of child soldiers, attacks on peacekeepers, obstruction of humanitarian operations, and exploitation of natural resources to finance persons engaged in these activities."  Exec. Order No. 13671, 79 Fed. Reg. 39949 (July 8, 2014).

As amended, Executive Order 13413 authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to designate persons determined "to be responsible for or complicit in, or to have engaged in," certain conduct that "threaten[s] the peace, security, or stability" of the DRC or that "undermine[s] [its] democratic processes or institutions" in order to "block[]" those persons' "property and interests in property" in the United States. See Exec. Order No. 13413, as amended, § 1(a)(ii)(C); see also 31 C.F.R. § 547.201(a)(2)(iii) (codification). The Executive Order also authorizes the Secretary of the Treasury to "take such actions, including the promulgation of rules and regulations . . . as may be necessary to carry out [its] purposes," Exec. Order No. 13413, § 5; see also Exec. Order No. 13671, § 4, authority which has been delegated to OFAC. See 31 C.F.R. § 547.802. When OFAC designates a person under Executive Order 13413, he is added to the SDN List, and "all [his] assets in the United States or under the control of any person who is in the United States are 'blocked,' or effectively frozen." Zevallos v. Obama, 793 F.3d 106, 110 (D.C. Cir. 2015) (cleaned up). The regulations also prohibit U.S. persons or entities from engaging in transactions with a designee. See 31 C.F.R. § 547.201.

An individual may seek "administrative reconsideration" of his designation by filing a so-called delisting petition. Id. § 501.807; see also id. § 547.101 (incorporating OFAC's generally applicable administrative-reconsideration procedures into regulations specifically applicable to DRC). Such a petition may include "arguments or evidence that the person believes establishes" either (1) "that insufficient basis exists for the sanction" or (2) "that the circumstances resulting in the sanction no longer apply." Id. § 501.807(a). The person may also (3) "propose" taking "remedial steps" — "such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps" — which he "believes would negate the basis for the sanction."

Id. After reviewing a delisting petition and requesting further information if necessary, OFAC "provide[s] a written decision to the [blocked] person." Id. § 501.807(b)(3). "If OFAC denies a request for reconsideration, the blocked person may challenge that determination under the APA" or may file another administrative petition. Sulemane v. Mnuchin, 2019 WL 77428, at *2 (D.D.C. Jan. 2, 2019); see also Rakhimov v. Gacki, 2020 WL 1911561, at *1 (D.D.C. Apr. 20, 2020). As the D.C. Circuit has noted, a designee may "request delisting as many times as he likes." Zevallos, 793 F.3d at 110 (citing 31 C.F.R. § 501.807).

      B. Factual & Procedural Background

          1. *Designation (March 2022)*

Eastern DRC has been the site of the globe's deadliest strife since the Second World War. See App. Pt. 1 at ECF p. 54 (2018 Sentry Report) at 5. Untold millions are estimated to have perished since the conflict erupted in the 1990s, with millions more displaced. See id. at 5, 34 nn.64–65 (noting low-end estimate of 3.1 million deaths between 1998–2007). Although the conflagration was sparked and fed by other causes, the United States and NGOs assess that the gold trade has been a key catalyst of continued fighting and corruption. See App. Pt. 1 at ECF p. 8 (2022 Evidentiary Memorandum) at 6, 23; App. Pt. 1 at ECF p. 4 (2022 Press Release) at 1. Indeed, gold is considered the largest source of funding for the scores of armed groups who control — and fight over — the region. See 2022 Evid. Memo. at 6, 23. Those groups profit from the trade by illegally taxing small-scale miners, partnering with smugglers, raiding mines, and operating their own, including through the labor of young children and enslaved miners. See id. at 6; 2018 Sentry Report at 6 & 35–36 nn.74–75. Flush with profits from so-called "conflict gold," these armed groups have killed, raped, and maimed thousands of people, many of them

women and children.  See 2018 Sentry Report at 6 & 37 n.74; App. Pt. 2 at ECF p. 431 (2021

Sentry Report) at 3.

The conflict-gold trade relies on a network of smugglers, refiners, traders, and exporters.

After its extraction in Eastern DRC, the gold is typically smuggled into neighboring Uganda and

Rwanda, where it is often refined before transport to Europe or Dubai.  See 2022 Evid. Memo. at

7–8; 2018 Sentry Report at 8.  All told, during the late 2010s period in which OFAC believes

Goetz was active, the vast majority of gold mined in Eastern DRC — perhaps upwards of 90%

— was smuggled out, meaning it evaded official taxes and was therefore cheaper to trade.  See

2022 Evid. Memo. at 6–8.

Plaintiff, in Defendants' telling, not only benefited from that trade — he helped construct

it.  His history in the region goes back decades.  According to the State Department, the United

Nations, and other watchdogs, Goetz was "an integral and essential part of the conflict gold

trade" during the DRC's civil wars in the 1990s.  See 2023 Evid. Memo. at 8–9.  Indeed, by the

middle of the decade, he reportedly maintained a "near monopoly" on the trade in the region.

See 2018 Sentry Report at 7; see also App. Pt. 12 at ECF p. 91 (2023 State Memorandum) at 2.

Defendants believe that his prolific buying and trading — and in particular his "willingness to

accept gold from sources without regard to [the] risk" that it was conflict gold — "helped to

establish the illicit routes through which gold" moved out of Eastern DRC, thereby "help[ing]

create the ecosystem that exists today where gold is used by numerous armed groups to fund

conflicts and violence."  2023 Evid. Memo. at 8, 9; see 2023 State Memo. at 2–3, 5.

After an apparent hiatus starting around 2000, Goetz returned to the Great Lakes region

in 2015, when he established AGR in Uganda.  See 2018 Sentry Report at 8.  In 2016 if not

earlier, OFAC believes, AGR's operations began illicitly sourcing gold from violent areas of

Eastern DRC.  See 2022 Evid. Memo. at 17, 18–19 (describing UN and NGO investigations).  In

that time period — between 2015 and 2016 — Uganda's gold exports increased sixfold, an

increase Goetz took personal credit for even as he said there was no way to verify the origins of

the gold he processed.  See App. Pt. 1 at ECF p. 49 (2017 State Cable) at 1–2.  Export records

indeed showed that in 2017, AGR handled 99% of Uganda's official gold exports, see 2022 Evid.

Memo. at 18, and the company's Uganda-based refinery was considered one of the largest on the

African continent.  See 2018 Sentry Report at 1, 6.  Goetz reportedly expanded operations to

Rwanda in 2017.  See id. at 19.  By year's end, according to a United Nations investigation, he

was also handling nearly all of that country's gold exports — valued at some $500 million per

year — much of which comprised illicitly traded DRC gold.  See App. Pt. 1 at ECF p. 236 (May

2018 UN Grp. of Experts Report) at 21; 2022 Evid. Memo. at 19.

        In March 2022, pursuant to Executive Order 13413, OFAC blocked Plaintiff's property

and interests and concurrently designated AGR as well as eight other companies connected to

Goetz.  See App. Pt. 1 at ECF p. 1 (Blocking Order) at 1–2.  The agency found that there were

three separate bases for his designation.  It concluded that (1) Goetz "[was] responsible for or

complicit in, or ha[d] engaged in, directly or indirectly, support to persons, including armed

groups, involved in activities that threaten the peace, security, or stability of the [DRC] or that

undermine democratic processes or institutions in the DRC, through the illicit trade in natural

resources of the DRC."  2022 Evid. Memo. at 15; see 31 C.F.R. § 547.201(a)(2)(iii)(G).  In

addition, OFAC concluded that because AGR was now a sanctioned entity and Goetz had

represented the company (including as its CEO), he was sanctionable for (2) being "a leader of

AGR" and (3) having "acted or purported to act for or on behalf of, directly or indirectly, AGR."

2022 Evid. Memo. at 24–25; 31 C.F.R. § 547.201(a)(2)(v), (a)(2)(vii).

Plaintiff apparently caught wind that he would be sanctioned before it became public. See ECF No. 32-1 (Defs. MSJ) at 7. In a letter sent on the day of the sanctions' announcement, he requested a "stay" of his designation. See App. Pt. 3 at ECF p. 48 (Mar. 2022 Letter) at 1–2. A month later, he filed the original Complaint in this case, charging Defendants with having violated the APA by failing to consider his letter prior to designating him. See ECF No. 1 (Complaint), ¶ 39. Although the parties discussed a settlement, see ECF No. 9 (Mot. for Extension of Time) at 1, none materialized. In December 2022, Defendants therefore told Plaintiff that they would treat his March 2022 letter as a delisting petition, see App. Pt. 9 at ECF p. 16 (Dec. 2022 Letter) at 2, and this Court approved a plan for Defendants to adjudicate that petition before any briefing in this suit proceeded. See ECF No. 12 (Scheduling Order).

### 2. *First Delisting Denial (June 2023)*

In his letter-turned-petition, Goetz claimed that AGR's due-diligence procedures were sound and that, in any event, he had sold his shares in the company, was no longer its CEO, and was serving the company only "in a limited role as a consultant/promoter." See Mar. 2022 Letter at 3–4. In response to a follow-up questionnaire from OFAC, he further assailed the agency's factual foundations for his designation, but he also offered "Proposed Terms of Removal" — remedial measures that he said would negate the bases for his designation, see 31 C.F.R. § 501.807(a), and that he would perform in exchange for being delisted. See App. Pt. 3 at ECF p. 171 (Feb. 2023 Response) at 6–11.

Defendants denied the petition in June 2023. See App. Pt. 3 at ECF p. 1 (2023 Denial). They agreed with Plaintiff that one of the three bases for his designation was not still valid: because he was no longer CEO of AGR, he was not sanctionable for being "a leader of" the company. See id. at 2; 31 C.F.R. § 547.201(a)(2)(v). OFAC maintained, however, that he could

and should remain sanctioned because he had more generally acted on the behalf of the now-sanctioned company and because his conduct had indirectly supported armed groups.  See 2023 Denial at 2–3; see also 31 C.F.R. § 547.201(a)(2)(iii)(G), (a)(2)(vii).  The agency was unconvinced by his protestations of innocence, in large part because it found him not credible.  In particular, it believed that he had intentionally obscured the date on which he had ceased to maintain ownership or control of AGR.  See 2023 Evid. Memo. at 20–22.

Not only did that history of "obfuscation" cause OFAC to find unpersuasive his attempts to discredit the accusations against him, see id. at 22, it was also one reason why the agency found his proposed terms of removal unavailing.  Many of the measures — e.g., self-reporting his income and allowing for an annual audit — depended on a baseline level of trust that did not exist.  See id. at 24–25.  In addition, OFAC assessed that the circumstances resulting in his designation had not changed.  See 31 C.F.R. § 501.807(a).  That was so, the agency said, because Goetz still owned mineral companies that would allow him to reengage in the conflict-gold trade, and, having not accepted responsibility for his past actions, he had offered no evidence that his attitude or approach toward sourcing conflict gold had changed.  See 2023 Evid. Memo. at 10, 25–26.

### 3. *Second Delisting Denial (March 2024)*

Following the denial, Plaintiff told Defendants that he intended to provide them additional information pertinent to his designation.  The Court stayed proceedings to allow him to do so and permit Defendants time to consider the new material.

Plaintiff followed through by submitting, a month after the denial, a short letter in which he proposed to take three additional remedial measures.  See App. Pt. 12 at ECF p. 23 (July 2023 Letter) at 2–3.  He offered to (1) make a public statement "clarifying" his view that the conflict-

mineral trade harms the people, environment, and governments of the Great Lakes region; (2) donate an unspecified sum ("an amount that he [could] afford") either to a charity working in the Great Lakes region or to the governments of the DRC or Uganda; and (3) "undertake efforts in the future to promote and support advocacy initiatives related to supply chain transparency." Id.

OFAC sent Goetz a questionnaire asking him to elaborate on each of these rather vague offers. See App. Pt. 12 at ECF p. 100 (Aug. 2023 Questionnaire) at 2–3. The agency also noted that he could "provide any additional information . . . that could assist" its review of his request. Id. at 3. "Critically," OFAC wrote, the agency "would welcome further assurances that Mr. Goetz will not continue to engage in the behavior that resulted in his designation." Id. While Goetz provided some additional information about his proposals — and retracted his offer to make a charity donation — he took OFAC's invitation for more information primarily as an opening to once again attack the bases of his designation. See App. Pt. 12 at ECF p. 26 (Nov. 2023 Response) at 2–9. Among other things, he claimed that the agency's first denial revealed that it had made his delisting conditional on an admission of guilt, an approach he said was legally baseless. See id. at 7–8.

Defendants treated his letter and questionnaire response as a second delisting petition and denied it in March 2024. See App. Pt. 12 at ECF p. 1 (2024 Denial). Relevant here, they explained why Goetz's promises of future action were insufficient to negate the bases for his designation; rejected that his delisting necessarily turned on an admission of guilt; and explained why they agreed with the State Department that delisting Plaintiff would undermine the U.S. foreign-policy goals served by sanctions. See App. Pt. 12 at ECF p. 5 (2024 Evidentiary Memorandum) at 8–13.

Plaintiff then filed an Amended Complaint, charging the second denial as arbitrary and capricious in violation of the APA.  <u>See</u> ECF No. 31 (Am. Compl.), ¶¶ 113–24.  Defendants have now filed a Motion for Summary Judgment, <u>see</u> Defs. MSJ, while Plaintiff has filed an Opposition and Cross-Motion for Summary Judgment.  <u>See</u> ECF No. 33 (Pl. MSJ).  Having conducted an *in camera* review of the classified administrative record, the Court is prepared to address the Motions.

## II.    Legal Standard

Although styled as Cross-Motions for Summary Judgment, the submissions in this case seek the Court's review of an administrative decision.  In such a case, "summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  <u>Louisiana v. Salazar</u>, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  The district court therefore "sits as an appellate tribunal," <u>Rempfer v. Sharfstein</u>, 583 F.3d 860, 865 (D.C. Cir. 2009) (quotation marks omitted), meaning its analysis is confined to the administrative record, <u>CTS Corp. v. EPA</u>, 759 F.3d 52, 64 (D.C. Cir. 2014), and the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513 (2009).

Plaintiff alleges that Defendants' decision to deny his delisting petition was arbitrary and capricious in violation of the APA.  <u>See</u> Am. Compl., ¶¶ 115–24; 5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow," and the court must not "substitute its judgment for that of the agency."  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  Rather, the court must "presume[] the validity of agency action," <u>AT&T Corp. v. FCC</u>, 349 F.3d 692, 698 (D.C. Cir. 2003), and uphold OFAC's

action as long as it "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (cleaned up); see also State Farm, 463 U.S. at 43. The D.C. Circuit, moreover, has counseled that courts are to be particularly deferential to executive blocking orders, decisions that sit "at the intersection of national security, foreign policy, and administrative law." Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007); see also Olivares v. TSA, 819 F.3d 454, 462 (D.C. Cir. 2016) ("[W]e defer to the informed judgment of agency officials whose obligation it is to assess risks to national security.").

## III. Analysis

In challenging Defendants' delisting denial as arbitrary and capricious, Plaintiff argues that: (1) they lack a sufficient basis to designate him; and (2) it was unreasonable for them to conclude that the circumstances resulting in his designation remain unchanged and that his proposed remedial measures fail to negate the basis for his sanctioning. See Am. Compl., ¶¶ 114–24; see also 31 C.F.R. § 501.807(a). Neither of his arguments hits a vein. The Court first addresses his attempts to undermine the foundation of his designation and then turns to his fallback position.

### A. Bases for Designation

#### 1. *Indirect Support to Armed Groups*

Plaintiff complains that OFAC did not adequately establish that he indirectly supported armed factions operating in the DRC. Recall that Goetz was originally sanctioned because OFAC believed that he had, among other things, "directly or indirectly" "engaged in . . . [s]upport to persons, including armed groups, involved in activities that threaten the peace, security, or stability of" the DRC "through the illicit trade in [its] natural resources." 31 C.F.R.

12

§ 547.201(a)(2)(iii)(G); see 2022 Evid. Memo. at 2, 15; 2022 Press Release at 2–3.  Goetz objects that the "administrative record fails to specify conduct linking [him] to rebel groups purportedly operating in the DRC."  Am. Compl., ¶ 119; see Pl. MSJ at 36–37.  He thus concludes that OFAC's decision was arbitrary because, rather than put forth any "concrete or specific evidence" tying him to armed groups, the agency relied on "various inferences and assumptions."  Pl. MSJ at 37.  Plaintiff, then, does not directly challenge — for example, with new exculpatory information — that his conduct benefited armed groups.  He instead nitpicks the form of Defendants' reasoning, decrying it as reliant on "attenuated" logical steps, id., and "circumstantial" evidence.  See ECF No. 37 (Pl. Reply) at 16.  That line of attack is not persuasive.

As an initial matter, the standard is whether substantial evidence supports the finding that Plaintiff indirectly supported armed groups in Eastern DRC.  To show that Defendants have failed to clear that threshold, see Pl. MSJ at 37, Plaintiff faces a difficult climb.  For an OFAC designation, "[t]he APA's substantial evidence standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."  Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, 857 F.3d 913, 925 (D.C. Cir. 2017) (emphasis added) (quotation marks omitted).  "If that threshold is met," this Court "must uphold the agency's judgment regarding the relevant facts, even if [it] think[s] the evidence tends to weigh against the agency's finding." Id. (quotation marks omitted).  This Court therefore asks only "whether record evidence" can "support[] the agency's ultimate decision," not whether it "could support [Plaintiff's] view of the issue."  Zevallos, 793 F.3d at 114 (emphasis added) (cleaned up).

Defendants satisfy that standard twice over.  To start, the non-public record material that they relied upon (and that this Court reviewed in camera) itself contains substantial evidence that

Goetz indirectly supported two armed groups who have contributed to the instability of the DRC. See 2023 Evid. Memo. at 22; see also People's Mojahedin Org. of Iran v. Dep't of State, 327 F.3d 1238, 1241–43 (D.C. Cir. 2003) (rejecting that OFAC's reliance on classified evidence necessarily violates due process).

Even disregarding that redacted material and relying only on the public record, Defendants' decision is not arbitrary.  Plaintiff is correct that, insofar as they relied on the public record, Defendants' decision was grounded in circumstantial evidence.  He is wrong, however, to the degree he insists that any reliance on circumstantial evidence necessarily makes a decision arbitrary.  See Pl. Reply at 16.  He offers no authority supporting that sweeping proposition, see, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (circumstantial evidence can "be more certain, satisfying and persuasive than direct evidence"), which not only runs headlong into the substantial-evidence standard but would moreover invert the deference owed the Executive Branch's fact-finding in this arena.  In the realm of international affairs, courts must "respect" the Government's "conclusions" as to its ability "to collect[] evidence" and the "factual inferences" it "draw[s]" from that evidence.  See Holder v. Humanitarian L. Project, 561 U.S. 1, 34 (2010). That is especially true when the Government's "national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain."  Id.  Such is the case here: Defendants seek to confront — and collect information about — ruthless armed factions and sanctions-dodging mineral traders operating in areas of the DRC ravaged by decades of civil conflict.  A prohibition against circumstantial evidence is thus untenable.

Nor, as Plaintiff contends, was Defendants' reasoning corroded by logical holes.  In denying his second delisting petition, OFAC relied on and incorporated its reasoning from both

the original designation and the first denial.  See Defs. MSJ at 13–14.  At each stage, Defendants'
circumstantial reasoning took the following form: because Goetz was heavily involved in trading
and refining gold originating in parts of the DRC controlled by armed groups and because such
trade was a main source of revenue for those groups, OFAC inferred that he had "indirectly"
"engaged in . . . [s]upport to . . . [those] groups."  31 C.F.R. § 547.201(a)(2)(iii)(G); see 2024
Denial at 2; 2024 Evid. Memo. at 5; 2023 Evid. Memo. at 9; 2022 Evid. Memo. at 15–23.
Although Goetz quibbles with the premise that he trafficked gold touched by armed groups, he
mainly challenges the key inferential step: to conclude that he had indirectly supported those
groups simply because he traded gold dug from mines or regions they controlled, he says, is an
indefensible logical leap.  See Pl. MSJ at 36–37; Pl. Reply 16.

Hardly.  Such an inference might be a stretch if Goetz were some bit player in the trade.
But the record before OFAC substantiated its view that he was the trade's architect and, at the
relevant time, remained one of its main beneficiaries.  The Court will walk through the evidence
supporting OFAC's inference.

*First*, a 2018 NGO investigation, which relied in part on interviews with traders and
government officials, found that Goetz then controlled "a significant portion of the market for
gold trafficked" out of the DRC.  See 2022 Evid. Memo. at 18 (quoting 2018 Sentry Report at 3).
It reported that Goetz annually refined up to eight tons of gold — worth $500 million —
originating from provinces in Eastern DRC where scores of armed groups operated.   See id. at 6
(citing 2021 Sentry Report at 4); id. at 16–17 (citing 2018 Sentry Report at 11); 2022 Press
Release at 2.  For reference, that amount equaled nearly all of Uganda's gold exports in 2018 —
exports that, remember, are widely thought to comprise gold smuggled into Uganda from other

countries.  See 2022 Evid. Memo. at 6–7 (observing that Uganda's gold exports somehow

ballooned from $10 million in 2009 to $514 million in 2018).

Other journalistic accounts, non-governmental investigations, and governmental findings

confirmed that Goetz's hands were all over the conflict-gold trade.  For instance, separate United

Nations investigations in 2018 concluded that AGR knew it illegally sourced smuggled DRC

gold, and that as DRC gold was being laundered through Rwanda, Goetz "controlled" "the

official export route."  2022 Evid. Memo. at 19 (first citing App. Pt. 1 at ECF p. 522 (Dec. 2018

UN Grp. of Experts Report) at 19; and then quoting May 2018 UN Grp. of Experts Report at 21).

Similarly, in 2022 the European Union determined that Goetz's company had "received,

purchased, refined, and traded illicit gold originating from mines in the DRC that are controlled

by non-governmental armed groups."  2023 Evid. Memo. at 13 (quoting 2022 O.J. (L 316I) 1, at

8); see also id. at 14, 17–19 (media and NGO accounts).

Plaintiff makes a meager attempt to dispute that he had an outsized — perhaps keystone

— role in the trade of DRC conflict gold.  Unlike in his prior administrative salvos, Goetz's

Complaint does not truly challenge that finding.  Compare Am. Compl., ¶¶ 115–24, with id.,

¶¶ 19–20, and 2023 Evid. Memo. at 17.  In his briefing, however, he pleads innocence by noting

that, when first contesting his designation, he provided OFAC with "copies of AGR's due

diligence policies and procedures."  Pl. Reply at 16.  In the face of the overwhelming evidence

the Court just described, waving aloft "50 pages," id., of his company's due-diligence policies is

far from exonerating.  Even if this Court were inclined to think otherwise, it must credit OFAC's

conclusion that those on-paper policies were largely ignored.  Olenga v. Gacki, 507 F. Supp. 3d

260, 282 (D.D.C. 2020) (court "must defer to OFAC's resolution of which pieces of evidence

were most credible and convincing").  Nor were Defendants obligated to "identify how AGR's

compliance program was lacking," Pl. Reply at 16, when explaining their conclusion that AGR processed conflict gold. OFAC's duty is to justify with substantial evidence that sanctionable conduct occurred, not diagnose its upstream causes. If Goetz wants to avoid sanctions, fixing AGR's supply chain is his job, not OFAC's.

*Second*, ample evidence in the record supports the view that the mineral trade was a financial boon to the armed factions who controlled the regions yielding the gold that ended up in Goetz's hands. Those groups, the State Department and NGOs assessed, "exploited [the gold] trade" generally — "and sales to the Goetz network" specifically — "to earn millions of dollars," money that subsidized "horrific armed attacks that have left tens of thousands of innocent people dead." 2023 State Memo. at 5; see, e.g., 2021 Sentry Report at 4.

In short, then, Defendants had mounds of evidence showing that rebel groups benefited from the gold mined from the terrain they controlled, and that for a period Goetz traded huge sums of it. OFAC was therefore on solid ground inferring that Goetz had provided at least indirect support to those armed factions, especially in light of the agency's expertise and that of the State Department in this area. See State Farm, 463 U.S. at 43 (agency decision is reasonable if it is not "so implausible that it could not be ascribed to . . . the product of agency expertise").

OFAC's circumstantial conclusion, moreover, was reinforced by direct unclassified evidence. See id. (agency decision is reasonable as long as it does not "run[] counter to the evidence before the agency"). When first designating Goetz, OFAC found credible the allegations relayed in a 2017 diplomatic cable from the U.S. Embassy in Kampala that Plaintiff had "friendly" relationships with armed factions operating mines in Eastern DRC and that AGR was able "to get gold out of [the] DRC . . . violently through rebel groups that enslave miners." 2022 Evid. Memo. at 20, 23 (quoting 2017 State Cable at 3). Goetz does not impeach those

allegations, which are the sort OFAC may rely on.  See Basengezi v. Smith, 2024 WL 1050340,
at *7 (D.D.C. Mar. 11, 2024) ("The Government may rely on a range of materials in making and
justifying its designation decisions, including intelligence data, hearsay declarations, unverified
open source materials like news media reports, and even its own press releases.") (cleaned up),
aff'd, No. 24-5130 (D.C. Cir. Feb. 11, 2025); see also Zevallos, 793 F.3d at 112–13; Holy Land,
333 F.3d at 162.

         To be sure, OFAC's unredacted explanation was a bit thin.  The agency could have better
articulated the nature and mechanism of the indirect support, including whether it was only
financial or took other forms.  See, e.g., 2024 Evid. Memo. at 5.  But OFAC's decision need not
be "a model of analytic precision to survive a challenge."  Dickson v. Sec'y of Def., 68 F.3d
1396, 1404 (D.C. Cir. 1995).  Rather, "[a] reviewing court will 'uphold a decision of less than
ideal clarity if the agency's path may reasonably be discerned.'"  Id. (quoting Bowman Transp.,
Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).  The agency's route is plainly
visible here: Goetz's participation in the conflict-gold trade indirectly filled the coffers of rebel
factions.  Indeed, Plaintiff only assails the steps in Defendants' reasoning; he does not claim the
path was inscrutable.  See Pl. MSJ at 36–37.

         Contrary to Goetz's assertion, then, it was not arbitrary for OFAC to conclude that a
person whose company at one point annually handled some half-billion dollars' worth of gold
extracted from areas controlled by armed groups indirectly supported those groups.

                    2.  *Continued Designation for Past Conduct*

         Goetz also objects that his continued designation cannot be justified on prior
transgressions alone.  Beyond his just-described attempt to contest his links to armed groups, his
Complaint does not challenge the underlying bases for his designation.  See Am. Compl., ¶¶ 7–9,

115–24; see also Pl. Reply at 13 (offhandedly denying any past wrongdoing). Instead, he contends that the decision to keep him sanctioned based on that historical misconduct — rather than for ongoing violations — contradicts the designation criteria in Executive Order 13413 and the delisting criteria in OFAC's regulations. See Am. Compl., ¶¶ 115–16; see also Pl. MSJ at 32–33. Defendants respond that their denial was grounded in part on suspicions that Plaintiff had not severed ties with the conflict-gold industry and could easily reoffend, see ECF No. 35 (Defs. Reply) at 10, a basis the Court addresses below. See infra Section III.B.1. But Defendants also maintain that it would not be arbitrary to sustain Plaintiff's continued designation based solely on his historical transgressions. See Defs. MSJ at 18–19. The Court agrees.

Executive Order 13413 as amended plainly permits sanctioning individuals for past conduct alone. It authorizes OFAC to designate individuals if they "have engaged in" certain actions, including providing "support" "through the illicit trade in [the DRC's] natural resources" to "armed groups" whose "activities . . . threaten the peace, security, or stability of the [DRC] or . . . undermine [its] democratic processes or institutions." Exec. Order No. 13413, as amended, § 1(a)(ii)(C)(7) (emphasis added); 31 C.F.R. § 547.201(a)(2)(iii)(G) (2024) (same). The limitation Goetz seeks thus cannot be found on the face of the Executive Order, which explicitly contains "past-tense designation criteria." Basengezi, 2024 WL 1050340, at *7.

Nor do the policies served by economic sanctions counsel that a continued designation based solely on past conduct is necessarily arbitrary. Both OFAC and the State Department maintain that "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior." Olenga, 507 F. Supp. 3d at 281 (quotation marks omitted); see OFAC, Filing a Petition for Removal from an OFAC List (last visited Jan. 21, 2025),

https://perma.cc/4MVD-6YVH; U.S. State Dep't, <u>Learn More About the Department of State's Delisting Process</u> (last visited Jan. 21, 2025), https://perma.cc/G7AL-TC2B.  That goal, both agencies acknowledge, is often furthered by delisting persons when they have rectified their ways.  <u>See</u> U.S. State Dep't, <u>Delisting Process</u> ("The power and integrity of U.S. sanctions programs derive not only from the U.S. government's ability to designate and add persons to sanctions lists but also from its willingness to remove persons from such lists consistent with the law."); OFAC, <u>Filing a Petition</u> (same).  On the flip side, however, the Executive Branch can sometimes "reasonably conclude that the deterrence of international bad actors . . . requires the imposition of sanctions on those who have retired or moved on to other pursuits."  <u>Olenga</u>, 507 F. Supp. 3d at 281.  Such a determination would be well within the President's "broad authority under IEEPA," and it "is precisely the type of judgment that . . . falls outside the judicial ken."  <u>Id.</u> at 281–82.

For these reasons, this Court and others have repeatedly found it reasonable for OFAC to rely exclusively on past conduct when designating or refusing to delist an individual, both in cases arising under Executive Order 13413, <u>see</u> <u>Basengezi</u>, 2024 WL 1050340, at *7; <u>Olenga</u>, 507 F. Supp. 3d at 281–82, or a different executive order whose text also contains past-tense designation criteria.  <u>See</u> <u>Pejcic v. Gacki</u>, 2021 WL 1209299, at *4, 7–8 (D.D.C. Mar. 30, 2021) (upholding OFAC's denial of delisting petition in 2019 in part based on conduct from 2004 because operative executive order permitted sanctioning persons found "to <u>have actively obstructed</u> . . . the Dayton Accords") (emphasis added); <u>Karadzic v. Gacki</u>, 602 F. Supp. 3d 103, 114–15 (D.D.C. 2022) (affirming that same executive order meant "past conduct alone [was] sufficient for maintaining sanctions").

        In light of the foregoing, it was not arbitrary for Defendants to keep Goetz sanctioned on

the basis of his past offenses alone.  First, as just established, doing so did not exceed OFAC's

authority pursuant to Executive Order 13413.  Second, Plaintiff did not offer — and OFAC did

not unearth — any reason to disturb its original determination that Goetz had engaged in

sanctionable conduct, see 2024 Evid. Memo. at 8–9, just as the agency had reaffirmed that

finding in the first denial based on post-designation information.  See id. at 5 (OFAC explaining

that its 2023 Denial rejected Goetz's claims that it had relied on "unfounded media allegations"

or "outdated information") (citing 2023 Denial at 2); 2023 Evid. Memo. at 5–6, 11 (noting that

Goetz claimed OFAC's denial was based on information from 2017 but in fact relied on

information more recent than that).

        Third, OFAC provided a reasonable — indeed compelling — explanation for why

Goetz's delisting might jeopardize the foreign-policy aims of Executive Order 13413.  Informed

by State's views on the matter, OFAC reasoned that because Goetz had recently been sanctioned

by the European Union and was reportedly subject to other investigations by foreign countries,

delisting him could "undermine or complicate international efforts to enforce standards and

accountability" in the Eastern DRC mineral trade.  See 2024 Evid. Memo. at 15 (quoting App.

Pt. 12 at ECF p. 87 (2024 State Memorandum) at 4).  Those concerns echoed State's assessment,

expressed during the first denial, that because Goetz had "helped to create the conflict gold

trade" in Eastern DRC and because the United States views "disrupting" that trade as an

imperative given the "horrific" violence it catalyzes, delisting Goetz would undercut

accountability efforts undertaken by the United Nations and civil-society groups and thus

"undermine U.S. foreign policy."  2023 State Memo. at 2, 5, 7.  Although Plaintiff takes issue

with other aspects of State's foreign-policy guidance, see infra Section III.B.3, he does not

attempt to impeach this rationale.  For good reason.  It is plainly reasonable, and this Court could not flyspeck it under arbitrary-and-capricious review.  See Islamic Am. Relief Agency, 477 F.3d at 734 (judicial review of blocking orders is "extremely deferential").

Plaintiff does not contest any of those points.  Instead, he seeks to fell Defendants with a smaller-bore claim: he contends that this case is distinguishable from those cited just above — Basengezi, Olenga, Pejcic, and Karadzic — because OFAC's decisions there rested not just on the target's past conduct but also on "ongoing" violations.  See Pl. MSJ at 32–33.  Those cases, he thus asserts, mean that OFAC could not rely exclusively on "historic[al]" transgressions and instead needed to dredge up conduct that is ongoing or at least from "the recent past."  Id. at 33.  Plaintiff's objection sails far wide of the mark.

For one, even if those cases were distinguishable on those grounds, it would be of no matter.  In the Court's view, they serve merely to confirm its conclusion that designation under Executive Order 13413 can turn on conduct from the past — even the relatively distant past.  That conclusion follows in the first instance from the plain text of the Order and the fact that sanctioning individuals for historical actions can be reasonable, including when doing so vindicates the foreign-policy and national-security imperatives that sanctions serve.

Next, Plaintiff misreads those cases.  In Basengezi, this Court did not weigh in on whether OFAC had erroneously "conclud[ed] that [the plaintiff] continue[d] to" engage in sanctionable conduct.  See 2024 WL 1050340, at *7 (emphasis added).  Instead, it held that the agency's alternative justification — that plaintiff had "engaged in sanctionable conduct in the past" — was a "sufficient," "independent ground[]" for denying his delisting petition.  Id. at *6–7 (quotation marks omitted).  In Olenga, the court explained that even if OFAC had relied solely on past acts, as the plaintiff supposed, doing so was permissible under Executive Order 13413.

See 507 F. Supp. 3d at 281.  Neither "the text" of the Executive Order nor "OFAC's policies or regulations," the court said, "prevented OFAC from re-designating [the plaintiff] based on his past conduct."  Id.  Karadzic and Pejcic likewise affirmed that, under a similarly worded executive order, historical conduct alone can justify continued sanctions.  See Karadzic, 602 F. Supp. 3d at 114–15 (holding that although OFAC relied on recent conduct in addition to past conduct, each was "an independent basis to continue the sanctions"); Pejcic, 2021 WL 1209299, at *7–8 (holding that OFAC's decision was reasonable given the agency's reliance on both past and ongoing conduct, but stressing that past conduct alone can be sufficient).

In sum, Executive Order 13413 empowers OFAC to keep an individual sanctioned based solely on his past conduct, and doing so here was reasonable.  It therefore was not arbitrary for the agency to conclude that a sufficient basis exists for Goetz's continued designation.  In any event, as the Court will turn to now, Defendants' denial did rely in part on well-grounded concerns that Plaintiff's sanctionable conduct could easily recur.

B.  Changed Circumstances and Remedial Measures

In addition to attempting to discredit the underlying basis for his designation, Plaintiff's second delisting petition argued that: (i) there were several reasons why the "circumstances resulting in [his] sanction no longer apply"; and (ii) the "remedial steps" he proposed "negate[d] the basis for the sanction."  31 C.F.R. § 501.807(a).  Goetz asserts various arguments for why it was arbitrary for Defendants to disagree, but none pans out.

1.  Continued Ties to Conflict-Gold Industry

Plaintiff protests that because he has fully "severed" ties with AGR, it was arbitrary for OFAC not to conclude that the circumstances surrounding his designation had changed.  See Am. Compl., ¶ 122.  In the second denial, the agency reiterated that it agreed, as it had before, that

because Goetz had stepped down as CEO of AGR, he was no longer sanctionable on that basis alone.  See 2024 Evid. Memo. at 12; see also 2023 Denial at 2.  But OFAC explained, again as it had before, that even if Goetz no longer helmed AGR, the circumstances resulting in his sanction had not changed.  That was so because Plaintiff (1) has a "long history" in the illicit gold trade, (2) has "a history of obfuscating his ownership and control of AGR and other entities," and (3) despite having severed ties to AGR, still "currently owns and controls companies that may enable him to continue engaging in the illicit gold trade."  2024 Evid. Memo. at 12.  The Court has already explained that substantial evidence supports the first pillar, see supra Section III.A.2, and Goetz fails to chip away at the second or third.  The Court takes them in turn.

First, Plaintiff belatedly disputes Defendants' view that he misrepresented his relationship with AGR.  See Pl. MSJ at 34; Am. Compl., ¶ 122 (Defendants acted arbitrarily in not finding his lack of ties to AGR was a "clear change of circumstances").  This issue initially arose because, when rejecting his first petition, OFAC documented the way in which Goetz had obscured whether or when he had cut ties with AGR.  See 2023 Evid. Memo. at 20–25.  OFAC pointed to this "pattern of obfuscation," id. at 22 — the specifics of which the Court will dig into just below — not to suggest that any ongoing connection to AGR was itself a sufficient basis for designation.  Rather, while OFAC said that it has reason to doubt his claim to have "severed" all ties to AGR, id. at 25, it agreed that because he had stepped down as its CEO, he was no longer sanctionable by virtue of leading AGR.  See id. at 27; 2023 Denial at 2.  The agency instead invoked Goetz's history of obfuscation to explain that it believed him generally untrustworthy. That, in turn, was one reason why OFAC found unpersuasive his attempts to discredit the accusations against him, see 2023 Evid. Memo. at 22, and why it concluded that his proposed remedial measures (e.g., reporting requirements and periodic audits) did not negate the bases for

his designation — in short, OFAC did not believe that his reports or books would be truthful. See id. at 10, 24–25; 2023 Denial at 3.

Plaintiff did not contest any of those conclusions when, a month later, he initiated his second delisting petition, see July 2023 Letter at 1–3, and his attempt to do so now is unavailing. Both classified *ex parte* materials and the public record independently demonstrate a history of obfuscating his connections to AGR. The Court focuses here on the latter, which supports Defendants' conclusion that Goetz's account contains inconsistencies and, more importantly, is misleadingly incomplete.

The first blemish is the duration and nature of his role as a consultant for AGR. See 2023 Evid. Memo. at 23. Across several submissions, he offered a story containing the same chronology: he sold all shares in AGR in February 2018, resigned as its CEO in November 2018, and then served as a "consultant/promoter" for the company. See Mar. 2022 Letter at 4 & n.14; Feb. 2023 Response at 7; App. Pt. 4 at ECF p. 12 (Apr. 2023 Response) at 5. When first seeking delisting, in March 2022, he said that he was currently connected to AGR in that capacity, see Mar. 2022 Letter at 4, and produced a consultancy agreement delineating that he would advise the company and act as a "promoter" (*e.g.*, helping it drum up business). See App. Pt. 3 at ECF p. 148 (Memorandum of Agreement) at 2. In a later submission, however, he claimed that this agreement had in fact formally ended on June 7, 2021. See App. Pt. 8 at ECF p. 45 (May 2023 Response) at 3. As support, he attached a termination letter from AGR stamped with that date. See App. Pt. 8 at ECF p. 99 (Termination). To explain why he told OFAC in March 2022 that he was still serving as a "consultant/promoter," see Mar. 2022 Letter at 4, despite having been terminated from that position nine months earlier, Goetz said that he had continued to speak "publicly" in defense of the company even after his termination because he felt a "duty . . . to

rebut the allegations" against it.  See May 2023 Response at 3.  What is more, he asserted that he

actually "never . . . provid[ed] any services to [AGR]" through the agreement in the first

place.  Id. (emphasis added).

It was reasonable for Defendants to find this discrepancy suspicious and his explanation

neither pellucid nor convincing.  As Goetz would have it, he did not perform a single ounce of

promotion for AGR while being paid to do so, but then, after being fired, could not help but be

the company's promoter because he felt an irresistible "sense of duty" to do so.  Id.  Other pieces

of his explanation do not add up.  During the period in which he said that he was retained as a

consultant yet provided no services, see id. at 3, public reporting indicated that he was indeed

doing work for AGR.  See 2023 Evid. Memo. at 18, 22 (citations omitted).  It was thus not

arbitrary for Defendants to be left unsatisfied by his explanation and to therefore conclude that

he was being less than forthright.  See id. at 23 (saying he "walked back" his earlier statement);

Defs. MSJ at 20, 22.

More important than the murkiness around Plaintiff's consulting position, however, is the

evidence that he obscured his continued ownership or control of AGR.  Goetz repeatedly told

OFAC that he had divested all of his shares of AGR in February 2018.  See Mar. 2022 Letter at 4

& n.14; Feb. 2023 Response at 7; Apr. 2023 Response at 5.  In context, it was reasonable for

Defendants to understand that he had presented this claim as evidence that he lacked any

ownership in AGR post-divestment.  See, e.g., Feb. 2023 Response at 7 ("OFAC does not

evidence [sic] . . . that Goetz currently owns or controls AGR . . . . As previously evidenced,

Goetz divested from AGR in February 2018 and resigned as the company's CEO in November

2018 . . . .").  Indeed, he publicly maintained as much, telling the Wall Street Journal in 2019, for

instance, that he had "sold AGR."  <u>See</u> 2023 Evid. Memo. at 22 (quoting App. Pt. 10 at ECF
p. 78 (WSJ) at 6 [App. Pt. 11 at ECF p. 1]).

The evidence Goetz himself provided OFAC, however, indicated that he maintained
ownership and control of AGR — albeit indirectly — until June 7, 2021.  According to
documents he produced, when he divested from AGR in February 2018, he sold 99 of his 100
shares to a corporation called AGR International.  <u>See id.</u> at 21 (citation omitted).  OFAC
believes, however, that at the time of that sale, all of AGR International's shares were owned
by Goetz — meaning that he effectively sold his stake in AGR to himself.  AGR International's
incorporation paperwork from December 2017 lists Goetz as the sole owner of its 150,000
shares, and he admits that he did not sell them until June 7, 2021.  <u>See id.</u> (citations omitted);
App. Pt. 6 at ECF p. 9 (Apr. 2023 Response – Annex K) at ECF pp. 15, 32; App. Pt. 9 at ECF
p. 18 (June 2023 Response) at 2; <u>see also</u> Apr. 2023 Response at 5 (acknowledging that he was
"a shareholder and director of AGR International Ltd. from 2017 until June 7, 2021").  There was
thus substantial evidence to support Defendants' view that while Plaintiff repeatedly pointed to
his divestment of AGR to show his lack of ownership, such claims were highly misleading given
that he continued to own at least a majority stake in the company through AGR International.

Plaintiff does not anywhere dispute that conclusion.  He does not so much as mention the
issue in his Complaint or summary-judgment briefing, even though Defendants laid out the
incriminating evidence in the first denial, repeatedly referenced his "past obfuscation" in the
second, and now invoke his ownership of AGR International at multiple points in their briefing.
<u>See</u> 2023 Evid. Memo. at 20–21, 25; 2024 Evid. Memo. at 12; Defs. MSJ at 15–16, 21–22; Defs.
Reply at 5–6.  The Court thus has little trouble concluding that the record not only <u>can</u> support

— but is <u>best</u> read to support — Defendants' position that he obscured his ownership of AGR. See <u>Epsilon Elecs.</u>, 857 F.3d at 925.

*Second*, Plaintiff challenges Defendants' position that his continued ownership of mineral companies suggests that he could reengage in the conflict-gold trade relatively easily. See Am. Compl., ¶ 119. That conclusion, he objects, is "pure speculation" and in any event was inadequately explained. See Pl. MSJ at 35. His argument yields no ore.

Tracing the provenance of this issue again sheds light on whether Defendants' consideration of it was reasonable. In its first denial, OFAC decided that Goetz's continued ownership of other mineral companies also weighed against his delisting. Before deciding his petition, the agency sent Goetz a questionnaire asking him to explain his past and current relationship with 21 specific companies and, moreover, to provide a list of all companies he owned or controlled directly or indirectly. See App. Pt. 4 at ECF p. 9 (Mar. 2023 Questionnaire) at 2. Goetz responded that, at that time, he "own[ed] and/or control[led]" five companies. See Apr. 2023 Response at 4–5; <u>see also id.</u> at 5–6 (noting another two companies he controlled were undergoing liquidation). Based on answers and documents he submitted in response to a follow-up questionnaire, OFAC concluded that one of those five companies was a mineral wholesaler and two were involved in gold refining in Rwanda. See 2023 Evid. Memo. at 25 (first citing May 2023 Response at 6, 7; and then citing App. Pt. 11 at ECF p. 60 (Exhibit 44) at 3). Indeed, Goetz represented that he understood one of the latter refining companies — called Aldango, in which he held a 50% stake — to be "currently operational." See May 2023 Response at 7; <u>see also</u> Apr. 2023 Response at 7 (affirming 50% ownership stake through separate company). That information led OFAC, in the denial, to conclude that Goetz's "ownership and control of gold

and metals companies provide[d] [him] with the means to continue operating in the illicit gold trade."  2023 Evid. Memo. at 25–26; <u>see</u> 2023 Denial at 2.

      Goetz did not challenge that conclusion in his second delisting petition.  Nor did he suggest — as he now does, <u>see</u> Pl. MSJ at 35 — that he had sufficiently extracted himself from the Great Lakes gold trade such that the circumstances for his original designation no longer apply.  In his petition, he quoted but did not challenge OFAC's conclusion that "[e]ven if [he] purport[ed] to have formally distanced himself from AGR," there was "no basis to believe his views or approach to sourcing gold from high-risk or conflict areas ha[d] changed."  July 2023 Letter at 2 (first alteration in original) (quoting 2023 Denial at 3).  One would think that, if Goetz in fact had no intention or opportunity to source gold from fraught areas like Eastern DRC, he would correct OFAC's premise that he had any such "sourcing" "approach" to speak of.  <u>See id.</u> But he nowhere did so, instead offering to pursue the three additional remedial measures described above.  <u>See id.</u> at 2–3.

      In response to the questionnaire asking him to elaborate on those additional measures, recall, Plaintiff once again attacked the grounds for his designation.  <u>See</u> Nov. 2023 Response at 6–9.  Among other points, he reiterated that he had "demonstrated a change in circumstances by separating himself from those entities OFAC identified as the means through which he engaged in sanctionable conduct" — <u>i.e.</u>, AGR.  <u>Id.</u> at 9.  Earlier in his letter, however, he acknowledged that he still maintained ties to <u>other</u> mineral companies.  <u>See id.</u> at 6.  In response to OFAC's question about whether, as a remedial step, any companies that Goetz "own[ed] or control[led] intend[ed] to issue any public reports or take other public actions regarding their sourcing and supply chain practices," he said that he was "unable to provide" a "responsive" answer because "the companies in which he still maintain[ed] an ownership interest [were] inactive."  <u>Id.</u>  He

also said that while he "ha[d] no control over" Aldango as an "indirect shareholder," he was "in litigation . . . with respect to his [previously held] ownership interest." Id. In short, then, when it came time for Defendants to consider Plaintiff's second delisting petition, he had not contested their conclusion (from the first denial) that he retained connections to the Great Lakes mineral industry through companies he controlled.

It was hardly speculative for Defendants to see those companies as a means for recidivism. Plaintiff does not dispute that he still owns several mineral companies, including a wholesaler and at least one in Rwanda (called Aldabra) involved in refining. See Pl. MSJ at 35. (He claims that the litigation related to the other active Rwanda-based company he partially owns through Aldabra — Aldango — is not an attempt to regain his ownership stake, compare Pl. Reply at 7–8, with Nov. 2023 Response at 6, and Defendants say they do not have enough information to decide one way or another. See Defs. Reply at 6.) While he protests that some of his companies are "inactive," he does not maintain — much less produce evidence showing — that they are all "undergoing liquidation," see Pl. MSJ at 35, or otherwise moribund. On the contrary, as Defendants observe, in his June 2023 response Goetz said that Aldabra had a "director" who was "responsible for administrative duties," June 2023 Response at 2, suggesting that companies he describes as "inactive" at least have personnel and ongoing business functions. See Defs. Reply at 7. And Plaintiff provides no reason to question Defendants' inference that his possession of mineral companies could make it materially easier for him to plug back into the East Africa mineral trade — a predictive judgment that implicates Defendants' foreign-policy expertise and is therefore owed respect. Holder, 561 U.S. at 34.

True, Defendants again could have spelled out their reasoning with a bit more granularity. See 2023 Evid. Memo. at 25–26; 2024 Evid. Memo. at 12. But their path can be "discerned"

here.  Dickson, 68 F.3d at 1404 (quotation marks omitted).  OFAC repeatedly stressed that Goetz

had "decades" of experience in the illicit gold trade, described the extensive "network" of

companies he built up over that time as key to his prominent role, and painstakingly documented

the degree to which he retained connections to its crown jewel, AGR.  See 2023 Evid. Memo. at

9–10, 21–22.  It is evident from Defendants' decision, then, that Goetz's own history led them to

believe that remnants of his network provided him a vehicle for reengaging in illicit dealing.

In sum, Defendants did not act arbitrarily in failing to credit his asserted separation from

AGR because their decision did not turn on his ongoing connections to that company.  See 2024

Denial at 2; 2024 Evid. Memo. at 12.  Defendants instead concluded that there had not been a

sufficient change in circumstances warranting delisting, see 31 C.F.R. § 501.807(a), because they

were concerned that he could continue to engage in his erstwhile pursuits through other mineral

companies.  See 2024 Evid. Memo. at 7–8, 12.  That conclusion was reasonable given his

uncontroverted ties to those companies and Defendants' justifiable concerns about his

truthfulness.

### 2.  *Public Statements*

Plaintiff also faults Defendants for neglecting to see either his past public statements or a

hypothetical future one as evidence of a change in circumstances warranting delisting.  See Am.

Compl., ¶¶ 122–23.  Recall that when initiating his second delisting petition, Goetz simply

proposed three additional remedial measures, one of which was making a future public statement

acknowledging that the conflict-gold trade "has an adverse impact on local populations, fuels

corruption and violence, and leads to environmental degradation."  July 2023 Letter at 2.  He

would also, he promised, "call upon those in the gold industry to adopt policies and procedures"

to address those ills, id., and clarify or retract any prior statements that suggested otherwise.  See

Nov. 2023 Response at 4; see, e.g., 2023 State Memo. at 6 (documenting Goetz's prior

comments, including rejecting concept of conflict gold and downplaying civil war in DRC as

"pockets of violence exaggerated by NGOs") (quotation marks omitted).  In a subsequent

submission to OFAC, he pointed the agency to five statements he had already made on X

(formerly Twitter) in the prior months.  See Nov. 2023 Response at 3–4 & nn.3–7.

   Defendants were understandably unmoved by his posts on X or his proposed future

statement.  Start with the former.  Defendants justifiably agreed with State's characterization that

the posts were "vague, high level, and devoid of serious content" and therefore could "not

provide any meaningful demonstration of" changed behavior.  See 2024 Evid. Memo. at 9

(quoting 2024 State Memo. at 3).  As State rightly observed, one post referred to "a refiner facing

serious issues related to its supply chain integrity and practices," but it is entirely "unclear" from

the post whether Goetz even disapproves of the refiner's "practices."  Id. at 10 (quoting 2024

State Memo. at 3); see App. Pt. 12 at ECF p. 37 (Nov. 8 X Post).  Defendants aptly describe the

other posts as "generalized pablum."  Defs. MSJ at 25.  In one, Goetz proclaimed that "every

player" in the precious-metals industry "must work to build a sustainable and responsible

business environment."  App. Pt. 12 at ECF p. 43 (Nov. 22 X Post).  Another: "Everything must

be done to end the insecurity in DRC.  It is my belief that all mineral extraction that benefit [sic]

rebel groups should be referred to as conflict minerals and must be banned from the trade supply

chain. . . ."  App. Pt. 12 at ECF p. 39 (July 12 X Post).  It was therefore entirely reasonable for

Defendants to decline to view these statements as evidence that Goetz had seen the light.

   Nor can this Court fault Defendants for declining to delist Plaintiff based on his promise

to make a future public statement.  Such a vow did not constitute changed circumstances,

Defendants explained, because they agreed with State's assessment that it did not amount to or

even imply a real change in behavior.  See 2024 Evid. Memo. at 10–11.  In reviewing Goetz's

proposal, State explained that it was disinclined "to recommend delisting" because it believed

changed behavior was established through "tangible actions rather than plans to make future

statements," particularly when their content is described in "amorphous and vague" terms.  See

2024 State Memo. at 2–3.  That policy judgment is not one this Court can second-guess, see

Zevallos, 793 F.3d at 112, so long as it rests on an accurate assessment of his proposal, as this

one does.  Goetz indeed offered only a very vague sense for what the statement would say, and

Defendants had reason to doubt that its substance would be meaningfully different from his posts

on X.  See 2024 Evid. Memo. at 10; Nov. 2023 Response at 3 (promising public statement

"would underscore the[] principles" articulated in X posts).  It was therefore not arbitrary for

Defendants to find his promise insufficient to warrant delisting.  He remains welcome,

Defendants point out, to actually make his much-theorized statement and then file another

petition.

### 3.  *Admission of Wrongdoing*

Goetz next complains that OFAC will not delist him until he admits to having engaged in

sanctionable conduct, and he asserts that its purported position impermissibly expands the scope

of delisting criteria in the regulations, violates his due-process rights, and arbitrarily treats him

differently from other petitioners.  See Am. Compl., ¶¶ 118, 120–21.  Premised on a foundation

of quicksand, his claim sinks.

In the first denial, State's assessment of the foreign-policy implications of delisting Goetz

was one reason, among others, that OFAC concluded sanctions remained warranted.  See 2023

Evid. Memo. at 7–8.  State recommended "on foreign policy grounds" that Goetz remain

sanctioned for two reasons: he "refus[ed] to acknowledge his role in [the] illicit gold trade in the

DRC," and he "ha[d] failed to demonstrate a change in behavior related to these activities."  Id. at 8; see 2023 State Memo. at 1.  Channeling State, OFAC explained that although Goetz "helped to create the [DRC] conflict gold trade" starting in the 1990s, and has thereafter played "an integral and essential part" in it, he had "denied any awareness of, or refused to accept any responsibility for," his actions.  See 2023 Evid. Memo. at 8–9; see also 2023 State Memo. at 2, 6.

Goetz's conspicuous silence mattered, said OFAC and State, for several reasons.  First, it bore on whether the circumstances of his designation had evolved.  Absent any recognition of his prominent role in a trade that had "result[ed] in the deaths of thousands of innocent civilians," Goetz "provided [OFAC] no basis to believe that his views or approach to sourcing gold from high-risk or conflict areas ha[d] changed."  2023 Evid. Memo. at 9–10; see 2023 State Memo. at 3, 7.  Accepting full "responsibility" for his actions and their consequences, then, was the first concrete action he could take to "demonstrate changed behavior."  See 2023 Evid. Memo. at 10; 2023 State Memo. at 7.  Second, an admission mattered for broader policies, including general deterrence: delisting Goetz without his having "acknowledg[ed] . . . his complicity in the consequences of the illicit gold trade" would "undermine" the foreign-policy goals of sanctions, undercut efforts by other NGOs seeking to hold him accountable, and "demonstrate that a decades-long pattern of engagement in high-risk trade with actors connected to armed groups in an area affected by destructive conflict does not need to be fully addressed, or even appropriately recognized, prior to delisting."  2023 Evid. Memo. at 10; see 2023 State Memo. at 7.

Plaintiff cried foul when submitting his second delisting petition.  He asserted that by relying on State's guidance, OFAC was imposing a requirement that to be delisted, he needed to admit to his sanctionable conduct.  See Nov. 2023 Response at 7.  There was no "legal authority" to require as much, Goetz protested, because such a condition is nowhere found in the

regulation's delisting criteria.  Id.  And he accused Defendants of acting arbitrarily by neglecting to explain why he was subject to such a requirement when other parties had been delisted without having to fess up.  Id. at 8.  None of those arguments or the related ones from his Complaint sticks.

As an initial matter, the Court sees no evidence that Defendants have imposed an inflexible requirement that makes Plaintiff's delisting contingent on an admission of past conduct.  Instead, as explained in the second denial, their view is that, "in some cases," an admission can "be evidence of changed circumstances, depending on the totality of the circumstances."  2024 Evid. Memo. at 9.  Defendants do not say, nor do their explanations anywhere suggest, that Plaintiff could not succeed in showing changed circumstances through some assortment of actions that did not include an admission.  Contra Pl. MSJ at 43.  Rather, they only said that an admission would go a long way toward making such a showing, and that he had not otherwise demonstrated changed circumstances.  See 2024 Evid. Memo. at 9; 2023 Evid. Memo. at 10 (suggesting several ways in which he could demonstrate acceptance of responsibility).

Nor did Defendants stray from the delisting criteria by considering a past admission to be relevant.   When OFAC considers a delisting petition, it may rely on a host of inputs to inform its decision, including State's assessment of the foreign-policy implications.  See Basengezi, 2024 WL 1050340, at *7–8; see also 31 C.F.R. § 547.201(a)(2)(iii)(B) (directing OFAC designation decisions pursuant to Executive Order 13413 to be "determined . . . in consultation with" State Department).  As OFAC pointed out, the factors State relies on to arrive at its assessment need not map directly onto the enumerated delisting criteria; what matters instead is whether OFAC's use of State's assessment is arbitrary.  See 2024 Evid. Memo. at 9.  (As the Court previously

described, Defendants found that State's foreign-policy assessment of delisting Goetz — *e.g.*, that it would undercut other broader accountability efforts — bore on whether he should remain sanctioned for historical conduct alone; that was reasonable because changing behavior is a goal of sanctions.  See *supra* pp. 21–22.)  Regardless, the parts of State's discussion that OFAC drew on here did correspond directly to the criteria.  That is, OFAC found persuasive State's discussion of why, given the particular aspects of his case, the absence of any admission by Goetz made it untenable to conclude that "the circumstances resulting in the sanction no longer apply."  31 C.F.R. § 501.807(a); see 2023 Evid. Memo. at 9–10; 2024 Evid. Memo. at 9.

Plaintiff resorts to bemoaning as unfair and arbitrary Defendants' emphasis on his refusal to accept responsibility when they have apparently not done so in other delisting cases.  See Am. Compl., ¶ 121.  The Court cannot agree.  Goetz provides no comparators against whom to judge Defendants' decision.  He alleges that there are "many" cases in which persons have been delisted without acknowledging their infractions, but he does not describe or even cite them.  Id.; Pl. MSJ at 44; Nov. 2023 Response at 8.  Simply because other designees were delisted does not alone make them "similarly situated," as he claims.  See Am. Compl., ¶ 121.  His argument is thus all gums.

Finally, Plaintiff accuses Defendants of putting him in a catch-22.  He contends that they will not delist him until he acknowledges his transgressions, but that once he does so, they will use that admission of past conduct as evidence of prior conduct, thereby allowing them to keep him sanctioned indefinitely.  See Am. Compl., ¶ 120; Pl. MSJ at 43–44.  As a threshold matter, there are several reasons to believe that this argument is not properly before the Court.  For one, the Court cannot see where he raised it in underlying proceedings, see Nov. 2023 Response at 7–9, meaning that he should not be able to rely upon it in this Court.  See Mingo Logan Coal Co. v.

EPA, 829 F.3d 710, 719–20 (D.C. Cir 2016).  For another, as it appears in his Complaint, the argument seems to allege that Defendants acted unlawfully because they violated his constitutional due-process rights.  See Am. Compl., ¶ 120.  As Defendants observe, as a foreign national with no discernible ties to the United States, he has no such rights to assert.  See Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections.").  That said, because Plaintiff's briefs (re)frame the argument as one alleging arbitrariness, see Pl. MSJ at 43–44; Pl. Reply at 21, the Court will address it on those terms.

First, as just discussed, Defendants have not made his delisting contingent on an admission.  Next, OFAC does not need an admission of guilt here to reasonably conclude that he remains sanctionable for his prior conduct.  The agency already has substantial evidence to conclude that he committed that conduct, and it is reasonable — at least at this point — to maintain his designation on that basis alone.  See supra Sections III.A.1–2.  That makes any admission from Goetz superfluous for purposes of his designation's foundation.  Last, and most importantly, an admission would not necessarily empower OFAC to keep him permanently sanctioned.  True, a contrite Goetz would presumably be unable to show that there was an "insufficient basis" for his sanction.  See 31 C.F.R. § 501.807(a).  But a designee's delisting does not turn on just that prong.  Goetz can seek delisting by persuasively establishing that, although the underlying basis for his designation was rock solid, the "circumstances resulting in [his] sanction no longer apply" or the "remedial steps" he has taken or will take "negate the basis for the sanction."  Id.  Indeed, Goetz would have a strong case that it would be arbitrary to deny a subsequent delisting petition if he were to accept responsibility in the manner that OFAC has suggested would demonstrate changed circumstances, see 2023 Evid. Memo. at 10, and were

moreover to undertake remedial measures that adequately addressed the agency's concerns.  To such measures the Court now turns.

### 4.  *Proposed Remedial Steps*

Recall that in his first and second delisting petitions, Plaintiff offered to perform several remedial steps that he argued negated the basis for his designation.  See 2023 Evid. Memo. at 6–7; 2024 Evid. Memo. at 6.  He complains that instead of explaining why those measures were unavailing, OFAC adopted a flat rule at odds with the delisting regulations whereby the agency considers "commitments to take actions in the future" to be "generally insufficient to justify delisting."  Am. Compl., ¶ 123.

As with many of his other arguments, this one sits on a faulty premise and topples accordingly.  Rather than adopt the rigid approach Plaintiff supposes, Defendants explained why, given the specific circumstances of this case, his proposals were insufficient.  See 2024 Evid. Memo. at 14–15; see also 2023 Evid. Memo. at 24–25.  Their reasoning, which is far from arbitrary, turned only in part on the future nature of the proposed commitments.

One familiar problem, said OFAC, was that certain of Goetz's proposals were simply too vague.  See 2024 Evid. Memo. at 11.  In his second delisting petition, he proposed "undertak[ing] efforts in the future to promote and support advocacy initiatives related to supply chain transparency."  July 2023 Letter at 3.  When pressed for more detail by OFAC, he offered little.  He explained that he "intend[ed] to join collaborative partnerships and participate in and promote supply chain transparency awareness campaigns," and he named a couple possible NGOs he might partner with.  See Nov. 2023 Response at 6.  He added that he also "intend[ed] to launch" similar "awareness campaigns," which could include "meetings, webinars, and social media campaigns to disseminate knowledge and encourage dialogue."  Id. (emphasis added).  It

was hardly arbitrary for OFAC to conclude that these proposals "lack[ed] sufficient specificity" to negate the basis for his designation.  See 2024 Evid. Memo. at 11.  Defendants accurately characterize them as "barely articulated concepts, not concrete plans," Defs. Reply at 15, and it was reasonable for Defendants to require more detail from Goetz given their justified concerns about his credibility.

Plaintiff objects that if Defendants had concerns that his proposals were too murky, they should have asked him to elaborate through a questionnaire.  See Pl. MSJ at 42.  Of course, they had already done exactly that, and he had provided them nothing concrete.  More importantly, Defendants' obligation is only to resolve reasonably a delisting petition based upon the information the designee provides.  See 31 C.F.R. § 501.807.  While OFAC "may request clarifying, corroborating, or other additional information," id. § 501.807(b)(1) (emphasis added), it is under no obligation to do so — much less to help ensure that a designee submits the most robust petition he can.  Goetz instead carries the burden of establishing that his "propose[d] remedial steps . . . would negate the basis for [his] sanction," id. § 501.807(a), and if he feels that he can provide further detail, he is free to submit another delisting petition.

A second problem was that OFAC could neither trust nor easily verify Goetz's pledges.  His proposal, Defendants explain, included a number of measures that OFAC had "little meaningful way to monitor or enforce," Defs. MSJ at 25, and they justifiably felt that he was not trustworthy enough to take at his word.  See 2023 Evid. Memo. at 25; see 2024 Evid. Memo. at 11.  For example, he proposed that once a year he would open his books to an audit, provide OFAC with "documentation" of his income sources and holdings, and provide the agency with "certification" (a term he does not define) that he "is not engaged in any sanctionable dealings" or violating any U.S. sanctions laws.  See Feb. 2023 Response at 7–8.  Such measures,

Defendants maintain, would require OFAC to "devote substantial resources to oversight and review," and, moreover, the agency would have to "trust that it was getting accurate information." Defs. MSJ at 26. Yet it could not: the agency had little "trust in the materials that would be provided by Goetz," 2023 Evid. Memo. at 25; see 2024 Evid. Memo. at 11, which was a reasonable position given his documented history of obfuscation. It was therefore not arbitrary, in turn, for Defendants to conclude that his proposal was inadequate. Having muddied the water for many years, Plaintiff cannot now fault Defendants for declining to say it runs clear.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion. A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: March 4, 2025